SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

1:23 CV01223

**CIVIL ACTION NUMBER:**

FIRST COMPLAINT FOR DECLARATORY & INJUNCTIVE RELIEF, DAMAGES (✦)
AND ALL FEES/COSTS (#) DUE TO ALLEGED VIOLATIONS OF THE:

2023 OCT 10 PM 3:08

CLERK US DISTRICT
WESTERN DISTRICT OF TEXAS

•United States Fair Housing Act [FHA].  42 U.S. Code Chapter 45.

•United States Racketeer Influenced and Corrupt Organizations
Act [RIaCOA].(†)
18 U.S. Code Part I Chapter 96.  18 U.S. Code Part I Chapter 95.
18 U.S. Code Part I Chapter 73.  18 U.S. Code Part I Chapter 63.

•United States Ku Klux Klan Act [KKKA]. Constitutional Rights:
Fourteenth, Fifth, First, Fourth, Eighth, Sixth Amendments.(†)
§1983.     Conspiracy to Interfere with Civil Rights.  §1985.
42 U.S. Code Chapter 21 Subchapter I.

•United States Civil Rights Act of 1866 [CRAo1866].
42 U.S. Code Chapter 21 Subchapter I. §1982.  §1981.

•United States Civil Rights Act of 1964 [CRAo1964].
42 U.S. Code Chapter 21 Subchapter V.  §2000d.

•United States Civil Rights Act of 1968 [CRAo1968].
18 U.S. Code Part I Chapter 13.  §242.  §245.(†)

•United States Hate Crimes Prevention Act [HCPA].
18 U.S. Code Part I Chapter 13.  §249.(†)

•United States COVID-19 Hate Crimes Act [CHCA].
135 U.S. Stat. 265.  34 U.S. Code Subtitle III Chapter 305.(†)

•United States Civil Rights Restoration Act of 1987 [CRRAo1987].
102 U.S. Stat. 28.(†)

•United States Crime Victims' Rights Act [CVRA].
18 U.S. Code Part II Chapter 237.

•Texas Property Code [TPrC]: Title 15. Fair Housing Practices.
Chapter 301. Texas Fair Housing Act [TFHA].

•Texas Civil Practice and Remedies Code [TCPaRC]: Title 5.
Governmental Liability. Chapter 106. Discrimination
Because of Race, Religion, Color, Sex, or National Origin.(†)

•Texas Penal Code [TPeC]: Title 8.  Chapter 37. Perjury & Other
Falsification.  Chapter 36. Bribery & Corrupt Influence.(†)

•Texas Penal Code [TPeC]: Title 8. Chapter 39. Abuse of Office.
39.02 Abuse of Official Capacity.  39.03 Official Oppression.
39.06 Misuse of Official Information.(†)

•Texas Code of Criminal Procedure [TCoCP]: Title 1. Chapter 2.
General Duties of Officers - Art. 2.131 Racial Profiling
Prohibited.(†)

•Texas Penal Code [TPeC]: Title 7. Chapter 32. Fraud.
Chapter 28. Arson, Criminal Mischief, and Other Property
Damage or Destruction. Sec. 28.03. Criminal Mischief.(†)

•Texas Code of Criminal Procedure [TCoCP]: Title 1. Chapter 2.
General Duties of Officers - Art. 2.01 Duties of District
Attorneys.(†)

•Texas Disciplinary Rules of Professional Conduct [TDRoPC]:
III. Advocate. 3.09 Special Responsibilities of a Prosecutor.
VIII. Maintaining the Integrity of the Profession.
8.03 Reporting Professional Misconduct.  8.04 Misconduct(†)

•Texas Code of Criminal Procedure [TCoCP]: Title 1. Chapter 56A.
Rights of Crime Victims

**SIDDHARTH KODE**
("Plaintiff")
private citizen; current resident of
788 Kingfisher Lane, Leander Texas 78641

⌈ PLAINTIFF ⌋

v.

**WILLIAMSON COUNTY**
("[WC]") (Ξ)
municipal corporation located in the
Western District of Texas

**JOSEPH PARGIN & KIMBERLY PARGIN**
("[JSP&KAP]") (Ξ)
husband & wife private citizens; former residents of
784 Kingfisher Lane, Leander Texas 78641

**REBECCA SUE ROBERTSON**
("[RSR]") (Ξ)
private citizen; former resident of
789 Kingfisher Lane, Leander Texas 78641

**[WC] CONSTABLE'S OFFICE**
("[WCCO]") (Ξ) (Θ)
law enforcement agency of defendant [WC]

**[WC] SHERIFF'S OFFICE**
("[WCSO]") (Ξ) (Θ)
law enforcement agency of defendant [WC]

**[WC] AND CITIES HEALTH DISTRICT**
("[WCCHD]") (Ξ) (Θ)
law enforcement agency of defendant [WC]

**[WC] COUNTY ATTORNEY'S OFFICE**
("[WCCAO]") (Ϻ) (Θ)
law enforcement agency of defendant [WC]

**[WC] DISTRICT ATTORNEY'S OFFICE**
("[WCDAO]") (Ϻ) (Θ)
law enforcement agency of defendant [WC]

⌈ DEFENDANTS ⌋

| | | |
|---|---|---|
| FEDERAL QUESTION | Original Jurisdiction | [28-USC-PIV-C85-§1331] |
| STATE LAW CLAIMS | Supplemental Jurisdiction | [28-USC-PIV-C85-§1367] |
| JURY TRIAL DEMAND | All Issues So Triable | [FRoCP-R38] |

(✦)  only where applicable and authorized by law
(#)  all reasonable attorney fees, expert fees and costs
(†)  only against applicable defendant(s)
(Ϻ)  secondary defendants: only declaratory, injunctive relief
(Ξ)  primary defendants
(Θ)  "[WCLE]": [WCCO], [WCSO], [WCCHD], [WCCAO], [WCDAO]

## ¶0

Plaintiff, Siddharth Kode, alleges as follows:

---

# §I

# JURISDICTION AND VENUE

## ¶1

In this complaint, the term *"this Court"* shall, unless otherwise specified, refer to: {United States District Court, Western District of Texas, Austin Division}.

## ¶2

This Court has original jurisdiction pursuant to:

Ⓐ  [28-USC-PIV-C85-§1331] "Federal Question", as the plaintiff:
asserts federal law claims against the applicable defendants under the [FHA], the [RIaCOA], the [KKKA], the [CRAo1866], and the [CRAo1964].

Ⓑ  [28-USC-PIV-C85-§1331] "Federal Question", as the plaintiff:
asserts common law claims against the applicable defendants under the [FHA], the [KKKA], the [CRAo1866], and the [CRAo1964].

Ⓒ  [28-USC-PIV-C85-§1343] "Civil Rights and Elective Franchise", as the plaintiff:
seeks to secure any-and-all applicable-and-appropriate relief under federal civil rights laws: the [FHA], the [KKKA], the [CRAo1866], and the [CRAo1964].

Ⓓ  [28-USC-PIV-C85-§1357] "Injuries under Federal laws", as the plaintiff:
a *"person"* suffering injury to *"⟨plaintiff's⟩ person ⟨and⟩ property"*, seeks to secure any-and-all applicable-and-appropriate relief under the [FHA], the [RIaCOA], the [KKKA], the [CRAo1866], and the [CRAo1964].

Ⓔ  [42-USC-C45-SI-§3613] "Enforcement by Private Persons", as the plaintiff:
a *"private person"* and an *"aggrieved person"*, seeks any-and-all applicable-and-appropriate relief for any-and-all of the applicable defendants' violations of the [FHA] against the plaintiff.

Ⓕ   [42-USC-C21-SI-§1983],[42-USC-C21-SI-§1988] "Proceedings in Vindication of Civil Rights", as the plaintiff:

a *"party injured"*, seeks any-and-all applicable-and-appropriate relief for any-and-all of the applicable defendants' Deprivation-Of-Rights-

Under-Color-Of-Law against the plaintiff under the [KKKA]:§1983.

Ⓖ   [42-USC-C21-SI-§1985],[42-USC-C21-SI-§1988] "Proceedings in Vindication of Civil Rights", as the plaintiff:

a *"party so injured ⟨and⟩ deprived"*, seeks any-and-all applicable-and-appropriate relief for any-and-all of the applicable defendants'

Conspiracy-To-Interfere-With-Civil-Rights/Obstruction-of-Justice/Witness-Intimidation actions against the plaintiff under the [KKKA]:§1985.

Ⓗ   [42-USC-C21-SI-§1982],[42-USC-C21-SI-§1988] "Proceedings in Vindication of Civil Rights", as the plaintiff:

seeks any-and-all applicable-and-appropriate relief for any-and-all of the applicable defendants' violation of property-rights-of-citizens against

the plaintiff under the [CRAo1866]:§1982.

Ⓘ   [42-USC-C21-SI-§1981],[42-USC-C21-SI-§1988] "Proceedings in Vindication of Civil Rights", as the plaintiff:

seeks any-and-all applicable-and-appropriate relief for any-and-all of the applicable defendants' violation of equal-rights-under-the-law against

the plaintiff under the [CRAo1866]:§1981.

Ⓙ   [42-USC-C21-SV-§2000d],[42-USC-C21-SV-§2000d–7] "Civil Rights Remedies Equalization", as the plaintiff:

seeks any-and-all applicable-and-appropriate relief for any-and-all of the applicable defendants' violation of discrimination-under-federally-

assisted-programs against the plaintiff under the [CRAo1964]:§2000d.

Ⓚ   [18-USC-PI-C96-§1964] "Civil Remedies", as the plaintiff:

a *"person injured in ⟨plaintiff's⟩ business ⟨and⟩ property"*, seeks any-and-all applicable-and-appropriate relief for any-and-all of the

applicable defendants' violations of the [RIaCOA] against the plaintiff.

---

▸ 28 U.S. Code› Part IV – Jurisdiction and Venue›   Chapter 85 – District Courts; Jurisdiction›   § 1331 – Federal question
▸ https://www.law.cornell.edu/uscode/text/28/1331

*The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.*

---

▸ 28 U.S. Code› Part IV – Jurisdiction and Venue›   Chapter 85 – District Courts; Jurisdiction›   § 1343 – Civil rights and elective franchise
▸ https://www.law.cornell.edu/uscode/text/28/1343

*(a) The district courts shall have original jurisdiction of any civil action authorized by law to be commenced by any person:*

*(1) To recover damages for injury to his person or property, or because of the deprivation of any right or privilege of a citizen of the United States, by any act done in*
*furtherance of any conspiracy mentioned in section 1985 of Title 42;*

*(2) To recover damages from any person who fails to prevent or to aid in preventing any wrongs mentioned in section 1985 of Title 42 which he had knowledge were about to*
*occur and power to prevent;*

*(3) To redress the deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of*
*the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States;*

*(4) To recover damages or to secure equitable or other relief under any Act of Congress providing for the protection of civil rights, including the right to vote ...*

---

▸ 28 U.S. Code› Part IV – Jurisdiction and Venue›   Chapter 85 – District Courts; Jurisdiction›   § 1357 – Injuries under Federal laws
▸ https://www.law.cornell.edu/uscode/text/28/1357

*The district courts shall have original jurisdiction of any civil action commenced by any person to recover damages for any injury to his person or property on account of any act*

*done by him, under any Act of Congress, for the protection or collection of any of the revenues, or to enforce the right of citizens of the United States to vote in any State.*

## ¶3

Additionally, this Court has supplemental jurisdiction pursuant to [28-USC-PIV-C85-§1367], for any-and-all of the plaintiff's State-of-Texas law claims related-to, analogous-to, appending-to, pendent-to, or ancillary-to the aforementioned federal law claims.

> 28 U.S. Code:   Part IV – Jurisdiction and Venue:   Chapter 85 – District Courts; Jurisdiction:   § 1367 – Supplemental jurisdiction
> https://www.law.cornell.edu/uscode/text/28/1367

*(a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties ...*

*(e) As used in this section, the term "State" includes the District of Columbia, the Commonwealth of Puerto Rico, and any territory or possession of the United States.*

> United States Constitution:   Article III. The Judiciary:   Section 2. Scope of Judicial Power
> https://www.law.cornell.edu/constitution/articleiii

*The judicial power shall extend to all cases, in law and equity, arising under this Constitution, the laws of the United States, and treaties made, or which shall be made, under their authority;--to all cases affecting ambassadors, other public ministers and consuls;--to all cases of admiralty and maritime jurisdiction;--to controversies to which the United States shall be a party;--to controversies between two or more states;--between a state and citizens of another state;--between citizens of different states;--between citizens of the same state claiming lands under grants of different states, and between a state, or the citizens thereof, and foreign states, citizens or subjects. ...*

## ¶4

Under [28-USC-PIV-C87-§1391(b)(2)], *"a civil action may be brought in ... a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated ..."* The plaintiff asserts that all of the applicable defendants' violations of federal laws, state laws and the common-law against the plaintiff (as substantially documented in this complaint) were suffered by the plaintiff within the Western-District-of-Texas. Therefore, venue is lodged in this Court under [28-USC-PIV-C87-§1391(b)(2)].

## ¶5

Under [28-USC-PIV-C87-§1391(b)(1)], *"a civil action may be brought in ... a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located ..."* The plaintiff asserts that, to the best of the plaintiff's limited knowledge and understanding, one-or-more of the defendants resides within the Western-District-of-Texas **and** all defendants are residents of the State-of-Texas in which the Western-District-of-Texas is located. Therefore, venue is additionally lodged in this Court under [28-USC-PIV-C87-§1391(b)(1)].

> 28 U.S. Code:   Part IV – Jurisdiction and Venue:   Chapter 87 – District Courts; Venue:   § 1391 – Venue generally
> https://www.law.cornell.edu/uscode/text/28/1391

*(a) Applicability of Section.—Except as otherwise provided by law—*

*(1) this section shall govern the venue of all civil actions brought in district courts of the United States; and*

*(2) the proper venue for a civil action shall be determined without regard to whether the action is local or transitory in nature.*

*(b) Venue in General.—A civil action may be brought in—*

*(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;*

*(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or*

*(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.*

*(c) Residency.—For all venue purposes—*

*(1) a natural person, including an alien lawfully admitted for permanent residence in the United States, shall be deemed to reside in the judicial district in which that person is domiciled;*

*(2) an entity with the capacity to sue and be sued in its common name under applicable law, whether or not incorporated, shall be deemed to reside, if a defendant, in any judicial district in which such defendant is subject to the court's personal jurisdiction with respect to the civil action in question and, if a plaintiff, only in the judicial district in which it maintains its principal place of business; and*

*(3) a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants.*

*(d) Residency of Corporations in States With Multiple Districts.—*

*For purposes of venue under this chapter, in a State which has more than one judicial district and in which a defendant that is a corporation is subject to personal jurisdiction at the time an action is commenced, such corporation shall be deemed to reside in any district in that State within which its contacts would be sufficient to subject it to personal jurisdiction if that district were a separate State, and, if there is no such district, the corporation shall be deemed to reside in the district within which it has the most significant contacts.*

# §II

# DEFINITIONS

## ¶6

Unless otherwise specified, certain terms/phrases highlighted in bold that are used in this complaint shall be defined as follows:

## ¶7

The term **Lawsuit** when referring to this document (and/or any amended version of this document), shall be used interchangeably with **Complaint** - in such case, the terms **Lawsuit** and **Complaint** shall have the exact same meaning. The term shall also include any supplements added to this document as evidence and/or motion(s), especially if this document is incomplete at the time of initial filing (see below).

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                                    1696907690

## ¶8

The term **multiple** shall mean two-or-more. The term **numerous** shall mean three-or-more. The term **countless** shall mean too burdensome/time-consuming to count due to being extremely-numerous.

## ¶9

The term **Petitioner** shall be distinguished from the term **Plaintiff**. The term Plaintiff shall be used to refer only to: Siddharth Kode. The term **Petitioner** shall be used to refer to any other person/entity that initiates-legal-action (sues) by filing a lawsuit against another party(s). These terms will be distinguished in this manner only to avoid confusion, even though, in any context outside of this lawsuit, they mean the same thing.

## ¶10

The term **Petitionee(s)/Respondent(s)** shall be distinguished from the term **Defendant(s)**. The term Defendant(s) shall be used to refer only to one-or-more of: [WC],[RSR],[JSP&KAP],[WCCO],[WCCHD],[WCSO],[WCCAO],[WCDAO]. The term **Petitionee(s)** or **Respondent(s)** shall be used to refer to any other person(s)/entity(s) that is sued in any other lawsuit (that is, not this lawsuit). These terms will be distinguished in this manner only to avoid confusion, even though, in any context outside of this lawsuit, they mean the same thing.

## ¶11

The term **federal-law-enforcement** shall, unless otherwise specified, refer to the {United States Federal Bureau of Investigations} ("[US-FBI]"), {United States Marshals} ("[US-M]"), and the {United States Attorneys Office} ("[US-AO]"). The term **law-enforcement** shall, unless otherwise specified, refer any agency(s) of law-enforcement, at the local, state or federal level.

## ¶12

The term **Constitutional Rights** shall refer to the rights guaranteed to every citizen of Texas under both the United States Constitution and the Texas Constitution.

## ¶13

The term **Statutory Rights** shall refer to the rights guaranteed to every citizen of Texas by the Statutes/Laws/Ordinances/Codes of the {United States} -- in essence, 【United States Code】 ("-USC-")("U.S. Code"), and the 【United States Statutes at Large】 ("-USSaL-")("U.S. Stat.") - the {State of Texas} and Local Governments (County and/or City).

## ¶14

The term **Common Law Rights** shall refer to the rights guaranteed to every citizen of Texas by the judges, courts, and agency adjudicatory tribunals, through their decisions and opinions (also called case-law).

## ¶15

The term **Civil Rights** or simply **Rights** shall collectively refer to Constitutional-Rights, Statutory-Rights and Common-Law-Rights.

## ¶16

The terms **clearly violate** (and **clearly conspire to violate**) or simply **violate** (and **conspire to violate**), when used to describe the behavior(s)/action(s) of law-enforcement employee(s)/agency(s) and/or other government employee(s)/agency(s) and/or government(s) and/or non-governmental co-conspirator(s)/co-actor(s)/agent(s)-of-the-government, shall mean any behavior(s)/action(s) (or pattern thereof) that are in violation of **clearly established Civil-Rights of which a reasonable person would have known** - in this lawsuit, abbreviated as **clearly established law [CEL]**.

## ¶17

The terms **Unconstitutional Search**, **Unlawful Search** or **Fourth Amendment Violation** shall refer to any inspection/search/seizure conducted by any government-employee(s), and/or any non-governmental agent(s)-of-the-government that is deemed to be Unconstitutional (under the Fourth-Amendment to the United States Constitution) by the ⟨Supreme Court of the United States⟩ [SCOTUS] rulings - particularly ⟪FLORIDA V. JARDINES⟫, ⟪COLLINS V. VIRGINIA⟫ and/or any other precedential lower-court ruling on this matter. Additionally, if the initial part of an inspection/search/seizure is Unconstitutional (warrantless-and-nonconsensual), then any evidence gathered from any part of that inspection/search/seizure cannot be admitted into any Court proceeding even if the latter parts of the inspection/search/seizure were otherwise lawful. In other words, the initial Unconstitutional (warrantless-and-nonconsensual) part of the inspection/search/seizure invalidates, taints and makes-defective the entire inspection/search/seizure. A nonconsensual, warrantless search of private-property is also an Unconstitutional deprivation of privacy guaranteed by the Due-Process clauses of the United States Constitution. If the government is not inspecting/searching/seizing every persons' property equally, then a warrantless inspection/search/seizure would also be Unconstitutional in violation of the Fourteenth-Amendment ( ★ ) of the United States Constitution guaranteeing *"equal protection of the laws"* (sometimes referred to as the Constitutional *"Freedom from Discrimination"*). Similarly, a warrantless inspection/search/seizure may also be **unlawful** in violation of Statutes/Laws/Ordinances/Codes barring discrimination (such as the [FHA]/[TFHA] and [TCPaRC-T5-C106] - see below) and/or racial-profiling (for example, [TCoCP-T1-C2-A2.131]). Unless otherwise specified, in this lawsuit, the term **unlawful** (and its other forms), when used to describe such inspection/search/seizure, shall primarily refer to the statutory-discrimination aspect of such inspection/search/seizure - specifically, the violation of [FHA], [TFHA], [TCPaRC-T5-C106] and [TCoCP-T1-C2-A2.131]. Even in cases where a search-warrant was obtained and executed against person(s) property, those person(s) can still challenge the validity of the search-warrant - through filing a motion-to-quash the search-warrant and/or suppress the evidence as:

Ⓐ insufficient on its face ; AND/OR

Ⓑ lacks probable cause ; AND/OR

Ⓒ resulted in the seizure of evidence that was not authorized by the search-warrant.

Moreover, those person(s) can also further-scrutinize the process (for example, using the legal processes of freedom-of-information-requests and/or Discovery), and if, during such scrutiny, it is determined that law-enforcement did not follow proper procedure and/or misrepresented-the-facts/provided-misleading-information/made-faulty-assumptions/relied-upon-questionable-witnesses (under Oath) to the Judge authorizing the search-warrant, then those person(s) can still file a motion-to-quash the search-warrant and/or suppress the evidence. A motion-to-quash a search-warrant can be filed even prior to the execution of that search-warrant. Additionally, if it can be shown that at least some members of law-enforcement have-acted/are-acting maliciously (or not in good faith) towards certain person(s), then those person(s) can, at the very least, also seek permanent injunctive relief or a protective order, permanently barring at least such members of law-enforcement (if not the entire police department) from ever obtaining and/or executing search-warrant(s) on those person(s)/person(s)-property. Finally, if after person(s)' private-property has been searched and evidence has been seized as a result of that search:

Ⓐ no criminal charge(s) were filed ; OR

Ⓑ criminal charge(s) were filed but were later dropped/dismissed ; OR

Ⓒ the person(s) were prosecuted but acquitted at trial

- then in all such cases, such person(s) can rightfully file a lawsuit (or motion) to, at a minimum, order the government to either return the evidence to such person(s) OR destroy the evidence (for example, if the evidence consisted of photographs, videos, audio-recordings, etc.) - whether or not the search/seizure was lawful or unlawful.

## ¶18

The terms **Curtilage** or **Homestall** shall refer to the area *"immediately surrounding and associated with the home"* and that is considered part of the home for Fourth-Amendment purposes. In other words, the curtilage or homestall has the same level of Fourth-Amendment protection from inspection(s)/search(es)/seizure(s) as the interior-of-the house itself (see 《FLORIDA V. JARDINES》). For the house and curtilage, the property owner has the right to determine who is allowed upon the property and to grant or withhold consent to those the owner wishes to exclude, including Government *"intruders."* Thus, the curtilage protection (*"No man may set his foot upon his neighbor's close without his permission"*) has permeated Court decisions in England from at least 1765 to [SCOTUS] case law as of May 29, 2018. See 《ENTICK V. CARRINGTON》, 19 Howell's State Trials (1765), discussed in 《SILVERMAN V. U.S》, 81 S.Ct. 679 (1961); and see, 《COLLINS V. VIRGINIA》, Case No. 16-1027, 584 U.S.____ (2018). The identity of home and what Blackstone called the curtilage or homestall, thereby *"protects and privileges all its branches and appurtenants."* (See 4 W. Blackstone, Commentaries on the Laws of England 223, 225 (1769)). This area around the home is *"intimately linked to the home, both physically and psychologically,"* and is where *"privacy expectations are most heightened."* (See 《CALIFORNIA V. CIRAOLO》, 476 U.S. 207,213 (1986)). Areas that have been deemed by the [SCOTUS] and/or lower-courts to be curtilage include (but are not limited to): *"area "outside the front window"", "side garden", "porches, garages, carports, car patios, back yards—and even a drive-way next to a house".*

## ¶19

The term **Unconstitutional** when used to describe a law (or portion of law), shall refer to any such law (or portion of such law) that violates the Constitution of the United States and/or the Constitution of the State of Texas.

## ¶20

The term **Unconstitutionally Vague** shall refer to any law or any portion of such law - the language of which is alleged to be: vague, ambiguous, open-to diverging/subjective interpretations, and/or prone to arbitrary/capricious/discriminatory/retaliatory/predatory/hypocritical/abusive/oppressive/selective/biased enforcement - so as to violate the Due-Process clause of the United States Constitution. A person accused of violating a law that is deemed to be Unconstitutionally-Vague - despite knowledge of the law:

Ⓐ may not have known that he/she was violating the law due to the vagueness/ambiguity of the law ; AND/OR

Ⓑ disputes that he/she was violating the law due to the vagueness/ambiguity of the law.

## ¶21

The term **Due Process violation** shall refer to any citizen(s)' deprivation of *"life, liberty or property, without due process of law"* (Fifth and Fourteenth-Amendments to the United States Constitution), including but not limited to:

**01.** Mis-interpreting and abusively/oppressively enforcing any law that is Unconstitutionally-Vague.

**02.** Failing to follow proper legal procedure prior to initiating a legal action (civil or criminal proceeding) against the accused - a general type of procedural-due-process violation.

**03.** Depriving the right to *"an unbiased tribunal"* - a specific type of procedural-due-process violation.

**04.** Failing to provide *"notice of the proposed action and the grounds asserted for it"* - a specific type of procedural-due-process violation.

**05.** Depriving the right to *"present reasons why the proposed action should not be taken"* - a specific type of procedural-due-process violation.

**06.** Depriving the right to *"present evidence, including the right to call witnesses"* - a specific type of procedural-due-process violation.

**07.** Depriving the right to *"know the opposing evidence"* - a specific type of procedural-due-process violation.

**08.** Depriving the right to *"cross-examine adverse witnesses"* - a specific type of procedural-due-process violation.

**09.** Failing to render *"a decision based exclusively on the evidence presented"* - a specific type of procedural-due-process violation.

**10.** Depriving the right *"to be represented by counsel"* - a specific type of procedural-due-process violation.

**11.** Failing to ensure *"that the tribunal prepare a record of the evidence presented"* - a specific type of procedural-due-process violation.

**12.** Failing to ensure *"that the tribunal prepare written findings of fact and the reasons for its decision"* - a specific type of procedural-due-process violation.

**13.** Failing to turn over any-and-all exculpatory/mitigating/impeachment evidence to the accused prior to the accused entering a plea - a specific type of procedural-due-process violation secured by the [SCOTUS] ruling in 《BRADY V. MARYLAND》 (and its progeny).

**14.** Depriving and/or restricting the right to privacy - a specific type of substantive-due-process violation.

**15.** Depriving and/or restricting the right to engage/participate in *"political processes which can ordinarily be expected to bring about repeal of undesirable legislation"* such as deprivations/restrictions on the *"right to vote"*, *"restraints upon the dissemination of*

*information"*, *"interferences with political organizations"* (freedom-to-organize/freedom-of-association), *"prohibition of peaceable assembly"* - a specific type of substantive-due-process violation.

**16.** Interpreting and/or enforcing any law in a manner that discriminates against *"discrete and insular minorities"* - especially *"racial"*, *"national"*, *"religious"*, and/or immigrant minorities - and, in general, those minorities who lack sufficient numbers or political-power to seek redress through the political process - a specific type of substantive-due-process violation.

## ¶22

The terms **predatory** (and adverb **predatorily**) shall refer to any harmful, abusive, oppressive and malicious behavior/action/conduct that not only exploits and victimizes the intended vulnerable targets, but that is also sadistic in nature - in other words, harmful/abusive/oppressive/violative/humiliative behavior(s)/action(s) that are performed in-order-to derive pleasure/joy (φ). This definition is used to distinguish the term predatory from the other moderate definitions: *"living by preying on other animals"* and *"exploiting or victimizing others for personal gain"*. For example, the animals wolves, lions and sharks prey on other animals and are thus considered to be predatory according to the first moderate definition - but in such case, such actions are only performed for the survival of those carnivorous animals. There is no evidence that such carnivorous animals kill their prey for any sadistic reasons - in other words, for deriving pleasure/joy out of such acts. According to the second moderate definition, the term predatory is used to describe, for example, perpetrators (persons, institutions, businesses/industries, etc.) that exploit or victimize their vulnerable targets for financial gain at the expense of those vulnerable targets. Even in this second moderate definition, it would be difficult to prove that such actions were performed for sadistic reasons, if there was only a financial motive involved. Thus, as used in this lawsuit, the term predatory shall refer to the more extreme and egregious definition that involves sadism. However, all three definitions share the common aspect that they usually involve a larger group of perpetrators and/or a larger institution ganging-up on their victim(s) that might be either a single vulnerable individual or a smaller number of vulnerable individuals or even a large number of *"powerless"* individuals (♙).

## ¶23

The terms **Predominantly White Neighborhood** or simply **White Neighborhood** shall refer to any residential-property subdivision/neighborhood/suburb whose racial demographics is over 70% White/Caucasian/American (color/race/nationality), and thus under 30% people-of-color.

## ¶24

The term **social justice** shall be an abbreviation for one-or-more of the following: economic-justice, racial-justice, gender-justice, environmental-justice/climate-justice.

## ¶25

The terms **political activist(s), social-justice activist(s)** or simply **activist(s)** shall be an abbreviation for one-or-more of the following: anti-racism-protester(s), civil-rights-demonstrator(s), political-dissident(s), democratic-socialist(s), libertarian-socialist(s), citizen-journalist(s), legal-observer(s), archivist(s).

## ¶26

The term **[LGBTQIA+]** shall refer to any person(s) that identify-as or that are-perceived-to-be lesbian, gay, bisexual, transgender, queer, intersex, asexual and/or related communities. The term **Homophobic Animus** shall refer to any animus against any person who is a member of [LGBTQIA+] or is perceived-to-be a member of [LGBTQIA+], where the animus is clear to be due to that (*"actual or perceived"*) *"gender identity, sexual orientation"*. It is also important to note that on {2020-06-15}, the [SCOTUS] ruled that laws that refer to discrimination based on *"sex"* also includes discrimination based on: *"gender identity, sexual orientation"* (*"actual or perceived"*) - see 《BOSTOCK V. CLAYTON COUNTY》, 《ALTITUDE EXPRESS, INC. V. ZARDA》, 《R.G. & G.R. HARRIS FUNERAL HOMES INC. V. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION》 referenced below.

## ¶27

The term **fair housing laws** shall refer to both the federal law codified in [42-USC-C45] ("[FHA]"), and the Texas law codified in [TPrC-T15-C301] ("[TFHA]"). The [FHA], codified within [42-USC-C45], is a combination of multiple enactments of federal legislation including *"Title VIII"* of the original 【Civil Rights Act of 1968】, ("[CRAo1968]"), later amended by the 【Fair Housing Amendments Act of 1988】. By its very definition, the fair-housing-laws created certain **protected classes** for which it is illegal for person(s) to perform any discriminatory housing practice upon, due to the fact that member(s) of such classes have historically faced systemic-oppression and/or deprivation-of-rights and/or conspiracy-against-rights - by virtue of being member(s) of such classes. For example, the 〔Connecticut Fair Housing Center〕 describes a member of a protected class's fair-housing right as the freedom from discrimination in housing and housing related services, *"born from decades of discrimination, segregation & divestment ... mainfested through the [FHA]."*

## ¶28

The terms **fair housing violation** or **[FHA] violation** or **[TFHA] violation** shall refer to any arbitrary/capricious/discriminatory/retaliatory/predatory/hypocritical/abusive/oppressive/selective/biased action(s) or practice(s) by any person(s) or institution(s) against any member(s) of a protected minority class - based on *"actual or perceived"* race/religion/national-origin/color/sexual-orientation/gender-identity - that would be considered to be a violation of the [FHA], at the Federal level, and/or the [TFHA] at the State level. Any [FHA] violation is also, by definition, a violation of the fourteenth-amendment (★) of the United States Constitution that guarantees *"equal protection of the laws"*:

▸ 42 U.S. Code: Chapter 45. Fair Housing: Subchapter I. Generally: § 3602 - Definitions
▸ https://www.law.cornell.edu/uscode/text/42/3602

*As used in this subchapter— ...*

*(b) "Dwelling" means any building, structure, or portion thereof which is occupied as, or designed or intended for occupancy as, a residence by one-or-more families, and any vacant land which is offered for sale or lease for the construction or location thereon of any such building, structure, or portion thereof.*

*(c) "Family" includes a single individual.*

*(d) "Person" includes one-or-more individuals, corporations, partnerships, associations, labor organizations, legal representatives, mutual companies, joint-stock companies, trusts, unincorporated organizations, trustees, trustees in cases under title 11, receivers, and fiduciaries. ...*

*(f) "Discriminatory housing practice" means an act that is unlawful under section 3604, 3605, 3606, or 3617 of this title. ...*

*(h) "Handicap" means, with respect to a person—*

  *(1) a physical or mental impairment which substantially limits one-or-more of such person's major life activities,*

  *(2) a record of having such an impairment, or*

  *(3) being regarded as having such an impairment, ...*

*(i) "Aggrieved person" includes any person who—*

  *(1) claims to have been injured by a discriminatory housing practice; or*

  *(2) believes that such person will be injured by a discriminatory housing practice that is about to occur. ...*

*(o) "Prevailing party" has the same meaning as such term has in section 1988 of this title.*

---

▶ 42 U.S. Code,   Chapter 45. Fair Housing,   Subchapter I. Generally,   § 3604 - Discrimination in the sale or rental of housing and other prohibited practices
▶ https://www.law.cornell.edu/uscode/text/42/3604

*As made applicable by section 3603 of this title and except as exempted by sections 3603(b) and 3607 of this title, it shall be unlawful—...*

  *(b) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin. ...*

  *(e) For profit, to induce or attempt to induce any person to sell or rent any dwelling by representations regarding the entry or prospective entry into the neighborhood of a person or persons of a particular race, color, religion, sex, handicap, familial status, or national origin. ...*

  *(f) ...*

    *(2) To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—*

      *(A) that person; ...*

---

▶ 42 U.S. Code,   Chapter 45. Fair Housing,   Subchapter I. Generally,   § 3605 - Discrimination in residential real estate-related transactions
▶ https://www.law.cornell.edu/uscode/text/42/3605

*(a) In general*

*It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making available such a transaction, or in the terms or conditions of such a transaction, because of race, color, religion, sex, handicap, familial status, or national origin.*

*(b) "Residential real estate-related transaction" defined*

*As used in this section, the term "residential real estate-related transaction" means any of the following:...*

  *(2) The selling, brokering, or appraising of residential real property ...*

---

▶ 42 U.S. Code,   Chapter 45. Fair Housing,   Subchapter I. Generally,   § 3617 - Interference, coercion, or intimidation
▶ https://www.law.cornell.edu/uscode/text/42/3617

*It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account*

*of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title.*

---

▸  42 U.S. Code:  Chapter 45. Fair Housing:  Subchapter I. Generally:  § 3613 - Enforcement by private persons
▸  https://www.law.cornell.edu/uscode/text/42/3613

*(a) Civil action*

*(1)*

*(A) An aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or the termination of an alleged discriminatory housing practice, or the breach of a conciliation agreement entered into under this subchapter, whichever occurs last, to obtain appropriate relief with respect to such discriminatory housing practice or breach. ...*

*(2) An aggrieved person may commence a civil action under this subsection whether or not a complaint has been filed under section 3610(a) of this title and without regard to the status of any such complaint, but if the Secretary or a State or local agency has obtained a conciliation agreement with the consent of an aggrieved person, no action may be filed under this subsection by such aggrieved person with respect to the alleged discriminatory housing practice which forms the basis for such complaint except for the purpose of enforcing the terms of such an agreement. ...*

*(c) Relief which may be granted*

*(1) In a civil action under subsection (a), if the court finds that a discriminatory housing practice has occurred or is about to occur, the court may award to the plaintiff actual and punitive damages, and subject to subsection (d), may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate).*

*(2) In a civil action under subsection (a), the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee and costs. The United States shall be liable for such fees and costs to the same extent as a private person. ...*

## ¶29

The {United States Department of Housing and Urban Development} ("[US-HUD]") more clearly outlines what is considered to be *"Housing Discrimination Under the Fair Housing Act"*, and also provides some *"Examples of Housing Discrimination"* and also provides some *"Examples of LGBTQ Discrimination"*:

---

▸  "Housing Discrimination Under the Fair Housing Act" :  United States Department of Housing and Urban Development
▸  https://www.hud.gov/program_offices/fair_housing_equal_opp/fair_housing_act_overview

*Housing discrimination is illegal in nearly all housing, including private housing, public housing, and housing that receives federal funding.*

*The Fair Housing Act*

*The Fair Housing Act protects people from discrimination when they are renting or buying a home, getting a mortgage, seeking housing assistance, or engaging in other housing-related activities. Additional protections apply to federally-assisted housing.*

*Learn about the History of the Fair Housing Act, and read Examples of the many forms of housing discrimination.*

*Who Is Protected?*

*The Fair Housing Act prohibits discrimination in housing because of:*

*(\*) Race*

*(\*) Color*

*(\*) National Origin*

*(\*) Religion*

*(\*) Sex*

*(\*) Familial Status*

*(\*) Disability*

...

*What Is Prohibited?*

*In the Sale and Rental of Housing:*

*It is illegal discrimination to take any of the following actions because of race, color, religion, sex, disability, familial status, or national origin:*

*(\*) Refuse to rent or sell housing*

*(\*) Refuse to negotiate for housing*

*(\*) **Otherwise make housing unavailable***

*(\*) Set different terms, conditions or privileges for sale or rental of a dwelling*

*(\*) Provide a person **different housing services or facilities***

*(\*) Falsely deny that housing is available for inspection, sale or rental*

*(\*) Make, print or publish any notice, statement or advertisement with respect to the sale or rental of a dwelling that indicates any preference, limitation or discrimination*

*(\*) Impose different sales prices or rental charges for the sale or rental of a dwelling*

*(\*) Use different qualification criteria or applications, or sale or rental standards or procedures, such as income standards, application requirements, application fees, credit analyses, sale or rental approval procedures or other requirements*

*(\*) **Evict a tenant or a tenant's guest***

*(\*) **Harass** a person*

*(\*) Fail or delay performance of maintenance or repairs*

*(\*) **Limit privileges, services or facilities of a dwelling***

*(\*) Discourage the purchase or rental of a dwelling*

*(\*) **Assign a person to a particular building or neighborhood or section of a building or neighborhood***

*(\*) For profit, persuade, or try to persuade, homeowners to sell their homes by suggesting that people of a particular protected characteristic are about to move into the neighborhood (blockbusting)*

*(\*) Refuse to provide or discriminate in the terms or conditions of homeowners insurance because of the race, color, religion, sex, disability, familial status, or national origin of the owner and/or occupants of a dwelling*

*(\*) Deny access to or membership in any multiple listing service or real estate brokers' organization*

*For more information and examples, visit Examples of Housing Discrimination.*

...

*Harassment:*

*The Fair Housing Act makes it **illegal to harass** persons because of race, color, religion, sex, disability, familial status, or national origin. Among other things, this forbids sexual harassment. Learn more about sexual harassment here.*

*Other Prohibitions:*

*In addition, it is **illegal discrimination** to:*

***Threaten, coerce, intimidate or interfere with** anyone exercising a fair housing right or assisting others who exercise the right*

***Retaliate against** a person who has filed a fair housing complaint or assisted in a fair housing investigation*

...

*Additional Protections For Persons With Disabilities:*

*Housing providers must make reasonable accommodations and allow reasonable modifications that may be necessary to allow persons with disabilities to enjoy their housing...*

▸ "Examples of Housing Discrimination" › United States Department of Housing and Urban Development
▸ https://www.hud.gov/program_offices/Fair_Housing_equal_opp/examples_housing_discrimination

*Housing discrimination can take many forms. Here are some examples of housing discrimination.*

*Discrimination Isn't Always Obvious – Example #1:*

*John, who is a Black man, speaks to a prospective landlord on the phone about leasing an apartment. On the phone, the landlord seems eager to rent to John, but when John meets with the landlord in person to fill out an application, the landlord's attitude is entirely different. A few days later, John receives a letter saying that his application was denied because of a negative reference from his current landlord. John is surprised because he never had problems with his landlord, and his landlord swears she was never contacted for a reference. John suspects that the real reason he was denied the apartment was because he is Black, so John files a complaint with HUD. HUD investigates and it turns out John is right – the landlord's files show a pattern of discrimination because of race and color.*

*Discrimination Isn't Always Obvious – Example #2:*

*Jane is a Muslim woman who wears a hijab. Jane walks into the leasing office for a large apartment building because she saw a sign in the building's window advertising several available units. Jane introduces herself to the leasing officer, who immediately says there are no units available. Jane asks to be put on the waiting list, but she never receives a call. Jane files a complaint with HUD because she suspects that the leasing officer does not want to rent to her because she is Muslim. HUD investigates and it turns out Jane is right – other employees of the building give HUD information that substantiates Jane's claim of religious discrimination.*

*Steering Is A Form Of Discrimination:*

*John, who is an Asian man, meets with a real estate broker to discuss purchasing a house for his family. When John names the neighborhood that he is interested in, the broker asks John if he is sure that his family will feel comfortable there. The broker tells John that she has a wonderful listing in another neighborhood where there are more "people like them." When the broker takes John to see the house, John notices that the residents of the neighborhood appear to be mostly Asian. John files a complaint with HUD because steering someone to a certain neighborhood because of his race is a form of race discrimination.*

*Harassment Is A Form Of Discrimination:*

*Jane has a Housing Choice Voucher (Section 8), but one month she falls behind on her portion of the rent. When Jane asks her landlord if he will give her a few more days, her landlord says yes but only if she will go out with him. Feeling she has no choice, Jane says yes. Over the next few days, Jane's landlord sends her sexually explicit text messages even though Jane tells him to stop. Jane's landlord tells her that if she does not go out with him again he is going to evict her and she will lose her voucher. Jane files a complaint with HUD because sexual harassment is a form of sex discrimination.*

*Many Housing Units Have Accessibility Requirements:*

*John, a person with a disability who uses a wheelchair, views a condominium he is hoping to purchase in a new multistory building. When John arrives, he finds there are no accessible parking spaces in the building's parking lot. When John tries to enter the unit, his wheelchair can barely fit through the door and he bangs his arms on the way in. Inside the unit, the thermostat and light switches are all too high for him to reach. The building has a fitness room, but he cannot look at it because the only way to get to the fitness room is to go up steps. John files a complaint with HUD because failing to comply with accessibility requirements is a form of disability discrimination.*

*Reasonable Accommodations Are Required for Persons With Disabilities*

*Jane has a developmental disability that affects her capacity to manage her own finances. Jane tells her building manager that her mother will be paying her rent for this reason and asks if all notices relating to her rent can be sent to her mother. The building manager tells Jane that the management company has a policy of only sending notices to residents, no exceptions. Several months later, Jane receives an eviction notice because her mother had not known that Jane's rent had been increased. Jane files a complaint with HUD because denying a reasonable accommodation is a form of disability discrimination.*

*Rules Against Children Are Discriminatory:*

*John has three teenage children. John's building has a patio with picnic tables, and one day John's children decide to have lunch there with some of their friends. The next day, John receives a notice from the homeowners association informing him that the building rules say that the patio is for adult-use only and that he needs to make sure his children do not violate the building rules. John files a complaint with HUD because building rules that discriminate against children are a form of familial status discrimination.*

*Mortgage Lending Discrimination Is Illegal:*

*Jane and John are filling out an application for a mortgage at their local bank. Their loan officer notices that Jane is visibly pregnant and asks whether she will be taking maternity leave. When Jane says yes, the loan officer informs the couple that they either have to apply without Jane's income or wait until she returns from leave. "I'm sorry," the loan officer says, "but I've seen too many women change their mind about going back to work." Jane and John file a complaint with HUD because the bank's policy discriminates based on sex (including gender identity and sexual orientation) and familial status.*

*Discrimination in the Conditions of Housing Is Illegal:*

*John recently moved to the United States from Mexico. One day, John sees that there is a new tenant in the apartment next to his, so he welcomes her to the building. John's neighbor comments on how nice everyone in the building seems, especially the building manager who offered to waive her security deposit because she seems like a good person. John is surprised because the building manager was short-tempered with him and said that John's accent made him hard to understand. John later asks around and finds out that the building manager has waived fees and deposits for other tenants he likes, but not for him or other persons from Mexico. John files a complaint with HUD because providing different terms and conditions to tenants because of national origin is illegal discrimination.*

▸  "Housing Discrimination and Persons Identifying as Lesbian, Gay, Bisexual, Transgender, and/or Queer/Questioning (LGBTQ)" :
▸  United States Department of Housing and Urban Development
▸  https://www.hud.gov/program_offices/fair_housing_equal_opp/housing_discrimination_and_persons_identifying_lgbtq

*Resources on housing discrimination and persons identifying as Lesbian, Gay, Bisexual, Transgender, and/or Queer/Questioning (LGBTQ)*

*Persons who identify as LGBTQ and believe they have experienced housing discrimination because of their actual or perceived sexual orientation or gender identity can assert their rights under the Fair Housing Act by filing a complaint with HUD.*

*(\*) HUD will accept and investigate all legally sufficient complaints of sex discrimination, including discrimination because of actual or perceived gender identity or sexual orientation, and enforce the Fair Housing Act where it finds such discrimination occurred or is about to occur.*

*(\*) In addition, some LGBTQ persons may have claims arising under other provisions of the Act, e.g., race, national origin, color, religion, disability and familial status.*

*(\*) HUD's Equal Access Rule also requires that eligibility determinations for housing assisted by HUD or subject to a mortgage insured by HUD be made regardless of actual or perceived gender identity, sexual orientation, or marital status.*

..

*Fair Housing Act Protections from Sex Discrimination Include Sexual Orientation and Gender Identity*

*(\*) The Fair Housing Act prohibits housing and housing-related discrimination because of race, color, national origin, religion, sex (including gender identity and sexual orientation), familial status, and disability. A person who has experienced (or is about to experience) discrimination in housing because of sex, including their actual or perceived sexual orientation or gender identity, may file a complaint with HUD. HUD will investigate complaints alleging violations of the Fair Housing Act on this basis.*

*(\*) On June 15, 2020, the Supreme Court issued a decision in Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020), which held that Title VII's prohibition against sex discrimination includes sexual orientation and gender identity. Following that decision on January 20, 2021, President Biden issued Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation. Pursuant to that Executive Order, HUD's Office of Fair Housing and Equal Opportunity issued a memorandum on February 11, 2021, "Implementation of Executive Order 13988 on the Enforcement of the Fair Housing Act," which addresses discrimination because of actual or perceived sexual orientation and gender identity under the Fair Housing Act. Where reasonable cause exists to believe that discrimination because of sex (including actual or perceived sexual orientation or gender identity) has occurred, FHEO will make a determination of reasonable cause and refer the case to HUD's Office of General Counsel for charge. If the discrimination occurs in conjunction with discrimination because of another protected characteristic, all such bases will be investigated and charged where reasonable cause exists. Similarly, HUD will conduct all activities involving the application, interpretation, and enforcement of the Fair Housing Act's prohibition on sex discrimination consistent with the Bostock decision.*

...

*Examples of housing discrimination against persons identifying as LGBTQ may also occur because of, or in addition to, other characteristics protected by the Fair Housing Act, e.g., race, national origin, color, religion, disability and familial status ...*

## ¶30

The term **indigenous peoples** shall not be limited to person(s)-of-color that are indigenous to a geographical area that live a traditional cultural/religious lifestyle, but instead, shall also include any person(s)-of-color whose immediate ancestry traces to indigenous culture(s)/religion(s) and who follow (or try-to-follow) the cultural/religious lifestyle/practices of such indigenous culture(s)/religion(s). As such, the term also includes at least some immigrant(s)-of-color in the United States who meet the aforementioned criteria, and also all person(s)-of-color who genuinely identify as *"indigenous"*. A person that identifies as *"indigenous"* is identifying in such manner to indicate a combination of both racial-identity and religious-identity.

## ¶31

The terms **combined racial profile** or simply **racial profile** shall collectively refer to the combination of all of the following four characteristics for a person - race, religion, color, and national-origin - and any other applicable characteristics that are directly or intricately-tied-to such combination of race-religion-color-and-national-origin including ethnicity/culture and any applicable physical characteristics including, but not limited to, grooming-style, hair-style, other-facial-hair (such as beard), height/weight (only to the extent that height/weight are the direct result of such combination of race-religion-color-and-national-origin). The term **racial animus** shall refer to any animus that is at least substantially, if not exclusively, based on any aspect(s) of a person's race, color, national-origin, or combined-racial-profile - *"actual or perceived"* - and shall also include: anti-immigrant-animus (xenophobic-animus), anti-indigenous-peoples-animus, anti-Muslim-animus

(Islamophobic-animus), anti-semitic-animus.

## ¶32

The term **racist** shall refer to any behavior(s), action(s), and/or conduct of a person (and/or institution) that demonstrates one-or-more of the following:

Ⓐ racial-animus: (as defined above) ; AND/OR

Ⓑ racial-superiority: the idea that those of the majority race/color/national-origin are superior (in appearance, intelligence, etc.) to those not of the majority race/color/national-origin ; AND/OR

Ⓒ racial-hierarchy: the idea that those of the majority race/color/national-origin ought to occupy the top-level of power-and-wealth within society/neighborhood/workplace, or a relatively higher-level of power-and-wealth to those not of the majority race/color/national-origin ; AND/OR

Ⓓ racial-hypocrisy: heavy-handedly targeting one-or-more person(s) of minority race(s)/color(s)/national-origin(s) on relatively trivial/harmless/petty/spiteful issue(s) (for example, purely-aesthetic/cosmetic issues of property-maintenance), while at the same time, completely ignoring (or deliberately turning a blind-eye to) the major crime(s)/violation(s) (such as, violent crimes, hate-crimes, civil-rights-violations, racketeering-acts, felony crimes, retaliatory crimes) committed by one-or-more person(s) of the majority race/color/national-origin ; AND/OR

Ⓔ racial-bias: treating one-or-more person(s) of the majority race/color/national-origin, in one-or-more manner(s), favorably or preferentially, over one-or-more person(s) of minority race(s)/color(s)/national-origin(s) ; AND/OR

Ⓕ ethnocentricity and/or racial/cultural insensitivity: having one-or-more expectation(s) and/or making one-or-more statement(s)-of-hostility-disappointment-or-disapproval indicating that one-or-more person(s) of minority race(s)/color(s)/national-origin(s) are not conforming their lifestyle and/or appearance/grooming/clothing and/or property-maintenance to the supposed norms/standards/conventions prescribed by those of the majority race/color/national-origin.

## ¶33

The term **far right wing extremist** shall refer to any behavior(s), action(s), and/or conduct of a person (and/or institution) that demonstrates one-or-more of the following:

Ⓐ hatred and/or intolerance based upon the ideals of White-supremacy and/or White-nationalism and/or Christian-Identity ; AND/OR

Ⓑ hatred and/or intolerance against one-or-more religious person(s)/group(s) whose religion is not of the dominant-majority Christian religion ;

AND/OR

Ⓒ hatred and/or intolerance against one-or-more immigrant person(s)/group(s) whose color/race is not of the dominant-majority White/Caucasian ; AND/OR

Ⓓ hatred and/or intolerance against one-or-more political activist(s)/group(s) whose politics does not perfectly align with the dominant-majority, White-Christian-conservative values ; AND/OR

Ⓔ hatred and/or intolerance against one-or-more person(s)/group(s) who do not conform to dominant-majority White-American standards (of lifestyle, and/or of appearance/grooming/clothing, and/or of property-maintenance, etc.) ; AND/OR

Ⓕ hatred and/or intolerance against one-or-more person(s) that are [LGBTQIA+] or that they perceive to be [LGBTQIA+] ; AND/OR

Ⓖ hatred and/or intolerance against government and/or taxation, at the very least, whenever and wherever they perceive (accurately or inaccurately) that government/tax programs/policy are, in any manner, benefiting those aforementioned person(s)/group(s) that they hate (δ).

Every person is extremely unique and nuanced (even as aforelisted), and thus, without making overly generalized statements about all those persons who exhibit far-right-wing-extremism, a common theme that seems to appropriately characterize all such persons is a strong combination of *"group narcissism and misanthropy"*. Such persons are, generally speaking and under most circumstances:

Ⓐ very loving and affectionate towards all of those persons of their own race/color/religion/nationality and/or political-persuasion and/or sexual-orientation - their *"in group"* - (*"group narcissism"*), while at the same time,

Ⓑ extremely hateful-of and/or intolerant-of and/or bitter-against and/or resentful-of all those people who are outside of their race/color/religion/nationality and/or political-persuasion and/or sexual-orientation - their *"out group"* - (*"misanthropy"*).

## ¶ 34

The terms **hate crime(s)** - including, but not limited to **racial/ethnic intimidation/interference** (or simply **racial-intimidation**) and **homophobic intimidation/interference** (or simply **homophobic-intimidation**) - shall refer to any crime(s) that are motivated by one-or-more of the following: racial-animus, religious-animus, anti-immigrant-animus (or animus-due-to-foreign-nationality), anti-indigenous-peoples-animus, anti-Muslim-animus (Islamophobic-animus), anti-semitic-animus, animus-due-to-skin-color, animus-due-to-ethnicity (or any characteristic associated with such ethnicity such as hair-style, grooming and/or dressing), animus-to-person(s)-with-disabilities (ableist-animus), anti-[LGBTQIA+]-animus. Under federal law, the definition of hate-crime is most-generally specified in 【108 U.S. Stat.: 2096. Violent Crime Control and Law Enforcement Act of 1994: § 280003. Direction to United States Sentencing Commission Regarding Sentencing Enhancements for Hate Crimes】 , while the definition of crime-of-violence being defined in 【18 U.S. Code: Part I. Crimes: Chapter 1 - General Provisions: § 16 - Crime of violence defined】 . The prohibition of hate-crimes and the enforcement of the hate-crime laws - along with other related criminal civil-

rights-laws barring deprivation-of-rights/conspiracy-against-rights - originally enacted by the [KKKA],[FHA],[CRAo1968] and then subsequently appended-to by the [HCPA],[CHCA] - are codified under the United States Codes:

01.  【18 U.S. Code:  Part I. Crimes:  Chapter 13. Civil Rights】 , ("[18-USC-PI-C13]"),

02.  【42 U.S. Code:  Chapter 45. Fair Housing:  Subchapter II. Prevention of Intimidation】 , ("[42-USC-C45-SII]"),

03.  【108 U.S. Stat.:  2096. Violent Crime Control and Law Enforcement Act of 1994:  § 280003. Direction to United States Sentencing Commission Regarding Sentencing Enhancements for Hate Crimes】 , ("[108-USSaL-2096-§280003]"),

04.  【34 U.S. Code:  Subtitle III - Prevention of Particular Crimes:  Chapter 305 - Hate Crimes】 , (" [34-USC-SIII-C305]"),

05.  【135 U.S. Stat.:  265. COVID-19 Hate Crimes Act】 , ("[135-USSaL-265]"),

 - and under the State of Texas's Codes:

06.  【Texas Property Code:  Title 15. Fair Housing Practices:  Chapter 301. Texas Fair Housing Act: Subchapter I. Criminal Penalty】 , ("[TPrC-T15-C301-SI]"),

07.  【Texas Penal Code:  Title 3. Punishments:  Chapter 12. Punishments:  Subchapter D. Exceptional Sentences:  Sec. 12.47. Penalty if Offense Committed Because of Bias or Prejudice.】 , ("[TPeC-T3-C12-SD-§12.47]"),

08.  【Texas Code of Criminal Procedure:  Title 1. Code of Criminal Procedure:  Chapter 42. Judgment and Sentence:  Sec. 42.014. Finding that Offense was Committed because of Bias or Prejudice.】 , (" [TCoCP-T1-C42-A42.014]").

---

» 42 U.S. Code:  Chapter 45. Fair Housing:  Subchapter II. Prevention of Intimidation:  § 3631 - Violations; penalties
» https://www.law.cornell.edu/uscode/text/42/3631

*Whoever, whether or not acting under color of law, by force or threat of force willfully injuries, intimidates or interferes with, or attempts to injure, intimidate or interfere with—*

*(a) any person because of his race, color, religion, sex, handicap (as such term is defined in section 3602 of this title), familial status (as such term is defined in section 3602 of this title), or national origin and because he is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing or occupation of any dwelling, or applying for or participating in any service, organization, or facility relating to the business of selling or renting dwellings; or*

*(b) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—*

*(1) participating, without discrimination on account of race, color, religion, sex, handicap (as such term is defined in section 3602 of this title), familial status (as such term is defined in section 3602 of this title), or national origin, in any of the activities, services, organizations or facilities described in subsection (a); or*

*(2) affording another person or class of persons opportunity or protection so to participate; or*

*(c) any citizen because he is or has been, or in order to discourage such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion, sex, handicap (as such term is defined in section 3602 of this title), or national origin, in any of the activities, services, organizations or facilities described in subsection (a), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate—*

*shall be fined under title 18 or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire shall be fined under title 18 or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit*

SIDDHARTH KODE     V.     WILLIAMSON COUNTY , ET AL.                     1696907690

*aggravated sexual abuse, or an attempt to kill, shall be fined under title 18 or imprisoned for any term of years or for life, or both.*

---

▸ 18 U.S. Code›  Part I. Crimes›  Chapter 13. Civil Rights›   § 242 - Deprivation of rights under color of law
▸ https://www.law.cornell.edu/uscode/text/18/242

*Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, **on account of such person being an alien, or by reason of his color, or race**, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.*

---

▸ 18 U.S. Code›  Part I. Crimes›  Chapter 13. Civil Rights›   § 241 - Conspiracy against rights
▸ https://www.law.cornell.edu/uscode/text/18/241

*If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or*

*If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—*

*They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.*

---

▸ 18 U.S. Code›  Part I. Crimes›  Chapter 13. Civil Rights›   § 245 - Federally protected activities
▸ https://www.law.cornell.edu/uscode/text/18/245

...

*(b) Whoever, whether or not acting under color of law, by force or threat of force willfully injures, intimidates or interferes with, or attempts to injure, intimidate or interfere with— ...*

  *(1) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from— ...*

    *(B) participating in or enjoying any benefit, service, privilege, program, facility, or activity provided or administered by the United States; ...*

    *(E) participating in or enjoying the benefits of any program or activity receiving Federal financial assistance; or*

  *(2) any person because of his race, color, religion or national origin and because he is or has been— ...*

    *(B) participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof; ...*

    *(E) traveling in or using any facility of interstate commerce, or using any vehicle, terminal, or facility of any common carrier by motor, rail, water, or air; ...*

    *(F) enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment which provides lodging to transient guests, or of any restaurant, cafeteria, lunchroom, lunch counter, soda fountain, or other facility which serves the public and which is principally engaged in selling food or beverages for consumption on the premises, or of any gasoline station, or of any motion picture house, theater, concert hall, sports arena, stadium, or any other place of exhibition or entertainment which serves the public, or of any other establishment which serves the public and (i) which is located within the premises of any of the aforesaid establishments or within the premises of which is physically located any of the aforesaid establishments, and (ii) which holds itself out as serving patrons of such establishments; or ...*

  *(4) any person because he is or has been, or in order to intimidate such person or any other person or any class of persons from—*

    *(A) participating, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1)(A) through (1)(E) or subparagraphs (2)(A) through (2)(F); or*

    *(B) affording another person or class of persons opportunity or protection to so participate; or*

(5) any citizen because he is or has been, or in order to intimidate such citizen or any other citizen from lawfully aiding or encouraging other persons to participate, without discrimination on account of race, color, religion or national origin, in any of the benefits or activities described in subparagraphs (1)(A) through (1)(E) or subparagraphs (2) (A) through (2)(F), or participating lawfully in speech or peaceful assembly opposing any denial of the opportunity to so participate— ...

---

▸ 18 U.S. Code⋅ Part I. Crimes⋅ Chapter 13. Civil Rights⋅ § 249 - Hate crime acts

▸ https://www.law.cornell.edu/uscode/text/18/249

*(a) In General.—*

*(1) Offenses involving actual or perceived race, color, religion, or national origin.—Whoever, whether or not acting under color of law, willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived race, color, religion, or national origin of any person—*

*(A) shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and*

*(B) shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if—*

*(i) death results from the offense; or*

*(ii) the offense includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill.*

*(2) Offenses involving actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability.—*

*(A) In general.—Whoever, whether or not acting under color of law, in any circumstance described in subparagraph (B) or paragraph (3), willfully causes bodily injury to any person or, through the use of fire, a firearm, a dangerous weapon, or an explosive or incendiary device, attempts to cause bodily injury to any person, because of the actual or perceived religion, national origin, gender, sexual orientation, gender identity, or disability of any person—*

*(i) shall be imprisoned not more than 10 years, fined in accordance with this title, or both; and*

*(ii) shall be imprisoned for any term of years or for life, fined in accordance with this title, or both, if—*

*(I) death results from the offense; or*

*(II) the offense includes kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill.*

*(B) Circumstances described.—For purposes of subparagraph (A), the circumstances described in this subparagraph are that—*

*(i) the conduct described in subparagraph (A) occurs during the course of, or as the result of, the travel of the defendant or the victim—*

*(I) across a State line or national border; or*

*(II) using a channel, facility, or instrumentality of interstate or foreign commerce;*

*(ii) the defendant uses a channel, facility, or instrumentality of interstate or foreign commerce in connection with the conduct described in subparagraph (A);*

*(iii) in connection with the conduct described in subparagraph (A), the defendant employs a firearm, dangerous weapon, explosive or incendiary device, or other weapon that has traveled in interstate or foreign commerce; or*

*(iv) the conduct described in subparagraph (A)—*

*(I) interferes with commercial or other economic activity in which the victim is engaged at the time of the conduct; or*

*(II) otherwise affects interstate or foreign commerce.*

*(3) Offenses occurring in the special maritime or territorial jurisdiction of the united states.—*

*Whoever, within the special maritime or territorial jurisdiction of the United States, engages in conduct described in paragraph (1) or in paragraph (2)(A) (without regard to whether that conduct occurred in a circumstance described in paragraph (2)(B)) shall be subject to the same penalties as prescribed in those paragraphs.*

*(4) Guidelines.—*

*All prosecutions conducted by the United States under this section shall be undertaken pursuant to guidelines issued by the Attorney General, or the designee of the Attorney General, to be included in the United States Attorneys' Manual that shall establish neutral and objective criteria for determining whether a crime was committed because of the actual or perceived status of any person.*

*(b) Certification Requirement.—*

*(1) In general.—No prosecution of any offense described in this subsection may be undertaken by the United States, except under the certification in writing of the Attorney General, or a designee, that—*

*(A) the State does not have jurisdiction;*

(B) the State has requested that the Federal Government assume jurisdiction;

(C) the verdict or sentence obtained pursuant to State charges left demonstratively unvindicated the Federal interest in eradicating bias-motivated violence; or

(D) a prosecution by the United States is in the public interest and necessary to secure substantial justice.

(2) Rule of construction.—

Nothing in this subsection shall be construed to limit the authority of Federal officers, or a Federal grand jury, to investigate possible violations of this section.

(c) Definitions.—In this section—

(1) the term "bodily injury" has the meaning given such term in section 1365(h)(4) of this title, but does not include solely emotional or psychological harm to the victim;

(2) the term "explosive or incendiary device" has the meaning given such term in section 232 of this title;

(3) the term "firearm" has the meaning given such term in section 921(a) of this title;

(4) the term "gender identity" means actual or perceived gender-related characteristics; and

(5) the term "State" includes the District of Columbia, Puerto Rico, and any other territory or possession of the United States.

(d) Statute of Limitations.—

(1) Offenses not resulting in death.—

Except as provided in paragraph (2), no person shall be prosecuted, tried, or punished for any offense under this section unless the indictment for such offense is found, or the information for such offense is instituted, not later than 7 years after the date on which the offense was committed.

(2) Death resulting offenses.—

An indictment or information alleging that an offense under this section resulted in death may be found or instituted at any time without limitation.

(e) Supervised Release.—

If a court includes, as a part of a sentence of imprisonment imposed for a violation of subsection (a), a requirement that the defendant be placed on a term of supervised release after imprisonment under section 3583, the court may order, as an explicit condition of supervised release, that the defendant undertake educational classes or community service directly related to the community harmed by the defendant's offense.

---

▸  108 U.S. Stat.▸   2096. Violent Crime Control and Law Enforcement Act of 1994▸
▸  § 280003. Direction to United States Sentencing Commission Regarding Sentencing Enhancements for Hate Crimes
▸  https://www.govinfo.gov/content/pkg/STATUTE-108/pdf/STATUTE-108-Pg1796.pdf#page=1

(a) DEFINITION. — In this section, "hate crime" means a crime in which the defendant intentionally selects a victim, or in the case of a property crime, the property that is the object of the crime, because of the actual or perceived race, color, religion, national origin, ethnicity, gender, disability, or sexual orientation of any person.

(b) SENTENCING ENHANCEMENT. — Pursuant to section 994 of title 28, United States Code, the United States Sentencing Commission shall promulgate guidelines or amend existing guidelines to provide sentencing enhancements of not less than 3 offense levels for offenses that the finder of fact at trial determines beyond a reasonable doubt are hate crimes. In carrying out this section, the United States Sentencing Commission shall ensure that there is reasonable consistency with other guidelines, avoid duplicative punishments for substantially the same offense, and take into account any mitigating circumstances that might justify exceptions.

---

▸  34 U.S. Code▸   Subtitle III - Prevention of Particular Crimes▸   Chapter 305 - Hate Crimes▸   § 30502 - Definitions
▸  https://www.law.cornell.edu/uscode/text/34/30502

In this division—

(1) the term "crime of violence" has the meaning given that term in section 16 of title 18;

(2) the term "hate crime" has the meaning given that term in section 280003(a) of the Violent Crime Control and Law Enforcement Act of 1994 (Public Law 103–322; 108 Stat. 2096), as amended by this Act;

(3) the term "local" means a county, city, town, township, parish, village, or other general purpose political subdivision of a State; and

(4) the term "State" includes the District of Columbia, Puerto Rico, and any other territory or possession of the United States. ...

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                          1696907690

> 18 U.S. Code:   Part I. Crimes:   Chapter 1 - General Provisions:   § 16 - Crime of violence defined
> https://www.law.cornell.edu/uscode/text/18/16

*The term "crime of violence" means—*

*(a) an offense that has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or*

*(b) any other offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense. ...*

> 34 U.S. Code:   Subtitle III - Prevention of Particular Crimes:   Chapter 305 - Hate Crimes:   § 30501 - Findings
> https://www.law.cornell.edu/uscode/text/34/30501

*Congress makes the following findings:*

*(1) The incidence of violence motivated by the actual or perceived race, color, religion, national origin, gender, sexual orientation, gender identity, or disability of the victim poses a serious national problem.*

*(2) Such violence disrupts the tranquility and safety of communities and is deeply divisive.*

*(3) State and local authorities are now and will continue to be responsible for prosecuting the overwhelming majority of violent crimes in the United States, including violent crimes motivated by bias. These authorities can carry out their responsibilities more effectively with greater Federal assistance.*

*(4) Existing Federal law is inadequate to address this problem.*

*(5) A prominent characteristic of a violent crime motivated by bias is that it devastates not just the actual victim and the family and friends of the victim, but frequently savages the community sharing the traits that caused the victim to be selected.*

*(6) Such violence substantially affects interstate commerce in many ways, including the following:*

*(A) The movement of members of targeted groups is impeded, and members of such groups are forced to move across State lines to escape the incidence or risk of such violence.*

*(B) Members of targeted groups are prevented from purchasing goods and services, obtaining or sustaining employment, or participating in other commercial activity.*

*(C) Perpetrators cross State lines to commit such violence.*

*(D) Channels, facilities, and instrumentalities of interstate commerce are used to facilitate the commission of such violence.*

*(E) Such violence is committed using articles that have traveled in interstate commerce.*

*(7) For generations, the institutions of slavery and involuntary servitude were defined by the race, color, and ancestry of those held in bondage. Slavery and involuntary servitude were enforced, both prior to and after the adoption of the 13th amendment to the Constitution of the United States, through widespread public and private violence directed at persons because of their race, color, or ancestry, or perceived race, color, or ancestry. Accordingly, eliminating racially motivated violence is an important means of eliminating, to the extent possible, the badges, incidents, and relics of slavery and involuntary servitude.*

*(8) Both at the time when the 13th, 14th, and 15th amendments to the Constitution of the United States were adopted, and continuing to date, members of certain religious and national origin groups were and are perceived to be distinct "races". Thus, in order to eliminate, to the extent possible, the badges, incidents, and relics of slavery, it is necessary to prohibit assaults on the basis of real or perceived religions or national origins, at least to the extent such religions or national origins were regarded as races at the time of the adoption of the 13th, 14th, and 15th amendments to the Constitution of the United States.*

*(9) Federal jurisdiction over certain violent crimes motivated by bias enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes.*

*(10) The problem of crimes motivated by bias is sufficiently serious, widespread, and interstate in nature as to warrant Federal assistance to States, local jurisdictions, and Indian tribes.*

> 34 U.S. Code:   Subtitle III - Prevention of Particular Crimes:   Chapter 305 - Hate Crimes:   § 30506 - Rule of construction
> https://www.law.cornell.edu/uscode/text/34/30506

...

*(2) VIOLENT ACTS*

*This division applies to violent acts motivated by actual or perceived race, color, religion, national origin, gender, sexual orientation, gender identity, or disability of a victim.*

...

> 135 U.S. Stat.:   265. COVID-19 Hate Crimes Act:
> https://www.govinfo.gov/content/pkg/PLAW-117publ13/html/PLAW-117publ13.htm
> 34 U.S. Code:   Subtitle III - Prevention of Particular Crimes:   Chapter 305 - Hate Crimes:   § 30507 - Jabara-Heyer NO HATE Act
> https://www.law.cornell.edu/uscode/text/34/30507

*[117th Congress Public Law 13]*
*[From the U.S. Government Publishing Office]*


*[[Page 135 STAT. 265]]*


*Public Law 117-13*
*117th Congress*


*An Act*


*To facilitate the expedited review of COVID-19 hate crimes, and for other purposes. ≪NOTE: May 20, 2021 - [S. 937]≫*


*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, ≪NOTE: COVID-19 Hate Crimes Act.≫*


*SECTION 1. ≪NOTE: 34 USC 10101 note.≫ SHORT TITLE.*


*This Act may be cited as the ``COVID-19 Hate Crimes Act".*


*SEC. 2. ≪NOTE: 34 USC 30501 note.≫ FINDINGS.*


*Congress finds the following:*

*(1) Following the spread of COVID-19 in 2020, there has been a dramatic increase in hate crimes and violence against Asian- Americans and Pacific Islanders.*

*(2) According to a recent report, there were nearly 3,800 reported cases of anti-Asian discrimination and incidents related to COVID-19 between March 19, 2020, and February 28, 2021, in all 50 States and the District of Columbia.*

*(3) During this time frame, race has been cited as the primary reason for discrimination, making up over 90 percent of incidents, and the United States condemns and denounces any and all anti-Asian and Pacific Islander sentiment in any form.*

*(4) Roughly 36 percent of these incidents took place at a business and more than 2,000,000 Asian-American businesses have contributed to the diverse fabric of American life.*

*(5) More than 1,900,000 Asian-American and Pacific Islander older adults, particularly those older adults who are recent immigrants or have limited English proficiency, may face even greater challenges in dealing with the COVID-19 pandemic, including discrimination, economic insecurity, and language isolation.*

*(6) In the midst of this alarming surge in anti-Asian hate crimes and incidents, a shooter murdered the following 8 people in the Atlanta, Georgia region, 7 of whom were women and 6 of whom were women of Asian descent: ≪NOTE: Xiaojie Tan. Daoyou Feng. Delaina Ashley Yaun Gonzalez. Paul Andre Michels. Soon Chung Park. Hyun Jung Grant. Suncha Kim. Yong Ae Yue.≫*

*(A) Xiaojie Tan.*

*(B) Daoyou Feng.*

*(C) Delaina Ashley Yaun Gonzalez.*

*(D) Paul Andre Michels.*

*(E) Soon Chung Park.*

*(F) Hyun Jung Grant.*

*(G) Suncha Kim.*

*(H) Yong Ae Yue.*

*(7) The people of the United States will always remember the victims of these shootings and stand in solidarity with those affected by this senseless tragedy and incidents of hate that have affected the Asian and Pacific Islander communities.*

*SEC. 3. «NOTE: 34 USC 30501 note.» REVIEW OF HATE CRIMES.*

*(a) «NOTE: Deadline. Designation.» In General.--Not later than 7 days after the date of enactment of this Act, the Attorney General shall designate an officer or employee of the Department of Justice whose responsibility during the applicable period shall be to facilitate the expedited review of hate crimes (as described in section 249 of title 18, United States Code) and reports of any such crime to Federal, State, local, or Tribal law enforcement agencies.*

*(b) Applicable Period Defined.--In this section, the term "applicable period" means the period beginning on the date on which the officer or employee is designated under subsection (a), and ending on the date that is 1 year after the date on which the emergency period described in subparagraph (B) of section 1135(g)(1) of the Social Security Act (42 U.S.C. 1320b-5(g)(1)) ends, except that the Attorney General may extend such period as appropriate.*

*SEC. 4. «NOTE: 34 USC 30501 note.» GUIDANCE.*

*(a) Guidance for Law Enforcement Agencies.--The Attorney General shall issue guidance for State, local, and Tribal law enforcement agencies, pursuant to this Act and other applicable law, on how to--*

*(1) establish online reporting of hate crimes or incidents, and to have online reporting that is equally effective for people with disabilities as for people without disabilities available in multiple languages as determined by the Attorney General;*

*(2) collect data disaggregated by the protected characteristics described in section 249 of title 18, United States Code; and*

*(3) expand public education campaigns aimed at raising awareness of hate crimes and reaching victims, that are equally effective for people with disabilities as for people without disabilities.*

*(b) «NOTE: Coordination.» Guidance Relating to COVID-19 Pandemic.--The Attorney General and the Secretary of Health and Human Services, in coordination with the COVID-19 Health Equity Task Force and community-based organizations, shall issue guidance aimed at raising awareness of hate crimes during the COVID-19 pandemic.*

*SEC. 5. «NOTE: Khalid Jabara and Heather Heyer National Opposition to Hate, Assault, and Threats to Equality Act of 2021. 34 USC 30507.» JABARA- HEYER NO HATE ACT.*

*(a) Short Title.--This section may be cited as the "Khalid Jabara and Heather Heyer National Opposition to Hate, Assault, and Threats to Equality Act of 2021" or the "Jabara-Heyer NO HATE Act".*

*(b) Findings.--Congress finds the following:*

*(1) The incidence of violence known as hate crimes, or crimes motivated by bias, poses a serious national problem.*

*(2) According to data obtained by the Federal Bureau of Investigation, the incidence of such violence increased in 2019, the most recent year for which data is available.*

*(3) In 1990, Congress enacted the Hate Crime Statistics Act (Public Law 101-275; 28 U.S.C. 534 note) to provide the Federal Government, law enforcement agencies, and the public with data regarding the incidence of hate crime. The Hate Crime Statistics Act and the Matthew Shepard and James Byrd, Jr. Hate Crimes Prevention Act (division E of Public Law 111-84; 123 Stat. 2835) have enabled Federal authorities to understand and, where appropriate, investigate and prosecute hate crimes.*

*(4) A more complete understanding of the national problem posed by hate crime is in the public interest and supports the Federal interest in eradicating bias-motivated violence referenced in section 249(b)(1)(C) of title 18, United States Code.*

*(5) However, a complete understanding of the national problem posed by hate crimes is hindered by incomplete data from Federal, State, and local jurisdictions through the Uniform Crime Reports program authorized under section 534 of title 28, United States Code, and administered by the Federal Bureau of Investigation.*

*(6) Multiple factors contribute to the provision of inaccurate and incomplete data regarding the incidence of hate crime through the Uniform Crime Reports program. A significant contributing factor is the quality and quantity of training that State and local law enforcement agencies receive on the identification and reporting of suspected bias-motivated crimes.*

*(7) The problem of crimes motivated by bias is sufficiently serious, widespread, and interstate in nature as to warrant Federal financial assistance to States and local*

jurisdictions.

(8) Federal financial assistance with regard to certain violent crimes motivated by bias enables Federal, State, and local authorities to work together as partners in the investigation and prosecution of such crimes.

(c) Definitions.--In this section:

(1) Hate crime.--The term ``hate crime'' means an act described in section 245, 247, or 249 of title 18, United States Code, or in section 901 of the Civil Rights Act of 1968 (42 U.S.C. 3631).

(2) Priority agency.--The term ``priority agency'' means--

(A) a law enforcement agency of a unit of local government that serves a population of not less than 100,000, as computed by the Federal Bureau of Investigation; or

(B) a law enforcement agency of a unit of local government that--

(i) serves a population of not less than 50,000 and less than 100,000, as computed by the Federal Bureau of Investigation; and

(ii) has reported no hate crimes through the Uniform Crime Reports program in each of the 3 most recent calendar years for which such data is available.

(3) State.--The term ``State'' has the meaning given the term in section 901 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (34 U.S.C. 10251).

(4) Uniform crime reports.--The term ``Uniform Crime Reports'' means the reports authorized under section 534 of title 28, United States Code, and administered by the Federal Bureau of Investigation that compile nationwide criminal statistics for use--

(A) in law enforcement administration, operation, and management; and

(B) to assess the nature and type of crime in the United States.

(5) Unit of local government.--The term ``unit of local government'' has the meaning given the term in section 901 of title I of the Omnibus Crime Control and Safe Streets Act of 1968 (34 U.S.C. 10251).

(d) «NOTE: State and local governments.» Reporting of Hate Crimes.--

(1) Implementation grants.--

(A) In general.--The Attorney General may make grants to States and units of local government to assist the State or unit of local government in implementing the National Incident-Based Reporting System, including to train employees in identifying and classifying hate crimes in the National Incident-Based Reporting System.

(B) Priority.--In making grants under subparagraph (A), the Attorney General shall give priority to States and units of local government that develop and implement the programs and activities described in subsection (f)(2)(A).

(2) Reporting.--

(A) Compliance.--

(i) «NOTE: Time period. Effective date.» In general.--Except as provided in clause (ii), in each fiscal year beginning after the date that is 3 years after the date on which a State or unit of local government first receives a grant under paragraph (1), the State or unit of local government shall provide to the Attorney General, through the Uniform Crime Reporting system, information pertaining to hate crimes committed in that jurisdiction during the preceding fiscal year.

(ii) Extensions; waiver.--The Attorney General--

(I) may provide a 120-day extension to a State or unit of local government that is making good faith efforts to comply with clause (i); and

(II) shall waive the requirements of clause (i) if compliance with that subparagraph by a State or unit of local government would be unconstitutional under the constitution of the State or of the State in which the unit of local government is located, respectively.

(B) Failure to comply.--If a State or unit of local government that receives a grant under paragraph (1) fails to substantially comply with subparagraph (A) of this paragraph, the State or unit of local government shall repay the grant in full, plus reasonable interest and penalty charges allowable by law or established by the Attorney General.

(e) Grants for State-run Hate Crime Hotlines.--

(1) Grants authorized.--

(A) In general.--The Attorney General shall make grants to States to create State-run hate crime reporting hotlines.

(B) Grant period.--A grant made under subparagraph (A) shall be for a period of not more than 5 years.

(2) Hotline requirements.--A State shall ensure, with respect to a hotline funded by a grant under paragraph (1), that--

(A) the hotline directs individuals to--

(i) law enforcement if appropriate; and

(ii) local support services;

(B) any personally identifiable information that an individual provides to an agency of the State through the hotline is not directly or indirectly disclosed, without the consent of

the individual, to--

(i) any other agency of that State;

(ii) any other State;

(iii) the Federal Government; or

(iv) any other person or entity;

(C) the staff members who operate the hotline are trained to be knowledgeable about--

(i) applicable Federal, State, and local hate crime laws; and

(ii) local law enforcement resources and applicable local support services; and

(D) the hotline is accessible to--

(i) individuals with limited English proficiency, where appropriate; and

(ii) individuals with disabilities.

(3) Best practices.--The Attorney General shall issue guidance to States on best practices for implementing the requirements of paragraph (2).


(f) Information Collection by States and Units of Local Government.--

(1) Definitions.--In this subsection:

(A) Covered agency.--The term ``covered agency'' means--

(i) a State law enforcement agency; and

(ii) a priority agency.

(B) Eligible entity.--The term ``eligible entity'' means--

(i) a State; or

(ii) a unit of local government that has a priority agency.

(2) Grants.--

(A) In general.--The Attorney General may make grants to eligible entities to assist covered agencies within the jurisdiction of the eligible entity in conducting law enforcement activities or crime reduction programs to prevent, address, or otherwise respond to hate crime, particularly as those activities or programs relate to reporting hate crimes through the Uniform Crime Reports program, including--

(i) adopting a policy on identifying, investigating, and reporting hate crimes;

(ii) developing a standardized system of collecting, analyzing, and reporting the incidence of hate crime;

(iii) establishing a unit specialized in identifying, investigating, and reporting hate crimes;

(iv) engaging in community relations functions related to hate crime prevention and education such as--

(I) establishing a liaison with formal community-based organizations or leaders; and

(II) conducting public meetings or educational forums on the impact of hate crimes, services available to hate crime victims, and the relevant Federal, State, and local laws pertaining to hate crimes; and

(v) providing hate crime trainings for agency personnel.

(B) Subgrants.--A State that receives a grant under subparagraph (A) may award a subgrant to a unit of local government within the State for the purposes under that subparagraph, except that a unit of local government may provide funding from such a subgrant to any law enforcement agency of the unit of local government.

(3) Information required of states and units of local government.--

(A) In general.--For each fiscal year in which a State or unit of local government receives a grant or subgrant under paragraph (2), the State or unit of local government shall--

(i) collect information from each law enforcement agency that receives funding from the grant or subgrant summarizing the law enforcement activities or crime reduction programs conducted by the agency to prevent, address, or otherwise respond to hate crime, particularly as those activities or programs relate to reporting hate crimes through the Uniform Crime Reports program; and

(ii) «NOTE: Reports.» submit to the Attorney General a report containing the information collected under clause (i).

(B) Semiannual law enforcement agency report.--

(i) «NOTE: Requirement.» In general.--In collecting the information required under subparagraph (A)(i), a State or unit of local government shall require each law enforcement agency that receives funding from a grant or subgrant awarded to the State or unit of local government under paragraph (2) to submit a semiannual report to the State or unit of local government that includes a summary of the law enforcement activities or crime reduction programs conducted by the agency during the reporting period to prevent, address, or otherwise respond to hate crime, particularly as those activities or programs relate to reporting hate crimes through the Uniform Crime Reports program.

(ii) Contents.--In a report submitted under clause (i), a law enforcement agency shall, at a minimum, disclose--

(I) whether the agency has adopted a policy on identifying, investigating, and reporting hate crimes;

*(II) whether the agency has developed a standardized system of collecting, analyzing, and reporting the incidence of hate crime;*

*(III) whether the agency has established a unit specialized in identifying, investigating, and reporting hate crimes;*

*(IV) whether the agency engages in community relations functions related to hate crime, such as--*

*(aa) establishing a liaison with formal community-based organizations or leaders; and*

*(bb) conducting public meetings or educational forums on the impact of hate crime, services available to hate crime victims, and the relevant Federal, State, and local laws pertaining to hate crime; and*

*(V) the number of hate crime trainings for agency personnel, including the duration of the trainings, conducted by the agency during the reporting period.*

*(4) Compliance and redirection of funds.--*

*(A) ≪NOTE: Deadline. ≫ In general.--Except as provided in subparagraph (B), beginning not later than 1 year after the date of this Act, a State or unit of local government receiving a grant or subgrant under paragraph (2) shall comply with paragraph (3).*

*(B) Extensions; waiver.--The Attorney General--*

*(i) may provide a 120-day extension to a State or unit of local government that is making good faith efforts to collect the information required under paragraph (3); and*

*(ii) shall waive the requirements of paragraph (3) for a State or unit of local government if compliance with that subsection by the State or unit of local government would be unconstitutional under the constitution of the State or of the State in which the unit of local government is located, respectively.*

*(g) Requirements of the Attorney General.--*

*(1) Information collection and analysis; report.--In order to improve the accuracy of data regarding the incidence of hate crime provided through the Uniform Crime Reports program, and promote a more complete understanding of the national problem posed by hate crime, the Attorney General shall--*

*(A) collect and analyze the information provided by States and units of local government under subsection (f) for the purpose of developing policies related to the provision of accurate data obtained under the Hate Crime Statistics Act (Public Law 101-275; 28 U.S.C. 534 note) by the Federal Bureau of Investigation; and*

*(B) ≪NOTE: Time period. Effective date. ≫ for each calendar year beginning after the date of enactment of this Act, publish and submit to Congress a report based on the information collected and analyzed under subparagraph (A).*

*(2) ≪NOTE: Analysis. ≫ Contents of report.--A report submitted under paragraph (1) shall include--*

*(A) a qualitative analysis of the relationship between--*

*(i) the number of hate crimes reported by State law enforcement agencies or other law enforcement agencies that received funding from a grant or subgrant awarded under paragraph (2) through the Uniform Crime Reports program; and*

*(ii) the nature and extent of law enforcement activities or crime reduction programs conducted by those agencies to prevent, address, or otherwise respond to hate crime; and*

*(B) a quantitative analysis of the number of State law enforcement agencies and other law enforcement agencies that received funding from a grant or subgrant awarded under paragraph (2) that have--*

*(i) adopted a policy on identifying, investigating, and reporting hate crimes;*

*(ii) developed a standardized system of collecting, analyzing, and reporting the incidence of hate crime;*

*(iii) established a unit specialized in identifying, investigating, and reporting hate crimes;*

*(iv) engaged in community relations functions related to hate crime, such as--*

*(I) establishing a liaison with formal community-based organizations or leaders; and*

*(II) conducting public meetings or educational forums on the impact of hate crime, services available to hate crime victims, and the relevant Federal, State, and local laws pertaining to hate crime; and*

*(v) conducted hate crime trainings for agency personnel during the reporting period, including--*

*(I) the total number of trainings conducted by each agency; and*

*(II) the duration of the trainings described in subclause (I).*

*(h) Alternative Sentencing.--Section 249 of title 18, United States Code, is amended by adding at the end the following:*

*``(e) ≪NOTE: Courts. Requirement. ≫ Supervised Release.--If a court includes, as a part of a sentence of imprisonment imposed for a violation of subsection (a), a requirement that the defendant be placed on a term of supervised release after imprisonment under section 3583, the court may order, as an explicit condition of supervised release, that the defendant undertake educational classes or community service directly related to the community harmed by the defendant's offense.''.*

*Approved May 20, 2021.*

*LEGISLATIVE HISTORY--S. 937:*

--------------------------------------------------------------------------------

*CONGRESSIONAL RECORD, Vol. 167 (2021):*

*Apr. 19, 20, 22, considered and passed Senate.*

*May 18, considered and passed House.*

*DAILY COMPILATION OF PRESIDENTIAL DOCUMENTS (2021):*

*May 20, Presidential remarks.*

---

▸ Texas Property Code⋅   Title 15. Fair Housing Practices⋅   Chapter 301. Texas Fair Housing Act⋅   Subchapter I. Criminal Penalty
▸ https://statutes.capitol.texas.gov/Docs/PR/htm/PR.301.htm

*Sec. 301.171. INTIMIDATION OR INTERFERENCE.*

*(a) A person commits an offense if the person, without regard to whether the person is acting under color of law, by force or threat of force intentionally intimidates or interferes with a person:*

*(1) because of the person's race, color, religion, sex, disability, familial status, or national origin and because the person is or has been selling, purchasing, renting, financing, occupying, or contracting or negotiating for the sale, purchase, rental, financing, or occupation of any dwelling or applying for or participating in a service, organization, or facility relating to the business of selling or renting dwellings; or*

*(2) because the person is or has been or to intimidate the person from:*

*(A) participating, without discrimination because of race, color, religion, sex, disability, familial status, or national origin, in an activity, service, organization, or facility described by Subdivision (1); or*

*(B) affording another person opportunity or protection to so participate; or*

*(C) lawfully aiding or encouraging other persons to participate, without discrimination because of race, color, religion, sex, disability, familial status, or national origin, in an activity, service, organization, or facility described by Subdivision (1).*

*(b) An offense under this section is a Class A misdemeanor.*

---

▸ Texas Penal Code⋅   Title 3. Punishments⋅   Chapter 12. Punishments⋅   Subchapter D. Exceptional Sentences
▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.12.htm

*Sec. 12.47. PENALTY IF OFFENSE COMMITTED BECAUSE OF BIAS OR PREJUDICE.*

*(a) If an affirmative finding under Article 42.014, Code of Criminal Procedure, is made in the trial of an offense other than a first degree felony or a Class A misdemeanor, the punishment for the offense is increased to the punishment prescribed for the next highest category of offense. If the offense is a Class A misdemeanor, the minimum term of confinement for the offense is increased to 180 days. ...*

---

▸ Texas Code of Criminal Procedure⋅   Title 1. Code of Criminal Procedure⋅   Chapter 42. Judgment and Sentence
▸ https://statutes.capitol.texas.gov/Docs/CR/htm/CR.42.htm

*Art. 42.014. FINDING THAT OFFENSE WAS COMMITTED BECAUSE OF BIAS OR PREJUDICE.*

*(a) In the trial of an offense under Title 5, Penal Code, or Section 28.02, 28.03, 28.08, or 42.0601, Penal Code, the judge shall make an affirmative finding of fact and enter the affirmative finding in the judgment of the case if at the guilt or innocence phase of the trial, the judge or the jury, whichever is the trier of fact, determines beyond a reasonable doubt that the defendant intentionally selected the person against whom the offense was committed, or intentionally selected the person's property that was damaged or affected as a result of the offense, because of the defendant's bias or prejudice against a group identified by race, color, disability, religion, national origin or ancestry, age, gender, or sexual preference or by status as a peace officer or judge.*

*(b) The sentencing judge may, as a condition of punishment, require attendance in an educational program to further tolerance and acceptance of others.*

*(c) In this article, "sexual preference" has the following meaning only: a preference for heterosexuality, homosexuality, or bisexuality.*

## ¶35

The terms **Obstruction-Of-Justice** and **Omnibus-Clause** shall refer to the specific portion of [18 U.S. Code⋅   Part I. Crimes⋅

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**Chapter 73. Obstruction of Justice:   § 1503 – Influencing or injuring officer or juror generally]** [18-USC-PI-C73-§1503] that is highlighted in bold in the excerpt below. The Omnibus-Clause is an all-encompassing and general Obstruction-Of-Justice clause that, by its very definition, subsumes most, if not all, other Sections of **[18 U.S. Code:   Part I. Crimes:   Chapter 73. Obstruction of Justice]** [18-USC-PI-C73]:

> ▸  18 U.S. Code:   Part I. Crimes:   Chapter 73. Obstruction of Justice:   § 1503 – Influencing or injuring officer or juror generally
> ▸  https://www.law.cornell.edu/uscode/text/18/1503
>
> *(a) Whoever corruptly, or by threats or force, or by any threatening letter or communication, endeavors to influence, intimidate, or impede any grand or petit juror, or officer in or of any court of the United States, or officer who may be serving at any examination or other proceeding before any United States magistrate judge or other committing magistrate, in the discharge of his duty, or injures any such grand or petit juror in his person or property on account of any verdict or indictment assented to by him, or on account of his being or having been such juror, or injures any such officer, magistrate judge, or other committing magistrate in his person or property on account of the performance of his official duties, or **corruptly or by threats or force, or by any threatening letter or communication, influences, obstructs, or impedes, or endeavors to influence, obstruct, or impede, the due administration of justice, shall be punished** as provided in subsection (b). If the offense under this section occurs in connection with a trial of a criminal case, and the act in violation of this section involves the threat of physical force or physical force, the maximum term of imprisonment which may be imposed for the offense shall be the higher of that otherwise provided by law or the maximum term that could have been imposed for any offense charged in such case. ...*

# ¶36

The terms **aggregate** and **aggregately**, when used to describe the action(s) of multiple persons (with the meaning of *"person"* including any corporation or any of such corporation's agencies), here referred to as a **conspiracy**, shall refer to the combined efforts of those persons working as a **conspiracy** to achieve the commonly-shared, long-term goals of the **enterprise**. Therefore, each individual action itself need not be performed by every single person of that **conspiracy** but only that they acted together in a conspiratorial manner (with the *"meeting of their minds"*) in furtherance of such **conspiracy** in-order-to achieve the commonly-shared, long-term goals of the **enterprise**. Similarly, it is not necessary for each person of the **conspiracy** to know about every other person's (of that **conspiracy**) actions, as long as the person was part of the overall **conspiracy** to achieve the commonly-shared, long-term goals of the **enterprise**. Finally, new person(s) can be added to the **conspiracy** just like, to use a sports analogy, free agents can be added onto a team - and therefore, it is unnecessary to prove that such new person(s) knew about the prior/initial action(s) of the **conspiracy**, advancing the commonly-shared, long-term goals of the **enterprise**.

# ¶37

The term **racketeer(s)** shall refer to any person(s) that either individually and/or aggregately (as part of a conspiracy), and through a **pattern-of-racketeering-activity**, performed two-or-more of the following **racketeering-acts** (also known as **predicate-offense(s)**), with no more than 10 years passing between any two consecutive **racketeering-acts** ([18-USC-PI-C96-§1961]):

01 .   issued threat(s)-of-murder ([18-USC-PI-C96-§1961],[18-USC-PI-C96-§1959]) against their targeted-victim(s);

02 .   issued threat(s)-of-physical-violence against their targeted-victim(s) and/or the private-property of such targeted-victim(s) - in furtherance of a plan/purpose/conspiracy to *"obstruct, delay or affect commerce"* ([18-USC-PI-C95-§1951],[18-USC-PI-C96-§1959]);

03 .   attempted/conspired to commit physical-violence against their targeted-victim(s) - in furtherance of a plan/purpose/conspiracy to *"obstruct, delay or affect commerce"* ([18-USC-PI-C95-§1951],[18-USC-PI-C96-§1959]);

04 .   obstructed, delayed or affected commerce - or attempted/conspired to do so - by extortion ([18-USC-PI-C95-§1951]) against their

targeted-victim(s);

05. engaged in the **racketeering-act(s)** of blackmail/extortion ([18-USC-PI-C96-§1961],[18-USC-PI-C41],[18-USC-PI-C95-§1951],[TPeC-T7-C31]) against their targeted-victim(s);

06. engaged in the **racketeering-act(s)** of wire-fraud ([18-USC-PI-C63-§1343]) via any online communications/submissions/postings (including social-media-postings and/or private-messaging and/or form-submissions), against their targeted-victim(s);

07. engaged in the **racketeering-act(s)** of mail-fraud ([18-USC-PI-C63-§1341]) via any interstate mail/package delivery-service, against their targeted-victim(s);

08. threatened/intimidated/corruptly-persuaded their targeted-victim(s) and/or other witness(s) (or attempted-to-do-so) from reporting crime(s)/civil-rights-violation(s) and/or for acting-as-witness to the reported crime(s)/civil-rights-violation(s) - in essence, committing the **racketeering-act(s)**/felony-crime(s) of witness/victim-intimidation ([18-USC-PI-C73-§1512],[TPeC-T8-C36-§36.05]) against such victim(s)/witness(s).

09. threatened/intimidated/corruptly-persuaded other witness(s) (or attempted-to-do-so) in-order-to corruptly influence such witness(s) to testify unfavorably against their targeted-victim(s) - in essence, committing the **racketeering-act(s)**/felony-crime(s) of witness-tampering ([18-USC-PI-C73-§1512],[TPeC-T8-C36-§36.05]) against such targeted-victim(s).

10. retaliated against such victim(s)/witness(s) (or attempted-to-do-so) for such victim(s)'/witness(s)' reporting/serving-as-witness to crime(s)/civil-rights-violation(s) - in essence, committing the **racketeering-act(s)**/felony-crime(s) obstruction/retaliation ([18-USC-PI-C73-§1513],[TPeC-T8-C36-§36.06]) against such victim(s)/witness(s).

11. destroyed evidence (or attempted-to-do-so) of crime(s)/civil-rights-violation(s) - in essence, committing the **racketeering-act(s)**/felony-crime(s) of evidence-tampering ([18-USC-PI-C73-§1512],[18-USC-PI-C73-§1519],[TPeC-T8-C37-§37.09]) against their targeted-victim(s).

12. fabricated/planted evidence in-order-to frame their targeted-victim(s) - in essence, committing the **racketeering-act(s)**/felony-crime(s) of fabricated-evidence ([18-USC-PI-C73-§1503],[18-USC-PI-C73-§1519],[TPeC-T8-C37-§37.09]) against their targeted-victim(s).

13. otherwise corruptly, or by threat of force or otherwise threatening communication:

Ⓐ covered-up/obstructed/influenced/impeded any-investigation-of any crimes(s)/civil-rights-violation(s) ; AND/OR

Ⓑ covered-up/obstructed/influenced/impeded the *"due administration of justice"* ; AND/OR

Ⓒ endeavored to cover-up/obstruct/influence/impede the *"due administration of justice"*

- in essence, committing the **racketeering-act(s)** of obstruction-of-justice ([18-USC-PI-C73-§1503]), *"Omnibus Clause"*, against their targeted-victim(s).


## ¶38

The **racketeer(s)** that engage in the aforementioned **pattern-of-racketeering-activity** have violated the [RIaCOA], codified under **[18 U.S. Code:  Part I. Crimes:  Chapter 96]** [18-USC-PI-C96], if there exists a (legal or extralegal) **racketeering-enterprise** that is *"engaged in, or the activities of which affect, interstate or foreign commerce"*, and at least one of the following can be proved ([18-USC-PI-C96-§1962]):

01. that such racketeer(s) conducted or participated in the affairs of the racketeering-enterprise through such pattern-of-racketeering-activity.

**02 .**  that such racketeer(s) acquired or maintained an interest in, or control of, the racketeering-enterprise through such pattern-of-racketeering-activity.

**03 .**  that such racketeer(s) invested the proceeds of such pattern-of-racketeering-activity into the racketeering-enterprise.

**04 .**  that such racketeer(s) conspired to do one of the above.

---

• 18 U.S. Code›  Part I. Crimes›  Chapter 96. Racketeer Influenced and Corrupt Organizations›  § 1961 – Definitions
• https://www.law.cornell.edu/uscode/text/18/1961

*(1) "racketeering activity" means*

  *(A) any act or threat involving murder, ... extortion ... which is chargeable under State law and punishable by imprisonment for more than one year;*

  *(B) any act which is indictable under any of the following provisions of title 18, United States Code: ...*

   *section 1341 (relating to mail fraud), ...*

   *section 1343 (relating to wire fraud), ...*

   *section 1503 (relating to obstruction of justice), ...*

   *section 1512 (relating to tampering with a witness, victim, or an informant),*

   *section 1513 (relating to retaliating against a witness, victim, or an informant), ...*

   *section 1951 (relating to interference with commerce, robbery, or extortion), ...*

*(2) "State" means any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, any territory or possession of the United States, any political subdivision, or any department, agency, or instrumentality thereof;*

*(3) "person" includes any individual or entity capable of holding a legal or beneficial interest in property; ...*

*(4) "enterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity;*

*(5) "pattern of racketeering activity" requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity; ...*

---

• 18 U.S. Code›  Part I. Crimes›  Chapter 96. Racketeer Influenced and Corrupt Organizations›  § 1962 – Prohibited activities
• https://www.law.cornell.edu/uscode/text/18/1962

*(a) It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce ...*

*(b) It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.*

*(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.*

*(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.*

---

• 18 U.S. Code›  Part I. Crimes›  Chapter 96. Racketeer Influenced and Corrupt Organizations›  § 1963 – Criminal penalties
• https://www.law.cornell.edu/uscode/text/18/1963

*(a) Whoever violates any provision of section 1962 of this chapter shall be fined under this title or imprisoned not more than 20 years (or for life if the violation is based on a racketeering activity for which the maximum penalty includes life imprisonment), or both, …*

> 18 U.S. Code›   Part I. Crimes›   Chapter 96. Racketeer Influenced and Corrupt Organizations›   § 1964 – Civil remedies
> https://www.law.cornell.edu/uscode/text/18/1964

*(a) The district courts of the United States shall have jurisdiction to prevent and restrain violations of section 1962 of this chapter by issuing appropriate orders, including, but not limited to: ordering any person to divest himself of any interest, direct or indirect, in any enterprise; imposing reasonable restrictions on the future activities or investments of any person, including, but not limited to, prohibiting any person from engaging in the same type of endeavor as the enterprise engaged in, the activities of which affect interstate or foreign commerce; or ordering dissolution or reorganization of any enterprise, making due provision for the rights of innocent persons. …*

*(c) Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the damages he sustains and the cost of the suit, including a reasonable attorney's fee …*

> 18 U.S. Code›   Part I. Crimes›   Chapter 96. Racketeer Influenced and Corrupt Organizations›   § 1965 – Venue and process
> https://www.law.cornell.edu/uscode/text/18/1965

*(a) Any civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agent, or transacts his affairs.*

*(b) In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof. …*

*(d) All other process in any action or proceeding under this chapter may be served on any person in any judicial district in which such person resides, is found, has an agent, or transacts his affairs.*

> 18 U.S. Code›   Part I. Crimes›   Chapter 95. Racketeering›   § 1951 – Interference with commerce by threats or violence
> https://www.law.cornell.edu/uscode/text/18/1951

*(a) **Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce**, by robbery or extortion or attempts or conspires so to do, or commits or **threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section** shall be fined under this title or imprisoned not more than twenty years, or both.*

*(b) As used in this section—*

*(2) The term "extortion" means the obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right.*

*(3) The term "commerce" means commerce within the District of Columbia, or any Territory or Possession of the United States; all commerce between any point in a State, Territory, Possession, or the District of Columbia and any point outside thereof; all commerce between points within the same State through any place outside such State; and all other commerce over which the United States has jurisdiction.*

> 18 U.S. Code›   Part I. Crimes›   Chapter 95. Racketeering›   § 1959 – Violent crimes in aid of racketeering activity
> https://www.law.cornell.edu/uscode/text/18/1959

*(a) Whoever, as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value from an enterprise engaged in racketeering activity, **or for the purpose of gaining entrance to or maintaining or increasing position in an enterprise engaged in racketeering activity**, murders, kidnaps, maims, **assaults with a dangerous weapon**, commits assault resulting in serious bodily injury upon, **or threatens to commit a crime of violence against any individual in violation of the laws of any State or the United States, or attempts or conspires so to do,** shall be punished— …*

*(4) for threatening to commit a crime of violence, by imprisonment for not more than five years or a fine under this title, or both; …*

*(6) for attempting or conspiring to commit a crime involving maiming, assault with a dangerous weapon, or assault resulting in serious bodily injury, by imprisonment for not*

*more than three years or a fine of under this title, or both. ...*

*(b) As used in this section—*

   *(1) "racketeering activity" has the meaning set forth in section 1961 of this title; and*

   *(2) "enterprise" includes any partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity, which is engaged in, or the activities of which affect, interstate or foreign commerce.*

# ¶39

The term **Felony/Racketeering-Act Obstruction/Retaliation** shall refer to either the Felony under Texas law `[Texas Penal Code: Title 8. Offenses Against Public Administration: Chapter 36. Bribery and Corrupt Influence: § 36.06. Obstruction or Retaliation]` [TPeC-T8-C36-§36.06] or the analogous Racketeering-Act under Federal Law `[18 U.S. Code: Part I. Crimes: Chapter 73. Obstruction of Justice: § 1513 - Retaliating against a witness, victim, or an informant]` [18-USC-PI-C73-§1513]:

▸ Texas Penal Code:   Title 8. Offenses Against Public Administration:   Chapter 36. Bribery and Corrupt Influence:   § 36.06. Obstruction or Retaliation
▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.36.htm

*Sec. 36.06. OBSTRUCTION OR RETALIATION.*

*(a) A person commits an offense if the person intentionally or knowingly harms or threatens to harm another by an unlawful act:*

   *(1) in retaliation for or on account of the service or status of another as a:*

     *(A) public servant, witness, prospective witness, or informant; or*

     *(B) person who has reported or who the actor knows intends to report the occurrence of a crime; or*

   *(2) to prevent or delay the service of another as a:*

     *(A) public servant, witness, prospective witness, or informant; or*

     *(B) person who has reported or who the actor knows intends to report the occurrence of a crime. ...*

▸ 18 U.S. Code:   Part I. Crimes:   Chapter 73. Obstruction of Justice:   § 1513 - Retaliating against a witness, victim, or an informant
▸ https://www.law.cornell.edu/uscode/text/18/1513

...

*(b) Whoever knowingly engages in any conduct and thereby causes bodily injury to another person or damages the tangible property of another person, or threatens to do so, with intent to retaliate against any person for—*

   *(1) the attendance of a witness or party at an official proceeding, or any testimony given or any record, document, or other object produced by a witness in an official proceeding; or*

   *(2) any information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings given by a person to a law enforcement officer;*

*or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both. ...*

*(e) Whoever knowingly, with the intent to retaliate, takes any action harmful to any person, including interference with the lawful employment or livelihood of any person, for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense, shall be fined under this title or imprisoned not more than 10 years, or both.*

*(f) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy. ...*

## ¶40

While the law referenced in the previous paragraph concerns any criminal act of **retaliation**, the general legal concept of retaliation also falls under the category of civil law, and when the act of retaliation is itself not any type of criminal act, then such retaliatory act may still be a actionable/sueable act under civil law. To provide a concrete example relevant to this lawsuit, a landlord that is accused, whether truthfully or untruthfully, of racial-discrimination by one of such landlord's accuser-tenant(s), may act retaliatorily against such accuser-tenant(s) by raising the rent on such accuser-tenant(s), by placing other undue burden(s) on such accuser-tenant(s), or by causing other harm onto such accuser-tenant(s). Under federal and/or state laws, such retaliatory action may not be criminal in nature, but would still qualify as a retaliatory action under civil law - for example, civil violation of the [FHA]/[TFHA] - even if the original accusation of racial-discrimination was untruthful/meritless. In this particular lawsuit, the plaintiff uses the word **retaliation** primarily, although not exclusively, to refer to the criminal-act of retaliation, and the specific context in which this word is used will determine whether such use falls under criminal-law or civil-law.

## ¶41

The term **Felony/Racketeering-Act Evidence-Tampering/Evidence-Fabrication** shall refer to either the Felony under Texas law **[Texas Penal Code:   Title 8. Offenses Against Public Administration:   Chapter 37. Perjury and Other Falsification:   § 37.09. Tampering with or Fabricating Physical Evidence]** [TPeC-T8-C37-§37.09] or the analogous Racketeering-Act under Federal Law **[18 U.S. Code:   Part I. Crimes:   Chapter 73. Obstruction of Justice:   § 1519 - Destruction, alteration, or falsification of records in Federal investigations and bankruptcy]** [18-USC-PI-C73-§1519]:

> ‣ Texas Penal Code:   Title 8. Offenses Against Public Administration:   Chapter 37. Perjury and Other Falsification:
> ‣ § 37.09. Tampering with or Fabricating Physical Evidence
> ‣ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.37.htm
>
> *Sec. 37.09. TAMPERING WITH OR FABRICATING PHYSICAL EVIDENCE.*
>
> *(a) A person commits an offense if, knowing that an investigation or official proceeding is pending or in progress, he:*
>
> *(1) alters, destroys, or conceals any record, document, or thing with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding; or*
>
> *(2) makes, presents, or uses any record, document, or thing with knowledge of its falsity and with intent to affect the course or outcome of the investigation or official proceeding. ...*

> ‣ 18 U.S. Code:   Part I. Crimes:   Chapter 73. Obstruction of Justice:
> ‣ § 1519 - Destruction, alteration, or falsification of records in Federal investigations and bankruptcy
> ‣ https://www.law.cornell.edu/uscode/text/18/1519
>
> *Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.*

## ¶42

The term **Felony/Racketeering-Act Witness-Intimidation/Witness-Tampering** shall refer to either the Felony under Texas law **[Texas Penal Code:   Title 8. Offenses Against Public Administration:   Chapter 36. Bribery and Corrupt Influence:   § 36.05. Tampering with Witness]** [TPeC-T8-C36-§36.05] or the analogous Racketeering-Act under Federal Law

【18 U.S. Code:  Part I. Crimes:  Chapter 73. Obstruction of Justice:  § 1512 – Tampering with a witness, victim, or an informant】 [18-USC-PI-C73-§1512]:

> Texas Penal Code:  Title 8. Offenses Against Public Administration:  Chapter 36. Bribery And Corrupt Influence:  § 36.05. Tampering with Witness
> https://statutes.capitol.texas.gov/Docs/PE/htm/PE.36.htm

*Sec. 36.05. TAMPERING WITH WITNESS.*

*(a) A person commits an offense if, with intent to influence the witness, he offers, confers, or agrees to confer any benefit on a witness or prospective witness in an official proceeding, or he coerces a witness or a prospective witness in an official proceeding:*

    *(1) to testify falsely;*

    *(2) to withhold any testimony, information, document, or thing;*

    *(3) to elude legal process summoning him to testify or supply evidence;*

    *(4) to absent himself from an official proceeding to which he has been legally summoned; or*

    *(5) to abstain from, discontinue, or delay the prosecution of another. ...*

> 18 U.S. Code:  Part I. Crimes:  Chapter 73. Obstruction of Justice:  § 1512 – Tampering with a witness, victim, or an informant
> https://www.law.cornell.edu/uscode/text/18/1512

*(a) ...*

  *(2) Whoever uses physical force or the threat of physical force against any person, or attempts to do so, with intent to—*

    *(A) influence, delay, or prevent the testimony of any person in an official proceeding;*

    *(B) cause or induce any person to—*

      *(i) withhold testimony, or withhold a record, document, or other object, from an official proceeding;*

      *(ii) alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding;*

      *(iii) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or*

      *(iv) be absent from an official proceeding to which that person has been summoned by legal process; or*

    *(C) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings; ...*

*(b) Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—*

  *(1) influence, delay, or prevent the testimony of any person in an official proceeding;*

  *(2) cause or induce any person to—*

    *(A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;*

    *(B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;*

    *(C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or ...*

*(c) Whoever corruptly—*

  *(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or*

  *(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,...*

*(d) Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—*

  *(1) attending or testifying in an official proceeding; ...*

*(k) Whoever conspires to commit any offense under this section shall be subject to the same penalties as those prescribed for the offense the commission of which was the object of the conspiracy.*

## ¶43

The terms **Mail-Fraud** and **Wire-Fraud**, including attempt/conspiracy thereof, shall refer to the Racketeering-Acts under Federal Law 【18 U.S. Code: Part I. Crimes: Chapter 63. Mail Fraud and Other Fraud Offenses: § 1341 - Frauds and swindles】 [18-USC-PI-C63-§1341] and 【18 U.S. Code: Part I. Crimes: Chapter 63. Mail Fraud and Other Fraud Offenses: § 1343 - Fraud by wire, radio, or television】 [18-USC-PI-C63-§1343] respectively, with the meaning of the words **defraud,fraud,fraudulent** also defined as follows (including in 【18 U.S. Code: Part I. Crimes: Chapter 47. Fraud and False Statements § 1001 - Statements or entries generally】 [18-USC-PI-C47-§1001]):

> 18 U.S. Code: Part I. Crimes: Chapter 63. Mail Fraud and Other Fraud Offenses: § 1341 - Frauds and swindles
> https://www.law.cornell.edu/uscode/text/18/1341

*Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.*

> 18 U.S. Code: Part I. Crimes: Chapter 63. Mail Fraud and Other Fraud Offenses: § 1343 - Fraud by wire, radio, or television
> https://www.law.cornell.edu/uscode/text/18/1343

*Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation occurs in relation to, or involving any benefit authorized, transported, transmitted, transferred, disbursed, or paid in connection with, a presidentially declared major disaster or emergency (as those terms are defined in section 102 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5122)), or affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.*

> 18 U.S. Code: Part I. Crimes: Chapter 63. Mail Fraud and Other Fraud Offenses: § 1349 - Attempt and conspiracy
> https://www.law.cornell.edu/uscode/text/18/1349

*Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.*

> 18 U.S. Code: Part I. Crimes: Chapter 47. Fraud and False Statements § 1001 - Statements or entries generally
> https://www.law.cornell.edu/uscode/text/18/1001

*(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—*

*(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;*

*(2) makes any materially false, fictitious, or fraudulent statement or representation; or*

*(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry; ...*

> "Defraud.": Merriam-Webster.com Dictionary: Merriam-Webster: (2023-07-30):
> https://www.merriam-webster.com/dictionary/defraud

*transitive verb*

*: "to deprive of something by deception or fraud"*

---

▶  "Fraud.": Merriam-Webster.com Dictionary: Merriam-Webster: (2023-07-30):
▶  https://www.merriam-webster.com/dictionary/fraud

*noun*

*1*

*a*

*: DECEIT, TRICKERY*

*specifically : "intentional perversion of truth in order to induce another to part with something of value or to surrender a legal right"*

*b*

*: "an act of deceiving or misrepresenting" : TRICK*

*2*

*a*

*: "a person who is not what he or she pretends to be" : IMPOSTOR*

*also : "one who defrauds" : CHEAT*

*b*

*: "one that is not what it seems or is represented to be"*

---

▶  "Fraudulent.": Merriam-Webster.com Dictionary: Merriam-Webster: (2023-07-30):
▶  https://www.merriam-webster.com/dictionary/fraudulent

*adjective*

*: "characterized by, based on, or done by fraud" : DECEITFUL*

## ¶44

The definition of **fraud** (see above) under federal law is distinct from the definition of **fraud** under the laws of the State of Texas, as it is defined in 【Texas Penal Code:   Title 7. Offenses Against Property:   Chapter 32. Fraud】 [TPeC-T7-C32]. In-order-to distinguish between **fraud** as it is defined in federal law (see Wire-Fraud, Mail-Fraud, Fraud-and-False-Statements above) and the State-of-Texas law (as follows), the plaintiff will refer to the specific text of the State-of-Texas law (codified within [TPeC-T7-C32]) that are relevant to this lawsuit as **Texas-Fraud**:

---

▶  Texas Penal Code:  Title 7. Offenses Against Property:  Chapter 32. Fraud:
▶  https://statutes.capitol.texas.gov/Docs/PE/htm/PE.32.htm

*Sec. 32.32. FALSE STATEMENT TO OBTAIN PROPERTY OR CREDIT OR IN THE PROVISION OF CERTAIN SERVICES ...*

*(b) A person commits an offense if he intentionally or knowingly makes a materially false or misleading written statement to obtain property or credit ...*

*Sec. 32.46. FRAUDULENT SECURING OF DOCUMENT EXECUTION*

*(a) A person commits an offense if the person, with the intent to defraud or harm any person:*

*(1) causes another person, without that person's effective consent, to sign or execute any document affecting property or service or the pecuniary interest of any person; or ...*

Sec. 32.47. FRAUDULENT DESTRUCTION, REMOVAL, OR CONCEALMENT OF WRITING.

(a) A person commits an offense if, with intent to defraud or harm another, he destroys, removes, conceals, alters, substitutes, or otherwise impairs the verity, legibility, or availability of a writing, other than a governmental record.

(b) For purposes of this section, "writing" includes:

   (1) printing or any other method of recording information;


Sec. 32.51. FRAUDULENT USE OR POSSESSION OF IDENTIFYING INFORMATION.

(a) In this section:

   (1) "Identifying information" means information that alone or in conjunction with other information identifies a person, including a person's:
      (A) name and date of birth; ...

(b) A person commits an offense if the person, with the intent to harm or defraud another, obtains, possesses, transfers, or uses an item of:

   (1) identifying information of another person without the other person's consent or effective consent; ...


# ¶45

The term **Extortion**, which includes **Blackmail**, shall refer to the Racketeering-Act as defined in Federal Law 【18 U.S. Code:  Part I. Crimes:  Chapter 41. Extortion and Threats】 [18-USC-PI-C41] and shall also refer to the commerce-related Racketeering-Act under Federal Law 【18 U.S. Code:  Part I. Crimes:  Chapter 95. Racketeering:  § 1951 - Interference with commerce by threats or violence】 [18-USC-PI-C95-§1951] (see above):

> 18 U.S. Code:  Part I. Crimes:  Chapter 41. Extortion and Threats:  § 873 - Blackmail
> https://www.law.cornell.edu/uscode/text/18/873

*Whoever, under a threat of informing, or as a consideration for not informing, against any violation of any law of the United States, demands or receives any money or other valuable thing, shall be fined under this title or imprisoned not more than one year, or both.*

> 18 U.S. Code:  Part I. Crimes:  Chapter 41. Extortion and Threats:  § 875 - Interstate communications
> https://www.law.cornell.edu/uscode/text/18/875

...

*(b) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than twenty years, or both.*

*(c) Whoever transmits in interstate or foreign commerce any communication containing any threat to kidnap any person or any threat to injure the person of another, shall be fined under this title or imprisoned not more than five years, or both.*

*(d) Whoever, with intent to extort from any person, firm, association, or corporation, any money or other thing of value, transmits in interstate or foreign commerce any communication containing any threat to injure the property or reputation of the addressee or of another or the reputation of a deceased person or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both.*

> 18 U.S. Code:  Part I. Crimes:  Chapter 41. Extortion and Threats:  § 876 - Mailing threatening communications
> https://www.law.cornell.edu/uscode/text/18/876

...

*(b) Whoever, with intent to extort from any person any money or other thing of value, so deposits, or causes to be delivered, as aforesaid, any communication containing any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than twenty years, or both.*

*(c) Whoever knowingly so deposits or causes to be delivered as aforesaid, any communication with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to kidnap any person or any threat to injure the person of the addressee or of another, shall be fined under this title or imprisoned not more than five years, or both. If such a communication is addressed to a United States judge, a Federal law enforcement officer, or an official who is covered by section 1114, the individual shall be fined under this title, imprisoned not more than 10 years, or both.*

*(d) Whoever, with intent to extort from any person any money or other thing of value, knowingly so deposits or causes to be delivered, as aforesaid, any communication, with or without a name or designating mark subscribed thereto, addressed to any other person and containing any threat to injure the property or reputation of the addressee ar of another, or the reputation of a deceased person, or any threat to accuse the addressee or any other person of a crime, shall be fined under this title or imprisoned not more than two years, or both. If such a communication is addressed to a United States judge, a Federal law enforcement officer, or an official who is covered by section 1114, the individual shall be fined under this title, imprisoned not more than 10 years, or both.*

## ¶46

Under the State-of-Texas's laws, the crimes of **Extortion** and **Blackmail** have been consolidated into the Theft law (Theft-of-Property, Theft-of-Service) codified within 【Texas Penal Code:   Title 7. Offenses Against Property:   Chapter 31. Theft】 [TPcC-T7-C31]:

> ▸ Texas Penal Code:   Title 7. Offenses Against Property:   Chapter 31. Theft:
> ▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.31.htm
>
> *Sec. 31.01. DEFINITIONS.*
>
> *In this chapter:*
>
> *(1) "Deception" means:*
>
> *(A) creating or confirming by words or conduct a false impression of law or fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;*
>
> *(B) failing to correct a false impression of law or fact that is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true;*
>
> *(C) preventing another from acquiring information likely to affect his judgment in the transaction;*
>
> *(D) selling or otherwise transferring or encumbering property without disclosing a lien, security interest, adverse claim, or other legal impediment to the enjoyment of the property, whether the lien, security interest, claim, or impediment is or is not valid, or is or is not a matter of official record; or*
>
> *(E) promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed, except that failure to perform the promise in issue without other evidence of intent or knowledge is not sufficient proof that the actor did not intend to perform or knew the promise would not be performed.*
>
> *(2) "Deprive" means:*
>
> *(A) to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner;*
>
> *(B) to restore property only upon payment of reward or other compensation; or*
>
> *(C) to dispose of property in a manner that makes recovery of the property by the owner unlikely.*

(3) "Effective consent" includes consent by a person legally authorized to act for the owner. Consent is not effective if:

(A) induced by deception or coercion;

(B) given by a person the actor knows is not legally authorized to act for the owner;

(C) given by a person who by reason of youth, mental disease or defect, or intoxication is known by the actor to be unable to make reasonable property dispositions;

(D) given solely to detect the commission of an offense; or

(E) given by a person who by reason of advanced age is known by the actor to have a diminished capacity to make informed and rational decisions about the reasonable disposition of property.

(4) "Appropriate" means:

(A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, **whether to the actor or another**; or

(B) to acquire or otherwise exercise control over property other than real property.

(5) "Property" means:

(A) real property;

(B) tangible or intangible personal property including anything severed from land; or

(C) a document, including money, that represents or embodies anything of value.

(6) "Service" includes:

(A) labor and professional service;

(B) telecommunication, public utility, or transportation service;

(C) lodging, restaurant service, and entertainment; and

(D) the supply of a motor vehicle or other property for use.

(7) "Steal" means to acquire property or service by theft. ...

Sec. 31.02. CONSOLIDATION OF THEFT OFFENSES.

Theft as defined in Section 31.03 constitutes a single offense superseding the separate offenses previously known as theft, **theft by false pretext**, conversion by a bailee, theft from the person, shoplifting, **acquisition of property by threat**, **swindling**, swindling by worthless check, embezzlement, **extortion**, receiving or concealing embezzled property, and receiving or concealing stolen property.

Sec. 31.03. THEFT.

*(a) A person commits an offense if he unlawfully appropriates property with **intent to deprive the owner of property**.*

*(b) Appropriation of property is unlawful if:*

*(1) it is without the owner's effective consent; ...*

*Sec. 31.04. THEFT OF SERVICE.*

*(a) A person commits theft of service if, with intent to avoid payment for service that the actor knows is provided only for compensation:*

*(1) the actor intentionally or knowingly secures performance of the service by deception, threat, or false token;*

*(2) having control over the disposition of services of another to which the actor is not entitled, the actor intentionally or knowingly diverts the other's services to the actor's own benefit or to the benefit of another not entitled to the services; ...*

## ¶47

For the sake of simplicity and abbreviation, the general term **intimidation/interference**, unless otherwise specified, shall refer to:

Ⓐ **Racial-Intimidation** (see above: [42-USC-C45-SII-§3631],[42-USC-C45-SI-§3617],[TPrC-T15-C301-SI-§301.171]) ; AND/OR

Ⓑ **Homophobic-Intimidation** (see above: [42-USC-C45-SII-§3631],[42-USC-C45-SI-§3617],[TPrC-T15-C301-SI-§301.171]) ; AND/OR

Ⓒ **Interference-with-Commerce-by-Threats-or-Violence** (see above: [18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959]) ; AND/OR

Ⓓ **Interference-with-Federally-Protected-Activities** (see above: [18-USC-PI-C13-§245]) **(Δ)** .

## ¶48

The terms **Criminal-Mischief** and **Vandalism** shall refer to violation of the Texas law specified in under 【Texas Penal Code: Title 7. Offenses Against Property: Chapter 28. Arson, Criminal Mischief, and Other Property Damage or Destruction: Sec. 28.03. Criminal Mischief】 [TPeC-T7-C28-§28.03]. In almost all, if not all, cases documented in this lawsuit, acts of Criminal-Mischief also constitute the federal crimes of **Interference-with-Commerce-by-Threats-or-Violence** (see above: [18-USC-PI-C95-§1951]):

▸ Texas Penal Code: Title 7. Offenses Against Property: Chapter 28. Arson, Criminal Mischief, and Other Property Damage or Destruction:
▸ Sec. 28.03. Criminal Mischief
▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.28.htm

*Sec. 28.03. CRIMINAL MISCHIEF.*

*(a) A person commits an offense if, without the effective consent of the owner:*

*(1) he intentionally or knowingly damages or destroys the tangible property of the owner;*

*(2) he intentionally or knowingly tampers with the tangible property of the owner and causes pecuniary loss or substantial inconvenience to the owner or a third person; or*

*(3) he intentionally or knowingly makes markings, including inscriptions, slogans, drawings, or pointings, on the tangible property of the owner.*

*(b) Except as provided by Subsections (f) and (h), an offense under this section is:*

*(1) a Class C misdemeanor if:*

*(A) the amount of pecuniary loss is less than $100; or*

*(B) except as provided in Subdivision (3)(A) or (3)(B), it causes substantial inconvenience to others;*

(2) a Class B misdemeanor if the amount of pecuniary loss is $100 or more but less than $750;

(3) a Class A misdemeanor if:

   (A) the amount of pecuniary loss is $750 or more but less than $2,500; or

   (B) the actor causes in whole or in part impairment or interruption of any public water supply, or causes to be diverted in whole, in part, or in any manner, including installation or removal of any device for any such purpose, any public water supply, regardless of the amount of the pecuniary loss;

(4) a state jail felony if the amount of pecuniary loss is:

   (A) $2,500 or more but less than $30,000;

   (B) less than $2,500, if the property damaged or destroyed is a habitation and if the damage or destruction is caused by a firearm or explosive weapon;

   (C) less than $2,500, if the property was a fence used for the production or containment of:

      (i) cattle, bison, horses, sheep, swine, goats, exotic livestock, or exotic poultry; or

      (ii) game animals as that term is defined by Section 63.001, Parks and Wildlife Code; or ...

# ¶ 49

A crime that is related to Criminal-Mischief, **Illegal-Dumping** shall refer to violation of the Texas law specified in under 【Texas Health and Safety Code: Title 5. Sanitation and Environmental Quality: Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, And Water. Chapter 365. Litter: Subchapter B. Certain Actions Prohibited: Sec. 365.012. Illegal Dumping; Discarding Lighted Materials; Criminal Penalties】 , ("[THaSC-T5-SB-C365-§365.012]"). It is crucial to note that, while it is illegal to dump any material(s) onto land or property that a person does not own, it is not illegal to dump *"litter or other solid waste"* onto land or property that a person does own - with both of these facts coming into play in a substantial manner in this lawsuit:

▸ Texas Health and Safety Code: Title 5. Sanitation and Environmental Quality:   Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, And Water:
▸ Chapter 365. Litter: Subchapter B. Certain Actions Prohibited:
▸ https://statutes.capitol.texas.gov/Docs/HS/htm/HS.365.htm

*Sec. 365.011. DEFINITIONS.*

*In this subchapter: ...*

*(5) "Dispose" and "dump" mean to discharge, deposit, inject, spill, leak, or place litter on or into land or water. ...*

*(6) "Litter" means:*

   *(A) decayable waste from a public or private establishment, residence, or restaurant, including animal and vegetable waste material from a market or storage facility handling or storing produce or other food products, or the handling, preparation, cooking, or consumption of food, but not including sewage, body wastes, or industrial by-products;*

   *(B) nondecayable solid waste, except ashes, that consists of:*

      *(i) combustible waste material, including paper, rags, cartons, wood, excelsior, furniture, rubber, plastics, yard trimmings, leaves, or similar materials;*

      *(ii) noncombustible waste material, including glass, crockery, tin or aluminum cans, metal furniture, and similar materials that do not burn at ordinary incinerator temperatures of 1800 degrees Fahrenheit or less; and*

      *(iii) discarded or worn-out manufactured materials and machinery, including motor vehicles and parts of motor vehicles, tires, aircraft, farm implements, building or construction materials, appliances, and scrap metal. ...*

*Sec. 365.012. ILLEGAL DUMPING; DISCARDING LIGHTED MATERIALS; CRIMINAL PENALTIES.*

*(a) A person commits an offense if the person disposes or allows or permits the disposal of litter or other solid waste at a place that is not an approved solid waste site, including a place on or within 300 feet of a public highway, on a right-of-way, on other public or private property, or into inland or coastal water of the state. ...*

*(e) An offense under Subsection (a), (b), or (c) is a Class B misdemeanor if the litter or other solid waste to which the offense applies weighs more than five pounds but less than*

*500 pounds or has a volume of more than five gallons but less than 100 cubic feet. ...*

*(l) This section does not apply to an individual's disposal of litter or other solid waste if:*

   *(1) the litter or waste is generated on land the individual owns;*

   *(2) the litter or waste is not generated as a result of an activity related to a commercial purpose;*

   *(3) the disposal occurs on land the individual owns; and*

   *(4) the disposal is not for a commercial purpose ...*

*(n) An offense under this section may be prosecuted without alleging or proving any culpable mental state, unless the offense is a state jail felony. ...*

# ¶50

The term **Abuse of Office** shall refer to any of the crimes defined in 【Texas Penal Code: Title 8. Offenses Against Public Administration: Chapter 39. Abuse of Office】 , including but not limited to:

▸ Texas Penal Code:   Title 8. Offenses Against Public Administration:   Chapter 39. Abuse of Office:   § 39.02. Abuse of Official Capacity
▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.39.htm

*Sec. 39.02. ABUSE OF OFFICIAL CAPACITY.*

*(a) A public servant commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he intentionally or knowingly:*

   *(1) violates a law relating to the public servant's office or employment; or*

   *(2) misuses government property, services, personnel, or any other thing of value belonging to the government that has come into the public servant's custody or possession by virtue of the public servant's office or employment. ...*

▸ Texas Penal Code:   Title 8. Offenses Against Public Administration:   Chapter 39. Abuse of Office:   § 39.03. Official Oppression
▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.39.htm

*Sec. 39.03. OFFICIAL OPPRESSION.*

   *(o) A public servant acting under color of his office or employment commits an offense if he:*

   *(1) intentionally subjects another to mistreatment or to arrest, detention, search, seizure, dispossession, assessment, or lien that he knows is unlawful;*

   *(2) intentionally denies or impedes another in the exercise or enjoyment of any right, privilege, power, or immunity, knowing his conduct is unlawful; or*

   *(3) intentionally subjects another to sexual harassment. ...*

▸ Texas Penal Code:   Title 8. Offenses Against Public Administration:   Chapter 39. Abuse of Office:   § 39.06. Misuse of Official Information
▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.39.htm

*Sec. 39.06. MISUSE OF OFFICIAL INFORMATION.*

   *(a) A public servant commits an offense if, in reliance on information to which the public servant has access by virtue of the person's office or employment and that has not been made public, the person:*

   *(1) acquires or aids another to acquire a pecuniary interest in any property, transaction, or enterprise that may be affected by the information;*

   *(2) speculates or aids another to speculate on the basis of the information; or*

   *(3) as a public servant, including as a school administrator, coerces another into suppressing or failing to report that information to a law enforcement agency.*

   *(b) A public servant commits an offense if with intent to obtain a benefit or with intent to harm or defraud another, he discloses or uses information for a nongovernmental purpose that:*

   *(1) he has access to by means of his office or employment; and*

   *(2) has not been made public.*

   *(c) A person commits an offense if, with intent to obtain a benefit or with intent to harm or defraud another, he solicits or receives from a public servant information that:*

   *(1) the public servant has access to by means of his office or employment; and*

*(2) has not been made public. ...*

## ¶51

The term **Discrimination** when used, outside of the context of the [FHA]/[TFHA], to describe the Texas criminal violation committed by a government and/or government-employee(s)/official(s), shall refer to the Texas law specified in 【Texas Civil Practice and Remedies Code:   Title 5. Governmental Liability:   Chapter 106. Discrimination Because of Race, Religion, Color, Sex, or National Origin.】 [TCPaRC-T5-C106]:

> ‣ Texas Civil Practice and Remedies Code:   Title 5. Governmental Liability:   Chapter 106. Discrimination Because of Race, Religion, Color, Sex, or National Origin.
> ‣ https://statutes.capitol.texas.gov/Docs/CP/htm/CP.106.htm
>
> *Sec. 106.001. PROHIBITED ACTS.*
>
> *(a) An officer or employee of the state or of a political subdivision of the state who is acting or purporting to act in an official capacity may not, because of a person's race, religion, color, sex, or national origin:*
>
> *(1) refuse to issue to the person a license, permit, or certificate;*
>
> *(2) revoke or suspend the person's license, permit, or certificate;*
>
> *(3) refuse to permit the person to use facilities open to the public and owned, operated, or managed by or on behalf of the state or a political subdivision of the state;*
>
> *(4) refuse to permit the person to participate in a program owned, operated, or managed by or on behalf of the state or a political subdivision of the state;*
>
> *(5) refuse to grant a benefit to the person;*
>
> *(6) impose an unreasonable burden on the person; or*
>
> *(7) refuse to award a contract to the person. ...*
>
> *Sec. 106.002. REMEDIES.*
>
> *(a) If a person has violated or there are reasonable grounds to believe a person is about to violate Section 106.001, the person aggrieved by the violation or threatened violation may sue for preventive relief, including a permanent or temporary injunction, a restraining order, or any other order.*
>
> *(b) In an action under this section, unless the state is the prevailing party, the court may award the prevailing party reasonable attorney's fees as a part of the costs. The state's liability for costs is the same as that of a private person.*
>
> *Sec. 106.003. PENALTIES.*
>
> *(a) A person commits an offense if the person knowingly violates Section 106.001.*
>
> *(b) An offense under this section is a misdemeanor punishable by:*
>
> *(1) a fine of not more than $1,000;*
>
> *(2) confinement in the county jail for not more than one year; or*
>
> *(3) both the fine and confinement. ...*

## ¶52

Under Texas law, **racial-profiling**, a specific type of racial-discrimination committed by law-enforcement official(s)/officer(s)/employee(s), is also prohibited under 【Texas Code of Criminal Procedure:   Title 1. Code Of Criminal Procedure:   Chapter 2. General Duties of Officers: Art. 2.131 Racial Profiling Prohibited】 [TCoCP-T1-C2-A2.131]:

> ‣ Texas Code of Criminal Procedure:   Title 1. Code Of Criminal Procedure:   Chapter 2. General Duties of Officers:   Art. 2.131 Racial Profiling Prohibited
> ‣ https://statutes.capitol.texas.gov/Docs/CR/htm/CR.2.htm
>
> *A peace officer may not engage in racial profiling.*

## ¶53

The term **Disorderly Conduct** and **Harassment** shall refer to the criminal law specified in 【Texas Penal Code: Title 9. Offenses Against Public Order and Decency: Chapter 42. Disorderly Conduct and Related Offenses】 [TPeC-T9-C42]:

> Texas Penal Code: Title 9. Offenses Against Public Order and Decency: Chapter 42. Disorderly Conduct and Related Offenses
> https://statutes.capitol.texas.gov/Docs/PE/htm/PE.42.htm

*Sec. 42.01. DISORDERLY CONDUCT.*

*(a) A person commits an offense if he intentionally or knowingly:*

*(1) uses abusive, indecent, profane, or vulgar language in a public place, and the language by its very utterance tends to incite an immediate breach of the peace;*

*(2) makes an offensive gesture or display in a public place, and the gesture or display tends to incite an immediate breach of the peace;*

*(3) creates, by chemical means, a noxious and unreasonable odor in a public place;*

*(4) abuses or threatens a person in a public place in an obviously offensive manner;*

*(5) makes unreasonable noise in a public place other than a sport shooting range, as defined by Section 250.001, Local Government Code, or in or near a private residence that he has no right to occupy;*

*(6) fights with another in a public place; ...*

*Sec. 42.07. HARASSMENT.*

*(a) A person commits an offense if, with intent to harass, annoy, alarm, abuse, torment, or embarrass another, the person:*

*(1) initiates communication and in the course of the communication makes a comment, request, suggestion, or proposal that is obscene;*

*(2) threatens, in a manner reasonably likely to alarm the person receiving the threat, to inflict bodily injury on the person or to commit a felony against the person, a member of the person's family or household, or the person's property;*

*(3) conveys, in a manner reasonably likely to alarm the person receiving the report, a false report, which is known by the conveyor to be false, that another person has suffered death or serious bodily injury;*

*...*

*(7) sends repeated electronic communications in a manner reasonably likely to harass, annoy, alarm, abuse, torment, embarrass, or offend another; or*

*(8) publishes on an Internet website, including a social media platform, repeated electronic communications in a manner reasonably likely to cause emotional distress, abuse, or torment to another person, unless the communications are made in connection with a matter of public concern. ...*

## ¶54

The term **Stalking** shall refer to the higher-level Felony specified in Texas Law 【Texas Penal Code: Title 9. Offenses Against Public Order and Decency: Chapter 42. Disorderly Conduct and Related Offenses: § 42.072. Stalking】 [TPeC-T9-C42-§42.072]:

> Texas Penal Code: Title 9. Offenses Against Public Order and Decency: Chapter 42. Disorderly Conduct and Related Offenses: § 42.072. Stalking
> https://statutes.capitol.texas.gov/Docs/PE/htm/PE.42.htm

*Sec. 42.072. STALKING.*

*(a) A person commits an offense if the person, on more than one occasion and pursuant to the same scheme or course of conduct that is directed specifically at another person, knowingly engages in conduct that:*

*(1) constitutes an offense under Section 42.07, or that the actor knows or reasonably should know the other person will regard as threatening:*

*(A) bodily injury or death for the other person;*

*(B) bodily injury or death for a member of the other person's family or household or for an individual with whom the other person has a dating relationship; or*

*(C) that an offense will be committed against the other person's property;*

*(2) causes the other person, a member of the other person's family or household, or an individual with whom the other person has a dating relationship to be placed in fear of bodily injury or death or in fear that an offense will be committed against the other person's property, or to feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended; and*

*(3) would cause a reasonable person to:*

*(A) fear bodily injury or death for himself or herself;*

*(B) fear bodily injury or death for a member of the person's family or household or for an individual with whom the person has a dating relationship;*

*(C) fear that an offense will be committed against the person's property; or*

*(D) feel harassed, annoyed, alarmed, abused, tormented, embarrassed, or offended.*

*(b) An offense under this section is a felony of the third degree, except that the offense is a felony of the second degree if the actor has previously been convicted of an offense under this section or of an offense under any of the following laws that contains elements that are substantially similar to the elements of an offense under this section:*

*(1) the laws of another state;*

*(2) the laws of a federally recognized Indian tribe;*

*(3) the laws of a territory of the United States; or*

*(4) federal law. ...*

# ¶55

The term **False Report** shall refer to one-or-more of the crimes specified in Texas Law 【Texas Penal Code:  Title 8. Offenses Against Public Administration:  Chapter 37. Perjury and Other Falsification:  § 37.08. False Report to Peace Officer, Federal Special Investigator, Law Enforcement Employee, Corrections Officer, or Jailer.】 [TPeC-T8-C37-§37.08], 【Texas Penal Code:  Title 9. Offenses Against Public Order and Decency: Chapter 42. Disorderly Conduct and Related Offenses:  § 42.06. False Alarm or Report.】 [TPeC-T9-C42-§42.06], 【Texas Penal Code:  Title 9. Offenses Against Public Order and Decency:  Chapter 42. Disorderly Conduct and Related Offenses:  § 42.0601. False Report to Induce Emergency Response.】 [TPeC-T9-C42-§42.0601], or under federal law 【18 U.S. Code:  Part I. Crimes:  Chapter 47. Fraud and False Statements  § 1001 - Statements or entries generally】 [18-USC-PI-C47-§1001]:

▸ Texas Penal Code:  Title 8. Offenses Against Public Administration:  Chapter 37. Perjury and Other Falsification
▸ § 37.08. False Report to Peace Officer, Federal Special Investigator, Law Enforcement Employee, Corrections Officer, or Jailer
▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.37.htm

*Sec. 37.08. FALSE REPORT TO PEACE OFFICER, FEDERAL SPECIAL INVESTIGATOR, LAW ENFORCEMENT EMPLOYEE, CORRECTIONS OFFICER, OR JAILER.*

*(a) A person commits an offense if, with intent to deceive, he knowingly makes a false statement that is material to a criminal investigation and makes the statement to:*

*(1) a peace officer or federal special investigator conducting the investigation;*

*(2) any employee of a law enforcement agency that is authorized by the agency to conduct the investigation and that the actor knows is conducting the investigation; or...*

▸ Texas Penal Code:  Title 9. Offenses Against Public Order and Decency:  Chapter 42. Disorderly Conduct and Related Offenses
▸ § 42.06. False Alarm or Report         § 42.0601. False Report to Induce Emergency Response
▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.42.htm

*Sec. 42.06. FALSE ALARM OR REPORT.*

*(a) A person commits an offense if he knowingly initiates, communicates or circulates a report of a present, past, or future bombing, fire, offense, or other emergency that he knows is false or baseless and that would ordinarily:*

*(1) cause action by an official or volunteer agency organized to deal with emergencies;*

*(2) place a person in fear of imminent serious bodily injury; or*

*(3) prevent or interrupt the occupation of a building, room, place of assembly, place to which the public has access, or aircraft, automobile, or other mode of conveyance.*

*...*

*Sec. 42.0601. FALSE REPORT TO INDUCE EMERGENCY RESPONSE.*

*(a) A person commits an offense if:*

*(1) the person makes a report of a criminal offense or an emergency or causes a report of a criminal offense or an emergency to be made to a peace officer, law enforcement agency, 9-1-1 service as defined by Section 771.001, Health and Safety Code, official or volunteer agency organized to deal with emergencies, or any other governmental employee or contractor who is authorized to receive reports of a criminal offense or emergency;*

*(2) the person knows that the report is false;*

*(3) the report causes an emergency response from a law enforcement agency or other emergency responder; and*

*(4) in making the report or causing the report to be made, the person is reckless with regard to whether the emergency response by a law enforcement agency or other emergency responder may directly result in bodily injury to another person. ...*

---

▸ 18 U.S. Code·  Part I. Crimes·  Chapter 47. Fraud and False Statements  § 1001 - Statements or entries generally
▸ https://www.law.cornell.edu/uscode/text/18/1001

*(a) Except as otherwise provided in this section, whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully—*

*(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact;*

*(2) makes any materially false, fictitious, or fraudulent statement or representation; or*

*(3) makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry: ...*

---

## ¶56

The terms **Impersonator Making Arrest or Search** and **Impersonating Public Servant** shall refer to the crimes specified under Federal law 〖18 U.S. Code·  Part I. Crimes·  Chapter 43. False Personation  § 913 - Impersonator making arrest or search〗 [18-USC-PI-C43-§913] and 〖18 U.S. Code·  Part I. Crimes·  Chapter 43. False Personation  § 912 - Officer or employee of the United States〗 [18-USC-PI-C43-§912] and the felony crime under Texas law, 〖Texas Penal Code·  Title 8. Offenses Against Public Administration·  Chapter 37. Perjury and Other Falsification·  § 37.11. Impersonating Public Servant〗 , [TPeC-T8-C37-§37.11], respectively:

---

▸ 18 U.S. Code·  Part I. Crimes·  Chapter 43. False Personation  § 913 - Impersonator making arrest or search·
▸ https://www.law.cornell.edu/uscode/text/18/913

*Whoever falsely represents himself to be an officer, agent, or employee of the United States, and in such assumed character arrests or detains any person or in any manner searches the person, buildings, or other property of any person, shall be fined under this title or imprisoned not more than three years, or both.*

---

▸ 18 U.S. Code·  Part I. Crimes·  Chapter 43. False Personation  § 912 - Officer or employee of the United States·
▸ https://www.law.cornell.edu/uscode/text/18/912

*Whoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States or any department, agency or officer thereof, and acts as such, or in such pretended character demands or obtains any money, paper, document, or thing of value, shall be fined under this title or imprisoned not more than three years, or both.*

---

▸ Texas Penal Code·  Title 8. Offenses Against Public Administration·  Chapter 37. Perjury and Other Falsification·  § 37.11. Impersonating Public Servant
▸ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.37.htm

*Sec. 37.11. IMPERSONATING PUBLIC SERVANT.*

*(a) A person commits an offense if the person:*

*(1) impersonates a public servant with intent to induce another to submit to the person's pretended official authority or to rely on the person's pretended official acts; or*

*(2) knowingly purports to exercise, without legal authority, any function of a public servant or of a public office, including that of a judge and court.*

*(b) An offense under this section is a felony of the third degree.*

## ¶57

The term **Criminal Conspiracy** shall refer to the crime specified in Texas Law 【Texas Penal Code: Title 4. Inchoate Offenses: Chapter 15. Preparatory Offenses: § 15.02. Criminal Conspiracy.】 [TPeC-T4-C15-§15.02]. Person(s) that commit the crime of Criminal-Conspiracy are also liable under **Civil Conspiracy**. However, even when a Criminal-Conspiracy does not exist, Civil-Conspiracy can still exist when there exists a conspiracy of action(s) that caused harm/damages. It is crucial to emphasize that the *"agreement"* (*"meeting of the minds"*) of such conspiracy need not be recorded in any evidence, but instead *"may be inferred from acts of the parties"*.

> ‣ Texas Penal Code: Title 4. Inchoate Offenses: Chapter 15. Preparatory Offenses: § 15.02. Criminal Conspiracy
> ‣ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.15.htm
>
> *Sec. 15.02. CRIMINAL CONSPIRACY.*
>
> *(a) A person commits criminal conspiracy if, with intent that a felony be committed:*
>
>  *(1) he agrees with one-or-more persons that they or one-or-more of them engage in conduct that would constitute the offense; and*
>
>  *(2) he or one-or-more of them performs an overt act in pursuance of the agreement.*
>
> *(b) An agreement constituting a conspiracy may be inferred from acts of the parties.*
>
> *(c) It is no defense to prosecution for criminal conspiracy that:*
>
>  *(1) one-or-more of the coconspirators is not criminally responsible for the object offense;*
>
>  *(2) one-or-more of the coconspirators has been acquitted, so long as two or more coconspirators have not been acquitted;*
>
>  *(3) one-or-more of the coconspirators has not been prosecuted or convicted, has been convicted of a different offense, or is immune from prosecution;*
>
>  *(4) the actor belongs to a class of persons that by definition of the object offense is legally incapable of committing the object offense in an individual capacity; or*
>
>  *(5) the object offense was actually committed. ...*

## ¶58

The terms **Assault** and **Terroristic Threat** shall refer to the violent crimes specified in Texas Law 【Texas Penal Code: Title 5. Offenses Against the Person: Chapter 22. Assaultive Offenses】 [TPeC-T5-C22-§22.01],[TPeC-T5-C22-§22.07]:

> ‣ Texas Penal Code: Title 5. Offenses Against the Person: Chapter 22. Assaultive Offenses
> ‣ https://statutes.capitol.texas.gov/Docs/PE/htm/PE.22.htm
>
> *Sec. 22.01. ASSAULT.*
>
> *(a) A person commits an offense if the person: ...*
>
>  *(2) intentionally or knowingly threatens another with imminent bodily injury, including the person's spouse; or ...*
>
> *Sec. 22.07. TERRORISTIC THREAT.*
>
> *(a) A person commits an offense if he threatens to commit any offense involving violence to any person or property with intent to:*
>
>  *(1) cause a reaction of any type to his threat by an official or volunteer agency organized to deal with emergencies;*
>
>  *(2) place any person in fear of imminent serious bodily injury; ...*

## ¶59

The term **anti-SLAPP** shall refer to any law (federal, state, or local) that protects against **Strategic Lawsuit Against Public Participation** - specifically the right to Constitutional speech that is *"matter of public concern"*, the right of association towards *"matter of public concern"*, and the right to petition - such as the law originally from the 【Texas Citizens Participation Act】 ([TCPA]) that is codified within 【Texas Civil Practice and Remedies Code: Title 2. Trial, Judgment, and Appeal: Subtitle B. Trial Matters: Chapter 27. Actions Involving the Exercise of Certain Constitutional Rights.】 [TCPaRC-T2-SB-C27]:

> Texas Civil Practice and Remedies Code: Title 2. Trial, Judgment, and Appeal: Subtitle B. Trial Matters:
> Chapter 27. Actions Involving the Exercise of Certain Constitutional Rights:
> https://statutes.capitol.texas.gov/Docs/CP/htm/CP.27.htm

*Sec. 27.001. DEFINITIONS.*

*In this chapter:*

*(1) "Communication" includes the making or submitting of a statement or document in any form or medium, including oral, visual, written, audiovisual, or electronic.*

*(2) "Exercise of the right of association" means to join together to collectively express, promote, pursue, or defend common interests relating to a governmental proceeding or a matter of public concern.*

*(3) "Exercise of the right of free speech" means a communication made in connection with a matter of public concern.*

*(4) "Exercise of the right to petition" means any of the following:*

   *(A) a communication in or pertaining to:*

      *(i) a judicial proceeding;*

      *(ii) an official proceeding, other than a judicial proceeding, to administer the law;*

      *(iii) an executive or other proceeding before a department of the state or federal government or a subdivision of the state or federal government;*

      *(iv) a legislative proceeding, including a proceeding of a legislative committee;*

      *(v) a proceeding before an entity that requires by rule that public notice be given before proceedings of that entity;*

      *(vi) a proceeding in or before a managing board of an educational or eleemosynary institution supported directly or indirectly from public revenue;*

      *(vii) a proceeding of the governing body of any political subdivision of this state;*

      *(viii) a report of or debate and statements made in a proceeding described by Subparagraph (iii), (iv), (v), (vi), or (vii); or*

      *(ix) a public meeting dealing with a public purpose, including statements and discussions at the meeting or other matters of public concern occurring at the meeting;*

   *(B) a communication in connection with an issue under consideration or review by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding;*

   *(C) a communication that is reasonably likely to encourage consideration or review of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding;*

   *(D) a communication reasonably likely to enlist public participation in an effort to effect consideration of an issue by a legislative, executive, judicial, or other governmental body or in another governmental or official proceeding; and*

   *(E) any other communication that falls within the protection of the right to petition government under the Constitution of the United States or the constitution of this state.*

*(5) "Governmental proceeding" means a proceeding, other than a judicial proceeding, by an officer, official, or body of this state or a political subdivision of this state, including a board or commission, or by an officer, official, or body of the federal government.*

*(6) "Legal action" means a lawsuit, cause of action, petition, complaint, cross-claim, or counterclaim or any other judicial pleading or filing that requests legal, declaratory, or equitable relief. The term does not include:*

   *(A) a procedural action taken or motion made in an action that does not amend or add a claim for legal, equitable, or declaratory relief;*

   *(B) alternative dispute resolution proceedings; or*

   *(C) post-judgment enforcement actions.*

*(7) "Matter of public concern" means a statement or activity regarding:*

   *(A) a public official, public figure, or other person who has drawn substantial public attention due to the person's official acts, fame, notoriety, or celebrity;*

   *(B) a matter of political, social, or other interest to the community; or*

   *(C) a subject of concern to the public.*

*(8) "Official proceeding" means any type of administrative, executive, legislative, or judicial proceeding that may be conducted before a public servant.*

*(9) "Public servant" means a person elected, selected, appointed, employed, or otherwise designated as one of the following, even if the person has not yet qualified for office or assumed the person's duties:*

> *(A) an officer, employee, or agent of government;*

> *(B) a juror;*

> *(C) an arbitrator, referee, or other person who is authorized by law or private written agreement to hear or determine a cause or controversy;*

> *(D) an attorney or notary public when participating in the performance of a governmental function; or*

> *(E) a person who is performing a governmental function under a claim of right but is not legally qualified to do so.*

*Sec. 27.002. PURPOSE.*

*The purpose of this chapter is to encourage and safeguard the constitutional rights of persons to petition, speak freely, associate freely, and otherwise participate in government to the maximum extent permitted by law and, at the same time, protect the rights of a person to file meritorious lawsuits for demonstrable injury. ...*

# ¶60

The terms **Property Owners Association** or **Homeowners Association [HOA]** shall refer to the institution-of-power that is formally defined in the [TPrC] and that, in addition to being subject to the other applicable State/Federal laws mentioned in this lawsuit, is also prohibited by the [TPrC] from acting in an *"arbitrary, capricious, or discriminatory"* manner. Additionally, a [HOA] cannot prohibit/restrict property-owner(s) from certain activities/improvements including, but not limited to: *"solid-waste composting"*, *"rain barrels or a rainwater harvesting system"*, *"drought-resistant landscaping or water-conserving natural turf"* (ψ), *"turf or landscaping design that promotes water conservation"* (ψ), *"security camera, motion detector, or perimeter fence"*:

> ‣ Texas Property Code:  Title 11. Restrictive Covenants. CHAPTER 202. Construction and Enforcement of Restrictive Covenants.
> ‣ https://statutes.capitol.texas.gov/Docs/PR/htm/PR.202.htm
>
> *Sec. 202.001. DEFINITIONS.*
>
> *In this chapter: ...*
>
> *(2) "Property owners' association" means an incorporated or unincorporated association owned by or whose members consist primarily of the owners of the property covered by the dedicatory instrument and through which the owners, or the board of directors or similar governing body, manage or regulate the residential subdivision, planned unit development, condominium or townhouse regime, or similar planned development ...*
>
> *Sec. 202.004. ENFORCEMENT OF RESTRICTIVE COVENANTS.*
>
> *(a) An exercise of discretionary authority by a property owners' association or other representative designated by an owner of real property concerning a restrictive covenant is presumed reasonable unless the court determines by a preponderance of the evidence that the exercise of discretionary authority was **arbitrary, capricious, or discriminatory** ...*
>
> *Sec. 202.007. CERTAIN RESTRICTIVE COVENANTS PROHIBITED.*
>
> *(a) A property owners' association may not include or enforce a provision in a dedicatory instrument that prohibits or restricts a property owner from:*
>
> > *(1) implementing measures promoting **solid-waste composting** of vegetation, including grass clippings, leaves, or brush, or leaving grass clippings uncollected on grass;*
>
> > *(2) installing rain barrels or a **rainwater harvesting** system;*
>
> > *(3) implementing efficient irrigation systems, including underground drip or other drip systems; or*
>
> > *(4) using **drought-resistant landscaping or water-conserving natural turf**.*
>
> *(b) A provision that violates Subsection (a) is void ...*
>
> *(d) This section does not: ...*
>
> > *(5) restrict a property owners' association from regulating yard and landscape maintenance if the restrictions or requirements **do not restrict or prohibit turf or landscaping***

*design that promotes water conservation; ...*

*Sec. 202.023. SECURITY MEASURES ...*

*(b) Except as provided by Subsection (c), a property owners' association may not adopt or enforce a restrictive covenant that prevents a property owner from building or installing security measures, including but not limited to a **security camera, motion detector, or perimeter fence** ...*

## ¶61

The terms **Texas-Public-Nuisance-Law** or simply **Public-Nuisance-Law** or simply **Public-Nuisance** shall collectively refer to the law specified in:

Ⓐ 【Texas Health and Safety Code:  Title 5. Sanitation and Environmental Quality:  Subtitle A. Sanitation:  Chapter 343. Abatement of Public Nuisances】 , ("[THaSC-T5-SA-C343]"); and

Ⓑ 【Texas Health and Safety Code:  Title 5. Sanitation and Environmental Quality:  Subtitle A. Sanitation:  Chapter 341. Minimum Standards of Sanitation and Health Protection Measures】 , ("[THaSC-T5-SA-C341]")

- but with some of the key terms used in [THaSC-T5-SA-C343],[THaSC-T5-SA-C341] also defined in:

Ⓒ 【Texas Health and Safety Code:  Title 5. Sanitation and Environmental Quality:  Subtitle B. Solid Waste, Toxic Chemicals, Sewage, Litter, And Water:  Chapter 365. Litter】 , ("[THaSC-T5-SB-C365]").

## ¶62

The terms **Private Property Maintenance Laws** or simply **Property Maintenance Laws** shall collectively refer to both the Public-Nuisance-Law and the restrictive-covenants (if any) of a neighborhood/subdivision.

## ¶63

The term **pesticide** shall include any herbicide, insecticide, fungicide, bactericide, rodenticide and/or other chemical poison used to kill intended pest(s). According to the plaintiff's limited knowledge and understanding, some synthetic/chemical fertilizers also serve the dual-purpose of being a pesticide and chemically-induced fertilizer. According to the plaintiff's limited knowledge and understanding, the use of pesticides and synthetic/chemical fertilizers tends to sterilize the landscape/soil, even killing beneficial species such as beneficial soil bacteria/microbes/fungi, beneficial insects, beneficial vegetation, and beneficial animals (such as lizards, frogs) - all of which contribute to beneficial bio-diversity and/or mitigate the damage caused by floods and/or deter soil-erosion and/or retard fires and/or detoxify the environment and/or organically-improve soil fertility and/or consume unwanted pests and/or provide other benefits to the overall health of the environment. One-or-more courts of the United States have ruled that certain widely-used pesticides are a probable cause of cancer and/or Parkinson's disease and/or organ-failure and/or other debilitating/crippling/terminal disease(s). The statistics of the Unites States show that approximately one-out-of-two American

males and approximately one-out-of-three American females contracts some form of cancer at some stage in their life, with extremely-large exposure to chemicals including, but not limited to pesticides, being a significant cause of such debilitating/crippling/terminal disease. Even in cases were some pesticides have not been determined to be a known cause of such debilitating/crippling/terminal disease, such pesticides may cause serious injury or death to humans; for example, cyanide - a common ingredient in some pesticides used to kill insects and rodents - is also extremely poisonous to humans. Such Courts have even awarded/approved large monetary judgments/settlements to some plaintiffs injured by exposure to such pesticides. A person's use of such pesticides where others and/or the property-of-others are inadvertently exposed to such pesticides is thus, indisputably and at a minimum, a violation of Texas-Public-Nuisance-Law [THaSC-T5-SA-C341-SB-§341.011(12)]. (For example, some person(s) may be growing vegetables meant for human-consumption on such person(s)' property; neighboring resident(s) who use such pesticides on their property may be greatly exposing the humans who consume such vegetables to extremely-poisonous and/or disease-causing pesticides.) The use of pesticides and synthetic/chemical fertilizers not only causes toxic chemical-pollution to the land on which such pesticides are applied and the surrounding land, but also the runoff from such chemicals causes unmitigated chemical-pollution and toxification of low-lying bodies of water (lakes, ponds, rivers, streams, seas, oceans), which in turn results in great harm (poisoning, diseases, deformities, death) to aquatic life. Finally, it is well known that there is a racial divide in the use of pesticides, with the overwhelming majority of indigenous peoples around the world not only never using any pesticide(s), but also strongly-opposed to all use(s) of pesticide(s) as a common-sense, public health-and-safety policy and environmental-protection policy. While the human body has at least hundreds-of-thousands-of-years of evolutionary defense mechanisms and/or immunity (particularly, the human immune-system) substantially-protecting both the human body from ordinary biological nuisances, the human body has little-to-no defense mechanisms and/or immunity, from the artificial, extremely-toxic, manufactured chemicals that are used in such pesticide(s). In most, if not almost-all, cases when there exists biological pest(s) that are an alleged *"threat"* to the overall environmental-health, there also exist predators of such pest(s) that naturally consume and/or kill such pest(s), thus eventually mitigating, if not eliminating the alleged *"threat"* posed to the environment by such biological pest(s). For these reasons, the plaintiff, like most environmentalists and indigenous-peoples, asserts that any-and-all use of such pesticides is clearly a case where the so-called *"solution"* is exponentially-worse than the original *"problem"*.

## ¶64

The term **greenwashing** shall refer to the fraudulent practice by people, organizations and/or governments of presenting themselves as environmentally-friendly and progressive to downplay their actual wasteful and destructive behavior(s)/action(s).

## ¶65

The terms **vegetation** and **vegetable growth or matter** shall only include any-and-all vegetable/plant matter that is not narcotics related. The plaintiff is fully aware that there are anti-narcotics laws that prohibit, restrict and/or regulate the growth of plants used to generate narcotics and other controlled substances, and that there may very-well be a legitimate and compelling-state-interest to prevent citizen(s) from growing such narcotics in-order-to prevent harm to society. So, any reference(s) in this lawsuit to Constitutional freedom(s) to grow vegetation (for example, as a Constitutionally protected religious-practice and/or other first-amendment-right) shall only refer to the freedom to grow vegetable/plant matter that is not narcotics related. The plaintiff will only reluctantly use the term **weeds** in this lawsuit because this term is very vaguely defined in Texas public-nuisance-law (see below), but more importantly, because the usage of this term - along with related terms

**overgrown/overgrowth** - do not represent a world-view - especially the cultural/religious views/values/practices of at least some, if not most, Eastern religions and most people-of-color (especially indigenous-peoples) around the world (see section below).

## ¶66

The term **off-grid lifestyle** shall mean a person's minimalist lifestyle of living without one-or-more of the following: electric-utility-service, water-utility-service, garbage/recycling-collection-utility-service, internet-utility-service, housing/shelter, purchased-food, purchased-drinking-water. It is well-known by all parties involved in this case that the overwhelming majority of indigenous-peoples around the world live an off-grid lifestyle. It is well-known by all parties involved in this case that at least some (non-zero) fraction of residents of the State of Texas (including, but certainly not limited to, homeless people) live an off-grid lifestyle. Living an off-grid lifestyle is thus, indisputably, a constitutionally protected religious practice and/or other first-amendment-protected right. The government cannot force a person to live any lifestyle that such person is religiously/politically opposed to, and furthermore, the government obviously cannot force a person to purchase product(s) and/or service(s) that such person cannot afford to pay for, because such conduct would also infringe on such person's other Constitutionally-protected rights such as the fundamental due-process right to privacy, the fundamental fourteenth-amendment (★) right to be free from discrimination and the fundamental eighth-amendment right to be free from cruel-and-unusual-punishment. No part of the laws of the United States and no part of the laws of the State of Texas (including the Public-Nuisance-law) in any way criminalizes or penalizes a person's fundamental right to live an off-grid lifestyle, and furthermore, any attempt made, whether-or-not *"under color of law"*, to deprive a person of such off-grid lifestyle is, thus, a clear violation of such person's civil-rights.

## ¶67

The term **zero-waste lifestyle** shall mean a person's minimalist lifestyle of living by consuming as-little-resources-as-possible, and generating as-little-waste-as-possible. It is well-known by all parties involved in this case that the overwhelming majority of indigenous-peoples around the world live a zero-waste lifestyle. It is well-known by all parties involved in this case that at least some (non-zero) fraction of residents of the State of Texas live a zero-waste lifestyle. Living a zero-waste lifestyle is thus, indisputably, a constitutionally protected religious practice and/or other first-amendment-protected right. The government cannot force a person to live any lifestyle that such person is religiously/politically opposed to, and furthermore, the government obviously cannot force a person to purchase product(s) and/or service(s) that such person cannot afford to pay for, because such conduct would also infringe on such person's other Constitutionally-protected rights such as the fundamental due-process right to privacy, the fundamental fourteenth-amendment (★) right to be free from discrimination and the fundamental eighth-amendment right to be free from cruel-and-unusual-punishment. No part of the laws of the United States and no part of the laws of the State of Texas (including the Public-Nuisance-law) in any way criminalizes or penalizes a person's fundamental right to live a zero-waste lifestyle, and furthermore, any attempt made, whether-or-not *"under color of law"*, to deprive a person of such zero-waste lifestyle is, thus, a clear violation of such person's civil-rights.

## ¶68

The term **anti-consumerist lifestyle** shall mean a person's minimalist lifestyle of living by consuming as-little-resources-as-possible for political

and/or religious reasons. For example, a person may have strong moral and/or religious opposition to the economic-system and/or consumerism and/or consumer-capitalism (🔊), and as such, may desire to boycott the purchasing of product(s) and/or service(s) as a way to refrain from participating in those immoral and unjust system(s). It is well-known by all parties involved in this case that some (non-zero) fraction of people around the world, including some (non-zero) fraction of residents of the State of Texas, live an anti-consumerist-lifestyle. Living an anti-consumerist-lifestyle is thus, indisputably, a constitutionally protected religious practice and/or other first-amendment-protected right. The government cannot force a person to live any lifestyle that such person is religiously/politically opposed to, and furthermore, the government obviously cannot force a person to purchase product(s) and/or service(s) that such person cannot afford to pay for, because such conduct would also infringe on such person's other Constitutionally-protected rights such as the fundamental due-process right to privacy, the fundamental fourteenth-amendment (⭐) right to be free from discrimination and the fundamental eighth-amendment right to be free from cruel-and-unusual-punishment. No part of the laws of the United States and no part of the laws of the State of Texas (including the Public-Nuisance-law) in any way criminalizes or penalizes a person's fundamental right to live an anti-consumerist-lifestyle, and furthermore, any attempt made, whether-or-not *"under color of law"*, to deprive a person of such anti-consumerist-lifestyle is, thus, a clear violation of such person's civil-rights.

## ¶69

The term **subsistence lifestyle** shall mean a person's minimalist lifestyle of living by consuming as-little-resources-as-possible - including, and in particular, food and water - as a racial, religious and/or cultural value and/or practice. It is well-known by all parties involved in this case that a majority of indigenous-peoples around the world live a subsistence-lifestyle. Living a subsistence-lifestyle is thus, indisputably, a constitutionally protected religious practice and/or other first-amendment-protected right. The government cannot force a person to live any lifestyle that such person is religiously/politically opposed to, and furthermore, the government obviously cannot force a person to purchase product(s) and/or service(s) that such person cannot afford to pay for, because such conduct would also infringe on such person's other Constitutionally-protected rights such as the fundamental due-process right to privacy, the fundamental fourteenth-amendment (⭐) right to be free from discrimination and the fundamental eighth-amendment right to be free from cruel-and-unusual-punishment. No part of the laws of the United States and no part of the laws of the State of Texas (including the Public-Nuisance-law) in any way criminalizes or penalizes a person's fundamental right to live a subsistence-lifestyle, and furthermore, any attempt made, whether-or-not *"under color of law"*, to deprive a person of such subsistence-lifestyle is, thus, a clear violation of such person's civil-rights.

## ¶70

The terms **defamation (noun)** and **defame (verb)** and **defamatory (adjective)** and **defamatorily (adverb)** shall also include within its definition, any types of libel and/or slander and/or false-light.

## ¶71

The term **blue wall of silence** shall refer to any government employee(s)/official(s)/officer(s)/agent(s) or larger group of such person(s) remaining-silent-about and/or failing-to-acknowledge/admit and/or failing-to-report misconduct of other government

employee(s)/official(s)/officer(s) despite their knowledge of such misconduct. The term is not limited to police officer(s) and can also include entire offices/departments/agencies/divisions/districts of governments such as the Prosecutor's Office, Constable's Office, Sheriff's Office, the Health Department/District, etc. When such government employee(s)/official(s)/officer(s) are involved in a criminal conspiracy or racketeering-enterprise which could also include other non-governmental private-citizen(s), then, at least under these limited circumstances, the Blue-Wall-Of-Silence should be considered similar-to, analogous-to, or synonymous-with *"Omertà"* - the code of silence used by the mafia and/or other organized-crime. However, the Blue-Wall-Of-Silence also includes the silence of well-meaning government-employees that, despite of their good intentions, are still unwilling to report their co-workers'/superiors' misconduct due to:

Ⓐ fear of retaliation ; AND

Ⓑ fear of being deemed a *"rat"* - Internal-Affairs-Department often being derogatorily referred to as *"rat squad"*; AND

Ⓒ the strict military hierarchy of government organizations that inferiors/rookies can never question/challenge the authority of their superiors/seniority.

In-order-to reduce or eliminate the possibility of a Blue-Wall-Of-Silence, police departments and other government agencies need to implement and enforce a strict, Zero-Tolerance, Duty-To-Report policy such that government employee(s)/official(s)/officer(s) that knowingly remain silent about their colleague(s)'/superior(s)' misconduct will also face negative consequences due to their silence. Such agencies also need to implement and enforce strong whistleblower protections and incentives so that such government employee(s)/official(s)/officer(s) that do report such misconduct can do so safely and without any fear of retaliation.

## ¶72

The term **Property Rights of Citizens** or **[42-USC-C21-SI-§1982], Section 1982**, or **[CRAo1866]:§1982** shall refer to any civil lawsuit brought against any person(s) (with any municipal-corporation or agency-of-municipal-corporation considered a *"person"*) for violations of property-rights-of-citizens as enacted by the 【Civil Rights Act of 1866】 , ("[CRAo1866]"):

▶  42 U.S. Code:  Chapter 21. Civil Rights:  Subchapter I. Generally:  § 1982 - Property rights of citizens
▶  https://www.law.cornell.edu/uscode/text/42/1982

*All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property.*

## ¶73

The term **Equal rights under the law** or **[42-USC-C21-SI-§1981], Section 1981**, or **[CRAo1866]:§1981** shall refer to any civil lawsuit brought against any person(s) (with any municipal-corporation or agency-of-municipal-corporation considered a *"person"*) for violations of equal-rights-under-the-law as enacted by the 【Civil Rights Act of 1866】 , ("[CRAo1866]"):

▶  42 U.S. Code:  Chapter 21. Civil Rights:  Subchapter I. Generally:  § 1981 - Equal rights under the law
▶  https://www.law.cornell.edu/uscode/text/42/1981

*(a) Statement of equal rights*

  *All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.*

*(b) "Make and enforce contracts" defined*

*For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.*

*(c) Protection against impairment*

*The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.*

# ¶74

The term **Civil action for deprivation of rights** or **[42-USC-C21-SI-§1983]**, **Section 1983**, or **[KKKA]:§1983** - the civil analog to criminal law specified in [18-USC-PI-C13-§242] (see above) - shall refer to any civil lawsuit brought against any person(s) (with any municipal-corporation or agency-of-municipal-corporation considered a *"person"*) for violations of Constitutional-Rights and/or Statutory-Rights and/or Common-Law-Rights under 【42 U.S. Code:   Chapter 21. Civil Rights:   Subchapter I. Generally:   § 1983 - Civil action for deprivation of rights】 . Both [42-USC-C21-SI-§1983] and [42-USC-C21-SI-§1985] (see below) were originally codified under the 【Ku Klux Klan Act】 , ("[KKKA]") - originally enacted (along with multiple other Civil Rights Acts) to address civil rights violations against racial minorities, making it particularly-relevant and directly-applicable to this lawsuit. As it pertains to this lawsuit, Constitutional rights violations shall include, but not be limited to:

**01.** Fourteenth-Amendment (★) violations - including violations of the "Equal Protection Clause" and/or "Privileges or Immunities Clause".

**02.** Fifth-Amendment violations - including any violations of "due-process" rights to *"life"* or *"liberty"* or *"property"*.

**03.** First-Amendment violations - including violation/deprivation of "freedom-of-religion" and/or "freedom-of-speech" and/or "political-speech" and/or "art" and/or other First-Amendment rights such as the right of private citizens to record Law-Enforcement and crimes/civil-rights-violations/abuses.

**04.** Fourth-Amendment violations - including unconstitutional/unlawful: search(s) and/or seizure(s) and/or interrogation(s) and/or detention(s).

**05.** Eighth-Amendment violations - including "cruel and unusual punishment" that causes suffering, pain and/or humiliation to a victim - especially in cases where the vicitm is not a suspect in any crime.

**06.** Sixth-Amendment violations - including violations of the "Right to Counsel", the "Right to Confrontation (of accuser(s) and other witness(s))" and/or the "Right to Notice of Accusation".

▶ 42 U.S. Code:   Chapter 21. Civil Rights:   Subchapter I. Generally:   § 1983 - Civil action for deprivation of rights
▶ https://www.law.cornell.edu/uscode/text/42/1983

*Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.*

▶ 42 U.S. Code:   Chapter 21. Civil Rights:   Subchapter I. Generally:   § 1988 - Proceedings in vindication of civil rights
▶ https://www.law.cornell.edu/uscode/text/42/1988

*(a) Applicability of statutory and common law*

*The jurisdiction in civil and criminal matters conferred on the district courts by the provisions of titles 13, 24, and 70 of the Revised Statutes for the protection of all persons*

*in the United States in their civil rights, and for their vindication, shall be exercised and enforced in conformity with the laws of the United States, so far as such laws are suitable to carry the same into effect; but in all cases where they are not adapted to the object, or are deficient in the provisions necessary to furnish suitable remedies and punish offenses against law, the common law, as modified and changed by the constitution and statutes of the State wherein the court having jurisdiction of such civil or criminal cause is held, so far as the same is not inconsistent with the Constitution and laws of the United States, shall be extended to and govern the said courts in the trial and disposition of the cause, and, if it is of a criminal nature, in the infliction of punishment on the party found guilty.*

*(b) Attorney's fees*

*In any action or proceeding to enforce a provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, title IX of Public Law 92–318 [20 U.S.C. 1681 et seq.], the Religious Freedom Restoration Act of 1993 [42 U.S.C. 2000bb et seq.], the Religious Land Use and Institutionalized Persons Act of 2000 [42 U.S.C. 2000cc et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or section 12361 of title 34, the court, in its discretion, may ollow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity such officer shall not be held liable for any costs, including attorney's fees, unless such action was clearly in excess of such officer's jurisdiction.*

*(c) Expert fees*

*In awarding an attorney's fee under subsection (b) in any action or proceeding to enforce a provision of section 1981 or 1981a of this title, the court, in its discretion, may include expert fees as part of the attorney's fee.*

> 18 U.S. Code:   Part I. Crimes:   Chapter 13. Civil Rights:   § 242 – Deprivation of rights under color of law
> https://www.law.cornell.edu/uscode/text/18/242

*Whoever, under color of any law, statute, ordinance, regulation, or custom, willfully subjects any person in any State, Territory, Commonwealth, Possession, or District to the deprivation of any rights, privileges, or immunities secured or protected by the Constitution or laws of the United States, or to different punishments, pains, or penalties, on account of such person being an alien, or by reason of his color, or race, than are prescribed for the punishment of citizens, shall be fined under this title or imprisoned not more than one year, or both; and if bodily injury results from the acts committed in violation of this section or if such acts include the use, attempted use, or threatened use of a dangerous weapon, explosives, or fire, shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse, or an attempt to commit aggravated sexual abuse, or an attempt to kill, shall be fined under this title, or imprisoned for any term of years or for life, or both, or may be sentenced to death.*

# ¶75

The term **Conspiracy to interfere with civil rights** or **[42-USC-C21-SI-§1985], Section 1985,** or **[KKKA]:§1985** - the civil analog to criminal law specified in [18-USC-PI-C13-§241] (see above) - shall refer to any civil lawsuit brought against two-or-more persons (with any municipal-corporation or agency-of-municipal-corporation considered a *"person"*) for violations of the Conspiracy-To-Interfere-With-Civil-Rights/Obstruction-of-Justice/Witness-Intimidation law specified in 【42 U.S. Code:   Chapter 21. Civil Rights:   Subchapter I. Generally:   § 1985】 :

> 42 U.S. Code:   Chapter 21. Civil Rights:   Subchapter I. Generally:   § 1985 – Conspiracy to interfere with civil rights
> https://www.law.cornell.edu/uscode/text/42/1985

*(1) Preventing officer from performing duties*

*If two or more persons in any State or Territory conspire to prevent, by force, intimidation, or threat, any person from accepting or holding any office, trust, or place of confidence under the United States, or from discharging any duties thereof; or to induce by like means any officer of the United States to leave any State, district, or place, where his duties as an officer are required to be performed, or to injure him in his person or property on account of his lawful discharge of the duties of his office, or while engaged in the lawful discharge thereof, or to injure his property so as to molest, interrupt, hinder, or impede him in the discharge of his official duties;*

*(2) Obstructing justice; intimidating party, witness, or juror*

*If two or more persons in any State or Territory conspire to deter, by force, intimidation, or threat, any party or witness in any court of the United States from attending such court, or from testifying to any matter pending therein, freely, fully, and truthfully, or to injure such party or witness in his person or property on account of his*

*having so attended or testified, or to influence the verdict, presentment, or indictment of any grand or petit juror in any such court, or to injure such juror in his person or property on account of any verdict, presentment, or indictment lawfully assented to by him, or of his being or having been such juror; or **if two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws, or to injure him or his property for lawfully enforcing, or attempting to enforce, the right of any person, or class of persons, to the equal protection of the laws;***

*(3) Depriving persons of rights or privileges*

  *If two or more persons in any State or Territory conspire or go in disguise on the highway or **on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one-or-more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one-or-more of the conspirators.***

---

▶   18 U.S. Code:   Part I. Crimes:   Chapter 13. Civil Rights:   § 241 – Conspiracy against rights
▶   https://www.law.cornell.edu/uscode/text/18/241

*If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State, Territory, Commonwealth, Possession, or District in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States, or because of his having so exercised the same; or*

*If two or more persons go in disguise on the highway, or on the premises of another, with intent to prevent or hinder his free exercise or enjoyment of any right or privilege so secured—*

*They shall be fined under this title or imprisoned not more than ten years, or both; and if death results from the acts committed in violation of this section or if such acts include kidnapping or an attempt to kidnap, aggravated sexual abuse or an attempt to commit aggravated sexual abuse, or an attempt to kill, they shall be fined under this title or imprisoned for any term of years or for life, or both, or may be sentenced to death.*

---

# ¶76

The term **Discrimination under Federally Assisted Programs** or **[42-USC-C21-SV-§2000d]** or **[CRAo1964]:§2000d** - shall refer to any civil lawsuit brought against any person (with any municipal-corporation or agency-of-municipal-corporation considered a *"person"*) for violations of the anti-discrimination provisions of *"TITLE VI"* of the 【Civil Rights Act of 1964】 , ("[CRAo1964]") - codified in 【42 U.S. Code:   Chapter 21. Civil Rights:   Subchapter V. Federally Assisted Programs】 ("[42-USC-C21-SV]"):

---

▶   42 U.S. Code:   Chapter 21. Civil Rights:   Subchapter V. Federally Assisted Programs:
▶   § 2000d – Prohibition against exclusion from participation in, denial of benefits of, and discrimination under federally assisted programs on ground of race, color, or national origin
▶   https://www.law.cornell.edu/uscode/text/42/2000d

*No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance.*

---

▶   42 U.S. Code:   Chapter 21. Civil Rights:   Subchapter V. Federally Assisted Programs:   § 2000d-7 – Civil rights remedies equalization
▶   https://www.law.cornell.edu/uscode/text/42/2000d-7

*(a) GENERAL PROVISION*

*(1) A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973 [29 U.S.C. 794], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 et seq.], the Age Discrimination Act of 1975 [42 U.S.C. 6101 et seq.], title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d et seq.], or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.*

*(2) In a suit against a State for a violation of a statute referred to in paragraph (1), remedies (including remedies both at law and in equity) are available for such a violation to the same extent as such remedies are available for such a violation in the suit against any public or private entity other than a State. ...*

## ¶77

The term **racial oppression** shall be an abbreviation for one-or-more of the following committed against one-or-more person(s)-of-color:

Ⓐ racially-motivated hate-crime(s) ; AND/OR

Ⓑ racially-motivated civil-rights-violation(s) ; AND/OR

Ⓒ racially-motivated abuse (of any type/shape/form) - including, but not limited to, any racially-motivated abuse-of-office ; AND/OR

Ⓓ racially-motivated misconduct (of any type, shape or form) ; AND/OR

Ⓔ racially-motivated coercion (of any type, shape or form) ; AND/OR

Ⓕ racially-motivated intimidation (of any type, shape or form) ; AND/OR

Ⓖ racially-motivated interference (of any type, shape or form) ; AND/OR

Ⓗ racial-profiling (of any type, shape or form) ; AND/OR

Ⓘ any deliberate/intentional/malicious/reckless/negligent and racially-motivated harm caused by one-or-more White-American person(s) and/or majority-White organization(s)/institution(s) onto such person(s)-of-color.

## ¶78

The term **modern-day-Jim-Crow** shall refer to any current-day (existing) law and/or interpretation/enforcement of such law that either disproportionately, invasively, predatorily, oppressively or directly targets at least some person(s)-of-color (on the basis of race and/or religion and/or color and/or national-origin) - especially those person(s)-of-color that do not conform to White-American standards - at least slightly reminiscent of the previous (and original) *"Jim Crow"* laws of the 19th and 20th centuries that did the same. The term shall also refer to either the relative-lack-of-enforcement or the complete-lack-of-enforcement of hate-crime laws and/or abuse-of-office laws and/or civil-rights laws by one-or-more government(s) that deliberately/maliciously do not enforce such laws in-order-to protect predatory White-American private-citizens and/or government employees/agencies with racial-animus from the hate-crimes/civil-rights-violations/racketeering-acts/abuses that they commit against at least some person(s)-of-color. The term is paraphrased and borrowed from internationally-renowned, former-director of the *"Racial Justice Project"* at the 〔American Civil Liberties Union〕 ("[ACLU]") of Northern California, former-law-clerk at the [SCOTUS], and now-Law-Professor, Michelle Alexander's bestselling book, ✎*The New Jim Crow: Mass Incarceration in the Age of Colorblindness* ✎.

# §III

# PARTIES

## ¶79

Primary-Defendant 〖{Williamson County}〗, ("[WC]"), is a municipal corporation located in the Western-District-of-Texas. Although [WC] is named as a municipal-corporation primary-defendant in this lawsuit, this lawsuit is filed almost-exclusively (with a few significant exceptions) in response to the action(s)/inaction(s) of Williamson-County-Law-Enforcement ("[WCLE]") for which primary-defendant [WC] bears liability, specifically: the {Williamson County Constable's Office}, ("[WCCO]"), the {Williamson County Sheriff's Office}, ("[WCSO]"), the {Williamson County and Cities Health District}, ("[WCCHD]"), and to a lesser (or secondary) extent, the {Williamson County District Attorneys Office}, ("[WCDAO]"), and the {Williamson County County Attorneys Office}, ("[WCCAO]"). [WC] is also named as a municipal-corporation primary-defendant in this lawsuit because numerous offices/departments/agencies/divisions/districts of the defendant [WC] - specifically those aforementioned agencies of [WCLE] - corruptly-maliciously-predatorily-and-retaliatorily conspired (along with private-citizen racketeer co-defendants [JSP&KAP],[RSR]) against the plaintiff and acted-in-furtherance-of such corrupt-malicious-predatory-and-retaliatory conspiracy against the plaintiff in-order-to violate all of the federal laws, state laws and common-law that the plaintiff has asserted against such defendants in this lawsuit. In this lawsuit, this primary-defendant shall be abbreviated as *"[WC]"* or *"[WCLE]"*. In this lawsuit, the term *"Williamson County"* and acronyms beginning with *"[WC"* shall refer to this municipal-corporation primary-defendant and/or its office(s)/department(s)/agency(s)/division(s)/district(s)/official(s)/employee(s) while the term *"County of Williamson"* shall refer to any non-governmental aspect of this geographical region. The plaintiff shall use these terms in this manner only in-order-to distinguish between the municipal-corporation primary-defendant [WC] which is being sued by the plaintiff in this lawsuit from any other non-governmental aspect of this geographical region (including the private citizens/residents of this region). In this lawsuit, the term *"the county"* shall, unless otherwise specified, refer to the non-government *"County of Williamson"* and the terms *"taxpayer"*,*"citizen"* shall, unless otherwise specified, refer to the civilian/non-governmental (non-defendant) private-citizens/residents of the county. According to {2019} estimates from the United States Census Bureau, the racial demographics of the county is approximately 80.6% White and thus, approximately 19.4% people-of-color. The exact racial demographics of the 〖Summerlyn〗 residential-property subdivision/neighborhood in which the Plaintiff owns property and resides could not be accurately determined by the plaintiff, but based upon the public-information about the {2019} demographics of 〖Liberty Hill, Texas〗 , is approximately 87.61% White and thus approximately 12.29% people-of-color. To the best of the plaintiff's knowledge, during the initial period of years covered by this lawsuit - {2009} through {2018} - the racial demographics of both the county and the 〖Summerlyn〗 subdivision/neighborhood was greater than 80.6%, 87.61% White respectively, and thus, lesser than 19.4%, 12.29% people-of-color respectively - with the relative percentage of White gradually decreasing as time passed. To the best of the plaintiff's knowledge, all of the plaintiff's immediate neighbors of the plaintiff's primary-residence private-property, [788KLLTX78641] (see below) - both past and present - were/are of the White/Caucasian/American color/race/nationality. (Despite turn-over in all of the plaintiff's immediate neighbors since {2009}, to the best of the plaintiff's knowledge, this fact has remained true

throughout the plaintiff's ownership/residence of [788KLLTX78641].) All of these racial-demographics are crucial facts to this lawsuit, because all of the defendants corruptly-maliciously-predatorily-and-retaliatorily capitalized-on and fully-exploited these racial-demographics, extremely unfavorable to the plaintiff, in-order-to freely engage in racial-oppression and racketeering-activity against the plaintiff, fully counting on the fact that such racial-demographics (and even the resulting jury pool) would, either substantially or completely, protect them from the legal consequences of over-a-decade of racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses that they aggregately committed - through a pattern of racketeering-activity, and as part of a racketeering-enterprise - against the plaintiff. Primary-Defendant [WC] is being sued by the plaintiff in this lawsuit for declaratory relief, injunctive relief, all applicable fees/costs (#) and all applicable damages. The mailing-address of primary-defendant [WC] is:

Williamson County
Williamson County Courthouse
710 Main Street
Georgetown, TX 78626

## ¶80

Primary-Defendants 『Joseph S. Pargin & Kimberly A. Pargin』, ("[JSP&KAP]"), also known by short form 『Joseph Pargin & Kimberly Pargin』, husband-and-wife private-citizens, are former residents of residential property (house-and-surrounding-land real-property), "784 Kingfisher Lane, Leander Texas 78641", ("[784KLLTX78641]"), and former next-door-neighbors of the plaintiff from approximately the month of {2009-03} through the end of the month of {2022-07} (according to public-information and/or the plaintiff's evidence) - see "LOT 39","#784" in the modified survey diagram below. Primary-Defendant 『Joseph S. Pargin』, ("[JSP]"), (short form 『Joseph Pargin』), sometimes referred to by one-or-more person(s) as "Joe" or "Joey", is of the White/Caucasian/American/Christian color/race/nationality/religion, and according to outdated public-records and the plaintiff's best estimates from the month of {2022-07}, primary-defendant [JSP] weighed approximately 240 pounds, and is approximately 6-feet-1-inches tall (↯). Primary-Defendant 『Kimberly A. Pargin』, ("[KAP]"), (short form 『Kimberly Pargin』), sometimes referred to by one-or-more person(s) as "Kim", is of the White/Caucasian/American/Christian color/race/nationality/religion, and according to the plaintiff's best estimates from the month of {2022-07}, primary-defendant [KAP] weighs approximately 160 pounds, and is approximately 5-feet-9-inches tall (↯). Primary-Defendants [JSP&KAP] are being sued by the plaintiff in this lawsuit for declaratory relief, injunctive relief, all applicable fees/costs (#) and all applicable damages. Primary-defendants [JSP&KAP] moved out of the 【Summerlyn】 residential-property subdivision/neighborhood (located within the County of Williamson) approximately on-or-about the date of {2022-07-31}. Any references made to primary-defendants [JSP&KAP]'s property in this lawsuit shall refer to primary-defendant [JSP&KAP]'s now-former private-property [784KLLTX78641]. The only mailing-address of [JSP&KAP] that is known to the plaintiff (as documented by current public records) is:

Joseph Pargin & Kimberly Pargin
2659 Belle Hubbard Trl
Belton, TX 76513

## ¶81

Primary-Defendant ⟦Rebecca Sue Robertson⟧, ("[RSR]"), private-citizen, is a former resident of residential property (house-and-surrounding-land real-property) "789 Kingfisher Lane, Leander Texas 78641", ("[789KLLTX78641]"), residing at that location from approximately the month of {2009-03} through the month of {2021-03} (according to public records and/or the plaintiff's evidence). Primary-Defendant [RSR], sometimes referred to by one-or-more person(s) as "Becky", is of the White/Caucasian/American/Christian color/race/nationality/religion, and according to outdated public records and the plaintiff's best estimates from the month of {2021-03}, primary-defendant [RSR] weighs approximately 225 pounds, and is approximately 5-feet-8-inches tall **(↵)**. Primary-Defendant [RSR] is being sued by the plaintiff in this lawsuit for declaratory relief, injunctive relief, all applicable fees/costs **(#)** and all applicable damages. Primary-defendant [RSR] moved out of the

⟦Summerlyn⟧ residential-property subdivision/neighborhood approximately on-or-about month of {2021-03}. One-or-more social-media-posting(s) by [RSR] indicate that since moving out of the ⟦Summerlyn⟧ residential-property subdivision/neighborhood, [RSR] moved to a location in-or-around Houston, Texas on-or-about the month of {2021-03}. However, the plaintiff is not able to obtain any public property-records for tax-years {2022},{2023} from ⟨Harris County Appraisal District⟩ or any County adjacent to the County-of-Harris indicating [RSR]'s current mailing-address. The plaintiff does not know and, despite of the plaintiff's best efforts to research such information, the plaintiff is unable to determine primary-defendant [RSR]'s current mailing-address. Therefore, pursuant to [18-USC-PI-C96-§1965(b)], which states in part, *"In any action under section 1964 of this chapter in any district court of the United States in which it is shown that the ends of justice require that other parties residing in any other district be brought before the court, the court may cause such parties to be summoned, and process for that purpose may be served in any judicial district of the United States by the marshal thereof"*, the plaintiff seeks the assistance of federal-law-enforcement, and specifically, the ⟨United States Marshals⟩, to determine primary-defendant [RSR]'s current mailing-address in-order-for the plaintiff to serve primary-defendant [RSR] with this lawsuit. Any references made to primary-defendant [RSR]'s property in this lawsuit shall refer to primary-defendant [RSR]'s now-former private-property [789KLLTX78641]. Due to the absence of information, the most-recent (but still obsolete) mailing-address of primary-defendant [RSR] that is known to the plaintiff is:

Rebecca Sue Robertson
789 Kingfisher Lane
Leander, TX 78641

## ¶82

Primary-Defendant ⟦⟨Williamson County Constable's Office⟩⟧, ("[WCCO]"), is a law enforcement agency of defendant [WC]. Primary-Defendant [WCCO] is being sued by the plaintiff in this lawsuit for declaratory relief, injunctive relief, all applicable fees/costs **(#)** and all applicable damages. All of Primary-Defendant [WCCO]'s violations of federal and state laws against the plaintiff were suffered by the plaintiff within the geographical area of Precinct 2 of the [WCCO]. However, the plaintiff also has evidence to prove that Precinct 3 of the [WCCO] not only discriminated against the plaintiff on the basis of the plaintiff's racial-profile - committing at least some acts of racial-oppression and racketeering-activity against the plaintiff - but was also actively involved in such corrupt-malicious-predatory-and-retaliatory conspiracy and associated racketeering-enterprise against the plaintiff - as substantially documented in this lawsuit. The mailing-address of [WCCO] Precinct 2 is:

Williamson County Constable Precinct 2

350 Discovery Blvd, Suite 205

Cedar Park, TX 78613

## ¶83

Primary-Defendant 〖{Williamson County and Cities Health District}〗, ("[WCCHD]"), is, at least in part, a law enforcement agency of defendant [WC] - with the legal designation of *"local health authority"* or *"local health department"*. Primary-Defendant [WCCHD] is being sued by the plaintiff in this lawsuit for declaratory relief, injunctive relief, all applicable fees/costs (#) and all applicable damages. The mailing-address of [WCCHD] is:

Williamson County and Cities Health District

355 Texas Ave

Round Rock, TX 78664

## ¶84

Primary-Defendant 〖{Williamson County Sheriff's Office}〗, ("[WCSO]"), is a law enforcement agency of defendant [WC]. Primary-Defendant [WCSO] is being sued by the plaintiff in this lawsuit for declaratory relief, injunctive relief, all applicable fees/costs (#) and all applicable damages. The mailing-address of [WCSO] is:

Williamson County Sheriff's Office

508 S Rock Street

Georgetown, TX 78626

## ¶85

Secondary-Defendant 〖{Williamson County County Attorney's Office}〗, ("[WCCAO]"), is a law enforcement agency of defendant [WC]. Secondary-Defendant [WCCAO] is being sued by the plaintiff in this lawsuit for declaratory relief, injunctive relief and all applicable fees/costs (#) . The mailing-address of [WCCAO] is:

Williamson County County Attorney's Office

Williamson County Justice Center

405 M.L.K. Street, Suite 229

Georgetown, TX 78626

## ¶86

Secondary-Defendant ⟦{Williamson County District Attorney's Office}⟧, ("[WCDAO]"), is a law enforcement agency of defendant [WC]. Secondary-Defendant [WCDAO] is being sued by the plaintiff in this lawsuit for declaratory relief, injunctive relief and all applicable fees/costs (#). The mailing-address of [WCDAO] is:

Williamson County District Attorney's Office
Williamson County Justice Center
405 M.L.K. Street, Suite 265
Georgetown, TX 78626

## ¶87

In the following text, the general term *"defendants"* shall, unless otherwise specified, refer to the primary-defendants [WCCO],[WCSO], [WCCHD],[JSP&KAP],[RSR], with the law-enforcement agencies of [WCCO],[WCSO],[WCCHD],[WCCAO],[WCDAO] abbreviated as [WCLE].

## ¶88

The Plaintiff ⟦Siddharth Kode⟧:

01 . is the owner and resident of residential property (house-and-surrounding-land real-property), "788 Kingfisher Lane, Leander Texas 78641" ("[788KLLTX78641]") - with the legal-description, *"S9718 - SUMMERLYN PH P-3B, BLOCK N, Lot 40"* - located within the ⟦Summerlyn⟧ residential neighborhood/subdivision, which in turn is located within the County of Williamson - see "Lot 40","#788" in the modified survey diagram below. Although the address of property [788KLLTX78641] includes the term "Leander", it should be noted that property [788KLLTX78641] is outside of the City-of-Leander, leaving most, if not all, of State-and-Local Law-Enforcement within the jurisdiction of defendant [WC]'s law-enforcement agencies, [WCLE]. In this lawsuit,

Ⓐ *"[788KLLTX78641]"* shall refer to the plaintiff's primary-residence. The plaintiff has owned [788KLLTX78641] since the month of {2009-03}, and has resided at [788KLLTX78641] for over 90% of the time since the month of {2009-03}.

Ⓑ *"The subdivision"* and *"the neighborhood"* shall, unless otherwise specified, refer to the ⟦Summerlyn⟧ residential neighborhood/subdivision within the County of Williamson.

Ⓒ *"Plaintiff's residential-private-property"*, *"plaintiff's private-property"*, *"plaintiff's property"*, when used in such singular form, shall, unless otherwise specified, refer to the plaintiff's primary-residence (real-property) private-property, [788KLLTX78641].

ⓓ *"Plaintiff's agricultural-private-property"*, *"plaintiff's farm"*, shall, unless otherwise specified, refer to a different (real-property) private-property (located on FM-112) - separate and distinct from [788KLLTX78641].

ⓔ *"Kingfisher"*, *"the street"*, and *"the road"* shall, unless otherwise specified, refer to *"Kingfisher Lane, Leander Texas 78641"* (public-property), abbreviated with the acronyms "KLLTX78641", or simply "KL".

ⓕ *"The sidewalk"* shall, unless otherwise specified, refer to the concrete-sidewalk (public-property) directly in front of the plaintiff's private-property [788KLLTX78641], and the adjacent private-properties [784KLLTX78641],[792KLLTX78641].

ⓖ *"The opposite-sidewalk"* shall, unless otherwise specified, refer to the concrete-sidewalk (public-property) across the street and directly in front of the private-properties [789KLLTX78641], [785KLLTX78641], and [781KLLTX78641].

ⓗ *"Hummingbird"* shall, unless otherwise specified, refer to *"Hummingbird Lane, Leander Texas 78641"* (public-property), perpendicular-to Kingfisher that makes the closest (stop-sign) intersection with Kingfisher relative to the plaintiff's private-property.

ⓘ *"Lark"* shall, unless otherwise specified, refer to *"Lark Street, Leander Texas 78641"* (public-property), that is the closest non-Kingfisher street to [788KLLTX78641], (at-least-partially) parallel-to Kingfisher, abbreviated with the acronyms "LSLTX78641", or simply "LS".

ⓙ *"The two properties"* shall, unless otherwise specified, refer to the two adjacent private-properties [788KLLTX78641] and [784KLLTX78641] which share an approximately 110-feet straight-line border, approximately 60 feet of which includes a 6-feet-tall, solid, opaque-privacy-fence, which in turn encloses the two respective private-properties' backyards.

ⓚ The entire *"time period"* shall span {2009-03} to {PRESENT-DAY}, and any words used to describe time or time-period, unless otherwise specified, shall be confined to this particular time-period. (So, for example, if the word *"always"* is used to specify a time-period, unless otherwise specified, such time and/or time-period shall be confined to, *"always"* within this particular time-period.)

ⓛ Any reference made to any part(s) of the plaintiff's residential-property's shall refer directly to such part(s) of private-property, [788KLLTX78641], as more-comprehensively listed as follows.

ⓜ *"[BACKYARD]"* shall refer to the private/concealed curtilage-area, within the private-property [788KLLTX78641], which is completely concealed by a 6-feet-tall opaque privacy-fence within and also at some of the borders of the private-property [788KLLTX78641].

ⓝ *"[HOUSE]"* shall refer to the building owned and occupied by the plaintiff, located centrally within the private-property [788KLLTX78641].

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

Ⓞ *"[GARAGE]"* shall refer to the private/curtilage interior of the embedded garage of [HOUSE] - that is closeable (and thus fully-concealable) with the garage-door.

Ⓟ *"[DRIVEWAY]"* shall refer to the outdoor curtilage-area concrete-aggregate driveway, within the private-property [788KLLTX78641], directly in front of [GARAGE] (facing the street).

Ⓠ *"[FRONTDOOR]"* shall refer to the front-door of [HOUSE].

Ⓡ *"[FRONTHALLWAY]"* shall refer to the private/concealed curtilage-area that is directly in front of [FRONTDOOR], that has been made private/concealed by fully-grown, trees/bushes in [FRONTYARD], along with a vehicle parked in the [DRIVEWAY], and that is also covered by the roof of the [HOUSE].

Ⓢ *"[FRONTPORCH]"* shall refer to the private/concealed curtilage-area that is directly in front of [FRONTHALLWAY], that has been made private/concealed by fully-grown, trees/bushes in [FRONTYARD], along with a vehicle parked in the [DRIVEWAY], and that is also covered by the roof of the [HOUSE].

Ⓣ *"[BACKDOOR]"* shall refer to the door at the back-side of the [HOUSE] (facing the street). Ⓤ *"[BACKPORCH]"* shall refer to the private/concealed curtilage-area at the back-side of [HOUSE] (facing the street), behind the [BACKDOOR], and that is also covered by the roof of the [HOUSE].

Ⓥ *"[FRONTYARD]"* shall refer to all of the curtilage-area - except the [DRIVEWAY] and [FRONTPORCH] - within the private-property [788KLLTX78641] - that exists in front of [HOUSE] (facing the street).

Ⓦ *"[SIDEYARD]s"* shall refer to all of the curtilage-areas to the left-and-right-sides of the [HOUSE] but only in front of the plaintiff's 6-feet-tall-privacy-fence (facing the street).

Ⓧ *"[YARD]"* shall refer to all of the curtilage-area - except the [DRIVEWAY], [FRONTPORCH], [BACKPORCH] and [GARAGE] - within the private-property [788KLLTX78641] - including the [FRONTYARD], [SIDEYARD]s and [BACKYARD].

Ⓨ *"Curbside-Grass-Area"* shall, unless otherwise specified, refer to the grass-and-concrete-landscape (public-property) directly in-between the sidewalk and the street.

Ⓩ *"Curbside"* and *"Opposite-Curbside"* shall refer to the 8-feet-wide-part of the street closest to those respective edges of the street (see modified survey diagram).

**02 .** is an immigrant-of-color of South-East-Asian origin - specifically South Indian origin - with very-dark-brown skin color, long-uncut hair/beard, and a strong middle-eastern/Indian accent. The plaintiff's religious views and associated cultural practices are of Eastern-indigenous religions/cultures, specifically of South Indian origin. The plaintiff weighs approximately 105 pounds and is approximately 5-feet-7-inches tall **( ꜀ )** . It should also be noted that the plaintiff has a significantly-darker skin-color than both of plaintiff's senior-citizen parents [PARENTS] - who are also of the same national origin - a genetic trait that the plaintiff is presumed to have inherited from the plaintiff's maternal grandmother. The plaintiff lives a minimalist, subsistence, anti-consumerist, and chemical-free lifestyle, very-much in-line-with and consistent-with the plaintiff's religious (indigenous) values and political values (see below). For example, as part of this subsistence lifestyle, the plaintiff lives on less than $2 per day (less than 1600 calories, on average, per day) in terms of food-and-drink expenditures, which is particularly remarkable because the plaintiff uses almost exclusively the-more-expensive USDA-certified-organic ingredients in the food that the plaintiff prepares from scratch. The plaintiff lives this minimalist, subsistence, anti-consumerist and chemical-free lifestyle not as a matter of financial-necessity, but rather, as an intentional religious practice, and also as a lifestyle in-solidarity-with all of the indigent peoples of the world who do not even have the financial means to live a consumerist lifestyle (see below for political-profile). At one point in time, while still an adult, the plaintiff weighed as little as 70 pounds (back in {2012}), due to strict adherence to this minimalist, subsistence, anti-consumerist, religious lifestyle. Throughout the time period documented in this lawsuit, the plaintiff has had a body-mass-index of as low as 11 *("severe-thinness")* to as much as 18 *("mild-thinness")*. Although the plaintiff is technically an immigrant-of-color, the plaintiff identifies as an *"indigenous person"* as such term more accurately describes the plaintiff's combined race and religion. These race/religion/national-origin/color and associated physical-characteristics will collectively be referred to as part of the plaintiff's combined racial-profile. The plaintiff's racial-profile is entirely relevant to this lawsuit due to the extreme racial-animus, hate-crimes, racketeering-acts, civil-rights-violations, and other abuses suffered by the plaintiff, at the hands of the defendants, as substantially documented in this lawsut **( μ )** .

**03 .** is a democratic-socialist **( ꜗ )** , libertarian-socialist (sometimes referred to as left-libertarian), social-justice-activist, political-dissident, citizen-journalist, legal-observer, archivist and part-time-permaculture-farmer that volunteered approximately 500 hours for the United-States-Senator Bernie Sanders' {2016} United States Presidential campaign. Additionally, as public records do show and have, since {2016}, shown, the plaintiff donated a total of more than $800 to the United-States-Senator Bernie Sanders' {2016} and {2020} United States Presidential campaigns (with some of these funds also being distributed for down-ballot democratic-socialist political-campaigns) in small monthly donations during the years of {2016}, {2019} and {2020}. Since the month of {2019-01}, the plaintiff has had political yard signs posted in the [FRONTYARD] that read: *"Alexandria Ocasio-Cortez [AOC] for President"*, *"Tax the Rich"*, *"Make Racism Wrong Again"* and *"Green New Deal"* (original exhibit(s) available), along with some other message(s) of social justice. It is important to note that the plaintiff originally installed the [AOC] yard-sign on the plaintiff's property well before United-States-Congresswoman [AOC] became a target of extreme racial and political hatred by far-right-wing-extremists/White-supremacists and by some members of law-enforcement throughout the United States **( ω )** . During the {2016} United States Presidential election in {2016-11}, the plaintiff also had a United-States-Green-Party *"Stein/Baraka"* political yard sign that read *"People, Planet and Peace over Profit"* posted at approximately the same location in [FRONTYARD] (original exhibit available). As public records do show and have, since {2016}, shown, the plaintiff donated a smaller amount of money to the {2016} Stein/Baraka United-States-Green-Party Presidential campaign. The plaintiff is not a registered member of any political party and does not identify/affiliate with any political party, but did vote in the {2016} and {2020} Texas Democratic Party Primary elections. The plaintiff is a member of the (nationally-

based) political organization [Democratic Socialists of America] [DSA], which is not affiliated with any of the major political parties in the United States. The plaintiff is also a member of the [Electronic Frontier Foundation] [EFF] and the [Free Software Foundation] [FSF] - two non-profit, public-interest, civil-rights, civil-liberties (nationally-based and/or internationally-based) organizations that are substantially focused on fighting for institutional (governmental and corporate) transparency and the freedoms/rights (including privacy rights $(\wedge)$) of people in the digital world. During the years {2010} through {2013}, the plaintiff would routinely (on almost every day) wear a 《Democracy Now!》 t-shirt $(\zeta)$ with 《Democracy Now!》 being a (nationally-based and/or internationally-based) grassroots-democracy, non-profit independent-media organization ; therefore, all of the primary defendants, and especially primary-defendant [WCLE], knew that the plaintiff was a political-activist since as early as the month of {2011-08} (see *"SEQUENCE OF RELEVANT INCIDENTS"* section below). These political characteristics will collectively be referred to as part of the plaintiff's combined political-profile. The plaintiff's political-profile is entirely relevant to this lawsuit due to the far-right-wing-extremist political-animus $(\omega)$, hate-crimes, racketeering-acts, civil-rights-violations and other abuses suffered by the plaintiff, at the hands of the defendants, as substantially documented in this lawsuit $(\mu)$. The plaintiff's political-profile is at least one component (of numerous components) of the plaintiff's [RIaCOA] claim against the defendants, necessary to prove that the defendants' pattern-of-racketeering-activity against the plaintiff, conducted as part of the defendants' decade-long racketeering-enterprise against the plaintiff, did affect (and/or was intended to affect) interstate or foreign commerce (see section below).

04. was a National-Merit commended student that scored a combined 1430 out of 1600 on the plaintiff's first attempt of the Scholastic-Aptitude-Test ("[SAT]") - a score that ranked in the top 2.5% of test-takers during the year that the plaintiff took the test, and a score that is the equivalent of approximately 1480 out of 1600 in today's ({post-2016}) [SAT] $(\equiv)$. This score was certainly not the ideal score of the plaintiff, as the plaintiff underperfomed significantly in the Mathematics portion of the test - an underperformance that the plaintiff attributes to both, a cumulative/chronic lack-of-sleep prior to taking the test, and the plaintiff's cognitive disability (which was only diagnosed as a cognitive disability well-after such test). The plaintiff was admitted into the highly-selective Turing-Scholars Honors Program (and Deans-Scholars Honors Program) at the [University of Texas at Austin] ("[UT-Austin]") where the mean combined [SAT] score (1600-point-scale) of the incoming freshman consistently ranges from the high-1400s ({pre-2016}) to the mid-1500s ({post-2016}) out of 1600 $(\equiv)$. For example, the {2025} class of incoming freshman of Turing-Scholars had a mean [SAT] score of 1560 out of 1600 - comparable-to, if not higher than, the mean [SAT] score of the incoming freshman of most so-called *"Ivy-League"* Universities - and it is the plaintiff's understanding that the Turing-Scholars Honors program primarily, if not almost-exclusively, admits candidates from within the top-10% of incoming [UT-Austin] Computer-Sciences majors. Although the plaintiff completed almost-all (all but one) of the required, very-rigorous honors courses, the plaintiff will fully-admit that the plaintiff was not smart-enough, or perhaps not disciplined-enough, to maintain the very-high GPA requirements to graduate with those very-prestigious and very-rigorous Honors degrees, but instead, graduated with a regular Bachelor-of-Science degree in Computer-Sciences from [UT-Austin] - a so-called *"Public Ivy"*, major research University that consistently ranks within the top-25 of the national engineering and computer-sciences research university rankings. The plaintiff was registered as a student with (cognitive) disabilities for at least some of the plaintiff's semesters at [UT-Austin]. These education characteristics will collectively be referred to as part of the plaintiff's combined education-profile. The plaintiff's education-profile not only provides credentials relevant to this lawsuit, but also puts-into-perspective the extremely predatory abuse and extreme-maliciousness motivated by racial-animus (and far-right-wing-extremist political-animus) - driven by a strong sense of racial-superiority over the plaintiff that the plaintiff has suffered from the primary-defendants for over a decade $(\mu)$. At no point in time

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                          1696907690

did the plaintiff reveal the full extent of the plaintiff's education profile to any of the defendants, and in fact, the plaintiff deliberately concealed most, if not all, of the plaintiff's education profile from the defendants for the very simple reason that the plaintiff wanted to document how abusively the plaintiff would be treated by the defendants - with the defendants (and all other implicated parties) *"judging a book by its cover"* rather than its true character - if the defendants were truly unaware of the plaintiff's actual education-profile. For over a decade, the plaintiff has unwittingly played the roles of undercover-researcher, citizen-journalist and legal-observer, involuntarily forced into these positions of documenting institutional-racism/government-misconduct and performing a unique case-study on such institutional-racism/government-misconduct occurring within one-or-more White neighborhood(s)/subdivision(s), while during that same time period, suffering the full-wrath of such institutional-racism/government-misconduct. Crucially, all of the abuse that the plaintiff has suffered from the defendants not only continued, but even escalated to higher levels, when the defendants became aware of the fact that the plaintiff was formerly registered as a student with cognitive disabilities, further indicating to the plaintiff, that the defendants' abuse against the plaintiff was not only motivated by extreme-racial-animus, far-right-wing-extremist political-animus, homophobic-animus (see below), but also animus against person(s) with cognitive disability(s) - since people with such disability(s) are easier and more-vulnerable targets of such abuse, and the perpetrators derive more pleasure/joy **($\varphi$)** out of such victimization. The plaintiff has no choice but to reveal the plaintiff's education profile as at least some of the defendants, due to their extreme racial-animus against the plaintiff, have described the plaintiff as *"stupid"*, *"uneducated"*, *"idiot"*, *"fool"*, *"retard"*, *"moron"*, *"dumbass"* - in essence, *"low-IQ"* and *"third-world-ignorant"*. The plaintiff has no choice but to reveal the plaintiff's education profile because one-or-more of the defendants have even fraudulently accused the plaintiff of being a beneficiary of so-called *"reverse-discrimination"* and/or *"affirmative-action"*, when in actuality, the plaintiff has never been such beneficiary, and instead, all of the plaintiff's academic credentials were obtained by the plaintiff, solely by plaintiff's actual merit. The plaintiff asserts that the plaintiff did not earn a relatively elite education only to have to suffer over a decade of racial-oppression and racketeering-activity from the defendants, as substantially documented in this lawsuit. The plaintiff's education profile is thus a substantial component of the plaintiff's fraud (racketeering-act) claim and the plaintiff's racial-discrimination claim against the defendants.

05.     was born outside of the United States in a position of extreme-poverty relative to the average American family - especially, the average White-American family. Unlike the average White-American family, the plaintiff's family - particularly [PARENTS] - after immigrating to the United States through the lengthy, waitlisted-process of legal immigration - having to wait on the waitlist approximately 12 years before even being allowed to legally enter into the United States - had to struggle and toil to make it in the United States, and in the plaintiff's own humble opinion, managed to achieve through a combination of their own hard-work, advanced-degrees, skills, and sacrifices, their current positions/statuses in American society. The plaintiff's education was only made possible through the patience, skills, diligence and sacrifices of [PARENTS], and additionally, those other extended family-members that assisted [PARENTS] in the legal-immigration process. These facts will collectively be referred to as part of the plaintiff's immigrant-background. The plaintiff's immigrant-background is fully relevant to this lawsuit as it further puts-into-perspective the extremely predatory abuse and extreme-maliciousness motivated by racial-animus, racial-superiority and far-right-wing-extremist political-animus that the plaintiff has suffered from the primary-defendants for over a decade. The plaintiff's immigrant-background is also relevant particularly in-regards-to the [FHA]/[TFHA] which, at least in part, was enacted to address historically prevalent discrimination, disparities, disadvantages and denials - including, but not limited-to, socioeconomic-status, opportunities and services - when comparing racial-minorities (especially immigrant-minorities) **($\Lambda$)** to the dominant majority, White-American. The plaintiff's immigrant-background is at least one component

(of numerous components) of the plaintiff's [RIaCOA] claim against the defendants, necessary to prove that the defendants' pattern-of-racketeering-activity against the plaintiff, conducted as part of the defendants' decade-long racketeering-enterprise against the plaintiff, did affect (and/or was intended to affect) interstate or foreign commerce (see section below).



*"788 Kingfisher Lane, Leander Texas 78641" AND SURROUNDING PROPERTIES: Modified Survey Diagram: Plaintiff: ON-OR-AFTER (2020-10-12):*

**DISCLAIMERS:**

*The plaintiff has made the modifications (primarily in color) to the original survey diagram initially provided to the plaintiff on-or-about about the date of {2009-03-04}.*
*The plaintiff is **not** a professional surveyor.*

*Therefore, all such modifications are only the best approximations of the plaintiff - done to the best of the plaintiff's abilities - in-order-to illustrate prominent structures/objects in-and-around the properties that are relevant to proving the plaintiff's claims, as substantially presented in this lawsuit.*

*In particular, this modified survey diagram reflects the approximate layout of all of these properties and associated prominent structures/objects on-and-after the date of {2020-10-12} - the date on which the plaintiff was fraudulently and retaliatorily charged (and subsequently) prosecuted for Class-C-Misdemeanor-Public-Nuisance by the defendants acting in-conspiracy-with and in-concert-with each other as part of the defendants' obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff (as substantially documented in this lawsuit).*

# §IV

# IMPLICATED NON-PARTIES

## ¶89

Although not named as defendants, the following "non-parties" (listed in no particular order) are, at least in some small part, implicated in this lawsuit, and at a minimum, the plaintiff seeks to subpoena and/or conduct Discovery/Depositions on these non-parties in-order-to provide/produce crucial evidence/testimony relevant to proving the plaintiff's claims. The following list of non-parties is also incomplete, as, for example, the plaintiff has suffered abuse from one-or-more additional members of [WCLE] that are not currently listed in this list:

01.  [WCCO] CONSTABLE DEPUTY (FIRST-NAME-UNKNOWN) Harrell, ("[WCCD-Harrell]"), is a current or former [WCCO] employee that is/was a Constable Deputy of the [WCCO] Precinct 2. [WCCD-Harrell] is of the White/Caucasian/American color/race/nationality, and according to the plaintiff's best and last-known estimates, [WCCD-Harrell] weighs approximately 140 pounds, and is approximately 5-feet-6-inches tall (↪). The plaintiff has indisputable evidence to prove that [WCCD-Harrell] clearly, repeatedly and egregiously violated numerous rights of the plaintiff via numerous acts of racial-oppression, discrimination and racketeering-activity against the plaintiff, and that [WCCD-Harrell] was very-directly involved as a co-conspirator racketeer in the racketeering-enterprise against the plaintiff involving [JSP&KAP],[RSR] and [WCLE].

02.  [WCCHD] SANITARIAN Vincent Delisi, ("[WCCHDS-VD]") is a current or former [WCCHD] employee that, according to public-records and/or media-reports, formerly worked as an employee for the {Austin-Travis-County Health-and-Human-Services-Department}. [WCCHDS-VD] is of the White/Caucasian/American color/race/nationality, and according to the plaintiff's best and last-known estimates, [WCCHDS-VD] weighs approximately 200 pounds, and is approximately 5-feet-11-inches tall (↪). The plaintiff has indisputable evidence to prove that [WCCHDS-VD] clearly and egregiously violated numerous rights of the plaintiff via multiple acts of racial-oppression, discrimination and racketeering-activity against the plaintiff.

03.  [WCCO] CONSTABLE DEPUTY (FIRST-NAME-UNKNOWN) Fowler, ("[WCCD-F]"), is a current or former [WCCO] employee that is/was a Constable Deputy of the [WCCO] Precinct 2. [WCCD-F] is of the White/Caucasian/American color/race/nationality, and according to the plaintiff's best and last-known estimates, [WCCD-F] weighs approximately 190 pounds, and is approximately 6-feet tall (↪). The plaintiff has indisputable evidence to prove that [WCCD-F] clearly violated numerous rights of the plaintiff via multiple acts of racial-oppression, discrimination and racketeering-activity against the plaintiff.

04.  [WCSO] Sheriff Deputy JOHN-DOE-8, ("[WCSD-JD-8]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO] that trespassed onto the plaintiff's property and performed a clearly unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff and plaintiff's property [788KLLTX78641] at nighttime on or about the date of {2020-02-06}. According to the plaintiff's best estimates, [WCSD-JD-8], at the time of this unconstitutional-and-unlawful search/seizure/interrogation/detention of [792KLLTX78641], was approximately 180 pounds, approximately 5-feet-9-inches tall (↪). The plaintiff has indisputable evidence to prove that [WCSD-JD-8] clearly violated numerous rights of the plaintiff via multiple acts of racial-oppression and discrimination against the plaintiff.

05.  [WCSO] Sheriff Deputy JOHN-DOE-9, ("[WCSD-JD-9]"), is a current or former White/Caucasian/American Sheriff Deputy of the

[WCSO] that trespassed onto the plaintiff's property and performed a clearly unconstitutional-and-unlawful search/seizure/interrogation of the plaintiff and plaintiff's property [788KLLTX78641] at approximately midnight on or about the date of {2021-08-14}. According to the plaintiff's best estimates, [WCSD-JD-9], at the time of this unconstitutional-and-unlawful search/seizure/interrogation/detention of [792KLLTX78641], was approximately 180 pounds, approximately 6-feet tall **(4)**. The plaintiff has indisputable evidence to prove that [WCSD-JD-9] clearly violated numerous rights of the plaintiff via multiple acts of racial-oppression and discrimination against the plaintiff.

**06.** [NP] is a White/Caucasian/American son of defendants [JSP&KAP] who remains unnamed in this lawsuit due to the substantial possibility that he was still a minor during most of the incidents documented in this lawsuit. According to the plaintiff's best estimates, [NP] is approximately 6-feet-2-inches tall and, according to the most recent information available to the plaintiff, weighed approximately 170 pounds. Despite of the fact that [NP] has committed at least some of the documented hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff, and due to the fact that [NP] was still a minor when he engaged in such criminal activity against the plaintiff, all civil-liability of [NP]'s unlawful actions against the plaintiff while [NP] was a minor falls upon [NP]'s parents, defendants [JSP&KAP].

**07.** [JJB] is a former White/Caucasian/American next-door neighbor of the Plaintiff - formerly residing at 【792 KINGFISHER LANE, Leander, TX 78641】 [792KLLTX78641], that according to the plaintiff's limited knowledge and/or public-records and/or public-media-reports, resided at [792KLLTX78641] from approximately {2009-03} to approximately {mid-2012}. According to current public-records and/or public-media-reports, [JJB] has a substantial criminal record, having served significantly more than one year in a Texas jail and/or Texas prison. According to the plaintiff's best estimates, [JJB], at the time of her residence at [792KLLTX78641], was approximately 150 pounds, approximately 5-feet-7-inches tall.

**08.** [BR] is the (formerly-minor, now-adult) son of defendant [RSR]. According to the plaintiff's best estimates and most recent information known to the plaintiff, [BR] is of the White/Caucasian/American color/race/nationality, approximately 6-feet-2-inches tall and weighs approximately 240 pounds.

**09.** "Summerlyn Property Owners Association" ("[SPOA]") is the private-corporation [HOA] of the 【Summerlyn】 subdivision. Unless otherwise specified, in this lawsuit, the term "the [HOA]" and any acronym containing (singular-form) "HOA" shall refer to [SPOA]. [SPOA] - most of its current/former Board-of-Directors, at least some of its current/former attorneys/paralegals, all of its current/former property-management-companies (and associated current/former property-management-company-employees) - are all either direct witnesses or potential witnesses to at least some of the incidents documented in this lawsuit.

**10.** "RealManage" [RealManage] is the Limited-Liability-Company, property-management-company representing [SPOA] during the initial years of {2009} through {mid-2016}.

**11.** "Spectrum Association Management" ("[SAM]") is the Limited-Liability-Company, property-management-company representing [SPOA] during the latter years of {mid-2016} through {PRESENT-DAY}.

**12.** [DMP] is a former White/Caucasian/American neighbor resident of the 【Summerlyn】 subdivision, formerly residing-at and/or owning the property 【785 KINGFISHER LANE, Leander, TX 78641】 ("[785KLLTX78641]"), that was a Board-Member of the [SPOA] Board-of-Directors for a very short period of time **(x)**. [DMP] acted as a crony/co-conspirator and/or extra-legal agent/front/proxy of [JSP&KAP],[RSR] in-order-to protect and insulate both [JSP&KAP],[RSR] and the [HOA] from all liability involved from [JSP&KAP]'s,[RSR]'s racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses committed against the plaintiff.

According to the plaintiff's limited knowledge and/or public records, [DMP] resided at [785KLLTX78641] from approximately {2011-09} to approximately {2018}, and served as a [SPOA] Board-Member from approximately {2017-11} to approximately {2018-04}. According to the plaintiff's best estimates, [DMP], at the time of his residence at [785KLLTX78641], was approximately 190 pounds, approximately 6-feet tall.

13.  [TH] is a former White/Caucasian/American neighbor resident of the 【Summerlyn】 subdivision, formerly residing-at and/or owning the property [785KLLTX78641] from approximately {2009-03} to approximately {2011-08}.

14.  [JH] and [SH], [JH&SH], husband and wife, are former White/Caucasian/American neighbor residents of the 【Summerlyn】 subdivision - formerly residing-at and/or owning the property 【780 KINGFISHER LANE, Leander, TX 78641】 , (" [780KLLTX78641]") - that according to the plaintiff's limited knowledge and/or public records, resided at [780KLLTX78641] from approximately {2009-03} to approximately {2016}. According to the plaintiff's best estimates, [JH] - not to be confused with [SPOA-CM-JH] - at the time of his residence at [780KLLTX78641], was approximately 190 pounds, approximately 6-feet-1-inches tall.

15.  [GR] is a current or former White/Hispanic/American neighbor resident of the 【Summerlyn】 subdivision - residing-at and/or owning the property [780KLLTX78641] - that according to the plaintiff's limited knowledge and/or public records, has been residing-at (or at least owning) [780KLLTX78641] since the year {2016}. According to the plaintiff's best estimates, [GR], at the time of the {2017} incidents documented in this lawsuit, was approximately 190 pounds and approximately 6-feet tall.

16.  [SPOA-P-BC], not to be confused with former [SPOA-CM-BC] (see below), is a current or former White/Caucasian/American resident the 【Summerlyn】 subdivision that is a former President of the [SPOA] Board-of-Directors. According to the plaintiff's limited knowledge and/or public records, [SPOA-P-BC] served as a [SPOA] Board-of-Director from approximately {2009} (or a year prior to {2009}) until his resignation as the [SPOA] President on-or-about the month of {2019-09}.

17.  [SPOA-VP-AH] is a current or former White/Caucasian/American resident the 【Summerlyn】 subdivision that is a former Vice-President of the [SPOA] Board-of-Directors. According to the plaintiff's limited knowledge and/or public records, [SPOA-VP-AH] served as a [SPOA] Board-of-Director from approximately {2009} (or a year prior to {2009}) until she lost her re-election campaign on or about the month of {2019-11}.

18.  [SPOA-MaL-ML] is a current or former White/Caucasian/American resident the 【Summerlyn】 subdivision that is a former Board-Member of the [SPOA] Board-of-Directors. According to the plaintiff's limited knowledge and/or public records, [SPOA-MaL-ML] served as a [SPOA] Board-of-Director (Member-at-Large) from approximately {2018} until she lost her re-election campaign on or about the month of {2019-11}. According to the plaintiff's limited knowledge and/or recollection, [SPOA-MaL-ML] had once stated that she was either a current or former employee of the State of Texas, specifically, the {Texas Department of Public Safety} [TDoPS].

19.  [SPOA-CM-BC] is a former Community-Manager (or Assistant-Community-Manager) of the [SPOA]. According to the plaintiff's limited knowledge and/or public records, [SPOA-CM-BC] served as a [SPOA] Community-Manager (or Assistant-Community-Manager) from approximately {2009} to approximately {2011}.

20.  [SPOA-CM-MA] is a former White/Caucasian/American Community-Manager of the [SPOA]. According to the plaintiff's limited knowledge and/or public records, [SPOA-CM-MA] served as a [SPOA] Community-Manager from approximately {2011} to approximately {2014}.

21.  [SPOA-CM-MW] is a former Community-Manager of the [SPOA]. According to the plaintiff's limited knowledge and/or public records,

[SPOA-CM-MW] served as a [SPOA] Community-Manager from approximately {2015} to approximately {mid-2016}.

22. [SPOA-CM-CD] is a former White/Caucasian/American Community-Manager of the [SPOA]. According to the plaintiff's limited knowledge and/or public records, [SPOA-CM-CD] served as a [SPOA] Community-Manager from approximately {mid-2016} to the month of {2019-09}.

23. [SPOA-CM-JH] is a former White/Caucasian/American Community-Manager of the [SPOA]. According to the plaintiff's limited knowledge and/or public records, [SPOA-CM-JH] served as a [SPOA] Community-Manager from approximately {2019-09} to approximately {mid-2021}.

24. [MP] is a former White/Caucasian/American resident the ⟦Summerlyn⟧ subdivision that was a Board-Member of the [SPOA] Board-of-Directors from a period of time spanning approximately {2014} (or a year prior to {2014}) through (approximately) the end of {2015}. According to the plaintiff's limited knowledge and/or public-records and/or public-media-reports, [MP] may still be a current or former Board-Member of another Property-Owners-Association located within Central-Texas.

25. [CLC] and [RAC], [CLC&RAC], husband and wife, are former White/Caucasian/American next-door-neighbor residents of the ⟦Summerlyn⟧ subdivision, formerly residing at ⟦792 KINGFISHER LANE, Leander, TX 78641⟧ [792KLLTX78641]. According to the plaintiff's limited knowledge and/or public records, [CLC&RAC] resided-at and/or owned-property-at [792KLLTX78641] from approximately {2012-10} to approximately {2016-04}.

26. [CB] and [KB], [CB&KB], husband and wife, are former White/Caucasian/American next-door-neighbor residents of the ⟦Summerlyn⟧ subdivision, formerly residing at ⟦792 KINGFISHER LANE, Leander, TX 78641⟧ [792KLLTX78641]. According to the plaintiff's limited knowledge and/or public records, [CB] resided-at and/or owned-property-at [792KLLTX78641] from approximately {2016-04} to approximately {2019-09}. According to the plaintiff's best estimates, [CB], at the time of his residence at [792KLLTX78641], was approximately 200 pounds, approximately 5-feet-9-inches tall.

27. "[TCEQ] James Lancaster" [TCEQ-JL] is a current or former White/Caucasian/American employee of the {Texas-Commission-for-Environmental-Quality} [TCEQ]. At the time of his unconstitutional-and-unlawful search/interrogation of the plaintiff and plaintiff's property on-or-about the date of {2017-05-28}, [TCEQ-JL] was approximately 225 pounds, 6-feet-1-inches-tall.

28. "[WCSO] Sheriff Deputy Peter Parks" ("[WCSD-PP]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO] that clearly, repeatedly and egregiously violated numerous of the plaintiff's rights via numerous acts of racial-oppression, discrimination and racketeering-activity against the plaintiff, and committed several retaliatory (thus felonious) and racially-motivated hate-crimes and racketeering-acts against the plaintiff, during the month of {2011-08}. According to the plaintiff's best estimates, [WCSD-PP], at the time of the documented incidents in {2011}, was approximately 200 pounds, approximately 6-feet tall.

29. "[WCSO] Sheriff Deputy JOHN-DOE-24" ("[WCSD-JD-24]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO] that was dispatched to the scene of the plaintiff's property on-or-about the date of {2011-08-30}, due to a 9-1-1 call made by the plaintiff's brother [PK].

30. "[WCSO] Sheriff Deputy JANE-DOE-25" ("[WCSD-JD-25]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO] that was dispatched to the scene of the plaintiff's property on-or-about the date of {2011-08-30}, due to a 9-1-1 call made by the plaintiff's brother [PK].

31. "[WCSO] Sheriff Deputy Stacy Pryor" ("[WCSD-SP]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO] that clearly and repeatedly violated multiple of the plaintiff's rights via multiple acts of racial-oppression and discrimination

SIDDHARTH KODE    V.    WILLIAMSON COUNTY, ET AL.                    1696907690

against the plaintiff, in the month of {2011-08} and {2012-03}. According to the plaintiff's best estimates, [WCSD-SP], at the time of the documented incidents in {2011}, was approximately 200 pounds, approximately 5-feet-8-inches tall.

32 . "[WCLE] Police Officer JOHN-DOE-21" ("[WCPO-JD-21]") is a current or former [WCLE] White/Caucasian/American Police officer (most likely, either Sheriff-Deputy or Constable-Deputy) that the plaintiff encountered in the 〖Summerlyn〗 {2011} *"National Night Out"* event.

33 . "[WCSO] Sheriff Sergeant Travis" ("[WCSS-T]") is a current or former Sheriff Sergeant of the [WCSO] who was the Sergeant superior to [WCSD-PP] and [WCSD-SP] during the incidents in {2011}/{2012}.

34 . "[WCSO] Sheriff Administrator Shannon Sandell" ("[WCSA-SS]") is a current or former Sheriff Administrator of the [WCSO] who provided information/contacts to the plaintiff for incidents in {2011}/{2012}.

35 . "[WCSO] Sheriff Detective Newell" ("[WCSDet-N]") is a current or former Sheriff Detective of the [WCSO] that refused to charge [JJB] even from [JJB]'s most-basic crimes of criminal-mischief/illegal-dumping against the plaintiff.

36 . "[WCSO] Sheriff Deputy Doan Cesar" ("[WCSD-DC]") is a current or former African-American Sheriff Deputy of the [WCSO] that took in a crime-report along with evidence from the plaintiff at the plaintiff's property [788KLLTX78641] on or about the date of {2019-07-30}. According to the plaintiff's best estimates, [WCSD-DC], at the time of the documented incidents in {2019}, was approximately 6-feet-tall, approximately 190 pounds.

37 . "[WCSO] Sheriff Deputy JOHN-DOE-6" ("[WCSD-JD-6]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO], who accompanied [WCSD-DC], and thus, took in a crime-report along with evidence from the plaintiff during the same incident dated {2019-07-30}.

38 . "[WCSO] Sheriff Deputy JOHN-DOE-13" ("[WCSD-JD-13]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO], who was summoned onto the plaintiff's private-property in-order-to interrogate the plaintiff due to a malicious complaint by defendant [RSR] made at nighttime during the month of {2017-04}.

39 . "[WCSO] Sheriff Deputy (FIRST-NAME-UNKNOWN) Conner" ("[WCSD-C]") is a current or former Sheriff Deputy of the [WCSO] that took in a report of criminal-trespass onto the plaintiff's private-property, and despite of the fact that there was already a warning citation issued to the perpetrator, [RSR], refused to charge, [RSR].

40 . "[WCSO] Sheriff Deputy Matthew Decker" ("[WCSD-MD]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO] that trespassed onto the plaintiff's property and performed an unconstitutional-and-unlawful search/interrogation of the plaintiff and plaintiff's property [788KLLTX78641] on or about the date of {2020-02-09}. According to the plaintiff's best estimates, [WCSD-MD], at that moment in time, was approximately 190 pounds, approximately 6-feet-1-inches-tall.

41 . "[WCSO] Sheriff Deputy JOHN-DOE-22" ("[WCSD-JD-22]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO] that accompanied [WCSD-MD] during another brief search of the plaintiff's property on or about the approximate date of {2020-02-24}. According to the plaintiff's best estimates, [WCSD-JD-22], at that moment in time, was approximately 200 pounds, approximately 6-feet tall.

42 . "[WCCHD] Sanitarian Sam Thomas" ("[WCCHDS-ST]") is a current or former White/Caucasian/American employee of the [WCCHD] that trespassed and performed an unconstitutional-and-unlawful search/seizure of the plaintiff's property on or about a day in the month of {2013-06}. According to the plaintiff's best estimates and/or recollection, [WCCHDS-ST], at that moment in time, was approximately 190 pounds, approximately 6-feet tall.

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

43. "[WCCHD] Team-Lead Steve Gilmer" ("[WCCHDTL-SG]") is a current or former employee (Team-Lead) of the [WCCHD] that provided information to the plaintiff over the phone on or about the month of {2013-06}.

44. "[WCSO] Sheriff Deputy JOHN-DOE-20" ("[WCSD-JD-20]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO] that accompanied [WCSD-JD-8] during the final moments of the unconstitutional-and-unlawful search of the plaintiff's property on or about the date of {2020-02-06}. According to the plaintiff's best estimates, [WCSD-JD-20], at that moment in time, was approximately 200 pounds, approximately 6-feet tall.

45. "[WCSO] Sheriff Deputy Chris Peña" ("[WCSD-CP]") is a current or former White/Hispanic/American Sheriff Deputy of the [WCSO] that accompanied [WCSD-MD] in the unconstitutional-and-unlawful search/interrogation of the plaintiff at the plaintiff's property [788KLLTX78641] on or about the date of {2020-02-09}. According to the plaintiff's best estimates, [WCSD-CP], at that moment in time, was approximately 210 pounds, approximately 5-feet-11-inches tall.

46. "[WCSO] Sheriff Detective Wayne Passailaigue" ("[WCSDet-WP]") is a current or former Sheriff Detective of the [WCSO].

47. "[WCSO] Sheriff Detective JOHN-DOE-23" ("[WCSDet-JD-23]") is a current or former Sheriff Detective of the [WCSO] that made a phonecall to the plaintiff on-or-about the date of {2021-01-22} regarding the plaintiff's reporting of racially-motivated hate-crimes by [JSP] and [RSR].

48. "[WCCO] Constable Deputy Robert Tijerina" ("[WCCD-RT]") is a current or former White/Hispanic/American Constable Deputy of the [WCCO] that performed one-or-more unconstitutional-and-unlawful search(s) of the plaintiff's property during the years of {2017} and {2019}. According to the plaintiff's best estimates, [WCCD-RT], at the moments in time that he entered the plaintiff's property, was approximately 200 pounds, approximately 5-feet-8-inches tall.

49. "[WCCO] Constable Deputy David Moore" ("[WCCD-DM]") is a current or former White/Caucasian/American Constable Deputy of the [WCCO] that performed one-or-more unconstitutional-and-unlawful search(s)/seizure(s) of the plaintiff's property during the year of {2015}. According to the plaintiff's best estimates, [WCCD-DM], at the moments in time that he entered the plaintiff's property, was approximately 200 pounds, approximately 5-feet-11-inches tall.

50. "[WCCO] Constable Deputy JOHN-DOE-4" ("[WCCD-JD-4]") is a current or former White/Caucasian/American Constable Deputy of the [WCCO] that made multiple racist and abusive statements while the plaintiff was on the plaintiff's parents property, [******LTX78641], on or about the date of {2020-02-03}. According to the plaintiff's best estimates, [WCCD-JD-4], at that moment in time, was approximately 180 pounds, approximately 5-feet-10-inches tall.

51. "[WCCO] Constable Deputy (FIRST-NAME-UNKNOWN) Holt" ("[WCCD-Holt]") is a current or former African-American Constable Deputy of the [WCCO] that unlawfully interrogated and blackmailed/threatened the plaintiff at the plaintiff's property on issues related to property-maintenance during the date of {2017-08-16}, despite of the fact that the plaintiff had already retained an attorney ([ATTORNEY-PS]) to represent the plaintiff on all matters related to property-maintenance on-or-about the previous month of {2017-04}.

52. "[WCCO] Constable Deputy (FIRST-NAME-UNKNOWN) Stinsoil" ("[WCCD-Stinsoil]") is a current or former African-American Constable Deputy of the [WCCO] who accompanied [WCCD-Holt] in aforementioned unlawful interrogation of the plaintiff at the plaintiff's property during the date of {2017-08-16}.

53. "[WCSO] Sheriff Deputy JANE-DOE-12" ("[WCSD-JD-12]") is a current or former Sheriff Deputy of the [WCSO] that later identified herself as "[WCSO] Sheriff Deputy Brandi Moore" ("[WCSD-BM]").

**54.** "[WCSO] Sheriff Deputy Don Zachary" ("[WCSD-DZ]") is a current or former Sheriff Deputy of the [WCSO] who updated crime-reports for crimes reported by the plaintiff in the month of {2011-09}.

**55.** "[WCSO] Sheriff Deputy Kiernan" ("[WCSD-K]") is a current or former Sheriff Deputy of the [WCSO] who updated crime-reports for crimes reported by the plaintiff in the month of {2011-09}.

**56.** "[WCSO] Sheriff Deputy Schaefer" ("[WCSD-S]") is a current or former Sheriff Deputy of the [WCSO] who updated crime-reports for crimes reported by the plaintiff in the month of {2011-09}.

**57.** "[WCSO] Sheriff Deputy Prez" ("[WCSD-Prez]") (Badge-Number-4778) is a current or former Sheriff Deputy of the [WCSO] who provided further information to the plaintiff regarding crime-procedure on-or-about the month of {2012-04}.

**58.** "[WCSO] Sheriff Deputy O'Neil" ("[WCSD-O-Neil]") is a current or former White/Caucasian/American Sheriff Deputy of the [WCSO] who stopped-his-police-vehicle-to-question the plaintiff while the plaintiff was walking within the public-property of the neighborhood on-or-about the morning of {2021-07-05} and the same Deputy who also visited the plaintiff on the plaintiff's property on-or-about the date of {2022-10-15} due to an alleged complaint made by a package-delivery-person.

**59.** "[WCCAO] Prosecutor Carson Walker" ("[WCCAOP-CW]") is a current or former Prosecutor employed by the [WCCAO] and/or the [WCDAO]. According to public records, [WCCAOP-CW] served in this Prosecutorial position since approximately {2020} or an earlier year.

# §V

# CAUSES OF ACTION (COUNT-4):

# DEFENDANTS' VIOLATIONS OF THE [RIaCOA] AGAINST

# PLAINTIFF

> "Defraud.": Merriam-Webster.com Dictionary: Merriam-Webster: (2023-07-30):
> https://www.merriam-webster.com/dictionary/defraud

*transitive verb*

*: "to deprive of something by deception or fraud"*

## ¶90

The plaintiff asserts that the plaintiff has sufficient evidence to indisputably prove the plaintiff's [RIaCOA] claim ("COUNT-4") against all of the defendants.

## ¶91

Through a pattern of corrupt-malicious-predatory-and-retaliatory racketeering-activity conducted as part of a more-than-a-decade-long, obstructive-and-retaliatory, blackmailing-and-defrauding, racketeering-enterprise against the plaintiff - the racketeering-activities of which did affect and/or were intended to affect interstate or foreign commerce (see below) - the defendants did knowingly conspire against the plaintiff, and did knowingly act-in-furtherance-of such corrupt-malicious-predatory-and-retaliatory conspiracy against the plaintiff to abusively weaponize (both as *"a sword and shield"*) the property-maintenance-laws and/or other property-laws as modern-day-Jim-Crow law, in-order-to directly engage in racial-oppression and racketeering-activity against the plaintiff, with the ultimate goal of the defendants' criminally-abusive actions against the plaintiff being to drive the plaintiff - an immigrant-of-color/indigenous-person - out of one-or-more White-neighborhood(s) (also in egregious violation of the [FHA]), thus ultimately in a conspiracy and scheme to defraud the plaintiff out of both the plaintiff's money and the plaintiff's (relatively-profitable) private-property-ownership, including, but not limited to, (relatively-profitable) private-property-ownership in one-or-more such White-neighborhood(s).

## ¶92

As part of this decade-long-racketeering-enterprise - the organization/hierarchy of which is depicted below (see diagram) - the defendants conspired against the plaintiff and acted-in-furtherance-of such conspiracy against the plaintiff, *"under color of law"*, abusively weaponizing (both as *"a sword and shield"*) the property-maintenance-laws and/or other property-laws as modern-day-Jim-Crow law to deprive and/or attempt-to-deprive the plaintiff of the plaintiff's rights - most notably, the plaintiff's right to private-property within one-or-more White-neighborhood(s) - directly engaging in such corrupt-malicious-predatory-and-retaliatory pattern-of-racketeering-activity against the plaintiff in-order-to achieve the defendants' ultimate goal of defrauding the plaintiff out of both the plaintiff's money and the plaintiff's (relatively-profitable) private-property-ownership within one-or-more such White neighborhood(s). Although [RSR] and [JSP&KAP] are accurately depicted in such diagram as the top-level-leadership of this extra-legal corrupt-malicious-predatory-and-retaliatory racketeering-enterprise against the plaintiff, [RSR] and [JSP&KAP] enlisted the help of otherwise legal organizations such as the agencies of [WCLE] (named as co-defendants in this lawsuit), the [SPOA] ("the [HOA]"), and otherwise seemingly law-abiding private-citizens (such as [DMP] and/or [CB]) to act either as their enforcers/muscle/cronies and/or agents/proxies, at least in circumstances of legal actions - such as the [HOA]'s predatory lawsuit against the plaintiff (in the years {2017,2018}), and [WCLE]'s purely-retaliatory Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff (in the years {2020,2021}) - in-order-to insulate (and thus protect) themselves and the entire racketeering-enterprise from facing the legal-consequences of their directly criminally-abusive actions of racial-oppression and racketeering-activity against the plaintiff.

▸ RACKETEERING-ENTERPRISE: ORGANIZATION AND HIERARCHY



## ¶93

In particular, the defendants conspired against the plaintiff and acted-in-furtherance-of such conspiracy against the plaintiff as part of the aforedescribed decade-long-racketeering-enterprise, performing the following racketeering-acts, through a pattern of corrupt-malicious-predatory-and-retaliatory racketeering-activity against the plaintiff - either individually or aggregately - but always in furtherance of the defendants' overall conspiracy/scheme and associated racketeering-enterprise aimed at defrauding the plaintiff (listed in no particular order of importance):

**01.**   viciously retaliate ([18-USC-PI-C73-§1513],[TPeC-T8-C36-§36.06]) against the plaintiff (by committing numerous retaliatory crimes against the plaintiff) for,

&#9398; the plaintiff's reporting of racially-motivated-hate-crimes (including, but not limited to, Intimidation/Interference, Blackmail, Criminal-

Mischief, Illegal-Dumping, False-Report, Texas-Fraud, Terroristic-Threat, Assault, Disorderly-Conduct, Harassment) committed against the plaintiff by chief-racketeers [RSR],[JSP&KAP], and/or the plaintiff's initial neighbor [JJB]; AND

Ⓑ the plaintiff's recording-of and/or reporting-of clearly unlawful racially-motivated civil-rights-violations committed against the plaintiff by individual members of the [WCLE] and [WCLE], as an entire institution, acting in furtherance of such corrupt-malicious-predatory-and-retaliatory conspiracy against the plaintiff

- specifically, under Texas law, the crimes of Abuse-Of-Official-Capacity ([TPeC-T8-C39-§39.02]), Official-Oppression ([TPeC-T8-C39-§39.03]), Criminal-Conspiracy ([TPeC-T4-C15-§15.02]), Discrimination ([TCPaRC-T5-C106-§106.001]), and in some cases, Misuse-Of-Official-Information ([TPeC-T8-C39-§39.06]), while under federal law, the crimes of Deprivation-of-Rights-Under-Color-of-Law ([18-USC-PI-C13-§242]), Conspiracy-Against-Rights ([18-USC-PI-C13-§241]), Intimidation/Interference ([42-USC-C45-SII-§3631],[18-USC-PI-C95-§1951],[18-USC-PI-C13-§245]).

02.  engage in numerous and retaliatory acts of witness-intimidation ([18-USC-PI-C73-§1512],[TPeC-T8-C36-§36.05]) against the plaintiff and/or other witnesses in-order-to coerce the plaintiff and/or other witnesses to refrain from reporting crimes committed against the plaintiff and/or threaten the plaintiff with adverse consequences for reporting such crimes committed against the plaintiff.

03.  engage in numerous and retaliatory acts of witness-tampering ([18-USC-PI-C73-§1512],[TPeC-T8-C36-§36.05]) of third-party-witnesses in-order-to corruptly-persuade such third-party-witnesses to testify unfavorably against the plaintiff.

04.  threaten the plaintiff with numerous, retaliatory and racially-motivated threats-of-murder ([18-USC-PI-C96-§1961],[18-USC-PI-C96-§1959]).

05.  attempt (and/or conspire) to use a dangerous weapon to retaliatorily assault (↙) the plaintiff ([18-USC-PI-C96-§1959],[42-USC-C45-SII-§3631],[18-USC-PI-C13-§249],[18-USC-PI-C13-§242],[18-USC-PI-C13-§245]) during multiple incidents.

06.  engage in numerous and retaliatory acts of interference-with-commerce-by-threats-or-violence ([18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959]) against the plaintiff (and/or one-or-more of the plaintiff's family members) and the plaintiff's private-property.

07.  engage in numerous and retaliatory acts of Interference-with-Federally-Protected-Activities ([18-USC-PI-C13-§245]) against the plaintiff (and/or one-or-more of the plaintiff's family members) (Δ).

08.  engage in numerous and retaliatory acts of felonious stalking ([TPeC-T9-C42-§42.072],[18-USC-PI-C95-§1951]) - including both in-person stalking and online stalking - against the plaintiff.

09.  engage in numerous and retaliatory acts of vandalism of the plaintiff's private-property, the sum damages of which, resulted in a felonious dollar-amount of criminal-mischief ([TPeC-T7-C28-§28.03],[18-USC-PI-C95-§1951]) against the plaintiff.

10.  retaliatorily destroy/conceal (and/or conspire-to/attempt-to destroy/conceal) at least some of the evidence-of the defendants' crimes ([18-USC-PI-C73-§1512],[18-USC-PI-C73-§1519],[TPeC-T8-C37-§37.09]) committed against the plaintiff, and in at least some cases, retaliatorily destroy/disable at least some of the plaintiff's recording-equipment and associated infrastructure ([18-USC-PI-C95-§1951]), including but not limited to, the plaintiff's security-cameras/security-camera-cables/security-camera-infrastructure (such as the physical part(s) of a building onto which such security-cameras have been installed), and the plaintiff's body-worn-camera - all of such recording-equipment that was deliberately and lawfully installed and/or used by the plaintiff to capture the defendants' virtually-limitless and seemingly-endless-stream-of hate-crimes/racketeering-acts/civil-rights-violations/abuses committed against the plaintiff.

11.  retaliatorily fabricate evidence and/or conspire-to/attempt-to fabricate evidence ([18-USC-PI-C73-§1503],[18-USC-PI-C73-§1519],

[TPeC-T8-C37-§37.09]), to be used in a purely-retaliatory Class-C-Misdemeanor-Public-Nuisance prosecution of the plaintiff - again, in the defendants' abusive weaponization of the property-maintenance-laws as modern-day-Jim-Crow law against the plaintiff.

12. retaliatorily abuse power, authority and the legal process by providing and using fraudulent and/or deliberately-misleading statements ([18-USC-PI-C47-§1001]) in-order-to deliberately thwart-and-impede the *"due administration of justice"* ([18-USC-PI-C73-§1503]) at least in some case(s), including the aforementioned fabricated evidence as part of multiple fraudulent, racially-motivated, criminal complaints against the plaintiff (dating back to {2011}) and as part of at least one civil complaint against the plaintiff - none of which, ultimately succeeded.

13. engage in multiple acts of retaliatory mail-fraud - via the {United States Postal Service}, [USPS] ([18-USC-PI-C63-§1341]) - against the plaintiff - all in furtherance of the defendants' overall conspiracy and scheme to defraud the plaintiff.

14. engage in numerous acts of retaliatory wire-fraud - via online (private-messaging, social-media-posting, form-submission) communications ([18-USC-PI-C63-§1343]) - against the plaintiff - all in furtherance of the defendants' overall conspiracy and scheme to defraud the plaintiff.

15. engage in numerous acts of retaliatory blackmail ([18-USC-PI-C41-§873],[TPeC-T7-C31]) against the plaintiff - abusively weaponizing the property-maintenance-laws, of all things:

Ⓐ in-order-to keep the plaintiff silent about the aforelisted hate-crimes/racketeering-acts/civil-rights-violations/felony-crimes ; AND/OR

Ⓑ in-order-to coerce the plaintiff to perform certain actions/services which they considered to be valuable ; AND/OR

Ⓒ in-order-to coerce, via racial-intimidation, the plaintiff to move out of *"their"* (exclusive-and-pure) White-neighborhood - all of the goals of which were valuable to the defendants.

16. engage in numerous other and retaliatory acts of obstruction-of-justice ([18-USC-PI-C73-§1503]) against the plaintiff, not only by performing the above, but by deliberately covering-up/concealing the above crimes ([18-USC-PI-C73-§1519]), and in the process, even predatorily railroading the plaintiff in a fraudulent and purely-retaliatory Class-C-Misdemeanor-Public-Nuisance prosecution of the plaintiff ([18-USC-PI-C73-§1513]) - the prosecution of which did not succeed.

17. with each-and-every one of the the aforedescribed retaliatory actions also being a separate violation of the [FHA] (see below), which strictly prohibits any retaliatory action(s) taken against those *"aggrieved person(s)"* (such as the plaintiff) who have made fair-housing-complaint(s) and/or taken part in fair-housing-investigation(s).

18. with the ultimate goal of all of the above pattern-of-racketeering-activity (and [FHA] violations) not only to cause both immense, irreparable and permanent/long-term harm onto the plaintiff, damages to the plaintiff's private-property and injury to the plaintiff's businesses, but much more importantly - in furtherance of the defendants' overall corrupt-malicious-predatory-and-retaliatory conspiracy and scheme to defraud the plaintiff out of both of the plaintiff's money and the plaintiff's (relatively-profitable) private-property-ownership - particularly private-property-ownership within one-or-more White neighborhood(s).

# ¶94

Although the plaintiff has amassed a very-large amount of incriminating evidence against the defendants, sufficient in-order-to prove the plaintiff's [RIaCOA] claim against the defendants, the plaintiff asserts that the plaintiff's claims of *"conspiracy"*, retaliatory *"witness-tampering"*, *"wire-fraud"* (and even *"mail-fraud"*) against the defendants is not limited solely to the evidence that the plaintiff currently has in

the plaintiff's possession. Instead, the plaintiff asserts that:

Ⓐ at least some (if not most) of [WCLE]'s recorded interactions with racketeer co-defendants [RSR],[JSP&KAP] will further corroborate the plaintiff's claim, assuming that [WCLE] did not engage in evidence-destruction (felony-crime and racketeering-act) of such recorded interactions; AND

Ⓑ one-or-more of the defendants have admitted to using multiple social-media-platforms and/or private-messaging platforms to engage in such *"conspiracy"*, retaliatory *"witness-tampering"*, and/or *"wire-fraud"* against the plaintiff.

As such, the plaintiff will only be able to determine the full range and scope of the defendants' conspiracy to violate the plaintiff's rights along with the defendants' scheme to defraud the plaintiff - and all of the defendants' actions in furtherance of such conspiracy against the plaintiff - if-and-when the plaintiff is granted the capability and opportunity by this Court to conduct Discovery and/or Depositions from:

Ⓐ the defendants; AND

Ⓑ the defendants' other co-conspirators, proxies, and agents; AND

Ⓒ the other implicated non-parties (see section above); AND

Ⓓ those particular social-media-platforms and moderators/administrators thereof ; AND

Ⓔ those particular private-messaging-platforms

- the latter two of which will most likely be necessary especially in cases where one-or-more of the defendants may have engaged in additional (and unlawful) evidence-destruction against the plaintiff.

# ¶95

In addition to all of plaintiff's assertions about the aforedescribed pattern-of-racketeering-activity performed as part of such racketeering-enterprise involving all of the defendants, the plaintiff also has sufficient evidence to prove that all three private-citizens named as racketeer co-defendants in this lawsuit - [RSR],[JSP],[KAP] - additionally violated [18-USC-PI-C43-§913] and/or [18-USC-PI-C43-§912] and/or [TPeC-T8-C37-§37.11] against the plaintiff, fraudulently operating *"under color of law"*, with the fraudulent authority of law-enforcement, and that all three of these private-citizens, while acting *"under color of law"*:

Ⓐ executed (or attempted to execute) unconstitutional-and-unlawful search(s)/seizure(s) of the plaintiff's private-property ; AND/OR

Ⓑ executed (or attempted to execute) unconstitutional-and-unlawful arrest(s)/detention(s) of the plaintiff (and/or one-or-more of the plaintiff's family-member(s)) ; AND/OR

Ⓒ demanded *"money, paper, document, or thing of value"* of the plaintiff (and/or one-or-more of the plaintiff's family-member(s)).

- with all three of these actions considered to be felony crimes under Texas law, [TPeC-T8-C37-§37.11]. The plaintiff further asserts that, on one-or-more occasions, [WCLE] did unlawfully deputize private-citizen racketeer co-defendants [KAP] and/or [JSP] in-order-to provide fraudulent authority to private-citizen racketeer co-defendants [KAP] and/or [JSP], so that [KAP] and/or [JSP] could act *"under color of law"* to execute one-or-more of the aforementioned unlawful search(s)/seizure(s) of the plaintiff's private-property.

## ¶96

Although no part of the plaintiff's [RIaCOA] claim against the defendants relies-upon, rests-upon or hinges-upon this particular assertion, the plaintiff additionally asserts that the defendants not only obstructed justice by directly engaging in the aforedescribed pattern of corrupt-malicious-predatory-and-retaliatory racketeering-activity against the plaintiff, but also indirectly, by preventing/hindering/deterring the plaintiff from approaching federal-law-enforcement - the [US-FBI] and the [US-AO] - and presenting the plaintiff's evidence to such federal-law-enforcement, because such federal-law-enforcement would have seen that the defendants:

Ⓐ got the [HOA] to sue the plaintiff (albeit, via blackmail, and based upon fraudulent-motivations); AND
Ⓑ charged and prosecuted, although unsuccessfully, the plaintiff for Class-C-Misdemeanor-Public-Nuisance

- and as a result of these facts, such federal-law-enforcement would not have taken the plaintiff's complaint against the defendants seriously. Therefore, the plaintiff asserts that the defendants repeatedly and egregiously abused power, authority and legal-process over the plaintiff, engaging in the aforedescribed pattern of corrupt-malicious-predatory-and-retaliatory racketeering-activity against the plaintiff ultimately in order to maliciously and fraudulently discredit and character-assassinate ( ☻ ) the plaintiff, while protecting-and-shielding themselves from liability for the decade of hate-crimes/racketeering-acts/civil-rights-violations/abuses that they aggregately committed against the plaintiff as a result of the decade of their conspiracy/scheme and associated racketeering-enterprise to defraud the plaintiff.

## ¶97

Again, the plaintiff asserts that the defendants acted with absolute impunity as part of the aforedescribed conspiracy/scheme and associated decade-long-racketeering-enterprise against the plaintiff, because they believed the plaintiff to be powerless (especially due to the plaintiff' racial-profile) and of too-low-intelligence (*"low-IQ"*) to do anything to stop it or expose it ( 🔒 ) .

## ¶98

The defendants criminally-abusive decade-long-racketeering-enterprise against the plaintiff was ultimately motivated by the defendants' strong racial-animus against the plaintiff, arising from their strong sense of racial-superiority over the plaintiff, leading them to believe that the plaintiff is a low-IQ, subhuman animal, unworthy of even the most basic human rights, let alone the right to private-property-ownership.

## ¶99

The plaintiff also asserts that [WCLE] made a crucial decision in {2011}/{2012} when it maliciously and predatorily conspired-with and acted-in-furtherance-of-such-conspiracy-with [RSR],[JJB] and [JSP] to egregiously violate the rights of the plaintiff - in those documented incidents of {2009-2012}.

## ¶100

After this crucial decision to predatorily violate the rights of the plaintiff that [WCLE] made in {2011}/{2012}, it then became virtually impossible for [WCLE] to charge and prosecute any existing and future crimes (of which there were several dozen counts) committed by these individuals - or for that matter, any of its own employees - because, if these individuals were to be charged and prosecuted for any of these crimes against the plaintiff, then it would have been revealed during the criminal trial(s) of these individuals that [WCLE] - an overwhelmingly majority-White government located in the overwhelmingly majority-White County of Williamson - repeatedly and consistently conspired-with and acted-with malicious individuals of the White-American race-and-nationality ([RSR],[JSP&KAP],[JJB],[WCSD-PP],[WCCD-Harrell] and their co-conspirators) to egregiously violate the rights of an immigrant-of-color/indigenous-person (the plaintiff) - a very incriminating and extremely damaging fact that defendant [WC] would never have wanted the public to know about.

## ¶101

Thus, [WCLE] did only do what it could do to avoid or, at least, postpone liability against itself and such co-defendants by repeatedly covering up the crimes committed by these co-defendants and some of its own employees against the plaintiff, while in the process, also repeatedly retaliating against the plaintiff, especially whenever the plaintiff made it clear that the plaintiff intended to press charges against the perpetrators.

## ¶102

In other words, after [WCLE] made that crucial decision in {2011}/{2012} to conspire with racketeer co-defendants [RSR],[JSP] to egregiously violate the rights of the plaintiff, [WCLE] had essentially dug itself into a hole - a hole that [WCLE] continued to deepen in the decade that followed - an increasingly-deep hole that it became increasingly difficult, if not impossible, for [WCLE] to get-out-of - ultimately and inevitably, leading to this plaintiff's [RIaCOA] lawsuit against defendants [WC], [WCLE], [JSP&KAP], [RSR].

## ¶103

The plaintiff asserts that the aforedescribed logic, is by far, the most innocent interpretation that explains [WCLE]'s shockingly and criminally abusive behavior/actions/conduct against the plaintiff - but even the most innocent interpretation of [WCLE]'s criminally abusive behavior/actions/conduct against the plaintiff would be more than enough to justify and substantiate the plaintiff's [RIaCOA] claim against defendant [WC] (and one-of-more of its employees).

## ¶104

Furthermore, even the most innocent interpretation of [WCLE]'s decade of criminally abusive actions against the plaintiff provides a cautionary tale of what happens after a government (or at the very least, some of its malicious employees/agencies) initially conspire-against and act-in-furtherance-of such conspiracy with malicious private citizens in-order-to violate the rights of another private citizen - regardless of whether-or-not racial-animus was a motivating factor.

## ¶105

Although no part of the plaintiff's [RIaCOA] claim (or [FHA] claim or [KKKA]:§1983 or [KKKA]:§1985 claim) - as already substantially

described above - against defendant [WC]/[WCLE] relies-upon, rests-upon or hinges-upon this additional assertion, the plaintiff also has strong-reason-to-believe, based on the evidence and fact-pattern accumulated by the plaintiff, that [WCLE] was prepared to offer [RSR], [JSP&KAP] with immunity (or at least substantial immunity/mitigation) from prosecution for their over-a-dozen count of felony-crimes/racketeering-acts and/or racially-motivated-hate-crimes aggregately committed against the plaintiff as part of their conspiracy/scheme and racketeering-enterprise against the plaintiff, if [RSR],[JSP&KAP] followed through (by providing fraudulent-testimony, fabricated-evidence, etc.) on a successful, but purely-retaliatory and fraudulent, Class-C-Misdemeanor-Public-Nuisance prosecution against the plaintiff - one of the more final parts/plans of the defendants' conspiracy/scheme and racketeering-enterprise against the plaintiff that ultimately did not succeed to fruition - since [WC] prosecutors dismissed the Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff after the plaintiff retained [ATTORNEY-TK], pled *"not guilty"*, demanded a jury trial, and requested discovery for approximately 4 months without being provided with any discovery (or any evidence) at any point in time.

## ¶106

The plaintiff further asserts that the defendants predatory weaponization (both as a *"sword and shield"*) of the property-maintenance-laws and/or other property-laws as modern-day-Jim-Crow law against the plaintiff was not only, a fraudulent legal cover and pretext under which the defendants could abuse the legal process and justify their crimes/civil-rights-violations (including racketeering-acts) against the plaintiff, but also, that much of this predatory weaponization actually relied upon the defendants' abusive gaslighting against the plaintiff: the defendants' repeated (although ultimately unsuccessful) attempts to paint the fraudulent narrative, again, for no other reason than their racial-animus arising from their strong sense of racial-superiority over the plaintiff, that there was something wrong with the plaintiff, while at the same time, the defendants were indisputably engaging in felony-crimes/racketeering-acts against the plaintiff - overt acts of the defendants' fraud and gaslighting against the plaintiff that the plaintiff seeks to fully expose by litigating this lawsuit.

## ¶107

As part of their decade-long predatory conspiracy against the plaintiff and their predatory actions taken against the plaintiff in furtherance of such conspiracy, the defendants expertly - not much unlike extremely skilled-and-intelligent con-artists - weaponized the property-maintenance-laws and/or other property-laws both as modern-day-Jim-Crow law and as fraudulent pretext under which they could not only freely, collaboratively and rejoicefully engage in the *"fun sport"* (φ) of the virtually endless stream of hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, but more importantly, with the ultimate goal of such conspiracy being to deprive and defraud the plaintiff out of the plaintiff's money and (relatively-profitable) private-property-ownership within one-or-more White neighborhood(s).

## ¶108

The plaintiff asserts that, if a police-department or any other law-enforcement-agency hires even one malicious/abusive person into their ranks, that even the hiring of that one malicious/abusive police-officer/law-enforcement-official is enough to allow the entire organization of law-enforcement to be operating as a corrupt organization against at least some victim(s) - the reason being that when even that one malicious/abusive police-officer/law-enforcement-official engages in civil-rights-violation(s) and/or racketeering-activity, the rest of the police-department and law-enforcement, more-often-than-not, remains silent about it - a well known and documented phenomenon known as the *"Blue Wall of Silence"*.

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                        1696907690

## ¶109

At least in this particular context, the *"Blue Wall of Silence"* should be considered to be the functional-equivalent of the *"Omertà"* - the code of silence used by members of criminal organizations - as in both cases, the silence is intended to protect both those members and the entire organization from liability - not only civil liability but also criminal liability.

## ¶110

As the plaintiff intends to prove, [WCLE] did not simply hire one malicious/abusive police-officer/law-enforcement-official into their ranks, but especially under the former Sheriff [WCS-RC], if even some of the reputable media report(s) are even partially accurate, [WCS-RC] made it a policy of hiring malicious/abusive police-officers/law-enforcement-officials into the ranks of the [WCLE] (see below) and there are even allegations that [WCS-RC] (and/or the leadership directly underneath [WCS-RC]) rewarded [WCLE] police-officers that engaged in at least one-or-more types of misconduct (see below).

## ¶111

The plaintiff asserts that even defendant [WC]'s hiring of [WCS-RC] as a [WCC] approximately 2 decades ago is extremely scandalous (to state the least) because [WCS-RC] was hired by defendant [WC] as a [WCCD] after he was either fired or forced to resign from the ⟨Austin Police Department⟩, [APD], following an alleged police-brutality incident involving him in which he and/or the ⟨City-of-Austin⟩, [CoA], were sued in federal court for civil-rights-violation(s) against one-or-more person(s)-of-color - a federal lawsuit that was not dismissed, but instead, settled out-of-court prior to trial (see below).

## ¶112

The plaintiff asserts that the same logic applies to the issue of racial-biases or racial-animus within a police-department or other law-enforcement-agency - that, if a police-department or other law-enforcement-agency hires even one malicious/abusive person with racial animus into their ranks, then the entire organization will be likely to operate with such racial-bias or racial-animus when that one malicious/abusive person engages in civil-rights-violation(s) and/or racketeering-activity against person(s)-of-color - again, due to the well known and documented phenomenon known as the *"Blue Wall of Silence"*.

## ¶113

For example, Jim Newton, a current or former journalist of the ⟨Los Angeles Times⟩, has stated about the ⟨Los Angeles Police Department⟩ ("[LAPD]"):

> *"The [LAPD] in the 1990s had reached a point in its history, where racism, if not openly accepted, at least was quietly tolerated. It was not something that would get you in trouble, to be seen as sort-of cavalierly racist - and that's where it's not 'a few bad apples'. That's an organization that is genuinely corrupt."*

## ¶114

There is only one, extremely-limited, scenario under which police-officer(s) and/or other law-enforcement-employee(s) are lawfully allowed to:

Ⓐ lie to a private-citizen: only when such law-enforcement-official(s) already have sufficient probable-cause to suspect that such private-citizen has committed a crime, or has been otherwise involved in a crime - and even in such case, such law-enforcement-official(s)' lying is only permitted to help elicit other incriminating information about the suspected crime(s). Even more importantly, such law-enforcement-official(s) never have the authority to lie to private-citizen(s) that are victim(s) of any crime(s).

Ⓑ execute a search/seizure without consent and without a search-warrant on a private-citizen's private-property: only when such law-enforcement-official(s) already have sufficient probable-cause to suspect that such private-citizen has committed a crime, or has been otherwise involved in a crime **AND** there are certain exigent/urgent circumstances (see below) that require the law-enforcement-official(s) to execute a search/seizure without such lawfully-obtained search-warrant.

Ⓒ detain a private-citizen: only when such law-enforcement-official(s) already have sufficient probable-cause to suspect that such private-citizen has committed a crime, or has been otherwise involved in a crime.

In every single instance documented in this lawsuit when official(s)/employee(s) of the [WCLE] have:

Ⓐ directly (either in person, or by phone) lied to the plaintiff, a private-citizen, the plaintiff has never been a suspect in any crime nor been otherwise involved in any crime, and instead, the plaintiff has almost always been a victim of crime.

Ⓑ executed clearly unconstitutional-and-unlawful search(s)/seizure(s) of the plaintiff's private-property, the plaintiff has never been a suspect in any crime nor been otherwise involved in any crime.

Ⓒ detained the plaintiff, the plaintiff has never been a suspect in any crime nor been otherwise involved in any crime.

For example, even when the plaintiff's predatory neighbors with extreme-racial-animus against the plaintiff - [JSP&KAP],[RSR] - and/or their cronies/co-conspirators had, acting repeatedly and fraudulently in-concert-with [WCLE], accused the plaintiff of any private-property-maintenance-violation, such alleged private-property-maintenance-violation does not constitute a crime because [WCLE] first has to issue a warning-citation to the plaintiff allowing the plaintiff 30 days (or 10 days based on the circumstances) to cure/abate the alleged private-property-maintenance-violation. The plaintiff intends to prove that the only reasons for the official(s)/employee(s)/agency(s) of [WCLE] to:
Ⓐ unlawfully lie to the plaintiff ; AND

Ⓑ conduct such brazenly unconstitutional-and-unlawful search(s)/seizure(s) of the plaintiff's private-property ; AND

Ⓒ unlawfully detain the plaintiff -

- were to:

Ⓐ (unlawfully) punish the plaintiff, as the defendants derived great pleasure/joy out of punishing the plaintiff ; AND/OR

Ⓑ conceal/cover-up crimes that they committed against the plaintiff ; AND/OR

Ⓒ retaliate against the plaintiff for the plaintiff's reporting of crime(s) and/or recording of crime(s) ; AND/OR

Ⓓ otherwise obstruct-justice against the plaintiff, for the decade of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses - committed by [JSP&KAP],[RSR] and some of [WCLE]'s own employee(s)/official(s) who directly acted in furtherance of such predatory conspiracy/scheme with these malicious neighbors (with extreme-racial-animus) against the plaintiff - that the plaintiff had the *"audacity"* to report and/or record.

## ¶115

For more than a decade, the plaintiff provided government defendant [WC], and specifically [WCLE], with more-than-sufficient, if not ample, information, primarily through the plaintiff's reporting of racially-motivated hate-crimes (including retaliatory, thus felonious, hate-crimes), that defendants [RSR], [JSP] (and initially, also the plaintiff's initial neighbor [JJB]) not only harbored extreme-racial-animus against the plaintiff, but were/are also of the far-right-wing-extremist persuasion - even if such individuals did not formally belong to one-or-more far-right-wing-extremist group(s)/cell(s) (see section concerning far-right-wing-extremism below) - that harbored extreme far-right-wing-extremist political-animus against the plaintiff, a political-activist. While government defendant [WC], and specifically [WCLE], is not allowed to curtail any type of political expression by far-right-wing-extremist(s) that would be considered to be first-amendment-protected activity, [WCLE] does, however, have the governmental responsibility, for the safety of all residents - and in particular, the most vulnerable minority-residents of the County of Williamson - at the very least, to minimally monitor the activities of such far-right-wing-extremist(s) and, whenever the activities cross the line into criminal territory, prosecute those criminal offenses to the fullest extent of the law. For example, the [US-FBI], other federal intelligence agencies (along with some non-profit watchdogs such as the [SPLC] and the [ADL]) have repeatedly - for many decades - reported that the far-right-wing-extremist threat is, by far, the greatest threat to both domestic and international security, especially due to the overwhelmingly larger volume of criminal activity committed by the relatively larger group(s)/cell(s) of such far-right-wing-extremists, at least some of which even cross into the territory of domestic and/or international terrorism (see section below). Government defendant [WC], and specifically [WCLE], due to their own right-wing leanings, not only did not take on this responsibility as part of the sworn official duties of law-enforcement with respect to the far-right-wing-extremist criminal activities of racketeer co-defendants [RSR],[JSP&KAP] (and initially, the plaintiff's initial neighbor [JJB]) against the plaintiff, but instead, actually repeatedly conspired-with and acted-with those same far-right-wing-extremists named as racketeer co-defendants in this lawsuit - [JSP&KAP],[RSR] - that had repeatedly and aggregately committed several dozen counts of hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff, in-order-to:

Ⓐ further violate the plaintiff's rights ; AND

Ⓑ fully deprive the plaintiff of the plaintiff's rights - most notably the plaintiff's rights to private-property ; AND

Ⓒ fully obstruct-justice against the plaintiff ; AND

Ⓓ drive the plaintiff, not only an immigrant-of-color/indigenous-person but also a (national-based) political-activist, out of an *"ultra-conservative"* White neighborhood ; THUS ULTIMATELY

Ⓔ in a conspiracy/scheme to defraud the plaintiff out of both the plaintiff's money and the plaintiff's (relatively-profitable) private-property-ownership within such White neighborhood.

As a more-than-a-decade-long, part-time political-activist, citizen-journalist, legal-observer and archivist, the plaintiff also studies United-States-

politics (and to a much lesser extent, international-politics) along with media-coverage of such politics, and as such student, the plaintiff is truly unaware of any case in recent American-history - the last 3 decades - where any governmental organization (at the local level, state level or federal level) has actively and directly conspired, in such a brazenly-open and unabashed manner, with far-right-wing-extremist(s) to violate the rights of the targeted-victim(s) of such far-right-wing-extremist(s). The closest recent high-profile case that comes to the plaintiff's mind is the vicious hunting and brutal murder of African-American young-man Ahmaud Arbery at the hands of far-right-wing-extremists (and former-law-enforcement/former-armed-forces private-citizens) Travis McMichael and Gregory McMichael. However, even in such case, it cannot be stated that [GCLE] actively conspired with those far-right-wing-extremists to commit the actual, isolated, one-off crime of murder, and instead, all the evidence known to the plaintiff shows that [GCLE] tried to cover-up that isolated, one-off crime because the McMichaels were former-law-enforcement/former-armed-forces, and thus, not because they were far-right-wing-extremists. Furthermore, to the best of the plaintiff's limited knowledge and understanding, there was no recognizable pattern-of-racketeering-activity involving [GCLE] acting in furtherance of any conspiracy with those far-right-wing-extremists (see section concerning national high-profile cases below). The plaintiff asserts that not only did [WCLE]'s predatory actions, in a more-than-a-decade-long corrupt-malicious-predatory-and-retaliatory conspiracy with racketeer co-defendants [JSP&KAP],[RSR], against the plaintiff encourage, legitimize, foster and nurture, vile, uncouth, barbaric and generally-uncivilized behaviors/actions/conduct against the plaintiff - not only from far-right-wing-extremist co-conspirator racketeer defendants [JSP&KAP],[RSR], but from some of its own officials/employees - but also, [WCLE]'s predatory actions against the plaintiff, in furtherance of such conspiracy actually rewarded and incentivized all of these individuals for the hate-crimes/civil-rights-violations/racketeering-acts/abuses that they aggregately committed against the plaintiff as part of such conspiracy - thus, creating a modern-day-Jim-Crow, obstructive-and-retaliatory, blackmailing-and-defrauding, toxic environment of racist lawlessness around the plaintiff. The plaintiff asserts that [WCLE] was, in actuality, not enforcing the laws of the State of Texas (nor the restrictive-covenants of the neighborhood) when it came to the plaintiff and the plaintiff's far-right-wing-extremist neighbors [JSP&KAP],[RSR],[JJB], but instead, by:

Ⓐ predatorily targeting the plaintiff in conspiracy with far-right-wing-extremist co-conspirator racketeer defendants [JSP&KAP],[RSR] for the plaintiff's alleged (and innocent) failure and/or *"inability"* to maintain the plaintiff's private-property according to White-American standards ; AND

Ⓑ protecting the plaintiff's far-right-wing-extremist co-conspirator racketeer defendants [JSP&KAP],[RSR] (and initial neighbor [JJB]) and some of its own employees from facing the consequences for the racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses that such far-right-wing-extremist neighbors and [WCLE] employees had aggregately committed against the plaintiff ; AND

Ⓒ protecting the plaintiff's far-right-wing-extremist neighbors from facing the consequences for their numerous, constant - and in some cases, far-more-egregious - restrictive-covenant violations -

- [WCLE] was truly, and in actuality, enforcing a modern-day-Jim-Crow version of *"White Supremacy"* against the plaintiff - retaliating against the plaintiff, obstructing-justice against the plaintiff, blackmailing the plaintiff, publicly-humiliating the plaintiff, and gaslighting the plaintiff - all in a conspiracy and scheme to defraud the plaintiff, an immigrant-of-color/indigenous-person, out of both the plaintiff's money and the plaintiff's (relatively-profitable) private-property-ownership within one-or-more of such White neighborhood(s). The plaintiff asserts that all of these particular set of facts are strongly indicative (as the plaintiff's evidence strongly demonstrates) that municipal-corporation government

defendant [WC]'s, and specifically [WCLE]'s, predatory conspiracy and actions taken, in-concert-with far-right-wing-extremist co-conspirator

racketeer defendants [JSP&KAP],[RSR], in furtherance of such conspiracy - through a pattern of corrupt-malicious-predatory-and-retaliatory

racketeering-activity - truly constitutes a *"corrupt organization"* and racketeering-enterprise (as defined by [RIaCOA]) against the plaintiff

(even lasting for a period of over ten years) - thus prosecutable, at least in Federal Civil Court, under the plaintiff's [RIaCOA] claim against the

defendants.

## ¶116

The plaintiff asserts that, for almost-all, if not all, of the time-period documented in this lawsuit, defendant [WC] - as a municipal-corporation

local-government - has, more-likely-than-not, been receiving Federal funds (from the {United States}) allocated for combating hate-crimes

- covering all aspects involved in such combating of hate-crimes - including, but not limited to, the reporting of hate-crimes to federal-law-

enforcement and recording of hate-crime incidents (accurately and thoroughly) onto federal-database(s) - especially since multiple federal hate-

crime laws enacted over the many decades ([HCPA],[CHCA],etc.) have allocated such Federal funds for State and Local governments. If it is

true that defendant [WC] has been receiving such Federal funds, then the plaintiff additionally asserts that despite of defendant [WC] receiving

such Federal funds, defendant [WC] has deliberately failed to properly and/or adequately use such Federal funds for all aspect(s) of combating

hate-crimes, including, but not limited to - the charging/prosecution of hate-crimes and/or reporting of hate-crimes to federal-law-enforcement

and/or recording of hate-crime incidents onto federal-database(s) - at the very least, in cases where the vicitms of such hate-crimes are

perceived-to-be *"powerless"* (such as the plaintiff). If these two particular assertions are true, then these assertions further corroborate the

plaintiff's claim that defendant [WC]'s law-enforcement, [WCLE], has truly been operating as a *"corrupt organization"* - by virtue of the fact

that defendant [WC] is:

Ⓐ accepting such Federal funds while deliberately failing to properly and/or adequately use such Federal funds for the intended purpose of

such Federal funds ; AND

Ⓑ retaliating and/or otherwise obstructing-justice against such *"powerless"* private-citizen victim(s) (such as the plaintiff) that do report hate-

crimes.

If these two particular assertions are true, then by acting in such corrupt manner, defendant [WC] has not only only been defrauding the

plaintiff but also the {United States}.

## ¶117

For all of, but not limited to, the reasons specified as follows, it is indisputable that the defendants' decade-long, corrupt-malicious-predatory-

and-retaliatory conspiracy to obstruct-justice-against the plaintiff and scheme to defraud the plaintiff - conducted as part of sueh decade-long

racketeering-enterprise against the plaintiff did affect and/or was-intended-to-affect interstate or foreign commerce, through such pattern of

aforespecified corrupt-malicious-predatory-and-retaliatory racketeering-activity:

01.   Every hate-crime *"substantially affects interstate commerce in many ways, including"*, but not limited to, all the ways specified by the

{United States Congress} findings in [34-USC-S111-C305-§30501] (see above). For over a decade, the defendants

conspiratorially and aggregately engaged in a seemingly-endless-stream-of hate-crimes against the plaintiff as part of such corrupt-

malicious-predatory-and-retaliatory racketeering-enterprise against the plaintiff.

**02.** The plaintiff is an immigrant-of-color, a (nationally-based) political-activist, a (real-property) private-property-owner, an engineer, an entrepreneur, a farmer, an archivist and a consumer. In every one of those capacities, but not limited to those capacities, the plaintiff is a person directly involved in interstate or foreign commerce - and with the plaintiff suffering all of the aforedescribed pattern-of-racketeering-activity from the defendants, acting in such corrupt-malicious-predatory-and-retaliatory conspiracy against the plaintiff.

**03.** During the entire time-period specified in this lawsuit, the plaintiff owned and continues-to-own one-or-more piece(s) of (real-property) private-property and the plaintiff is also an heir and/or beneficiary of one-or-more additional piece(s) of (real-property) private-property - including, but not limited to, such (real-property) private-property located outside of the United States - all of which are, by their very nature, involved in interstate or foreign commerce. For example, it is estimated that up-to or approximately forty-percent of (real-property) private-property purchases in the Central-Texas area are from out-of-state investors, while at least some percentage of private-property purchases and/or foreclosures are from out-of-state financial institutions. Two-or-more of the defendants repeatedly, corruptly and fraudulently blackmailed the [HOA] to foreclose on one of the plaintiff's (real-property) private-properties - thus, in a conspiracy and scheme to defraud the plaintiff out of the plaintiff's (real-property) private-property-ownership within such White neighborhood.

**04.** The plaintiff's (real-property) private-property [788KLLTX78641] (and in-particular, the plaintiff's [HOUSE]) is a private-property (and building) involved in interstate or foreign commerce. In particular, transactions of interstate or foreign commerce are executed from within [788KLLTX78641], with delivery of products and/or services involved in interstate or foreign commerce to-and-from [788KLLTX78641]. The defendants' pattern-of-racketeering-activity caused substantial damages to the plaintiff's private-property [788KLLTX78641] - a felonious amount in damages was done to at least one of the plaintiff's private-properties, a private-property involved in interstate or foreign commerce, as part of the aforedescribed racketeering-enterprise.

**05.** Two-or-more of the defendants' racketeering-acts against the plaintiff were also either suffered by (and/or directly witnessed by) the plaintiff's senior-citizen [MOTHER] and/or the plaintiff's senior-citizen [FATHER] - both immigrants-of-color who, and whose private-properties of which, are also indisputably involved in interstate or foreign commerce (δ).

**06.** The defendants' pattern-of-racketeering-activity caused a substantial amount in damages to three-or-more of the plaintiff's businesses - with each of these businesses involved in interstate or foreign commerce.

**07.** A primary (although not exclusive) goal of the aforedescribed racketeering-enterprise was to defraud the plaintiff out of both of the plaintiff's money and one-of-more of the plaintiff's private-properties, with such private-property(s) being involved in interstate or foreign commerce.

**08.** Two-or-more of the defendants conspired to stop one-or-more of the plaintiff's (national-based) political activities - the activities of which, are not only first-amendment-protected, but also involve interstate or foreign commerce.

**09.** At least one defendant threatened to cut the plaintiff's internet-service-cable - with both the internet-service and the plaintiff's use of such internet-service being involved in interstate or foreign commerce.

**10.** At least one defendant demanded the plaintiff, an immigrant-of-color, to return back to the country of the plaintiff's national-origin - a demand clearly intended to affect interstate or foreign commerce.

**11.** One-or-more of the defendants engaged in one-or-more racketeering-acts of *"wire-fraud"* against the plaintiff, which were transmitted by wire (online social-media communications and/or private-messaging communications) in interstate or foreign commerce. Furthermore, the plaintiff asserts that, even to this day, one-or-more of the defendants' communications (particularly social-media communications and/or private-messaging communications) in furtherance of the conspiracy/scheme to defraud the plaintiff are, more-likely-than-not, still

stored in out-of-state computer-servers that are involved in interstate or foreign commerce.

**12 .** One-or-more of the defendants engaged in one-or-more racketeering-acts of *"mail-fraud"* against the plaintiff, which were transmitted via the [USPS], an agency of the {United States} involved in interstate or foreign commerce.

**13 .** Three-or-more of the defendants engaged in one-or-more acts of *"Interference-with-commerce-by-threats-or-violence"* ([18-USC-PI-C95-§1951],[18-USC-P1-C95-§1959]) against the plaintiff, the plaintiff's private-property (and/or one-or-more of the plaintiff's family-member(s)).

**14 .** all of the defendants engaged in one-or-more acts of *"Interference-with-Federally-Protected-Activities"* ([18-USC-PI-C13-§245]) against the plaintiff - with such *"Federally-Protected-Activities"* being involved in interstate or foreign commerce (Δ) .

**15 .** The plaintiff has had to hire multiple attorneys - each of whom are involved in interstate or foreign commerce - to defend the plaintiff's rights from the direct and indirect criminally-abusive actions of the aforedescribed racketeering-enterprise.

**16 .** The defendants' criminally-abusive decade-long-racketeering-enterprise against the plaintiff coerced the plaintiff, through no choice of the plaintiff's own, to take multiple, directly protective measures such as, but not limited to:

Ⓐ wearing a body-worn-camera almost-always recording whenever the plaintiff goes outdoors ; AND

Ⓑ installing fence lock(s) ; AND

Ⓒ attending and recording [SPOA] meetings for further indications of the defendants' fraud against the plaintiff ; AND

Ⓓ monitoring,recording publicly-visible online communications (social-media-postings) for defendants' online harassment/stalking/witness-tampering/wire-fraud against plaintiff ; AND

Ⓔ installing increasing numbers of security-cameras (and associated security-camera-system infrastructure and recording-medium) on the plaintiff's private-property and even private-property owned by the plaintiff's senior-citizen [PARENTS] -

- with much of this recording equipment and/or security-devices being purchased as part of interstate or foreign commerce.

## ¶118

To simplify and shorten the terms used in this lawsuit, the term *"racketeering-enterprise"*, as it is used in the rest of this lawsuit, shall be short-form for the defendants' more-than-a-decade-long obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff as summarized above, and as further detailed in this lawsuit. Additionally, although the plaintiff repeatedly uses the time-period short-form *"decade"* to describe the defendants violations of both federal and state laws against the plaintiff, in actuality, most of such violations of law spanned **over** a decade, as the period of time documented in this lawsuit is the month of {2009-03} through {PRESENT-DAY}.

## ¶119

In this lawsuit, the plaintiff reveals over a decade of the defendants' numerous violations of both Texas criminal law (especially Texas felony law) and federal criminal law against the plaintiff. Although the plaintiff reveals over a decade of the defendants numerous violations of the Texas criminal law (especially Texas felony law) against the plaintiff, the plaintiff asserts that since all of these Texas crimes - beyond any-and-all reasonable doubt - are racially-motivated, such crimes are also federal crimes under the:

Ⓐ [FHA] (see section below): [42-USC-C45-SII-§3631] ; AND/OR

Ⓑ [CRAo1968]: [18-USC-PI-C13-§242], [18-USC-PI-C13-§241], [18-USC-PI-C13-§245] ; AND/OR

SIDDHARTH KODE     V.     WILLIAMSON COUNTY , ET AL.                1696207690

© [HCPA] - [18-USC-PI-C13-§249].

Thus, for the purposes of this lawsuit, any-and-all of such federal crimes:

Ⓐ committed in retaliation against witness-victim (plaintiff or third-party-witness(s) to crimes committed against plaintiff) ; AND/OR

Ⓑ committed in-order-to otherwise obstruct-justice against plaintiff ; AND/OR

Ⓒ committed as part of a scheme to defraud the plaintiff ; AND/OR

Ⓓ committed as part of a scheme to deprive the plaintiff of private-property ; AND/OR

Ⓔ committed as part of a scheme to deprive the plaintiff of the plaintiff's equal-rights ; AND/OR

Ⓕ committed as part of a conspiracy in furtherance of any of the above -

- are fully-actionable under the plaintiff's:

Ⓐ [RIaCOA] claim ; AND/OR

Ⓑ [FHA] claim (see relevant section below) ; AND/OR

Ⓒ [KKKA]:§1985 claim (see relevant section below) ; AND/OR

Ⓓ [KKKA]:§1983 claim (see relevant section below) ; AND/OR

Ⓔ [CRAo1866]:§1982 claim (see relevant section below) ; AND/OR

Ⓕ [CRAo1866]:§1981 claim (see relevant section below) ; AND/OR

Ⓖ [CRAo1964]:§2000d (see relevant section below) claim -

- against the defendants.


## ¶120

The plaintiff has also suffered other crimes by other unnamed residents and/or guests of the neighborhood, but not only because the plaintiff was tied up in researching, compiling and formulating this lawsuit, but also far more importantly, because the plaintiff has repeatedly been retaliated against by [WCLE], the plaintiff has deliberately failed to report these other crimes, because the plaintiff has-considered and continues-to-consider [WCLE] to be an organization that is purely-malicious and retaliatory towards the plaintiff and an organization that has acted with extreme racial-bias, if not overt racial-animus, against the plaintiff. Thus, the plaintiff has, for over a decade, been in a fully-vulnerable position to any-and-all crimes by any person(s) due to the decade of criminally-abusive, obstructive-and-retaliatory, blackmailing-and-defrauding pattern-of-racketeering-activity by the defendants that has effectively silenced the plaintiff by placing the plaintiff into an extremely dangerous position of powerlessness, or at the very least, *"learned helplessness"* - a crippling condition suffered by victims of human experimentation ( 🔒 ) .


## ¶121

Due to their relative lack of power, private citizens (including the plaintiff) and the general public place an enormous amount of trust on powerful law-enforcement-agencies to enforce the laws of the land. The plaintiff asserts that defendant [WC]'s malicious and predatory actions of obstruction-of-justice for the crimes committed against the plaintiff (including crimes committed by some employees of [WCLE]) for over a decade is the most extreme violation of the trust that any private-citizen and the public reasonably places on government (*"abuse of position of trust"*).

## ¶122

Although the plaintiff makes many additional assertions to bolster the plaintiff's [RIaCOA] claim against the plaintiff, per the [RIaCOA], the plaintiff only needs to prove that the defendants conspired with each-other and acted with each-other to commit racketeering-acts against the plaintiff, through a pattern of racketeering-activity conducted as part of a racketeering-enterprise against the plaintiff, the racketeering-activities of which did affect and/or was-intended-to-affect interstate or foreign commerce. Furthermore, per the [RIaCOA], although the plaintiff has an abundance of evidence of the defendants' racketeering-acts against the plaintiff, the plaintiff only needs to prove a pattern of such racketeering-activity consisting of two or more racketeering-acts within an open-ended period of time, with the additional requirement that no more than ten years pass between two consecutive racketeering-acts.

## ¶123

Additionally, per the [RIaCOA], the plaintiff only needs to prove that the defendants engaged in such racketeering-enterprise against the plaintiff. Thus, in order to succeed in the plaintiff's [RIaCOA] claim against the defendants, the plaintiff does not need to prove that the defendants engaged in any type of racketeering-enterprise against any other person(s).

## ¶124

The plaintiff asserts that federal-lawmakers wrote the [RIaCOA] as a long-ranging and open-ended law that was meant to target pattern-of-racketeering-activity conducted as part of a racketeering-enterprise over an extended (or open-ended) period of time. Thus, the plaintiff asserts that the [RIaCOA] is directly applicable to the extended time period - spanning over 10 years - of pattern-of-racketeering-activity committed by the defendants against the plaintiff - as substantially documented in this lawsuit.

## ¶125

Although the [RIaCOA] was originally written as part of federal criminal law, there is both a civil component ([18-USC-PI-C96-§1964]) and criminal component to the [RIaCOA], and the plaintiff's filing of COUNT-4 of this civil lawsuit against the defendants only enforces the civil component of the plaintiff's [RIaCOA] claims against the defendants - as the plaintiff, who is a private citizen, clearly has no enforcement-authority to enforce the criminal component of the plaintiff's [RIaCOA] claims against any of the defendants.

## ¶126

Pursuant to [18-USC-PI-C96-§1964(c)], which states in part, *"Any person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court ... "*, the plaintiff asserts that the defendants' numerous acts in violation of the [RIaCOA] against the plaintiff not only contributed to the plaintiff's significant injuries sustained within such (real-property) private-property (and place of business), but also caused:

Ⓐ significant (and felonious) amounts of damages to the plaintiff's private-property (and place of business) ; AND

Ⓑ significant economic damages to the plaintiff's multiple businesses - involved in interstate and/or foreign commerce, and which are run primarily, if not almost-exclusively, from within such private-property (and place of business) ; AND

Ⓒ while most importantly, having the ultimate goal of (fully) defrauding the plaintiff out of all of the plaintiff's money and the plaintiff's (relatively-profitable) private-property-ownership, as summarized above.

---

# §VI

# CAUSES OF ACTION (COUNT-2 ; COUNT-3):

# DEFENDANTS' VIOLATIONS OF THE [KKKA]:§1983 AGAINST PLAINTIFF

# DEFENDANTS' VIOLATIONS OF THE [KKKA]:§1985 AGAINST PLAINTIFF

## ¶127

The plaintiff asserts that this lawsuit is, in part, a deprivation-of-rights-under-color-of-law ([KKKA]:§1983) lawsuit and a conspiracy-against-rights ([KKKA]:§1985) lawsuit - in the most classic and quintessential form:

Here, the plaintiff, asserts that at least three private citizens - defendants [JSP],[KAP],[RSR] (initially four private citizens including [JJB]) - all of the White/Caucasian/American/Christian color/race/nationality/religion - did knowingly, repeatedly, corruptly, maliciously, predatorily, and retaliatorily conspire against the plaintiff, and did act in furtherance of such corrupt-malicious-predatory-and-retaliatory conspiracy against the plaintiff - along with other White-American private citizen co-conspirators/agents/proxies/cronies and an overwhelmingly majority-White-American municipal-corporation government (located within the overwhelmingly majority-White-American County of Williamson) - defendant [WC] - and specifically defendant [WC]'s law-enforcement-agencies - [WCLE] - to repeatedly - over the course of over a decade - violate and deprive the rights of the plaintiff, an immigrant-of-color/indigenous-person.

## ¶128

Pursuant to the plaintiff's [KKKA]:§1983 Deprivation-of-Rights-Under-Color-of-Law claims ("COUNT-2.1") against the defendants, the plaintiff seeks to present evidence to indisputably prove that the defendants did knowingly act **both** individually **and** in-concert-with each

other, for over a decade, in-order-to clearly-violate and deprive - in many cases, either repeatedly or constantly - the plaintiff's Constitutional rights and common-law rights under federal law, including, but not limited to the following Constitutional rights, listed in the order of greatest importance (or level-of-violation) to least importance (or level-of-violation):

01.   Fourteenth-Amendment (⭐): the plaintiff's right to freedom-from-discrimination - or the plaintiff's right to equal-protection-of-the-laws ; AND

02.   Fifth-Amendment: the plaintiff's due-process rights to *"life"*, *"liberty"*, **and** *"property"* - both procedural due-process and substantive due-process ; AND

03.   First-Amendment: the plaintiff's right to freedom-of-religion, freedom-of-expression, political-speech and art ; AND

04.   Fourth-Amendment: the plaintiff's rights to freedom-from-unreasonable-searches/seizures, freedom-from-unlawful-detainment, freedom-from-unlawful-interrogation ; AND

05.   Eighth-Amendment: the plaintiff's right to freedom-from-cruel-and-unusual-punishment ; AND

06.   Sixth-Amendment: the plaintiff's right to confrontation (of the plaintiff's accusers), the plaintiff's right to counsel, and the plaintiff's right to notice-of-accusation.

## ¶129

Pursuant to the plaintiff's [KKKA]:§1983 Deprivation-of-Rights-Under-Color-of-Law claims ("COUNT-2.2") against the defendants, the plaintiff also seeks to present evidence to indisputably prove that the defendants did knowingly act **both** individually **and** in-concert-with each other, for over a decade, in-order-to clearly-violate and deprive - in many cases, either repeatedly or constantly - the plaintiff's Statutory rights and common-law rights under Texas law, including but not limited to, the plaintiff's:

01.   Texas fair-housing-rights as defined by the [TFHA] ([TPrC-T15-C301]) - see next section ; AND

02.   Texas crime victims' rights as codified in the [TCoCP-T1-C56A] - all of those rights afforded (by law) to victims of crime in the State of Texas ; AND

03.   Texas private-property rights as codified in the [TPrC-T11-C202] - including, but not limited to, the non-discriminatory and fair enforcement of restrictive-covenants ; along with numerous rights afforded to Texas private-property-owners living within [HOA] subdivisions ; AND

04.   Texas private-property rights as codified in the [TPrC-T11-C209] - including, but not limited to, the fair procedure for enforcement of restrictive-covenants as they apply **equally** to **all** Texas private-property-owners (not just Texas White-American private-property-owners) ; AND

05.   Texas private-property rights as codified in [THaSC-T5-SA-C343] - concerning the unlawful entry into Texas private-property-owner's *"premises"* ; along with the Texas private-property-owner's lawful enjoyment/usage of his/her Texas private-property ; AND

06.   Texas private-property rights as codified in [THaSC-T5-SB-C365] - concerning the Texas private-property-owner's lawful enjoyment/usage of his/her Texas private-property ; AND

07.   Texas private-property rights as codified in [TCoCP-T1-C18] - concerning the unlawful search/seizure occurring within a Texas private-property-owner's *"premises"* ; AND

08.   Texas "Protection of Property" rights as codified in [TPeC-T2-C9-SD] - commonly referred to as the Texas private-property-owner's

*"Castle Doctrine"* rights ; AND

**09.** Texas "Protection of Persons" rights as codified in [TPeC-T2-C9-SC] - commonly referred to as the Texas private-property-owner's *"Stand Your Ground"* rights ; AND

**10.** ___.

## ¶130

Pursuant to the plaintiff's [KKKA]:§1985 *"Conspiracy to interfere with civil rights: Depriving ⟨plaintiff⟩ of rights ⟨and⟩ privileges"* claim ("COUNT-3.1") against the defendants, the plaintiff seeks to present evidence to indisputably prove that the defendants did knowingly conspire against the plaintiff and did knowingly act-in-furtherance-of-such-conspiracy against the plaintiff, for over a decade, in-order-to:

Ⓐ *"deprive"* the plaintiff of *"the equal protection of the laws"* (★) ; AND

Ⓑ *"prevent by force, intimidation, or threat"*, the plaintiff, *"who is lawfully entitled to vote, from giving"* the plaintiff's *"support or advocacy in a legal manner, toward"* and *"in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States"* ; AND

Ⓒ *"injure"* the plaintiff in the plaintiff's *"person or property on account of such support or advocacy"* ; AND

Ⓓ *"deprive"* the plaintiff, a citizen of the United States, *"of having and exercising"* the *"rights and privileges"* of such citizenship - including, but not limited to, the plaintiff's Constitutional, Statutory and common-law rights listed in the [KKKA]:§1983 sub-section above.

## ¶131

As already substantially outlined in the previous section (concerning [RIaCOA]), pursuant to the plaintiff's [KKKA]:§1985 *"Conspiracy to interfere with civil rights: Obstructing justice; intimidating ⟨plaintiff as⟩ party, witness"* claim ("COUNT-3.2") against the defendants, the plaintiff seeks to present evidence to indisputably prove that the defendants did knowingly conspire against the plaintiff and did knowingly act-in-furtherance-of-such-conspiracy against the plaintiff, for over a decade, in-order-to:

Ⓐ *"deter, by force, intimidation, or threat"*, the plaintiff, a party/witness, and one-or-more third-party-witness(s) of crimes committed against plaintiff, in *"court of the United States from attending such court, ⟨and⟩ from testifying to ... matter pending therein, freely, fully, and truthfully"* ; AND

Ⓑ *"impede, hinder, obstruct, or defeat ... the due course of justice in"* the State of Texas *"with intent to deny"* the plaintiff *"the equal protection of the laws"* ; AND

Ⓒ *"injure"* plaintiff and the plaintiff's property *"for lawfully enforcing, or attempting to enforce, the right of"* the plaintiff *"to the equal protection of the laws."*

SIDDHARTH KODE   V, __   WILLIAMSON   COUNTY ,   ET   AL,                   1696907690

## ¶132

The [KKKA], codified under [42-USC-C21], was originally written as part of federal civil law, and as such, the plaintiff's filing of this civil lawsuit against the defendants only seeks to enforce such federal civil [KKKA] claims against the defendants. However, the plaintiff, who is a private citizen, clearly has no enforcement-authority to enforce the criminal analog of the [KKKA] against the defendants, codified under [18-USC-PI-C13] - a substantial fraction of the defendants' civil-rights crimes committed against the plaintiff falling under the categories of [18-USC-PI-C13-§242] (*"Deprivation of Rights under Color of Law"*) and/or [18-USC-PI-C13-§241] (*"Conspiracy against Rights"*) and/or [18-USC-PI-C13-§245] (*"Interference with Federally Protected Activities"*).

## ¶133

The plaintiff asserts that defendant [WC] - and in particular, the law-enforcement-agencies of defendant [WC], [WCLE] - have policies and procedures and practices that fully allowed for such clear, deliberate, malicious and predatory violations-of, deprivations-of and conspiracy-against the plaintiff's rights as substantially documented in this lawsuit.

## ¶134

Although the plaintiff fully asserts that the defendants' egregiously discriminatory housing practice(s) against the plaintiff (see next section concerning [FHA],[TFHA]) were precisely due to the plaintiff's racial-profile, under the plaintiff's fourteenth-amendment (★) right to freedom-from-discrimination, the plaintiff also additionally asserts the *"class of one"* theory of *"equal protection"* under which, the plaintiff does not have to be a member of any such protected-class, but instead, that the defendants singled-out the plaintiff for discriminatory treatment on an *"irrational and wholly arbitrary"* basis, and that the defendants' conduct was motivated by a *"spiteful effort to get ⟨the plaintiff⟩ for reasons wholly unrelated to any legitimate state objective."*

## ¶135

The plaintiff asserts that the defendants' numerous acts in violation of both the [KKKA]:§1983 (COUNT-2) and the [KKKA]:§1985 (COUNT-3) against the plaintiff (as summarized above) caused the plaintiff's injuries.

---

# §VII

# CAUSES OF ACTION (COUNT-1):

# DEFENDANTS' VIOLATIONS OF THE [FHA],[TFHA] AGAINST

# PLAINTIFF

## ¶136

According to the (United States Department of Housing and Urban Development) ("[US-HUD]"), *"Housing Discrimination under the [FHA]"* is *"illegal in nearly all housing ... including private housing ... and housing that receives federal funding"*. The plaintiff asserts that the plaintiff's housing, [788KLLTX78641], is protected under the [FHA]'s definition of *"Housing Discrimination"* by virtue of being both *"private housing"* and *"housing that received federal funding"*.

## ¶137

Pursuant to the plaintiff's [FHA] claim and the plaintiff's [TFHA] claim against the defendants, the plaintiff is an *"aggrieved person"*, with the plaintiff, an *"aggrieved person"*, having cumulatively and aggregately suffered numerous [FHA] and [TFHA] violations from the defendants - acting individually and in-concert-with-each-other and in-conspiracy-with-each-other against the plaintiff from the years of {2009} through {2023}.

## ¶138

Pursuant to the plaintiff's [FHA] claim against the defendants, the plaintiff is also a person with *"handicap"*, with the plaintiff, a person with *"handicap"*, having cumulatively and aggregately suffered numerous [FHA] violations from the defendants - acting individually and in-concert-with-each-other and in-conspiracy-with-each-other against the plaintiff from the years of {2009} through {2023}.

## ¶139

Pursuant to the plaintiff's [TFHA] claim against the defendants, the plaintiff is also a person with *"Disability"*, with the plaintiff, a person with *"disability"*, having cumulatively and aggregately suffered numerous [TFHA] violations from the defendants - acting individually and in-concert-with-each-other and in-conspiracy-with-each-other against the plaintiff from the years of {2009} through {2023}.

## ¶140

The plaintiff asserts that the defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - acted to *"coerce, intimidate, threaten"* **and** *"interfere-with"* the plaintiff's *"exercise or enjoyment of"* **and** *"on account of (plaintiff's) having exercised or enjoyed"* **and** *"on account of (numerous persons') having aided or encouraged"* the plaintiff *"in the exercise or enjoyment of"* one-or-more rights guaranteed under the [FHA], including but not limited to, the plaintiff's ownership and residence of a *"dwelling"*, [788KLLTX78641], located within a predominantly White neighborhood of the County of Williamson - because of a combination of the plaintiff's race **and** the plaintiff's color **and** the plaintiff's religion **and** the plaintiff's national-origin - such combination hereby referred to as the plaintiff's racial-profile.

## ¶141

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.

The plaintiff additionally asserts that the defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - acted to *"coerce, intimidate, threaten"* **and** *"interfere-with"* the plaintiff's *"exercise or enjoyment of"* **and** *"on account of (plaintiff's) having exercised or enjoyed"* **and** *"on account of (numerous persons') having aided or encouraged"* the plaintiff *"in the exercise or enjoyment of"* one-or-more rights guaranteed under the [FHA], including but not limited to, the plaintiff's ownership and residence of a *"dwelling"*, [788KLLTX78641], located within the County of Williamson - because of the plaintiff's *"handicap"* **and** *"disability"*.

## ¶142

The plaintiff additionally asserts that the defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - acted to *"coerce, intimidate, threaten"* **and** *"interfere-with"* the plaintiff's *"exercise or enjoyment of"* **and** *"on account of (plaintiff's) having exercised or enjoyed"* **and** *"on account of (numerous persons') having aided or encouraged"* the plaintiff *"in the exercise or enjoyment of"* one-or-more rights guaranteed under the [FHA], including but not limited to, the plaintiff's ownership and residence of a *"dwelling"*, [788KLLTX78641], located within the County of Williamson - because of the plaintiff's *"actual or perceived"* *"gender identity"* and/or *"actual or perceived"* *"sexual orientation"* - a specific type of sexual discrimination barred under all federal civil-rights law.

## ¶143

The plaintiff asserts that the defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - acted to *"discriminate against"* the plaintiff *"in the terms, conditions, or privileges of sale or rental of a dwelling"*, [788KLLTX78641], *"or in the provision of services or facilities in connection therewith"* - because of the plaintiff's racial-profile.

## ¶144

The plaintiff additionally asserts that the defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - acted to *"discriminate against"* the plaintiff *"in the terms, conditions, or privileges of sale or rental of a dwelling"*, [788KLLTX78641], *"or in the provision of services or facilities in connection therewith"* - because of a the plaintiff's *"handicap"* and *"disability"*.

## ¶145

The plaintiff additionally asserts that the defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - acted to *"discriminate against"* the plaintiff *"in the terms, conditions, or privileges of sale or rental of a dwelling"*, [788KLLTX78641], *"or in the provision of services or facilities in connection therewith"* - because of a the plaintiff's (*"actual or perceived"*) *"gender identity"* and/or *"sexual orientation"* - a specific type of sexual discrimination barred under federal law.

## ¶146

The plaintiff asserts that the defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - additionally acted against the plaintiff to *"make housing unavailable"* to the plaintiff - primarily on the basis of the plaintiff's racial-

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

profile, but also on the basis of the plaintiff's handicap/disability and the plaintiff's *"actual or perceived"* gender-identity/sexual-orientation.

## ¶147

The plaintiff asserts that the defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - additionally acted against the plaintiff to deny *"housing services or facilities"* to the plaintiff - primarily on the basis of the plaintiff's racial-profile, but also on the basis of the plaintiff's handicap/disability and the plaintiff's *"actual or perceived"* gender-identity/sexual-orientation.

## ¶148

The plaintiff asserts that the defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - additionally acted against the plaintiff in-order-to *"evict"* the plaintiff - primarily on the basis of the plaintiff's racial-profile, but also on the basis of the plaintiff's handicap/disability and the plaintiff's *"actual or perceived"* gender-identity/sexual-orientation.

## ¶149

The plaintiff asserts that defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - additionally acted against the plaintiff to constantly *"harass"* the plaintiff - primarily on the basis of the plaintiff's racial-profile, but also on the basis of the plaintiff's handicap/disability and the plaintiff's *"actual or perceived"* gender-identity/sexual-orientation.

## ¶150

The plaintiff asserts that defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - additionally acted against the plaintiff to *"limit privileges, services or facilities"* of the plaintiff's *"dwelling"* - primarily on the basis of the plaintiff's racial-profile, but also on the basis of the plaintiff's handicap/disability and the plaintiff's *"actual or perceived"* gender-identity/sexual-orientation.

## ¶151

The plaintiff asserts that defendants - both individually **and** collectively - both in-conspiracy-with-each-other **and** in-concert-with-each-other - additionally acted against the plaintiff to *"assign (the plaintiff) to (another) neighborhood"* instead of the White neighborhood in which the plaintiff purchased private-property - primarily on the basis of the plaintiff's racial-profile, but also on the basis of the plaintiff's handicap/disability and the plaintiff's *"actual or perceived"* gender-identity/sexual-orientation.

## ¶152

The plaintiff seeks to present evidence to indisputably prove that the defendants - either individually or collectively (in-conspiracy-with-each-other or in-concert-with-each-other) - aggregately engaged in numerous and egregious Fair-Housing violations against the plaintiff, including but

not limited to:

Ⓐ multiple-dozen-count crimes of Racial-Intimidation against the plaintiff ;

Ⓑ multiple-dozen-count crimes of racially-motivated Harassment/Disorderly-Conduct against the plaintiff ;

Ⓒ over-a-dozen-count crimes of racially-motivated (and felonious) Stalking against the plaintiff ;

Ⓓ over-a-dozen-count crimes of racially-motivated Assault/Terroristic-Threats against the plaintiff including approximately-a-half-dozen-count of Threats-Of-Murder against the plaintiff ;

Ⓔ multiple-dozen-count crimes of racially-motivated Vandalism (Criminal-Mischief) against the plaintiff - the sum total of which resulted in a felonious dollar-amount of damages to the plaintiff ;

Ⓕ over-a-dozen-count crimes of racially-motivated Fraud (including, but not limited-to, Wire-Fraud, Mail-Fraud, and Texas-Fraud) against the plaintiff ;

Ⓖ numerous-count crimes of racially-motivated (and felonious) Evidence-Tampering/Fabricated-Evidence against the plaintiff ;

Ⓗ over-a-dozen-count crimes of racially-motivated (and felonious) Witness-Intimidation against the plaintiff, and/or other witnesses assisting the plaintiff, and/or other witnesses that witnessed crimes committed against the plaintiff ;

Ⓘ multiple-dozen-count crimes of racially-motivated (and felonious) Witness-Tampering against the plaintiff, in-order-to corruptly persuade/influence other witnesses to testify unfavorably against the plaintiff ;

Ⓙ over-a-dozen-count crimes of racially-motivated Blackmail/Extortion against the plaintiff ;

Ⓚ multiple-dozen-count crimes of racially-motivated Interference-with-Commerce-by-Threats-or-Violence against the plaintiff, the plaintiff's private-property (and/or one-or-more of the plaintiff's family members) ;

Ⓛ multiple-dozen-count crimes of racially-motivated Interference-with-Federally-Protected-Activities against the plaintiff (Δ) (and/or one-or-more of the plaintiff's family members) ;

Ⓜ multiple-dozen-count crimes of racially-motivated Deprivation-of-rights-under-color-of-law against the plaintiff ;

Ⓝ multiple-dozen-count crimes of racially-motivated Conspiracy-against-rights/Criminal-Conspiracy against the plaintiff ;

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                1696907690

Ⓞ multiple-dozen-count crimes of racially-motivated (and felonious) Obstruction/Retaliation against the plaintiff ;

Ⓟ multiple-dozen-count crimes of racially-motivated Obstruction-Of-Justice against the plaintiff ;

## ¶153

The plaintiff seeks to present evidence to indisputably prove that defendants [WCCO], [WCCHD], and the [WCSO] - either individually or collectively (as part of the aforedescribed conspiracy and associated racketeering-enterprise) - aggregately engaged in numerous crimes and/or abuses-of-office against the plaintiff, including but not limited to:

Ⓐ multiple-dozen-count crimes of racially-motivated Official-Oppression against the plaintiff ;

Ⓑ multiple-dozen-count crimes of racially-motivated Abuse-Of-Official-Capacity against the plaintiff ;

Ⓒ numerous-count crimes of racially-motivated Misuse-Of-Official-Information against the plaintiff ;

Ⓓ multiple-dozen-count crimes of racially-motivated Discrimination against the plaintiff ;

Ⓔ multiple-dozen-count acts of racial-profiling against the plaintiff ;

## ¶154

Furthermore, in addition to the extreme and irreparable injury caused by the crimes perpetrated by the defendants against the plaintiff, [WCLE]'s deliberate failure to prosecute any of the multiple-dozen-count of crimes - including felony-crimes/racketeering-acts and racially-motivated-hate-crimes - aggregately committed by the defendants (including some employees of [WCLE]) against the plaintiff during a period spanning over a decade is an egregious act of *"redlining"* - one of the most fundamental types of racial-discrimination - that is, a majority-White-American government's denial of taxpayer-funded services to an immigrant-of-color/indigenous-person - in clear violation of the [FHA] and the [TFHA].

## ¶155

By deliberately failing-to and/or refusing-to prosecute any-and-all crimes committed against the plaintiff, [WCLE] continued to send a powerful message, loud-and-clear, to all of these individuals (include its own employees/agencies), that the plaintiff - due to the plaintiff's minority-of-one racial-profile - has no rights, that all are free to continue to violate the plaintiff's rights with absolute impunity - as there will never be any prosecution of any crimes committed against the plaintiff. Indeed, [WCLE]'s deliberate failure and/or refusal to prosecute the initial and subsequent racially-motivated hate-crimes committed against the plaintiff by defendants [RSR],[JSP],[JJB], and the initial racially-motivated civil-rights-violations committed by some of [WCLE]'s own employees (that acted in conspiracy with [RSR],[JSP]) only served to embolden

[RSR],[JSP&KAP],[JJB] and their other White-American cronies/co-conspirators that they were free to continue-to-commit crimes against the plaintiff with absolute impunity.

## ¶156

Hearing [WCLE]'s powerful and loud message, the plaintiff's predatory neighbors - [RSR], [JSP&KAP] (and initial neighbor [JJB]) - and some of [WCLE]'s own employees/agencies have, for over a decade, engaged in overt crimes including numerous retaliatory crimes as part of the aforedescribed racketeering-enterprise against the plaintiff - many of the felonious type, many of the racketeering-activity type, all of which are racially-motivated hate-crimes/civil-rights-violations - and have faced absolutely no consequences for those crimes whatsoever (other than being rewarded for doing so), while during that same period of time, those same defendants conspired-with each other and acted-with each other to abusively weaponize (both as a *"sword and shield"*) the property-maintenance-laws as modern-day-Jim-Crow law, in an unsuccessful attempt to criminalize the plaintiff for the plaintiff's (innocent) failure and *"inability"* to:

Ⓐ maintain the plaintiff's private-property according to their (hypocritically-enforced) White-American standards ; AND

Ⓑ live a lifestyle - in direct conflict with the plaintiff's indigenous (religious) lifestyle - that conforms to their (hypocritically-enforced) White-American standards; AND

Ⓒ each individual action of which, and the combination of which, are clear violations of the plaintiff's civil-rights and the plaintiff's fair-housing-rights under the [FHA],[TFHA].

## ¶157

Any action to threaten, coerce, intimidate-or-interfere-with anyone exercising a fair-housing right or assisting others who exercise the right is a clear violation of the [FHA]. The plaintiff asserts that for over a decade, in response to the plaintiff's exercising of the plaintiff's fair-housing-rights and in response to numerous persons assisting the plaintiff's exercising of the plaintiff's fair-housing-rights, the defendants have repeatedly committed actions of threats, coercion and intimidation/interference against the plaintiff and/or those assisting the plaintiff in the exercise of the plaintiff's fair-housing-rights - thus in the process, clearly and repeatedly violating the [FHA] against the plaintiff.

## ¶158

Any action to retaliate against a person who has filed any fair housing complaint or assisted in any fair housing investigation is a clear violation of the [FHA]. The plaintiff asserts that, as early as {2011} and as early as late as {2022}, in response to the plaintiff's repeated reporting of racially-motivated hate-crimes (many of which are codified within the [FHA] and the [TFHA]) and racially-motivated civil-rights-violations committed by the defendants against the plaintiff, the defendants have repeatedly retaliated against the plaintiff, including, but not limited to, further counts of retaliatory crimes against the plaintiff. The plaintiff also further asserts that the plaintiff had reported information about such racially-motivated hate-crimes/civil-rights-violations to be used in an official fair-housing-investigation and/or official fair-housing-complaint, coordinated by a local non-profit agency, the [Austin Tenants Council] ("[ATC]"), which coordinates official fair-housing-investigations and fair-housing-complaints with the [US-HUD] and/or **{Texas Workforce Commission}** ("[TWC]") - the federal and state agencies (respectively) that handle official housing discrimination complaints.

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.   1696907690

## ¶159

Any action to harass a person because of race, color, religion, sex (including gender-identity - *"actual or perceived"*), handicap, familial status, national origin, or any combination thereof, is a clear violation of the [FHA]. The plaintiff asserts that for over a decade, the plaintiff has faced the most egregious forms of racially-motivated harassment from the defendants, with the defendants targeting the plaintiff precisely due to the plaintiff's minority-of-one combined-racial-profile (a combination of the plaintiff's race, color, religion, and national origin). The plaintiff additionally asserts that for over a decade, the plaintiff has faced the most egregious forms of harassment from the defendants, with the defendants targeting the plaintiff precisely due to the plaintiff's handicap/disability. The plaintiff additionally asserts that for over a decade, the plaintiff has faced the most egregious forms of harassment from the defendants, with the defendants targeting the plaintiff precisely due to the plaintiff's (*"actual or perceived"*) *"gender identity"* and/or *"sexual orientation"*.

## ¶160

Even ignoring the decade of racially-motivated, criminally-abusive actions committed by the defendants against the plaintiff - for which the defendants have faced absolutely no legal consequences whatsoever - the plaintiff asserts that the defendants have maliciously (thus deliberately) mis-interpreted the property-maintenance-laws (and other property-laws), and that the defendants maliciously (thus deliberately) enforced the property-maintenance-laws (and other property laws) both in an egregiously racially-discriminatory manner but also as modern-day-Jim-Crow law, predatorily targeting the plaintiff - an immigrant-of-color/indigenous-person:

Ⓐ for eviction from a White neighborhood (which the plaintiff asserts is, by far, the most egregious violation of the [FHA]); AND

Ⓑ for deprivation of the plaintiff's right to private-property and other rights of private-property-ownership within such White neighborhood.

## ¶161

The plaintiff also asserts that the defendants abusively weaponized (both as a *"sword and shield"*) the restrictive covenants ("civil contract law") as modern-day-Jim-Crow law against the plaintiff. According to Texas law, both [HOA](s) and property-owner(s) are prohibited from enforcing any restrictive covenant(s) in any manner that is *"arbitrary, capricious, or discriminatory"*. The plaintiff asserts that defendant [WC], and specifically the employees/agencies of [WCLE], are liable for their own clearly unlawful actions, and even if they were instructed to act in certain unlawful manner(s) by a [HOA] and/or other property-owner(s) against the plaintiff, then that fact does not, in any way, lessen defendant [WC]'s or its' relevant employees'/agencies' liability for such clearly unlawful actions, especially if defendant [WC] (or its' relevant employees/agencies) knew or reasonably-should-have-known the complaining parties to have malicious-intent, discriminatory-intent and/or animus (of any kind) against the plaintiff.

## ¶162

For example, the plaintiff asserts that for almost a decade, the employees/agencies of [WCLE] repeatedly engaged not only in numerous clearly Unconstitutional-and-Unlawful searches/seizures of the plaintiff's property, but also numerous racially-discriminatory inspections of the plaintiff's property. The plaintiff additionally asserts that for almost a decade, the employees/agencies of [WCLE] repeatedly engaged not only in numerous clearly Unconstitutional-and-Unlawful detentions/interrogations of the plaintiff, but also numerous racially-discriminatory detentions/interrogations of the plaintiff.

## ¶163

Even more egregiously, in their repeated attempts to unlawfully and/or discriminatorily enforce certain property-maintenance-laws against the plaintiff, the employees/agencies of [WCLE] repeatedly engaged in clearly Unconstitutional-and-Unlawful searches/seizures of the plaintiff's property, while at the same time the plaintiff reported certain property-maintenance-law violations to [WCLE] that [WCLE] never did need to violate anyone's right to enforce - as all of those violations were (or are) clearly visible from the public street. In particular, the plaintiff asserts that, at least within the White neighborhood and/or street in which the plaintiff resides, defendant [WC] deliberately has-not-been and is-not enforcing (or at the very least, not-consistently-enforcing) several property-maintenance-laws that primarily (if not exclusively) White-American (or non-immigrant) residents of the neighborhood (or a relatively greater fraction of such White-American/non-immigrant residents) have violated and are continuing-to-violate.

## ¶164

The plaintiff has evidence to prove that at least some of these violations were committed by neighboring-resident defendants [JSP&KAP], [RSR]. However, to the best of the plaintiff's knowledge and available evidence, these defendants also faced no consequences for such harmful violations, and by sharp contrast, it was only the plaintiff that faced the wrath of the [HOA] due to the predatory actions of the defendants.

## ¶165

The plaintiff strongly asserts that no corporation (including municipal-corporation government), let alone an overwhelmingly majority-White-government (such as defendant [WC]) located within an overwhelmingly majority-White-County (such as the County of Williamson), can *"cherry-pick"* which property-maintenance-laws it gets to enforce and/or how it interprets/enforces such law in any manner that - in any way, shape or form - favors (or gives a free pass to) residents of the dominant race/color/religion/nationality - White-Americans (and/or non-immigrants) - without such *"cherry-picking"* being considered a racially-discriminatory housing practice - thus, a clear violation of the [FHA] and the [TFHA].

## ¶166

The plaintiff strongly asserts that such racially-discriminatory *"cherry-picking"*, while clearly illegal, is also particularly egregious if the actual or potential harm (health-and-safety hazards) caused by the relative lack-of-enforcement of certain property-maintenance-restrictive-covenants committed by residents of the dominant race/color/religion/nationality - White-Americans (and/or non-immigrants) - is relatively much-greater than the heavy-handed enforcement of certain property-maintenance-restrictive-covenants disproportionately directed towards racial-minorities that are truly harmless and purely aesthetic/cosmetic. During the period of time documented in this lawsuit, the plaintiff strongly asserted (and continues-to-assert) that many of the violations of property-maintenance-laws primarily by White-Americans (or non-immigrants), for example - the illegal (and dangerous) lighting of fireworks, the illegal (and dangerous) unleashing of large dogs and cats to roam freely (even into others' backyards), and illegal (and dangerous) routinely speeding vehicles - in such deed-restricted neighborhoods posed and continues-to-pose an exponentially-worse threat to health-and-safety than any alleged property-maintenance-violation that the defendants (fraudulently) alleged against the plaintiff (during that same period of time), especially since the plaintiff was affirmatively asserting the plaintiff's Constitutional rights

(see section below) in innocently, but yet deliberately, maintaining the plaintiff's own private-property in such manner - all entirely (and exclusively) within the confines of the plaintiff's private-property. In particular, while the plaintiff has for almost a decade, brought attention to legitimate and serious health-and-safety hazards created by numerous White-American residents of such White neighborhood, the defendants have targetted the plaintiff - in a purely retaliatory manner - for purely aesthetic/cosmetic issues on the plaintiff's private-property - including the plaintiff's private/concealed [BACKYARD] - almost-always executing egregiously Unconstitutional-and-Unlawful searches/seizures of the plaintiff's private/concealed [BACKYARD] in such purely retaliatory and predatory actions undertaken as party of their predatory conspiracy to defraud the plaintiff.

## ¶167

The plaintiff also has substantial evidence to prove that [WCLE] even enforced some of the restrictive-covenants or other property-maintenance-laws regarding vegetation for which it repeatedly and predatorily targeted the plaintiff (in clear violation of the plaintiff's Constitutional rights) in a brazenly racially-discriminatory manner.

## ¶168

Despite of the decade of the defendants' predatory actions ostensibly (but fraudulently) meant to coerce the plaintiff to live-according-to and maintain the plaintiff's private-property according to their (hypocritically-enforced) White-American standards (in direct violation of the plaintiff's right to freedom-of-religion, freedom-of-expression, and freedom-from-discrimination), ignoring any temporary conditions on the plaintiff's private-property, and ignoring the fact that the plaintiff has installed a "no-mow" grass in the plaintiff's [FRONTYARD] - which was a compromise that the plaintiff unwillingly made in order to best preserve the plaintiff's Constitutionally-protected religious (indigenous) practices - there has been no substantive change in the manner in which the plaintiff lives, and there has been no substantive change in the manner in which the plaintiff maintains the plaintiff's private-property. In other words, the defendants have been largely unsuccessful in their coercive gaslighting/indoctrination attempts against the plaintiff, and the plaintiff still lives according to the plaintiff's indigenous (religious) values/practices and the plaintiff still maintains the plaintiff's private-property according to the plaintiff's indigenous (religious) values/practices, while defendants [JSP&KAP],[RSR], initial neighboring-resident [JJB] and at least some of the defendants' other White-American cronies/co-conspirators against the plaintiff have all moved out of the neighborhood.

## ¶169

For these reasons, if the plaintiff was "guilty" of the Class-C-Misdemeanor-Public-Nuisance charge that the defendants fraudulently, but unsuccessfully, tried-to-prosecute and did-prosecute and against the plaintiff in a purely-retaliatory manner for over a decade - continuing to obstruct justice and blackmail the plaintiff in the process of doing so - then, the plaintiff is just as "guilty" of that alleged Class-C-Misdemeanor-Public-Nuisance today. However, the plaintiff is unaware of any public-nuisance complaint made against the plaintiff by any neighbor since racketeer co-defendants [JSP&KAP],[RSR], the plaintiff's initial-neighbor [JJB], and at least some of their White-American cronies/co-conspirators/proxies/agents have moved out of the neighborhood - especially including the period of time (to the {PRESENT-DAY}) even after new tenants have moved into the private-property [784KLLTX78641] that was the former primary-residence of [JSP&KAP]. Despite of the fact that there has been no substantive change made by the plaintiff to the manner in which the plaintiff lives nor the manner in which the plaintiff maintains the plaintiff's private-property, the plaintiff has noticed a diametrically-opposite, night-and-day

difference from the corrupt-malicious-predatory-and-retaliatory treatment - over a decade of racial-oppression and racketeering-activity - that the plaintiff had suffered from racketeer co-defendants [JSP&KAP],[RSR] (and their former co-conspirators/agents/proxies/cronies) compared to the civilized treatment of the plaintiff by the plaintiff's new neighbors. The plaintiff asserts that all of these set of facts firmly establish that the decade of racial-oppression and racketeering-activity that the plaintiff suffered by the defendants were purely motivated by racketeer co-defendants [JSP&KAP]'s,[RSR]'s extreme-racial-animus against the plaintiff, and the municipal-corporation local-government, [WC]'s - specifically its law-enforcement-agencies, [WCLE]'s - active participation in such racially-motivated conspiracy and associated racketeering-enterprise to drive the plaintiff out of what they considered to be *"their"* (exclusive-and-pure) White neighborhood.

# ¶170

The plaintiff further asserts that there are a few crucial motivating factors, beyond simple racism, driving not only the aforedescribed racially discriminatory application of law, but also, far more importantly, the defendants' predatory, criminally-abusive behaviors/actions/conduct against the plaintiff - including, but not limited to, the decade of the defendants' racial-oppression and racketeering-activity against the plaintiff - that is not only both very beneficial/favorable to White-American private citizens (or at least those with racial-animus and/or racial-bias) and the majority-White government of [WC], or at least, the current and recent-past political leadership of defendant [WC], but at same time, that is also completely violative of the rights of peoples-of-color, including, but not limited to, the plaintiff. Since the plaintiff is filing this [FHA] and [TFHA] complaint against the defendants based primarily on racial discrimination, these additional assertions must also be pled:

01.  Firstly, White-Americans with racial-animus and/or racial-bias do not want to live-in and raise-their-children-in what they perceive to be *"their"* (exclusive-and-pure) White neighborhoods, living next to person(s)-of-color or at least those person(s)-of-color that do not conform to White-American standards. So, it is in the interest of such White-Americans with racial-animus and/or racial-bias to, by any means necessary, conspire with institutions of power such as local-government and/or [HOA] to evict (or deprive-of-private-property-or-other-rights) person(s)-of-color from what they perceive to be *"their"* (exclusive-and-pure) White neighborhoods - resorting to any type of "redlining" tactics/strategies.

02.  Secondly, it is indisputable that the government of [WC] - or at least the current and recent-past leadership of [WC] - is dominated by the Republican Party (🐘). The plaintiff asserts that the Republican Party leadership of [WC] wants to maintain the County of Williamson - and especially the suburban/exurban White neighborhoods of the County of Williamson - as White-American as possible, for clearly-obvious political reasons: so, that the Republican Party can continue to win re-election, and maintain their political power within the County of Williamson. Within the last few decades, as time has passed, the general-election results have become increasingly tighter - with the Republican Party now winning elections by sometimes razor-thin margins within the County of Williamson. Therefore, every person-of-color, such as the plaintiff, that is adversarial to the Republican Party is potentially *"fair-game"* for such evictions, in-order-to make sure that the Republican Party maintains control over the County of Williamson.

03.  Thirdly, aside from the *"political power"* reason specified above, at least some majority-White governments have long known that beneficial (for political reasons) and/or convenient racial divisions within society are best-achieved (or at least more-easily-achieved) by keeping the population segregated by race, and perhaps the easiest way to segregate the population by race is to, by any means necessary, evict person(s)-of-color residing within White neighborhoods. Racial divisions within society contribute to beneficial and/or convenient differences in political-ideology and culture between differing racial groups, and it is at least sometimes stated or asserted, that one of the best ways for a government to control a population is to divide (or atomize or polarize) the population - for example,

along racial/political lines - and keep the population divided (or atomized or polarized) under such racial/political lines. So, at least some such majority-White-governments view racial segregation not only as a beneficial tool for maintaining *"political power"*, but also as an easy way to control the population - as one of the more pernicious means/methods of social control.

04. Fourthly, and perhaps most importantly, it is indisputable that every real-estate private-property is an investment with the value (thus profit) of such investment typically rising in most years. The real-estate in the Central-Texas area of the United States has been a particularly profitable type of real-estate investment - amongst the most profitable regions in the United States - with relatively-larger numbers of out-of-state investors investing in real-estate in the Central-Texas area - primarily due to huge demand for such real-estate located in this highly-favorable (for multiple reasons) region of the United States and not enough supply to meet that demand - leading to relatively rapid increases in property appraisal/valuation from year-to-year, compared to other parts of the United States. It is indisputable that the defendants' criminal-abusive, predatory actions against the plaintiff were always intended to drive the plaintiff - an immigrant-of-color/indigenous-person - out of relatively-profitable private-property-ownership within the County of Williamson, thus defrauding the plaintiff out of such highly-profitable private-property-ownership and investment, so that, such right and privilege of the most profitable regions - in essence, the best investments - of private-property-ownership can be placed into the hands of the most privileged class of people - indisputably, White-Americans. By placing greater wealth into the hands of such privileged class of people, majority-White-governments such as defendant [WC] are also, indisputably, placing more financial power, more legal power and more political power into the hands of this privileged class of people - at least in part, so that they can maintain political power over the region - while at the same time, maliciously depriving and defrauding at least some people-of-color, including, but not limited to, the plaintiff, from such wealth and power.

## ¶171

For all of, but not limited to, the reasons specified above, the plaintiff asserts that the plaintiff represented a similar, if not the same, type of *"demographical problem"* to the defendants that is alleged by the Petitioner, ⟪United States⟫, against the respondents in ⟪UNITED STATES V. CITY OF HESPERIA, COUNTY OF SAN BERNARDINO, AND SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT⟫ (see section below).

## ¶172

Despite the fact that the plaintiff is filing this [FHA] and [TFHA] complaint against the defendants primarily over the issue of racial-discrimination, a common theme that is documented in this lawsuit is better expressed as follows: For the plaintiff to describe the defendants' conduct (including [WCLE]'s conduct) against the plaintiff as *"racial discrimination"* would be a gross understatement, as the phrase *"racial discrimination"* does not begin to capture the egregious racially-motivated civil-rights-violations that the defendants have continually perpetrated against the plaintiff for over a decade. The defendants' conduct against the plaintiff far exceeds what would normally be considered *"racial discrimination"*, and instead, falls under the more egregious categories of *"racial-oppression"* and/or racially-motivated *"racketeering-activity"* (including retaliation-against-witness, retaliatory witness-tampering, retaliatory fabrication-of-evidence/evidence-tampering, retaliatory threats-of-murder, retaliatory blackmail, retaliatory fraud, retaliatory conspiracy and general obstruction-of-justice).

## ¶173

Although the plaintiff makes all of these additional assertions about the defendants, per the [FHA], the plaintiff only needs to prove that the defendants engaged in illegal housing discrimination (or such discriminatory housing practice(s)) against the plaintiff, and the plaintiff has an abundance of evidence to prove that claim.

## ¶174

The plaintiff asserts that federal-lawmakers wrote the [FHA] as a long-ranging and open-ended law that was meant to target illegal housing discrimination (or such discriminatory housing practice(s)) committed over an extended (or open-ended) period of time. Thus, the plaintiff asserts that the [FHA] is directly applicable to the extended time period of illegal housing discrimination (or such discriminatory housing practice(s)) that the defendants committed and/or continue-to-commit against the plaintiff.

## ¶175

Although the [FHA] was originally written as part of both federal criminal law and federal civil law, the plaintiff's filing of COUNT-1 of this civil lawsuit against the defendants only seeks to enforce the civil component of the plaintiff's [FHA] claims against the defendants - as the plaintiff, who is a private citizen, clearly has no enforcement-authority to enforce the criminal component of the plaintiff's [FHA] claims against the defendants.

## ¶176

The plaintiff asserts that the defendants' numerous acts in violation of the [FHA] and [TFHA] against the plaintiff (as summarized above) caused the plaintiff's injuries.

## ¶177

The plaintiff asserts that while the plaintiff has filed this lawsuit against the defendants with seven core-claims (seven counts) against the defendants under five separate and distinct federal laws - the [FHA]; the [RIaCOA]; the [KKKA] ([KKKA]:§1983, [KKKA]:§1985); the [CRAo1866] ([CRAo1866]:§1982, [CRAo1866]:§1981); and the [CRAo1964] - the plaintiff further asserts that the plaintiff's primary claim against the defendants in this lawsuit is under the [FHA]. In particular, the plaintiff asserts that this lawsuit has been modeled, at least in a very small part, based upon the [FHA] lawsuits, 《UNITED STATES V. CITY OF HESPERIA, COUNTY OF SAN BERNARDINO, AND SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT》 and 《GILEAD COMMUNITY SERVICES V. TOWN OF CROMWELL》 (see sections below).

---

# §VIII

# CAUSES OF ACTION (COUNT-5):

# DEFENDANTS' VIOLATIONS OF THE [CRAo1866]:§1982

# AGAINST PLAINTIFF

## ¶178

As already substantially outlined in the previous section (concerning [FHA]/[TFHA]), pursuant to the plaintiff's [CRAo1866]:§1982 claim against the defendants, the plaintiff seeks to present evidence to indisputably prove that the defendants did knowingly conspire together and act in-concert-with each other, in furtherance of such conspiracy - both individually and collectively - for over a decade - in-order-to deprive the plaintiff, an immigrant-of-color/indigenous-person, of all of the plaintiff's rights to private-property - both *"real and personal property"* - specifically, the rights *"to inherit, purchase, lease, sell, hold, and convey"* such private-property - as was enjoyed and is (continues-to-be) enjoyed by *"White citizens"*.

## ¶179

The plaintiff asserts that the defendants' numerous acts in violation of the [CRAo1866]:§1982 (COUNT-5) against the plaintiff (as summarized above) caused the plaintiff's injuries.

---

# §IX

# CAUSES OF ACTION (COUNT-6):

# DEFENDANTS' VIOLATIONS OF THE [CRAo1866]:§1981

# AGAINST PLAINTIFF

## ¶180

As already substantially outlined in the previous section (concerning [FHA]/[TFHA]), pursuant to the plaintiff's [CRAo1866]:§1981 claim against the defendants, the plaintiff seeks to present evidence to indisputably prove that the defendants did knowingly conspire together and act in-concert-with each other, in furtherance of such conspiracy - both individually and collectively - for over a decade, in-order-to deprive the plaintiff, an immigrant-of-color/indigenous-person, of the plaintiff's equal rights *"to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White*

SIOBHANIE KODE   V.   WILLIAMSON COUNTY ; ET AL.

*citizens"*.

## ¶181

The plaintiff asserts that the defendants' numerous acts in violation of the [CRA01866]:§1981 (COUNT-6) against the plaintiff (as summarized above) caused the plaintiff's injuries.

---

# §X

# CAUSES OF ACTION (COUNT-7): DEFENDANTS' VIOLATIONS OF THE [CRA01964]:§2000d AGAINST PLAINTIFF

## ¶182

The plaintiff, an immigrant-of-color/indigenous-person, did *"receive federal financial assistance"* to help finance the plaintiff's private-housing, [788KLLTX78641] (Δ) .

## ¶183

According to the plaintiff's limited knowledge and understanding, [JSP&KAP], both persons of the White/Caucasian/American color/race/national-origin, did *"receive federal financial assistance"* to help finance [JSP&KAP]'s former private-housing, [784KLLTX78641].

## ¶184

According to the plaintiff's limited knowledge and understanding, [RSR], a person of the White/Caucasian/American color/race/national-origin, did *"receive federal financial assistance"* to help finance [RSR]'s former private-housing, [789KLLTX78641].

## ¶185

According to the plaintiff's limited knowledge and understanding, Defendant [WC] - and in particular, defendant [WC]'s law-enforcement-agencies, [WCLE] - did and continue-to *"receive federal financial assistance"* - for multiple purposes, including, but not limited to, defendant [WC]'s and/or [WCLE]'s:

Ⓐ operation and/or administration of housing/property-related services ; AND

Ⓑ enforcement of housing/property-related laws ; AND

Ⓒ enforcement of the hate-crime laws (as defined in the previous section) ; AND

Ⓓ construction and/or maintenance of infrastructure for the equal benefit of all citizens of the County of Williamson.

## ¶186

Therefore, each-and-every-violation of the defendants' numerous violations of plaintiff's:

Ⓐ fair-housing rights under the [FHA]/[TFHA] ([42-USC-C45]/[TPrC-T15-C301]) to be free from any-and-all forms of housing-discrimination ; AND

Ⓑ equal rights to *"private-property"* - specifically, the equal rights *"to inherit, purchase, lease, sell, hold, and convey"* both *"real and personal property"*, *"as is enjoyed by White citizens"* ([CRAo1866]:§1982) ; AND

Ⓒ equal rights to *"to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by White citizens"* ([CRAo1866]:§1981) ; AND

Ⓓ rights to *"equal protection of the laws"* - the plaintiff's fourteenth-amendment rights under the [KKKA]:§1983 ; AND

Ⓔ rights to be free from any conspiracy against the plaintiff's rights to *"equal protection of the laws"* under the [KKKA]:§1985 -

- as already summarized in the previous sections, is also a separate-and-distinct-violation of the defendants' numerous violations of [CRAo1964]:§2000d against the plaintiff - which states:

> *"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."*

## ¶187

The plaintiff asserts that the defendants' numerous acts in violation of the [CRAo1964]:§2000d (COUNT-7) against the plaintiff (as summarized above) caused the plaintiff's injuries.

---

# §XI

# CAUSES OF ACTION (NON-COUNT):

# DEFENDANTS' VIOLATIONS OF THE [CRAo1964], [CRRAo1987] AGAINST THE ⟪United States⟫

## ¶188

The plaintiff asserts that both defendant [WC] and its law-enforcement-agencies, [WCLE], receive multiple forms of federal financial assistance from the ⟨United States⟩ - including, but not limited to, the forms specified in the previous section.

## ¶189

As a condition for receiving any-and-all of such federal financial assistance from the ⟨United States⟩, both defendant [WC] and its law-enforcement-agencies, [WCLE], are required by *"TITLE VI"* of the [CRAo1964] - later strengthened, broadened, and clarified by the [CRRAo1987] - to comply with all of the terms-and-conditions of *"TITLE VI"*, which means that both Defendant [WC], and [WCLE], are further forbidden under federal law from engaging in any discrimination against any member of any protected-class in **any-and-all** of their operations - as each-and-every-act of such discrimination is a separate-and-distinct-violation against the ⟨United States⟩.

## ¶190

By engaging in over a decade of egregiously discriminatory practices against the plaintiff, an immigrant-of-color/indigenous-person, as substantially documented in this lawsuit, defendant [WC] and its law-enforcement-agencies, [WCLE], have thus repeatedly - and for over a decade - violated the [CRAo1964] and the [CRRAo1987] against the ⟨United States⟩.

---

# §XII

# ⟪UNITED STATES V. CITY OF HESPERIA, COUNTY OF SAN BERNARDINO, AND SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT⟫

- "First Amended Complaint And Demand For Jury Trial" : United States District Court, For The Central District Of California, Western Division:
- William P. Barr, United States Attorney General, et al.: (2020-09-14):
- https:/www.justice.gov/media/1091536/dl

<< POSTING OMITTED DUE TO LENGTH >>

## ¶191

This {2020} [FHA] lawsuit filed in Federal District Court by the Petitioner 《United States》 alleged that the respondents *"CITY OF HESPERIA, COUNTY OF SAN BERNARDINO, AND SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT"* systematically engaged in a pattern of egregious fair-housing-violations against Black and Latino renters. The plaintiff asserts that the plaintiff represented a similar type of *"demographical problem"* to the defendants that is alleged by the 《United States》 against the respondents of that particular federal lawsuit. However, as alleged in that partieular federal lawsuit, unlike the municipal-corporation government (and government agency) respondents *"CITY OF HESPERIA, COUNTY OF SAN BERNARDINO, AND SAN BERNARDINO COUNTY SHERIFF'S DEPARTMENT"* who:

Ⓐ acted alone, or out of their own volition, to fix such *"demographical problem"*, defendant [WCLE] instead, and even more egregiously, acted in conspiracy with private-citizen far-right-wing-extremist, racketeer eo-defendants [RSR],[JSP&KAP] (as part of the aforedescribed racketeering-enterprise) who they knew, not only harbored extreme-racial-animus and far-right-wing-extremist political-animus against the plaintiff, but actually committed and continued-to-commit several racially-motivated (and retaliatory) hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff that defendant [WCLE] deliberately turned a blind-eye to, as part of their efforts to drive the plaintiff, an immigrant-of-color/indigenous-person, out of such White neighborhood;

Ⓑ acted to cause significant harm to a very-large number of Black and Latino renters, the defendants, instead, predatorily focused an overwhelming amount of their attention, time, manpower and (unmatched, virtually-unlimited) resources, for over a decade, primarily on targeting the plaintiff and/or the plaintiff's property(s) - aggregately engaging in a huge number of hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff as part of their obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff - in-order-to drive the plaintiff, an immigrant-of-color/indigenous-person, out of *"their"* (exclusive-and-pure) White neighborhood - thus, in a conspiracy and scheme to defraud the plaintiff out of such private-property-ownership.

---

# §XIII

# 《GILEAD COMMUNITY SERVICES, INC., et al.

# v.

# TOWN OF CROMWELL, et al.》

▸ "Ruling And Order On Cross-Motions For Summary Judgment" ' United States District Court, District Of Connecticut'
▸ United States District Judge Victor A. Bolden'   (2019-12-23)'
▸ https://www.relmanlaw.com/media/cases/700_Gilead_-_Summary_Judgment_Decision_28Dec._20_2C_2019_29.pdf

┌─────────────────────────────────────────────────────────────────┐
│ << POSTING OMITTED DUE TO LENGTH >>                               │
└─────────────────────────────────────────────────────────────────┘

## ¶192

In this recent ({2021}) precedent-setting [FHA] lawsuit resulting favorably for the Petitioners *"GILEAD COMMUNITY SERVICES, INC., et al."*, against the municipal-corporation Respondent *"TOWN OF CROMWELL"*, United States District Judge Victor A. Bolden:

Ⓐ ruled that, since the [SCOTUS] ruling in 《CITY OF CLEBURNE, TEXAS, ET AL. V. CLEBURNE LIVING CENTER, ET AL.》 established *"that it is a violation of equal protection for government officials to take action against people with disabilities **based on prejudice that the citizenry may harbor against them"***, it is also a violation of the [FHA] for the same reason.

Ⓑ ruled that Punitive-Damages are an available remedy upon finding of liability against municipal-corporations under the [FHA], especially since federal-lawmakers fully and explicitly authorized Punitive-Damages in the text of the [FHA], codified in [42-USC-C45-SI-§3613(c)].

Ⓒ affirmed one-or-more [SCOTUS] ruling(s) that established that *"corporations are liable under traditional vicarious liability principles for their employees' conduct which violates the [FHA]."*

Ⓓ affirmed all of the case-law that established that, *"in multi-defendant [FHA] cases involving vicarious liability, joint liability attaches to co-defendants."*

## ¶193

The plaintiff asserts that, for plainly obvious reasons, the exact same aforelisted rulings and affirmations that apply to people-with-disabilities also applies to people-of-racial-minorities - although the plaintiff was (and still is) a member of both of those aforementioned protected-classes.

## ¶194

The plaintiff asserts that the plaintiff has a mountain of incriminating evidence to indisputably prove that defendant [WC] - and, in particular, defendant [WC]'s law-enforcement-agencies, [WCLE] - acted corruptly-maliciously-predatorily-and-retaliatorily against the plaintiff, for over a decade, *"based on 〈extreme-racial-animus〉 prejudice that 〈White/Caucasian/American/Christian private-citizen racketeer co-defendants [JSP&KAP],[RSR] and their non-immigrant, private-citizen co-conspirators/agents/proxies/cronies〉 harbored against"* the plaintiff, an immigrant-of-color/indigenous-person.

## ¶195

The plaintiff additionally asserts that the plaintiff has sufficient incriminating evidence to indisputably prove that defendant [WC] - and, in particular, defendant [WC]'s law-enforcement-agencies, [WCLE] - acted corruptly-maliciously-predatorily-and-retaliatorily against the plaintiff,

for over a decade, *"based on ⟨anti-[LGBTQIA+]-animus⟩ prejudice that ⟨heterosexual private-citizen racketeer co-defendants [JSP&KAP], [RSR] and their heterosexual, private-citizen co-conspirators/agents/proxies/cronies⟩ harbored against"* the plaintiff, a person that such racketeer co-defendants perceived to be [LGBTQIA+].

## ¶196

The plaintiff additionally asserts that the plaintiff has sufficient incriminating evidence to indisputably prove that defendant [WC] - and, in particular, defendant [WC]'s law-enforcement-agencies, [WCLE] - acted corruptly-maliciously-predatorily-and-retaliatorily against the plaintiff, for over a decade, *"based on ⟨ableist-animus⟩ prejudice that ⟨non-cognitive-disabled private-citizen racketeer co-defendants [JSP&KAP], [RSR] and their non-cognitive-disabled, private-citizen co-conspirators/agents/proxies/cronies⟩ harbored against"* the plaintiff, a person that such racketeer co-defendants knew to have a cognitive disability and handicap.

## ¶197

To the best of the plaintiff's limited knowledge and understanding, unlike the aforementioned Petitioners *"GILEAD COMMUNITY SERVICES, INC., et al."* who did not allege such conduct by the Respondents *"TOWN OF CROMWELL, et al."*, the plaintiff suffered over a decade of racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses (*"racial-oppression and pattern-of-racketeering-activity"*) from the defendants acting in-conspiracy-with-each-other and in-concert-with-each-other as part of such corrupt-malicious-predatory-and-retaliatory racketeering-enterprise engaged in obstructing-justice-against and defrauding the plaintiff.

---

# §XIV

# FAR-RIGHT-WING-EXTREMISM: BY FAR, THE GREATEST THREAT OF DOMESTIC TERRORISM AND ORGANIZED-CRIME ACTIVITY THAT IS BASED UPON HATRED AND INTOLERANCE

▸ "FIVE YEARS LATER: PROGRESS SLOW BUT STEADY AGAINST VIOLENT EXTREMISM SINCE DEADLY 'UNITE THE RIGHT' RALLY IN CHARLOTTESVILLE" (⬤)﹐

▸ (The Southern Poverty Law Center) ("[SPLC]")﹐  Michael Lieberman, Senior Policy Counsel, Hate & Extremism﹐  (2022-08-12)﹐

▸ https://www.splcenter.org/news/2022/08/12/five-years-progress-against-extremism-since-unite-right

●
●
●

*Far-right extremism has been mainstreamed*

*The attempt to bring white nationalist ideas into the mainstream that manifested in Charlottesville has continued unabated – and has perhaps accelerated. An alarming number*

*of leading elected officials now embrace the movement's false conspiracy theories and promote former President Donald Trump's lie that he lost the 2020 election only because of massive voter fraud engineered by Democrats.*

*Though the mainstreaming of far-right extremism certainly did not begin with Trump's presidency, there is no doubt that his racist, antisemitic and xenophobic words and actions helped create a permissive climate for hate. For example, we saw a* ***dramatic spike in violence against the Asian American and Pacific Islander (AAPI) community*** *following Trump's vilifying language at rallies and at news conferences about the spread of COVID-19, calling it "Wuhan flu" and "Chinese virus." Earlier, soon after the 2016 election, the Southern Poverty Law Center documented what we called the "Trump Effect" across the country – a surge of incidents involving racial slurs and symbols, bigotry and the harassment of Black and Brown children in the nation's schools during and after Trump's campaign.*

### *Increased threat of political violence*

*The SPLC's annual Year in Hate and Extremism report, released in March, documented a third straight year of declines in the number of hate and antigovernment extremist groups operating across the U.S. We concluded, however, that the threat from these groups was not actually diminishing; rather, extremist ideas were now embraced more openly in the mainstream, increasing the threat of politically motivated violence.*

*We saw this play out starkly on Jan. 6, 2021. Dozens of members of hate groups have been arrested in association with the Capitol attack.* ***The vast majority of people who took part in the insurrectionist violence, however, were not associated with a specific extremist group****, demonstrating just how deeply hate and antigovernment narratives have penetrated the political right.*

*A recent poll jointly conducted by the SPLC and Tulchin Research provided more evidence. We found that the white nationalist "great replacement" narrative, which apparently motivated the alleged white supremacist who murdered 10 people at a supermarket in Buffalo, New York – as well as numerous other domestic terrorists – has become thoroughly absorbed into mainstream politics. In fact, two-thirds of Republican respondents in our survey agreed with the statement that the country's demographic changes are being orchestrated by "liberal leaders actively trying to leverage political power by replacing more conservative white voters."*

*In addition, more than a third of respondents said the country's changing demographics are a threat to white Americans and their culture and values. Twenty percent think threatening a politician is acceptable, and nearly a quarter of respondents approve of assassinating "a politician who is harming our country or democracy."*

- 
- 
- 

### *Increased awareness of the threat of white supremacy and expanded government action to confront it*

*In recent years, the director of National Intelligence, the FBI, the Justice Department and the Department of Homeland Security have taken actions to address what they repeatedly identify as the most lethal domestic terrorism threats: (1) racially or ethnically motivated violent extremists who advocate for the "superiority" of the white race and (2) anti-government or anti-authority violent extremists, including militia groups such as the Oath Keepers. Also, a number of congressional committees have held hearings highlighting the threat, on topics like extremism in the military, financing of domestic extremist groups, bomb threats against historically Black colleges and universities and improved hate crime prevention, data collection and response.*

### *Expanded tools and tactics to confront violent extremism*

*In November 2021, nine victims of the Charlottesville violence won a historic court victory against a number of white supremacist groups and leaders. Twelve individual defendants and five organizations were ordered to pay $26 million in damages. This innovative lawsuit, brought under the leadership of Integrity First for America, resulted in necessary accountability and significant financial, legal and operational consequences for the planners and perpetrators of the violence and mayhem.*

### *Dismantling Confederate memorials*

White supremacists were drawn to Charlottesville in August 2017 over the city's plans to dismantle statues of Confederate leaders. The deadly riot sparked increased efforts to remove Confederate memorials in other cities, and the police murder of George Floyd in May 2020 ignited significant new community activism. Last month, the statue of a Confederate general in the U.S. Capitol was replaced by a statue of civil rights pioneer Mary McLeod Bethune – the first Black person to have a state-commissioned statue there.

The U.S. military has also made progress in addressing extremism in the ranks and is working toward changing the names of nine Army bases named after Confederates.

## The Jan. 6 select committee

The bipartisan House select committee investigating the Jan. 6, 2021, insurrection has presented compelling evidence that the insurrection was the culmination of a months-long strategy coordinated by Trump and his allies to overturn the 2020 election they knew he had lost.

We now know that this strategy includes efforts to undermine the 2024 elections. Trump allies in state legislatures have enacted dozens of racially discriminatory voter suppression laws and continue to wage a disinformation campaign designed to sabotage future elections.

The committee's hearings and the Justice Department's ongoing criminal investigations are essential steps toward transparency, accountability and real consequences for the planners and perpetrators of the Capitol insurrection, along with those who inspired and funded their activities.

## Hate crime prevention and response

The FBI documented almost 8,300 hate crimes in 2020 – the most current national data available – the highest number since 2001. The data showed a 32% increase in race-based crimes, a 42% increase in crimes targeting the Black community and a **64% increase in crimes directed against the AAPI community**.

But over the past two years, there have been significant advances in confronting hate violence.

In May 2021, Congress enacted the COVID-19 Hate Crimes Act, which included the provisions of the Khalid Jabara and Heather Heyer NO HATE Act. The new law – **sparked by thousands of incidents of violence, harassment and intimidation directed against members of the AAPI community** – authorizes incentive grants to build community resilience and hate crime prevention, training and data collection initiatives, including state hate crime hotlines to help address incomplete reporting nationwide.

Also, the FBI has designated hate crimes as a "national threat priority," a rare classification. In testimony before the Senate Judiciary Committee last week, FBI Director Christopher Wray said that "[t]he investigation of hate crimes is the number one priority within the FBI's civil rights program."

## Moving forward

Five years after Charlottesville, we can identify lessons learned and a path forward to face the threat of racially motivated violence and the white nationalist threat to our democracy.

Today, there is much better awareness about the nature and magnitude of this threat. And, as we move forward, we have the great advantage of a much more active and willing federal partner and better tools and tactics to confront the evolving challenges.

We know the political landscape can change abruptly, however, so we must all continue working together to confront the threat of white nationalism and violent extremism. Our democracy absolutely depends on it.

¶198

In this lawsuit, the plaintiff seeks to present evidence of the conspiracy and pattern-of-racketeering-activity in-furtherance-of-such-conspiracy, conducted as part of a decade long racketeering-enterprise to obstruct-justice against the plaintiff and defraud the plaintiff, consisting of far-right-wing-extremist racketeer co-defendants [JSP&KAP],[RSR], and their municipal-corporation, government co-conspirator defendant [WC] - specifically, the agencies of [WCLE] named as co-defendants in this lawsuit. Although most types of organized-crime in the United States are purely profit-driven enterprises, the only two major types of organized-crime in the United States that are based almost-exclusively, if not exclusively, upon extremist hatred and intolerance are from far-right-wing-extremism and, to a much lesser extent (see below), from Islamic extremism. The plaintiff asserts that the defendants' decade-long conspiracy and racketeering-enterprise against the plaintiff did, indisputably, have the economic motive of defrauding the plaintiff out of both the plaintiff's money and the plaintiff's (relatively-profitable) private-property-ownership within one-or-more White neighborhood(s), while at the same time, profiting from such defrauding of the plaintiff. Therefore, as a small part of proving the plaintiff's numerous claims against the defendants (see COUNT-1 through COUNT-7 above), the plaintiff must put the defendants' predatory behaviors/actions/conduct against the plaintiff into context of the larger, hatred-based far-right-wing-extremism that exists within the United States.

## ¶199

Additionally, the plaintiff has at least some evidence to prove that the defendants, at least in some small part, tried to justify their predatory behaviors/actions/conduct against the plaintiff, by fraudulently accusing (via insinuation) the plaintiff - not only without having any evidence, but, to the contrary, based upon purely-racist fraud - of being either a left-wing extremist and/or Islamic extremist - again, due to the purely-racist reason of the plaintiff's physical-appearance and overall racial-profile. Although such unsubstantiated insinuation(s) were based upon purely-racist fraud, at the very least, and for the sake of argument, the plaintiff must still highlight the exponentially-greater threat posed by far-right-wing-extremism in the United States, when compared to the alleged threat(s) posed by other forms of extremism such as left-wing extremism and/or Islamic extremism.

## ¶200

According to the [Anti-Defamation League] ("[ADL]") - one of the prominent, international civil-rights non-governmental-organizations ("[NGO]") which collects and/or monitors such statistics, during the years {2007} through {2016}, approximately 74% of all deaths resulting from extremism were from far-right-wing-extremists, compared to only a minute 2% of deaths allegedly resulting from left-wing extremists, and 24% of deaths allegedly resulting from Islamic extremists. It should be noted that such relatively-outdated statistics do not reflect the relatively huge increase in far-right-wing-extremist violence (resulting in deaths) in the years since {2016}, which would surely skew such statistics documenting far-right-wing-extremist violence for the longer-term, far more in excess of the aforementioned 74%.

## ¶201

According to the [ADL], during the years {1993} through part of {2017}, approximately:

Ⓐ 43% of all reported incidents of far-right-wing-extremist violence were deemed to be under the general umbrella-category of White-Supremacist;

Ⓑ 2% of all reported incidents of far-right-wing-extremist violence were deemed to be under the specific subcategory of Anti-Muslim;

Ⓒ 1% of all reported incidents of far-right-wing-extremist violence were deemed to be under the specific subcategory of Anti-Immigrant;

Ⓓ 1% of all reported incidents of far-right-wing-extremist violence were deemed to be under the miscellaneous category of *"Other"*.

The plaintiff asserts that the aforelisted percentages representing both Anti-Muslim far-right-wing-extremist violence and Anti-Immigrant far-right-wing-extremist violence are undercounts due to at least two reasons:

Ⓐ At least some of the violence deemed under the general umbrella-category of White-Supremacist should have instead been subcategorized as Anti-Muslim and/or Anti-Immigrant.

Ⓑ A relatively-greater fraction of Muslims, those that look *like* Muslims (such as, but not limited to, those of the Sikh religion), and immigrants (especially undocumented immigrants) are scared to report hate-crimes committed against them to law-enforcement-agencies due to their deep-distrust of law-enforcement and/or due to their fear of retaliation.

The plaintiff asserts that the plaintiff suffered not only all of the aforementioned types of far-right-wing-extremist violence from the aggregate actions of racketeer co-defendants [JSP&KAP],[RSR] against the plaintiff, but also numerous, brazen-acts of racketeering-activity by the defendants acting in-concert-with and in-conspiracy-with each other in-order-to conceal/obstruct-justice for such major crimes committed against the plaintiff, and/or retaliate against the plaintiff for the plaintiff's *"audacity"* to report and/or record such major crimes (via security-cameras, body-worn-camera, audio-recorder).

## ¶202

Although relatively outdated, a reputable and well-cited study of far-right-wing-extremist violence, conducted by the ⟨Combating Terrorism Center⟩ at ⟨West Point⟩ (⟨United States Military Academy⟩ ("[USMA]")) documented the following findings, in a {2013} publication tiled   *"Challengers from the Sidelines: Understanding America's Violent Far-Right"* , that are relevant to this lawsuit.

> ▸  "Challengers from the Sidelines: Understanding America's Violent Far-Right" ; [USMA]; ⟨Combating Terrorism Center⟩; {2013-01-15};
> ▸  https://www.ctc.usma.edu/v2/wp-content/uploads/2013/01/ChallengersFromtheSidelines.pdf
>
> **<< POSTING OMITTED DUE TO LENGTH >>**

## ¶203

According to such study, which categorized the types of violent crime committed by far-right-wing-extremists within the United States during the years {1990} through {2012}:

Ⓐ 34% of far-right-wing-extremist violence were acts of vandalism;

Ⓑ 9% of far-right-wing-extremist violence resulted in heavy damage to property;

Ⓒ 42% of far-right-wing-extremist violence were deliberately targeted at specific human target(s) - see below for types of human targets;

Ⓓ 6% of far-right-wing-extremist violence were acts of intimidation/interference;

Ⓔ 3% of far-right-wing-extremist violence were foiled in some manner, shape or form.

Within these particular statistics, the plaintiff asserts that intimidation/interference accounts for only 6% of reported far-right-wing-extremist violence for at least two reasons:

Ⓐ A significant fraction of protected-minority victim(s) of intimidation/interference do not know that intimidation/interference is actually a serious crime and a (civil) violation of anti-discrimination law(s).

Ⓑ The act(s) of intimidation/interference are actually successful, by way of *"chilling-effect"*, in silencing the protected-minority victim(s) from reporting such crime(s).

The plaintiff asserts that, as a result of these two reasons, the crime of far-right-wing-extremist intimidation/interference is relatively under-reported and/or under-counted in the United States, especially when compared to other types of far-right-wing-extremist violence. The plaintiff asserts that the plaintiff suffered not only all of the aforementioned types of far-right-wing-extremist violence from one-or-more of the defendants, but also numerous, brazen-acts of racketeering-activity by the defendants in-order-to conceal/obstruct-justice for such crimes committed against the plaintiff, and/or retaliate against the plaintiff for the plaintiff's *"audacity"* to record and report such crimes.

## ¶204

According to such study, which documented the number of violent crime(s) committed by far-right-wing-extremists within the United States, on a year-by-year basis, during the years {1990} through {2012}, there has been a more than 400% increase in violent crimes from the beginning of the decade of the {1990s} to the end of the decade of the {2000s}. In particular, when considering all types of far-right-wing-extremist violence during this period of time, there has been a sharp increase in the number of acts of vandalism, and the number of acts deliberately targeted at specific human target(s) - see below for types of human targets. The general idea behind this increase is that, as American society, over the many decades, has become increasingly tolerant of racial-minorities, [LGBTQIA+], women's rights, etc. - with some of this increasing tolerance even demonstrated by local, state and federal electoral victories - far-right-wing-extremists have lashed out against such progress, as they deem such progress to be a fundamental threat to their dominant status within society via White-supremacy (as noted above) **(δ)** .

## ¶205

According to such study, various civil-rights milestones/accomplishments in United States history - including legislation (such as the original legislative enactment of the [FHA] in the year {1964}), [SCOTUS] decisions, and executive-orders - have triggered *"significant rise"* in the level of far-right-wing-extremist violence - the general idea being that far-right-wing-extremists deem such civil-rights milestones/accomplishments as fundamental threats to their dominant status within society via White-supremacy **(δ)** .

## ¶206

According to such study, far-right-wing-extremists are very deliberate and purposeful in whom they target/victimize, and the statistics reflect such fact:

Ⓐ 55% of far-right-wing-extremist violence are targeted towards racial minorities;

Ⓑ 14% of far-right-wing-extremist violence are targeted towards [LGBTQIA+] (including those perceived to be [LGBTQIA+]);

Ⓒ 2% of far-right-wing-extremist violence are targeted towards government and/or political targets (including political-activist(s)).

The plaintiff asserts that the plaintiff suffered not only all of the aforementioned types of far-right-wing-extremist violence from one-or-more of the defendants, but also numerous, brazen-acts of racketeering-activity by the defendants in-order-to conceal/obstruct-justice for such crimes committed against the plaintiff, and/or retaliate against the plaintiff for the plaintiff's *"audacity"* to report such crimes.

## ¶207

According to such study, far-right-wing-extremist violence, classified by the number of perpetrators, has roughly the following break-down:

Ⓐ 54% of far-right-wing-extremist violence were committed by a single-perpetrator (*"single-cell"*);

Ⓑ 20% of far-right-wing-extremist violence were committed by two-perpetrators (*"dual-cell"*);

Ⓒ 26% of far-right-wing-extremist violence were committed by a group of more than two-perpetrators (*"multi-cell"*).

## ¶208

According to such study, the overwhelmingly majority - or almost 80% - of far-right-wing-extremist violence resulted from perpetrators that were **not** affiliated with any larger extremist group/movement such as, but not limited to, the long-lasting extremist group(s)/movement(s): the Ku-Klux-Klan, the Neo-Nazis, the Skinheads, the Militia-Movement(s), the Christian-Identity-Movement(s), the Anti-Abortion group(s) - or the numerous recently-started far-right-wing-extremist group(s)/movement(s) such as: the *"Proud Boys"*, the *"Boogaloo Movement"*, the *"Sovereign Citizen Movement"*, the *"QAnon Movement"*, the *"Oath Keepers Movement"*. Therefore, for this very reason, although the plaintiff does not currently have any direct evidence linking far-right-wing-extremist racketeer co-defendants [RSR],[JSP&KAP] to any of the aforementioned far-right-wing-extremist groups/movements, the plaintiff asserts that the plaintiff does not need to have any direct evidence proving any such linkage in-order-to succeed in establishing at least some small parts of the plaintiff's numerous claims against the defendants (see COUNT-1 through COUNT-7 above).

## ¶209

The plaintiff seeks to present evidence to prove that far-right-wing-extremist racketeer co-defendants [RSR],[JSP&KAP] not only engaged in the most brazen forms of egregious fraud against the plaintiff, but that they did so in-order-to obstruct justice against the plaintiff while acting, in-concert-with with their government co-conspirators at [WCLE], in furtherance of their corrupt-malicious-predatory-and-retaliatory conspiracy to defraud the plaintiff - with the same brazen combination of group-narcissism-and-misanthropy that is not uncommon amongst far-right-wing-extremists - for example, the far-right-wing-extremists that engaged in the {2021-01-06} United-States-Capitol-Insurrection (see below) (δ).

## ¶210

The plaintiff asserts that not only did [WCLE]'s predatory actions, in a more-than-a-decade-long conspiracy with racketeer co-defendants [JSP&KAP],[RSR], against the plaintiff encourage, legitimize, foster and nurture, vile, uncouth, barbaric and generally-uncivilized behaviors/actions/conduct against the plaintiff - not only from far-right-wing-extremist co-conspirator racketeer defendants [JSP&KAP],[RSR], but from some of its own employees - but also, such predatory actions actually rewarded all of these individuals for the hate-crimes/civil-rights-violations/racketeering-acts/abuses that they aggregately committed against the plaintiff as part of such conspiracy - thus, creating a modern-day-Jim-Crow, obstructive-and-retaliatory, blackmailing-and-defranding, toxic environment of racist lawlessness around the plaintiff. In so creating such toxic environment of racist lawlessness around the plaintiff, [WCLE] has fully enabled, and even encouraged, far-right-wing-extremist co-conspirator racketeer defendants [JSP&KAP]'s,[RSR]'s government-sanctioned hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff.

## ¶211

While federal-law-enforcement (along with some of the aforementioned civil-rights [NGO]s) has repeatedly warned, for many decades, about the threat of far-right-wing-extremism as the biggest threat of domestic terrorism in the United States, in sharp contrast and for over a decade, [WCLE]'s predatory actions (in conspiracy with far-right-wing-extremist racketeer co-defendants [JSP&KAP],[RSR]) against the plaintiff has done nothing other than *"fan the flames"* of such far-right-wing-extremist terror committed against the plaintiff.

---

# §XV

# COMPLAINT ALSO FILED, DESPITE OVERWHELMING BURDEN, AS A MATTER OF SOCIAL JUSTICE AND PURE SURVIVAL

## ¶212

This lawsuit, like most legitimate civil rights lawsuits, has been filed due to the plaintiff's strong need for justice - for the numerous injustices that the defendants perpetrated onto the plaintiff, and for the justice that the defendants maliciously and predatorily deprived the plaintiff of for over a decade.

## ¶213

However, this lawsuit has also been filed as a matter of pure survival for the plaintiff.

## ¶214

The plaintiff seeks to prove that the defendants repeatedly-and-predatorily, blackmailed, gaslighted, defrauded, publicly-humiliated (numerous violations of the plaintiff's right to be free from *"cruel and unusual punishment"*), retaliated-against and obstructed-justice-against the plaintiff, and that the purpose of this blackmail, gaslighting, fraud, public-humiliation, retaliation and obstruction-of-justice was to silence the plaintiff - especially from making any of the plaintiff's claims as substantially presented in this lawsuit.

## ¶215

At least a few of the crimes - including racially-motivated hate-crimes, felonious crimes and racketeering-acts - that the defendants predatorily perpetrated against the plaintiff were also witnessed by a number of the plaintiff's other neighbors.

## ¶216

Those neighbor witnesses may rightfully be wondering: Why it is the case that none of the defendants have faced any legal consequences for their crimes committed against the plaintiff - in other words, whether or not the defendants have *"dirt"* on the plaintiff to keep the plaintiff silent.

## ¶217

Furthermore, the plaintiff was publicly charged with Class-C-Misdemeanor-Public-Nuisance by the defendants, but over a year after that charge including approximately four months of the plaintiff's attorney, [ATTORNEY-TK], requesting discovery from [WCLE], that charge was dismissed by [WC] prosecutors without any explanation or apology provided to the plaintiff or to the public.

## ¶218

The public - or at least those that are aware that the plaintiff was publicly charged with Class-C-Misdemeanor-Public-Nuisance - may rightfully be wondering: Why it is the case that neither defendant [WC] nor any of its officials/agencies have faced any legal consequences, at the very least, for their unjust and unexplained charge and prosecution of the plaintiff - in other words, whether or not defendant [WC] and/or its co-conspirators (racketeer co-defendants [JSP&KAP],[RSR]) have *"dirt"* on the plaintiff to keep the plaintiff silent.

## ¶219

The plaintiff must prove - by filing and litigating this lawsuit - that the defendants have absolutely no *"dirt"* on the plaintiff to silence the plaintiff - that instead, the defendants abusively weaponized (both as a *"sword and shield"*) the property-maintenance-laws as modern-day-Jim-Crow law for over a decade in order to engage in racial-oppression and racketeering-activity against the plaintiff - with the ultimate aim of such criminally-abusive actions, being not only to intentionally inflict untold amounts of injury (especially long-term/permanent psychological-trauma, mental-anguish and emotional-distress) onto the plaintiff but also to drive the plaintiff - an immigrant-of-color/indigenous-person - out of a White neighborhood - in egregious violation of the [FHA], thus defrauding the plaintiff out of (relatively-profitable) private-property-ownership, also in egregious violation of the [RIaCOA].

## ¶220

The plaintiff's failure to file this lawsuit and prove these claims would open the door wide-open to any resident of the neighborhood, or even any person of the world to, similarly, engage not only in blackmail, gaslighting, fraud and/or public-humiliation against the plaintiff, but even worse crimes against the plaintiff, without facing any legal consequences for such criminally-abusive actions.

## ¶221

The plaintiff's failure to file this lawsuit and prove these claims would open the door wide-open to any government (not limited to defendant [WC]) or any other institution-of-power to, similarly, engage in racial-oppression, racketeering-activity and/or civil-rights-violation(s) against the plaintiff without facing any legal consequences for such criminally-abusive actions.

## ¶222

Thus, the plaintiff asserts that the plaintiff's failure to file this lawsuit would send an extremely dangerous message that would threaten the plaintiff's survival in this world - an extremely dangerous message that the plaintiff simply cannot afford to send - again, out of the plaintiff's pure survival.

## ¶223

At the very least, the plaintiff files this lawsuit and pleads to litigate this case, in-order-to firmly establish that the plaintiff is not, figuratively-speaking, a *"doormat"* to be walked-all-over-on - that no person(s), institution(s), corporation(s) and/or government(s) that violate the plaintiff's rights will be able to get-away with such criminally-abusive actions without facing the appropriate legal consequences.

## ¶224

Finally, the plaintiff seeks many crucial pieces of injunctive relief from the Court (see below), at least some of which, Ⓐ seeks to ensure that defendant [WC] is, from this point forward, not allowed to engage in any forms of racial-oppression or racketeering-activity against any person(s)-of-color by, for example but not limited to, abusively weaponizing any law as modern-day-Jim-Crow law, and Ⓑ seeks to legally bind defendant [WC] to fully and consistently enforce the *"Hate-Crimes"* laws and the *"Abuse-of-Office"* laws of the State of Texas - because as the plaintiff asserts in this lawsuit, these laws are maliciously not being enforced by defendant [WC] at least in cases where the victims of such crimes are perceived to be powerless - such as the plaintiff (🙏). The plaintiff further alleges that defendant [WC]'s failure to fully and consistently enforce the basic *"Abuse-of-Office"* laws of the State of Texas - at least in cases where the victim(s) of such crimes are perceived to be powerless (such as the plaintiff) - has even allowed or emboldened at least some employees/agencies of [WCLE] to engage in some of the more serious felony/racketeering-activity crimes specified in *"Title 8. Offenses-Against-Public-Administration"* of the [TPC] (Chapter 36: Bribery and Corrupt Influence, and Chapter 37: Perjury and Other Falsification) - further encouraging and fostering a culture of absolute-impunity and/or overt-corruption that the plaintiff asserts that at least some (if not all) of [WCLE] operates under at least in cases where the victim(s) of such crimes are perceived to be powerless (such as the plaintiff).

## ¶225

The plaintiff's failure to file this lawsuit would thus also send an extremely dangerous message that government defendant [WC] and private-citizen defendants [JSP&KAP],[RSR] (and their co-conspirators) can continue to predatorily engage in racial-oppression and racketeering-activity against other members of society that they perceive to be powerless - including but not limited to, other person(s)-of-color and/or other person(s) that are otherwise similarly situated to the plaintiff. The plaintiff's failure to file this lawsuit would thus be an extreme injustice not only to the plaintiff, but also to other such person(s) perceived by the defendants to be powerless within society ( 🔒 ) .

## ¶226

Most importantly, since the plaintiff asserts that the defendants repeatedly engaged in racial-oppression and racketeering-activity against the plaintiff for clearly racially-motivated reasons, the plaintiff further asserts that the plaintiff's failure to expose the defendants' criminally-abusive actions against the plaintiff would be an extreme injustice to all people-of-color. Thus, the plaintiff strongly asserts that, in the interest of justice, the plaintiff has a moral duty, responsibility and obligation to expose the defendants' criminally-abusive actions against the plaintiff, in the hopes that, doing so will help to make sure that no person(s)-of-color suffer the same (or similar) injustices at any point in the future.

## ¶227

So, by engaging in over a decade of racial-oppression and racketeering-activity against the plaintiff, the defendants have also unjustly imposed onto the plaintiff, the extreme burden of having to research, compile, file and litigate this lawsuit - an extreme burden that no single private citizen, let alone the plaintiff - an extremely marginalized immigrant-of-color/indigenous-person (and person with handicap) - should have to bear.

## ¶228

The plaintiff asserts that many potential lawsuits of racial-discrimination and/or racketeering-activity are not filed (and thus not litigated) because many person(s)-of-color do not have the necessary resources (time, effort, money, legal-knowledge, etc.) to document the civil-rights-violations, racial-discrimination and/or racketeering-activity, and the necessary courage to expose such civil-rights-violations, racial-discrimination and/or racketeering-activity in civil-rights-lawsuit(s).

## ¶229

The plaintiff, having accumulated over a decade of evidence of the defendants' racial-oppression and racketeering-activity against the plaintiff, has felt (for over a decade) and continues-to-feel an incredible-and-overwhelming burden to expose the defendants' criminally-abusive actions against the plaintiff - not only for the benefit of the plaintiff but also for all those person(s)-of-color who suffer racial-oppression and/or racketeering-activity from a government predatorily acting in conspiracy with malicious private citizens.

## ¶230

While the plaintiff has filed this lawsuit independently, solely and individually, the plaintiff still feels an incredible-and-overwhelming burden to preserve and maintain the good reputation ( ⚓ ) not only of the plaintiff, but also of all person(s)-of-color who may have suffered racial-oppression and/or racketeering-activity - whose voices may never be heard due to, but not limited to, the reasons specified above.

## ¶231

It is also abundantly clear from the plaintiff's evidence, that in conducting their decade of racial-oppression and racketeering-activity against the plaintiff, the defendants employed the cruel-and-unusual strategy of *"flooding"*: That is, the defendants inundated the plaintiff with as many incidents of racial-oppression and racketeering-activity as possible, so that even if the plaintiff summoned the necessary resources and courage to sue the defendants, it would take the plaintiff an overwhelming amount of time, effort, money and mental-strength in-order-to do so - again, placing all of this incredible-and-overwhelming burden solely onto the shoulders and heart of the plaintiff.

## ¶232

The plaintiff will refrain from making comment regarding the alleged misconduct of Texas Attorney General Warren Kenneth Paxton Jr. [TAG-WKPJ], but will instead, refer to the extra-judicial statement of high-profile criminal-defense attorney, Dick DeGuerin - one of the attorneys responsible for handling impeachment proceedings against [TAG-WKPJ] - issued to the broadcast-media, and thus broadcasted to the people of the world:

*"The people of the State of Texas are entitled to know whether their top cop is a crook."*

## ¶233

In light of Attorney DeGuerin's highly-publicized extra-judicial statement about the formerly impeached [TAG-WKPJ], the plaintiff likewise asserts that, the general public, but in particular, the people of the County of Williamson are entitled to know whether-or-not any of defendant [WC]'s agencies, but especially the agencies of [WCLE], act like untouchable racketeers to a certain segment, however small, of the population (including the plaintiff) that they consider to be powerless ( ⚖ ).

## ¶234

Therefore, the plaintiff also files this lawsuit, with incredible-and-overwhelming burden, on fundamental first amendment grounds (under the [TCPA] and the right to petition), to expose egregious government-misconduct that every person of the world is entitled to know about.

---

# §XVI

# THE PLAINTIFF'S "POWERLESSNESS" VERSUS THE

# DEFENDANTS' EXTREME, UNCHECKED, ABUSIVE, PREDATORY

# POWER AND INFLUENCE

## ¶235

Based on the plaintiff's racial-profile which includes the plaintiff's physical-stature/visual-appearance/grooming/clothing (see above), the defendants have always assumed, or taken for granted, that the plaintiff is not only of very-low intelligence (*"low-IQ"*), but also, a powerless, subhuman animal ( 🐾 ) .

## ¶236

The plaintiff does not need to elaborate on the fact that police-officers and government-employees belong to an informal/unofficial, untouchable *"protected-class"* that are protected by various aspects of the justice system including, but not limited to: the racial-demographics (and thus political-demographics) of a geographical area; the enormously powerful and intimidating police-union(s) and/or other government-employee-union(s); the *"blue-wall-of-silence"*; prosecutors' offices (at least in some areas of the United States) that all-too-often deliberately turn a blind-eye to police-misconduct (and other government-misconduct); and most importantly, the unmatched, virtually-unlimited, taxpayer-funded resources of the government.

## ¶237

As part of all of the plaintiff's claims, in general, but as part of the plaintiff's [RIaCOA] claim (COUNT-4), in particular, the plaintiff does, however, need to prove that racketeer co-defendants [RSR], [JSP&KAP] wielded enormous amount of abusive power - even kingpin-like/mafia-godfather-like/mob-hoss-like power - over the plaintiff, and that this power was not only attributed to their White/Caucasian/American/Christian color/race/nationality/religion, but also, due to their positions within society.

## ¶238

For example, [RSR] advertises in her social-media-profile(s) and/or one-or-more of her retaliatory, fraudulent and witness-tampering social-media-postings against the plaintiff (see below) that she is/was a registered-nurse [RN] for a reputable organization during most, if not all, of the time-period documented in this lawsuit - even fraudulently flaunting such position as if she was speaking from a position of innocence, righteousness and intellectual-superiority over the plaintiff.

## ¶239

Publicly-available information and/or social-media information posted-by [KAP] indicate that [KAP] is/was a member/employee/manager/executive of a relatively powerful and reputable financial-institution during most, if not all, of the time-period documented in this lawsuit.

## ¶240

[JSP] has boasted in one-or-more incidents (see below) that he is/was a construction superintendent, even flaunting and/or bragging-about such position of power/authority.

## ¶241

Based upon the plaintiff's perceived powerlessness (as substantially described above), and defendants [JSP&KAP]'s,[RSR]'s (actual or perceived) relatively-powerful statuses within society not only due to their racial-profiles (and thus, their dominant racial-status within society), [WCLE] has for over a decade, repeatedly and predatorily conspired-with and acted-in-furtherance-of-such-conspiracy-with [JSP&KAP], [RSR], through a pattern of corrupt-malicious-predatory-and-retaliatory racketeering-activity, to both, egregiously violate the rights of the (lowly, powerless) plaintiff, and defraud the plaintiff of both money and private-property-ownership within one-or-more White neighborhood(s).

## ¶242

[WCLE] are the named law enforcement agencies of defendant [WC] - an extremely-powerful, multi-billion-dollar municipal-corporation with the unmatched, virtually-unlimited, taxpayer-funded resources of such municipal government. The plaintiff's evidence indisputably proves that, for over a decade, [WCLE] fully-protected and shielded racketeer co-defendants [JSP&KAP],[RSR] (along with their other co-conspirators such as [JJB]) from facing the legal consequences of such racketeer co-defendants' decade of hate-crimes/civil-rights-violations/racketeering-acts/abuses committed against the plaintiff.

## ¶243

In the State of Texas, [HOA]s are institutions-of-power that are, generally-speaking, feared by most homeowners due to the financial-power that they wield over homeowners, along with the enormous, some would argue extremely-disproportionate, legal-power and political-power that they wield over the ⟨Texas Legislature⟩ - with the [Community Associations Institute] ("[CAI]") representing the [HOA] industry before the ⟨Texas Legislature⟩. The plaintiff assserts that [SPOA] - the [HOA] of the ⟦Summerlyn⟧ subdivision - substantially protected and shielded racketeer co-defendants [JSP&KAP],[RSR] from facing the legal consequences of such racketeer co-defendants' decade of hate-crimes/civil-rights-violations/racketeering-acts/abuses committed against the plaintiff.

## ¶244

To put all of these power-dynamics into context by providing just one simple example that made the national news, Amy Cooper was a then-employee of an extremely-powerful and reputable financial-institution when she committed just one, very-brief, video-recorded hate-crime against her person-of-color victim whom she did not even know - not even at the victim's residence, but on what appeared to be public-property. But because such video-recording was posted onto social-media and went *"viral"* on social-media within a relatively short period-of-time, that financial-institution promptly fired Ms. Cooper over such hate-crime and publicly defended its action of firing Ms. Cooper. Furthermore, Ms. Cooper's otherwise reputable and relatively-powerful status within society did not stop the local-law-enforcement of that

particular jurisdiction to charge her for that single hate-crime.

## ¶245

The plaintiff asserts that defendants [JSP&KAP],[RSR] inflicted exponentially-worse and irreparable harm onto the plaintiff during over a decade of (and numerous dozens of) far-more-egregious and direct acts of racial-oppression and racketeering-activity against the plaintiff primarily (although not exclusively) at the plaintiff's own place-of-residence, the plaintiff's private-property (or *"castle"*) - normally where all rights (such as the those rights provided for by the *"castle doctrine"*) of such private citizens are at their absolute greatest/highest - and that they were only able to do so in conspiracy with the local-law-enforcement of defendant [WC], [WCLE], that has repeatedly and viciously punished and retaliated-against the plaintiff, for the plaintiff's *"audacity"* to record extremely-incriminating information of such conspiracy and associated racketeering-enterprise, along with the plaintiff's intentions to press-charge(s) against two-or-more of the defendants - [JSP],[RSR] - along with the plaintiff's initial malicious neighbor, [JJB]. As a result of the defendants' outrageously-brazen conspiracy and associated obstructive-and-retaliatory, blackmailing-and-defrauding, racketeering-enterprise against the plaintiff, none of the defendants (including the relevant individual employees/agencies of [WCLE]) have faced any consequences (other than being rewarded) for their decade of racial-oppression and racketeering-activity against the plaintiff.

---

# §XVII

# SYNOPSIS

## ¶246

The plaintiff suffered numerous hate-crimes/racketeering-acts/abuses committed aggregately by then-neighbors [JJB] and defendant [RSR] from the period of the years {2009} through {2011}.

## ¶247

The plaintiff started to report these hate-crimes/racketeering-acts to [WCLE] in the beginning of the month of {2011-08}, at a time when all of these hate-crimes/racketeering-acts/abuses that the plaintiff's neighbors [RSR] and [JJB] had (aggregately) committed against the plaintiff could have been charged and prosecuted within the Statute-of-Limitations.

## ¶248

Despite of the plaintiff's reporting of such crimes to [WCLE], [WCLE] disregarded the plaintiff's multiple crime-reports, and did not charge the perpetrators of these initial hate-crimes/racketeering-acts committed against the plaintiff by neighbors [RSR] and [JJB].

## ¶249

As a direct result of [WCLE]'s deliberate dereliction-of-sworn-official-duties, the plaintiff continued to notice an escalation of some hate-crimes/racketeering-acts in the same month ({2011-08}) - which the plaintiff could-only (at that moment in time) conclude to be further (felonious) crimes of retaliation by neighbors [RSR],[JJB] for the plaintiff's *"audacity"* to report their previous hate-crimes/racketeering-acts to [WCLE].

## ¶250

When the plaintiff continued to report the escalation of hate-crimes/racketeering-acts to [WCLE] in the same month ({2011-08}), the plaintiff was brazenly retaliated against by [WCLE] acting, with racial-animus against the plaintiff, in conspiracy with [RSR],[JJB],[JSP], clearly demonstrating [WCLE]'s predatory-maliciousness towards the plaintiff, in an audio-recorded ( ♪ ) incident culminating in {2011-08-30}, Ⓐ that was driven by the demonstrably-false, fraudulent accusations and the predatory demands (motivated by racial-animus) of [RSR],[JSP],[JJB] and, Ⓑ that was extremely-violative of the plaintiff's rights, and Ⓒ that was also witnessed by many witnesses including (but not limited to) the plaintiff's neighbors [JSP&KAP],[RSR],[JJB] - some of whom are also named as defendants in this lawsuit, but also 2 other good-samaritan neighbor witnesses, [AJC] and his wife (773KL-2009-2), who spoke very-favorably of the plaintiff to all of the [WCLE] police-officers at the scene and who also reported crime(s)/abuse(s) committed against themselves by [RSR].

## ¶251

This audio-recorded incident was extremely revealing and informative not only regarding the predatory-maliciousness, motivated by racial-animus, exhibited by [RSR],[JJB],[JSP] against the plaintiff, but also, much more importantly, the predatory-maliciousness, also motivated by racial-animus, exhibited by [WCLE] acting in conspiracy with [RSR],[JJB],[JSP] against the plaintiff.

## ¶252

Amongst the many important revelations in this audio-recorded incident, the White-American [WCLE] police-officer, [WCSD-PP], that completely violated the plaintiff's rights by acting in such predatory conspiracy with [RSR],[JJB],[JSP] made some very-important, incriminating and damaging admissions that he knew that [JJB] was committing at least some of the hate-crimes (including retaliatory hate-crimes) committed against the plaintiff, and even admitted that [RSR] committed multiple hate-crimes (including retaliatory hate-crimes) in his presence - as was fully-revealed/directly-conveyed to [RSR]'s terroristic-threat phonecall (made to the [WCSO]) against the plaintiff.

## ¶253

Despite of these admissions - witnessed by multiple witnesses and fully-captured on the plaintiff's audio-recordings - [WCLE] declined to charge and prosecute either [JJB] or [RSR] in {2011}/{2012} for such hate-crimes/racketeering-acts that [JJB],[RSR] had committed against the plaintiff, even though the plaintiff repeatedly requested [WCLE] to, at the very least, charge and prosecute [JJB], if not [RSR], for all of the many hate-crimes/racketeering-acts that the plaintiff had already suffered from both [RSR] and [JJB] at that moment in time.

## ¶254

Unbeknownst to the plaintiff until the following month, {2011-09}, [JJB] had already been charged by [WCLE] several months prior in {2011-03} and had started to be prosecuted by [WCLE] for the felony crime of *"credit card abuse"* (for allegedly stealing and using another person's credit-card), which defendants [JSP],[RSR],[WCLE] knew about during the same period of time that the plaintiff had suffered these predatory and retaliatory acts of [JJB],[RSR],[JSP],[WCLE].

## ¶255

Therefore, [WCLE],[JSP],[RSR] deliberately deprived the plaintiff of their knowledge that [JJB] acted maliciously and in a criminal manner to other victims, and thus, not coincidentally, that [JJB] was also committing several hate-crimes (including retaliatory hate-crimes) against the plaintiff.

## ¶256

Most importantly, [WCLE] sent a powerful message, loud-and-clear, to both the plaintiff and to the plaintiff's predatory neighbors [JSP&KAP],[RSR],[JJB], that if [JJB],[RSR],[JSP&KAP] committed crimes against any person in society that matters - for example, any other White-American person - then [JJB],[JSP&KAP],[RSR] will be prosecuted to the fullest extent of the law, but on the other hand, if [JJB],[RSR],[JSP&KAP] committed even hate-crimes/civil-rights-violations/racketeering-acts and retaliatory (thus felonious) crimes against a person that [WCLE] completely disregarded as *"powerless"* - for example, the plaintiff (due to the plaintiff's racial-profile) - then, [JJB], [JSP&KAP],[RSR] would be able to do so, and indefinitely continue to do so, with absolute impunity ( 🔒 ).

## ¶257

Furthermore, [WCLE]'s predatory retaliation against the plaintiff and [WCLE]'s deliberate failure to fully-investigate, charge and prosecute any of the initial hate-crimes/civil-rights-violations/racketeering-acts committed against the plaintiff (in the years {2009} through {2011}) also sent a powerful message, loud-and-clear, to the plaintiff's neighbors [RSR],[JSP&KAP],[JJB], not only that they could feel free to commit hate-crimes/civil-rights-violations/racketeering-acts and other abuses against the plaintiff with absolute impunity, but also, even more egregiously, that these neighbors would even be rewarded - with [WCLE]'s further acts of malicious retaliation against the plaintiff - if the plaintiff dared to report their hate-crimes/civil-rights-violations/racketeering-acts to [WCLE] - essentially setting-the-stage for more than ten years of further obstructive-and-retaliatory, hate-crimes/racketeering-acts/civil-rights-violations/abuses that the plaintiff would continue to suffer from three of these same neighbors [RSR],[JSP&KAP] and government defendant [WCLE].

## ¶258

(The only reason that the plaintiff did not continue to suffer many more hate-crimes/civil-rights-violations/racketeering-acts from [JJB] was because [JJB] had lost her 〖Summerlyn〗 property to foreclosure in {2012} as a direct result of the loss of her job stemming from her aforementioned criminal charge(s) and conviction(s), ultimately resulting in [JJB] having to move out of the subdivision in that year.)

## ¶259

Additionally, the [WCLE] police-officer, [WCSD-PP], that egregiously-violated the plaintiff's rights and that had committed several *"Abuse of Office"* (and related federal civil-rights-violations/racketeering-acts) crimes (Official-Oppression, Abuse-of-Official-Capacity, Misuse-of-Official-Information, Discrimination, Intimidation/Interference, Disorderly-Conduct, Harassment, Obstruction/Retaliation, Witness-Tampering, Witness-Intimidation, Criminal-Conspiracy) against the plaintiff in that {2011-08-30} incident, was never charged nor prosecuted for those crimes, despite the fact that the plaintiff did report and protest [WCSD-PP]'s egregious misconduct to [WCSD-PP]'s colleagues and superiors at the [WCSO].

## ¶260

The plaintiff did not even have to report [WCSD-PP]'s egregious civil-rights-violations/racketeering-acts against the plaintiff to his superiors, as during the events that took place during that {2011-08-30} incident, [WCSD-PP] was fully communicating (via police-radio) his abusive actions against the plaintiff back to [WCSO] headquarters - while fully coordinating such abusive actions undertaken against the plaintiff with the [WCSO] - and with the [WCSO] also being a direct witness to, at the very least, [RSR]'s racially-motivated and retaliatory terroristic-threat(s) and retaliatory false-report(s) against the plaintiff.

## ¶261

When the plaintiff reported [WCSD-PP]'s egregious civil-rights-violations/racketeering-acts against the plaintiff, both [WCSD-PP]'s colleague, [WCSD-SP], and [WCSO] Sergeant Travis [WCSS-T], the Sergeant superior to [WCSD-PP], rudely hung-up the phone on the plaintiff, showing their racial-animus towards the plaintiff and their total disregard for the plaintiff's police-misconduct complaint.

## ¶262

The plaintiff made a crucial mistake of revealing to [WCSD-SP], and thus the [WCSO], that the plaintiff had audio-recorded all of the plaintiff's interactions with the [WCSO] and its employees. The plaintiff asserts that the plaintiff's revelation of these extremely-incriminating audio-recordings to the [WCSO], inadvertently made the plaintiff an enemy of the defendant [WC], which as this lawsuit documents, is an extremely retaliatory organization, setting the stage for a decade of retaliation that [WCLE] would continue to engage in against the plaintiff - again, acting in such corrupt-malicious-predatory-and-retaliatory conspiracy with [JSP&KAP],[RSR].

## ¶263

[WCLE]'s deliberate failure to charge and prosecute [WCSD-PP] for [WCSD-PP]'s {2011} *"Abuse of Office"* crimes and retaliatory crimes against the plaintiff also sent a powerful message, loud-and-clear, to future employees of [WCLE] that would interact with the plaintiff, that they could feel free to commit racially-motivated civil-rights-violations/racketeering-acts/abuses against the plaintiff with absolute impunity - essentially setting-the-stage for more than ten years of further civil-rights-violations/racketeering-acts/abuses that the plaintiff continued-to-suffer at the hands of other employees/agencies of [WCLE], again, almost always acting in such corrupt-malicious-predatory-and-retaliatory

conspiracy with [JSP&KAP],[RSR], along with any other White-American neighbors (herein referred to as co-conspirators/agents/proxies) that [RSR],[JSP&KAP] fraudulently engendered and indoctrinated with racial-animus against the plaintiff.

# ¶264

In particular, [WCLE] executed numerous unconstitutional-and-unlawful searches/seizures on the plaintiff's-property and unconstitutional-and-unlawful detentions/interrogations of the plaintiff from the years {2013} through {2019} - all due to the malicious, retaliatory, abusive, violative, oppressive, humiliative and predatory demands of the plaintiff's neighbors [RSR],[JSP&KAP] (along with their co-conspirators/agents/proxies) - and in at least some of these cases, [WCLE] unlawfully forced the plaintiff to sign a warning citation and/or [WCLE] unlawfully threatened to file a criminal-charge of *"Class-C-Misdemeanor-Public-Nuisance"* against the plaintiff, either for temporary conditions on the plaintiff's property (which are never a violation of the law), and/or for the plaintiff's failure/*"inability"* to live-according-to White-American standards (in direct violation of the plaintiff's Constitutional rights), and/or the plaintiff's failure/*"inability"* to maintain the plaintiff's private-property according to White-American standards (in direct violation of the plaintiff's Constitutional rights) - in effect, maliciously mis-interpreting, abusively-enforcing and predatorily-weaponizing Texas's Public-Nuisance-Law as a modern-day-Jim-Crow law against the plaintiff.

# ¶265

Meanwhile, the plaintiff had also gathered many additional dozens of pieces of evidence of hate-crimes/civil-rights-violations/racketeering-acts that the plaintiff suffered from [RSR],[JSP&KAP] from the subsequent months (late-{2011} through {2021}), informed [WCLE] on several occasions (in the years of {2017}, {2019}, {2020} and {2021}), of such hate-crimes/civil-rights-violations/racketeering-acts that the plaintiff had suffered from [JSP&KAP],[RSR] in the months following the initial aforementioned incidents of {2011}/{2012}. Additionally, on several occasions (in the years of {2017}, {2019}, {2020} and {2021}) following the initial incidents of {2011}/{2012}, the plaintiff made it clear to [WCLE] that the plaintiff intended to press charges against these perpetrators - again, at a time when the overwhelming majority of the crimes committed against the plaintiff by these particular defendants could have been prosecuted under the Statute-of-Limitations (especially since many, if not most, of such crimes where felonious crimes, and almost-all, if not all, of such crimes were retaliatory crimes).

# ¶266

On multiple occasions since the initial aforementioned incidents of {2011}/{2012}, the plaintiff had also protested to [WCLE] about the clearly discriminatory, retaliatory, abusive, and oppressive treatment that the plaintiff has suffered not only by [JSP&KAP],[RSR], but also from several employees/agencies of [WCLE].

# ¶267

Despite of the plaintiff's numerous, legitimate protests, [WCLE] has always not only brazenly ignored/disregarded the plaintiff's protests, but also instead, [WCLE] again brazenly-retaliated in an extremely predatory and malicious manner against the plaintiff by executing several unconstitutional-and-unlawful searches/seizures of the plaintiff's property (along with unconstitutional-and-unlawful detentions/interrogations of the plaintiff) in the years {2020},{2021} - and, based on a combination of fabricated-evidence, misleading (and illegally-seized) evidence,

fraudulent testimony, and misleading testimony (possibly included in sworn-statements) of the plaintiff's predatory neighbors [JSP&KAP], [RSR] - [WCLE] fraudulently and retaliatorily charged the plaintiff with *"Class-C-Misdemeanor-Public-Nuisance"*.

## ¶268

To be clear, in a showing of extreme hypocrisy (motivated by racial-animus) and extreme racial-discrimination, the plaintiff's predatory neighbors [RSR],[JSP&KAP] have, on numerous occasions, demanded [WCLE] to execute several unconstitutional-and-unlawful searches/seizures of the plaintiff's private-property and several unconstitutional-and-unlawful detentions/interrogations of the plaintiff, that they never have tolerated on their own private-property - simply because [RSR],[JSP&KAP] and [WCLE] believed that the plaintiff, due to the plaintiff's racial-profile, is a powerless, subhuman, low-IQ animal, not deserving of even the most basic human rights ( 🔒 ).

## ¶269

In the process, [WCLE] - acting in-conspiracy-with and in-concert-with racketeer co-defendants [JSP&KAP],[RSR] - also egregiously violated, conspired-to-violate and further attempted-to-violate the plaintiff's due-process rights to *"life"*, *"liberty"*, **and** *"property"* in several manners detailed in this lawsuit.

## ¶270

In response to the fraudulent *"Class-C-Misdemeanor-Public-Nuisance"* charge against the plaintiff, the plaintiff hired [ATTORNEY-TK], requested a jury trial with [ATTORNEY-TK] requesting Discovery - including all exculpatory/mitigating/impeachment evidence such as (but not limited to) all of [WCLE]'s recorded interactions (Body-Worn-Camera, Dash-Camera, emails, phone-calls, voice-mails, sworn-statements, interviews, verbal-statements, social-media-messages, online-form-submissions, physical/electronic documents/images/forms, etc.) concerning the plaintiff and/or plaintiff's private-property, with all of the plaintiff's neighbors from the years {2009} through {2021}.

## ¶271

The case dragged on for another 4 months after the initial Discovery request with [WCLE] refusing to provide any bit of information (let alone exculpatory/mitigating/impeachment evidence) to the plaintiff.

## ¶272

Instead, the [WCDAO]/[WCCAO], and in particular [WCCAOP-CW], demanded to the plaintiff's then-Attorney [ATTORNEY-TK] that the plaintiff should plead guilty to the charge (and pay the approximately $131 fine/costs) without receiving any evidence, and without proceeding to trial.

## ¶273

The plaintiff's then-Attorney [ATTORNEY-TK] refused and again, requested Discovery.

## ¶274

On or about {2021-11-01} - more than a year after the charge - the case was finally dismissed with [WCLE] (including [WC] prosecutors) failing to provide any evidence, explanation or apology to the plaintiff.

## ¶275

These extremely-revealing sequence-of-events can only be interpreted as, at best, prosecutorial cover-up of over a decade of police-misconduct and health-district misconduct - racial-oppression and pattern-of-racketeering-activity committed against the plaintiff - with [WCLE] prosecutors attempting to shield [WCLE] police and health-district-employee(s) from liability for that misconduct (which is in itself an egregious act of prosecutorial misconduct given that the prosecutor's primary duty is to see that *"Justice is Done"*), and at worst, a decade-long combination of police misconduct, health-district-employee misconduct **and** prosecutorial misconduct - wherein the [WCLE] prosecutors were at least partially-culpable, if not almost-as-culpable, along with [WCLE] police departments and the [WCCHD] in the decade of predatory-conspiracy, and associated racially-motivated, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff.

## ¶276

Additionally, [WCLE]'s brazenly-fraudulent, malicious, retaliatory, abusive, oppressive, violative, humiliative, character-assassinating ( ⊕ ) *"Class-C-Misdemeanor-Public-Nuisance"* criminal-charge against the plaintiff was a direct result of [WCLE] acting predatorily and retaliatorily against the plaintiff based exclusively on the extreme-racial-animus of racketeer co-defendants [JSP&KAP],[RSR] - the same neighbor defendants that had aggregately committed multiple-dozen counts of hate-crimes/civil-rights-violations/racketeering-acts (including felony crimes) against the plaintiff from the years {2009} through {2022} (a few of which were even witnessed/video-recorded by other current/former neighbors, and a few of which were even suffered by the plaintiff's senior-citizen [PARENTS]) - but none of which were fully-investigated (almost-all of which were completely-uninvestigated), charged nor prosecuted by [WCLE], despite of the fact that the plaintiff did report almost all of these crimes to the [WCLE].

## ¶277

The plaintiff had to suffer through almost three years of the racial-oppression and pattern-of-racketeering-activity of the plaintiff's initial predatory neighbor [JJB], approximately twelve years of the racial-oppression and pattern-of-racketeering-activity of the plaintiff's predatory neighbor [RSR] (and her son [BR]), approximately twelve years of the racial-oppression and pattern-of-racketeering-activity of the plaintiff's predatory neighbors [JSP&KAP] (and their son [NP]), the hatred/animus of at least some other neighborhood residents that these predatory neighbors successfully indoctrinated (with racial-animus) and conspired-with, numerous abusive-and-oppressive actions (including racketeering-acts) by officials/agencies of [WCLE], numerous abusive-and-oppressive actions by the former [HOA] Board-of-Directors ("[f-HOA-BoD]s") led by [SPOA-P-BC],[SPOA-VP-AH],[DMP] - all of whom are White-American and all of whom were very receptive to the these racketeer defendants' predatory demands against the plaintiff and most-of-whom had resigned and/or lost-their-re-election-campaigns due to abuse-of-office - thanks entirely, to the Orwellian nightmare of the modern-day-Jim-Crow police-state around the plaintiff and the toxic environment of racist-lawlessness around the plaintiff - both maliciously created, fostered, and nurtured by the predatory actions and deliberate inactions of the

[WCLE] (and, to a lesser extent, the former [HOA] under those [f-HOA-BoD]s).

## ¶278

Indeed, the defendants egregious, predatory/abusive/oppressive actions against the plaintiff have made the plaintiff suffer as if the plaintiff - who the defendants deemed to be a powerless, *"low-IQ"* and/or *"third world ignorant"*, subhuman animal - has no rights, and as if the plaintiff was/is trapped in a pre-civil-rights-era (or Jim-Crow-era) bubble for over a decade - in other words, as if the plaintiff lives in an alternate world in which none of the civil-rights-legislation and anti-racketeering-activity legislation existed - and all of the limited gains towards freedom/independence/justice made by the many civil-rights-movements/racial-justice-movements in the United States meant nothing in-regards-to the plaintiff and were all null-and-void in-regards-to the plaintiff (🔒).

## ¶279

For over a decade, the primary-defendants [JSP&KAP], [RSR] and [WCLE] have fully and abusively exploited the racial-demographics and political-demographics of the 【Summerlyn】 subdivision and the County of Williamson, and by virtue of the racial-demographics and political-demographics of the 【Summerlyn】 subdivision, the County of Williamson, and thus the resulting jury pool in the County of Williamson, which are all extremely unfavorable to the plaintiff (a crucial-component of modern-day-Jim-Crow), the defendants have been given free-reign to completely abuse the legal/justice system in-order-to fully deprive the plaintiff of the plaintiff's rights, while at the same time, totally deny the plaintiff the opportunity from setting the record straight by dismantling their fraudulent, institutionally-racist narratives against the plaintiff and seeking justice for the huge number of substantial hate-crimes/racketeering-acts/civil-rights-violations/abuses that they aggregately committed against the plaintiff.

---

# §XVIII

# LAWSUIT COULD HAVE BEEN AVOIDED IF DEFENDANT [WC] ACTED EARLY BY TAKING APPROPRIATE CORRECTIVE-ACTIONS IN {2011}/{2012}

## ¶280

As the plaintiff has already summarized, the plaintiff has suffered a huge number of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses, especially from predatory, far-right-wing-extremist, co-conspirator, racketeer defendants [JSP&KAP],[RSR], but also a large number of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses from some members of [WCLE]. However, if [WCLE] had acted early in {2011}/{2012} by performing all of the following corrective-actions after the {2011-08-30} traumatizing incident

suffered by the plaintiff, then predatory, far-right-wing-extremist, co-conspirator, racketeer defendants [JSP&KAP], [RSR] and the subsequent members of [WCLE] would not have operated with a sense of absolute impunity and racist lawlessness against the plaintiff, by aggregately committing the huge number of subsequent, racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff (over the course of the following decade), and the plaintiff would, thus, not have suffered the extreme, permanent irreparable injury/harm caused by these huge number of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses (including abuse from the [HOA] under the [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH]), and therefore, the damages suffered by the plaintiff would have been minimized, in terms of liability for defendant [WC], and its law-enforcement-agencies, [WCLE]:

01.  Charged and prosecuted [JJB] in {2011}/{2012} for all of [JJB]'s Obstruction/Retaliation, Harassment/Stalking, Intimidation/Interference, Blackmail, Criminal-Mischief, Illegal-Dumping racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff from {2009} through the end of this particular period of time.

02.  Charged and prosecuted [RSR] in {2011}/{2012} for all of [RSR]'s Obstruction/Retaliation, Criminal-Conspiracy, Witness-Intimidation, Witness-Tampering, Harassment/Stalking, Terroristic-Threat, Assault, Intimidation/Interference, False-Report, Texas-Fraud, Disorderly-Conduct, Blackmail racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff from {2009} through the end of this particular period of time.

03.  Charged and prosecuted [JSP] in {2011}/{2012} for all of [JSP]'s Obstruction/Retaliation, Criminal-Conspiracy, Witness-Intimidation, Harassment, Terroristic-Threat, Assault, Intimidation/Interference, Texas-Fraud, Disorderly-Conduct, Blackmail racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff from {2010} through the end of this particular period of time.

04.  Charged and prosecuted [WCSD-PP] in {2011}/{2012} for Obstruction/Retaliation, Criminal-Conspiracy, Witness-Intimidation, Witness-Tampering, Official-Oppression, Abuse-Of-Official-Capacity, Misuse-Of-Official-Information, Intimidation/Interference, Texas-Fraud, Disorderly-Conduct, Harassment, Discrimination racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff from {2011} through the end of this particular period of time.

05.  Charged and prosecuted [WCSD-SP] in {2011}/{2012} for Obstruction/Retaliation, Witness-Intimidation, Official-Oppression, Abuse-Of-Official-Capacity, Misuse-Of-Official-Information, Discrimination racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff from {2011} through the end of this particular period of time.

06.  Issued, in {2011}/{2012}, a Public-Letter-of-Apology to the plaintiff for egregiously violating the plaintiff's rights.

# ¶281

However, since [WCLE] did not perform all - and, in fact, any - of the aforementioned corrective-actions in {2011}/{2012}, the plaintiff continued to suffer needlessly and miserably for over a decade more ({2013} through {2022}), after already having suffered the initial years of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses from {mid-2009} through {mid-2012}. Instead, [WCLE] took the exact-opposite course-of-actions by continuing to conspire and act, in furtherance of such conspiracy - corruptly-maliciously-predatorily-and-retaliatorily against the plaintiff along-with and on-behalf-of predatory, far-right-wing-extremist, co-conspirator, racketeer defendants [JSP&KAP],[RSR] - as part of their obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff - for almost a decade after those initial {mid-2009} through {mid-2012} incidents - as substantially documented in this lawsuit.

# §XIX

# PRIVACY LAW, COPYRIGHT LAW AND OTHER LEGAL DISCLAIMERS

## ¶282

To the best of the plaintiff's knowledge, any (online/print) publication, newspaper/journalist article, blog-posting and/or social-media-posting cited/posted by the plaintiff in this lawsuit is either already within the *"public domain"* OR is not privacy-protected under the *"third-party doctrine"* OR has been minimally cited/posted under the *"fair-use doctrine"* solely for the non-commercial purpose of proving the plaintiff's claims, and as such, such citing/posting is not intended to violate anyone's (or any entity's) privacy-right(s) or copyright(s). All credit(s) and attribution(s) for those items go to the respective author(s) and/or copyright-holder(s) of those items. As is already evident in the text of this lawsuit, the plaintiff has taken great care and diligence including, but not limited to - the redaction of names/phone-numbers, the blurring/shrinking/cropping of images - to eliminate any potential unauthorized posting of any privacy-protected and/or copyrighted-materials in this lawsuit, including, but not limited to: social-security-numbers, names-of-minor-children, dates-of-birth, financial-account-numbers, driver-license-numbers (and other identification-numbers), medical-records, employment-history, individual-financial-information, proprietary/trade-secret-information. Whenever and wherever the plaintiff has provided any address of any current-resident-witnesses, the plaintiff has ensured not to identify the current-resident-witness(s) at such address, and as such, these addresses are only used to indicate the relative location of such address to the plaintiff's residence. Furthermore, since the plaintiff's own residence address, as used abundantly in this lawsuit, is not subjected to any privacy protections (since the plaintiff's name and address are visible in publicly-visible property/appraisal records), the use of these other addresses located directly-around the plaintiff's residence does not, in any way, compromise any person(s) privacy. Most importantly, since this lawsuit involves, in substantial part, a housing-discrimination complaint, the use of such addresses, without any other personally-identifying information, is unavoidable and crucial to the performance of this lawsuit. The plaintiff has redacted any-and-all potentially sensitive/private information, not only by blurring/shrinking/cropping images, but also by using the asterisk character, *"\*"*, to mask any potentially-sensitive textual information, and by using only non-identifying initials (rather than full names) of certain third-party witnesses/parties even though, almost-all, if not all, of these persons' full-names and addresses are already public-information - publicly-accessible via the property/appraisal records, local Court records and/or other public records. Wherever a current/former resident is not listed in the publicly-accessible property/appraisal records, the plaintiff has tried to avoid using such resident's initials, and has tried instead to only refer to such resident by the non-identifying string of characters, [STREETNUMBER-INITIALYEAROFRESIDENCE-SINGLEDIGIT]. In the interest of privacy, the plaintiff has also not posted any live-links to the video/audio recorded evidence of incidents described in this lawsuit, and will only submit this information directly (and privately) to the defendants through the legal processes of discovery/depositions. The plaintiff has thus, out of an abundance of caution, made every reasonable effort to fully-comply with all of the privacy-terms of the 〚E-Government Act of 2002〛, 〚Federal Rules of Civil Procedure: Rule 5.2. Privacy Protection For Filings Made with the Court〛, other applicable privacy-law(s) and copyright-law(s).

## ¶283

The views expressed in this lawsuit are exclusively the plaintiff's views and, thus, do not necessarily represent the views of any other party.

## ¶284

No part/aspect of this lawsuit seeks to defame any-one, any-group, any-institution or any-entity:

01. This lawsuit seeks to present the truth - with truth being a valid defense to invalid/illegitimate claims of defamation.

02. In-Order-To prove defamation, the accuser must prove that the accused knowingly made false/fraudulent statements about the accuser and that the accused did so with malice against the accuser. As this lawsuit regarding the plaintiff and the defendants reveals, only the defendants knowingly made false/misleading/fraudulent public statements about the plaintiff (sometimes in extremely public-settings such as social-media), only the defendants harbored extreme animus against the plaintiff, and only the defendants acted with extreme malice against the plaintiff. The plaintiff has taken great care and diligence to carefully and truthfully word this lawsuit as-conservatively-as and as-reasonably-as the plaintiff could, with the plaintiff's own limitations (for example, intellectual limitations and limited breadth-of-knowledge), perspectives and cumulative life-experiences, and without making any extra-judicial (out-of-court) public-statements (see below).

03. The standard for proving defamation against public figures including, but not limited to, governments, government officials, government agencies and other public-authorities - *"clear-and-convincing-evidence"* - is much higher than the standard for proving defamation against private citizens (*"preponderance-of-evidence"*, sometimes referred to as *"more-likely-than-not"*).

04. Generally speaking, defamation only applies to extra-judicial (out-of-court) statements.

05. Private-citizen litigants in a lawsuit are substantially protected by *"quasi-immunity"* of *"litigation privilege"* from claims of defamation resulting from any litigation action.

06. Private-citizen litigants in a lawsuit are substantially protected by *"quasi-immunity"* of the fundamental first-amendment-right-to-petition from claims of defamation resulting from any litigation action.

07. Private-citizen litigants in a lawsuit are substantially protected by *"quasi-immunity"* of the equal-right-to-sue ([42-USC-C21-SI-§1981]) from claims of defamation resulting from any litigation action.

08. All parts/aspects of this lawsuit are fully-protected by anti-SLAPP laws (for example, the 〖Texas Citizens Participation Act〗 codified within [TCPaRC-T2-SB-C27]) that fully-protect Constitutional speech, especially Constitutional speech that is a *"matter of public concern"* and *"general public importance"* - as specified in the [FHA] ([42-USC-C45-SI-§3614]). The general topic of government-misconduct is the most extreme *"matter of public concern"* and *"general public importance"* as are the sub-topics of institutional-racism/White-Supremacy/racial-oppression/racial-tyranny/modern-day-Jim-Crow/far-right-wing-extremism/racketeering-activity. The plaintiff asserts that there is no Constitutional-speech of greater *"public concern"* and *"general public importance"* than such speech regarding government-misconduct - the primary topic of this lawsuit.

09. *"Absolute Power Corrupts Absolutely." "Power remains strong when it remains in the dark; exposed to the sunlight, it begins to evaporate." "Power concedes nothing without a demand.":* The primary purpose of this lawsuit is to expose egregious government-misconduct and egregious government abuse-of-power, and despite of the fact that the plaintiff - a citizen-journalist - has not made any

extra-judicial statements about this case, all parts/aspects of this lawsuit are protected by the same first-amendment protections afforded to the media/press (including citizen-journalists) and whistleblowers - with a primary goal of both media/press and whistleblowers to expose government-misconduct and government abuse-of-power.

10. Enforcement of the [FHA]/[TFHA] requires all parties involved to have open, honest and uncensored dialogue about legitimate grievances of homophobic-animus, Islamophobic-animus, anti-semitic-animus, anti-immigrant-animus, anti-indigenous-peoples-animus, and all other forms of racial-animus including but not limited to: institutional-racism/White-Supremacy/racial-oppression/racial-tyranny/modern-day-Jim-Crow/far-right-wing-extremism. Prospective petitioner(s) in [FHA]/[TFHA] lawsuits cannot reasonably be expected to present their legitimate grievances to Court if they could easily be retaliated-against, censored or otherwise-punished for doing so.

11. Similarly, if the underlying sub-claims to a prospective petitioner(s)' [RIaCOA] lawsuit involves retaliation, retaliatory threats-of-murder, retaliatory blackmail/extortion, witness-intimidation, retaliatory witness-tampering, retaliatory evidence-tampering, retaliatory fabrication-of-evidence, mail-fraud, wire-fraud, obstruction-of-justice, etc., then the same logic also applies to such [RIaCOA] lawsuit. Victims of retaliation, retaliatory threats-of-murder, blackmail/extortion, witness-intimidation, witness-tampering, evidence-tampering, fabricated-evidence, mail-fraud/wire-fraud, obstruction-of-justice, etc. - in particular - need to be provided with an open and uncensored space to voice their legitimate grievances in Court, without any fear of retaliation, censorship or other punishment. If the prospective petitioner(s) of such [RIaCOA] lawsuit failed to file such [RIaCOA] lawsuit due to fear of retaliation/censorship/punishment, then such prospective petitioner(s) would, in effect, be allowing long-term pattern of criminal racketeering-activity conducted as part of a racketeering-enterprise to go completely undetected and unpunished.

12. Victims of abuse (especially, abuse for the purpose of humiliation) need to be provided an open and uncensored space to voice their legitimate grievances in Court, without any fear of retaliation/censorship/punishment. If such victims are, in any way, punished for exercising such Constitutional rights, then such punishment would not only cause further irreparable-harm/emotional-distress/psychological-trauma/mental-anguish onto such victims, but would also, by way of chilling-effect, send a strong message to other victims of abuse to remain silent about such abuse.

13. If the plaintiff failed to file this lawsuit - and thus, if the plaintiff failed to expose all of the government/government-agency misconduct substantially documented in this lawsuit - the plaintiff would have committed an extreme injustice not only onto the plaintiff, but much more importantly, to all other persons-of-color and/or political-activists who have suffered institutional-racism/White-Supremacy/racial-oppression/racial-tyranny/modern-day-Jim-Crow/far-right-wing-extremism/political-repression/racketeering-activity from their local government acting maliciously in conspiracy with malicious private citizens that *"harborbed prejudice"*. Furthermore, as a social-justice-activist, the plaintiff would not have been able to live with the extreme regret of failing to file this lawsuit - which would have meant that all of the more-than-a-decade-worth-of egregious government-misconduct that the plaintiff has suffered and documented being, figuratively-speaking, *"swept under the rug"*. Thus, the plaintiff has filed this lawsuit solely in the interest-of-justice.

§XX

# SEQUENCE OF RELEVANT INCIDENTS

*"... if you were to trim these bushes and make em look good - everybody would leave you alone!"*

- **[WCSD-PP]**  speaking to  **PLAINTIFF,[JSP]**  on the date of {2011-08-30}

*"... SHE SAID THAT SHE WAS GOING TO COME HOME AND WHOOP WHOEVER'S ASS WAS OVER HERE!"*

- **[WCSD-PP]**  speaking to  **PLAINTIFF,[JSP]**  on the date of {2011-08-30}

*"THE BEST SOLUTION SID, IS TO MOW YOUR GRASS! AND THEN YOU WON'T HAVE THIS PROBLEM!"*

- **[WCSD-SP]**  speaking to  **PLAINTIFF**  on-or-about the date of {2012-03-??}

*"People call us all the time for b.s. stuff, and for genuine stuff. It's our job to determine whether it's b.s. or genuine, right?"*

- **[WCSD-MD]**  speaking to  **PLAINTIFF**  on the date of {2020-02-09}

*"IF YOU DON'T TAKE CARE OF YOUR YARD, I'M GOING TO GET THE STRICTEST RULES APPLIED TO YOU BY THE [HOA], AND IF YOU STILL DON'T SEE TO IT - I'M GOING TO GET THE [HOA] TO KICK YOU OUT OF THE HOUSE! SO, YOU BETTER TAKE CARE OF IT! LOOK AT YOU! YOU'RE NOT EVEN TAKING CARE OF YOURSELF! ... WHAT DO YOU DO IN THERE, ANYWAYS?!"*

- **[RSR]**  speaking to  **PLAINTIFF**  on the date of {2010-06-05}

*"I KNOCKED ON YOUR DOOR! ... I TOLD YOU I WOULD CALL THE [HOA] AND THE [HOA] WOULD TAKE CARE OF IT! ... I WILL GET YOU OUT OF THIS NEIGHBORHOOD BY VIOLATING THE [HOA] LAWS - IF I HAVE TO! BECAUSE THAT IS MY RIGHT, BUT HERE'S THE THING: I NEVER WOULD RACE ACROSS THE STREET AND DUMP KITTY-LITTER INTO YOUR YARD! ... I HAVE EVIDENCE! S*** AND I SAT THERE, WHILE THAT DRUNK WOMAN OVER HERE LAUGHED ABOUT - NUMBER ONE - LAUGHED ABOUT - THROWING LITTER IN YOUR BACKYARD! ... BECAUSE IT DOESN'T MATTER ANYWAYS - HE DOESN'T LOOK AT HIS YARD ANYWAYS! AND ALSO, SHE LAUGHED ABOUT, WHEN SHE WOULD COME IN IN THE MIDDLE OF THE NIGHT, AND KNOCK ON YOUR DOOR - THOSE ARE THE THINGS SHE SAID!"*

- **[RSR]**  speaking to  **PLAINTIFF**  on the date of {2016-10-11}

*"... I JUST KNOCKED ON YOUR DOOR AND ... I SAID I WILL CALL THE [HOA] AND HAVE YOU FORECLOSED ON IF YOU CONTINUE TO BREAK THE RULES!"*

- **[RSR]**  speaking to  **PLAINTIFF**  on the date of {2017-02-06}

*"... OK, WELL - WHERE YOU'RE FROM - GO BACK THERE AND LIVE THERE!"*

- **[RSR]**  speaking to  **PLAINTIFF**  on the date of {2017-02-06}

*"... I'M SO TIRED OF HEARING [THAT] IT'S ILLEGAL! ... THE YARD IS A MESS. THE BACKYARD - HE HAD CABLES - WITH CAMERAS ALL OVER THE PLACE. OVERGROWTH IN ATTACHED PORCH - ALL OF THAT - AND FOR 9 YEARS, I'VE ASKED YOU GUYS TO DO SOMETHING. ... BECAUSE, IF I SHOW, AND MY NEIGHBOR CAN SHOW - THAT HE LOST A SALE - THAT IS A 'CAPITAL LOSS' - THAT YOU, THEN WOULD BE RESPONSIBLE - AND IN TURN, THAT HOMEOWNER WOULD BE RESPONSIBLE. I'VE DONE MY HOMEWORK, AND I'M DANGEROUS ENOUGH TO KNOW JUST A LITTLE AND TO MAKE IT WORSE ... I JUST WANT HIM TO MOW HIS GRASS! I JUST WANT HIM TO CLEAN UP THE PIG-PEN IN HIS BACKYARD! I WANT HIM TO BE A NEIGHBOR! I DON'T WANT TO BE CALLED A RACIST! AND IN FACT, I THINK THAT IT'S LIKE REVERSE-DISCRIMINATION! BECAUSE YOU'RE SO CAREFUL BECAUSE OF SOMEBODY'S RACE - RACE IS AN ISSUE WHEN THE - WHEN THEY DON'T HAVE A BETTER ARGUMENT! ... NO! I JUST WANT - I JUST WANT THAT HOUSE TAKEN CARE OF! ... "*

- **[RSR]**   speaking to   **[HOA]**, **PLAINTIFF**   on the date of {2019-08-19}

*"... BUT WHAT I'M SAYING IS THAT THE BOARD HAS THE RESPONSIBILITY TO ACT IN THE HOMEOWNER'S BEST INTEREST. AND MY INTERESTS ARE NOT BEING PROTECTED! - I'M NOT ASKING FOR YOU KNOW, FOR YOU TO STOP THE FIREWORKS! I'M ASKING YOU TO GET THE GUY TO MOW HIS GRASS AND TAKE OFF THOSE STUPID SIGNS, AND CLEAN OUT HIS BACKYARD. I ASKED YOU THIS FOR 9 YEARS - AND I'VE PAID MY $88 [???] SOMETIMES, SOMETIMES NOT... AND I STILL DON'T GET ANYTHING BACK OTHER THAN [???]. AND I - YOU HAVE THAT FIDUCIARY RESPONSIBILITY - AND JUST IN THE LAST YEAR - I NEED TO KNOW! I WANT TO SELL MY HOUSE - I DON'T WANT TO LIVE ACROSS THAT GUY! I DON'T! HE'S BAD NEWS! HE'S INCONSIDERATE! HE DOESN'T CARE ABOUT- IF HE WANTS TO LIVE LIKE THAT - THAT'S FINE! LET HIM BUY A PIECE OF LAND! BUT WHEN YOU COME INTO OUR NEIGHBORHOOD, YOU SIGNED THE COVENANTS - AND YOU ARE CONTRACTUALLY OBLIGATED TO THAT! SO, AS AN EXAMPLE.. [???] BUT THAT'S NOT SO... BUT I NEED YOU TO LET HIM KNOW, IN NO UNCERTAIN TERMS, THAT HE HAS TO ABIDE BY THEM! ... [???] 9 YEARS! - AND I'M NOT PATIENT ..."*

- **[RSR]**   speaking to   **[HOA]**, **PLAINTIFF**   on the date of {2019-08-19}

*"... WHY DON'T YOU JUST MOVE! ..."*

- **[RSR]**   speaking to   **PLAINTIFF**   on the date of {2020-05-05}

*"... WHAT IS HIS PROPERTY?! ARE YOU SURE THAT THAT'S HIS PROPERTY? ... I MEAN, WHO KNOWS IF THAT'S EVEN HIS PROPERTY?! ..."*

- **[RSR]**   speaking to   **[JSP]**   on the date of {2020-06-22}

*"YOUR YARD LOOKING THE WAY IT DOES, BRINGS DOWN THE VALUE OF OUR HOUSES! BEING NEXT DOOR AND ACROSS THE STREET DE-VALUATES OUR HOUSES! ... IT LOOKS GHETTO, YOU KNOW, THAT'S WHAT IT LOOKS LIKE! ... WE DON'T WANT GHETTO NEXT-DOOR BRINGING OUR PROPERTY-VALUE DOWN! ... ALL WE ASK YOU TO DO IS TRIM YOUR DAMN BUSHES - HOW FRICKING HARD IS THAT?! GOD DAMN - WE DON'T ASK MUCH OF YA! ... IT'S JUST TO LOOK DECENT ... WE'LL LIVE THE FACT THAT YOUR GRASS LOOKS LIKE SHIT ... BUT AT LEAST CLIP YOUR BUSHES, LOOKS LIKE - I DON'T EVEN KNOW WHAT THAT IS! ... IT LOOKS TERRIBLE ... MINE WOULD BE ALL OVER MY HOUSE IF I LET IT GROW LIKE THAT. MINE GROWS LIKE CRAZY, YOU KNOW WHY - CAUSE I TRIM IT - IT GROWS FASTER WHEN YOU TRIM IT - JUST LIKE HAIR!"*

- **[JSP]**   speaking to   **PLAINTIFF**   on-or-about the date of {2011-09-??}

*""*

- **[JSP]**   speaking to   **PLAINTIFF**   on-or-about the date of {2011-09-??}

*"IN EVERY OTHER COMMUNITY, THEY WOULD HAVE HUNG YOUR ASS BY NOW! YOU WOULD BE GONE!"*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2017-05-27}

*"MOVE! ... GO SOMEWHERE ELSE!"*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2017-05-27}

*"I TALK TO YOU - I'M THE ONLY ONE HERE, IN THIS NEIGHBORHOOD, THAT'S NICE TO YOU! ... WHY WOULD I DO IT! ... LET ME TELL YOU WHO DID IT - THE [HOA] HAS DONE IT! ... I MEAN, I'M NOT GOING TO LIE! - I WANT EM TO DO IT! - I WANT EM TO GET RID OF YOU! - I WANT THIS PLACE TO LOOK NICE, BECAUSE WHEN IT COMES TIME FOR ME TO SELL MY HOUSE, I DON'T WANT THIS PIECE-OF-SHIT NEXT TO ME! - I'M SORRY, I DON'T! - I'M JUST BEING HONEST!"*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2017-05-27}

*"YOU'RE DAMN LUCKY - THAT YOU CAN HIDE BEHIND THAT LITTLE RACE CARD OVER THERE - BECAUSE, I WOULD COME OVER THERE AND WHOOP YOUR ASS!"*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2017-10-29}

*"BAM! I'D KNOCK YOU SENSELESS - YOU SICK SON OF A BITCH! YOU KNOW WHAT - YOU'RE SUCH A [???] - **YOU'RE A FAGGOT!** YOU'RE A LITTLE BITCH! ALL OF THESE PEOPLE THAT [???] - THEY COULD LOOK AT YOUR PIECE-OF-SHIT HOUSE AND YOUR PERVERTED ASS! AND GET THOSE CAMERAS OFF MY BACKYARD - QUIT BEING A LITTLE PERVERT, YA FREAK! ... **I WILL KNOCK YOU OUT! YOU WON'T NEVER SEE TOMORROW, BOY,** I TELL YOU WHAT! YOU'RE SUCH A PUNK-ASS LITTLE BITCH!"*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2019-01-22}

*"I'VE GOT THE HEALTH DEPARTMENT COMING UP HERE! ... GOD WE WERE ALL PRAYING, [THAT] YOU WERE MOVING! ... WHY DON'T YOU TAKE ALL THIS SHIT, AND GO SOMEWHERE ELSE! ... IT'S DISGUSTING! THERE'S NO REASON WHY WE ALL HAVE TO DEAL WITH IT! ... "*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2020-03-16}

*"... SID, YOU ARE A FUCKING WORTHLESS PIECE OF DOGSHIT! YOU STINK LIKE ASS! ..."*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2020-04-18}

*"... I WILL HAVE THE HEALTH DEPARTMENT RIGHT UP THE MIDDLE OF YOUR ASS-HOLE! OR WILLIAMSON COUNTY OR SOMEONE ELSE YOU DON'T WANT TO TALK TO! ... SID - YOU CAN'T TAKE CARE OF THIS PLACE! **WHY DON'T YOU JUST MOVE! GET AN APARTMENT OR SOMETHING!** ... YOU CAN'T HANDLE IT! - IT'S OBVIOUS! ALL YOU'RE DOING IS COSTING YOUR PARENTS MONEY! ... **AND THEN YOU HAVE ALL THESE SIGNS OUT THERE - TALKING ABOUT "RACISM"** AND "TAX THE WEALTHY", **AND ALL THAT KIND OF BULLSHIT!** ... YOU DON'T EVEN WORK! - WHO ARE YOU TO SAY ANYTHING ABOUT ANYTHING! YOU PIECE OF SHIT! ... YOU'RE A NOBODY! - YOU SHOULD HAVE NO SAY! **YOU DO HAVE NO SAY, THANK GOD!** ... YOU RIDICULOUS SON OF A BITCH! YOU SHOULD HAVE NO SAY! ..."*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2020-06-17}

*"WHAT ARE YOU CALLING [THE POLICE] ON BECKY FOR, THE OTHER DAY?! WHAT A RIDICULOUS DICKLESS MOVE THAT WAS?!! ... ARE YOU KIDDING ME?!! YOU LITTLE CHICKEN-SHIT! BECAUSE SHE WALKED ACROSS THE FRONT OF YOUR YARD! ... YOU KNOW HOW PISSED OFF THE COPS WERE ABOUT THAT?! YOU KNOW WHAT'S GOING TO HAPPEN IF YOU KEEP DOING THAT?! ... **YOU KNOW WHEN THAT COP HAD YOU BACKED UP AGAINST THE WALL THAT DAY! - THAT'S GOING TO HAPPEN AGAIN, SOON! PREPARE YOURSELF!** AND IT AINT GOING TO BE NO 'RODNEY KING' OR ANY OF THAT KIND OF JACK SHIT! THEY JUST DON'T CARE ABOUT YOU!"*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2020-06-17}

*"... SID - YOUR HEAD! **YOUR HAIR IS RIDICULOUS!** [???] ARE YOU KIDDING ME?! WHAT IS THAT ABOUT?! **YOU CAN'T CUT YOUR HAIR?!** THAT IS RIDICULOUS! - THAT MUST SMELL LIKE SOMEBODY'S ASS HOLE! MY GOD - ARE YOU KIDDING ME?! PROBABLY WHAT I SMELL ALL THE TIME! ... [???] WHAT'S UP WITH THAT - CAN YOU DO SOMETHING ABOUT THE SMELL! ... I DON'T WANT TO HAVE TO CALL THE HEALTH DEPARTMENT OUT HERE AGAIN! - THEY'VE GOT MORE IMPORTANT THINGS TO DO THAN TO DICK WITH YOU! ... BUT YOU KNOW, I DON'T HAVE A CHOICE, BECAUSE YOU'RE SUCH A DISGUSTING SON OF A BITCH! ..."*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2020-06-17}

*"HEY SID - COPS CAME BY [???] LOOKING FOR YOU! ... I KNOW YOU WERE HOME! WHY DIDN'T YOU ANSWER THE DOOR?! ... I'M GOING TO CALL EM NEXT TIME - AND NEXT TIME, [???] I'M GOING TO TELL THEM! I'M BOUT TO CALL EM RIGHT NOW AND LET EM KNOW YOU'RE HERE! ... TAKE CARE OF YOUR BUSINESS! ... 'NATURE BOY'! ... I'LL TELLING EM SID! - I'M TELLING EM YOU'RE HERE!"*

- **[JSP]**   speaking to   **PLAINTIFF**   on the date of {2020-10-20}

*"WHAT?! BECAUSE I DON'T LIKE HIS CAMERA ON MY YARD! ... I CAN DO WHATEVER I WANNA DO! ... HEY, I'VE LIVED NEXT TO THIS GUY FOR 10 YEARS! OK?! ... TRUST ME, YOU DON'T HAVE TO LIVE BY HIM! HAVE YOU SEEN HIS BACKYARD?! ... YEAH, I'M SURE THEY HAVE MUCH MORE SERIOUS PROBLEMS THAN ME THROWING SNOWBALLS [AT THEIR HOUSE]!"*

- **[JSP]**   speaking to   **[785KL-2018-1]** , **[785KL-2018-CHILDREN]** , **PLAINTIFF**   on the date of {2021-02-17}

*"SO EXACTLY, WHAT MAKES YOU THINK THAT'S ACCEPTABLE?! ... HAVE YOU DECIDED WITH THE [HOA] THAT THAT'S ACCEPTABLE, SID?! ... HAVE YOUUU?!!!"*

- [KAP] speaking to PLAINTIFF on the date of {2021-04-26}

*"I MEAN, I'LL HAVE THE HEALTH DEPARTMENT OVER HERE REAL QUICK IF YOU DON'T HANDLE THAT SOON! ... THEY'LL BE UP YOUR BUTT! ... I'LL HAVE THE POLICE UP YOUR BUTT! ... I'LL HAVE EVERYBODY UP YOUR BUTT! ... AND I KNOW YOU DON'T LIKE PEOPLE UP YOUR BUTT! ... SO, YOU BETTER GET A HANDLE! ... I'VE TAKEN PICTURES OF ALL OF THIS! - I'VE TOOK PICTURES OF YOUR BACKYARD WITH THE WEEDS UP TO HERE!"*

- [JSP] speaking to PLAINTIFF on the date of {2021-06-18}

*"AND WHY ARE YOU EVEN ALLOWED TO LIVE BY YOURSELF, BLOWS MY MIND!"*

- [JSP] speaking to PLAINTIFF on the date of {2021-06-18}

*"WHEN I GET THE HEALTH DEPARTMENT IN HERE, THEY'RE GOING TO BE SO FAR UP YOUR BUTT! ... THAT YOU'RE GOING TO BE VERY UNCOMFORTABLE! ... AND I KNOW YOU DON'T LIKE TO BE UNCOMFORTABLE!"*

- [JSP] speaking to PLAINTIFF on the date of {2021-06-18}

*"... I'MA TAKE A PICTURE OF ALL OF IT, CALL YOU IN TO ALL YOUR BUDDIES, THAT THINK YOU'RE 'GREEN'! YOU'RE ACTUALLY **'BLACK'**! ... "*

- [JSP] speaking to PLAINTIFF on the date of {2021-06-30}

*"FREAK-O! ... YOU'RE A FREAK! [???] DAMN [???]! YOU ARE A FREAK TO BE ABLE TO LIVE BY YOURSELF! FUCKING WEIRDO! ..."*

- [JSP] speaking to PLAINTIFF on the date of {2021-07-09}

*"... WHY DON'T YOU JUST WEAR A RAG! THAT WOULD BE MORE APROPOS! ... LIKE TARZAN! ... "* 〔 MIMICS THE SOUND OF THE TARZAN YELL, AND THEN LAUGHS OUT LOUD 〕 *"WHY DON'T YOU GET THOSE CAMERAS OFF MY PROPERTY! ..."* 〔 [JSP] PICKS UP A LARGE ROCK FROM [784KLLTX78641] AND THROWS IT TOWARDS ONE OF THE PLAINTIFF'S CORNER SECURITY CAMERAS. THE LARGE ROCK LANDS ON THE PLAINTIFF'S [YARD] UNDERNEATH THOSE SECURITY CAMERAS. 〕

- [JSP] speaking to PLAINTIFF on the date of {2021-10-10}

*"sir, it's um- in totalitarian societies, they used to put people in prison for things that are 'unusual'!"*

- PLAINTIFF speaking to [WCCHDS-VD] on the date of {2020-04-28}

*"Indigenous cultures. **Every Indigenous culture**. I'm not doing anything out of the ordinary when it comes to indigenous cultures. ok, so- we're talking about the people that used live on this land- I mean, but still do to very minute extent. and also, indigenous cultures in Africa, South-America and, you know, Asia as well. And, I happen to be from the Asian cultures. But what I mean to say is, indigenous cultures have a distinct, I mean very traditional way of living, that you might consider to be 'primitive'."*

- PLAINTIFF speaking to [WCCHDS-VD] on the date of {2020-04-28}

## ¶285

On or about the date of {2009-03-06} the plaintiff becomes owner of the residential property [788KLLTX78641], and within one week or two weeks after {2009-03-06}, the plaintiff moved into [788KLLTX78641] located in the 【Summerlyn】 residential-property subdivision.

# ¶286

On or about an afternoon in the beginning of the month of {2009-06}, while inside of the [HOUSE], the plaintiff heard knock(s) on the plaintiff's [FRONTDOOR] and/or the door bell rung. The plaintiff opened the front-door of the [HOUSE] to find then-next-door-neighbor from 【792 KINGFISHER LANE, Leander, TX 78641】 [792KLLTX78641], [JJB], standing in front of the [FRONTDOOR]. [JJB] inquired about what she claimed to be unmowed or uncut grass on the plaintiff's property. She called the plaintiff to follow her to look at the plaintiff's sideyard - the areas of the plaintiff's property nearest to the sideyard of her property. When she and the plaintiff were at the plaintiff's sideyard, she pointed at the grass, and told the plaintiff that grass needs to be cut on a regular basis, even saying, in an almost-threatening, yet-calm manner, *"You know, we do have an [HOA]!..."* **(Δ) (λ)**. She then started to talk about what she claimed to be insects on the plaintiff's yard and inquired about whether the plaintiff is using pesticide(s). The plaintiff informed [JJB] that, as an environmentalist, the plaintiff is strongly-opposed to the use of such chemical(s). (At that moment in time, being far more timid about talking about the plaintiff's religion/culture/race, the plaintiff did not mention that it was also strongly against the plaintiff's indigenous religious/cultural values/practices to use such chemical(s).) [JJB] responded with words that included *"homestead"* which the plaintiff did not really understand (as the plaintiff did know know what *"homestead"* had to do with pesticides), but pretended to acknowledge. As a way to amicably resolve the situation, the plaintiff said that the plaintiff had just recently received an electric lawn-mower as an online package delivery and that the plaintiff would be mowing the grass using this lawn-mower. This initial incident (unlike most incidents documented in this lawsuit), ended relatively-civilly with the plaintiff entering back into the [HOUSE] and [JJB] walking back onto her property. This incident was likely to be one of only two incidents in which [JJB], while still intruding into the private affairs of the plaintiff and while still making a somewhat threatening statement towards the plaintiff, acted in a relatively calm and a relatively civilized manner towards the plaintiff. At some point during this incident, [JJB] even reveals to the plaintiff that she had planted two shrubs around the electric-box and telephone/cable-tv pedestals - both at the border of the plaintiff's property - and with both of these shrubs actually extending into the plaintiff's property - and with both of these shrubs fully-visible (and easily-visible) from the street. While [JJB] explains to the plaintiff that she planted these shrubs in-order-to hide what she alleged to be the *"unsightly"* electric-box and telephone/cable-tv pedestals, [JJB] did not consult with the plaintiff prior to planting these shrubs, nor did [JJB] seek approval from the plaintiff prior to planting these shrubs. Also, since [JJB] moved into her property, [792KLLTX78641], very-recently - on-or-about the month of {2009-03} - it appeared very-unlikely that [JJB] submitted architectural-approval documents to the [HOA] seeking the [HOA]'s approval, prior to planting such shrubs. These, now-fully-grown, unapproved shrubs exist at those same locations to this very day. On numerous occasions in the following decade, during the plaintiff's residence at [788KLLTX78641], the plaintiff's malicious-and-predatory neighbors with extreme-racial-animus against the plaintiff - [RSR],[JSP&KAP] - would complain about the plaintiff to the [HOA] and/or [WCLE] for the plaintiff's failure to get approval from the [HOA]:

Ⓐ even for vegetation in the plaintiff's private/concealed [BACKYARD] that were not even in the least bit visible from the street.

Ⓑ even for minor-additions to the plaintiff's private/concealed [BACKYARD] that were not even in the least bit visible from the street.

Ⓒ even for the plaintiff's replacement of the grass in the plaintiff's [FRONTYARD] - which numerous homeowners including [JSP&KAP] would also do without ever obtaining [HOA] approval.

[JSP&KAP] would even plant a medium-sized tree very close to the border of the plaintiff's private-property, without seeking approval of the plaintiff (since the branches of such fully-grown tree extend into the plaintiff's private-property) and, more-likely-than-not, without seeking approval from the [HOA] - especially since such tree was in very close proximity to the (public-property) sidewalk - eventually growing into such sidewalk, obstructing at least half of such sidewalk - with such tree fully-visible (and easily-visible) from the street. (Such unapproved, wide tree with dense branches extending near ground-level also directly obstructed and continues-to-directly-obstruct the watering path of one of the automatic-sprinklers on [784KLLTX78641] - leading to such sprinkler wasting large amounts of irrigation-water on every week that it is run - with much of such wasted irrigation-water flowing in the opposite direction onto the sidewalk).) Thus, all of the fraudulent and racially-discriminatory complaints made by [JSP&KAP],[RSR] against the plaintiff - regarding so-called *"unapproved changes"* - was driven purely by their extreme-racial-animus against the plaintiff, because they never believed that the plaintiff - an immigrant-of-color/indigenous-person - deserved to own private-property within what they always considered to be *"their"* (exclusive-and-pure) White neighborhood.

## ¶287

On or about a late-afternoon in the month of {2009-08}, the plaintiff walked out of the [HOUSE] and was in the process of entering into plaintiff's vehicle parked in the plaintiff's [DRIVEWAY]. Before the plaintiff could enter into the plaintiff's vehicle, defendant [RSR] - then a resident of 【792 KINGFISHER LANE, Leander, TX 78641】 [789KLLTX78641] (property-across-the-street and diagonal-to the plaintiff's property) - driving either a sports-utility-vehicle or a minivan, approached the plaintiff inside of such vehicle, pulled down her driver-side window, and yelled at the plaintiff: *"EXCUSE ME! ... I WAS WONDERING WHEN YOU WERE GOING TO START TAKING CARE OF YOUR YARD?!"* The plaintiff was taken aback by the rather intrusive nature of [RSR]'s statement, but nonetheless, acted in a very-timid manner, saying: *"Right, there are several patches of grass that are not growing properly over there, and I'm waiting for them to grow back before I mow it."* [RSR] responded with a menacingly-angry look on her face, *"WELL, YOU NEED TO WATER IT!"*. The plaintiff responded that the plaintiff is watering the grass, but that the plaintiff was only allowed to water on certain days of the week. (During the plaintiff's initial years residing at this property, the {Texas Legislature} had not yet passed any *"drought-resistant-landscaping"* provisions into the [TPrC]; such provisions prohibiting [HOA]s from requiring the watering of landscaping were only enacted into law in the subsequent year of {2013}. The plaintiff was also only watering such grass because it was still an unestablished grass, newly-installed in {2009-02} by the builder of the subdivision, and such turfgrass usually takes at least two full years - or two full growing seasons - to fully-establish.) With that same menacingly-angry look on her face, she continued her intrusive, hateful and threatening speech, *"AND YOUR GRASS IS GROWING WILD IN YOUR BACKYARD, CAUSING ALL SORTS OF PROBLEMS FOR YOUR NEIGHBORS! SO, MOW IT! - GET A YARDMAN TO MOW IT! - OR, I'M CALLING THE [HOA] NOW!* 【 SLAMS HER FIST DOWN INTO THE PALM OF HER OTHER HAND 】*"* The plaintiff did not know how [RSR] obtained any such alleged information about the plaintiff's [BACKYARD], because [BACKYARD] was not even in the least bit visible from the street (due to the 6-feet-tall-privacy-fence). It became increasingly clear to the plaintiff, that either [JJB] and/or [JSP&KAP] - the plaintiff's then nextdoor neighbors - had inappropriately provided [RSR] with such information (in violation of the plaintiff's right to privacy) - with all of these individuals being of the White/Caucasian/American color-race-and-nationality. The plaintiff again timidly responded that there were plenty of properties within the subdivision that regularly have and continue-to-have unmowed grass, and to this, [RSR] responded, *"WELL, YOU LIVE ON MY STREET, AND LISTEN TO ME!: WE KNOW YOUR PARENTS PURCHASED THIS HOME, BUT WE ALL WORKED VERY-HARD FOR OUR HOMES, AND THIS IS JUST UNACCEPTABLE!"* [RSR] then proceeded to reverse her SUV/minivan vehicle back into her driveway at

[789KLLTX78641] with that same menacingly-angry look on her face, shaking her head in hostile disapproval towards the plaintiff. The plaintiff, while internally shell-shocked by such brazen acts of intimidation/interference, pretended not be offended by such statements and entered into the plaintiff's vehicle, leaving the plaintiff's property in such vehicle. These initial criminal acts of harassment/intimidation/interference/disorderly-conduct were also [RSR]'s first acts of blackmail against the plaintiff **(Δ) (λ)**. [RSR]'s hateful and threatening statements to the plaintiff also reflect [RSR]'s outrageous sense-of-entitlement-and-power: that she clearly believed that she owned (or at least exercised power-and-control over) the entire street, calling it *"MY STREET"* - an outrageous sense-of-entitlement-and-power that she also shared with her soon-to-be co-conspirator [JSP] (see numerous incidents below). Up until this incident, the plaintiff was almost-always leaving the plaintiff's vehicle parked in the [DRIVEWAY] - with such vehicle thus visible from the street. However, after these initial incidents involving the maliciousness of at least two of the plaintiff's White-American neighbors, the plaintiff began to park the plaintiff's vehicle inside of the plaintiff's (closed) [GARAGE] - so that every time the plaintiff needed to drive such vehicle out of the plaintiff's private-property, the plaintiff would not have to deal with such malicious neighbors. (The plaintiff would also immediately close the [GARAGE]-door after parking such vehicle inside the [GARAGE] in-order-to avoid any possibility of such malicious neighbors accosting the plaintiff - but as future incidents would prove, such strategy would not help.)

## ¶288

On or about a late-afternoon in the middle of the month of {2009-09}, as the plaintiff was in the [DRIVEWAY], [RSR], while on the opposite-sidewalk, across the street, yelled-out at the plaintiff: *"YOU GOING TO START TAKING CARE OF YOUR YARD?!"* The plaintiff having spent over an hour mowing and edging the plaintiff's [FRONTYARD], responded with total surprise/shock, *"I already did!"*. In response, [RSR] shook her hands downwards, as if to show disbelief or dissatisfaction. The plaintiff indignantly continued, *"Ma'am, what do you want from me?! I spent over an hour the other day mowing and edging the yard! So, what is it that you want from me?!"*. [RSR], with a menacing look on her face, angrily shouted to the plaintiff with the usual racist and fraudulent narrative, *"I WANT YOU TO START RESPECTING YOUR NEIGHBORS AND TO START TAKING CARE OF YOUR YARD!"* The plaintiff, as timid as the plaintiff was at that stage in the plaintiff's life, decided to let the issue go, and returned to continue whatever the plaintiff was doing in [DRIVEWAY]. This were the second criminal acts of harassment/intimidation/interference by [RSR] against the plaintiff **(Δ) (λ)**.

## ¶289

It was only after these 3 initial incidents with neighbors [JJB] and [RSR], did the plaintiff begin to realize that the multiple notices that the plaintiff had received in the mail during the previous months from the then [HOA] regarding unmowed grass and/or so-called *"weeds"* were instigated by, to a substantial-degree, complaints from (at least) these two neighbors. To be clear, the plaintiff was mowing the plaintiff's [FRONTYARD] using the plaintiff's corded-electric mower (and corded-electric edger and corded-electric string-trimmer), but probably not-as-frequently as the plaintiff's neighbors. Since the plaintiff was using these relatively-heavy corded-electric tools, it would take the plaintiff significantly greater amount of time and effort - due to the plaintiff's relatively-small stature (compared to the plaintiff's much-larger neighbors who were all using gasoline-powered tools or hiring yardman to do this relatively-labor-intensive work) - handling the heavy equipment, dragging the very-bulky extra-heavy-duty extension cord around and carefully moving such cord so as to ensure that such cord did not get run-over by sharp blades of the equipment. When the plaintiff did mow, the plaintiff was setting the electric-mower to the tallest height setting, thus minimizing the length of grass cut in-order-to minimize the damage/shock to the grass - again following plaintiff's indigenous religious/cultural

values. Since the plaintiff had mowed the plaintiff's [FRONTYARD], the plaintiff was truly clueless as to what the subsequent notice required the plaintiff to do. The plaintiff thus hired a yardman on or about an afternoon early in the month of {2009-10} to do whatever else was required, as the plaintiff was truly not-aware of what the plaintiff's [FRONTYARD] was in violation of. The yardman performed the usual mowing/edging but then, the yardman also started to remove additional vegetation that were growing in the *"foundation plants"* section of the plaintiff's [FRONTYARD], directly in front of the [FRONTPORCH]. Up until that point in time, the plaintiff simply assumed that such vegetation was just part of the bushes/trees planted in that area, and did not even know that those were apparently so-called *"weeds"*. Before moving into the subdivision, the plaintiff did not even know the meaning of the word *"weeds"* and did not know there was even a specific category of plants that White-Americans considered to be undesirable - as this was completely alien-to and against the plaintiff's indigenous religious, cultural and environmentalist views. Both the meaning of the words *"weeds"/"lawn"* and the practice of *"lawnmowing"* are, as history reveals, uniquely White-American and prior to being White-American, were uniquely White-European. But since the plaintiff had not yet completed the plaintiff's University education at that moment in time, the plaintiff did not want to question these culturally-insensitive, ethnocentric rules, let alone, fight such culturally-insensitive, ethnocentric rules, but instead, simply continued to mow - again, probably not-as-frequently as the plaintiff's immediate neighbors, and with the plaintiff always using the highest height-setting on the electric-mower. The plaintiff's malicious neighbors - [JJB], [RSR] and, unbeknownst to the plaintiff at that moment in time, the plaintiff's other nextdoor neighbors, [JSP&KAP] - were all predatorily conspiring against the plaintiff, painting a racist, egregiously-fraudulent-narrative about the plaintiff behind the plaintiff's back - about how the plaintiff was being *"inconsiderate"/"disrespectful"* to the plaintiff's White-American neighbors by not mowing the plaintiff's yard frequently-enough (and/or low-enough), and demanding that the [HOA] take predatory actions against the plaintiff, fully-exploiting and capitalizing-upon the plaintiff's initial lack of knowledge of these culturally-insensitive, ethnocentric rules that were clearly alien-to the plaintiff, and *"sowing the seeds"* or *"preparing the stage"* for a large number of subsequent incidents/actions (including legal action) by manipulatively driving a wedge between the plaintiff and the then [HOA].

## ¶290

On or about the morning of {2010-01-18}, a White-American male door-to-door salesman approached the front-door of the plaintiff's residence and rung the [FRONTDOOR]-bell. When the plaintiff answered the [FRONTDOOR], the salesman greeted the plaintiff, pointed at [RSR]'s residence and told the plaintiff, *"She sent me over here."* The salesman asked some rather private and rather intrusive questions about the plaintiff and the plaintiff's property - questions that the plaintiff felt very uncomfortable about answering. After the plaintiff kindly rejected the product(s) and/or service(s) which the salesman was trying to sell to the plaintiff (answering at the end, *"No, Thanks."*), the salesman then walked back to [RSR]'s residence so as if to report back to [RSR], the private details of the answers that the plaintiff had provided to the salesman. This was yet another indication to the plaintiff that [RSR] was willing to employ underhanded tactics/techniques and go to great lengths to intrude into the private life of the plaintiff. Needless to state, the plaintiff felt very violated by this experience **(λ)**.

## ¶291

On or about a late-morning in the month of {2010-05}, as the plaintiff was picking so-called *"weeds"* from the [FRONTYARD], [JSP], right before leaving in his truck parked at the driveway of his residence, [784KLLTX78641], told the plaintiff that he had placed, what the plaintiff observed to be a substantial amount of yard-trimmings (cut branches from bushes and leaves detached from the cut branches), on the plaintiff's sideyard but that he would pick it up after he arrived back from work. As timid as the plaintiff was at that early moment in time, the plaintiff

timidly responded to [JSP] that it is not a problem. Technically, in this particular instance, [JSP] committed the Class-B-Misdemeanor crime of Illegal-Dumping ([THaSC-T5-SB-C365-SB-§365.012]) against the plaintiff and if this Illegal-Dumping caused any damage to the plaintiff's grass and/or private-property, then also the additional Class-B-Misdemeanor crime of Criminal-Mischief ([TPcC-T7-C28-§28.03]) against the plaintiff, but the plaintiff did not know these facts at this particular moment in time, and even if the plaintiff had known these facts, the plaintiff would most-probably not have reported it to [WCLE], because it did not seem to be a malicious act to the plaintiff at such early moment in time. However, [JSP]'s action did indicate, even at this early moment in time and at the very least, [JSP]'s brazen disregard of the plaintiff's private-property rights - as any good neighbor would not have used his/her neighbor's property as if it were his/her own property (λ). It is important to note that, according to the Texas law, this act by [JSP] would not have been considered an Illegal-Dumping crime if [JSP] had placed those same yard-trimmings on his own property's side-yard.

## ¶292

On or about the Saturday morning of {2010-06-05}, the plaintiff had arrived back to [788KLLTX78641] in the plaintiff's vehicle and parked the vehicle inside of the [GARAGE], immediately closing the [GARAGE] right after the vehicle was fully inside of the [GARAGE]. The plaintiff entered into [HOUSE] via the internal-door and approximately 30 seconds later, the plaintiff heard loud banging on the [FRONTDOOR] and multiple rings of the [FRONTDOOR]-bell. The plaintiff took more than 30 seconds to answer the [FRONTDOOR], and upon opening the [FRONTDOOR], the plaintiff saw [RSR] on the plaintiff's property ([DRIVEWAY]) walking back to the sidewalk, and then once on the sidewalk, [RSR] yelled at the plaintiff, *"HEY, YOU NEED TO CUT YOUR GRASS! WHY DON'T YOU TAKE CARE OF IT! OR WHY DON'T YOU GET YOUR MOM TO TAKE CARE OF IT!"* The plaintiff ignored the insult, and responded that the plaintiff is cutting the grass, but not at the frequency that [RSR] was demanding and not to the low height to which [RSR] was demanding it to be cut. [RSR] continued to yell at the plaintiff, *"IF YOU DON'T TAKE CARE OF YOUR YARD, I'M GOING TO GET THE STRICTEST RULES APPLIED TO YOU BY THE [HOA], AND IF YOU STILL DON'T SEE TO IT - I'M GOING TO GET THE [HOA] TO KICK YOU OUT OF THE HOUSE! SO, YOU BETTER TAKE CARE OF IT! LOOK AT YOU! YOU'RE NOT EVEN TAKING CARE OF YOURSELF! ... WHAT DO YOU DO IN THERE, ANYWAYS?!"* The plaintiff immediately realized that [RSR] was referring to the plaintiff's long, uncut hair/beard and it was the first solid indication to the plaintiff that [RSR]'s animus towards the plaintiff was racially-motivated - although the plaintiff had already suspected, based on [RSR]'s prior behaviors/actions against the plaintiff that she did harbor substantial racial-animus against the plaintiff. The plaintiff was also very-distressed that [RSR] questioned the plaintiff about what the plaintiff does inside the privacy of the plaintiff's own [HOUSE] - as if, due to plaintiff's appearance/racial-profile, it was somehow sinister - and as if [RSR] was somehow entitled to that extremely private information. The plaintiff ignored the racial-insult and the extremely rude/invasive/intrusive comment, and reiterated to [RSR], that there are plenty of properties in the neighborhood that have consistently unmowed grass - and the plaintiff even noted examples where grass was actually taller than on the plaintiff's property. [RSR] yelled in response, *"OH, SO IF THEY JUMP OFF A CLIFF, YOU'RE GOING TO DO THAT TOO?! YOU'RE SUCH A PUNK!"* This was also the first time, the plaintiff heard a homophobic slur directed at the plaintiff by [RSR]. [RSR] continued yelling, cutting the plaintiff's response short, *"NO! - I'M NOT GOING TO GET INTO THIS ARGUMENT WITH YOU! GET IT TAKEN CARE OF, OR I'M CALLING THE [HOA], AND I'LL HAVE THEM TAKE ACTION AGAINST YOU!"* [RSR] then turned around, walked back across the street and started unloading items from the back of her SUV/minivan parked in her driveway. There was at least one other witness to this incident (see below). These were the third criminal acts of harassment/stalking/intimidation/interference/disorderly-conduct/blackmail/criminal-trespass against the plaintiff. This incident which involved [RSR] yelling loudly at the plaintiff (from a distance of approximately 30 feet) was also the first

indication to the plaintiff that, not only did [RSR] intend to inflict harm onto the plaintiff, but also that she was so-easily-willing-to and even enjoyed publicly humiliating the plaintiff by loudly using such abusive/oppressive language in an open/public setting - and on a sunny Saturday summer morning, where a substantial amount of neighboring property owner(s)/occupant(s) and their children could easily hear (Δ) (λ).

## ¶293

The plaintiff was finishing the plaintiff's education at the University and thus taking some required on-campus classes during the summer month of {2010-06} - requiring the plaintiff to be on-campus almost every weekday in the month of {2010-06}, {2010-07} and the majority of weekdays in the month of {2010-08}. Also, the plaintiff's place of residence was very far away from the University, requiring the plaintiff to drive plaintiff's vehicle to the nearest Capitol-Metro-Park-and-Ride and make use of the Park-and-Ride buses spending more than 3 hours every day round-trip in commutation time. The plaintiff was also registered as a Student with Disabilities. So, given these circumstances/time-constraints and given the harassment/intimidation/interference/blackmail tactics that the plaintiff suffered from [RSR], the plaintiff once again caved-into [RSR]'s predatory demands, hiring the same yardman to perform the work on the morning of Monday {2010-06-07}. After the yardman left the plaintiff's property, and while the plaintiff was in the [DRIVEWAY], [781KL-2009-3], the son of then-owners of the residence across the street 【781 KINGFISHER LANE, Leander, TX 78641】 [781KLLTX78641], approached the plaintiff saying to the plaintiff in a friendly manner, *"You going to back to school or...?"* The plaintiff briefly discussed with [781KL-2009-3] each of the two individual's respective plans for the future, since both the plaintiff and [781KL-2009-3] were relatively young at that moment in time. At one point in the conversation, the plaintiff changed the topic and asked [781KL-2009-3]: *"Hey, let me ask you something, do you guys mind the way I maintain my yard?"* [781KL-2009-3] responded: *"Not as long as the grass gets cut every now and then. We're not lawn aficionados ourselves..."* The plaintiff replied, *"Yeah, that's what I was thinking. But apparently, some people just won't leave me alone about it..."* [781KL-2009-3] asked, *"Is it just one person, or... ?"* The plaintiff responded that it is just one person. [781KL-2009-3] continued, as he was pointing to the [HOUSE], *"You can just tell them that this house is paid for. So, you don't need to answer to them. They don't need to get involved in your property, and they can just mind their own business..."* The conversation ended soon after this short dialogue, as both the plaintiff was preparing to leave the [HOUSE], and [781KL-2009-3] had work to resume at his house across the street. But at that moment in time, it was clear to the plaintiff that [781KL-2009-3] was a witness to at least one of [RSR]'s prior harassment/stalking/intimidation/interference/disorderly-conduct/blackmail/criminal-trespass acts against the plaintiff - including the most important of such abusive actions that took place only two days before.

## ¶294

Unbeknownst to the plaintiff until later on that year (in the month of {2011-09} - see below), in the month of {2011-03}, [JJB] had resigned as a teacher from ⦃Leander Independent School District⦄, [LISD], after she was arrested by [WCLE] during that month on a felony charge of *"credit card abuse"*, with the following news-report posting her mugshot along with a brief description/circumstances surrounding the charge(s), and a brief history of her prior criminal conviction(s):

- "LISD elementary teacher resigns after arrest" : ⦃Hill Country News⦄: STAFF REPORTS: {2011-03-28 07:01AM}:
- https://www.hillcountrynews.com/stories/lisd-elementary-teacher-resigns-after-arrest,50626

<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

## ¶295

On or about a day in the month of {2011-04}, the plaintiff noticed a heap of multi-colored granular material - that was identified only many months later (see below) by a [WCSD] ([WCSD-SP]) as cat-litter - dumped at the ground-level inside [BACKYARD] very-close-to (almost-touching) the fence bordering the plaintiff's property and [JJB]'s property, [792KLLTX78641] - in an area that was approximately 12-feet away from the [BACKPORCH], and approximately 20-feet away from the plaintiff's [BACKDOOR]. When the plaintiff initially consulted [PARENTS] about this issue, [PARENTS] advised plaintiff that the material was probably left-over concrete-mix from when the fence was constructed which the plaintiff must not have noticed before, and further advised the plaintiff to just ignore it. The plaintiff still had suspicions since the amount of material was rather large - approximately 1-feet-long by 10-inches-wide by 4 inches tall (at the tallest part of the heap) - and such material was located approximately in the middle of 2 fence posts. Having never dealt with concrete-mix (nor cat-litter) at that point in time, the plaintiff could not immediately verify, by the appearance, whether or not it was concrete-mix, cat-litter or any other substance. The plaintiff feared that the material was dumped there by a malicious person (well after the fence was built), and if so, that the material was likely to be something harmful like pesticide (see below). (λ)

## ¶296

On numerous (sunny, cloudless) days during the months of {2011-04} and {2011-05}, the plaintiff heard very-loud noises coming from the plaintiff's roof - the same type of very-loud noises that the plaintiff would later experience during large-hail-storms, when such large hail would directly strike (at high impact) the roof of [HOUSE]. Given the brief-history of racial-animus that the plaintiff already had experienced in the neighborhood, the plaintiff immediately suspected some malicious neighbor(s) were violently throwing large stones onto the plaintiff's roof. It should be noted that the roofing-shingles and/or other roofing-materials installed by the original builder of the subdivision were of very-low-quality (and durability) to begin with; thus, any such acts of vandalism would very effectively deteriorate such already poor-quality building materials. The plaintiff reported such apparent acts of vandalism to the plaintiff's [PARENTS], who having never experienced this type of malicious racism before, did not take the plaintiff's complaint seriously, most likely because they did not believe such very-loud-noises to be the result of vandalism.

## ¶297

On or about a day at the end of the month of {2011-05}, the plaintiff noticed a second heap of multi-colored granular material - that was identified only many months later (see below) by a [WCSD] ([WCSD-SP]) as cat-litter - dumped at the ground-level inside [BACKYARD] very-close-to (almost-touching) the fence bordering the plaintiff's property and [JJB]'s property, [792KLLTX78641] - in an area that was also approximately 12-feet away from the [BACKPORCH], but this time, in the other direction - parallel to the side of the [HOUSE]. The plaintiff immediately realized that these were definitely-not heaps of concrete-mix as the plaintiff's senior-citizen [FATHER] had previously re-assured the plaintiff. Upon speaking to the plaintiff's [FATHER] about such issue again, the plaintiff's [FATHER] finally, but reluctantly, admitted to the plaintiff that such heaps were probably the result of vandalism. The plaintiff's [FATHER] further advised the plaintiff not to report the crimes because unless the plaintiff had definitive-proof of who was committing such acts of vandalism against the plaintiff, the plaintiff could not make blind accusations against the plaintiff's malicious neighbors, as such blind accusations could result in legal problems.

## ¶298

On or about the Saturday evening of {2011-07-30}, while the plaintiff was tending to the plaintiff's vegetable-garden in [BACKYARD], the plaintiff heard a loud noise originating from behind the plaintiff. When the plaintiff turned around to determine the source/cause of the noise, and then approached the fence area, the plaintiff noticed another large heap of the same material dumped along the same side of fence, but this time, further down the fence-line closer to the fence's corner post. Only at this point it time, did it immediately occur to the plaintiff that a person from the other side of the fence had been dumping such materials on two-or-more separate, prior occasions (that the plaintiff knew about) - making this at least the third such act of Criminal-Mischief/Illegal-Dumping against the plaintiff. Having never experienced this type of brazen criminal conduct before, the plaintiff was shell-shocked. The plaintiff did not know what would motivate someone to commit such brazen crimes against the plaintiff, when the plaintiff had done absolutely nothing wrong. The plaintiff also was shell-shocked that someone would commit this crime in a such a brazen manner while the plaintiff was outdoors in [BACKYARD] at the moment the crime took place, not more than thirty feet away from where the crime took place. Since the plaintiff did not experience any overt animus from [JJB] at that early moment in time, and since the plaintiff noticed that [JJB] would routinely hang-around and engage-in-conversations-with [RSR], and since the plaintiff had already-suffered the aforementioned incidents of racial-animus from [RSR], the plaintiff suspected that it was more likely to be the case that [RSR] was the perpetrator of these additional crimes against the plaintiff (and thus, not [JJB]) **(Δ) (λ)**.

## ¶299

On or about the Monday following the late-Saturday incident, the plaintiff called the [WCSO], around noontime, to report at least the most-recent incident **(ζ)**. When the police dispatch handled the call, the operator instructed the plaintiff not to touch the dumped material and dispatched it to then-[WCSD] Stacy Pryor [WCSD-SP] **(‡) (¥)**. [WCSD-SP] called the plaintiff on the phone:

> RECORDED CONVERSATION (⊩) BETWEEN THE PLAINTIFF AND [WCSD-SP] :   {2011-08-01}
> [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

《 OVER THE PHONE 》

**[WCSD-SP]**   *I'm with the [WCSO], what can I help you with?*

**PLAINTIFF**   *Oh, so basically when I called the [WCSO], I told them that I would like to report an activity that I believe is most-likely a crime, and if it is, then to seek the services of the [WCSO].*

**[WCSD-SP]**   *Ok, so what happened?*

**PLAINTIFF**   *Ok, so in this case, someone seems to have been dumping large amounts of some material onto my backyard, and...*

**[WCSD-SP]**   *Like, what type of material?*

**PLAINTIFF**   *It looks like it's pesticide, but I'm not sure, it might be something worse...*

**[WCSD-SP]**   *Pesticide?*

**PLAINTIFF**   *Yes, it might be something worse, though. I have no idea. When I..*

**[WCSD-SP]**   *Ok, what does it look like?*

SIDDHARTH KODE   v.   WILLIAMSON COUNTY, TRE AL.

**PLAINTIFF**  But when I go close to it. And if I'm 1 feet away from it, and I inhale [INDECIPHERABLE], I can get a strong chemical odor from it. And this is the second time..

**[WCSD-SP]**  And this is in your backyard?

**PLAINTIFF**  And actually, I should mention that this is the second time this has happened, yes. But this time, this particular episode happened on a Saturday night around 8:45PM, when the sun was basically setting and I heard it - I was in the backyard at the time - and my back was turned towards the incident itself. And so, …

**[WCSD-SP]**  You saw something do this...?

**PLAINTIFF**  I'm sorry..?

**[WCSD-SP]**  You saw something do this...?

**PLAINTIFF**  I didn't get a glimpse at the individual because the individual was behind a fence and I couldn't see and second-of-all, my back was turned towards, I was basically watering some plants, and this individual, I mean, so my back was turned towards this incident - so, I could not see...

**[WCSD-SP]**  So, did this happened behind your house, so, in like a greenbelt area or what...?

**PLAINTIFF**  I'm sorry could you repeat that one more time...

**[WCSD-SP]**  So, did this happen behind your backyard in a greenbelt area or what...?

**PLAINTIFF**  Na, this happened, I mean the material was dumped onto my backyard - if that's what you're asking...?

**[WCSD-SP]**  And they were back there, and you didn't see them there then?

**PLAINTIFF**  First of all, my back was turned. They're behind a fence and I didn't even know that someone was there while this was happening. So, basically I was watering some plants. And I heard a noise and about a minute later when I checked, I can see that this material was dumped...

**[WCSD-SP]**  Ok, and what does this material look like...

**PLAINTIFF**  It looks like round granules, like white granules, and interspersed with like blue and green granules. So, like white, grey, green and lightly-colored blue granules. And yeah, so it's basically, covering a region of grass right now...

**[WCSD-SP]**  Like how big of an area?

**PLAINTIFF**  It's about 1-foot by 1-foot. And I should also say that on the previous occasion, which happened about a couple of months ago, it was like maybe 10 or 5 yards away, and about the same area - 1-feet by 1-feet. And yeah, I consider that to be quite a large amount, I mean...

**[WCSD-SP]**  Do you have a neighbor behind you?

**PLAINTIFF**  I have a neighbor to the side of me and 2 neighbors to the back of me...

**[WCSD-SP]**  Ok... and when you talk to your neighbors, to see if they dumped something over?

**PLAINTIFF**      *Oh, no! I mean, I absolutely ... I don't want to confront criminals.*

**[WCSD-SP]**      *Well, we don't know if this was a criminal act that's happened.*

**PLAINTIFF**      *Um ok, but I understand ... I'm the one that said I don't know if this is a crime or not, but I consider it to be, at least an offense. I don't know. Ok, but anyways - but, basically, my point is if this individual is hostile enough to dump this material onto the backyard while I was there. I mean, I don't know if this individual knew if I was there or not, but if this individual was bold-enough to do that, then I'm not going to confront this individual, I mean, I'm looking out for my own safety here...*

**[WCSD-SP]**      *Ok, what's your address?*

**PLAINTIFF**      *It's 788 KINGFISHER.*

**[WCSD-SP]**      *I'm sorry, say that again?*

**PLAINTIFF**      *7-8-8 - KINGFISHER.*

**[WCSD-SP]**      *788 KINGFISHER - Ok, are you currently home?*

**PLAINTIFF**      *Yes, I'm currently home.*

**[WCSD-SP]**      *Ok, and those granules still on your property?*

**PLAINTIFF**      *Yes, and I've not interfered with it... and actually, I wouldn't. I'm trying not to, I guess, leave the residence so that something might be altered over there. So, yeah, I'm basically trying to stick home.*

**[WCSD-SP]**      *Ok, give a few minutes. I'm coming from Georgetown and I'll head that way. So...*

**PLAINTIFF**      *I understand.*

**[WCSD-SP]**      *Ok.*

**PLAINTIFF**      *Ok, so could repeat, would you be able to a time...?*

**[WCSD-SP]**      *I'm sorry?*

**PLAINTIFF**      *Would you be able to tell me a rough time period of...?*

**[WCSD-SP]**      *About 30 minutes or so...*

**PLAINTIFF**      *30 minutes, Ok, I understand. Thank you.*

**[WCSD-SP]**      *Uh-huh. Bye.*

**PLAINTIFF**      *Sorry, I'm sorry - who am I speaking to?*

**[WCSD-SP]**      *Deputy Pryor.*

1696907690

| | |
|---|---|
| **PLAINTIFF** | *Ok. Thanks.* |
| **[WCSD-SP]** | *Ok.* |
| **PLAINTIFF** | *Bye.* |
| **[WCSD-SP]** | *Bye Bye.* |

〚 PHONECALL ENDS. 〛
〚 ABOUT 30 MINUTES LATER, [WCSD-SP] VISITS PLAINTIFF IN PERSON AT PLAINTIFF'S RESIDENCE ([FRONTDOOR]). 〛

| | |
|---|---|
| **[WCSD-SP]** | *Hello, Sid?* |
| **PLAINTIFF** | *Yes, Hello.* |
| **[WCSD-SP]** | *Where's the stuff at?* |
| **PLAINTIFF** | *It's in the backyard. Mind if I show up, I mean, meet you in the backyard.* |
| **[WCSD-SP]** | *On this side?* |
| **PLAINTIFF** | *Yes, it's on this side. The fence is on this side.* |

〚 PLAINTIFF ENTERS BACK INTO [FRONTDOOR] OF [HOUSE] AND ENTERS [BACKYARD] THROUGH THE [BACKDOOR]. 〛
〚 [WCSD-SP] WALKS AROUND [HOUSE] THROUGH FENCE-GATE AND INTO BACKYARD. 〛
〚 PLAINTIFF SHOWS [WCSD-SP] THE LOCATIONS OF THE TWO ILLEGAL DUMPINGS ([THaSC-T5-SB-C365-SB-§365.012]). 〛

| | |
|---|---|
| **PLAINTIFF** | *There's two dumpings... First* [INAUDIBLE] *is...* |
| **[WCSD-SP]** | *That's Kitty-Litter.* |
| **PLAINTIFF** | *Oh. Alright. Actually..* |
| **[WCSD-SP]** | *Someone dumped their kitty-litter in your yard.* |
| **PLAINTIFF** | *Oh ok. So, uh, well...* |
| **[WCSD-SP]** | *Who has a cat?* 〚 POINTS AT [JJB]'S PROPERTY 〛 *Do you know if they have a cat?* |
| **PLAINTIFF** | *I have no idea.* [INAUDIBLE]... *but this is something different.* 〚 POINTS AT FIRST DUMPING THAT OCCURRED MANY MONTHS EARLIER SITUATED CLOSER TO THE BACKDOOR 〛 *I mean, this was a couple of months ago.* |
| **[WCSD-SP]** | *That's kitty-litter,* [INDECIPHERABLE]. |
| **PLAINTIFF** | *Actually, No ma'am - this smells like a chemical,* [INAUDIBLE]. |
| **[WCSD-SP]** | [INAUDIBLE] *I guarantee you, it's kitty-litter ... I can go talk to your neighbor.* [INAUDIBLE] |

**PLAINTIFF**    [INAUDIBLE].  〚 INDICATES TO [WCSD] PRYOR THAT PLAINTIFF WOULD LIKE TO SPEAK ABOUT THIS MATTER INSIDE [HOUSE], BECAUSE PLAINTIFF DID NOT WANT MALICIOUS NEIGHBOR(S) TO OVERHEAR CONVERSATION - SO, PLAINTIFF, [WCSD-SP] WALK TOWARDS BACKDOOR 〛 .

**[WCSD-SP]**    [INAUDIBLE]

**PLAINTIFF**    *Um, so how confident are you that this is the material? I'm not sure if they have cats, but how...?*

**[WCSD-SP]**    *Very Confident. That's kitty-litter.*

**PLAINTIFF**    *I understand.*

**[WCSD-SP]**    *I'm not going to sniff nasty kitty-litter.*

**PLAINTIFF**    *Well, kitty-litter is not going to kill you, but um, pesticide, you know... will*

**[WCSD-SP]**    *Yeat it will, but that's kitty litter....* [INAUDIBLE] *because it has poop in it. Let me go nextdoor and talk to them real quick.*

**PLAINTIFF**    *Um before you do that, can I* [INAUDIBLE]*...*

**[WCSD-SP]**    *Why didn't you* [INAUDIBLE]*...*

**PLAINTIFF**    *Oh, actually I couldn't. First of all,* [INAUDIBLE]. *Well, first of all...*

〚 THE PLAINTIFF DID NOT WANT TO SPEAK FURTHER ON THIS MATTER OUTDOORS WHERE MALICIOUS NEIGHBORS MAY OVERHEAR. 〛
〚 SO, FOR THIS REASON ALONE, THE PLAINTIFF INVITES [WCSD-SP] INTO [HOUSE] (THROUGH BACK-DOOR) TO SPEAK FURTHER. 〛
〚 PLAINTIFF OPENS BACKDOOR AND THEY BOTH ENTER THE [HOUSE]. 〛

**PLAINTIFF**    [INAUDIBLE]*... and um... anyways, before you go there... Essentially, there's sort of a history here. First of all, essentially, about, actually this was last year - one individual knocked on my door - and they were upset that I'm not maintaining the frontyard, front-lawn or something. And then, this individual, basically, essentially, humiliated me in front of ... um, she was talking from the curb area, and I was near the frontdoor. Um, so basically she said "ok, if you don't get this ..."*

**[WCSD-SP]**    *Is this a Homeowners Association person?*

**PLAINTIFF**    *Oh, no no no... This was in the weekend, this was - this was the neighbor over* 〚 POINTS TO [789KLLTX78641] - THEN-OWNED AND OCCUPIED BY [RSR] 〛 *diagonally here...*

**[WCSD-SP]**    *Ok.*

**PLAINTIFF**    *And, I'm just telling you, that there's sort of a history here.*

**[WCSD-SP]**    *I understand that there's history with that, so...*

**PLAINTIFF**

*But the individual. Well, first of all, I should say that I'm not accusing anyone here.. All I'm saying, there's been some strong words, animosity, hostile words directed at me. And basically, um, the individual said, "If you don't get your yard, I'm going to get the toughest, strictest rules applied to you with the [HOA] and if you still don't see to it, I'm going to see to it that you've basically thrown out of the house!" So, this was...*

[WCSD-SP]     *Ok, then more than likely, they're probably a part of the [HOA], and that's why they've probably telling you that.*

PLAINTIFF     *Oh, I understand, but this is also, but...*

[WCSD-SP]     *But my concern here, is today...*

PLAINTIFF     *I understand, this is also the neighbor - this the neighbor that told me, so..*

[WCSD-SP]     *But the neighborhood is ... an [HOA], they all ... they're part of it.*

PLAINTIFF     *I understand...*

[WCSD-SP]     *And if they have complaints, they can make complaints to the [HOA], and this person maybe a member of the [HOA].*

PLAINTIFF     *I'm a member of the [HOA] as well.. But I'm not a ...*

[WCSD-SP]     *You pay each month - Correct?*

PLAINTIFF     *Exactly. So..*

[WCSD-SP]     *But I'm saying, this person is probably on the board, or something to that effect, probably, and that's probably why they're having, saying what they're saying...*

PLAINTIFF     *But you can't...*

[WCSD-SP]     *My concern is today. Its the kitty-litter in your backyard.*

PLAINTIFF     *Oh no doubt, no doubt. And actually.*

[WCSD-SP]     *Um...*

PLAINTIFF     *This neighbor - the neighbor here, approached me 2 years ago, about 4 months after I moved in, and um, about regarding the, this was regarding the, basically, the fact that...*

[WCSD-SP]     *The property line.*

PLAINTIFF     *Oh, no, no, no. The frontyard. It was just, again, this neighbor wanted me to apply insecticide to kill spiders or something, that she said, and other stuff were on my lawn... But first of all, I don't... I told her, I'm actually against using pesticide... I don't personally use... I mean insecticide. I don't use those ...*

[WCSD-SP]     *Ok, and that's your right as a homeowner.*

PLAINTIFF     *Oh no, I understand, I understand, I understand, ma'am, but um... I should say that, um, this material - is it right for kitty-litter to smell like a chemical?*

**[WCSD-SP]**       *It probably has, It probably does smell like ammonia because cats peed in it. And it does have that tinge to it, and it will give off an odor of ammonia, that's probably what you're smelling... I can guarantee you, probably 101%, that that's kitty-litter because there's poop in it.*

**PLAINTIFF**       *Ok, I under:.. [INDISCERNIBLE].*

**[WCSD-SP]**       *So, they're probably ticked off at you for some reason, and they're dumping their kitty-litter into your yard. Now, for you what I can do is, I can go tell them to stop, and if it persists, then you can call back and say, "Its persisting". You know, you had me talk to em today to ask for them stop and if they don't stop beyond that point, then you can maybe try filing charges...*

**PLAINTIFF**       *Right.*

**[WCSD-SP]**       *Now, it's going to be... the only thing I can say maybe will be "criminal mischief", because they're intentionally throwing it into your yard. As far as littering, there's certain poundage and weight for it to be considered littering, and that'd be a far stretch.*

**PLAINTIFF**       *Ok, Ok...*

**[WCSD-SP]**       *Because it's a rocky material. It's something that will dissolve with time, or go into your yard with time.*

**PLAINTIFF**       *I understand. I understand. My initial concern, I should just tell you where I'm coming from. My initial concern is that it was pesticide, and...*

**[WCSD-SP]**       *And it's not. I can guarantee you it's not. It's kitty-litter.*

**PLAINTIFF**       *Right, because it smelled like ammonia or whatever you said... And, you might be right. And most likely - I hope you're right.*

**[WCSD-SP]**       *Even when you and I, if we go to the restroom, and it sits there for a while, it's going to have that ammonia smell to it. That's just the natural bodily fluid where it turns into ammonia.*

**PLAINTIFF**       *But just for reference, is there anywhere I can get it tested?*

**[WCSD-SP]**       *We don't do anything like that...*

**PLAINTIFF**       *I understand, not you guys, but do you happened to know anywhere where I can get it tested?*

**[WCSD-SP]**       *I have no idea, but I'm going to tell you right now - you're wasting your time, because it's kitty-litter.*

**PLAINTIFF**       *It's kitty-litter. Ok, I understand.*

**[WCSD-SP]**       *But like I said, I can go talk to these individuals today and ask them to stop. If it persists, call us back and then, we'll take a report from you.*

**PLAINTIFF**       *I see, Ok.*

**[WCSD-SP]**       *Fair enough?*

**PLAINTIFF**       *But before you do - that does sound fair, but before you do that, I'm not accusing anyone here.*

**[WCSD-SP]**       *Well, it's pretty obvious, it's coming from this yard... Because of, the one - the one side right there, and then, in the corner.*

**PLAINTIFF**       *Oh Ok, Right, that's what I thought - that's what I thought.*

**[WCSD-SP]**  *So, obviously - it's coming from these people here - I guarantee if I go knock on the door, and they open the door, they're going to have cats ... Ok?*

**PLAINTIFF**  *Right, I understand, I understand. Um But, my concern was that it might not have been this individual 〚 POINTS AT [J.B.]'S PROPERTY 〛 - it might have been somebody else entering into the yard...*

**[WCSD-SP]**  *I doubt it. I doubt it ... Very highly doubt it.*

**PLAINTIFF**  *I understand, it was on a Saturday night, so...*

**[WCSD-SP]**  *Very highly doubt it. It's close to dark.*

**PLAINTIFF**  *Yeah, It's close to dark. Yeah.*

**[WCSD-SP]**  *You said it was at 8:45.*

**PLAINTIFF**  *This is the second incident.*

**[WCSD-SP]**  *It's starting to get dark, they probably did that 〚 POINTS AT THE FIRST DUMPING THAT OCCURRED MANY MONTHS EARLIER SITUATED CLOSER TO THE BACKDOOR 〛 another time... It could be kid that's doing it... It could be doing it because they may have an issue with you. I don't know.*

**PLAINTIFF**  *Right ... Right.*

**[WCSD-SP]**  *But I'm going to go talk to them, and see what's going on, ok? So, if you can bear with me..*

**PLAINTIFF**  *Right. And I appreciate, I also appreciate it there's no, um... personal, any information - you know, any information that I discussed with you ...*

**[WCSD-SP]**  *Ok. And this is the thing. If, once I go talk to em, and tell them to stop. And it keeps on, and some odd things start happening to your property, that's called retaliation. They can't retaliate against you - because that's a whole different offense... Ok?*

**PLAINTIFF**  *Right... Alright, Ok.*

**[WCSD-SP]**  *So, if you start having odd things happening beyond the kitty-litter, like I don't know, they're throwing over big pieces of logs or - you know, just unreasonable stuff. If you see something that's different, call us.*

**PLAINTIFF**  *Alright, sure. And Just for my reference, if it is something like insecticide that's thrown over - I know you're saying.*

**[WCSD-SP]**  *Insecticide is not going to harm you.*

**PLAINTIFF**  *I understand, ma'am, But i'm growing vegetables in my garden. And I don't want.*

**[WCSD-SP]**  *I understand that. And insecticides are not going to harm your vegetables either.*

**PLAINTIFF**  *Ma'am, I'm an organic gardener - I don't want - I don't like.*

**[WCSD-SP]**  *And that's fine if you don't. It's not insecticide, so you don't have to worry about it. You're jumping to a conclusion that's not there.*

| PLAINTIFF | *ok. ok.* |
|---|---|
| [WCSD-SP] | *It's poop - and rocks - and pee.* |
| PLAINTIFF | *ok. ok. I understand. But just for future reference, if there was some insecticide or something worse - something also, which I consider to be toxic, for my yard - would I...* |
| [WCSD-SP] | *We'd need to look up to see if there's anything that has to do with pesticides - that I don't of personally - I wouldn't look that up for you if it was. I don't know anything off the top of my head. But being, that's why I wanted to come out here today and see for myself, what it was...* |
| PLAINTIFF | *Right, I understand.* |
| [WCSD-SP] | *Cause, very well, if it was insecticide, it could have been that these people could have gotten their house treated, their yard treated - and the person that treated it, dumped something over - could have been - but that's not the case today. It's kitty-litter.* |
| PLAINTIFF | *And the reason I'm, first of all, concerned that its insecticide is because of the smell.* |
| [WCSD-SP] | *The smell - and that's the ammonia you're smelling in it.* |
| PLAINTIFF | *I thought it was granules of insecticide.* |
| [WCSD-SP] | *Well, there are some granules, but an insecticide granule is not a rock - it's not rock - it's an actual granule - it's something that, if you took it in your hand and you could do this - it would blow out* ¨INDECIPHERABLE)... *Its not a rock-based.* |
| PLAINTIFF | *I see. I understand. I'm sorry to keep you here so long.* |
| [WCSD-SP] | *It's ok. Do you live here by yourself?* |
| PLAINTIFF | *Um... Yes, I live here by myself currently. Um and yeah, and I you know... I've had many hostile words directed at me. I'm not going to waste your time with it. I would just like to say that I've had many hostile words directed at me, actually there was one back - the first incident was, you know... was in...* |
| [WCSD-SP] | *Right, I understand that. And the deal is - this is a fairly new neighborhood - this is a nice neighborhood. People want there home and their community to look nice.* |
| PLAINTIFF | *Oh, I understand.* |
| [WCSD-SP] | ***And I don't blame them if you've got weeds that are this tall...*** |
| PLAINTIFF | *Oh, no no no...* |
| [WCSD-SP] | *And you're not... I'm just saying...* |
| PLAINTIFF | *No, no no... There's no ... First of all, I did not have weeds that tall. I do maintain my frontyard less regularly than the average person - I will confess that. But they have every right to go and complain to the [HOA] and board.* |
| [WCSD-SP] | *But if they do give you that problem. They start saying, "Hey, you need to do this..." Tell them to make the complaint with the [HOA]. So, the [HOA] board can reach out - to come talk to you and tell you - ok? - and you have the right as a resident of this community to also voice your opinion to the [HOA] - that these people are giving you a hard time, which is not their place - and they're not a part of the board.* |

**PLAINTIFF**   *Right I did. I did tell them that - and they told me to get a restraining order placed against them. Essentially, that's what they said.*

**[WCSD-SP]**   *Ok, well, A restraining order is a civil document. It really holds no value to you, whatsoever, other than them not talking to you.*

**PLAINTIFF**   *I understand. Yeah, I mean. I just don't want anything to get worse. I'm uncomfortable and I just don't want the situation to get any worse.*

**[WCSD-SP]**   *Right. Let me go talk to them and see if I can get in touch with em, and talk to em.*

**PLAINTIFF**   *Right.*

**[WCSD-SP]**   *Um. And if I cannot... I will come back and I will let you know um, if I can, I'll come back and let you know. Like, if I can. Either way, I will come back and talk to you.*

**PLAINTIFF**   *Right.*

**[WCSD-SP]**   *And like I said, if it persists, if there's unusual activity that continues to happen after if I'm able ta talk to them [:NDECIPHERABLE]. Then call us back, saying you know the problem is persisting after you asked me to go talk to them.*

**PLAINTIFF**   *Right ... Right... And the last thing I'd like to say about that, is basically, I was first of all, I was in shock that this person would do something like that in my presence. I mean, I was basically watering in the yard [INAUDIBLE]...*

**[WCSD-SP]**   *Well, they may not have even realized that you were there.. And like I said, it could have been a kid... That's why I'd like to go to talk to them.*

**PLAINTIFF**   *And I also contacted my mother - who is also joint-owner of this house - and basically, she said that, yeah...*

**[WCSD-SP]**   *Where's all your furniture?*

**PLAINTIFF**   *No, Actually - It's just. First of all, It's just me that's living here for right now. I mean, my mom is temporarily in Houston.*

**[WCSD-SP]**   *What do you do with all the computers?*

**PLAINTIFF**   *Oh, I'm a student. I, and actually, that's the reason I had a deadline to meet - and not only that, the first time this happened, I was so busy that - I would have called the first time this happened, a couple of months ago, the other incident over here [[ POINTS AT THE FIRST ILLEGAL-DUMPING CLOSER TO THE BACKDOOR AREA ]]. This happened on Saturday - the incident [[ POINTS AT SECOND ILLEGAL-DUMPING ]] over there. In fact, I let my parents know about it, and my parents saw it - and they said, if it happens again, then contact the authorities. That's what they told me - and that's basically what I'm doing right now. And so, I'm just explaining why it wasn't on Saturday night - I was contacting my parents. I was also, first of all, in shock - I didn't know who to contact in the first place. So, that's why [INAUDIBLE].*

**[WCSD-SP]**   *A Student ... Right ... Alright, can I go out that way?* [INAUDIBLE]

**PLAINTIFF**   [INAUDIBLE]

**[WCSD-SP]**   *You sleep right here* [[ POINTS TO PLAINTIFF'S DORM-STYLE BED ]] *?!*

**PLAINTIFF**   *Yeah,* [INAUDIBLE].

**[WCSD-SP]**

|  |  |
|---|---|
|  | *You don't have an AC?* |
| **PLAINTIFF** | *Oh, I do, but I don't use it to save on the bills.* |
| **[WCSD-SP]** | *Oh Ok.* ⟦ [WCSD-SP] exits the plaintiff's residence through the front-door ⟧ *Alright, let me see if I can go talk to them. I'll be right back...* [INAUDIBLE] |
| **PLAINTIFF** | *Ok, appreciate it.* |

⟦ [WCSD-SP] WALKS TOWARDS [JJB]'S RESIDENCE FRONT-DOOR. PLAINTIFF CLOSES THE FRONT DOOR. ⟧
⟦ APPROXIMATELY 5 MINUTES LATER, [WCSD-SP] APPROACHES THE PLAINTIFF'S FRONT DOOR AND KNOCKS ON THE FRONT DOOR. ⟧

|  |  |
|---|---|
| **PLAINTIFF** | *Ok, so...?* |
| **[WCSD-SP]** | *Um, they're not answering.* |
| **PLAINTIFF** | *Oh. They're not there.* |
| **[WCSD-SP]** | *Let me go ahead and get your info and I'll do a short little report on it - so,* [INDECIPHERABLE] *any other issues.* |
| **PLAINTIFF** | *I understand ... Would you be able to?* |
| **[WCSD-SP]** | *No, let's just do it right here. That's fine.* |
| **PLAINTIFF** | *Actually, I prefer that we do it inside. I'm really not... I know it* [INDECIPHERABLE]. |
| **[WCSD-SP]** | *It's hot. And I'm not* [INDECIPHERABLE]. |
| **PLAINTIFF** | *I understand.* |
| **[WCSD-SP]** | *It won't take, all I need to do is get your information, and then I'm going to be out of here.* |
| **PLAINTIFF** | *I understand. I understand.* |
| **[WCSD-SP]** | *Right here is fine. Sid - S - I - D ?* |
| **PLAINTIFF** | *Right.* |
| **[WCSD-SP]** | *And its Kodd - K - O - D - D.* |
| **PLAINTIFF** | *Ma'am I really don't.* |
| **[WCSD-SP]** | *Do you have a middle name?* |
| **PLAINTIFF** | *Um No.* |
| **[WCSD-SP]** | *What's your date of birth?* |

| | |
|---|---|
| **PLAINTIFF** | *Actually, my middle initial is C, sorry.* |
| **[WCSD-SP]** | *C for what?* |
| **PLAINTIFF** | *Um, C for Choudhary. Um,* ⟦INAUDIBLE⟧. |
| **[WCSD-SP]** | *It's hot in there. And* ⟦INAUDIBLE⟧. |
| **PLAINTIFF** | *I understand. I just don't* ⟦INAUDIBLE⟧. |
| **[WCSD-SP]** | *It's just going to take a couple of minutes to get your information – then I'm going to be gone!* |
| **PLAINTIFF** | *I understand. But, I'm uncomfortable...* |
| **[WCSD-SP]** | *What's your date-of-birth?* |
| **PLAINTIFF** | *I really don't want to reveal this information out there.* |
| **[WCSD-SP]** | *There's not, people around.* |
| **PLAINTIFF** | *Ok, I can write it down for you. I can write it down for you.* |
| **[WCSD-SP]** | *Why are you not going to... ? I'm asking for your information, so I can write a report for you.* |
| **PLAINTIFF** | *I understand.* |
| **[WCSD-SP]** | *You and I are here. I'm a police officer. You called me here to get your information to take a report for you – did you not?* |
| **PLAINTIFF** | *I understand. ... Yes, ma'am.* |
| **[WCSD-SP]** | *Ok, I'm asking for your information. Are you going to give me your information?* |
| **PLAINTIFF** | ⟦HESITATES⟧ *I will.* |
| **[WCSD-SP]** | *What is your date-of-birth?* |
| **PLAINTIFF** | ⟦WHISPERS⟧ ******, *_***, ******_**** |
| **[WCSD-SP]** | *I can't hear you.* |
| **PLAINTIFF** | ⟦WHISPERS⟧ ***_***, ****_***, |
| **[WCSD-SP]** | *Why are you whispering?* |
| **PLAINTIFF** | *Ma'am, I told you* ⟦INAUDIBLE⟧ |
| **[WCSD-SP]** | *No one's going to hear you but you and I... There's no-one within earshot of you and I.* |

**PLAINTIFF**     *I don't want to take any risk. That's all. It's just me. It's just my personal preference...*

**[WCSD-SP]**     *What's your -* [INDECIPHERABLE] *the last four?*

**PLAINTIFF**     *All I'm asking is that you respect my privacy. That's all. \*\*\* \*\*\*\* \*\*\*\*\*\* \*\*\*\*.*

**[WCSD-SP]**     *\*\*\*\*\*\* \*\*\*\*.*

**PLAINTIFF**     *\*\*\* \*\*\*\* \*\*\*\*\*\* \*\*\*\*.*

**[WCSD-SP]**     *Alright. And you're a student?*

**PLAINTIFF**     [INAUDIBLE] *... Right.*

**[WCSD-SP]**     *And the number I called you on is your cell-phone?*

**PLAINTIFF**     *It's...* ⟦ HESITATES ⟧ *yes.*

**[WCSD-SP]**     *Ok, so this happened 2 months ago also?*

**PLAINTIFF**     *Um no, actually it was, um - April, April is when I discovered it.* [INAUDIBLE]

**[WCSD-SP]**     *Ok. What I'm going to do is I'm going to write a suspicious incident, ok? Cause, like I said, it could be that the kids are being lazy and did it? Or, it could be that they personally wanted to dump it over here, because they're pissed at you. One of the two reasons, ok?*

**PLAINTIFF**     *I understand.*

**[WCSD-SP]**     **Alright... So, like I said, I mean, this is a nice neighborhood. People are going to give you a hard time - if you don't keep up with your stuff.**

**PLAINTIFF**     *Oh, no doubt.*

**[WCSD-SP]**     *And I don't blame them.*

**PLAINTIFF**     *Oh, no doubt. no doubt. I mean, Basically, they can complain all they want to the [HOA]. Believe me - I have no problem with that.*

**[WCSD-SP]**     *Let me get a case number for you.* ⟦ TALKS INTO POLICE RADIO ⟧ *Eleven - Fourteen - Twenty - Six - Nine. Can I have a report number?*

**PLAINTIFF**     *Ok... That's not the issue at all.*

**[POLICE RADIO]**     *Zero Zero* [INAUDIBLE] *Zero Zero. Zero Two Four.*

**[WCSD-SP]**     *Ok, let write this down for you... Do you ever come out your house, other than when someone comes and knocks on your door?*

**PLAINTIFF**     *Um, Actually not very often... But yeah, I am a student.*

**[WCSD-SP]**     *Ok, do you have paranoia, little bit of paranoia?*

**PLAINTIFF**   I would say, yeah. Probably.

**[WCSD-SP]**   Ok, are you diagnosed with anything?... Any paranoia, Schizophrenia - anything like that... I just want you to be honest. I'm trying to be honest with you... Or Anxiety?

**PLAINTIFF**   No. Oh, no doubt, no doubt. And I actually confess that I probably do, but even if I did, ma'am... even if I did, I wouldn't want my weaknesses revealed to the entire neighborhood. That's all.

**[WCSD-SP]**   And I'm not giving it to the entire neighborhood. It's between you and I.

**PLAINTIFF**   That's all. I understand. I understand.

**[WCSD-SP]**   Ok... Your report is a matter of public record. So, if anybody in this neighborhood wants to get a copy of it, they can, including yourself.

**PLAINTIFF**   Oh, I understand that. I understand. I understand.

**[WCSD-SP]**   That's the case number on the back. If you have any future incidences, you can call the dispatch number which is the one I'm writing on here. You do not have to ask for me, because I don't work 24/7. You can speak to any Deputy, if you have any future problems.

**PLAINTIFF**   Got it. ... Got it.

**[WCSD-SP]**   Ok, if its - remember, if its rock, its kitty-litter. If its a granule that you can take in you hand and squish up, and it goes, blows in the wind, that's going to be maybe a pesticide or insecticide.

**PLAINTIFF**   Ok. ... Ok.

**[WCSD-SP]**   If it's got poop in it, kitty-litter.

**PLAINTIFF**   And if I do find something worse, I can...

**[WCSD-SP]**   And I don't... I hope you don't find anything worse, but like I said... it could be very well that their kid is lazy and dumping it over here instead of the trash... **Or, it could be that they're pissed off at you for some reason, which very well could be - and they're trying to send a message to you, say hey: "Clean up your shit!"**

**PLAINTIFF**   Right... Right... Right. I understand. I understand.

**[WCSD-SP]**   They have an issue already because of the insecticide thing, right? ... And you said this happened how long ago?

**PLAINTIFF**   Um... Oh, this was like - like 2 years ago

**[WCSD-SP]**   2 years ago? But nothing since then?

**PLAINTIFF**   No - well, besides that, well actually -  〚 POINTS AT [JJB]'S RESIDENCE 〛, she contacted me about the fence - the fence situation.

**[WCSD-SP]**   Ok, what's wrong with the fence?

**PLAINTIFF**   Well the fence.. My dad was also here, at the time. And the fence - you saw the stilts, right? The stilts that I have up there? For temporarily?

| [WCSD-SP] | *Holding it up.* |
|---|---|
| PLAINTIFF | *My dad helped. My dad actually went to her yard, and helped her.* |
| [WCSD-SP] | *Right...* 〖 HANDS THE PLAINTIFF A BUSINESS CARD WITH THE CASE NUMBER WRITTEN ON THE BACK. 〗 *. That's yours.* |
| PLAINTIFF | *And she was actually very cooperative, and very friendly at that point.* |
| [WCSD-SP] | *Its a White female?* |
| PLAINTIFF | *Um.. Yes it is.* |
| [WCSD-SP] | *About how old is she?* |
| PLAINTIFF | *Um... oh, I don't know, um...* |
| [WCSD-SP] | *Do you know her name?* |
| PLAINTIFF | *Yes, I believe its J****.* |
| [WCSD-SP] | *Do you know her last name?* |
| PLAINTIFF | *Um.. Actually, I'm not. no.* |
| [WCSD-SP] | *About how old?* |
| PLAINTIFF | *I'm sorry?* |
| [WCSD-SP] | *How old do you think she is?* |
| PLAINTIFF | *Um probably, maybe late 20s. early 30s. maybe... I don't know. I wouldn't want to..* |
| [WCSD-SP] | *20 to 30.* |
| PLAINTIFF | *Yeah, I wouldn't want to, you know, upset anyone.* |
| [WCSD-SP] | *and That's fine - don't worry about it. You have a hair color and eye color for her?* |
| PLAINTIFF | *Oh, its a, blonde hair. And eye color ... Um, I don't know - blue I guess, I don't know.* |
| [WCSD-SP] | *Maybe blue. How tall is she?* |
| PLAINTIFF | *Uh, she's about my height, maybe a little shorter.* |
| [WCSD-SP] | *What are you - about, 5'7"?* |
| PLAINTIFF | *5'7-and-a-half. Yes.* |

**[WCSD-SP]**   *About how much would you say she weighs?*

**PLAINTIFF**   *Um, ... Weighs ... maybe about ... thirty pounds more than me. I don't know.*

**[WCSD-SP]**   *And you weigh what?*

**PLAINTIFF**   *I don't want to, I don't want to... upset anyone.*

**[WCSD-SP]**   *Its ok. We're not offending anybody.*

**PLAINTIFF**   *Right.*

**[WCSD-SP]**   *What do you weigh - about 130? 120?*

**PLAINTIFF**   *I weigh 115.*

**[WCSD-SP]**   *So, she weighs about 135.*

**PLAINTIFF**   *Right.*

**[WCSD-SP]**   *And she has kids? I saw a scooter over there - so, I'm assuming she probably has kids?*

**PLAINTIFF**   *Yeah, she has kids.*

**[WCSD-SP]**   *How may kids?*

**PLAINTIFF**   *I think its ... 2. Think its 2. Believe its 2.*

**[WCSD-SP]**   *2 male ? female?*

**PLAINTIFF**   *Oh... Female.*

**[WCSD-SP]**   *Both females?*

**PLAINTIFF**   *I believe, yes.*

**[WCSD-SP]**   *No boys?*

**PLAINTIFF**   *No... boys. I don't, I'm not aware of it, sorry.*

**[WCSD-SP]**   *Ok, that's the case number. Like I said, I'm going to write up a short-little MOR - which is a miscellaneous report.*

**PLAINTIFF**   *Right ... I understand.*

**[WCSD-SP]**   *If you continue to have issues, call us back, refer to that case number. Tell em, that you're continuing to have problems - that you had called once before and that these people keep dumping kitty-litter into your backyard. That way we can forward, try to forward. As far as today, um, a report is going to show that I came here and spoke with you today and saw that it was kitty-litter. And that I attempted to make contact with them, but no one was there at this time to figure out what was going-on with the whole incident, ok?*

| PLAINTIFF | Right... Right... Got it. Um, Yeah. I guess, the only thing I wanted to add was that, I'm sorry if I gave you a hard time, with being inside, and also, you know... |
| [WCSD-SP] | I'm sweating out here, but I'm going to be sweating in there, cause it's hot either way. |
| PLAINTIFF | I understand, I'm extremely sorry. |
| [WCSD-SP] | Cause I've got a vest on that keeps me very hot. |
| PLAINTIFF | Oh, I understand... I understand. Yeah, I'm extremely sorry for keeping |
| [WCSD-SP] | No, that's your deal - that's how you live, and that's fine, that's fine. So, if you need anything else, continue to have problems, call - refer to that case number. Like I said, you do not have talk to me, you can talk to any Deputy. But if I'm here, sure - I'll talk to you again. |
| PLAINTIFF | And I'm sorry for [INAUDIBLE]. |
| [WCSD-SP] | Na, it's fine, it's fine. That's what we're here for - to take reports... and try to help you out. Like I said, it could be nothing, or it could be something. And that's what we're going to write a report today, Ok? |
| PLAINTIFF | Right. And I'm sorry to inconvenience [INAUDIBLE]. |
| [WCSD-SP] | Alright. Ok. |
| PLAINTIFF | Got it. Thanks. |

〖 PLAINTIFF CLOSES THE [FRONTDOOR]. 〗

# ¶300

After this initial incident with [WCSD-SP], the plaintiff was very-alarmed (and even more so, a decade later, after reviewing the audio) about the manner in which [WCSD-SP] handled this incident (λ) (ζ) (Δ):

01. [WCSD-SP] asked if the plaintiff talked to the neighbor about the crime - when, as the plaintiff rightly answered - no one that is reasonable and in their right mind would approach and confront a hostile neighbor about a crime committed by that hostile neighbor - and this is especially true if the victim is a historically-oppressed racial minority and the perpetrator was part of the dominant racial majority - even more so, if the crime is suspected to be a racially-motivated hate-crime.

02. When speaking to the plaintiff over the phone, [WCSD-SP] refused to initially acknowledge that a crime even occurred - when the Texas law concerning "Illegal Dumping" ([THaSC-T5-SB-C365-SB-§365.012]) is absolutely clear that, in this particular case and at that particular moment in time, a *"Class B Misdemeanor"* crime did in fact occur twice (based on the approximate weight of the materials dumped on the two separate occasions).

03. [WCSD-SP] even after investigating this incident of 2 illegal-dumpings (which had occurred on 2 different dates), was not willing to charge the perpetrator with either of the crimes (or rather, 2 counts of the same crime), and only advised the plaintiff to call back if it happens again.

04. [WCSD-SP] admits that the perpetrator is committing this crime "intentionally", but explains that it would be "criminal mischief" and not "littering" - because it did not meet the poundage for littering, even though [THaSC-T5-SB-C365-SB-§365.012] is pretty clear that any "illegal dumping" above "five pounds" (as was the case here) is an automatic "Class B Misdemeanor". Additionally, the multiple counts of "criminal mischief", which [WCSD-SP] correctly referred to, would have all been charged as racially-motivated hate-crimes under [TPeC-T3-C12-SD-§12.47] with enhanced sentencing.

05. [WCSD-SP] says that because the material is "rocky" and will "dissolve with time", that it was "a far stretch" to consider it "littering" - even though [THaSC-T5-SB-C365-SB-§365.012] makes absolutely no distinction whether the "illegal-dumping" material is "rocky"/"granules" or any other texture/shape/type. [WCSD-SP] compares the illegal-dumping of "kitty-litter" to illegal-dumping of other potential objects like "logs" - only the latter of which [WCSD] Pryor considered to be "unreasonable". Again, the plaintiff is still befuddled by [WCSD-SP]'s logic because, firstly, the act of illegal-dumping is not "unreasonable" - but rather "malicious" and "hostile" - and secondly, the object(s) being dumped is not as important (besides the weight of the object(s)) as the malicious/hostile act itself.

06. [WCSD-SP] even admitted that the litter had "poop" in it, which is even more egregious/brazen of a crime - and which increases the severity of the malicious intent of the perpetrator.

07. [WCSD-SP] brazenly suggests to the plaintiff that if [RSR] was a board member of the [HOA], that it somehow justifies her egregiously trespassing onto the plaintiff's property, and engaging in acts of intimidation/interference/disorderly-conduct/harassment/threat/discrimination/blackmail against the plaintiff, ostensibly to force the plaintiff to "take care of ⟨plaintiff's⟩ yard". Today, in retrospect, the plaintiff finds [WCSD-SP]'s suggestion to be even-more-absurd, because by the plaintiff's estimation - no [HOA] board member in their right mind would engage in such acts against a property-owner, unless they did not mind the potential criminal charges filed against them and unless they also did not mind the [HOA] being sued by the property-owner. The plaintiff did not know it at the time - although the plaintiff suspected - that [RSR] was not a board member of the [HOA], but rather - just like the plaintiff - was just a regular member of the [HOA] - and as the plaintiff later found out, the plaintiff's suspicions were true for the entire time period that [RSR] resided within the neighborhood.

08. [WCSD-SP] mentions "retaliation" - a felony offense - which, in retrospect, the plaintiff considers to be eerily prescient, since a substantial focus of this lawsuit is the huge amount of retaliation (including many dozen counts of retaliatory crimes) that the plaintiff has suffered from the defendants.

09. [WCSD-SP] claims multiple times that it may be a "kid" that's doing the dumping - so as if to somehow justify the criminal action. If a "kid" did do it, then the parents would still be liable. But also, it would have had to be a tall/strong "kid" that was capable of lifting a heavy-weight (of kitty-litter and container) over the 6-feet-tall-privacy-fence to dump over the fence, and the plaintiff failed to disclose to [WCSD-SP] that the plaintiff did not believe [JJB] to have any tall/strong kids living at her residence.

10. [WCSD-SP] says to the plaintiff, "insecticide is not going to harm you." The plaintiff disagreed, and in retrospect, the plaintiff strongly disagrees as, since that time, Court(s) in the United States have already awarded substantial amounts of money in damages to some people who have suffered cancer, "Parkinson's Disease", organ failure and/or other serious long-term, debilitating and potentially life-threatening injuries/diseases caused by at least some pesticides. (But from a purely logical standpoint, if certain chemical(s) are dangerous/potent enough to kill insects - especially in mass - then one should only logically assume that such chemical(s) also are of substantial harm to humans.)

11. [WCSD-SP] asks if the plaintiff lived alone at this residence. The plaintiff felt very-uncomfortable answering this question (and feels

even more uncomfortable about this question today) - as the plaintiff believed, and continues to believe that the substantial crimes/abuses that the plaintiff has suffered - not only from the plaintiff's neighbors but also from [WCLE] - was in substantial part, caused by the fact that the plaintiff lived alone at [788KLLTX78641] for the overwhelming majority of the years {2009} through {2022}.

12. [WCSD-SP] brazenly suggests in multiple statements to the plaintiff that if the plaintiff has alleged, so-called *"weeds"* in [YARD], then this allegation alone somehow justifies any racially-motivated hate-crimes committed against the plaintiff by the plaintiff's predatory White-American neighbors. According to Texas law, *"weeds"* are limited to certain undesirable/uncultivated vegetation that are over 3 feet in height - and the plaintiff did not have any such vegetation reaching that height during this particular incident - especially due to the fact that that the plaintiff had not watered any part of the plaintiff's [YARD] at any point during that most-extreme, record-setting summer-heat-and-drought of {Summer-2011} - with even so-called *"weeds"* needing water to grow. Despite of the Texas law concerning *"weeds"*, the plaintiff could have also easily been intentionally growing all of such vegetation in the plaintiff's private/concealed/curtilage [BACKYARD] as a Constitutionally-protected religious-practice or other first-amendment-right - meaning that none of such vegetation in the plaintiff's [BACKYARD] were actually *"weeds"*. Therefore, the employees/officials of [WCLE] were abusively/oppressively exploiting such ethnocentric property-maintenance laws, jumping to fraudulent conclusions and/or making wildly-inaccurate assumptions about the plaintiff's maintenance of the plaintiff's private-property. Most importantly, this outrageous conduct by [WCLE] is simply the very beginnings of [WCLE]'s modern-day-Jim-Crow racial-oppression against the plaintiff that the plaintiff describes in this lawsuit - that if a person-of-color (or worse: immigrant-of-color/indigenous-person) like the plaintiff, living within such White neighborhood innocently fails to maintain his/her private-property according to White-American standards, then such person automatically loses all rights, and any crimes, including racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses, that are committed against him/her especially by White-American person(s) (including police-officers) are automatically justified. The plaintiff asserts that such outrageous conduct and justification by a [WCLE] employee/official ranks very high in terms of *"abuse of office"* and *"abuse of position of trust"*.

13. [WCSD-SP] peddles the same racist, extremely-fraudulent-narrative peddled by the other neighbor defendants, some of the other government-employee defendants, and by White-Nationalists ( ↓ ) that this is a *"nice"* neighborhood. By *"nice"*, [WCSD-SP], the other neighbor defendants ([JSP&KAP],[RSR]), some of the other government-employee defendants, and White-Nationalists ( ↓ ) - all really-mean that this is a *"White"* neighborhood, and so, they demand that the neighborhood and each individual property within the neighborhood looks according to their hypocritically-enforced White-American standards, and they deliberately ignore all of the racially-motivated abuses and/or crimes committed by such individuals against their racial-minority victim(s) - none of which, of course, can be described as *"nice"*. Furthermore, the plaintiff totally-rejects the racist, extremely-fraudulent-narrative argument that has been repeatedly peddled, and to the contrary, even if people decide to grow wild-vegetation/tallgrass in their yard, they may very-well be doing so as a Constitutionally protected religious-practice, with the best of intentions, for the benefit of humanity and the environment ( ✳ ). [WCSD-SP]'s absurd use of the word *"nice"* is, thus, not only hypocritical and Orwellian - diametrically-opposite to reality - but also nothing other than a euphemistic, racist dog-whistle.

14. [WCSD-SP] asked many intrusive questions regarding the plaintiff's private home and lifestyle that the plaintiff felt very uncomfortable answering - such as questions about the plaintiff's many computers, fans, bed, lack-of-furniture, etc. Due to this line of questioning, the plaintiff even felt the need to reveal that the plaintiff was a student - information that the plaintiff did not have to disclose either. Again,

the only reason that the plaintiff invited [WCSD-SP] into [HOUSE] is because the plaintiff wanted to communicate in private to [WCSD-SP] about the racially-motivated hate-crimes that the plaintiff had already suffered (at that point in time), without such malicious neighbors overhearing the conversation - but this does not mean that [WCSD-SP] can exploit the plaintiff's need-for-privacy to ask the plaintiff rather-intrusive questions about [HOUSE] and lifestyle. In other words, [WCSD-SP] was questioning the plaintiff as if the plaintiff were a criminal suspect, when in fact, the plaintiff was reporting several racially-motivated hate-crimes committed against the plaintiff.

15. [WCSD-SP] asked many questions - rather loudly - concerning the plaintiff's private information - such as date-of-birth, full name, how often the plaintiff leaves the house, etc. - which the plaintiff did not feel comfortable providing in front of [FRONTDOOR] where anybody around could overhear. The plaintiff would have rather provided those private details inside of [HOUSE], where nobody could overhear.

16. [WCSD-SP] was even brazen enough to ask if the plaintiff had any issues with paranoia, or had been diagnosed with paranoia - so as if to blame, shame and dehumanize a vulnerable victim of racially-motivated hate-crimes. The plaintiff confessed that the plaintiff is probably a little paranoid, but to the plaintiff's defense - any person with the plaintiff's "racial profile" and "political profile" living around predatory White people that had already suffered racially-motivated hate-crimes by those predators would be paranoid, and would have every reason to be paranoid. Paranoia is a vulnerable victim's psychological defense-mechanism that tries to protect a vulnerable victim from predators. And even ignoring the plaintiff's own traumatizing experiences with the plaintiff's predatory neighbors, given the history of racial oppression in the United States, at least some of which continues to this very day, it should not surprise any reasonable person that at least some person(s)-of-color (such as the plaintiff) would be extremely-distrustful, if not paranoid, about both: White police officers and predatory White neighbors.

17. The plaintiff mistakenly tells [WCSD-SP] that the plaintiff weighed 115 pounds at this moment in time. The plaintiff stated this false approximation of the plaintiff's weight because the plaintiff weighed approximately 110 pounds during the year {2008} - the last time that the plaintiff checked the plaintiff's weight. It was only when the plaintiff checked the plaintiff's weight a month after this incident in the following month of {2011-09}, did the plaintiff realize that the plaintiff actually weighed approximately 85 pounds. (The plaintiff was wearing either an extra-large T-shirt; so, it would have been difficult for [WCSD-SP] to accurately estimate the plaintiff's weight.) The plaintiff raises this issue to further-illustrate the substantial difference in size/weight between the plaintiff and the perpetrators of the racially-motivated hate-crimes against the plaintiff (4).

18. In crimes of "illegal dumping" ([THaSC-T5-SB-C365-SB-§365.012]), the statute explicitly states that it is not necessary for law-enforcement to prove any "culpable mental state" - such as "malicious intent" or "recklessness" or "criminal negligence". [WCSD-SP] speaks (on multiple occasions) about "why" the perpetrator(s) might have committed the crime; however, these facts are clearly irrelevant for the charging and prosecution of "illegal dumping" (except that racial bias/prejudice would be considered an aggravating factor to increase the level and/or sentencing of the charge).

19. In her racist justifications of racially-motivated crimes committed against the plaintiff by the plaintiff's predatory White-American neighbors, [WCSD-SP] abusively uses the *"abusive, indecent, profane or vulgar"* (and/or *"obscene"*) word *"shit"* one-or-more times. Police officers use of profanity is only reasonable and justifiable during "exigent circumstances" - for example, when ordering suspect(s) evading arrest to stop and submit to the arrest. When police officers use profanity during interactions with private citizens outside of "exigent circumstances" - especially when unprovoked and during normal conversation - it is, at best, considered to be very

unprofessional by any reasonable person, and at worst, considered to be Disorderly-Conduct and/or Harassment by any reasonable person.

20. The plaintiff made a false estimation of [JJB]'s age - saying she was *"late 20s ... early 30s"*, when in fact, at that moment in time (according to public records), [JJB] was in her early 40s - almost 20 years older than the plaintiff. Additionally, according to public records, [JJB] weighed approximately 150 pounds. So, at that moment in time, there was likely-to-be more of an approximately 60-pound difference in weight between the plaintiff and [JJB], instead of the 30 pound estimated difference that the plaintiff had mistakenly reported to [WCSD-SP] **(4)**.

21. During [WCSD-SP]'s questioning of the plaintiff, the plaintiff describes [JJB] as a *"White female"* having *"blonde hair"* and *"blue eyes"*. Given the diametrically-opposite racial-profiles of [JJB] versus the plaintiff, and the controversially-preferential treatment (to state the least) that such people of [JJB]'s racial-characteristics receive from American society and European society, it would be, at a minimum, extremely-inappropriate for [WCLE] to provide [JJB] with any preferential treatment based upon those racial-characteristics especially if [JJB] is known and/or suspected to have committed racially-motivated hate-crime(s) against the plaintiff - but as the full record of {2011} and {2012} would show, this is precisely how [WCLE] did preferentially treat [JJB] versus the plaintiff - even protecting [JJB] from the numerous racially-motivated hate-crimes that they knew she had committed against the plaintiff.

22. The plaintiff was not aware at this moment of time that [JJB] had been charged several months earlier with *"credit card abuse"* (allegedly for stealing and using another's credit-card) and was forced-to-resign her position as [LISD] teacher for this reason (see above). The plaintiff is fully-aware that all charged defendants are "presumed innocent until proven guilty", but since [JJB] was charged publicly (by [WCLE]), and her mugshot posted online onto local-news-media, the plaintiff finds it highly unlikely that [WCSD-SP] did not know about [JJB]'s criminal charge - especially since she was booked into a [WC] jail (and it would obviously be [WCLE] that would be responsible for her pending prosecution). In other words, [WCSD-SP], in all likelihood, knew of this crucial information, but failed to disclose it to the plaintiff, and obviously, failed to take this fact into account while processing the plaintiff's crime report.

23. The plaintiff disputes the implicit allegation that the vegetation on [YARD] was in any way non-compliant with the restrictive covenants of the subdivision. In fact, in the same month of this incident, the plaintiff had contacted the Property-Management Company (at that time, [RealManage]) about the issue, and had received a (recorded) voice-mail (see below) in response saying that the plaintiff's [YARD] was in compliance (in other words, not exceeding 6-inches in height - at least, in the frontyard). Furthermore, this incident happened during the extreme drought of {2011} - and the plaintiff (due to the plaintiff's religious/cultural beliefs/values of conservation) was not watering the grass (both [FRONTYARD] and [BACKYARD]) even during those extreme-drought summer months - meaning that the grass on the plaintiff's property was almost 100% yellow and not even growing due to the extreme lack-of-water. In other words, the blades of grass on the plaintiff's property were completely parched and brittle at this moment in time, and it would have caused even further damage to the grass for the plaintiff to cut it to any lower height at its weakest and most-vulnerable point **(⁎) (Q)**. Again, the restrictive covenants of the subdivision stated that grass could not exceed 6 inches in height - but the malicious neighbors living around the plaintiff had consistently insisted that the plaintiff's grass be cut to 1-2 inches in height, which the plaintiff, due to the plaintiff's religious/cultural beliefs/values, has consistently refused to do throughout every year of the plaintiff's residence - {2009} through {PRESENT-DAY}. As would also be revealed in subsequent incidents, the plaintiff's malicious neighbors were also insisting that the plaintiff water the plaintiff's already-established grass **(⁎) (Q)**, which is not only against the plaintiff's religious/cultural beliefs/values, but since {2013-09-01} **(ψ)**, is also a violation of the [TPrC-T11-C202-§202.007(a:4),(d:5)] that prohibits a [HOA] from

requiring a homeowner to water/irrigate vegetation within their private-property.

24. Despite the fact that the plaintiff alerted [WCSD-SP] of several of the aforementioned hate-crimes committed by [RSR] against the plaintiff, and despite the fact that the plaintiff also alerted [WCSD-SP] about the fact that the [HOA] had advised the plaintiff to get a restraining order against [RSR], and despite of the fact that at least some of these hate-crimes were even witnessed by other neighboring resident(s), [WCSD-SP] did not bother (or show any concern) to further investigate these hate-crimes (for example, by interviewing the other witnesses), or at the very least, issuing a criminal-trespass-warning [CTW] to [RSR] against the plaintiff's property, if not charge [RSR] for those hate-crimes. The plaintiff considers this complete-disregard and complete-dereliction-of-duty to be, at the very least, a severe case of racial-discrimination - which is also crime as per [TCPaRC-T5-C106], especially as future incidents would reveal.

25. [WCSD-SP] makes a crucial admission in one of her statements to the plaintiff, fully acknowledging that the plaintiff lives an off-grid (and/or zero-waste) lifestyle, stating, *"No, that's your deal - that's how you live, and that's fine, that's fine."* [WCSD-SP]'s statement shows that, not only is the plaintiff's off-grid (and/or zero-waste) lifestyle *"fine"* - that is, not a problem to the plaintiff or to any other person, but more importantly, that such lifestyle is a substantial part of the plaintiff's fundamental rights, particularly the plaintiff's first-amendment-rights to freedom-of-religion and freedom-of-expression. This statement of admission by [WCSD-SP] directly contradicts much of the predatory actions committed by the defendants against the plaintiff in the decade that followed - predatory actions that not only both directly and maliciously infringed upon the plaintiff's first-amendment-protected lifestyle, but also fully-exploited such lifestyle (that was/is non-conformant to the White-American lifestyle) in-order-for the defendants to engage in racketeering-acts (particularly blackmail, retaliation, intimidation/interference) and other civil-rights-violations (particularly fourth-amendment violations, general invasion-of-privacy and public-humiliation) against the plaintiff.

# ¶301

On or about the day of {2011-08-08} - approximately one week after after the initial reported incident - the plaintiff called the [WCSO] to update them on further evidence of illegal dumpings on the plaintiff's property, which now also included several illegal-dumpings of what-appeared-to-be dog-faeces. As expected, the dispatch picked up the call, the plaintiff provided the case number and the call was dispatched to then-[WCSD] Breef **(‡)** [WCSD-B] since the dispatch let the plaintiff know that [WCSD-SP] was not on duty on this day:

> RECORDED CONVERSATION (+) BETWEEN THE PLAINTIFF AND [WCSD-B]:   {2011-08-08}(~)
> [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

 〚 OVER THE PHONE 〛


PLAINTIFF        *Hello, this is Sid.*

[WCSD-B]         *Hey Sid, this is Deputy Breef, with the [WCSO].*

PLAINTIFF        *Ok.*

[WCSD-B]         *What can I do for you?*

PLAINTIFF        *Could you repeat that one more time?*

[WCSD-B]         *What can I do for you, today?*

1696907690

| | |
|---|---|
| **PLAINTIFF** | *Oh, Ok. So, I would just like to, um, follow-up on a case or a report that was opened up last week on my behalf. So, I would like, it was basically regarding someone dumping material onto my backyard. And now...* |
| **[WCSD-B]** | *Wait, what is it, what now?* |
| **PLAINTIFF** | *Um, somebody dumping material onto my backyard - I mean, I'm not sure if you've got the case opened with you, but um, ar the report or whatever. But there are .. I had basically reported last week that somebody was dumping some material into my backyard and um ...* |
| **[WCSD-B]** | *What kind of material was it?* |
| **PLAINTIFF** | *Um, well, Deputy Stacy Pryor had told me that it was, um, it seems to be cat-litter. Um... now also I'm finding... um, dog-poop.* |
| **[WCSD-B]** | *Uh-huh.* |
| **PLAINTIFF** | *So, I just wanted to follow-up and say that I'm continuing to find I guess - what I found most recently is just dog-poop. Um... so - yeah, I just wanted to sort-of report that it seems to be continuing.* |
| **[WCSD-B]** | *Ok.* |
| **PLAINTIFF** | *And I'm not sure, I'm not sure if further action needs to be taken... Um, or if so, what the further action should be... So...* |
| **[WCSD-B]** | *Well, what you're going to is speak to Stacy. She'll be back on Wednesday..* |
| **PLAINTIFF** | *Ok.* |
| **[WCSD-B]** | *Yeah, she's available on Wednesday. Just give her a call, ok? I'm not real sure on the case. I don't know anything about the case. I can't find anything on the case.* |
| **PLAINTIFF** | *Oh, Ok.* |
| **[WCSD-B]** | *Um... So, I would give her a call and see what. Did she trace it? Did she do a report? Or what'd she do?* |
| **PLAINTIFF** | *Um... I think she said that, yeah, she took down the information, I mean, she took down all the information, so, I think that the idea was that she would create a report - or I'm not sure. But she gave a card with the number on, with the... with the case number on the back, what seems to be a case number on the back of it.* |
| **[WCSD-B]** | *Ok. I don't know. Well, give her a call. She'll be back on duty on Wednesday, ok?* |
| **PLAINTIFF** | *Alright. Would you be able to give me um, so, if I'm to call her on Wednesday, how am I supposed to reach, would I just call back the main number* |
| **[WCSD-B]** | *Yeah, just call back the same number - ok?* |
| **PLAINTIFF** | *Ok, just to confirm - that's 943-1389?* |
| **[WCSD-B]** | *Yes sir.* |
| **PLAINTIFF** | *Ok, I guess I'll call back on Wednesday then.* |

| [WCSD-B] | Alright, thank you sir. |
| PLAINTIFF | Um, is Wednesday the only day that she's available or? |
| [WCSD-B] | Wednesday and Thursday. |
| PLAINTIFF | Wednesdays and Thursdays. Got it, ok I guess that's um, that's Wednesdays and Thursdays every week? |
| [WCSD-B] | Say that one more time? |
| PLAINTIFF | It's Wednesdays and Thursdays every week? I mean, I... |
| [WCSD-B] | No, Wednesday and Thursday this week, and [INDECIPHERABLE], and its Wednesday and Thursday this week, and then Monday and Tuesday next week. |
| PLAINTIFF | Oh, Ok. Got it. Yeah, I guess that's all the information I needed. Thank you, sir. |
| [WCSD-B] | Alright... Alright, thank you. |
| PLAINTIFF | Bye. |
| [WCSD-B] | Bye-Bye. |

⟦ THE PHONECALL ENDS. ⟧

## ¶302

After this call with [WCSD-B], the plaintiff was very disappointed and disheartened by [WCSD-B]'s lack-of-concern over the racially-motivated crimes committed against the plaintiff, and by his shirking of official duties to other [WCSD](s).

## ¶303

On or about the approximate date of {2011-08-15}, approximately 2 weeks after after the initial reported incident - the plaintiff called the [WCSO] to update them on further evidence of illegal dumpings on the plaintiff's property. As expected, the dispatch picked up the call, the plaintiff provided the case number and the call was dispatched first to the [WCSO] "Criminal Investigations" Division, and then to then-Sergeant Jeremy Brinkman's (‡) [WCSS-JB] voicemail, at which point, the plaintiff left a message, letting [WCSS-JB] know that the plaintiff needed to update case-number C2011-08-00024 (initially created [WCSD-SP]) with new information. By the end of the day approximately 4PM, the plaintiff received the a voicemail from then-Detective Newell (‡) [WCSDet-N] of the [WCSO] providing the plaintiff with his phone number. The plaintiff called [WCSDet-N] back most likely on the same day:

▸ RECORDED VOICEMAIL(‡) SENT BY PLAINTIFF TO [WCSS-JB]: {2011-08-15}
▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

⟦ OVER THE PHONE ⟧

[WCSS-JB]

⟦ AUTOMATED VOICEMAIL MESSAGE ⟧ : *Hello, this Sergeant Jeremy Brinkman of the Williamson County Sheriff's Office Criminal Investigations Division. Please leave your name and number and I'll return your call as soon as possible...* ⟦ VOICEMAIL BEEPS ⟧

**PLAINTIFF**     *Yes, Hello, My name is Sid - and I just wanted to follow up on a case or a report that was opened up two weeks ago on my behalf. Um, I guess I can provide you with the case number so that you can have more information - C2011-08-00024. Again that is - C2011-08-00024. Um, my name is Sid and you can call me back at 826-2436. That's 8-2-6 2-4-3-6. Um, yeah, I guess that's all the information I needed to convey, thanks.*

---

◦   RECORDED CONVERSATION (▶) BETWEEN THE PLAINTIFF AND [WCSDet-N],   (2011-08-15) (∼)
▸   [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

⟦ OVER THE PHONE ⟧

**[WCSDet-N]**     *Newell speaking.*

**PLAINTIFF**     *Um, Yes, Hello, This is Sid.*

**[WCSDet-N]**     *Hey!*

**PLAINTIFF**     *Yeah, I gat your message, but I'm sorry, I didn't get your name again? What was it?*

**[WCSDet-N]**     *I'm Detective Newell which is N-E-W-E-L-L.*

**PLAINTIFF**     *One more time, how do you spell it?*

**[WCSDet-N]**     *N as in Nancy. E is in Edward. W as in William. E is in Edward. L as in Lincoln. L as in Lincoln.*

**PLAINTIFF**     ⟦ MISPRONOUNCED ⟧ *Newell?*

**[WCSDet-N]**     *Newell.*

**PLAINTIFF**     *Oh, Sorry.*

**[WCSDet-N]**     *That's alright, what can I do for you Sid?*

**PLAINTIFF**     *So, basically - I just wanted to update a case that was opened on my behalf - I guess, 2 weeks ago...*

**[WCSDet-N]**     *ok.*

**PLAINTIFF**     *Um, it was Deputy Pryor that was attended to the case initially. So, I guess the thing which I called in 2 weeks ago was to report an activity that I thought maybe a crime basically dumping material onto my backyard.*

**[WCSDet-N]**     *Right, yeah I went through it. What - um? You said you had an update? What's up?*

**PLAINTIFF**     *Right, Right, Right. So now I'm just, so - it seems to be continuing. So I just wanted to keep you - keep the case update. Um so, yeah, basically now I'm noticing that I guess, dog-poop, has been dumped recently - I'm not sure exactly when, but um, since I did not detected when it happened. But um, yeah I guess, there's at least 1 or 2 locations, actually...*

**[WCSDet-N]**     *Ok, so where do you want to go with this? Do you want to actually charge, file charges against them, or are you just letting us know about it again?*

| PLAINTIFF | *Yeah again, just for right now. Just letting you know. Um, last time, I wanted to let you guys know as soon as possible, so - in case any, there's any further action that needs to be taken. Again, I'll let you guys decide.* |
|---|---|
| [WCSDet-N] | *Ok... Ok.* |
| PLAINTIFF | *So, Yeah, and again, regarding also, regarding the previous thing that I reported which was dog, cat-litter - or at least that was what Deputy Pryor identified it as. Um, and it seems to be the "Bentonite" type of cat litter.* |
| [WCSDet-N] | *It's What now?* |
| PLAINTIFF | *It's a particular type of cat-litter made out of "Bentonite" - one of the substances is called "Bentonite".* |
| [WCSDet-N] | *Oh, Ok.* |
| PLAINTIFF | *And actually, so, and upon further reading, I'm not actually completely with the chemicals in "Bentonite" and other carcinogens that are found in "Bentonite" - I'm not completely comfortable with the fact that that's on my - on the backyard. So, especially, because when it rains, the chemicals are going to leach into the soil, and pollute the soil - because it's not biodegradable.* |
| [WCSDet-N] | *Ok - so, what are you want done - that's my question. Because, if you don't want to file charges against them, there's nothing else we can do about - We can't make it, obviously when it comes to - if you just want to document it - there's not, we can't make them - [INDECIPHERABLE] - I guess you'd say, or clean it up.* |
| PLAINTIFF | *Right, right. I understand that. Right, I wasn't asking that they be required to clean-it-up. I'm just letting you know that I'm not completely comfortable with the fact that this particular material - I mean, I'm actually, to be honest with you - I'm not - I wouldn't mind - I mean the cat-poop and the dog-poop itself is not too much of a concern for me.* |
| [WCSDet-N] | *Oh.* |
| PLAINTIFF | *But the actual cat-litter material - which is made out of "Bentonite" - is something that is a chemical which I would rather not have on the backyard.* |
| [WCSDet-N] | *Well, what we can do is - I will document what you told me about the "Bentonite" today - and then, if it happens again, we can go from there, ok?* |
| PLAINTIFF | *Got it.* |
| [WCSDet-N] | *Does that sound reasonable?* |
| PLAINTIFF | *Yeah, sounds fine.* |
| [WCSDet-N] | *Ok, well I'm document it - I'll add it to your report - your original report - that you've done some research, and determined to be "Bentonite" - containing the non-biodegradable "Bentonite", and that way, in the future, if you need a copy of the report - then you can pull it open with no problem.* |
| PLAINTIFF | *That sounds great.* |
| [WCSDet-N] | *Ok, we'll do that then - if you need anything else, call our dispatch ok?* |
| PLAINTIFF | *Alright. And also one more thing I forgot to tell Deputy Pryor when she was here 2 weeks - that the same type cat-litter, the bentonite type cat-litter substance also seems to have been spread on the front-yard where the - where the plants in front of my front-porch is.* |

| [WCSDet-N] | *Uh-huh... Ok.* |
|---|---|
| PLAINTIFF | *It seems to have been spread like, almost, not evenly - unevenly throughout - like a lot of - close to the roots of a lot of the plants.* |
| [WCSDet-N] | *Ok, I'll put that into the report too.* |
| PLAINTIFF | *Yeah, I guess that's the only other thing I wanted to let you know. Yeah, I guess that was all the information I needed to report.* |
| [WCSDet-N] | *Ok... Ok, well I'll add it to your report, and if you need anything else, give us a call ok?* |
| PLAINTIFF | *Yeah, I guess. Ok, thanks.* |
| [WCSDet-N] | *Your welcome, Bye-Bye.* |
| PLAINTIFF | *Bye.* |

〚 THE PHONECALL ENDS. 〛

## ¶304

As the plaintiff had reported to [WCSDet-N] in the phone conversation documented above, on or about the day of {2011-08-15}, had also discovered the similar heaps of cat-litter material illegally-dumped and/or spread unevenly around the plaintiff's bushes/trees of the plaintiff's frontyard. The plaintiff did however know that the home directly across the street - 〚785 KINGFISHER LANE, Leander TX 78641〛 - had a *"Under Contract"* yard-sign - so, it was likely that that house was not occupied at the moment in time when these crime(s) occurred. Furthermore, it is still unclear to the plaintiff if [JJB] committed these crimes against the plaintiff by herself or if she was assisted in any way by any of the other malicious neighbors that the plaintiff had the misfortune of living-around including, but not-necessarily limited to, [RSR] (again, since the plaintiff had regularly noticed [JJB] and [RSR] hanging around each-other and talking many times during the years {2009} through {2011}).

## ¶305

On or about noontime on {2011-08-29} - approximately 4 weeks after the initial reported incident - the plaintiff received a voicemail from B***** C***** of [RealManage] ([SPOA]'s then-Property-Management-Company) - the then-Community-Manager of the [SPOA], [SPOA-CM-BC]. The plaintiff's status with the [HOA] at this point in time (or at any point in time), would actually be irrelevant to this lawsuit, but the plaintiff documents it to further-illustrate that the actions/rhetoric of the plaintiff's predatory neighbors and [WCLE] were not only completely unjustified (since first of all, they are not the [HOA] and have no authority take even the legal actions of the [HOA]), but more importantly, that they were deliberately mis-interpreting/abusing/weaponizing these restrictive covenants as a modern-day-Jim-Crow law to deny the plaintiff justice for the numerous hate-crimes that the plaintiff had already suffered (at that moment in time), and to further-deprive the plaintiff of the plaintiff's rights:

▸ RECORDED VOICEMAIL(+) FROM [SPOA-CM-BC] TO PLAINTIFF:   {2011-08-29 09:03AM}(~)
▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

〚 BEGINNING OF VOICEMAIL. 〛

1696907690

[SPOA-CM-BC]   *Yes, Mr. Kode, this is B***** C***** - calling from [RealManage]. I got your email asking if the inspector had been out there, and what the yard looked like. Well, the inspector was out there on the 17th, and everything looked great - so, he's closed the DRV* **(ρ)**. *So, you are free and clear, um, as far as the yard goes. We do want to thank you for doing all that - keeping it up, and hopefully we won't have to send a letter out ever again. Have a great week - and if you have any questions, my name is B*****, and the phone number here is ***-****. Thanks, and have a great week.*

〖 END OF VOICEMAIL. 〗

# ¶306

On or about noontime on {2011-08-29} - approximately 4 weeks after after the initial reported incident - the plaintiff called the [WCSO] to update them on further evidence of illegal dumpings on the plaintiff's property, and most-recently discovered, the illegal cutting of branches from one of the plaintiff's front-trees. The dispatch directed the call to another [WCSD], this time, to then-[WCSD] Peter Parks [WCSD-PP] **(‡) (4)**:

▸  RECORDED CONVERSATION (▸) BETWEEN THE PLAINTIFF AND [WCSD-PP]:   {2011-08-29} (~)
▸  〖 PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY 〗

〖 OVER THE PHONE 〗

| | |
|---|---|
| **PLAINTIFF** | *Hello, this is Sid?* |
| **[WCSD-PP]** | *How you doin, sir. This is Deputy Parks of the Sheriffs Office.* |
| **PLAINTIFF** | *I'm sorry, I didn't get your name again.* |
| **[WCSD-PP]** | *Um, Deputy Parks.* |
| **PLAINTIFF** | *How do you spell that?* |
| **[WCSD-PP]** | *P - A - R - K - S.* |
| **PLAINTIFF** | *P - A - R - K - S?* |
| **[WCSD-PP]** | *Yes.* |
| **PLAINTIFF** | *I see. Sorry, um, I guess I would like to follow-up on a case or a report that was opened, um, 4 weeks ago, on my behalf, by Deputy Pryor, and I guess, later updated by Detective Newell.* |
| **[WCSD-PP]** | *Uh-huh.... Ok.* |
| **PLAINTIFF** | *I guess there have been new developments regarding that case, so um, just to confirm this case number is - um, i'm not sure if you have it or not - its C20110800024.* |
| **[WCSD-PP]** | *24 - Yes.* |
| **PLAINTIFF** | *Ok, I guess I had called - just to review the case, I called 4 weeks ago, and then subsequently 2 weeks later, to weeks after that, to report activities that I had thought might have been crimes - basically regarding somebody dumping material onto my backyard and also plants in my frontyard.* |

**[WCSD-PP]**    *Ok... Ok.*

**PLAINTIFF**    *Um... And Sergeant Newell, or I'm sorry, Detective Newell, had told me that me that the last time I called, um, which is I guess, 2 weeks ago, the case file would be updated with the new information...*

**[WCSD-PP]**    *Uh-huh.*

**PLAINTIFF**    *Um, and, I guess if any such further incident took place, that ... I should let you guys know, so that maybe further action could be taken... Um, I guess now - what I want to report is basically the same activity has taken place with someone dumping material around my front-yard plants also - in addition to that, I believe somebody might be, um, chopping limbs off one of the frontyard trees - um, chopping branches I guess. Um, so I thought that - I should report this activity and find out if further action needs to be taken. And, just to summarize, this is at least the, i think, at least the fifth time - at least the fifth time, that someone has um, illegally-dumped material onto my property.*

**[WCSD-PP]**    *Ok. Well, basically I can add onto the report. Um, but unless you know who's doing it, its going to hard for us to find anybody.*

**PLAINTIFF**    *Right, well, actually the third time that it happened, it happened um, the - I was there when it happened, and um, so - In fact, the - when I called first, 4 weeks ago - I was reporting that someone from the neighbor, the neighbor to the left of - or to the right of me, basically, from that side - dumped the material - I heard it happen - I was in the backyard while it happened - Um, but I didn't obviously - since that individual or individuals were behind a fence - I can't see who that individual is, but - I was there there and it was, and I can say from which side it came from - obviously because, um, from where the material was dumped and also, um, when Deputy Pryor had seen where it was - where the, I mean the location of the dumping, um - she had told me that it would have to be from this particular neighbor. I mean, I didn't want to accuse anybody, but - Um, she said yeah - it would have to be her. Um...*

**[WCSD-PP]**    *Well, did anybody talk to this lady?*

**PLAINTIFF**    *Um, Deputy Pryor had knocked on the door - and um, told me that basically that no one was answering so, that maybe that person was not at home - so, um, at that point - she had just given me her card, and - um the case number - and had told me that um, if this happens again, please call back - so, it's happened I guess 2 more times, in addition to when I first contacted her 4 weeks ago. Um, contacted the department 4 weeks ago.*

**[WCSD-PP]**    *Are you sure - Are you sure - that it's kitty-litter?*

**PLAINTIFF**    *Um... actually, that was what Deputy Pryor identified the material as - um, I mean, but from - I'm not experienced in looking at kitty-litter. So, I don't know if that is in fact kitty-litter or not... But that was what Deputy*

**[WCSD-PP]**    *Is it spread out - I mean, Is it spread out - or is it dumped at [INDECIPHERABLE].*

**PLAINTIFF**    *Well, they - I mean, the third time it was dumped, it was dumped in basically large - I mean basically I could hear the noise - I was in the backyard while it happened and, it's like almost - I don't know if it's the entire amount - i mean, if its entire package of kitty-litter - I really can't tell. And in fact, I'm hoping its - I mean, even kitty-litter - when I look at it - and I looked at it - looked it up online - it looks like the Bentonite-type kitty-litter which is a particular type of kitty-litter... um, and I guess um, upon further reading, um, I'm actually not comfortable with that, the chemicals in that, in that substance - found in that particular kitty-litter. Either my backyard, and especially my frontyard plants as well... Um, because especially, when it rains, or whenever I'm watering, the chemicals are going to leach into the soil and pollute the soil as well...*

**[WCSD-PP]**    *You understand that like, some fertilizers for grass - it looks like kitty litter.*

**PLAINTIFF**

*Um - that very well may be, but I when I went close to it, and I was trying to pick it up - I got a very strong odor - like a very strong chemical odor and, in fact, it was irritating my nose - and I mean, I guess my - when I was breathing it in, it was irritating my, whatever the system is - and so, basically um, yeah, respiratory system - was slightly irritated ...*

**[WCSD-PP]**   *I just put fertilizer down on my yard - and, and it looks like kitty-litter - and it has a very-strong chemical odor, to it.*

**PLAINTIFF**   *Right, I understand.*

**[WCSD-PP]**   *It needs to be watered in, to make your grass grow.*

**PLAINTIFF**   *I completely understand - you might very well be right if it's fertilizer but, actually if - I'm - my preference is that I don't want even fertilizer - I mean, my personal preference is that I don't use fertilizer, um... I would not like fertilizer on grass either...*

**[WCSD-PP]**   *Ok, well... Like I said, there's. The only thing that I can do is try and knock on your neighbor's door and ask them if they accidentally spilled something. Maybe they could clean it up.*

**PLAINTIFF**   *Well... Actually,*

**[WCSD-PP]**   ***But, if you're trying to file charges, the District Attorneys office is not going to do anything. They're not going to file charges on anybody for fertilizer.***

**PLAINTIFF**   *Um... ok, but I understand sir - but this is the fifth time this has happened - and its not just, cat litter, but it's also been dog-poop, I mean dog-poop, I'm not too concern - I mean somebody dumping dog-poop onto my backyard - I'm not too concerned, about the about the dog-poop or even the cat-poop, to be honest with you. But I am concerned about the chemicals in either fertilizer or cat litter, because like I said. I prefer not to - I don't use those chemicals myself, and I prefer not use those - um, I prefer that those chemical, I mean that material was not dumped onto the backyard - and sir, I can, I con go ahead and do what you're advising me, and not do - and just ignore this. But, I can tell you that it's just going to continue to happen - and not only that - it seems like - they're cutting, well whoever it is, they're cutting branches off the front-yard tree, and um, seemingly getting-away-with-it. So, I mean, I mean go ahead and continue to let it happen, and at some point it was going to be viewed as property destruction - so, I don't know when...*

**[WCSD-PP]**   *Have you tried knocking on your neighbor's door? To talk to them?*

**PLAINTIFF**   *Well, ma'am - I'm sorry - sir. I'm sorry - what I - the way I see it is that, if this person is so hostile that they're going to be dumping material while I'm the backyard - and not even care that...*

**[WCSD-PP]**   *That's not... That's not volatile, really...*

**PLAINTIFF**   *I'm sorry.*

**[WCSD-PP]**   *Like, if they're throwing stuff at your house - they're throwing eggs, stuff like that at your house. Breaking stuff - that's volatile.*

**PLAINTIFF**   *Um, Did you say, vo-*

**[WCSD-PP]**   *Some people would go next door, and go knock on their door and say, "Hey, I've been noticing piles in my yard - Um, I don't know if yall accidentally dropped something over there, or whatever, but if you can try and be a little-bit more careful, I'd appreciate it." Something like that?*

**PLAINTIFF**

*Right... Um, I personally don't like confronting, I mean - I'm um, I guess I'm sort of a humble person myself - I don't like to um... and not only that, I don't know if this person is - is, you might very well be right that this person is not a violent person. But at the same time, I don't want to put myself at risk, um, by, by going over to this individual, and also, I would also like to add that, um, there have been some harsh words directed towards me - um, in the past. By another, I mean, by 1 individual - um, in the neighborhood - and so, I'm not - I'm definitely not accusing anyone, in regards to this particular case - but, um...*

**[WCSD-PP]**   *Was it the neighbor on the right side of your house?*

**PLAINTIFF**   *It wasn't the neighbor ton the right side - it was the neighbor diagonal to me - which is, yeah, I guess diagonal to my house... Um, this happened a year ago. And it was, the - yeah. And, like I said, um...*

**[WCSD-PP]**   *And where was the large pile of dog-poop and all that stuff piled in your yard?*

**PLAINTIFF**   *Um, well the dog-poop was the fourth dump - I mean, these are, these happened in different locations. I mean, the most - I mean the dog-poop is in the back - was dumped in the backyard. Um, ...*

**[WCSD-PP]**   *Was it close to your house?*

**PLAINTIFF**   *Yeah, this was all close on 1 side of the house. So, I can say this was all on 1 side of the house - facing that, adjacent to that 1 particular neighbor... Um, but it's yeah, it yeah - but yeah, like I said, I'm not accusing anyone here.*

**[WCSD-PP]**   *Ok, well we'll try and um, talk to them, and let them know that they need to stop doing whatever they're doing, if they're doing it. And um, hopefully that'll take care of it.*

**PLAINTIFF**   *Um, I guess that was all the - yeah, I mean if that's the um.. that seems to be an appropriate action on my, in my opinion. Um... So, if that could be done, I would greatly appreciate that. Because*

**[WCSD-PP]**   *Ok.*

**PLAINTIFF**   *I would, I would personally follow your advise and knock on their door and politely ask them to stop doing it - but, like I said sir, I'm extremely um, you know - nervous in such type situations, and I wouldn't want to confront a hostile neighbor. Um... So, I'm a peaceful person, I don't want to start, I mean, I personally wouldn't be able to say much if the person is hostile. um....*

**[WCSD-PP]**   *Ok.*

**PLAINTIFF**   *Yeah, I guess, um, like you said if you would be able to talk to whoever is doing it - and ask them to stop. It would a huge - I would greatly appreciate it.*

**[WCSD-PP]**   *Ok, well I'll try and get over there, sometime this afternoon, and talk to somebody*

**PLAINTIFF**   *Ok, um - yeah, and yeah, obviously, this is not - I wouldn't consider this - this is not obviously an emergency - so, it doesn't have to be done today, or - I'm not requiring any of that. But, I guess soon, so that such incidents don't happen, I mean, in particular, I would like to water my front-plants but since that material is there, I'm not even able to - I'm sort of postponing on watering my plants. Since, watering the front-plants that is - since that material - a large amount of it is still there. Um..*

**[WCSD-PP]**   *Ok.*

**PLAINTIFF**   *I guess - any help to remedy the situation would be really - would be greatly appreciated, like I said. Um... is there anything else that I can do on my end?*

**[WCSD-PP]**   *Unless you want to put cameras up - and try and get video of these people.*

**PLAINTIFF**   *Right, but I figured - that might be taking it too far - I mean, from my part - yeah, that is a good piece of advise, actually - I was considering that. And, I guess I should consider that further - I guess I need to consider that further. Um... besides that, is there anything else that you can suggest?*

**[WCSD-PP]**   *Um, no - not really.*

**PLAINTIFF**   *And if you said cameras - how would, I be able to - I guess I would have to look into that, but - just really briefly, how would I be able to place those - I mean, because I don't know about the legal implications of that - how would I be able to place a camera - would I be able to place a camera that's facing outside? I mean, I don't even know how that works - and if its even legal?*

**[WCSD-PP]**   *You can put cameras on your house. You can put a surveillance camera on your house that's motion-activated.*

**PLAINTIFF**   *I see, and... but, would I be able to direct that camera in front of my front yard - on my front-plants? on my front-trees?*

**[WCSD-PP]**   *Yeah, you can put em in the corner of your house, and have them face out to the street, and whenever something moves in front of the camera, it turns on and records... And, there's no problem with that.*

**PLAINTIFF**   *I see... And that's perfectly legal and everything?*

**[WCSD-PP]**   *Yes.*

**PLAINTIFF**   *I see. And I guess the same can be done for the backyard as well... Um, yeah I guess I'll definitely look into that, but for right now, I guess, um - If, whoever it is the person, if they could be, um, approached or I mean talked-to and politely asked not do that anymore, I mean. That would be, that would be of great help to me.*

**[WCSD-PP]**   *Yep. I'll try to get over there shortly.*

**PLAINTIFF**   *I'm sorry - I didn't get that?*

**[WCSD-PP]**   *I said, I'll try to get over there shortly.*

**PLAINTIFF**   *Ok. Ok, yeah that sound's great. um... yeah, I guess that's all the, all that I wanted to convey and request I guess.*

**[WCSD-PP]**   *Ok sir.*

**PLAINTIFF**   *Well, I really appreciate your time, Deputy Parks.*

**[WCSD-PP]**   *No problem. Take care.*

**PLAINTIFF**   *Have a nice day. Bye.*

〚 THE PHONECALL ENDS. 〛
〚 APPROXIMATELY 40 MINUTES LATER, PLAINTIFF NOTICED [WCSD-PP] POLICE CAR PARKED CURBSIDE IN FRONT OF [788KLLTX78641]. 〛
〚 PLAINTIFF NOTICED [WCSD-PP] WALK TO [JSP&KAP] RESIDENCE'S FRONT-DOOR. 〛
〚 PLAINTIFF NOTICES THAT [WCSD-PP] HANGS IN FRONT OF [JSP&KAP]'S RESIDENCE FOR A FEW MINUTES. 〛
〚 PLAINTIFF THEN NOTICES THAT [WCSD-PP] WALKS ONE HOUSE DOWN TO [JH&SH]'S RESIDENCE [780KLLTX78641]. 〛
〚 APPROXIMATELY 5 MINUTES LATER, PLAINTIFF NOTICES THAT [WCSD-PP] APPROACHES [FRONTDOOR] AND KNOCKS ON THE DOOR. 〛

1696907690

STEPHANIE KOLL ... v. WILLIAMSON COUNTY ...

**PLAINTIFF**       *Hi... Deputy Parker? Parks?*

**[WCSD-PP]**       *Yes... Yes.*

**PLAINTIFF**       *Um, So, I just wanted to - I can show all the locations of* [INAUDIBLE].

〚 PLAINTIFF WALKS IN FRONT OF [WCSD-PP] POINTING AT LOCATIONS UNDER FRONT BUSHES/TREES WHERE CAT-LITTER WAS DUMPED. 〛
〚 PLAINTIFF WALKS TOWARDS AND POINTS AT THE FRONT-TREE WHERE THE BRANCHES HAD BEEN CUT. 〛
〚 PLAINTIFF WALKS TOWARDS SIDE-YARD, OPENS FENCE-GATE, AND BOTH ENTER PLAINTIFF'S BACKYARD. 〛
〚 PLAINTIFF WALKS AND POINTS AT MULTIPLE LOCATIONS OF DUMPED DOG-POOP, CAT-LITTER. 〛

**PLAINTIFF**       *And* 〚 POINTS 〛 *... And* 〚 POINTS 〛 *... And* 〚 POINTS 〛

**[WCSD-PP]**       [INAUDIBLE]

**PLAINTIFF**       *Well, I noticed it.. The first time I noticed it..*

**[WCSD-PP]**       *Who has a litter box?*

〚 WITHOUT ASKING PLAINTIFF'S PERMISSION, [WCSD-PP] HOPS ONTO PLAINTIFF'S FENCE BOTTOM-RAIL, AND PEEKS OVER FENCE INTO [JJB]'S BACKYARD. 〛

**[WCSD-PP]**       *Their litter box.*

**PLAINTIFF**       *That might ... Um, well* [INAUDIBLE]. *But yeah, but yeah, if I could... pretty quickly* [INAUDIBLE], *if that's ok with you?... Um*

〚 PLAINTIFF POINTS [WCSD-PP] TO BACKDOOR ASKING IF PLAINTIFF COULD SPEAK TO PLAINTIFF INDOORS. 〛

**[WCSD-PP]**       *For what?*

**PLAINTIFF**       *No, I just wanted to explain the situation.*

**[WCSD-PP]**       *No, I already talked to you on the phone.*

**PLAINTIFF**       *I just wanted to put it all into context. I understand.*

**[WCSD-PP]**       *If you don't keep your yard up - it looks like this house is just sitting here abandoned. Like nobody lives here.*

**PLAINTIFF**       *Right, I understand that.*

**[WCSD-PP]**       [INAUDIBLE] *the backyard.*

**PLAINTIFF**       *Right, I did trim it - just you know, a week ago, or a week and half ago. I don't know - I'm not sure. If you're referring to the fact that it's yellow. It's because, there's a stage-four drought that's with the water company - and the water company - the water utility is saying that we can't water the grass... I mean, the instructions were to only water the plants and the trees. And, and so... I'm not really sure what I'm doing wrong. I mean I'm trying to...*

**[WCSD-PP]**    *But you haven't mowed the backyard... ?*

〖 PLAINTIFF TRIES TO EXPLAIN TO [WCSD-PP] THAT PLAINTIFF IS CONVERTING BACKYARD FROM LAWN INTO GARDEN: 〗

**PLAINTIFF**    *Well, the backyard - I'm trying to maintain it - well, actually I'm trying to not maintain the backyard - or, when I say "not maintain", I mean that, the grass, I would have another plan for the grass... I'm not actually watering the backyard at all. And I've not been watering it at all... Um, and so the only water its get is maybe rain, and then the reason I'm not watering it is because I would actually like the grass to subside and die because I don't want the grass in the backyard to be honest with you - I have other plans that I want, um, that are going on.. So, that's why I'm trying to just get the grass* {INAUDIBLE}. *And I'm sure if I don't water it, it will die. So, anyways, my point is, I don't want to waste your time, but the point is - this is not something that I'm ... intentionally doing or anything, it's just the way I figured, um, the way, I just made a choice to* {INAUDIBLE} *and also, regarding the frontyard - like I said, about the drought, and also - I am trimming it, I am trimming it and I am...*

**[WCSD-PP]**    *What about the bushes - the bushes look crazy...*

**PLAINTIFF**    *Are you talking about the bush that's in front of the front yard? I mean, the front-door?*

**[WCSD-PP]**    *Yeah.*

**PLAINTIFF**    *Well, I contacted the [HOA] and they said, they're fine with the - I mean, they didn't have any problem with that. Um so, and actually, I've actually contacted the [HOA] and according to them, I mean, there's nothing that ... they're not, going to, they're not getting on me about any of it. And also, I've made sure that everything that I'm doing is - you know, is in accordance with what their - whatever their rules are.*

**[WCSD-PP]**    *Right.*

**PLAINTIFF**    *And also, I...*

**[WCSD-PP]**    *You live here by yourself?*

**PLAINTIFF**    *No actually, well right now, yeah, but ... yeah, I mean, there's supposed to be somebody else moving in, but yeah...*

**[WCSD-PP]**    *And you own this house, or just renting?*

**PLAINTIFF**    *Well yeah, I'm a co-owner of it.*

〖 [WCSD-PP] IS SHOCKED THAT PLAINTIFF IS OWNER OF PROPERTY IN SUCH WHITE NEIGHBORHOOD: 〗

**[WCSD-PP]**    *Oh.*

**PLAINTIFF**    *So... yeah, I mean I guess that's basically the deal - and to be honest with you, I'm sorry to have to bring you here, I'm sorry to have to waste your time, I know you guys probably have higher priorities, then having to deal with this stuff, but... Like I said, at the same time, I don't want the situation to get worse, and more complicated, by you know... Maybe something else next-time happens, and something worse is dumped or something worse is cut off the tree, and stuff like that... and...*

**[WCSD-PP]**    *Ok - Well, I'm going to go nextdoor and talk to them, ok?*

**PLAINTIFF**    *Ok, I really appreciate that...*

**[WCSD-PP]**

*Ok.*

⟪ PLAINTIFF STARTS WALKING TOWARDS BACKDOOR. [WCSD-PP] STARTS WALKING TOWARDS GATE. ⟫

**PLAINTIFF**   *Oh, actually, I should mention that um,* [INAUDIBLE], *offer to, in particular, regarding the fence, I mean, I got the fence taken care of. So, I'm not really sure what the deal is, I mean they were very-cooperative and very-friendly, at least this neighbor was* ⟪ POINTS AT [JJB] RESIDENCE ⟫ . *And* [INAUDIBLE]. *And like I said, I'm not accusing anyone here.*

**[WCSD-PP]**   *Ok... Well, I* [INAUDIBLE]

⟪ PLAINTIFF OPENS BACKDOOR AND ENTERS INTO [HOUSE]. ⟫
⟪ [WCSD-PP] OPENS GATE AND WALKS TOWARDS [JJB]'s FRONT-DOOR. ⟫
⟪ PLAINTIFF WAS EXPECTING [WCSD-PP] TO REPORT BACK TO PLAINTIFF AFTER TRYING TO CONTACT [JJB], BUT THIS DID NOT HAPPEN. ⟫
⟪ A FEW MINUTES LATER, PLAINTIFF NOTICED [WCSD-PP] GET INTO HIS POLICE CAR AND DRIVE AWAY. ⟫

# ¶307

After this incident with [WCSD-PP], the plaintiff was very-alarmed (and even more so, a decade later, after reviewing the audio) about the manner in which [WCSD-PP] handled this incident **(λ) (ζ) (Δ)** :

01.  [WCSD-PP] tried to convince the plaintiff that the material illegally-dumped onto the plaintiff's property (several times and in multiple places) might have been fertilizer, and not cat-litter. If the illegally-dumped material was "fertilizer" as [WCSD-PP] suggested, then, it would still be the crimes of "criminal mischief" (if not "illegal dumping"). Additionally, the plaintiff tried to explain to [WCSD-PP], that chemical fertilizer might be just as harmful (if not more) to the plaintiff and the plaintiff's property than cat-litter, since the plaintiff is an organic gardener that does not use any chemicals - neither pesticides nor synthetic/chemical fertilizer - on [YARD].

02.  [WCSD-PP] was apparently very-quick to dismiss [WCSD-SP]'s "101% confidence" that the material was cat-litter. The plaintiff believes that the actual reason for [WCSD-PP] to deem the material as fertilizer - is that [WCSD-PP] did not want to do anything about the crimes being committed against the plaintiff, even though even if the material was fertilizer, that would not have changed the fact that the crimes still did occur.

03.  [WCSD-PP] told the plaintiff that the [WCDA] would not do anything if the illegally-dumped material was "fertilizer". Again, even if the material was "fertilizer", it would still be the crimes of "criminal mischief" (if not "illegal dumping"). So, the plaintiff can only interpret this statement as an act of, at the very least, denial-of-services (redlining) and discrimination, but at worst, obstruction-of-justice (especially since such crimes were racially-motivated hate-crimes).

04.  Just like [WCSD-SP], [WCSD-PP] suggested to the plaintiff that the multiple acts of illegal-dumping/criminal-mischief might have been an "accident" - when it would be clearly impossible to convince any Judge or Jury that multiple dumpings of large-amounts (greater than 5 feet-tall of granular material over a 6-feet-tall-privacy-fence could be an accident - especially since most fertilizer-spreader equipment are designed to broadcast the granular material at a very-low height and in an even manner (so that the granules just disappear into the grass/soil) - and not dump large-amounts of it over a 6-feet-tall-privacy-fence.

05.  Just like [WCSD-SP], [WCSD-PP] suggested to the plaintiff that the plaintiff should knock on the respective neighbor's door and ask them if they could be a little-bit more careful (if it was an "accident"), or tell them to stop doing it (if it was intentional). Again, no reasonable person in their right mind would approach and confront a hostile neighbor about a crime committed by that hostile neighbor -

and this is especially true if the victim is a historically-oppressed racial minority and the perpetrator was part of the dominant racial majority - even more so, if the crime is suspected to be a racially-motivated hate-crime.

06.    [WCSD-PP] explained to the plaintiff that a person illegally-dumping large amounts of material over a 6-feet-tall-privacy-fence onto a neighbor's property is not "volatile", whereas someone throwing eggs at the house is "volatile". The plaintiff still, to this day, does not understand the logic behind this argument, because for one thing, in both cases - the acts are both intentional and malicious. Again, the plaintiff could only interpret these illogical arguments as excuses to cover-up [WCSD-PP] reluctance to do anything about the crimes being committed against the plaintiff.

07.    The plaintiff let [WCSD-PP] know that it was in fact, [WCSD-SP] that informed the plaintiff to call the [WCSO] back again if such crimes continued to happen - which was exactly what the plaintiff was trying to do in speaking to [WCSD-PP]. The plaintiff further informed [WCSD-SP] that if the plaintiff did not report these issues, and/or if no police at least minimally-investigated the issue, then the perpetrator would continue to commit crimes - and perhaps even escalate the severity of the crimes committed - against the plaintiff. Again, since [WCSD-PP] was initially reluctant to do anything about the crimes being committed, it took at least 5 minutes for the plaintiff to convince [WCSD-PP] that it was, indeed, part of his official duties to investigate such crimes. Only then did [WCSD-PP] agree to visit the plaintiff's property to try to investigate.

08.    [WCSD-PP] - after arriving in his police vehicle at the plaintiff's property - first walks towards the [JSP&KAP]'s frontdoor, ostensibly to speak to [JSP] and/or [KAP] for a period of several minutes, and then (a few minutes later), to the next house down the street, ostensibly to speak to them. There was absolutely no justifiable reason for [WCSD-PP] to speak to [JSP] and/or [KAP], and the plaintiff's neighbors further down the street, [JH] and/or [SH], because these particular crimes committed against the plaintiff where happening along the side of the plaintiff's other next-door-neighbor [JJB]. The only reason that the plaintiff can ascertain as to the reason [WCSD-PP] went to speak to these other White-American neighbors, is because [WCSD-PP] wanted to further-justify his (and [WCSD-SP]'s) extremely offensive and racist narrative, that if a person-of-color (especially immigrant-of-color) does not maintain his/her property according to the unreasonable/oppressive demands of his/her predatory White-American neighbors, then that somehow any hate-crimes committed against that person by those predatory White-American neighbors is somehow justified (see below). Furthermore, the plaintiff did not authorize [WCSD-PP] to provide any private information from the plaintiff (including about the crimes being committed against the plaintiff) to any other neighboring property-owners.

09.    After the plaintiff points to several locations of the plaintiff's property where material (dog-faeces, cat-litter) had been illegally-dumped - on at least 5 different occasions during this year {2011} - [WCSD-PP] brazenly shifts the topic to the way the plaintiff maintained the plaintiff's property. He claims that the plaintiff's [HOUSE] looks "abandoned". The plaintiff strongly disputes this claim, as grass that is parched/yellow in the plaintiff's [FRONTYARD] and maybe approximately 10-inches-tall and shaggy (Q) in the plaintiff's [BACKYARD] does not mean that the plaintiff's [HOUSE] is abandoned - especially if such private-property is intentionally/willfully being maintained in that manner - for example, according to Constitutionally-protected religious/cultural practice(s). [WCSD-PP] even mentions that the plaintiff's [FRONTYARD] bushes/trees looked *"crazy"* - however, the plaintiff failed to disclose to [WCSD-PP] that in the 【Summerlyn】 subdivision, there were no restrictive covenants that regulated the height/width/depth or shape of bushes/trees. (At this moment in time, even the [HOA] had never raised this particular issue to the plaintiff.)

10.    [WCSD-PP], just like [WCSD-SP], asks if the plaintiff lives alone at the property - which again, according to the plaintiff, was private information that the plaintiff felt very-uncomfortable answering. It might be an appropriate question if the police considered that as a

possible motives for the crimes being committed against the plaintiff, but it would clearly be highly-inappropriate if the police planned to use the information that the plaintiff was-living-alone against the plaintiff (as future incidents would reveal - they did).

11. [WCSD-PP] asks the plaintiff, if the plaintiff owns the property or if the plaintiff was renting the property - so as if to suggest that a person of the plaintiff's racial-profile was somehow not-capable or not-worthy of owning property within such White neighborhood.

12. [WCSD-PP] agrees to talk to [JJB], and while the plaintiff did observe [WCSD-PP] approach [JJB]'s front-door, it is completely unclear to the plaintiff whether [WCSD-PP] actually spoke to [JJB] or not, as [WCSD-PP] just drives-away in his police vehicle - a few minutes after this. Again, the plaintiff was, at the very least, expecting [WCSD-PP] to report back to the plaintiff and explain to the plaintiff what he was able to do - and whether-or-not he was able to speak to [JJB] about the crimes committed against the plaintiff. This extremely-disrespectful action by [WCSD-PP] also continued-to-reveal [WCSD-PP]'s (and by extension, the [WCSO]'s) racist disregard for the plaintiff's rights as a victim of multiple racially-motivated hate-crimes.


# ¶308

On or about noontime on {2011-08-30} - approximately 4 weeks after the initial reported incident - the plaintiff called the [WCSO] to report to them that the plaintiff was extremely-distressed about an extra-heavy-duty (12-gauge) 100-feet extension cord (valued at approximately $70) stolen from [BACKYARD] - the same cable that the plaintiff was using for lawn-maintenance. The plaintiff knew that the perpetrator(s) deliberately stole the cable from [BACKYARD] precisely because that was the extra-heavy-duty extension cord that the plaintiff needed to power the corded-electric lawn equipment - to maintain the frontyard according to the restrictive covenants. The plaintiff purchases almost all of the plaintiff's equipment from online stores - therefore, there is always a delay in shipping time (especially since the plaintiff almost always uses the "Free Shipping" option). So, in other words, the perpetrators deliberately stole the cable that the plaintiff needed for lawn-maintenance in an attempt to get the plaintiff cited by the [HOA] for an unmowed lawn. Also, the dollar-value of the item(s) stolen from the plaintiff's backyard was not as much of a concern to the plaintiff, as the fact that someone was brazen enough to open the plaintiff's fence gate, enter into the plaintiff's backyard, and steal the item(s) - without any fear of repercussions. In other words, the plaintiff was obviously concerned that if the perpetrator(s) were bold enough to do this (perhaps, in addition to the other crimes that the plaintiff had already suffered), then what else might the perpetrator(s) be capable of? The plaintiff also had no idea if the crime was committed during broad-daylight (for example, when the plaintiff might not have been at home) or during nighttime (when the plaintiff was at home). Again, to be clear, the plaintiff did not know about [JJB]'s "credit card abuse" criminal charge at this moment in time. The plaintiff's call to the [WCSO] was dispatched again to [WCSD-PP]:

> RECORDED CONVERSATION (⊕) BETWEEN THE PLAINTIFF AND THEN-[WCSD-PP]  ·  {2011-08-30} (~)
> [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

⟦ OVER THE PHONE ⟧

**PLAINTIFF**      *Hello... This is Sid.*

**[WCSD-PP]**      *How you doing, sir. This is Deputy Parks.*

**PLAINTIFF**      *Oh hey - I spoke to you yesterday, Deputy Parks. My name is Sid.*

**[WCSD-PP]**      *Yes - Uh-huh.*

1696007690

| | |
|---|---|
| **PLAINTIFF** | *Am I speaking with the same Deputy Parks as yesterday?* |
| **[WCSD-PP]** | *Yes.* |
| **PLAINTIFF** | *Oh, ok. I would like to report I guess a robbery. I guess, I mean - someone seems to have entered to my backyard and stolen an item of value - and possibly other items as well. I'm checking to see what else might have been stolen. Um, as of right now - 1 item seems to be, that I know of - seems to be stolen. Um, is a Coleman Cable 02589 12-Gauge, 100-Foot Vinyl Outdoor extension cord. Um, it's yellow in color and it's valued at roughly $50. Um, so...* |
| **[WCSD-PP]** | *An extension cord?* |
| **PLAINTIFF** | *Right - it's a 12-gauge.* |
| **[WCSD-PP]** | *Where was the extension cord?* |
| **PLAINTIFF** | *I'm sorry?* |
| **[WCSD-PP]** | *WHERE was the extension cord at?* |
| **PLAINTIFF** | *The extension cord was, wrapped in o circle in the backyard, um, basically - almost visible as soon as I open my backdoor - it's immediately visible. Right in front of my little patio, yeah, little patio area - it's - it was right there... And it was used recently.* |
| **[WCSD-PP]** | *Ok...* |
| **PLAINTIFF** | *And I have recollection of it being right there, um, and I have educated guess as to when it might have been stolen, but...* |
| **[WCSD-PP]** | *How do you know when it might have been stolen?* |
| **PLAINTIFF** | *Unless it happened in the middle of the night, which I really doubt - I think I would have heard it, if it happened in the middle of the night. Um, but - I know... um, when I, um - when I left the house, on one particular occasion, um, this is my educated guess - I should say - I'm not 100% sure, obviously, this is my educated guess - and so, I know this happened - ond in addition to this happening, this coincides I guess - this might be coinciding with the other dumping which I showed you in front-yard yesterday. It might have coincided with that - I don't know that for a fact but that's my educated guess.* |
| **[WCSD-PP]** | *Ok, Well, you said it's a 100-foot cable, yellow in color and costs $50?* |
| **PLAINTIFF** | *That's correct.* |
| **[WCSD-PP]** | *Ok, Well, I'll take a - I'll do a report, and [INDECIPHERABLE].* |
| **PLAINTIFF** | *Um - Ok. Is there anything I guess, um, I should be doing - I mean, um, besides...* |
| **[WCSD-PP]** | *Lock your gate maybe, put a lock on your gate? I don't know.. Put [.NDECIPHERABLE] on the inside of your garage...* |
| **PLAINTIFF** | *Lock on the - on the fence gate? on the fence gote - you mean?* |
| **[WCSD-PP]** | *Yeah - the gate that goes into your backyard - put a lock on it. And then everything that you have laying out in the backyard, I would put it inside my garage.* |

| | |
|---|---|
| PLAINTIFF | *Right - I've already done - basically tried to do that. Um.. or at least, yeah I've tried to do that right now. I mean, obviously, it's too late, for that particular item, it's too late, but.. um, besides that you're saying a lock on the backyard fence - and is there anything else I can do, besides that? And besides putting my stuff in the garage - what else can I?* |
| [WCSD-PP] | *I already told you yesterday. You can put cameras up - lock the gate that goes into your backyard. Um, I mean I don't know what else to tell you.* |
| PLAINTIFF | *Right, ok - so, beyond that, that should be ok. All the advise. Alright, well - besides the report, is there anything else that can be done? I guess...* |
| [WCSD-PP] | *No - No sir. I don't know what else can be done. I'm just going to write a report. Send it up to a Detective.* |
| PLAINTIFF | *I see - ok, and um, what I be able to - um, get in contact...* |
| [WCSD-PP] | *They will probably contact you - sometime next week...* |
| PLAINTIFF | *I see - um... I see - um... ok, so, he'll contact me sometime next week, I guess. Ok, um - is there anything else, I can do - I mean I know you already -* |
| [WCSD-PP] | *No, I don't know what else to tell you - I don't know what else you can do - All I can do is take a report - and turn it in. A Detective might be in contact with you next week. If I were you, I would lock the gate - and put all* [INDECIPHERABLE] *in the garage.* |
| PLAINTIFF | *Right - right, I understand that. Right I understand. Um, ok - I guess, um... right, I'm just trying to calculate all my options and see if there's anything else that can be done - I mean just trying to brainstorm here. I guess, um... yeah, I guess that's the best we can do here - then, I appreciate your time again. Um, and ...* |
| [WCSD-PP] | *Ok...* |
| PLAINTIFF | *And just to confirm - so, you're saying someone will contact me - a detective will contact me sometime - is it the end of this week or...* |
| [WCSD-PP] | *Possibly they might - I mean, I can't tell you when - don't know when.* |
| PLAINTIFF | *I see - but, just curiously - Isn't this something of, that should be of concern though - I mean um... um...* |

〚 PLAINTIFF NOTICED THAT [WCSD-PP] ENDED THE PHONECALL IN THE MIDDLE OF PLAINTIFF'S PREVIOUS STATEMENT. 〛
〚 PLAINTIFF WAS INDIGNANT AT [WCSD-PP]' DISREGARD/UNPROFESSIONALISM, BUT STILL DECIDED TO CALL [WCSO] DISPATCH AGAIN. 〛

# ¶309

The plaintiff was indignant in the manner in which [WCSD-PP] treated the plaintiff - completely disregarding the plaintiff's concern and the magnitude of the numerous crime(s) being committed against the plaintiff, unprofessionally ending the phone-call with the plaintiff, in the middle of the plaintiff's sentence, as the plaintiff was questioning [WCSD-PP]' lack-of-concern over the issue of numerous racially-motivated hate-crimes committed against the plaintiff. **(λ) (ζ) (Δ)**.

# ¶310

On or about noon on {2011-08-30} - approximately 4 weeks after the initial reported incident - the plaintiff called the plaintiff's older brother,

[PK], on the phone and asked [PK] to visit the plaintiff at the plaintiff's property. ([PK] was never an owner of the plaintiff's property [788KLLTX78641] and [PK] was never a resident of the plaintiff's property [788KLLTX78641]; in fact, [PK] was never a staying guest at the plaintiff's property [788KLLTX78641].) [PK] was living in Austin at that moment in time (despite also owning additional property within the County of Williamson), and was/is approximately 7 years older than the plaintiff. [PK] was/is approximately 5-inches taller than the plaintiff, and unlike the plaintiff, conforms his physical-appearance to White-American standards by, for example, cutting his facial-hair/beard and/or maintaining his grooming according to White-American standards. On or about the date and approximate time {2011-08-30 15:30}, [PK] parks his vehicle at the curbside of the street and enters into the plaintiff's [HOUSE] through the [BACKDOOR] - as the plaintiff had instructed [PK] that the plaintiff wished to talk to [PK] in private without any of the malicious neighbors overhearing such private conversation, in which the plaintiff would reveal all of the crimes committed against the plaintiff by such malicious neighbors to [PK]. Although distraught and literally crying (in tears), the plaintiff briefly describes to [PK], in person, all of the traumatizing crimes that had been committed against the plaintiff over the past 2 years of the plaintiff living at the plaintiff's residence, which [PK] was previously completely-unaware-of. After the plaintiff's pouring of the plaintiff's heart out to [PK] - in revealing such traumatizing experiences to [PK] - the plaintiff asked [PK] to install a security camera system on the plaintiff's property and also asked [PK] to install a lock on the fence gate of the plaintiff's property. [PK] specifically asked the plaintiff if the plaintiff had reported to the police the multiple incidents of the plaintiff's predatory/malicious neighbor [RSR] committing the crimes of intimidation/interference/disorderly-conduct/blackmail against the plaintiff, and the plaintiff informed [PK] that the plaintiff did let the police-officers know about these incidents. However, since the plaintiff informed [PK] that the police officers did not do anything about these crimes, [PK] became indignant, and despite the plaintiff's literally begging [PK] not to approach [RSR] at her residence - even grabbing onto [PK]'s shirt prior to his leaving the [HOUSE] - [PK] indignantly walked-out of the plaintiff's [HOUSE], and started walking in the direction of [RSR]'s residence. [PK] - a headstrong-and-thickheaded Democrat that, unlike the plaintiff, proudly and publicly identifies with the Democratic Party - is clearly too headstrong-and-thickheaded to not even be willing to follow former First-Lady-Michelle-Obama's highly-popularized statement and common-sense advice:

   *"... when someone is cruel or acts like a bully, you don't stoop to their level. No, our motto is, when they go low, we go high."* ( 🌐 ). (The plaintiff has the entire aforementioned dialogue between the plaintiff and [PK] also recorded in an audio-recording.) Through the front-window of the front-room of [HOUSE], the plaintiff noticed [PK] approach [RSR]'s front-door, and approximately a minute later, walk away from [RSR]'s front-door towards his vehicle parked curbside at the plaintiff's property. The plaintiff then saw [PK] enter into his vehicle (parked at the curbside in front of the plaintiff's property) and drive away in such vehicle. On or about the time of {2011-08-30 16:15}, approximately 30 minutes after [PK] drove away from the curbside in his vehicle, the plaintiff noticed a [WCLE] police car abruptly arrive and park at the curbside in front of [HOUSE]. The plaintiff noticed the same [WCSD] - [WCSD-PP] - step out of such vehicle and approach the plaintiff's [FRONTDOOR]:

▷   **RECORDED CONVERSATION (⊢) BETWEEN THE PLAINTIFF AND THEN-[WCSD-PP]:**   **{2011-08-30 16:15} (~)**
▷   **〔 PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY 〕**

   〚 [WCSD-PP] GETS OUT OF THE VEHICLE AND BANGS VIOLENTLY ON THE [FRONTDOOR]. 〛  〚 PLAINTIFF OPENS THE [FRONTDOOR]. 〛

**[WCSD-PP]**      *HEY!*

**PLAINTIFF**      *Hey.*

**[WCSD-PP]**      *OK, LET ME EXPLAIN SOMETHING TO YOU, OK?!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**      *Sure.*

**[WCSD-PP]**      *YOU DO NOT GO TO OTHER PEOPLE'S PROPERTY! -*

**PLAINTIFF**      *Um, I'm sorry - I did not go onto another person's property!*

**[WCSD-PP]**      *YOU DIDN'T GO TO THAT HOUSE OVER THERE AND CUSS OUT A KID?! ... A FOURTEEN-YEAR-OLD?!*

**PLAINTIFF**      *I didn't do it! No, my brother was here, and he went over there and did that! I didn't do that!*

**[WCSD-PP]**      *WHEN?! ... WHERE'S YOUR BROTHER?!*

**PLAINTIFF**      *My brother just left! Um, I didn't do that - sir!*

**[WCSD-PP]**      *WHERE IS YOUR BROTHER?!*

**PLAINTIFF**      *um, my brother is gone to, um...*

**[WCSD-PP]**      *CALL HIM! CALL HIM AND TELL HIM TO COME BACK HERE!*

**PLAINTIFF**      *Ok - I can do that. I didn't do that!*
〘 [WCSD-PP] UNLAWFULLY DETAINS PLAINTIFF EVEN THOUGH HE KNOWS PLAINTIFF IS INNOCENT OF ANY-AND-ALL CRIME: 〙

**[WCSD-PP]**      *LEAVE THE DOOR OPEN!- CALL HIM AND TELL HIM TO GET BACK HERE!*
〘 PLAINTIFF WALKS DEEPER INTO [HOUSE] TO PICKUP PHONE IN-ORDER-TO CALL [PK]. 〙

**[WCSD-PP]**      *SO, YOU DIDN'T GO OVER THERE AT ALL?!*

**PLAINTIFF**      *No, Sir!*
〘 [WCSD-PP] CONTINUES TO UNLAWFULLY DETAIN PLAINTIFF EVEN THOUGH HE KNOWS PLAINTIFF IS INNOCENT OF ANY-AND-ALL CRIME: 〙

**[WCSD-PP]**      *OK - COME STAND OUT HERE! - STAND RIGHT HERE!* 〘 POINTS TO THE FRONTYARD - IN FRONT OF BUSHES 〙 *!*
〘 PLAINTIFF WALKS TOWARDS THE AREA POINTED-TO BY [WCSD-PP]. 〙

**[WCSD-PP]**      *HOLD ON! HOLD ON ONE SECOND!* 〘 STARTS RUNNING TO [RSR] AND HER LARGE-TEENAGE SON, [BR], ACROSS THE STREET 〙

〘 PLAINTIFF TIMIDLY TURNS AROUND AND WALKS TO [FRONTPORCH]. 〙

**[WCSD-PP]**      〘 TALKS TO [BR] 〙 *IS THIS THE GUY?!* 〘 POINTS AT THE PLAINTIFF 〙 *SID - COME OUT HERE FOR ME!* 〘 POINTS IN FRONT OF BUSHES 〙 *.*

〘 PLAINTIFF TURNS AROUND - AND WALKS IN FRONT OF BUSHES 〙

**[BR]**      〘 TALKS TO [WCSD-PP] 〙   [INAUDIBLE]

**[WCSD-PP]**      〘 TO [BR]: 〙 *OH, HIS BROTHER? OK.* 〘 WALKS BACK TOWARDS PLAINTIFF, WHILE YELLING AT THE PLAINTIFF: 〙 *CALL HIM ON THE PHONE!*

**[WCSD-PP]**      *WHY DID - WHY DID YOUR BROTHER HAVE A PROBLEM WITH THEM?!*

**PLAINTIFF**      *Oh, because she - I was going to tell you this yesterday - She had come over here - sir, I can tell you the entire story-*

| [WCSD-PP] | SHE CAME OVER HERE AND ASKED YOU TO CUT YOUR YARD AND YOUR GRASS AND TRIM YOUR BUSHES BECAUSE IT LOOKS LIKE SHIT! |
| --- | --- |
| PLAINTIFF | Well, well- |
| [WCSD-PP] | YOU MAKE THE WHOLE NEIGHBORHOOD - THE WHOLE NEIGHBORHOOD LOOKS GOOD - AND YOUR YARD LOOKS LIKE SHIT! |
| PLAINTIFF | No, Sir! Actually - |
| [WCSD-PP] | AND ALL YOUR NEIGHBORS ARE TIRED OF IT! ALL YOUR NEIGHBORS HAVE EVEN TOLD ME - THAT THEY'RE WILLING TO COME OVER HERE AND HELP YOU AND TRIM YOUR BUSHES FOR YOU - AND CUT YOUR GRASS - DO YOU UNDERSTAND THAT?! |
| PLAINTIFF | Oh - Oh - I didn't .. they didn't.. |
| [WCSD-PP] | EXPLAIN TO YOUR BROTHER THAT IT DOESN'T GIVE HIM A RIGHT - TO GO OVER THERE AND CUSS OUT A FOURTEEN-YEAR-OLD BOY! |
| PLAINTIFF | I did not tell him to do that! |
| [WCSD-PP] | OK, WELL THAT'S WHY YOU NEED TO GET HIM ON THE PHONE AND TELL HIM TO GET HERE NOW! |
| PLAINTIFF | I - I'm... I'm- |
| [WCSD-PP] | WHERE DOES HE LIVE?! |
| PLAINTIFF | He lives in - He lives um - He lives about, um - He lives in a - He lives just close-by-here, I mean about- |
| [WCSD-PP] | WHERE?! |
| PLAINTIFF | Um... in the Cedar Park area. |
| [WCSD-PP] | OK! WELL CALL HIM AND TELL HIM TO GET HERE! |
| PLAINTIFF | Right, he might not be there now, but I can, I can, I can leave a- I guess, I can- |
| [WCSD-PP] | WELL, HE NEEDS TO COME BACK HERE! |
| PLAINTIFF | Right... |
| [WCSD-PP] | AND THIS RIGHT HERE 〚 VIOLENTLY SLAMS A DOCUMENT ONTO THE PLAINTIFF'S [FRONTPORCH] WALL WHICH THE PLAINTIFF CONSIDERS TO BE VANDALISM AGAINST THE PLAINTIFF'S PROPERTY 〛 - THIS IS A CRIMINAL TRESPASS WARNING - OK?! WHICH MEANS THAT IF YOU STEP-FOOT ON THAT PROPERTY! - ONE FOOT COMES AND TOUCHES THEIR GRASS!... |
| PLAINTIFF | Right... |
| [WCSD-PP] | YOU GO TO JAIL! |
| PLAINTIFF | Well, I didn't, I didn't go over there! |

**[WCSD-PP]**   *I DON'T CARE!*

**PLAINTIFF**   *I didn't go over there!*

**[WCSD-PP]**   *I DON'T CARE - THEY DON'T WANT YOU OVER THERE, EITHER! OK?!*

**PLAINTIFF**   *Well, I've never gone there!*

**[WCSD-PP]**   *OK - THAT'S FINE, BUT IF YOU DO GO OVER THERE - YOU GOTO JAIL!*

**PLAINTIFF**   *But, let me* [INAUDIBLE]

**[WCSD-PP]**   *YOU DON'T NEED TO EXPLAIN ANYTHING! - I'M GOING TO DO THE EXPLAINING, OK?! THIS! THIS IS HOW IT WORKS! THEY DON'T WANT YOU ON YOUR PROPERTY BECAUSE- YOUR BROTHER WENT THERE AND CUSSED OUT THEIR 14-YEAR OLD SON!*

**PLAINTIFF**   *I under- ... But they've been... I didn't ask him to do that!*

**[WCSD-PP]**   *YOUR BROT- I DON'T CARE! BUT THEY DON'T WANT ANYONE FROM THIS HOUSE OVER ON THEIR PROPERTY! DO YOU UNDERSTAND THAT?! IF YOU STEP A FOOT ON THAT PROPERTY - YOU GOTO JAIL!*

**PLAINTIFF**   *Right ... I understand that!*

**[WCSD-PP]**   *AND YOU CAN GOTO JAIL FOR UP TO A 180 DAYS! OR A $2000 FINE OR BOTH!*

**PLAINTIFF**   *I understand that ... I understand that ... I understand that, Sir!*

**[WCSD-PP]**   *OK, I NEED YOUR SIGNATURE RIGHT THERE!*

**PLAINTIFF**   *But it's not me that did that!-*

**[WCSD-PP]**   *I DON'T CARE! I NEED YOUR SIGNATURE RIGHT HERE SAYING YOU UNDERSTAND - IF YOU GO OVER THERE, YOU GOTO JAIL. THAT'S ALL IT IS - A PIECE OF PAPER, SAYING, I UNDERSTAND IF I GO OVER THERE - I GOTO JAIL.*

**PLAINTIFF**   ⟦ FRANTICALLY LOOKS AT THE LEGAL DOCUMENT THAT [WCSD-PP] IS FORCING PLAINTIFF TO SIGN. ⟧   ⟦ CRIES IN DESPERATION: ⟧ *But I didn't do anything!*

**[WCSD-PP]**   *I DON'T CARE! THEY DON'T WANT YOU OVER THERE!*

**PLAINTIFF**   *Sir, but they came over to my house as well! I mean-*

**[WCSD-PP]**   *AND THEY KNOCKED ON THE DOOR AND THEY PROBABLY SAID, CAN I, CAN WE CUT YOUR GRASS, BECAUSE IT'S GETTING OUT OF CONTROL!*

**PLAINTIFF**   *No, No, No! They said - "if you don't get this done - I'm going to make sure that you're thrown out of this house!" Um, that's what she - I was going to - I told-*

**[WCSD-PP]**   *SO, YOUR BROTHER WENT OVER THERE AND ACTED LIKE AN ASS FOR NO REASON!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**    *No, No, No! I told the [HOA] about this, and the [HOA] told me to get a restraining order against them! They told me to get a - sir! This happened in 2010-*

**[WCSD-PP]**    *OK, WELL THEN HERE - THEN, YOU NEED TO SIGN THIS!*

**PLAINTIFF**    *No, No - how come, how come it doesn't work the other way! She came over here and she said, she was-*

**[WCSD-PP]**    *THEY CAN, THEY WON'T COME OVER HERE - I'M GOING TO EXPLAIN TO THEM THAT THEY CANNOT COME OVER HERE EITHER.*

**PLAINTIFF**    *Oh, Ok - so, are they going to sign one of these?*

**[WCSD-PP]**    *YES, I'LL GET THEM TO DO ONE TOO.*

**PLAINTIFF**    *I really appreciate that-*

**[WCSD-PP]**    *SO, SIGN!*

**PLAINTIFF**    *-Sir, I'll sign it if they're-*
⟦ [WCSD-PP] FRAUDULENTLY STATES THAT HE WILL GET [RSR] TO SIGN A [CTW] AGAINST PLAINTIFF'S PROPERTY BUT THIS NEVER HAPPENED:
⟧

**[WCSD-PP]**    *NO, YOU CAN SIGN IT RIGHT NOW! AND I CAN GO GET ANOTHER PIECE OF PAPER, AND I'LL GO GET THEM TO SIGN ONE.*

**PLAINTIFF**    *I understand ... but-*

**[WCSD-PP]**    *BUT NOTHING! HERE!* ⟦ HANDS PLAINTIFF A PEN TO SIGN WITH. ⟧

**PLAINTIFF**    *Right. Sir-*

**[WCSD-PP]**    *YOU WILL GET A COPY OF THIS - I WILL HAVE COPY OF THIS - THE SHERIFF'S OFFICE WILL HAVE A COPY - AND THEY WILL HAVE A COPY.*

**PLAINTIFF**    *I understand ... Right ...*

**[WCSD-PP]**    *OK - YOUR SIGNATURE NEEDS TO GO RIGHT THERE!*

**PLAINTIFF**    *But-*

**[WCSD-PP]**    *IT SAYS IT ALL RIGHT HERE! ... THIS IS THE EFFECTIVE DATE! THIS EFFECTIVE DATE!*

**PLAINTIFF**    *I wasn't the one that did the-*

**[WCSD-PP]**    *DOESN'T MATTER - IT SAYING - IT'S A CRIMINAL TRESPASS WARNING. IT'S SAYING IF YOU DO GO OVER THERE, YOU ARE TRESPASSING - AND YOU WILL GOTO JAIL! SO, AS LONG AS YOU DON'T GO OVER THERE, YOU'RE FINE. THIS IS JUST A PIECE OF PAPER.*

**PLAINTIFF**    ⟦ READS AND MUMBLES SOME OF THE TEXT OF THE [CTW] DOCUMENT. ⟧ ... *Yeah, I've never went over there.*

**[WCSD-PP]**    *OK, SO THEN YOU CAN SIGN IT, AND YOU'LL BE OK - AS LONG AS YOU DON'T GO OVER THERE.*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                    1696907690

| | |
|---|---|
| **PLAINTIFF** | *Right... but I just want to make sure, that's, that is the case, because-* |
| **[WCSD-PP]** | *THAT IS THE CASE! AND I'M A HAVE THEM DO THE SAME THING! SAYING THEY CANNOT COME TO THIS PROPERTY.* |
| **PLAINTIFF** | *Right... because I just want to make sure that, basically, yeah, I, I, I, I'll go ahead and sign it sir - but, I just want to explain that, the situation is they came over here. but, basically - the situation is that they came over here - um, over - over to my house-* |
| **[WCSD-PP]** | *YOU UNDERSTAND WHY, THOUGH?!* |
| **PLAINTIFF** | *Oh, I, I, I-* |
| **[WCSD-PP]** | *CAUSE YOUR YARD LOOKS LIKE SHIT! AND IT LOOKS LIKE THIS HOUSE IS ABANDONED.* |
| **PLAINTIFF** | *Sir! ... Sir - no, not, not-* |
| **[WCSD-PP]** | *LOOK YOU HAVE, LOOK YOU HAVE CRAP ALL OVER YOUR FRONT! ALRIGHT.* |
| **PLAINTIFF** | *I, but they- ...* |
| **[WCSD-PP]** | *YOUR BUSHES- ARE JUST OUT OF CONTROL! YESTERDAY, YOU HAD PAPERS ALL OVER YOUR DRIVEWAY!* |
| **PLAINTIFF** | *That wasn't mine!* |
| **[WCSD-PP]** | *YOUR BACKYARD LOOKS LIKE A DAMN FARM!* |
| **PLAINTIFF** | *But, that wasn't mine, Sir!* |
| **[WCSD-PP]** | *AND IT'S NOT, AND IT'S NOT YOUR - IT'S NOT GROWING THAT STUFF BACK THERE - THOSE ARE ALL WEEDS THAT ARE GROWING-* |
| **PLAINTIFF** | *Right, exactly! - I'm trying to-* |
| **[WCSD-PP]** | *AND IT LOOKS RIDICULOUS! YOU SAID THAT YOU'RE GROWING, YOU'RE NOT CUTTING - OR WATERING THE BACKYARD, CAUSE YOU WANT THE GRASS TO DIE, WELL, IT LOOKS HORRIBLE.* |
| **PLAINTIFF** | *Well, the thing is-* |
| **[WCSD-PP]** | *WELL, THAT'S WHY PEOPLE THINK THIS HOUSE LOOKS LIKE IT'S ABANDONED - NOBODY LIVES HERE!* |
| **PLAINTIFF** | *Well, sir - no, actually, no! To be honest with-* |
| **[WCSD-PP]** | *SO, I NEED YOU NEED YOU SIGN THIS, RIGHT THERE! AND THEN, I WILL GO OVER THERE! YOU CALL BROTHER AND TELL HIM TO GET BACK HERE!* |
| **PLAINTIFF** | *Ok, so, I just want to make sure that* [INAUDIBLE] |
| **[WCSD-PP]** | *YES! AND YOU WILL GET A COPY OF IT! I NEED YOUR SIGNATURE RIGHT THERE!* |
| **PLAINTIFF** | |

*Can I -* [INAUDIBLE]

**[WCSD-PP]**   *I GO HOME IN 20 MINUTES! SO, I WANT YOU TO SIGN IT! SO, I CAN GO OVER THERE AND HANDLE THAT - AND YOU CAN CALL YOUR BROTHER AND GET HIS ASS HERE! AND THEN, HE CAN SIGN ONE!*

**PLAINTIFF**   *ok -* 〚 CONTINUES TO READ/RE-READ THE [CTW] DOCUMENT 〛   〚 MUMBLES SOME OF THE TEXT OF THE [CTW] DOCUMENT 〛

**[WCSD-PP]**   *OK - CAN YOU, JUST SIGN IT!*

**PLAINTIFF**   〚 CONTINUES TO READ/RE-READ THE [CTW] DOCUMENT 〛   〚 MUMBLES SOME OF THE TEXT OF THE [CTW] DOCUMENT 〛

**[WCSD-PP]**   *YOU'RE, YOU'RE NOT GETTING IN TROUBLE FOR NOTHIN - IT'S JUST SAYING, IF YOU GO OVER THERE, YOU WILL GET IN TROUBLE. THEY'RE GOING TO SIGN THE SAME THING.*

**PLAINTIFF**   *And that's the same thing on the back?*

**[WCSD-PP]**   *YEAH - EVERYTHING IS THE SAME THING. YOU WILL GET A COPY-*

**PLAINTIFF**   *Sir, does this even apply to people who have not, who didn't even go there? what to, I-*

**[WCSD-PP]**   *YES, BECAUSE THEY DON'T WANT YOU ON THEIR PROPERTY! YES, BECAUSE THEY ARE AFRAID OF PEOPLE AT THIS RESIDENCE! CAUSE YOUR BROTHER WENT OVER THERE AND ACTED LIKE AN ASS TO A 14-YEAR-OLD. SO, I NEED YOUR SIGNATURE RIGHT THERE! ... NO, THAT'S NOT HIM - SO, JUST SIGN IT SO, I CAN GO OVER THERE AND...*

**PLAINTIFF**   *Ok...* 〚 CONTINUES TO READ/RE-READ [CTW] DOCUMENT 〛

**[WCSD-PP]**   *YOU'RE NOT ADMITTING TO BEING GUILTY OF ANYTHING! THIS IS JUST SAYING, I PROMISE - SID KODD - THAT I WILL NOT GO INTO THAT HOUSE! THAT'S ALL IT IS! I PROMISE I WON'T GO OVER THERE!*

**PLAINTIFF**   *Right...*

**[WCSD-PP]**   *AND I NEED YOU TO SIGN IT!*

**PLAINTIFF**   〚 STILL HESITANT TO SIGN SOMETHING THAT WAS COMPLETELY UNWARRANTED. NOTICES [JSP]'S PICKUP-TRUCK DRIVE AND PARK AT [JSP]'S RESIDENCE DRIVEWAY. 〛 *Can I ...?* 〚 APPROACHES [JSP] TO CONSULT WITH HIM ABOUT THIS ISSUE. 〛 *Joe?*

**[WCSD-PP]**   *WHY?! WHAT DOES HE HAVE TO DO WITH ANYTHING?!*

〚 [JSP] APPROACHES THE PLAINTIFF ENTERING THE PLAINTIFF'S PROPERTY AFTER BEING CALLED ON BY THE PLAINTIFF. 〛
〚 PLAINTIFF MOVES TOWARDS THE EDGE OF THE [DRIVEWAY] TO SPEAK WITH [JSP]. 〛
〚 PLAINTIFF STARTS TO QUESTION [JSP] IF [JSP] HAD ANY ISSUES IN THE WAY PLAINTIFF MAINTAINED [YARD]. 〛
〚 PLAINTIFF WAS STRONGLY UNWILLING TO SIGN THE UNWARRANTED [CTW]. 〛
〚 SO THE PLAINTIFF TRIED TO DO ANYTHING TO STALL OR CANCEL THE [CTW]. 〛

**PLAINTIFF**   〚 TO [JSP] 〛 *Well, I want to know if you,* [INAUDIBLE] *the yard.*

**[WCSD-PP]**

[INAUDIBLE] *THIRD PARTY. HE PROBABLY THINKS THAT YOUR YARD LOOKS LIKE SHIT TOO, JUST LIKE THE REST OF THE NEIGHBORHOOD!*

**PLAINTIFF**   〖 TO [JSP]: 〗 *, Sir, [INAUDIBLE]. I have not watered the yard, because first-of-all, there's a drought - stage 4 drought. I just wanted to know if you had a serious problem with the yard, they way it's... I try to keep it cut, I try to maintain it. I try my best to get it um-*

**[JSP]**   *Yeah... You do get a lot of weeds in my yard, but you know, what are you going to do. what can you do about it...*

**PLAINTIFF**   〖 TO [JSP]: 〗 *So, Ok. Oh, so-*

**[WCSD-PP]**   *AND ALSO GETS INSECTS INFESTED IN THEIR YARD.*

**[JSP]**   *Lots of Insects, I spray a lot-*

**[WCSD-PP]**   *LOTS OF SPIDERS. LOTS OF FLEAS.*

**PLAINTIFF**   *I can, I can do a, I can cardboard that entire area up - so that there's, it doesn't even grow back there. I can cardboard that area up.* **(n)**. *So, basically its just going to be cardboard placed on there, and then nothing will be-*

**[JSP]**   *Bugs will get under there man.*

**[WCSD-PP]**   *Why dont' you just get a rake - and rake up all the dead grass that's back there - so that there's no grass.*

**PLAINTIFF**   *I can-*

**[WCSD-PP]**   *That's what you're trying to do anyways...*

**PLAINTIFF**   *Right, right but actually, if you put cardboard, the grass will die...*

**[WCSD-PP]**   *The grass is dead. I went back there yesterday. Remember, you took me back there?*

**PLAINTIFF**   *Right, I understand. I understand.*

**[WCSD-PP]**   *So, get a rake, and just rake it up!*

**PLAINTIFF**   *So, but besides that - it's not like a serious problem, I mean if I get that taken care of, you think that the yard otherwise - I mean, um. The thing is, ike I said, I'm not-*

**[JSP]**   *Sid, you're a young man - you can* [INAUDIBLE].

**[WCSD-PP]**   *LOOK AT HIS YARD - LOOK AT HOW NICE AND BUSHES ARE TRIMMED... LOOK AT YOUR BUSHES!*

**[JSP]**   *And I work 12 to 13 hours a day.*

**PLAINTIFF**   *Right, Right, Right. I understand that-*

**[WCSD-PP]**

SIDDHARTH KODE   v.   WILLIAMSON COUNTY , ET AL.                    1696907690

|  | That's why all your neighbors are... You know what, I guarantee - if you were to trim these bushes and make em look good - everybody would leave you alone! |
|---|---|
| PLAINTIFF | Right... |
| [JSP] | J\*\*, J\*\* said he'd do it for free though. |
| [WCSD-PP] | Right, the neighbor next door - I talked to him yesterday. |
| [JSP] | Yes sir. |
| PLAINTIFF | Right... Really? |
| [WCSD-PP] | He even asked me, he said, "Can I even go over there and do it without you knowing." Well, I said, I wouldn't because he might freak-out and try to file charges that you damaged his trees. |

〖 PLAINTIFF DUE TO RELIGIOUS/CULTURAL BELIEFS/VALUES, WAS STRONGLY-OPPOSED TO THE CUTTING OF BUSHES/TREES 〗
〖 BUT PLAINTIFF, UNDER DURESS, WOULD COMPROMISE SUCH RELIGIOUS/CULTURAL BELIEFS/VALUES TO AVOID SUCH [CTW] 〗

| PLAINTIFF | Oh, Ok. Na, no, no - you know what - I don't mind him doing that - I mean, I don't mind him doing that. I don't mind him doing that at all |
|---|---|
| [JSP] | Ok. |
| [WCSD-PP] | Now, you understand, you just said that in front of me - so, when he comes and does that, you cannot call the Sheriff's office and say, someone broke your limbs of your bushes and try to file a report. |
| PLAINTIFF | Well... |
| [WCSD-PP] | Like you're doing with the kitty-litter. and the dog-poop. |
| PLAINTIFF | Well, the thing about the kitty-litter. well, the kitty-litter- |

〖 [WCSD-PP] ADMITS FOR FIRST TIME, THAT [JJB] HAD COMMITTED RACIALLY-MOTIVATED CRIMINAL-MISCHIEF/ILLEGAL-DUMPING CRIMES AGAINST PLAINTIFF: 〗

| [WCSD-PP] | I know who's doing the kitty-litter! I've already talked to her about it! |
|---|---|
| PLAINTIFF | Oh, she's not doing it? Oh, ok. |
| [WCSD-PP] | Well, she said she didn't do it. But... |
| [JSP] | I don't have a cat. |
| [WCSD-PP] | Yeah - No, it's on her side. Over the fence. |

〖 BY "IT", [WCSD-PP] IS REFERRING TO [JJB]'S LITTER-BOX THAT WAS USED AS HER WEAPON OF CRIMINAL-MISCHIEF/ILLEGAL-DUMPING 〗

| PLAINTIFF | Right, right, right... |
|---|---|

⟦ AMAZINGLY, [JSP] ADMITS TO HIS KNOWLEDGE OF [JJB]'S VANDALISM OF PLAINTIFF'S PROPERTY, SIGNIFYING THAT THE- ⟧

⟦ -CRIMINAL-CONSPIRACY,RACKETEERING-ENTERPRISE AGAINST PLAINTIFF INCLUDED NOT ONLY [JJB],[RSR],[WCLE], BUT ALSO [JSP]: ⟧

**[JSP]**          *Sid, I would never do anything malicious like that to you, man - I'm not* [1NAUDIBLE]

⟦ TO THE CONTRARY, PLAINTIFF WOULD CONTINUE-TO-SUFFER OVER DECADE OF MALICIOUSNESS FROM [JSP&KAP],[RSR],[WCLE]. ⟧

**PLAINTIFF**      *Oh, no, no, no!*

**[JSP]**          *I'm not thrilled with the bugs and stuff, and...*

**PLAINTIFF**      *Oh, no, no, no! I wasn't accusing you! -*

**[JSP]**          *I know - I understood - I'm just saying... You're ok - You've never done anything to me... So, I would never do anything to you.*

⟦ [JSP] ADMITS THAT THE MANNER-IN-WHICH PLAINTIFF MAINTAINS PROPERTY IS NOT HARMFUL. ⟧

**PLAINTIFF**      *No, no, no! ... I know, I know ... Yeah, I was just wondering, because-*

⟦ [WCSD-PP] FRAUDULENTLY STATES THAT [PK] LIVES AT PLAINTIFF'S PROPERTY: ⟧

**[WCSD-PP]**      *So, the main reason I'm here today - is his brother came home - and went over there, and cussed that little boy out.*

**PLAINTIFF**      *Well, actually...*

**[WCSD-PP]**      *Said that he was going to get a lawyer, and have them sued. And all kinds of stuff, and went off on that kid!*

**PLAINTIFF**      *Well, Well, Well the, well-*

⟦ [WCSD-PP] ADMITS TO [RSR]'S RACIALLY-MOTIVATED TERRORISTIC-THREAT/ASSAULT AGAINST PLAINTIFF: ⟧

**[WCSD-PP]**      *HOLD ON, HOLD ON - SO,* ⟦ POINTING AT [RSR] ⟧ **SHE SAID THAT SHE WAS GOING TO COME HOME AND WHOOP WHOEVER'S ASS WAS OVER HERE!**

**PLAINTIFF**      *Right, right, right - no, but-*

⟦ [WCSD-PP ] ADMITS TO ILLEGALLY COERCING PLAINTIFF TO SIGN [CTW] BECAUSE OF [RSR]'S THREAT-OF-VIOLENCE: ⟧

**[WCSD-PP]**      *SO, WHAT I'M TRYING TO DO, FOR THE PAST 15 MINUTES - IS TO GET HIM TO SIGN A CRIMINAL-TRESPASS-WARNING-*

**PLAINTIFF**      *I didn't do that! I didn't go over there, sir!*

**[WCSD-PP]**      *I UNDERSTAND - BUT THEY DON'T WANT ANYBODY FROM THIS HOUSE ON THEIR PROPERTY!*

**PLAINTIFF**      *I understand that, um-*

**[WCSD-PP]**      *ALL THIS IS - SHHH! - I'M TRYING TO EXPLAIN TO HIM - AND GET YOU TO TO UNDERSTAND, ALL THIS IS - IS A SHEET OF PAPER, SAYING, I PROMISE, NOT TO GO TO THAT HOUSE - IF I GO TO THAT HOUSE, I'M GOING TO GOTO JAIL-*

| | |
|---|---|
| **PLAINTIFF** | *Well yeah-* |
| **[WCSD-PP]** | *THAT'S ALL IT IS!* |
| **PLAINTIFF** | *I just want to make sure that's the only thing it is, because I don't want to be signing -* |
| **[JSP]** | *He wouldn't tell you otherwise...* |
| **[WCSD-PP]** | *YOU CAN READ IT! YOU CAN READ IT!* |
| **PLAINTIFF** | *I wouldn't want to be signing something that I didn't know-* |
| **[JSP]** | {INDECIPHERABLE} |

〖 [WCSD-PP] FRAUDULENTLY PRETENDS THAT HE WOULD GET [RSR] TO SIGN [CTW] FOR PLAINTIFF'S PROPERTY: 〗

| | |
|---|---|
| **[WCSD-PP]** | *I'M GOING TO HAVE - LIKE I TOLD YOU, I'M A HAVE THEM DO THE SAME THING!* |
| **PLAINTIFF** | *Right...* |
| **[WCSD-PP]** | *They cannot come over to you-* |
| **PLAINTIFF** | *If that's the case, then I'm perfectly fine with that -* |
| **[WCSD-PP]** | *TOLD YOU THAT 10, 15 MINUTES FOR THAT!-* |
| **PLAINTIFF** | *Well yeah, I understand that - but as long as I can get to their - if I can get a copy of their -* |
| **[WCSD-PP]** | *SIGN IT! - SO THAT I CAN GO OVER THERE AND FILL IT OUT -* |
| **PLAINTIFF** | *Just to, just to let you know - just to give you some background here -* |
| **[WCSD-PP]** | *GOOD LORD, WE DON'T NEED YOUR BACKGROUND, SID!* |
| **[JSP]** | *I KNOW WHAT'S GOING ON, SID!... I'VE* {INAUDIBLE} |
| **PLAINTIFF** | *No, I understand, but I, I know but-* |
| **[WCSD-PP]** | *WE DON'T NEED BACKGROUND!* |
| **PLAINTIFF** | *I understand. Like last year-* |
| **[WCSD-PP]** | *I WANT TO GO HOME!* |
| **PLAINTIFF** | *I understand-* |

〖 [JSP], ACTING UNDER-COLOR-OF-LAW AND IN-CONSPIRACY-WITH [WCSD-PP],[RSR], UNLAWFULLY COERCES PLAINTIFF TO SIGN SUCH ILLEGAL

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET  AL.                                                1696907690

[CTW]: 〗

**[JSP]**          *DO IT - GO AHEAD AND SIGN THAT FOR HIM!*

**[WCSD-PP]**      *In 15 minutes, I go home!*

**PLAINTIFF**      *Got it, Got it, but... I wanted to-*

〖 [JSP], ACTING UNDER-COLOR-OF-LAW AND IN-CONSPIRACY-WITH [WCSD-PP],[RSR], CONTINUES TO UNLAWFULLY COERCE PLAINTIFF TO SIGN SUCH ILLEGAL [CTW]: 〗

**[JSP]**          *LET THE MAN GO HOME!*

**PLAINTIFF**      *I'm sorry, I'm sorry.*

**[WCSD-PP]**      *And you still need to call your brother - so I can get him back here, so I can get him to do the same thing.*

**PLAINTIFF**      *Got it, Got it, Got it.*

**[JSP]**          *I know B\*\*'s a big boy, but he's only 12 or 13.*

**PLAINTIFF**      *Right, I didn't! I didn't ask-*

**[WCSD-PP]**      *He's like 14 years* [INAUDIBLE]..

**PLAINTIFF**      *-Sorry, I didn't ask my brother to do that - ok, all I said was, she had come over here-*

〖 [JSP] ABUSIVELY INTERRUPTS PLAINTIFF, ONLY ALLOWING [WCSD-PP]'S PURELY-RACIST, FRAUDULENT NARRATIVE AGAINST PLAINTIFF TO BE HEARD: 〗
〖 [JSP], ACTING UNDER-COLOR-OF-LAW AND IN-CONSPIRACY-WITH [WCSD-PP],[RSR], CONTINUES TO UNLAWFULLY COERCE PLAINTIFF TO SIGN SUCH ILLEGAL [CTW]: 〗

**[JSP]**          *YOU SIGN THAT YET?! SIGN IT FOR HIM!* 〖 LAUGHS OUT LOUD 〗 *SIGN IT FOR HIM!... GO PUT IT UP AGAINST YOUR-*

**[WCSD-PP]**      〖 SPEAKING INTO THE POLICE RADIO: 〗 *Yeah probably, I wouldn't doubt it.*

**[JSP]**          [INAUDIBLE] *your handwriting.*

**PLAINTIFF**      *Person...* 〖 TRIES TO READ WHERE PLAINTIFF WOULD NEED TO SIGN 〗

**[WCSD-PP]**      〖 SPEAKING INTO THE POLICE RADIO: 〗 *I'll wait for him, so that I can have a little conversation with him right here!*

**[JSP]**          *Signature of persons warned - that's you. Right here...*

**PLAINTIFF**      〖 MUMBLES 〗 *Signature of persons warned.*

**[WCSD-PP]**      *The one right above that signature. Right there.*

〖 PLAINTIFF RELUCTANTLY SIGNS THE [CTW] DUE TO THE EFFECTIVE COERCION TACTICS OF [WCSD-PP], [JSP], [RSR] 〗
〖 PLAINTIFF HANDS THE SIGNED DOCUMENT BACK TO [WCSD-PP]. 〗

**PLAINTIFF** *Right, the reason um, the reason, um, the reason I wanted to ask you is that-*

**[WCSD-PP]** *How do you spell your last name? Is it K-O-D-D?*

**PLAINTIFF** *K-O-D. Well, you had it right there, yeah*

**[WCSD-PP]** *So, that's it right there?*

**PLAINTIFF** *Well, actually-* 〖 LOOKS AT DOCUMENT AGAIN 〗

**[WCSD-PP]** *DUDE, HOW DO YOU SPELL YOUR NAME?! DO YOU HAVE AN ID CARD?*

**PLAINTIFF** *Yeah, I have an ID. It's E at the end. It's E.*

**[WCSD-PP]** *Ok, Let me see your ID.*

**PLAINTIFF** *Sir, I-*

**[JSP]** *I'm* [INDECIPHERABLE]

**PLAINTIFF** *Ok, I Appreciate, it.*

〖 PLAINTIFF ENTERS INTO [HOUSE] TO GET ONE OF PHOTO-ID CARDS. 〗
〖 PLAINTIFF COMES OUT OF [HOUSE] WITH A PHOTO-ID CARD. 〗
〖 PLAINTIFF HANDS THE PHOTO-ID CARD TO [WCSD-PP]. 〗

**[WCSD-PP]** *You don't have driver's license or nothing like that?*

**PLAINTIFF** *it's, I - can't, deep within my- I can't even...*

**[JSP]** *But yeah, he used to look like that- I saw him...*

**[WCSD-PP]** *Used to?*

**[JSP]** *He did - he used to have short hair.*

**PLAINTIFF** *Yeah, yeah - I did, I did.*

**[JSP]**
**[WCSD-PP]**
**PLAINTIFF** *But sir, I just wanted to explain to you - I just wanted to tell you that - she came over here, like last year - you didn't know that? Like she came-*

**[JSP]** *I know - I did -*

**PLAINTIFF** *And she cussed me out-*

**[WCSD-PP]**   *I'm going to go over there and give them one, ok?*

**PLAINTIFF**   *Alright, I appreciate that, sir.*

**PLAINTIFF**

**[JSP]**   *I know, I know.*

**[WCSD-PP]**   *Ok.*

**PLAINTIFF**   *So, all I did was - tell my brother that, my brother went over there... I asked him not to go over there.*

**[WCSD-PP]**   [INAUDIBLE]

**[JSP]**
**[WCSD-PP]**
**PLAINTIFF**   *Um... I told my, -*

**[WCSD-PP]**   [INAUDIBLE]

**PLAINTIFF**   *Oh, well, because I reported the fact that something was stolen from the backyard - did - are you officer Parks?*

〖 [WCSD-PP] SMILES (☺)  IN RECOGNITION AS HE HAD UNPROFESSIONALLY HUNG-UP THE PHONE ON THE PLAINTIFF. 〗

**PLAINTIFF**   *ALI i did was tell him about the - the - and that's all I did...*

**[JSP]**   [INAUDIBLE]

**PLAINTIFF**   *Yeah, yeah -*

**[JSP]**   [INAUDIBLE].

**PLAINTIFF**   *And so, all I did was tell my brother that - and then basically,* [INAUDIBLE] - 〖 RECEIVES A CALL ON PHONE. 〗 〖 PICKS UP THE CALL 〗 *Hello, this is um, Sid.*

〖 INAUDIBLE SPEECH OF [PK] 〗

**PLAINTIFF**   *Yeah, yeah yeah - you need to get over here right now - these people are complaining to um, they're complaining to... they want you sign a trespass warning, so that you won't ...*

〖 INAUDIBLE SPEECH OF [PK] 〗

**PLAINTIFF**   *Yeah, yeah yeah - ok, so, you're coming over here - ok, try to* [INAUDIBLE], *ok, then bye.*

**[JSP]**   *Waitin on* [INAUDIBLE].

**[JSP]**   [INAUDIBLE]

**PLAINTIFF**   No, he's was [INAUDIBLE] *just here, So, ..*

**[JSP]**   [INAUDIBLE]

**PLAINTIFF**   *Ok, sir - so I just wanted to make sure- Um- Deputy over here was telling me the whole neighborhood is thinking that my yard is - this one - and everyone's against me - is this true?*

**[JSP]**   *We're not, We're not thrilled with* [INAUDIBLE] *You haven't been watering...*

**PLAINTIFF**   *I understand, but sir there's a drought. A Stage-4 Drought!*

**[JSP]**   *Even when its started* [INAUDIBLE] *... See, you gotta understand - see all these weeds that you have in your yard - they get into my yard - see my yard -* [INAUDIBLE]

**PLAINTIFF**   *Is there anything that I could do, for example if I could -*

**[JSP]**   *Yeah, I'll show you what you can do - it's called "Weed-n-Feed". And everytime I do my, I'll* [INAUDIBLE] *for you to let you know.*

**PLAINTIFF**   *Got it - ok, so, basically-*

**[JSP]**   *I know you're a young man - you don't want to do this - I know it's not your highest priority-*

**PLAINTIFF**   *Right... Right...*

**[JSP]**   *I understand that... How old are you, Sid? ... Twenty-Four or something?*

**PLAINTIFF**   *um, I'm - how did* [INAUDIBLE]

**[JSP]**   [INAUDIBLE]

**PLAINTIFF**   *Right ...*

**[JSP]**   *If I my own own house, it wouldn't be my highest concern either...*

**PLAINTIFF**   *Right, Right...*

**[JSP]**   [INAUDIBLE] *things better to do... Next time, Next time when I'm going to put Weed-n-Feed down,*

**PLAINTIFF**   *Right,*

**[JSP]**   [INAUDIBLE]

**PLAINTIFF**   *Right,*

**[JSP]**   [INAUDIBLE] *I would never do anything malicious towards you, Sid.*

**PLAINTIFF**   *No, no, no, I'm not accusing you -*

**[JSP]**  *I know you're not – I just wanted to let you know.*

**PLAINTIFF**  *I know that I'm good with you, man. No, I just wanted to make sure that I'm ok with* [INAUDIBLE]

**[JSP]**  *They told me – and see, just because you're quiet, and you don't talk to a lot of people ... they don't don't – they don't know what to think about it.*

**PLAINTIFF**  *. Yeah...*

**[JSP]**  [INAUDIBLE] [INAUDIBLE]

**PLAINTIFF**  *Right...*

**[JSP]**  *But um, you know, when we don't have a drought, and you ...* [INAUDIBLE] *I'll let you know when to do – when to put it down and-*

**PLAINTIFF**  *But, sir – I mean Joe, sorry – is there a – is there a – I'm* [INAUDIBLE] *kind of an environmentalist –*

**[JSP]**  *That's alright... That's fine*

**PLAINTIFF**  *Is there an environmentally-friendly way of doing it, without using fertilizer? I mean– is there a way, um-*

〚 THEN-NEIGHBORING-RESIDENT OF 〖773 KINGFISHER LANE, LEANDER, TX 78641〗 [773KLLTX78641] – [AJC] – WALKS TOWARD PLAINTIFF 〛
〚 [JSP] GREETS [AJC], ALTHOUGH FROM THE PLAINTIFF'S UNDERSTANDING, FOR THE VERY FIRST TIME: 〛

**[JSP]**  〚TO [AJC]:〛 *What's going on?*

**[AJC]**  〚TO PLAINTIFF:〛[INAUDIBLE]... *She was* [INAUDIBLE] *... All kinds of bullshit -* [INAUDIBLE]

**PLAINTIFF**  *Really!*

**[AJC]**  *[She was getting] into my yard – [and get right] into my face – and said, "DON'T YOU EVER F-UP!", Cause B\*\* likes to come over there, and screw around, and ride his bike in front of the house and stare... We said, we were going to call the cops– So, she stormed in our house– ran right into my wife's face – on my lawn – and said, "DON'T YOU EVER – COME INTO MY* [INAUDIBLE]*" So, whatever she just accused you of - she did to me!*

**PLAINTIFF**  〚 LOOKS STUNNED 〛 *You're kidding me!*

**[AJC]**  *No! ... So, I'll back you ALL DAY LONG! -*

**PLAINTIFF**  *I appreciate it, Sir! What's your name?*

**[AJC]**  \*\*\*\*.

**PLAINTIFF**  \*\*\*\*.

**[AJC]**  *I'm not going to take it anymore. They've been screwing around with us. Them over there* 〚 POINTS AT [780KLLTX78641] TOWARDS [JH&SH] 〛 *screwing around with us - and I will back you ALL DAY LONG!*

〚 PLAINTIFF TRIES TO EXPLAIN THAT PLAINTIFF HAS BEEN LIVING UNDER EXTREME-STRESS OF [RSR]'S TERROR FOR SEVERAL YEARS: 〛

SIDDHARTH KODE   v.   WILLIAMSON COUNTY , ET AL.                    1696907590

---

**PLAINTIFF**   *Sir, you have just - you have - you have just taken a huge load off my* [INAUDIBLE] *- I have been living in- sort of in* [INAUDIBLE]-

**[AJC]**   *I haven't even seen you!... How have* [INAUDIBLE]*?! I've been living here 2 years and I hadn't even seen you yet!*

**[JSP]**   ⟦LAUGHS⟧ [INAUDIBLE]

**PLAINTIFF**   *Sir, please, Is there anyway you can explain this-*

**[AJC]**   *I'll tell em! I'll tell em! ...* [INAUDIBLE] *... yeah, because she did the same thing to us!* [INAUDIBLE]

**PLAINTIFF**   *My brother is going to get here right now, I mean, basically-*

**[JSP]**   *His brother's in trouble for* [INAUDIBLE]

**[AJC]**   *Oh, I don't* [INAUDIBLE]

**PLAINTIFF**   *She came over here!*

**[JSP]**   [INAUDIBLE]

**[AJC]**   *Yeah... Yeah... Yeah...*

**PLAINTIFF**   *She punched?*

**[AJC]**   *No, she didn't punch, But she walked right into my - she was in my wife's face - right on my lawn...* [INAUDIBLE] *... Yeah, I can tell ya - They go over there on purpose, and "Get off the property!" and-*

**PLAINTIFF**   *It's just them?!*

**[JSP]**   *Yeah.*

**[AJC]**   [INAUDIBLE]*, "Do not talk to those kids! ... Stay - away - from the kids!"*

**[JSP]**   *No reason to bother them.* [INAUDIBLE]

**[AJC]**   *B\*\* likes to ride the bike up and down...* [INAUDIBLE]

**[JSP]**   *They're trying - they're trying to egg-it-on!*

**PLAINTIFF**   *I thought I was the only one that was being picked on here... I mean-*

**[JSP]**   *No...* [INAUDIBLE]

**[AJC]**   *No... We don't even come out the front! Because it's just not worth it!*

**[JSP]**   *That's what it's gotten to.* [INAUDIBLE]

**[AJC]**        *We're just, I'm just, counting the days to - cause, I know I'm going to last in my house longer than they're going to last in their house.*

⟦ [JSP] LAUGHS. PLAINTIFF LAUGHS. ⟧

**PLAINTIFF**     *Sir, if you can just wait here [until]-*

**[AJC]**        *Yeah, I'll [???]-*

- 
- 
- 

**[[[TRANSCRIPT INCOMPLETE: TO BE COMPLETED]]]**

- 
- 
- 

⟦ [PK] ARRIVES BACK AT SCENE IN HIS VEHICLE AND PARKS HIS VEHICLE, NEARBY, ON CURBSIDE OF THE STREET. ⟧
⟦ BOTH [WCSD-PP] AND [RSR] (WITH [BR] BEHIND [RSR]), WHO IS ACROSS THE STREET, WALK MENACINGLY/ANGRILY TOWARDS [PK]: ⟧

**[WCSD-PP]**      *WHY DID YOU GO OVER THERE AND CUSS OUT A 14-YEAR-OLD BOY?!*

**[PK]**         *I did not cuss-out any [???], ok! [???]*

**[WCSD-PP]**      *LET ME GET YOUR DRIVER'S LICENSE!*

⟦ [PK] TAKES OUT HIS WALLET FROM HIS POCKET, AND THEN HIS DRIVER-LICENSE FROM HIS WALLET. ⟧
⟦ [RSR] CONTINUES TO YELL RACIST THREATS/SLURS IN BACKGROUND, AS [WCSD-PP] IS INTERROGATING [PK]: ⟧

**[RSR]**        *[???]! [???]!*
⟦ [PK] YELLS AT [RSR] TO GET AWAY FROM HIM: ⟧

**[PK]**         *HEY, SHUT-UP AND GO OVER THERE! I'M NOT TALKING TO YOU!*

**[RSR]**        *[???]! [???]!*

⟦ [WCSD-PP] LUNGES AT [PK], STARING DIRECTLY INTO [PK]'S EYES, HIS FACE, ONLY AN INCH-OR-TWO FROM [PK]'S FACE: ⟧
⟦ EVERY BRAZENLY RACIST ACTION UNDERTAKEN BY [WCSD-PP] AGAINST PLAINTIFF,[PK] SHOWS HE DOES NOT CARE IF HE OR HIS EMPLOYER THE [WCSO], IS ACCUSED OF RACISM. ⟧

**[WCSD-PP]**      *HEY! SHUT YOUR MOUTH! TURN AROUND AND SHUT YOUR MOUTH!*

**[RSR]**        *[???]! [???]!*

**[WCSD-PP]**      *I WILL TAKE CARE OF IT!*

⟦ [PK] REMAINS MOTIONLESS AND DOCILE, OBEYING [WCSD-PP]'S ORDERS: ⟧

**[PK]**        *Ok, please do!*

**[RSR]**       *[???]! [???]!*

**[WCSD-PP]**   *Ma'Am, go back to your property, or be quiet, ok?*

⟦ [RSR], ACTING IN EXTREME-RECALCITRANCE, COMPLETELY DISOBEYS [WCSD-PP]'S LACKLUSTER ORDERS AGAINST [RSR] AND CONTINUES TO YELL RACIST THREATS/SLURS AT [PK], PLAINTIFF: ⟧

**[RSR]**       *[???] AT MY SON!*

**[WCSD-PP]**   *MA'AM! I'm handling it!*

**[RSR]**       *I KNOW, I'M SORRY! [???]!*

**[WCSD-PP]**   *So, go away! ... go away.*

⟦ [RSR], ACTING IN EXTREME-RECALCITRANCE, CONTINUES TO FRAUDULENTLY STATE THAT PLAINTIFF ENTERED INTO HER PROPERTY: ⟧
⟦ [RSR], ACTING IN EXTREME-RECALCITRANCE AND RESTRAINED-JUBILATION(φ), USES HOMOPHOBIC-SLUR AT PLAINTIFF, [PK]: ⟧

**[RSR]**       ***IT'S BOTH HIM AND HIS WACKY WIFE!***

⟦ [RSR] TURNS-AROUND AND LAUGHS ALONG WITH HER WHITE-AMERICAN CO-CONSPIRATORS [JSP], [JH&SH] (WHO ARE ALSO LAUGHING) – ⟧
⟦ –WITH ALL OF THESE WHITE-AMERICAN INDIVIDUALS COMPLETELY ENJOYING THEIR VIOLATION OF PLAINTIFF'S RIGHTS(φ): ⟧

**[WCSD-PP]**   *go away.*

**[PK]**        *Ok, So, let me explain what happened. So, I went over there and knocked on the door. And I told him, his mom- I asked him if his mom was home. He said no, his mom is not there. I said, your mom has been pestering my brother, and I want you tell her, if she doesn't stop-*

⟦ [WCSD-PP] IGNORES [PK]'S STATEMENTS, AND WITH A MALICIOUS SMILE ON HIS FACE, HANDS-OVER TO PLAINTIFF A [CTW] WHICH [RSR] REFUSED TO SIGN: ⟧

**[WCSD-PP]**   *She refused to sign it!*

⟦ PLAINTIFF WAS ABSOLUTELY SHOCKED AND INDIGNANT, FEELING LIKE A CHUMP FOR HAVING SIGNED SUCH [CTW] AGAINST [RSR]'S PROPERTY: ⟧

**PLAINTIFF**   *I ...!*

⟦ [WCSD-PP] WITH A MALICIOUS SMILE ON HIS FACE, MOCKINGLY JUSTIFIES HIS UNBELIEVABLY-RACIST ACTIONS AGAINST PLAINTIFF: ⟧

**[WCSD-PP]**   *It's the same thing! It's still good!*

⟦ PLAINTIFF FOOLISHLY ASKS IF PLAINTIFF'S SIGNATURE OF [CTW] ISSUED TO [RSR] CAN BE CANCELLED-OUT: ⟧

**PLAINTIFF**          *Sir, can I refuse to sign it - mine, as well?!*

〖 AS FUTURE INCIDENTS WOULD REVEAL, THIS PROMISE MADE BY [WCSD-PP] IS PURELY-RACIST FRAUD, AS [RSR] DID CRIMINALLY-TRESPASS MULTIPLE TIMES, BUT WAS NEVER EVEN CHARGED FOR IT: 〗

**[WCSD-PP]**          *It's the same thing! ... Sid, it means the same thing! ... If she comes to your property, she goes to jail.*

**PLAINTIFF**          *I understand, but, but- you got me to sign it! i didn't- she said refused!*

〖 [WCSD-PP], WITH A MALICIOUS SMILE ON HIS FACE, CONTINUES TO TOY-AROUND-WITH AND MOCK PLAINTIFF FOR BEING A CHUMP: 〗

**[WCSD-PP]**          *RIGHT, YOU ACTUALLY SIGNED IT! SHE WOULD NOT SIGN IT!*

〖 PLAINTIFF CRIES OUT IN ABSOLUTE INDIGNATION: 〗

**PLAINTIFF**          *I didn't want to sign ... ! Sir!!!*

**[WCSD-PP]**          *BUT YOU SIGNED IT! IT DOESN'T MATTER!*

〖 PLAINTIFF CONTINUES TO CRY-OUT IN ABSOLUTE INDIGNATION: 〗

**PLAINTIFF**          *Sir, you forced me to sign it!*

〖 [WCSD-PP] THREATENS PLAINTIFF THAT HE DOES NOT WANT TO HEAR ANYMORE ABOUT PLAINTIFF'S COMPLAINT: 〗

**[WCSD-PP]**          *SID!*

〖 [PK] TELLS PLAINTIFF TO BE QUIET, NOT REALIZING [WCSD-PP] USED RACIAL-INTIMIDATION TO COERCE PLAINTIFF TO SIGN [CTW]: 〗

**[PK]**          *Hey, calm down.*

〖 [WCSD-PP] HANDS A [CTW] FOR [PK] TO SIGN AGAINST [RSR]'S PROPERTY : 〗

**[WCSD-PP]**          *SAME THING ... I NEED YOU TO DO THE SAME THING! ... THAT'S ALL IT IS!*

〖 PLAINTIFF CONTINUES TO QUIETLY CRY IN SHOCK AND DISBELIEF THAT [WCSD-PP] COERCED PLAINTIFF TO SIGN SUCH [CTW]: 〗

**PLAINTIFF**          *He forced me to sign it!*

〖 MULTIPLE OTHER WHITE-AMERICAN [WCSD]S - ONE MALE, ONE FEMALE - ARRIVE AT SCENE IN THEIR POLICE-VEHICLES: 〗

〖 [PK] EXPLAINS THAT HE CALLED 9-1-1 BECAUSE HE THOUGHT PLAINTIFF WAS IN DANGER: 〗

**[PK]**          *I called in 9- ... I called 9-1-1 because, I thought someone was doing-*

〖 [WCSD-PP] IGNORES [PK]'S STATEMENTS, AND QUESTIONS OTHER POLICE-OFFICERS - [WCSD-JD-24],[WCSD-JD-25] - AT THE SCENE: 〗

**[WCSD-PP]**          *WHERE DID THEY GO?!*

〘 [AJC], WHO HAD BEEN STANDING NEXT TO PLAINTIFF, EXPLAINS [RSR] AND [BR] WENT TO THEIR CO-CONSPIRATORS [JH&SH]'S PROPERTY: 〙

**[AJC]**          *They went over to that house - to hang out-*

〘 [WCSD-PP] LOUDLY INTERRUPTS [AJC] AND SHOUTS HIS RACIST AND FRAUDULENT-NARRATIVE IN-FRONT-OF ALL WITNESSES AT SCENE, WHILE POINTING AT PLAINTIFF: 〙

〘 IN A REMARKABLE FEAT OF OUTRAGEOUSLY-RACIST FRAUD, [WCSD-PP] TAKES [RSR]'S RACIST-THREATS OF INTIMIDATION/INTERFERENCE/DISORDERLY-CONDUCT/BLACKMAIL AGAINST PLAINTIFF - SPECIFICALLY [RSR]'S MULTIPLE THREATS OF FORECLOSURE/EVICTION AGAINST PLAINTIFF — AND FRAUDULENTLY SHOUTS IN FRONT OF ALL OTHER WITNESSES (AND HIS POLICE-RADIO) AS IF [PK] ISSUED THAT SAME THREAT TO [RSR] AND/OR [BR]: 〙

**[WCSD-PP]**      *LIKE I EXPLAINED TO HIM! YOU HAVE NO RIGHT, TO GO TO ANYBODY'S PROPERTY AND TELL EM, THAT YOU ARE GOING TO TAKE THEIR HOUSE!*

**[PK]**          *Oh! No! No! No! I didn't say that! I didn't say that!-*

〘 [WCSD-PP] RUDELY INTERRUPTS [PK] AND CONTINUES SHOUTING HIS RACIST AND FRAUDULENT-NARRATIVE AGAINST PLAINTIFF, [PK]: 〙

〘 [WCSD-PP] FRAUDULENTLY STATES [PK] SCARED [BR] WHEN [BR] WAS MALICIOUSLY SMILING/LAUGHING ALONGSIDE [RSR],[JSP],[JH&SH] THROUGHOUT MOST OF THIS INCIDENT(φ): 〙

**[WCSD-PP]**      *HOLD ON! HOLD ON! YOU SCARED THE SHIT OUT OF A FOURTEEN-YEAR-OLD-BOY, BECAUSE YOU WENT OVER THERE AND WHATEVER YOU SAID TO EM! ... I DON'T CARE WHAT YOU SAID!*

**[PK]**          *But what I did that because, my mother had told me to go over [???] my brother and said, hey! why don't you just go talk to the neighbor, and-*

〘 [WCSD-PP] CONTINUES FRAUDULENT NARRATIVE THAT IT WAS FERTILIZER, WHEN [WCSD-SP] HAD ALREADY IDENTIFIED WITH BEYOND 100% CERTAINTY, AS CAT-LITTER: 〙

**[WCSD-PP]**      *I TALKED TO HIM ON THE PHONE, AND HE SAID SOMEONE THREW KITTY-LITTER IN THE YARD. AND I SAID WELL YOU KNOW WHAT: MAYBE YOU SHOULD GO TALK TO YOU NEIGHBOR AND SEE IF THEY PUT FERTILIZER DOWN - AND FERTILIZE YOUR YARD!*

**[PK]**          *Well, he just said- he said, go talk to the neighbor- so, I went- ok, let me-*

〘 [WCSD-PP] CONTINUES TO COMPLETELY DISREGARD [PK]'S STATEMENT AND RACISTLY CONTINUES TO SPEAK-OVER [PK]: 〙

〘 [WCSD-PP] STILL DOES NOT BELIEVE HOW PLAINTIFF AND/OR [PK] COULD BE OWNER OF PROPERTY WITHIN SUCH WHITE-NEIGHBORHOOD: 〙

**[WCSD-PP]**      *DO YOU LIVE HERE?! OR IS IT JUST HIM?!*

**[PK]**          *No- Just him.*

〘 [WCSD-PP] STILL DOES NOT BELIEVE HOW PLAINTIFF AND/OR [PK] COULD BE OWNER OF PROPERTY WITHIN SUCH WHITE-NEIGHBORHOOD: 〙

**[WCSD-PP]**      *OK, WELL, WHO OWNS THIS HOUSE?!*

**[PK]**          *It's in his name and my mom's name.*

〘 [WCSD-PP] OUTRAGEOUSLY JUSTIFIES ALL OF THE PREDATORY, RACIST ACTIONS COMMITTED AGAINST PLAINTIFF BY STATING PLAINTIFF IS NOT MAINTAINING PROPERTY ACCORDING TO WHITE-AMERICAN STANDARDS: 〙

**[WCSD-PP]**      *OK! I MEAN, LOOK AT IT! LOOK AT IT!*

**[PK]**      *Yeah.*

**[WCSD-PP]**      *YOU KNOW IT LOOKS LIKE CRAP, RIGHT?!*

〘 PLAINTIFF CONTINUES TO BE INDIGNANT AT SUCH RACIST-FRAUD BEING USED TO JUSTIFY VIOLENCE AGAINST PLAINTIFF: 〙

**PLAINTIFF**      *I talked to Joe- I talked to Joe, and Joe was fine with it!*

〘 [WCSD-PP] OUTRAGEOUSLY DESCRIBES [JSP] AS *"NICE GUY"* WHEN [JSP] WOULD COMMIT NUMEROUS FELONY-CRIMES/RACKETEERING-ACTS AGAINST PLAINTIFF IN FUTURE INCIDENTS: 〙

**[WCSD-PP]**      *JOE WAS FINE WITH IT, BECAUSE HE'S A NICE GUY WHO DOESN'T SAY - THAT HE DOESN'T [???]*

〘 [PK] CONTINUES-TO-TELL PLAINTIFF TO BE QUIET, NOT REALIZING [WCSD-PP] USED RACIAL-INTIMIDATION TO COERCE PLAINTIFF TO SIGN [CTW]: 〙

**[PK]**      *Hey, Sid- Calm down. Calm down. ...*

〘 [PK] REMINDS [WCSD-PP] THAT HE IS WELL BEYOND HIS AUTHORITY AS A [WCSD] TO COMMENT ON ANY AESTHETIC/COSMETIC ISSUE ON PLAINTIFF'S PRIVATE-PROPERTY: 〙

**[PK]**      *[???] There's a [HOA] for that.*

**[WCSD-PP]**      *YEAH! 10 DAYS LATER, THEY'LL SEND YOU A COPY [IN THE MAIL]!- AND TELL YOU HAVE A 180 DAYS TO FIX IT! - IN THE MEANTIME, THIS COMPLETE NEIGHBORHOOD LOOKS LIKE SHIT!*

**[PK]**      *Right... Right.*

**[WCSD-PP]**      *[HIS] NEIGHBORS HAD OFFERED TO COME OVER HERE, AND TRIM THE BUSHES! AND CUT THIS GRASS! AND MAKE IT LOOK PRETTY! SO THAT THEY DON'T HAVE A FRICKING EYE-SORE IN THEIR NEIGHBORHOOD!*

〘 [PK] ONCE-AGAIN REMINDS [WCSD-PP] THAT HE IS WELL-BEYOND HIS AUTHORITY AS A [WCSD] TO BE COMMENTING ON ANY AESTHETIC/COSMETIC ISSUE OF PLAINTIFF'S PROPERTY: 〙

**[PK]**      *I do understand, that. But these are rules of the [HOA].*

〘 [AJC]'S WIFE, [773KL-2009-2], EXPLAINS TO [WCSD-PP] HOW [RSR] HAD ISSUED THREATS TO HER, AFTER ENTERING ONTO THEIR PROPERTY: 〙

**[773KL-2009-2]**      *I just wanted to say. Give my view. I live over here. And she told me to go - she was walking down, cussing me off [???] - and i'm only [???] Come on! I mean! She was over here! She was flipping me off! ... and-*

〘 [PK] REPEATEDLY AND ANNOYINGLY TELLS PLAINTIFF TO CALM DOWN, SINCE PLAINTIFF WAS BECOMING VISIBLY INDIGNANT ABOUT [RSR]'S,

[WCSD-PP]'S OUTRAGEOUS CONDUCT: ⟧

**[PK]**          *Calm down, Sid! Calm down, Sid!*

⟦ [AJC] INTERJECTS, STATING THAT WHATEVER ABUSE [RSR] DID TO PLAINTIFF, [RSR] ALSO DID TO [AJC],[773KL-2009-2]: ⟧

**[AJC]**          *They've [obviously] did to him, what they've done to us!*

⟦ [WCSD-PP] LOUDLY INTERRUPTS, JUSTIFYING [RSR]'S OUTRAGEOUS CRIMES AGAINST PLAINTIFF,[AJC],[773KL-2009-2], MAKING SURE THAT
ONLY HIS,[RSR]'S RACIST NARRATIVE IS HEARD BY ALL WITNESSES AT SCENE: ⟧

**[WCSD-PP]**          *THERE'S OBVIOUSLY SOMETHING GOING ON THIS NEIGHBORHOOD!*

⟦ [773KL-2009-2] TRIES TO EXPLAIN THAT ALL OF CRAZINESS IS SOLELY FROM [RSR], NOT WITH PLAINTIFF,[AJC],[773KL-2009-2]: ⟧

**[773KL-2009-2]**   *It's not, yeah, us-*

⟦ [WCSD-PP] FRAUDULENTLY INSULTS PLAINTIFF THAT PLAINTIFF IS CRAZY, WHEN PLAINTIFF IS AMONGST THE MOST CIVILIZED PERSONS AT
THE SCENE, ALONG WITH [AJC],[773KL-2009-2]: ⟧

**[WCSD-PP]**          *THERE'S SOME CRAZINESS GOING ON HERE! THERE'S CRAZINESS GOING ON THERE! THIS YARD IS FRICKING HORRIBLE! AND DO
                      YOU RUN THE AIR-CONDITIONER IN THERE?! CAUSE IT SMELLS REALLY BAD!*

⟦ [AJC],[773KL-2009-2] SHOCKED BY [WCSD-PP]'S UNBELIEVABLY-RACIST STATEMENT, TURN-TOWARDS AND TALK TO TWO OTHER [WC] POLICE-
OFFICERS AT THE SCENE: ⟧
⟦ PLAINTIFF IS SHELL-SHOCKED BY [WCSD-PP]'S UNBELIEVABLY-RACIST STATEMENT, RESPONDING IN SHAMBLES: ⟧

**PLAINTIFF**     *Well- ... it- ... did- ... but-*

**[PK]**          *Well! That's his house! Right, comeon!*

⟦ [WCSD-PP] CONTINUES TO HAVE A MALICIOUS SMILE, AND LOOK OF RESTRAINED-JUBILATION(φ) ON HIS FACE, THOROUGHLY ENJOYING- ⟧
⟦ -EVERY BIT OF HIS,[RSR]'S VIOLATION OF PLAINTIFF'S RIGHTS: ⟧

**[WCSD-PP]**          *NO, I UNDERSTAND- THAT'S FINE! IT CAN SMELL BAD, IF HE WANTS IT TO!*

⟦ PLAINTIFF CONTINUES TO MUMBLE WORDS, STILL SHELL-SHOCKED BY [WCSD-PP]'S UNBELIEVABLY-RACIST STATEMENTS: ⟧

**[PK]**          *It's only when the **neighbors come and interfere in your property**- that you-*

⟦ [WCSD-PP] LOUDLY INTERRUPTS, JUSTIFYING [RSR]'S OUTRAGEOUS CRIMES AGAINST PLAINTIFF,[AJC],[773KL-2009-2], MAKING SURE THAT
ONLY HIS,[RSR]'S RACIST NARRATIVE IS HEARD BY ALL WITNESSES AT SCENE: ⟧
⟦ [WCSD-PP] ALSO ADMITS FOR A SECOND TIME, THAT [JJB] HAD COMMITTED RACIALLY-MOTIVATED CRIMINAL-MISCHIEF/ILLEGAL-DUMPING
CRIMES AGAINST PLAINTIFF: ⟧

**[WCSD-PP]**          *OK, HERE'S THE DEAL! **THIS LADY IS THROWING KITTY-LITTER INTO HIS YARD BECAUSE SHE DOESN'T LIKE HIM**, BECAUSE HE
                      DOESN'T TAKE CARE OF HIS YARD! ...*

❪ [WCSD-PP] RACISTLY AND FRAUDULENTLY INSINUATES THAT PLAINTIFF'S CLAIM ABOUT STOLEN PROPERTY IS FALSE. PLAINTIFF HAD NEVER STATED THAT SUCH THEFT OCCURRED ON THIS PARTICULAR DAY. ❫

❪ [WCSD-PP] CONTINUES TO MAKE MULTIPLE PURELY-RACIST, FRAUDULENT STATEMENTS AGAINST PLAINTIFF, [PK], STATING IT WAS A HOSE, WHEN PLAINTIFF HAD STATED IT WAS A $50+ EXTRA-HEAVY-DUTY EXTENSION CABLE THAT PLAINTIFF WAS USING TO POWER ELECTRIC YARD-EQUIPMENT: ❫

**[WCSD-PP]**      *SO, I TOLD HIM TO GO TALK TO THE NEIGHBORS AND SEE IF THEY WERE DOING FERTILIZING OF THE GRASS- HE SAID THERE WAS A BIG PILE. SO, HE TELLS HIS BROTHER, SOMETHING ABOUT FRICKING INTRUDERS COMING IN HERE TODAY AND STEALING A FRICKING HOSE OUT OF THE BACKYARD!*

- 
- 
- 

**[[[TRANSCRIPT INCOMPLETE: TO BE COMPLETED]]]**

- 
- 
- 

# ¶311

The plaintiff was extremely traumatized and, to this day, continues-to-feel extremely traumatized about the shockingly racist, malicious, predatory, abusive, manipulative, retaliatory, humiliative and traumatizing manner in which the plaintiff was treated by [WCSD-PP] (and his employer, the [WCSO]), [RSR], [JJB], and [JSP] on that day **(λ) (ζ) (Δ) (ε) (Σ)**:

01.   Without being provided with any credible information about the plaintiff, and to the contrary, with [WCSD-PP] only being provided with clearly fraudulent information about the plaintiff due to [RSR]'s multiple and malicious, fraudulent accusations against the plaintiff (see below), [WCSD-PP] uses racial-intimidation to fraudulently accuse the plaintiff of trespassing into [RSR]'s property and issuing a threat to sue [RSR] despite of the fact that he knew that the plaintiff did no such thing (see below). [WCSD-PP] immediately engaged in such racial-intimidation to corner the plaintiff into the vulnerable position of duress, so that the plaintiff was forced into admitting that the plaintiff's brother [PK] was briefly at the plaintiff's property, and it was [PK] that probably did whatever [RSR] was fraudulently accusing the plaintiff of. While police, without using any forms of intimidation or coercion, may be allowed to lie to suspect(s) during official interrogations, it is abundantly clear from the plaintiff's recording that [WCSD-PP] immediately engaged in racial-intimidation - a criminal act - against the plaintiff (who is not a suspect of any crime) in-order-to coercively elicit information that he actually had no right to coercively extract from the plaintiff especially since the plaintiff was not guilty of any unlawful action - with the plaintiff having not even stepped out [HOUSE] on that particular day.

02.   The mere thought/imagery of a person-of-color being, metaphorically-speaking, *"dragged out of his house"*, to be identified by the fraudulent-accusations of his terrorizing, predatory White-American accusers with extreme-racial-animus - [RSR] in particular - conjures-up and illustrates the nightmare scenario of a *"Jim-Crow-era"* racial-oppression (or public-lynching) by White-American law-enforcement acting on-behalf-of violent, predatory White-American private-citizens with extreme-racial-animus in-response-to such predatory peoples' violent and oppressive demands against such person(s)-of-color.

**03.**   After surviving this thoroughly-traumatizing *"Jim-Crow-era"* incident more than ten years ago, the plaintiff immediately came to understand the truly egregious extent of the maliciousness of [WCSD-PP], [WCSD-SP] and [WCLE] (as a government institution) against the plaintiff. Prior to this incident, both [WCSD-PP] and [WCSD-SP], during the course of questioning the plaintiff about the hate-crimes, had asked the plaintiff if the plaintiff had knocked on the next-door-neighbor's door to find out the reason for the criminal-mischief/illegal-dumpings. Only after this thoroughly-traumatizing incident did it immediately occur to the plaintiff that both [WCSD-PP], [WCSD-SP] and thus [WCLE] were maliciously trying to entrap and bait the plaintiff. [WCLE] wanted the plaintiff - an immigrant-of-color/indigenous-person with very dark-brown skin color - to go onto a hostile White-American person's property - a White-American person that has already demonstrated substantial racial-animus against the plaintiff - an action by the plaintiff that this hostile White-American with racial-animus could then either react-violently-to and/or report-back-to-[WCLE] - so that this action by the plaintiff could then be maliciously used by [WCLE] and/or such hostile person against the plaintiff. Thankfully, due to the plaintiff's common-sense and highly civilized/peaceful/introverted nature **(Ω)**, the plaintiff completely rejected those extremely-risky and potentially-entrapping *"suggestions"*. In other words, the plaintiff did not even take the bait that [WCLE] maliciously laid-out to entrap the plaintiff, but yet, as this incident reveals, the plaintiff was still viciously punished, regardless, by [WCLE],[RSR],[JJB] and [JSP].

**04.**   Although this entire incident is filled with numerous abusive acts of racial-discrimination and racial-intimidation against the plaintiff (and/or [PK]), as one of the notable acts of racial-discrimination (not only an unlawful act under Federal law - the [FHA], but also a crime under Texas law - [TCPaRC-T5-C106]) and witness-intimidation by a government-employee against the plaintiff, [WCSD-PP] shouts at the plaintiff (even though the plaintiff is a purely innocent victim of all of the incidents documented in this lawsuit), *"YOU DON'T NEED TO EXPLAIN ANYTHING! - I'M GOING TO DO THE EXPLAINING, OK?!"* The plaintiff asserts that this is at least the second count of the crime of racial-discrimination that [WCSD-PP] committed against the plaintiff, the first count occurring during the prior incident when [WCSD-PP] refused to hear what the plaintiff had to say about [RSR]'s prior crimes against the plaintiff, when he had stated to the plaintiff, *"No, I already talked to you on the phone"*, even though the plaintiff was trying to put these particular criminal-mischief/illegal-dumping crimes being reported by the plaintiff into proper context of all other crimes committed against plaintiff which also involved [RSR] (see prior incident above).

**05.**   The extreme racial discrimination, racist hypocrisy and retaliation by [WCLE] against the plaintiff was so abundantly-clear. Here, the plaintiff - a rather-scrawny, very-timid, relatively-introverted immigrant-of-color - reported multiple hate-crimes committed by the substantially-larger (in physical size) predatory White-American neighbors - [RSR],[JJB] - to the [WCSO], none of which were fully-investigated and/or charged and none of which [WCLE] showed any serious concern about - to the contrary, with [WCLE] actually providing racist justifications for such crimes committed against the plaintiff. In particular, there was no [WCSD] that approached [RSR] and questioned [RSR] or any other witnesses about the multiple hate-crimes that [RSR] had already committed against the plaintiff at this point in time. Yet, the plaintiff did not act out in even any indignant manner against anybody, but instead, merely reported the crimes to [PK] (after reporting the crimes to the [WCLE]). As all of the audio-recorded conversations reveal, the plaintiff only did this to convince [PK] to install a security-camera-system and fence-lock onto the plaintiff's property - both tasks that, at that moment in time, the plaintiff did not know how to do. The plaintiff clearly has no control over [PK] who:

Ⓐ has never lived at the plaintiff's property;

Ⓑ was never a resident nor staying guest at the plaintiff's property;

Ⓒ was never a co-owner of the plaintiff's property;

Ⓓ spent no more than a total of 45 minutes (combined) during those initial 3 years at plaintiff's property;

Ⓔ was/is almost seven years older in age than the plaintiff;

Ⓕ was/is approximately five-inches taller than the plaintiff;

Ⓖ at approximately 150 pounds, was approximately sixty pounds more in weight than the plaintiff;

Ⓗ made much more income and was much wealthier than the plaintiff;

Ⓘ was almost-always very stubborn, hard-headed and impulsive as a person; AND

Ⓙ is not even in the least-bit concerned about the peaceful reputation-and-image (ⓦ) that the plaintiff is carefully and conscientiously trying to preserve.


So, the very moment that [PK] does something out of [PK]'s own indignation that the plaintiff had absolutely no control over, all of the most predatory-and-retaliatory weight of [WCLE] decided to *"bring-down-the-hammer"* on the plaintiff - a pure-victim that was completely innocent in every sense of the word.

06.  It is abundantly clear from the recorded conversation that [RSR], in addition to the other hate-crimes that [RSR] had already committed on prior occasions against the plaintiff, also, during this particular incident, committed the hate-crime of *"false report to peace officer, federal special investigator, law enforcement employee, corrections officer, or jailer"* ([TPeC-T8-C37-§37.08]) against the plaintiff by deliberately making the fraudulent-accusation that the plaintiff entered onto her property, when [RSR] knew fully-well how scrawny, timid and introverted the plaintiff was (and still is to this day). The plaintiff - at 5-feet-7-inches tall - is substantially shorter than [PK] who is approximately - 6-feet tall. The plaintiff was (and still is) very-thin and scrawny at approximately 85 pounds, while [PK] was only thinner-than-average at approximately 150 pounds. Additionally, the plaintiff had long/uncut hair-and-beard and, as an indigenous-person, the plaintiff does not conform the plaintiff's appearance/grooming to White-American standards. [PK] had short/trimmed hair, no beard and, generally-speaking, does conform his appearance/grooming to White-American standards. The plaintiff did not (and does not) wear any sun-glasses (or any glasses), while [PK] almost always wore sun-glasses during the summer-months. The plaintiff was almost always dressed (during the summer, and at that moment in time) in an extra-large 《Democracy Now!》 T-shirt and long-shorts, but [PK] wore slightly more formal (although not business) attire. The plaintiff has a significantly-stronger middle-eastern/Indian accent, while [PK] has a less-pronounced hybrid Indian-American accent. The only real characteristic that the plaintiff shares with [PK] is that both persons had/have very dark-brown skin color (although the plaintiff has a slightly-darker skin color than [PK]). Most importantly, in every single interaction that [RSR] had with the plaintiff, the plaintiff's behavior/response ranged from timid to timidly-indignant. The plaintiff was, thus, also entirely-incapable of doing whatever [RSR] initially fraudulently-accused the plaintiff of doing, and it would also have been completely out-of-character for the plaintiff to do so. Therefore, [RSR] knowingly made a brazenly-fraudulent accusation about the plaintiff to the [WCLE], in-order-to make the plaintiff - a rather-scrawny, very-timid and relatively-introverted immigrant-of-color/indigenous-person (who was terrified of both predatory White-American neighbors and the White-American police) suffer through the racial-terror of [WCLE] and, one of its extremely predatory/abusive police officers with considerable racial-animus against the plaintiff, [WCSD-PP]. Despite this, [RSR] was never charged with the hate-crime of [TPeC-T8-C37-§37.08].

07.  [WCSD-PP] also knew perfectly-well, from his prior interactions with the plaintiff - that the plaintiff was a very-timid, relatively-introverted, highly-civilized and peaceful person (Ω) - entirely-incapable of doing whatever [RSR] was accusing the plaintiff of doing.

The plaintiff had openly stated to [WCSD-PP] in the prior phone conversation: *"I would personally follow your advise and knock on their door and politely ask them to stop doing it - but, like I said sir, I'm extremely um, you know - nervous in such type situations, and I wouldn't want to confront a hostile neighbor. Um... So, I'm a peaceful person, I don't want to start, I mean, I personally wouldn't be able to say much if the person is hostile."* So, [WCSD-PP] knew fully well, not only that it would have been completely out-of-character for the plaintiff to do what [RSR] fraudulently accused the plaintiff of doing, but also that the plaintiff was entirely incapable of doing what [RSR] fraudulently accused the plaintiff of doing - with the plaintiff being less than half the size and weight of [RSR] and with the plaintiff being approximately 50 pounds lesser in weight than [RSR]'s large-teenage son, [BR] (who weighed approximately 140 pounds even at that moment in time) - described by [JSP] as *"a big boy"*. Despite of this knowledge, [WCSD-PP] showed his extremely-malicious anger/aggression, motivated by his racial-animus, onto the plaintiff, fraudulently pretending as if the plaintiff had done whatever [RSR] was fraudulently-accusing the plaintiff of doing - and fully exploiting these fraudulent accusations as a fraudulent basis to coerce the plaintiff to sign the Criminal-Trespass-Warning [CTW] against [RSR]'s property.

08. At this moment in time, with [RSR] having resided at her residence [789KLLTX78641] for over two years, and with the plaintiff, having resided alone at [788KLLTX78641] for over two years (with the exception of an approximately four-month-period during which the plaintiff's senior-citizen [FATHER] resided at [788KLLTX78641] with the plaintiff), and with [RSR] repeatedly prying into the plaintiff's private affairs (as documented in the previous incidents) - [RSR] knew that the plaintiff lived alone at [788KLLTX78641] and that [PK] did not live at the plaintiff's property, and that [PK] was never a co-owner of the plaintiff's property. Despite of this knowledge, [RSR] knowingly reported fraudulent information to the [WCLE] and/or [WCSD-PP] that a resident and/or co-owner of the plaintiff's residence trespassed onto her property, again committing yet another count of the crime of *"false report"* ([TPeC-T8-C37-§37.08]) against the plaintiff. Despite of [WCSD-PP] determining these two of [RSR]'s accusations about the plaintiff and the plaintiff's property (respectively) to be fraudulent, [WCSD-PP] continued to engage in vicious abuse/oppression/humiliation against the plaintiff regardless of his knowledge that [PK] was never a resident, guest or owner of the plaintiff's property, and continued to egregiously-violate the plaintiff's rights by coercing the plaintiff, via racial-intimidation, to sign the [CTW] - which he knew he had absolutely no lawful authority to do.

09. [WCSD-PP] asked the plaintiff about where [PK] lived/resided - and the plaintiff answered somewhere in the "Cedar Park" area - in other words, clearly at a residence that was not the plaintiff's, and that was approximately ten miles away from the plaintiff's property [788KLLTX78641]. Despite of this knowledge, [WCSD-PP] went ahead and proceeded with his abusive verbal-battering to coerce the plaintiff, via racial-intimidation, to sign the illegitimate and unwarranted [CTW]. [WCLE], [WCSD-PP], [WCSD-SP], [RSR], [JJB] and [JSP] all knew that the plaintiff lived alone at plaintiff's residence, and that [PK] never did reside at the plaintiff's residence, and that [PK] was never an owner of the plaintiff's property. To be clear, even if [PK] lived at the plaintiff's property (which was never true) and even if [PK] was a co-owner of the plaintiff's property (which was never true), even those facts would not have justified a [CTW] being issued to the plaintiff, since such [CTW]s are only issued to people who actually enter into others' property without authorization. From the beginning of the plaintiff's ownership of residential property [788KLLTX78641], {2009-03}, to this moment in time on-or-about the date of {2011-08-30}, [PK] had not spent even one hour at the plaintiff's residence, spending a combined-total of approximately 45-minutes on the plaintiff's property - yet, the plaintiff was viciously punished and humiliated by [WCLE] for [PK]'s alleged actions of indignation - which was caused by [WCLE]'s refusal to charge [RSR] and [JJB] for their multiple racially-motivated hate-crimes against the plaintiff.

10. In an act of clear vandalism against the plaintiff's private-property, [WCSD-PP] violently slammed the [CTW] document form onto the plaintiff's [FRONTPORCH]-wall - again to impose his racially-motivated abusive/oppressive anger and aggression onto the plaintiff, despite the fact that [WCSD-PP] knew fully-well that the plaintiff was not guilty of committing any crime (and for that matter, neither was [PK] - see below). All of the illegitimate, abusive, oppressive, coercive tactics that [WCSD-PP] used were done knowingly and maliciously in-order-to coerce the plaintiff, via racial-intimidation, to sign a legal document that, at the very least, there was absolutely no justification for the plaintiff to have to sign.

11. [WCSD-PP] used highly-abusive and racist language - reminiscent of the enforcement of the oppressive Jim-Crow-laws/Black-Codes/Vagraney-laws - for example, shouting-to and racially-threatening the plaintiff that *"... IF YOU STEP-FOOT ON THAT PROPERTY! - ONE FOOT COMES AND TOUCHES THEIR GRASS! ... YOU GO TO JAIL! ... "* - an especially egregious threat given that the plaintiff, a very introverted person, had not even stepped out of [HOUSE] on that particular day.

12. The plaintiff frantically told [WCSD-PP] on multiple occasions that the plaintiff did not step onto [RSR]'s property and the plaintiff even failed to disclose that the plaintiff had never even stepped outside of [HOUSE] on that particular day. Despite of the plaintiff's desperate pleadings, [WCSD-PP] repeatedly shouted *"I DON'T CARE!"* - as if he was above the law, and as if the law did not matter to him.

13. [WCSD-PP], in his abusive/oppressive and racist rant against the plaintiff, refers to the *"papers"* scattered on the plaintiff's yard. Those newspapers that [WCSD-PP] was referring to were thrown over onto those locations on the plaintiff's property by the newspaper delivery person(s), and the plaintiff is clearly not responsible for someone else's actions.

14. [WCSD-PP] in his racist anger/aggression, continues to loudly and abusively verbally-batter the plaintiff, repeatedly using unjustified profanity such as: *"YOUR YARD LOOKS LIKE SHIT!"* Furthermore, [WCSD-PP] repeated these loud, abusive, derogatory and racist statements about the plaintiff's yard as if to suggest that the manner in which the plaintiff maintains the plaintiff's private-property somehow justifies the racially-motivated hate-crimes that were committed against the plaintiff, and that such alleged maintenance also somehow justified the plaintiff being coerced to sign the [CTW].

15. In abusively describing the plaintiff's [YARD] as looking like *"SHIT"*, [WCSD-PP] maliciously disregarded the well-known fact that all of Central-Texas and most of Texas was suffering the worst extreme-drought and extreme-heat in recorded history - with the extreme-drought and extreme-heat of {Summer-2011} remaining the worst drought and heat in Central-Texas history until {Summer-2023}, which only recently surpassed {Summer-2011} in terms of both drought and heat. The plaintiff was not watering any of the vegetation in [YARD] - resulting in the grass in [YARD] looking completely parched and sparse - since, according to the Water-Utility-Service-Provider of the 【Summerlyn】 subdivision - at that moment in time, Chisholm-Trail-Special-Utility-District, [CTSUD] - there was Stage-4-Drought-Watering-Restrictions in effect, forbidding all automatic-sprinkler-system outdoor-watering, except for manual watering using a hose. In particular, the grass in [FRONTYARD], despite having already having-been cut on a monthly basis, was very sparse and parched and not even growing due to the extreme-drought-and-heat. So, the plaintiff is truly clueless as to why [WCSD-PP] keeps angrily ranting that the plaintiff needed to cut the plaintiff's grass when the grass in [YARD] - which was fully yellow-brown, sparse and parched - was not even growing due to such extreme conditions. Again, all of these irrational behaviors/actions/conduct by [WCSD-PP], [WCSD-SP], the [WCSO] and their malicious private-citizen co-conspirators with extreme-racial-animus - [RSR],[JSP],[JJB] - show that all of these malicious parties were predatorily weaponizing/abusing/exploiting such property-maintenance-laws as modern-day-Jim-Crow law against the plaintiff - acting *"under color of law"* and under such fraudulent pretext to freely engage in racial-oppression and racketeering-activity (particularly, retaliation) against the plaintiff, for the plaintiff's *"audacity"* to report the racially-motivated hate-

crimes that the plaintiff had initially suffered from [RSR] and [JJB] (during the years of {2009} through {mid-2011}).

16. [WCSD-PP] loudly shouted and ranted his anger/aggression onto the plaintiff so as to publicly humiliate the plaintiff - a rather-scrawny, very-timid and relatively-introverted immigrant-of-color extremely concerned about the plaintiff's own personal-privacy - in front of the plaintiff's predatory White-American neighbors [RSR],[JJB],[JSP] and other witnesses - the first two of whom had already committed racially-motivated hate-crimes against the plaintiff. This abusive, humiliative treatment of the plaintiff would be only the first of many incidents (spanning over a decade) where members of the [WCLE] would similarly abuse/publicly-humiliate the plaintiff in front of the plaintiff's predatory neighbors - again, to reward the plaintiff's predatory neighbors for their abusive predation against the plaintiff, and punish the plaintiff for choosing to live in the White neighborhood.

17. [WCSD-PP]'s extreme dishonesty, manipulativeness and disingenuousness, motivated by his strong racial-animus against the plaintiff, becomes very-apparent in this sequence of incidents. [RSR] weighed more than 200 pounds while the plaintiff weighed approximately 85 pounds - so, [RSR] was more than twice the plaintiff's size. (To the best of the plaintiff's knowledge and recollection, [RSR] was/is also approximately or at least 1-inch taller than the plaintiff.) [RSR]'s 14-year-old son, [BR], was described in the conversation by [JSP] as *"a big boy"* - and according to the plaintiff's best estimates, was at that moment in time, approximately 140 pounds and probably only one-inch or two-inches shorter (if even that) than the plaintiff. [WCSD-PP], in his initial racist verbal-battering of the plaintiff, uses the racist dog-whistle that [RSR] has repeatedly peddled for many years, that the plaintiff - the scrawny 85-pound immigrant-of-color/indigenous-person living across the street - is to be feared by the apparently *"innocent"* (but, in actuality, clearly predatory and much-larger) White-American people (who are more than twice the plaintiff's physical size) living around the plaintiff. Later on in the recorded conversation, [WCSD-PP] reveals that [RSR] was planning to enter into the plaintiff's [HOUSE] - that is a threat to commit felony burglary against the plaintiff - and to *"whoop (the plaintiff's and/or [PK]'s) ass"*. Clearly, nobody who fears a person would also threaten to single-handedly burglarize such person's property in-order-to commit felonious assault (or even murder) against such person. Only [WCSD-PP]' latter statement is credible, while the former statement just reeks of racist, egregiously-fraudulent-narrative and totally-manipulative-dishonesty. So, [WCSD-PP] was repeatedly using dishonest, disingenuous, manipulative and abusive verbal-battering and racist narratives to force the plaintiff to sign the [CTW] - which [WCSD-PP] had absolutely no authority to do, given that the plaintiff did not enter onto anybody else's property on that day, and in fact, nobody who lived at the plaintiff's property entered into anybody else's property.

18. [WCSD-PP] admits that [RSR] made a threat to commit felony burglary against the plaintiff and a threat to commit felonious assault (or even murder) against the plaintiff (*"whoop (the plaintiff's and/or [PK]'s) ass"*) despite of the fact that the plaintiff did not commit any harmful action against [RSR]; furthermore, it is abundantly clear that [RSR] maliciously made these threats against the plaintiff precisely in-order-to incite an abusive response from the [WCLE] against the plaintiff. Despite of [RSR]'s malicious threats to burglarize and cause bodily injury to the plaintiff (and/or [PK]), [RSR] was never charged with the hate-crimes of *"assault"* [TPeC-T5-C22-§22.01(a) (2)], *"terroristic threat"* [TPeC-T5-C22-§22.07(a)(1,2)], or *"intimidation or interference"* [TPrC-T15-C301-SI-§301.171]. Also, given the aforementioned substantial-difference in physical size between the plaintiff and [RSR] - with [RSR] weighing more than twice the plaintiff - it is indisputable that any threat that [RSR] makes to cause bodily injury to the plaintiff should be interpreted as a death-threat (threat-of-murder - a racketeering-activity) because the plaintiff (once described as *"scrawny"*) would be entirely defenseless to any serious physical attack by [RSR] who weighs more than twice the weight of the plaintiff. It is indisputable that [WCSD-PP], [RSR] and [JSP] - all acting in conspiracy against the plaintiff - engaged in threats of blackmail and violence against the plaintiff, thereby

violating *"interference with commerce by threats or violence"* ([18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959]) - also, an additional

count of racketeering-act of many dozen such racketeering-acts documented in this lawsuit. Finally, for every count of the [RSR]'s

and/or [WCSD-PP]'s aforementioned crimes, [RSR] and/or [WCSD-PP] also indisputably committed an additional count of Felony

Obstruction/Retaliation, since under Texas law, any crime committed in retaliation against a witness-victim is a felony crime (and

analogously, a racketeering-act under federal law).

**19.** In addition to all of the other illegitimate reasons that [WCSD-PP] verbally-battered to the plaintiff to coerce the plaintiff to sign the

[CTW], [WCSD-PP] also demanded that the plaintiff sign the document because, *"I GO HOME IN 20 MINUTES!"* In other words,

according to [WCSD-PP], whether justice is served-or-not highly depends, at the very least, upon what time of day, and during which

part of [WCSD-PP]' shift/work-schedule that the plaintiff has the misfortune to encounter [WCSD-PP], or for that matter, any other

member of [WCLE]. As the plaintiff would later find-out, such fully-corrupt, abusive/coercive and egregiously-discriminatory tactics -

depriving the plaintiff of the plaintiff's rights - were employed not only by [WCSD-PP] but other members of [WCLE] that the plaintiff

would have the misfortune of encountering during future incidents that occurred in the following decade (see below).

**20.** Towards the end of the abusive verbal battering, both [WCSD-PP] and [JSP] were both trying to coerce the plaintiff to sign the [CTW],

even though [JSP] was clearly not a law-enforcement officer. Additionally, [JSP] was a close friend of [RSR] (even knowing of [RSR]'s

son's name) and so, [JSP] would clearly not be considered a neutral/unbiased observer or a neutral/unbiased third-party. [JSP] did not

initially acknowledge the abuses/crimes that the plaintiff had already suffered from [RSR], and effectively tried to prevent the plaintiff

from revealing this information in the presence of [WCSD-PP] - although the plaintiff had already revealed much of [RSR]'s criminal

actions against the plaintiff to [WCSD-PP]. This lack-of-neutrality was also evident as [JSP] incorrectly stated the age of [RSR]'s son at

*"12 or 13"*, when [WCSD-PP] had already stated that the large teenager's age was 14.

**21.** Media reports have, for a very long time, documented cases where predatory White-American people and/or police-officers commit

abusive actions against large children/teenagers (minors), only to later claim that they did not know that the victims of those abusive

actions were minors. But as evidenced in this incident, as soon as any adult person-of-color - or at the very least, [PK] - only due to

egregious injustice already suffered (and thus, only out of indignation), issues a threat to sue some abusive White-American adult person

to the physically-large White-American teenage son (who looked like an adult) of such abusive person, and whom such person-of-color

did not know to be a minor, then according to [WCLE], that act of such person-of-color speaking suddenly becomes an unforgivable

*"crime"* that the whole extended-family (including the plaintiff) of such person-of-color must be viciously punished for - even if those

family members live at different/unrelated properties (such as the plaintiff living at [788KLLTX78641] while [PK] supposedly living

approximately ten miles away in *"Cedar Park"*).

**22.** Although the plaintiff inaccurately stated that [PK] lived in *"Cedar Park"*, in actuality, [PK] only used to live in *"Cedar Park"*, and so,

[PK] actually resided, at that moment in time, in the [CoA], at a location approximately forty miles away from the plaintiff. However,

[PK] did at that moment in time, still own the referenced residence in *"Cedar Park"* and was currently serving as landlord of that

property (also located within the County of Williamson). [WCSD-PP] made the fraudulent claim that [CTW]s are reciprocal in nature -

that if the first property-owner demands a [CTW] against the second property-owner, then the second property-owner has the right to

obtain a [CTW] against the first property-owner. Although the plaintiff asserts this claim to be fraudulent, as [CTW]s are only supposed

to be issued in cases where a person actually trespasses onto another's private-property in an unauthorized manner - even if the

reasonable observer were to assume [WCSD-PP]'s fraudulent logic and claim to be true, then [RSR] should have been issued two

SIDDHARTH KODE     V.     WILLIAMSON COUNTY , ET AL.                                    1696907690

additional [CTW]s for each of [PK]'s aforementioned private-properties. However, no such additional [CTW]s were issued to [RSR], further revealing the one-sided-abuse and racist hypocrisy of [WCSD-PP], acting predatorily against the plaintiff and [PK], with full authorization of his superiors at the [WCSO].

23. During this particular incident, [JSP] states that he would never do anything malicious to the plaintiff. However, this lawsuit documents a large count of racially-motivated hate-crimes (including many felonious crimes and racketeering-acts) - committed by [JSP] against the plaintiff from the years {2011} through {2022}. The plaintiff also has strong reason to believe that all four neighbors - [RSR], [JJB] and [JSP&KAP] - were all clandestinely complaining-to and conspiring-with the [HOA] about the plaintiff since {2009} (and complaining-to/conspiring-with defendant [WC] since {2011}). Thus, [JSP]'s statement is clearly false even at this relatively early moment in time. Indeed, in this very incident, [JSP] abusively and unjustly acts *"under color of law"* and with racially-intimidation against the plaintiff to coerce the plaintiff to sign the [CTW] - even providing fraudulent and racist justifications for the plaintiff to do so - despite of the fact that the [CTW] was abusively and coercively issued to the plaintiff by [WCSD-PP] (acting in full-authorization-of and coordination-with [WCSO]) without any legitimate justification whatsoever.

24. During this incident, [WCSD-PP] even states that [JSP] is a *"nice guy"*. This statement is a clear indication of not merely the extreme-racial-bias that exists not only within [WCSD-PP], and by extension, his employer - the [WCSO] - but more broadly, the type of purely-racist fraud that [WCLE] has been perpetrating against the plaintiff (for over a decade), that the plaintiff seeks to expose by litigating this lawsuit. Indeed, the plaintiff asserts that any reasonable observer that witnesses the decade of racially-motivated hate-crimes (including numerous retaliatory crimes) committed by [JSP] against the plaintiff will inevitably realize the decade of purely-racist fraud that [WCLE] has perpetrated against the plaintiff.

25. In a remarkable feat of outrageously-racist fraud, [WCSD-PP] takes [RSR]'s racist-threats of intimidation/interference/disorderly-conduct/blackmail against plaintiff - specifically [RSR]'s multiple threats of foreclosure/eviction against plaintiff - and fraudulently shouts in front of all other witnesses (and his police-radio) as if [PK] issued that same threat to [RSR] and/or [BR]. Much of [WCSD-PP]'s and [RSR]'s fraudulent statements made during this incident were also brazen acts of retaliatory witness-tampering against the plaintiff - corruptly persuading/influencing all of such witnesses with fraudulent statements against the plaintiff and/or the plaintiff's family-members so that such corrupt persuasion/influence could then be used against the plaintiff and/or the plaintiff's family-members in police-report(s), criminal-complaint(s), and/or civil-lawsuit(s) (especially with the [HOA] - see below) against the plaintiff and/or the plaintiff's family-members. Since the plaintiff asserts that the defendants engaged in outrageously fraudulent conduct, corrupt witness-tampering and obstruction-of-justice against the plaintiff and/or the plaintiff's family-members, the plaintiff must, in the course of this lawsuit, highlight every instance where one-or-more of the defendants did just that.

26. Despite [JSP&KAP] being next-door neighbors to the plaintiff, [JSP] admits to the plaintiff and [WCSD-PP] the obvious fact that the plaintiff had never done anything to harm [JSP]. In other words, [JSP] clearly admits to the plaintiff and [WCSD-PP] (and thus [WCLE]) that the manner in which the plaintiff maintains the plaintiff's property could obviously never harm [JSP&KAP], even if there were a greater amount of bugs/insects/*"weeds"*/tall-grass originating from the plaintiff's [YARD] **(§)** - a crucial fact that is completely contradicted by much of the subsequent fraudulent rhetoric (and fraudulent criminal-complaint) that the defendants have made against the plaintiff in much of the decade that followed this incident.

27. Both [WCSD-PP] and [JSP] emphasize the issue of the plaintiff's front-yard *"bushes"*/trees which they alleged to be growing wild. (It should be noted that these *"bushes"*/trees are located approximately in the middle of the [FRONTYARD] - relatively far away from the

boundaries of the plaintiff's property - so, these neighbors truly do not have any authority over the growth of such vegetation, especially if the plaintiff is growing such vegetation as a Constitutionally protected religious practice. Also, it should be noted that the restrictive covenants of the neighborhood do not specify that bushes or trees have to be cut to certain height/length/width.) [WCSD-PP] alleges that *"everybody would leave the (plaintiff) alone"* if the plaintiff made the *"bushes" "look good"*. Also, at several points in time, [WCSD-PP] comments on what he alleges to be the *"horrible"* look of the plaintiff's grass/*"bushes"*/yard, further claiming that the plaintiff's backyard *"looks like a damn farm"*. All of these statements - in conjunction with [JSP]'s statement about the plaintiff never doing anything to harm [JSP] - clearly illustrate that the perpetrators of the abuses/hate-crimes against the plaintiff - including [RSR], [JJB] and [JSP&KAP] - were, at best, maliciously/predatorily targeting the plaintiff merely for aesthetic/cosmetic issues on the plaintiff's property, and at worst, only abusively weaponizing such aesthetic/cosmetic issues as a convenient excuse to maliciously/predatorily commit abuses/hate-crimes against the plaintiff, and as a convenient method to circumvent the [FHA], the civil-rights laws and the hate-crime laws (ξ).

28.   In his unlawful interrogation and detainment of the plaintiff, [WCSD-PP] even coerced the plaintiff to show him a photo-ID. Again, the plaintiff was inside [HOUSE], minding the plaintiff's own business, did not step onto anybody else's private property and was not a suspect in any crime. Therefore, [WCSD-PP] had absolutely no authority to detain or coerce (or even ask) the plaintiff to present a photo-ID. This issue of photo-ID is not only an issue of egregious abuse-of-government-authority but is also an issue of privacy since civil-rights/privacy organizations and privacy advocates (such as the plaintiff) insist that the government is not entitled to any information - especially photo documentation - when a person is not a suspect of any crime. This action would be considered an egregious abuse-of-government-authority and invasion-of-privacy even if the person was on public property (such as in a vehicle located on a public street), but this action would be particularly egregious when it happens on such person's own private property residence (as was the case here) where fourth-amendment, fifth-amendment (due-process) and fourteenth-amendment (equal-protection) rights and other privacy-rights are extremely high, especially due to the so-called *"castle doctrine"*.

29.   To be sure, [WCSD-PP] violated the plaintiff's rights in many ways described in this lawsuit. Given that [RSR] fraudulently accused the plaintiff, [WCSD-PP] would have only been authorized to kindly-question the plaintiff to find out if the plaintiff had entered into [RSR]'s property. As soon as [WCSD-PP] determined that the plaintiff did not commit the action that [RSR] fraudulently-accused the plaintiff of committing - which would have happened within a matter of 30 seconds - this should have been the end of the conversation, and the plaintiff should have been free to enter back into [HOUSE], shut [FRONTDOOR], and conduct the plaintiff's own private affairs without being further disturbed by the [WCLE]. Yet, [WCSD-PP] persisted with his abusive actions against the plaintiff, motivated by his strong racial-animus against the plaintiff, thus, forever-traumatizing the plaintiff for no justifiable reason (and in the process, taking up over an hour of the plaintiff's time on that particular day).

30.   [WCSD-PP] spoke on numerous occasions over the police-radio back to [WCSO] headquarters, relaying back to [WCSO] the details of the events taking place, and even coordinating the course-of-action with the [WCSO] (as police officers are required by policy to do). Therefore, it cannot be stated that [WCSD-PP] was a rogue police-officer acting alone (and abusively) out of his own racial animus against the plaintiff. Instead, the entire [WCSO] was, at the very least, complicit - if not active participants - in [WCSD-PP]'s abusive, oppressive and completely-unlawful sequence of operations against the plaintiff.

31.   [WCSD-PP] admits on at least two separate occasions that [WCSD-PP] definitively knew that [JJB] was the perpetrator of the multiple racially-motivated criminal acts of criminal-mischief/illegal-dumpings against the plaintiff - and in doing so, [WCSD-PP] also admitted

that the subsequent crimes (after the initial crimes that the plaintiff had already reported to [WCSD-SP]) committed against the plaintiff were crimes of retaliation, thus making them felonious under Texas law (and racketeering-acts under federal law). [WCSD-PP] admits that he had spoken to [JJB] about these hate-crimes - but again, even after [WCSD-PP] had spoken to [JJB] about these hate-crimes (on a previous day), [WCSD-PP] failed to report back to the plaintiff about his findings. Despite of these facts, no member of the [WCLE] ever charged/prosecuted [JJB] for these hate-crimes - felonious/racketeering-activity or otherwise - that [JJB] committed against the plaintiff.

32. On multiple occasions, [WCSD-PP] even admits and/or acknowledges that [RSR] illegally entered onto the plaintiff's property in-order-to intimidate/interfere-with/harass/blackmail the plaintiff, but yet, no member of the [WCLE] ever charged/prosecuted [RSR] for [RSR]'s multiple criminal acts (hate-crimes) of intimidation/interference/harassment/blackmail committed against the plaintiff.

33. On at least one occasion, [WCSD-PP] even admits that another White-American man and then property-owner of [780KLLTX78641], [JH], had asked [WCSD-PP] if he could simply go over onto the plaintiff's property and cut the plaintiff's front-yard *"bushes"* without even seeking permission from the plaintiff. This admission truly reveals the sheer amount of institutionally-racist brazenness that the [WCSO] and the plaintiff's predatory White-American neighbors were operating under - that they clearly thought not-only that the plaintiff was completely-undeserving of the property [788KLLTX78641], but even more egregiously, that the property [788KLLTX78641] did not belong to the plaintiff (despite the property-records proving otherwise).

34. Since the plaintiff had already reported to [WCSD-PP] that perpetrators had maliciously cut branches from the plaintiff's trees - with the plaintiff even showing [WCSD-PP] evidence of such cut-branches - [WCSD-PP] clearly engages in witness-intimidation against the plaintiff when he instructs the plaintiff not to report to the [WCSO], at any point in the future, if any of the plaintiff's neighbors enter into the plaintiff's property in-order-to cut the plaintiff's vegetation - because according to [WCSD-PP], the plaintiff had consented to such crimes on this particular occasion. This issue is particularly relevant to the rest of this lawsuit, as the plaintiff has suffered the intentional damages caused by [JSP]'s malicious cutting-of (or more accurately, the parching-of) the plaintiff's *"no-mow"* grass installation, during the midst of the intense summer-heat-and-drought taking place in a subsequent year (see below).

35. [JSP], in speaking to the plaintiff and [AJC], admits that *"they're trying to egg-it-on!"* - fully-revealing one of the malicious motives of both [RSR]'s actions and [JJB]'s actions. In other words, both [RSR] and [JJB] in their abusive-actions/crimes against the plaintiff, were deliberately trying to incite/provoke a volatile/violent/erratic/angry/indignant response from the plaintiff, [AJC] and [773KL-2009-2] - so that that this volatile/violent/erratic/angry/indignant response could then be used against those victims of their abuses/crimes. Despite all of [RSR]'s and [JJB]'s many malicious, deliberate and repeated enticements/provocations/harassments of the plaintiff, the plaintiff never did take-the-bait and instead, the plaintiff kept composure and simply suffered the injustices on every single occasion. However, even despite of this one-sided criminally-abusive conduct suffered by the plaintiff at the hands of [RSR],[JJB], the plaintiff was viciously punished by the malicious/predatory actions of [WCLE], while both [RSR] and [JJB] were never charged with any of the many crimes that they had already committed against the plaintiff at this moment in time.

36. As soon as [WCSD-PP] briefly mentions the topic of the criminal-vandalism (multiple batches of cat-litter, dog-poop dumped onto the plaintiff's property), [JSP] immediately says, without any hesitation, that he would never do anything malicious like that against the plaintiff - which further proves that all of these parties - [WCLE],[RSR],[JSP&KAP] and even [JH&SH] - knew that [JJB] had maliciously committed these racially-motivated hate-crimes against the plaintiff well before the plaintiff knew - with [RSR] even admitting that [JJB] had actually bragged and laughed to [RSR] that she had committed these crimes against the plaintiff (see later

incidents below), but due to the fact that these malicious individuals were all part of the same conspiracy and racketeering-enterprise against the plaintiff, they deliberately and maliciously deprived the plaintiff of this information.

**37.** [JSP], a private citizen, despite not being a member of [WCLE] (nor a member any other law-enforcement-agency), acting *"under color of law"*, ordered the plaintiff the sign the [CTW], further serving to coerce the plaintiff (who was under extreme duress) into signing the [CTW] - therefore, although [RSR],[JJB] and [WCLE] (led by [WCSD-PP]) were primarily responsible for committing the racially-motivated civil-rights-violations documented in this incident, [JSP] entered into the equation when [JSP] unlawfully coerced the plaintiff to sign the document - and by contributing to the fraudulent and racist narrative that [WCSD-PP],[RSR],[JJB] were perpetrating - by deliberately suppressing the fact that [RSR] had blackmailed/threatened/intimidated/interfered-with/harassed the plaintiff on numerous prior occasions - with [RSR] even banging on [FRONTDOOR] to blackmail/threaten/intimidate/interfere-with/harass the plaintiff. When the plaintiff tried to bring up these facts to dismantle the fraudulent narrative that all of these malicious persons were predatorily perpetrating against the plaintiff, the plaintiff was immediately shut down by both [JSP] and [WCSD-PP].

**38.** [JSP]'s manipulative, chameleon-like behaviors were also revealed in this incident. Right after [WCSD-PP] had almost-ended his abusive-verbal-battering of the plaintiff, [JSP] sided with [RSR],[JJB],[WCSD-PP], fraudulently-portraying the plaintiff and/or [PK] as the wrong-doers, even though, at that point, [WCSD-PP] had already acknowledged the crimes committed by [RSR],[JJB] against the plaintiff. After [WCSD-PP] walks across the street to speak to [RSR], and after [AJC] enters into the scene, revealing to the plaintiff all of the abuses/crimes that [RSR] had committed against [AJC]'s family, [JSP] immediately shifts to the diametrically-opposite position - now taking the side of the plaintiff/[AJC] against [RSR]. In other words, [JSP] manipulatively plays-both-sides-of-the-fence during this incident, revealing much of his lack of moral-character in the process.

**39.** [AJC] - who lived only 3 houses down-the-street from the plaintiff - joked to the plaintiff that he had never *"even seen"* the plaintiff, despite of the fact that both the plaintiff and [AJC] lived at such persons' respective houses for over two years at that point in time (to which [JSP] laughed as acknowledgement), further corroborating the plaintiff's claim that the plaintiff lived a very-private and very-introverted life, and still for the most part, continues to do so to this day - fully-in-line-with the plaintiff's religious views and the plaintiff's political views. [RSR] maliciously made several fraudulent-accusations against the plaintiff while [WCSD-PP] abused/oppressed/humiliated the plaintiff despite of the fact that both of these persons knew fully-well that it would-have-been completely out-of-character for the plaintiff to commit whatever action [RSR] and [WCSD-PP] fraudulently accused the plaintiff of committing.

**40.** As soon as [PK] arrives back on the scene and parks his vehicle on the curbside of the plaintiff's property and gets out of his vehicle, both [RSR] (with her son [BR] maliciously smiling behind her) and [WCSD-PP] walk menacingly towards [PK]. [RSR] starts to shout some abusive, racist threats at [PK], while [PK] yells back at [RSR] to shut-up and get away from him. [WCSD-PP] did little-to-nothing to silence [RSR], but as soon as [PK] yells back at [RSR], [WCSD-PP] literally lunges at [PK]'s face (with only an inch or so separating the two) and loudly-orders [PK]: *"HEY! SHUT YOUR MOUTH! TURN AROUND AND SHUT YOUR MOUTH!"*. After [WCSD-PP] shouts these orders at [PK], both [PK] and [WCSD-PP] continue-to-stare at each other for at least 5 more seconds with only an inch or so separating the two. [WCSD-PP] takes this abusive action as at least seven other witnesses (including the plaintiff) are at the scene watching, with absolutely no fear that his actions would be perceived to be overtly-racist and abusive, and precisely so that he can enforce his style of White-supremacy within such overwhelmingly White neighborhood.

**41.** [WCSD-PP] loudly interrogates [PK] in front of all the other witnesses (and anyone else that was outdoors nearby since [WCSD-PP]

was talking so loudly and abusively) as to who actually owned the plaintiff's property, brazenly-humiliating the plaintiff as if the plaintiff - due to the plaintiff's racial profile - was incapable-of or somehow-unworthy-of owning property in the White neighborhood. The plaintiff had already answered to [WCSD-PP] (on a previous day) that the plaintiff was a co-owner of the property, but clearly, due to the plaintiff's racial profile, [WCSD-PP] did not believe the plaintiff. Many aspects of this incident are somewhat reminiscent to the plaintiff of the {2009} arrest of internationally-renowned Harvard University Professor Henry Louis Gates Jr. at Dr. Gates' Cambridge, Massachusetts residence by police officers who were also acting on the complaint(s) of White-American neighbor(s) (although the plaintiff was/is clearly not publicly-esteemed and clearly did-not/does-not have the substantially-superior credentials of Dr. Gates).

42. In his loud verbal-battering of [PK] (clearly motivated by extreme-racial-animus) which was witnessed by all other immediate witnesses (including the plaintiff) at the scene, [WCSD-PP] commits the most brazen act of fraud by, figuratively-speaking, putting the extremely-abusive and criminal, blackmailing words of [RSR] into [PK]'s mouth. [WCSD-PP] had already admitted that [PK] issued a threat to sue [RSR] (if [RSR] did not stop harassing the plaintiff) in the previous, more-private statements to the plaintiff. But in these loud public statements witnessed by many, [WCSD-PP] shouts that [PK] intended to take [RSR]'s house away from [RSR] and her family (to which, [PK] immediately and vigorously denied making any such statements) - literally taking almost exactly the same blackmailing words that [RSR] viciously issued against the plaintiff on a previous day - statements of blackmail that [RSR] has even admitted to making against the plaintiff in a subsequent incident (see below) - and fraudulently attributing those words to [PK]. Once again, this is the type of purely-racist fraud that [WCLE] has been engaging in against the plaintiff, starting in the month of this incident, {2011-08}, and spanning more than a decade after this incident - with almost all of this purely-racist fraud being perpetrated in conspiracy with their co-conspirators that harbored extreme-racial-animus against the plaintiff: [RSR],[JSP&KAP]. Once again, the motivation behind this purely-racist fraud is to obstruct justice by retaliation in an egregious manner that is patently obvious to any reasonable observer: make the plaintiff and the plaintiff's brother, [PK], look like the villains, when in fact, both the plaintiff and [PK] were the victims of [RSR], while at the same time, protecting the actually malicious-and-predatory villains - who, out of no coincidence, happen to be White-American - from the legal consequences of the racially-motivated hate-crimes that they committed against the plaintiff and/or [PK].

43. [WCSD-PP] demands to see [PK]'s driver's license - instead of using the generic term *"photo-id"* as he did with the plaintiff - and it was only after [WCSD-PP] looks at [PK]'s driver's license which showed [PK]'s address as a [CoA] address, did it begin to sink-in to [WCSD-PP] that [PK] was never a resident of the plaintiff's property nor was [PK] ever an owner of the plaintiff's property (as [WCSD-PP] could have just-as-easily verified by checking defendant [WC]'s online property-appraisal records at *"wcad.org"*), and as such, that he had egregiously violated the plaintiff's rights based on the predatory-racist demands of [RSR],[JSP] by coercing (using racial-intimidation) the plaintiff to sign the [CTW] against [RSR]'s property. Instead of shifting course and rectifying the situation by apologizing to the plaintiff for egregiously violating the plaintiff's rights, nullifying the unjustified [CTW] that he had fraudulently issued to the plaintiff, and charging [RSR] for making fraudulent-statements and terroristic-threat(s) against the plaintiff - both of which were racially-motivated and retaliatory (thus felonious) hate-crimes and both of which were done in his presence and the [WCSO]'s presence - [WCSD-PP] continues his abusively racist actions on that day, for example, by making further racist statements and acts of intimidation and/or humiliation against the plaintiff - adding further injury to the plaintiff's already-deep psychological wounds - a completely innocent witness-victim of all of the abuse described above.

44. Additionally, there were two other White-American [WCSD]s that were called and/or dispatched-to the scene by [PK], and they too had seen, based on all of the information above, that the plaintiff's rights were egregiously violated, but despite of this fact, they just stood in

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                                    1696907690

their stationary positions near their police-vehicles, and laughed at the plaintiff, as if the plaintiff was not worthy of any rights. This additional fact is further indication that [WCSD-PP] was not a rogue-officer that acted with racial-animus against the plaintiff, but instead, that there is, at the very least, a tolerated culture of institutional-racism that much (if not most, and if not all) of [WCLE] operates under.

45 .   As previously stated, [PK] was indignant that [WCLE] did not charge/prosecute the perpetrators of the hate-crimes against the plaintiff - namely [RSR], [JJB] - and decided to take matters into his own hands as a result of those deliberate and malicious actions/inactions of the [WCLE]. But even ignoring this unjust lack-of-prosecution, and given the sequence of events that did take place (thanks to the deliberate/malicious actions/inactions of the [WCLE]), the only people that should have been issued [CTW]s on that day were [RSR] (two [CTW]s - one [CTW] against the plaintiff's property and another [CTW] against [AJC]'s property) and [PK] (one [CTW] against [RSR]'s property). There was absolutely no reason for the plaintiff, [AJC] nor [773KL-2009-2] to have to sign [CTW]s but this was exactly what took place by the end of that day, thanks to the extremely abusive and racist actions of [WCSD-PP] (fully-authorized-by and coordinated-with the [WCSO]).

46 .   In his racist and abusive verbal-battering of the plaintiff, [WCSD-PP] abusively shouts the *"abusive, indecent, profane or vulgar"* (and/or *"obscene"*) word *"shit"* multiple times. Police officers use of profanity is only reasonable and justifiable during "exigent circumstances" - for example, when ordering suspect(s) evading arrest to stop and submit to the arrest. When police officers use profanity during interactions with private citizens outside of "exigent circumstances" - especially when unprovoked and during normal conversation - it is, at best, considered to be very unprofessional by any reasonable person, and at worst, considered to be Disorderly-Conduct and/or Harassment and/or Official-Oppression by any reasonable person.

47 .   [WCSD-PP]'s unprofessional use of profanity (for example, his repeated and loud use of the word *"shit"*) is completely overshadowed by his abusive/aggressive verbal-battering of the plaintiff (motivated by his strong racial-animus against the plaintiff), and his total violation of the plaintiff's rights. [WCSD-PP]'s, [RSR]'s, [JJB]'s and [JSP]'s predatory actions against the plaintiff in this incident far exceed racist-unprofessionalism and racial-discrimination ([42-USC-C45-SI-§3604]) and were effectively criminal in nature - namely, an egregious violation of the intimidation/interference/deprivation/conspiracy criminal-law specified in [42-USC-C45-SI-§3617], [42-USC-C45-SII-§3631], [18-USC-PI-C13-§242], [18-USC-PI-C13-§241], [TPrC-T15-C301-SI-§301.171].

48 .   On the [CTW] form that [WCSD-PP] issued (in the most egregiously unlawful manner) to the plaintiff - a carbon-copy of which was also provided to [RSR] - [WCSD-PP] filled out the plaintiff's date-of-birth and possibly other private information. At no point in time did the plaintiff authorize [WCSD-PP] to disclose the plaintiff's date-of-birth (or any other private information) to any third-party, and as the plaintiff's previous recorded (private) interaction with [WCSD-SP] showed, the plaintiff felt very uncomfortable about providing such private information even in a private setting, taking extra precautions (by whispering) to ensure that other people could not overhear any private transmission of such private information to [WCSD-SP]. So, knowing how tremendously-concerned the relatively-introverted plaintiff was about the plaintiff's privacy, [WCSD-PP] deliberately and maliciously performed this additional abusive action to violate the plaintiff's right to privacy, in essence, committing the additional crime of 【Texas Penal Code:   Title 8. Offenses Against Public Administration:   Chapter 39. Abuse of Office:   §39.06 Misuse of Official Information】 [TPeC-T8-C39-§39.06] against the plaintiff.

49 .   [WCSD-PP] unprofessionally and cunningly smiles at the plaintiff as he hands a copy of the [CTW] form to the plaintiff that [WCSD-PP] said [RSR] refused to sign. [WCSD-PP] further toys-around with the plaintiff, with a malicious smile on his face, maliciously stating

in front of at least seven other witnesses, *"RIGHT, YOU ACTUALLY SIGNED IT! SHE WOULD NOT SIGN IT!"* - maliciously suppressing the fact that he, and to a lesser extent - his co-conspirator [JSP] - had engaged in brazen racial-intimidation in-order-to fraudulently coerce the plaintiff to sign such [CTW]. The plaintiff was absolutely furious at [WCSD-PP] for his extremely abusive and racist actions. In this incident, [WCSD-PP] had engaged in racial-intimidation (including abusive verbal-battering) of the plaintiff to effectively coerce the plaintiff (who was under duress) to sign the [CTW] when there was absolutely no justification for [WCSD-PP] to do so. The plaintiff, under extreme duress, ended up caving-into the abusive/oppressive racial-intimidation tactics by signing the [CTW] due to the abusive/oppressive coercive actions of both [WCSD-PP] and [JSP]. And yet, [WCSD-PP] did not coerce [RSR] to sign both of the [CTW] forms issued to her on that day (based on the demands of two different properties' owners) - when [RSR] was the only perpetrator of crimes that were worthy of, not only, multiple [CTW]s, but also, at the very least, multiple criminal charge counts of Intimidation/Interference/Disorderly-Conduct/Blackmail against the plaintiff, and at least one additional criminal charge count of Disorderly-Conduct for the crime that [RSR] committed against [AJC]'s family. The motives of [WCSD-PP]'s extremely abusive, racist actions is obvious - these actions were deliberately performed to make the plaintiff look guilty of some fraudulently-accused bad action that the plaintiff clearly did not commit, and to make [RSR] look innocent of the multiple malicious criminal actions that she clearly did commit against the plaintiff and at least one additional malicious action that [RSR] committed against [AJC], [773KL-2009-2] (as witnessed and/or reported by these multiple witnesses). A secondary motive of [WCSD-PP]'s actions was to publicly-humiliate the plaintiff and to make the plaintiff look like a chump/fool - as the plaintiff was clearly duped and taken-advantage-of by [WCSD-PP], [RSR] and [JSP]. The most sinister motive of [WCSD-PP]'s actions was to destroy the plaintiff's peaceful, highly-civilized, social-justice-activist reputation **( ⓪ )**, make the plaintiff look like an aggressor, and make [RSR] look like the victim of the plaintiff's aggression - when the actual recorded course of incidents, and when the plaintiff's physique versus [RSR]'s physique - with [RSR] being more than twice the plaintiff's physical size and weight - both reveal the exact-opposite findings.

50. When [AJC] and [AJC]'s wife, [773KL-2009-2], were repeatedly trying to report to [WCSD-PP] the malicious abuses/crimes that [RSR] had committed towards them, [WCSD-PP] shouted-out-loud as if to defend/justify [RSR]'s abuses/crimes, pretended as if there was *"craziness"* on both sides of the street - despite of [WCSD-PP]'s knowledge that the plaintiff (unlike the plaintiff's malicious neighbors [RSR],[JJB]) did not even approach (let alone threaten) any of the plaintiff's neighbors, especially given the plaintiff's timid/introverted/highly-civilized demeanor and the plaintiff's racial/political profile. It is abundantly clear to any reasonable person, that even if [WCSD-PP],[RSR],[JJB],[JSP]'s allegations that the plaintiff-did-not-take-care-of-[YARD] were true, that truth, in no way, confers *"craziness"* upon the plaintiff, especially if the plaintiff was morally-opposed to cutting vegetation due to the plaintiff's indigenous religious views/practices.

51. Just like almost-all of the criminally-abusive actions against the plaintiff committed by [WCSD-PP] and his employer, the [WCSO], on this particular day, [WCSD-PP] and his employer, the [WCSO], completely abused their authority against the plaintiff when [WCSD-PP] made numerous disparaging statements about the plaintiff's private-property, including when [WCSD-PP] stated, *"So, get a rake, and just rake it up!"*, and *"... if you were to trim these bushes and make em look good - everybody would leave you alone!"* - as if the [WCSO] (or for that matter, any agency of government) had any right to intimidate and/or dictate-to any private-citizen, let alone person-of-color, how such private-citizen was to maintain the vegetation on his/her private-property - which, in almost-all cases (except in cases of demonstrable harm caused - see section above), is the exclusive, Constitutionally-protected right of such private-property-owner.

**52.**  [WCSD-PP] then culminates his loud, offensive rant by shouting, with a smile on his face, about the [FRONTYARD], *"THIS YARD IS FRICKING HORRIBLE!"* and then while looking/pointing at the plaintiff and the [HOUSE], loudly shouted, with a smile on his face, to the plaintiff, the extremely-offensively, racist statement in the edge of the street/sidewalk with at least seven other witnesses in the area: *"AND DO YOU RUN THE AIR-CONDITIONER IN THERE?! CAUSE IT SMELLS REALLY BAD!"* It is important to note that, although the plaintiff had, during a previous day, asked [WCSD-PP] to enter into the [HOUSE] so that the plaintiff could speak to [WCSD-PP] in private (without any malicious neighbors overhearing the conversation), [WCSD-PP] had rejected the plaintiff's request, arrogantly deeming that the plaintiff had already explained everything that [WCSD-PP] needed to know. In other words, at no point in time did [WCSD-PP] ever enter into the [HOUSE], but yet, [WCSD-PP] was somehow made aware of an alleged odor from the inside of the [HOUSE], which clearly revealed to the plaintiff that [WCSD-SP] maliciously-reported to her co-workers at the [WCSO] about private/confidential alleged details of the plaintiff's person and property - despite [WCSD-SP] being repeatedly told by the plaintiff that the plaintiff did not want any private details about the plaintiff and/or the plaintiff's property (whether alleged or actual) revealed to anybody else (including her co-workers at the [WCSO]). This fact further establishes the abusive and institutionally-racist culture of [WCLE] that the plaintiff seeks to substantially-expose in executing this lawsuit.

**53.**  The exact sequence of dialogue was as follows. [WCSD-PP] loudly shouts the racist statement while looking at the plaintiff, *"AND DO YOU RUN THE AIR-CONDITIONER IN THERE?! CAUSE IT SMELLS REALLY BAD!"* The plaintiff is utterly shocked by [WCSD-PP]'s overtly-racist statement shouted-out, for humiliative purpose, in front of all the other witnesses at the scene. Due to the plaintiff's shock, and thus silence, [PK] indignantly responds, *"Well! That's his house! Right, comeon!"*, to which, [WCSD-PP] then loudly responds with laughter, *"NO, I UNDERSTAND, THAT'S FINE! IT CAN SMELL BAD, IF HE WANTS IT TO!"*. As the rest of this lawsuit seeks to document, this would not be the only incident of extreme racist-unprofessionalism and public-humiliation that the plaintiff has suffered from [WCLE], and the plaintiff simply began to realize the fact that such racist-unprofessionalism and public-humiliation was simply just part of [WCLE]'s way of punishing, and thus deterring, person(s)-of-color (such as the plaintiff) from seeking the taxpayer-funded services of [WCLE]. Far more importantly, this dialogue and all of the incidents that led up to it, reveal to any reasonable observer that [WCSD-PP], and by extension the rest of [WCLE], thoroughly-enjoyed violating the plaintiff's rights - that these types of racially-motivated civil-rights-violations were simply one of the perks and/or privileges for White-American government-employee working at [WCLE].

**54.**  [PK] uses the very accurate term *"interfere in"* to describe [RSR]'s, [JSP]'s, [JJB]'s and [WCLE]'s racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff - that none of these parties had any right to interfere-with the plaintiff's right to private-property, as such rights are fully protected under both federal law (the [FHA]) and under state law (the [TFHA]).

**55.**  [WCSD-SP] was aware of the plaintiff's lack of furniture (see above). Both [WCSD-SP] and [WCSD-PP] were aware of the plaintiff's lack-of-use of the air-conditioner, and from other information regarding the manner in which the plaintiff was living - in particular, the plaintiff's off-grid lifestyle - they, and by extension [WCLE], drew the conclusion that the plaintiff was living in poverty. A common theme that is expressed in this lawsuit is that [WCLE] predatorily targeted the plaintiff along with their co-conspirators [RSR], [JSP&KAP] because they believed the plaintiff to be entirely powerless to expose their predatory abuse. In other words, the defendants' perception that the plaintiff is a powerless, low-IQ, racial-minority living in poverty played a crucial role in the decade of predatory abuse that the plaintiff suffered at the hands of the defendants ( 🔒 ) . The plaintiff asserts that any government that predatorily targets a racial-minority or a poverty-stricken person - or worse, a person that is both - is committing the most serious type of predatory abuse - akin to

the predatory targeting of the elderly, the predatory targeting of young children, or the predatory targeting of disabled person(s). At least some of the injunctive relief that the plaintiff seeks is intended to ensure, not only that the government is prohibited from predatorily targeting any racial-minority over the issue of private-property-maintenance, but also that government is prohibited from intimidating, coercing, threatening, criminalizing or otherwise predatorily-targeting any person for such persons(s) poverty-based lifestyle - especially over the issue of private-property-maintenance (see below).

**56.** Right after [WCSD-PP] made the aforementioned extremely-offensive, racist statement, both [AJC] and [773KL-2009-2] - who were, at that moment in time, rightfully-protesting that all of the abuses/crimes (*"craziness"*) were one-sided, exclusively committed by [RSR] against them - were immediately turned-off/repulsed by the extremely-offensive, racist demeanor/speech of [WCSD-PP], and so, [AJC] and his wife, [773KL-2009-2], then turned with disgust towards the other police officers (who were acting in a less-offensive/less-racist manner at that moment in time), so that they could protest/report the abuses/crimes of [RSR] and lodge their legitimate complaints to these less-offensive/less-racist police officers at the scene.

**57.** It is important to note that [WCSD-PP]'s extremely-offensive, racist, abusive, loud comment about an alleged odor inside of the [HOUSE] which was clearly heard by at least 8 other witnesses, even if true, would, just like [WCSD-PP]'s illegal disclosure of the plaintiff's date-of-birth, also be an additional count of criminal-act 【**Texas Penal Code: Title 8. Offenses Against Public Administration: Chapter 39. Abuse of Office: §39.06 Misuse of Official Information**】 [TPeC-T8-C39-§39.06] by [WCSD-PP] against the plaintiff. As the plaintiff would later discover, these criminally abusive actions committed by members of the [WCLE] against the plaintiff were just part of a much larger pattern of malicious misuse-of-official-information, invasion-of-privacy, racial-oppression, and public-humiliation that would continue to reveal itself in future incidents that the plaintiff suffered from [WCLE] and its co-conspirators [RSR],[JSP&KAP] - as the plaintiff would suffer multiple incidents of such criminally-abusive actions by [WCLE] acting in conspiracy with [RSR],[JSP&KAP].

**58.** [RSR],[WCSD-PP],[JJB],[JSP]'s criminal-actions and abusive-treatment of the plaintiff and [PK] were/are also extremely racist, vile, uncouth, barbaric and uncivilized because both the plaintiff and [PK] were, more-likely-than-not, to have been the most educated persons at the scene, with both the plaintiff and [PK] having graduated from [UT-Austin] - a so-called *"Public Ivy"* University - and with the plaintiff's education-profile (and [PK]'s education-profile) being a crucial component of the plaintiff's racial-discrimination and fraud (racketeering-act) claims against the defendants.

**59.** In her racially-motivated verbal threats to [PK] that took place right in front of [WCSD-PP] and 7 other witnesses, [RSR] also uses the homophobic slur *"wacky wife"* to derogatorily refer to the plaintiff, so as if to indicate that the relationship between the plaintiff and [PK] was not a brother-brother relationship, but rather, a husband-wife relationship. So, during this incident, [RSR],[WCSD-PP],[JSP] not only used racial-intimidation in-order-to violate the plaintiff's rights, but [RSR] also resorted to using homophobic-intimidation against the plaintiff based on her homophobic-animus against the plaintiff.

**60.** Right after she used the homophobic-slur *"wacky wife"* against the plaintiff and [PK], [RSR] immediately turns-around (facing the direction of [JSP],[JH&SH]) and laughs towards her White-American co-conspirators ([JSP],[JH&SH]), further showing that all her malicious actions against the plaintiff leading up to this day (and including this day) were deliberately committed in-order-to publicly-humiliate the plaintiff and in-order-to publicly-violate the plaintiff's rights, and further showing that [RSR] thoroughly-enjoyed **(φ)** publicly-violating the plaintiff's rights. [RSR]'s abusive use of a homophobic slur, in this public setting, to fraudulently describe the relationship between two brothers - the plaintiff and [PK] - who also happen to be immigrants-of-color, also demonstrates [RSR]'s

maliciousness in her utter disregard for the extreme harm that she had-caused and was-continuing-to-cause to the plaintiff. In other words, it was not good enough to [RSR] that [RSR] deliberately made multiple fraudulent-statements, terroristic-threat(s), and racial-intimidation against the plaintiff and [PK], in-order-to-to fraudulently coerce the plaintiff to sign such [CTW], but on top of all of these criminally-abusive actions, [RSR] had to shout such fraudulent homophobic slur in front of 7 other witnesses to deepen the wound of the plaintiff's already severe-injury. Despite of all of the extreme abusive harm that [RSR] committed against the plaintiff on this particular day and on previous occasions (as documented in the aforementioned previous incidents), [RSR] was rewarded (rather than criminally-charged-and-prosecuted) with the extremely-malicious, institutionally-racist, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-actions of [WCLE] - and in particular, one of its more abusive police-officers, [WCSD-PP] - against the plaintiff.

61. [WCSD-PP], in ordering the plaintiff to leave the plaintiff's door open and in ordering the plaintiff to make a phonecall to the plaintiff's brother [PK], was in effect, unlawfully and fraudulently detaining the plaintiff (false-imprisonment) - in total violation of the plaintiff's rights - particularly, the plaintiff's fourth-amendment right to be free from unreasonable search/seizure. Despite unlawfully detaining the plaintiff, [WCSD-PP] never informed the plaintiff of the plaintiff's Miranda-rights, thus, also in total violation of the plaintiff's due-process rights.

62. Also, in publicly-humiliating and abusing the plaintiff in this egregious manner documented in this incident (within a public setting - with other witnesses watching and listening), [WCSD-PP],[RSR],[JSP] totally violated the plaintiff's eighth-amendment-right to be free from cruel-and-unusual-punishment - even more egregious given that the plaintiff had not been granted any jury trial alleging any criminal violation(s) against the plaintiff.

63. During this incident, and as the plaintiff's audio-recording reveals, [WCSD-PP], [RSR] and [JSP] - in their mannerisms and conduct - thoroughly-enjoyed (φ) abusing the plaintiff and violating the plaintiff's rights - a pattern of predatory abuse that would repeat itself in countless incidents in the decade that follows this incident, thanks to this toxic environment of modern-day-Jim-Crow racist-lawlessness around the plaintiff created, fostered and nurtured by [WCLE]. [WCSD-PP] shouts loudly and abusively making one fraudulent and/or racist statement after another against the plaintiff in his loud, abusive rant - while smiling on at least two different occasions: Ⓐ after he had coerced, using racial-intimidation, the plaintiff into signing the [CTW], while refusing to coerce [RSR] to sign the her [CTW] document, returning that unsigned document back to the plaintiff, AND Ⓑ as he was loudly-shouting to a substantial fraction of neighboring residents within the street (not just the eight witnesses nearby), the racist statement that there was an odor from inside of the plaintiff's [HOUSE].

64. During the night following this traumatizing incident, the plaintiff could not sleep, literally tossing-and-turning in bed for over six hours while the plaintiff failed to fall sleep - the plaintiff's mind too caught-up-in and ruminating-over the traumatizing, malicious, extremely-unjust and predatory abuse that the plaintiff suffered from [WCSD-PP],[RSR],[JSP] during the previous afternoon/evening.

65. To this day, the plaintiff feels extremely-violated and extremely-traumatized by this entire incident (especially given the series of other traumatizing incidents that led up to it), but these initial incidents at the plaintiff's residence of [788KLLTX78641] also taught the plaintiff an excruciatingly-painful lesson that the plaintiff must never-trust any police-officer - particularly White-American police-officers - because despite of the plaintiff's racial/physical profile and the plaintiff's well-justified distrust-of-police-officers, these particular police officers egregiously violated the plaintiff's trust in them, and acted in a deliberately-coordinated and calculated-manner to oppress and humiliate the plaintiff in a very public setting (witnessed by many). Clearly, these malicious police officers - [WCSD-PP], and to a

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    1696907690

smaller degree, [WCSD-SP] - deliberately and maliciously violated the plaintiff's trust in them so as to make the plaintiff, in general, even-more-untrusting-of (than the plaintiff already was prior to this incident) police-officers - particularly White-American police officers. After this incident, these brazenly predatory/retaliatory actions of the [WCSO] made it abundantly clear to the plaintiff that any attempt made by the plaintiff to report hate-crimes committed against the plaintiff - for example, by the plaintiff's malicious neighbors - would be met with vicious acts of predatory retaliation by [WCLE] - a long trend and pattern of vicious retaliation that the plaintiff has suffered from [WCLE] to the present day.

66. Based on the audio-recorded conversations alone, it is totally indisputable that [WCSD-PP] committed the crimes of 【Texas Penal Code: Title 8. Offenses Against Public Administration: Chapter 39. Abuse of Office: §39.03 Official Oppression】 [TPeC-T8-C39-§39.03] and 【Texas Penal Code: Title 8. Offenses Against Public Administration: Chapter 39. Abuse of Office: §39.02 Abuse of Official Capacity】 [TPeC-T8-C39-§39.02], and 【Texas Penal Code: Title 8. Offenses Against Public Administration: Chapter 39. Abuse of Office: §39.06 Misuse of Official Information】 [TPeC-T8-C39-§39.06] against the plaintiff - in addition to the intimidation/interference/deprivation/conspiracy crimes specified in: [42-USC-C45-SI-§3617], [42-USC-C45-SII-§3631], [18-USC-PI-C13-§241], [18-USC-PI-C13-§242], [TPrC-T15-C301-SI-§301.171]. Despite of these facts, [WCSD-PP] was never charged nor prosecuted for these crimes against the plaintiff, even though, and as the record will show (see below), the plaintiff did report [WCSD-PP]'s misconduct to his superior(s) at the [WCSO].

67. It is indisputable that [WCLE], and in particular [WCSD-PP], conspired with [RSR] and [JSP] against the plaintiff, with all three of these co-conspirators using racial-intimidation to coerce the plaintiff to sign the [CTW] so that all three of these co-conspirators could then use this fraudulent [CTW] to fraudulently portray the plaintiff as a nefarious person, when neither the plaintiff nor the [PK] acted in any nefarious manner. In particular, all three of these co-conspirators used racial-intimidation to coerce the plaintiff to sign the [CTW] so that [RSR] could then show to other White-American residents of the neighborhood, that the plaintiff had trespassed onto her property and issued a threat to sue [RSR] to her teenage son, which, as the sequence of incidents described above shows, is completely fraudulent with respect to the plaintiff, and completely misleading with respect to [PK]. [WCLE] thus gave this coerced [CTW] as a fraudulent *"trophy"* to [RSR] - a *"trophy"* that [RSR] could then fraudulently show off to other White-American residents of the neighborhood, in-order-to engender more racial-animus against the plaintiff in the overwhelmingly White-American neighborhood - which as future incidents do show, [RSR] did do manipulatively and masterfully - even leading to multiple fraudulent and/or fraudulently-motivated legal actions against the plaintiff (by [WCLE] and/or the [HOA]) - see below.

68. As the plaintiff would only later find out - approximately seven months after this incident (see below), [WCSD-PP] had deliberately not written any police-report for documenting any of the traumatizing (to the plaintiff) criminal events taking place during the incident above (during the date of {2011-08-30} and starting from the moment in time when the [WCSO] received that terroristic-threat phone-call from [RSR] against the plaintiff) - despite of the fact that several counts of felony crimes and racketeering-acts were committed against the plaintiff during this day alone (even ignoring all of the crimes committed against the plaintiff on prior days) - all of which were racially-motivated. The plaintiff thus further asserts that [WCSD-PP], and by extension, the [WCSO], committed another count of the crime of Obstruction-of-Justice against the plaintiff by deliberately failing to write a police-report on this incident, as in his deliberate failure to write such police-report, [WCSD-PP] and the [WCSO] were deliberately concealing all evidence of the racially-motivated crimes/civil-rights-violations that he (and the [WCSO]) committed against the plaintiff, and all of the racially-motivated crime(s) that his

co-conspirators ([RSR],[JSP]) had committed against the plaintiff during this particular incident - forever impeding the due administration of justice.

69.   As the plaintiff would only later find out - approximately nine years after this incident in the year {2020} - at least one of the years during which [RSR] did criminal-trespass onto the plaintiff's property on at least two different occasions (the dates of {2020-02-28}, {2020-06-04}), the [WCSO] would inform the plaintiff that there is no evidence of any such [CTW](s) being issued to [RSR], thus preventing [RSR] from being charged for these two counts of criminal-trespass against the plaintiff. Thus, the plaintiff further asserts that the [WCSO] committed another separate count of the crime of Obstruction-of-Justice against the plaintiff by deliberately destroying at least some (if not all) of the evidence of their criminal actions against the plaintiff and their co-conspirators' ([RSR],[JSP]) criminal actions against the plaintiff committed on that particular day ({2011-08-30}) - further impeding the due administration of justice.

70.   [WCLE]'s failure to charge and prosecute [RSR] even for the most basic multiple counts of criminal-trespass in the following years - again, ignoring her serious felony crimes against the plaintiff - onto the plaintiff's private property (see below) is further evidence of the plaintiff's fraud claim against the defendants. [WCLE] used racial-intimidation and coercion to fraudulently coerce the plaintiff to sign a [CTW] against [RSR]'s property based upon the fraudulent condition that [RSR] would be prosecuted for entering into the plaintiff's property at any point in the future. However, as those later incidents would show (see below), [WCLE] never even meant on fulfilling their end of this fraudulent bargain.

71.   It is indisputable that [WCSD-PP], [RSR], and [JSP] all additionally committed multiple count(s) of the crime of *"Fraud"* ([TPeC-T7-C32-§32.46], [TPeC-T7-C32-§32.51] and [TPeC-T7-C32-§32.32]) against the plaintiff, when the fraudulently coerced, using racial-intimidation, the plaintiff (who was under duress) to sign such [CTW] - while also maliciously including the plaintiff's personally-identifying information (name and date-of-birth) on such [CTW] - and that their crime of *"Fraud"* committed against the plaintiff was also a retaliatory (thus felonious) crime committed against the plaintiff.

72.   As traumatizing as this incident was (and still is) to the plaintiff, this predatory incident would be just one of numerous predatory incidents (documented in this lawsuit) involving the defendants [RSR], [JSP] (and/or [KAP]), and [WCLE] - almost always involving White-American police-officers/government-employees of defendant [WC] - against the plaintiff in which all of such defendants acted in a shamelessly (and overtly) racist and predatory manner against the plaintiff - as if they were not even in the least bit ashamed or concerned that they would be accused of modern-day-Jim-Crow predatory-racism by the plaintiff - as if proudly wearing and flaunting their modern-day-Jim-Crow predatory-racism against the plaintiff as a badge-of-honor, that they will never apologize for.

73.   Instead, as future incidents would show, every single malicious and/or predatory action taken by [JJB], defendants [RSR],[JSP] (later even [JSP]'s wife, defendant [KAP]) and defendant [WC] (in particular, [WCLE]) against the plaintiff, would be further acts of retaliation against the plaintiff, as the defendants had already, at this point in time, developed their substantial racial-animus against the plaintiff - for the plaintiff's *"audacity"* to report racially-motivated hate-crimes of the plaintiff's predatory White-American neighbors [RSR],[JJB]. [WCLE], in particular, would become incensed against the plaintiff, when the plaintiff revealed to [WCLE] in the following year {2012} (see below) that the plaintiff had audio-recorded at least some, if not all, of these plaintiff's interactions with members of [WCLE], thus already amassing a substantial amount of highly incriminating evidence against [WCLE], and it is this ever-increasing anger against the plaintiff, accumulating over the decade that followed, that would continue to fuel the defendants' predatory and retaliatory actions against the plaintiff.

74.   **To ensure that this Court is fully-aware-of and fully-clear-about the actual sequence of incidents, at this point in time, in the**

previous years {2009} and {2010}, [RSR] - a White-American person weighing-more-than-twice-the-weight-of and significantly-older-than the plaintiff - committed multiple counts of the actual racially-motivated hate-crimes of racial-intimidation (intimidation/interference), disorderly-conduct, harassment/stalking, and blackmail against the plaintiff, an immigrant-of-color/indigenous-person (see previous incidents documented above), while [JJB] - a White-American person, weighing approximately sixty pounds more than the plaintiff, with blonde-hair/blue-eyes and also significantly-older-than the plaintiff - committed multiple counts of the actual racially-motivated hate-crimes of illegal-dumping and criminal-mischief against the plaintiff, with at least some counts of these racially-motivated hate-crimes being felonious counts of the retaliatory crime of obstruction/retaliation (see previous incidents documented above). In response to the racially-motivated hate-crimes that [RSR],[JJB] committed against the plaintiff which [WCLE] not only ignored, but actually provided outrageously fraudulent and racist justifications for (see above), the plaintiff's brother [PK], indignant that [WCLE] completely disregarded those racially-motivated hate-crimes committed against the plaintiff, issued a threat-to-sue [RSR] to [RSR]'s physically-large teenage son [BR] (whom [PK] did not know to be a minor), if [RSR] continued to commit any further racially-motivated hate-crimes against the plaintiff - an action by [PK] which the plaintiff begged [PK] not to do, prior to [PK] leaving the plaintiff's [HOUSE] (original audio-recording exhibit available). However, according to the plaintiff's understanding of both federal law and state law, [PK] did not commit any crime. In response to [PK]'s threat-to-sue [RSR] if [RSR] did not stop engaging in racially-motivated hate-crimes against the plaintiff (which is not a crime):

Ⓐ [RSR] committed further counts of felony obstruction/retaliation by committing the retaliatory hate-crimes of two counts of False-Report (both against the plaintiff), two counts of Witness-Intimidation (one against the plaintiff and one against [PK]), one count of Terroristic-Threat (against the plaintiff), one count of Assault (against the plaintiff), one count of Harassment (against the plaintiff), at least two counts of Disorderly-Conduct (one against the plaintiff and one against [PK]) and additional count(s) of Racial-Intimidation (one against the plaintiff and one against [PK]), one count of Texas-Fraud (against the plaintiff), one count of Criminal-Conspiracy (against the plaintiff) - all against the plaintiff, an immigrant-of-color/indigenous-person that is completely innocent witness-victim of all of the above - with all of these felonious hate-crimes also being retaliatory federal crimes [18-USC-PI-C47-§1001],[18-USC-PI-C73-§1512],[18-USC-PI-C13-§242],[18-USC-PI-C13-§241],[42-USC-C45-SII-§3631] and thus racketeering-acts - and with all of these felonious hate-crimes being witnessed directly by [WCLE] and one of its more abusive police-officers with substantial racial-animus against the plaintiff, [WCSD-PP].

Ⓑ [WCSD-PP] committed the racially-motivated hate-crimes of at least one count of Witness-Intimidation (against the plaintiff), two counts of Racial-Intimidation (one against the plaintiff and one against [PK]), two counts of Disorderly-Conduct (one against the plaintiff and one against [PK]), two counts of Texas-Fraud (against the plaintiff), one count of Criminal-Conspiracy (against the plaintiff) and the racially-motivated civil-rights-violations of two counts of Abuse-of-Official-Capacity (one against the plaintiff and one against [PK]), two counts of Official-Oppression (one against the plaintiff and one against [PK]), one count of Misuse-of-Official-Information (against the plaintiff) and one count of Discrimination (against the plaintiff) - along with their federal-crime analogs: [18-USC-PI-C73-§1512],[18-USC-PI-C13-§242],[18-USC-PI-C13-§241],[42-USC-C45-SII-§3631] - all against the plaintiff, an immigrant-of-color/indigenous-person that is a completely

innocent witness-victim of all of the above. It should be noted that for every count of retaliatory crime committed by [WCSD-PP] against the plaintiff listed above, [WCSD-PP] had likewise also committed the additional corresponding count of crime of Felony Obstruction/Retaliation - as any crime that is committed in retaliation against a witness/victim (in this case, the plaintiff) is a felony crime under Texas law and, in this particular case, a racketeering-act under federal law - since each of those crimes are also federal crimes: [18-USC-PI-C73-§1512],[18-USC-PI-C13-§242],[18-USC-PI-C13-§241],[42-USC-C45-SII-§3631].

© [JSP] committed the retaliatory (thus felonious) crimes of one count of Witness-Intimidation (against the plaintiff), one count of Texas-Fraud (against the plaintiff), one count of Disorderly-Conduct (against the plaintiff), one count of Racial-Intimidation (against the plaintiff), and one count of Criminal-Conspiracy (against the plaintiff) - with all of these crimes also being racketeering-acts, due to falling into the category of retaliatory federal crimes of [18-USC-PI-C73-§1512],[18-USC-PI-C13-§242],[18-USC-PI-C13-§241],[42-USC-C45-SII-§3631].

(It should also be noted that both [WCSD-PP] and [JSP] were physically on the plaintiff's property - the plaintiff's [DRIVEWAY] - while they were committing the aforementioned racially-motivated, felonious crimes and racketeering-acts against the plaintiff.) Despite the fact that neither [PK] nor the plaintiff committed any crime - and with the plaintiff being a completely innocent witness-victim of all of the above - the plaintiff, and to lesser extent, [PK], were viciously punished and retaliated-against by [WCSD-PP] (acting with full-authorization-of and coordination-with [WCSO]), [RSR], [JJB] and [JSP], with none of these individuals (nor defendant [WC] as a municipal-corporation) facing any legal consequences whatsoever for their initial racially-motivated hate-crimes, racially-motivated civil-rights-violations and/or the subsequent retaliatory (felonious) hate-crimes and racketeering-acts against the plaintiff, thanks to the numerous criminal acts of Obstruction-of-Justice that [WCLE] - along with [WCLE]'s co-conspirators [RSR],[JSP],[JJB] - had committed against the plaintiff at that moment in time. These initial incidents taking place in the years of {2009} through {2011} (and extending into the following year {2012} - see below) document the very beginnings of the decade-long, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff involving [WCLE],[RSR],[JJB],[JSP] - with [KAP]'s involvement in such racketeering-enterprise occurring in subsequent incidents (see below) - and with [JJB]'s involvement in such racketeering-enterprise ending (to the best of the plaintiff's knowledge) in the year {2014} due to her property, [792KLLTX78641], being foreclosed-upon in {mid-2012}.

75.  Setting aside such overt acts of racial-oppression and racketeering-activity suffered by the plaintiff at the hands of the defendants during this incident, and setting aside the outrageously fraudulent manner in which the defendants justified their oppressive and corrupt actions against the plaintiff, the plaintiff had also never suffered such brazenly uncivilized and barbaric conduct (whether by the defendants or anybody else) at this particular moment in the plaintiff's life. The toxic-environment of racist-lawlessness that the plaintiff refers to in this lawsuit - not only enabled by and nurtured by, but actually created by [WCLE] - had developed into fruition at the end of this incident, and the plaintiff would continue to painfully suffer the full wrath of such toxic-environment of racist-lawlessness in the decade that followed this incident.

## ¶312

On or about the afternoon of {2011-08-31}, the neighbor who owned and lived at the residence right-behind the plaintiff - at 〖525 L*** S*****, Leander, Texas 78641〗 [525LSLTX78641] which borders (and shares a side of fence with) the plaintiff's property [788KLLTX78641] - [SPM], rung the [FRONTDOOR]-bell. When the plaintiff answered, [SPM], a White-American male, introduced himself (since that was the first time that the plaintiff had met [SPM]). [SPM] thanked the plaintiff for the plaintiff paying a fence-installation-person to repair the side of the fence bordering [525LSLTX78641], primarily due to substandard fencing installed by the original builder of the subdivision (see below). [SPM] offered to pay for half of the cost of this fence-repair, and did pay the plaintiff half of the cost. The plaintiff thanked [SPM] for the payment. The plaintiff also took this opportunity to ask [SPM] if [SPM] had any problems with the manner in which the plaintiff maintained the plaintiff's backyard - and [SPM] did not hesitate to respond, *"No, it's fine."* The plaintiff also took this opportunity to briefly-describe the relatively-recent criminal-mischief/illegal-dumping and theft crimes that occurred against the plaintiff, and asked if [SPM] had, by any chance, witnessed the criminal-mischief/illegal-dumpings/theft crimes, and if so, if [SPM] saw who had committed these crimes against the plaintiff. [SPM] responded that he had unfortunately not witnessed the crimes committed against the plaintiff. (The other part of the plaintiff's fence-repair was on the side of fence that the plaintiff shared with [JJB]. However, [JJB] never offered to pay for any part of the installation or materials.) This encounter with [SPM] further indicated to the plaintiff, that the aforementioned crimes committed against the plaintiff were not only completely-unjustified, but rather, that the defendants (and [JJB]) were all maliciously exploiting what they alleged to be the non-conformant manner in which the plaintiff maintained the plaintiff's property (which was never a crime of any type) as a convenient excuse to commit racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff. This encounter with [SPM], also a White-American person, provides a sharp, night-and-day, contrast between the manner in which the plaintiff was (and continued-to-be) treated by malicious neighbors [JSP&KAP],[JJB] and [RSR] (whose property is across-the-street-from the plaintiff's property and thus does not even share a border the plaintiff's property) - all with extreme racial-animus against the plaintiff - and the manner in which the plaintiff was treated by [SPM] - also a White-American person who shared a large border with the plaintiff, and continued-to-share this large border with the plaintiff for approximately five more years until the year {2016} - the year in which [SPM] sold the property [525LSLTX78641] and moved out of the subdivision.

## ¶313

On-or-about the day of {2011-09-01}, the plaintiff contacted [RealManage] - the management company representing the [HOA] and the plaintiff reported the aforementioned racially-motivated crimes committed against the plaintiff that involved malicious neighbors. This fact is crucially relevant to this lawsuit, because while the [HOA] is not in charge of enforcing the criminal laws of the State of Texas, the [HOA] still cannot claim ignorance of the abusive racially-motivated crimes that the plaintiff, a member of the [HOA], had suffered by other members of the [HOA] - the plaintiff's malicious neighbors with extreme-racial-animus against the plaintiff: [RSR],[JJB],[JSP]. Therefore, any future actions undertaken by the [HOA] against the plaintiff on behalf of these malicious neighbors should be interpreted as predatory enforcement - which as long as the [HOA] was run by [SPOA-P-BC],[SPOA-VP-AH] (until the end of the year {2019}) would continue to mean at least eight more years of suffering by the plaintiff from the [HOA] acting on predatory demands of malicious neighbors [JSP&KAP],[RSR] - all acting in conspiracy against the plaintiff. The plaintiff had specifically asked the representative at [RealManage], that since there was an attorney and/or law-firm representing the [HOA], whether that attorney and/or law-firm would be involved in any legal action taken on behalf of a homeowner who suffered crimes from other homeowners. Interestingly, the representative of [RealManage] informed the plaintiff that

they never receive complaints from homeowners about crimes committed against such homeowners by other homeowners - that those types of situations are dealt with exclusively by the police.

## ¶314

On or about the date of {2011-09-08}, the plaintiff discovers by online research that [JJB] has been charged with felony credit-card-abuse by [WCLE] in the month of {2011-03} (see above), and the plaintiff is utterly shocked and indignant about the fact that no one from [WCLE] informed the plaintiff about [JJB]'s felony charge - given that [JJB] was the plaintiff's next-door-neighbor AND the plaintiff had suffered numerous racially-motivated criminal-mischief/illegal-dumpings crimes at the side of the plaintiff's property bordering [JJB]'s property. [WCLE] had deliberately deprived the plaintiff of this crucial information, thus protecting [JJB] from the crimes that [JJB] had committed against the plaintiff - again, because of the racial profiles of the plaintiff and [JJB]. The plaintiff first speaks with [JH], who had entered into the plaintiff's property offering to cut the plaintiff's alleged *"bushes"*, which the plaintiff had politely declined since it was against the plaintiff's Constitutionally protected religious practices/beliefs, further explaining to [JH] that the restrictive covenants of the neighborhood do not specify any height/width/depth requirement or any shape requirement for either *"bushes"* or trees. Despite advising the plaintiff on how he would trim the *"bushes"* and the plaintiff's tree, [JH] even candidly admitted to the plaintiff that this private-property was the plaintiff's private-property, and as a result of such fact, no-one could dictate to the plaintiff how the plaintiff maintained it. The plaintiff used this opportunity to show [JH] a copy of the printout of the aforementioned *"hillcountrynews.com"* media report that described the felony criminal charge against [JJB] (along with her mugshot), and [JH] acknowledges that he knows a great amount of detail into what happened - that [JJB] was drunk and had stolen a credit card from a colleague (presumably at [LISD]), and that she was allegedly *"bi-polar"*, and was allegedly taking medication for such disorder. The plaintiff explained to [JH] that:

Ⓐ [JJB] had (maliciously and) illegally-dumped and/or spread such cat-litter not only around the plaintiff's [FRONTYARD] trees, but also at 4 different locations in the plaintiff's [BACKYARD] (on 4 separate and distinct incidents); AND

Ⓑ The plaintiff had paid to fix the fence bordering [SPM]'s then-property, [525LSLTX78641], and [JJB]'s then-property, [792KLLTX78641], but despite of this, only [SPM] paid the plaintiff for this work, but not [JJB].

In response, [JH] joked to the plaintiff that [JJB] doesn't have any money - with [JJB] having just lost her employment at [LISD] as a result of such credit-card-abuse felony charge. The plaintiff conveyed to [JH] at least some of the plaintiff's extreme mental-anguish that [WCLE] predatorily and retaliatorily came after the plaintiff (due to the multiple fraudulent-accusations and terroristic-threat of [RSR]), when the plaintiff had done absolutely nothing wrong and the plaintiff had only reported to [WCLE] (and to the plaintiff's brother [PK]) about such crimes committed against the plaintiff. At the end of this very informative incident, the plaintiff was further alarmed that [JJB] was, at the very least, allegedly a mentally-unstable White-American person living nextdoor to the plaintiff, that was alleged to have committed one-or-more felony-crime(s), and that had already committed numerous racially-motivated hate-crimes against the plaintiff - all crucial information that the [WCSO] deliberately and maliciously:

Ⓐ did not inform the plaintiff about; AND

Ⓑ did not take into consideration when the plaintiff informed the [WCSO] that [JJB] was likely to have committed those aforedescribed racially-motivated hate-crimes against the plaintiff.

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                               1696907690

## ¶315

On or about a night early in the month of {2011-09}, [DMP] and at least one other individual move into the property [785KLLTX78641],
directly in front of and across the street from the plaintiff's property [788KLLTX78641], that [DMP] purchased on-or-about the date of
{2011-09-01}. The plaintiff notices both [RSR] and [JH] assisting [DMP] in moving items into [DMP]'s property. At some point in time
during this incident, the plaintiff notices [DMP], [RSR], and [JH] all sitting-down on chairs on the [785KLLTX78641] property driveway,
laughing-out-loud - recounting and celebrating the vicious manner in which [RSR], [JSP] and [WCSD-PP] (acting in full coordination-with the
[WCSD]) had retaliated-against and publicly-humiliated the plaintiff - egregiously violating the plaintiff's rights during the traumatizing incidents
of the previous month ({2011-08}). It was clear that [RSR] had expertly manipulated and recruited another new White-American resident,
[DMP], into her malicious and predatory conspiracy against the plaintiff, as [DMP] would play at least a partial role and conspiratorial role in
future violations of the plaintiff's rights.

## ¶316

On or about the date of {2011-09-09}, the plaintiff contacts the [WCSO] to express great concern that the plaintiff was never made aware by
anyone from the [WCSO] of the felony-charge against [JJB] and the other details about [JJB] revealed to the plaintiff by [JH]. The plaintiff
makes a phonecall to [WCSO] dispatch to report this issue, and receives a phonecall back from [WCSO] Sheriff Deputy Don Zachary
[WCSD-DZ]. After explaining all of the new details to [WCSD-DZ] that the plaintiff has been recently made aware of (including the
information by [JH]), and after the plaintiff did express the plaintiff's fear that [JJB] may even resort to violence against the plaintiff or the
plaintiff's other family-members, [WCSD-DZ] responds back that there is nothing that the [WCSO] could do about all of new details that the
plaintiff reported.

## ¶317

On or about the date of {2011-09-14}, the plaintiff contacts the victims-assistance-unit of the [WCSO] not only to discuss the situation with
[JJB], an allegedly mentally-unstable person living next-door that was committing some of the aforementioned crimes (including retaliatory
crimes) against the plaintiff. The victims-assistance-unit advised the plaintiff of two routes - the route of criminal prosecution against [JJB] and
also the route of restraining-order against [JJB], and the operator dispatches the plaintiff's call to a [WCSO] Deputy to further assist in such
restraining-order. "Deputy Kiernan" [WCSD-K] calls the plaintiff, and the plaintiff explains to [WCSD-K] all of the information regarding the
crimes, needed to obtain a restraining-order. [WCSD-K] advises the plaintiff that the [WCSO] does not handle restraining-orders - that such
issue would need to be handled by a magistrate, and [WCSD-K] provides the plaintiff with the name of the local magistrate responsible for
granting the desired restraining-order.

## ¶318

On or about the day of {2011-09-15}, the plaintiff contacts dispatch of the [WCSO] regarding the new details that the plaintiff has gained from
[JH],[AJC] hoping that the new information (including [JJB]'s full name and past/pending criminal charges) could be added to the existing case-
file. The plaintiff would receive a call back from "Deputy Schaefer" [WCSD-S]; the plaintiff would continue to explain to [WCSD-S], all of the

new information that the plaintiff has learned about [JJB], so that information could be added to the case-file. [WCSD-S] adds some of the additional information regarding suspect [JJB] to the existing case-file, but also informs the plaintiff that the $70 extension-cord stolen from the plaintiff's backyard does not appear anywhere in the existing reports. This indicated to the plaintiff that [WCSD-PP] maliciously omitted crucially-important piece(s) of information regarding the crimes committed against the plaintiff - yet another count of [WCSD-PP]'s Obstruction-of-Justice against the plaintiff. [WCSD-S] said that he would add this information to a new case file, and provided the plaintiff with the new case number, because according to [WCSD-S], despite of the powerful circumstantial evidence indicating that [JJB] committed this theft (since she was charged with felony credit-card-abuse for stealing a credit-card), there was no way to link this additional crime (to the existing crimes of criminal-mischief/illegal-dumpings) to her, based on the current information. [WCSD-S] further went on to explain to the plaintiff that stealing an extension cord from [BACKYARD] - even if it is of the more-expensive heavy-duty type - is still a *"blue collar crime"* which requires brazenness (but not necessarily intelligence) whereas, stealing a credit-card is a *"white-collar crime"* that requires superior intelligence from the criminal that is committing it. [WCSD-S] further provided an example indicating that suspecting a person of one theft of another theft (without having sufficient evidence of the second theft) is akin to *"profiling"*, and that the police are not allowed to engage in *"profiling"*. [WCSD-S] noted a detective would contact the plaintiff within thirty days regarding the two separate cases of the criminal-mischief/illegal-dumpings and the theft - but only if there was enough evidence to move forward with prosecution. The plaintiff remained indignant that, despite of all the direct and circumstantial evidence that the plaintiff did have - with [WCSD-PP] admitting multiple times on the record that [JJB] committed the criminal-mischief/illegal-dumpings against the plaintiff and with the plaintiff witnessing first-hand one of these crimes, that nothing could be done - and as the record would show, nothing was done. In retrospect, the plaintiff is particularly indignant about the statements concerning *"profiling"* that [WCSD-S] shared with the plaintiff - because, while his statements are technically correct, this is exactly what several agencies of the [WCLE] (the agencies being sued in this lawsuit) have been brazenly engaging-in against the plaintiff for over ten years - and furthermore, that such *"profiling"* against the plaintiff is of the most egregious type: *"racial profiling"* via abusive-weaponization of the property-maintenance-laws, of all things, as modern-day-Jim-Crow law - and a clear violation of both State laws and Federal Laws barring such racial discrimination. Again, [WCLE]'s powerful message to the plaintiff is crystal-clear: [JJB] is a White-American woman (with blonde-hair/blue-eyes), of significantly older age (and thus more powerful) than the plaintiff, and therefore, under no circumstance, will [WCLE] engage in any type of *"profiling"* against her, especially if the victims of her crime(s) are people who do not matter within society - such as the plaintiff (due to the plaintiff's racial-profile). Whereas, the plaintiff is only a lowly immigrant-of-color/indigenous-person; therefore, [WCLE] is free to engage in as much of the most egregious forms of profiling - *"racial-profiling"* - as they wished against the plaintiff - a powerless, low-IQ subhuman animal clearly without any such rights ( 🔒 ).

## ¶319

On or about the date of {2011-09-21}, the plaintiff is contacted by [WCSDet-N], who explains to the plaintiff that he cannot pursue the theft case because the plaintiff does not have video-recording of such theft. When the plaintiff asked about the criminal-mischief/illegal-dumpings, [WCSDet-N] explained to the plaintiff that he had already closed the case, because it was his understanding that the plaintiff did not want to press charges. The plaintiff explained to the [WCSDet-N] that plaintiff never committed to closing the case, especially since the plaintiff had evidence of two [WCLE] police-officers on audio-recording, admitting in approximately five different statements that it was [JJB], and the plaintiff had even witnessed one of the criminal-mischief/illegal-dumpings into the backyard. Although the plaintiff asked several questions on the [WCSDet-N], with [WCSDet-N] rudely interrupting the plaintiff on numerous occasions, [WCSDet-N] repeatedly told the plaintiff that he did not have time to argue with the plaintiff, that there was not enough to proceed with prosecution, and advised the plaintiff multiple times to,

for future reference, get video-cameras to record the persons committing such crimes. It became abundantly clear to the plaintiff that if [WCLE] was not going to charge and prosecute [JJB] for her numerous racially-motivated hate-crimes against the plaintiff, then there was little-to-no chance that [RSR] would be charged-and-prosecuted for the numerous racially-motivated hate-crimes that she had committed against the plaintiff, and that finally, there was absolutely-no-chance that either [WCSD-PP] nor [WCSD-SP] would be charged and prosecuted for the Abuse-of-Office crimes and civil-rights-violations that these police-officers committed against the plaintiff - despite of the substantially-incriminating, audio-recorded evidence that the plaintiff had already reorded. Although this was an extremely-painful message for the plaintiff to accept, [WCSDet-N] advice regarding video-cameras was, in retrospect, extremely revealing, because as future hate-crimes/racketeering-acts/civil-rights-violations/abuses suffered by the plaintiff would show, even though the plaintiff did amass a huge amount of video-evidence (and in some cases, audio-evidence) of over a decade more of such hate-crimes/racketeering-acts/civil-rights-violations/abuses suffered by the plaintiff at the hands of the defendants, none would result in criminal charges, let alone prosecutions, and furthermore, that [WCLE] would continue to engage in blackmail, fraud, abuse-of-office, retaliation and other acts of obstruction-of-justice against the plaintiff to ensure that all persons and agencies responsible for violating the plaintiff's rights would remain immune from prosecution. Again, [WCLE]'s powerful message - loud-and-clear - both to the plaintiff and the plaintiff's predatory neighbors is crystal-clear:

Ⓐ If [JJB], [RSR], [JSP] or [WCSD-PP] - all White-Americans, and all of older age (and thus more powerful) than the plaintiff - commit crimes against other members of society that matter to [WCLE] - for example, other White-Americans, then [JJB], [RSR], [JSP] or even [WCSD-PP] will be charged and prosecuted to the fullest extent of the law.

Ⓑ On the other hand, if [JJB], [RSR], [JSP] or [WCSD-PP] commit the most serious crimes - including felony crimes and/or racketeering-acts - against the plaintiff - a low-IQ, powerless, subhuman animal clearly unworthy of any rights - then [JJB], [RSR], [JSP] or [WCSD-PP] are free to do so, and continue-to-do-so with absolute impunity - just one of the major components of the pattern of corrupt-malicious-predatory-and-retaliatory racketeering-activity that the plaintiff would continue to suffer from the defendants in the decade that followed these initial incidents.

## ¶320

On or about a late-afternoon or evening of the date of {2011-10-01}, [PK] arrives at the plaintiff's property in-order-to begin the process of a security-camera-system installation. The plaintiff instructs [PK] to park his vehicle - with such unboxed security-camera-system inside of such vehicle - inside of the plaintiff's enclosed [GARAGE] so that the plaintiff's malicious neighbors are not aware of any plans to install such security-camera-system, and so that such security-camera-system could be installed as inconspicuously as possible. [PK] installs 1 (out of the initial 4) security-cameras (at one of the corners of the plaintiff's [HOUSE]) and connects such security-camera to such security-camera-system so that the plaintiff could experiment with such security-camera and get an understanding of how such security-camera-system works (before proceeding to install the remaining 3 security-cameras at a later date).

## ¶321

On or about the late-afternoon or evening of the date of {2011-10-05}, the plaintiff took a print-out of the aforementioned news-media article

that documented [JJB]'s felony charge, and very-briefly attended the 【Summerlyn】 subdivision's *"National Night Out"* event in which, some of the neighborhood's residents meet with each other and a few members of [WCLE] to discuss crime,safety,etc. The plaintiff meets with the event-organizer and hands her a copy of the print-out telling her that the person, [JJB], whose mugshot is depicted in the news-report, is also alleged to have been committing several acts of criminal-mischief/illegal-dumpings against the plaintiff. The plaintiff also mentions that the plaintiff had noticed items stolen from the plaintiff's [BACKYARD]. At no point in time did the plaintiff mention the multiple hate-crimes that [RSR] had committed against the plaintiff at this incident, nor the fact that [WCSD-PP],[WCSD-SP] - the two [WCSO] Deputies that the plaintiff had the misfortune of encountering totally violated the plaintiff's rights, by acting in such malicious conspiracy with [RSR] and [JSP] against the plaintiff. While the event-organizer expresses her condolences to the plaintiff for the plaintiff having suffered crimes from [JJB], a White-American [WC] police-officer (either Constable-Deputy or Sheriff-Deputy) who is present at that meeting, [WCPO-JD-21], interjects and states states to the event-organizer that the plaintiff *"has already filed several (police) reports"*. [WCPO-JD-21] then continues to state to the plaintiff in a very intimidating and threatening manner, *"UNLESS WE HAVE ABSOLUTE KNOWLEDGE THAT THAT'S THE PERSON THAT DID IT, THEN WE DON'T NEED TO BE REALLY BLAMING PEOPLE FOR STUFF, RIGHT?!"*. Both the intimidating/threatening tone of [WCPO-JD-21]'s voice and the content of [WCPO-JD-21]'s statement to the plaintiff made it seem that [WCPO-JD-21] was engaging in witness-intimidation against the plaintiff. The plaintiff responds that it was not the plaintiff that accused [JJB], and instead, that it was [WCSD-PP] who had admitted (in multiple statements) to [JJB]'s criminal actions against the plaintiff . [WCPO-JD-21] responds to the plaintiff *"I KNOW PETE PRETTY WELL. I'LL TALK TO HIM ABOUT IT. FIND OUT WHAT'S GOING ON ... "* As documented above, the plaintiff has an audio-recording from the extremely abusive and traumatizing incident involving [WCSD-PP], in which [WCSD-PP] cheerfully/joyfully shouts (on at least two separate occasions) that he knows that [JJB] had committed the criminal-mischief/illegal-dumping actions against the plaintiff. The plaintiff only attended the meeting to deliver a copy of the printout and notify the event-organizer about [JJB]'s crimes against the plaintiff, but again, the plaintiff did not mention anything about [RSR]'s multiple crimes against the plaintiff nor of [WCSD-PP]'s,[WCSD-SP]'s egregious violation of the plaintiff's rights. The plaintiff left the meeting right-after this brief interaction. Despite [WCPO-JD-21]'s in-depth knowledge of the crimes committed against the plaintiff, and despite [WCPO-JD-21] telling the plaintiff that he would speak to [WCSD-PP] about these crimes, neither [JJB] nor [RSR], let alone [WCSD-PP], were ever charged (let alone prosecuted) for all of the crimes that they committed against the plaintiff - at this early point in time, back in the year {2011} - when all of their crimes could have legally been charged and prosecuted within the statute-of-limitations. As the plaintiff would only later fully-realize, [WCPO-JD-21] would only be one of many dozens of [WC] police-officers that were directly aware of the crimes committed against the plaintiff (as early as {2011}), but despite of this knowledge, nothing would be done by [WCLE] against the perpetrators, again precisely due to the racial-profiles of the perpetrators versus the racial-profile of the plaintiff. Furthermore, the manner in which [WCPO-JD-21] spoke very-favorably of [WCSD-PP] provided further strong indication to the plaintiff that racist abuse and retaliation by [WC] police-officers is not merely tolerated by [WCLE], but rather, is part of the normal, everyday workings of [WCLE] - as part of the same type of *"corrupt organization"* described by 《Los Angeles Times》 journalist Jim Newton (see above). From these initial incidents in {2009} through {2011}, [WCLE]'s deliberate disregard for the plaintiff's fundamental right-to-justice (for crimes committed by [JJB],[RSR] against the plaintiff) and [WCLE]'s malicious violation of the plaintiff's rights, would only serve to embolden the plaintiff's predatory neighbors [JSP&KAP],[RSR] - that they could engage, with absolute impunity, in a virtually-unlimited number of hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff without facing any consequences.

## ¶322

On or about the late-morning of {2011-10-06}, the plaintiff was performing some yard-work in the [FRONTYARD], when [JSP] approached the plaintiff on the plaintiff's [DRIVEWAY]. [JSP] loudly expressed his anger to the plaintiff for what [JSP] alleged to be bushes growing *"WILDLY"* in front of the plaintiff's [FRONTPORCH], angrily stating to the plaintiff that the plaintiff was not upholding the plaintiff's *"WORD"* to *"THE SHERIFF"* (by which he meant [WCSD-PP]) that the plaintiff would get the bushes cut, derogatorily stating that the plaintiff *"ACTED LIKE A PUSSY IN FRONT OF THE SHERIFF!"*. It is important to note that the plants at the center the plaintiff's foundation-plants-area in front of the [FRONTPORCH] are trees (and thus, not bushes). [JSP] condescendingly alleges to the plaintiff that the plaintiff's manner of maintaining the plaintiff's property is inferior to the way the plaintiff's White-American (and/or non-immigrant) neighbors are maintaining their properties, even alleging that [TH] - the previous owner of [785KLLTX78641] - did not earn nearly as much money in selling [785KLLTX78641] than [TH] would have earned if the plaintiff maintained the plaintiff's property according to White-American standards. [JSP] dominates the conversation, repeatedly talking-over and/or interrupting the plaintiff, including the use of racial slur(s), and even making derogatory and racist comment about the plaintiff's failure to cut the plaintiff's hair/beard,

> *"YOUR YARD LOOKING THE WAY IT DOES, BRINGS DOWN THE VALUE OF OUR HOUSES! ... IT DOES! BEING NEXT-DOOR AND ACROSS-THE-STREET DE-VALUATES OUR HOUSES, [???]! ... IF YOU DON'T UNDERSTAND THAT, YOU OBVIOUSLY SHOULDN'T [???]! ... IT'S PRETTY BASIC! ... IT LOOKS **GHETTO**! YOU KNOW, THAT'S WHAT IT LOOKS LIKE! ... **WE DON'T WANT GHETTO NEXT-DOOR BRINGING OUR PROPERTY-VALUE DOWN!** ... ALL WE ASK YOU TO DO IS TRIM YOUR DAMN BUSHES - HOW FRICKING HARD IS THAT?! ... GOD DAMN! WE DON'T ASK MUCH OF YA! ... IT'S JUST TO LOOK DECENT! ... WE'LL LIVE THE FACT THAT YOUR GRASS LOOKS LIKE SHIT - WE'LL DEAL WITH THAT! BUT AT LEAST CLIP YOUR BUSHES, LOOK AT THAT! LOOKS LIKE- I DON'T EVEN KNOW WHAT THAT IS! ... IT LOOKS TERRIBLE! ... IT LOOKS GREEN?! ... WHAT THE HELL LOOKS GREEN ABOUT IT?! MAN, MINE ARE GREENER THAN YOURS! ... THEY LOOK DEAD TO ME! ... YEAH, MINE WOULD BE ALL OVER MY HOUSE IF I LET IT GROW LIKE THAT! MINE GROWS LIKE CRAZY, YOU KNOW WHY?! CAUSE I TRIM IT! **IT GROWS FASTER WHEN YOU TRIM IT! JUST LIKE HAIR!**"*

In actuality, the true reason that [JSP&KAP]'s bushes grew faster is because [JSP&KAP] was irrigating such vegetation, whereas the plaintiff was not irrigating any of the vegetation on the plaintiff's property (especially due to the extreme, unprecedented drought of {Summer-2011}). The plaintiff questions why plants growing in their natural manner without any irrigation - just as in nature - would, in any way, lower property values, and [JSP] angrily responds,

> *"CAUSE IT LOOKS LIKE SHIT! THAT'S WHY! THAT'S WHY WE TRIM IT! SO IT WILL LOOK NICE! IT WILL LOOK PRESENTABLE! JUST LIKE THE SHERIFF TOLD YOU! NOBODY WANTS THEIR HOUSES NEXTDOOR TO ONE THAT LOOKS LIKE CRAP! IT LOOKS LIKE CRAP! HOW DOES THAT LOOK GOOD?! WHAT IS GOOD ABOUT THAT?!"*

The plaintiff further explained to [JSP] that if every property had the same look to it, then there would be no variety - no aesthetic-diversity - and that there would be no bio-diversity in the growth of vegetation - that every property would look the same - mundane/monotonous and not unique/individual. [JSP] scornfully smirked at the plaintiff, sarcastically talking-over at the plaintiff, not allowing the plaintiff to finish the plaintiff's statement, while at the same time, inadvertently admitting that he had made what appeared to be unapproved changes to his front-yard-landscaping by adding stones around his trees,

*"OH, SO YOU'RE THE CHANGE ⟨AGENT⟩, HUH?! ... BUT THAT'S NOT A GOOD UNIQUE, MAN! YOU SEE THE STONES AROUND MY TREES! THAT'S UNIQUE! THAT'S UNIQUE, MY WAY - WHAT I DID THERE, NO BODY ELSE HAS! THAT'S UNIQUE AND IT LOOKS GOOD! WHY DON'T YOU DO SOMETHING UNIQUE THAT YOU HAVE TO DO, SID! I THINK YOU'RE JUST LAZY! ... I'M STARTING TO BELIEVE YOU'RE JUST REAL LAZY! YOU'VE GOT ALL THE TIME IN THE WORLD! ... YOU'RE NOT GOING TO FIND ANYBODY IN THE WORLD THAT THINKS THAT LOOKS GOOD, BRO! ... IT DOESN'T! IT LOOKS TERRIBLE! ... YOU CAN DISAGREE ALL YOU WANT! I GET A PANEL OF A 100 PEOPLE - I GUARANTEE YOU THAT 99, 99 OF THEM WOULD! ... AT LEAST! AND I THINK THEY WOULD PROBABLY BE ALL 100 OF THEM!*

When the plaintiff continued to strongly disagree with [JSP]'s assessment on the basis of cultural differences, [JSP] continued to interrupt and/or talk-over the plaintiff, continuing to make derogatory/abusive statements about the plaintiff, while even threatening to call [WCLE] about the plaintiff's lack-of-conformance to White-American standards,

*YOU KIDDING ME, MAN?! ARE YOU ACTUALLY SERIOUS?! ... YOU THINK THAT'S OK?! ... YOU'RE NOT WORTH TALKING TO! I DON'T EVEN KNOW WHY [???]! IF THAT'S WHAT YOU'RE GOING TO DO, THAT'S WHAT YOU'RE GOING TO DO! I CAN'T DO ANYTHING ABOUT IT! **EXCEPT TALK TO THE SHERIFF ABOUT IT!** THAT YOU DIDN'T TRIM YOUR TREES! THAT YOU DIDN'T LET J\*\* DO WHAT YOU'D SAY YOU'D LET HIM DO! CAUSE WHAT HE SAY?! HE SAY, 'WHEN HE COMES OVER HERE AND TRIM YOUR TREES, YOU BETTER LET HIM TRIM YOUR TREES! YOU'RE GOING TO DO THAT, RIGHT?!' AND YOU SAID, 'YES SIR'! ... SO, YOU JUST ACTED LIKE A PUSSY IN FRONT OF THE SHERIFF'! ... WHY YOU BEING LIKE [???]! SEE I'M STARTING TO BELIEVE THAT YOU'RE NOT [???], SID! YOU DON'T SEEM TO UPHOLD YOUR WORD! YOU DON'T DO WHAT YOU SAY YOU'RE GOING TO DO! AND EVERYTHING LOOKS LIKE CRAP! I DON'T GET IT! ... YOU'RE THE ONLY ONE, SID! EVERBODY ELSE DOES! YOU KNOW, DON'T YOU GIVE A SHIT ABOUT WHAT ANYBODY ELSE THINKS OF- I MEAN! DON'T YOU GIVE [???]?! [DON'T YOU CARE] ABOUT WHERE YOUR PROPERTY-VALUE IS AT?! ... DO YOU THINK THAT HELPS ANYTHING! I GUARANTEE YOU, WHY DON'T YOU CALL A REALTOR AND ASK THEM! ... PRETTY EASY TO ANSWER THAT QUESTION! IT IS, MAN!"*

The plaintiff timidly tried to respond, although unsuccessfully due to [JSP]'s abusive, and dominating rant, that the plaintiff disagreed - that there really is no *"damage"* to property values - and that people are different, and that people of different cultures (such as the plaintiff) have different ways of maintaining private-property and/or living-in-harmony-with nature/plants. When the plaintiff tried to respond, [JSP] abruptly and rudely interrupted the plaintiff, angrily stating to the plaintiff that that he didn't have time to argue with the plaintiff, and that he needed to get to work, angrily walking away from the plaintiff. The plaintiff continued to respond and insist that there was absolutely nothing wrong with the manner in which the plaintiff maintained the plaintiff's private-property. This was the second act of intimidation/interference/disorderly-conduct/blackmail that [JSP] committed against the plaintiff. It became increasingly clear to the plaintiff that [WCSD-PP]'s,[WCLE]'s predatory, abusive, institutionally-racist treatment of the plaintiff in the prior month of {2011-08} - especially on the day of {2011-08-30} - had only emboldened the plaintiff's predatory neighbors to step-up their intimidation/interference/disorderly-conduct/blackmail tactics against the plaintiff - even threatening to use [WCLE], as proxy enforcers, to engage in further acts of racial-intimidation by proxy against the plaintiff.

# ¶323

On or about a late-afternoon or evening of the date of {2011-10-08} - during the weekend before the Monday on which the plaintiff, an indigenous person, celebrates *"Indigenous Peoples' Day"* - [PK] arrives at the plaintiff's property in-order-to finish the security-camera-system

installation on the plaintiff's property. [PK] advised the plaintiff to install all 4 of the security-cameras at certain locations of the the plaintiff's [HOUSE] pointed in the directions of [JJB]'s property, [792KLLTX78641], and [RSR]'s property, [789KLLTX78641] - and/or directly around these two properties - given the malicious and criminal conduct of these two individuals against the plaintiff. The plaintiff rejected such idea, explaining to [PK] that all areas of the plaintiff's property needed to be covered by such security-camera-system, and that there should be no point of weakness (or blindspots) for such security-camera-system due to the plaintiff's numerous malicious neighbors. In particular, the plaintiff firmly believed, based on the plaintiff's unprovoked interactions with [JSP] (see above) that [JSP] is a highly irrational person, at best, or a highly malicious person, at worst, because of the way [JSP] irrationally and outrageously justified his, [RSR]'s, [JJB]'s, and [WCSD-PP]'s abusive and criminal conduct towards the plaintiff. The plaintiff further explained to [PK] that every security-camera should be able to cover one other security-camera so that if one security-camera is vandalized or tampered-with in any manner, the other security-camera could capture such vandalism/tampering on the record. Interestingly, [PK] sarcastically told the plaintiff that if the neighbors were brazen enough to vandalize the plaintiff's security-cameras, then the plaintiff had much bigger problems on the plaintiff's hands. In retrospect, the plaintiff considers [PK]'s sarcastic statement to be very prescient because as future incidents would reveal, the plaintiff's malicious neighbors would actually resort to far-worse and increasingly-severe (retaliatory, felonious) crimes than simply vandalize a large number of the plaintiff's (subsequently-installed) security-cameras - as part of their aggregate efforts to retaliate-against, obstruct-justice-against and ultimately defraud the plaintiff. The plaintiff drew on a sheet of paper how the plaintiff expected [PK] to install such security-cameras and where the security-cameras needed to be pointed so that such security-camera-system could provide reasonably widespread/comprehensive coverage (with minimal blindspots) of all exterior areas of the plaintiff's private-property. As [PK] proceeded to install a security-camera at the corner of the plaintiff's [HOUSE] that is closest to [RSR]'s property, [789KLLTX78641], [RSR] - standing on the opposite sidewalk with [JH] by her side, and with a malicious smile on her face - maliciously shouts out to [PK] while laughing at [PK]: *"IS THAT A SECURITY CAMERA?!"*. Neither [PK] nor the plaintiff respond to [RSR]'s malicious questioning - as the plaintiff had repeatedly instructed [PK] not to acknowledge or respond-to anything that any of the plaintiff's malicious neighbors do or say. The plaintiff then observes [JH] talking and laughing with [RSR] as they continue to stare at [PK] while [PK] is installing the security-camera. The plaintiff also observes [DMP], who has just recently purchased (at the very-beginning of the previous month) the property next-door to [RSR], [785KLLTX78641], also standing on the opposite sidewalk, briefly stare at [PK], showing his disapproval of [PK] and the plaintiff, as [PK] is installing the security-camera. (As future incidents would reveal, [DMP] would turn out to be a close associate/crony and agent/proxy of [RSR],[JSP&KAP],[JH&SH],[CB&KB],[WCLE] in the predatory conspiracy against the plaintiff.) Later on that same day, as [PK] continues to install more security-cameras on the plaintiff's [HOUSE], the plaintiff sees [KAP], who up until this point in time, has not shown any animus directly towards the plaintiff, talking with [JJB] on the sidewalk in front of the plaintiff's property - making it abundantly clear to the plaintiff that they are all part of the same malicious and predatory criminal-conspiracy and racketeering-enterprise against the plaintiff. Therefore, as early as the month of {2011-10}, all of these individuals - who, not coincidentally, are all of the White/Caucasian/American color/race/nationality - did not take much of any steps to conceal their malicious animus, predatory conspiracy and racketeering-enterprise against the plaintiff. But this incident that documents all of these individuals' menacing intimidation and disapproval towards the plaintiff and [PK] due to such initially-installed security-camera-system also reveals a common theme expressed in this lawsuit:

Ⓐ People who get away with committing crime(s) as part of a predatory conspiracy are usually able to get-away-with committing such crime(s) since they believe there is no evidence documenting such crime(s) and predatory conspiracy thereof.

Ⓑ As soon as the victim(s) take any step(s) to prevent, or at the very least catch-on-the-record, future occurrence(s) of crime(s), there is likely to be some negative reaction from all of those individuals (and/or agencies) that are involved in such predatory conspiracy.

Ⓒ Therefore, such people that commit crime(s) as part of such predatory conspiracy clearly want to continue-to-do-so with absolute impunity, and such recording devices are, at the very least, an obstacle to such predatory conspiracy.

In the plaintiff's particular case, the crimes committed against the plaintiff are egregiously malicious and predatory because the perpetrators acting in such predatory conspiracy against the plaintiff are collectively and fully abusing/exploiting/capitalizing-upon their extremely-powerful status as a dominant racial-majority (that in the not-so-distant past, openly engaged in extreme racial violence) that is predatorily targeting a powerless racial-minority (that in the not-so-distant past, were targets of such overt, extreme racial violence). However, as future incidents would continue to reveal, and thanks in large part due to [WCLE]'s active-participation in the predatory criminal-conspiracy and racketeering-enterprise against the plaintiff, the fact that the plaintiff has security-cameras and other personal recording devices potentially recording all of the hate-crimes/racketeering-acts/civil-rights-violations/abuses committed against the plaintiff would mean little-to-nothing, due to the existence of this predatory local-government - defendant [WC] - that not only green-lights such criminal activity but actively, conspiratorially and predatorily participates in such criminal activity - including blackmail, fraud, racial-intimidation, retaliation, witness-intimidation, abuse-of-official-capacity, official-oppression, misuse-of-official-information, and other acts of obstruction-of-justice and civil-rights-violation - against the plaintiff. During this incident, the plaintiff also utilized such in-person meeting with [PK] in-order-to:

Ⓐ reveal to [PK] that the plaintiff had audio-recorded the entire incident of criminally-abusive conduct that the plaintiff had suffered from [RSR], [JSP], the [WCSD-PP] on that particular date of {2011-08-30}.

Ⓑ playback at least part (although not even close to all) of such crucial audio-recording of criminally-abusive conduct, dated {2011-08-30}.

Ⓒ at least begin-to (although far from completely) explain to [PK], that especially due to the plaintiff's cognitive disability - the plaintiff had an extremely difficult time coping with the extreme mental-anguish of the injustices (and the resulting deep psychological wounds) that the plaintiff had suffered from such criminally-abusive conduct.

Ⓓ explain, in particular, the extremely-deep psychological trauma caused by such malicious and predatory White-American neighbors acting in such predatory conspiracy with an overwhelmingly White-American police department ([WCSO]) - all with substantial racial-animus against the plaintiff - in-order-to predatorily target the plaintiff - an immigrant-of-color/indigenous-person - even the mere imagery of which invokes the deeply painful experience of modern-day-Jim-Crow racial-oppression.

[PK] unconvincingly tried-to-reassure the plaintiff that, with their knowledge of such security-camera-system, and with their understanding that the plaintiff has a *"big brother"* looking out for the plaintiff, that the plaintiff's predatory neighbors would not dare to continue in such criminally-abusive conduct against the plaintiff. The plaintiff - knowing the manner in which racial-oppression and racketeering-enterprise works - was not even in the least bit convinced by [PK]'s reassuring words. (Additionally, [PK] - weighing approximately 150 pounds - was not even close to being as physically-large as most of the plaintiff's much larger and heavier predatory neighbors.) If anything, the sequence of

incidents - which included [PK], and which, more-importantly, included [WCLE]'s brazen involvement in such racketeering-enterprise - only galvanized the collective, extreme-racial-animus against the plaintiff - uniting and reinvigorating all of the plaintiff's predatory White/Caucasian/American neighbors' in their commonly-held extreme-racial-animus against the plaintiff - especially since there exists such malicious local-government - defendant [WC] - that not only green-lights such criminal activity but actively, conspiratorially and predatorily participates in such criminal activity - including blackmail, fraud, racial-intimidation, retaliation, witness-intimidation, abuse-of-official-capacity, official-oppression, misuse-of-official-information, and other acts of obstruction-of-justice and civil-rights-violation - against the plaintiff.

## ¶324

On or about a late-afternoon or evening of the date of {2011-11-08}, the plaintiff is shopping at a local grocery store. Out of pure coincidence and on the plaintiff's way out of such grocery store, the plaintiff encounters [AJC] and his wife [773KL-2009-2] outside of such grocery store. The plaintiff greets [AJC],[773KL-2009-2] and a brief conversation about the previous incidents spontaneously ensues. While the plaintiff informs the couple about [JJB]'s crime(s) - the one(s) that were prosecuted by [WCLE] - as well as those crimes [JJB] committed against the plaintiff which remained uncharged and unprosecuted, [773KL-2009-2] spontaneously - completely out of her own volition - explains to the plaintiff a few more details regarding [RSR]'s unauthorized entry into their property and the outrageous threat(s) that [RSR] made to [773KL-2009-2] while unlawfully on their property. Despite 3 different persons - the plaintiff, [AJC] and [773KL-2009-2] - repeatedly corroborating the plaintiff's claim that [RSR] is an extremely malicious and predatory person, both [WCLE] and the [HOA] openly embraced [RSR] as one of their beloved residents - while they repeatedly - for over a decade after these initial incidents - conspired with [RSR] (and her co-conspirators [JSP&KAP]) in targeting the plaintiff based upon [RSR]'s (and her co-conspirators [JSP&KAP]'s) predatory demands against the plaintiff:

> RECORDED CONVERSATION(i) BETWEEN THE PLAINTIFF AND [AJC],[773KL-2009-2] ·   (2011-11-08 17:00)(~)
> 【 PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY 】

《 PLAINTIFF EXITS GROCERY STORE, WALKS TOWARDS PLAINTIFF'S VEHICLE AND SEES,RECOGNIZES [AJC],[773KL-2009-2]: 》

| PLAINTIFF | *Heyyyy!* |
|---|---|
| [AJC] | *Hows it goin, buddy!* |
| PLAINTIFF | *****, right?* |
| [AJC] | *Yeah!* |
| PLAINTIFF | *What's up.* |
| [AJC] | *[???] [???]* |
| PLAINTIFF | *Um, no - I [????] [???]* |
| [AJC] | *[???] [???]* |
| PLAINTIFF | *Um, no. Actually, I'm much better now.* |
| [AJC] | *I see you guys just put those security cameras up.* |

**PLAINTIFF**       *Yeah.*

**[AJC]**       *You gotta show me how [you guys did that.]*

**PLAINTIFF**       *Right. You know, [I got] a couple of items stolen from my backyard. And-*

**[773KL-2009-2]**       *Oh, I believe it! I believe it! ... They're- They're nasty people!*

**PLAINTIFF**       *By the way, the one- the neighbor right across- um, my nextdoor neighbor, on the right side. you know, the-*

**[773KL-2009-2]**       *J****?*

**PLAINTIFF**       *Yeah.*

**[773KL-2009-2]**       *Uh hmmm.*

**PLAINTIFF**       *You know about her? ... Do you know what happened with her?*

**[AJC]**       *No.*

**PLAINTIFF**       *Um- She got- She lost her job for stealing-*

**[773KL-2009-2]**       *She was a teacher.*

**PLAINTIFF**       *Yeah, she was a teacher and she lost her job for stealing a credit-card apparently.*

**[AJC]**       *Ohhh!!!*

**[773KL-2009-2]**       *Ohhh!!!*

**PLAINTIFF**       *Right!*

**[AJC]**       *See! What goes around, comes around, man!*

**[773KL-2009-2]**       *I didn't know that one stole a credit-card!*

**[AJC]**       *They're all evil, man!*

**PLAINTIFF**       *Exactly! Exactly!*

**[773KL-2009-2]**       *They're- The one- The heavy-set one. She came up to my house accusing me of wanting to- saying- What she did to you!*

**[AJC]**       *Exactly what- but yeah, exactly!*

**PLAINTIFF**       *Really!*

**[773KL-2009-2]**       *She was in my yard! And like- In my door! In my face! And I backed her all the way out of my yard!*

| PLAINTIFF | *Right.* |
|---|---|
| [773KL-2009-2] | *And I told her! Um, I said. You know, I told her, I said, "You need to stay off my property!", and she goes, "THIS IS A-", you know, she goes, "WE PAY [HOA]-"* |
| [AJC] | *"THIS IS A NEIGHBORHOOD!"* |
| [773KL-2009-2] | *"THIS IS A NEIGHBORHOOD! AND MY KID SHOULD BE ALLOWED IN!" And I said, "When you start paying my [HOA] fees, then your kid can sit in my yard! Until then, keep him out!"* |
| PLAINTIFF | *Right. Right. Right.* |
| [773KL-2009-2] | *Yeah, they're - they're just nasty- people!* |
| [AJC] | *Stop over, man!* |
| PLAINTIFF | *Right.* |
| [AJC] | *Please ... Come over one day!* |
| [773KL-2009-2] | *Yeah. [???] [???]* |
| [AJC] | *Yeah, it's gettin cooler! I'm gonna start a little fire-pit in the back!* |
| PLAINTIFF | *Right. Right. Right.* |
| [773KL-2009-2] | *Yeah.* |
| [AJC] | *Alrite, man ...* |
| PLAINTIFF | *Same here. If you need anything, just let me know!* |
| [773KL-2009-2] | *Alrite!* |
| PLAINTIFF | *Alrite! Have a good evening!* |
| [AJC] | *Alrite- You too!* |
| [773KL-2009-2] | *See-ya!* |

〘 PLAINTIFF STARTS TO WALK TOWARDS PLAINTIFF'S VEHICLE PARKED IN PARKING LOT OF SUCH GROCERY-STORE. 〙

# ¶325

On or about an afternoon in the month of {2012-03}, [BR], who is substantially-larger in physically-size than the plaintiff, but who is still a minor at that moment in time, runs from deep-inside [JSP&KAP]'s property, [788KLLTX78641], well through deep-inside the plaintiff's property across the plaintiff's [FRONTYARD] grass and [DRIVEWAY] - on his way back to his mother, [RSR]'s property,

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.     1696907690

[789KLLTX78641]. Since [AJC] had left a copy of his business card with the plaintiff, the plaintiff makes a phonecall to [AJC] and asks [AJC] if it is still considered to be criminal-trespassing if the minor child of the parent who was issued the [CTW], trespasses. [AJC] advises the plaintiff not to report the issue, since the [CTW] applies to the parent [RSR], and not her minor child, but that if the plaintiff did get [RSR] on the record trespassing, that the plaintiff absolutely should report it, which the plaintiff eventually did do when [RSR] criminally-trespasses multiple times on the plaintiff's property, and at the very least, eight years later during the year {2020} - see below. (Regarding this particular incident, the plaintiff follows [AJC]'s advice and does not report [BR]'s trespass to [WCLE].) During this conversation, the plaintiff also expresses the plaintiff's extreme frustration and mental-anguish to [AJC] that both the plaintiff and [AJC] were forced to sign [CTW] against [RSR]'s property, when neither [AJC] nor the plaintiff ever stepped anywhere near [RSR]'s property - and in fact, it was only [RSR] that stepped well-into the plaintiff's property and [AJC]'s property in-order-to viciously threaten the plaintiff and [773KL-2009-2] respectively - and in so doing, [RSR] had actually committed crimes against both the plaintiff and [AJC],[773KL-2009-2] - none of which were even charged, let alone prosecuted by [WCLE]. The plaintiff expressed intense frustration and mental-anguish to [AJC] that the plaintiff's rights were egregiously violated by both [RSR] and [WCSD-PP] (acting in full coordination-with the [WCSO]), and that the plaintiff had been totally abused - in a criminal manner - by both [RSR] and [WCSD-PP] - neither of whom are facing any legal consequences for their abusive and criminal actions against the plaintiff nor their abusive and criminal actions against [AJC]'s family. At some point in time during this conversation, [AJC] states to the plaintiff, *"I'll be honest with you - that cop is a racist!"*. The plaintiff was very relieved to hear these words from [AJC], as it truly did capture the true nature of the abuse - that such abuse was motivated by the racial-animus of [RSR] and the [WCSO] against the plaintiff - and the corresponding mental-anguish that the plaintiff was suffering as a result of the traumatizing incident. The plaintiff asked [AJC] if he knew of any lawyers for legal advice on this issue. [AJC] provided the plaintiff with a number to a free legal-aid hotline. The plaintiff expressed great appreciation for the words of relief and other information that [AJC] had provided to the plaintiff, and the phonecall ended shortly thereafter. This incident also reveals that the plaintiff was considering filing lawsuit against defendants [WC],[WCSO],[RSR],[JSP] (and police-officers [WCSD-PP], [WCSD-SP]) as early as the years {2011}/{2012} - but clearly did not do so. The plaintiff did not, at this early point in time, realize that the plaintiff's decision not to sue defendants [WC],[WCSO],[RSR],[JSP] for such defendants' numerous criminally-abusive actions against the plaintiff in the years {2011}/{2012} would lead to the plaintiff continuing to suffer over ten more years (after this incident) of escalating hate-crimes/racketeering-acts/civil-rights-violations/abuses by [WCLE], acting in conspiracy with the plaintiff's predatory neighbors [RSR],[JSP&KAP] - but not [JJB], since [JJB] would soon lose ownership of her then-property, [792KLLTX78641], in the middle of the year {2012} due to all of the fallout from her felony charge(s) and/or criminal-conviction(s).

# ¶326

On or about a morning in the month of {2012-03}, the plaintiff would notice on the plaintiff's security-camera-system-monitor, [JJB], [JSP] and [JH] congregate on the sidewalk directly in front of the plaintiff's private-property (and directly in front of the plaintiff's [FRONTDOOR]) in-order-to carefully inspect the plaintiff's [FRONTYARD] at close range, while continuing to make derisive comments about what they alleged to be so-called *"weeds"* growing throughout many areas of the plaintiff's [FRONTYARD] grass. The plaintiff continues to notice the continuing, deleterious effects of the toxic-environment of racist-lawlessness that [WCLE] had created, not only by failing to prosecute the racially-motivated hate-crimes committed against the plaintiff during the previous year of {2011} (at the very least, by [RSR],[JJB],[JSP]), but also by actually predatorily conspiring with those very same White-American perpetrators of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff to further-violate the rights of the plaintiff - especially during that traumatizing incident of

{2011-08-30}.

## ¶327

On or about an afternoon in the month of {2012-03}, the plaintiff heard loud knocks on the [FRONTDOOR]. The plaintiff took more than a minute to respond to the front-door, but when the plaintiff did open the front-door, the plaintiff did not see anybody outside of the [FRONTDOOR]. The plaintiff then walked approximately ten-feet-forwards to the [FRONTPORCH] area to see [JJB] in the sideyard of [792KLLTX78641] who shouted menacingly at the plaintiff, *"YEAH, ARE YOU GOING TO TAKE CARE OF ALL OF THESE WEEDS?! OR SHOULD I TURN-YOU-IN TO THE [HOA]?!"* The plaintiff timidly responded with *"Ok...".* [JJB] continued to stare menacingly at the plaintiff, and then a few seconds later, continued to enter into her vehicle located in the driveway of [792KLLTX78641], reversed the vehicle out of the driveway and then drove down the street in such vehicle. It is important to note that, not only were the so-called *"weeds"* that [JJB] was referring to flowering spring plants (wildflowers) that were approximately 1-feet in height, but more importantly, on or about this moment in time, the property [792KLLTX78641], which [JJB] used to own, was already under foreclosure proceedings as a result of [JJB]'s recent loss of her job, which in turn, was a direct result of her *"credit card abuse"* criminal-charge and/or conviction. Therefore, [JJB] was not even an owner of [792KLLTX78641] when she made this blackmail threat to the plaintiff, as the ownership of [792KLLTX78641] had already been transferred over to a financial-institution which then maintained ownership over such property. This brazen intimidation/interference/disorderly-conduct/blackmail/criminal-trespass criminal acts by [JJB] against the plaintiff (which clearly shows that [JJB] was acting predatorily against the plaintiff without even having legal ownership of [792KLLTX78641]) reveals that [JJB] was acting out of pure maliciousness and racial-animus and not even under the fraudulent/fictitious guise of *"protecting property values"* - a pattern of purely-malicious behavior/actions and hate-crimes/racketeering-acts/civil-rights-violations/abuses that the plaintiff would continue to suffer from the other co-conspirator defendants [RSR],[JSP&KAP],[WCLE] for almost a decade after this incident. Furthermore, these hate-crimes by [JJB] against the plaintiff were clearly committed in retaliation for the plaintiff's reporting of [JJB]'s prior hate-crimes to the [WCLE], thus making them felony crimes under Texas law (and racketeering-acts under federal law since such crimes were also federal crimes). It became increasingly clear to the plaintiff that [WCSD-PP]'s,[WCLE]'s predatory, abusive, institutionally-racist treatment of the plaintiff in the month of {2011-08} - especially on the day of {2011-08-30} - had only emboldened the plaintiff's predatory neighbors to step-up their intimidation/interference/disorderly-conduct/blackmail tactics against the plaintiff - even threatening to use the [HOA], as proxy enforcers, to engage in further acts of racial-intimidation by proxy against the plaintiff.

## ¶328

Within a week of the previous incident the plaintiff makes a phonecall to the [WCSO] in-order-to report this additional crime from [JJB] to the [WCSO]. The dispatched [WCSO] Sheriff Deputy JANE-DOE-12 [WCSD-JD-12], later identified as Brandi Moore [WCSD-BM] (see below), calls the plaintiff without clearly specifying her full-name, and saying her last name so rapidly that the plaintiff is unable to decipher it. After the plaintiff reported these latest crimes to [WCSD-JD-12], and the fact that the plaintiff has these crimes caught on recording, [WCSD-JD-12] first asked if the plaintiff had any issues with the [HOA]. The plaintiff was surprised by this question and responded to [WCSD-JD-12] that the plaintiff recently called the [HOA] to find out that the plaintiff had no pending violations with the [HOA] and that the plaintiff was in-the-clear with the [HOA]. The plaintiff further explained that even if the plaintiff was in any bad-standing with the [HOA] - which was not true - then that fact, in no way, gives any neighbor the right to commit crimes against the plaintiff. [WCSD-JD-12] agrees and then explains to the

plaintiff that the plaintiff first needs to verbally tell [JJB] to stop coming over onto the plaintiff's property, further explaining that, only after the plaintiff does this, and then [JJB] continues to violate the plaintiff's order, can the [WCSO] handle the complaint as a harassment complaint. However, none of the Texas law or federal law concerning *"harassment"*, *"disorderly-conduct"*, *"intimidation/interference"* or *"blackmail"*, in any way, requires a victim of such crime(s) to alert/warn the perpetrator to stop such criminal action. So, the plaintiff can only interpret this response and lack-of-concern by the [WCSO] as yet another instance of the [WCSO] denial-of-services and deprivation of the plaintiff's rights - again, due to the (victim) plaintiff's racial profile versus (perpetrator) [JJB]'s racial profile. The plaintiff then continued to protest the fact that the plaintiff was forced to sign a [CTW] (by the abusive actions of [WCSD-PP]) even though the plaintiff had not even stepped out of the plaintiff's [HOUSE] on the day that [RSR] fraudulently accused the plaintiff of entering into [RSR]'s property. So, if the plaintiff was unjustly forced to sign a [CTW] even though the plaintiff did not do anything wrong, then the plaintiff continues to question: Why are [JJB] (and even [RSR]) not facing any consequences for the multiple and actual crimes that these individuals have committed and continue-to-commit against the plaintiff? The plaintiff further asks [WCSD-JD-12] if the plaintiff could have that [CTW] removed from the plaintiff's record, because the plaintiff should not have the plaintiff's reputation ( ⊕ ) needlessly tarnished by coercive, abusive actions of [WCSD-PP] (who was maliciously acting in conspiracy against the plaintiff along with [RSR],[JSP]). [WCSD-JD-12] said that she would need to look into the matter, and places the plaintiff on hold. A few minutes later, [WCSD-JD-12] responds that there is nothing that could be done about the [CTW], because the plaintiff agreed to sign the [CTW]. The plaintiff started to become indignant, given that [WCSD-PP] had engaged in modern-Day-Jim-Crow racial-intimidation, while making multiple fraudulent statements in-order-to unlawfully coerce the plaintiff to sign that document (in violation of several aforelisted State-of-Texas laws and federal laws). [WCSD-JD-12] goes on to respond to the plaintiff that [RSR] did not want the plaintiff on her property. The plaintiff continues to become more indignant, stating to [WCSD-JD-12] that if both [WCSD-JD-12]'s and [RSR]'s (unsound) logic were correct, then the plaintiff could pick anyone at random from the neighborhood - who had never stepped foot on the plaintiff's property - and demand that the [WCSO] issue to them a [CTW] against the plaintiff's property, claiming that the plaintiff did not want that innocent random resident on the plaintiff's property - which as the plaintiff continued to explain, makes absolutely no sense, and that that is not how the system (of criminal-trespass) is supposed to work. [WCSD-JD-12] explains that she was not there, and that she does not know what happened. [WCSD-JD-12] continued to rudely talk-over the plaintiff and stated that she can only try to address what's going on today. The plaintiff asserts that this is yet another tactic that the [WCLE] has repeatedly used to deny their taxpayer-funded services to the plaintiff - by claiming that they can only handle what happens today or recently (when, in fact, the relevant statute-of-limitations states otherwise). [WCSD-JD-12] explains that she cannot speak for the actions of [WCSD-PP]. The plaintiff tries to explain why what happened many months prior connects to today, as it reveals the utter, racist hypocrisy of the situation:

Ⓐ Here, the plaintiff has had multiple malicious individuals enter into the plaintiff's property, bang on the plaintiff's door in order to threaten/blackmail and racially-intimidate the plaintiff, and they faced absolutely no consequences

Ⓑ Despite of the fact that the plaintiff had not stepped onto any of these malicious persons' respective properties nor committed any crime against any of these persons, the plaintiff was forced to sign a [CTW] due to the malicious, abusive and predatory actions of [WCSD-PP] (acting in full coordination-with the [WCSO]).

Ⓒ The plaintiff further explains that [AJC],[773KL-2009-2] had been harassed/threatened by [RSR] after [RSR] unlawfully entered into their property, and furthermore, on that same day, [AJC],[773KL-2009-2] came to speak to [WCSD-PP] to defend the plaintiff - further explaining

that whatever [RSR] fraudulently accused the plaintiff of, [RSR] had also threatened to do to them.


[WCSD-JD-12] continues to be obstructive towards the plaintiff, providing the same response as before. The plaintiff, still indignant, continues to double-down that neither the plaintiff nor [AJC],[773KL-2009-2] should have been forced to sign a [CTW] when none of these individuals did anything wrong. The plaintiff further states that [WCSD-PP] maliciously forced the plaintiff to sign the [CTW], while requiring no such thing of [RSR] - that he simply (with a malicious/mocking smile on his face) issued a copy of [RSR]'s [CTW] to the plaintiff indicating that she refused to sign it. The plaintiff then makes it known to [WCSD-JD-12] that the plaintiff has that entire incident recorded on audio, and that the plaintiff could easily take that recording to a lawyer, and explain to the lawyer the injustice of this situation. The plaintiff continues to indignantly explain that the plaintiff's point about past crimes connects to the most recent issue - the most recent crimes committed by [JJB] against the plaintiff - that if the plaintiff has a [CTW] issued against [JJB], the plaintiff should not be forced to sign one against [JJB]'s property (which as the record would show, was not even the property-owner of her residence at that moment in time, due to that property being under foreclosure proceedings) - that this entire issue of reciprocal [CTW] demand has absolutely no basis in the law, that [CTW] is only supposed to be issued to those who **actually** commit the trespass. The plaintiff further explains to [WCSD-JD-12], that based on the plaintiff's online research, if a [CTW] was issued in error, that it could be removed from a person's record. [WCSD-JD-12] places the plaintiff on another hold. This assurance that [WCSD-JD-12] briefly and momentarily provided the plaintiff with false hope - that the plaintiff could finally clear the plaintiff's name from any wrongdoing. After the minute-long hold, to the plaintiff's surprise, [WCSD-SP], not [WCSD-JD-12], responds to the plaintiff and [WCSD-SP] asks the plaintiff if the plaintiff remembers her which the plaintiff did acknowledge. [WCSD-SP] asks the plaintiff to explain the situation to her, which the plaintiff tried to do. [WCSD-SP] takes the same initial stance as [WCSD-JD-12] - that [RSR] could demand that the plaintiff sign the [CTW] even though the plaintiff did not do anything wrong. The plaintiff continued to protest the sheer injustice of this situation, and [WCSD-SP] says that it is simply a warning, that the plaintiff did not have to do anything wrong to be issued this warning. [WCSD-SP] continues to rudely talk over the plaintiff, even stating that she is not going to *"yell with"* the plaintiff, even though the plaintiff was not yelling - but rather, explaining out of extreme frustration and indignation. The plaintiff continues to explain that, if what [WCSD-SP] is saying is true, that the plaintiff could just pick anyone at random from the neighborhood and demand that the [WCSO] issue a [CTW] against them even if they were not guilty of any such act. [WCSD-SP] agreed, further qualifying that the person(s) that needed to be warned need to be present at the property for the [CTW] to be issued to them. [WCSD-SP] further states that this issue was many months ago, and wanted to know how it connects to today. The plaintiff explains [JJB]'s most recent crimes to [WCSD-SP]. [WCSD-SP] then yells an extremely-racist statement to the plaintiff - in effect, justifying all of such crimes committed against the plaintiff: *"THE BEST SOLUTION SID, IS TO MOW YOUR GRASS! AND THEN YOU WON'T HAVE THIS PROBLEM!"* [WCSD-SP]'s abusively racist statement - as outrageous as it is - would serve as just one of many microcosms for this lawsuit: [WCSD-SP] is basically explaining to the plaintiff that the plaintiff's neighbors, who all out of no coincidence, happen to be of the White/Caucasian/American color/race/nationality (just like the overwhelmingly majority of the [WCSD]s), could commit a seemingly unlimited number of racially-motivated hate-crimes against the plaintiff and get away with doing so, while justifying these crimes by stating that the plaintiff was failing to maintain the plaintiff's private-property according to White-American standards. This is precisely the type of criminal abuse - totally violative of the plaintiff's Constitutional rights and the plaintiff's fair-housing rights - that the plaintiff has suffered for over ten years by [JSP&KAP],[RSR], [WCLE] (and their co-conspirators) - even after [JJB] would lose her property to foreclosure during the year {2012}. The other infuriatingly-racist aspect about [WCSD-SP] statement is that it is clearly false - because the plaintiff's innocent failure and/or *"inability"* to maintain the plaintiff's private property according to White-American standards was always (throughout the time-period documented in this lawsuit) simply a fraudulent pretext that was fully abused,

exploited and weaponized by the defendants. The plaintiff has filed this lawsuit, in substantial part, to prove that the defendants engaged in racial-oppression and racketeering-activity against the plaintiff, and that they simply found the property-maintenance laws to be the only convenient weapon under which they could fraudulently act *"under color of law"* to engage in such racial-oppression and racketeering-activity against the plaintiff. The plaintiff tries to explain that the plaintiff did contact the [HOA] and found out that the plaintiff was in-the-clear with the [HOA] - that there were no restrictive-covenant violations. But before the plaintiff could even explain this, [WCSD-SP] rudely talks over the plaintiff, interrupts the plaintiff and threatens to hang-up on the plaintiff if the plaintiff did not keep quiet while she talked. Despite of the fact that the plaintiff was in-the-clear with the [HOA], the plaintiff further makes it clear that the [WCSO] has absolutely no authority over enforcement of restrictive-covenants as such enforcement-authority lies with the [HOA] - especially given that such enforcement-authority is a matter of civil contract law; [WCSD-SP] agrees. The conversation continues in frustrating circles (thanks to the [WCSO]'s obstructive conduct against the plaintiff), with the plaintiff trying to re-explain the sheer injustice of the entire situation. [WCSD-SP] tries to shift the blame away from the [WCSO] and onto the [HOA], instructing the plaintiff to make the [HOA] know about [RSR]'s and [JJB]'s abusive/criminal actions against the plaintiff, which the plaintiff said that the plaintiff had already done - although, clearly, the [HOA] is not responsible for enforcing criminal law. The plaintiff then further questions [WCSD-SP] as to the reason why she informed her co-workers at the [WCSO] about the private information that the plaintiff does not run the air-conditioning/heating unit inside of the plaintiff's [HOUSE], and that as a result of this lack of air-conditioning/heating, that there is an alleged odor inside of the plaintiff's [HOUSE]. [WCSD-SP] justifies her invasion of the plaintiff's privacy by making the egregiously racist statement that if the plaintiff's [HOUSE] is an *"unsafe environment"*, then she has a right to tell her co-workers about it. [WCSD-SP]'s continued abusive statements made it increasingly clear to the plaintiff that [WCLE] was hell-bent upon abusing/humiliating the plaintiff - making the plaintiff's life as miserable as possible - while at the same time, completely depriving the plaintiff of any right to justice - a pattern that would increasingly repeat itself over the decade that followed. The plaintiff would continue to question [WCSD-SP] as to why [WCSD-PP] included the plaintiff's date-of-birth in the [CTW] that he issued to [RSR] - a clear invasion of the plaintiff's privacy - and in actuality, the additional crime of *"Misuse-of-Official-Information"*. In yet another shocking statement, [WCSD-SP] justifies [WCSD-PP]'s abusive action stating that it is a government document, and that the government has the right to put the plaintiff's private information on there, for other unauthorized third-parties to see - in total violation of the plaintiff's fundamental right to privacy. The plaintiff questions [WCSD-SP] as to why [RSR] was made aware of the plaintiff's (confidential) date-of-birth, and [WCSD-SP] doubles-down on her previous statement. The plaintiff questions [WCSD-SP] as to why [WCSD-PP] did not note down [RSR]'s date-of-birth on the copy of the [CTW] document issued to the plaintiff, and [WCSD-SP], realizing that none of these abusive actions are, in any way, justifiable, states to the plaintiff that she cannot speak to what [WCSD-PP] did, since she was not there at that moment in time, and as a result of not being there, that she does not know the answer to such questions. The plaintiff asserts that such feigning-of-lack-of-knowledge is yet another commonly used tactic of [WCLE] employees - and [WCLE] in general - in-order-to evade accountability and liability for their actions. At this moment in time, the plaintiff makes it known to [WCSD-SP] that the plaintiff has audio-recorded that entire incident involving [WCSD-PP], further asking that if the plaintiff presented the audio evidence to her, if she could get such fraudulent [CTW] against the plaintiff removed. As soon as [WCSD-SP] realizes this extremely damaging and incriminating fact, [WCSD-SP] immediately tries to turn-the-table on the plaintiff, shouting at the plaintiff that the plaintiff committed an illegal act by secretly recording [WCSD-PP] without his consent. Once again, the plaintiff is increasingly reminded that the plaintiff is dealing with what appears to be a racketeering-enterprise, rather than a police-department. Contrary to what [WCSD-PP] fraudulently claimed, the facts are that:

Ⓐ Texas is a one-party-consent state, meaning that the plaintiff did not need [WCSD-PP]'s consent in-order-to record [WCSD-PP].

Ⓑ Even in some two-party-consent states (of which, Texas is not), a person is lawfully allowed to record a suspected perpetrator of crime(s) -

including police-officer(s) - without the consent of such perpetrator.

Ⓒ [WCSD-PP] unlawfully detained the plaintiff within the plaintiff's own private-property, engaging in abusive verbal-battering and racial-intimidation against the plaintiff while in front of [FRONTDOOR] to unlawfully coerce the plaintiff to sign a [CTW], and that the plaintiff has the lawful right to record anyone that is acting unlawfully within the plaintiff's private property (or within any other area that the plaintiff is lawfully allowed to be).

Ⓓ During the beginning of that very same year - {2012} - the 〈United States Department of Justice Civil Rights Division Special Litigation Section〉 issued a letter-opinion in the [SCOTUS] case of 《CHRISTOPHER SHARP V. BALTIMORE CITY POLICE DEPARTMENT, ET. AL.》, affirming that private-citizens have the first-amendment-right, the fourth-amendment-right and the fourteenth-amendment-right to *"record police officers in the public discharge of their duties"* - even while on public property or on any other property that such citizens are lawfully allowed to be.


So, the plaintiff additionally asserts that [WCSD-SP] - acting in her official-capacity under the authority of the [WCSO] - engaged in the racketeering-act of *"witness-intimidation"* against the plaintiff when she fraudulently shouts to the plaintiff that the plaintiff had committed an illegal act by secretly recording [WCSD-PP]'s (federal and state) crimes against the plaintiff without his consent. The plaintiff explains that the plaintiff's brother, [PK], owned two (real-estate) properties at that moment in time - one property in Cedar Park (which is located within the County-of-Williamson) and another property in Austin (which is located within the bordering County-of-Travis). So, the plaintiff further questions [WCSD-SP] that although [WCSD-PP] forced [PK] to sign the [CTW] against [RSR]'s property, as to why, [RSR] was not made to sign a [CTW] against either, or both, of [PK]'s private-properties. [WCSD-SP] explains that [RSR] would have no reason to go over to [PK]'s property - which the plaintiff asserts is completely irrelevant according to the previous logic that [WCSD-SP] had explained to the plaintiff. The plaintiff further questions [WCSD-SP] as to why [WCSD-SP] never issued [RSR] a [CTW] against the plaintiff's property when the plaintiff initially reported [RSR]'s crimes against the plaintiff to [WCSD-SP] during the day of {2011-08-01}. The plaintiff further questions why it had-to-take [PK] to issue a threat-to-sue [RSR] in-order-to get [RSR] to stop engaging in such brazenly criminal conduct against the plaintiff for [RSR] to be finally issued a [CTW] against the plaintiff's property - which, in turn, only happened after [WCSD-PP] abusively and unlawfully coerced, via racial-intimidation, the plaintiff to sign a [CTW] against [RSR]'s property. The plaintiff questions [WCSD-SP] if she recognizes that each of the questions that the plaintiff has asked of [WCSD-SP] reveals a separate count of the unlawful act of racial-discrimination against the plaintiff and/or [PK]. Not surprisingly, [WCSD-SP] denies any discrimination, and demands to end the phonecall if the plaintiff does not have any other issue to resolve. Since the plaintiff has a recording of [JJB] entering into the plaintiff's property, the plaintiff asks [WCSD-SP] if the plaintiff can have a [CTW] issued to [JJB] without [JJB] forcing the plaintiff to be served with a reciprocal [CTW]. [WCSD-SP] responds that this is not possible, and continues to question if the plaintiff would like to proceed with the reciprocal [CTW]. The plaintiff declines to proceed since the plaintiff fears that when the plaintiff is picking so-called *"weeds"* near the border-area of the two properties , the plaintiff could easily be falsely-accused of violating the [CTW] by the plaintiff's malicious neighbors who had already demonstrated their extreme racial-animus against the plaintiff. Although the plaintiff became increasingly-indignant and frustrated throughout this entire conversation, the plaintiff tries to end the conversation as civilly as possible - even confirming whether the plaintiff was speaking with [WCSD-SP]. Before the plaintiff could complete this final question, [WCSD-SP] had already unprofessionally hung-up the phonecall on the plaintiff. After this unprofessional hangup, the plaintiff calls the [WCSO] dispatch again, and tries to find out from the dispatch if whether this aforementioned process of issuing [CTW] is legitimate or not. The dispatch takes in the information, but informs the plaintiff that only Deputies are able to discuss such matters of criminal-law with the plaintiff, and so, the plaintiff is informed that the plaintiff will receive a call-

back from a Deputy. The plaintiff asks which Deputy the plaintiff would be speaking to, and the plaintiff is told that the plaintiff would be speaking to whoever is operating the plaintiff's particular residential area. A few minutes later, the plaintiff receives a call back from [WCSD-JD-12] who, this time, more clearly identifies herself with last name Moore [WCSD-BM]. The plaintiff quickly explains the situation and questions why the plaintiff was forced to sign a [CTW], and the plaintiff is immediately interrupted by [WCSD-BM], who explains that she was the one that initially spoke to the plaintiff prior to [WCSD-SP] and that she is the partner of [WCSD-SP]. [WCSD-BM] informs the plaintiff that she is going to provide the same response to the plaintiff as was provided by [WCSD-SP], and just as any other Deputy within the [WCSO] would provide to the plaintiff. As the plaintiff continues to question why the plaintiff should suffer any negative consequence on the plaintiff's otherwise clean (and empty/blank) record, when the plaintiff did not do anything wrong. [WCSD-BM] informs the plaintiff that it is not on the plaintiff's record and that it simply a sheet of paper that all parties - the [WCSO], the plaintiff and [RSR] - has copies of. The plaintiff tries to re-explain the situation, further explaining that it is absurd and bizarre that any resident can demand a [CTW] out of any other resident out of pure whim-and-faney, without any proof of any violation of trespass law (or any associated criminal law). And this time, the plaintiff gets a slightly different response from [WCSD-BM]. [WCSD-BM] reveals that if [RSR] *"may have believed"* that the plaintiff was on her property, that [RSR] could then lawfully demand that the plaintiff be issued a [CTW]. But as the plaintiff's audio recording of that incident immediately reveals - right from the very beginning - when [WCSD-PP] initiates his abusively-raeist verbal-battering of the plaintiff, the plaintiff alarmingly denies entering onto [RSR]'s property, [WCSD-PP] takes the plaintiff's denial to [RSR]'s son [BR], who then confirms that the plaintiff was never seen - that in fact, the plaintiff was inside the plaintiff's [HOUSE] the whole time. Thus, [RSR] knowingly made a fraudulent accusation against the plaintiff in-order-to get [WCSD-PP] to force the plaintiff to sign the [CTW], even though [RSR] had trespassed onto the plaintiff's property, even blackmailing the plaintiff by threatening to get the plaintiff kicked out of the plaintiff's [HOUSE] by the [HOA] - a threat of racial-intimidation that was an egregious violation of the [FHA]. Despite of these facts, [WCSD-BM] pretends not to understand the plaintiff's simple point concerning the egregious injustices and racial-discrimination. The plaintiff explains that if the plaintiff contacted a lawyer and explained this situation to them, that they would be able to understand and agree that this method of issuing reciprocal [CTW]s is illegitimate and unlawful, and that [CTW]s should only be issued to those who had actually trespassed. The plaintiff further explains that, according to the plaintiff's online research, a [CTW] can be removed if it was issued in error. [WCSD-BM] continues to state that the [CTW] was not issued in error, because [RSR] demanded it of the plaintiff - despite [RSR] finally admitting that she had made multiple fraudulent accusations against the plaintiff since the plaintiff never was on her property, and [PK] was never a resident nor property-owner of the plaintiff's private-property, [788KLLTX78641]. The plaintiff, once again, questions [WCSD-BM] as to why [RSR] was not issued [CTW]s against either of [PK]'s multiple properties (in Austin and Cedar-Park). [WCSD-BM] responds that [WCSD-SP] has already explained the reasons for this, and that their answers are not going to change. The plaintiff, in extreme mental-anguish, expresses extreme frustration that [WCSD-BM] eonld not have an honest conversation on this legitimate topic of racial-discrimination with the plaintiff. The plaintiff finalizes the conversation by asking [WCSD-BM] for her first name - for which she responds: Brandi. The plaintiff then asks if she is part of the patrol unit, which she confirms to be true. Despite the plaintiff's mental-anguish, the plaintiff ends the call with [WCSD-BM] in a relatively eivil manner, this time, with neither party hanging-up the phone on the other.


## ¶329

Shortly after the previous phonecall, the plaintiff makes another phonecall to the *"Cedar Park Annex"* of the [WCSO] - the closest regional department rather than the main [WCSO] Georgetown/Communications headquarters - and this time speaks to Sheriff Administrator Shannon Sandell [WCSA-SS]. The plaintiff briefly recounts to [WCSA-SS] the traumatizing experience where the plaintiff was foreed to sign a [CTW]

SIDDHARTH KODE    V.    WILLIAMSON COUNTY ,   ET  AL.                    1696907690

due to the malicious, predatory and discriminatory actions of [RSR],[WCSD-PP],[WCSD-SP],[JSP] despite of the fact that [RSR] was the only one who trespassed onto the plaintiff's property in order to commit the crimes of intimidation/interference/disorderly-conduct/blackmail against the plaintiff (none of the crimes of which she was charged/prosecuted for). For the most part, [WCSA-SS] allowed the plaintiff to speak without rudely interrupting/talking-over the plaintiff, and allowed the plaintiff to convey the excruciating and traumatizing pain that plaintiff was suffering as a result of the injustice suffered by the plaintiff at the hands of [RSR],[WCSD-PP],[WCSD-SP],[JSP]. [WCSA-SS] initially directs the plaintiff to speak to the main Communications line and have them dispatch to one of the Deputies. The plaintiff responded that the plaintiff had already tried pursued that option and was directed to the same Deputies that were involved in the abusive actions against the plaintiff - so, clearly, the plaintiff was not going to get a resolution through that path. [WCSA-SS] understood and tries to look up these cases using the case-numbers/event-numbers involved - the case-number of the criminal-mischief/illegal-dumping (C20110800024), and also the case-number/event-number for the [CTW] issue (2011078376). The plaintiff further explains to [WCSA-SS] that, according to the plaintiff's online research, if a [CTW] is issued in error, then it can be removed. The plaintiff then continued to, in much greater detail, explain to [WCSA-SS] the circumstances surrounding the criminal/abusive incidents involving [RSR],[JJB],[WCSD-PP],[WCSD-SP],[JSP] that took place during the previous 3 years. The plaintiff expresses great shock at the brazen sense of impunity that all of these individuals - [RSR],[JJB], [WCSD-PP],[WCSD-SP],[JSP] - have operated with, when it comes to committing crimes/abuses against the plaintiff - that these individuals feel with supreme-confidence that there will be no consequences for their brazen violations of the plaintiff's rights. [WCSA-SS] reveals to the plaintiff that there was no report written for the [CTW] incident (2011078376). The plaintiff explains to [WCSA-SS] that it does not surprise the plaintiff that there was no report written on that [CTW] incident, because if [WCSD-PP] wrote a report on that incident, then he would have been forced to reveal in that report that he had egregiously violated the plaintiff's rights, and further, that multiple of the plaintiff's neighbors ([RSR],[JJB],[JSP]) along with [WCSD-PP],[WCSD-SP] had committed serious crimes against the plaintiff. At this moment in time, the plaintiff begins to realize that [WCSD-PP], and by extension the [WCSO], committed an additional count of Obstruction-of-Justice against the plaintiff by deliberately failing to write such police-report, thus concealing all evidence of crimes that he and his co-conspirators [RSR], [JJB],[JSP] committed against the plaintiff. While [WCSA-SS] was initially hesitant to acknowledge any wrongdoing on the part of the [WCSD]s, after the plaintiff conveyed in greater detail the sequence of events, [WCSA-SS] was more receptive to the fact that there may have been injustice here, and provided the plaintiff with contact information for the Sergeant superior to [WCSD-PP]: [WCSS-T]. The plaintiff had even expressed frustration that it should not have to take the plaintiff nor [AJC],[773KL-2009-2] to have to contact lawyer(s) to resolve this issue through litigation, when this issue can be resolved by simply revoking the [CTW] that was abusively issued against the plaintiff (and also against [AJC],[773KL-2009-2]), and by prosecuting all of those individuals involved in committing crimes against the plaintiff (and also against [AJC],[773KL-2009-2]). Surprisingly, [WCSA-SS] even acknowledged that that might be the route that the plaintiff might have to pursue if the plaintiff is not able to resolve the issue by talking to [WCSD-PP]'s boss.

## ¶330

[WCSS-T] called the plaintiff shortly after the plaintiff requested to speak to [WCSD-PP]'s boss. The plaintiff tried to explain to [WCSS-T] that the plaintiff was unjustly forced to sign a [CTW] when no one from the plaintiff's property did anything wrong (and when the plaintiff did not even step out of [HOUSE] on that particular day) nor stepped onto any other person's property. [WCSS-T] parrots the same outrageous justification that if [RSR] demanded that the plaintiff not step foot on her property (and even though the plaintiff had never even crossed the street to the opposite sidewalk where [RSR] lived), then she was justified in demanding it and [WCSD-PP] was justified in forcing the plaintiff to sign the [CTW]. The plaintiff tried at least three times to explain the situation to [WCSS-T], and [WCSS-T] responded in the same manner

as [WCSD-BM] and [WCSD-SP], that he had already explained his opinion to the plaintiff, and further that, his opinion is not going to change. The plaintiff tried to explain to [WCSS-T] that this is not an issue of difference-of-opinion, but rather a legitimate legal issue - that is, at best, a miscarriage-of-justice, and at worst, an act of extreme abusiveness and predatory maliciousness of [WCSD-PP], acting in conspiracy with [RSR], and while working in concert with the [WCSO] (since [WCSD-PP] was police-radio-communicating with the [WCSO] during this incident). The plaintiff further asked that since this is a legitimate legal issue: What if the plaintiff took this issue to a lawyer and explained the entire situation to the lawyer. [WCSS-T] stated that the plaintiff is free to discuss the topic with anybody the plaintiff chooses, and before the plaintiff could respond, [WCSS-T] had already hung-up the phone on the plaintiff. Once again, the plaintiff is reminded that the plaintiff is not dealing with a police-department, but rather, an obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise. After these, yet more, remarkable acts of racist-unprofessionalism and blue-wall-of-silence suffered by the plaintiff, the plaintiff calls the *"Cedar Park Annex"* of the [WCSO] again, and this time speaks again with [WCSA-SS] who informs the plaintiff that there is nothing that she could do, since she is a Sheriff Administrator, and as a Sheriff Administrator, she does not have the power to override the decisions of a Deputy. The plaintiff understood and asked [WCSA-SS] if there was anyone else at the [WCSO] that could help the plaintiff resolve the issue, and [WCSA-SS] informs the plaintiff that the plaintiff could speak to Lieutenant Tony Carter [WCSL-TC] - the boss of [WCSS-T] - but also that [WCSL-TC] was not on duty on that day. The plaintiff asked {WCSA-SS]: How likely is it for the plaintiff to succeed in getting this [CTW] removed by speaking to [WCSL-TC]. [WCSA-SS] explains to the plaintiff that she does not know the answer to that question, especially since she does not have the power to override the decisions of Deputies, but that [WCSL-TC] is likely to speak to [WCSS-T] to find out more about the situation. The plaintiff thanks [WCSA-SS] for providing the plaintiff with this information, and the phonecall ends civilly. The plaintiff decided not to contact [WCSL-TC], because it became increasingly apparent to the plaintiff, that the plaintiff was not only further-injuring a deep wound of the plaintiff that would not heal - at least, not by speaking to anyone at the [WCSO] - and furthermore, that the plaintiff would likely face further acts of retaliation by speaking out to [WCSD-PP]'s superiors at the [WCSO]. Indeed, the plaintiff already realized that the plaintiff made a crucial mistake of revealing to the [WCSO] that the plaintiff had, at that point in time, audio-recorded all (or at least some) of the plaintiff's interactions with the [WCSO] and its employees. The plaintiff asserts that the plaintiff unwittingly became an *"enemy of the state"* by revealing to [WCLE] that the plaintiff had audio-recorded extremely incriminating and damaging information - the racially-motivated crimes/civil-rights-violations committed against the plaintiff by [WCLE] and its co-conspirators [RSR],[JJB],[JSP] - about [WCLE] and some of its employees. The plaintiff asserts that, as an unwitting *"enemy of the state"*, the plaintiff would continue, over the next decade, to suffer numerous acts of racketeering-activity - particularly Obstruction-of-Justice and retaliation - by defendant [WC], particularly [WCLE] and some of its employees, in substantial part, because of the extremely incriminating and damaging information about [WCLE] that the plaintiff had in the plaintiff's possession. More importantly, since none of the persons that had committed the aforedescribed hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff - [RSR],[JJB],[JSP],[WCSD-PP],[WCSD-SP] - was in any way punished for those criminally abusive actions - despite of [WCLE]'s full (or at least substantial) knowledge of these hate-crimes/racketeering-acts/civil-rights-violations/abuses committed against the plaintiff - this dereliction-of-sworn-official-duties from [WCLE] against the plaintiff would continue-to-send a powerful message, loud-and-clear to the plaintiff's predatory neighbors [RSR],[JSP&KAP] and other members of the [WCLE] - that they are completely free to commit, with absolute impunity, hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff - a low-IQ, powerless subhuman animal - living within a White neighborhood, apparently, without any rights (🔒).

## ¶331

On a day following the aforementioned incidents, the plaintiff called the [WCSO] again, this time to see if the old case regarding [JJB]'s

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

criminal-mischief/illegal-dumping of the plaintiff's property could be re-opened given the new evidence that the plaintiff had of [JJB] knocking on the [FRONTDOOR] in order to threaten the plaintiff about so-called *"weeds"* on the plaintiff's property. The call was dispatched to Deputy Prez [WCSD-Prez], who first asked the plaintiff if the plaintiff had definitive proof of the criminal-mischief/illegal-dumping. The plaintiff once-again explained that besides the fact that the [WCSD-PP] had made multiple statements that it was [JJB] that committed these crimes against the plaintiff, and the fact that the plaintiff was outdoors in [BACKYARD] while one of these criminal-mischief/illegal-dumpings occurred into [BACKYARD], and the fact that [JJB] was the only tall/adult resident at that property that was capable of committing the crimes on those days in {2011}, the plaintiff did not have any other video evidence to prove that those criminal-mischief/illegal-dumpings were committed by [JJB]. [WCSD-Prez], while admitting that the [WCLE] could not proceed with prosecution unless the plaintiff had directly-witnessed (seen) [JJB] committing those crimes or had video of [JJB] committing those crimes, also directed the plaintiff to the [WC] Constable's Office [WCCO], Precinct 3, which is responsible for handling illegal-dumping cases. This fact is also yet another significant component of the plaintiff's racial-discrimination complaint against the defendants, because as future incidents would show, while the [WCCO] did not do anything to even investigate, let alone charge/prosecute, [JJB]'s illegal-dumping crimes against the plaintiff in the years {2011}/{2012}, the [WCCO] would play a crucial role in the years {2015} through {2021} in its predatory, malicious, abusive and retaliatory targeting of the plaintiff for the plaintiff's failure to maintain the plaintiff's private-property according to [JSP&KAP]'s,[RSR]'s subjective White-American standards. So, to make this point more clear, the [WCCO] deems it acceptable for [JJB] - a physically-larger White-American woman with blonde-hair/blue-eyes to, motivated by her racial-animus, criminally-vandalize an immigrant-of-color's private-property - but it is not, under any circumstance, acceptable for that same immigrant-of-color to fail-to-maintain his/her private-property according to the subjective White-American standards of malicious, predatory White-American neighbors: the striking injustice and racist hypocrisy of this situation goes well-beyond mere *"racial discrimination"*. The plaintiff then questioned [WCSD-Prez] regarding issuing [JJB] with a [CTW] against the plaintiff's property, given that the plaintiff did have the evidence of [JJB] knocking on the plaintiff's door in-order-to make the aforementioned threat to the plaintiff. [WCSD-Prez] stated that a Deputy could issue her such a [CTW], and further stated the correct fact that [JJB] did not need to threaten the plaintiff in order to justify such a [CTW] - only her mere trespass would have sufficed for such [CTW]. The plaintiff further questioned [WCSD-Prez] if [JJB] was issued a [CTW], if [JJB] could also have a [CTW] issued against the plaintiff, and to the plaintiff's surprise, [WCSD-Prez] provided a significantly different response compared to his aforementioned colleagues. [WCSD-Prez] stated that [JJB] would not be able to have a Deputy issue the plaintiff with a [CTW] unless [JJB] had proof that the plaintiff trespassed onto [JJB]'s property, because without such proof, the issuance of such [CTW] would be a pure act of *"retaliation"*. In retrospect, the plaintiff is truly shocked by [WCSD-Prez]'s surprisingly honest statements concerning criminal-trespass law, because this is precisely what the plaintiff had been trying to communicate to many of the aforementioned [WCSD]s that refused to acknowledge that the plaintiff was egregiously and unjustly forced to sign a [CTW] out of pure *"retaliation"* - retaliation, not only by [RSR],[JSP],[JJB] but more importantly, retaliation by [WCSD-PP],[WCSD-SP], and the [WCSO] - all acting in a retaliatory conspiracy against the plaintiff with co-conspirators [RSR],[JSP],[JJB]. The plaintiff strongly believes that the reason why [WCSD-Prez] provided answers significantly different from the other aforementioned [WCSD]s is because the plaintiff had not revealed to [WCSD-Prez] about how the plaintiff was viciously retaliated-against and criminally-abused by [WCSD-PP],[RSR],[JJB],[JSP] in those traumatizing incidents of {2011-08} (and their aftermath). In other words, as long as [WCSD-Prez] was unaware of the situation involving the plaintiff and his colleagues at the [WCSO], thus answering the plaintiff's questions in an unbiased and objective manner without realizing that he was implicating his colleagues at the [WCSO], the so-called *"blue-wall-of-silence"* did not kick in to his responses to the plaintiff. In so doing, the plaintiff had, without even intending to do so, inadvertently conducted a small-scale and modified version of Jane Elliot's famous ({1968}) *"Blue-Eyes, Brown-Eyes"* experiment on [WCLE] - an inadvertent experiment that, in this particular case, clearly shows how extreme

racial-biases and/or pro-police-biases within law-enforcement do result in radically-different responses.

# ¶332

On or about a morning in the month of {2012-04}, the plaintiff notices [JSP] approach the [FRONTDOOR] with a hand-written angry note/page in hand. [JSP] uses some duct-tape to tape such angry note/page onto the plaintiff's [FRONTDOOR]. [JSP] would then jog back to the driveway of [784KLLTX78641] and drive away in his pickup truck. At some point in time, the plaintiff opens the [FRONTDOOR] and reads the angry note/page. The page on which the angry note was written may (or may-not) have been torn-out of a notepad from what appears to be [JSP]'s then-employer (redacted below), since it included the logo, address and contact information of this business located in the Central-Texas area (redacted below). In the angry note, [JSP] admits to re-doing his front-yard with what clearly appeared to be a different species of grass. [JSP] would later admit to the plaintiff that [JSP&KAP] never sought approval from the [HOA] at any point in time to install that new grass, even though to this day, that new grass remains on the front-yard of [784KLLTX78641]. As the plaintiff would later find out, that new species of grass, Saint Augustine, is a very-water-thirsty, non-drought-tolerant grass that requires frequent irrigation to be kept alive, especially during the summer months. It would appear to the plaintiff (from this incident and several subsequent incidents) that the [HOA] is giving preferential treatment to at least some White-American homeowners who violate the restrictive-covenant(s) (by performing unapproved changes to front-yard landscaping) while wastefully consuming more natural resources, and/or polluting the environment by using pesticides and/or synthetic/chemical fertilizers. This fact is also a very small, but still significant, part to the plaintiff's discrimination claim, as both [JSP&KAP] and [RSR] would successfully extort/blackmail the [HOA] into suing the plaintiff in the years of {2015}-through-{2019} for the plaintiff's insistence to install a *"no-mow"* grass, while simultaneously submitting approval documents - hypocritically demanding to the [HOA] that the plaintiff needs to be sued due to the plaintiff's lack of seeking prior-approval. It became increasingly clear to the plaintiff that [WCSD-PP]'s,[WCLE]'s predatory, abusive, institutionally-racist treatment of the plaintiff in the month of {2011-08} - especially on the day of {2011-08-30} - had only emboldened the plaintiff's predatory neighbors to step-up their intimidation/interference/disorderly-conduct/blackmail tactics against the plaintiff. The angry note, which included [JSP]'s then-phone-number (redacted below), and which the plaintiff has preserved to this day (original exhibit preserved and available), reads as follows:

> ▸   HAND-WRITTEN ANGRY NOTE FROM [JSP] TO PLAINTIFF CONCERNING ALLEGED "NEEDS" ALLEGED TO BE ORIGINATING FROM PLAINTIFF'S YARD    (2012-04-?? 08:00) (~)
> ▸   [ PRIVATE INFORMATION IN NOTE OMITTED/REDACTED TO PROTECT THE PRIVACY OF [JSP] ]
>
> [JSP]                                                        *Joey*
>                                                                        *** ****
>
>            *Sid,*
>
>            *Its Joey from next door. Please under no circumstance mow or weedeat your lawn w/out a catch on your mower. Im already having to redo my whole*
>            *yard due to your weed problem. If you don't have one please let me mow it. Ive spent a lot of $ redoing my lawn and I would be very upset if you shot*
>            *seeds all over my new lawn.*
>
>                                                        *Thanks*
>                                                        *Joey*

# ¶333

On or about the day of {2012-05-16}, a designated *"Neighborhood Watch Coordinator"* [NWC] of the 【Summerlyn】 subdivision sends the

following email message to countless residents of the subdivision, alerting them of so-called *"fear and unrest"* caused by *"one or two bald African American men"*, and further that the [WCLE] police have been called on to monitor the situation by *"driving through the neighborhood often"*. This email was sent a few months after the death of African-American teenager Trayvon Martin caused by a neighborhood-watch vigilante that harbored significant racial-animus, sparking nationwide outrage, protests and the birth of the *"Black-Lives-Matter"* [BLM] movement. While the plaintiff is not opposed the general-idea of a neighborhood-watch, the plaintiff is strongly opposed to the use of any neighborhood-watch for the spreading of racist messages/propaganda or even racially-insensitive-language and/or racist-dog-whistles that causes any harm against members of racial-minorities. At the very least, this email could have been written without identifying the men as *"African American"* - since there was other identifying information provided and because there could have been other non-racial identifying information additionally provided. Furthermore, if any resident of the neighborhood needed to know the alleged race of the alleged individuals, then this information could have been exchanged by individual private emails or private phone-calls - on an individual, need-to-know basis - instead of posting the race to the huge mailing-list of countless residents. (Incidentally, the designated [NWC] lived on the same street as the plaintiff.) More importantly, this email shows the huge difference in actions/behaviors/conduct of [WCLE] - clearly responding with a strong showing of force when the demands are made by White-Americans and the alleged perpetrators are *"African American"* whereas, there was absolutely no such showing of any force by [WCLE] to any of the numerous incidents of racial-intimidation, assault, terroristic-threat, harassment/stalking, disorderly-conduct, criminal-mischief, illegal-dumping, blackmail, etc. - those crimes committed by the White-American defendants against the plaintiff - clearly because the victim of these serious crimes - including racially-motivated hate-crimes and retaliatory (felony) crimes - is an immigrant-of-color/indigenous-person - whom the defendants always considered to be a low-IQ, subhuman animal - completely devoid of any rights. Instead, whenever there was any strong showing of force by [WCLE] regarding the plaintiff, it was because the plaintiff's predatory White-American neighbors - particularly [JSP&KAP],[RSR],[JJB] (and some of their co-conspirators such as [DMP]) - demanded that the [WCLE] police egregiously-violate the plaintiff's rights, by threateningly reminding the plaintiff that the plaintiff lives in a White neighborhood, and as a result of living in such White neighborhood, the plaintiff better keep silent about all of the crimes that are committed against the plaintiff by White-American neighbors, especially if the plaintiff is not maintaining the plaintiff's property according to White-American standards. The message also makes other racially-insensitive references and/or racist-dog-whistles - such as how the White neighborhood, and in particular, the White neighborhood's White-American children needed to be protected by [WCLE] from such *"African American men"*, whom the poster automatically refers to as *"criminals"*. This email would be just one of many emails/social-media-messages that would serve as a painful reminder to the plaintiff that racial-bias, or at the very least, the widespread use of racially-insensitive-language and/or racist-dog-whistles - if not overt, then at least subtle - is alive-and-well within the neighborhood. It is within this backdrop of subtle racism existing within the 【Summerlyn】 subdivision that the plaintiff has suffered the more-overt predatory racism of the defendants - the existence of subtle racism within the neighborhood making the overall environment more hospitable to the more-overt predatory racism directly suffered by the plaintiff at the hands of the defendants:

> "Neighborhood Alert!!" ·   EMAIL FROM [NWC] TO COUNTLESS 【Summerlyn】 RESIDENTS CONCERNING "FEAR AND UNREST"   (2012-05-16 17:55)(~)
> [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT THE PRIVACY OF SENDER [NWC] ]

[NWC]

*Hello!*

*This is \*\*\*\*\*\* \*\*\*\*, Neighborhood Watch Coordinator for Summerlyn Neighborhood. It is has been brought to my attention that there has been a red or maroon colored car in the neighborhood causing concern, fear and unrest to children and adults this week. The occupants are one or two bald **African American men. The Williamson County Sheriff's department has been called and are driving through the neighborhood often**. Please reply if you have experienced any harm or fear from the above description. If you see a situation like this one or feel uncomfortable at all about anything going on in the neighborhood, please call the WILCO Sheriff's office and then send me an email. We are coordinating an information gathering drive in the next couple of weeks. I am hoping to gather email addresses or phone numbers, for those who do not have internet capabilities, to be able to put out ALERTS for fires, assaults, or other issues that we need to be aware to either keep **our** kids, home or ourselves from stumbling into danger. Please reply to this email and talk to your safety conscious neighbors about helping with the gathering or data entry of this information for the nearly 700 homes in Summerlyn. If we all work together it will not be as daunting of a project for any one person to tackle to help keep this neighborhood unattractive to* **criminals.**

*WILCO Sheriff's Office*
*Immediate Emergencies - 911*
*Non-Emergent Issues - 512-943-1389*
*Main Office - 512-943-1300*

*Thanks so much!*
*\*\*\*\*\*\* \*\*\*\*, NWC Coord.*
*Kingfisher Lane*

## ¶334

On or about a late-morning in the end of the month of {2012-05}, the plaintiff was performing some yard-work in [FRONTYARD], when [JSP] approached the plaintiff on the [784KLLTX78641] sideyard and expressed his anger at the plaintiff for what [JSP] alleged to be so-called *"weeds"* growing in the plaintiff's [BACKYARD]. The plaintiff responded in a timid/friendly manner stating that many indigenous peoples actually live in jungles - suggesting that whatever vegetation that the plaintiff had growing in the plaintiff's [BACKYARD] pales in comparison to the wild environments that such indigenous peoples willfully live-in and thrive-in. The plaintiff also stated that the plaintiff likes the natural vegetation growing in plaintiff's [BACKYARD] and would not be growing such vegetation otherwise - in other words, that such vegetation are not *"weeds"* because the term *"weeds"* only refers to undesirable (or unintentionally-grown) vegetation. [JSP] expressed his anger to his perception that the plaintiff smiled as the plaintiff was responding, angrily shouting at the plaintiff, *"IT'S NOT FUNNY, SID! ... I MEAN I'VE HAD NEIGHBORS TELL ME THAT I SHOULD COME OVER THERE AND KICK YOUR ASS!"* The plaintiff, taken aback by [JSP]'s threat of violence, timidly responded that the plaintiff normally smiles when talking to people as a way of showing friendliness. [JSP] then countered the plaintiff's argument by alleging what he alleged to be the lower-life-expectancy of such indigenous peoples. The plaintiff strongly disagreed, stating that many (if not most) of those indigenous peoples live to ninety years-of-age and above and that some even live in so-called *"blue zones"* (where a larger fraction of such people live to hundred years-of-age or above), even suggesting to [JSP] that their relatively longer-life-expectancies are a direct result of their indigenous/traditional/natural lifestyle choices. [JSP] then threatened the plaintiff that a nearby two-story house has a greater view into the plaintiff's [BACKYARD], and that they could easily contact {Animal Control Services} on the plaintiff, if the plaintiff did not *"take care of"* the plaintiff's [BACKYARD]. (At this relatively-early point in time, many the neighborhood's newly-planted trees had not grown to full-size-and-maturity; therefore, since that relatively-early point in time, the alleged *"view"* from two-story houses into the plaintiff's [BACKYARD] that [JSP] is referring to, has almost completely, been

obstructed by such fully-grown trees.) [JSP] thus shifted the blame for such predatory behavior away from [JSP&KAP] and onto other neighbors - even claiming that [JSP&KAP] had never complained to the [HOA] about the plaintiff - a fraudulent claim that would be disproved within a matter of weeks when the plaintiff would receive another threatening letter from the [HOA] which included a alleged photograph of the plaintiff's [BACKYARD] that was clearly taken from a private area of [JSP&KAP]'s property (by a person raising his/her camera-phone over the 6-feet-tall-privacy-fence) - see below. [JSP]'s predatory intimidation/interference/disorderly-conduct/blackmail acts and gaslighting tactics against the plaintiff, as the plaintiff would later find out, would be part a much larger-pattern of deliberately-malicious and predatory strategy/behavior/actions of hate-crimes/racketeering-acts/civil-rights-violations/abuses undertaken by [JSP&KAP],[RSR] to predatorily brainwash/indoctrinate and gaslight the plaintiff into thinking that,

Ⓐ the whole neighborhood (consisting of approximately 90% White-American residents) were somehow against the plaintiff because of the manner in which the plaintiff maintained the plaintiff's private-property (which, even if true, in actuality, had much more to do with the plaintiff's racial-profile), and that

Ⓑ they would continue to predatorily demand authorities including the [HOA] and the agencies of [WLCE] to take more predatory enforcement actions against the plaintiff, thereby inflicting further harm and emotional distress onto the plaintiff.

This was at least the fourth act of intimidation/interference/disorderly-conduct/harassment/blackmail/terroristic-threat/assault that [JSP] committed against the plaintiff. It became increasingly clear to the plaintiff that [WCSD-PP]'s,[WCLE]'s predatory, abusive, institutionally-racist treatment of the plaintiff in the month of {2011-08} - especially on the day of {2011-08-30} - had only emboldened the plaintiff's predatory neighbors to step-up their intimidation/interference/disorderly-conduct/harassment/blackmail/terroristic-threat/assault tactics against the plaintiff - even threatening to use [WCLE], as proxy enforcers, to engage in further acts of racial-intimidation by proxy against the plaintiff.

# ¶335

On or about the date of {2012-06-13}, the plaintiff received a deed-restriction-violation, [DRV], notice from the [HOA], demanding that the plaintiff cut what the [HOA] alleged to be so-called *"weeds"* growing in the plaintiff's private/concealed/curtilage [BACKYARD] (since the default-installed bermuda-grass does not grow to over approximately 12 inches in height). Due to the 6-feet-tall-privacy-fences installed in all of (or almost all of) the properties in the subdivision, [HOA] inspectors do not have a direct-view into such private-property backyards from the public street, and as a result, cannot take photographs of such alleged *"violations"*. The notice instead clearly showed an alleged photograph originating from a private area of [JSP&KAP]'s property [784KLLTX78641], which showed that a person within such private area of [JSP&KAP]'s property - either [JSP] or [KAP] - took such alleged photograph from such private area of [784KLLTX78641]. It is indisputable that [JSP&KAP] submitted to an unauthorized third-party - the [HOA] - what [JSP&KAP] alleged to be a photograph of the plaintiff's private/concealed/curtilage [BACKYARD]. The fact that [JSP&KAP] would send a photograph which they alleged to be of the plaintiff's private/concealed/curtilage [BACKYARD] - areas of the plaintiff's private-property that are clearly not only not visible from the public street **and** areas of the plaintiff's private-property that are not fully-visible even to them (due to such 6-feet-tall-privacy-fence) - to an unauthorized third-party - in this case, the [HOA] - is a clear violation of the plaintiff's fundamental right to privacy. Additionally, [HOA]s are required, by Texas law ([TPrC-T11-C202]), to enforce the restrictive-covenants of the subdivision in a manner that is not *"arbitrary, capricious, or discriminatory"*. Therefore, if the [HOA] is not inspecting every property-owner's backyard, then the [HOA] certainly cannot inspect the

plaintiff's [BACKYARD] - which would not only be a violation of [TPrC-T11-C202] but also a violation of the [FHA]/[TFHA], since the plaintiff asserts that such discrimination is racially-motivated (especially as [JSP&KAP]'s extreme-racial-animus against the plaintiff would fully reveal itself in future incidents). In other words, the [HOA] would have to prove in Court, at a minimum, that they are inspecting every backyard in an manner that is not *"arbitrary, capricious, or discriminatory"* to be able move forward with any legal claim regarding the plaintiff's private/concealed/curtilage [BACKYARD]. Furthermore, under the [FHA]/[TFHA], the [HOA] cannot *"cherry-pick"* which restrictive-covenants it gets to enforce and how it gets to enforce those restrictive-covenants if that cherry-picking, in any way, targets a racial-minority and/or gives a free pass to certain restrictive-covenants that are repeatedly violated overwhelmingly (or disproportionately) by White-Americans (and/or non-immigrants), such as, but not limited to - the rampant illegal-lighting of fireworks, the rampant parking-related violations, the rampant speeding-vehicles, the rampant noise-nuisances, the rampant unleashing of large cats to enter into other residents' backyards, etc - as such *"cherry-picking"* is a clearly racially-discriminatory housing practice. This was just one of the countless abusive/oppressive/intrusive/invasive actions committed against the plaintiff (over the course of approximately twelve years) by the [HOA] that consistently acted predatorily against the plaintiff based on the malicious, predatory demands of predatory neighbors [JSP&KAP],[RSR] (and former predatory neighbor [JJB]) - all of whom harbored extreme-racial-animus against the plaintiff. The plaintiff would later find out (see numerous social-media-postings and/or [HOA] meeting incidents below) that both [RSR] and [JSP&KAP] were engaging in blackmail against the [HOA] by repeatedly, and along with their other White-American cronies/co-conspirators/proxies/agents, threatening to sue the [HOA] if the [HOA] did not take legal action in-order-to evict the plaintiff (through the process of foreclosure), while the plaintiff repeatedly - over the course of at least a decade - informed the [HOA] that both [RSR] and [JSP&KAP] harbored extremely-predatory racial-animus against the plaintiff. [JSP&KAP]'s and [RSR]'s blackmail of the [HOA] - in addition to being illegal, with the ultimate victim of such blackmail being the plaintiff - were also, at best, empty threats, since, even if they did sue the [HOA]:

Ⓐ They would have had to admit during the course of such litigation the damaging facts that they were repeatedly and/or constantly violating multiple restrictive-covenants such as: the illegal-lighting of fireworks; one-or-more parking-related violations; one-or-more other noise-nuisances; one-or-more unapproved changes (including, but not limited to, unapproved changes to front-yard landscaping); one-or-more speeding-vehicles; one-or-more unleashed large dogs/cats roaming freely onto public-property and onto others' private-property; etc.

Ⓑ As multiple subsequent incidents would show, they had little-to-no understanding of the law (in general) and the property laws (in particular) - but despite of their complete lack of understanding of the law, both the [HOA] and [WCLE] showed great deference, and even fear, towards them because they were predatory White-American people that were predatorily targeting a *"powerless"*, *"low-IQ"* immigrant-of-color/indigenous-person - namely the plaintiff.

Ⓒ They would have had to admit during the course of such litigation the extremely damaging facts that they had conspiratorially and aggregately committed numerous hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff - most of which [WCLE] were aware of, but despite of such awareness, none of which were ever even charged by [WCLE] - thanks to the obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise involving all of these parties against the plaintiff, which had already been firmly established at this point in time.

In addition to the fact that such enforcement is egregiously racially-discriminatory, [JSP&KAP], the [HOA], and [WCLE] were all predatorily

making outrageously wild assumptions about the types of vegetation that are growing in the plaintiff's private/concealed/curtilage [BACKYARD] - always deeming such vegetation to be so-called *"weeds"*, when in fact, the plaintiff was intentionally growing all of such vegetation - at least some of which were vegetables meant for human consumption. The fact that the [HOA] would even reveal to the plaintiff this alleged photograph of the plaintiff's private/concealed/curtilage [BACKYARD] that was clearly sent to them by [JSP&KAP], showed not only that the [HOA] operated in such a brazenly racially-discriminatory manner toward the plaintiff, but also that they did not mind acting upon the predatory demands of [JSP&KAP], who not only harbored extremely-predatory racial-animus against the plaintiff, but also in later years, would both end up committing numerous additional felony crimes against the plaintiff - none of which were charged or prosecuted by [WCLE]. This is the type of overt racial-discrimination and institutionally-racism that the plaintiff would suffer from both the [HOA] and [WCLE], and that the plaintiff would only begin to fight back against in later years - when, for example, the plaintiff demanded the [HOA] (in the year {2015} and later) to provide the plaintiff with some evidence or indication that the [HOA] was inspecting all other residents' private/concealed/curtilage backyards. When the plaintiff did make those demands of the [HOA] in later years ({2015} and later), the [HOA] finally admitted to the plaintiff that it does not inspect any other resident's backyard. Once the [HOA] made this crucial admission to the plaintiff, and once the plaintiff made it clear to the [HOA] that such practice was clearly racially-discriminatory, the plaintiff would not receive any notices or alleged photographs about the plaintiff's private/concealed/curtilage [BACKYARD] in the years {2016} and after. However, the [HOA] would continue to send multiple notices in the mail per year regarding alleged [DRV]s from the initial years of {2009} through {2021} - all motivated by the extreme-racial-animus of [JSP&KAP],[RSR] (and initial neighbor [JJB]) - with the [HOA] deliberately ignoring the fact that these same predatory neighbors had committed serious racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff (at least some of which the plaintiff did reveal to the [HOA]).

## ¶336

On or about a date at the end of {2012-06}, the plaintiff's senior-citizen father [FATHER] helped the plaintiff install a barrier in the plaintiff's [BACKYARD] preventing [PARENTS]' large-dog from entering into a large area of the [BACKYARD] dedicated to growing vegetables since such dog was known to dig-up and uproot at least some types of root-vegetables. Despite this low-height barrier (3-feet-tall) being installed in the [BACKYARD] - thereby not even in the least bit visibile from the street - [JSP&KAP] would, on a later date, demand the [HOA] to get the plaintiff to remove this barrier, again as yet another instance of [JSP&KAP]'s intimidation/interference and racial-discrimination by proxy against the plaintiff.

## ¶337

On or about the date of {2013-02-25}, the plaintiff received a [DRV] notice from the [HOA] requesting the plaintiff to use some type of *"weed treatment"* to eliminate so-called *"weeds"* in the plaintiff's [FRONTYARD]. The plaintiff contacted the [HOA] by phone and/or email and let the [HOA] know that the plaintiff is strongly opposed to the use to any-and-all pesticides, and that [HOA]s cannot force any homeowner to use any chemicals on their private-property. The [HOA] responded that the so-called *"weeds"* need to be taken-care-of, if not by chemical means, then by natural means (manual cutting/pulling) - essentially backing down from their initial demand of forcing the plaintiff to use such chemicals against the plaintiff's will. This incident revealed that [JSP&KAP] and/or [RSR] would continue to demand the [HOA] to take egregiously racially-discriminatory and oppressive actions against the plaintiff - coercing the plaintiff to do what no other White-American homeowners are required to do. To this {PRESENT-DAY}, the plaintiff continues to notice many of the front-yards in the neighborhood where the so-called

*"weeds"* are encompassing the whole front-yard, in some cases, where the amount of so-called *"weeds"* is actually rivaling the amount of grass - further revealing to the plaintiff that all of the [HOA]'s predatory actions against the plaintiff - during these initial years - were driven exclusively by [RSR]'s,[JSP&KAP]'s (and initially [JJB]'s) predatory demands against the plaintiff to the [HOA] - all motivated by these predatory neighbors' extreme-racial-animus against the plaintiff.

## ¶338

On or about the approximate date of {2013-06-05}, the plaintiff noticed on the plaintiff's security-cameras recorded footage, what the plaintiff would later discover to be a [WCCHD] employee, [WCCHDS-ST] (‡) - knocking on the plaintiff's [FRONTDOOR]. The plaintiff then noticed that, when [WCCHDS-ST] did not get a response at the [FRONTDOOR], [WCCHDS-ST] then proceeded to walk through the [FRONTPORCH] area (*"curtilage"*), then into the plaintiff's sideyard (*"curtilage"*) and then towards the plaintiff's [BACKYARD]-fence-gate - all, in violation of the plaintiff's rights. The plaintiff then noticed [WCCHDS-ST] opened the plaintiff's [BACKYARD]-fence-gate, and entered into the plaintiff's [BACKYARD] (*"curtilage"*), again, in egregious violation of the plaintiff's rights. The plaintiff then noticed [WCCHDS-ST] raise his camera-phone with his hands and appear to take photographs of the plaintiff's [BACKYARD]. The plaintiff then noticed that [WCCHDS-ST] then exited the plaintiff's [BACKYARD] (again, through the [BACKYARD]-fence-gate) and returned to the [FRONTDOOR]. The plaintiff then noticed that [WCCHDS-ST] placed a single slip of paper on the [FRONTDOOR]. When the plaintiff finally discovered the slip at a later point in time, the plaintiff realized that the slip was a *"warning citation"* from [WCCHD] demanding that the plaintiff cut alleged *"weeds"* growing in the plaintiff's [BACKYARD], and remove alleged so-called *"trash"*, and threatened the plaintiff that the plaintiff would face further action(s) from [WCLE] if the plaintiff did not take-care-of the matter within a matter of days. It is important to note that the [WCCHDS-ST] did not have any other papers on his person, and did not leave any other papers at the [FRONTDOOR], meaning that this [WCCHDS] executed an Unlawful (discriminatory) and Unconstitutional (fourth-amendment violation, fourteenth-amendment (★) violation, fifth-amendment violation) warrantless inspection/search and seizure of the plaintiff's property curtilage-area that was not even visible from the street, even resorting to the use of hands-on physical-intrusion (opening the [BACKYARD]-fence-gate with his hands) in this Unlawful and Unconstitutional inspection/search - a search and seizure that has clearly been deemed to be Unlawful and Unconstitutional by, amongst many other court cases, the {2013-03-26} [SCOTUS] ruling in 《FLORIDA V. JARDINES》, and then, later affirmed and/or strengthened in the {2018-05-29} [SCOTUS] ruling in 《COLLINS V. VIRGINIA》 - see section below. Additionally, the plaintiff, in trying to protect the plaintiff's first-amendment Constitutional-rights to freedom-of-religion and freedom-of-expression, has-denied and continues-to-deny the allegation that such vegetation are *"weeds"*, especially when such vegetation is intentionally-cultivated in an enclosed backyard as part of such first-amendment-right - see section below. In fact, most of the vegetation in the center-area of the plaintiff's [BACKYARD] was actually the okra (vegetable) plant - which again, grows rapidly and densely up to 8-feet-tall. It is crucial to note that most of the actions that [WCCHDS-ST] took on this particular day while on the plaintiff's private-property was a clear and egregious violation of the plaintiff's rights - once [WCCHDS-ST] did not get a response, and thus consent, from the property owner/occupant (at the [FRONTDOOR]), then the *"knock-and-talk"* protocol clearly-established by one-or-more [SCOTUS] rulings, requires that the government-employee/police-officer must immediately leave the private-property in the same *"baseball"* path to the nearest public-property (in this plaintiff's case, the sidewalk/street).

## ¶339

Shortly after this unconstitutional-and-unlawful search, the plaintiff made a phonecall to the number on slip, and spoke to another employee of

the [WCCHD], [WCCHD] Steve Gilmer [WCCHDTL-SG]. During this first phonecall, the plaintiff needed to obtain more information about the complaint that was lodged against plaintiff, because the plaintiff saw absolutely nothing wrong - and to this very day, continues to see absolutely nothing wrong - in the way that the plaintiff was maintaining and continues-to-maintain, the plaintiff's [BACKYARD]. [WCCHDTL-SG] told the plaintiff that the plaintiff's *"neighbors"*, without actually identifying who these neighbors were - although the plaintiff has every reason to believe (based on the rest of the rest of the evidence presented in this lawsuit) that the list of neighbors at least included [JSP&KAP] and/or [RSR] - in addition to accusing the plaintiff of having so-called *"weeds"* in [BACKYARD], had also accused the plaintiff of *"burying trash"* in [BACKYARD] - a complaint that as the record will show, was not verified/confirmed even by the unconstitutional-and-unlawful search that the [WCCHDS-ST] had conducted on the plaintiff's property, and that is not only nonsensical because it is physically impossible to do, but also a nonsensical complaint that has been repeatedly parroted by defendants [RSR],[JSP&KAP] (and even the [HOA] under [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH],[DMP] acting upon the predatory demands of [RSR],[JSP&KAP]) in future incidents (see below) - revealing very clearly to the plaintiff, all of the predatory people that are making these malicious and fraudulent complaint(s) against the plaintiff were abusively weaponizing (both as a *"sword and shield"*) the property-maintenance laws as modern-day-Jim-Crow law against the plaintiff, maliciously exploiting the plaintiff's failure and/or *"inability"* to maintain even private areas of the plaintiff's private-property according to their (hypocritically-enforced) White-American standards. [WCCHDTL-SG] clarified to the plaintiff that some of these neighbors were not only accusing the plaintiff of dumping items onto [BACKYARD], but rather, actually, *"burying"* items - that is, digging soil up and burying *"trash"* - which the plaintiff immediately recognized as particularly malicious, because both these neighbors and [WCLE] knew they were engaging in pure-fraud when they made this complaint. (Also, as documented in the section below, Texas law does not define the term *"trash"* and only defines the term *"garbage"*, *"refuse"*, and *"rubbish"*. Thus, these malicious neighbors use of the undefined term *"trash"* further indicated to the plaintiff that such malicious neighbors are fraudulently skirting Texas law by using term(s) that are not even defined in Texas law.) When the plaintiff revealed to [WCCHDTL-SG] that the plaintiff did not use garbage service, [WCCHDTL-SG] explains that that may be the reason why the neighbors were targeting the plaintiff. When the plaintiff revealed that, like most indigenous peoples, the plaintiff lived a *"zero-waste"* lifestyle, the plaintiff was told by [WCCHDTL-SG] that that is *"not normal"* and *"not natural"* - which the plaintiff can only interpret as an extremely racist view that forcefully imposes White-American lifestyle standards onto any indigenous-person (such as the plaintiff) that willfully chooses to live an off-grid, zero-waste, anti-consumerist, minimalist lifestyle according to such indigenous-person's Constitutionally-protected religious practices. The plaintiff strongly asserts that such indigenous-peoples' off-grid, zero-waste, anti-consumerist, minimalist lifestyle is, indisputably, a fully-protected Constitutional right under the freedom-of-religion and freedom-of-expression clauses of the United States Constitution. The plaintiff explained that there were miscellaneous items in [BACKYARD], none of which was *"trash"*. The plaintiff asked what else was in the complaint that was lodged by the neighbors, and [WCCHDTL-SG] reveals that the neighbors accused the plaintiff had *"brush"* stored in the [BACKYARD]. The plaintiff admitted that the plaintiff did have some brush stored over a thin-layer of cardboard, holding such cardboard in place for the ecological practice of *"sheet-mulching"* - decomposing the grass underneath to create rich, fertile soil that could later be used for planting vegetables - further explaining to [WCCHDTL-SG], that this practice of *"sheet-mulching"* is part of the larger permacultural practice of *"no-dig-gardening"* and *"no-till-agriculture"*. [WCCHDTL-SG] then explains to the plaintiff that the use of such cardboard may not be compliant with Texas-Public-Nuisance-Law, which as the plaintiff would later find out (by reading [THaSC-T5-SB-C365]) is not true - since such cardboard is being used, not as a waste product, but as an intentional landscaping technique to decompose grass (and/or other vegetation) while adding the fertility of such decomposed grass (and/or other vegetation) back into the soil. During this phonecall, [WCCHDTL-SG] made a crucial admission to the plaintiff: that person(s) can eliminate the possibility of a public-nuisance by storing item(s) located within private-property above ground-level; by elevating items onto, for example, shelves/racks above ground-level,

person(s) can eliminate the possibility of wild animals like rodents/vermin burrowing under such item(s). (As future incidents would show, the plaintiff has followed this advice by storing item(s) in the [BACKYARD] above ground-level - so as to eliminate any possibility of alleged public-nuisance violation - but despite following this advice, the malicious complaints of predatory neighbors with extreme-racial-animus against the plaintiff - [RSR],[JSP&KAP] and their other White-American co-conspirators - persisted). During this same phonecall, [WCCHDTL-SG] also made another, even more important admission to the plaintiff: that person(s) can have a *"messy"* yard while still complying with the Public-Nuisance-Law by erecting a fence such that the *"messy"* yard is not visible from the public street. The plaintiff explained to [WCCHDTL-SG] that the builder of the subdivision had already installed a 6-feet-tall-privacy-fence so that [BACKYARD] was not, in any way, visible from the street. The plaintiff further explained to the [WCCHDTL-SG] that since none of the items in [BACKYARD] that the neighbors were (maliciously and predatorily) complaining about were, in any way, visible from the street, that their complaint against the plaintiff was not an actual violation of the Texas Public-Nuisance-Law. Yet, [WCCHDTL-SG] was still not willing to close the complaint, saying that he was not at the plaintiff's property, and that only [WCCHDS-ST] could close the complaint since only [WCCHDS-ST] had been onto the plaintiff's property. The plaintiff repeatedly tried to ask [WCCHDTL-SG] what the plaintiff would need to do to close the complaint, and [WCCHDTL-SG] kept advising the plaintiff to clean it up a little, solely for the purpose of getting the plaintiff's neighbors *"off of the plaintiff's back"*. [WCCHDTL-SG] further-explained to the plaintiff that since the plaintiff's neighbors know that the plaintiff does not use garbage service, that they are, in effect, exploiting that fact about the plaintiff to make fraudulent accusations about the plaintiff; and so, [WCCHDTL-SG] further advised the plaintiff to purchase a garbage-bin(s) and store within such garbage-bin(s) some of these items out-of-sight, so that at least the neighbors cannot use the aforementioned fact regarding the plaintiff's lack-of-garbage-service against the plaintiff. This advice/instruction from [WCCHDTL-SG] reveals that such predatory neighbors wield so much power that they can predatorily inflict this huge amount of stress and burden onto the plaintiff, engaging in racial-intimidation-by-proxy against the plaintiff, by just predatorily complaining to law-enforcement about the plaintiff - making multiple fraudulent and/or extremely-misleading accusations against the plaintiff, driven by their extreme racial-animus against the plaintiff, in-order-to maximize their infliction of harm onto the plaintiff, by abusively weaponizing (both as a *"sword and shield"*) such property-maintenance laws as modern-day-Jim-Crow law against the plaintiff. This advice/instruction from [WCCHDTL-SG] also revealed a painful truth to the plaintiff about the enforcement of such property-maintenance-laws, at least by [WCLE] and/or the [HOA] - that such enforcement is not about the fair, unbiased and equal application of law to all property-owners, but rather, the extremely-discriminatory complaint system, in which, whether or not a property-owner faces the stress and burden of attending to such complaints is almost-exclusively (if not exclusively) a function of how predatory, malicious and/or invasive/intrusive such property-owner's neighbors are, rather than a function of how meritorious the complaint(s) actually are. In other words, a property-owner is free to maintain private areas of his/her property - particularly enclosed/private backyard, private-front-porch, etc. - in as sloppy/messy and/or unsanitary a manner as he/she wants to maintain it - as long he/she has friendly (or at least neutral) neighbors that do not maliciously complain about him/her to [WCLE]/[HOA]. While at the same time, those same rights clearly do not transfer over onto those property-owner(s) who have predatory/malicious neighbors - especially, predatory/malicious neighbors that will use any means necessary to intimidate/interfere-with/harass their victim in-order-to apply extreme pressure onto their victim to move out of the neighborhood, due to their biases/animuses against their victim that have absolutely nothing-to-do with legitimate public-nuisance. Underlying all of these facts is the most fundamental fact that the majority of people-of-color around the world (and the overwhelming majority of indigenous-peoples around the world) do not live according to White-American standards, and so, such people-of-color cannot be coerced to live according to White-American standards without such coercion being a clear violation of such people-of-color's fundamental first-amendment rights to freedom-of-religion and freedom-of-expression. The plaintiff asserts that even if there are alleged, so-called *"unsanitary conditions"* on an accused-person's private-property, then

that fact alone does not mean that such alleged *"unsanitary conditions"* poses any type of nuisance to neighboring properties - especially if such alleged *"unsanitary conditions"* are entirely confined within the accused-person's private-property (for example, by way of a 6-feet-tall-privacy-fence). In other words, there is a clear burden-of-proof placed on the accuser to show, beyond any-and-all reasonable doubt, how such alleged *"unsanitary conditions"* on the accused person's private-property is causing any harm to the accuser's use and/or enjoyment of his/her own private property. Additionally, the plaintiff strongly asserts that if all of the alleged, so-called *"unsanitary conditions"* are strictly enclosed and/or strictly confined within, for example, a backyard that is fully-enclosed by a 6-feet-tall-privacy-fence, then the accuser will have a very-difficult, if not impossible, time proving how any of such alleged *"unsanitary conditions"* are in any way encroaching upon the use and/or enjoyment of the accuser's private property. Furthermore, if the accused person lives at the property that houses the so-called *"unsanitary conditions"*, then in almost all cases, the accuser will have a very-difficult, if not impossible, time proving how such so-called *"unsanitary conditions"* are causing harm, because clearly, if there is actually any such harm caused, then the accused person will be just-as-exposed-to if not more-exposed-to such harm, as a direct result of living on such property. To summarize, if there is no actual, demonstrable harm caused to neighboring property owner(s) nor to the environment, then there simply is no *"compelling state interest"* nor authority for government to step in and act on such predatory, irrational and illogical complaint(s), especially if the complaint(s) involve private/curtilage areas of private-property that are not visible from the public street, and especially if the accused is legitimately asserting that such property-maintenance practices are Constitutionally-protected rights. Finally, the plaintiff asserts that many White-Americans' use of pesticides/herbicides/insecticides is a classic example that illustrates the utter hypocrisy of [WCLE]'s racially-discriminatory and predatory actions against the plaintiff, as such pesticides/herbicides/insecticides cause extreme harm both to human health and to environmental health - and is also technically a violation of Texas Public Nuisance law [THaSC-T5-SA-C341-SB-§341.011(12)] as one-or-more Courts in the United States have ruled that at least some of the most widely-used pesticides/herbicides/insecticides are known causes of cancer and/or Parkinsons-Disease and/or organ-failure and/or other disease(s):

*Each of the following is a public health nuisance: ...*

*(12) an object, place, or condition that is a possible and probable medium of disease transmission to or between humans.*

At no point in time did [WCCHDTL-SG] admit to the plaintiff that all of those who have complained about the plaintiff were, by no coincidence, of the White/Caucasian/American color/race/nationality, whereas the plaintiff was the sole immigrant-of-color/indigenous-person who was the one being targeted. At no point in time did [WCCHDTL-SG] admit to the plaintiff that at least some of those who have complained about the plaintiff ([JSP] and/or [RSR]) had already demonstrated their substantial racial-animus against the plaintiff (see previous incidents above). At no point in time did [WCCHDTL-SG] admit that [WCCHDS-ST] had egregiously violated the plaintiff's rights by executing an egregiously unconstitutional-and-unlawful search-and-seizure of [BACKYARD]. [WCCHDTL-SG] eventually shows his anger towards the plaintiff, shouting at the plaintiff because [WCCHDTL-SG] did not want to continue answering the plaintiff's questions that were not only questioning the logic and rationality of the government's invasive/intrusive/predatory actions against the plaintiff, but that were also raising some rather uncomfortable facts about the complaint and, more importantly, the predatory people that were instigating such invasive/intrusive/predatory actions, motivated by extreme racial-animus against the plaintiff. [WCCHDTL-SG] concludes the phonecall by letting the plaintiff know that he will pass the information onto [WCCHDS-ST] and have [WCCHDS-ST] call the plaintiff back, since the plaintiff needed further clarification.

# ¶340

Since the plaintiff did not receive a phonecall from [WCCHDS-ST] in a timely manner, the plaintiff made multiple phonecalls to the [WCCHD]

in the plaintiff's attempt to speak to [WCCHDS-ST] and to make the plaintiff's voice heard - due to multiple fraudulent and/or extremely-misleading accusations already described above. After multiple failed attempts to reach [WCCHDS-ST], the plaintiff finally does manage to speak to [WCCHDS-ST] over the phone. [WCCHDS-ST] immediately starts to oppressively take-control and dominate the conversation, by railing at the plaintiff that the plaintiff's neighbors were complaining due to the so-called *"weeds"* and several miscellaneous items (mostly gardening, landscaping and fence-construction tools-and-materials) - which he fraudulently alleged to be *"trash"* - scattered in [BACKYARD]. (Also, as documented in the section below, Texas law does not define the term *"trash"* and only defines the term *"garbage"*, *"refuse"*, and *"rubbish"* - thus, both [WCLE]'s and the neighbors' use of the undefined term *"trash"* further indicated to the plaintiff both [WCLE] and the neighbors were fraudulently skirting actual Texas law that regulates such sanitation issues.) [WCCHDS-ST] fraudulently accused the plaintiff of having *"grass up back to your elbows"* - even though the default builder-installed grass, bermuda-grass, does not grow more than a foot-tall in most areas, and even though all of the vegetation that was growing above that bermuda-grass was growing sparsely (not densely) with each plant-stem approximately a foot-or-more apart from each other, and even though many, if not most, of those plant-stems were from vegetables like okra that the plaintiff and/or the plaintiff's senior-citizen [PARENTS] had intentionally planted (for consumption) in the plaintiff's [BACKYARD]. On at least one occasion, [WCCHDS-ST] even fraudulently uses the term *"refuse"* to describe items in [BACKYARD], when *"refuse"* is clearly defined in Texas law as a mixture of **both** *"decayable"* waste **and** *"nondecayable"* waste. As the plaintiff had already explained to [WCCHDTL-SG] - by even itemizing all items in [BACKYARD] - there was absolutely no waste in [BACKYARD], and furthermore, even if any such items were falsely alleged to be waste, then those items would have been of the nondecayable type, meaning that would have been *"rubbish"* and not *"refuse"*. Although the plaintiff has always strongly denied that any items stored in the plaintiff's [BACKYARD] was *"waste"* of any kind (including *"rubbish"*), Texas law requires only *"refuse"* and *"garbage"* - but not *"rubbish"* - to be placed within *"closed receptacle(s)"*. In this phonecall, [WCCHDS-ST] admits to (unconstitutionally-and-unlawfully) entering into the [BACKYARD], without a search-warrant, and without consent of the plaintiff (because the plaintiff was not available to provide consent), and while in the [BACKYARD], taking photographs of alleged so-called *"weeds"* and the other aforementioned miscellaneous items in the [BACKYARD] (since all of these items were completely enclosed inside the plaintiff's private [BACKYARD] and not visible from the street). It was clear to the plaintiff that [WCCHDS-ST] was blackmailing the plaintiff to keep the plaintiff silent not only about his unconstitutional-and-unlawful search of the plaintiff's property, but also about the fact that the complaint was instigated by the extreme-racial-animus of the plaintiff's predatory White-American neighbors - particularly [JSP&KAP] and/or [RSR]. The plaintiff continued to insist that none of the miscellaneous items in [BACKYARD] were *"trash"*, and instead began to itemize each and every item and/or type-of-item. As the plaintiff has always maintained that the plaintiff has been intentionally cultivating such vegetation that the plaintiff considers to be desirable vegetation, including some vegetables like okra, which rapidly grows up to 8-feet-tall - and furthermore, that any intentionally grown vegetation - whether vegetables or otherwise - cannot be considered to be so-called *"weeds"*. [WCCHDS-ST] angrily states to the plaintiff that the plaintiff was wasting the plaintiff's time by entering into such arguments, and that, in the same amount of time that the plaintiff is questioning/arguing-with [WCCHDS-ST], the plaintiff could have instead spent that same time using a so-called *"weed-whacker"* to take care of the issue. [WCCHDS-ST] even threatened to levy a fine of *"thousands of dollars"* against the plaintiff - which would have been unlawful according to the Texas-Public-Nuisance-Law for at-least 2 reasons. Firstly, any fine associated with such Public-Nuisance is limited to a maximum of $500, and secondly, that fine is only levied upon successful conviction of the Class-C-Misdemeanor-Public-Nuisance - typically at the end of a jury-trial that decides on such matter. When the plaintiff continued to ask questions like how exactly the plaintiff's property was in violation of such law and/or what proof of harm such conditions on the plaintiff's property created, [WCCHDS-ST] brazenly threatens the plaintiff that if the plaintiff doesn't stop asking questions and take care of the issue, then [WCCHDS-ST] was going to assume that the plaintiff was audio-

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.   1696907690

recording this conversation, and take such audio-recording to an attorney in-order-to fight the issue and/or sue [WC], and, for that reason, that [WCCHDS-ST] would abruptly hang-up the phone and *"press charges"* against the plaintiff - even before the stated deadline expired, in egregious violation of the plaintiff's due-process-rights and the plaintiff's sixth-amendment-right to counsel - in effect, punishing the plaintiff for asking questions and/or for even thinking about hiring an attorney to fight the issue and/or sue [WC] in Court. (Since, during a moment of indignation, the plaintiff had indignantly made the [WCSO] aware that the plaintiff had audio-recorded most, if not all, of the plaintiff's interactions with the [WCSO] in the prior years of {2011,2012}, all of defendant [WC]'s agencies became cognizant of this fact and the plaintiff had, through no choice of the plaintiff's own, inadvertently become an *"enemy of the state"* of defendant [WC].) [WCCHDS-ST] further threatens the plaintiff against *"fighting city hall"* on this issue, claiming that its not worth *"fighting city hall"* on an issue like this. The actual reason that [WCCHDS-ST] made these brazen threats against the plaintiff was because [WCCHDS-ST] knew that [WCCHDS-ST] had egregiously violated the plaintiff's rights by, at the very least, conducting a clearly unconstitutional-and-unlawful search of the plaintiff's private-property - and as such, both [WCCHDS-ST] (personally) and defendant [WC] were clearly liable to the plaintiff as a result of such clear violations of the plaintiff's rights. (As future incidents would show, this pattern of [WCLE] threatening to press Public-Nuisance charge against the plaintiff - on behalf of predatory White-American neighbors with extreme racial-animus against the plaintiff - would continue in future incidents, and when [WCLE] did eventually follow-through on this threat and did charge the plaintiff with Class-C-Misdemeanor-Public-Nuisance on-or-about the date of {2020-10-12} - more than 7 years after this incident - [WCLE] would not grant the plaintiff with the jury trial that the plaintiff had demanded, refusing to provide any evidence, apology, or explanation to the plaintiff, forcing [WCLE] prosecutors do dismiss the fraudulent charge against the plaintiff on-or-about the date of {2021-11-01}.) On multiple occasions in this phonecall, [WCCHDS-ST] even admits that the plaintiff feels violated by the government's egregious infringement of the plaintiff's rights, but continues to justify his actions by stating that the steps that he had taken were the only reasonable way to enforce the law. While it is 100% accurate the plaintiff felt extremely-violated by what [WCCHDS-ST] and his employer, the [WCCHD], had done, two aspects of [WCCHDS-ST]'s statements were clearly false. First, in its ruling of 《FLORIDA V. JARDINES》, the [SCOTUS] had already defined how the government is legally allowed to enter a person's private-property (*"base-path to the frontdoor"*), and what the government is legally allowed to do while they were on such person's private-property (*"knock-and-talk"*) - without consent nor a search-warrant lawfully obtained with sufficient probable-cause for a crime *"already having been committed"*. So, [WCCHDS-ST] clearly violated the plaintiff's rights in what he fraudulently claims is a reasonable enforcement of law. Secondly, as [WCCHDTL-SG] had already admitted to the plaintiff in the previous phonecall, the 6-feet-tall-privacy-fence makes any such public-nuisance allegation null-and-void due to the fact that the alleged item(s)/condition(s) are both not visible from the street, and any-and-all item(s)/condition(s) are exclusively-confined within the confines of [BACKYARD] due to the physical barrier of this 6-feet-tall-privacy-fence. However, since the *"no-mow"* movement (as documented in the section below) had not taken root in the United States at this moment in time (in the year {2013}) as it has done today, the plaintiff - under extreme duress due to [WCCHDS-ST]'s coercive threats - reluctantly agreed to just comply with [WCCHDS-ST]'s unreasonable and threatening demands by cutting the alleged *"weeds"* - even though none of such vegetation were actually *"weeds"*, and even though it would mean sacrificing the plaintiff's deeply-held religious/cultural views/practices. And despite of [WCCHDS-ST] fraudulently insisting that the plaintiff's property was in violation of the Texas-Public-Nuisance-law, the most important admission of these sequence of phonecalls was already revealed in the plaintiff's initial phonecall with [WCCHDTL-SG]: that a person can avoid being in violation of the Texas-Public-Nuisance-Law by erecting a privacy-fence so that any items/conditions that may-have-otherwise-been-a-violation rendered not-a-violation due to the privacy-fence blocking such items/conditions from being visible from the street, and also blocking such items/conditions from potentially spilling-over/blowing-onto neighboring yards. These facts are crucial not only for this particular series of incidents, but also for many subsequent incidents as substantially-documented in the

remainder of this lawsuit: that subsequent incidents would show [WCLE] continuing-to-engage in egregious racially-motivated violations of the plaintiffs rights - particularly [WCLE]'s numerous racially-motivated unconstitutional-and-unlawful searches/seizures of the plaintiff's private/curtilage areas (not limited to [BACKYARD]), and [WCLE]'s numerous racially-motivated unconstitutional-and-unlawful detentions/interrogations of the plaintiff - all for alleged items/conditions that are not only not visible from the public street, but also entirely within the confines of a 6-feet-tall-privacy-fence - or even worse, within the confines of [HOUSE] - rendering any-and-all such allegation(s) of public-nuisance violation as null-and-void. [WCCHDS-ST] had also indicated to the plaintiff that he would be mailing to the plaintiff (via the [USPS]) a copy of the (fraudulent) allegations/complaints lodged against the plaintiff by the plaintiff's predatory White-American neighbors - including the fraudulent complaint that the plaintiff had *"trash"* scattered around in the plaintiff's private/concealed/curtilage [BACKYARD], and the fraudulent complaint that the plaintiff had *"weeds"* growing in the plaintiff's private/concealed/curtilage [BACKYARD], when in fact, all of such vegetation (including some vegetables) was intentionally grown (thus *"cultivated"*) by the plaintiff. The plaintiff did receive such mail, and given the long-term decade-long pattern of racketeering-activity suffered by the plaintiff at the hands of the defendants, as substantially-documented in this lawsuit - especially in the latter years of {2016} through {2022} (see below) - the plaintiff asserts that such mailing constituted the first occurrence of the racketeering-act of Mail-Fraud involving two-or-more of the defendants - particularly [WCCHD], [JSP&KAP] - acting in conspiracy with each other and as part of the same racketeering-enterprise against the plaintiff, ultimately meant to drive the plaintiff out of what they considered to be *"their"* (exclusive-and-pure) White neighborhood - thus, defrauding the plaintiff out of (relatively-profitable) private-property-ownership within such White neighborhood.

## ¶341

After the plaintiff finally does reluctantly - but under extreme duress - comply with the [WCCHDS-ST]'s demands by cutting down the vegetation (even though such vegetation were not *"weeds"*, and some of which were actually vegetables like okra), [WCCHDS-ST] makes a second trip to the plaintiff's property approximately 10 days later, this time parking his official [WCCHD] vehicle on the plaintiff's [DRIVEWAY], which the plaintiff never authorized him to do. When the plaintiff shows [WCCHDS-ST] that the plaintiff did (albeit reluctantly and under extreme duress) comply with the demands, [WCCHDS-ST] informs the plaintiff that he would be closing the case, even stating to the plaintiff, *"I'M JUST HERE TO GET YOUR NEIGHBORS OFF YOUR BACK!"*, in essence, shifting responsibility for his abusive/oppressive/invasive/intrusive/predatory actions from himself/[WCLE] onto the plaintiff's predatory neighbors - and acting as if it was/is justifiable for the government to act upon the abusive/oppressive/invasive/intrusive/predatory demands of predatory neighbors - and even worse, predatory neighbors that harbored extreme-racial-animus against the plaintiff. Not once, during this entire series of incidents, did [WCCHDS-ST] acknowledge that all of the plaintiff's immediate neighbors, were, not so coincidentally, of the White/Caucasian/American color/race/nationality whereas only the plaintiff was/is an immigrant-of-color/indigenous-person - which would have clearly indicated that, at the very least, there were/are religious/cultural/racial differences - and thus first-amendment (and fourteenth-amendment (⭐)) Constitutional-rights - that should have been taken into account. Not once, during this entire series of incidents, did [WCCHDS-ST] acknowledge that the plaintiff had already suffered many criminal acts motivated by extreme-racial-animus by at least three of the plaintiff's neighbors at that point in time - [JSP],[RSR] and former neighbor [JJB] - for which none of the perpetrators faced any negative consequences. Not once did [WCCHDS-ST] acknowledge that he was not inspecting/searching and seizing evidence from the plaintiff's neighbors' properties, thus brazenly targeting the plaintiff in egregious violation of the [FHA]/[TFHA], [TCPaRC-T5-C106] and the Texas law barring racial-profiling. Not once did [WCCHDS-ST] acknowledge that he had brazenly violated the plaintiff's fourth-amendment, fifth-amendment and fourteenth-amendment Constitutional-rights by conducting an unconstitutional-and-unlawful (warrantless-and-nonconsensual) search of the plaintiff's enclosed/shielded

curtilage-areas (including [BACKYARD]). Shortly after [WCCHDS-ST] leaves the plaintiff's property and the plaintiff enters back into [BACKYARD], the plaintiff hears a racial slur (the *"n-word"*) angrily yelled at the plaintiff either by a (non-defendant) neighboring resident or a guest/relative of such neighboring resident, apparently due to the fact that the plaintiff has maintained a [BACKYARD] that does not conform to their hypocritically-enforced White-American standards - yet another indication of the many hazards suffered by an immigrant-of-color/indigenous-person living within a White neighborhood - where such acts of predatory abuse, institutional-racism and White-Supremacy dominate. Based on the decade-long pattern of predatory and retaliatory racketeering-activity documenting in this lawsuit, there is simply no doubt in the plaintiff's mind that these predatory and retaliatory actions undertaken by the [WCCHD] against the plaintiff were instigated not only by the racial animus of the aforementioned neighboring resident/guest against the plaintiff, but far-more-importantly, the extreme racial-animus of [JSP&KAP],[RSR] against the plaintiff - who, indisputably orchestrated this particular series of predatory and retaliatory actions in conspiracy with the [WCCHD] - along with their crony/co-conspirator/proxy/agent, [DMP]. However, since [WCCHDS-ST] never identified the actual neighbors that did complain (instead, only referring to them as *"YOUR NEIGHBORS"*), the plaintiff can only prove this assertion by conducting Discovery and Depositions upon co-conspirator defendants [JSP&KAP],[RSR],[WCCHD] and the non-defendant implicated-parties: [DMP], [SPOA], and the property-management-company originally representing the [SPOA] - at this moment in time, [RealManage]. It is important to note that even capital-murder suspect(s) do not have their backyard (or any other curtilage-area) inspected/searched without a search-warrant. But yet, [WCLE]'s institutionally-racist perception that the plaintiff has no rights, has, as the record will show, on numerous occasions, resulted in the plaintiff's private curtilage-areas (including [BACKYARD]) and the interior of the [HOUSE] unconstitutionally-and-unlawfully inspected/searched by the [WCLE] only for alleged Public-Nuisance violation - despite the fact that an alleged Public-Nuisance, even if true, and even if prosecutors could prove the harm caused by the accused and the malicious-intent of the accused, only results in a Class-C-Misdemeanor charge, punishable by only a fine without any jail-time, and only after the suspect has been warned with a warning-citation within the previous 31 days (assuming that all other proper legal procedure was also followed). [WCCHDS-ST] also violated the plaintiff's due-process rights in another manner that is clearly enshrined in the Texas-Public-Nuisance-Law - that the plaintiff was to be provided 30 days to remedy the alleged violation. Instead, the slip that [WCCHDS-ST] provided the plaintiff demanded that the plaintiff remedy the alleged violation within 10 days.

## ¶342

Even though the plaintiff's rights were egregiously violated by [WCCHDS-ST] acting maliciously against the plaintiff with full support from [WCCHDS-ST]'s superiors and top-level management of the [WCCHD], to the best of the plaintiff's knowledge, [WCCHDS-ST] did not face any disciplinary-action by defendant [WC]. So, just like abusive police-officer [WCSD-PP] - who had acted upon his racial-animus against the plaintiff and had egregiously-violated the plaintiff's rights on the aforementioned {2011-08-30} incident - did not face any disciplinary-action by defendant [WC] (even though the plaintiff made a complaint to his superiors at the [WCSO]), by allowing these aggregate, abusive, unlawful actions committed by [WCLE] employees against the plaintiff to go completely-unchecked, defendant [WC] has-sent and continues-to-send a loud, strong and powerful message to all current and future [WCLE] employees/officials that they are free to violate the plaintiff's rights (even egregiously) without facing any consequences - creating a seemingly endless pattern/cycle of civil-rights-violations/racketeering-acts/abuses that the plaintiff would continue to suffer during the more-than-a-decade period of time documented in this lawsuit from many [WCLE] officials and/or agencies. Furthermore, by repeatedly acting on the malicious/abusive/oppressive/violative/humiliative/predatory demands of predatory neighbors [JSP&KAP],[RSR] for a period of over 10 years, defendant [WC] has sent a powerful message to all of these predatory neighbors that they can feel free to commit predatory/obstructive/retaliatory hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff

with absolute impunity and without facing any consequences from [WCLE] - which, as this lawsuit substantially documents, actually did repeatedly happen. Just as defendants [JSP&KAP],[RSR] and their cronies (such as [DMP]) were demanding that [WCLE], in this particular instance, the [WCCHD], *"bring down the hammer"* on the plaintiff, [JSP&KAP],[RSR] and their cronies (such as [DMP]) were also demanding that the [HOA] take legal action against the plaintiff, for the plaintiff's refusal to cut the vegetation in the plaintiff's private [BACKYARD] (and the plaintiff's [FRONTYARD] bushes), in addition to, the plaintiff's refusal to remove a tree in the plaintiff's [FRONTYARD] which they so-fraudulently claimed was dead, when the plaintiff had consulted with one-or-more master-gardener(s) who also confirmed that such tree was, in fact, not dead (having plenty of vibrant green leaves showing that such tree was alive-and-well.) Despite of the fact that the plaintiff spent huge amounts of time sending emails to the [HOA] property-management-company (at that time, [RealManage]), and several Central-Texas master-gardeners, the plaintiff was forced, by no choice of the plaintiff's own, to sacrifice and/or compromise so much of the plaintiff's deeply held religious/cultural (indigenous) values/practices in-order-to satisfy the predatory and ethnocentric/culturally-insensitive demands of such far-right-wing-extremist neighbor(s) and their predatory institutions-of-power: [WCLE] and the [HOA]. The plaintiff was even forced by the defendants, their cronies and their predatory institution(s)-of-power to remove the aforementioned tree, despite of the fact that the plaintiff vigorously campaigned to keep such tree, as the plaintiff knew, with 100%-certainty, that such tree was not dead - causing tremendous pain-and-suffering onto the plaintiff. The plaintiff was even cautiously advised by one such master-gardener who spoke with candidness about at least one-such institution-of-power, as follows: *"It is not uncommon for residents to disagree about how their landscaping looks as opposed to what the HOA has in their requirements. Having said all of this, HOA's can pretty much do as they wish because it is written into most deed restrictions that they have control over landscaping in a subdivision and unless you are willing to go to court to defend your beliefs then you are at the mercy of the HOA."* It was clear that by predatorily and simultaneously demanding that both [WCLE] and the [HOA] *"bring down the hammer"* on the plaintiff - that defendants [JSP&KAP],[RSR] and their cronies (such as [DMP]) were trying to viciously attack the plaintiff, the plaintiff's private-property and the plaintiff's rights on multiple fronts at the same time, in-order-to so clearly overwhelm and exhaust the plaintiff, who simply did not have the resources, manpower and psychological-strength/courage to take on both of these extremely-powerful and predatory institutions-of-power at the same time. As the plaintiff would later find out (as is documented in numerous subsequent incidents), defendants [JSP&KAP],[RSR] and their cronies would similarly and repeatedly engage in the same vicious and predatory strategy of demanding both [WCLE] and the [HOA] to *"bring down the hammer"* on the plaintiff at the same time.

## ¶343

On or about the date of {2013-06-25}, the community-manager of the property-management-company representing the [HOA], [SPOA-CM-MA], sends the following email message (see below) to all residents of the subdivision, ahead of July-Fourth, reminding all residents that the lighting of fireworks is illegal within the subdivision. Such email makes references to the additional burn-ban in effect by defendant [WC] that prohibits all unauthorized burning within the County of Williamson. Such references to the burn-ban are irrelevant because, whether-or-not there is a burn-ban in effect, the subdivision's restrictive-covenants explicitly prohibits any-and-all lighting of fireworks at any time of the year. The [HOA] would, on one-or-more occasion, reference such county-wide burn-ban in-order-to shirk responsibility onto [WCLE] for enforcement of the subdivision's fireworks-ban, because as the plaintiff intends to prove, the [HOA] never did seriously intend to tackle the problem (existing to the {PRESENT-DAY}) of rampant fireworks being lit in the subdivision on numerous days per year. The plaintiff asserts that, if the [HOA] and/or [WCLE] seriously intended to enforce such fireworks-ban, then the [HOA] and/or [WCLE] would have, at a minimum:

amenity privileges for the year.

While the burn ban is currently lifted for Williamson County, residents may also call the Sheriff's office if a resident is engaging in firework activity after 10:30 p.m., as that is deemed a disturbance of the peace. If, however, the burn ban is re-instated by the Courts prior to the 4th , then any use of fireworks can be reported to the Sheriff's office at any time.

We also wanted to make sure everyone was aware that the City of Leander offers all residents of Summerlyn a great alternative ... Liberty Fest, which will feature music, food and a professional fireworks show, will be held on the 4th of July in the vacant field at the intersection of Old 183 and Hero Way (across from the HEB). The festival gates open at 5:00 p.m. The Washers will perform at 6:15 p.m., followed by country artist Cory Morrow at 8:15. The fireworks will be presented by Pyrotechnicho at 9:15 p.m. and will be followed by an encore presentation by Cory Morrow. Food vendors will be offering various food items for sale. Coolers are allowed, but the City asks that no glass containers or tents be brought in the festival. Should be a great time for the whole family, while leaving the fireworks to the professionals. More information can be found at the new City of Leander website at www.LeanderTX.gov

.

Thank you, in advance, for your cooperation. Should you have any questions, please feel free to submit them to service@CiraMail.com

.

Thank you,

M*** A*****

RealManage
Toll Free Phone: 866-4-RealService (866-473-2573)
Toll Free Fax: 866-919-5696

www.realmanage.com

Comprehensive community management solutions

Ⓐ dispatched multiple inspectors and/or police-officers to patrol the streets of the neighborhood during the critical/rampant violation nights of July-3rd, July-4th, December-31st, January-1st.

Ⓑ issued a fine of up to *"$200 for each day of violation"* to first-time offenders or second-time offenders.

Ⓒ taken legal action (either civil breach-of-contract or criminal-charge of disorderly-conduct) against those offenders that have offended three-or-more times.


The plaintiff further asserts that, instead, the [HOA] and/or [WCLE] never did seriously tackle the problem of rampant fireworks in the neighborhood because such restrictive-covenant violations were committed overwhelmingly (and/or disproportionately) by countless White-American (and/or non-immigrant) residents of the neighborhood, and the [HOA] and/or [WCLE] feared facing the wrath of this most-powerful and most-privileged large constituency within the neighborhood. For this reason, racketeer co-defendants [JSP&KAP] and/or [RSR] - along with countless other White-American (and/or non-immigrant) residents of the neighborhood - were freely (but illegally) allowed to light fireworks within the subdivision from the years of {2009} through {2021}. It should be noted that, as even the local-news-media in the Austin area has continued-to-widely-report, the illegal lighting of fireworks within such residential neighborhoods has, on countless occasions, caused serious injury and property-damage (in addition to being a serious noise-nuisance that causes long-term-hearing-loss, disturbance to sleep/work schedules, and contributing to air-and-land pollution). The end result is that, while the defendants were constantly and predatorily targeting the plaintiff on completely harmless/trivial/petty issue-after-issue entirely within the confines of the plaintiff's private-property - often within areas of the plaintiff's private-property that were not even visible from the street (such as the plaintiff's private/concealed/curtilage [BACKYARD]) - racketeer co-defendants [JSP&KAP] and/or [RSR] - along with countless other White-American (and/or non-immigrant) residents of the neighborhood - were freely (but illegally) allowed to so-overtly violate the restrictive-covenants of the neighborhood in plain sight - on public-property (the street) - for almost-all, if not all, of the other residents (including the plaintiff) to witness. The end result is that the serious health-and-safety hazard (in addition to the serious nuisance problem and the pollution/littering problem) of rampant fireworks within the neighborhood is just as rampant in the present year ({2023}) as it was during the first year ({2009}) that the plaintiff moved into the neighborhood.

▸ "REMINDER OF SUMMERLYN FIREWORK BAN" ▸ EMAIL FROM [SPOA-CM-MA] TO ALL [Summerlyn] RESIDENTS CONCERNING "FIREWORKS BAN" (2013-06-25 16:05) (~)
▸ [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

[SPOA-CM-MA]     *Dear Summerlyn Residents,*

*We realize that the excitement and anticipation of another fun 4th of July*
*celebration is building, and want to wish everyone a safe and happy holiday!*

*Accordingly, we also wish to take this opportunity to remind all Summerlyn*
*residents that Section 3.4 (l) of the deed restrictions for the Summerlyn*
*Property Owners Association do prohibit the use of fireworks anywhere within the*
*Summerlyn community. Residents are asked for full compliance to this*
*restriction, and to report any violations observed to management at*
*service@CiraMail.com . The report should indicate*
*the date and time the property owner was observed engaging in the use of*
*fireworks, their address, and a photograph as evidence to help the association*
*Board enforce the deed restrictions as strictly as possible. The property owner*
*will then be notified in writing of the infraction, and subject to the loss of*

## ¶344

On or about an evening in the month of {2013-09}, the plaintiff's senior-citizen-mother, [MOTHER], who was at that moment in time was temporarily residing with the plaintiff at [788KLLTX78641], walks with her dog on the sidewalk near the plaintiff's property [788KLLTX78641], back towards [788KLLTX78641]. As [MOTHER] is walking with such dog down the sidewalk approaching [788KLLTX78641], the then children of [JSP&KAP] and/or [JH&SH] start loudly singing an abusive song to [MOTHER], as if they were instructed to do so by their parents: *"WE - DON'T - LIKE - YOU! ... PLEASE - MOVE - AWAY - NOW! ... BUY - ANOTHER - HOUSE!"* **(δ)**. [MOTHER] reports what she heard to the plaintiff, who is again, both shocked, but yet, not completely surprised. The plaintiff can do nothing else but document yet another incident that reveals one of the many hazards suffered by immigrants-of-color living within a White neighborhood - where such acts of predatory-racism, institutional-racism and White-Supremacy are left unchecked and unpunished.

## ¶345

On or about the month of {2014-02}, after the plaintiff had received one-or-more threatening [DRV] notice(s) from the [HOA] alleging that the aforementioned barrier in [BACKYARD] (initially installed over a year prior during the month of {2012-06}) is a [DRV], the plaintiff scheduled a hearing before the Board to dispute the alleged *"violation"*. On or about the morning of {2014-02-22}, the plaintiff attended the scheduled hearing, which was held at an outdoor table-and-bench located near the swimming pool of the subdivision, before the now-[f-HOA-BOD]s [SPOA-P-BC],[SPOA-VP-AH] and [MP] to dispute the alleged violation since the plaintiff had noticed several unapproved items within the neighboring property-owner's backyards. (For example, [JSP&KAP] had volleyball poles and net installed in the backyard of their property [788KLLTX78641] and poles and net were even visible to the plaintiff over the privacy fence bordering [788KLLTX78641], [784KLLTX78641].) And despite of the fact that they could not show proof to the plaintiff that they were inspecting all backyards within the subdivision, these [f-HOA-BOD]s continued to insist that only the plaintiff was violating the restrictive-covenants by having an unapproved barrier installed in the [BACKYARD] which, due to the low-height of the barrier, was not even visible from the street. Most importantly, during this meeting, the plaintiff noticed [KAP] inside her vehicle drive such vehicle into a location directly in front of where the plaintiff was in such hearing before the [f-HOA-BoD]s. [KAP] remained within her vehicle that was paused in front of the plaintiff for many minutes, staring at the plaintiff while the plaintiff was also facing and speaking to these [f-HOA-BoD]s. After these many minutes staring at the plaintiff with her vehicle paused, [KAP] then drives her vehicle out of the parking-area in front of the swimming pool and into a road leading out of the swimming-pool area. During the end of the hearing, [f-HOA-BoD]s would even question the plaintiff about sheets-of-cardboard that the plaintiff had spread in the [BACKYARD] to ecologically clear an area of grass close to the border area of [788KLLTX78641], [784KLLTX78641] through the aforementioned gardening technique of *"sheet-mulching"* - which the plaintiff had been doing in various areas of the plaintiff's private/concealed/curtilage [BACKYARD] since at least the year {2011}. Again, since such sheets of cardboard are clearly not visible from the street, it became abundantly clear to the plaintiff that [JSP&KAP] had demanded the [HOA] to get the plaintiff to remove such sheets of cardboard used for *"sheet-mulching"*, despite of the fact that the plaintiff had been relying on this ecological gardening-technique in the [BACKYARD] for over 2.5 years (at that particular moment in time). This incident not only confirmed to the plaintiff that it was, in fact, [JSP&KAP] that had demanded the [HOA] to get the plaintiff to remove this barrier and to get the plaintiff to remove the sheets-of-cardboard,

but also revealed to the plaintiff, the great lengths that [JSP&KAP] would undertake in-order-to engage in racial-intimidation-by-proxy against the plaintiff, even brazenly using their favorite predatory institution-of-power - the [HOA] - as a proxy to intimidate/interfere-with the plaintiff. Even the mere imagery of 3 White-American [HOA] Board members acting predatorily against the plaintiff - an immigrant-of-color/indigenous-person - based-upon the predatory demands of the plaintiff's predatory White-American neighbors [JSP&KAP],[RSR] - who all harbored extreme-racial-animus against the plaintiff - simply screams of modern-day-Jim-Crow racial-oppression. Also, at one point in time during such hearing, the plaintiff informs these three [f-HOA-BOD]s of the plaintiff's disability-status - that the plaintiff was registered as a Student with Disabilities at [UT-Austin]. Therefore, from at least this moment in time onwards, the [HOA] is aware of the plaintiff's disability-status.

# ¶346

The plaintiff intends to prove that [RSR] and her co-conspirators used one-or-more online social-media-platforms in-order-to engage in online harassment/stalking, character-assassination ( 🔵 ) (defamation), wire-fraud, witness-tampering and overt-racial-discrimination against the plaintiff - all as part of the defendants' overall conspiracy to violate the plaintiff's rights and the defendants' overall scheme to defraud the plaintiff. However, at least some of [RSR]'s other social-media postings also reveal crucial aspects of [RSR]'s (and/or [RSR]'s co-conspirators') conduct that must be revealed in-order-for the plaintiff to paint a fuller picture about [RSR] (and/or [RSR]'s co-conspirators) necessary for the plaintiff to prove at least some of the plaintiff's core-claims as presented in this lawsuit. For example, at least some of [RSR]'s social-media postings reveal the enormous power that she wielded in the neighborhood, virtually playing the role of an extremely-manipulative neighborhood-boss or mafia-godfather - even making numerous intimidating and threatening demands of [HOA] board members - and the plaintiff asserts that these particular aspects of [RSR]'s conduct are crucially needed for the plaintiff to prove the defendants' obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff that the plaintiff has tried to substantially document in this lawsuit. The plaintiff asserts that, in order for the plaintiff to fully prove the plaintiff's conspiracy claim, fraud claim, witness-tampering claim, online-harassment/stalking claim, and racial-discrimination claim against [RSR] (and her co-conspirator defendants), the plaintiff must, in the interest of justice, be allowed to fully dissect every aspect of [RSR]'s social-media communications that is relevant to proving such claims. Thus, at least some of the plaintiff's analysis of such social-media communications may seem repetitive, but the plaintiff does not, in any way, intend for any such analysis to be unnecessarily repetitive. Finally, since the plaintiff is filing this lawsuit, in substantial part, for the plaintiff's [FHA] violations claim, at least some of [RSR]'s other social-media postings also reveal other aspects of illegal housing discrimination (or racially-discriminatory housing practice(s)) - illegal housing discrimination that both [RSR] and her co-conspirators were fully-aware-of and/or were active-participants-in. Towards these ends, the plaintiff must, in the interest of justice, present multiple public social-media postings, even if any of such social-media postings do not - Ⓐ initially, and/or Ⓑ at surface-level, and/or Ⓒ upon cursory inspection, and/or Ⓓ when viewed in isolation - appear to be relevant to this lawsuit. In one of her first public social-media postings/responses on the *"nextdoor.com"* social-media-platform (that is known to the plaintiff) dated {2014-05-14}, [RSR], going by the name of *"Becky Robertson"*, celebrates the monthly *"Yard of the month"* ritual - a ritual that many environmental organizations and environmental publications (see section below) deem to be extremely wasteful, destructive and damaging to the environment. [RSR] has at least in some instances, tried to portray herself as environmentally-friendly (or as having *"a green thumb"*), while in some cases, even fraudulently smearing ( 🔵 ) the plaintiff as environmentally-unfriendly - which, as the overwhelming volume of the evidence shows, is the exact opposite of the truth. Thus, this post begins to dismantle [RSR]'s fraudulent claim of [RSR] being *"environmentally-friendly"*, or at the very least, [RSR]'s fraudulent denial of being *"anti-environment"* (see subsequent social-media-postings below).

| "May yard of the month?" : Nextdoor Summerlyn Leander: [RSR], [MP], et al.: (2014-05-14): |



## ¶347

In another one of her initial public social-media postings/responses on the *"nextdoor.com"* social-media-platform dated {2014-05-22}, [RSR] not only acknowledges but even seems to celebrate that some of the residents of the White neighborhood routinely *"trash"* the *"common areas"*, including, but not limited to, the area in-or-around the pool. [RSR] shows little-to-no concern if others are littering on public/common-area property, whereas [RSR] - despite living across the street from the plaintiff - has, for over a decade, been laser-focused to deprive the plaintiff of the plaintiff's legitimate right to use various aspects of the plaintiff's private property - specifically the private/concealed [BACKYARD] and private/concealed [FRONTPORCH] - which are all exclusively within the confines of the plaintiff's private property:

▶  "Trash" ,  Nextdoor Summerlyn Leander,  [RSR], et al. ,  {2014-05-22},
▶  https://summerlynleander.nextdoor.com/news_feed/?post=4932198



**Trash**

For those who were concerned about trash around the common areas, here is what they sent me....

22 May 14 · Summerlyn Leander in General

☺ Thank    💬 Reply ⌄                                            2 Thanks  16 Replies

Becky Robertson, Summerlyn Leander · 22 May 14                    ⌄
Geez I Gotta love it!
☺ Thank   1 Thank

Ellen Saper, Summerlyn Leander · 22 May 14                        ⌄
I'm with Becky, just what are we paying for? I don't use the pool, why should I have
to pay to clean it? Just sayin
☺ Thank

Jennifer Jurevicious-Fella, Summerlyn Leander · 22 May 14         ⌄
My family is going to choose a day once every 2 weeks, go for a walk, and pick up
random trash for 10-15 minutes, it'll be a good lesson for the kids, and we're more
than happy to volunteer to clean up our own neighborhood.
☺ Thank   11 Thanks

SJ Schwartz, Summerlyn Leander · 22 May 14                        ⌄
Going and not going to the pool is a choice.  Buying and not buying in our
neighborhood is a choice.  Summerlyn having a pool and HOA are Facts.  I agree
with the HOA are as a community should pitch in and help with the trash.  I also will
participate in trash pick up with my kids
☺ Thank   5 Thanks

Toni Permann, Summerlyn Leander · 22 May 14                       ⌄
One.... I was simply passing along info that was given to me.
Two... do as you please but please don't expect a pat on the back  The tone that
some people seem to feel the need to use here is ridiculous and rude.

Agree it don't, but we are all adults and nobody here needs to talked down too.

That's all. Have a great evening everyone.
☺ Thank   1 Thank

SJ Schwartz, Summerlyn Leander · 22 May 14                        ⌄
I liked that you posted us the info.  I didn't know that we were responsible.  I don't
expect any pat on the back  Not sure if your comment was to me, but when i
posted my comment it was mostly directed to the person complining that they have
to pay HOA fees for an aminity that they don't use.  When I was typing it I didn't
have any attitude in my head, so sorry if it came out in text with attitude.  Thx
☺ Thank   2 Thanks

Ellen Saper, Summerlyn Leander · 22 May 14                        ⌄
I'm also sorry if I came across as rude, I didn't mean it to be. Sometimes things
don't come out quite right in print.
☺ Thank   3 Thanks

Toni Permann, Summerlyn Leander · 22 May 14                       ⌄
Ughh, don't mind me, I'm probably pms'ing....

No but really, I understand we may not all agree on things, I just think we need to be
more mindful of how we all speak/type. We are all different. Different backgrounds,
ages, etc ...but we can all get along! :)
☺ Thank   1 Thank

Kim M., Legends Run · 22 May 14                                  ⌄
We're going to do the same on our walks with my kids. Just make sure if you're
down in the greenbelt, by the outlets from the storm drainage, to watch for snakes.
They're not uncommon down that way.  For those able to, I am excited to see
families getting involved to solve a problem.  Not everyone is able to run around
cleaning up trash. For some it's physical ability, others it's time. End result is, we
have all come together to solve a need in our neighborhood. Thanks for posting
this. I look forward to more collaboration between all of us neighbors to address the
needs of our community and help one another as mature adults.  We all misread,
mistype, and misinterpret now and again. Goodnight all
☺ Thank   4 Thanks

Tyler Stradiner, Summerlyn Leander · 23 May 14                    ⌄
all of the new construction is stirring up the snakes, we had a dead 3.5 footer on
the side of the road in front of our house and we saw a huge, 5 feet at least, snack
by the first entrance with some older kids messing with it. so everyone should be
careful about them, it is not only a few garden snakes anymore. :)
☺ Thank   1 Thank

Add a reply:...

# ¶348

In another one of her initial public social-media postings/responses on the *"nextdoor.com"* social-media-platform (that is known to the plaintiff),

[RSR] admits to throwing large amounts of materials on a weekly-basis to the landfill (which is both wasteful and destructive), and celebrates

using the brand-new (at that moment in time) recycling service. [RSR] is either unaware of the facts concerning recycling - for example, that only approximately 9% of plastics sent to the recycling center is actually recycled (with the rest being sent to the landfill) - or is fully aware of such facts, and is undertaking in the fraudulent practice of *"greenwashing"*. [RSR] is clearly aware of the common-knowledge oath *"REDUCE, REUSE, RECYCLE"* (in that order) with the utmost priority being placed on the first 2 components of that oath:



## ¶349

On or about the day of {2014-06-03}, both [RSR] and then [HOA-BoD][MP] post a response to a social-media posting initially concerning a camera, but then digresses into the topic of the large amount of snakes, rats, spiders, ants, etc. that live within the subdivision. In this posting, one of the residents admits that the subdivision is *"full of (rodents)"*. Another resident posts that there are a *"lot of mice"* in the subdivision and that they have caught 6 *"mice"* in traps within their garage. Both residents agree that snakes are a good pest-control of such rodents. (Neither of these residents lived in close proximity to the plaintiff.) As the plaintiff has already tried-to-documented in the section below, and as the plaintiff has repeatedly tried-to-explain to the defendants (and the [HOA]), rodents are not attracted by uncut grass nor so-called *"weeds"* (as the defendants have repeatedly and fraudulently alleged) since such uncut vegetation does not provide a sufficient high-calorie food source for rodents that need to consume a high-calorie sources of food in order to survive. Rodents are also not attracted to plastics, metals, glass, ceramics, or any type of *"rubbish"* since such *"nondecayable"* materials do not provide rodents (or any other animal) with any food source. Instead, rodents are attracted to (even small-crumbs of) dog-food, (even small-crumbs of) cat-food, dog-faeces, cat-faeces - all of which do exist in many, if not most, of the subdivision's yards since many, if not most, of the subdivision's residents own such pets - with all of those items being the high-calorie food sources that rodents (or vermin) thrive upon. With the exception of the 17-month time-period from approximately {2012-06} through approximately {2013-05} and approximately {2013-08} through approximately {2014-01}, during which the plaintiff's parents did leave a dog at the plaintiff's property, the plaintiff has never willingly had/owned a dog on the plaintiff's property. The plaintiff has also never willingly had/owned a cat at the plaintiff's property at any point in time. As past and future incidents reveal, the defendants would continue to make the fraudulent accusation that only the plaintiff's property has rodents or that all of such rodents were originating from the plaintiff's property, when the evidence of such rodents has always been abundantly clear throughout the entire neighborhood. All of those fraudulent accusations were just part of the defendants' larger scheme to defraud the plaintiff of both money and property, by taking great measures to predatorily target the plaintiff, including blackmailing the [HOA] to the sue the plaintiff (which they succeeded in doing in {2017} - see below) and including fraudulently charging the plaintiff with Class-C-Misdemeanor-Public-Nuisance (which they succeeded in doing in {2020} - see below) - with the defendants' ultimate goal being to either cause enough long-term psychological-trauma onto the plaintiff in-order-to drive the plaintiff, an immigrant-of-color/indigenous-person, out of *"their"* (exclusive-and-pure) White neighborhood, or better yet, cause the plaintiff to lose the plaintiff's (relatively-profitable) private-property through the legal process of

foreclosure. There are countless social-media-postings regarding such rodents, snakes and insects in the neighborhood/subdivision. However, the plaintiff only highlights this particular social-media-posting as [RSR] commented on such social-media-posting:





## ¶350

On or about the day of {2014-06-09}, [RSR] posts the following response to a public social-media posting about some of the wild animals that reside within the subdivision. [RSR] has on numerous occasions accused the plaintiff of conditions on the plaintiff's property that harbor wild animals, even making the outrageously-fraudulent and laughable allegation that wild animals are crossing the street from the plaintiff's property and onto her property. In this particular message, [RSR] even admits to the *"aroma"* from a *"family of skunks"* that she smells from the inside of her house - a family of skunks that she alleges lives around one of the entrances into the subdivision (which is not even close to the plaintiff's property). [RSR] even admits that this family of skunks goes through her immediate neighbors' yard onto her yard. (The plaintiff is not an immediate neighbor of [RSR] and the plaintiff never owned a property that shared a border with [RSR].) Even then [HOA-BoD][MP] admits to such vermin, that are clearly a natural occurrence in the neighborhood - as they are in many, if not most, residential neighborhoods. Obviously, when humans expropriate land away from wildlife in order to selfishly build their own neighborhoods/subdivisions, humans should expect animals to live in-and-around such neighborhoods/subdivisions instead of expecting a sterile environment that is (unjustly) devoid of

wildlife. Despite of such vermin roaming and digging freely within the neighborhood/subdivision, [RSR] has made the racist, fraudulent-allegation (see below) that the plaintiff's (timid, shy, quiet and extremely-docile) companion-tortoise(s) and hens that she even admits are exclusively within the confines of the plaintiff's property are hazardous to her, the neighboring White-American residents and their White-American children (see subsequent incident below) (○). There are countless social-media-postings regarding such vermin in the neighborhood/subdivision. However, the plaintiff only highlights this particular social-media-posting as [RSR] commented on such social-media-posting:



## ¶351

In another public social-media posting dated {2014-06-16}, [RSR] points out the now-common-knowledge that the builder of the subdivision has used low-quality, low-durability materials and/or has poorly installed such materials, so as to cause low-durability and/or lack-of-reliability and/or health-and-safety issues. She even asks if other residents are interested in a class-action lawsuit presumably against the builder of the subdivision and/or the manufacturer(s) of such materials. This posting illustrates that [RSR] acknowledges that the real damage-done to property-value and the real lowering-of property-value is attributed not to the plaintiff, but rather, due to the corporations that profit from

providing substandard materials and/or service - requiring homeowners to spend unnecessary amounts of money, in both material-cost and labor-cost, replacing materials and/or installation with decent-quality materials that are installed properly (and according to proper standards). This posting is actually one of multiple postings in which [RSR] seeks approval from the other residents for a class-action lawsuit (see below). But as the records will indicate, no such lawsuit, let alone class-action lawsuit, was ever filed, and instead, [RSR] maliciously spent the lion's share of her attention on blackmailing the [HOA] to sue the plaintiff (which did happen - see below) and manipulating [WCLE] to fraudulently criminally-charge-and-prosecute the plaintiff (which did happen - see below). The reasoning for [RSR]'s perverse priorities is clear to any reasonable observer: both the builder and manufacturer(s) are huge-corporations that are, by virtue of their overwhelming power/wealth, *"too big to sue"*, whereas the plaintiff is just a low-IQ, subhuman immigrant-of-color/indigenous-person (apparently without any political-power/rights) living alone within *"their"* (exclusive-and-pure) White neighborhood without conforming to White-American standards at a property that the plaintiff is apparently (according to [RSR] and her co-conspirators) not the rightful owner-of - and thus, a perfectly-vulnerable target to sue and prosecute - with [RSR] even admitting to the plaintiff (see below) that the ultimate goal of such predatory lawsuit/prosecution being foreclosure (the plaintiff's involuntary loss of ownership of [788KLLTX78641]):



## ¶352

In another public social-media posting dated {2014-07-06}, [RSR] fraudulently accuses the plaintiff of making a landfill in [BACKYARD]. Even though the original-poster of this posting was not referring to the plaintiff's property, [RSR] maliciously exploited this opportunity to interject this irrelevant misinformation - deliberately in-order-to smear/character-assassinate ( ⊕ ) the plaintiff using a fraudulent claim against the plaintiff. Some of the other residents express frustration about the litter/debris on the streets from fireworks that are illegally lit by some of the neighborhood's residents, but [RSR] remains noticeably silent about this topic because both she and her co-conspirators [JSP&KAP] are known to illegally light fireworks (as the plaintiff's evidence does show). Since the year {2010}, the plaintiff has never left any unsightly filled-garbage-can (nor filled-recycling-can) on the front-curb visible to all people passing on the street - but despite of this fact, according to [RSR], only the plaintiff is guilty of so-called *"unsightly"* conditions. [RSR] and some other residents posting on this message-thread are even warned

by then [f-HOA-BoD][MP] not to make any personal attacks on this publicly-visible social-media-platform, but despite this initial warning and as [RSR]'s future postings will show, [RSR] would continue to viciously attack and harass/stalk the plaintiff on this (and other) social-media-platforms, as part of her larger strategy to engender more racial-animus against the plaintiff in such White neighborhood's many other White-American residents. [RSR] fails to disclose to the other residents of the neighborhood at any point in time that she has already, at this point in time, directly committed several hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, along with her co-conspirators [WCLE],[JSP] and former-co-conspirator [JJB]:



▸  "Why do I get a nasty letter about a garbage can and this guy's house looks like this 24/7??" ▸   Nextdoor Summerlyn Leander▸     [RSR], [MP], et al. ▸    (2014-07-06)▸

▸  https://summerlynleander.nextdoor.com/news_feed/?post=5605050

Amy AnneMarie, Summerlyn Leander

**Why do I get a nasty letter about a garbage can and this guy's house looks like this 24/7??**

Driving down property values?? U mm yea.. looking pretty nasty.

Edited 6 Jul 14   Summerlyn Leander in General

☺ Thank   ◯ Reply ⌄                                         1 Thank  18 Replies

David Mathis, Leander Station · 6 Jul 14
Is it like that for weeks on end or are they in the process of cleaning and organizing? Looks almost like they are just cleaning.

☺ Thank   2 Thanks

Lyndsay Stradtner, Summerlyn Leander · 6 Jul 14
I'm not sure calling someone out on a neighborhood forum accomplishes much. If you have a problem with your neighbor either talk to them about it or go to real manager. If neither of those things work, then coming here would be relevant.

☺ Thank   7 Thanks

Debbie Davis, Summerlyn Leander · 6 Jul 14
To be honest, I've never seen any house in Summerlyn look like that for more than a day, while someone was moving in/out, having a garage sale, or cleaning/organizing. Your picture sort of looks like the latter... Somebody cleaning out a garage or something. At any rate, it probably doesn't have anything to do with your garbage can issue. I know that a lot of people (myself included) don't like our garbage cans inside the garage. It's okay for you to hide it out of sight behind your air conditioning unit. Don't know if that's what the problem is, but just a thought. :-)

☺ Thank

Debbie Davis, Summerlyn Leander · 6 Jul 14
Have you tried talking to them about it?

☺ Thank

David Mathis, Leander Station · 6 Jul 14
I would assume (which is all I can do) that they probably get those nasty letters too.

☺ Thank   1 Thank

Amy AnneMarie, Summerlyn Leander · 6 Jul 14
It's on and off like this all the time for the past few months. We have our cans in the back yard, one day after and we got a letter. It's just really frustrating to work 12+ hrs a day, take care of our son and still have the energy to make sure our house looks good. It's just part of being a responsible home owner. Summerlynn is a nice community. But it takes everyone to keep it that way.

☺ Thank   4 Thanks

Debbie Davis, Summerlyn Leander · 6 Jul 14
Wow. Are they the actual home owners, or tenants? I ask, because IF they're not the homeowners, you might find some success in contacting them. If they are the homeowners, I'd suggest making complaints to RealManage, on three separate occasions of this, with pictures-- meaning, at least three separate complaints (and encourage your neighbors who witness this to do the same). The RM person may not be seeing the property like this on a regular basis. But, if you can demonstrate that this isn't a one-off event, and that others neighbors are witnessing, and are frustrated by this as a norm, I think you'll get a different response from RM (I hope).

☺ Thank

Trevor Million, Summerlyn Leander · 6 Jul 14
Are you referring to the house that appears to be cleaning out the garage?

☺ Thank

Twyla Lamb, Summerlyn Leander · 6 Jul 14
I'm assuming that the other house in question is getting letters as well if the front of their house looks like this all the time. If it's only on occasion, perhaps they are sweeping out their garage. Some people like to move everything out and sweep once in a while. I know it's frustrating but I don't believe posting pictures of someone else's mess on here is helpful either.



## ¶353

In another public social-media posting dated {2014-09-02}, [RSR] admits that she has left her dog roam freely in the neighborhood - which the plaintiff has noticed [RSR] do on a regular basis (not only her dog, but also her cat(s)) - this time, forcing another resident to catch and hold such dog for her to pick up. (Residents' dogs often escape confined areas within their property by accident, but such is not the case with [RSR] who routinely allowed her dog to roam freely onto the street and neighboring yards.) The neighborhood's restrictive-covenants strictly prohibit the unleashing of both dogs and cats to roam freely onto public property or other's private property. The reasoning for this common-sense health-and-safety rule is self-explanatory: both dogs and cats are capable of causing serious harm onto people (especially children) and other pets (by biting, scratching, mauling, disemboweling, gouging, transmitting-disease-or-virus, etc.) and violations of this common-sense health-and-safety rule poses a huge liability both for such pets' owner(s) and the [HOA], that could both be rightfully sued as a result of such harm. Despite of this and other clear violations (such as the illegal lighting of fireworks and parking-related violations), [RSR],[JSP&KAP] continued

to perpetrate the racist fraud that the plaintiff (due to the plaintiff's racial-profile) was only person guilty of violating the subdivision's restrictive-covenants - a racist-fraud that successfully got their co-conspirator [HOA] to unjustly sue the plaintiff (see below), and a racist-fraud that got their co-conspirator [WCLE] to predatorily-prosecute the plaintiff (see below). As future social-media posting(s) would show (see below), this would not be the last time that other residents would have to catch and hold [RSR]'s dog for her to pickup:



## ¶354

In another public social-media posting dated {2014-11-04}, [RSR] thanks other White-American residents of the neighborhood for their efforts in getting people to vote on-or-about the general-election day of year {2014}. As a future incident would reveal (see below), [RSR] while in a [HOA] meeting with the plaintiff present in the same room, engages in one of her many rants filled with venom and racial-animus against the plaintiff, demanding amongst other things, that the [HOA] force the plaintiff to remove the plaintiff's aforementioned "stupid (POLITICAL-YARD-)signs". [RSR]'s co-conspirator, [JSP], would on at least one occasion, brazenly vandalize the plaintiff's political yard-signs right in front of one of the plaintiff's security cameras - while even making menacing gesture(s) into such security camera(s). [RSR] would, on at least one other occasion (see below), stare menacingly into the plaintiff's political yard-signs and then stare menacingly into the plaintiff's security camera(s), showing her uncontrolled racial-animus and far-right-wing-extremist political-animus against the plaintiff for the plaintiff's social-justice political messages. [WCCD-F], on one-or-more occasions, would stare menacingly into the plaintiff's political yard-signs, showing his animus against the plaintiff's political messages - on the very same day that the plaintiff was fraudulently and maliciously charged with Class-C-Misdemeanor-Public-Nuisance by co-conspirators [WCLE],[JSP&KAP],[RSR] (see below). In other words, [RSR] is fully supportive, and in fact thrilled, with her far-right-wing base (including her co-conspirators [WCLE],[JSP&KAP]) having full, unmitigated and monopoly control

over the levers of government, but at the same time, [RSR] took at least some actions to fully-deprive the plaintiff and/or the plaintiff's social-justice/political-activist base from having any voice in that same political system - in complete violation of the plaintiff's first-amendment-rights and the plaintiff's fourteenth-amendment-rights. This social-media-posting is just one small piece of evidence out of an entire body of evidence that the plaintiff presents in-order-to demonstrate not only [RSR]'s racist hypocrisy, but such brazen combination of group-narcissism-and-misanthropy that is not uncommon amongst far-right-wing-extremists - for example, the far-right-wing-extremists that engaged in the {2021-01-06} United-States-Capitol-Insurrection (see below) **(δ)** .



¶355

In another public social-media posting dated {2015-01-15}, [RSR] recognizes that serious crime does occur within the neighborhood - even during *"broad daylight"* - while still failing to disclose to the residents of the subdivision that she has, even at this point in time, committed several hate-crimes/civil-rights-violations/rackcteering-acts/abuses against the plaintiff, also in *"broad daylight"*. More importantly, [RSR] would make demands on multiple occasions both personally to the plaintiff and to the [HOA], to get the plaintiff to remove the plaintiff's security cameras. [RSR] even chastised the plaintiff on multiple occasions for the plaintiff's wearing of a body-worn-camera in-order-to record her abusive actions filled with racial-animus against the plaintiff. In other words, [RSR] knows that serious crimes do occur in the neighborhood, and furthermore, that she has personally committed hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff (along with her co-conspirators [JSP],[WCLE] and former co-conspirator [JJB]), but yet, does not want and never did want the plaintiff to have any recorded evidence of such crimes, in-order-to completely deprive the plaintiff of the plaintiff's fundamental right to justice, and in-order-to continue-to-act with absolute impunity against the plaintiff - which her co-conspirator [WCLE] gladly accommodated for her.





SIDDHARTH KODE   v.   WILLIAMSON COUNTY, ET AL.                    1696907690

responsible? Somebody had to tell them to tow it!

◡ Thank   1 Thanks

Carol Paone, Summerlyn Leander · 9 Jan 15
It's true! My husband did not sign any papers yet, until we talk to the bank
on Monday. There are no late payments ever. Our tires took a beating, and
just the stress of thinking that someone could come in broad daylight and
take your car is what gets me. Oh well, guess we'll wait till Monday to find
out exactly what happened.

◡ Thank

Debbie Davis, Summerlyn Leander · 9 Jan 15
Guess the tow company never heard of a VIN? I hope the police aren't going
to let them off that easily. Glad your car was returned to you, though!

◡ Thank   1 Thank

Branden Kilian, Summerlyn Leander · 9 Jan 15
Id take it to a mechanic for an inspection to be sure theres no unseen
damage... we see tow companys damage customers cars all the time at the
dealership and if it was taken with out checkin vin and confirming a positive
repo make them pay up at least get a set of tires out of it for draggin it

◡ Thank   3 Thanks

Jayne O'Dell, Summerlyn Leander · 9 Jan 15
Glad you got it back. A little scary a tow company can just take a car off
your property with out your signature, specially seeing it wasn't a Repo or
ordered by you. No neighbors or friends pulling a prank on you?
Hope your vehicle is ok and has no problems :) I would think you could file a
police report against them.

◡ Thank

Chris Rodriguez, Summerlyn Leander · 9 Jan 15
I don't know the facts of your situation, but if it was illegally towed, you do
have rights and they are liable for damage that may have happened.
Request a tow hearing in small claims court within 14 days of the tow. The
court will hold a hearing within 21 days of filing. Contact the Texas
department of licensing and regulation for more info. That is the entity that
overseas Tow companies amongst other things.

◡ Thank   6 Thanks

Carol Paone, Summerlyn Leander · 13 Jan 15
Thank you for the information Best Regards. Carol Paone

◡ Thank

Add a reply...

## ¶356

In another public social-media posting dated {2015-01-23}, a resident expresses her frustration and anger at some resident(s) unlawfully leaving their dogs unleashed, resulting in such dogs defecating on public property and/or other's private property. (Obviously, defecation is much less severe than the other aforementioned much-more-serious harm that unleashed large-dogs are capable of committing.) [RSR] responds to this posting, totally downplaying this violation as if it was not a serious health-and-safety issue for a very obvious reason: [RSR] is guilty of repeatedly committing the exact same health-and-safety violation, which she fails to mention in her response(s) to this posting. Another resident posts a message notifying the other residents that there is a leash law and that either the [HOA] and/or defendant [WCLE] are responsible for enforcing such leash law. In approximately 14 years that the plaintiff has resided within the subdivision, the plaintiff has yet to notice any leash law enforced against any owner of dogs that roam freely in the neighborhood, or for that matter, any owner of the domestic cats that enter into other residents' backyard, including [BACKYARD], multiple times per week. During the 17-month period during which the plaintiff's parents owned a dog on the plaintiff's property, such dog would always be on leash when such dog was taken outside of the plaintiff's property. The plaintiff asserts the fact that the leash law (restrictive-covenants) on dogs/cats was never enforced - by either defendant [WCLE] or the [HOA] - is further evidence of such institutions-of-power ignoring restrictive-covenant-violations committed by White-Americans - clearly another racially-discriminatory housing-practice.

▸   "Loose dogs/dog poop" ▸  Nextdoor Summerlyn Leander▸  [RSR] et al.▸  {2015-01-23}▸
▸   https://summerlynleander.nextdoor.com/news_feed/?post=8905042

were not even visible from the street.



## ¶358

In another public social-media posting dated {2015-04-09}, [RSR] publicly expresses her strong dissatisfaction, both during this incident and during subsequent incidents (see below), in having to pay what she alleges to be high property taxes, even going as far as to garner support from other residents for *"fighting city hall"* on this issue of property-taxation. If there is sufficient evidence to show that a property is being deliberately over-valued by a government for the purposes of increasing tax revenue, then that is a legitimate grievance of such property-owner. If citizens do not like how the government is spending (or not spending) their tax-dollars, then that is another legitimate grievance, but not sufficient to protest/fight the amount of taxes owed. If citizens do not feel that they are being adequately represented/served by their government, then that is another legitimate grievance, but again, not sufficient to overthrow the fundamental system of taxation which is a basic democratic function that is necessary to adequately fund social-services. If citizens of the working-class and middle-class believe that they are shouldering too much of the tax-burden within society and that the wealthy/big-corporations are not being made to pay their fair-share in taxes in order to properly fund social-services, then that is certainly a legitimate grievance that people should rightfully protest/fight, and use the political process, to change the tax-brackets/tax-code/tax-loopholes/tax-havens, but again, this is not a legitimate reason to protest/fight the current taxes owed. The plaintiff asserts that, outside of these legitimate grievances, to simply blanket protest/fight the fundamental system of property-taxation without any good reason - and do so in conspiracy with other like-minded people of the far-right-wing that do not want to be



SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL,                                                    1696907690

Cheri Harris, Summerlyn Leander ✎5                                                    ⌄

**Loose dogs/dog poop**

So we walk our dog almost daily and always notice the same area of our street
covered in piles of dog poop. Today I witnessed a neighbor's dog, (one of which lets
their dogs roam free) pooping on someone else's lawn. This particular dog has been
caught & brought back to its home by myself numerous times. I'm done, I will no longer
bring you your dog, animal control will be called from now on. It's always the same
couple of neighbors who just let their dogs out to roam around and do their business
wherever. Enough is enough.

23 Jan 15 · Summerlyn Leander in General

☺ Thank   ⬭ Reply ⌄                                         2 Thanks · 6 Replies

Becky Robertson, Summerlyn Leander · 23 Jan 15                    ⌄
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

☺ Thank   4 Thanks

Cheri Harris, Summerlyn Leander · 23 Jan 15                        ⌄
Like I said, I have returned this dog several times and the owners just don't care.
Trust me that has always been my first resort

☺ Thank   1 Thank

Danielle S , Bells Ferry Rd · 23 Jan 15                            ⌄
I have returned this same dog and was greeted with annoyance that I brought it
back. It was promptly set back down on the stoop and the door was shut.

☺ Thank   2 Thanks

Cheri Harris, Summerlyn Leander · 23 Jan 15                        ⌄
There is another one too black papillon mix at same house however that one
doesn't wonder
Yes when I got that attitude I told them I was going to take and care for & own
their dog if they really didn't care!! It's a cute dog! Not really too great around my
dog when it was on my lap once or twice but a sweet dog.

☺ Thank

David Herbert, Summerlyn Leander · 23 Jan 15                      ⌄
call animal control and wilco. there is a leash law here, not sure if wilco would be
the one to give a fine or not. I have 2 dogs and I am able to keep them in control
and in my yard, the concept is not that difficult.

☺ Thank   2 Thanks

Cheri Harris, Summerlyn Leander · 23 Jan 15                        ⌄
Oh they both have been contacted!!

☺ Thank   2 Thanks

Add a reply

## ¶357

In another public social-media posting dated {2015-02-15}, multiple residents express their concern over vehicles speeding on the streets within the subdivision while there were children on/near the street waiting-for and/or entering-into the schoolbus. While one resident points out that the violators of the speed-limit are not limited to teenagers, [RSR] alerts the other residents to watch out for her son [BR]'s vehicle, and even states that she would *"TALK"* to her son, who apparently engages in the illegal practice of speeding. Speeding vehicles are a huge health-and-safety issue that could cause and does cause both serious injury (some cases death) and property-damage - again, with the serious liability not limited to the offending driver but also to the [HOA] that is responsible for enforcing the *"no-speeding"* restrictive-covenant (and Texas law). Also, speeding vehicles cause at least some amount of psychological harm to the residents as residents do not feel safe living in a neighborhood with routinely speeding vehicles. The plaintiff has, on multiple occasions, noticed [JSP] and [NP] speeding using their respective vehicles on the street; the plaintiff has also noticed [KAP], at least on one occasion, speeding on the street. However, despite of the serious harm caused by speeding vehicles, the plaintiff has not noticed any enforcement action by the [HOA] or by [WCLE] against any of the countless violations of the speeding ban. Also, at least some [HOA]s have installed speed-detection signs to deter people from speeding, but the plaintiff has not noticed any such protective measures undertaken at any point in time by the [SPOA] - at least on the street on which the plaintiff resides. The persistent issue of speeding vehicles was/is also another dangerous health-and-safety issue that was never on the radar of co-conspirators [RSR],[JSP&KAP],[WCLE], who again, were always laser-focused on maliciously targeting the plaintiff, in almost-all cases, with alleged aesthetic/cosmetic (harmless) issues allegedly on the plaintiff's property that, even if true (which the plaintiff vehemently denies), in most cases

taxed - is an indication of extreme selfishness and greed expressed by many people of the far-right-wing. Also, most property-owners are, generally-speaking, relatively privileged and wealthier compared to those who do not own property - for example, most of the people that rent property and the homeless. So, for such relatively-privileged and wealthier property-owners to blanket protest/fight their legitimate taxation without any good reason is yet another indication of unjust-and-unfair selfishness and greed expressed by such property-owners in-order-to coerce the government look elsewhere for earning the tax-revenue that it needs to adequately fund social-services. Since both the State of Texas and the local governments of Texas do not have a system of income taxation nor wealth taxation, much of the tax-revenue gained outside of the State of Texas' extremely regressive sales-taxation is from property-taxation, and as such, property-taxation - in combination with property-tax exemptions (which is a way of tax-bracketing the system of property-taxation) - is one of the only meaningful mechanisms by which the government can at least begin to address the issue of unfair taxation by ensuring that the relatively-privileged and wealthier property-owners pay their fair share in taxes. In general, the average person-of-color's family (or immigrant family) owns much less property, in dollar value, than the average White-American family. So, for relatively-privileged members of the White/Caucasian/American color/race/nationality to, for not good reason, unjustly-and-unfairly protest/fight the payment of their property-taxes can be seen as yet another indication of preserving and even enhancing the status-quo of unjust, race-based economic-inequality. It would appear to the plaintiff that [RSR] is not expressing a legitimate grievance regarding property-taxation in this posting. This issue is particularly relevant to this lawsuit, because as later incidents would reveal, [RSR] (and her co-conspirator [JSP]) would, on multiple occasions, make derisive statements about the plaintiff's *"Tax the Rich"* political yard-sign, even demanding that the [HOA] force the plaintiff to remove such yard-signs. In other words, [RSR] has only wanted her far-right-wing regressive view on taxation to be expressed, but did not want the more nuanced social-justice view of progressive taxation - which, as polling data has consistently shown for many decades, is strongly supported by the overwhelming majority of Americans - to be expressed by the plaintiff. More importantly, this posting, along with multiple other postings, also demonstrates more of [RSR]'s hypocrisy regarding her views of government, because although [RSR] has demonstrated an unwillingness to pay her fair-share in property-taxes, even going as far as to call for *"fighting city hall"* on this issue of property-taxation - with the collection of taxes being a very unintrusive, basic and reasonable function of any government within a democratic society that uses tax dollars in-order-to properly fund social-services and in-order-to reduce the harmful effects of unmitigated wealth/income inequality - [RSR] has repeatedly demanded that [WCLE], a taxpayer-funded institution-of-government, egregiously-violate the plaintiff's rights (as revealed by many of the incidents substantially documented in this lawsuit) and, at the very least, intrude-into the private-affairs of the plaintiff - a hypocritical mindset that the plaintiff asserts is very-typical of far-right-wing-extremists **(δ)**.

"Market Analysis" ·   Nextdoor Summerlyn Leander·   [RSR] et al.·   (2015-04-09)·

https://summerlynleander.nextdoor.com/news_feed/?post=10595652

Becky Wendt, Summerlyn Leander

**Market Analysis**

Is there anyone in the Summerlyn area that could do a market analysis for my home? Need to check because of taxes, the value has gone up quite a lot. Thanks

9 Apr 15 · 17 neighborhoods in Recommendations

Thank    Reply                                   6 Thanks · 30 Replies

Becky Robertson, Summerlyn Leander · 9 Apr 15
ME TOO. I think as homestead they can raise tax rate up to x 10% value pr house. I was really shocked at the increase. Here is to fighting city hall

Thank  3 Thanks

Jewelee Merka, Summerlyn Leander · 9 Apr 15
I can! I am a real estate broker & own my own company, Hill Country Estates. I need to know your address, # of beds & baths, & approx sq ft. You can email the info to HillCountryEstates@gmail.com.  Taxes went up, again, but not as much as they did from 2013-2014 :)

Thank  1 Thank

Fannie C. Hewgley, Summerlyn Leander · 9 Apr 15
Ours went up $20k last year and the same amount this year. What is going on?  Bet nobody in the appraisal district office would not pay almost $200k if my house were on the market. Maybe it is time to sell.

😊 Thank  1 Thank

Fannie C. Hewgley, Summerlyn Leander · 9 Apr 15
Ours went up $20k last year and the same amount this year. What is going on?  Bet nobody in the appraisal district office would not pay almost $200k if my house were on the market. Maybe it is time to sell.

😊 Thank  1 Thank

JAN BOWMAN, Summerlyn Leander · 9 Apr 15
I'm happy to help if needed, I'm from RE/MAX.

😊 Thank  1 Thank

Cara Gallagher, Summerlyn Leander · 9 Apr 15
Mine was a new build and it is valued at what we paid for it last May. Is that normal? This is going to be a HUGE jump in my mortgage. =/

😊 Thank

Jayne O'Dell, Summerlyn Leander · 9 Apr 15
Same here. $20k We are researching it also.

😊 Thank

Jayne O'Dell, Summerlyn Leander · 9 Apr 15
Becky, we did too.

😊 Thank

Becky Robertson, Summerlyn Leander · 9 Apr 15
I unify the first year you pay tax on the lot as that is all they have to value and then the next year...not too on...

Becky Robertson | Oncology Nurse Information Specialist

American Cancer Society, Inc.

11701 Stonehollow Dr

Austin, TX 78758

Phone  512.997.3605

cancer.org <http://www.cancer.org>  |  1.800.227.2345

[http://inimages.cancer.org/images/facebook.jpg]<http://www.facebook.com/americancancersociety?societysignature=facebook>
[http://inimages.cancer.org/images/twitter.jpg] <http://www.twitter.com/americancancer?societysignature=twitter>  [http://inimages.cancer.org/images/youtube.jpg] <http://www.youtube.com/user/AmerCancerSociety?societysignature=youtube>
[http://inimages.cancer.org/images/linkedin.jpg] <http://www.linkedin.com/company/american-cancer-society?societysignature=linkedin>

[http://inimages.cancer.org/images/acs-emailsig-255x51_V3.png]<http://www.cancer.org/>      [http://inimages.cancer.org/images/BBB_no_tagline_rgb_sm.jpg] <http://charityreports.bbb.org/public/seal.aspx?ID=14113312005>

This message (including any attachments) is intended exclusively for the individual to whom it is addressed and may contain proprietary, protected, or confidential information. If you are not the named addressee, you are not authorized to read, print, copy, or disseminate this message or any part of it. If you have received this message in error, please notify the sender immediately.

American Cancer Society  Untag

😊 Thank

Stephanie Garcia, Summerlyn Leander · 9 Apr 15
The market has changed quite a bit in the last year. Our neighborhood's price per square foot has consistently gone up every year for the past couple of years.

I am an agent with Keller Willam Realty and I am about to list a home in our neighborhood that in 2012 would have sold for $150,000 and now we are going to list it for almost $200,000. We don't have enough inventory in Austin, not to mention under $200,000. I expect this home to sell within a week.

If you are wondering what you might be able to sell your home for in this seller's market I would be happy to do a current market analysis of your home. If you give me a little more information I will even work up a seller's net sheet so you can see how much cash you can walk away with after you pay closing costs.

Call me anytime (512) 660-9254 or email me at
StephanieGarcia.RealEstate@gmail.com.

😊 Thank  5 Thanks

Jayne O'Dell, Summerlyn Leander · 9 Apr 15
What's the sq ft on house you are going to list? (Stephanie)

😊 Thank

Rebecca McGinnis, High Gabriel · 9 Apr 15
That is why we bought below our means. We are older and have been burned before...

😊 Thank  2 Thanks

Megan Riggins, Summerlyn Leander · 9 Apr 15
What is the price per square foot houses in our neighborhood are going for?

😊 Thank  1 Thank



Ryan Rogers, Summerlyn Leander · 9 Apr 15
Ours did the same. Up almost $30k in 2 years. Our mortgage went up about $200 per month. We are taking it to the county to fight it.
🙂 Thank · 2 Thanks

Jewelée Merka, Summerlyn Leander · 9 Apr 15
Make sure you all have filed for the homestead exemption!
🙂 Thank · 4 Thanks

Marc Petrick, Highlands at Crystal Falls · 10 Apr 15
I'd also like to know the price per square foot houses are going for in our neighborhood.
🙂 Thank

Jayne O'Dell, Summerlyn Leander · 10 Apr 15
We did homestead exemption and only lived here 1 year and it said $23k.... Plus our mortgage went up $180 a month.
🙂 Thank

Becky Robertson, Summerlyn Leander · 10 Apr 15
and let me know how to fight  I understand you have to bring comparables but any other tips would be greatly appreciated
🙂 Thank · 1 Thank

Jayne O'Dell, Summerlyn Leander · 10 Apr 15
Wonder if we could all get together and protest it?
🙂 Thank

Becky Robertson, Summerlyn Leander · 10 Apr 15
Ya sure where's a strength in numbers
🙂 Thank · 2 Thanks

Fannie C. Hewgley, Summerlyn Leander · 10 Apr 15
Count me in.
🙂 Thank

Fannie C. Hewgley, Summerlyn Leander · 10 Apr 15
If we are going as a group, wouldn't one set of comps work?
🙂 Thank

Alexandria H , Churchill Farms · 10 Apr 15
We bought 2 years ago and my value has gone up $50000. I just had an analysis done. I'm at 1700sq ft. And they are selling from $191000 – $210000 in our neighborhood. Payment went up $150 because of taxes.
🙂 Thank

Toni Permann, Summerlyn Leander · 10 Apr 15
A 1700sq ft just sold for about 185,000 on inca dove... A pretty nice one.
🙂 Thank

Stephanie Garcia, Summerlyn Leander · 10 Apr 15
Jayne - I will be listing a 1700 sqft house on King Elder in June.

There is a company that will fight your property taxes for you. They are called Five Stone. Protest FiveStoneTax.com They do take a 40% contingency fee but that is money you wouldn't have if you didn't protest them yourself.
🙂 Thank

Megan Riggins, Summerlyn Leander · 10 Apr 15
Our payment also went up quite significantly and our home value has increased just over $50k in 2 years.
🙂 Thank

Daniele S. , Beb Fany Pd · 10 Apr 15
Our mortgage went up over $200 this year as well.
🙂 Thank

Cathi Stalings, Summerlyn Leander · 10 Apr 15
I've heard that our taxes are so high because of all the new schools we are having to build and high demand for the area. With Leander being a bedroom community and no "Big Dollar" businesses /industry, all the tax burden falls on us. With the masses of people coming into the area, there is high demand and low supply, so values have gone up. Great if you are planning to move, but for those of us that are not planning on moving anytime soon, it's a huge blow to the budget -and again, with more and more people moving into the area, there comes a need for even more schools... Don't get me wrong, I'm a retired teacher and appreciate the need for schools, I'm just saying that those two things play a big part in our taxes going up so fast. We have a homestead exemption, and our house value went up from 166K to over 191K since last year!
🙂 Thank

Jennifer Correa, Summerlyn Leander · 10 Apr 15
The first year I was here my value went up over 20k. I'm in the mortgage industry so used tools available to me and all my research, I found that my home was coded wrong. There are some simple things you can do as well. Pull up addresses of homes that are the same model as yours, on the appraisal district website and see what those homes are being valued at. If they are within 1-2k of yours than your value is more than likely accurate. I've already looked in to this years and it looks accurate when compared to recent sales and other homes around me that are the same model as my mine. As someone else stated, make sure you file your homestead exemption, you can do this directly from the appraisal districts website.
🙂 Thank · 1 Thank



Elizabeth Cook, Summerlyn Leander · 11 Apr 15
Lynn, no. It's only filed once. :)
Thank   2 Thanks

Add a reply...

# ¶359

On or about a date in the first week of the month of {2015-06}, [WCCD-DM] approached the plaintiff's [FRONTDOOR] which was, at that moment in time, only partly open, and verbally announced his presence to the plaintiff. Before the plaintiff arrived at the [FRONTDOOR], the plaintiff noticed [WCCD-DM] appear to shine a torch-light into the [HOUSE] in-order-to see the contents of the inside of the plaintiff's unlit (and thus darker) interior of [HOUSE] - an egregious violation of the plaintiff's rights. When the plaintiff arrived at the [FRONTDOOR], [WCCD-DM] notified the plaintiff that he had received a complaint from neighbor(s) that there were rodent(s) on or originating-from the plaintiff's property. The plaintiff denied that there were any conditions on the property that would harbor rodents, but did offer to purchase traps to trap such animals - if they existed - and release them into the wild. [WCCD-DM] advised the plaintiff that he would check with his department, the [WCCO] and/or [WCCHD], to see if it was legal for the plaintiff to release such wild animals loose into the County, took the plaintiff's email address, and later on, emailed the plaintiff that he had confirmed that it was, in fact, legal to do so (see below). [WCCD-DM] also questioned the plaintiff for what he alleged to be the plaintiff's unmowed grass. The plaintiff, having read the Texas Public-Nuisance-Law, tries to inform [WCCD-DM] that the height-limitation for unmowed-grass is 36-inches (3-feet) - and that the default Bermuda-Grass installed in this residential-subdivision has a maximum height under 18 inches, thus making it impossible for the plaintiff's grass to be in violation of that law. But [WCCD-DM] fraudulently responds to the plaintiff that the 36-inch height-limitation applies only to open-fields and not to residential-subdivisions. The significance of these particular statements by [WCCD-DM] is at least four-fold:

Ⓐ Such statements indicated to the plaintiff that many of the officials/agencies of [WCLE] - including the [WCCO], [WCSO] and [WCCHD] - were maliciously engaging in clearly unconstitutional-and-unlawful searches/seizures of the plaintiff's property and person, while at the same time, justifying such clearly unlawful actions by abusively weaponizing the property-maintenance-laws (both as a *"sword and shield"*) as modern-day-Jim-Crow law against the plaintiff - resulting in the plaintiff repeatedly and increasingly suffering severe, permanent and irreparable harm/injury from such rights-violations.

Ⓑ According to Texas law, there is no clearly no height-limitation on grass or any wild vegetation located in open-fields, and even if there was, farmers would have strongly (and long-since) protested such law since many pasture-based farmers grow pastures and wild-vegetation well-above 36-inches in height. (The plaintiff has first-hand knowledge of this fact concerning vegetation, as the plaintiff's family had just recently purchased agricultural-private-property in the prior month of {2015-03}.)

Ⓒ It alarmed the plaintiff that, not only were/are the employees/officials of [WCLE] neither properly-trained nor properly-supervised to respect/honor the plaintiff's rights (particularly the plaintiff's fourth-amendment-rights, fifth-amendment-rights and fourteenth-amendment-rights (⭐)), but also, more importantly, that

Ⓓ The plaintiff's predatory neighbors - particularly [JSP&KAP],[RSR] - were/are constantly making fraudulent, malicious complaints against the plaintiff to various agencies of the [WCLE], in order to indirectly engage in racial intimidation/interference/harassment by proxy against the

plaintiff.

To be clear, the plaintiff has never noticed rats at any point in time on the plaintiff's property [788KLLTX78641], and furthermore, as the academic/environmental literature posted below document, unmowed vegetation is neither an attractant nor harborage for rodents of any kind. The plaintiff has, on very rare occasions over the course of over ten years, noticed a single very-small mouse in the outdoor [BACKYARD], and a possum and an armadillo in other areas of the plaintiff's property, but no other occurrences of rodents/vermin aside from these very-rare occurrences. By sharp contrast, the plaintiff has consistently noticed for almost a decade, other residents' unleashed large domestic cats roam freely onto the plaintiff's yard, and enter into the [BACKYARD] during nighttime, multiple times per week. Therefore, there was/is never any possibility of any long-term rodent harborage nor vermin harborage anywhere on the plaintiff's yard - [BACKYARD], [FRONTYARD] or [SIDEYARD]s. [WCCD-DM] clarifies to the plaintiff that it is legal for the plaintiff to trap and release what [WCCD-DM] fraudulently refers to as *"rats"*:

> ▸ *"TRAPPING ANIMALS"* : EMAIL FROM [WCCD-DM] TO PLAINTIFF: (2015-06-04 09:17) (~)
> ▸ [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]
>
> [WCCD-DM]    *Hi Mr. Kode this is Deputy Moore from the constables office. In reference to our conversation about trapping and releasing the rats, I inquired about that and was advised that you can trap the rats and release them out in the county without any issues. Thank you.*
>
>      *Deputy David Moore #5320*
>      *Williamson County Constables Pct. 3*
>      *301 SE Inner Loop Suite 102*
>      *Georgetown, Tx. 78262*
>      *Office: 512-943-1447*
>      *Fax: 512-943-1440*
>      *e-mail: ******@wilco.org*

# ¶360

On or about the date of {2015-06-17}, the plaintiff receives an email from the [HOA] with attached photograph of the interior of the plaintiff's private/concealed [BACKYARD] that had been unconstitutionally-and-unlawfully taken by [WCCD-DM] when [WCCD-DM] (during the aforementioned incident) unconstitutionally-and-unlawfully trespassed onto the plaintiff's property side-yard (*"curtilage"*), used his hand to hold his camera-phone over the plaintiff's privacy-fence, snap the photograph(s), and then, as if those plaintiff's rights-violations were not sufficient enough, [WCCD-DM] illegally submitted these photograph(s) to the [HOA] in further violation of the plaintiff rights. In so doing, [WCCD-DM] committed the crimes of *"Misuse-Of-Official-Information"*, *"Abuse-Of-Official-Capacity"* and *"Official-Oppression"* against the plaintiff. The photographs showed one of the plaintiff's companion-tortoises within the plaintiff's private/concealed [BACKYARD], and the email message (along with corresponding [DRV] notice) from the [HOA] stated that the plaintiff is not allowed to have tortoises on the plaintiff's property - a brazen slap-in-the-face to the plaintiff by both the [HOA] and [WCLE] (acting on the malicious, predatory complaints of [JSP&KAP],[RSR]) since many homeowners within [HOA] subdivisions in-and-around Central-Texas have-owned and continue-to-own companion-tortoises on their private-property (○) . The plaintiff received this email response from the [HOA] because the plaintiff had inquired about a [DRV] notice that the plaintiff received regarding so-called *"animals"* on the plaintiff's property. The plaintiff had mistakenly assumed that, this time, the plaintiff's predatory neighbors [JSP&KAP],[RSR] had made fraudulent complaint to the [HOA] about rodents and/or vermin on the plaintiff's property, but on this particular occasion, it was clearly not any wild animals on the plaintiff's property that the

plaintiff's predators were fraudulently accusing against the plaintiff, but one of the plaintiff's own legitimate companion-tortoises that the plaintiff's predatory neighbors were attempting to deprive the plaintiff of (○). At this relatively-early moment in time, the plaintiff already had at least 4 security-cameras installed on the plaintiff's property at this moment in time, but this incident made it clear to the plaintiff that the plaintiff needed to install more security-cameras on the plaintiff's property in-order-to ensure that predatory people/institutions-of-power realize that if they unlawfully step onto the plaintiff's property to commit any unconstitutional-and-unlawful action(s), or if they commit any unlawful (for example, discriminatory) act while directly-around the perimeter of the plaintiff's property, that at the very least, their unlawful action(s) will be fully recorded on such security-camera(s).

## ¶361

In another public social-media posting dated {2015-09-16}, [RSR] responds that she *"love (s) to watch … of course fox news"*. This posting provides more insight into [RSR]'s political profile, just as the plaintiff's (public-record) political donations, the plaintiff's publicly-visible political yard-signs, and the plaintiff's wearing of a ⟪Democracy Now!⟫ T-shirt provides great insight into the plaintiff's political-activist political-profile. In particular, these facts further establish that [RSR] and the plaintiff are at opposite-ends of the political spectrum. Additionally, [RSR]'s use of the words *"of course"* in such statement indicates that [RSR] deems ⟪Fox News Network⟫ to be an intellectually-superior source of information - catering exclusively to a high-IQ audience - and that [RSR] clearly belongs to the select-few of high-IQ individuals that watch ⟪Fox News Network⟫. For the purpose of this particular lawsuit, the plaintiff must show how [RSR]'s *"love"* of watching ⟪Fox News Network⟫ reveals significant aspect(s) of [RSR]'s conduct and character - just as the plaintiff's listenership and/or readership of ⟪Democracy Now!⟫ reveals significant aspect(s) of the plaintiff's conduct and character. Despite having a strong following from their right-wing audience (including, but not limited to, far-right-wing-extremists), ⟪Fox News Network⟫ and/or the owner(s)/leadership of ⟪Fox News Network⟫ have been involved in multiple legal scandals over the many years, perhaps the most recent and high-profile of which concerned ⟪Fox News Network⟫' alleged defamation of *"Dominion Voting Systems"*. In this particular recent court case, ⟪Fox News Network⟫ was alleged to have knowingly made fraudulent claims of a *"stolen election"* (during the United States Presidential election of {2020}) while continuing to do so, because at least some of their top-level leadership stated their concern that fact-checking such fraudulent claims would alienate their viewers. (If this particular allegation is true, then such top-level leadership of ⟪Fox News Network⟫ believed that the viewers of ⟪Fox News Network⟫ prefer that ⟪Fox News Network⟫ provides them with far-right-wing propaganda that fits their far-right-wing world-view, rather than providing them with truthful and accurate reporting.) Despite ⟪Fox News Network⟫ having virtually unlimited financial resources to hire the best-and-brightest legal team, and despite ⟪Fox News Network⟫ having the best-and-brightest lawyers litigating on their behalf, during the litigation of this lawsuit, the Judge of such court case was angered by ⟪Fox News Network⟫' lack-of-compliance with rules of Discovery, leaving such Judge no choice but to consider appointing a *"special master"* to investigate whether ⟪Fox News Network⟫ made assertions to the court that were *"untrue or negligent"*. With the jury of such trial seated and the attorneys about to make their opening statements on a day in the month of {2023-04}, the Judge announced that the parties had reached a settlement with ⟪Fox News Network⟫ agreeing to pay the petitioner(s) $787.5 million and acknowledging the court ruling that ⟪Fox News Network⟫ knowingly spread falsehoods about the petitioner(s). As part of such settlement, ⟪Fox News Network⟫ was not required to apologize for any wrongdoing in its own programming, thereby evading the requirement to notify its viewers that it had repeatedly lied to its viewers about the so-called *"stolen election"*. Instead, ⟪Fox News Network⟫ released a public statement saying, in part, *"We acknowledge the Court's rulings finding certain claims about Dominion to be false. This settlement reflects Fox's continued commitment to the highest journalistic standards."* It has been alleged that ⟪Fox News Network⟫ settled this lawsuit, primarily because ⟪Fox News Network⟫ and/or the owner(s)/leadership of ⟪Fox News Network⟫ had far more to lose by having

other extremely damaging information about its behavior/conduct (or such behavior/conduct of its employees/leadership) revealed in public court. As a direct result or fallout from this lawsuit and/or other pending lawsuit(s) and/or the potential for other lawsuit(s), 《Fox News Network》 even dismissed television anchor Tucker Carlson, described by at least some other reputable organizations as a *"right-wing extremist"*, despite of the fact that Mr. Carlson's 《Fox News Network》 television-show was, more-likely-than-not, to have been one of 《Fox News Network》' most profitable television-shows. It has been alleged that 《Fox News Network》 dismissed Mr. Carlson despite of the significantly-greater profits that Mr. Carlson's anchoring was generating for 《Fox News Network》 because 《Fox News Network》 and/or the owner(s) of 《Fox News Network》 had far more to lose by keeping Mr. Carlson due to the potential liabilities associated with Mr. Carlson's past and/or present alleged behavior/conduct. It was also revealed as part of the publicly-released information from one-or-more of the aforementioned lawsuit(s) that, in private messages prior to his dismissal from 《Fox News Network》 (on or about the date of {2021-01-04}), Mr. Carlson stated words-to-the-effect that he *"passionately hates"* the former President of the United States - further stating *"I can't handle much more of this"* - while during many, if not most, of his television-segments on 《Fox News Network》, even at those particular moments in time, Mr. Carlson was vigorously advocating for the former President - just one example of countless similarly-revealing examples of how one-or-more far-right-wing platform(s) of television-media and/or other-news-media (not limited to 《Fox News Network》) operate that even George Orwell could not fictionalize.



## ¶362

On or about a day in the month of {2015-09}, the plaintiff's senior-citizen [PARENTS] who live at another residential-subdivision within 5 miles of the 【Summerlyn】 subdivision received a letter in the mail (via the [USPS]) without the sender's address on the envelope. The letter threatened the plaintiff's senior-citizen [PARENTS] to move the plaintiff out of the 【Summerlyn】 subdivision and into the agricultural-private-property that the plaintiff had recently - in the month of {2015-03} - purchased with the plaintiff's [PARENTS], or else they will *"show no mercy"* and *"settle for nothing less than 〈taking the 【Summerlyn】 home, [788KLLTX78641], away from the plaintiff〉"*. The racial threats made in this letter are not only clear Fair-Housing-Violations and the racketeering-acts of mail-fraud, blackmail/extortion, but more importantly, were made by individual(s) that where closely monitoring all of the plaintiff's activities including the plaintiff's recent purchase of such agricultural-private-property, which neither the plaintiff nor the plaintiff's parents had disclosed to anyone else.

## ¶363

In another public social-media posting dated {2015-09-25}, a resident expresses frustration that this social-media-platform is being abused by some residents (such as [RSR]) to launch unjustified and out-of-control personal attacks against other residents. [RSR] provides a response to this posting, agreeing with it, while at the same time, continuing to smear ( 🌐 ) the plaintiff, by stating *"our block has same issues."* [RSR]'s response further indicates that she admits that whatever she is alleging the plaintiff of doing, even if true, is also being done by at least some other White-American residents of the neighborhood; yet, [RSR], throughout her 12-years of residence at [789KLLTX78641], was only-and-always laser-focused on maliciously and predatorily targeting the plaintiff. [RSR]'s use of the word *"our"*, yet-again, indicates very clearly that

the *"block"* belongs to the White-American residents of the neighborhood (most importantly - [RSR],[JSP&KAP]), while the plaintiff - due to the plaintiff's non-White racial-profile - does not belong in such (exclusive-and-pure) White-American block. [RSR] makes yet another extremely hypocritical statement: *"This forum should function to bring us together and not to divide us."* Again, throughout her 12-years of residence at [789KLLTX78641], [RSR] has always been laser-focused on using racist propaganda (both inside and outside of social-media) to engender more racial-animus against the plaintiff in the White neighborhood's other residents; so, for [RSR] to claim that [RSR] intends to unite the neighborhood - the plaintiff can only interpret this statement as [RSR]'s relentless efforts to unite more of the White neighborhood to pressure her co-conspirators - the [HOA] and [WCLE] - to undertake more predatory enforcement action(s) against the plaintiff - as [RSR] has always deemed the plaintiff to be an *"outcast"* of the neighborhood due to her extreme racial-animus against the plaintiff. The plaintiff was already being periodically bombarded with threatening [DRV] notices from the [HOA] during the years {2009} through {2016}, and [RSR]'s, [JSP&KAP]'s,[WCLE]'s (along with prior co-conspirator [JJB]'s) series of malicious actions against the plaintiff had always made it abundantly clear to the plaintiff, the malicious people that were unjustly driving this predatory targeting of the plaintiff. Despite of the fact that [RSR] agrees not to use this social-media-platform to launch personal attacks, as future postings would show, [RSR] does not even pretend to abide by this agreement, continuing her relentless campaign of racist propaganda for the purposes of engendering more racial-hatred and predatory-enforcement-actions against the plaintiff:

»   "If you see a violation in the neighborhood, you have 2 options" ᛫   Nextdoor Summerlyn Leander᛫   [RSR] et al.᛫   (2015-09-25)᛫
»   https://summerlynleander.nextdoor.com/news_feed/?post=16189698

campaign yard-sign on land that such resident considered to be his private-property. [RSR] responds to the posting that the individuals being endorsed in these political-campaign yard-sign(s) have done *"a lot of GOOD"*, apparently justifying some stranger's action of trespassing and posting their political-campaign yard-sign(s) on someone-else's private property. This posting is particularly relevant to this lawsuit because, as future incidents would reveal, [RSR] would make multiple derisive and racist comments about the plaintiff's political-yard-signs and would even demand the [HOA] to force the plaintiff to remove the *"stupid signs"*, that the plaintiff had installed on the plaintiff's own private-property. Once again, the racist hypocrisy of [RSR]'s actions is revealed not only in this action but also several dozen of other abusive actions that she has maliciously and predatorily committed against the plaintiff during the period of over a decade:

»   "Sign on my property" :   Nextdoor Summerlyn Leander:   [RSR], et al. :   (2015-10-07):

»   https://summerlynleander.nextdoor.com/news_feed/?post=16644960



If you see a violation in the neighborhood, you have 2 options
1. Speak to the neighbor in question
2. Report violation to real manage. You can report any violation you see via the resident portal at www.restmanage.com

That's it, folks. Coming on here to complain and expect something to get done will not only cause more drama, but the neighbor itself is most likely not even seeing the message.

Stop. Drop. And Report. If you want resolution you need to take action. Either DO IT or don't complain. It's like voting.

25 Sep 15 · Summerlyn Leander in General

😊 Thank     💬 Reply ⌄                                                          32 Thanks · 15 Replies

Becky Robertson, Summerlyn Leander · 25 Sep 15
(highlighted text illegible)

😊 Thank     3 Thanks

Geneva Early, Summerlyn Leander · 25 Sep 15
THANK YOU!
😊 Thank     2 Thanks

Toni Permann, Summerlyn Leander · 25 Sep 15
YES!!!!!!!
😊 Thank     2 Thanks

Joanie Brown, Summerlyn Leander · 25 Sep 15
Well said! I agree 100%.
😊 Thank     2 Thanks

Kendra Jones, Leander Station · 25 Sep 15
You forgot number 3! 3 Complain about it on social media! :-P lol I kid I kid
😊 Thank     8 Thanks

Sherry Mojica, Summerlyn Leander · 26 Sep 15
Is that link to the HOA?
😊 Thank     1 Thank

Danlele S., Bells Ferry Rd · 26 Sep 15
Sherry, yes that is the management company
😊 Thank     1 Thank

Sherry Mojica, Summerlyn Leander · 26 Sep 15
Who responsibility is it to maintain the grass along the sidewalk in the greenbelt area by the bridge on Morning Dove?
😊 Thank     1 Thank

Danlele S., Bells Ferry Rd · 26 Sep 15
That is the Mud and not the HOA.
😊 Thank     2 Thanks

Danlele S., Bells Ferry Rd · 26 Sep 15
Mud #13 contact number is 512-476-6604.
😊 Thank     3 Thanks

Sherry Mojica, Summerlyn Leander · 26 Sep 15
Good to know. We got "the letter" about 2 weeds being too big so I just figured since that area looks like a jungle it's a double standard.
😊 Thank     2 Thanks

Twyla Lamb, Summerlyn Leander · 26 Sep 15
The MUD unfortunately. It always looks so unsightly.
😊 Thank     1 Thank

Twyla Lamb, Summerlyn Leander · 26 Sep 15
You're joking right?!...your yard is fine!
😊 Thank

Sherry Mojica, Summerlyn Leander · 26 Sep 15
Not joking.
😊 Thank

Twyla Lamb, Summerlyn Leander · 26 Sep 15
Well that's ridiculous....
😊 Thank

Add a reply...

# ¶364

In another public social-media posting dated {2015-10-07}, a resident expresses frustration and alarm that someone had posted a political-



## ¶365

In at least 2 other public responses to social-media postings dated {2015-12-29} and {2016-01-11} respectively, [RSR], once-again, points out the now-common-knowledge that the builder of the subdivision has used low-quality, low-durability materials and/or has poorly installed such materials, so as to cause low-durability and/or lack-of-reliability and/or health-and-safety issues. On this particular occasion, the issue being

discussed is *"black mold"* forming on the inside of the house as a result of wet window sills, which is a both a structural hazard (since mold destroys building structure) and health-and-safety hazard since mold generates toxins that are toxic to humans when inhaled (or ingested). Both [RSR] and some other residents are discussing the possibility of a class-action lawsuit against either the builder and/or manufacturer(s), presumably since the warranty period has expired. [RSR] states that she complained about this issue and did not get any resolution, but that she would be having *"a window company come out soon to give an estimate and write a report"* that could be used in case of such class-action lawsuit. In the response(s) to this posting, one resident ask if either the [HOA] or [WCCHD] will *"do anything"* (by legal action, if necessary) to resolve this issue if the *"builders"* won't fix these serious health-and-safety hazards: *"Maybe if the HOA called the builders that might help. With a class action suit brought against both of the builders no one will want to move here. I have enough of health issues without the help of the builders with black mold in my house. Will the Williamson county Health Department do anything? Worth a call if builders don't fix problem."* In later incidents (see below), [RSR] would, on multiple occasions, fraudulently claim that people will not want to purchase her property since the plaintiff lives across the street from her, or that she will have to reduce the sale-price of her property - by as much as $15,000 - solely due to the plaintiff (see below). However, these postings reveal that the real reason that resident(s) might not want to purchase homes in this subdivision is due to the serious health-and-safety hazards caused by sub-standard building materials and/or installation caused by the *"builders"* and/or manufacturer(s). According to the plaintiff's limited knowledge, neither the [WCCHD] nor the [HOA] have taken any action(s) against the *"builders"* and/or manufacturer(s) to help resolve this serious health-and-safety hazard. But the fact that one resident asks if [WCCHD], an agency of defendant [WC] that is being sued in this lawsuit, will *"do anything"* to help to fix this serious health-and-safety hazard affecting many (if not most) residents of the subdivision is also very revealing, given that the [WCCHD] has on multiple occasions, as substantially documented in this lawsuit, engaged in predatory enforcement action(s) against the plaintiff (including, but not limited to, multiple egregious unconstitutional-and-unlawful searches of the plaintiff's private-property), based on the malicious complaints of the plaintiff's predatory neighbors [JSP&KAP],[RSR]. These are only 3 of numerous different social-media-postings that show that the real damage to [RSR]'s property-value, and many (if not most) property-owners' property-value, is not how the plaintiff (living across the street from [RSR]) is maintaining the plaintiff's private-property, but rather, all of the substandard materials/installation that many (if not most) of the houses in the subdivision were built with. As already documented (see above), these are 3 additional postings in which [RSR] discusses with other residents the possibility of a class-action lawsuit against the builder and/or manufacturer(s). But as the records will indicate, no such lawsuit, let alone class-action lawsuit, was ever filed, and instead, [RSR] maliciously spent the lion's share of her attention on blackmailing the [HOA] to predatorily sue the plaintiff (which did happen - see below) and manipulating [WCLE] to fraudulently and predatorily criminally-charge-and-prosecute the plaintiff (which did happen - see below). The reasoning for [RSR]'s perverse priorities is clear to any reasonable observer that knows all of the relevant facts: both the builder and manufacturer(s) are huge-corporations that are, by virtue of their overwhelming power/wealth, *"too big to sue"*, whereas the plaintiff is just a low-IQ, subhuman immigrant-of-color/indigenous-person (apparently without any political-power/rights) living alone within *"their"* (exclusive-and-pure) White neighborhood without conforming to White-American standards at a property that the plaintiff is apparently (according to [RSR]) not the rightful owner-of - and thus, a perfectly-vulnerable target to sue and/or prosecute - with [RSR] even admitting to the plaintiff (see both above and below) that the ultimate goal of such predatory lawsuit/prosecution being foreclosure (the plaintiff's unwilling loss-of-ownership of [788KLLTX78641]):

»    "This is a picture my son sent ..." ›   Nextdoor Summerlyn Leander›   [RSR], [MP], et al.›   (2015-12-29)›
»    https://summerlynleander.nextdoor.com/news_feed/?post=19655902

Carol Paone, Summerlyn Leander                                    ⌄

**This is a picture my son sent ...**

This is a picture my son sent me just now when wiping down our windows. This to
me is not a trade off. Also, I believe that our windows are covered by Centex for the
first 5 years. I don't want to go to the television or anything like that. However, I do
think that the Windows should be replaced for every Centex homeowner who is
having this problem. Centex should stand behind their workmanship.

file:///var/mobile/Containers/Data/Application/4310F96A-EFD6-4422-990B-
1B6316BE47F1/Library/Caches/Attachments/ae9fda2010d40ac38a4a10864c57ba5b
AMG_0567.JPG

28 Dec 15 · 4 neighborhoods in Recommendations

☺ Thank    💬 Reply ⌄                                3 Thanks · 3 Replies

🖼 Becky Robertson, Summerlyn Leander · 29 Dec 15            ⌄

⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛
⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛⬛

☺ Thank   1 Thank

Carol Paone, Summerlyn Leander · 29 Dec 15                  ⌄

Bring it on. I've been here three years and have had one window replaced that
had condensation and still have wet window sills and mold. Can we sign a
petition?

Just a thought.

Carol Paone

☺ Thank

Marc Petrick, Highlands at Crystal Falls · 29 Dec 15         ⌄

Hi Everyone! We do not need multiple threads on the condensation and the
windows. Please use the main thread located here -
https://summerlynleander.nextdoor.com/news_feed/?post=19614447 rather
then creating a new thread about this. I am going to close new threads on this
topic.

☺ Thank

Marc Petrick closed the discussion on 29 Dec 15

▸ "Condensation on Windows" :    Nextdoor Summerlyn Leander·   [RSR], et al.·   (2016-01-11)·
▸ https://summerlynleander.nextdoor.com/news_feed/?post=19614447

**Condensation on Windows**

Anyone else having this condensation problem? Been here 2 years and it happens
whenever it's cold outside. I asked about this the first year I was here and was told it
was normal. They said I should just raise my blinds just a little And that would help
solve the problem.  But it did not. I am not so happy I have to dry all my windows off
several times a day during these cold snaps. Seems the window sills would warp as
well. Anyone else have condensation puddling up on the window sill? Is this
fixable? Thanks!

28 Dec 15 · Summerlyn Leander in General

☺ Thank    💬 Reply ⌄                                5 Thanks · 66 Replies

🖼 Jayne O'Dell, Summerlyn Leander · 28 Dec 15              ⌄

We have it also. I guess it's the cheap Windows that are installed....that's what
I was told when asked others about it.
I have to clean ours weekly to remove most of it. First time I ever had this
happen in all the homes we've owned.

☺ Thank   1 Thank

🖼 Christena Dankworth, Summerlyn Leander · 28 Dec 15        ⌄

I had that happen in the last home we live in. They told me the same thing.
Raise the blinds a bit. It does not work

☺ Thank   1 Thank

🖼 April Rancier, Summerlyn Leander · 28 Dec 15              ⌄

Yes, every time it gets cold. Cleaning the window sill has become a much
dreaded chore.

☺ Thank   1 Thank

🖼 Sig Gardarsson, Summerlyn Leander · 28 Dec 15             ⌄

The builder is blowing smoke the windows need to be replaced if they don't
want to replace them then call bbb or a TV station.

☺ Thank   5 Thanks

⬛ mary Jansen, Summerlyn Leander · 28 Dec 15               ⌄
I'm not too happy with this. I highly doubt they would replace all the windows

I'm not too happy with this. I highly doubt they would replace all the windows.
I'm guessing they aren't in the warranty either.

☺ Thank   1 Thank

Darrelle S ., Bells Ferry Rd · 28 Dec 15                                                        ⌄
My construction manager told me it was the cheap aluminum windows the
builder installed. I leave my blinds up a bit and wipe them down daily. Highly
annoying but cheaper then replacing atm !!

☺ Thank   2 Thanks

J R Cox, Summerlyn Leander · 28 Dec 15                                                          ⌄
Code requires that Windows must be double layered with an air space between
layers. Contact the building ins
pector for this area. A contractor can be cited if they certify codes have
adhered to when they have not.  Obviously they were not followed.

☺ Thank   3 Thanks

frank emery, Summerlyn Leander · 28 Dec 15                                                      ⌄
Having the problem, anyone have any suggestions besides wiping or replacing
the Windows?

☺ Thank

mary Jansen, Summerlyn Leander · 28 Dec 15                                                      ⌄
I emailed them...will let you all know what they say. Thanks!

☺ Thank   4 Thanks

Silvia Silva, Summerlyn Leander · 28 Dec 15                                                     ⌄
Yesssss! I'm not happy! Your story is mine to a T What can we do about this??

☺ Thank   1 Thank

Silvia Silva, Summerlyn Leander · 28 Dec 15                                                     ⌄
Kitchen window :( Dinning room window :( Bedroom window :(

☺ Thank   1 Thank

mary Jansen, Summerlyn Leander · 28 Dec 15                                                      ⌄
Thanks everyone... Good to know its not just my house.  will let you know what
kind of response I get.  I posted this on fb site as well.  Didn't mean to double
post.  Wasn't sure where to post.  And if anyone finds a solution please share.

☺ Thank   3 Thanks

Silvia Silva, Summerlyn Leander · 28 Dec 15                                                     ⌄
This problem needs to be fixed! I won't take no for answer anymore. I have
complained and other things that need to be addressed.
This the text I sent to the contractor
Jimmy Garcia.

☺ Thank   2 Thanks

frank emery, Summerlyn Leander · 28 Dec 15                                                      ⌄
Having same problem, in kitchen , living room and bedrooms

☺ Thank   1 Think

mary Jansen, Summerlyn Leander · 28 Dec 15                                                      ⌄
They responded quickly:  .

I understand your frustration with the condensation you are experiencing.  I
have had to deal with condensation issues myself personally as well.
Condensation is not from defective windows.  It occurs because houses are
built so tight these days.  Windows and doors are sealed, and minimal air drafts
occur, which also means that the interior climate holds not only the temperature
but the moisture in the air.  Please keep in mind that condensation elevates
with frequent cooling or higher thermostat settings.  In regards to the mildew
that can grow, a simple bleach and water sprayed on the windows and any
affected area will kill and remove this.  Regretfully, during the seasons that
bring sufficient difference between internal and external air temperatures, it is a
necessary maintenance to remove any accumulated water from the windows
and sill.  Keeping a ceiling fan on, if available, will also help circulate the air
around the windows and minimize condensation as well.

☺ Thank

Trina Mendoza, Summerlyn Leander · 28 Dec 15                                                    ⌄
That doesn't even sound like a good enough explanation. The bottom line is
that they gave us cheap windows. It's ridiculous when you pay so much money
for a house and you can't get decent windows. My parent's house never had
this problem and they built theirs too (not through centex though).

☺ Thank

J R Cox, Summerlyn Leander · 28 Dec 15                                                          ⌄
We moved here in 2006, not one time have we ever had any condensation on
our windows. I was a builder for forty years. I don't know who your builder was
but your windows are not insulated and are not to code if you are having that
much water accumulate. It is not because your home is too tight, it is because
the glass on the inside of the window is in contact with the exterior cold
temperature.  If the glass was layered with a space between the layers the
inside layer would be warmer than the exterior pane and would not accumulate
moisture. The air space between layers of glass in an insulated window



insulates the interior pane of glass from the exterior temperature which is what it requires to avoid condensation.
Note my builder was Lennar

☺ Thank   6 Thanks

Linda Osteros, Summerlyn Leander · 28 Dec 15
I'm having the same problem and I have never had this before, only when it rains hard or cold.

☺ Thank

Robert Frisby, Summerlyn Leander · 28 Dec 15
We have a Lennar home - 6 yrs ago - Never had that problem (knock on wood)

☺ Thank

Carol Paone, Summerlyn Leander · 28 Dec 15
I had all my window sills replaced after the first year. The problem is the pressboard wood that is used
When making the windowsills. I asked Jim to replace them with real wood but his partner said no.

I still have the problem and wipe my windows down with towels

Carol

☺ Thank

Tina Houy, Summerlyn Leander · 28 Dec 15
Mine do the same.

☺ Thank

Jamie Sylvester, Summerlyn Leander · 28 Dec 15
The thermal seal is broken in the window. Most likely from being cheap windows

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 28 Dec 15
We have a new house and have this as well. To the point that there are puddles on the sills and paint is bubbling. I called the builder and he said it's from all the moisture in the new wood and drywall and v that they use aluminum frames. Seems excessive to me and mold is inevitable.

☺ Thank   1 Thank

Sarah Vecchionacce, Summerlyn Leander · 28 Dec 15
I've already tried getting the builder to do something and at this point I have 2 sills that need replacing and we just bought in the end of oct. I'd be up for forming a group of us who bought with pulte and really drawing some attention to the craftsmanship.

☺ Thank   6 Thanks

Tara Neal, Summerlyn Leander · 28 Dec 15
We have this same problem too.  Huge puddles on every window sill and condensation on the window frame as well every time it rains or gets cold.  I emailed the builder when I bought the house two years ago and they told me the same thing about it being because the house is too water tight. I agree, if this is because something was done improperly or not up to code that we should all come together and do something.

☺ Thank   1 Thank

Larry & Carla Brownfield, Summerlyn Leander · 28 Dec 15
I think this is a common occurrence. Have experienced it in every house we've lived in, and this includes multiple regions of Texas, as well as Florida. Condensation happens. Keeps us on our toes keeping windows and sills clean. :)

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 28 Dec 15
I moved here from Seattle so I'm familiar with cold and I have NEVER seen condensation like this.

☺ Thank   1 Thank

Larry & Carla Brownfield, Summerlyn Leander · 28 Dec 15
...forgot to add that perhaps humidity and homes kept at a fairly warm temperature (warmer than "back in the day") increase the problem. As someone above stated, houses are being built tighter these days also. Probably a number of factors are involved. Always something. Keeps it real.

☺ Thank

Kendra Jones, Leander Station · 28 Dec 15
Is everyone that is having issues in centex homes? We are in a Lennar and have had no condensation

☺ Thank   1 Thank

Christina Dankworth, Summerlyn Leander · 28 Dec 15
Castle Rock home and I also have this problem. My last home was a Main Street home and also had that problem.

☺ Thank

Mike Trim, Summerlyn Leander · 28 Dec 15
Aluminum Windows will sweat.  Code doesn't require "non condensation". Code is only about SHGC and UV factors.  If I'm right Lennar has Vinyl Windows.  It's all about costs.  Most brand new 2015 and up will have Vinyl as aluminum is all but gone in the window market.  Not to say a cheap vinyl won't sweat, but aluminum definitely will.  As far as the window seals.  If anything stays wet..... It will go bad.  Most use a moisture resistant window stool.

☺ Thank

mary Jansen, Summerlyn Leander · 28 Dec 15
Mine is a Centex home built in 2013. I have lived in many states with extreme
weather conditions and never ever had this problem. Maybe it is because they
are energy efficient houses and "tight". Seems absolutely ridiculous to have to
wipe the windows every day to prevent mold, and damage to window sills.
☺ Thank   3 Thanks

April Rancier, Summerlyn Leander · 28 Dec 15
Sad thing is I wiped all of my windows earlier today. They are all covered in
condensation again. My neighbor has the exact same house, built by the same
builder at same time, no condensation.
☺ Thank

Mike Tinn, Summerlyn Leander · 28 Dec 15
That's probably the case. I can tell you this is normal for aluminum Windows.
Other types are more expensive. Which is not required in our area. If it was,
the price of homes would be several thousand more. City of austin does
require better Windows, but you'll pay for it. That's one reason I don't live in
the city of Austin. I know no one wants to hear it, but these homes are not
made with the best materials possible. It's a trade off.
☺ Thank   2 Thanks

mary Jansen, Summerlyn Leander · 28 Dec 15
Mike, I agree with you. I moved here because it was cheaper than Austin. It is
indeed a trade off.
☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 29 Dec 15
I don't agree with the trade off. If they are using materials that are known to
produce condensation, which in turn cause mold and rot, that is just
irresponsible and needs to be addressed. I took photos of all of my windows
this morning and will be emailing them to Jimmy. I encourage all of you with a
Centex home to do the same. He can brush off one of us but he can't brush off
all of us.
Jimmy.garcia@centex.com

☺ Thank

Steph Freitag, Summerlyn Leander · 29 Dec 15
We have a Lennar home and never had that issue. We moved here in 2009. It
appears to be a builder issue (not a climate issue) which isn't right.
☺ Thank   1 Thank

Silvia Silva, Summerlyn Leander · 29 Dec 15
I wiped and dried all my window sills yesterday. This is today!

☺ Thank   1 Thank

Danielle S., Betis Ferry Rd · 29 Dec 15
We have a Castle Rock home and they cut corners with just about everything.
☺ Thank

Corey Lindberg, Summerlyn Leander · 29 Dec 15
In response to Danielle, that's interesting because I have a CastleRock home
as well and we haven't had any issues with the windows. I don't know if its
because we have one of the very first homes they built in the neighborhood or
what but our house doesn't experience the issues that other homes seem to be
having. All this time I assumed it was because I had a different builder, but I
guess not and I'm thankful we have not had this problem.
☺ Thank

Jessica Marshall, Summerlyn Leander · 29 Dec 15
I have a CastleRock and my house is doing it too. It's nowhere near as
pronounced as some of the pictures posted but it's definitely doing it. I keep my
house pretty cool too, between 62-64. Definitely going to have to keep an eye
on it.
☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 30 Dec 15
My dad recommended leaving the bathroom fans going, as they suck air and
moisture out. I ran them all day yesterday and we had no condensation this
morning but it was quite a bit warmer last night so I don't know which it was.
☺ Thank   1 Thank

Jessica Marshall, Summerlyn Leander · 30 Dec 15
I would be very cautious leaving on those fans for an extended period of time,
they are known to cause house fires!
☺ Thank   1 Thank

Alexandria H., Churchill Farms · 30 Dec 15
My windows are like this all the time.  The wood on the seal is all bubbled up.
We are moving and I asked my inspector about this.  He said he didn't know
without seeing it. I too called jimmy. Received the same response of leaving
the blinds up.  It is so annoying!
☺ Thank



☺ Thank

Tony Presta, Summerlyn Leander · 17 Jan
That is a beer can affect. That's what happens when hot and cold mix when
there's humidity involved. I have a Castle Rock house and I have to wipe my
windows down all the time. I think the windows are great though my energy bills
are not even high

☺ Thank

Tony Presta, Summerlyn Leander · 17 Jan
If you have mold concerns there is a product called a reme Halo that is
installed in the air conditioning system that would knock down any Airborne
contaminants caused by this

☺ Thank  1 Thank

Sarah Vecchionacce, Summerlyn Leander · 7 Apr
We bit the bullet and are having new windows installed. I would've rather
preferred a vacation with that money but I don't want worse problems down the
road. If you want the company info I'm happy to share it. They've been doing
great work!

☺ Thank  1 Thank

Christy Stilwell, Summerlyn Leander · 7 Apr
Sarah, if you wouldn't mind sending me their information I would really
appreciate it. Thanks so much.

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 8 Apr
Tell him I referred you!

☺ Thank

Elizabeth Rayle, Summerlyn Leander · 8 Apr
We have condensation all of the time whenever the weather is cold outside.
(From top to bottom of windows) We have been in our new home for 1 1/2
years. I asked about this as well right after we moved it. They said it was
"normal". We get puddles as well on every window and then mold grows which
is so awesome because I'm allergic to it and get sick from it.

☺ Thank

Christy Stilwell, Summerlyn Leander · 8 Apr
Thanks so much!!! I sure will.

☺ Thank

Add a reply...

"I'm fed up with these windows!" · Nextdoor Summerlyn Leander· [RSR], et al.· (2016-02-04),(2016-02-05)·
https://summerlynleander.nextdoor.com/news_feed/?post=21129810

Sarah Vecchionacce, Summerlyn Leander

**I'm fed up with these windows!**

I sent an email to Jimmy and Nick, as well as the Centex main office and Cameron
who was the sales person who helped us. These windows are garbage and we now
have black mold growing in 2 of them which was only inevitable with all the
condensation. My daughter has been sick with chronic upper respiratory infections
since we moved in which I'm sure are related.
I am prepared to move forward with a class action lawsuit and will even get the ball
rolling if enough of you are with me. I would encourage you to start by emailing
pictures and details to Jimmy at jimmy.garcia@centex.com. Let's give them the
opportunity to fix this!

4 Feb 16 · Summerlyn Leander in General

☺ Thank  💬 Reply ∨                                    9 Thanks · 61 Replies

Becky Robertson, Summerlyn Leander · 4 Feb 16
Count me in, I just gave up!

☺ Thank  1 Thank



Sandi McHoney, Summerlyn Leander · 2 Jan 16
I have the same problem with a Pulte home, very frustrating. Class action
lawsuit?

☺ Thank   2 Thanks

Linda Osteros, Summerlyn Leander · 2 Jan 16
Yes I am having the same problem. I have to keep blinds up some so my blinds
don't get ruined.

☺ Thank

Silvia Silva, Summerlyn Leander · 17 Feb 16
Can someone please refer me to a lawyer that can handle this problem. I have
had no luck with contractor or Centex. Please advise .

☺ Thank

Silvia Silva, Summerlyn Leander · 17 Feb 16
Mold!!!

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 17 Feb 16
We were referred to this attorney. He handles real estate cases.
http://www.legalstrategy.com/theteam/KareemTHajjar

☺ Thank   2 Thanks

Carla Contreras, Summerlyn Leander · 11 Jan
Sarah is he willing to take this case? I want to take this lawsuit. I still haven't
heard a response from the builder (Centex). I think this is excessive, not just a
little condensation. Crap!

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 11 Jan
I never contacted this guy. I did speak with another attorney who advised
against a class action. I honestly gave up because everyone in the
neighborhood was like yeah yeah we want in but NO ONE helped.  I couldn't do
it on my own. Sadly you probably won't hear from Centex or it will be the same
BS they told me.  That is because these house are built so well (hah) And that
we should just Crack a window.  Uh huh....when is 20 degrees out I'm going to
Crack a window.  I'd be happy to fight this...or try to again if people want to help
but I'm not interested in doing all the work while everyone complains about the
problem but then just sits back. Totally not directed at you Carla...you seem
motivated.

☺ Thank   2 Thanks

Sarah Vecchionacce, Summerlyn Leander · 11 Jan
I do agree it's excessive. The way they worded the warrantee is very vague and
subjective...convenient. I literally home because of this problem.

☺ Thank

Becky Robertson, Summerlyn Leander · 11 Jan
I have had this since I moved in and was told to wave it off and I am going to
have a window company come out soon to give an estimate and write a report
because it is like Carla stated CRAP!

☺ Thank

Ava Schroen, Summerlyn Leander · 11 Jan
Just chiming in that we've had same issues since we moved in. I wrote to them
and was told it was normal. I respectfully replied that they were full of it. But all
said they refused to help.

☺ Thank

Barclay Martin, Summerlyn Leander · 11 Jan
Just adding to the pile of replies here--has happened to us for 7 & 1/2 years
since we bought in 2009 and ours was built by Pulte. Was told the same thing
as the rest of you--it's normal and we basically just need to deal with it.
Although it's good to know we're not the only ones, I agree with the majority
here--it sucks and we've never had it happen anywhere else we've lived
(multiple regions of the country).

☺ Thank

Ava Schroen, Summerlyn Leander · 11 Jan
I forgot to mention that ours is also Centex. Built in 2015.

☺ Thank

Carla Contreras, Summerlyn Leander · 16 Jan
Well I wrote to them last week, no response.  I am writing to them again today.
I will continue.  I am motivated, I just don't know where to start. I will ask
around to the few attorneys I know, but they are more family law...not property
law.

☺ Thank

Renee Daniels, Summerlyn Leander · 16 Jan
To help with the mold my company uses shockwave, you can use Milgo!

☺ Thank

Debbie Griffiths, Summerlyn Leander · 16 Jan
Our Centex home was completed in October 2015. We moved in November
that same year and had issues soon after with the condensation that everyone
has noted. I was told to keep my blinds raised a bit off the window sill and that
actually worked for me.

Linda Osteros, Summerlyn Leander · 4 Feb 18
I will join you. It's ridiculous that the homes are so nice and our windows have
to be dried continuously.

☺ Thank   2 Thanks

Sarah Vecchionacce, Summerlyn Leander · 4 Feb 18
Jimmy just responded that nick will stop by with some other suggestions on
how to deal with the condensation.  Not interested!  This isn't something we
should have to be "dealing" with. Unluckily for nick,  I am in a really bad mood
today!

☺ Thank

Tara Neal, Summerlyn Leander · 4 Feb 18
I'm in.

☺ Thank   1 Thank

Skye Crane, Summerlyn Leander · 4 Feb 18
Let us know what he says. Our next door neighbors had to got a dehumidifier
and they said it helped "a little"..but I am really not interested in having to
spend money on something, or having to do upkeep on a brand new $200k+
house. No thanks!

☺ Thank   1 Thank

Sarah Vecchionacce, Summerlyn Leander · 4 Feb 18
Exactly! That's one of the reasons we bought new. If there was going to be any
work done it was going to be cosmetic. Not this nonsense!

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 4 Feb 18
He just left.  Actually threw some papers on my counter and walked out when I
told him I wasn't interested in him explaining the science of condensation to me
that I just need them to fix it. He tried telling me that these kinds of windows
have been around since the 50s.  Yeah I believe it and that's why they have
designed newer more efficient ones.  My baby has been sick with chronic upper
respiratory infections since we moved in and is now having surgery next week.
Our doctor told us that these infections could very well be being caused by the
mold. I explained this to Nick who had nothing to say in return. He also refused
to come look at the damage on most of the windows.

☺ Thank   1 Thank

Carol Paone, Summerlyn Leander · 4 Feb 18
I'm with you, I hate to say it but I have more mildew than I care to think about.
We have lived here for 3 years. Carol

☺ Thank

Loree Way, Summerlyn Leander · 4 Feb 18
The window should have a sticker on them when you bilt them in.   They should
be covered thru manufacturer.  The thermal seal  between the glass is shot.
The sashes need to be replaced

☺ Thank

April Rancier, Summerlyn Leander · 4 Feb 18
I'm in. 12 windows and they all have the same issue. Its ridiculous. I've been
wiping windows numerous times a year for 7 years.

☺ Thank   2 Thanks

Tina Houy, Summerlyn Leander · 4 Feb 18
Our windows our bad too.

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 4 Feb 18
I'm currently emailing a class action attorney. After my interaction with Nick
today,  I have no more patience.  I will keep you all posted. If you have a
Centex home and are experiencing the extreme condensation will you please
private message me your name, address and any photos of the problem.

☺ Thank   3 Thanks

Danielle S , Bells Ferry Rd · 5 Feb 18
It's not just centex homes, Castlerock is the same.

☺ Thank

Angie Drewen, Summerlyn Leander · 5 Feb 18
Pulte homes (built in 2008) in this hood do it too.

☺ Thank

Dena Jenkins, Summerlyn Leander · 5 Feb 18
yes they do Angie!

☺ Thank

Michelle Dozier, Summerlyn Leander · 5 Feb 18
My husband won't even speak to Nick at all. Every time my husband speaks
about ANY problems with the house he would get an attitude from him. We
have condensation on all our windows too. We r on Talon grasp. I just got done
wiping them all. I've had to soak up the water numerous times.

☺ Thank

Linda Osteros, Summerlyn Leander · 5 Feb 18
The sad thing about the builders not accepting the responsibility of fixing their
mistake is everyone pays. When potential buyers ask about living here and
hear about the lack of support they will not buy here. Once a class action suit is
filed this sub division will be known for shoddy houses. It looks like black mold
on my back window. If builders don't step up, I will be talking to my attorney.

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 5 Feb 16
I understand that it is not just Centex but that is who I'm dealing with. I would encourage everyone to take a stand against their builders.

☺ Thank

Toni Permann, Summerlyn Leander · 5 Feb 16
I let the manager of our subdivision (from Centex) know what was going on. She hasn't heard anything about it before now. But now she knows.

☺ Thank   2 Thanks

Linda Osteros, Summerlyn Leander · 5 Feb 16
Maybe if the HOA called the builders that might help. With a class action suit brought against both of the builders no one will want to move here. I have enough of health issues without the help of the builders with black mold in my house. Will the Williamson county Health Department do anything? Worth a call if builders don't fix problem.

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 5 Feb 16
Everyone from centex is going to deny knowing anything.

☺ Thank

Toni Permann, Summerlyn Leander · 5 Feb 16
No Sarah, she is a friend of mine. She didn't know. She took over Summerlyn 2 weeks ago as manager.

☺ Thank

Becky Robertson, Summerlyn Leander · 5 Feb 16
I also have had this issue since I moved here and they told me it was normal and just to keep wiping the windows. But I would be will to join in on the cause. They keep blowing you off till you give up!

☺ Thank

Skye Crane, Summerlyn Leander · 5 Feb 16
Toni- Did she say how she was going to try to follow up?

When we did our final walkthrough they told us it was normal at first... but made it seem like it was only a few months while things were getting settled?, we thought it sounded strange, but as first time home owners we had no idea..

☺ Thank   1 Thank

Toni Permann, Summerlyn Leander · 5 Feb 16
No, she didn't. I'm sorry. It was just a quick relay between us through fb messenger this morning.  She said thanks for telling her about and that she would be fwd'ing it to the proper people since Jimmy and Nick weren't getting it done.

☺ Thank

Linda Osteros, Summerlyn Leander · 5 Feb 16
Lennar has the same problems with the windows. I contacted their office. Their number is 512-418-0258.

☺ Thank   1 Thank

Elizabeth Cook, Summerlyn Leander · 5 Feb 16
My opinion: I wouldn't bother with the local reps/offices. My friend fought with local Lennar for two years trying to get an issue resolved for shoddy construction. After two years of getting the run around, she finally contacted the VP of Lennar's TX division and she got a response within a day and the issue was fixed the following week. I suggest finding out who the highest person in charge for your builder's TX division is and contacting them. Let them know the local office is refusing to fix the actual issue.

EDIT: I just saw Toni's message so maybe her friend can get some action happening for Centex homes with this issue. Good luck!

☺ Thank   3 Thanks

Kassondra Johnson, Summerlyn Leander · 5 Feb 16
Nick is useless. He always talks to you like you are dumb, I brought up the windows too and was told it was normal.

☺ Thank   1 Thank

Toni Permann, Summerlyn Leander · 5 Feb 16
No, I actually agree with what you said Liz.

☺ Thank   1 Thank

Linda Osteros, Summerlyn Leander · 5 Feb 16
I was told by the Real Management that my home was built by Lennar but it was Centex. Lennar is so great about returning calls immediately.

☺ Thank

Rob Ducroz, Summerlyn Leander · 5 Feb 16
I was told these aluminum windows are no longer being used due to code however builders still use them right now until the deadline is up for them to not be able to.

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 5 Feb 16
Exactly! These windows are not allowed anywhere else.

☺ Thank

Maia C. · 5 Feb 16
Following this...my very small children have the chronic upper respiratory issues, and this may be the culprit! :-(
☺ Thank

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690



⌣ Thank

Sarah Vecchionacce, Summerlyn Leander · 5 Feb 16
Maia I spoke with my ped about this just yesterday because my 13 month old
had has 3 URI since we moved in. 72 days ago. She said that it is a very good
possibility since she's not in day care or around a lot of kids.
⌣ Thank   1 Thank

mary Jansen, Summerlyn Leander · 5 Feb 16
I posted this pic at end of December and Centex told me it was normal.
Ridiculous!

⌣ Thank   2 Thanks

Tou Permann, Summerlyn Leander · 5 Feb 16
Mary, that's what mine look like. Twice the water even ran off the ledge to the
carpet.
⌣ Thank   2 Thanks

Sarah Vecchionacce, Summerlyn Leander · 5 Feb 16
Yesterday Nick gave me some papers on condensation and it specifically said
that extreme condensation is a problem that needs resolution. I would consider
this extreme.
I am from Seattle where it is cold most of the year and have never seen
anything like this.
⌣ Thank

Rob Ducroz, Summerlyn Leander · 5 Feb 16
I think we def need to take pictures and keep them handy!
⌣ Thank

Michelle Lowry, Summerlyn Leander · 5 Feb 16
I am in!
⌣ Thank

Wendi Roycroft, Summerlyn Leander · 6 Feb 16
Count me in. Same issues here.
⌣ Thank

Carol Paone, Summerlyn Leander · 6 Feb 16
Count me in. I'll email Jimmy now. Carol
⌣ Thank

Cynthia V., Park Lane · 6 Feb 16
Perhaps getting the local media to chime in would be good too. KXAN or Fox
7. They could help get our concerns out. Especially if our children are being
subjected to their too "efficient" homes that cause mold.
I laugh at the notion. I am certified on Applied Structural Drying which is an
industry certification for water restoration companies to have to properly dry
your home to prevent your house from getting mold. Look it up IICRC 500
Series. I do this for a large insurance company that holds our services
accountable for secondary damages (aka mold).
Builders are not certified on this. I think they read an article and pass it on to
you guys. Never take a general contractors advice. Trust me. Rant over!!
⌣ Thank   2 Thanks

Angie Ross, Summerlyn Leander · 6 Feb 16
Count me in. Same issues here!

⌣ Thank

Angie Ross, Summerlyn Leander · 6 Feb 16
You can see here where water has collected then dried. We have black mold
growing around the window sill in our bathroom.

⌣ Thank

Katie Leal, Summerlyn Leander · 7 Feb 16
Count us in! Ours are bad and we've gotten the same run around.
⌣ Thank

Sarah Vecchionacce, Summerlyn Leander · 13 Feb 16
Ok...I haven't forgotten or given up on this. As you can imagine I'm just getting
the run around. I have been advised not to pursue a class action lawsuit as
they can draw out for years and after the attorney greys their fee and the rest is
split between everyone involved it doesn't usually end up being worth the effort.
I do have an email address for the central Texas customer service. Let's start
bombarding them with emails, photos, complaints. Let's be loud!
CustomerServiceCentralTexasDivision@pulte.com
⌣ Thank   4 Thanks



Sarah Vecchionacce, Summerlyn Leander · 17 Feb 16
I was referred to this attorney who handles real estate issues.
http://www.legalstrategy.com/theteam/KareemTHajjar

☺ Thank   1 Thank

Stacey Balliff, Summerlyn Leander · 19 Feb 16
Question about these window issues b/c we aren't moved in yet... Does this happen all the time? or just when the a/c unit is off? when it's hot or cold? Is there any trend to when it happens? Just trying to see if there's anything we can do to minimize or prevent the damage.

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 19 Feb 16
It happens when it's cold out. It hasn't happened recently but when it does it is very dramatic. It's not the window itself but the aluminium frame.

☺ Thank   1 Thank

Hector Guevara, Summerlyn Leander · 19 Feb 16
I'll join this cause. Same issue at my house! I've seen plenty of posts consistent with the same complaint. It has gotten ridiculous!

☺ Thank   1 Thank

Sarah Vecchionacce, Summerlyn Leander · 29 Feb 16
Ok...there is a Centex Facebook page and I posted a pic asking the question is this work that they stand by and almost immediately got a response asking for my phone number so someone can contact me. Once again, they can try and brush one of us off but not all of us.  Post your pictures to their Facebook page!

☺ Thank   2 Thanks

Cynthia V., Park Lane · 29 Feb 16
Send us the link to make sure we are putting it on the same page haha 😊

☺ Thank

Sarah Vecchionacce, Summerlyn Leander · 29 Feb 16
https://m.facebook.com/Centexhomes/

☺ Thank   1 Thank

Sarah Vecchionacce, Summerlyn Leander · 29 Feb 16
The link is there.

☺ Thank   1 Thank

Ellen Saper, Summerlyn Leander · 13 Mar 16
I just put a ticket in. I don't know what good it will do. I just saw mold on my windows also! Not what I signed up for.

☺ Thank

Brian Winkelmann, Summerlyn Leander · 13 Mar 16
I'm in a pulte that went up in 2005, so far, I have not seen anything like this (we moved in summer 2015, north hoot owl). I'm hoping this isn't in our future, good luck to those who have it in the present :(

☺ Thank

Ellen Saper, Summerlyn Leander · 13 Mar 16
I'm also in a Pulte going on my third year. Good luck Brian.

☺ Thank

Blake Foster, Summerlyn Leander · 16 Mar 16
I have had jimmy come out and gotten the same response . It's normal please let me know if any class action lawsuit will be moving forward. I never bothered to follow up because me bring a first time homeowner I assumed it was normal as I was advised . Jimmy was awesome throughout the whole process but my son also has asthma issues and I would like to see an end as well. Count me in!

☺ Thank   1 Thank

Ellen Saper, Summerlyn Leander · 16 Mar 16
I wrote a letter to Pulte, this was their response to me,

The discoloration is a result of condensation. Windows will collect condensation on their interior surfaces when high humidity within the home turns into water on the colder window surface. Large temperature variations from interior to exterior may cause condensation even with low interior humidity. If the condensation is not controlled or wiped down it can discolor the drywall around the windows and/or the window sill. The Homeowner is responsible for controlling interior temperature and humidity to avoid condensation. Under the Warranty, no action on the part of the Builder is required. In addition, any damage caused or made worse by condensation due to inadequate ventilation is not covered by the Warranty. To remove the discoloration use a 1-to-8 bleach/water solution.

If there is a class action suit, I want in!!

☺ Thank   2 Thanks

Innie Brown, Summerlyn Leander · 21 Mar 16

person's property damage - for example, when lit fireworks (including flames or sparks) cause a significant fire that results in any damage to a building, vehicle or other structure (such as Shed) - the offender(s) could easily be charged with felony Criminal-Mischief and/or felony Arson (if there was any malicious intent by the perpetrator) - the reason being that the offender(s) are knowingly and recklessly lighting fireworks in an area where this activity is not permitted (due to the serious health-and-safety hazard). In cases where fireworks did cause personal injury of other person(s) - for example, when lit fireworks (including flames or sparks) make direct contact with another person - the offender(s) could easily be charged with felony Assault - the reason being that the offender(s) are knowingly and recklessly lighting fireworks in an area where this activity is not permitted (due to the serious health-and-safety hazard). (For example, the (City of Austin), [CoA], reminds its residents, at the very least through its' local-news-media public-messaging, that the lighting of fireworks is illegal within the [CoA] and that, furthermore, any person who lights fireworks within the [CoA] will be held fully-responsible and fully-liable for any harm, injury, property-damage, other-uncontrolled-wildfire, and/or death resulting from their illegal lighting of such fireworks within the [CoA].) Despite of the fact that residents (and/or the guest(s) of such residents) that light fireworks within this subdivision could easily and reasonably be criminally-charged with multiple different crimes - Disorderly-Conduct and/or Littering and/or Criminal-Mischief and/or Arson and/or Assault - in the approximately 14 years that the plaintiff has resided within the subdivision, the plaintiff has yet to observe even one [WCLE] police-vehicle patroling the neighborhood - at the very least around the plaintiff's property - to cite/charge offender(s) for the fireworks-ban, and based on the repeated fireworks-ban violations of [JSP&KAP],[RSR], the plaintiff has every reason to believe that neither [JSP&KAP] nor [RSR] have faced any legal consequences for their illegal lighting of fireworks within the neighborhood. The responsibility for enforcing the fireworks-ban lies with both the [HOA] (as a matter of civil contract law) and [WCLE] (as a matter of criminal law). Despite of [SPOA-VP-AH]'s fraudulent concern, even more outrageously, [RSR] tries to shut-down [SPOA-VP-AH]'s complaint, encouraging [SPOA-VP-AH] to directly confront some of those that are lighting the fireworks and asking them to stop, stating, *"I would like to see this format used for constructive things instead of complaining! Besides I doubt they are reading your complaint."* The term *"racist hypocrisy"* does not even begin to describe [RSR]'s outrageous conduct. For many years (at this point in time), [RSR] has engaged in racially-motivated and/or retaliatory crimes of harassment/stalking, intimidation/interference, blackmail and even terroristic-threat(s) against the plaintiff, in at least some of such cases, justifying such crimes against the plaintiff by claiming that the plaintiff was failing to maintain the plaintiff's private-property according to her (hypocritically-enforced) White-American standards. For for many years (at this point in time), [RSR] has used the subdivision's social-media-platform(s) (including but not limited to: *"nextdoor.com"* , *"facebook.com"*) to viciously-smear ( ⚙ ) and engage-in-character-assassination-against the plaintiff for the plaintiff's *"inability"* and/or failure to maintain the plaintiff's private-property according to her (hypocritically-enforced) White-American standards. For many years (at this point in time), [RSR] has demanded that the [HOA] take legal action against the plaintiff for the plaintiff's *"inability"* and/or failure to maintain the plaintiff's private-property according to her (hypocritically-enforced) White-American standards. So, if [RSR] noticed that any other resident mention the plaintiff's name or plaintiff's property - even in a favorable light - [RSR] would have used such opportunity to launch a lengthy tirade, filled with venom and racial-animus against the plaintiff, as she has done on multiple occasions (see below). But as soon as anyone, including a powerful [HOA] Board-Member, complains about a serious, harmful violation that [RSR] and her co-conspirators [JSP&KAP] are guilty of committing, [RSR] immediately lashes out, intimidating her overwhelming White-American audience into silence while, at the same time, indoctrinating this audience into thinking that the lighting of fireworks is not a serious violation - when the lighting of fireworks is, in fact, a far more serious violation (in terms of harm caused) than any alleged violation that [RSR] has ever fraudulently alleged the plaintiff of (almost always, exclusively within the confines of the plaintiff's own private property). [RSR]'s intimidating and indoctrinating response also reveals the extreme, mafia-godfather-like, power that she wields over the entire neighborhood:

SIDDHARTH  KODE  V.  WILLIAMSON  COUNTY , ET  AL.                    1696907690

> [illegible] Our home is built by Lennar. I want to follow this issue because I've hear
> Lennar houses are having the same problem. We've been in our house for 3
> years come July. We have a 4 year old special needs daughter that has
> involved health problems. She has weak lungs and we have had many different
> cases of collapsed lungs. I just haven't complained about anything because the
> warranty on the home was up and I didn't think I'd have a fighting chance to get
> them to fix it.
>
> 😊 Thank
>
> Laura L., Cypress Creek · 21 Mar 16
> Same issue on all my windows. I'm in.
>
> 😊 Thank
>
> Add a reply...

# ¶366

In another public social-media posting dated {2016-01-03}, then [HOA] Vice-President [SPOA-VP-AH] complains about loud fireworks being lit late on the Sunday night of January 3rd - 3 days after New-Years-Eve {2016}. The majority of fireworks were lit on the New-Years-Eve (3 days prior to this complaint) - with one resident complaining that fireworks were lit for *"7 straight HOURS"* - but [SPOA-VP-AH] complains only on the Sunday 3 days after that major incident. The plaintiff has resided in the subdivision for approximately 14 years at the time of filing of this lawsuit, and there has not been even one year during which the subdivision has been free from the illegal lighting of loud, disturbing, polluting and dangerous fireworks. The plaintiff asserts that all of the fireworks that are being lit within the subdivision are being lit by, if not almost-exclusively the White-American residents of the subdivision, then exclusively the non-immigrant-of-color residents of the subdivision. The plaintiff further asserts that the lack of enforcement of the fireworks-ban within the neighborhood is, thus, another discriminatory housing practice(s) - with the discrimination being based, if not exclusively upon race, then certainly, a combination of race and/or nationality. In every year since {2009}, the nights (even past midnight) of the days in-and-around New-Years-Eve and the nights (even past midnight) of the days in-and-around July-the-Fourth have always been days in which loud, disturbing, polluting and dangerous fireworks have been lit within this subdivision - with [JSP] lighting fireworks on these days almost every year (if not every year) and with [RSR], on at least some occasions, joining [JSP] in this illegal activity that has occurred in very close proximity to the plaintiff's property [788KLLTX78641] - unjustly putting both the plaintiff and the plaintiff's property at serious risk for serious injury and damages. In at least one of her re-election campaigns (see below), [SPOA-VP-AH] admits that she was the very first homeowner Board-Member of the [HOA] (see below), and so, for [SPOA-VP-AH] to only at this moment in time (during the year {2016}) complain, after serving as [HOA] Board-Member for almost 10 years (at this point in time) about the fireworks, screams of fraudulent concern. As the then Board-Member of the [HOA], [SPOA-VP-AH] and her [HOA] co-Board-Members could have implemented - many years prior to this date - strict policies to enforce the fireworks-ban, given that the [HOA] does have full-authority to enforce the fireworks-ban, by having [HOA] inspectors inspect at night-time (during those specific days of the year), or by contacting the [WCLE] police departments ([WCCO] and/or [WCSO]) to cite/charge people for Disorderly-Conduct and/or Littering since the lighting of fireworks is not only a violation of the Restrictive-Covenants, but also a violation of Texas's Disorderly-Conduct law concerning *"unreasonable noise"*, and a violation of Texas's Public-Nuisance law concerning Littering ([THaSC-T5-SB-C365-SB-§365.012] on public-property or on someone else's private-property). When fireworks are lit in the neighborhood, it is very difficult, if not impossible, for most residents to distinguish between potential gunshots and fireworks. (During one-or-more mass-shootings in the United States, the gunman was able to perpetrate more killings and/or injuries since the witnesses/victims initially mis-interepreted loud-noises as fireworks - thereby failing to take the immediate-threat seriously.) In cases where fireworks did cause even small amounts of another person's property damage - for example, when lit fireworks (including flames or sparks) make direct contact with vegetation or a fence - the offender(s) could easily be charged with misdemeanor Criminal-Mischief - the reason being that the offender(s) are knowingly and recklessly lighting fireworks in an area where this activity is not permitted (due to the serious health-and-safety hazard). In cases where fireworks did cause large amounts of another

Ⓐ [RSR] is not a [HOA] board-member of this neighborhood, and by her own admission (see below), never was a [HOA] board-member of the neighborhood;

Ⓑ [RSR] is not a member of law-enforcement, and according to the plaintiff's limited knowledge, never was a member of law-enforcement;

Ⓒ Despite of the fact that [RSR] was never a [HOA] board-member nor a member of law-enforcement, [RSR], like a neighborhood-boss or mafia-godfather, brazenly and publicly confronts the prominent and powerful then [HOA-BoD][SPOA-VP-AH] and instructs [SPOA-VP-AH] to stop *"complaining"* - about clear violations of the restrictive-covenants (fireworks, noise, nuisance, health-and-safety-hazard, pollution, etc.) that every property-owner of the subdivision signed a contract promising never to violate.

This mafia-godfather-like power that [RSR] (and her co-conspirators [JSP&KAP],[DMP]) wielded from the year {2009} through the end of year {2021} - illustrated by this incident and other incidents documented in this lawsuit - plays a substantial component of the racketeering-enterprise substantially-documented in this lawsuit, wherein, [RSR] and her co-conspirators [JSP&KAP], despite not holding any official position of authority and power, would freely and intimidatingly command, and/or even threaten, the [HOA] and [WCLE] to preserve their unquestioned, illegitimate authority/power to do as they please - not only by illegally lighting fireworks but all of the other numerous and persistent [DRV]s that they got away with committing without facing any legal action from the [HOA] - while at the same time, threatening those very same institution-of-power - the [HOA] and [WCLE] - to engage in predatory enforcement-actions (including legal-action) against the plaintiff for the plaintiff's *"audacity"* to exercise the rights that the plaintiff was/is lawfully and fully-entitled-to exercise entirely (and exclusively) within the confines of the plaintiff's private-property. This would not be the only time that neighborhood-boss [RSR] intimidates and indoctrinates other residents - including the then [HOA] Board Member(s) whether on this issue of violations of restrictive-covenants committed almost-exclusively (if not exclusively) by White-American (or non-immigrant/non-indigenous) residents (such as, but certainly not limited to fireworks) or, on other the other hand, on issue of alleged violations of certain restrictive-covenant(s) that predatorily target immigrant(s)-of-color/indigenous-person(s), such as the plaintiff.

▸ "Please stop" ﹐ Nextdoor Summerlyn Leander﹐ [SPOA-VP-AH], [RSR], et al.﹐ {2016-01-03}﹐
▸ https://summerlynleander.nextdoor.com/news_feed/?post=19863425



Alicia Hynum, Summerlyn Leander ˅

**Please stop**

Is anyone else getting tired of you guys having to put up with the endless FIREWORKS going off for over 3 hours!!!

3 Jan 16 · Summerlyn Leander in General

☺ Thank   ⬜ Reply ˅                          14 Thanks · 12 Replies

Nancy Young, Summerlyn Leander · 3 Jan 16
I love fireworks as much as the next person, but this has been absurd. It was 7 straight HOURS on New Years Eve, then three more days after that. It really is enough.

☺ Thank   3 Thanks

Jayne O'Dell, Summerlyn Leander · 3 Jan 16   ˅
I heard 2 only, thinking they were celebrating kids going back? Lol

☺ Thank   1 Thank

SJ Schwartz, Summerlyn Leander · 3 Jan 16   ˅
Jayne, that is a celebration indeed!

☺ Thank   1 Thank

Angie Drewen, Summerlyn Leander · 4 Jan 16   ˅
LOL Jayne, but seriously dang... I needed to go to bed early & couldn't get to sleep. They were popping off by the pool area until 10:30pm. :(

☺ Thank   1 Thank

Fannie C. Hewgley, Summerlyn Leander · 4 Jan 16   ˅
Sounded more like cannons. Our 8 yr old, whose bedtime is 8, was terrified because sounds did not sound like fireworks. Losing battle.

☺ Thank   1 Thank

Becky Robertson, Summerlyn Leander · 4 Jan 16   ˅
Do I know a somebody or where there's anybody that illegal or nosing off your computer way not address those who breaking the rules and use them to them. I would like to see the owner used to county offer if they even had consumer. Besides I doubt they do relate to your company.

☺ Thank   3 Thanks

Danielle S , Bells Ferry Rd · 4 Jan 16   ˅
Unfortunately it can be hard to pin point where they are coming from so going to talk to them can be hard. Christmas Eve a sheriff's officer drive around for half an hour looking for the people setting them off.

☺ Thank   5 Thanks

Debbie Davis, Summerlyn Leander · 4 Jan 16   ˅
What Danielle said. And, some neighbors, already in their pajamas and in bed, or with little ones in bed can't always just dash out to hunt down the individuals who are doing it. One of the reasons that we have this social media platform is to reach a wide range of our neighbors, without having to go door-to-door, so to speak. While the neighbors may or may not be on ND, there's a chance that they (or their parents) or near neighbors will see/read and let them know that they're disturbing people. And, it sometimes helps when neighbors see that it's not an isolated 'crotchety person' complaining, just for the sake of complaining. Setting off fireworks at 9pm and later, on a Sunday night is a good opportunity for the neighborhood to set a standard... "Absolutely not!"

☺ Thank   8 Thanks

Shauna Stiles, Summerlyn Leander · 4 Jan 16   ˅
I get that it is hard to pin point where they are coming from but I do have to say all the complaints made on this site are beyond exhausting. Certainly not what I thought I was signing up for at all. Another point is the people being complained about probably arent the neighbors that take pride in this neighborhood and go the extra mile to sign up for things like this. So really a lot of it is rants for those of us who do to endure. This is simply an opinion I have been wanting to state for some time as I see complaints so much so no one take it personal or freak out please.

☺ Thank   9 Thanks

Angie Drewen, Summerlyn Leander · 4 Jan 16   ˅
I did go down to the pool area, but they were back in the woods from the best I could tell. Pajamas+Slippers+the woods=no good.

☺ Thank   3 Thanks

Alicia Hynum, Summerlyn Leander · 4 Jan 16   ˅
The officer (if I could find one) they were coming from in the woods cross the street would have been the pool and those in the side of across. To get what we did we would of had to go into those woods and reach to them or rebuild.

☺ Thank   4 Thanks

Angie Drewen, Summerlyn Leander · 6 Jan 16   ˅
If I went into the woods, the mere image of some lady with crazy hair, old pj's & a mean look on her face may have just scared them away. LOL. We've found all kinds of crazy stuff back there - bonfires, make-out areas, etc. We always trash their stuff to p*ss them off so they have to move on or rebuild.

☺ Thank   4 Thanks

Add a reply...

## ¶367

On or about the approximate date and time of {2016-04-?? 11:00}, the plaintiff was planting some vegetation in [FRONTYARD], when [RSR] accosted the plaintiff. Then next-door-neighbor and then owner of {792KLLTX78641}, [RAC], stops [RSR] from crossing the sidewalk onto the plaintiff's property {788KLLTX78641}, presumably because [RAC] knew that [RSR] had been issued a [CTW] against the plaintiff's property and/or [RAC] knew [RSR] may be tempted to engage in some assaultive-act, some intimidation/interference act, some disorderly-conduct-act or some property-destruction-act against the plaintiff - while illegally stepping into the plaintiff's property. During most of this entire incident, [RAC] remains in front of [RSR], albeit mostly silent, to prevent [RSR] from stepping onto the plaintiff's property. [RSR] initially yells at the plaintiff for what [RSR] alleged to be unmowed grass on the plaintiff's property, and then starts to complain about the plaintiff's security-cameras, claiming that [RSR] did not want the plaintiff to live a paranoid life. The plaintiff found and continues-to-find [RSR]'s statement concerning alleged paranoia to be particularly outrageous - and a clear form of gaslighting - given that [RSR] had, at that moment in time, already committed several hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, and [RSR] even acknowledged in a previous posting (see above) that serious crime does occur in the neighborhood. It was as if [RSR] was conveying to the plaintiff that the plaintiff did not have the right to document on the record, hate-crimes/civil-rights-violations/racketeering-acts/abuses that were committed against the plaintiff - in particular, by [RSR],[JSP&KAP],[WCLE]. The plaintiff responded not only regarding [RSR]'s previous crimes against the plaintiff (referencing the incidents of {2009},{2010},{2011}), but also, that on multiple occasions, two-or-more person(s) had raised a camera-phone over the plaintiff's fence to illegally take photograph(s) of the plaintiff's private/concealed [BACKYARD] in egregious violation of the plaintiff's right to privacy - and further, that such photograph(s) were even illegally (and in total violation of the plaintiff's rights) submitted to the [HOA] and/or [WCLE]. [RSR] responded that the plaintiff has security-cameras pointed at other peoples' property including [RSR]'s property. The plaintiff responded that those security-cameras were installed precisely because the [WCLE] police advised the plaintiff to install them back in {2011}, specifically in response to crimes committed against the plaintiff by [RSR] and the plaintiff's former predatory neighbor [JJB]. This particular action of gaslighting against the plaintiff also reveals [RSR]'s extremely manipulative behavior of trying various tactics to manipulate the plaintiff to remove the plaintiff's security-cameras, so that she and her co-conspirators could then continue to commit hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff with absolute impunity - with the ultimate goal of defrauding the plaintiff of the plaintiff's right to private-property within such White neighborhood - while at the same time, freely continuing to violate the restrictive-covenants of the neighborhood (illegal-lighting of fireworks, unleashed large-dog crossing the street and entering into the plaintiff's [YARD], her cat(s) roaming freely even into the plaintiff's [BACKYARD], her son [BR]'s speeding vehicle and other speeding vehicles, the constant/daily parking violations, etc.) - all with absolute impunity. The incident ended shortly thereafter with [RSR] continuing to talk to [RAC], while the plaintiff resumed yard-work on [FRONTYARD].

## ¶368

On or about the date and approximate time of {2016-05-15 17:30}, the plaintiff attends a scheduled hearing before the then [HOA-BoD]s, run by [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH], making it clear to the then [HOA] that the plaintiff's refusal to cut the default grass on the plaintiff's frontyard, but instead pick/cut the tallest so-called *"weeds"*, is precisely what the new Texas law of {2013} concerning *"drought-resistant-landscaping"* grants-the-right and entitles the plaintiff to do - without being in violation of any restrictive-covenants that may have become obsolete and/or non-compliant with such new law. The plaintiff strongly maintained and insisted, at this hearing, that the requirement of mowing even the default frontyard grass - as may have been required by the original contract that was written and/or amended in the years

{2004}/{2005}/{2006} - was made obsolete and/or non-compliant by the new Texas law, taking effect in {2013}, that prohibited [HOA]s from prohibiting and/or restricting any practice that promoted *"drought-resistant-landscaping"*. The plaintiff further explained, at this hearing, that the plaintiff has strong religious/cultural/racial values/practices that prevent and/or forbid the plaintiff from cutting of any-and-all vegetation, especially for mere aesthetic reasons. The plaintiff explained, at this hearing, that the cutting of grass, in particular, is a White-American cultural practice, and prior to being a White-American cultural practice, was a White-European cultural practice. The plaintiff also provided a brief history of the ethnocentric and/or culturally-insensitive practice of cutting vegetation, especially for purely aesthetic reasons (see section below). Towards the end of the hearing, one of the then [f-HOA-BoD]s, [SPOA-VP-AH], shows the plaintiff a picture of the plaintiff's default frontyard grass from the curbside-grass-area, which she and/or another person measured to be approximately 11-inches in height, while these [HOA-BoD]s still continued-to-claim that such unmowed grass is not compliant with the neighborhood's restrictive-covenants. The plaintiff continued-to-insist that the plaintiff was doing precisely what the new Texas law entitles the plaintiff to do, and furthermore, that if the [HOA] did not like the aesthetic/cosmetic appearance of the plaintiff's unmowed default frontyard grass, then the [HOA] should be willing to pay the plaintiff to have such default frontyard grass replaced with a drought-resistant *"no-mow"* grass that does not grow to over 6-inches in height, thereby fully-eliminating the mowing requirement - without any controversy and without any litigation - a compromise that the plaintiff was willing to live with. When the plaintiff makes this proposition of the [HOA] which the plaintiff thought to be an entirely reasonable proposition and compromise, given the aforementioned facts, at least one of the then [HOA-BoD]s, [SPOA-P-BC], sarcastically laughs at the plaintiff and clarifies his laughter by stating that the [HOA] will be doing no such thing. The hearing ends shortly after this dialogue, as the [HOA] cut the plaintiff's speech short (as they had similarly done in the previous hearing during the previous month of {2014-02}). Although the plaintiff had much more to say on this issue, as the plaintiff's later *"drought-resistant-landscaping"* [HOA] architectural-approval document (original exhibit available) - which the plaintiff's then-lawyer, [ATTORNEY-PS], would jokingly describe as a *"doctoral dissertation"* - would much-more-thoroughly reveal, the plaintiff was unjustly cut-short by these [f-HOA-BoD]s, with these [f-HOA-BoD]s stating that the [HOA] had given the plaintiff enough time to present the plaintiff's argument(s) at the hearing - which the plaintiff thought to be an unjustly and arbitrarily short amount of time. Clearly, at the end of this hearing, the two parties - the plaintiff and the [HOA] - were still in such unresolved contractual-dispute. It became clear to the plaintiff, that by cutting the plaintiff's hearing short, the then [HOA] (under those [f-HOA-BoD]s) had deliberately prevented the plaintiff from fully-presenting the plaintiff's social-justice/environmental-justice argument(s), thus preventing the then [HOA] from being perceived as anti-social-justice and/or anti-environmental-justice, while at the same time, paving the road for the [HOA]'s lawsuit against the plaintiff - which would occur in the following year. One of the themes that plaintiff seeks to present in this lawsuit is that even a theoretically-representative institution-of-power - such as the [HOA] or the local-government - is only as good as the people that they are (exclusively) acting on behalf of, or the people who they are (exclusively) representing, and if the people that such institution-of-power are (exclusively) representing are malicious and/or predatory, then the [HOA] and/or local-government will only rightfully be perceived to be malicious and/or predatory. The plaintiff asserts that this is, by far, the most innocent interpretation that explains the then [HOA]'s predatory actions against the plaintiff, and defendant [WC]'s more-than-a-decade-of predatory actions against the plaintiff.

## ¶369

In another social-media-posting, a resident complains about the persistent noise caused by the dogs of a neighboring resident, and specifically, that this noise deprives them and/or their guests of sleep. [RSR] admits that this violation does exist within the neighborhood, but does not seem to take the issue seriously (or at the very least, not any issue as serious as her more-than-a-decade-long predatory targeting of the

plaintiff), by stating, *Walk over and talk to them, if that doesn't work, check out the noise ordinance and she if that will be helpful.* The plaintiff has on several occasions, noticed [RSR]'s dog bark loudly and uncontrollably. Another resident points out that since *"noise nuisance"* is a violation of the restrictive covenants, that violating residents can be reported to the [HOA] and/or the [WCLE] - who can issue *"ticket"* for *"repeat"* offenders. In the almost 14 years that the plaintiff has lived within the subdivision, the plaintiff has, on countless occasions, observed other residents' dogs barking loudly and uncontrollably, and on many occasions, even during the typical sleeping hours of 9PM through 7AM. In one-or-more social-media-posting(s) of the residents complaining about the very-loud fireworks lit on approximately 6-10 days per year, one of the residents posted a question sarcastically asking if those who complain about such very-loud fireworks, also complain about the rampant problem of noisy-dogs during the other 350+ days of the year. However, the plaintiff is not aware of any enforcement-actions taken against such residents by either the [HOA] and/or the [WCLE], and based on the fact that the issue has persisted for all of these years, the plaintiff has every reason to believe that no serious enforcement-actions were ever taken against such residents by either the [HOA] and/or [WCLE].





We have only been in the neighborhood for a month, and we have tried to contact them
more than once to no avail. Honestly, I have two dogs myself and I NEVER let them
continuously bark or howl especially at hours when people are sleeping. I understand
everyone in awhile if your dog's bark, that's how they communicate but it is
inconsiderate and downright rude to let them bark at ungodly hours and continuously I am
assuming you don't live around them either.

⊙ Thank   4 Thanks

Bill S , Lake Cyrus   10 Jun 16

Never quite understand the outside dog concept unless you live on a farm. I had to call
the cops at our last house because a house a few doors down left their 2 little dogs bark
most of the night. The house before I had a neighbor directly at the top of the hill from me
keep their big dog on a chain to bark all night. I tried the note thing. Never could get them
to answer. One night I unchained him. He roamed the neighborhood for a few hours and
went back home. They brought him inside after that I d.

⊙ Thank   2 Thanks

Debbie Davis, Summerlyn Leander · 10 Jun 16

Thanks Debbie, that is very helpful!

⊙ Thank

Sabrina Baez, Summerlyn Leander   10 Jun 16

Thanks Debbie, that is very helpful!

⊙ Thank

John Liendo, Summerlyn Leander · 10 Jun 16

Sabrina they are my next door neighbors so I hear them as well but it doesn't bother me at
all

⊙ Thank

Sabrina Baez, Summerlyn Leander · 10 Jun 16

That's awesome for you then, because trust me it's loud and obnoxious.  For us
unfortunately we hear them..everyday..all the time, mostly in the wee hours of the
morning so that's teen super fun. Perhaps if you see them around, you can let them know
we stopped by the other day Our yard backs up to theirs, so maybe that's why for some
reason WE hear them LOUDLY and you don't.

⊙ Thank

Toni Penmann, Summerlyn Leander · 10 Jun 16

John, the way our houses are built that seems to happen a lot. I know of another area of
the hood that dealt with the same thing. People behind them were going nuts because of
the noise but people directly next to them didn't even hear it!! It's crazy! But it happens...

⊙ Thank   3 Thanks

Morgan Correia, Summerlyn Leander · 10 Jun 16

I'm pretty sure the people who live behind us think I'm screaming at my dog to come in all
the time x

⊙ Thank

Add a reply.

## ¶370

In another social-media-posting, a resident complains about hazardous *"black mold"* occurring inside their home, this time, caused by leaking

roofs. [RSR] admits that the responsibility lies with one of the builders, stating, *"There seems to be a problem with many of the roofs in the*

*pulte homes especially around the vents that were not placed properly."* The plaintiff has observed that many, if not most, of the plaintiff's property-owners in the subdivision have had to undergo roof-repair or roof-replacement - some even during the ten-year warranty period - ostensibly due to poor-quality materials and/or installation by the original builder and/or manufacturer(s). Like some of the other postings documented in this lawsuit, this posting reveals that the real damage to [JSP&KAP],[RSR] (or any other resident's) *"property value"* is not how the plaintiff is maintaining the plaintiff's private property (which, even as [JSP] admits, never caused any harm to anybody), but rather, that the builder has used several poor-quality/sub-standard materials and/or performed poor/faulty installation, so as to cause health-and-safety-hazards within the house, with some of these hazards causing even long-term structural damage to many (if not most) of the homes' building structure. Again, despite of the fact that many residents have reported that substandard materials and/or installation were used in the windowing and/or the roofing and/or the air-conditioning/heating (and/or the fencing) of many (if not most) of the properties in the subdivision, and despite of the fact that many residents have reported that serious health-and-safety-hazards and/or serious structural-hazards like *"black mold"* were caused by at least some of such substandard materials/installation, and despite of the fact that [RSR] discussed with some of the other residents the possibility of a class-action lawsuit against the builder (and/or manufacturer(s)) for at least some of these serious health-and-safety-hazards issues and damages, as the record will show, no lawsuit, let alone class-action lawsuit, was ever filed against the builder (and/or manufacturer(s)). Instead, despite of the fact that the plaintiff has never caused [RSR] or any of the other residents any harm at any point in time, both [RSR] and her co-conspirators [JSP&KAP] would continue to remain laser-focused on engaging in predatory enforcement-actions against the plaintiff - using their co-conspirator institutions-of-power, the [HOA] and [WCLE], as their primary tools of predation - in order to inflict long-term psychological-harm onto the plaintiff, and with their ultimate goal being to drive the plaintiff out of the White-neighborhood or, better-yet, getting the plaintiff's property foreclosed-on - the reason being that the plaintiff - a low-IQ, subhuman animal unworthy of any rights - was an easy and defenseless target, whereas the builder/manufacturer(s) are big corporations that are *"too big to sue"*.



## ¶371

In another social-media-posting, a resident advertises that a cat she allows to roam freely in the neighborhood (in violation of the restrictive covenants) has, on this particular occasion, not returned home. [RSR], who has routinely (and unlawfully) allowed her own cat(s) to roam freely, and clearly speaking from her own personal experience, responds, *"They say put her litter outside and the cat will find the scent. I got this info from this message board and I believe that it worked."* This and several other social-media-postings show that both [RSR] and other

residents in the neighborhood are clearly violating the restrictive covenants by allowing their domestic cats to roam freely through the neighborhood. Since as early as {2013}, the plaintiff has noticed other residents' large domestic cats enter into the [BACKYARD], often scratching/tugging at the grass/vegetation after urinating, entering even into areas where the plaintiff has vegetables growing, etc. To this day, the plaintiff continues to notice multiple different large cats enter into the [BACKYARD] multiple times per week. The fact that such large cats routinely enter into the [BACKYARD] also dismantles the defendants fraudulent accusation (made on several occasions over the course of at least 8 years) that the plaintiff has so-called *"rodent-harborage"* in the [BACKYARD] - as cats have, at the very least, several hundreds-of-thousands-of-years of evolutionary instincts to both detect and hunt rodents, their natural prey. Like the total lack of enforcement-actions for the lighting-of-fireworks, the speeding vehicles, the loud barking dogs (or many of the other noise-nuisances), the dogs routinely left to roam freely sometimes defecating in others' yards, the numerous parking-related violations (commercial-trucks, trailers, boats, parking-more-than-2-vehicles-visible-from-any-street-for-over-72-hours, parking-on-any-curbside-of-any-street-overnight), the numerous unapproved changes, etc., the plaintiff has noticed that this restrictive covenant of freely-roaming domestic cats has also never been enforced. Despite of all of this overwhelming evidence of violations of the restrictive covenants - many of which were routinely committed by [RSR] and her co-conspirators [JSP&KAP], both [RSR] and her co-conspirators [JSP&KAP], in their predatory-targeting of the plaintiff, for over 10 years, continued to make the brazenly fraudulent accusation that the plaintiff, due to the plaintiff's minority-of-one racial-profile, is the only one that is allegedly violating the restrictive covenants.





I saw cat with collar on barn owl loop today around noon

☺ Thank   1 Thank

Rose Butenhorst, Summerlyn Leander · 9 Aug
There appears to be one by the celco right now. I'm allergic so i didnt get close

☺ Thank

Jessica A ., Stonebridge Ranch · 10 Aug
She is still missing 🐈

☺ Thank   1 Thank

Becky Robedson, Summerlyn Leander · 10 Aug
~~this is a post her litter outside and find the cat will find the scent I put litter boxs with this and maybe outside and it might bring back to home it~~

☺ Thank

Jessica A ., Stonebridge Ranch · 10 Aug
We tried the cat litter trick to no avail. Still praying she finds her way back home somehow!

☺ Thank   2 Thanks

Debbie Davis, Summerlyn Leander · 11 Aug
Do you have a picture of her?

☺ Thank

Danielle S ., Bells Ferry Rd · 11 Aug
Does this fit her description?

☺ Thank   2 Thanks

Jessica A ., Stonebridge Ranch  11 Aug
My husband saw her this morning on kingfisher but she ran into the gutter before he could grab her. Looking for a pic of her now. She is kind of antisocial so we don't have many of them!

☺ Thank   2 Thanks

Toni Permann, Summerlyn Leander · 12 Aug
Just saw her in the storm drain I believe....on Inca dove...

☺ Thank   1 Thank

Toni Permann, Summerlyn Leander · 12 Aug
I parked my van and walked down and the kitty bolted into the drain....I walked away and she came out.....as soon as I walked back she bolted lol. It was the drain in front of 132 Inca dove.

☺ Thank   1 Thank

Add a reply ..

# ¶372

In another social-media-posting dated on-or-about {2016-08-18}, a resident calls attention to the *"reckless drivers"* speeding within the subdivision and/or close to the entrance(s) to the subdivision, placing *"people's lives and property at severe risk."* The resident also calls attention to the total lack of enforcement-action against those who unlawfully light fireworks within the subdivision (again, as already explained above, in violation of both Texas law and the subdivision's restrictive covenants). (Both of these issues are routine and unchecked violations that the plaintiff has noticed throughout the approximately-14-year time-period that the plaintiff has resided within this subdivision.) [RSR], in what can only be described as yet another remarkable feat of extreme racist hypocrisy, tries to shut-down these legitimate complaints rightfully raised by many residents of the subdivision, ranting that such residents *"jeopardize the freedom of many for a few"* and that she would *"fight any motion to have a police state in our neighborhood."* For over 10 years, [RSR], along with her co-conspirators [JSP&KAP], [WCLE], have aggregately committed several dozens of hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, thanks to the toxic environment of racist-lawlessness that has been created and enabled by all these parties. For over 10 years, [RSR], along with her co-conspirators [JSP&KAP], [WCLE], have created a vicious, modern-day-Jim-Crow police-state around the plaintiff and the plaintiff's property, with [WCLE] being dispatched to the plaintiff's property over a dozen times - executing unconstitutional-and-unlawful searches/seizures of the plaintiff's property, unlawfully detaining the plaintiff, unlawfully interrogating the plaintiff, abusively shouting at the plaintiff while fraudulently

forcing the plaintiff who is under duress to sign legal documents ([CTW] citation, [PNW] citations) - as part of a larger scheme and pattern to defraud, blackmail, humiliate, racially-intimidate, witness-intimidate and retaliate-against the plaintiff. [RSR] is fully aware that the lighting of fireworks within this subdivision (with people, houses, fences and vegetation located in very close proximity) is: a serious health-and-safety hazard (with the great potential for serious injury/death and serious property-damage including the burning-down of entire houses/trees/yards/fences), noise-nuisance-violation (disturbing sleep-schedules and work-schedules), disorderly-conduct, air-pollutant (with the air strongly tinged with chemical-smelling smoke), littering. [RSR] makes an egregiously-fraudulent comparison, *"Why don't we focus on getting people to mow their grass instead of worrying about twice a year fireworks"*, when she is fully-aware that the lighting of fireworks (especially on public-property) is not Constitutionally-protected in any regard nor under any circumstance, whereas the growing of native-and-naturalized-vegetation within a person's private-property is, indeed, Constitutionally-protected in the many regards documented in this lawsuit (religious/cultural/racial practice, political speech/expression, art, etc). Yet, despite of these truths, [RSR], with a straight-face (and clearly without any shame) that only the most-skilled and most-manipulative con-artists are capable of perpetrating, is able to brazenly rail at other residents within this subdivision whom she (fraudulently) accuses of creating a so-called *"police state"* that polices real health-and-safety-hazards (fireworks and speeding-vehicles), noise-nuisances, air-pollution, littering caused by her, her co-conspirators [JSP&KAP], and a large-fraction of other residents of the subdivision. It is also important to note that [RSR] is perpetrating another fraud when she fraudulently states that those who complain about the lighting of the fireworks *"jeopardize the freedom of many for a few"* because in the plaintiff's best estimation (based upon the plaintiff's own observations), approximately 10% to 20% of the residents within this subdivision unlawfully light fireworks; therefore the *"few"* are the ones that light fireworks, whereas the *"many"* are the ones that do not light fireworks, but instead, have to suffer all of the effects of those *"few"* lighting fireworks. [RSR] concludes her abusive and intimidating rant, by stating that she will *"definitely will be at the next ⟨[HOA]⟩ meeting"*, no doubt, for the sole reason of demanding that the [HOA] engage in further predatory-enforcement-actions (in particular, legal-action) against the plaintiff. This posting also reveals that [WCLE] could have easily been contracted by the [HOA] to enforce the fireworks-ban, as the fireworks-ban can be, easily and uncontroversially, enforced from the street without infringing on any person's (or any group's) Constitutional rights; yet, the plaintiff, has never noticed any such enforcement-actions by [WCLE] (nor the [HOA]), and instead, [WCLE], for over 10 years, only operated in a predatory manner against the plaintiff - egregiously infringing upon many of the plaintiff's rights - based upon the malicious and fraudulent complaints of [RSR],[JSP&KAP]. [RSR] intimidating response not only shows her full support of those who unlawfully light fireworks in the subdivision (including herself and her co-conspirators [JSP&KAP]), but also intimidates all of those (including the plaintiff) that want both the [HOA] and [WCLE] to strictly enforce the fireworks-ban - for the health-and-safety of all residents of the subdivision, and for the protection of all private-property within the subdivision. This message is just one part (of many parts) to proving the plaintiff's claim that [RSR] is a highly-manipulative and intimidating con-artist that mastered her skills/techniques of defrauding the plaintiff over the course of over 10 years - with [RSR] fraudulently claiming that the plaintiff is the *"one person"* that is solely violating one-or-more of the restrictive-covenants of the subdivision. Although this fireworks issue is just one component of the plaintiff's fraud and racial-discrimination claims against the defendants, this issue highlights a very important and significant difference between what defendants [RSR],[JSP&KAP],[WCLE] were/are alleging about the plaintiff, versus what the plaintiff was/is alleging against defendants [RSR],[JSP&KAP],[WCLE] and the [HOA]. Even if it the defendants claim that the plaintiff was in violation of any rules concerning *"unsanitary conditions"* was true - which the plaintiff has always vehemently denied - such conditions are entirely within the confines of the plaintiff's private-property meaning that there is no possibility of any-one else being in any way inconvenienced, let alone harmed, from such conditions. By sharp contrast, fireworks - that are lit on public-streets and/or public-sidewalks - can cause (and has caused) serious injury (in some cases, lethal injury) even to innocent bystander(s) and fireworks can uncontrollably burn (and has uncontrollably

burned) down entire residential-properties - each of which is valued at several hundreds of thousands of dollars. So, even from a pure liability standpoint, the restrictive-covenant and Texas law that [RSR],[JSP&KAP] are breaking by illegally lighting fireworks, would incur significantly-more liability (a sum of which is at least in the six-figures) in terms of money-damages against [RSR],[JSP&KAP],[WCLE] and the [HOA], whereas, [RSR],[JSP&KAP],[WCLE] and the [HOA] would, at best, only be able to obtain injunctive-relief (without any possibility of money-damages against the plaintiff even if their (fraudulent) allegations of *"unsanitary conditions"* exclusively within the confines of the plaintiff's private-property were true - that is, if they were even able to prove that such conditions actually existed on the plaintiff's property (which the plaintiff vehemently denies) **and** only if they were able to prove that the plaintiff was not entitled to maintain the plaintiff's property according to such Constitutionally protected religious-practices. (The same point concerning liability also applies to [RSR]'s unleashing of a large dog to roam freely within the subdivision, and her/others unleashing of large cats to roam freely with some cats even routinely entering into the [BACKYARD].) This social-media-posting documenting [RSR]'s intimidation of other residents, also continues to reveal that [RSR] played the role of a neighborhood-boss or a mafia-godfather - a crucial component of [RSR]'s conduct that is clearly part of the plaintiff's [RIaCOA] claim against the defendants.





# ¶373

In another social-media-posting, a resident calls attention regarding an unpleasant interaction that he had with a [HOA] inspector from the newly-contracted property-management-company. [RSR] immediately exploits this opportunity to engage in backstabbing and character-assassination (⊕) against the plaintiff, who was never even mentioned by any of the other residents in this posting, brazenly stating: *"I would*

*love for him to take his clipboard to the haunted house on Kingfisher, (we all know which one) that doesn't mow his grass, buries trash and fix that before they QUIBBLE about a temporary driveway situation."* Unlike the other residents of the subdivision who are completely unaware of the situation between the plaintiff and the [HOA], [RSR] is completely aware of at least 3 crucial facts, thus committing a fraud against the plaintiff when she maliciously targets the plaintiff in this manner:

Ⓐ The plaintiff, due to the combination of the plaintiff's racial-profile and the plaintiff's political-profile, has always had a strong religious/cultural/racial and political opposition to the practices of lawnmowing (and all other artificial cutting of vegetation especially for aesthetic/cosmetic reasons) - even prior to the {2012}/{2013} Texas law concerning *"drought-resistant-landscaping"*.

Ⓑ The plaintiff, since at least the month of {2016-05} (as explained above), has been in contractual-dispute with the [HOA] specifically regarding the mowing of grass, with the plaintiff arguing that the term(s) in the contract requiring mowing were written in the years {{2004}/{2005}/{2006}}, thus preceding the newly incorporated Texas law (in {2012}/{2013}) concerning *"drought-resistant-landscaping"* that forbid [HOA]s from requiring any homeowners in Texas to water their landscapes, and that in particular, that the mowing of grass necessitates the watering of such landscapes in order to keep such grass alive - a clear violation of the new Texas law; by sharp contrast, leaving that same grass unmowed, allows that grass to survive even severe Central-Texas summer droughts without the need for water. (Grass can also be killed during winter when mowed during/before/after prolonged winter-freezes that can kill the grass especially if there is not enough soil-moisture to keep the grass alive during those long freezes. So, the lack-of-mowing protects grass from both temperature extremes.)

Ⓒ The plaintiff was compromising the plaintiff's deeply-held religious/cultural values/practices by, at least twice a month, cutting/picking the tallest so-called *"weeds"* in the frontyard without damaging the grass (since the default builder-installed grass only grows to a maximum of 12-inches in height in most areas).

[RSR] is clearly perpetrating another fraud against the plaintiff when she says that the plaintiff *"buries trash"* when she knows fully-well that this is both physically and logistically impossible, let alone completely false. Whenever [RSR] singles-out the plaintiff in this malicious manner, it it is crucial to note that [RSR]'s malicious targeting of the plaintiff would have been considered to be predatory even if all parties involved (including plaintiff) were (non-immigrant) White-American. But the predatory situation documented in this lawsuit is as egregious as it is, because all of the perpetrators and almost-all of the spectating audience are of the dominant-majority (non-immigrant) White/Caucasian/American color/race/nationality, whereas the plaintiff is of an extremely small (and historically oppressed) racial-minority and political-minority (in fact, a minority-of-one) - democratic-socialist, immigrant-of-color/indigenous-person with very-dark-brown-skin-color, long/uncut hair/beard, Middle-Eastern/Indian accent, etc. [RSR] also further reveals that she has been engaging in such backstabbing and character-assassination ( Ⓦ ) against the plaintiff for *"7 years"* - not only through her use of racist propaganda to engender more racial/anti-immigrant/xenophobic/Islamophobic animus against the plaintiff amongst the neighborhood's other White-American residents, but also by repeatedly and routinely demanding that the [HOA] take predatory-enforcement-actions (in particular, legal action) against the plaintiff. As the record shows, [CB] also *"thanked"* [RSR]'s backstabbing/character-assassination post against the plaintiff - indicating that even though he had only resided within the subdivision for approximately 4 months at this point in time, he was already draw-into/recruited-into the conspiracy to violate the plaintiff rights along with [RSR],[JSP&KAP],[DMP],[WCLE] and the [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH].

▶  "Our new HOA ( sorry it's long)" ▸  Nextdoor Summerlyn Leander:  [RSR], [MP], et al.▸  (2016-08-25)▸

▶  https://summerlynleander.nextdoor.com/news_feed/?post=31263313

Matt Fitch, Summerlyn Leander

## Our new HOA ( sorry it's long)

So I wanted to share with you the interaction I had this morning with our new rep from Spectrum. I'm in my driveway with my truck backup to my garage, tail gate down and totes and misc. item in the bed of the truck. Behind my tailgate were two shelving unit.

A white car stops in front of my house and the gentleman rolled down his window and said good morning, I wanted to introduce myself. my name is Kevin with Spectrum. I said OK. he said, are you going to leave those things in your driveway. I said what things. he said, those white shelves. I said . are you serious . he said yeah . I wanted to make sure you didn't leave them in your driveway, it would be a violation.

I said, you have got to be kidding me...It's extremely obvious I'm loading my vehicle . You need to put on your thinking cap!! He gave me a hard stare and then drove away

The moral of the story is although we have changed to another HOA, it will only be as good as the people they employ and base all on my first interaction, we're in trouble. Don't get me wrong, I'm extremely pro-hoa . but I pay 7k in taxes and Kevin's salary through my HOA fees and I don't need to be harassed by a guy with a pen and a clipboard and feels he has the authority to question what I'm doing in my driveway. I follow the rules and have not had any violations in 10 years.

25 Aug · Summerlyn Leander in General

☺ Thank   💬 Reply ⌄                    23 Thanks · 20 Replies

Melissa Hutchinson, Summerlyn Leander · 25 Aug                          ⌄
Thanks for sharing. Wow, that is a disappointing first impression.
☺ Thank

Becky Robertson, Summerlyn Leander · 25 Aug                            ⌄
[illegible highlighted text]
☺ Thank   9 Thanks

Fannie C. Heegley, Summerlyn Leander · 25 Aug                          ⌄
Let's just Hope we did not jump from the frying pan into the fire.
☺ Thank   1 Thank

Marc Petrick, Highlands at Crystal Falls · 25 Aug                      ⌄
Maybe I'm not understanding what the issue is here. The way I read your post, the guy who stopped was courteous and was just making sure that the items were not going to be left there. Maybe it was not obvious to him that you were loading (or unloading) the shelves. I guess I'm not understanding why you feel you were being "harassed"?
☺ Thank   7 Thanks

Danielle S., Bills Ferry Rd · 25 Aug                                   ⌄
Better he asked you the. Get a world on notice. Becky the house you are referring to has been mentioned and like a few other houses in the neighbor are being addressed but when it comes to fining, leins, forecmosures, etc, it takes time.
☺ Thank   3 Thanks

Elizabeth Cook, Summerlyn Leander · 25 Aug                            ⌄
I actually had a very nice interaction with the same gentleman this morning. He seemed to really be on top of it and was very friendly. Sorry yours wasn't as pleasant.
☺ Thank   5 Thanks

Debbie Davis, Summerlyn Leander · 25 Aug                              ⌄
It sounds like he was polite, and just giving friendly reminders out. I know it can be irritating when someone seemingly asks a question with an obvious answer, but he's probably driven by a few house here that have left him bewildered, and he honestly didn't know RM was so completely incompetent, for so long, that a lot of people have forgotten the deed restrictions, or assumed that because they've never been enforced, that they're moot or unenforceable. I think that community contact and being a presence will help with that.

And, maybe having a conscientious management company will result in improved behavior and pride in ownership. In a few months, perhaps that question won't even be necessary because we won't have some homes that do double duty as junk yards/dumping grounds.
☺ Thank   8 Thanks

Matt Fitch, Summerlyn Leander · 25 Aug                                ⌄
I love all the different opinions, but let me try to simplify it you, the home owner are standing on your driveway with any item next to you why would that even be considered a violation . Marc, it's no different if you were cleaning out your garage and had items on your driveway and someone with a clipboard stopped and ask you if you were going to leave them out, if so it would be a violation. Really !
☺ Thank   4 Thanks

Becky Robertson, Summerlyn Leander · 25 Aug                           ⌄
[illegible highlighted text]
☺ Thank   3 Thanks

Ashley DuParc, Summerlyn Leander · 25 Aug                             ⌄
I sure hope they leave me alone. I hate the HOA people.
☺ Thank   4 Thanks

Marc Petrick, Highlands at Crystal Falls · 25 Aug                     ⌄
I don't know. I guess I just see it differently. I would not feel annoyed if I was cleaning out. Y garage and had stuff in my driveway and he stopped to remind me that leaving those



**¶374**

In another social-media-posting, several residents discuss their varying opinions (respectively) on what-to-do with grass clippings: Ⓐ blow the mowed grass-clippings onto the road, Ⓑ bag them using the bag-attachment to the lawnmower, Ⓒ sweep them back up (presumably to throw them away in the garbage bin), Ⓓ sweep them into the storm drains. Many of the residents argue as to which of the above are violations of the restrictive covenants. One of the residents makes a comparison of the grass-clippings to the litter/debris caused by fireworks - stating that most homeowners that illegally light fireworks, fail to pick-up their *"mess"* (the toxic debris/chemicals from the fireworks which lands on public property and on others' private-property). Other residents express their opinion that Saint-Augustine-grass, a non-standard (non-default) grass that has been installed by many homeowners within the subdivision (including [JSP&KAP]), is not allowed by the restrictive covenants (which is actually true if those homeowners did not obtain prior approval before performing that grass-replacement.) At least two of the more rational/logical/scientific-minded (or at least, the more practical/reasonable-minded) residents point out how insignificant this issue is, with one

SIDDHARTH BODE   V.   WILLIAMSON COUNTY, ET AL.                                      1696907690

of the residents stating how luck the rest are to be discussing such an insignificant issue, when they have much bigger problems to deal with. The original-poster of this message alleges that he was called *"White trash"* by another complaining party for his blowing of such grass-clippings onto the road. One resident uses the social-media hashtag *"#firstworldproblems"*, indicating that this type of discussion can only be had by extremely-privileged White-American people who don't even seem to realize the extreme privilege that they have in taking these insignificant and purely-cosmetic issues so seriously. But perhaps more importantly, [RSR] fraudulently-claims that it is not *"respectful to the community"* to leave the grass-clippings uncollected. Clearly, according to [RSR], it is completely acceptable and *"respectful to the community"*:

Ⓐ to light-fireworks;

Ⓑ to allow one's dog to roam freely unleashed;

Ⓒ to allow one's dog to bark loudly and uncontrollably;

Ⓓ to allow one's cat(s) to enter into others' backyards;

Ⓔ to block the public-sidewalk using one's vehicle;

Ⓕ to park a boat on the public-road within the subdivision;

Ⓖ to park one-or-more vehicle(s) on the public-road overnight; etc.

- all in clear violation of the restrictive-covenants - but it is neither acceptable nor *"respectful to the community"* to leave grass-clippings uncollected. Once again, the sheer racist hypocrisy of [RSR]'s (and her co-conspirators') conduct is clearly revealed in a large number of social-media-postings (this social-media-posting and numerous other social-media-postings). All of these residents (including [RSR]) seem to be completely unaware of the {2013} Texas law (modifications to the [TPrC]) that allowed homeowners to leave their grass-clippings on the grass as an in-place *"solid-waste composting"* measure. Most importantly, all of these residents seem to be completely-unaware of the *"elephant in the room"* - the root problem that is causing this unnecessary discussion to be had in the first-place: the wasteful, destructive, ethnocentric and culturally-insensitive/religiously-insensitive practice of lawn-mowing - and in general, the cutting of any-and-all vegetation purely for alleged aesthetic/cosmetic reasons. A common theme that is expressed in this lawsuit is that: While some homeowners seem to allege violations of certain restrictive covenants, many (if not most) of such homeowners have not actually read the Declaration-of-Covenants-Conditions-and-Restrictions ("[DCCR]s"), and almost all of the homeowners are completely ignorant of the constantly-changing Texas law ([TPrC]) that regulates [HOA]s - which plays a crucial role in determining what their fundamental rights as homeowners are - regardless of what some of the very-obsolete restrictive-covenants listed in the [DCCR]s state. When many, if not most, of the residents (including [HOA] Board-Members) within a subdivision do not know what their rights as homeowners are, then this lack of knowledge is fertile ground for rampant violation of rights - with the victims of such rights-violations unjustly including those who do know what their rights are (such as the plaintiff). The plaintiff asserts that this *"fertile ground for rampant violation of rights"* is significantly amplified when lay-persons (with little-to-no legal background or training) - and without understanding even basic civil-rights-law - fill the powerful positions of Board-Members on [HOA]-Boards. The plaintiff asserts that this *"fertile ground for rampant violation of rights"* is significantly amplified when any persons who are, by their very nature, abusive and/or dictatorial, fill these positions of power.



> "Do you sweep your grass?"  ·  Nextdoor Summerlyn Leander·   [RSR], et al.·   {2016-09-19}·
> https://summerlynleander.nextdoor.com/news_feed/?post=32743256

Beau Jones, Summerlyn Leander

**Do you sweep your grass?**
When I mow my lawn, I blow the grass clippings out into the street, as ive always done, and when cars go up/down the street the grass goes away in about a day. If the grass clippings are excessive ill sweep them up. Otherwise they are blown around by the traffic and gone pretty quick

Ive never had a problem, at any home ive owned until a neighbor drove by and demanded I sweep my damn grass off the street. If I had been asked politely I wouldve swept it and all been good. I

SIDDHARTH KODE v. WILLIAMSON COUNTY, ET AL.                    1696907690

[text obscured/highlighted: ...nied outside his truck at the urged confronted him and then he blew off yelling while trying run a family man have a daughter, go to church. definitely not white trash]

As ive seen around the neighborhood, quite a few people do as I do. Hell, professional landscaping companies arent out there sweeping grass. They blow it out on the road. But maybe im wrong.

Do yall sweep or blow the grass?
18 Sep · Summerlyn Leander in General

😊 Thank    💬 Reply ∨                                    1 Thank  23 Replies

Ryan Rayle, Summerlyn Leander · 18 Sep                              ∨
I personally think that it isn't that big of a deal but then again I'm pretty sure there is a code or section or bylaw that outlines grass clippings. My mower has a bag attachment so I need not worry about that.
😊 Thank

Brian Grantham, Summerlyn Leander · 18 Sep                          ∨
Me personally I say sweep it up. I hate seeing grass blown all over the road especially if I've just had my car washed and then grass gets kicked up and sticks to it. I dont think it's that big of an issue to get out and confront someone over, but i would definitely be saying some stuff under my breath.
😊 Thank   1 Thank

Toni Pennann, Summerlyn Leander · 18 Sep                            ∨
LOL Wow... Honestly, it irritates me to see it. But to each his own. I would never even bother to say anything to anyone. I try to make my husband either get it all with the blower or wash it down.
😊 Thank

Beau Jones, Summerlyn Leander · 18 Sep                              ∨
I understand the grass getting on my clean car deal. Whether or not the likelyhood of that is in my favor. I also understand it looks better once the grass is gone, but it's never there more then 24 hours or so. Ive never had an issue with it. Never even thought of it being an issue. Im a reasonable person, if the whole neighborhood got on here and said they all sweep their grass and its hideous blown out on the street...id sweep it! [highlighted: but the fact still remains, professional laws care companies dont sweep the grass, they blow it out on the road.]

Again, if the majority says they sweep their grass...or if you live on Chickadee and you say it bothers you too. Ill sweep the grass. No big deal at all, I never thought of it being an issue.
😊 Thank   1 Thank

Deonna Spencer, Summerlyn Leander · 18 Sep                          ∨
I have no problem with it in the street. At least you mow your yard and unless it harms me or my house why would I care. But a lot of people have an opinion about a lot of things I have noticed. But I say thanks for mowing your yard and keeping your street looking better than if you did not now it 😊
😊 Thank   10 Thanks

Erin DeBarbieri, Summerlyn Leander · 18 Sep                         ∨
We blow the grass too. Like you said, hired professionals tend to blow the grass as well. Also...it's just grass. Your car getting dirty from grass is the silliest thing. You can't drive more than 5 seconds without a big bug splattering across the front of your car....
😊 Thank   2 Thanks

Toni Pennann, Summerlyn Leander · 18 Sep                            ∨
It's amazing to me that someone asks for opinions, and then instantly the rude comments come out. It always amazes me more that it isnt even the person who actually had the situation happen to them who is being so rude. It's not "petty" to "prefer" something over something else. It was "petty" what happened to him.
😊 Thank   3 Thanks

Faye Johnson, Summerlyn Leander · 18 Sep                            ∨
I personally think it should be swept up. That is my opinion and preference.
😊 Thank   1 Thank

Cynthia V, Park Lane · 18 Sep                                       ∨
Yeah, sometimes I see grass on the street when people mow but it is gone in a couple of days. Gotta love nature haha!
But if my neighbor told me to clean up I would just do it. Or ask Bret Marler how he does it because he runs a mower without a bag and somehow we never have grass on our street.  He may blow it back into our grass.  Maybe that is why our grass is so green 🤷
😊 Thank

Angie Drewen, Summerlyn Leander · 18 Sep                            ∨
You cant buy class. That "man" should be ashamed of his behavior. [highlighted: When adults can't act trying to concern trivial issue.] I'm sorry that happened to you Beau.
😊 Thank   7 Thanks

Beau Jones, Summerlyn Leander · 18 Sep                              ∨
I appreciate yalls responses. Seems to be a pretty normal occurrence despite personal preferences.

Craziest thing is, he doesnt live near me. I would understand if he lived next door and he felt it made his house look bad. He lives on the complete opposite side.
😊 Thank   5 Thanks



## ¶375

On or about the date of {2016-10-10} - the date on which the plaintiff, an indigenous person, celebrates *"Indigenous Peoples' Day"* - [RSR]

creates a social-media posting titled, in all capital-letters for emphasis and intimidation, *"BOARD MEETING"* (see below) demanding that the

[f-HOA-BoD]s hold a [HOA] Board Meeting in-order-to vote-for and plan legal action against the plaintiff for the plaintiff's refusal to mow the

plaintiff's grass (in-line-with the plaintiff's religious/cultural/racial views and in favor of true drought-resistant-landscaping), despite knowing

fully-well that the plaintiff is in contractual-dispute with the [HOA] regarding this obsolete requirement from the obsolete/outdated restrictive-

covenants (see above and below). This posting and all the following responses to this posting were made in public - thus visible to all residents of the overwhelming majority-White neighborhood - and was clearly part of [RSR]'s (and her co-conspirators') malicious, decade-long conspiracy and scheme to defraud the plaintiff by using racist propaganda against the plaintiff to engender more racial-animus against the plaintiff in the White neighborhood's other residents. Shockingly, the then [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH], acting as pawns of the mafia-godfather-like neighborhood-boss, [RSR], order a force-mow on the plaintiff's property, the very next day (see below) - illustrating just how oppressive the situation is for an immigrant-of-color/indigenous-person such as the plaintiff who dares to question the firm establishment of White-supremacy even within the confines of such person-of-color's own private-property. This upcoming sequence of incidents documenting abuse against the plaintiff - although not as egregious as the incidents documenting abuse against the plaintiff during the month of {2011-08} - further illustrates the enormous, mafia-godfather-like power that [RSR] wielded over the plaintiff, thanks to the unfavorable (to the plaintiff) racial-demographics of the neighborhood and the unfavorable (to the plaintiff) racial-demographics of County of Williamson: This situation of racist-lawlessness in this neighborhood has been as if [RSR] had the collective power of the overwhelmingly White-American racial majority of the neighborhood in the palm of her hands, and [RSR], shades of modern-day-Jim-Crow, intended to abuse that enormous, unjust and ill-gotten power to racially-oppress the plaintiff at every opportunity that she could.

# ¶376

As already referenced above, on or about the dates of {2016-10-10}, {2016-10-11} - [RSR] posted the following responses to her initial, intimidating and threatening social-media posting titled *"BOARD MEETING"* on the same social-media-platform, demanding that the [HOA] take legal-action against the plaintiff for the plaintiff's refusal to mow the plaintiff's grass (in-line-with the plaintiff's religious/cultural views and in-favor-of true drought-resistant-landscaping), again, because both [RSR],[JSP&KAP] never did want to engage in any of the risky/burdensome/unpleasant/expensive work of litigation themselves - especially given that the plaintiff had already substantially documented (at that moment in time) more than 7 years of their extreme-racial-animus and homophobic-animus towards the plaintiff - and instead, as the top-level-leadership of the racketeering-enterprise against the plaintiff, [RSR],[JSP&KAP] have always demanded that this risky/burdensome/unpleasant/expensive work of litigation to be out-sourced to their favorite predatory and authoritarian institutions - in particular, the [HOA] and [WCLE]. Although it does not impact the actual understanding of the documented crimes against the plaintiff, to the best of the plaintiff's understanding, the initial postings by [RSR] (on the day of {2016-10-10}) take place shortly before the [HOA]'s attempted, but unsuccessful, force-mow of the plaintiff's [FRONTYARD] on the following date of {2016-10-11}, while at least some of the latter, more-abusive postings by [RSR] and her co-conspirators taking place on the following date of {2016-10-11} - may have been posted after the [HOA]'s attempted, but unsuccessful, force-mow of the plaintiff's [FRONTYARD]. Also, [DMP] - a close associate of [RSR], [JSP&KAP] - *"thanked"* [RSR]'s final posting showing that this illegal conspiracy against the plaintiff also included - at that moment in time, [DMP]. As the record will show, [DMP] would soon run for Board-Member of the [HOA] in the following year {2017}, win the so-called *"election"* (✗) and use his substantial powers as a [HOA] Board-Member solely to continue predatory enforcement actions against the plaintiff, on behalf of plaintiff's predatory neighbors [RSR],[JSP&KAP]. [DMP]'s role as direct agent and/or proxy of [RSR],[JSP&KAP] is crucial in this racketeering-enterprise, because again, for this racketeering-enterprise to be able to successfully abuse the legal system against the plaintiff, it was absolutely crucial that the [HOA] (especially under [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH]) and [WCLE] both fully-insulate both [RSR] and [JSP&KAP] from the actual legal proceedings, because if [RSR] and/or [JSP&KAP] could be drawn into the legal proceedings against the plaintiff at any point in time (which did happen in the events of {2020}/{2021} - see below), the entire conspiracy and racketeering-enterprise against the plaintiff would be exposed, with significant legal-consequences for all of those involved in such racketeering-

enterprise. Neither [RSR] nor [JSP&KAP] could ever realistically expect to win an election for [SPOA] Board-Member (although [RSR] did try in {2019} - see below), for one crucial reason: because such action would clearly be too much of a huge-liability for the [HOA]; so, again, both [RSR],[JSP&KAP] demanded that other institutions-of-power (with the war-chest of virtually unlimited financial resources) - the [HOA] and [WCLE] - to do this risky/burdensome/unpleasant/expensive work of litigation against the plaintiff for them. It should be noted that [f-HOA-BoD][SPOA-VP-AH] states *"I'm sorry that other homeowners aren't always good neighbors"*, parroting the same fraudulent, racist-narrative that the plaintiff was not a *"good neighbor"*, and accepting the fraudulent-narrative that [RSR], who had already committed several hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff at that moment in time, apparently is a *"good neighbor"*. [RSR] almost-immediately begins her vitriolic and venomous statements against the plaintiff that she is furious with the then [HOA]'s lack of predatory enforcement actions against the plaintiff - even blackmailing the then [HOA] with the threat - *"I do hold the Board responsible"* - for what she alleged to be the then [HOA]'s lack of predatory enforcement actions against the plaintiff. By making such statement of blackmail, [RSR] was very directly threatening the then [HOA] - that if the [HOA] did not *"bring down the hammer"* on the plaintiff by initiating legal action against the plaintiff - that [RSR] and her co-conspirators (including racketeer co-defendants [JSP&KAP], and including their crony/proxy [DMP]) would be suing the [HOA] for the [HOA]'s lack of predatory enforcement against the plaintiff. As the plaintiff would later find out in a later year - {2019} (see below) - [RSR] even admits to blackmailing the [HOA] in such manner for a total of *"9 years"* (in that later year), in-order-to coerce the [HOA] into engaging in further predatory enforcement actions (including legal actions) against the plaintiff. [RSR] outrageously describes herself as a *"powerless member of this neighborhood"* - when all of the plaintiff's highly incriminating evidence against [RSR] - especially in the years preceding this incident - shows that [RSR] played the role of the kingpin/mafia-godfather in the obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff - ultimately focused on defrauding the plaintiff out of both money and private-property-ownership. (It is not uncommon for con-artists and fraudsters to play *"victim"* in-order-to to further-advance their fraud and conspiracy towards their real, actual victims.) Also, it should be noted that [RSR] repeatedly resorts to the overtly racist dog-whistle that the neighborhood's White-American residents, and in particular, the neighborhood's White-American children are somehow being harmed by the plaintiff without providing any proof of any harm - thus, manipulatively using this overtly racist dog-whistle as justification for the [HOA] to take legal-action against the plaintiff. [RSR] continues to make the fraudulent claim about *"rat infestation"* on the plaintiff's property - a fraudulent, proofless claim that has even been fraudulently parroted by the [HOA] and [WCLE] since as early as {2013} - when she (and all of these other parties) knew fully-well there was never any rat on the plaintiff's property at any point in time. [RSR] continues to make the outrageously fraudulent claim that the plaintiff buries *"garbage"* in the [BACKYARD] - another outrageously fraudulent claim that has even been fraudulently parroted by the [HOA] and [WCLE] since {2013} - when she, the [HOA] and [WCLE] knew fully-well that it is physically and logistically impossible to sustainably bury *"garbage"* in one's (extremely-space-limited) backyard. Additionally, as documented in the section below, *"garbage"* is a legally defined term in Texas law that consists of a mixture of both decayable waste (such as moist food-waste) and non-decayable waste (*"rubbish"*); thus, *"garbage"* is completely different from *"rubbish"*, which is exclusively composed of non-decayable waste (waste plastics, waste metals, waste glass, waste ceramics, etc), and since the plaintiff lives a zero-waste lifestyle, the plaintiff has always maintained that any-and-all material(s) located in the [BACKYARD] was never of any waste. So, by fraudulently using the term *"garbage"*, [RSR] is deliberately and maliciously making a fraudulent statement, fraudulently painting the plaintiff's private [BACKYARD] as unsanitary when it never was, and fraudulently mislabeling item(s) stored in the plaintiff's private [BACKYARD] - which is not even in the least bit visible from the street (thus, in total violation of the plaintiff's right to privacy). [RSR] had already claimed in the in-person harassment/stalking incident (see below) that the plaintiff's uncut grass/bushes were *"UNKEMPT"* and *"UNSIGHTLY"* which, even if true, by definition, are harmless conditions; yet, now [RSR] fraudulently changes the narrative to pretend as if the plaintiff is causing

harm to others by such alleged harmless *"unsightly"* conditions. [RSR] makes another brazenly fraudulent claim, complaining that there are chicken on the plaintiff's property - when she knew that there were no chicken on the plaintiff's 【Summerlyn】 property at that moment in time, and furthermore, that there were no chicken on the plaintiff's 【Summerlyn】 property for over a year at this particular moment in time. Even at that moment in time, there were multiple social-media postings (with pictures) revealing that multiple residents of the subdivision owned chicken in their backyards. For example, in another *"nextdoor.com"* social-media posting from a previous year, another White-American property-owner of the 【Summerlyn】 subdivision reveals that he has discovered a chicken roaming freely in a publicly visible area of the subdivision and this property-owner makes a friendly and humorous inquiry as to who owned the chicken - without any indication nor intention to report it as a violation. In at least one other social-media posting regarding chicken, [RSR] responds in a friendly manner that she would love to have egg-laying chicken. In at least 2 other social-media postings from a later moment-in-time dated {2017-11-18}, a resident advertises in the posts' title that he discovers some other resident's chicken in his backyard, and one of the other residents informs him that it might be one of at least two chicken of a particular resident (not the plaintiff) within the subdivision - the one whose chicken keep getting loose onto others' yards; not surprisingly, [RSR] remains noticeably silent in these postings - as those where White-American (and/or non-immigrant) property-owners. Again, the racist hypocrisy of [RSR]'s actions cannot be understated: In other words, it is totally acceptable for other White-American property-owners including [RSR] to own chicken on their 【Summerlyn】 property but, clearly, not the plaintiff - and the plaintiff did not even own any chicken on the plaintiff's 【Summerlyn】 property for a long time when [RSR] made this fraudulent claim in this {2016-10-10} social-media posting. [RSR] also fraudulently refers to a *"tortoise"* as a *"dangerous situation"* on the plaintiff's property when she knows that owning (harmless) tortoise(s) is not a violation of the restrictive-covenants, and many homeowners residing within [HOA] subdivisions in the Central-Texas area own tortoises at their residential properties (○) . [RSR] continues to make outrageously racist and fraudulent claims about the plaintiff and the plaintiff's brother [PK] - claiming that the plaintiff sent the plaintiff's brother [PK] to *"threaten"* her *"13 y.o. son"* - as the aforementioned incidents from {2009} through {2011} already clearly documents as pure, massive, racist fraud - deliberately failing to reveal to her overwhelmingly White-American audience all of the other incidents of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff that led up to that uncivilized, barbaric and extremely-traumatizing incident for the plaintiff, including that:

Ⓐ she had repeatedly and maliciously harassed/stalked, intimidated/interfered-with, blackmailed and even loudly threatened, at the plaintiff's [FRONTDOOR], to get the [HOA] to kick the plaintiff out of the plaintiff's [HOUSE] during the initial years of {2009} and {2010}.

Ⓑ her then co-conspirator [JJB] (and initial next-door-neighbor of the plaintiff that [RSR] fraudulently refers to as *"victim"* of the plaintiff) had committed numerous malicious (including retaliatory) crimes of criminal-mischief and illegal-dumping against the plaintiff.

Ⓒ she further committed the retaliatory (thus felonious) crime of false-report against the plaintiff by fraudulently reporting to [WCLE], and one of its most abusive police-officers (with racial-animus), [WCSD-PP], that the plaintiff had trespassed onto her property and threatened her son.

Ⓓ she further committed the retaliatory (thus felonious) crime of false-report against the plaintiff by fraudulently reporting to [WCLE] that the plaintiff's brother [PK] lived-at and/or co-owned the plaintiff's property [788KLLTX78641] - when [PK] was never an owner of the plaintiff's property [788KLLTX78641], and when [PK] did not even spend more than a total of 1 hour at the plaintiff's property in more than 29 months of the plaintiff's ownership of [788KLLTX78641] (at that particular moment in time).

In fraudulently stating that the plaintiff has unmowed grass and uncut bushes in direct defiance of the restrictive-covenant(s) of the subdivision, [RSR] (and her co-conspirators) are maliciously creating a fraudulent narrative to all of the residents of the overwhelmingly-White-American subdivision that the plaintiff is willfully and maliciously defying the restrictive-covenants of the subdivision, when in fact, [RSR] (and her co-conspirators) know fully-well that, unlike over 99% of the other residents, the plaintiff, due to the plaintiff's racial-profile, has always been strongly morally/religiously/culturally opposed to the artificial-cutting of any-and-all vegetation, and [RSR] (and her co-conspirators) know fully-well that the new Texas law (concerning drought-resistant-landscaping) taking effect on-or-about the month of {2013-09} overriding the [SPOA] contract that was written/amended during the years ({2004}/{2005}/{2006}), prohibited [HOA]s from any practices/requirements/restrictions that requires the watering of landscapes - and thus, as a result of these new developments, at the very least, that the plaintiff was merely in a contractual-dispute with the [HOA], and that every homeowner - not just White-American homeowners - are allowed to legitimately dispute one-or-more aspect(s) about such obsolete/outdated contract. [RSR] fraudulently accuses the plaintiff of willfully violating one-or-more restrictive-covenant(s), while at no place in this social-media posting or any of her other social-media postings does [RSR] admit to the rest of the overwhelmingly-White-American neighborhood that [RSR] is repeatedly, willfully, defiantly and arrogantly violating multiple restrictive-covenant(s) by:

Ⓐ allowing her large dog to roam freely unleashed onto both public property onto the street, and at least on some occasions, into the plaintiff's [YARD] which is across the street from her ; AND

Ⓑ allowing her large dog to bark loudly-and-uncontrollably (causing a noise-nuisance) ; AND

Ⓒ allowing her cat(s) to roam freely onto the plaintiff's [DRIVEWAY],[YARD] (including, at least on some occasions, the plaintiff's private [BACKYARD]) ; AND

Ⓓ lighting fireworks with her co-conspirators [JSP&KAP] ; AND

Ⓔ leaving her unsightly and/or smelling garbage-can in a clearly-visible manner from the street several days after garbage-collection-day (often, for long periods of time on her publicly-visible driveway).

Additionally, [RSR] fraudulently fails to disclose to her overwhelmingly-White-American audience that her co-conspirators [JSP&KAP] repeatedly - or at least occasionally - willfully, defiantly and arrogantly violating additional restrictive-covenants by:

Ⓕ parking more than 2 vehicles visible from the street for over 72 hours ; AND

Ⓖ parking vehicle(s) to block the sidewalk ; AND

Ⓗ parking vehicle(s) on the street curb overnight ; AND

Ⓘ parking boat(s) visible from the street ; AND

Ⓔ she further committed the retaliatory (thus felonious) crime of terroristic-threat against the plaintiff when she threatened [WCLE] that she would burglarize the plaintiff's [HOUSE] in-order-to commit felonious assault on the plaintiff, if [WCLE] did not fraudulently arrest, or at the very least, fraudulently issue a [CTW] to the plaintiff.

Ⓕ she further committed the retaliatory (thus felonious) crime of fraud against the plaintiff when she demanded [WCLE] to coerce (using racial-intimidation) the plaintiff to sign a [CTW] against her property, based upon her fraudulent allegation(s) against the plaintiff.

Ⓖ she further committed the retaliatory (thus felonious) crime of disorderly-conduct against the plaintiff when she publicly, loudly, maliciously and abusively called the plaintiff, [PK]'s *"wacky wife"* - once again, demonstrating her far-right-wing-extremist conduct.

Ⓗ her co-conspirator [JSP], one of the plaintiff's next-door-neighbors that she fraudulently refers to as *"victim"* of the plaintiff, had also witness-intimidated-with, and committed-fraud-against the plaintiff in that same single incident of {2011-08-30}.

Ⓘ her co-conspirator [JSP], one of the plaintiff's next-door-neighbors that she fraudulently refers to as *"victim"* of the plaintiff, had also maliciously and/or repeatedly harassed/stalked, intimidated/interfered-with, assaulted, blackmailed and committed his own criminal act(s) of disorderly-conduct against the plaintiff.

Ⓙ that her co-conspirator [WCSD-PP] had committed the retaliatory (thus felonious) crimes of Official-Oppression, Abuse-Of-Official-Capacity, Misuse-Of-Official-Information, Intimidation/Interference, Fraud, Disorderly-Conduct, Harassment and Discrimination against the plaintiff during the month of {2011-08}.

Ⓚ [WCLE] was not only fully-aware of all of these crimes committed against the plaintiff, but actually encouraged and enabled such crimes as part of the obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise documented in this lawsuit.

Ⓛ her then *"13 y.o. son"* - even at that age - was significantly larger in physical-size/weight than the plaintiff (even at that earlier moment in time) - in other words, that the plaintiff was *"scrawny"* at a mere 90 pounds compared even to her then *"13 y.o. son"*.

Ⓜ she was/is more than twice the physical-size/weight of the plaintiff (at almost every point in time documented in this lawsuit).

Ⓝ her co-conspirator [JSP] was/is more than twice the physical-size/weight of the plaintiff (at almost every point in time documented in this lawsuit).

Ⓞ her original co-conspirator [JJB] was also significantly larger in physical-size/weight than the plaintiff.

Ⓟ her co-conspirators at [WCLE] were/are, likewise, significantly larger in physical-size/weight than the plaintiff.

Ⓙ leaving their fence bordering the plaintiff's property [788KLLTX78641] leaning/dangling/unfixed, in total disrepair, for over 7 years ; AND

Ⓚ making unapproved changes to their frontyard by replacing their grass and by planting an additional tree ; AND

Ⓛ having unapproved swimming-pool, volleyball-poles/nets, etc., in the backyard ; AND

Ⓜ running loud yard equipment late at night (in violation of the restrictive-covenant concerning noise-nuisance/obnoxious-activity) ; AND

Ⓝ running artificially-loudened pickup trucks even during the middle of the night (in violation of the restrictive-covenant concerning noise-nuisance/obnoxious-activity) ; AND

Ⓞ lighting large bonfires in their backyard, while using a large fan to maliciously blow the toxic fumes from that fire into the plaintiff's property (which is clearly a crime) ; AND

Ⓟ speeding their vehicles on the street.

(The list of unpunished, routine/persistent violations above committed by [RSR] and/or [JSP&KAP] also does not include the list of unpunished, routine/persistent violations committed by other White-American residents of the neighborhood, which the defendants deliberately turned-a-blind-eye to, by virtue of those other violators' racial-profiles versus the plaintiff's racial-profile.) Additionally, if it is true that certain types of unpunished violations (for example, the lighting-of-fireworks, and the parking-related-violations) are overwhelmingly-committed (or at least more-likely-to-be-committed) by non-immigrant White-American people, and certain other types of punished alleged violations (for example, an alleged unmowed lawn) are overwhelmingly-committed (or at least, more-likely-to-be-committed) by immigrants-of-color/indigenous-persons (for example, due to religious/cultural/racial opposition to such culturally-insensitive/religiously-insensitive requirements), then there is ample ease to be made for systemic discrimination based on race, color, religion and/or nationality due to the deliberate, discriminatory, malicious and predatory enforcement and/or *"cherry-picking"* of the enforcement of such restrictive-covenants. [RSR] advertises in this post, and in other posts, that she is a registered nurse [RN] for at least 4 crucial reasons:

Ⓐ because she rightfully believes that adding this information will add credibility to her massively-fraudulent and racist narrative against the plaintiff, AND

Ⓑ because people are less-likely to suspect that a nurse (than those of most other professions) will engage in any type of fraud, defamation, witness-tampering or any other malicious/predatory activity, AND

Ⓒ because she can then operate under a fraudulent sense of intellectual-superiority and higher-education-level over the plaintiff, AND

Ⓓ because people normally associate nurses with those with good-character - those that do good within society.

In other words, [RSR] is manipulatively advertising her profession as a [RN] to convince her overwhelmingly White-American audience that she is on the side of intelligent-people, educated-people and justice versus the plaintiff who is, apparently, on the side of the low-IQ, subhuman animals and injustice - which as almost-all of the incidents documented in this lawsuit involving [RSR] reveal, is a purely racist fraud. However, despite [RSR] flaunting her credentials as an [RN], as the record will show, [RSR]'s far-right-wing-extremist behaviors/actions (demonstrated at numerous points in this lawsuit) are, at the very least, strongly at odds with the political views of the largest union of [RN]s in the United States - the [NNU] - a union that publicly identifies as democratic-socialist (see below). As the record in this lawsuit documents, although [RSR] makes many racist, fraudulent statements against the plaintiff in this posting, the plaintiff considers the statement *"Trying to talk reason"* to be the most racist, fraudulent, insulting and infuriating - even more so than her use of overt racial-slurs and/or homophobic-slurs against the plaintiff - especially, given the plaintiff's education-profile and given the fact that the plaintiff is a scientist/engineer that is trained, and perhaps even hard-wired, to think logically and scientifically. So, despite of announcing her own *"superior"* credentials as a [RN] to all the residents, and despite engaging in pure-fraud, defamation and witness-tampering against both the plaintiff and, to a smaller degree, the plaintiff's brother [PK], at no point in time, in not one of her many social-media postings does [RSR] reveal to the other residents of the subdivision (who are overwhelmingly of the White/Caucasian/American color/race/nationality) that the plaintiff (and the plaintiff's brother [PK]) are both educated - that both have-been awarded Computer-Sciences degrees from [UT-Austin], a top-ranked, so-called *"Public Ivy"* research university that consistently ranks within the top-15 in the national Computer-Sciences research university rankings. [RSR] fraudulently refers to the plaintiff's security-cameras *"monitoring … neighbors every move …"*, when she knows perfectly well that it was actually her malicious co-conspirator [WCLE], that had *"advised"* the plaintiff to install security-cameras in response to [RSR] (and her co-conspirator [JJB]) committing those initial hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff in those initial years of {2009} through {2011} - security-cameras that are even a fully-protected homeowners' right under Texas law [TPrC-T11-C202-§202.023(c)]. In yet-another act of racist fraud, [RSR] refers to the plaintiff and/or various condition(s) on the plaintiff's property as a *"dangerous situation"*, fraudulently protesting that the [HOA] was meant to *"protect"* the White neighborhood from the plaintiff - the *"scrawny"* immigrant-of-color/indigenous-person weighing approximately 90 pounds (at that moment in time). Another crucial aspect of the racist fraud that [RSR] is perpetrating against the plaintiff in her predatory targeting of the plaintiff is that [RSR] lived diagonally across the street from the plaintiff, with the two houses being approximately 120-feet-apart, meaning that [RSR] had absolutely no claim to any harm from any such alleged conditions (even if all true) on the plaintiff's property. Furthermore, the fraud in [RSR]'s statements is enormously enhanced by the facts that, not only did [RSR] not have any proof of any actual harm that the plaintiff had ever caused [RSR], but also, and to the contrary, the plaintiff had significant evidence of harm (in fact, felony hate-crimes/racketeering-acts/civil-rights-violations/abuses) that [RSR], along with her co-conspirators [JSP],[WCLE], committed against the plaintiff, but also that all of these fraudulent statements and crimes against the plaintiff were/are based upon [RSR]'s (and her co-conspirators') extreme-racial-animus and homophobic-animus against the plaintiff. Despite of the fact that the plaintiff, due to the plaintiff's minority-of-one racial-profile, is overwhelmingly outnumbered in this subdivision - the situation would have at least showed some minute semblance of fairness if all of the residents were truly-informed about all of the issues raised by this lawsuit, in other words, if all of the residents were not being fed, by [RSR], this massively-fraudulent, one-sided, racist narrative regarding the plaintiff. [RSR] knowingly engaging in fraud against the plaintiff is also demonstrated by the confidentiality notice that she adds to one of her publicly visible messages on a public forum visible to all of the residents (including the plaintiff) of the subdivision; in other words, [RSR] wants to communicate in secret within a public setting in a public forum and [RSR] clearly does not want her racist/fraudulent/defamatory/discriminatory/retaliatory/predatory ( ⊕ ) statements made in public against the plaintiff to be used against her, as

is being done in this lawsuit. Both [RSR]'s racist/fraudulent/defamatory/discriminatory/retaliatory/predatory statements against the plaintiff and her confidentiality notice also demonstrate that [RSR] has little-to-no understanding of privacy law (such as the *"third party doctrine"*), in particular, and little-to-no basic understanding of law, in general. [RSR] even references the {2012}/{2013} Texas law that adds new prohibitions/restrictions to what [HOA]s can do regarding homeowners' rights on several key environmental issues, but in referencing such law, [RSR] demonstrates either a total lack-of-understanding of such law or that she is maliciously mis-interpreting such law or that she actually has not even read such law to begin with. But despite of [RSR] demonstrating her lack of understanding of law, both the [HOA] (especially under [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH]) and [WCLE] showed great deference to [RSR], for more than a decade, and both of these institutions-of-power treated [RSR] as if [RSR] was a superior person of superior intelligence, of superior legal-authority and of superior legal-wisdom, while treating the plaintiff in the most abusive, oppressive, derogatory, disrespectful and institutionally-racist manner. It is indisputable, that [RSR]'s racist, fraudulent messages against the plaintiff is very-similar-to - in fact, almost identical to - the overtly-racist messages posted by White-Supremacists/White-Nationalists in, for example, the [SBPDL] blog (see section below for examples). Every aspect of [RSR]'s (and her co-conspirators') actions against the plaintiff from the early month of {2009-08} to this particular incident and subsequent incidents, demonstrate not only her (and her co-conspirators') extreme manipulativeness against the plaintiff, but also that [RSR], acting as an extremely-manipulative con-artist against the plaintiff, had mastered her skills/techniques of not only privately gaslighting the plaintiff, but also defrauding the plaintiff over the course of over 10 years. [RSR]'s publicly-displayed extreme-racial-animus against the plaintiff as-well-as [RSR]'s (and her co-conspirators') clear scheme to defraud the plaintiff is so highly controversial, incriminating and damaging, that both [f-HOA-BoD][SPOA-VP-AH] and [f-HOA-BoD][MP] try to shut down the thread, stating that they cannot discuss private details of any homeowner on a public forum, but as far as the plaintiff, who is the pure-victim of all of this fraud, is concerned, the irreparable and irreversible damage to the plaintiff has already been done at this point, and the total mass of ship representing such racketeering-enterprise against the plaintiff is already in full-motion and full-momentum against the plaintiff, further leading to the inevitability of the plaintiff's lawsuit against the defendants. Although the plaintiff only became aware of these messages well-after these messages were written, as soon as the plaintiff read these messages, the plaintiff was indignant and continues to be indignant that the plaintiff was publicly humiliated, defamed ( ⊙ ) and privacy-invaded by this racist, fraudulent narrative in this public-setting by [RSR], [f-HOA-BoD][SPOA-VP-AH] and soon-to-be [f-HOA-BoD][DMP] - with these actions of [RSR] (and her co-conspirators) being one small, but significant, part of the defendants' conspiracy and scheme to defraud the plaintiff out of the plaintiff's right to private-property-ownership within one-or-more White neighborhood(s) - and thus defraud the plaintiff out of all of the associated necessities, protections, facilities, benefits and profits of such private-property-ownership. [RSR]'s (and her co-conspirators') racist, fraudulent narrative against the plaintiff documented in this and other social-media postings would also serve as a fraudulent justification for the then [HOA]'s (run by abusive/oppressive, corrupt, dictatorial [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH] and soon-to-be co-conspirator [f-HOA-BoD][DMP]) outrageously unjust lawsuit against the plaintiff in the following year {2017} - see below ( ⊕ ) . Both during and after the resolution and/or disposal of such outrageously unjust lawsuit (see below), the defendants would then fully exploit that even-more-powerless (or at least even-more-vulnerable) position of the plaintiff to significantly step-up their pattern of racketeering-activity against the plaintiff, conducted as part of their decade-long, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff ( ⚖ ) . As the next day's incident would reveal (see below), the then [HOA] (under predatory [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH]) - pressured/blackmailed by the predatory demands of [RSR] and the plaintiff's other predatory neighbors ([JSP&KAP],[DMP]) - order landscaping contractors to execute a force-mow of the vegetation on the plaintiff's property, which the plaintiff promptly rushed outside the [HOUSE] to deny and stop (see below). It is indisputable, that by posting this particular set of messages and responses - especially when viewed in totality of all of [RSR]'s (and her co-conspirators') criminally-abusive actions against the plaintiff - [RSR] committed yet another

count (of over a dozen counts) of the crimes of harassment/stalking against the plaintiff, and additionally, one-or-more count(s) of the racketeering-act of wire-fraud against the plaintiff - with both of these crimes also being retaliatory crimes against the plaintiff - that is, such crimes were committed in retaliation for the plaintiff's *"audacity"* to report [RSR]'s prior racially-motivated hate-crimes against the plaintiff to [WCLE] and/or the [HOA]. When looking at all the plaintiff's evidence against the defendants in its totality, it is indisputable that, by posting this social-media-posting, [RSR] engaged in intimidation/interference, wire-fraud, witness-tampering and online harassment/stalking against the plaintiff:



(·) Thank   3 Thanks

Toni Peimann, Leander/Liberty Hill/GT · 10 Oct 16
Becky is it a question that a board member has to answer or could possible
Candace, our community manager, help?  Her email is
cdavison@spectrumam.com. Also, as Jamie said, Bernie, Alicia and James
can all be messaged here. :)

(·) Thank

Becky Robertson, Summerlyn Leander · 10 Oct 16
Thank you, Bernie
So at this meeting may we bring up concerns?

Becky Robertson, RN,OCN | Oncology Nurse Information Specialist

American Cancer Society, Inc.

11701 Stonehollow Dr

Austin, TX 78758

Phone: 512.997.3605

cancer.org<http://www.cancer.org> | 1.800.227.2345

[http://irimages.cancer.org/images/facebook.jpg]<http://www.facebook.com
/americancancersociety?societysignature=facebook>
[http://irimages.cancer.org/images/twitter.jpg] <http://www.twitter.com
/americancancer?societysignature=twitter> [http://irimages.cancer.org/images
/youtube.jpg] <http://www.youtube.com
/user/AmerCancerSociety?societysignature=youtube>
[http://irimages.cancer.org/images/linkedin.jpg] <http://www.linkedin.com
/company/american-cancer-society?societysignature=linkedin>

[http://irimages.cancer.org/images/ACS_email_logo_88x50.png][http://irimages.cancer.org/images
/ACS_email_BBB_logo_28x50.png] <http://charityreports.bbb.org/public
/seal.aspx?ID=1413312005>

This message (including any attachments) is intended exclusively for the
individual to whom it is addressed and may contain proprietary, protected, or
confidential information. If you are not the named addressee, you are not
authorized to read, print, copy, or disseminate this message or any part of it. If
you have received this message in error, please notify the sender immediately.

(·) Thank

Becky Robertson, Summerlyn Leander · 10 Oct 16
Yes, I would like to know when the board will do something about the house on
Kingfisher?

Becky Robertson, RN,OCN | Oncology Nurse Information Specialist

American Cancer Society, Inc.

11701 Stonehollow Dr

Austin, TX 78758

Phone: 512.997.3605

cancer.org<http://www.cancer.org> | 1.800.227.2345

[http://irimages.cancer.org/images/facebook.jpg]<http://www.facebook.com
/americancancersociety?societysignature=facebook>
[http://irimages.cancer.org/images/twitter.jpg] <http://www.twitter.com
/americancancer?societysignature=twitter> [http://irimages.cancer.org/images
/youtube.jpg] <http://www.youtube.com
/user/AmerCancerSociety?societysignature=youtube>
[http://irimages.cancer.org/images/linkedin.jpg] <http://www.linkedin.com
/company/american-cancer-society?societysignature=linkedin>

[http://irimages.cancer.org/images/ACS_email_logo_88x50.png][http://irimages.cancer.org/images
/ACS_email_BBB_logo_28x50.png] <http://charityreports.bbb.org/public
/seal.aspx?ID=1413312005>

This message (including any attachments) is intended exclusively for the
individual to whom it is addressed and may contain proprietary, protected, or
confidential information. If you are not the named addressee, you are not
authorized to read, print, copy, or disseminate this message or any part of it. If
you have received this message in error, please notify the sender immediately.

(·) Thank   1 Thank

Bernie Cottle, Summerlyn Leander · 11 Oct 16
Yes.  Resident's concerns may voice those at the annual meeting  Contact
Spectrum and get your name and concern on the agenda.  There will be some
time limits on presentations to control the length of the meeting

(·) Thank   1 Thank

Alicia Hynum, Summerlyn Leander · 11 Oct 16
I encourage any and all homeowners with concerns to contact Spectrum and
voice your concerns. Please don't feel like you have to wait for a board
meeting. I will also add that because of privacy and legal rights we can't always
discuss everything that is being done. I know it is frustrating. I know you all are
tired of it. I know you want answers and results. I'm sorry that other
homeowners aren't always good neighbors

(·) Thank   3 Thanks

Becky Robertson, Summerlyn Leander · 11 Oct 16

these particular unidentified witness(s), and any other witness(s) that [RSR] is referring to in her numerous venomous rants against the plaintiff. In her lengthy, venomous rant against the plaintiff, [RSR] - knowing that the plaintiff is video-recording her predatory-and-abusive actions against the plaintiff - inserts numerous fraudulent statements about the plaintiff and/or the plaintiff's brother [PK] - which the plaintiff already has recorded evidence to fully disprove (see incidents from the year {2011} above). For the first time (and also a second time in a subsequent incident - see other incident below), [RSR] admits to blackmailing the plaintiff - using such property-maintenance-laws, of all things - at the plaintiff's [FRONTDOOR] after banging on the plaintiff's [FRONTDOOR]. Specifically, [RSR] admits to repeatedly demanding the [HOA] to kick the plaintiff out of the plaintiff's [HOUSE] - through the process of foreclosure - in her conspiracy and scheme to defraud the plaintiff out of both money and private-property-ownership in what [RSR] has always considered to be *"their"* (exclusive-and-pure) White neighborhood. [RSR] even reveals more incriminating information of her initial co-conspirator, [JJB] - and [JJB]'s racially-motivated and retaliatory (thus felonious) hate-crimes against the plaintiff - about how [JJB] had bragged to [RSR] about such serious crimes committed against the plaintiff - thanks, in large part, to the [WCLE]'s active participation in such corrupt-malicious-and-predatory obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff.

▸  RECORDED RACIST, ABUSIVE, THREATENING RANT FROM [RSR] TO PLAINTIFF(⊢)(~)
▸  [ PRIVATE INFORMATION OMITTED/REDACTED TO PROTECT PRIVACY ]
▸  [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]


〖 PLAINTIFF  IMMEDIATELY  RUNS  TO  THE  FORCE-MOWERS  AND  ORDERS  THEM  TO  STOP  THEIR  ACTIONS  IMMEDIATELY:  〗
〖 [HOA]-FORCE-MOWERS  ARE  LABELED  [HFM-B]  (THE  BOSS  OF  THE  GROUP),  [HFM-1],  [HFM-2],  [HFM-3]:  〗

**PLAINTIFF**          *Sir! Sir - Stop! Stop! Sir - Stop! Stop! Sir - Stop Sir! You can't do that! - that's not - that's not for me, Sir! I told you guys - I was dealing with it! Sorry - sir - I can't compensate - this is the way I had it!*


〖 THE  FORCE-MOWERS,  UPON  HEARING  THE  PLAINTIFF  ORDER  THEM  TO  STOP  THEIR  ACTIONS,  STOP  THEIR  ACTIONS.  〗
〖 [HFM-1]  SHOWS  PLAINTIFF  A  SHEET  OF  PAPER  SHOWING  A  WORK-ORDER  FROM  [HOA]  TO  FORCE-MOW  [FRONTYARD]:  〗


**[HFM-1]**          *This is your house, no?-*


〖 PLAINTIFF  SEES  PRINTOUT  AND  AGREES  THAT  THE  PAPER  DOCUMENTS  THE  PLAINTIFF'S  PROPERTY  [788KLLTX78641]:  〗


**PLAINTIFF**          *Yes - That's true - Yes, that's true. I can't...*


**[HFM-2]**          *〘SPEAKS IN SPANISH TO OTHER CREW MEMBERS〙*


〖 PLAINTIFF  TRIES  TO  EXPLAIN  TO  THE  FORCE-MOWERS  THAT  PLAINTIFF  IS  IN  A  CONTRACTUAL-DISPUTE  WITH  [HOA]:  〗
〖 PLAINTIFF  TRIES  TO  EXPLAIN  THAT  FORCE-MOWERS  CANNOT  CONTINUE  UNTIL/UNLESS  DISPUTE  IS  LEGALLY  RESOLVED:  〗


**PLAINTIFF**          *I explained to them. Right? Who - Who's your? Who are you representing? Who are you representing? Which company?*


**[HFM-1]**          *The company - this one-*


〖 [HFM-1]  POINTS  TO  HIS  TRUCK'S  LOGO  DEPICTING  HIS  LANDSCAPING  COMPANY:  〗


**PLAINTIFF**          *No, I mean, but you've been contracted by somebody else, right?*



## ¶377

On or about the approximate date and time of {2016-10-11 12:00}, the plaintiff is asleep inside of the [HOUSE]. The plaintiff is awakened by loud noise(s) from gasoline-powered lawn equipment outside of the [HOUSE]. The plaintiff immediately looks into the plaintiff's security-camera-system-monitors and immediately realizes that the noise is from the [HOA]-contracted force-mowers that are starting to trim/edge the [FRONTYARD] grass and/or cut the [FRONTYARD] bushes. The plaintiff immediately grabs the plaintiff's body-worn-camera, starts the recording on such body-worn-camera and immediately rushes outside of [HOUSE] to stop this unauthorized and damaging activity. This was actually the second time that the then [HOA] (under [f-HOA-BoDs][SPOA-P-BC],[SPOA-VP-AH]) had contracted these force-mowers to force-mow the plaintiff's property, the previous incident taking place approximately 4 months earlier during a day in the month of {2016-07}. Again, the plaintiff was compromising the plaintiff's ideals by - as the aforementioned environmental publications suggested - cutting/picking the tallest so-called *"weeds"* in the frontyard without damaging the grass (since the default bermudagrass only grows to a maximum of 12-inches in height in most areas) - approximately twice a month; so, the repeated allegations that the plaintiff was not spending any time/effort tending to the [FRONTYARD] was simply fraudulent. In both incidents, the plaintiff rushed outside the [HOUSE] in-order-to refuse to allow the force-mowers to force-mow the plaintiff's yard, and on both occasions, the plaintiff tried to explain to the these contractors that their actions are not morally-correct, even if they were operating under the legal-cover and/or orders of the [HOA]. During this particular incident, however, [RSR] actually accosts the plaintiff and abusively demands the plaintiff to let the force-mowers mow the grass on [FRONTYARD]. In her lengthy, venomous rant against the plaintiff, [RSR] mentions one-or-more unidentified witness(s) that she has spoken-to about the plaintiff's private-property. If this Court grants the plaintiff the opportunity to litigate this case, the plaintiff would seek to identify, depose and/or cross-examine

**[HFM-1]**          *Well, I don't know. We're sub-contractors.*

**PLAINTIFF**        *Yeah, i know - you're not acting on behalf of yourself, though. Somebody is hiring your company to do this... So, I want to know who's doing that. Like, I just want to make clear - I cannot be compensating you for this - so, you'll have to contact whoever and say - say to them - I contacted to them, that I'm maintaining this. I already told you guys about this before - so, I can be compensated - I mean, I cannot compensate you - that's what I mean to say...*

⟦ [HFM-2] CALLS HIS BOSS ON THE PHONE: ⟧
⟦ PLAINTIFF EXPRESSES DISSATISFACTION THAT THE FORCE-MOWERS DAMAGED PLAINTIFF'S VEGETATION (BOTH GRASS AND BUSHES): ⟧

**PLAINTIFF**        *Sir, that's actually, just to let you know - I mean - that's - I want it that way - That's the kind of landscape that I want. Just to let you know - That's something that I'm trying to do - I don't like it cut like that. That's something that actually - I'm against - You've actually done something that I don't like right there. I'm not personally saying something against you, but like...*

**[HFM-1]**          *It looks better though, no?*

**PLAINTIFF**        *So, you think it's better cut?*

⟦ [HFM-1] NODS YES: ⟧

**PLAINTIFF**        *I like nature. You understand what I'm saying - I like nature. I like things to grow.*

⟦ [HFM-1] NODS YES: ⟧
⟦ [HFM-2] CONTINUES TO TALK IN THE BACKGROUND OVER THE PHONE TO THEIR BOSS ⟧

**PLAINTIFF**        *I don't like things - like all - like you - like you want to try to - I don't know how else to put it - like you wont to try to destroy nature - just to make things look a certain way - I don't like that - you know what I'm saying?*

⟦ [HFM-2] CONTINUES TO TALK IN THE BACKGROUND OVER THE PHONE TO THEIR BOSS ⟧

**PLAINTIFF**        *And also, Texas Law protects what I'm doing right now - it's called "Drought Resistant Landscaping" - that means that like, when it's like - when you have a drought - I don't water my - I dont water this at all - when you have a drought, the only way this survives if it has deep roots, and that means that you need to let this stuff grow, and when you let it grow, the roots grow deeper to search for water - that's the way you have - that's the way you maintain "Drought Resistant Landscape" and, um... like I said, Texas Law protects against that now.*

⟦ [RSR] EMERGES FROM THE HOUSE OF {789KLLTX78641} AND REJOICES TO SEE THE FORCE-MOWERS: ⟧

**[RSR]**            *Woohoo! Finally!!*

**PLAINTIFF**        *Yea, I'm actually upset about that, actually-*

⟦ PLAINTIFF POINTS AT THE BRANCHES OF THE BUSHES THAT THE FORCE-MOWERS CUT AND PLACED ONTO THEIR TRUCK: ⟧

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**    *I mean, I would have really been upset if it was like more than that... I can actually make use of that - I can actually, sort-of, make use that you know - I can actually pick up that stuff and try to see if can compost it - but, if it was more than that, I would have been really ... you know...*

**[HFM-1]**    *You know it doesn't kill the roots, if you cut it, right?*

〚 PLAINTIFF DISAGREES AS PLAINTIFF IS WELL-INFORMED ABOUT THE SCIENCE OF SUCH GRASSES: 〛

**PLAINTIFF**    *Actually, it does - its called root-shoot ratio. It's not - So, it's called - so basically, it decomposes the roots - the roots, when..*

〚 [RSR] RUDELY SHOUTS-AT AND INTERRUPTS THE PLAINTIFF FROM ACROSS THE STREET: 〛

**[RSR]**    *[???] ... THE RULES OF THE NEIGHBORHOOD! THESE ARE THE [HOA] RULES!*

**PLAINTIFF**    *So, actually, it's not... The rules are..*

**[RSR]**    *THAT'S BULLSHIT, SID!*

**PLAINTIFF**    *The rules are in violation of Texas law!*

**[RSR]**    *MOVE TO THE COUNTRY!! CARE ABOUT [???] - LET EM MOW YOUR GRASS! LET EM MOW YOUR GRASS!*

**PLAINTIFF**    *Why are you?! ... Why don't you?! .... The Texas law now protects homeowners.*

**[RSR]**    *LET EM MOW YOUR GRASS! BE RESPECTFUL TO THE ENTIRE NEIGHBORHOOD!*

**PLAINTIFF**    *You're disrespecting me right now!*

**[RSR]**    *NO I'M NOT!*

**PLAINTIFF**    *Yes you are - look at the way you're talking to me!*

**[RSR]**    *[???] YOU'RE [???] DISRESPECTING [???]*

**PLAINTIFF**    *Look at the way you're talking to me!*

| [RSR] | *LET EM MOW YOUR GRASS - YOU ENTERED INTO THE COVENANTS OF THE [HOA]!* |
| --- | --- |

**PLAINTIFF**  *No, the covenants were written in 2005. They were written in 2005. The Texas law was written in 2012. Why don't you accept the... You don't want to accept the facts - that's the reason!*

**[RSR]**  *YOUR SIGNED YOUR CONTRACT WITH THE [HOA]!*

**PLAINTIFF**  *The contract was written in 2005 - I mean, that was drafted in 2005, this was in 2012. 2012 - is "Drought Resistant Landscaping" - protects the homeowner!*

**[RSR]**  *IT'S PART OF THE CONTRACT!*

**PLAINTIFF**  *No, it protects... Why dont' you listen to the facts - you don't want to know the truth. I'm fighting for justice here!*

**[RSR]**  *IT'S NOT JUSTICE!*

**PLAINTIFF**  *It is justice! It's Environmental Justice! It's Property Justice! It's Homeowner's justice! Don't tell me its not about Justice! It's about Justice! I know that - see! That's what you want - you want to show me that you're that kind of person! I don't want to - I'm not that kind of person, Ma'Am! Ok - I want to do what's right for the environment!*

**[RSR]**  *MOW YOUR GRASS!*

**PLAINTIFF**  *No! Ma'Am, I want to do what's right for the environment!*

〖 [RSR] MAKES OUTRAGEOUSLY MISLEADING STATEMENT ABOUT PLAINTIFF'S BROTHER [PK] FOR WHICH SHE HAS NO PROOF: 〗

**[RSR]**  *IT IT JUSTICE THAT YOUR BROTHER CAME OVER AND HARASSED MY SON!*

**PLAINTIFF**  *What are you talking about! Is it justice that you came over here!-*

〖 PLAINTIFF POINTS TO PLAINTIFF'S [FRONTDOOR]: 〗
〖 PLAINTIFF TRIES TO CORRECT RECORD BY STATING THAT [RSR] ACCOSTED PLAINTIFF WHILE ON PLAINTIFF'S PROPERTY: 〗

**[RSR]**  *YOUR BROTHER ACCUSED ME OF THROWING KITTY-LITTER IN YOUR YARD!*

**PLAINTIFF**  *Actually, I still don't know that's not you - how do I know that's not you!*

**[RSR]**          *BECAUSE IT WAS HER!*

〖 [RSR] POINTS TO PROPERTY FORMERLY OWNED BY [JJB]. 〗

**PLAINTIFF**      *You're just saying that! I can't...*

**[RSR]**          *BECAUSE SHE EVEN ADMITTED TO ME THAT SHE DID IT - SHE BRAGGED ABOUT IT! WHY WOULD I CARRY MY CAT-LITTER - COME ALL THE WAY, ACROSS THE STREET - WHEN I CAN THROW IT IN MY GARBAGE CAN!*

**PLAINTIFF**      *I don't know... ok, that's - I don't have any...*

**[RSR]**          *FOR MY SELF [???]*

**PLAINTIFF**      *what i'm saying is.. what i'm saying is.. I don't have any proof...*

〖 [HOA]-FORCE-MOWERS START-UP THEIR TRUCK TO LEAVE THE PROPERTY. 〗
〖 [RSR] ALSO DEROGATORILY REFERS TO PLAINTIFF AS "KID": 〗

**[RSR]**          *I'M TELLING YOU, KID! IF YOU WANT TO BELONG TO THIS NEIGHBORHOOD, THE COVENANTS ARE WHAT THEY ARE - LET EM MOW YOUR GRASS!*

**PLAINTIFF**      *Actually... No, actually, the covenants say - the covenants were written well before Texas law was modified.*

**[RSR]**          *Let em mow the grass!*

〖 PLAINTIFF KINDLY NOTIFIES [HOA]-FORCE-MOWERS THAT PLAINTIFF CANNOT COMPENSATE THEM FOR ANY UNAUTHORIZED ACTIVITY: 〗

**PLAINTIFF**      *Sir! Hold on - a second. Sir, I appreciate what you're doing, but I got to say - I cannot compensate you for what you did - this is nothing - Basically - I was caught off guard - I was doing my work there. I can't be supervising this at all times - So, let me just make it clear - that I cannot compensate you for the work you did here. Do you understand what I'm saying - It would not be right for me - I would not be - Um... I wish I could, but like, that would be like setting a bad example, to - as far as the [HOA] is concerned. SO, isn't it the [HOA] that hired your company to do this?*

**[HFM-1]**        *This - we don't know.*

**PLAINTIFF**      *Ok - You don't know... Ok so, you're just doing it on behalf of your company, yeah. So, let your bosses know that I appreciate what you guys - your business or whatever - and that you ought to be paid for what you do - but I can't be compensating you for any of this - you didn't do much anyways - right, it was like 2 minutes. appreciate that - thank you. Ok, can I see your paperwork again - sorry about that, man..*

〖 PLAINTIFF ASKS IF PLAINTIFF CAN SEE THE PAPERWORK AS IT IS INCRIMINATING INFORMATION AGAINST THE [HOA]. 〗

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                    1696907690

**[HFM-1]**      no, i'm sorry.

**PLAINTIFF**    I just want to see it really quick - for my own records - you know what I mean?

**[HFM-1]**      no, i'm sorry.

**PLAINTIFF**    I just want to see your paperwork man! come-on - sir... sir.. come-on...

**[HFM-1]**      [???]

**PLAINTIFF**    I'm just asking to see your paperwork - that's all I'm asking.

**[HFM-1]**      I got to go, please.

〚 PLAINTIFF REASSURES CREW THAT PLAINTIFF'S LEGAL DISPUTE IS WITH THE [HOA], NOT WITH ANY CONTRACTOR THAT THE [HOA] HIRES: 〛

**PLAINTIFF**    I know you got to go... Let me just see your paperwork... See, you came over here... You started my work on this [property]. I'm not trying to sue - I'm not trying to sue you or anything - you understand what i'm saying... I'm not trying to sue you... you're not... come on...

〚 [HFM-1] TALKS ON PHONE TO HIS BOSS: 〛

**PLAINTIFF**    Sir, I just want to see your paperwork - that's all i'm saying.. You understand? ... That's all I'm trying to do-

〚 PLAINTIFF SIGHS IN FRUSTRATION. 〛
〚 [HFM-1] GETS OUT OF TRUCK AND HANDS PLAINTIFF HIS PHONE FOR PLAINTIFF TO SPEAK TO HIS BOSS [HFM-B]: 〛

**PLAINTIFF**    Oh, ak, let me see. Oh, it's your boss?

**[HFM-1]**      Yeah.

**PLAINTIFF**    Is he on speaker? A hello? - Hey, how do I put it on speaker?

**[HFM-B]**      Hello?

**PLAINTIFF**    Yeah, whom I'm speaking with?

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    1696907690

**[HFM-B]**     *Good Morning. I'm [???] with ******* ***** *********** ********... how you doing sir?*

**PLAINTIFF**   *yeah, how's it going. I'm just letting your guys know ... I was just letting your people know over here... That i appreciate your business, and the fact that...*

*that you're like... you're trying to make... run a business here... but like, I can't be compensating you for any ... first of all, they only did like [a minute]...*

*they started the work, and started the work like 30 seconds or so, and uh... I just want to let you know, that I can't be compensating you for anything that*

*you did here... because I made it clear to you the last time you guys came here... I believe it was the same guys ... um, that, i'm maintaining my yard - the*

*way I - in compliance with Texas law - um, protects my rights now... So, I can't explain the details to you - I explained it to the [HOA]. Um, apparently*

*they don't want to... I think the [HOA] is the one that is contracting you guys out right?*

**[HFM-B]**     *yes, I work for the [HOA]. They just send us over there and get us back there - That's all we do. We just show up at the house that they want to be cut-*

**PLAINTIFF**   *right right.*

**[HFM-B]**     *But if there is any issue - as far as you standing in front of my guys truck - and not letting me guys leave - that is not ok - let them [go]. We are not gonna*

*do - any more work at your property - you are not responsible for paying us - The part that we that - Just please... We do not want any issue.*

〖 [RSR] USES CAMERA-PHONE TO RECORD PLAINTIFF, NARRATING IN INTIMIDATING MANNER THAT PLAINTIFF REFUSED FORCE-MOWERS: 〗

**[RSR]**       *HE REFUSED TO LET THEM MOW...*

**PLAINTIFF**   *right, right - i know - i understand that. so, basically , we're not trying to create issues here. the issue that the [HOA] is not respecting Texas law. That's*

*the issue.*

**[HFM-B]**     *and if they're not.. then, you have to explain to this to your [HOA]. It's not my [HOA] - we just do work for them.*

**PLAINTIFF**   *Yeah, yeah, I know... I completely understand that. I completely understand that. It's not your fault - i'm just trying to explain that the [HOA] is at fault*

*here - so, it's not you.*

**[HFM-B]**     *what's happening is that - whats it is - its affecting us is that is that you're standing in front of my truck... and not letting my guys leave your property.*

〖 PLAINTIFF EXPLAINS THAT HIS EMPLOYEES MADE UNAUTHORIZED ENTRY,MODIFICATIONS TO PLAINTIFF'S PROPERTY: 〗

**PLAINTIFF**   *right, but, exactly, and it is my property - So, I have every right to protect my property. and my property..*

〖 [HFM-B] MISUNDERSTANDS THE PLAINTIFF'S WORDS: 〗

**[HFM-B]**     *The road - the road is not your property.*

**PLAINTIFF**

SIDDHARTH  KODE   V.   WILLIAMSON  COUNTY , ET  AL.                    1696907699

*oh - Yeah, Yeah, Yeah, Yeah, Yeah.. Oh, you're-*

**[HFM-B]**  *Now, if my guys are in your yard - then that's fine - kick them off your yard. But you cannot stand in front of my truck, and not let them leave, when they're...*

〖 [RSR] CONTINUES INTIMIDATING NARRATION INTO HER VIDEO-RECORDING, EVEN MAKING FRAUDULENT STATEMENTS: 〗

**[RSR]**  *HE BURIES HIS TRASH IN HIS YARD!*

**PLAINTIFF**  *Sure, sure sure - i understand... I was only asking them for the paperwork, the just wanted to see the paperwork. Again, this is not - we're not trying to sue you guys, or anything. I just want to see some - I just want to see the documentation - so, that if something does get to court or something - I can present that as evidence. It's not going to be used against you - that's what I'm trying to make clear to you.*

**[HFM-B]**  *I know, we're just subcontracting for the [HOA]... so, if there's anything that's done at your house - so, if there's anything that we do - we just mow it for contracting for the [HOA] - you need to go through your [HOA]. so, you have to stand in front of their car - so you have to call them and talk to them about it - we're just doing them about it. We're just doing our job to [???]*

**PLAINTIFF**  *Sure, sure sure, i understand.*

**[HFM-B]**  *If you don't want us to come back to your house - we called them just now and I talked to them and let them know "you were there... you're not wanting us to cut your yard... " and they said "We just pack up and leave... We'll take care of it. We don't want any issues."*

**PLAINTIFF**  *right. right. right.*

**[HFM-B]**  *So, I said - "We're packing up and leaving... My guys called me and said you're standing in front of my truck and not letting my guys leave.. that's why i'm talking to you right now."*

**PLAINTIFF**  *see- the only thing i'm asking for - the guy showed me the - you know - paperwork*

**[HFM-B]**  *Work order - it's basically a work order.*

**PLAINTIFF**  *The work order - I just wanted to take a photograph of that work order. That's the only thing I'm asking for...*

**[HFM-B]**  *No, but you're not need a copy of my work order - now, if you want a copy from your [HOA] saying - they sent us over there to cut your [yard]... You need to talk to your [HOA] for a work order from them... You don't need any work order from us.*

SIDDHARTH KODE  V.  WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**       *Alright, Ok...*


**[HFM-B]**         *So, you understand what i'm saying?*


**PLAINTIFF**       *Yeah, I see what you're ...*


**[HFM-B]**         *they already contacted us, so .. please look to them for any other information.*


**PLAINTIFF**       *ok, i see what you're saying...*


**[HFM-B]**         *Thank you sir, Appreciate it.*


**PLAINTIFF**       *Ok, alright...*


**[HFM-B]**         *Bye.*


**PLAINTIFF**       *Bye.*

〚 PHONECALL ENDS AND PLAINTIFF RETURNS PHONE TO [HFM-1]. 〛
〚 PLAINTIFF MAKES FINAL WORDS TO THE [HOA]-FORCE-MOWERS IN TRUCK: 〛

**PLAINTIFF**       *Alright - Ok, that sounds good then - I'll just go through them.*

〚 PLAINTIFF TRIES TO APPEASE [RSR] WHO CONTINUES TO CREATE HOSTILITY/INTIMIDATION TOWARDS PLAINTIFF: 〛

**PLAINTIFF**       *Ma'Am - I dont want to cause - I just want to let you know, I dont want to cause any any problems with you. But you're trying to be against me!*


**[RSR]**           *NO! I AM AGAINST YOU! AND HERE IS WHY! HERE IS WHY! YOU BURY YOUR TRASH IN THE BACKYARD!-*


**PLAINTIFF**       *I dont bury my trash!! That's a myth!*

〚 [RSR] SEEMS INCAPABLE OF UNDERSTANDING THAT PEOPLE CAN LIVE ZERO-WASTE LIFESTYLES: 〛

**[RSR]**           *Where's your trash?!*


**PLAINTIFF**       *I don't generate trash - I only eat food. See, I'm an environmentalist. Ok, i don't...*

**PLAINTIFF**        *ok.*

**[RSR]**        *I HAVE GOTTEN A LETTER ABOUT MY YARD WHEN I HAD WEEDS - WHEN MY FINGER GOT CUT OFF - I COULDN'T MOW MY GRASS..*
*BUT GUESS WHAT! I HAD TO PAY SOMEONE TO CUT MY GRASS - AND THAT'S NOT DISCRIMINATION!*

**PLAINTIFF**        *no, no, no, no, no - you see...*

〚 [RSR] REPEATEDLY, RUDELY INTERRUPTS PLAINTIFF EXERTING HER ILLEGITIMATE AUTHORITY/SENSE-OF-SUPERIORITY OVER PLAINTIFF: 〛

**[RSR]**        *YOU WILL ALSO GET SOMETHING... AND HERE'S THE THING! I'M NOT DONE TALKING!*

**PLAINTIFF**        *Ok, then you're going to let me speak after that...*

〚 [RSR] FRAUDULENTLY PROMISES PLAINTIFF THAT SHE WILL LET PLAINTIFF PROVIDE A FULL-RESPONSE: 〛

**[RSR]**        *YES I WILL!*

**PLAINTIFF**        *ok.*

**[RSR]**        *WHEN YOU BOUGHT INTO THIS NEIGHBORHOOD!*

**PLAINTIFF**        *Right.*

**[RSR]**        *YOU AGREED TO THE [COVENANTS] OF THE [HOA]!*

**PLAINTIFF**        *and I'm trying to explain...*

**[RSR]**        *AND THE [HOA] STATES, THAT YOU'RE TO KEEP YOUR YARD IN GOOD APPEARANCE!*

**PLAINTIFF**        *I am...*

〚 [RSR] FRAUDULENTLY CLAIMS TO FOLLOW ALL RESTRICTIVE-COVENANTS WHEN PLAINTIFF HAS SUBSTANTIAL PROOF TO PROVE OTHERWISE: 〛

**[RSR]**        *IF YOU DON'T LIKE THOSE RULES, AND TRUST ME - THERE'S A LOT OF THEIR RULES, I DON'T LIKE EITHER - BUT YOU KNOW WHAT,*
*MY CHOICE IS TO EITHER ABIDE BY THOSE RULES...*

**[RSR]**  *OH - OK, SEE, HERE'S THE THING - LOOK AT HIS YARD, LOOK AT HIS YARD, AND LOOK ALL THESE OTHER YARDS! WHEN WE BOUGHT A HOUSE IN A [HOA] COMMUNITY - WE ABIDE BY...*

**PLAINTIFF**  *I do not...*

〖 [RSR] REPEATEDLY, RUDELY INTERRUPTS PLAINTIFF EXERTING HER ILLEGITIMATE AUTHORITY/SENSE-OF-SUPERIORITY OVER PLAINTIFF: 〗
〖 [RSR] FRAUDULENTLY CLAIMS THAT PLAINTIFF BREAKS RULES WHEN PLAINTIFF IS IN LEGITIMATE LEGAL DISPUTE WITH [HOA]: 〗
〖 [RSR] FRAUDULENTLY CLAIMS THAT PLAINTIFF IS THE ONLY RULE-BREAKER WHICH PLAINTIFF HAS SUBSTANTIAL PROOF TO DISPROVE: 〗

**[RSR]**  *YOU'RE GOING TO LET ME FINISH! WE ABIDE BY THE RULES!*

**PLAINTIFF**  *you're going to let me finish after that as well!*

**[RSR]**  *WE ABIDE THOSE RULES!*

**PLAINTIFF**  *the rules were written in 2005!*

**[RSR]**  *THE RULES CALL FOR YOU TO CUT YOUR GRASS, AND YOU KEEP YOUR HOUSE IN GOOD APPEARANCE! BELIEVE IT OR NOT... I HAVε HEARD THAT YOU CRY DISCRIMINATION!*

**PLAINTIFF**  *it is - it is - it actually is both!*

**[RSR]**  *NO - LET ME JUST TELL YOU! I GOT ..*

〖 [RSR] WAS STEPPING DANGEROUSLY CLOSE TO CRIMINALLY-TRESPASSING ON PLAINTIFF'S PROPERTY: 〗
〖 SO, PLAINTIFF KINDLY WARNS HER TO AVOID THAT UNPLEASANT SCENARIO: 〗

**PLAINTIFF**  *ma'am - let's just move away from my ...*

**[RSR]**  *NO, ACTUALLY THIS ISN'T YOUR PROPERTY! AND NEITHER IS THIS-*

〖 [RSR] POINTS AT CURBSIDE-GRASS-AREA: 〗
〖 PLAINTIFF JUST WARNS [RSR] THAT SHE IS TOO CLOSE TO CRIMINALLY-TRESPASSING: 〗

**PLAINTIFF**  *i understand that - let's just be on the safe side.*

**[RSR]**  *BUT HERE IS THE THING!*

**PLAINTIFF**   *right.*

**[RSR]**   *OR TO MOVE... I DON'T GET EXTRA RIGHTS BECAUSE I DISAGREE WITH WHAT THEY SAY.... NOW, YOU DISAGREE WITH THEM... AND THAT'S FINE. YOU CAN DISAGREE WITH THEM... BUT YOUR CHOICES ARE TO EITHER GO BY THE RULES AND THE LAWS, WHICH ARE TAKEN INTO ACCOUNT...*

**PLAINTIFF**   *the laws..*

**[RSR]**   *AND/OR YOU LEAVE... BUT YOU ARE INFRINGING ON THEIR RIGHTS. ON THEIR...*

**PLAINTIFF**   *I'm not infringing on anybody's rights!*

〖 [RSR] PARROTS THE SAME RACIST, FRAUDULENT NARRATIVE CONCERNING LAWNS AND PROPERTY-VALUES: 〗

**[RSR]**   *YES - BECAUSE YOU'RE DECREASING THE PROPERTY VALUES-*

**PLAINTIFF**   *no actually, first of all - first of all - i don't believe - I don't accept that! i don't accept that it does!*

**[RSR]**   *WHEN I SELL MY HOUSE...*

**PLAINTIFF**   *right.*

**[RSR]**   *AND THEY WALK BY - AND THEY SAY "WE'RE NOT BUYING THIS HOUSE..."!*

**PLAINTIFF**   *that's because of outdated - outdated - property - you have an outdated view of property values. That's not my fault... ok..*

**[RSR]**   *IF I CAN'T SELL MY HOUSE...!*

**PLAINTIFF**   *so, we're living ...*

**[RSR]**   *WHICH GOES LIKE - EVERY HOUSE IN THIS MARKET - HAS GONE LIKE THAT!*

**PLAINTIFF**   *ok, we're living in a new world.*

[RSR]        *IF MY HOUSE DOES NOT SELL... AND THIS PROPERTY...*

PLAINTIFF    *You're going to let me finish after this.*

〖 [RSR] FRAUDULENTLY PRETENDS AS IF PLAINTIFF IS INTERRUPTING WHEN SHE NEVER ALLOWS PLAINTIFF TO RESPOND-IN-FULL: 〗

[RSR]        *YOU HAVEN'T STOPPED!*

PLAINTIFF    *ok, go ahead.*

[RSR]        *AND YOU - ARE DEVALUING MY PROPERTY!*

PLAINTIFF    *that's not - i'm not doing that! ok, I...*

〖 [RSR] CONTINUES FRAUDULENT NARRATIVE IGNORING HER INITIAL BLACKMAIL THREATS WHILE TRESPASSING ON PLAINTIFF IN {2010}: 〗

[RSR]        *AND ALSO! I HAVE AN ISSUE WITH YOUR - YOUR BROTHER COMING OVER AND THREATENING!-*

PLAINTIFF    *no, no - let's deal with that!..*

〖 [RSR] MAKES OUTRAGEOUSLY FRAUDULENT STATEMENT ABOUT THE PLAINTIFF'S BROTHER [PK]. 〗
〖 IT WAS [RSR] THAT MADE A FALSE-REPORT ABOUT THE PLAINTIFF TO THE POLICE: 〗

[RSR]        *HE CALLED THE POLICE ON ME! AND HERE'S THE THING!... AND I'M NOT GOING TO LIE TO YOU!*

PLAINTIFF    *Why did you come over here!-*

〖 PLAINTIFF POINTS AT PLAINTIFF'S FRONT DOOR. 〗

PLAINTIFF    *why did you come over my - Dont you see that you're the one [who started this]!-*

〖 [RSR] ACTUALLY HAD BANGED, NOT KNOCKED, ON THE PLAINTIFF'S DOOR IN THE {2010-06-05} INCIDENT: 〗

[RSR]        *I KNOCKED ON YOUR DOOR!*

PLAINTIFF    *and you - yeah, yelled at me!*

〖 [RSR] FRAUDULENTLY DOWNPLAYS THE FACT THAT SHE HUMILIATED PLAINTIFF IN THE {2010,2011} INCIDENTS: 〗
〖 [RSR] HAD SHOUTED AT THE PLAINTIFF SO THAT PEOPLE MANY HOUSES DOWN COULD HEAR HER ABUSIVE RHETORIC: 〗

**[RSR]**       *I talked to you...*

**PLAINTIFF**   *and you threatened to get me kicked out of this house! do you not remember that!*

**[RSR]**       *UM NO, I TOLD YOU I WOULD CALL THE [HOA] AND THE [HOA] WOULD TAKE CARE OF IT!*

**PLAINTIFF**   *Ah! - You said - "I'M GOING TO GET YOU KICKED OUT THIS HOUSE!" That's what you said!*

〖 [RSR] CONTINUES HER FRAUDULENT NARRATIVE, MAKING ONE FRAUDULENT STATEMENT AFTER ANOTHER: 〗

**[RSR]**       *your brother said that.*

**PLAINTIFF**   *no! actually, you said that! - dont lie! - you were over here. you said that - you said.*

**[RSR]**       *WELL, NUMBER ONE - I'M NOT GOING TO LIE, BECAUSE THERE'S NO PURPOSE TO IT!*

**PLAINTIFF**   *you're the one that said that! you said you'd get me kicked out of this house! That's what...*

〖 [RSR] FINALLY ADMITS THAT SHE DID MAKE OUTRAGEOUS BLACKMAIL THREAT TO KICK PLAINTIFF OUT OF [HOUSE]: 〗

**[RSR]**       ***I WILL GET YOU OUT OF THIS NEIGHBORHOOD BY VIOLATING THE [HOA] LAWS** - IF I HAVE TO! BECAUSE THAT IS MY RIGHT, BUT HERE'S THE THING: I NEVER WOULD RACE ACROSS THE STREET AND DUMP KITTY-LITTER INTO YOUR YARD!-*

**PLAINTIFF**   *Ok - no, You're saying that! I dont' have any evidence that shows - that you didn't...*

〖 [RSR] ADMITS TO AN ILLEGAL CONSPIRACY AGAINST PLAINTIFF INCLUDING [RSR],[JH&SH],[JJB]: 〗
〖 [RSR] FRAUDULENTLY PRETENDS AS IF [JJB] WAS ONLY PERSON WHO ACTED MALICIOUSLY AGAINST PLAINTIFF: 〗

**[RSR]**       *I HAVE EVIDENCE! S*** AND I SAT THERE, WHILE THAT DRUNK WOMAN OVER HERE LAUGHED ABOUT - NUMBER ONE - LAUGHED ABOUT - THROWING LITTER IN YOUR BACKYARD!*

**PLAINTIFF**   *what you're saying...*

〖 [RSR] EXPLAINS HOW THIS CONSPIRACY, INCLUDING HERSELF, JUSTIFIED VANDALIZING PLAINTIFF'S PROPERTY: 〗
〖 [RSR] ADMITS TO OTHER CRIMES THAT [JJB] HAD COMMITTED AGAINST PLAINTIFF: 〗

**[RSR]**       *BECAUSE IT DOESN'T MATTER ANYWAYS - HE DOESN'T LOOK AT HIS YARD ANYWAYS! AND ALSO, SHE LAUGHED ABOUT, WHEN SHE WOULD COME IN IN THE MIDDLE OF THE NIGHT, AND KNOCK ON YOUR DOOR - THOSE ARE THE THINGS SHE SAID!*

**PLAINTIFF**       *ok, i understand that -*

⟦ [RSR] STARTS TO WALK AWAY FROM PLAINTIFF WITHOUT ALLOWING PLAINTIFF TO PROVIDE A RESPONSE: ⟧

**PLAINTIFF**       *Ok, let me finish - you're not let me finish. you're not going to let me say it - So, those rules -*

⟦ [RSR] FRAUDULENTLY PRETENDS AS IF PLAINTIFF INTERRUPTED HER, WHEN SHE PREVENTED PLAINTIFF FROM RESPONDING-IN-FULL: ⟧

**[RSR]**       *YOU INTERRUPTED ME! - YOU INTERRUPTED ME ALL THE TIME!*

**PLAINTIFF**       *No, actually, but you didn't let me finish!*

**[RSR]**       *AND YOU CALLED ME A LIAR - AND I'M NOT A LIAR. SO, IF YOU'RE GOING TO CALL ME A LIAR!*

**PLAINTIFF**       *but that you did say that!*

**[RSR]**       *NO - NO - NO - I DON'T WANT TO TALK TO YOU, BECAUSE WHEN YOU CALL ME A LIAR - I'M NOT GOING TO TALK TO YOU!*

⟦ PLAINTIFF' REALIZES THAT [RSR] WOULD NEVER AGREE TO FAIR DEBATE BECAUSE SHE KNOWS SHE IS NOT ON THE SIDE OF JUSTICE: ⟧

**PLAINTIFF**       *oh - ok, see, you don't want to listen to the facts!*

**[RSR]**       *YOU'RE CALLING ME NAMES!*

**PLAINTIFF**       *No - actually, I just said you're lying - I didn't call you a name..*

**[RSR]**       *YOU DID CALL ME A LIAR!*

**PLAINTIFF**       *So, Texas law was written in 2012 - it protects the homeowner's right to maintain a drought-resistant landscaping and solar energy devices - and other protections for the homeowner. The contract that I signed was actually written in 2005 - it was drafted in 2005.. That is outdated! It no longer corresponds to today! My argument is - i'm trying to maintain a drought-resistant...*

⟦ PLAINTIFIF WAS MINIMALLY-MOWING GRASS DURING THE INITIAL YEARS PRIOR TO THE NEW LAW, BUT [RSR] FRAUDULENTLY CLAIMS OTHERWISE: ⟧

**[RSR]**       *WHAT ABOUT 2009 - WHAT ABOUT 2010 - WHAT ABOUT 2011?*

**PLAINTIFF**       *yeah, yeah yeah - ok, well - you can make an argument THEN that - but you cannot make the argument after 2012 when the law took effect.*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                    1696907690

**[RSR]**        *SO, IN OTHER WORDS - YOU DON'T CARE THAT YOUR YARD-*

**PLAINTIFF**    *I was trying to be as environmentally responsible as I could! ...*

**[RSR]**        *HOW IS THIS ENVIRONMENTALLY RESPONSIBLE?!*

**PLAINTIFF**    *obviously! because - I want to maintain a drought-resistant landscape - i dont water - the grass will die out! the grass has died out on his side of the yard - you want to see there!-*

⟦ PLAINTIFF POINTS TO SIDE OF THE YARD - WHERE MOST OF THE GRASS HAS DIED OUT DUE TO REPEATED MOWING WITHOUT WATER: ⟧

**PLAINTIFF**    *That's because I don't use water on my yard! There's the reason for it!*

**[RSR]**        *NO.... MOW YOUR YARD!..*

**PLAINTIFF**    *Because, I don't want to use water - water is a precious resource!*

**[RSR]**        *THEN, MOVE TO THE COUNTRY! BUT SEE, YOU'RE IN A NEIGHBORHOOD!*

**PLAINTIFF**    *yes, so?...*

**[RSR]**        *YOU'RE IN A NEIGHBORHOOD! AND WHEN YOU'RE IN A NEIGHBORHOOD, YOU GO WITH WHAT THE NEIGHBORHOOD SAYS!*

**PLAINTIFF**    *there are many neighborhoods.. there are many neighborhoods... See, if I did what you did! If I did...*

**[RSR]**        *OK, BECAUSE BUT YOU'RE SAYING: "NO, I DON'T CARE ABOUT MY NEIGHBORHOOD - I DON'T CARE ABOUT MY NEIGHBORS - I'M JUST GOING TO DO WHAT I WANT!"*

**PLAINTIFF**    *See, your values are very destructive! - your values are very destructive! - and they destroy...*

**[RSR]**        *NO, MY VALUES ARE NOT DESTRUCTIVE!*

**PLAINTIFF**    *I'm not singling you out! - i'm talking about your collective - your collective values...*

**[RSR]**       *SO SAY YOU! - MY VALUES ARE NOT DESTRUCTIVE! MY VALUES ARE THE SAME..*

**PLAINTIFF**       *No - the [HOA]'s values are destructive!*

**[RSR]**       *NO - YOU CAN'T SAY MY VALUES ARE DESTRUCTIVE..*

**PLAINTIFF**       *The [HOA]'s values are destructive! And the things that you're...*

〘 [RSR] ADMITS THAT LAWN-MAINTENANCE HAS ABSOLUTELY NOTHING TO DO WITH PROPERTY-VALUES- 〙
〘 BECAUSE PEOPLE IN NEIGHBORHOODS WITHOUT AN [HOA] ALSO CARE ABOUT THEIR PROPERTY-VALUES: 〙

**[RSR]**       *IF YOU DONT' WANT TO GO WITH A [HOA] - THEN MOVE TO A NEIGHBORHOOD [WITHOUT A [HOA]] -*

**PLAINTIFF**       *But then, things would never change! but then, things would not change! There's got to be somebody from the inside-*

〘 [RSR] CONTINUES TO PRETEND THAT SHE OWNS/CONTROLS THE ENTIRE NEIGHBORHOOD: 〙

**[RSR]**       *THEN MOVE SOMEWHERE ELSE! DON'T RUIN MY NEIGHBORHOOD!*

**PLAINTIFF**       *Oh ok! I'm not trying to ruin!*

〘 [RSR] CONTINUES TO MAKE RACIST STATEMENTS ABOUT PROPERTY-MAINTENANCE: 〙

**[RSR]**       *YOU KNOW - HOW MANY TIMES - SOMEBODY HAS COME OVER AND SAYS - "WHAT THE HECK IS GOING OVER AT THAT HOUSE!"*

**PLAINTIFF**       *oh no! that's not my -*

**[RSR]**       *"I WOULD NEVER BUY THIS HOUSE HERE - BECAUSE LOOK AT THAT! WHAT ARE YOU GOING TO DO ABOUT THAT!"*

**PLAINTIFF**       *its not - it is not my fault that you guys have an outdated - it's not my fault that you guys have an outdated value...*

〘 [RSR] MAKES RACIST INSULT ABOUT PLAINTIFF'S APPEARANCE: 〙

**[RSR]**       *IT IS YOUR FAULT - MOVE TO A NEIGHBORHOOD WITH YOUR RULES AND YOUR UGLINESS!...*

**PLAINTIFF**       *so, you have outdated notion of property values - I'm sorry that you have that..*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**[RSR]**  *AND SINCE 2012, BUT I WILL TELL YOU THAT... [???]*

**PLAINTIFF**  *and even... and first of all - look up root-to-shoot -*

〖 [RSR] FRAUDULENTLY CLAIMS THAT PLAINTIFF HAS ALIENATED HIMSELF, WHEN IT WAS HER,[JSP&KAP]'S RELENTLESSLY-RACIST 〗
〖 PROPAGANDA AGAINST PLAINTIFF THAT HAS ENGENDERED HATRED AGAINST THE PLAINTIFF FROM OTHER RESIDENTS. 〗

**[RSR]**  *AND SID, IT'S SAD! YOU'VE ALIENATED YOURSELF FROM THIS WHOLE NEIGHBORHOOD!*

**PLAINTIFF**  *can you lookup root-to-shoot ratio? because - the root-to-shoot ratio - when you cut grass, its sheds its roots! Do you understand what i'm saying? I'm even compromising - I've even compromising by doing what I'm doing - I dont even have to do that...*

〖 [RSR] REVEALS TO THE PLAINTIFF HOW SHOCKINGLY UNINFORMED SHE IS ABOUT EVEN ELEMENTARY PLANT BIOLOGY: 〗

**[RSR]**  *YOU KNOW, WHAT WITH WHAT THE TRUE THING IS - IS THE FACT THAT YOU'RE ALLOWING YOUR GRASS TO GROW LONG - MEANS, THAT YOUR ROOTS ARE GOING TO BE SHALLOW - BECAUSE THE ROOTS HAVE TO COME UP TO GET THE WATER... WHEREAS, WHEN YOU CUT IT...*

**PLAINTIFF**  *The roots are... That's! That's- That's so wrong! No, that is wrong! No, when you have a plant - when you have a plant - its called "equilibrium" - when you cut it up!*

〖 [RSR] MAKES AN OUTRAGEOUS COMPARISON TO A GOLF-COURSE WHEN GOLF-COURSES ARE WATERED MULTIPLE TIMES PER DAY: 〗

**[RSR]**  *THEN GO TO A GOLF COURSE! GO TO A GOLF COURSE!*

**PLAINTIFF**  *they water the golf course multiple times per day!! that's the point i'm trying to make! they don't...*

〖 [RSR] REALIZES THAT SHE DOES NOT HAVE A VALID ARGUMENT AGAINST PLAINTIFF - SO, SHE CHANGES STRATEGY. 〗
〖 [RSR] FAILS TO REALIZE THAT THE [HOA] HAD A 70% GRASS REQUIREMENT. 〗
〖 [RSR] FAILS TO REALIZE THAT PLAINTIFF ACTUALLY LOVES GRASS - BUT IS ONLY STRONGLY AGAINST ARTIFICIAL CUTTING OF GRASS: 〗

**[RSR]**  *THEN, YOU KNOW WHAT! THEN TAKE ALL YOUR GRASS UP - AND PUT ROCKS, AND DROUGHT-RESISTANT PLANTS. THIS IS NOT A DROUGHT-RESISTANT PLANT!*

**PLAINTIFF**  *Ok, i'm actually - to be honest - to be honest with you, i'm considering that option.*

**[RSR]**  *SID, THIS IS NOT NICE! THIS IS SLOPPY AND THIS IS LAZY! AND WHAT THE HELL IS THAT OVER THERE?!*

〖 [RSR] POINTS TO PLAINTIFF'S USE OF CARDBOARD AS SHEET-MULCHING TO ECOLOGICALLY CLEAR A PATCH OF GRASS: 〗

**PLAINTIFF**  *to be honest, that's "sheet mulching" - that's a technique that I use to clear an area - it's called "Lasagna Gardening"*

⟦ [RSR] FRAUDULENTLY CLAIMS THAT PLAINTIFF'S PROPERTY AESTHETICS VIOLATES OTHERS RIGHTS: ⟧

[RSR]          *I DON'T CARE WHAT YOU WANT TO DO! - I DON'T CARE WHAT YOU WANT TO DO - I WANT YOU TO HAVE THE RIGHT TO DO WHATEVER*
               *YOU WANT TO! - AS LONG AS YOU DON'T VIOLATE THE RIGHTS OF OTHERS!*

PLAINTIFF      *i'm not violating the rights of others!*

[RSR]          *YES YOU ARE! YOU DON'T THINK YOU ARE, BUT YOU ARE!*

PLAINTIFF      *I'm not!*

[RSR]          *IF YOU WANT TO DO A DROUGHT-RESISTANT - THEN YOU NEED TO GO WITHIN THE COVENANTS OF THE [HOA]!*

PLAINTIFF      *yeah, the covenants of the [HOA], first of all, are not even...*

⟦ [RSR] FRAUDULENTLY EQUATES PLAINTIFF'S OPPOSITION TO ENVIRONMENTAL DESTRUCTION/WASTE TO A HOMEOWNERS' AESTHETIC CHOICE OF
⟧
⟦ PAINTING A HOUSE. PAINTING A HOUSE IS A "WANT", IT IS NOT A "NEED"; SAVING THE ENVIRONMENT IS A "NEED", NOT A "WANT". ⟧

[RSR]          *IT'S LIKE.... IF I WANTED TO PAINT MY HOUSE A COLOR... AND THERE'S COLORS I WOULD LOVE TO PAINT WITH..*

PLAINTIFF      *I'm not painting my house! This is completely different!*

[RSR]          *WHAT I'M SAYING IS ... I GO BY WHAT THE [HOA]!*

PLAINTIFF      *But, that's a completely different issue!*

[RSR]          *NO - IT ISN'T!*

PLAINTIFF      *It is! Because - there's a difference.*

[RSR]          *BECAUSE I BOUGHT INTO THIS NEIGHBORHOOD, FOR [HOA] PROTECTION - FOR PEOPLE WHO TAKE CARE OF THEIR YARDS!*

PLAINTIFF      *Let me explain the difference.*

〖 [RSR], LIKE A DICTATOR WITH A RACIAL SUPERIORITY-COMPLEX, CONTINUES TO REJECT DEBATING WITH PLAINTIFF: 〗

[RSR]          *NO, I DON'T NEED YOU TO EXPLAIN THE DIFFERENCE, BECAUSE!*

PLAINTIFF       *There's the huge difference - because that is something you can - is something - a "want" - a desirable - basically - that's a preference.*

[RSR]          *I DON'T LIKE TO HAVE 2 TREES IN MY YARD - I DON'T WANT TO HAVE 2 TREES IN MY YARD - BUT GUESS WHAT, I'M PART OF THE [HOA]!*

PLAINTIFF       *right, whenever - When you paint your house - that's something that ...*

〖 ACTUALLY, HOMEOWNERS ARE ADVISED TO SUBMIT APPROVAL DOCUMENT WHICH IS REVIEWED BY AN [ACC], NOT [HOA]-BOARD: 〗

[RSR]          *I HAVE TO GO BEFORE THE BOARD AND ASK THEM WHAT COLORS-*

PLAINTIFF       *yes - but that is something that is understandable - I can agree with that! But this is something that is protecting the...*

[RSR]          *THAT IS NOT UNDERSTANDABLE!*

PLAINTIFF       *yes, but this is something that's protecting the environment. - that's protecting the environment -*

[RSR]          *THAT'S NOT PROTECTING THE ENVIRONMENT!*

PLAINTIFF       *and also setting an example so that other people can follow in the same footsteps!*

[RSR]          *SO, YOU WOULD LOVE FOR THE REST OF THE NEIGHBORHOOD [TO DO AS YOU DO]?!*

PLAINTIFF       *ABSOLUTELY! ABSOLUTELY! Let me make that clear! YES!*

[RSR]          *THEN, BUY INTO A NEIGHBORHOOD THAT DOES THAT!*

PLAINTIFF       *no, no - so we need to change ...*

〖 [RSR] FRAUDULENTLY PAINTS [JSP&KAP] AS VICTIM, WHEN [JSP&KAP] HAVE COMMITTED SEVERAL SERIOUS CRIMES AGAINST PLAINTIFF: 〗

[RSR]          *WHAT ABOUT HIM? WHAT ABOUT JOEY ?*

PLAINTIFF       *What about them!*

[RSR]           *why are your rights any more [than his]?*

PLAINTIFF       *My rights are for protecting the future generations of earth - to survive on this planet! - I'm sorry that you don't know that Greenland is melting, and it's going to, actually, take out the entire coast-lines around the world - within the next 30 years!-*

〚 [RSR] FAILS TO REALIZE THAT PLANT BIOMASS IS WHAT KEEP THE PLANET COOL THROUGH PHOTOSYNTHESIS: 〛
〚 [RSR] FAILS TO REALIZE THAT PLANT BIOMASS IS WHAT KEEP THE PLANET COOL THROUGH PRESERVING SOIL MOISTURE: 〛

[RSR]           *I REALLY DOUBT THAT MOWING YOUR GRASS.. IS GOING TO MAKE [ANY DIFFERENCE]!* (⌘)

PLAINTIFF       *actually, actually, it is - first of all - everything - the use of water.*

〚 [RSR] FRAUDULENTLY CLAIMS THAT HER MOWED BACKYARD IS A BUTTERFLY/BEE HAVEN: 〛

[RSR]           *I do not use Weed-N-Feed - my backyard is a butterfly and bee haven - for those things.*

PLAINTIFF       *ok - but, you're mowing it though! but you're mowing it - so, there's ways of doing-*

[RSR]           *I'M MOWING IT BUT I'M TAKING THE MULCH FROM THE CLIPPINGS!-*

PLAINTIFF       *most of it blows away in the wind!... most of it blows away in the wind!... and it goes to waste!*

[RSR]           *ONCE IN MY BACKYARD, IT'S THERE... AND LET ALL MY ROSES IN THE BACK - HAVE ALL THE GRASS CLIPPINGS IN THE BACK - THERE IS BEING RESPONSIBLE TO THE ENVIRONMENT AND TO YOUR FELLOW NEIGHBORHOOD AND TO THE LAWS OF THE LAND!*

PLAINTIFF       *actually, you're generating... its a solar - so, basically, its a carbon store - not only that - you're making the planet a cooler place by having more green matter on your yard - and that includes the bushes as well - the more green you have, the more Carbon-dioxide is converted into oxygen - that keeps the air - you know, the atmosphere cooler. We're already facing unprecedented heat - if it goes above - 2-degrees-celsius beyond the level - it's going to melt Greenland!*

[RSR]           *I UNDERSTAND!... I UNDERSTAND!*

PLAINTIFF

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

[RSR]         *BUT YOU'RE IN A NEIGHBORHOOD!*

PLAINTIFF     *they act... they're wildflowers...*

[RSR]         *I'M NOT SAYING YOU CAN'T HAVE YOUR VIEWS - I'M NOT SAYING YOU CAN'T BE ENVIRONMENTALLY-FRIENDLY.*

PLAINTIFF     *see, if everybody thought like you did -*

〚 [RSR] FRAUDULENTLY CLAIMS PLAINTIFF IS IMPOSING PLAINTIFF'S VALUES/BELIEFS ON OTHERS, WHEN THE EXACT OPPOSITE IS TRUE: 〛

[RSR]         *BUT YOU ARE IN A NEIGHBORHOOD! AND IN THAT NEIGHBORHOOD - IF YOU'RE GOING TO DO YOUR YARD LIKE THIS. THEN YOU*
              *SHOULD BE RESPECTFUL OF OTHER PEOPLE WHO CHOOSE NOT TO AGREE WITH YOU - CHOOSE NOT LET YOU GIVE THEM LIFE*
              *LESSONS - CHOOSE TO HAVE THEIR OWN BELIEFS!*

PLAINTIFF     *I have my beliefs-*

[RSR]         *YOU STAND THERE AND TOLD ME MY VALUES ARE WRONG!*

PLAINTIFF     *HOA's values are wrong - well, First of all - I'm not imposing my values on you. They're ... The difference is...*

[RSR]         *THEN GO TO ANOTHER NEIGHBORHOOD!*

PLAINTIFF     *The difference is... I'm not imposing my values on you - you're imposing your values on me!*

[RSR]         *YES YOU ARE! YES YOU ARE-*

PLAINTIFF     *I'm saying that you can follow my example - but i'm not asking - i'm not forcing you to follow my example!-*

[RSR]         *YES, BUT WHEN I PUT MY HOUSE ON THE MARKET - I'VE HAD A REALTOR LOOK - AND SHE SAYS, UNTIL YOU DO SOMETHING WITH*
              *THIS YARD - YOU'RE PROBABLY [WONT] BE ABLE TO SELL YOUR HOUSE FOR WHAT YOU WANT TO!*

PLAINTIFF     *well, I'm - that is not my fault!-*

〚 [RSR] THREATENS TO SUE PLAINTIFF, BUT NEVER DID – BECAUSE SHE NEVER DID HAVE A VALID CLAIM. 〛

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.

1696907690

*Ok! Florida is going to go underwater!*

**[RSR]**     *I UNDERSTAND!*

**PLAINTIFF**     *Florida-*

**[RSR]**     *I'm part of several organizations...*

〚 PLAINTIFF FAILS TO MENTION LAWMOWER EMISSIONS WHICH ARE THE MAIN PROBLEM: 〛

**PLAINTIFF**     *then, why don't you ask them about the destructive impact... if you could look at the long impact on the entire ... you'd be surprised.. lawn-mowers - you know - use up a huge amount of gasoline...*

**[RSR]**     *then, use a push mower.*

**PLAINTIFF**     *even if it does, it doesn't solve the issue of! first of fall, destroying the fertility of the land! - destroying the fact that-*

**[RSR]**     *YOU'RE NOT ON A FARM! BUT, SEE THIS IS THE DIFFERENCE!*

**PLAINTIFF**     *It doesn't?!... what if future generations want to grow food here? what if they wanted-*

**[RSR]**     *YOU LIVE IN A NEIGHBORHOOD! YOU'RE NOT IN THE COUNTRY!*

**PLAINTIFF**     *future generations-*

**[RSR]**     *YOU'RE NOT A FARM!*

**PLAINTIFF**     *You have to look at what future generations might want! right - we can't just destroy the land here - and not only that - especially, people are using all sorts of chemicals on their yard - i'm not saying you are, but they are... And I'm trying to make the fertility of the land last as long as possible. That's why i'm trying to keep the "weeds" there - the "weeds" are what add bio-diversity to the soil - adds all the beneficial bacteria - the fungi - the earthworms - and everything - the grubs - whatever else that are keeping the soil fertile!-*

**[RSR]**     *Then dont' use organic weed-killers because weeds are so important...*

**PLAINTIFF**     *why? yes - weeds are actually important...*

⟦ MORE IMPORTANTLY, [RSR] WANTED THE [HOA] TO DO THE RISKY/BURDENSOME/UNPLEASANT/EXPENSIVE LITIGATION WORK FOR HER: ⟧

**[RSR]**          *AND WHEN THAT HAPPENS SID! GUESS WHAT - THERE IS A FINANCIAL IMPACT - WHICH IS A CIVIL MATTER!-*

**PLAINTIFF**     *you're actually trying to threaten me here...*

**[RSR]**          *NO - WHAT I'M TELLING YOU IS!-*

**PLAINTIFF**     *I'm trying to make this a conversation...*

**[RSR]**          *THE LAW IS THERE! IF YOU FIGHT THE LAW. IF YOU DON'T LIKE THE LAW - GO TO THE LAW - AND THEN FIGHT TO CHANGE IT. BUT BY DOING THIS!-*

**PLAINTIFF**     *The law already protects my rights!-*

**[RSR]**          *YOU'RE ONLY [INFRINGING] THE RIGHTS OF OTHER PEOPLE! AND THAT'S NOT RIGHT!-*

**PLAINTIFF**     *the law already protects my rights! ma'am - that's what I'm trying to explain!*

**[RSR]**          *NO - IT DOESN'T!*

**PLAINTIFF**     *IT DOES! THE 2012 ... SO, IF YOU LOOK AT THE...*

⟦ [RSR] REVEALS THAT SHE IS TOTALLY IGNORANT OF THE 2012/2013 LAW THAT RESTRICTS [HOA] ENFORCEMENT: ⟧

**[RSR]**          *THAT DOES NOT APPLY TO PEOPLE WHO LIVES IN [HOA]!*

⟦ PLAINTIFF MISTAKENLY CITES CHAPTER 209, WHEN PLAINTIFF MEANT CHAPTER 202: ⟧

**PLAINTIFF**     *No it does! - it says [HOA]s - the Property Owners Association may NOT - it says may NOT - prohibit the homeowner's right to, and it outlines - "drought resistant landscaping"... "solar devices"... all these rights are outlined in Texas Property Code - Chapter 209 - you look at that - you see that's what it does... now, if you want me.... if you think-*

**[RSR]**          *YES!*

**PLAINTIFF**     *if you prefer something else, like you were talking about - the rocks... that is something that i'm considering - let me look into that - but until then - you may not infringe upon my right - do understand what i'm saying? let me-*

SIDDHARTH  KODE   V.   WILLIAMSON  COUNTY , ET AL.                    1696907690

[RSR]              *THEN, WHY ARE YOU INFRINGING ON MY RIGHT!*

PLAINTIFF          *I'm not infringing on your right!*

[RSR]              *YES YOU ARE!*

PLAINTIFF          *what i'm talking about is Texas law - Texas Property Code protected homeowners right-*

[RSR]              *YOU'RE INFRINGING ON MY RIGHTS - YOU'RE INFRINGING ON MY PROPERTY VALUES!*

PLAINTIFF          *i'm - No, no - no first of all - the Texas Property Code supersedes that - it actually protects my right! you're property values were..*

[RSR]              *WHAT ABOUT MY RIGHT NOT TO SEE THIS!*

PLAINTIFF          *your property-*

〖 [RSR] MAKES OUTRAGEOUSLY-FRAUDULENTLY CLAIM WILD ANIMALS ARE INFILTRATING HER PROPERTY ACROSS STREET. 〗
〖 - A LAUGHABLE CLAIM THAT HAS BEEN FRAUDULENTLY ENTERTAINED BY THE [HOA] AND DEFENDANT [WC]: 〗

[RSR]              *WHAT ABOUT MY RIGHT TO KNOW THAT ALL THE ANIMALS AND ALL THE CRAP THAT FROM OVER THERE AND INTO OUR YARD!?*

PLAINTIFF          *I could - so, first of all, I could - I do not like the carefully manicured landscape that you have - but am I coming to you and I telling you, you know, "Don't have your yard like this!"*

[RSR]              *I FOLLOW THE [HOA] COVENANTS - BECAUSE, IF I LET MY YARD GROW - GUESS WHAT - I GET A LOVE LETTER FROM THEM!*

PLAINTIFF          *So do I - I get letters from them as well... You think i'm just avoiding the letters - no, i'm contacting them and letting them know - this is my right - and i'm trying to protect my right - i'm fighting for my right here... See, if no-one did what I was doing... if no one did... see, if no-one did...*

[RSR]              *SID, I UNDERSTAND YOUR RIGHT - BUT YOU HAVE TO UNDERSTAND THE RIGHTS OF OTHERS!*

PLAINTIFF          *What are you talking about! these are my rights being exercised-*

〖 [RSR] FRAUDULENTLY SAYS "NEED". AT BEST, MOWING-GRASS IS A "WANT" - A VERY WASTEFUL/DESTRUCTIVE "WANT" - NOT A "NEED". 〗

[RSR]            *THE RIGHTS OF OTHERS - THE NEEDS OF ONE DO NOT OUTWEIGH THE NEEDS OF ALL!*

PLAINTIFF       *first of all - my rights do not... my rights do not-*

[RSR]            *YOUR RIGHTS DO NOT SUPERSEDE THE RIGHTS OF THE NEIGHBORHOOD!*

PLAINTIFF       *no, it doesn't - that's not what I was saying!*

[RSR]            *MOW YOUR GRASS, SID!*

PLAINTIFF       *No, See, you don't wanna... you don't wanna-*

[RSR]            *WE DONT' LIKE THIS! THIS IS UNSIGHTLY! IT'S UNKEMPT!*

PLAINTIFF       *So, Actually-*

〚 PLAINTIFF STRONGLY PREFERS - IN FACT LOVES - UNCUT GRASS OVER ROCKS/CACTUS AND SHOULD NOT HAVE TO MAKE ANY COMPROMISE: 〛

[RSR]            *AND, IF YOU DON'T LIKE IT - THEN DO SOME ZERO-SCAPING - GETS SOME ROCKS, GET SOME CACTUS!*

〚 PLAINTIFF POINTS OUT THAT IF THE DEFAULT BERMUDA-GRASS WAS LEFT UNMOWED, IT IS A ZERO-SCAPE: 〛
〚 PLAINTIFF POINTS OUT EVEN [F-HOA-BOD][SPOA-VP-AH] ADMITTED THAT BERMUDA-GRASS IS A ZERO-SCAPE IS A ZERO-SCAPE: 〛

PLAINTIFF       *that's.. first of all, even the [HOA] Board member whom I spoke to admitted that this was zero-scaping... Even she admitted that!*

[RSR]            *IT'S NOT ZERO-SCAPING!*

PLAINTIFF       *It is zero-scaping! she admitted that - I got her [on record]!*

〚 [RSR] STRONGLY OBJECTS TO PLAINTIFF CONTINUOUSLY-RECORDING USING PLAINTIFF'S BODY-WORN-CAMERA: 〛
〚 [RSR] POINTS TO PLAINTIFF'S BODY-WORN-CAMERA: 〛

[RSR]            *ARE YOU NUTS?! THAT'S JUST BULLSHIT!-*

PLAINTIFF       *So, what?!*

〚 AFTER ALL OF THE SUBSTANTIAL MALICIOUSNESS/CRIMES THAT PLAINTIFF HAS SUFFERED FROM [RSR],[JSP&KAP],[JJB],[WCLE],[HOA]- 〛

〖 -[RSR] STILL QUESTIONS PLAINTIFF AS TO WHY PLAINTIFF RECORDS PEOPLE: 〗

**[RSR]**          *WHY DO YOU GOT TO TAPE PEOPLE?!*

**PLAINTIFF**          *Well - you were over here doing the same thing!*

〖 [RSR] ADMITS THAT SHE WAS INTIMIDATING THE PLAINTIFF IN-ORDER-TO INFURJATE THE PLAINTIFF: 〗

**[RSR]**          *JUST TO PISS-YOU-OFF! - AND JUST TO SHOW YOU HOW STUPID IT IS!*

**PLAINTIFF**          *to piss.. Oh, so there are many people that...*

**[RSR]**          *JUST TO SHOW YOU HOW STUPID IT IS!*

**PLAINTIFF**          *Well, i'm trying to protect myself!*

〖 [RSR] FRAUDULENTLY CLAIMS NO ONE TRESPASSED/WILL-TRESPASS ON PLAINTIFF'S PROPERTY WHEN RECORD REPEATEDLY PROVES OTHERWISE:
〗

**[RSR]**          *NOBODY IS GOING TO COME TO YOUR YARD - NO-ONE IS GOING TO TRESPASS ON YOUR PROPERTY!*

**PLAINTIFF**          *well, they were just doing - what were they doing! To me, I consider that... [trespassing].*

〖 [RSR] ADMITS TO [JSP] TRESPASSING ON THE PLAINTIFF'S YARD: 〗

**[RSR]**          *HE WAS JUST - JOE WAS JUST PROTECTING HIS YARD FROM YOU!*

**PLAINTIFF**          *Protecting his? I'm talking about the landscapers - I'm not blaming them, I'm just saying - "Why were they doing what they're doing?" I'm trying to protect my property!*

**[RSR]**          *BECAUSE IT'S A VIOLATION OF THE [HOA]!*

**PLAINTIFF**          *No, they were just following orders! And I have to tell them, that unfortunately, I cannot let you do this!*

**[RSR]**          *SID - SID - IT DOESN'T GIVE YOU THE RIGHT.. IF YOU WANT TO ZERO-SCAPE, THEN ZERO-SCAPE - BUT HERE'S THE THING!-*

**PLAINTIFF**          *I'm... this is a zero-scape!*

**[RSR]**          *IT MUST BE NEAT - THIS IS UNKEMPT AND UNSIGHTLY!*

**PLAINTIFF**      *It's not! That is your [subjective opinion]! See, I'm actually compromising by actually picking out the tallest weeds... I don't even have to do that... To be*
                   *honest with you... This actually looks more attractive...*

**[RSR]**          *Well, ok, if you're going to do that...*

**PLAINTIFF**      *My honest... My honest opinion...*

**[RSR]**          *SO, WHAT MAKES THAT - WHAT MAKES THAT WEED LESS VALUABLE TO YOUR ZERO-SCAPE-*

**PLAINTIFF**      *That's because I'm not - I'm not doing any much damage to the landscape - at all. I'm basically hand-picking - I'm hand-picking - I'm hand-picking.*

〚 [RSR] FRAUDULENTLY EQUATES MITIGATING-DAMAGE (PICKING TALLEST WEEDS) TO TOTAL-DAMAGE (MOWING ALL GRASS/WEEDS): 〛

**[RSR]**          *WELL, IF YOU'RE ABOUT MITIGATING DAMAGE - THEN, BY ALL MEANS - TRIM IT AND MOW IT!*

〚 BY "ENERGY", PLAINTIFF IS REFERRING TO SOLAR ENERGY CAPTURED BY PLANTS AND STORED IN PLANT'S BIO-MASS: 〛

**PLAINTIFF**      *no, that's horrible - that would be horrible - that would be - have you seen the amount of water that comes out of the grass after you mow it! It's a waste!*
                   *Not only the water, but all that.. all that energy!*

**[RSR]**          *MOVE TO ANOTHER NEIGHBORHOOD, SID! SID - LEAVE THE NEIGHBORHOOD! [???]*

**PLAINTIFF**      *All that energy is wasted... You're using fossil-fuel energy to do that as well!*

〚 [RSR] FRAUDULENTLY POINTS TO PLAINTIFF'S GASOLINE-POWERED-CAR WHEN SHE KNEW PLAINTIFF BARELY USES IT LESS-THAN-5-TIMES-PER-
YEAR: 〛

**[RSR]**          *Then, why do you have a gas-powered car?*

**PLAINTIFF**      *I don't use - have you noticed that I never use it! And first of all, I will be buying an electric car that is going to be powered by solar-panels - I'm not in*
                   *that position yet!*

〚 [RSR] FAILS TO UNDERSTAND THAT CLEAN-RENEWABLE-ENERGY CAN BE USED TO GENERATE MORE CLEAN-RENEWABLE-ENERGY MATERIALS: 〛

**[RSR]**          *AND SO - GUESS WHAT MAKES - GUESS WHAT MAKES THOSE SOLAR PANELS - GUESS WHAT MAKES ALL OF THOSE PARTS! FOSSIL*
                   *FUELS!*

**PLAINTIFF**   what?! actually - no it doesn't! First of all - it's sand - it's actually mostly sand and silica that makes up a solar panel. and also electric components - which are also based on mostly...

**[RSR]**   WHAT ABOUT - THE ELECTRICITY THAT CHARGES YOUR BATTERIES!

**PLAINTIFF**   are you against solar technology? i means, ok, so ...

**[RSR]**   no i'm not against solar technology.

**PLAINTIFF**   solar and wind are like - the most clean - the most clean technologies that you could possibly have!

**[RSR]**   I'M NOT AGAINST THESE THINGS... I'M NOT AGAINST THESE THINGS!

**PLAINTIFF**   Ok, so - that's what i'm trying to get to! And I want to protect my rights!

〚 [RSR] ACCUSES PLAINTIFF OF HYPOCRISY WHEN [RSR], THROUGH VARIOUS ACTIONS, HAS PROVEN HERSELF TO BE A MASTER OF HYPOCRISY: 〛

**[RSR]**   WHAT I'M SAYING IS THAT YOU NEED TO IDENTIFY THE HYPOCRISY!

**PLAINTIFF**   It is not a hypocrisy! Let me [be] clear!

**[RSR]**   YOU NEED FOSSIL-FUELS TO PRODUCE THE ELECTRICITY!

**PLAINTIFF**   It is not using fossil-fuels! ...

**[RSR]**   PEOPLE ARE USING ELECTRICITY BECAUSE THEY THINK IT'S CLEAN... YEAH, IT'S CLEAN... BUT GUESS WHERE YOU GET THE ENERGy TO GENERATE THE ELECTRICITY?!

**PLAINTIFF**   what you talking about it!! It's generated by solar panels!

〚 [RSR] ADMITS TO BEING PART OF THE CONSPIRACY WITH THE [HOA] AGAINST THE PLAINTIFF: 〛

**[RSR]**   YOU KNOW WHAT - I'M AM GOING TO SUPPORT **MY** [HOA] - TO TRY TO GET YOU TO MOW AND KEEP YOUR YARD TIDY! BECAUSE, HERE'S WHY!

PLAINTIFF          *SO.. So, you keep.. So, you're the one that keeps going against me!*

[RSR]              *POOR CHRIS ASKED YOU KEEP IT CLEAN SO HE COULD SELL HIS HOUSE!*

PLAINTIFF          *So - I did! Look at what I did - you know, he basically, asked me take out all of this stuff, and I did! I complied with his [requests]!*

[RSR]              *[SID - YOU DON'T FOLLOW THE RULES], IT'S OK NOT TO FOLLOW THE RULES - THEN MOVE! MOVE!*

PLAINTIFF          *No - actually no - I'm trying to make people more aware...*

〖 [RSR] FRAUDULENTLY CLAIMS PLAINTIFF IS IMPOSING HIS VALUES ON OTHERS, WHEN THE EXACT OPPOSITE IS TRUE: 〗

[RSR]              *WHEN YOU KEEP - WE DON'T WANT TO BE MORE AWARE! YOU'RE FORCING YOUR VIEWS ON US!*

PLAINTIFF          *No, that's actually - that's not true - you're forcing your views on me!*

〖 [RSR] FRAUDULENTLY FAILS TO DISCLOSE THE MANY WAYS IN WHICH SHE VIOLATES THE RESTRICTIVE-COVENANTS: 〗

[RSR]              *I'M NOT - I'M FOLLOWING THE RULES!*

PLAINTIFF          *I'm trying to do... No, actually, In doing what I'm doing...*

[RSR]              *BECAUSE IF I DON'T WANT TO FOLLOW THE RULES OF THE [HOA] - THEN MY CHOICE IS TO FOLLOW THE RULES, GET FINED OR MOVE!*

PLAINTIFF          *no - no - see, see but the thing is - that eliminates - that eliminates the option for justice! And I'm trying to fight for justice here!*

〖 [RSR] FRAUDULENTLY IGNORES NOT ONLY HER VIOLATIONS OF RESTRICTIVE-COVENANTS BUT ALSO LAWS - HER PRIOR CRIMES AGAINST PLAINTIFF: 〗

[RSR]              *YOU THINK THAT THE RULES DON'T APPLY TO YOU!*

PLAINTIFF          *I will never stop fighting for justice! Do you understand what I'm saying - I will always! - ok...*

〖 [RSR] ADMITS THAT SHE IS ANTI-JUSTICE: 〗

[RSR]              *WE DON'T WANT YOUR JUSTICE - JUST, MOW YOUR YARD!*

**PLAINTIFF**    *see, I know that you don't care about justice!*

**[RSR]**    *THAT'S NOT TRUE!*

**PLAINTIFF**    *There are always people throughout history that opposed justice - for example, that opposed the civil rights legislation back in the 1960s! that opposed currently the environmental legislation!*

〚 [RSR] SPEAKS CONDESCENDINGLY TO PLAINTIFF FRAUDULENTLY PRETENDING AS IF SHE IS ON MORAL HIGHER-GROUND: 〛

**[RSR]**    *LET ME TELL YOU SOMETHING LITTLE BOY - LET ME TELL YOU SOMETHING LITTLE BOY - I GREW UP IN THE 60S AND LET ME TELL YOU - I KNOW WHAT SEGREGATION WAS LIKE - LET ME TELL YOU!*

**PLAINTIFF**    *right, ok... so, yes exactly! ... you're telling me.. right..*

**[RSR]**    *MY FATHER STOOD UP WHEN THEY ASKED TO VOTE A BLACK FAMILY INTO THE CHURCH - MY FATHER STOOD UP AND SAID - HOW DARE YOU!...*

**PLAINTIFF**    *Ok - that's - I don't know if what you're saying is true - but - even if that's true, that's great! if it's true, that's great!*

**[RSR]**    *RIGHT, LIKE I'M GOING TO MAKE SHIT UP - THERE YOU GO AGAIN!*

〚 [RSR] STARTS TO WALK AWAY FROM THE PLAINTIFF, AGAIN, REFUSING TO ALLOW A FAIR DEBATE WITH PLAINTIFF: 〛

**PLAINTIFF**    *But what you're... even if what you're saying is true - that's great! But what I'm saying is - you're not caring about environmental justice! You're not caring about the future of your own family!*

**[RSR]**    *THERE YOU GO AGAIN!*

**PLAINTIFF**    *For future generations - including your own family - you're not even setting an example! alright, so, I'm trying to protect my rights - and that's nothing else - I'm protecting my rights. That's all I'm doing here!*

**[RSR]**    *[???] YOU'RE NOT GOING TO SAY I DON'T HAVE VALUES! YOU'RE NOT GOING TO SAY THAT I DON'T CARE ABOUT MY...*

**PLAINTIFF**    *No - Actually - No, I'm just trying to protect my rights!*

**[RSR]**

*YOU CAN SAY THOSE THINGS - BUT YOU KNOW WHAT?! WHAT YOU SAY DOES NOT MATTER - PRETTY MUCH WHAT YOU SAY TO THE REST OF US - BY YOUR PRESENTATION - YOUR LACK OF CONSIDERATION FOR OTHERS!*

**PLAINTIFF**   *Actually - that is not true at all! That is not true at all! You know that is not true at all! I've basically debunked your argument and you know that's not true at all! I appreciate..*

**[RSR]**   *NO YOU DIDN'T!*

**PLAINTIFF**   *I did!*

〖 [RSR] CANNOT HELP BUT REVEAL HER RACIST ATTITUDES TOWARDS THE PLAINTIFF: 〗

**[RSR]**   *IT SHOWS HOW STUPID YOU ARE! HOW SELFISH... OK, SID!*

〖 PLAINTIFF MAKES REFERENCE TO THE PLAINTIFF'S CELEBRATION OF "INDIGENOUS PEOPLES' DAY" : 〗

**PLAINTIFF**   *Oh, "stupid"! Oh, really - I'm the "stupid" one! Oh, I see what you - you think of indigenous people! This is what you think of culture colored people - colored people! indigenous people! ok - that's what I - I see what you're saying! ...*

〖 [RSR] WALKS TOWARDS HER DRIVEWAY AND ENTERS BACK INTO HER HOUSE. 〗

〖 PLAINTIFF THEN STARTS TO TAKES FEW MINUTES TO RECORD DAMAGE DONE TO PLAINTIFF'S LANDSCAPE FROM FORCE-CUT GRASS/BUSHES. 〗

〖 PLAINTIFF THEN ENTERS BACK INTO [HOUSE] AT [788KLLTX78641]. 〗

# ¶378

During the same day of {2016-10-11}, shortly after [RSR]'s final response in the previous posting - and immediately following [RSR]'s previous in-person stalking/intimidation/interference/disorderly-conduct/blackmail of the plaintiff (while the plaintiff was stopping the [HOA] force-mowers from force-mowing the [YARD]), which included one her many lengthy in-person racist rants against the plaintiff - [RSR] posted the following racist, intimidating and threatening public messages on the 〖Summerlyn〗 subdivision's *"nextdoor.com"* social-media-platform, demanding that the [HOA] take legal-action against the plaintiff for the plaintiff's refusal to mow the plaintiff's grass (in-line-with the plaintiff's religious/cultural/racial views and in favor of true drought-resistant-landscaping) and because the plaintiff denied and refused-to-allow the [HOA] force-mowers to force-mow the [YARD]. First, while [RSR] is addressing the then [HOA-BoD]s, [RSR] refers to the [HOUSE] as *"Our house"*, indicating not only that the plaintiff, due to the plaintiff's racial-profile, is not the rightful owner of [788KLLTX78641], but rather that they - [RSR] and her White-American (or overwhelmingly White-American) co-conspirators, [JSP&KAP],[HOA],[WCLE] - are the actual and rightful owners of the [HOUSE]. As this posting shows and the previous posting shows, [RSR] is warned multiple times by both [f-HOA-BoD][MP] and [f-HOA-BoD][SPOA-VP-AH], not to talk about such private matters or any other matter involving homeowners rights in a public forum, but instead that [RSR] should send private-messages/emails to the then [HOA-BoD]s - which the plaintiff can only interpret to be a clear indication of an illegal secret conspiracy against the plaintiff between predatory White-American residents [RSR], [JSP&KAP], [DMP], any other residents that these predatory residents successfully indoctrinated via racist propaganda, and the [HOA],[WCLE] - with [WCLE] playing a much more active role in such conspiracy in the years following this incident. As [RSR]'s own admissions would continue-to-reveal

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                                    1696907690

(during these incidents and future incidents), this illegal secret conspiracy against the plaintiff, which occurred solely due to a combination of the plaintiff's racial-profile and the plaintiff's political-profile, had existed since the initial years that the plaintiff resided within the subdivision of {2009} through {2011}. Also, [DMP] - a close associate of [RSR],[JSP&KAP] - *"thanked"* [RSR]'s final posting showing that this illegal secret conspiracy against the plaintiff also included - at that moment in time, [DMP]. The plaintiff discovers these social-media-postings only well-after they actually took place, but once the plaintiff did discover these social-media-postings, the plaintiff was indignant and remains indignant that the plaintiff was publicly humiliated, defamed (⊕) and privacy-invaded by this racist, fraudulent narrative in this public-setting by [RSR],[DMP] and their co-conspirators. The racist, fraudulent narrative documented in these social-media postings would also serve as a fraudulent justification for the then [HOA]'s (run by abusive, oppressive, corrupt, dictatorial [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH] and soon-to-be [f-HOA-BoD][DMP]) outrageously unjust lawsuit against the plaintiff in {2017} (@) When looking at all the plaintiff's evidence against the defendants in its totality, it is indisputable that, by posting this additional social-media-posting, [RSR] engaged in intimidation/interference, wire-fraud, witness-tampering and online harassment/stalking against the plaintiff:



## ¶379

On or about a late-afternoon/early-evening on a Saturday or Sunday in the middle of the month of {2016-10} (most likely during the day of {2016-10-22} or {2016-10-23}), the plaintiff was with [PARENTS] inside the garage of the plaintiff's property [788KLLTX78641], as [FATHER] was helping the plaintiff jump-starting the plaintiff's vehicle (since the plaintiff barely used the vehicle a few times per year and the battery had been completely discharged, rendering the vehicle inoperable). At some point in time, the plaintiff noticed [JSP] located around the sidewalk in front of [788KLLTX78641], and the plaintiff noticed soon-to-be [f-HOA-BoD][DMP] approach [JSP] on the sidewalk, and then start a conversation with [JSP]. The plaintiff overhead the conversation which was clearly of a very malicious and conspiratorial nature against the plaintiff, about how [PARENTS] were approving of the plaintiff leaving the plaintiff's front-yard grass unmowed, which is what they perceived-to-be in defiance of White-supremacy. The plaintiff had always maintained, in several emails to the [HOA], and in the aforementioned abusive, racist rants from [RSR] that the plaintiff was merely trying to protect the plaintiff's right to maintain a truly-drought-tolerant (and thus *"no-mow"*) grass as the relatively-new Texas law now allowed for. It was clear from this incident that both [JSP] and soon-to-be [f-HOA-BoD][DMP] intentionally spoke loud enough, and in a malicious and conspiratorial manner, so that they could be overheard by the plaintiff and [PARENTS] - as a subtle form of racial intimidation/interference performed in-order-to coerce the plaintiff to strictly follow their White-American standards of property-maintenance, and thereby never even question White-supremacy. As the sequence of incidents reveals, all of these racial intimidation/interference tactics by [JSP],[RSR] and soon-to-be [f-HOA-BoD][DMP] were all part of their long-term conspiracy, strategy and justification to force the [HOA] to sue the plaintiff - which would eventually happen in the beginning of {2017} - see below.

## ¶380

On or about an evening at the end of the month of {2016-11}, the plaintiff was kneeling on the [FRONTYARD] grass, planting small amount(s) of some vegetation in the [FRONTYARD]. The plaintiff suddenly noticed that [RSR] had approached the plaintiff and was standing on the sidewalk bordering the plaintiff's property. (The plaintiff is very-alarmed and distressed whenever [RSR] is close to the border of the plaintiff's property, because [RSR] has already been issued a [CTW] against the plaintiff's property.) [RSR] questioned the plaintiff as to what the plaintiff was planting. The plaintiff questioned [RSR] as to why she cared what the plaintiff was planting. [RSR], this time pretending to act in a friendly manner towards the plaintiff, but in reality, maliciously trying to manipulate the plaintiff into providing her with information - information that she could then later-on use against the plaintiff - responds, *"Hey, I have a green thumb, too!"* The plaintiff responds that the plaintiff is *"planting plants"*. [RSR] responds that she has gardening hand-tools to aid the plaintiff in the planting of such vegetation, maliciously and manipulatively pretending as if to offer to help the plaintiff to plant such vegetation. The plaintiff rejects any of [RSR]'s offers to help, knowing fully-well, [RSR]'s extremely-manipulative tactics and sinister motives. [RSR] would shortly walk-away from the plaintiff, after realizing that she was not able to manipulatively extract the information from the plaintiff that she had desired. It is important to note that, at this particular moment in time, and as the upcoming incidents will show, at least 3 of the plaintiff's predatory neighbors - [JSP&KAP], [RSR],[DMP] - were all illegally conspiring behind-the-scenes with the [HOA] to file a lawsuit against the plaintiff, due to the plaintiff's refusal to mow the [FRONTYARD] grass in-order-to maintain truly drought-resistant-landscaping (as protected by the then recent Texas law). So, [RSR] was approaching the plaintiff and recording the plaintiff as an attempt to use the plaintiff's own words against the plaintiff in such upcoming [HOA] lawsuit against the plaintiff. Again, [RSR]'s sinister strategy against the plaintiff may have been successful if the plaintiff did not already have, at that moment in time, almost a decade of evidence of [RSR]'s (and her co-conspirators') racially-motivated, malicious and criminally-abusive actions against the plaintiff.

## ¶381

On or about a subsequent evening at the end of the month of {2016-11}, the plaintiff was kneeling on the [FRONTYARD] grass, again, planting small amount(s) of some vegetation in the [FRONTYARD]. At some point in time during this activity, [JSP] yells out to the plaintiff from approximately 40 feet away near the border his property [784KLLTX78641], demanding to know what the plaintiff was doing. The plaintiff informs [JSP] that the plaintiff was planting some vegetation. [JSP], outraged by what he considered to be the plaintiff's *"unapproved changes"*, angrily storms away as if to indicate that he demands legal-action against the plaintiff from the [HOA].

## ¶382

On or about a subsequent evening at the end of the month of {2016-11}, the plaintiff was kneeling on the [FRONTYARD] grass, this time on the opposite side of the [DRIVEWAY], again, planting small amount(s) of some vegetation in the [FRONTYARD]. The plaintiff suddenly noticed that [RSR] approach across the street, with a camera-phone in her hand, shouting the typical fraudulent and racist narrative into her video-recording, *"WHAT ARE YOU DOING, SID?! LOOK AT ALL OF THE HARM THAT YOU'RE CAUSING TO YOUR NEIGHBORS!"*, fraudulently pretending as if the plaintiff's planting of small-amounts-of vegetation in the plaintiff's [FRONTYARD] (and/or the plaintiff leaving the [FRONTYARD] grass unmowed) is some-how causing harm to the plaintiff's White-American neighbors. In the State of Texas, [HOA]s often sue property-owners for damages, whenever such property-owners are alleged to have committed some restrictive-

covenant violations, but as relatively-recent precedent-setting court-cases in Texas have demonstrated, [HOA]s are not able to actually obtain damages verdicts unless [HOA]s are able to prove/establish that actual harm was caused onto the [HOA], which in almost all such cases, is very difficult, if not impossible for [HOA]s to do. Thus, whenever a [HOA] sues property-owner(s) in Texas, and such lawsuit is contested by the respondent(s) without any settlement, the [HOA] is, at best, only able to obtain reasonable-attorneys-fee(s) and/or injunctive-relief, but rarely, damages. So, [RSR]'s narration of this fraudulent narrative against the plaintiff into her camera-phone video-recording is quite deliberate and purposeful - painting such fraudulent narrative directly into her video-recording that the plaintiff had caused harm onto the plaintiff's White-American neighbors - and yet another intimidation/interference tactic by [RSR] against the plaintiff.

## ¶383

On or about the approximate date of {2017-01-23}, the plaintiff's senior-citizen parents, [PARENTS], residing in a neighboring subdivision (only a few miles away from the plaintiff) - received a certified-mail-return-receipt-requested [CMRRR] from the Attorney/Law-firm representing the [HOA] of the 〖Summerlyn〗 subdivision, threatening to file lawsuit against the plaintiff and/or [PARENTS], if the plaintiff did not cut the plaintiff's grass. [PARENTS] almost immediately notified the plaintiff about this threat of legal-action, which caught the plaintiff completely off-guard - as the plaintiff was expecting that since the plaintiff was already periodically picking/cutting the tallest so-called *"weeds"* in the [FRONTYARD], in accordance with the relatively-new legislation affording property-owners the right to maintain *"drought-resistant-landscaping"* (and any practices thereof), that the plaintiff had already compromised with the [HOA], and that the plaintiff did not need to compromise any further with the [HOA]'s unreasonable demands, especially, given that the plaintiff had already made the aforementioned proposition to the then-[HOA-BoD]s regarding grass replacement, and especially given that the obsolete/outdated contract (written in the year {2004}/{2005}/{2006}) that the [HOA] was referring to, was not amended, in any way, to accommodate the new law concerning *"drought-resistant-landscaping"* taking effect at the end of the year {2013}, and most importantly, given that the [HOA] was exclusively acting on the predatory blackmail of malicious neighbors with extreme-racial-animus against the plaintiff: [JSP&KAP],[RSR] (and their cronies). This threat of legal-action, nonetheless, involuntary forced the plaintiff, through no choice of the plaintiff's own, to seriously follow-through on the aforementioned grass-replacement, whether or not the [HOA] was willing to pay for it. The plaintiff began to formulate plans to re-landscape the [FRONTYARD] with a species of *"no-mow"* grass, along with drafting an official *"architectural-approval"* document to be submitted in short-order to the [HOA], even though the plaintiff had knowledge that several homeowners within the subdivision including [JSP&KAP] had already replaced their original-builder-installed grass with a different species of grass without seeking or obtaining approval from the [HOA] at any point in time. From the dates of {2017-01-24} through {2017-01-30}, the plaintiff began to order supplies, materials and equipment in-order-to perform this re-landscaping work, because, at no point in time, was the plaintiff willing to abandon the plaintiff's strongly-held religious/cultural views/practices of refraining from cutting vegetation - especially, since there was also a larger *"no-mow"* movement taking root nationwide by like-minded political-activists challenging such antiquated, draconian and ethnocentric/culturally-insensitive laws concerning vegetation on private-property.

## ¶384

On or about the morning of {2017-01-30}, the plaintiff is in the [FRONTYARD] surveying the work that needed to be done for such re-landscaping, including taking measurements of the area that needed to be replaced, and making note of other tasks that needed to be completed. [JSP] drives his pickup-truck down the road, pauses in front of the plaintiff, and with passenger-window down, angrily yells at the

SIDDHARTH KODE    V.    WILLIAMSON COUNTY, ET AL.                      1696907690

plaintiff, *"HEY SID, THE ELECTION IS OVER!"*, referring to the plaintiff's United-States-Green-Party *"Stein/Baraka"* political yard sign that read *"People, Planet and Peace over Profit"* posted at approximately the same location in [FRONTYARD] as the plaintiff's subsequent yard-signs. [JSP]'s statement was so brazenly revealing, demonstrating his far-right-wing-extremist political-animus against the plaintiff. By making such statement, [JSP] was conveying to the plaintiff, in referring to the recent United States Presidential Election of {2016}, [USPEo2016], that, to use the conventional expression, *"There's a new mayor in town"*, and as a result of such *"new mayor"*, that the national tide had finally shifted against the plaintiff. It is a well-documented fact that far-right-wing-extremist intimidation/interference and other violence sharply-escalated - according to some estimates, quadrupling - after the [USPEo2016], with far-right-wing-extremists extremely emboldened by the recent [USPEo2016] resulting in the President of their choice. The plaintiff ignored [JSP]'s obvious attempt to intimidate the plaintiff with such [USPEo2016] results, instead responding that the plaintiff would be re-landscaping the [FRONTYARD], and as result of such re-landscaping, the plaintiff would need to remove such yard-sign in any case. Not coincidentally, in the years after the [USPEo2016], the plaintiff would suffer a sharp-escalation of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses by [RSR],[JSP&KAP] against the plaintiff, with both far-right-wing-extremists [RSR],[JSP&KAP] fully emboldened by the recent [USPEo2016] resulting in the President of their choice. [JSP] gave the plaintiff a thumbs-up, pretending to be in support of the plaintiff's re-landscaping efforts when all of the evidence that the plaintiff would continue to gather would continue to show that both [JSP&KAP] and [RSR] were maliciously and secretly conspiring with the then-[HOA] against the plaintiff - backstabbing/badmouthing the plaintiff using the same relentlessly-racist propaganda, including, but not limited to, their use of social-media (see above), that they had engaged in against the plaintiff for over 7 years at this point in time, and even blackmailing the then-[HOA], demanding that the then-[HOA] take immediate and heavy-handed legal-action against the plaintiff, in-order-to foreclose-on the plaintiff's private-property.

# ¶385

On or about the date and time of {2017-01-30 15:30}, the plaintiff and the plaintiff's senior-citizen parents, [PARENTS], in response to the predatory/abusive/threatening letter that the plaintiff's parents received from the [HOA] attorney, started to place sheets of cardboard to cover the [FRONTYARD] grass in-order-to both satisfy the [HOA]'s unreasonable demand of mowing grass over 6-inches in height, and start the process of grass decomposition, so that once fully decomposed or at least sufficiently decomposed, a new species of *"no-mow"* grass could be installed, again to placate the [HOA]'s unreasonable demand. [PARENTS] had just arrived with multiple large sheets of cardboard that they placed in the [FRONTPORCH] of the plaintiff's property prior to installation. The plaintiff's senior-citizen father, [FATHER], was assisting the plaintiff in installation of these large sheets of cardboard over all the existing [FRONTYARD] grass that the [HOA],[RSR] had fraudulently claimed was not in compliance of the aforementioned, obsolete restrictive-covenant(s). As [FATHER] and plaintiff were installing such sheets of cardboard, [RSR] arriving at [789KLLTX78641] in her vehicle, immediately notices the plaintiff and [FATHER], and starts her abusive, threatening, blackmailing harassment and racial-intimidation against both the plaintiff and [FATHER]. At least two other witnesses at the scene, [781KL-2009-4] and [GR] ask the plaintiff if the plaintiff and/or [FATHER] are ok, after suffering such racist abuse by [RSR], clearly concerned about the welfare of the plaintiff and/or [FATHER] (♦):

▸  RECORDED RACIST, ABUSIVE, THREATENING, BLACKMAILING RANT FROM [RSR] TO PLAINTIFF/[FATHER] (♦) WITNESSED BY AT LEAST 2 OTHER CONCERNED RESIDENTS: {2017-01-30 15:30} (~)

▸  [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

《 PLAINTIFF AND [FATHER] ARE PLACING SHEETS OF CARDBOARD ON [788KLLTX78641] front-yard grass. 》

《 [RSR] WHO HAD JUST PARKED HER VEHICLE IN THE DRIVEWAY OF [789KLLTX78641] YELLS OUT AT PLAINTIFF AND [FATHER]. 》

**[RSR]**          *ARE YOU KIDDING ME!! JUST MOW THE GRASS! - THIS IS SO UNSIGHTLY!*

**PLAINTIFF**      ⟪TO [FATHER]:⟫ *Ok, just leave it there.*

**[RSR]**          *SID! - THIS IS UNSIGHTLY! I'M TELLING YOU! - I'M CALLING THE [HOA] RIGHT NOW!*

⟪ [FATHER], WHO HAS NEVER EXPERIENCED SUCH OVERTLY RACIST ABUSE IN HIS LIFE, STANDS IN SHOCK, UNRESPONSIVE TO PLAINTIFF'S REQUESTS. ⟫

**PLAINTIFF**      ⟪TO [FATHER]:⟫ *Just...*

⟪ [FATHER] IS ONLY VAGUELY FAMILIAR OF [RSR] DUE TO THE PLAINTIFF'S RECOUNTING OF PRIOR RACIST ABUSE TO [FATHER]: ⟫

**[FATHER]**       ⟪TO PLAINTIFF:⟫ *She's the same lady, huh?*

**PLAINTIFF**      ⟪TO [FATHER]:⟫ *Yeah, why do you bother - don't bother about that?! Oh, shit - oh, shit, can you get that - why don't you do it. You have to be careful, don't cut yourself.*

⟪ [RSR] WITH HER CAMERA-PHONE APPEARING TO RECORD, ESCALATING HER ABUSIVE ACTIONS AGAINST BOTH PLAINTIFF AND [FATHER]. ⟫

**[RSR]**          ⟪TO PLAINTIFF:⟫ *SID, WHY DON'T YOU JUST LIVE IN THE COUNTRY! - IF YOU CAN'T GO BY THE RULES!*

⟪ PLAINTIFF NOT WANTING TO ANSWER TO ANY PREDATORY/ABUSIVE NEIGHBORS, RELUCTANTLY ANSWERS: ⟫

**PLAINTIFF**      ⟪TO RSR:⟫ *Look, I'm going to be putting soil over this.*

⟪ [RSR] WASN'T INTERESTED IN A RESPONSE FROM PLAINTIFF, THAT COULD COUNTER HER FRAUDULENT NARRATIVE. [RSR] WAS ONLY– ⟫
⟪ –INTERESTED IN FORCEFULLY IMPOSING HER USUAL ONE-SIDED FRAUDULENT NARRATIVE TO JUSTIFY HER RACIST ABUSE ONTO PLAINTIFF/[FATHER]: ⟫

**[RSR]**          ⟪TO PLAINTIFF:⟫ *NO, I'M NOT GOING TO TALK TO YOU!*

⟪ PLAINTIFF, DESPITE BEING CRIMINALLY ABUSED BY [RSR] IN THE PAST, WAS STILL STUNNED BY THE BRAZENNESS OF [RSR]'S ACTIONS. ⟫

**PLAINTIFF**      ⟪TO RSR:⟫ *oh, ok. ok. right! - because you're a psychopath!*

⟪ [RSR] MAKES FRAUDULENT STATEMENT: PLAINTIFF NEVER RAN DOWN ANY PERSON'S TREES: ⟫

**[RSR]**          ⟪TO PLAINTIFF:⟫ *Hey, i'm not the one with wires, that runs down people's trees.*

⟪ [FATHER] IS STANDING MOTIONLESS DUE TO [RSR]'S ABUSE: INTIMIDATION/INTERFERENCE/DISORDERLY-CONDUCT/– ⟫
⟪ –BLACKMAIL. PLAINTIFF STARTS TO BECOME INFURIATED AT THE SITUATION. ⟫

**PLAINTIFF**      ⟪TO RSR:⟫ *shit, seriously!... Unbelievable!...*

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    1696907690

⟦ PLAINTIFF FRUSTRATINGLY INSTRUCTS [FATHER] TO CONTINUE CUTTING CARDBOARD. ⟧

**PLAINTIFF**          ⟦TO [FATHER]:⟧ *Go ahead!*

⟦ [RSR], WHO IS MUCH BIGGER IN SIZE THAN [FATHER], APPROACHES [FATHER] IN AN ASSAULTIVE MANNER. ⟧
⟦ [RSR], STANDING A FEW FEET AWAY FROM [FATHER] WHO WAS BENDING TO CUT CARDBOARD, YELLS: ⟧

**[RSR]**          ⟦TO [FATHER]:⟧ *MOW THE GRASS SIR! JUST, MOW IT!*

⟦ PLAINTIFF, STUNNED THAT [RSR] HAD DIRECTLY ADDRESSED SENIOR-CITIZEN [FATHER], IS OUTRAGED: ⟧

**PLAINTIFF**          ⟦TO RSR:⟧ *OK, YOU'RE NOT GOING TO TELL MY FATHER WHAT TO DO! ALRIGHT! WHAT THE FUCK!! DON'T EVEN KID...!*

⟦ [RSR], WHO IS MORE THAN TWICE PLAINTIFF'S SIZE, APPROACHES 2-FEET AWAY FROM PLAINTIFF IN AN ASSAULTIVE MANNER. ⟧
⟦ [RSR] AGGRESSIVELY HOLDS-UP HER MIDDLE-FINGER RIGHT IN FRONT OF THE PLAINTIFF'S FACE, HER HAND EXTENDED INTO PLAINTIFF'S PROPERTY. ⟧
⟦ [RSR], WHO IS RECORDING THE INCIDENT WITH HER PHONE, FRAUDULENTLY PRETENDS AS IF SHE HAS NEVER CUSSED AT PLAINTIFF: ⟧

**[RSR]**          ⟦TO PLAINTIFF:⟧ *DON'T CUSS AT ME!*

**PLAINTIFF**          ⟦TO RSR:⟧ *OH YEAH - LIKE YOU DIDN'T?! YOU'VE NEVER CUSSED AT ME?!!*

**[RSR]**          ⟦TO PLAINTIFF:⟧ *SID - NOT A WORD!!! LOOK AT WHAT YOU DO TO THIS NEIGHBORHOOD!*

⟦ [RSR] POINTS TO PLAINTIFF AS SHE MAKES AN INSULTING, ABUSIVE STATEMENT TO [FATHER] ABOUT PLAINTIFF: ⟧

**[RSR]**          ⟦TO [FATHER]:⟧ *AND YOU SIR, RAISED THIS?!!*

**PLAINTIFF**          ⟦TO RSR:⟧ *What the hell - Look, JUST MIND YOUR OWN FUCKING BUSINESS - ALRIGHT! MIND YOUR OWN FUCKING BUSINESS! ALRIGHT!*

⟦ [RSR] FRAUDULENTLY PRETENDS AS IF WHAT PLAINTIFF/[FATHER] DO AT OWN PRIVATE-PROPERTY IS HER BUSINESS: ⟧

**[RSR]**          ⟦TO PLAINTIFF:⟧ *THIS IS MY BUSINESS! THIS IS MY BUSINESS!*

**PLAINTIFF**          ⟦TO RSR:⟧ *I SPOKE TO HIM AND HE'S FINE WITH IT*

**[RSR]**          ⟦ON PHONECALL TO [HOA]:⟧ *Hello?*

⟦ [RSR] BRAZENLY SHOWS HER EGREGIOUS SENSE-OF-ENTITLEMENT: THAT SHE OWNS THE ENTIRE NEIGHBORHOOD: ⟧

**[RSR]**

⟪TO PLAINTIFF:⟫ *THIS IS MY NEIGHBORHOOD! I GO BY THE RULES! - YOU NEED TO GO BY THE RULES! LOOK AT WHAT YOU'VE DONE TO THIS NEIGHBORHOOD!*

**PLAINTIFF**    ⟪TO RSR:⟫ *Ah, so-*

**[RSR]**    ⟪TO PLAINTIFF:⟫ *PEOPLE LOOK AT MY HOUSE, THEN THEY SEE YOURS! - THEY DON'T WANT TO LIVE HERE!*

**PLAINTIFF**    ⟪TO RSR:⟫ *SSHHUH... I CAN'T HELP IT IF YOU WANT TO DESTROY THE ENVIRONMENT!*

**[RSR]**    ⟪TO PLAINTIFF:⟫ *THEN MOVE TO THE COUNTRY! [???]*

**PLAINTIFF**    ⟪TO RSR:⟫ *WHY! THEN THINGS WILL NEVER CHANGE! THINGS WILL NEVER CHANGE!*

⟪ [RSR] FRAUDULENTLY PRETENDS AS IF SHE HAS NEVER VIOLATED THE COVENANTS: ⟫

**[RSR]**    ⟪TO PLAINTIFF:⟫ *YOU SIGNED THE COVENANTS!*

**PLAINTIFF**    ⟪TO RSR:⟫ *THE COVENANTS DID NOT UPDATE FOR THE NEW LAW THAT TOOK EFFECT 2013! I TALKED TO ... I TALKED TO CLEAN WATER ACTION - I TALKED TO CLEAN WATER ACTION - AND THEY AGREE WITH ME - WHAT I SAID. THEY'RE THE ONES THAT ACTED - THE 2013 LAW!*

**[RSR]**    ⟪TO PLAINTIFF:⟫ *MOW YOUR GRASS!! MOW YOUR GRASS!! JUST, MOW YOUR GRASS!! MOW YOUR GRASS!!*

⟪ PLAINTIFF WALKS OVER TO [FATHER]: ⟫

**PLAINTIFF**    ⟪TO [FATHER]:⟫ *Unbelievable!*

**[FATHER]**    ⟪TO PLAINTIFF:⟫ *Don't argue with her!*

⟪ PLAINTIFF INSTRUCTS FATHER TO CONTINUE WORK AS FATHER HAS REMAINED SHOCKED/MOTIONLESS THE ENTIRE TIME: ⟫

**PLAINTIFF**    ⟪TO [FATHER]:⟫ *I know - why don't you cut this. come on. look - just try to pay attention - just try to pay attention. alright?*

**[FATHER]**    ⟪TO PLAINTIFF:⟫ *Don't argue with her!*

**PLAINTIFF**    ⟪TO [FATHER]:⟫ *ok ok ok. I understood - I understood. That's my fault.*

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    1696907690

〚 [RSR] CONTINUES SPEAKING LOUDLY ON PHONECALL TO [HOA] IN-ORDER-TO RACIALLY-INTIMIDATE PLAINTIFF/[FATHER] 〛

**PLAINTIFF**          《TO [FATHER]:》 *sshhuh... Unbelievable!*

〚 PLAINTIFF CONTINUES TO SELECT BETWEEN CUT/FLATTENED SHEETS OF CARDBOARD 〛
〚 PLAINTIFF EXPRESSES DISAPPOINTMENT TO [FATHER] THAT [FATHER] HAD SHOWN WEAKNESS BY STANDING MOTIONLESS TO [RSR]'S ABUSE. 〛

**PLAINTIFF**          《TO [FATHER]:》 *Which one? Again, you're.. Unbelievable!*

〚 PLAINTIFF CONTINUES TO SELECT BETWEEN CUT/FLATTENED SHEETS OF CARDBOARD 〛
〚 [781KL-2009-4], DAUGHTER OF THEN PROPERTY-OWNERS OF [781KLLTX78641] ASK IF PLAINTIFF/[FATHER] WERE OK AFTER SUFFERING ABUSE- 〛
〚 AND INTIMIDATION/INTERFERENCE/DISORDERLY-CONDUCT FROM [RSR] 〛

**[781KL-2009-4]**   《TO PLAINTIFF/[FATHER]:》 *You guys ok?*

**PLAINTIFF**          《TO [781KL-2009-4]:》 *What?*

**[781KL-2009-4]**   《TO PLAINTIFF/[FATHER]:》 *You guys ok?*

**PLAINTIFF**          《TO [781KL-2009-4]:》 *Yeah, I wish I were...*

**[781KL-2009-4]**   《TO PLAINTIFF/[FATHER]:》 _____

- 
- 
- 

**[[[TRANSCRIPT INCOMPLETE: TO BE COMPLETED]]]**

- 
- 
- 

〚 AT ONE POINT IN TIME, WHILE THE PLAINTIFF WAS REMOVING SOME OF THE GRASS OF [788KLLTX78641] GROWING ONTO- 〛
〚 -THE SIDEWALK, [RSR] LOUDLY EXPLAINS TO THE [HOA] OVER THE PHONE, AGAIN, SO THAT HER INTIMIDATING WORDS- 〛
〚 -CONTINUE-TO-BE AUDIBLE TO THE PLAINTIFF: 〛

**[RSR]**          《TO [HOA]:》 *He's edging the grass on the sidewalk...!*

〚 [RSR] CONTINUES TO LOUDLY DISCUSS WITH THE [HOA] OVER THE PHONE, WHETHER THE [HOA] WOULD NOW BE TAKING LEGAL- 〛
〚 -ACTION AGAINST THE PLAINTIFF. AND SHORTLY THERE-AFTER, WHEN [RSR] RECEIVES SOME ACKNOWLEDGEMENT THAT THE [HOA]- 〛
〚 -WOULD BE CONSIDERING LEGAL-ACTION AGAINST THE PLAINTIFF, [RSR] THANKS THE [HOA] REPRESENTATIVE AND/OR ATTORNEY- 〛

1696907690

SIDDHARTH RODE    V.    WILLIAMSON COUNTY , ET AL.

〖 -THAT SHE WAS SPEAKING WITH, DESPITE OF THE FACT THAT THE PLAINTIFF AND [PARENTS] WERE TAKING SERIOUS STEPS TO- 〗

〖 -ADDRESS THE PREDATORY/MALICIOUS THREATS OF LEGAL ENFORCEMENT ACTIONS. JUST LIKE HER PREVIOUS MANIPULATIVE- 〗

〖 -ACTIONS, [RSR]'S ACTIONS OF THIS DAY, ARE BY NO MEANS, CHILDISH, BUT RATHER, PURELY PREDATORY AND MALICIOUS- 〗

〖 -BASED ON HER EXTREME-RACIAL-ANIMUS, FAR-RIGHT-WING-EXTREMIST/FASCIST POLITICAL-ANIMUS AGAINST THE PLAINTIFF. 〗

**[RSR]**          〖TO [HOA] :〗 *Thank you!*

〖 IT SHOULD BE NOTED THAT [HOA]S ARE REQUIRED BY LAW TO PRESERVE AT LEAST 7 OF THE MOST-RECENT YEARS WORTH OF RECORDS.- 〗

〖 -THEREFORE, SINCE ALL PHONECALLS TO THE [HOA] ARE RECORDED, THIS ENTIRE PHONE CONVERSATION THAT [RSR] HAD WITH THE- 〗

〖 -[HOA], ON THIS PARTICULAR DAY, AND GENERALLY-SPEAKING, ANY-AND-ALL OF THE OTHER COMMUNICATIONS THAT [RSR],[JSP&KAP]- 〗

〖 -HAD WITH THE [HOA] DURING THIS TIME PERIOD SHOULD BE AVAILABLE/DISCOVERABLE AS EVIDENCE TO THIS CASE. 〗

- 
- 
- 

# ¶386

On or about an afternoon early in the month of {2017-02}, the plaintiff continues to work tirelessly on re-landscaping the [FRONTYARD]. The plaintiff notices a loud pickup-truck belonging to then-[HOA-BoD]-President [SPOA-P-BC] drive up the street in front of the plaintiff's property and then pause on the street right in front of the plaintiff's property. [SPOA-P-BC] lowers his front-window and starts to take photograph(s) of the plaintiff's [FRONTYARD]. When the plaintiff walked towards the public-sidewalk area, and started to explain to then-[HOA-BoD]-President [SPOA-P-BC] that the plaintiff was in the process of submitting approval document(s) to the [HOA] concerning grass-replacement in the [FRONTYARD] - with the initial version of those document(s) submitted to the [HOA] (management-company) and [HOA] attorney via email, during that very same week, while still strongly asserting in that very same email, that a homeowners grass-replacement with another species of grass did not require [HOA] approval (according to the deed-restrictions of the neighborhood). Before the plaintiff could even complete a sentence, then-[HOA-BoD]-President [SPOA-P-BC] angrily shouted to the plaintiff: *"NO! GET AWAY FROM ME! DON'T WANNA TALK TO YA! I'M JUST HERE TO TAKE A PICTURE! ... GOOD-BAYE!"* After raising his phone to take the photograph(s), then-[HOA-BoD]-President [SPOA-P-BC] raised up the front-window of his pickup-truck, and angrily drove his pickup-truck up the street. Clearly, the leadership of any reputable organization that operates in a lawful and professional manner, would not need to resort to such underhanded tactics of intimidation and demonstrations-of-anger to achieve their goals, and would instead, fight their legal battles in the proper manner, while following proper legal procedure. Such was clearly not the case with the then-[HOA] under [SPOA-P-BC] and [SPOA-VP-AH] who governed over the neighborhood with a heavy-handed iron-fist - resorting to such unprofessional tactics of intimidation and demonstrations-of-anger - even to those homeowners (such as the plaintiff) that were merely asserting their lawful rights as homeowners (see below for the scandalous incidents in {2019} involving [SPOA-P-BC],[SPOA-VP-AH] eventually leading to their ousting as Board-Members).

# ¶387

On or about the approximate date and time of {2017-02-06 17:00}, the plaintiff continues to work tirelessly to re-landscape the [FRONTYARD] with the *"no-mow"* grass - to meet the unreasonable demands of the [HOA]. [RSR] initially walks up the opposite sidewalk

SIDDHARTH KODE   v.   WILLIAMSON COUNTY , ET AL.                                    1696987690

(across the street) nearest her house, loudly threatening the plaintiff and even repeatedly yelling a racial-slur at the plaintiff. Approximately 20 minutes later, [RSR] walks on the sidewalk closest to the plaintiff's property (when she had no reason to even be on such sidewalk since her home is across the street), accosting the plaintiff, vandalizing and/or violently kicking the plaintiff's property, threatening the plaintiff, and continuing to use racial-slurs and other racist, psychologically-abusive, rhetoric that clearly imposes her strong sense of racial-superiority over the plaintiff. Similar to the so-called *"Karens"* that have caught the attention of the national media (Permit-Patty, Pool-Patrol-Paula, BBQ-Becky, Amy-Cooper, etc.), [RSR], acting under color of law, even interrogates the plaintiff if the plaintiff has a permit for temporarily using wood on the 2-inch-edge of the sidewalk (when the sidewalk is 4-feet wide) for the purpose of holding soil inside the plaintiff's yard - even though [RSR] knows that her co-conspirators [JSP&KAP] have, on numerous occasions, illegally parked their vehicles on the sidewalk for long periods of time (without any such permit), forcing people that were walking on the sidewalk to walk onto the road in-order-to avoid such illegally-parked vehicles. On numerous occasions, [RSR] even vandalizes the plaintiff's property - violently kicking the wood - threatening that the plaintiff is not allowed to temporarily use even the two-inch-edge of a 4-feet-wide sidewalk for temporary re-landscaping purposes, and repeatedly demands the plaintiff to remove the wood from the 2-inch-edge of the sidewalk immediately. [RSR], continuing to act under color of law, and despite never being a [SPOA] Board-Member, even interrogates the plaintiff to know if the plaintiff had [HOA] approval for such re-landscaping, when even [HOA] Board-Members would not be brazen enough to accost/confront a property-owner on any such issue. During this racist, abusive rant, [RSR] continues her usual abusive actions of blackmail/extortion against the plaintiff, under the fraudulent pretense of *"protecting property values"*, when the entire neighborhood's sharply-rising appraisal values clearly establish her fraud:

---

‣  RECORDED RACIST, ABUSIVE, THREATENING RANT FROM [RSR] TO PLAINTIFF(I·) ·    (2017-02-06 17:00)(~)
‣  [ PRIVATE INFORMATION OMITTED/REDACTED TO PROTECT PRIVACY ]
‣  [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]


〚 PLAINTIFF CONTINUES TO PIN-DOWN SHEETS OF CARDBOARD NECESSARY FOR RE-LANDSCAPING PROCESS. 〛
〚 [RSR] WALKING DOG IN SIDEWALK ACROSS STREET, YELLS OUT A THREAT AND RACIAL SLUR AT PLAINTIFF: 〛


**[RSR]**          *BETTER NOT HAVE THAT ON THE SIDEPATH!... OR I'M MOVING IT! - IF IT'S ON THE SIDEPATH - I'M MOVING IT!... NEIGHBORHOOD*
                   *TERRORIST!*


〚 PLAINTIFF REACTS IN SHOCK AT THE RACIAL SLUR: 〛


**PLAINTIFF**      *You're a racist!*


〚 [RSR] CONTINUES TO USE THE RACIAL SLUR, AND FRAUDULENT NARRATIVE: 〛


**[RSR]**          *NO, YOU'RE A TERRORIST - WHO TERRORIZES THIS WHOLE COMMUNITY!*


**PLAINTIFF**      *You're a racist!*


**[RSR]**          *[???]*


**PLAINTIFF**      *Yeah - You just called me a "terrorist" - that's a racist statement right there!*


〚 [RSR] CONTINUES WALKING DOG UP SIDEWALK AND AWAY FROM PLAINTIFF. 〛

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

〚 PLAINTIFF REMAINS SHOCKED THAT [RSR] WOULD BRAZENLY SHOUT A RACIAL-SLUR WHEN PEOPLE COULD EASILY HEAR. 〛

〚 PLAINTIFF CONTINUES TO WORK TIRELESSLY ON THE [FRONTYARD] RE-LANDSCAPING. 〛

〚 [RSR] ACCOSTS PLAINTIFF, THIS TIME ON THE SAME SIDEWALK WHICH IS ACROSS THE STREET FROM HER HOUSE: 〛


**[RSR]**        *MOVE THIS OFF THE SIDEWALK!*


**PLAINTIFF**        *There's nothing on the sidewalk!*


〚 [RSR] EVEN ADMITS PLAINTIFF IS WORKING HARD TO SATISFY UNREASONABLE [HOA] DEMANDS. 〛

〚 YET, [RSR] CONTINUES TO INTIMIDATE/INTERFERE-WITH/HARASS/THREATEN PLAINTIFF: 〛


**[RSR]**        *IT IS - RIGHT HERE! OR I'LL MOVE IT AND ALL YOUR HARD WORK - RIGHT HERE - THAT'S ON THE SIDEWALK!*


**PLAINTIFF**        *Well... that's - That's on the edge!*


**[RSR]**        *NO! THIS IS PUBLIC PROPERTY - AN EASEMENT!*


**PLAINTIFF**        *That's on the edge!*


〚 [RSR] KICKS AT WOOD ENCLOSURE (HOLDING SOIL INSIDE THE PLAINTIFF'S PROPERTY) THAT IS TOUCHING THE EDGE OF SIDEWALK. 〛

〚 [RSR] FRAUDULENTLY CLAIMS THAT WOOD IS IN HER WAY WHEN SUCH WOOD WAS OCCUPYING 2-INCH-EDGE OF 4-FEET-WIDE SIDEWALK: 〛


**[RSR]**        *THIS OVER HERE IS IN MY WAY - I CAN MOVE IT!*


〚 PLAINTIFF TRIES TO EXPLAIN THAT THE ENCLOSURE IS ONLY TEMPORARY: 〛

**PLAINTIFF**        *ok... It will be there only for like 2 months!*


〚 [RSR] QUESTIONS WHETHER PLAINTIFF HAS PERMIT, NOT MUCH UNLIKE "PERMIT PATTY": 〛

**[RSR]**        *NO! - UH UH - IT NEEDS TO MOVE! IT CAN'T BE THERE FOR 2 MONTHS! DO YOU HAVE A PERMIT FOR THIS?! [CAUSE ...]*


**PLAINTIFF**        *It just needs to hold the soil in place! There's...*


〚 [RSR] CONTINUES TO INTIMIDATE/INTERFERE-WITH/HARASS PLAINTIFF DESPITE FACT THAT WOOD IS ON EDGE OF SIDEWALK. 〛

〚 [RSR] NEVER COMPLAINED ABOUT NUMEROUS TIMES [JSP&KAP],[JSP&KAP]'S CHILDREN HAVE PARKED VEHICLES ON SIDEWALK. 〛

〚 [RSR] CONTINUES TO VIOLENTLY KICK THE PLAINTIFF'S PROPERTY - THE WOOD ENCLOSURE. 〛

**[RSR]**        *NO! IT NEEDS TO BE MOVED! - THIS IS SIDEWALK! - THIS IS PUBLIC PROPERTY, SID! YOU HAVE TO MOVE THIS! THIS IS ON THE*
                 *SIDEWALK RIGHT HERE! THIS IS SIDEWALK! - SIDEWALK! - YOU CANNOT HAVE IT THERE! IT CANNOT-*


〚 PLAINTIFF IS SHOCKED THAT [RSR] WOULD BRAZENLY VANDALIZE PLAINTIFF'S PROPERTY RIGHT IN FRONT OF PLAINTIFF: 〛

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                                    1696907690

**PLAINTIFF**        *Ok- Yes!*

〔 [RSR] CONTINUES TO INTIMIDATE/INTERFERE-WITH/HARASS/THREATEN PLAINTIFF: 〕

**[RSR]**        *SIDEWALK RIGHT HERE! CANNOT HAVE IT THERE! - THIS IS ALL SIDEWALK! YOU NEED TO MOVE IT!*

〔 PLAINTIFF POINTS OUT ABOUT GRASS THAT GROWS ONTO PUBLIC SIDEWALK: 〕

**PLAINTIFF**        *What about - What about the edging?! What about the grass?!*

**[RSR]**        *I DON'T GIVE A SHIT! DON'T WANT IT! YOU NEED TO PUT IT ON YOUR PROPERTY AND NOT ON THE SIDEWALK!*

**PLAINTIFF**        *Ssh! The grass is growing on there! And that's public! ... What about the grass?!*

〔 [RSR] CONTINUES FRAUDULENT NARRATIVE ABOUT PLAINTIFF'S PROPERTY APPEARANCE WHICH SHE KNOWS TO BE HARMLESS: 〕

**[RSR]**        *HEY! HEY! HEY! LOOK! YOU HAVE SUBJECTED US TO THIS KIND OF YARD FOR AT LEAST 9 YEARS!*

**PLAINTIFF**        *I've- I've not subjected you to anything! I'm just trying to-*

**[RSR]**        *YES YOU HAVE! YOU HAVE VIOLATED FLAGRANTLY-*

**PLAINTIFF**        *I've not violated any rules!*

〔 [RSR] CONTINUES FRAUD - CONTINUES PRETENDING AS IF SHE HAS NEVER VIOLATED THE RESTRICTIVE-COVENANTS: 〕

**[RSR]**        *THE RULES OF THE [HOA] WHICH YOU SIGNED!*

**PLAINTIFF**        *In 2013, they- in 2013, they-*

〔 [RSR] CONTINUES TO INTIMIDATE/INTERFERE-WITH/HARASS PLAINTIFF ABOUT WOOD ENCLOSURE, KICKING AT THE WOOD: 〕

**[RSR]**        *THIS IS PUBLIC PROPERTY. IF YOU WANT THIS HERE - THEN YOU MOVE IT ON YOUR GRASS! BUT YOU DONT' MOVE IN THE SIDEWALK!*

**PLAINTIFF**        *Ok, But this is the same area!*

**[RSR]**        *THIS NEEDS TO BE MOVED OFF THE SIDEWALK! YOU NEED TO PUT IT ON YOUR PROPERTY! NOT ON THE SIDEWALK!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**        *Ok- this!*

〘 [RSR] ALSO BRAZENLY THREATENS PLAINTIFF: 〙

**[RSR]**        *MOVE IT ONTO YOUR GRASS, OR IT WILL BE REMOVED!*

〘 PLAINTIFF IS EXHAUSTED AS PLAINTIFF HAS WORKED HARD TO CREATE ENCLOSURE AND MOVE SOIL AROUND: 〙
〘 PLAINTIFF SIGHS IN DISBELIEF, AS [RSR] ADVANCES FRAUDULENT NARRATIVE (SINCE WOOD IS ONLY ON EDGE): 〙

**PLAINTIFF**        *What about-*

**[RSR]**        *ON YOUR GRASS! - THIS IS THE SIDEWALK! - YOU DON'T HAVE THE RIGHT RESTRICT ACCESS THE [???] SIDEWALK!*

**PLAINTIFF**        *What if the grass is growing there?! what about that?!*

〘 [RSR] CONTINUES ADVANCING RACIST, FRAUDULENT NARRATIVE ABOUT PLAINTIFF: 〙

**[RSR]**        *IT DOESN'T MATTER - SID - YOU ARE TERRORIZING THIS NEIGHBORHOOD!*

**PLAINTIFF**        *I'm not t-! I'm not!*

**[RSR]**        *BY YOUR FLAGRANT DISREGARD OF THE RULES!*

**PLAINTIFF**        *I'M NOT DISREGARDING!*

〘 [RSR] ADMITS AGAIN THAT SHE IS ABUSING PLAINTIFF BECAUSE SHE DOES NOT LIKE PLAINTIFF'S PROPERTY APPEARANCE: 〙

**[RSR]**        *EVERYTIME I LOOK OUT MY FRONTYARD - I SEE THIS CRAP!*

**PLAINTIFF**        *That's temporary! It's going to be soil there!*

**[RSR]**        *NO! - ITS BEEN 8 YEARS, SINCE 2009 - YOU HAVE FLAGRANTLY DISREGARDED THE [HOA] RULES!*

**PLAINTIFF**        *I have not disregarded anything!*

**[RSR]**        *YES YOU ARE! YES YOU ARE!*

**PLAINTIFF**

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

the [HOA] has disregarded the-

[RSR]        YOU CAN HIDE BEHIND LOOPHOLES!

PLAINTIFF    Its not loopholes! They're-

[RSR]        ALL YOU WANT - BUT YOU ARE FLAGRANTLY DISREGARDING - YOU'RE SELFISH AND INCONSIDERATE!

PLAINTIFF    No - you're selfish! Right - you're sel- Why don't you care about the environment!! Why don't you care about the environment!!

[RSR]        I CARE ABOUT THE ENVIRONMENT!

PLAINTIFF    No, you don't! Because if you did - then - why would you be - why would you be wasting resources, why would you be wasting water, the way that you do!
             Why would you be you - you know -

[RSR]        I DO NOT WASTE WATER!

PLAINTIFF    Yeah, you do waste water! Even the fact that you're mowing...

[RSR]        You don't know what I do Sid!

PLAINTIFF    No actually, Even...

[RSR]        YOU ARE MAKING ASSUMPTIONS BASED ON THE FACT THAT I'M A WHITE FEMALE!

PLAINTIFF    No! Actually, it's not-

[RSR]        I do not run the water, when I'm brushing my teeth! I make sure I have a full load!

PLAINTIFF    Actually... you know what! Don't-

⟦ AS USUAL, [RSR] CONTINUES TO RAMBLE-ON WITH ONE UNPROVEN STATEMENT AFTER ANOTHER. ⟧

[RSR]        All my vegetables and everything are composted!

**PLAINTIFF**        *Yes - So, do I have-*

**[RSR]**        *[???]*

**PLAINTIFF**        *I don't have access- I don't even use water!*

**[RSR]**        *SO I DON'T - I DO NOT WASTE!*

**PLAINTIFF**        *Where I'm from-*

**[RSR]**        *[???] ABOUT WASTING RESOURCES! LOOK AT ALL THIS [???] WASTED!*

**PLAINTIFF**        *Where I'm from.. people live on 4 - 4 liters of water [per person] per day!*

**[RSR]**        *WHAT ABOUT THE PVCS IN THIS!*

**PLAINTIFF**        *People live on a gallon or 2 of water per day - hey, where I'm from! where I'm from!*

⟦ [RSR] MAKES OVERTLY-RACIST STATEMENT TELLING PLAINTIFF TO MOVE BACK TO PLAINTIFF'S COUNTRY OF ORIGIN: ⟧

**[RSR]**        *THAT'S GREAT - OK, WELL - **WHERE YOU'RE FROM - GO BACK THERE AND LIVE THERE!***

**PLAINTIFF**        *ok! so, that's a racist statement – right there! that's a racist...*

**[RSR]**        *NO ITS NOT!*

**PLAINTIFF**        *Yes it is! That is as racist statement!*

⟦ [RSR] REPEATS THE OVERTLY-RACIST STATEMENT TO PLAINTIFF: ⟧

**[RSR]**        *YOU DON'T LIKE IT OVER HERE! IF YOU DON'T LIKE IT HERE - THEN GO BACK THERE!*

**PLAINTIFF**        *Ok - It's not that I don't like it here!*

〖 PLAINTIFF NEVER IMPOSED PLAINTIFF'S CULTURAL/RELIGIOUS VALUES ON [RSR]; ONLY THE OPPOSITE IS TRUE: 〗

**[RSR]**          *ITS NOT UP TO ME TO GO BY YOUR RULES!*

**PLAINTIFF**     *I'm not going - I'm not not imposing you - I'm not imposing my rules on you!*

〖 [RSR] CONTINUES FRAUD; IN NO WAY DID PLAINTIFF'S WOOD ON EDGE OF SIDEWALK OBSTRUCT USE OF SIDEWALK: 〗

**[RSR]**          *YOU DON'T LIKE THIS - YOU'RE ON PUBLIC PROPERTY! GET THIS SHIT OUT OF MY WAY! SO, THAT I CAN WALK THE SIDEWALK IN [???]!*

**PLAINTIFF**     *So... So... I'm not imposing my rules on you!*

**[RSR]**          *YES YOU ARE! [???]*

**PLAINTIFF**     *I'm just going by the [HOA] rules!*

〖 [RSR] CONTINUES TO REVEAL HER ILLEGAL SECRET CONSPIRACY WITH THE [HOA]: 〗

**[RSR]**          *[???] WELL, THEY'RE COMING FOR YOU BUDDY!*

**PLAINTIFF**     *Well the [HOA], the rules, they state that 2013. In 2013, they state that, there's drought resistant landscaping!*

〖 [RSR] CANNOT DENY THAT SHE HAS MADE COUNTLESS RACIST STATEMENTS/ACTIONS TOWARDS PLAINTIFF, YET: 〗

**[RSR]**          *SID! SID! SID! SID! SID! NUMBER ONE - I'M NOT A RACIST! AND I [???]*

**PLAINTIFF**     *Ok, I - I highly disagree with that! Because the very targeting of me - the very targeting of me!-*

〖 [RSR] CONTINUES TO USE RACIAL-SLURS AGAINST PLAINTIFF, EVEN THOUGH SHE KNOWS PLAINTIFF IS RECORDING: 〗

**[RSR]**          *[???] I'M SPEAKING TO YOU LIKE THE VILLAGE IDIOT THAT YOU ARE!*

〖 PLAINTIFF ENCOURAGES [RSR] TO CONTINUE MAKING RACIST STATEMENTS SINCE PLAINTIFF IS RECORDING: 〗

**PLAINTIFF**     *Oh!! Exactly!! Keep going! I mean, that's exactly what it is!*

**[RSR]**          *OH, SO IF I SAY VILLAGE IDIOT - HOW IS THAT A RACIST STATEMENT?!*

**PLAINTIFF**     *I'm trying to do what is right for the environment here!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                                          1696907690

**[RSR]**          *NO, YOU'RE NOT!*

**PLAINTIFF**      *Yes I am! I'm trying to cultivate-*

〔 [RSR] MAKES FRAUDULENT STATEMENT THAT WOOD ON EDGE OF SIDEWALK IS HARMING HER: 〕

**[RSR]**          *IT'S NOT SAFE FOR ME FOR YOU TO HAVE THIS WOOD HERE! YOU DON'T NEED THIS WOOD!*

**PLAINTIFF**      *actually, to hold the soil - the soil in place - yes I do!*

**[RSR]**          *YOU DON'T NEED THIS WOOD AND IT DOESN'T NEED TO BE ON THIS SIDEWALK!*

**PLAINTIFF**      *Ok, well how the hell - how am I supposed to hold this soil in place?! Its only going to be-*

**[RSR]**          *GET A BARRIER AND PUT IT ON YOUR PROPERTY! DON'T PUT IT ON THE SIDEWALK!*

**PLAINTIFF**      *Ok, i'll try to accommodate that request, but other than that!-*

〔 [RSR] CONTINUES FRAUD - COMMITTED SEVERAL HATE-CRIMES AGAINST PLAINTIFF, NOT ONE OF WHICH WAS EVEN CHARGED: 〕

**[RSR]**          *NO, IT IS NOT A REQUEST, IT'S THE LAW! SO, WHEN I COME WALK HERE... IF THIS IS IN MY WAY, I HAVE EVERY RIGHT TO REMOVE IT!*

**PLAINTIFF**      *So, you're the - you're the one that's the neighborhood terrorist - you're coming at me and you're terrorizing me!*

**[RSR]**          *I HAVE PUT WITH YOUR CRAP FOR YOUR 8 YEARS! SINCE 2009!*

〔 PLAINTIFF TRIES TO EXPLAIN THAT NO ONE ELSE IS MAKING THESE DEMANDS OF PLAINTIFF: 〕

**PLAINTIFF**      *So, no-one, as far as - as for as I can tell - as far as I can tell - no one else is-. this is what i'm trying to .. see.. you're*

〔 [RSR] MAKES ANOTHER OF MANY EMPTY-THREATS TO SUE PLAINTIFF, BUT NEVER DID SUE PLAINTIFF: 〕

**[RSR]**          *THEY HAVE WRITTEN - WE HAVE WRITTEN. WE ARE SICK AND TIRED.. AND BECAUSE OF THAT, IF THE [HOA] DOESN'T ... WE HAVE A LAWYER AND WE ARE GOING TO SUE YOU!*

**PLAINTIFF**      *Basically, what i'm trying to do-*

〔 [RSR] CONTINUES FRAUD: PLAINTIFF CALLED BROTHER [PK] TO INSTALL CAMERAS, FENCE-LOCK - NOTHING ELSE: 〕

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

《 [RSR] MAKES FRAUDULENT ACCUSATION ABOUT PLAINTIFF'S BROTHER: 》

**[RSR]**         *YOU BROUGHT YOUR BROTHER TERRORIZED MY [SON]..!*

**PLAINTIFF**    *I'm not doing anything here! I'm not doing anything here!*

《 PLAINTIFF NEVER MADE FALSE ACCUSATION ABOUT [RSR] - EVEN TELLING [WC] POLICE THAT PLAINTIFF ACCUSES NO-ONE. 》

**[RSR]**         *AND YOU ACCUSED ME OF DUMPING CAT LITTER IN YOUR THING!-*

**PLAINTIFF**    *I still don't know if that's true or not! I still don't know if that's false or not!*

**[RSR]**         *SID! WHY WOULD I TAKE MY CAT LITTER AND WALK ACROSS THE STREET WITH IT... WHY WOULD I GET UP AND WHY WOULD I KNOCK ON YOUR DOOR [IN THE MIDDLE OF NIGHT]!*

**PLAINTIFF**    *Why are you doing what you're doing right now?!!*

《 [RSR], LIKE A CON-ARTIST, TRIES TO JUSTIFY HER DEVIOUS, FRAUDULENT TACTICS: 》

**[RSR]**         *THAT WAS A CRAZY NEIGHBOR! I'M GOING TO TALK TO YOU FACE-TO-FACE!*

**PLAINTIFF**    *Why would you?-*

《 [RSR], LIKE A CON-ARTIST, FRAUDULENTLY PRETENDS AS IF HER WORDS DO NOT TERRORIZE PLAINTIFF: 》

**[RSR]**         *I'M NOT GOING TO TERRORIZE BY THROWING CAT LITTER - I'M GOING TO TELL YOU RIGHT UP FRONT!*

《 PLAINTIFF LAUGHS SARCASTICALLY IN TOTAL DISBELIEF: 》

**PLAINTIFF**    *Yeah!*

《 [RSR], LIKE A CON-ARTIST, FRAUDULENTLY PRETENDS AS IF SHE CANNOT WALK SIDEWALK DUE TO PLAINTIFF'S WOOD ON EDGE: 》

**[RSR]**         *I CAN'T WALK THIS SIDEWALK BECAUSE YOU GOT YOUR CRAZY SHIT!*

**PLAINTIFF**    *I still don't-*

《 [RSR] CONTINUES FRAUD - TERRORIZES PLAINTIFF BECAUSE OF PLAINTIFF'S PROPERTY APPEARANCE: 》

**[RSR]**         *I'VE PUT UP WITH YOUR CRAP FOR 8 YEARS, AND I'M AT THE END OF IT!*

PLAINTIFF       *This is what i'm trying to do to accommodate all of yall!*

[RSR]           *NO! - NO YOU'RE NOT!*

PLAINTIFF       *Yes I am - I'm trying to develop a no-mow-*

〚 [RSR] CONTINUES FRAUD - PRETENDS AS IF SHE OWNS PUBLIC SIDEWALK - ACROSS STREET FROM HER HOUSE: 〛

[RSR]           *YOU KNOW WHAT - IF YOU WANT TO ACCOMMODATE ME, GET THIS OFF MY PUBLIC SIDEWALK!-*

PLAINTIFF       *You're just trying to - you're just trying to make it hard on me!*

[RSR]           *NO, I'M NOT MAKING IT HARD!*

PLAINTIFF       *yes - you are!*

〚 [RSR] CONTINUES FRAUD - THERE WAS NO PLASTIC, AND WOOD WAS ONLY ON THE 2-INCH-EDGE: 〛

[RSR]           *I WANT TO WALK ON THIS SIDEWALK - I SHOULDN'T HAVE TO JUMP OVER LUMBER AND PLASTIC!*

PLAINTIFF       *Ok!*

[RSR]           *SO, ALL I'M ASKING YOU IS TO MOVE IT BACK ON YOUR GRASS LINE - AND NOT ON PUBLIC PROPERTY!*

PLAINTIFF       *Ok, i'll try - like I said - I'll try to [accommodate that]!*

[RSR]           *AND ITS NOT RACIST TO SAY THAT!*

PLAINTIFF       *Ok, no actually - When you call me a "VILLAGE IDIOT", when you call me a "TERRORIST"!-*

〚 [RSR] CONTINUES TO USE RACIAL-SLURS: 〛

[RSR]           *YOU'RE A VILLAGE IDIOT!*

PLAINTIFF       *Oh - ok! but, i'm trying to do what's right for the environment - and that makes me a "VILLAGE IDIOT"!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

〘 [RSR] CONTINUES TO MAKE YET MORE UNPROVEN STATEMENTS: 〙

**[RSR]**          *[YOU DON'T KNOW] RACISM! I AM FAR FROM RACISM! IF YOU KNEW MY FAMILY HISTORY - YOU WOULD NOT ACCUSE ME OF THAT!*

**PLAINTIFF**      *ok ok ok - actually, if you knew anything about the environmental movement!-*

〘 [RSR] CONTINUES FRAUD - PRETENDS AS IF SUPPORTING ENVIRONMENTAL MOVEMENT WHEN ACTIONS PROVE OTHERWISE: 〙

**[RSR]**          *OH, I DO! I DO!*

**PLAINTIFF**      *And indigenous people - and indigenous people - indigenous people all over the world - They live like I do!*

〘 [RSR] ADMITS THAT INDIGENOUS PEOPLES ARE NOT WELCOME IN HER WHITE NEIGHBORHOOD: 〙

**[RSR]**          *NOT IN A NEIGHBORHOOD!*

**PLAINTIFF**      *They try to conserve resources!*

〘 [RSR] ADMITS THAT INDIGENOUS PEOPLES ARE NOT WELCOME IN A [HOA] NEIGHBORHOOD: 〙

**[RSR]**          *NOT WITH YOUR [HOA] RULES! PEOPLE WHO LIVE LIKE THIS - YOU'RE NOT INDIGENOUS TO HERE!*

**PLAINTIFF**      *Not in the... ok, what you're basically saying is!-*

〘 [RSR] ADMITS RACIAL-SUPERIORITY - THAT "DEVELOPED" WHITE NEIGHBORHOOD IS SUPERIOR: 〙

**[RSR]**          *YOU'RE NOT INDIGENOUS TO HERE! AND THIS IS A DEVELOPED NEIGHBORHOOD, SID!*

**PLAINTIFF**      *Well, first all - so, what - so, what you're basically saying is that indigenous people are not welcome in this neighborhood!*

**[RSR]**          *NO, THAT'S NOT WHAT I'M SAYING!*

**PLAINTIFF**      *That's basically - that's exactly what you're saying!*

〘 [RSR] CONTINUES FRAUD - AFTER MAKING SEVERAL THREATS TO KICK PLAINTIFF OUT OF WHITE-NEIGHBORHOOD: 〙

**[RSR]**          *NO, YOU'RE VERY WELCOME HERE!*

**PLAINTIFF**      *That's what you're saying! Because-*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

〖 [RSR] CONTINUES FRAUD - MAKES ONE STATEMENT - THEN ANOTHER STATEMENT THAT DIRECTLY CONTRADICTS IT: 〗

**[RSR]**         *I COULD CARE LESS WHAT YOU DO! I COULD CARE LESS WHO YOU ARE - JUST MOW YOUR GRASS, AND GO BY COVENANTS OF THE NEIGHBORHOOD!*

**PLAINTIFF**     *You're basically saying-*

〖 [RSR] CONTINUES TO IMPOSE HER OVERT SENSE OF RACIAL SUPERIORITY OVER PLAINTIFF: 〗

**[RSR]**         *THAT'S BASICALLY - I DON'T NEED YOU TO TELL ME WHAT I'M SAYING!*

〖 PLAINTIFF LAUGHS SARCASTICALLY WITH INDIGNATION: 〗
〖 [RSR] CONTINUES TO ORDER PLAINTIFF AS IF SHE IS THE BOSS/MASTER OF PLAINTIFF: 〗

**[RSR]**         *I WILL TELL YOU WHAT I'M SAYING - WHAT I'M SAYING JUST MOW YOUR GRASS AND [???] OF ACCESS!*

**PLAINTIFF**     *No, but basically-*

**[RSR]**         *AND IF YOU'RE GOING TO THIS KIND OF CRAP - THEN MOVE IT OFF THE SIDEWALK!*

**PLAINTIFF**     *The [HOA] rules calls for - the [HOA] rules call for - but the [HOA] rules call for-*

**[RSR]**         *WHAT I'M SAYING THAT YOU'RE NOT INDIGENOUS TO THIS AREA - HECK, I'M NOT INDIGENOUS TO THIS AREA!*

**PLAINTIFF**     *exactly! so, what i'm trying to say is-*

〖 [RSR] CONTINUES FRAUD - CONTINUES PRETENDING AS IF SHE HAS NEVER VIOLATED RESTRICTIVE-COVENANTS: 〗

**[RSR]**         *SO, WHAT I'M SAYING IS I GO BY THE RULES - I GO BY THE RULES!*

**PLAINTIFF**     *Actually, I am-*

**[RSR]**         *AND YOU ARE NOT GOING BY THE RULES!*

**PLAINTIFF**     *What i'm trying to say, i am trying to live by -*

**[RSR]**         *NO - YOU ARE NOT GOING BY THE RULES - YOU ARE FIGHTING THE RULES, AND YOU'RE THROWING A LOT OF BULLSHIT LOOPS!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**       *Actually, I am - I am trying to get- I'm doing-*

**[RSR]**       *YOU ARE NOT GOING BY THE RULES - YOU ARE FIGHTING THE RULES!*

**PLAINTIFF**       *No, i'm not!*

**[RSR]**       *AND YOU'RE THROWING A LOT OF BULLSHIT LOOPS!*

**PLAINTIFF**       *I'm not doing - I'm not doing anything!*

**[RSR]**       *YES YOU ARE!*

**PLAINTIFF**       *Did you read the law?! Did you read the law?!*

〖 [RSR] CONTINUES TO ACT AS BOSS/MASTER TO PLAINTIFF - DEPRIVING PLAINTIFF OF PLAINTIFF'S CULTURAL/RELIGIOUS VALUES: 〗

**[RSR]**       *NO YOU'RE NOT - JUST MOW YOUR GRASS AND TRIM YOUR TREES!*

**PLAINTIFF**       *No it isn't - i'm trying to install a "no-mow" grass!*

**[RSR]**       *AND IF YOU DON'T LIKE THE RULES HERE-*

**PLAINTIFF**       *I'm trying to install a "no-mow" grass!*

〖 [RSR] CONTINUES INTOLERANCE THAT INDIGENOUS PEOPLES ARE NOT WELCOME IN [HOA]/WHITE NEIGHBORHOODS: 〗

**[RSR]**       *-THEN, BUY YOU A LOT OF LAND! AND DO ALL YOU WANT TO!*

〖 PLAINTIFF NOTICES FEW OTHER PEOPLE CONGREGATING TO SEE OUTRAGEOUS SCENE [RSR] HAS CREATED: 〗

**PLAINTIFF**       *It takes time to establish! You're trying to make a scene here! All i'm trying to say is-*

〖 [RSR] CONTINUES FRAUD - PRETENDS AS IF WOOD AT 2-INCH-EDGE OF SIDEWALK IS PREVENT HER FROM WALKING: 〗

**[RSR]**       *NO, I'M TELLING YOU - I CAN'T WALK THE SIDEWALK WITH YOUR CRAP - MOVE YOUR CRAP OFF THE SIDEWALK!*

**PLAINTIFF**       *I'm trying to install-*

SIDDHARTH  KODE    V.    WILLIAMSON  COUNTY ,  ET  AL.                    1696907690

**[RSR]**          *MOVE YOUR CRAP ALL OFF THE SIDEWALK!*

**PLAINTIFF**     *Ok... Ok... Ok.... I'm trying to install-*

〚 [RSR] CONTINUES TO THREATEN PLAINTIFF: 〛

**[RSR]**          *PUT IT ON THIS AREA HERE - ON YOUR GRASS! ... THEN - THEN - THEN DO THAT - DO IT - GET IT OFF THE SIDEWALK. OTHERWISE*
                   *NEXT TIME, I'M MOVING IT!*

**PLAINTIFF**     *ok, I will try to accommodate your request - but, why are you coming at me! i'm just trying to do what's right by the environment here!*

**[RSR]**          *BECAUSE I'M SICK AND TIRED OF YOU, SID! SINCE, 2009, SID! 2009!*

**PLAINTIFF**     *So - what - since 2009, since 2009, I've been trying to do-*

**[RSR]**          *YOUR BROTHER COME OVER AND [???]*

〚 PLAINTIFF DENIES [RSR]'S FRAUDULENT STATEMENTS. TRIES TO CORRECT RECORD. PLAINTIFF POINTS- 〛
〚 -TO FRONTDOOR OF [788KLLTX78641] STATING [RSR] THREATENED PLAINTIFF WHILE ON PLAINTIFF'S PROPERTY: 〛

**PLAINTIFF**     *what are you talking about!! you came over here - You came over here!*

〚 [RSR] CONTINUES FRAUD - ACTUALLY THREATENED TO HAVE PLAINTIFF KICKED OUT OF WHITE-NEIGHBORHOOD: 〛

**[RSR]**          *I JUST **KNOCKED ON YOUR DOOR** - AND ASKED YOU TO TAKE TAKE OVER YOUR YARD!*

**PLAINTIFF**     *You told me that you'd be getting me kicked out of the neighborhood! That's basically what you said!*

〚 [RSR] FINALLY ADMITS TO BLACKMAILING PLAINTIFF, THREATENING TO KICK PLAINTIFF OUT OF WHITE-NEIGHBORHOOD USING FORECLOSURE: 〛

**[RSR]**          ***I SAID I WILL CALL THE [HOA] AND HAVE YOU FORECLOSED ON IF YOU CONTINUE TO BREAK THE RULES!***

〚 PLAINTIFF IS RELIEVED THAT [RSR] FINALLY ADMITS TO REPEATEDLY BLACKMAILING PLAINTIFF BACK IN {2009}-{2010}: 〛

**PLAINTIFF**     *Yes - exactly! Yes - exactly! Well, I did not break the rules!*

**[RSR]**

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

*YES, YOU ARE BREAKING THE RULES!*

**PLAINTIFF**      *No - you see-*

⟦ [RSR] CONTINUES FRAUD - MANY HOMES WITH CONSISTENTLY UNMOWED LAWNS HAVE ALWAYS EXISTED IN THIS SUBDIVISION: ⟧

**[RSR]**          *WHY IS EVERYONE ELSE'S LAWN MOWED?!*

**PLAINTIFF**      *They have every right to do what's right by them! I'm trying to do what's right by me and the environment!*

⟦ [RSR] CONTINUES FRAUD - ALREADY ADMITTED TO PLAINTIFF THAT SHE PREFERS APPEARANCE OF MOWED-LAWN: ⟧

**[RSR]**          *I DON'T WANT TO MOW MY GRASS EVERY TIME THEY TELL ME TO - BUT THAT IS THE COVENANTS OF THE [HOA]!*

**PLAINTIFF**      *Ok, but that's - actually there's a 2013 law - that says drought-resistant landscaping - that's what i'm trying to - you're basically - i'm trying to accommodate to the best of [???] abilities!*

⟦ [RSR] CONTINUES FRAUD - PRETENDS AS IF LANDSCAPING AND/OR TEMPORARY-LANDSCAPING-CHANGES AFFECT PROPERTY VALUES ⟧

**[RSR]**          *[???] AND I PUT MY HOUSE UP FOR SALE - AND I SHOW THAT MY PROPERTY VALUES ARE DEVALUED!*

**PLAINTIFF**      *This is going to be temporary!*

**[RSR]**          *NO IT'S NOT - THIS IS NOT TEMPORARY!*

**PLAINTIFF**      *IT IS TEMPORARY!*

⟦ [RSR] CONTINUES FRAUD - PRETENDS AS PLAINTIFF HAS BEEN REMODELING/CHANGING PLAINTIFF'S LANDSCAPING SINCE {2009} ⟧

**[RSR]**          *ITS BEEN GOING ON SINCE 2009!-*

**PLAINTIFF**      *This is temporary - this is going to be there before I install the new "no-mow" grass!*

⟦ [RSR] DID NOT EVEN ASK IF PLAINTIFF HAD APPROVAL - TERRORIZED PLAINTIFF WITHOUT THIS KNOWLEDGE: ⟧

**[RSR]**          *HAVE YOU GOTTEN [HOA] CLEARANCE FOR THIS!*

**PLAINTIFF**      *I've already submitted the proposal - yes, I've submitted the proposal!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                              1696907690

**[RSR]**          *NO YOU HAVEN'T! YOU DON'T PROCEED UNTIL YOU THAT APPROVAL - UNTIL IT IS APPROVED!*

**PLAINTIFF**      *I submitted the proposal! well, until then - until then - its just soil! - its just soil!*

〚 [RSR] CONTINUES USING RACIAL-SLURS AGAINST PLAINTIFF: 〛

**[RSR]**          *DONT TELL ME THERE'S A 2013 LAW FOR THAT - YOU ARE A "VILLAGE IDIOT"!*

**PLAINTIFF**      *ok, that's basically is a racist statement - that is a racist statement!*

〚 [RSR] CONTINUES MAKING RACIST, FRAUDULENT STATEMENTS: 〛

**[RSR]**          *YOU ARE TERRORIZING THIS NEIGHBORHOOD!*

**PLAINTIFF**      *That's also a racist statement! That's a racist statement!*

**[RSR]**          *NO, ITS NOT RACIST!*

**PLAINTIFF**      *Yes that is - You're calling me a terrorist!*

〚 [RSR] ADMITS THAT HER USE OF RACIAL-SLUR "TERRORIST" IS TIED TO PLAINTIFF'S RACE/CULTURE: 〛

**[RSR]**          *NO THAT'S RACIST, BECAUSE YOU'RE IMPLYING PEOPLE LIKE YOU ARE TERRORISTS!*

**PLAINTIFF**      *no - what are you! No you're coming at me - i'm not imposing my stuff on you!*

〚 [RSR] CONTINUES TO USE RACIAL-SLUR "TERRORIST" AGAINST PLAINTIFF: 〛

**[RSR]**          *YOU ARE A NEIGHBORHOOD TERRORIST!*

〚 PLAINTIFF TRIES REPEATEDLY TO POINT OUT UTTER-HYPOCRISY OF [RSR]'S STATEMENTS: 〛

**PLAINTIFF**      *You're coming at me!*

〚 [RSR] CONTINUES FRAUD - THERE ARE NO CHICKENS ANYWHERE ON PLAINTIFF'S PROPERTY: 〛

**[RSR]**          *YOUR CHICKENS - YOUR TURTLES!*

**PLAINTIFF**      *I'm not - I don't have - I don't have any chickens! I dont know what you're talking about!*

〚 [RSR] ADMITS TO ILLEGALLY USING PHOTOGRAPHS OF PLAINTIFF'S PRIVATE BACKYARD: 〛

**[RSR]**          *YOUR MICE - COME FROM OVER THERE. WE HAVE PICTURES!*

〖 PLAINTIFF TRIES TO EXPLAIN DIFFERENCE IN RACIAL/CULTURAL VIEWS OF RODENTS INCLUDING MICE: 〗

**PLAINTIFF**     *Mice! Mice - you're talking about mice - First of all - where I'm from - mice are actually, you know, respected - they're fed - where i am from! Ok, so basically-*

**[RSR]**          *THEN GO BACK OVER THERE AND FEED YOUR MICE!*

**PLAINTIFF**     *Ok, exactly! EXACTLY! - This is why what you're talking - this is a - this is a - a racist statement!*

**[RSR]**          *IF I LIVED IN A NEIGHBORHOOD-*

**PLAINTIFF**     *This is a racist statement!*

**[RSR]**          *IF I LIVED IN A NEIGHBORHOOD-*

**PLAINTIFF**     *See - you're not!-*

〖 [RSR] CONTINUES TO IMPOSE HER SENSE OF RACIAL-SUPERIORITY OVER PLAINTIFF: 〗

**[RSR]**          *YOU CAN'T TALK WHEN I'M TALKING!*

**PLAINTIFF**     *Oh ok! - you can talk when I talk! But I can't talk-*

**[RSR]**          *IF I LIVED IN A NEIGHBORHOOD, WHERE YOU FEED MICE-*

**PLAINTIFF**     *I'm not feeding mice! I'm not-*

**[RSR]**          *THAT THAT WOULD BE EXPECTED-*

**PLAINTIFF**     *I'm not feeding-*

〖 [RSR] ADMITS THAT THE NORMS OF WHITE PEOPLE ARE TO BE RUTHLESSLY IMPOSED UPON PEOPLE-OF-COLOR: 〗

**[RSR]**

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907650

> *THAT WOULD BE THE SOCIAL NORM OF THAT AREA - IT IS NOT THE SOCIAL NORM OF THIS AREA!*

**PLAINTIFF**     *No, but basically what you're trying to do is - you're imposing your rules - and your culture's rules on mine!*

⟦ [RSR] CONTINUES TO ADMIT HER ABUSE AGAINST PLAINTIFF IS SOLELY BASED UPON PLAINTIFF'S PROPERTY-APPEARANCE: ⟧

**[RSR]**     *WHAT YOU'RE DOING IS THAT YOU'RE DEVALUING THE NEIGHBORHOOD AND YOU'RE HOLDING US HOSTAGE WITH YOUR HORRIBLE DISREGARD FOR LAWN-CARE!*

**PLAINTIFF**     *no - see this is, you're imposing your-*

⟦ [RSR] CAUSES MILLIONS IN DAMAGES TO PLAINTIFF IN RETALIATION FOR HER FRAUDULENTLY-ALLEGED $15K IN DE-VALUATION TO [789KLLTX78 641]: ⟧

**[RSR]**     *NO, I CAN'T SELL MY HOUSE - UNTIL YOU GET THIS CLEANED UP. MY REALTOR TOLD ME ITS A 15-THOUSAND VALUE DE-VALUATION BECAUSE OF YOURS!*

⟦ PLAINTIFF COMPLETELY DENIES ALLEGATION CITING SHARPLY-RISING APPRAISAL VALUES: ⟧

**PLAINTIFF**     *Ok - I've seen the appraisal values go up! up an up and up and up and up!*

**[RSR]**     *YES - UNTIL YOU SELL A HOUSE - AND YOU HAVE SOMEBODY SAY - WHAT'S GOING TO HAPPEN TO THAT - I DON'T KNOW - BECAUSE THE [HOA] HAS BEING DEALING WITH HIM SINCE 2009. SO, I'M NOT GOING TO BUY A HOUSE!*

**PLAINTIFF**     *So, this is the very reason - I'm trying to do what's right by-*

**[RSR]**     *SID, JUST MOW YOUR GRASS! IF YOU'RE TRYING TO DO WHAT'S RIGHT - JUST MOVE IT OFF THE PROPERTY!*

**PLAINTIFF**     *Yes, Why are you?! - I will do that!*

**[RSR]**     *MOVE IT OFF THE SIDEWALK!*

**PLAINTIFF**     *i said will do that! But, why are you coming at-*

**[RSR]**     *AND HAVE YOU GOTTEN APPROVAL FOR THIS - NO!!*

**PLAINTIFF**     *Yes i have - I've submitted the approval!!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

〖 [RSR] PRETENDS AS IF SHE ALONE IS THE [HOA] WHEN SHE HAS NEVER BEEN ON THE [HOA] BOARD. 〗

**[RSR]**          *WHERE'S THE APPROVAL?*

**PLAINTIFF**          *I didn't submit it to you!!*

〖 [RSR] ADMITS TO MULTIPLE PEOPLE IN ILLEGAL SECRET CONSPIRACY WITH [HOA],[SPOA-CM-CD] AGAINST PLAINTIFF: 〗

**[RSR]**          *BECAUSE C****** HAS NO... C****** HAS REPORTED - WE'VE REPORTED THIS TO C******. NOT JUST ME, BUT THEM!*

**PLAINTIFF**          *I'm talking about-*

〖 [RSR] CONTINUES FRAUD - PRETENDS AS IF PLAINTIFF HAS CAUSED ANY NEIGHBOR HARM: 〗

**[RSR]**          *THEY WRITE LETTERS. I'VE COME TO YOU - HOPING THAT MAYBE YOU'D HAVE SOME EMPATHY FOR WHAT THESE POOR NEIGHBORS!*

**PLAINTIFF**          *I am doing... First of all - this is soil! this is soil!*

〖 [RSR] CONTINUES FRAUD - PRETENDS AS IF SHE OWNS PUBLIC SIDEWALK: 〗

**[RSR]**          *NO - GET THIS FUCKING WOOD OFF MY - OFF THE SIDEWALK -*

**PLAINTIFF**          *See, you're coming back to that same thing!-*

〖 [RSR] CONTINUES TO IMPOSE HER SENSE OF RACIAL-SUPERIORITY OVER PLAINTIFF: 〗

**[RSR]**          *GET IT OFF THE SIDEWALK!*

**PLAINTIFF**          *You're talking - You keep coming back to the same rule here-*

〖 [RSR] CONTINUES HER RACIST FRAUD AGAINST PLAINTIFF - PRETENDING AS IF THERE WAS NO CHANGE IN LAW IN {2013}: 〗

**[RSR]**          *BECAUSE IT'S STILL ON THE SIDEWALK!*

**PLAINTIFF**          *Ok, i will get it off the sidewalk!... I'm talking about the soil - you jump from one topic to...*

〖 [RSR] CONTINUES HER RACIST FRAUD AGAINST PLAINTIFF - PRETENDING AS IF THERE WAS NO CHANGE IN LAW IN {2013}: 〗

**[RSR]**          *NO, YOU'RE CALLING ME A RACIST, BECAUSE ITS BEEN - FOR 8 YEARS, SINCE 2009!*

**PLAINTIFF**

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

*No, actually, because you are - you are targeting me for this very reason! And and - and - i'm trying to do what's right by the environment! - And you're targeting me just because of the -*

〚 [RSR] OVERTLY ADMITS TO TARGETING PLAINTIFF BASED ON RACE - AS THERE ARE NUMEROUS UNMOWED PROPERTIES WITHIN SUBDIVISION: 〛

**[RSR]**        *I'M TARGETING YOU BECAUSE - YOU'RE THE ONLY FRICKING YARD OUT HERE - THAT HAS A FLAGRANT DISREGARD FOR [???]*

**PLAINTIFF**    *Actually no! - i'm doing what's right for the environment!*

**[RSR]**        *NO, YOU'RE NOT!*

**PLAINTIFF**    *I'm being - I'm doing what's right for what my indigenous culture requires me to do!*

〚 [RSR] ENDS SUCH ABUSE RANT AGAINST PLAINTIFF, BY AGAIN, IMPOSING HER SENSE OF RACIAL-SUPERIORITY OVER PLAINTIFF: 〛

**[RSR]**        *CLEAN IT UP SID! ... CLEAN IT UP!*

〚 AFTER THOSE ABUSIVE, RACIST DEMANDS, [RSR] BEGINS TO SPEAK WITH [CB&KB], THEN-OWNERS OF [792KLLTX78641], MAKING- 〛
〚 -MANY DEROGATORY STATEMENTS ABOUT PLAINTIFF, AGAIN EXERTING HER SENSE OF RACIAL SUPERIORITY OVER PLAINTIFF,- 〛
〚 -REMINDING PLAINTIFF, YET AGAIN, ABOUT HAZARDS OF AN IMMIGRANT-OF-COLOR THAT QUESTIONS WHITE-SUPREMACY- 〛
〚 -WHILE LIVING WITHIN A WHITE NEIGHBORHOOD - THAT WHITE-SUPREMACY DOMINATES AND THAT ANY ATTEMPTS TO- 〛
〚 -QUESTION WHITE-SUPREMACY WILL BE MET WITH VICIOUS, PREDATORY, RETALIATORY AND ABUSIVE ACTIONS. 〛

## ¶388

On or about an evening in the day in the month of {2017-02}, the plaintiff continues to work tirelessly on re-landscaping the [FRONTYARD]. [RSR], from the driveway and/or sidewalk across the street, shouts out to the plaintiff, a fraudulent claim that the wood that the plaintiff is using has been pressure-treated with toxic chemicals - so as if to somehow indicate that the plaintiff is not living up to the plaintiff's environmental principles. The plaintiff, pointing to the natural yellow-white color of the wood (as opposed to the green-tint of pressure-treated wood), rejects [RSR]'s fraudulent claim and states that the wood is completely untreated (or *"kiln-dried"*). [RSR] then yells to the plaintiff that the wood will rot if it is not pressure-treated. Clearly, [RSR] has tried to trap the plaintiff into a winless *"Damned if you do, damned if you don't"* type of argument. The plaintiff continues to reject [RSR]'s fraudulent claims, reiterating to [RSR] that the wood is only for temporary use. [RSR] continues her fraudulent claim that the plaintiff is lowering property values, even loudly threatening the plaintiff, *"I'M GOING TO SUE YOU FOR DAMAGES!"*. However, as the record will show, [RSR] never sued the plaintiff because she was always clearly engaging in racist fraud against the plaintiff, and any reasonable, unbiased finder-of-fact would have easily been able to recognize her racist fraud against the plaintiff. On numerous occasions during the plaintiff's residence at [788KLLTX78641], [RSR] has repeatedly peddled this racist and fraudulent narrative that the plaintiff is lowering property values - even fraudulently claiming in a previous rant against the plaintiff that the plaintiff's property appearance caused a $15,000 de-valuation on [RSR]'s property when even the [WCAD] appraisal records have consistently proven otherwise - and when [RSR], through almost a decade (at that moment in time) of racially-motivated hate-crimes, psychologically-abusive torture and gaslighting that she has continued to inflict onto the plaintiff, had already caused millions in damages (in long-term pain-

and-suffering, in permanent psychological trauma and in extreme emotional distress alone) to the plaintiff.

## ¶389

On or about an evening in the day in the month of {2017-03}, the plaintiff continues to work tirelessly on re-landscaping the [FRONTYARD]. [RSR], walking on the sidewalk across the street from the plaintiff, threatens the plaintiff that the plaintiff better take extra measures to pin down all of the plaintiff's landscaping work - sheets of cardboard, soil, etc. - due to a tornado and/or strong-winds approaching the area. Again, [RSR] was using as many opportunities as she could to-threaten-to sue the plaintiff, using any fraudulent reason as the basis, even though she lived across the street from the plaintiff, and thus had no claim to any harm caused by any conditions - temporary or permanent - within the plaintiff's property.

## ¶390

During the final-week of the month of {2017-03}, the then [HOA] under predatory [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH] - acting under the extreme pressure and blackmail of the plaintiff's predatory neighbors [JSP&KAP],[RSR] with [JSP] even admitting, on multiple occasions, to the plaintiff that they threatened to sue the [HOA] if the [HOA] did not sue the plaintiff (see below) - file lawsuit against the plaintiff, alleging breach-of-contract. The text of the lawsuit indicated that the plaintiff proceeded with *"unapproved"* changes to the plaintiff's [FRONTYARD] landscaping without seeking prior approval from the [HOA], despite the fact that, at that moment in time (of filing of such lawsuit), the plaintiff had already submitted multiple versions of the plaintiff's landscaping approval documents to the [HOA] (management-company) and [HOA] attorney via email, with the plaintiff even asking if they needed any other information to render their decision on approval/denial, and also with the plaintiff asserting the plaintiff's right to a hearing before the [HOA-BoD]s regarding any-and-all allegation(s) of *"unapproved changes"*, as the plaintiff was entitled to by the law regulating [HOA]s in Texas (codified within the [TPrC]). The plaintiff did not receive a response to any of those multiple emails - except a single email from the [HOA] attorney, instructing the plaintiff to cease communications with the [HOA] property-management-company - although the plaintiff was sending all of the plaintiff's emails regarding this matter directly to that [HOA] attorney. The [HOA] thus proceeded to lawsuit against the plaintiff without taking all necessary steps to resolve this issue without litigation - in essence, without *"exhaustion"*. The extreme pressure and blackmail tactics that the plaintiff's predatory, malicious neighbors [JSP&KAP],[RSR] - both with extreme-racial-animus and far-right-wing-extremist political-animus against the plaintiff - was clearly enough to coerce the then [HOA] to file lawsuit against the plaintiff - even though, as it turns out - neither [JSP&KAP],[RSR] had any meritorious/legitimate claims against the plaintiff to begin with - especially, with [JSP] even admitting to the plaintiff that he had replaced his front-yard grass on [784KLLTX78641] (in the year {2012}) without ever seeking any approval from the [HOA]. Again, as the leadership of the decade-long obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff, [JSP&KAP],[RSR] had always demanded that the powerful institutions-of-power - initially the [HOA] but always including [WCLE] - engage in the risky/burdensome/unpleasant/expensive work of litigation against the plaintiff, because they knew that they could never sue the plaintiff directly due to the huge volume of directly-incriminating evidence of hate-crimes/racketeering-acts/civil-rights-violations/abuses that the plaintiff had accumulated against defendants [JSP&KAP],[RSR] (and some members of [WCLE]).

## ¶391

On or about a late morning on the day during the first-week of {2017-04}, [WCCO] Constable-Deputy Robert Tijerina, [WCCD-RT], approaches [FRONTDOOR] and rings the door-bell. When the plaintiff answers, [WCCD-RT] informs the plaintiff that the plaintiff has been sued and serves the aforementioned [HOA] lawsuit onto the plaintiff. [WCCD-RT] asks the plaintiff if the other co-defendant named in the lawsuit, the plaintiff' senior-citizen [MOTHER], is also available to be served with such lawsuit. The plaintiff informed [WCCD-RT] that [MOTHER] did not live at this property, and further informs [WCCD-RT] of [MOTHER]'s residential address. [WCCD-RT] also stated to the plaintiff that the plaintiff's version of served documents was more detailed and informative than the version served to [MOTHER] (which did not make any sense to the plaintiff), but as the plaintiff would later find out, the two versions were identical. [WCLE] - in particular, the [WCCO] - was thus fully-aware that the plaintiff was in legal-dispute with the [HOA] starting from this moment in time - knowledge that they would continue to fully-exploit and fully-capitalize-upon in-order-to engage in further acts of predatory blackmail, intimidation, civil-rights-violations and/or other racketeering-activity against the plaintiff in most, if not all, of the incidents that followed. During that same day, as the plaintiff is continuing to work tirelessly in [FRONTYARD] on the re-landscaping, [JSP] drives his pickup truck on the street past the plaintiff, blaring the horn of his vehicle as he is passing the plaintiff (as he has done on numerous other occasions) - this time, not only to intimidate the plaintiff, but also as a loud-sound of signaling his victory - indicating that he had succeeded in blackmailing the [HOA] to sue the plaintiff - that the plaintiff better bow-down to his authority. Again, the plaintiff emphasizes that all of the defendants' predatory actions against the plaintiff focused not only maximizing the harm-and-damage that they inflicted onto the plaintiff, but also to engage in enough harm-and-damage onto the plaintiff, in-order-to drive the plaintiff, an immigrant-of-color/indigenous-person, out of such White-neighborhood.

## ¶392

On or about 9PM (nighttime) during a date in the month of {2017-04}, the plaintiff continues to work tirelessly on re-landscaping the [FRONTYARD], using an LED-light to light-up [FRONTYARD] in-order-to perform such work. [RSR] approaches the plaintiff from across the street, viciously shouting at the plaintiff to turn off the light, despite the fact that the light was only pointed at [FRONTYARD] and thus not onto any other resident's property - further threatening that she will call the police if the plaintiff did not turn off the light. The plaintiff did not respond to [RSR]'s threat, and instead just continued working. [RSR] heads back into her house, and approximately 20 minutes later, an unidentified [WCSD], [WCSD-JD-13], parks his vehicle near the plaintiff's property, approaches the plaintiff and asks the plaintiff about the elaborate work that the plaintiff was doing on [FRONTYARD]. [WCSD-JD-13] asked the plaintiff if the plaintiff was almost-done or done working on the landscaping for the day, which the plaintiff did acknowledge that the plaintiff was done for the day. The incident ends when [WCSD-JD-13] leaves the property after realizing that the plaintiff is about to enter back into the [HOUSE]. As this lawsuit tries to document, this incident would be only one of over a dozen incidents that the plaintiff's predatory neighbors - [RSR] and/or [JSP&KAP] - would use a fraudulent complaint, based exclusively on their extreme-racial-animus, far-right-wing-extremist political-animus, and homophobic-animus against the plaintiff, to call the [WCLE] police and/or other government-agencies (such as the [WCCHD],[TCEQ]) on the plaintiff in-order-to racially intimidate/interfere-with/harass/threaten the plaintiff by proxy.

## ¶393

On or about the day and approximate time of {2017-05-05 15:30}, two-or-more children of the homeowners of [525LSLTX78641] enter into the plaintiff's [BACKYARD] through a small opening in the plaintiff's [BACKYARD] fence, in-order-to play with the plaintiff's tortoises - which the plaintiff had noticed on multiple prior occasions (⊙). However, on this particular occasion, said children also started to pick up items

from the plaintiff's [BACKYARD] and throw such items over the fence, and into the backyard of neighboring property [792KLLTX78641] -

then owned by [CB&KB]. The plaintiff, noticing such activity via the plaintiff's security-camera-system-monitor, opens the plaintiff's [BACK-

DOOR], and states to said children that they are welcome to play with the plaintiff's tortoises, but to please refrain from throwing items into the

neighboring properties, and also to please refrain from moving items around in the plaintiff's [BACKYARD] (which the plaintiff had also

noticed). In response, one of the children questions the plaintiff, *"Why not?"* The plaintiff explains to said child that the plaintiff would get into

trouble with those neighbors if they thought that the plaintiff was throwing items into their property's backyard. The children seemed to agree

with the plaintiff's requests, and the plaintiff enters back into [HOUSE]. A few hours after this incident, the plaintiff noticed one of the

plaintiff's tortoises flipped over - in a helpless condition, with such tortoise unable to flip itself back into upright position - presumably because

one of the children had flipped such tortoise without flipping such tortoise back into upright position. This incident reveals a few crucial points,

demonstrating both the fraud perpetrated by defendants [RSR],[JSP&KAP],[WCLE] (and their co-conspirators) against the plaintiff, but also,

certain aspects of the plaintiff's character:


Ⓐ the plaintiff did not call the police ([WCLE}) on said children or the parents of said children, and instead, the plaintiff did not even tell said

children to leave the plaintiff's [BACKYARD].

Ⓑ [RSR] had on multiple occasions spread the racist fraud even on public social-media postings that the plaintiff's property has been a

*"dangerous situation"* for over 7 years, and this incident further dismantles that racist fraud - that the plaintiff's [BACKYARD] was, instead, a

perfectly-safe environment for even children to play in.

Ⓒ it is still unclear to the plaintiff, whether-or-not [CB&KB] reported to [WCLE] and/or the [HOA] that such items thrown into their backyard

were acts of vandalism by the plaintiff (which it clearly was not).

Ⓓ the plaintiff was hospitable-enough to allow the neighbors' children to repeatedly enter into the plaintiff's [BACKYARD] in-order-to play

with the plaintiff's tortoises, further demonstrating that the plaintiff never harbored any type of animus towards any of the plaintiff's neighbors.


## ¶394

On or about the afternoon of the day of the month of {2017-05-27}, the plaintiff is working inside of [HOUSE], when the plaintiff sees (on the

security-camera-system-monitor) [JSP] approach the plaintiff's sideyard and tamper-with the re-landscaping materials that the plaintiff had

installed along (but within) the border of the plaintiff's property [788KLLTX78641] and [JSP&KAP]'s property [784KLLTX78641] -

including tearing out excess piece of cardboard near the border-area - and dumping such torn excess cardboard into the plaintiff's sideyard. The

plaintiff walks outside of [HOUSE], approaches [JSP] to investigate the issue of clear vandalism. [JSP] angrily demands to know why the

plaintiff stopped the work of landscaping of [FRONTYARD], and is allowing the newly-install sod-grass (which the plaintiff had already spent

approximately two-thousand dollars on including supporting infrastructure, along with many months of the plaintiff's back-breaking labor) to

die. The plaintiff explains to [JSP] that the [HOA] attorney issued a threatening demand to the plaintiff's attorney to stop all re-landscaping

work. The plaintiff further explains to [JSP] that the [HOA] attorney threatened that if the plaintiff did not stop the re-landscaping work, that

the [HOA] would be seeking a temporary-restraining-order [TRO] from the [WC] District Court (the same Court in which the [HOA]'s lawsuit

against the plaintiff was filed), to stop the re-landscaping work - at least until an agreement was reached where the plaintiff's drought-resistant-

landscaping approval documents were formally approved by the [HOA]. On numerous occasions, [JSP] angrily states that the plaintiff signed a

Contract requiring the plaintiff to cut the grass - but fails to provide a justification when the plaintiff informs [JSP] that the contract was

written/amended during the years {2005},{2006} whereas the new drought-resistant-landscaping provisions of the [TPrC] were written and

took effect around the year {2013}. On numerous occasions, the plaintiff informs [JSP] that the plaintiff is simply trying-to-do what is right from the environment due by eliminating the extreme waste and destruction that is caused by maintaining a mowed-lawn - that the plaintiff was simply trying to install a *"no-mow"* (drought-resistant) grass/groundcover that was already allowed for by the said contract. [JSP] angrily yells, *"WE DON'T GIVE A FUCK ABOUT WHAT'S RIGHT FOR THE ENVIRONMENT! WE GIVE A FUCK ABOUT HOW THIS PLACE LOOKS! THAT'S WHAT WE GIVE A FUCK ABOUT! WE'RE SICK-AND-TIRED OF YOUR PLACE LOOKING LIKE SHIT!"* [JSP] even questions whether the plaintiff obtained approval for replacing the grass, even though [JSP] had already admitted to the plaintiff that [JSP&KAP] never sought approval from the [HOA] prior to replacing their front-yard grass (on [784KLLTX78641]) with another (thirstier, thus, not environmentally-friendly) grass-species on-or-about the month of {2012-03} - yet another component of the plaintiff's racial-discrimination complaint against the defendants. The plaintiff questions [JSP] whether he cared about the future of his children and grand-children because they would be inheriting the world which might not even support human habitation, or at the very least, to the same degree and same-standard-of-living that the current generations are enjoying. [JSP] responds by skirting the issue, stating, *"We're fine, man. ... We're fine."*, although (fraudulently) stating that the plaintiff's fight for a *"no-mow"* frontyard was not going to make a difference, for the better of the environment (❄). [JSP] then questions the plaintiff about alleged *"bugs"* on the plaintiff's property - first with alleged *"yellow-jackets"* (wasps). When the plaintiff explains that there is a large percentage of people who do not use bug-spray to kill so-called *"bugs"*, [JSP] angrily responds *"WE DONT' GIVE A SHIT ABOUT THOSE PEOPLE! THEY DON'T LIVE HERE! ... YOU LIVE IN A DIFFERENT, A COMMUNITY THAT REQUIRES YOU TO ABIDE BY CERTAIN RULES - THAT YOU'RE NOT ABIDING BY!"* The plaintiff denies that any such rule exists, explaining that there is no rule that requires homeowners to use bug-spray to kill so-called *"bugs"*. [JSP] then shifts focus, once again, questioning why the [HOA] stopped the plaintiff from continuing work on the re-landscaping. The plaintiff explains that the plaintiff is trying to resolve the issue amicably without litigation (or at the very least, with minimal litigation), to which, [JSP] threatens, *"OH, YOU'RE GOING TO COURT! YOU CAN TAKE THAT TO THE BANK! ... YOU'RE SCREWED, SID! THEY'RE GOING TO BURN YOU DOWN! YOU KNOW THAT, RIGHT! ... YOU'RE BURNING YOUR PARENTS DOWN - YOU ARE GOING TO COST YOUR PARENTS A TON OF MONEY!"* The plaintiff asks whether the threat of expensive litigation was justified, given that the plaintiff was merely trying to do what was right for the environment. {JSP} fraudulently states that the plaintiff is hiding behind that loophole in Texas law concerning drought-resistant-landscaping, while the plaintiff states that, [JSP]'s statement is the exact opposite of the truth - further explaining that [HOA]s were unjustly allowed to fine homeowners for not watering their yards, prior to the enactment of that law; in other words, it was the [HOA]s (and/or their property-management-companies) that were fully-exploiting and fully-profiting from such lack of regulation. On one-or-more occasions during such abusive rant, [JSP] asks the plaintiff if the drought-resistant-landscaping is a (Texas) State-Law or some law that was passed by Congress - indicating very clearly to the plaintiff that all of the private-citizen co-conspirators named in this lawsuit - [JSP&KAP],[RSR] - and also their cronies (such as [DMP]) had not even read the relatively-new additions to the Texas Property Code allowing for the homeowners' right to such drought-resistant-landscaping. During at least one point in time, [JSP] further gaslights the plaintiff, stating that the plaintiff is lucky with the then-[HOA] (despite of the fact that then-[HOA] had already sued the plaintiff), even threateningly stating to the plaintiff, *"IN EVERY OTHER COMMUNITY, THEY WOULD HAVE **HUNG** YOUR ASS BY NOW! YOU WOULD BE GONE!"*, clearly referencing a Jim-Crow-era lynching of colored person(s) by predatory White-Americans. [JSP]'s threat also reveals the type of vicious blackmail and gaslighting that the defendants engaged in against the plaintiff - that the defendants believed that they could fully capitalize-on and fully exploit the aforementioned unfavorable racial-demographics of the County of Williamson, in-order-to inflict maximum harm onto the plaintiff and/or plaintiff's family. [JSP] responds, *"IS THAT WORTH IT?! ... IS THAT WORTH BURNING YOUR PARENTS DOWN! ... "*, again, gaslighting the plaintiff into thinking that the plaintiff has no chance of winning a lawsuit against the [HOA]. The plaintiff continues to maintain that doing what's right for the environment

SIDDHARTH KODE    v.    WILLIAMSON COUNTY , ET AL.                    1696907690

should not result in expensive litigation - especially, since the new additions to the [TPrC] allow homeowners the right to pursue environmentally-sustainable options. The plaintiff states that there are multiple aspects about the others' yards including [JSP]'s yard that the plaintiff is disapproving of - and [JSP] sarcastically laughs, responding, while demonstrating his strong sense of racial-superiority: *"ABOUT HOW IT ALL LOOKS NORMAL?!"* The plaintiff also states on multiple occasions during [JSP]'s hostile rant that what White-Americans consider to be *"NORMAL"* is clearly not-normal to the people-of-color living in other parts of the world - including South-America, Africa and South-Asia - who do not live the same (extravagant) lifestyles of White-Americans and thus, do not maintain property/land in the same manner as White-Americans (as alluded to in the previous social-media-posting by the hashtag *"#firstworldproblems"*). [JSP], once again, brings up the issue of the plaintiff signing a Contract, but the plaintiff this time responds stating that the lighting of fireworks within the subdivision is illegal, and further that leaving dogs/cats unleashed to roam freely (with cats jumping into [BACKYARD]) is also illegal. [JSP] initially fraudulently states that lighting of fireworks is perfectly legal outside of City limits, but the plaintiff denies that fraudulent statement stating that the contract explicitly prohibits such lighting of fireworks anywhere within the subdivision. (In addition to being a violation of contract law, the lighting of loud fireworks in such residential neighborhood is also, as indicated above, and at a minimum, a violation of Texas criminal law *"Disorderly-Conduct".*) [JSP], realizing that he cannot perpetrate that particular fraud against the plaintiff, then shifts his reasoning, stating instead that the lighting for fireworks is only twice a year, failing to take account of the fact that the lighting of such fireworks occurs on several days - both before and after - July-the-fourth and New-Years-Eve, resulting in as many as 10 total days where fireworks are illegally lit for prolonged periods of time. [JSP] fails to acknowledge that the illegal lighting of such fireworks:

Ⓐ causes an extreme nuisance to most residents who do not want to suffer such nuisance, AND

Ⓑ causes an extreme disruption to sleep/work schedules (and resulting sleep-deprivation and/or lack-of-productivity) that such fireworks causes, AND

Ⓒ may easily cause both short-term and long-term damage to hearing for those that are exposed to such loud noises, AND

Ⓓ causes at least some of the residents' pets (such as dogs) to be traumatized, AND

Ⓔ could easily result in (and has resulted in) serious injury, or in some extreme cases death, especially if those lighting such fireworks do not take proper safety precautions, AND

Ⓕ could very-easily result in (and has resulted in) serious property damage, with both property's vegetation and building-structures/fences significantly damaged by such dangerous/unpredictable fireworks, AND

Ⓖ causes serious air-pollution - with all of the toxic burned chemicals and smoke from such debris blanketing and clouding the air, AND

Ⓗ causes serious land-pollution - with all of the debris falling not only onto public property (street/sidewalk) but also others' private-property.

[JSP] fails to acknowledge that the illegal unleashing of dogs/cats - especially large dogs/cats - to roam freely onto other's yard:

Ⓐ could easily result in serious injury to other residents or to other residents' pets - if such animals bit/scratched/mauled/pounced-on/etc, AND

Ⓑ could easily result in transferring diseases/viruses to other residents or to other residents' pets, AND

Ⓒ could easily result in property-damage, if for example, such dogs/cats dig-up landscaping/vegetation, such as, but not limited to vegetables and other landscaping plants, AND

Ⓓ often results in such animals defecating and urinating in others' yards.

During such angry rant against the plaintiff, [JSP] angrily states to the plaintiff that he had heard that the plaintiff accused [JSP&KAP],[RSR] (and their co-conspirators like [DMP]) of being racist. The plaintiff insists that it is, in fact, racist for those of the dominant White-American racial-majority to forcefully impose their dominant cultural standards/norms (when it comes to property-maintenance, and particularly when it comes to the growth of vegetation) onto minority immigrant(s)-of-color/indigenous-person(s) such as the plaintiff - further explaining that the

manner in which the plaintiff is maintaining the plaintiff's private-property is fundamentally no-different-than (or at the very least, is much-closer-to) the natural way that the people-of-color in South-America, Africa and South-Asia live. On one-or-more occasion(s), [JSP] angrily states that he doesn't care about the manner in which people-of-color around the world live, and instead, demanded that, as a resident of such White neighborhood, the plaintiff was expected to maintain the plaintiff's private-property according to White-American standards. During [JSP]'s abusive rant against the plaintiff, the plaintiff informs [JSP] of the plaintiff's disability-status - that the plaintiff was registered as a Student with Disabilities at [UT-Austin]. [JSP] abusively dismisses the plaintiff's claim of disability, stating that if the plaintiff was skilled-enough to re-landscape the plaintiff's [FRONTYARD] - including all of the back-breaking labor involved in such process - then, there is no disability. [JSP] continues to threaten that the plaintiff's insistence on doing what's right for the environment will result in the plaintiff losing the plaintiff's property and being evicted from such property - due to foreclosure caused by the [HOA] - in addition, causing the plaintiff to be *"burnt down"* by litigation-related expenses. [JSP] then makes several derogatory statements regarding the plaintiff's off-grid lifestyle even fraudulently alleging that the plaintiff was dumping human-faeces in [BACKYARD] - which the plaintiff vehemently denies. As the incident on the following day would show (see below), [JSP&KAP] contacts the [TCEQ] to fraudulently report that the plaintiff was dumping and/or burying human-faeces in [BACKYARD] - resulting in yet another unconstitutional-and-unlawful search/seizure of the plaintiff's private-property. [JSP] even admits that if humans were facing an Armageddon-type situation, then of course, everybody would be leading an off-grid lifestyle out of pure necessity - but that humans are not facing such an extreme situation at such current moment in time. [JSP] fails to acknowledge that the reason why many peoples of all races (not limited to indigenous peoples) have chosen to live an off-grid lifestyle is not out of necessity, but rather out of living as-humbly-as and as-sustainably-as one can - so that one does not consume limited, non-renewable resources, and so that one can do minimal harm/impact/footprint onto the environment - for the benefit of current and future generations of all life on earth - in particular, allowing the world to be both habitable and hospitable for future generations of all life on earth - lifestyle choices that are Constitutionally protected as religious-practice and political-expression. More importantly, this statement by [JSP] clearly showed the plaintiff that [JSP] either was-deliberately-ignoring or was-blissfully-ignorant-about the increasing seriousness of the environmental-crisis that is simply being made increasingly worse by the continued, extravagant and unsustainable lifestyles of humans, especially of the so-called *"first-world"*. (In particular, according to certain American Public-Television programs, the statistics show that if every person on earth consumed resources at the save level that the average American did, then such resource consumption would require the resources of five earths. Likewise, such statistics show that if every person on earth consumed resources at the same level that the average European did, then such resource consumption would require the resources of three earths, indicating, that Europeans, on average, are living only a slightly more sustainable lifestyle choice as Americans, on average.) The plaintiff explains to [JSP] not only that there were even American Public-Television programs that document how people (of all races - including Americans) live off-grid lifestyles, but also that there are entire communities (not limited to *"intentional communities"*) in which all residents live an off-grid lifestyle. [JSP] then shifts his focus onto a tiny section of fence on the plaintiff's property - essentially one panel of fencing - that was leaning. [JSP] even admits to (illegally) entering into the plaintiff's property, without the plaintiff's permission, and placing a heavy wooden-post in a leaning position to hold up that one fence-panel on the plaintiff's property, claiming that he would have to end up fixing the fence, by which [JSP] also meant significant parts of the fencing that resided on the plaintiff's property - both a brazen interference into the private-affairs and private-property of the plaintiff, and another purely racist fraud as future incidents would reveal. [JSP] fails to take into account that the plaintiff had already invested several thousands of dollars in materials for extra-heavy-duty (commercial-grade) steel fence-posts and several thousands of pounds of concrete-mix to re-construct the entire [BACKYARD] fencing with a permanent fence that would never have to be repaired/replaced again (see below), thus rendering [JSP]'s argument about replacing a single fence-panel on the plaintiff's property, moot and meaningless. The most hypocritical aspects about [JSP]'s

statements about the fence is that - while the plaintiff would spend a huge amount of money, time, and backbreaking labor in building the plaintiff's permanent fence (see below) on the 2 sides of the fence that the plaintiff did have access to - during the final months of {2017} and the initial months of {2018} - [JSP&KAP]'s fence bordering the plaintiff's property has been leaning/dangling for over 3 years since that moment in time (since {2014}) - due to [JSP&KAP]'s complete negligence in fixing the fence that only they could fix from their side (due to all of the fence-posts being on their side). [JSP] then complains to the plaintiff about vegetation that was growing in between the separation of the new landscape-edging material that the plaintiff had installed, when the plaintiff had already explained to [JSP] that the plaintiff was ordered to stop all such landscaping work on the plaintiff's property, and so, the plaintiff could not do anything about such complaint. [JSP] continues to angrily rant - that the plaintiff's property is going to continue to *"LOOK LIKE SHIT"* until the [HOA] provides approval for the plaintiff to resume work (which could take several months). [JSP] also complains about the vegetation that was growing between the small crevices of concrete-slabs on [DRIVEWAY]; the plaintiff responds that that vegetation only grows at such location because the builder of the subdivision has poorly-installed (or failed to install) the proper materials to prevent the arbitrary growth of vegetation through such crevices in the driveway (and sidewalk). [JSP] then makes a very-revealing admission to the plaintiff - at least the first part of which is surprisingly honest: *"I think you're an alright guy - I think your intentions mean well, but you're going about this the wrong way ..."*, revealing not only that the plaintiff never had any bad intentions in the plaintiff's maintenance of the plaintiff's private-property, but furthermore, that the plaintiff had nothing but good intentions in the plaintiff's maintenance of the plaintiff's property - which further indicates that, at best, all of the defendants were abusively weaponizing (both as a *"sword and shield"*) the property-maintenance laws as modern-day-Jim-Crow law against the plaintiff merely for aesthetic/cosmetic issues on the plaintiff's private-property. When the plaintiff asks how the plaintiff could go about it *"the right way"*, [JSP] then rudely orders the plaintiff to *"MOVE! ... GO SOMEWHERE ELSE!"* - further indicating the true motives behind all of the defendants' predatory actions against the plaintiff, and thus, laying the substantial (although not exclusive) basis for the plaintiff's filing of this lawsuit. [JSP] continues to demand that the plaintiff conceal the cardboard used to prevent the previous landscape's vegetation from growing, ranting that *"IT LOOKS LIKE DOGSHIT!"*. The plaintiff continues to repeat to [JSP] that the plaintiff cannot touch any aspect of the landscaping due to the [HOA]'s legal threat of obtaining a [TRO] against the plaintiff to stop such landscaping work. The plaintiff explains that if [JSP] wanted the plaintiff to be able to take care of the issue, then [JSP&KAP] should take such complaint to the [HOA] - allowing the plaintiff to resume such work. The plaintiff further explains to [JSP], that if [JSP&KAP],[RSR] did not repeatedly-complain to the [HOA] regarding the plaintiff's original landscaping to begin with (for over 7 years), that the alleged undesirable scenario that [JSP] was currently complaining about would not have existed to begin with. [JSP] fraudulently continues-to-deny that [JSP&KAP] ever complained about the plaintiff to the [HOA], instead stating the words that many abusers fraudulently perpetrate onto their victims, by gaslighting and trying to isolate their victims from the rest of the world: *"I TALK TO YOU - I'M THE ONLY ONE HERE, IN THIS NEIGHBORHOOD, THAT'S NICE TO YOU! ... WHY WOULD I DO IT! ... LET ME TELL YOU WHO DID IT - **THE [HOA] HAS DONE IT! ... I MEAN, I'M NOT GOING TO LIE! - I WANT EM TO DO IT! - I WANT EM TO GET RID OF YOU!** - I WANT THIS PLACE TO LOOK NICE, BECAUSE WHEN IT COMES TIME FOR ME TO SELL MY HOUSE, I DON'T WANT THIS PIECE-OF-SHIT NEXT TO ME! - I'M SORRY, I DON'T! - I'M JUST BEING HONEST!"* The fraud in [JSP]'s statement is further-revealed in a subsequent incident in the subsequent month of {2017-11} (while the plaintiff was still in pending litigation with the [HOA]) during which [JSP] threateningly reveals to the plaintiff that [JSP&KAP],[RSR], [DMP] (and other co-conspirators) had repeatedly threatened to sue the [HOA] if the [HOA] did not take legal action against the plaintiff - essentially blackmailing the [HOA] into suing the plaintiff. [JSP] then continues to perpetrate the racist fraud that both [JSP] and [RSR] have repeatedly peddled - that the plaintiff's property is *"devaluating"* [JSP&KAP]'s property - further threatening the plaintiff, *"YOU'RE DE-VALUATING ... YOU'RE TAKING LOTS OF MONEY OUT OF MY POCKET, AS IT IS! - AND TO TAKE MORE MONEY OUT OF MY*

*POCKET - I'M NOT GOING TO FUCKING HAVE THAT, SID! I'M JUST NOT GOING TO HAVE THAT!".* When the plaintiff calmly asks

how the plaintiff was *"taking money out of"* [JSP]'s pocket, [JSP] angrily responds, *"YOUR PIECE OF SHIT HOUSE IS GOING TO*

*DEVALUATE MY HOUSE!"* [JSP] then continues to rant that its not just an issue of the [FRONTYARD] grass, but also the plaintiff's

*"bushes"*, and the *"wasp nests"*. [JSP] then tells the plaintiff that he cannot imagine how the inside of [HOUSE] looks like, if this is the manner

in which the plaintiff maintains the exterior of the plaintiff's property. The plaintiff doubles-down on the accuracy of this particular statement of

[JSP] - stating that if [JSP] knew how the inside of the plaintiff's [HOUSE] looked, then he would fully realize that the manner in which the

plaintiff was maintaining the exterior of [HOUSE] to be *"extremely generous"* and *"very accommodating"* to all of the plaintiff's neighbors - in

other words, that the plaintiff was maintaining the exterior of the plaintiff's property in a much-more *"neat and attractive"* manner than the

plaintiff was maintaining the interior of [HOUSE] - further illustrating that the plaintiff had nothing but good intentions in the plaintiff's

maintenance of the exterior of the plaintiff's property. So, the plaintiff continues to express befuddlement as to why the plaintiff's neighbors

(including [JSP&KAP],[RSR]) were predatorily targeting the plaintiff, when the plaintiff was being nothing other than *"extremely generous"*

and *"very accommodating"* to the plaintiff's neighbors. [JSP] continues to fraudulently deny that either he or his wife, [KAP], are instigating

the [HOA]'s predatory litigation efforts against the plaintiff - that no one else is coming after the plaintiff except *"maybe Becky"* ([RSR]). [JSP]

continues to angrily rant, *"AND ANOTHER REASON THAT I COULD COME AFTER YOU - IS BECAUSE OF ALL THE FUCKING BUGS*

*IN MY YARD - ALL THE ANTS - ALL THE FUCKING SPIDERS!"* When the plaintiff explains that there's many people in the neighborhood

that do not use *"bug spray"*, [JSP] angrily shouts *"I DON'T GIVE A FUCK ABOUT OTHER PEOPLE! I CARE ABOUT WHAT'S GOING ON*

*IN MY HOUSE! ... I DON'T USE BUG-SPRAY EXCEPT TO KILL YOUR BUGS!"* [JSP] angrily explains to the plaintiff, that since the

plaintiff had/has unmowed-grass in [YARD], *"bugs"* (ants, spiders, etc.) live in such unmowed grass, but that since the plaintiff does not

irrigate [YARD], that such bugs would enter into [JSP&KAP]'s yard to drink the water due to the irrigation supplied to [JSP&KAP]'s yard.

The plaintiff found and continues-to-find residents (including [JSP]) that expect to have a landscape of soil and grass without *"bugs"* such as

ants/spiders to be completely irrational, illogical and unreasonable - that if such residents truly wanted to have a landscape without such *"bugs"*,

then such residents should have never decided on grass-and-soil to begin with - instead opting for a landscape of gravel (stones) or concrete.

(Ants, for example, are so extremely successful as a species that their total biomass on this planet exceeds the total biomass of all birds and

mammals, including humans, combined. The plaintiff is thus reminded of all of the problems caused by such ethnocentric mindset of wanting a

landscape of living, irrigated grass installed around one's house, but yet, with such living, irrigated grass being completely sterile and devoid of

all other life. Once again, the idiom *"You can't have your cake and eat it too"* comes to the plaintiff's mind.) [JSP] then angrily rants that the

so-called *"weeds"* from the [YARD] enters into his yard - that he spends a lot of money on both *"weed killer"* and *"bug spray"*. The plaintiff

tries to explain to [JSP] that the plaintiff is not only not requiring [JSP] to use any of those chemicals, but even further, that the plaintiff is

completely against the use of such extremely-toxic chemicals - as explained in the sections above and below. [JSP] angrily states that he would

love to walk on his yard, barefoot, without getting his feet bitten by ants. The plaintiff reiterates that there is no rule in the restrictive covenants

requiring any homeowner to use bug-spray, stating that such chemicals are very destructive/damaging to the environment - and to human

health. [JSP] angrily and derogatorily responds, *"IT'S JUST A COURTESY THING, DICK-HEAD!"*, indicating to the plaintiff that its a

*"courtesy"* for neighbors to be performing actions that are destructive/damaging, both to the environmental health and to human health. [JSP]

then continues to angrily complain to the plaintiff about yellow-jacket (wasp) nests around the [HOUSE], that [JSP&KAP] use bug-spray to

kill all the wasps on [JSP&KAP]'s property so that they don't sting their kids (who are both teenagers at this point in time). (The plaintiff is

reminded of a Public-Television program in which one of the hosts admits to leaving the wasp-nests around his house untouched - that he

never disturbs the wasps and the wasps never disturb him.) [JSP] continues to angrily rant that the cardboard protruding from the sides of the

landscape-edging that the plaintiff had installed - *"LOOKS LIKE SHIT"*. The plaintiff reminds [JSP] that every construction-project takes time - that the property under construction will not look presentable until after the work is completed and cleaned-up - that at least some construction projects can look much messier than whatever the plaintiff has currently, but incompletely, installed on the plaintiff's [FRONTYARD]. [JSP] responds that he works in construction, that he is a construction superintendent, that he knows how construction works, further ranting, *"I'LL TELL YOU WHAT - WE CAN'T LEAVE ANY OF OUR JOBSITES LOOKING LIKE DOG SHIT - I GUARANTEE YOU THAT! - WE HAVE TO MAKE IT LOOK TIDY! - WE CAN'T MAKE IT LOOK LOOKING LIKE ... IT'S TRASH, IS WHAT IT IS!"* The plaintiff continues to repeatedly remind [JSP] that the plaintiff cannot continue any of the landscaping work that the plaintiff has left unfinished in [FRONTYARD], due to the [HOA]'s aforementioned legal threat of a [TRO] to stop all landscaping work until further approval. [JSP] continues to gaslight the plaintiff that it was the plaintiff's fault for not obtaining approval prior to replacing the grass, even though [JSP] already admitted to the plaintiff that he had replaced the grass on the front-yard of his property without seeking any such approval from the [HOA]. The plaintiff explains to [JSP] that there are many residents living within [HOA] subdivisions that have submitted approval documents after already initiating alleged *"unapproved changes"* to property - but that as soon as such approval documents are submitted - from the time that such submission is submitted to the time that such submission is responded to (with either an approval, denial or need for further information) - the clock is stopped on any enforcement action(s) on such residents - since the residents are barred from acting in furtherance of such alleged *"unapproved changes"* (as no person can be held, in any way, liable for failing to perform any action(s) that they are not legally permitted to do.) [JSP] continues to peddle the fraudulent narrative that the plaintiff is not abiding by the contract - next turning his attention onto the plaintiff's *"bushes"*, continuing to gaslight the plaintiff, claiming *"THEY LOOK AWFUL - EVERY SINGLE PERSON THAT GOES BY HERE THINKS THE SAME THING! EVERY SINGLE ONE, SID! THERE'S NOT A SINGLE ONE THAT SAYS - HEY THOSE BUSHES LOOK FANTASTIC! NOT A ONE! AND YOU'RE ALSO BRINGING UNWANTED - PEOPLE ARE COMING THROUGH HERE - PEOPLE ARE DRIVING BY TO SEE YOUR FUCKING YARD NOW! TO SEE YOUR MONSTROSITY, HERE! - THAT'S WHAT'S GOING ON! PEOPLE WALKING THEIR DOGS, PISSING ON MY TREES - IT WAS UNCALLED FOR - NOW YOU GOT ALL THIS CRAP PILED UP ON THIS FRONT! ...."* [JSP] continues to threaten the plaintiff, *"YOU KNOW WHAT'S GOING TO HAPPEN, SID! - DO YOU REALLY KNOW WHAT'S GOING ON! - YOU KNOW YOU'RE NOT GOING TO WIN THIS, RIGHT?!"* [JSP] then rants to the plaintiff that [JSP]'s other next-door neighbor, [JH], had a pile of dirt in his driveway of [780KLLTX78641] that [JH] was putting into his yard during the weekend that resulted in [JH] being cited with a ticket, for one day - by the [HOA]. The plaintiff explains that the plaintiff does not understand [JSP]'s anger nor fraudulent-claim of the what [JSP] implied to be the [HOA]'s preferential-treatment of the plaintiff, because the plaintiff is facing expenses much greater than *"a ticket"* - indicating that the [HOA] had already filed lawsuit against the plaintiff, further forcing the plaintiff to spend thousands of dollars in-order-to retain an attorney to represent the plaintiff in such legal battle against the [HOA] - whereas [JH] never faced any expense of such litigation, let alone, the risky/burdensome/unpleasant/stressful task of litigation. In other words, the plaintiff was trying to explain to [JSP] that [JH] had faced a maximum (ticket) expense in the hundred(s) of dollars (if even that) - whereas the plaintiff was facing litigation expenses that might turn-out to be in the tens-of-thousands of dollars (if not more); therefore, the plaintiff did not understand [JSP]'s implication that the plaintiff was being preferentially treated by the [HOA], when the plaintiff has always alleged that the plaintiff has faced nothing but predatory treatment from the [HOA], thanks to the malicious and predatory complaints made against the plaintiff, by in particular - [JSP&KAP],[RSR], [DMP]. [JSP] continues to threaten the plaintiff that the plaintiff is not going to win - that the [HOA] is basically *"the government"*, seemingly unaware of, or refusing to acknowledge, the difference between such private-organization and a public-government. [JSP] accuses the plaintiff of calling [JSP&KAP],[RSR], and all of those who complained to the [HOA] about the plaintiff, *"a bunch of racists"*, which even if true, further indicates that [JSP] is admitting to knowing and/or having access to private/internal communications between the plaintiff and the

[HOA] - which, according to even basic privacy-law, no other homeowner (that is not directly involved in such contractual-dispute) is supposed to know about - further revealing the true extent of the malicious conspiracy, invasions of privacy and the *"misuse of official information"* against the plaintiff. At one point in time during such rant, [JSP] angrily, but very-revealing states, *"FIRST AND FOREMOST - I DON'T LIKE THE [HOA]! I DON'T LIKE ANYBODY TELLING ME WHAT TO FUCKING DO! I JUST DON'T LIKE IT! I DON'T LIKE PEOPLE TELLING ME I CAN'T PARK A BOAT HERE!"*. This very-revealing statement by [JSP] shows that:

Ⓐ While the defendants, the then-[HOA] and [WCLE] were predatorily (and discriminatorily) targeting the plaintiff via the predatory (and discriminatory) enforcement of ethnocentric/culturally-insensitive restrictive-covenants - particularly those obsolete restrictive-covenants concerning mowing which did not take into account the new Texas law concerning drought-resistant-landscaping - [JSP] brazenly believed that he could freely violate such non-ethnocentric/non-culturally-insensitive (race-neutral) restrictive-covenants by unlawfully parking a boat on the curbside of the street - which the plaintiff noticed [JSP] routinely and persistently did - particularly in the latter years of {2020} through {2022}.

Ⓑ [JSP] and his White-American co-conspirators believe that only White-Americans were free to exercise their individual liberties on their own private-property, but as soon as a person-of-color, such as the plaintiff, does the same, that act in the pursuit of freedom by that person-of-color somehow becomes an unforgivable *"crime"* that must be punished to the maximum extent - once again, yet another clear indication of racist hypocrisy.

[JSP] then fraudulently denies that their tagetting of the plaintiff had anything to do with race, while the plaintiff responds that nobody in the rest of the world maintains property nor is expected to maintain property according to White-American standards - that people-of-color around the world, in particular, do not maintain property according to such standards. [JSP] responds that this subdivision is not like the rest of the world - in essence, all but admitting that this is a racial issue. [JSP] angrily questions the plaintiff about why the manner in which people-of-color around the world live matters, because clearly, the only matter of importance to [JSP] is that the plaintiff lives in *"their"* (exclusive-and-pure) White-American neighborhood, and a result of such fact, the plaintiff is blindly and unquestioningly expected to maintain the plaintiff's property according to their White-American standards. The plaintiff doubles-down that this is a racial issue - that the issue of a mowed-lawn, in particular, is indisputably a racial-issue because, a majority of people-of-color around the world do no cut grass for aesthetic/cosmetic reasons. [JSP] angrily responds to the plaintiff, *"I DON'T CARE ABOUT THE REST OF THE WORLD! ... I REALLY DON'T! ... I DON'T GIVE A SHIT WHAT THEY'RE DOING!"* [JSP] ends his loud rant against the plaintiff with greater hostility, continuing to engage in gaslighting and threats of violent assault against the plaintiff as he walks away from the plaintiff, *"... YOU'RE AN ASSHOLE! ... THAT'S THE TRUTH! YOU'RE A SELFISH SON OF A BITCH! ... YOU PISS ME OFF, BECAUSE YOU'RE SO HARD-HEADED, AND YOU DON'T LISTEN TO SHIT! ... I GOTTO WALK-AWAY, OR I'D BEAT THE SHIT OUT OF YA!"* After quickly picking up the sheets of torn-cardboard resulting from [JSP]'s acts of vandalism against the plaintiff, the plaintiff walks back towards [FRONTDOOR], startled not only by [JSP]'s irrational anger towards the plaintiff, but also by [JSP]'s threat of violence against the plaintiff. During this incident, after [JSP] incited the plaintiff (out of no choice of the plaintiff's own) to come of out of the plaintiff's [HOUSE] by such act of vandalism, [JSP] spent a total of approximately 48 minutes in such racially-motivated and blackmailing harassment against the plaintiff. At surface level, when any uninformed, unbiased third-party, reasonable observer studies any of these incidents in isolation, such observer may consider [JSP]'s (and [RSR]'s) egregious intrusion into the private-affairs of the plaintiff - as documented in this particular incident to be not only completely irrational, illogical and unreasonable, but

simply malicious and predatory. However, if such observer were to study all of [JSP&KAP]'s,[RSR]'s predatory actions against the plaintiff,

along with [JSP&KAP]'s and [RSR]'s malicious conspiracy with co-conspirator [WCLE] against the plaintiff - over the course of over 10 years

- such observer would immediately reach the conclusion that both [JSP&KAP],[RSR] harbored extreme-racial-animus, homophobic-animus

(see below) and far-right-wing-extremist political-animus (see below) against the plaintiff - that they were willing to use *"every trick in the*

*book"* to deprive and defraud the plaintiff out of the plaintiff's fundamental rights - in particular, the plaintiff's fundamental right to private-

property ownership within such White neighborhood (as part of their decade long racketeering-enterprise against the plaintiff) - while in the

process, maximizing the amount of pain-and-suffering that they were inflicting onto the plaintiff.


# ¶395

On or about noon on the day of {2017-05-28}, the plaintiff is working inside the [HOUSE], when the plaintiff notices (on the plaintiff's

security-camera-system-monitor) a White male, approximately 225-pounds, approximately 6-feet-1-inches-tall, at the [FRONTDOOR], ringing

the doorbell. The plaintiff notices this White male wait about 30 seconds for a response at the [FRONTDOOR], and then proceeds to walk

around the plaintiff's sideyard and towards the plaintiff's fence-gate. The plaintiff notices that this White male looks through the narrow fence-

slits to peek into the [BACKYARD]. The plaintiff walks outside, enters near the sideyard, and questions the White male. The White male

identifies himself as [TCEQ-JL], a government employee of the State of Texas. Clearly, [TCEQ-JL] has already executed an unconstitutional-

and-unlawful search on the plaintiff's private-property. [TCEQ-JL] informs the plaintiff that he has received a complaint from a neighbor that

the plaintiff is dumping and/or burying human-faeces in the [BACKYARD]. The plaintiff completely denies the fraudulent allegation - and

under duress by such search and fraudulent allegation, the plaintiff asks [TCEQ-JL] if he wanted to enter into the [BACKYARD] to check to

ensure that the allegation was fraudulent. [TCEQ-JL] responded that he did want to check the plaintiff's [BACKYARD]. Again, the plaintiff

did not explicitly provide prior-consent, but in any case, any consent given after an unconstitutional-and-unlawful search has already been

initiated is considered to be tainted (or made under duress), and in such case, the entire search is considered to be unconstitutional-and-

unlawful in clear violation of the plaintiff's rights. The plaintiff, outraged by the fraudulent allegation, opened the lock on the fence-gate from

behind the fence-gate in-order-to open the fence-gate, and then opened the gate to allow [TCEQ-JL] into the [BACKYARD]. [TCEQ-JL] then

walks through the [BACKYARD], and looks at various areas in the [BACKYARD] to see that there was no human-faeces anywhere. The

plaintiff had planted potatoes and sweet-potatoes in several areas of the backyard, and had asked [TCEQ-JL] not to step onto such plants. The

plaintiff asked [TCEQ-JL] about who had made the frandulent complaint against the plaintiff, and the [TCEQ-JL] responded that it was an

anonymous complaint. [TCEQ-JL] upon verifying that the complaint was fraudulent, lets the plaintiff know that he will close the complaint,

and then starts to walk back towards the plaintiff's fencegate to exit the [BACKYARD]. [TCEQ-JL] also asks the plaintiff about the buckets

around the house that the plaintiff was using to harvest rainwater, and the plaintiff responded that the plaintiff was using them to water the

plants. Finally, as [TCEQ-JL] is about the exit the [BACKYARD], [TCEQ-JL] even asked the plaintiff if the plaintiff lives in a subdivision with

a [HOA], as if to intimidate/interfere-with/harass/threaten/blackmail the plaintiff by proxy, again on behalf of the complainant [JSP&KAP] (see

below). The plaintiff responded that this subdivision does have a [HOA] (which the plaintiff is also a member of), but the plaintiff also made it

clear to [TCEQ-JL], that Texas law is clear that [HOA]s are required to enforce the rules in a non-discriminatory, non-arbitrary and non-

capricious manner - and unless the [HOA] can prove in court that they are inspecting every owner's backyard, that they would not be able to

legally inspect the [BACKYARD]. As [TCEQ-JL] walked out the [BACKYARD], the plaintiff asks [TCEQ-JL] again to confirm [TCEQ-JL]'s

name and employer, and then proceeds to re-lock the plaintiff's fence-gate. The plaintiff then notices that [TCEQ-JL] walks towards the front-

door of [784KLLTX78641], in-order-to talk to [JSP&KAP]; approximately 5 minutes later, [TCEQ-JL] drives away in the same [TCEQ]

truck that he arrived in. So, even though [TCEQ-JL] failed to disclose the malicious complainant to the plaintiff, the identify of the malicious complainant became immediately obvious to the plaintiff. As this lawsuit tries to document, this incident would be only one of over a dozen incidents that the plaintiff's predatory neighbors with extreme-racial-animus against the plaintiff - [RSR],[JSP&KAP] or any of their co-conspirators - would use fraudulent and/or misleading complaint(s) to call agencies of [WCLE] and/or other government-agencies (in this case, the State of Texas) on the plaintiff in-order-to racially-intimidate/interfere-with/harass/threaten the plaintiff by proxy. This incident is also egregious since, like many incidents documented in this lawsuit, it indisputably resulted in an unconstitutional-and-unlawful search of the plaintiff's property in total violation of the plaintiff's rights. But even more importantly, all of the parties involved in this incident - [JSP&KAP], [TCEQ-JL], and [TCEQ-JL]'s employer (the State of Texas) - know fully-well that it is not only not-a-crime to live an off-grid-lifestyle (nor is it a crime to live zero-waste-lifestyle), but furthermore, that living an off-grid-lifestyle (and/or zero-waste-lifestyle) is a Constitutionally-protected first-amendment right that many White-American residents of the State-of-Texas and the United States enjoy. Therefore, this incident can only be interpreted as yet another incident of institutional-racism, racial-oppression and racial-intimidation - with [JSP&KAP], yet again, using a government agency as a proxy for engaging in brazen racial-intimidation against the plaintiff. It is also very important to note the Orwellian nature of this incident - the plaintiff, a minimalist individual that lives a very-humble, anticonsumerist, subsistence, off-grid, zero-waste, indigenous-person's lifestyle, who has also been called a *"tree-hugger to the extreme"* and *"Mr. Green (without any carbon footprint)"* - suffered an egregiously unconstitutional-and-unlawful inspection/search and interrogation by an employee of an agency of the State of Texas that is supposedly intended to protect so-called *"Environmental Quality"* (the [TCEQ]) - reminding the plaintiff, yet again, of the painful reality that many government institutions have very Orwellian names and purposes.

## ¶396

On or about the dates of {2017-06-30} and {2017-07-03}, the then [HOA-BoD]s (led by [SPOA-P-BC],[SPOA-VP-AH]) send the following email messages (see below) to all residents of the subdivision, ahead of July-Fourth, reminding all residents that the lighting of fireworks is illegal within the subdivision. The plaintiff asserts that such repeated emails from the [HOA] are truly disingenuous because neither the [HOA] nor [WCLE] truly-and-seriously intended to enforce the fireworks-ban restrictive-covenant (and the Texas law of Disorderly-Conduct) within the neighborhood. As a result of this lack-of-enforcement, the rampant lighting of fireworks in the neighborhood (by countless residents of the neighborhood) continued through this year and following years (as evidenced by numerous social-media-postings by numerous residents complaining about such issue).

> "Summerlyn POA: Fireworks" :   EMAIL FROM [HOA-BoD]s TO ALL [Summerlyn] RESIDENTS CONCERNING "FIREWORKS BAN"   {2017-06-30 11:29}(~)
>
> [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]
>
> [HOA-BoD]s



Dear Homeowners:

With the 4th of July only a few days away, we want to remind everyone that the association documents strictly prohibit the use of fireworks in the community. Specifically, this language can be found in Section 3.4 (l) Uses Specifically Prohibited of the DCC&Rs of the Declaration of Covenants, Conditions, and Restrictions.

We hope everyone has a safe and enjoyable Independence Day!

Regards,

Board of Directors

---

• "Reminder: Fireworks" • EMAIL FROM [HOA-BoD]s TO ALL [Summerlyn] RESIDENTS CONCERNING "FIREWORKS BAN" {2017-07-03 12:28}{~}
• [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

[HOA-BoD]s       Dear Homeowners:


With the 4th of July only a few days away, we want to remind everyone that the association documents strictly prohibit the use of fireworks in the community. Specifically, this language can be found in Section 3.4 (l) Uses Specifically Prohibited of the DCC&Rs of the Declaration of Covenants, Conditions, and Restrictions.


We hope everyone has a safe and enjoyable Independence Day!


Regards,


Board of Directors

## ¶397

On or about the date of {2017-08-16 12:00}, the plaintiff noticed on the plaintiff's security-camera-system-monitor, what appeared to be at least 4 police-officers from the [WCCO] with their police-vehicles parked in-front-of and/or near-the-front-of the plaintiff's private-property. The plaintiff noticed two deputies from the [WCCO], [WCCD-Holt] and [WCCD-Stinsoil], approach the plaintiff's [FRONTDOOR], with [WCCD-Holt] knocking on [FRONTDOOR] and/or ringing the [FRONTDOOR]-bell, while 2 other deputies, [WCCD-Harrell] and [WCCD-RT], brazenly and thuggishly began to execute a clearly unconstitutional-and-unlawful search of private/curtilage areas of the plaintiff's private-property - including, but not limited to, their unlawful entry deep into the plaintiff's side-yard in-order-to peak into the plaintiff's private [BACKYARD] through a small hole/crevice in the privacy-fence - without seeking the consent of the plaintiff. At the end of this incident, it would become abundantly clear to the plaintiff that the [WCCO] deliberately dispatched 4 such [WCCD]s onto the plaintiff's property so that 2 [WCCD]s could distract the plaintiff in conversation, while the other 2 [WCCD]s could freely execute such clearly unconstitutional-and-

unlawful search of private/curtilage areas of the plaintiff's private-property (without the plaintiff's consent) - a particularly malicious strategy of excessive force in such unconstitutional-and-unlawful search/seizure against the plaintiff that the plaintiff would notice on at least 3 additional incidents. When the plaintiff answered the [FRONTDOOR], [WCCD-Holt] and [WCCD-Stinsoil] stated that they needed to interrogate the plaintiff, even summoning the plaintiff to walk outside into the plaintiff's [FRONTHALLWAY], claiming that they did not want to get stung by wasps (since there was a wasps' nest at the ceiling on top of the plaintiff's [FRONTDOOR]). Since [WCCD-RT], along with [WCCD-Harrell], were also accompanying [WCCD-Holt] and [WCCD-Stinsoil] at the plaintiff's property, all of these [WCCD]s were fully aware that the plaintiff had, as publicly available and accessible court-records indicated, already retained legal-representation from an attorney - at that moment in time, [ATTORNEY-PS] - on all matters related to the plaintiff's private-property-maintenance. Despite of such fact concerning the plaintiff's legal-representation that all of such [WCCD]s were fully-aware of, such [WCCD]s and the [WCCO] decided to circumvent the plaintiff's legal-representation, and directly interrogate the plaintiff, which the plaintiff asserts is yet another violation of the plaintiff's rights - at a minimum, the plaintiff's sixth-amendment-right to counsel. The plaintiff had also preferred to speak from behind the [FRONTDOOR], in-order-to protect the plaintiff's private conversations with such police-officers to be overheard by any malicious neighbors. The plaintiff reluctantly walked further out into outdoor [FRONTHALLWAY], in the [FRONTPORCH] area, at which point, [WCCD-Holt] informed the plaintiff that the plaintiff had a couple of *"problems"* that the plaintiff would need to *"fix"*. First, [WCCD-Holt] stated that it is fire-hazard for the plaintiff to store any items that block substantial parts of the plaintiff's [FRONTHALLWAY]; therefore, [WCCD-Holt] instructed the plaintiff that the plaintiff would need to clear out many of such items out of the way. The plaintiff responded that the plaintiff would be able to clear most of the items, but not the very-heavy miter-saw attached to a table-saw-stand, since the plaintiff asserted that such location was the ideal place for the plaintiff to be able to use such miter-saw. [WCCD-Holt] then asks some rather intrusive questions as to what the plaintiff was building with such miter-saw - as if he and the [WCCO] wanted to know what the plaintiff's plans were so that he and the [WCCO] could secretly communicate this information back to the [HOA], as it was abundantly clear to the plaintiff that the [WCCO] was also secretly coordinating all their violative actions against the plaintiff with the then-[HOA] (under [f-HOA-BoD]s [SPOA-VP-AH],[SPOA-P-BC]), who were also secretly conspiring against the plaintiff with the plaintiff's predatory neighbors [JSP&KAP],[RSR],[DMP] - especially since the plaintiff was still in pending-litigation with the [HOA] at that moment in time. [WCCD-Holt] then summoned the plaintiff into the plaintiff's [DRIVEWAY], claiming that he needed to discuss with the plaintiff aspects about the plaintiff's landscaping, which again, was an issue that the plaintiff had already retained legal-representation over. [WCCD-Holt] asked the plaintiff regarding the plaintiff's use of cardboard in the [FRONTYARD]. The plaintiff explains that the plaintiff needed such sheets of cardboard spread over the original species of grass in-order-to ecologically-decompose that original species of grass back-into the soil in the [FRONTYARD] so that the plaintiff could then replace such grass with the new species of *"no-mow"* grass and/or groundcover - via the ecological process/technique of *"sheet-mulching"* that is widely used by both permacultural gardeners and farmers. The plaintiff further explains that the plaintiff would not be able to continue with any changes to such work until the plaintiff receives formal approval from the [HOA] - with the plaintiff already having submitted multiple versions of such approval documents to the [HOA]'s attorney - given that the [HOA]'s attorney had previously threatened the plaintiff's attorney with a [TRO] if the plaintiff proceeded with any further landscaping-related work without such formal approval. [WCCD-Holt] then summoned the plaintiff to the sidewalk area, while [WCCD-Harrell] and [WCCD-Holt] continued their unconstitutional-and-unlawful search of private/curtilage areas of the plaintiff's property. [WCCD-Holt] orders the plaintiff to cut any-and-all vegetation extending onto the sidewalk, along with tearing the small strip of cardboard extending a few inches into such sidewalk. At this point in time, the plaintiff did not summon the courage to bring up the fact that [JSP&KAP]'s front-tree was blocking half of the sidewalk (along with extending into the plaintiff's property) just 20 feet away, and that [JSP&KAP] even planted such tree without seeking approval from the plaintiff, and more-likely-than-not, without even seeking

approval from the [HOA]. The plaintiff kept reiterating to [WCCD-Holt] that one of the specifications that the plaintiff had put into the plaintiff's approval documents was that the plaintiff was religiously opposed to the ethnocentric/culturally-insensitive practice of cutting of vegetation, and so, while the plaintiff was willing to accommodate the [WCCO] by clearing the sidewalk area, the plaintiff would still need to go through the formal approval process before making any further changes to the landscaping within the interior of the plaintiff's [FRONTYARD]. As the plaintiff is speaking with [WCCD-Holt], with [WCCD-Stinsoil] standing by his side, both [WCCD-Harrell] and [WCCD-RT] brazenly and thuggishly pass in front of the plaintiff to enter into the other side of the plaintiff's private-property, in-order-to continue executing such clearly unconstitutional-and-unlawful search of the plaintiff's private-property, by peeking through small hole/crevice in the plaintiff's privacy-fence into the plaintiff's private concealed [BACKYARD] from the other side of the plaintiff's property. [WCCD-Holt] then begins to intrusively interrogate the plaintiff as to what type of plants the plaintiff was intending to plant within the [FRONTYARD] of the plaintiff's property, again, as if the [WCCO] was privy to such private information of the plaintiff. The plaintiff once-again reiterates that the plaintiff was planning on planting a *"no-mow"* grass and/or groundcover within such [FRONTYARD]. [WCCD-Holt] then begins to alert the plaintiff of the *"public-nuisance"* law, claiming that if the [WCCO] could see such vegetation from the street, then such vegetation would be in violation of such public-nuisance law. The plaintiff begins to explain to [WCCD-Holt] that even the public-nuisance law only applies to *"rank and uncultivated"* vegetation determined to be so-called *"weeds"* that are of three-feet-tall or taller in height, in an attempt to further that such vegetation on the plaintiff's [FRONTYARD] clearly did not meet that criteria. [WCCD-Holt] rudely interrupts the plaintiff claiming that the plaintiff might not see such conditions on the plaintiff's private-property as a nuisance, but that the plaintiff's neighbors did see such conditions on the plaintiff's private-property as a nuisance - once again, deliberately failing to take into account all of the extreme-racial-animus (along with several racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses) that the plaintiff's neighbors had already demonstrated onto the plaintiff in several prior incidents dating back to {2009}. [WCCD-Holt] even advises the plaintiff to trim the plaintiff's bushes/trees located deep within the plaintiff's [FRONTYARD] (thus not even touching any neighboring property), which as the plaintiff had already explained, the plaintiff was religiously opposed to doing. [WCCD-Holt]'s focus on such bushes/trees located deep within the plaintiff's [FRONTYARD] (thus not even touching any neighboring property) further indicated to the plaintiff that the [WCCO] and its co-conspirators was targeting the plaintiff over purely-harmless, purely-subjective aesthetic/cosmetic issue(s) on the plaintiff's private-property - and Texas's public-nuisance law is only concerned with actual harmful conditions on private-property, and thus, not any harmless aesthetic/cosmetic issue(s) on private-property. The plaintiff explains to [WCCD-Holt] that there are actually like-minded gardeners just like the plaintiff all around the United States that share the plaintiff's *"no-mow"* philosophy and that whatever the plaintiff had in the plaintiff's [FRONTYARD] was not fundamentally different from many of those other *"no-mow"* gardeners and horticulturists. The plaintiff further explains that just because some neighbors claim to dislike the manner in which the plaintiff was maintaining the plaintiff's private-property does not give them the right to unjustly impose their subjective and/or ethnocentric/culturally-insensitive standards or preferences of such property-maintenance onto the plaintiff and the plaintiff's private-property, especially if such intrusive actions are actually motivated by their extreme-racial-animus against the plaintiff. As the plaintiff and [WCCD-Holt] are in such conversation, both [JSP&KAP]'s and [RSR]'s crony/co-conspirator, [DMP], slowly passes the plaintiff in his vehicle on the street and parks such vehicle at his then-property, [785KLLTX78641], directly-across the street from the plaintiff, providing further hint to the plaintiff as to who had complained about the plaintiff on this particular occasion. The plaintiff ignores [DMP]'s intimidation of the plaintiff, and reiterates to [WCCD-Holt] that the plaintiff was willing to clear the sidewalk and any piece-of-cardboard partially-protruding onto public-property, along with most of the items stored in the plaintiff's [FRONTHALLWAY] area. [WCCD-Holt] then brazenly asks, in an almost intimidating manner, a very intrusive question as to what the plaintiff intended to do if the [HOA] did not approve of the plaintiff's landscaping plans. The plaintiff responds that the plaintiff would simply need to re-submit the plans with any

modifications that the [HOA] might be requesting, especially since the new relatively-new Texas law (at that moment in time) concerning *"drought-resistant-landscaping"* disallowed [HOA]s from prohibiting such property owner's right to such drought-resistant-landscaping. [WCCD-Holt] then brazenly threatens the plaintiff that if the plaintiff did not follow the [HOA]'s rules, then the [HOA] could put a lien on the plaintiff's private-property. [WCCD-Holt] further increases the brazenness of such threat, claiming that if the [HOA] puts a lien on the plaintiff's private-property, that the [HOA] could then sell the plaintiff's private-property. [WCCD-Holt] continued to threaten the plaintiff, that in the plaintiff's well-meaning efforts to fight for a *"no-mow"* landscape, the plaintiff could end up being evicted from such neighborhood by the process of lien/foreclosure. [WCCD-Holt]'s final statement of threat to the plaintiff was, *"Is this a battle that is worth losing your house for?!"* These extremely revealing statements made by [WCCD-Holt] acting in his official capacity under the authority of the [WCCO] clearly and indisputably showed that the [WCCO] was acting in-concert-with and in-conspiracy-with the plaintiff's predatory White-American neighbors - racketeer co-defendants [JSP&KAP],[RSR] and their co-conspirators such as [DMP] - in-order-to to both evict the plaintiff from such White neighborhood, while at the same time, defraud the plaintiff from the plaintiff's private-property-ownership within such White neighborhood. All of such racially-motivated harassive, discriminatory and blackmailing statements made to the plaintiff by [WCCD-Holt] under the authority of the [WCCO], in addition to being clear violations of the [FHA]/[TFHA], clearly demonstrated that the [WCCO] was completely uninformed about the Texas law governing property-owner's rights codified within [TPrC-T11-C209] and [TPrC-T11-C202]. Specifically, as such deputies were already fully-aware-of, the plaintiff had already retained an attorney, [ATTORNEY-PS], in-order-to dispute the then-[HOA]'s fraudulent/misleading claim(s) against the plaintiff in a [WC] District Court, meaning that until there is actually an unpaid debt by the plaintiff resulting from a verdict/judgment against the plaintiff in such lawsuit - and the public Court records indicated that there clearly was no verdict/judgment against the plaintiff at such moment in time - there was no possibility of the [HOA] imposing a lien on the plaintiff's private-property. Furthermore, [WCCD-Holt] was just simply following a long pattern of more-egregious and more-sinister racially-motivated blackmail/threats concerning foreclosure/eviction that the plaintiff had received directly from the plaintiff's predatory neighbors [RSR],[JSP]. The plaintiff informs [WCCD-Holt] that the plaintiff is well-aware of the plaintiff's rights under Texas law, and that the plaintiff is simply following all of the legal procedure that the plaintiff is fully entitled to, while still, to the best of the plaintiff's abilities and limitations, maintaining compliance with all of the restrictive-covenants of the neighborhood - including avoiding any further legal complications with the [HOA] by refraining-to-perform any unapproved work on the plaintiff's [FRONTYARD]. [WCCD-Holt], having concluded that he did his very best to intimidate and blackmail the plaintiff into backing down from the plaintiff's fight for such *"no-mow"* landscaping, then shifts focus to reiterating what the plaintiff had already agreed to doing as described in the dialogue above. [WCCD-Holt] then stated that be would provide the plaintiff 5 days to fix those issues, while the plaintiff jokingly claimed that even the Public-Nuisance law allows the plaintiff a minimum of 10 days (if not up to 30 days) to fix such property-maintenance issue(s). [WCCD-RT] who, along with [WCCD-Harrell], had executed a clearly unconstitutional-and-unlawful search of multiple private/curtilage areas of the plaintiff's private-property, then alerts the plaintiff about a wheelbarrow (used for all of the plaintiff's re-landscaping work), which the plaintiff was temporarily storing behind the plaintiff's outdoor Air-Conditioning/Heating unit deep inside the plaintiff' side-yard right next to the plaintiff's privacy-fence, claiming that such wheelbarrow was storing stagnant water which could be a potential breeding ground for mosquitoes. [WCCD-RT] ordered the plaintiff to dump such water, to which the plaintiff obeyed, dumping such water into the plants in such side-yard area. The plaintiff failed to explain to such [WCCD]s that the overwhelming sources and primary breeding-grounds for mosquitoes are clogged storm-drains, clogged gutters, and generally-speaking, the much-larger low-lying areas of the subdivision in which water accumulates for long periods of time. [WCCD-Holt] alerts the plaintiff that the plaintiff could be stung by the wasps living in the nest above the plaintiff's [FRONTDOOR], and that it was not in the plaintiff's best interest to allow wasps to nest in such areas. (The plaintiff is reminded of a Public-Television program in which one of the hosts admits to leaving the

wasp-nests around his house untouched - that he never disturbs the wasps and the wasps never disturb him.) The plaintiff responds that,

according to the plaintiff's strong religious/cultural views, the plaintiff lives in harmony with nature, and since wasps do not sting unless they are

threatened, the plaintiff adopts a *"live and let live"* attitude towards wasps, along with all other wildlife that does not pose an actual threat to

human habitation. The plaintiff further explains that in the eight years that plaintiff had lived at such property while also allowing wasps to nest

at numerous areas of the plaintiff's [HOUSE], the plaintiff had only been stung once by a wasp, and that was only because the plaintiff had

disturbed such wasps' nest. The plaintiff fails to mention to [WCCD-Holt], that as both an organic-farmer and an organic-gardener, the plaintiff

also considers the wasp to be a beneficial insect that preys upon other unwanted insects, including, but not limited to aphids and flies. (To this

{PRESENT-DAY}, the plaintiff leaves wasps nests attached to multiple exterior areas of the plaintiff's [HOUSE] untouched.) As such

[WCCD]s were about to leave the scene, the plaintiff asks if the plaintiff could get [WCCD-Holt]'s business-card. [WCCD-Holt] searches for

such card, while, [WCCD-RT] provides the plaintiff with a copy of his business-card. Such [WCCD]s then announce to the plaintiff that they

would be leaving the property, and the plaintiff thanks them for doing so - which is simply the plaintiff's involuntary, reflexive response as a

result of duress, since the plaintiff had suffered such a nonconsensual, invasive and predatory search and interrogation by the government at

the plaintiff's own private-property. Shortly after such [WCCD]s leave the plaintiff's property, the plaintiff notices on the plaintiff's security-

camera-system-monitor, that [WCCD-Holt] approaches the front-door of [DMP]'s then-property, [785KLLTX78641], further indicating to the

plaintiff at least one of the malicious neighbors that had instigated such complaint against the plaintiff. The plaintiff's [HOUSE], located at

[788KLLTX78641], and [DMP]'s house, located at [785KLLTX78641], were separated by at approximately 100 feet (or more) of open-space

(including public-property such as the street, 2 sidewalks, etc). So, it is abundantly clear to any reasonable observer that [JSP&KAP]'s,[RSR]'s

crony/co-conspirator, [DMP], complained about the plaintiff to the [WCLE] purely on harmless, aesthetic/cosmetic issue(s) on the plaintiff's

private-property - because [DMP], just like [RSR], clearly never had any claim to any actual harm caused by any condition(s) on the plaintiff's

private-property, since these two particular properties were separated so far apart from one-another. This particular search/seizure by [WCLE]

against the plaintiff and plaintiff's private-property - in addition to being clearly unconstitutional-and-unlawful - was also particularly excessive

due to the large number of [WCCD]s dispatched onto the plaintiff's private-property, especially considering that the plaintiff was the sole-

resident of such private-property, and especially considering the plaintiff's relatively-smaller physical-size/weight. At least some of both the

declaratory-relief and injunctive-relief that the plaintiff seeks from this Court, is to ensure that no law-enforcement agency of [WCLE] is

allowed to predatorily target any resident(s) - especially resident(s)-of-color - purely upon harmless, aesthetic/cosmetic issue(s) on private-

property (especially since the subjective aesthetics/cosmetics of a private-property is a first-amendment protected right) - that instead, the

government is only allowed to intervene into a resident's use of private-property, when there is demonstrable-harm or the real potential for

demonstrable-harm caused by condition(s) on private-property. According to the plaintiff's recorded-footage, all of these [WCCD]s at the

scene of the plaintiff's private-property during this incident did have body-worn-cameras - and as such, such body-worn-cameras should have

been recording not only all aspects of this unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff and the plaintiff's

private-property, but also such [WCCD]s following interactions with [DMP] - unless, such [WCCD]s deliberately turned-off their body-worn-

cameras (at any point in time) in-order-to Obstruct Justice against the plaintiff. As traumatizing as this incident was (and still is) to the plaintiff,

this predatory incident would be just one of numerous predatory incidents (documented in this lawsuit) involving the defendants [RSR], [KAP]

(and/or [JSP]) - or in this particular case, one of their cronies/co-conspirators, [DMP] - along with [WCLE] - almost always involving White-

American and/or non-immigrant police-officers/government-employees of defendant [WC] - against the plaintiff in which all of such defendants

acted in a shamelessly (and overtly) racist and predatory manner against the plaintiff - as if they were not even in the least bit ashamed or

concerned that they would be accused of modern-day-Jim-Crow predatory-racism by the plaintiff - as if proudly wearing and flaunting their

modern-day-Jim-Crow predatory-racism against the plaintiff as a badge-of-honor, that they will never apologize for.

# ¶398

On or about the approximate date and approximate time of {2017-08-21 10:30}, the plaintiff reluctantly began to cut any-and-all vegetation extending into the sidewalk (along with tearing any piece(s) of cardboard extending a few inches into such sidewalk). Within just a few minutes of the plaintiff performing such work, the plaintiff noticed what appeared to be a member of the then [HOA-BoD]s drive his vehicle in front of the plaintiff's property, pausing such vehicle on the road right in front of the plaintiff. It appeared to the plaintiff that such [HOA-BoD] was taking photograph(s) and/or video(s) of the plaintiff's performing such work, as if by doing so, such [HOA-BoD] was somehow recording some incriminating evidence against the plaintiff that could then be used against the plaintiff - for example, to obtain a [TRO] against the plaintiff. After spending less than minute taking such photograph(s) and/or video(s), the plaintiff noticed that such vehicle performs a three-point-u-turn very close to the plaintiff, and then drive back down the road. The plaintiff would notice such intimidation and discrimination tactics on numerous occasions from the then-[HOA] (under [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH]), and the plaintiff reiterates that no professional and law-abiding organization would resort to such underhanded tactics of intimidation and discrimination in-order-to achieve their goals, and would instead, fight their legal battles in a lawful and civilized manner within the Court-of-law.

# ¶399

On or about the date of {2017-08-31 16:00}, the plaintiff noticed on the plaintiff's security-camera-system-monitor, what appeared to be at least 2 police-officers from the [WCCO] with their police-vehicles parked in-front-of and/or near-the-front-of the plaintiff's private-property. The plaintiff recognized [WCCD-RT] and [WCCD-Harrell] approach the plaintiff's [FRONTDOOR] in-order-to knock on the plaintiff's [FRONTDOOR] and/or ring the plaintiff's [FRONTDOOR]-bell. [WCCD-RT] summoned the plaintiff out into the plaintiff's [FRONTHALLWAY] area in-order-to speak to the plaintiff. As soon as the plaintiff walked into such [FRONTHALLWAY] area, [WCCD-RT] stated that they had noticed that the plaintiff had taken care of the issue on the sidewalk, and that they appreciated such plaintiff's work. The plaintiff reiterates to such [WCCD]s that the plaintiff had been given direct orders from the [HOA] to stop all landscaping-related work, and so the plaintiff could not touch any other aspect(s) of the plaintiff's [FRONTYARD] landscaping until further approval, even if such landscaping was incomplete at such moment in time. [WCCD-RT] asks the plaintiff, a rather intrusive question as to what the plaintiff's plan with the [HOA] was, in-regards-to, such [FRONTYARD] landscaping, again, as if the [WCCO] was in any way privy to such private information between two private parties. The plaintiff reluctantly explains that the plaintiff planned on installing a groundcover in the [FRONTYARD] - a type of vegetation that covers an area by growing primarily horizontally onto such area. [WCCD-RT] then asks the plaintiff about the possibility of *"zero-scaping"*. The plaintiff explains to [WCCD-RT] that such groundcover was a type of *"zero-scaping"*, as part of the plaintiff's application for *"drought-resistant-landscaping"*. [WCCD-Harrell] then intrusively questions the plaintiff as to why the plaintiff did not consider the option of just rocks/stones/gravel (in essence, non-living landscaping) - again, as if the government had the authority to influence and/or dictate a property-owner's choices on such matter within such property-owner's own private-property. The plaintiff stated that the plaintiff considered that option, but that the plaintiff prefers a living, ecological landscape composed of plants, further explaining that a landscape of rocks/stones/gravel contributes significantly to the urban-heat-island-effect (which only worsens the problem of man-made climate-change, whereas, by sharp contrast, a landscape of plants actually cools the surroundings down due a large list of reasons, including but not limited to, their retention of soil-moisture along with their biological processes of photosynthesis and evapotranspiration).

[WCCD-RT] explains that he has seen other property-owners change their landscapes to a mixture of such rocks/stones/gravel and some plants, and that he had read a bit about such *"zero-scaping"* but that he did not know a whole lot about such topic, stating that he cut his grass like most homeowners do. The plaintiff further explains that the plaintiff was, in fact, looking for such plant-based landscape without the need for watering, except only minimal watering during the summer in-order-to keep such landscaping alive during the most intense periods of summer-drought. [WCCD-RT] points to a very large and heavy unopened/sealed package delivered to the plaintiff's {FRONTPORCH} area, jokingly stating that the plaintiff had *"some mail"* that the plaintiff needed to check. {WCCD-RT} then summons the plaintiff to the front of street area, alerting the plaintiff that plaintiff would need to additionally cut any sheet(s) of cardboard protruding a few inches into the curbside of the street. The plaintiff agrees to perform such additional work. [WCCD-RT] then summons the plaintiff to talk back in the [FRONTHALLWAY] area due to the loud noises made by a nearby garbage-pickup-truck. [WCCD-RT] stated that the last time that they were at the plaintiff's property, that they had noticed some mosquitoes on the plaintiff's property. [WCCD-RT] further explains to the plaintiff that they had talked to *"some neighbors"* about alleged tall grass in the plaintiff's [BACKYARD], failing to take into account the fact that the default grass installed in such subdivision, berumdagrass, does not grow to over a foot in most areas, thus making such grass incapable of violating Texas's public-nuisance law. [WCCD-RT] continues on the issue of mosquitoes, as if to fraudulently/misleadingly insinuate that the vegetation on the plaintiff's private-property was the source and/or breeding-ground of such mosquitoes - a fraudulent/misleading claim which all of the scientific evidence and literature on this matter completely refutes. (In other words, as the law-review article in the section below documents, there is absolutely no scientific evidence that indicates that mosquitoes originate and/or breed due to uncut vegetation, and to the contrary, if such uncut vegetation absorbs relatively-larger amounts of stagnant water during flooding rains, then such uncut vegetation actually reduces the incidence of mosquitoes (when compared to cut vegetation), instead of the other way around, as the plaintiff's malicious neighbors had fraudulently accused the plaintiff of.) The plaintiff did not summon the courage to dispute [WCCD-RT]'s fraudulent/misleading claims even though such [WCCD]s actually had visited the plaintiff's property during a time of day (noon/mid-afternoon) when mosquitoes are not known to be active to begin with. [WCCD-RT] then alerts the plaintiff to what these [WCCD]s observed were buckets of water around certain areas of the plaintiff's [HOUSE] within the plaintiff's private/concealed [BACKYARD] - which again, was a brazen and unapologetic admission to the plaintiff that [WCCD-RT] and [WCCD-Harrell] had conducted a brazenly unconstitutional-and-unlawful search/seizure of such private/concealed areas of the plaintiff's property that were clearly not visible from the street (due to the 6-feet-tall privacy-fence fully-obstructing such view). The plaintiff responded that the plaintiff was regularly using such buckets to harvest water in-order-to water plants in the plaintiff's [BACKYARD]. (The plaintiff failed to mention that the plaintiff had actually heard about such technique of harvesting rainwater using buckets around one's house from a public-television program - clearly indicating that the plaintiff is not the only one that employs such technique to harvest rainwater.) [WCCD-RT] states that he had contacted the [WCCHD] about such issue. The plaintiff erroneously responds that a member of the [WCCHD] had already visited the plaintiff's [BACKYARD] in a previous incident - when in fact, as the incident above reveals, such person ([TCEQ-JL]) was actually from the [TCEQ] - and that such person did not see a problem as long as the plaintiff was regularly using such water for the purposes of watering plants. [WCCD-RT] asks the plaintiff if such person provided the plaintiff with any *"mosquito dunks"* to be able to be used in such tanks of water. The plaintiff stated that such person did not provide the provide with any such *"mosquito dunks"* and asked [WCCD-RT] if those were chemicals (since the plaintiff was strongly opposed to any-and-all use of chemicals). [WCCD-Harrell] states that such mosquito-dunks are safe for fish, since they put such dunks in ponds. [WCCD-RT] further states that [WCCHD] provides such mosquito-dunks to private-citizens for free, and that the [WCCHD] would not provide anything to the plaintiff that is toxic to the plaintiff or to anybody else, failing to take into account the potential toxicity to the environment/wildlife. (As a side-note to such claim of [WCCHD]'s innocence made by [WCCD-RT], the plaintiff found out that the [WCCHD], at least occasionally, sprays chemicals in

certain areas of the County of Williamson supposedly as a *"solution"* to combat the *"problem"* of mosquitoes, whereas many environmentalists and/or indigenous-peoples such as the plaintiff rightfully assert that the use of such highly-toxic chemicals is actually a case where the so-called *"solution"* is much-worse than the original *"problem"* - due to the high-toxicity of such chemicals - both to human health and to environmental health.) [WCCD-Harrell] reiterates that such mosquito-dunks are used in ponds and have no impact on dogs, wildlife and fish. [WCCD-RT] then suggests to the plaintiff that the plaintiff would need to use such mosquito-dunks in such tanks of water. [WCCD-RT] then shifts his focus back to the vegetation in the plaintiff's [BACKYARD] - once again, brazenly admitting that both he and [WCCD-Harrell] had conducted a brazenly unconstitutional-and-unlawful search/seizure of such private/concealed areas of the plaintiff's private-property. [WCCD-RT] erroneously states that any-and-all grass cannot exceed 35 inches in height, when the (public-nuisance) state-law actually states that certain types of vegetation that is deemed to be so-called *"weeds"* cannot exceed *"36 inches in height"*. [WCCD-RT] again brings up the issue of mosquitoes when referring to such vegetation, when the plaintiff had already read the aforecited law-review article, which documents that mosquitoes have never been attributed to uncut vegetation. [WCCD-RT] states that, on this particular occasion, he was not going to provide the plaintiff only with a verbal warning, but instead, that he was going to provide the plaintiff with a warning-citation. [WCCD-RT] states that he also contacted the fire-department about items stored on the plaintiff's private/concealed [FRONTPORCH] area. [WCCD-RT] alerts the plaintiff that the fire-department advised that if any items blocking the entryway into a house could be a potential fire-hazard. [WCCD-RT] then asks the intrusive question of whether the plaintiff lived alone at the property, to which the plaintiff reluctantly responded that the plaintiff did live alone at such property. [WCCD-RT] then alerts the plaintiff's attention to (excess, currently-unused) sheets of cardboard (to be used for the aforementioned landscaping technique of sheet-mulching) that the plaintiff had stacked in one area of the plaintiff's private/concealed [FRONTPORCH] area. [WCCD-RT] states that, while the plaintiff's use of such cardboard for landscaping purposes was entirely legal and within the plaintiff's rights, the fire-department still advised the plaintiff, just for the plaintiff's own health-and-safety that such cardboard stored in such manner near the [HOUSE] could be a potential fire-hazard. This particular statement by [WCCD-RT] about the plaintiff's use of such cardboard for ecological (re-)landscaping purposes entirely within the confines of the plaintiff's private-property is another piece of evidence of the plaintiff's fraud claim against the defendants - see incident from {2020-04-28} below, where [WCCHDS-VD] angrily informs the plaintiff that the plaintiff was not allowed to use cardboard for such (re-)landscaping purposes. The plaintiff re-focuses [WCCD-RT]'s attention back onto the vegetation in the plaintiff's private/concealed [BACKYARD], stating that the actual grass in the plaintiff's [BACKYARD] is not taller than approximately 12-inches in height since the default bermuda-grass does not grow to more than approximately 12-inches in height, and due to such reason, that such grass is not actually in violation of the Public-Nuisance law. The plaintiff mentions that there may be other vegetation that might be growing sporadically and interspersed between such grass which may exceed 36 inches in height, but that the grass itself, is well-below such height. [WCCD-RT] then asks the plaintiff if he could enter into the plaintiff's [BACKYARD], and the plaintiff instead directed the plaintiff towards the side-yard area, where such [WCCD]s had already unconstitutionally-and-unlawfully peaked through such privacy-fence. [WCCD-RT] looks through a small-hole in such privacy-fence again and states that any vegetation over *"35 inches"* in height is a violation of the public-nuisance law. The plaintiff corrects [WCCD-RT] by stating *"36 inches"*, at which point, [WCCD-RT] states that he would head back to his vehicle to bring the plaintiff a hardcopy printout of such public-nuisance law. [WCCD-RT] then walks towards his vehicle parked across the street from the plaintiff's property. Meanwhile, [WCCD-Harrell] stood in supervision of the plaintiff, as if the plaintiff was still under the detainment of the [WCCO], within the confines of the plaintiff's own private-property. The plaintiff almost-immediately notices [RSR]'s vehicle approach [WCCD-RT] in-order-for [RSR] to speak to [WCCD-RT], making it abundantly clear to the plaintiff who the predatory *"neighbors"* were that complained about the plaintiff in such malicious manner. [RSR] then parks her vehicle in her driveway, with the plaintiff immediately hearing [RSR]'s dog, [L], barking in the same obnoxiously-loud manner that the plaintiff had routinely observed. [WCCD-RT]

then shows the plaintiff such hardcopy printout, reading that such public-nuisance law defines *"weeds"* as *"rank and uncultivated"* vegetation that has exceeded *"36 inches"* in height. The plaintiff immediately interrupts [WCCD-RT] stating that some of the vegetation in the plaintiff's [BACKYARD] were vegetables which did exceed *"36 inches"* in height, but that such vegetation clearly did not fit the definition of *"weeds"*. The plaintiff reiterates that the default bermuda-grass installed within such subdivision does not grow to such height. [WCCD-RT] then refers to the part of the law that states that such vegetation could also be considered to be a *"harborage"* of rodents, vermin, or other disease-carrying pests - with [WCCD-RT] fraudulently/misleadingly continuing-to-state that mosquitoes is included in such description. [WCCD-RT] then states that he has spoken to neighbors who state that they have seen *"rats and mice"* in the area. The plaintiff immediately interrupts [WCCD-RT], stating that such rodents are on everybody's properties, pointing to the (at that moment in time) completely-open (undeveloped) area of land directly behind [RSR]'s property which is full of such wildlife. The plaintiff also states that anybody who cultivates a vegetable-garden has at least some encounters with such rodents - and that some vegetable/fruit gardeners actually resort to using electric-zappers and/or traps to deal with such rodents. [WCCD-RT] laughs and states that he understands those facts, but just alerts the plaintiff to ensure that the such rodents are not originating from the plaintiff's private-property. [WCCD-RT] further explains that he is not from *"Animal Control"* and that he is not as well-versed in where such animals originate from, but again, just reiterates to the plaintiff to ensure that the such rodents are not originating from the plaintiff's private-property. [WCCD-RT] begins to read other aspects of the public-nuisance law to the plaintiff, none of which, the plaintiff's private-property were in violation of. The plaintiff, having read the aforecited documentation on *"no-mow"* landscaping, then begins to explain to [WCCD-RT] that this issue of *"no-mow"* landscaping is being fought by like-minded environmentalists and at least some immigrant(s)-of-color (due to religious reasons) such as the plaintiff, and that such public-nuisance law still needs to take into account such Constitutionally-protected rights of property owners, failing to mention that even the public-nuisance law, allows the government to grant *"SPECIAL EXCEPTION OR VARIANCE TO PUBLIC NUISANCE CLASSIFICATION"*, [THaSC-T5-SA-C343-SB-§343.0111]. The plaintiff even specifically refers to one article and research-paper co-authored and/or published by the [NRDC] - a highly-reputable, nationally-based, non-profit, environmental-organization - that advocates for such *"no-mow"* landscaping - see section below. On multiple occasions during this conversation, the plaintiff asks [WCCD-RT] if [WCCD-RT] had any internet-connected device where he could look up such article and read such article about such *"no-mow"* landscaping, and [WCCD-RT] responded that he would take down such information to look at it later. [WCCD-RT] skirts the issue of environmental-justice referred to by the plaintiff, instead, referring the plaintiff to the Texas Public-Nuisance law. [WCCD-RT] continues to fraudulently/misleadingly state that the plaintiff had mosquitoes on the plaintiff's property, when in fact, there was not even one mosquito on the plaintiff's property that he could point to, even during this particular incident. The plaintiff explains to [WCCD-RT] that since this environmental-justice issue of *"no-mow"* landscaping could potentially come into conflict with Texas's Public-Nuisance law, that there needs to be some middle-ground that would allow the plaintiff to maintain the plaintiff's strongly-held religious/cultural and environmental values while at the same time complying such law. [WCCD-RT] agrees, stating, *"That's exactly what we're trying to do here today."* [WCCD-RT] states that he will write up a warning-citation explaining to the plaintiff what needed to be done, while the plaintiff clarifies the tasks that the plaintiff would need to have done. [WCCD-RT] acknowledges that the plaintiff is clearly very-educated on such environmental issues. [WCCD-RT] then opens up his binder with such warning-citation, and then begins to fill-out such warning-citation. [WCCD-RT] then reiterates that he could request the [WCCHD] to provide the plaintiff with those free mosquito-dunks. In filling out such form, [WCCD-RT] asks numerous privacy-invading questions of the plaintiff, such as the plaintiff's Date-Of-Birth, the plaintiff's Phone-Number, the plaintiff's Drivers-License-Number, which the plaintiff was every reluctant to provide. The plaintiff stated that the plaintiff would like to provide as minimal information as possible in-order-to avoid any potential for invasion-of-privacy, especially since these were government-documents, and especially since [WCLE] had already committed multiple criminal action(s) of *"Misuse-Of-Official-Information"*

during prior incidents suffered by the plaintiff. [WCCD-RT] writes down on such warning-citation, instructing the plaintiff to cut down any vegetation - so-called *"weeds"* or *"grass"* - that exceeds 36 inches in height, while the plaintiff takes exception to the use of the word *"grass"* since there is no grass that is growing even anywhere near to such height anywhere in the plaintiff's [BACKYARD], and such statement is extremely-misleading, especially on such official government-document. [WCCD-Harrell] rudely interrupts the plaintiff that they are not going to allow the plaintiff 30 days to fix such issue(s) concerning so-called *"weeds"*, only to later find out that there does exist *"grass"* above such height, while the plaintiff responds that this is *"bermuda-grass"*, further explaining that the genetics of bermuda-grass does not allow it to grow to anywhere near such height. The plaintiff was merely objecting to such extremely-misleading statement made on an official government-document - making the plaintiff's [BACKYARD] look as if such [BACKYARD] was full of dense/tall-grass higher than 36-inches in height which was, at a minimum, extremely-misleading. [WCCD-RT] stubbornly states that he's just going to leave the verbiage including *"grass"* as is, once-again, revealing to the plaintiff that the [WCCO] was neither interested in truth nor justice, but that the [WCCO] was simply going to railroad the plaintiff, including but not limited to, their use of such fraudulent/misleading statements on official government-document(s) - all due to the predatory demands of the plaintiff's predatory neighbors with extreme-racial-animus against the plaintiff - [JSP&KAP],[RSR] - and their cronies/co-conspirators (including, but not limited to [DMP]). [WCCD-RT] then refers back to his printout, while the plaintiff looks more closely at the warning-citation that [WCCD-RT] is filling out, because the plaintiff increasingly began to suspect that the plaintiff was being railroaded by such [WCCD]s of the [WCCO]. The plaintiff was very alarmed by the fact that the warning-citation stated *"Environmental-Crime"* on it, and asked [WCCD-RT] why the warning-citation states *"Environmental Crime"* on it. [WCCD-RT] states, *"That's what we do ... This is an Environmental-Crime-Unit ... It is a criminal offense. It is not a civil offense... or something like that..."* [WCCD-Harrell] threateningly states to the plaintiff that this is not an *"HOA Violation"* or any civil violation like that - instead, threatening that such offense was actually considered to be a criminal offense. The plaintiff further asks such [WCCD]s why such issue was considered to be an *"Environmental Crime"* when what the plaintiff was actually fighting for Environmental-Justice in the plaintiff's fight for such *"No-Mow"* landscaping. [WCCD-RT] flippantly responds to the plaintiff, *"Well, we appreciate that!"* - once again, revealing to the plaintiff that they do not work for the plaintiff, but instead, that they were only working on behalf of the plaintiff's predatory neighbors with extreme-racial-animus: [JSP&KAP], [RSR] - and their cronies/co-conspirators (including, but not limited to [DMP]). [WCCD-RT] states that he needs the plaintiff to read the statement above the signature line and sign on such form. The plaintiff begins to take photograph(s) of the form, and [WCCD-RT] responds that they would provide the plaintiff a copy of such form. [WCCD-RT] states that such photograph(s) were not necessary because he was not here to trick the plaintiff in any way. [WCCD-RT] re-reads the warning statement to the plaintiff under which the plaintiff would need to sign, stating, *"I've been informed of the violation(s) listed above, and agree to take the stated corrective action(s). No penalty or charge(s) will be accessed at this time."* [WCCD-RT] states, *"Either you can sign it,"* but fails to complete the rest of that sentence, instead, stating, *"Do you want to sign it"* The plaintiff assumed that [WCCD-RT] meant that the plaintiff could either sign it, or [WCCD-RT] could issue such warning-citation to the plaintiff indicating that the plaintiff refused to sign it. Given such *"Sophie's Choice"*, and acting under duress, the plaintiff was coerced into signing such warning-citation. [WCCD-RT] then tears out the carbon-copy and provides such carbon-copy to the plaintiff. [WCCD-RT] reiterates to the plaintiff that they're going to provide the plaintiff with 30 days to comply with such warning-citation. [WCCD-RT] states that he would provide the plaintiff with his business-card, and walks back towards his police-vehicle to get such business-card. The plaintiff provides [WCCD-RT] with the name of the organization (*"[NRDC]"*), and the name of the article ( *"More Sustainable (and Beautiful) Alternatives to a Grass Lawn"* ), and that such article documents how such *"no-mow"* landscaping is challenging such out-dated, draconian, and ethnocentric/culturally-insensitive laws concerning vegetation on private-property. [WCCD-RT] reiterates that the plaintiff seems well-versed on both such environmental-issues and the relevant statutes. [WCCD-RT] concludes by stating, *"It's not an issue between*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

'you and me', or an issue between 'law-enforcement and you'. All it is, is about being a good neighbor ... I want to be able to create that middle-ground, and that's what we're doing." [WCCD-RT] indicates that they would be leaving the plaintiff alone, while the plaintiff reminds such [WCCD]s to read such article regarding, "No-Mow" Landscaping, which [WCCD-RT] agreed to do. Such [WCCD]s would walk back to their vehicles, while the plaintiff would enter back into the [HOUSE] urgently searching for the full-link to such "No-Mow" Landscaping Article. The plaintiff found such full-link, wrote such full-link down on a card, and rushed to such [WCCD]s to provide them with the full-link to such article. On the plaintiff's walk towards such [WCCD]s vehicles, the plaintiff observed [RSR] clearly talking to such [WCCD]s. As the plaintiff would hand the card with such information to [WCCD-RT], [RSR] would be standing alongside [WCCD-Harrell] staring menacingly/angrily at the plaintiff. The plaintiff walks back towards the plaintiff's [HOUSE], and while inside the [HOUSE], continues to observe [RSR] speaking with such [WCCD]s - once again, viciously backstabbing/badmouthing the plaintiff behind the plaintiff's back with such relentlessly-racist propaganda against the plaintiff, as she had done on countless occasions dating back to {2009}, and as she would continue to do in the numerous years that followed. Such [WCCD]s would smile and laugh along with each other before driving away in their respective police-vehicles. A common theme expressed in this lawsuit is that almost-all, if not all, of the members of [WCLE] that violated the plaintiff's rights (dating back to {2011}) would take great pleasure and joy out of violating the plaintiff's rights - as if such violation of the plaintiff's rights was a "fun sport" that all of these individuals, including the plaintiff's predatory neighbors with extreme-racial-animus against the plaintiff - [RSR],[JSP&KAP] - could all happily and joyfully participate in (φ). Once again, the plaintiff would like to reiterate that [RSR] lived diagonally and across-the-street from the plaintiff with her house and the plaintiff's [HOUSE] separated by approximately 110-feet of open-space, meaning that there was absolutely no legitimate legal claim to any such property-maintenance issue that [RSR] ever had against the plaintiff. The law-enforcement agencies of the [WCCO], the [WCCHD] and the [WCSO] predatorily targeted the plaintiff in such a brazenly-racist manner, in aggregate, for over a decade, based exclusively upon the extreme-racial-animus against the plaintiff harbored by [RSR], [JSP&KAP] and their cronies/co-conspirators (including, but not limited to, [DMP]). In particular, [WCLE] was threatening to charge the plaintiff with Class-C-Misdemeanor-Public-Nuisance on behalf of the plaintiff's predatory neighbors with extreme-racial-animus against the plaintiff - [RSR],[JSP&KAP] - while neither [RSR] nor [JSP] were ever charged, let alone prosecuted, for over the over dozen count of racially-motivated and/or retaliatory hate-crimes/racketeering-acts/civil-rights-violations/abuses that such neighbors had already committed against the plaintiff (at this early moment in time). The plaintiff cringes with sheer pain, whenever the plaintiff plays-back [WCCD-RT] Orwellian and fraudulent statement, "All it is, is about being a good neighbor", because in making such Orwellian and fraudulent statement, [WCCD-RT] is indicating that the plaintiff's predatory neighbors with extreme-racial-animus against the plaintiff - [RSR],[JSP&KAP] - can commit a virtually endless stream of hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff, with all of such criminally-abusive conduct being considered "being a good neighbor". Even if the plaintiff was the most-eloquent and most-intelligent dystopian author (such as George Orwell), the plaintiff would still have a very difficult time fictionalizing any aspect of living in a White neighborhood that is more dystopian and more modern-day-Jim-Crow than what the plaintiff continued to suffer from [WCLE], due to [WCLE]'s predatory targeting of the plaintiff, based on the predatory demands of far-right-wing-extremist neighbors with extreme-racial-animus against the plaintiff: [RSR],[JSP&KAP]. According to the plaintiff's recorded-footage, all of these [WCCD]s at the scene of the plaintiff's private-property during this incident did have body-worn-cameras - and as such, such body-worn-cameras should have been recording not only all aspects of this unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff and the plaintiff's private-property, but also such [WCCD]s following interactions with racketeer co-defendant [RSR] - unless, such [WCCD]s deliberately turned-off their body-worn-cameras (at any point in time) in-order-to Obstruct Justice against the plaintiff. As traumatizing as this incident was (and still is) to the plaintiff, this predatory incident would be just one of numerous predatory incidents (documented in this lawsuit) involving the defendants [RSR], [JSP] (and/or

[KAP]), and [WCLE] - almost always involving White-American police-officers/government-employees of defendant [WC] - against the plaintiff in which all of such defendants acted in a shamelessly (and overtly) racist and predatory manner against the plaintiff - as if they were not even in the least bit ashamed or concerned that they would be accused of modern-day-Jim-Crow predatory-racism by the plaintiff - as if proudly wearing and flaunting their modern-day-Jim-Crow predatory-racism against the plaintiff as a badge-of-honor, that they will never apologize for.

## ¶400

During the final week of the month of {2017-09}, while the [HOA] denied the plaintiff's requests for the numerous other (non-grass) *"groundcovers"* that the plaintiff sought in favor over grass, the [HOA] did provide *"conditional approval"* for a species of drought-tolerant, *"no-mow"* grass known as *"Cutless Zoysia"* that the plaintiff had offered to install as a last resort, if case none of the aforementioned *"groundcovers"* were approved. The plaintiff was truly disappointed that the plaintiff would not be able to install any of such preferred *"groundcovers"*, and reluctantly accepted the fact that the plaintiff would be forced to install such *"No-Mow"* grass.

## ¶401

After the plaintiff fully-resolved the issues ordered by the aforementioned [WCCD]s in the incident on the last day of the month of {2017-08}, the plaintiff still respectfully-submitted the following email-message to both the [WCCD-RT] (thus the [WCCO]) and to the top-executive of the [WCCHD], fully-documenting the plaintiff's point-of-view, which documents many articles (including legal literature) concerning *"no-mow"* landscaping, while also making at least some of the plaintiff's claim concerning racial-discrimination clear to defendants [WCCO] and [WCCHD]. In particular, the plaintiff also mentioned that the plaintiff contacted the [NRDC] - a highly-reputable, nationally-based, non-profit, environmental-organization that advocates for such *"no-mow"* landscaping - in the plaintiff's own efforts to fight for the right to such *"no-mow"* landscaping - even citing the informative response that the plaintiff received from the [NRDC] (see embedded-email below). (In such email, the plaintiff erroneously refers to *"James Lancaster"* as an employee of the [WCCHD], when in fact, [TCEQ-JL] was actually an employee of the [TCEQ].) The plaintiff did not receive any response to this email to the [WCCO] and the [WCCHD]. In his in-person interaction with the plaintiff (see incident from {2017-08-31} above), [WCCD-RT] had promised to either personally provide the plaintiff with free mosquito-dunks and/or get someone from the [WCCHD] to issue the plaintiff with such free mosquito-dunks. However, no such free mosquito-dunks were ever issued to the plaintiff, and instead, the plaintiff ended up purchasing and using such privately-purchased mosquito-dunks, along with multiple electric mosquito zappers - one for the [BACKYARD] and one for the [FRONTYARD].

---

▷  "Full Compliance and Response to "Warning Citation", Case# 2017-08-0008" ↓   EMAIL FROM PLAINTIFF TO [WCCD-RT],[WCCHD]↓   PLAINTIFF↓   {2017-09-30 23:52}↓

Hello Senior Deputy Tijerina,

This is Sid Kode, property owner at: **788 Kingfisher Lane, Leander, Texas 78641**. This email is my response to the **Warning Citation** [Case#: **2017-08-0008**] that you issued to me on **2017-08-31 16:04 CDT** at my property, alleging:

   1. **so-called "unsanitary conditions" resulting in "mosquitoes"**
   2. **vegetation in my backyard growing above 36 inches in height that you consider to be so-called "weeds"**

The **Warning Citation** requested me to:

   1. **maintain the property in a so-called "sanitary condition free of mosquitoes"**
   2. **cut down vegetation that you consider to be so-called "weeds" under 36 inches in height**

**Please forward this email to the Williamson County Health Department and any other law enforcement entities/officials/individuals that are involved in this case (including James Lancaster of the Williamson County Health Department).**

Even though I am taking all the necessary actions to **fully comply** with both of the requests listed above and thus fully avoid any penalties (please read below for details), **in this writing, I still formally request a hearing before the commissioners court or any board, commission, or official designated by the commissioners court** (as per [Texas Health And Safety Code, Section 343.022]), so that I can formally provide my response to the issue of so-called "weeds" to the court.

**Please meet me at my property** sometime within the next 2 weeks (**by 2017-10-13**), so that you can **inspect** my property and verify that I have **fully complied** with both of your requests, and so that you can **close this case**, while still providing the **hearing** that I requested.

Also, please keep in mind that I fully realize that you have been told a lot of things about me and my property by some of my neighbors. But what you might not know is that these neighbors have always had it against me, for reasons that have absolutely nothing to do with the way I maintain my property. They have always held an extreme grudge, anger and hostility towards me, some of which can be attributed to hostile neighborhood politics, but much more of which is just plain racism/bigotry and clash of cultures. And this clash of cultures is not only evident in our current situation, but is also documented in some of the literature that I posted in this document. I have tried my very best to reason with these neighbors and explain my environmental/cultural values to them, but narrow-minded/bigoted and/or racist as they are, these attempts have been largely futile. These racist/bigoted neighbors have no right to impose or force their narrow-minded/bigoted and environmentally-destructive and wasteful values/lifestyles on me or my property. In fact, not too long ago (back in 2011), one of my former next-door neighbors, who was fully supported and instigated by some of my current neighbors, vandalized my property by dumping cat litter both in my front yard and back yard, for which I did file a police report. So, some of my neighbors have demonstrated a long history of very strong hostility and animosity towards me and my environmental/cultural values. They have always strongly resented the fact that my parents purchased this property for me, and simply cannot get over that fact, despite not knowing anything about me or my history or my cognitive disability. You could probably tell from the way I spoke to you - in particular, the way that I stuttered - that I do have a cognitive disability, and while I was a student, I was registered as a student with disabilities.

Please keep all of this in mind before you take their word at face value, and also please keep in mind that, as a public law enforcement officer, you are fully accountable to all citizens of Williamson County - not just some citizens over others, because that would be discriminatory treatment. Since you did issue me a **Warning Citation** to me for what I consider to be dubious, marginal and/or unproven issues at best (given the information that I have provided in this document which proves that there really is no "public nuisance"), and since I am still, nonetheless **fully complying** with your requests despite these being dubious/marginal/unproven issues, I will have to ask you to issue these **Warning Citations** against some of these neighbors of mine (especially the one you were speaking with who lives at **789 Kingfisher Lane, Leander, Texas 78641** - the one who you were speaking with who demanded that you issue this **Warning Citation** to me) for multiple issues that are all real/actual/legitimate and huge public nuisances and health/safety hazards. These immediate neighbors of mine are committing various actions that are very **toxic to my health** (and even other neighbors' health) and/or significantly **compromise my safety/security** and/or a **fire hazard** to everyone in the community **including my property**. These actions constitute real public nuisances, most of which are caught as evidence on my security cameras, and some of which are caught as evidence on the neighborhood's online social media platform "NextDoor" (https://summerlynleander.nextdoor.com/), where these neighbors openly admit to committing those public nuisances. Furthermore, all of these actions are not only real public nuisances, but they are also flagrant violations of the Homeowners Association rules. I can provide you with the evidence when you meet with me and/or in a subsequent email(s). These real public nuisances include:

- Many of my neighbors light loud, toxic, dangerous fireworks every 4th of July, Christmas Eve and New Year's Eve. Whether or not there is a county-wide burn ban in effect, our Homeowners Association rules explicitly prohibit the lighting of fireworks at any time during the year, due to the fire hazard, safety hazard, health hazard, property damage, loud noises that disturb people that work from home or people that are sleeping, etc. Unfortunately, the Homeowners Association does want to enforce its own rules, despite my repeated attempts to get them to do so. As you know, fireworks are a real public nuisance and a real fire hazard that can not only cause huge property damage, but can also cause real human injury/pain and even death, and not to mention, the resulting high medical expenses. In fact, about 90% of all fires are caused by fireworks, and so, fireworks are the **most common fire hazard**:
  - https://www.cpsc.gov/Safety-Education/Safety-Education-Centers/Fireworks/
  - https://www.statesman.com/news/local/burn-ban-williamson-county-prohibits-outdoor-burning-for-days/NWCtCPbLhJhSXeQhIlrieO/

By lighting fireworks at several points during the year (in all of the 8.5+ years that I have lived here), these neighbors are not only keeping me fearful of fire and injury, but they are also disturbing my sleep (and work) schedule, since they usually light these fireworks very late at night, sometimes past 1AM. I leave some of my windows open during the summer to let in the cool air at night time (since I do not use the Air Conditioner for environmental reasons), and so, the noise from these fireworks is unbelievably loud - to the point, where they could easily cause permanent hearing damage to my ears. These neighbors have also fully admitted to breaking the law by lighting fireworks on the neighborhood's online social media platform "NextDoor Summerlyn" (https://summerlynleander.nextdoor.com/), which requires and verifies that neighbors use their real names when posting online. This includes the neighbor you were speaking with who demanded that you issue me this **Warning Citation** - the one across the street that lives at **789 Kingfisher Lane, Leander, Texas 78641**. In addition to this online evidence, I have both photographic and video evidence of these neighbors lighting fireworks right in front of my property. In fact, a lot

of the debris from these fireworks land in my frontyard and my backyard. If you take a close look at my frontyard carefully even now (several months beyond July 4th), you will still see evidence of debris from these fireworks. Please keep in mind that the debris from fireworks is toxic (since it has toxic chemicals in it), and causes both land pollution and air pollution:

https://www.usatoday.com/story/weather/2015/06/30/fireworks-air-quality/29509259/
http://backcountryattitude.com/toxic_fireworks.html

So, to summarize this public nuisance issue, these neighbors of mine who recklessly light fireworks are obviously causing a huge public nuisance from many different reasons:

fire hazard (both in terms of property damage and bodily injury/death)
air pollution (toxic chemicals/fumes released into the air when fireworks are lit)
land pollution (toxic debris from fireworks fall onto my property and is potentially "illegal dumping", and my backyard animals might eat this toxic debris and get injured or worse.)
noise pollution (extremely loud and causes permanent hearing damage)
huge disturbance to sleep schedule and thus a drop in productivity the following day, along with all the other hazards caused by lack of quality sleep.
huge disturbance to my work schedule since I am constantly working at home.

These neighbors are fully aware that they are violating the rules/laws and causing a huge public nuisance and several health/safety hazards, but they continue to commit these violations in spite of that knowledge.

• One of my nextdoor neighbors lit a huge bonfire in the backyard last Sunday evening, 2017-09-24 07PM-09PM (see above as the hazards to health/safety remain the same). I had to inhale a lot of smoke from this recent backyard bonfire created by my nextdoor neighbor and this resulted in me becoming sick with a runny nose the following day, especially since I tend to leave some of the windows in my house open during the hot summer months, and the smoke from my neighbor's bonfire filled up the insides of my house - I very rarely get sick and I very rarely get a runny nose. This neighbor intentionally lit the bonfire to spite me, because he has repeatedly and verbally expressed his anger/hostility/animosity towards me, and he has repeatedly expressed his desire for me to move away from my property.

• Some of my immediate neighbors are fumigating extremely toxic pesticides/insecticides/herbicides into my yard at nighttime. I get the extremely strong toxic chemical smells from these neighbors' fumigation, while I am inside my house. This is a real threat to my health/safety since most of these powerful chemicals are cancer-causing carcinogens, and the fumes/vapors from these extremely-toxic chemicals enter into my house through my open windows. I have noticed these strong chemical smells many times per year (but especially during the warmer months), for at least the last 3 years now (since the summer of 2015).

• Some of my neighbors leave their dogs and cats unleashed to roam freely onto the street/sidewalk and even onto my property. This is also a violation of the Homeowners Association rules, but again, unfortunately, the Homeowners Association does not want to enforce its own rules, despite my repeated attempts to get them to do so. As you know, dog bites are a huge health hazard for humans causing major injuries/pain (and huge medical expenses) and, in some cases, even death. Even if these dogs do not bite, I do have a real fear of dogs, and I cannot be living in fear on my own property, simply because of the extremely reckless, irresponsible and criminal behavior of my neighbors. Several of these neighbors, including the same property owner who demanded that you issue me this Warning Citation - the one living at 789 Kingfisher Lane, Leander, Texas 78641 - freely allow their dogs and cats to roam freely on the street and onto my property. For example, in the case of the neighbor living at 789 Kingfisher Lane, Leander, Texas 78641, I have video evidence of her dog approaching me and entering into my property, while she was watching the whole time, and at several times while I was gardening in my frontyard, and I have had real fear of being bitten which causes real psychological damage/trauma regardless if the dog actually does bite me - I fear that if I make one wrong move, the dog can misinterpret this and aggress on me and bite me, causing severe injury/pain. I cannot even run away from the dog, because then the dog will chase after me and probably bite me - so, I have to just stop whatever I am doing and freeze and hope that the dog simply goes away without biting. I simply should not have to live in such fear, and should not have to suffer this psychological trauma, just because of the reckless behavior of my neighbors. Many of these neighbors including the neighbor from 789 Kingfisher Lane, Leander, Texas 78641 also freely allows their cats to roam around the neighborhood, and these neighbors' cats (in particular, neighbor 789's cats) have entered into my backyard and caused havoc in my backyard, especially with my vegetables, and have even woken me up from sleep due to noises being made in the middle of the night. These cats (again, like the ones from 789) have also defecated on my property, and I have video evidence of the cat defecating on my property, earlier on this year. And as you know, even cats can cause harm by scratching humans with their nails. I have plenty of video evidence of these pet-related infractions that routinely happen multiple times a month, dating back to at least 2013. Also, just like in the case of the fireworks, the routine unleashing of these pets so that they roam freely onto others properties which is a huge hazard and nuisance, is fully documented on the online social media platform, "Nextdoor Summerlyn" (https://summerlynleander.nextdoor.com/), where these neighbors openly admit to committing these violations of the law. And again, these neighbors are fully aware that they are violating the rules/laws and causing a huge public nuisance and health/safety hazard, but they continue to violate despite of that knowledge.

Assuming that you agree that these are indeed real public nuisances (which I certainly hope that you do), I will have to ask you to issue Warning Citations to each and every one of these neighbors of mine that are causing these public nuisances, in order to ensure that these public nuisances do not continue in the future. At the very least, I will need you to issue the appropriate Warning Citations to the neighbor living at 789 Kingfisher Lane, Leander, Texas 78641, who is guilty of committing multiple offenses (only some of which are described above).

NOTE: In this document, any text that is enclosed in a box/border has been quoted directly from the referenced webpage(s). Please see the

referenced webpage(s) for more information.

First, I wanted to let you know that I am **fully cooperating to comply with your requests** by doing the following:

1. Instead of waiting for you (or the Health Department) to provide me with the free "mosquito dunks" that you informed me about, I purchased them myself (**https://smile.amazon.com/Summit-responsible-solutions-185502-Mosquito/dp/B0002568YA**) and will be installing them in all unclosed rainwater-harvesting containers including buckets or other containers without lids on them. Any containers with harvested rainwater that do not have these mosquito dunks in them will be closed tightly with lids. Also, my use of buckets/containers for harvesting rainwater is only a temporary solution until I eventually install huge rainwater-harvesting tanks along the sides of my property - and yes, after these tanks are installed (probably sometime next year), I will have these mosquito dunks installed in them at all times. I am actually opposed to using electronic "bug zappers" for environmental/ecological reasons, since I do not want to kill any insects other than mosquitoes, but to further ensure that mosquitoes are not originating from my property, I also purchased the following bug zapper: **https://smile.amazon.com/Aspectek-Electronic-Zapper-Indoor-Insect/dp/B00HSRD7RQ**. I will use this bug zapper outdoors in my backyard but only for a few days, to ensure that any remaining mosquitoes that maybe in the air are taken care of. I should also note that I have been collecting rainwater in such buckets/containers for more than 3 years now (since 2014), and I have not received any complaints until the summer of this year (starting in June 2017), which leads me to disbelieve any false claims of health/safety hazards. In short, no one's health or safety has been put at risk throughout these 3 years of my rainwater-harvesting in the same manner. Also, just so that you know, in my attempt to live as "off-the-grid" as possible, I obviously do use the harvested rainwater for all of the following uses:

| | |
|---|---|
| **Cooking/Baking/Steaming:** | Anybody can use harvested rainwater to cook using the method of "steaming", since the water - even if it is dirty - does not make direct contact with the food - only the hot steam touches the food, and steam, by definition, cannot be dirty. I even have a large cooking vessel outdoors in my backyard to bake bread using the technique of steaming. On average, I use about 1/2 a gallon (or 64 ounces) of harvested rainwater per day for cooking/baking purposes - so, I need a reliable and constant supply of harvested rainwater. |
| **Watering Plants:** | Especially during prolonged droughts, I use harvested rainwater to water my vegetables/herbs/groundcovers and even grass. |
| **Fixing Broken Fence:** | Fences get blown-down/broken with strong winds (including the recent hurricane in 2017-08), and fence posts need to be secured into the ground with a lot of concrete which needs a lot of water to set. This year alone, I had to use about 20% of my harvested rainwater just to install 5 fence posts, and if more of the fence had blown-down/broken, then I would have had to use a lot more water. In short, I need to harvest as much rainwater as possible, especially for these types of situations. |
| **Cleaning Cooking Vessels:** | When it rains very heavily, I put dirty/unwashed cooking vessels outside so that the heavy rain cleans (or at least rinses) them. |
| **Drinking Water for Wildlife:** | Birds and other wildlife regularly drink water from my rainwater harvesting containers. As part of my Certified Wildlife Habitat certification (**https://en.wikipedia.org/wiki/Backyard_Wildlife_Habitat**) from the National Wildlife Federation (NWF) (please read below for details), I need to provide sources of drinking water for wildlife such as birds, skunks, armadillos, etc. This is why I needed to confirm if the "mosquito dunks" make the water safe to drink for wildlife. |
| **Drinking Water for Myself:** | In emergency/disaster situations, when there are no other water sources available, harvested rainwater can be filtered using a combination of biological filters (**https://smile.amazon.com/I/7691442011**) and chemical filters (**https://smile.amazon.com/Best-Sellers-Home-Kitchen-Water-Coolers-Filters/zgbs/home-garden/510202**). |

2. Even though I do not consider them to be "weeds" (please read the **"permaculture"** farming philosophy explained below, and the **unmowed "prairie"/"meadow"** wildlife garden literature attached below), I will **fully comply** with your request by compressing-down-to-the-ground and/or cutting them down to under 36 inches in height and making sure that any such vegetation stays below 36 inches in height at all times. Also, I should note that even at the time when you noticed such vegetation, only about 20% of my entire backyard was composed of such vegetation above 36 inches in height. About 60% of my backyard was/is entirely "Common Bermuda" grass which only grows to a maximum of 18 inches in height, and 20% of the backyard was dedicated for vegetables like sweet potato and garlic. In fact, from March 2017 through Mid-July 2017, about 50% of the backyard was dedicated to growing russet potatoes - I planted almost 500 russet potatoes - since I was

conducting an experiment to see if these russet potatoes would survive the triple-digit-heat and long summer droughts. You can even ask **James Lancaster** of the Williamson County Health Department because he entered into my backyard with me at the beginning of June 2017, and he saw the russet potatoes growing throughout more than half of my backyard landscape. Another reason why I consider the **Warning Citation** that you issued to me to be *unjustified* is because **Mr. Lancaster** had **inspected my backyard** to find evidence of **mosquitoes** or **other health/safety hazards** and he said that he would **close the case** - that is why **I thought that no further action would be needed**. But then, I get your **Warning Citation** after I thought this **case had already been closed** since my **backyard was already inspected in June 2017 and found not to contain any health/safety hazard**. But anyways, as I found out the hard way, these russet potatoes are not drought/heat tolerant to the Central Texas summers, and every single one died by Mid-July 2017 - I was hoping that they just went dormant during the summer and would re-awake in the fall, but I have not seen any indication of that, meaning that they all died. However, in conducting this experiment, I found out that mature sweet potatoes are exceptionally drought/heat tolerant and will easily survive the Central Texas summers. So, while the russet potatoes all failed due to the heat/drought, all of the mature sweet potatoes succeeded without any problems. To understand why my backyard has such vegetation that you consider to be "weeds", you should know that I use the "permaculture" farming philosophy of "no-dig-gardening" and "no-weeding", because this is a method of growing strong, self-sufficient, resilient and highly-nutritious vegetables that are capable of surviving extreme conditions and out-competing the other vegetation. This technique is very popular amongst permaculture farmers/gardeners as described in the following permaculture farmer's website (**http://greenstringfarm.com/about**):

---

*Competition Control*

*The Green String approach to farming reconsiders the idea of "weeds." Instead of fighting against these persistent plants, we let them grow up alongside our food crops. When they threaten resources like light and space, we hoe or mow them back just enough, and leave the cut plant material to enrich the soils. Sometimes, we get a little help from herds of goats and sheep to keep overzealous cover crops in check! By resisting the urge to allow only the food crop to grow, we maintain biodiversity and enrich the soils while spending less time eradicating "undesirable" plants from our fields.*

---

And just to let you know, by next spring (March 2018), I will be planting cultivated vegetables (like sweet potato) and cultivated groundcovers/herbs (oregano and mint) 100% throughout my entire backyard, and so, there will be no room for the growth of any other vegetation that you might otherwise consider to be "weeds". Please keep in mind that some of these cultivated groundcovers/herbs like oregano and mint do grow up to 36 inches in height, and some vegetables like okra can easily grow up to 8 feet in height, but again, these are all "cultivated" plants, and the "Public Nuisance Law" in **[Texas Health And Safety Code, Section 343.011]** that you informed me about only deals with "uncultivated" plants. So, in the future, if you see any vegetation on my property growing above 36 inches in height, please keep in mind that, such vegetation is the exact opposite of "weeds" - they are all 100% cultivated plants (vegetables/groundcovers/herbs). Also, even though I am **complying** with your request here by cutting/compressing them down, the reason why I do not consider the plants that you saw to be "weeds" is because they are actually serving a vital, beneficial and intentional purpose to my landscape and to the environment:

- ○ they occupy the niche environment not occupied by grass and other vegetation, thus making maximum utilization of all of the soil.

- in almost all cases, they are native plants, and most environmentalists/naturalists/conservationists and indigenous people that have natural landscapes cultivate such native plants on their yards.

- they anchor the soil to the ground, helping preventing to prevent soil erosion

- ○ they hold moisture at the top layers of the soil, for the benefit of the grass and other beneficial soil life (soil bacteria/fungi, earthworms, grubs, insects, etc.)

- ○ they improve soil fertility by comprehensively covering every last space of soil (both horizontally and vertically).

- ○ they improve soil structure/depth. better soil structure means, better moisture retention and better aeration. better soil depth means more of the soil is productive (which is very important for growing vegetables).

- they sequester more carbon from the atmosphere, thus reducing man-made global heating.

- ○ they provide food and habitat for wildlife including: birds, grasshoppers, crickets, scorpions, toads, frogs, lizards, bees, wasps, butterflies, beetles, etc. I have obtained the "Certified Wildlife Habitat" certification from the Natural Wildlife Federation (NWF), and in order to maintain this certification (see attached certification document), I need to provide habitat and sources of food/water for such wildlife.

- ○ scientific studies at universities have shown that, when growing vegetables, vegetables that grow with competing vegetation, and that have to out-compete these other plants in order to survive, turn out to have more nutrition (particularly, more antioxidants and more phytochemicals) than vegetables that are grown in bare dirt without any competition.

- ○ they increase biodiversity (not only of plants, but also beneficial soil microbes, insects, small animals, birds, etc.)

SIDDHARTH  KODE    V.    WILLIAMSON  COUNTY ,  ET  AL.                    1696907690

they increase biodiversity (not only of plants, but also beneficial soil microbes, insects, small animals, birds, etc.)

- they increase carbon sequestration (and thus help combat man-made global heating) due to greater photosynthesis.

- they eliminate the need for irrigation and substantially-improve drought resistance - native or well-adapted plants that are not mowed do not need any irrigation due to much-better insulation, much-greater biomass, much-greater biodiversity, the plants' root-shoot ratio, etc.

- they improve soil moisture retention (due to better insulation from the vegetation)

Also, I am strongly opposed to mowing, because it is extremely environmentally destructive, extremely wasteful, and it is completely against my ethnic/cultural/indigenous values of protecting mother nature. To be more specific, I am opposed to mowing because:

- emits greenhouse gases when any powered equipment (either gasoline or non-renewable electric) is used

- wastes energy (fossil-fuel energy or electricity) resources when any powered equipment (either gasoline or electric) is used

- causes noise pollution (and long-term ear/hearing damage) due to the loud noise from the powered equipment

- exposes the operator and those nearby to cancer-causing chemicals emitted by gas-powered equipment, and also causes air pollution.

- kills most, if not all, wildlife living in the mowed vegetation, and eliminates their wildlife habitat, food and water.

- destroys bio-diversity not only of non-plants, but also the biodiversity of plants by enforcing a monoculture of only the most well-adapted, most drought-tolerant grasses.

- forces the owners to irrigate during the long triple-digit-heat, summer droughts to keep the plants alive.

- compacts soil and leads to poor soil structure for numerous reasons

- over the long-term, destroys soil fertility since the clipped/mowed vegetation is blown away in the wind or removed by the rain and does not get incorporated back into the soil.

- wastes all of the water that was stored in the plant tissue, but as a result of mowing, is no longer harvested and stored by the plants. fresh water is considered to be the "oil of the 21st century" and wars will be fought (and are already being fought) over access to fresh water and fertile land.

- contributes to pollution in landfills - Yard waste and food waste account for about 27% of all waste.

- contributes to methane emissions and thus, man-made global heating - all mowed and thus decomposing matter releases methane gas. By contrast, unmowed vegetation sequesters much more carbon, and thus helps to combat man-made global heating.

- minimizes the beneficial service of water filtration that uncut plants perform that protect the surrounding environment/ecosystems

- minimizes the beneficial service of improving air quality (by reducing air pollution) that uncut plants perform on the surrounding environment

- minimizes the beneficial service of providing flood control that uncut plants perform in environments inhabited by humans and other terrestrial species

- totally wastes a vital store of solar energy - plants are the original solar panels.

- totally wastes a useful material resource - if parts of plants absolutely had to be cut, those cut parts should at least be used for food, or for producing material goods, or as winter forage for livestock, rather than being wasted by blowing/flowing away in the wind/rain.

- is simply morally wrong - we as humans, do not have the moral authority to arbitrarily cut plants for supposedly "aesthetic" or supposedly "nuisance" reasons, especially since those reasons are not justifiable (**https://archive.epa.gov/greenacres/web/html/jmlr.html#Weed%20Laws%20as%20Irrational**), and not backed up by scientific evidence. Just because some nation-state or governmental authority does not make it illegal for us to arbitrarily cut plants, does not give us the moral authority to do so.

- several countries such as Bolivia, Ecuador and Costa Rica have passed laws protecting the "Rights of Mother Earth".

- originated in Medieval Europe (first England, then spread throughout the rest of Europe) and was used by aristocratic elites and the monarchy to show off their wealth/prestige. So, why does mowing still persist amongst ordinary working-class/middle-class people today?

- is a total waste of time that could have been used for constructive/productive use rather than destructive use.

○ imposes the cultural "mowed lawn" aesthetic/requirement of one culture on other cultures that have both historically and contemporarily not adopted that aesthetic/requirement. The idea of "mowed lawns" is almost non-existent in much of the rest of the world, particularly in the Global South. I was born in South India, and I lived a large part of my life in South India.

○ is inherently in conflict with the "off-the-grid"/homesteading lifestyle - if one wants to harvest all of the water they consume from the rain, it would be very wasteful to use that limited resource - rainwater - as irrigation for maintaining "mowed lawns".

○ totally violates a person's right to adopt a "zero-waste" lifestyle - mowing is inherently wasteful for numerous reasons (many of which are mentioned above).

○ persists today only because a large part of the population is unaware of the huge environmental, unsustainable costs - all of the destruction and waste - of maintaining mowed landscapes. if the population was more aware of this environmental issue, they would also be opposed to mowing.

○ is an unhealthy obsession that many property owners are obsessed about - maintaining that perfectly manicured, monoculture, mutilated-vegetation lawn.

However, this is only a partial list of reasons demonstrating my strong opposition to mowing - for a more thorough and more descriptive list, please refer to my Homeowners Association **"No-Mow" Xeriscape Landscaping** approval document, as this document provides much more details. This document has also been attached to this email, even though I know that you are not the Homeowners Association. So, in short, I do not consider such vegetation to be "weeds", but instead:

○ **"cover-crops"** for my cultivated vegetables with all of the beneficial, environmental/ecological functions mentioned above.

○ part of my **prairie/meadow wildlife garden** (as documented in the literature attached below) composed of mostly **native plants**, again, with many beneficial, environmental/ecological functions.

○ **forage (food)** for animals whose native diet is grasses, forbs, legumes, and other **native** plants that you might consider to be "weeds", but which are actually not "weeds" (please read below for details).

○ **wind breaks** for protecting property structures including the fence and house building: https://en.wikipedia.org/wiki/Wind_break

○ **buffer strip** to improve air, soil, and water quality, along with solving other environmental/ecological problems: https://en.wikipedia.org/wiki/Buffer_strip

○ **flood control** to reduce the impact of severe/catastrophic flooding rains, for example, like the flooding rains during Hurricane Harvey: https://en.wikipedia.org/wiki/Flood_control#Causes_of_floods

And to be clear, despite this difference in interpretation between you and me, I am reluctantly **complying** with your request here even though there is **absolutely no risk to health or safety** from these **tall native plants**. I have had such **tall native vegetation** growing on the property for more than 5 years now (since the beginning of 2012), and I regularly walk amongst these tall plants all the time, and **neither my health/safety nor my neighbors' health/safety has ever been put at risk because of it**. Also, **mosquitoes have absolutely nothing to do with tall plants** and this false myth has been thoroughly disproven - please read the attached documentation below for details. And also, since I am still strongly against mowing for environmental/ecological reasons (see attached documentation below for details), I am not technically cutting the plants but instead, I am letting grazing/browsing animals eat them, since at least they are making use of that vegetation as food/energy for their survival. This is the way most other indigenous cultures (like mine) deal with **marginal landscape vegetation** (https://www.youtube.com/watch?v=Z5A8BYrjRfU):

> Quote from the UN report, "Under natural conditions, which were maintained for thousands of years and still widely exist around the world, there is a closed circular system, in which some animals feed themselves from landscape types which would otherwise be of little use to humans. They thus convert energy stored in plants into food, while at the same time fertilizing the ground with their excrements. Although not an intensive form of production, this coexistence and use of marginal resources was, and still is in some regions, an efficient symbiosis between plant life and animal life and human needs."

I was born in South India and I lived there for a large part of my life. And where I come from, they do not mow down any plants. We do not have such "nuisance" laws regarding vegetation, and vegetation is allowed to grow freely and wildly, for the benefit of the environment (soil fertility, carbon sequestration, improving air/water quality, flood control, etc.), wildlife and grazing livestock, and simply because it is part of our cultural traditions that call for leaving mother nature intact. Cows/buffaloes/sheep/goat/etc. may roam freely on peoples' properties and those animals usually eat much of the vegetation, thus keeping a lot of it under control. But for any plants that are uneaten, my people just leave them untouched and **do not cut/mow them**, because there is **absolutely no reason to cut them**, and because that would be damaging to the environment/ecology (as partly explained in these documents). In fact, in many parts of the world, especially where

damaging to the environment/ecology, (as partly explained in these documents). In fact, in many parts of the world, especially where indigenous people are a large fraction of the population such as in South America and in South Asia, the people have even **passed laws protecting vegetation from being cut**, as documented here:

- https://en.wikipedia.org/wiki/Law_of_the_Rights_of_Mother_Earth
- http://intheamericas.org/works/302-bahian-reconcavo-of-brazil-quilombos-candomble-and-the-mata-atlantica/
- http://www.pbs.org/program/india-natures-wonderland/
- http://www.pbs.org/video/india-natures-wonderland-episode-1/

Furthermore, the myth of such uncut vegetation being considered a public nuisance has been fully disproven by the attached documentation from the United States Environmental Protection Agency (US EPA), which was written by an active, practicing attorney - please read the attached documentation and the details below for more information:
https://archive.epa.gov/greenacres/web/html/jmlr.html#Weed%20Laws%20as%20Irrational. And to the contrary, the following academic publication written by a University Law Professor, argues that mowed lawns (and not unmowed meadows/prairies) are the real public nuisance because of all of the environmental destruction involved:

- https://www.wildones.org/wp-content/uploads/2012/01/Schindler-Banning-Lawns-2014.pdf
- https://mainelaw.maine.edu/faculty/profile/schindler-sarah/
- https://www.commondreams.org/views/2015/08/04/my-township-calls-my-lawn-nuisance-i-still-refuse-mow-it

But anyways, to deal with any such uneaten plants on my property that are still over 36 inches in height, I am compressing them down to the ground . And as these animals are these plants, I could not help but feel a deep feeling of sadness because the pristine wildlife habitat that I had taken so long to create was being reduced or destroyed. Please note that I am making all of these extra, strenuous efforts and sacrificing so much of my environmental/ecological principles/values to **comply** with your request even though I should not have to do this, because the evidence provided in this document clearly proves that there is absolutely no health/safety hazard with such natural landscaping. And the only reason that I am **fully complying** with your request, is because by next spring in March 2018, I will be replanting all 100% of my backyard with cultivated vegetables/groundcovers/herbs - otherwise, I would have fully challenged this issue in court.

---

So, as I explained above, I will **fully comply** with your requests, thus fully avoiding any potential penalties. However, having said that, **in this writing, I am still formally requesting a hearing in front of the commissioners court (or any board, commission, or official designated by the commissioners court)**, for all of the following reasons (but not limited to these reasons):

1. I want the conclusive evidence that I have provided to you in these documents to be admitted into court and formally recognized for what it is.

2. I want the court to formally recognize that native "prairie"/"meadow" wildlife gardens are certainly not a threat to public health/safety.

3. I want the court to formally recognize that nobody's health or safety has been put at risk as a result of the prior state and current state of my property, and that there was no real health or safety hazard proven here, especially since I have lived on this property throughout the entire time period for the last 8.5 years (https://archive.epa.gov/greenacres/web/html/jmlrapndx.html):

> 1. If a complaint is filed by a citizen or the city against a piece of property, the burden or proof lies with the complainant to establish that a health or safety hazard in fact exists. Natural landscapes shall be assumed to be harmless, until proven otherwise.

4. I want the court to formally recognize that native "prairie"/"meadow" wildlife gardens serve all of the beneficial environmental/ecological functions documented in these documents.

5. I want the court to formally recognize that laws cannot be unreasonably interpreted so that they deny citizens their cultural/ethnic/indigenous and/or religious traditions/values (https://archive.epa.gov/greenacres/web/html/jmlr.html#Landscaping%20as%20Religion):

> Natural landscaping, for some, can be a constitutionally protected form of religious practice. Courts essentially recognize religious practices subjectively, the only test being whether the individual asserts his belief in good faith and that belief could arguably be religious. Therefore, not only would the established Native American religions and Eastern religions which preach the oneness of humankind and Nature be entitled to First Amendment protection for natural landscaping, but those who hold "nontraditional" religious beliefs would also be entitled to such protection. Certainly, the adherents of Deep Ecology would be entitled to First Amendment protection for natural landscaping practices

practices.

6. I want the court to formally recognize that laws cannot be unreasonably interpreted so that they deny citizens their right to free speech, since all natural landscaping/gardening is constitutionally protected speech (**https://archive.epa.gov/greenacres/web/html/jmlr.html#Landscaping%20as%20Speech**):

> Natural gardening can be constitutionally protected speech and, therefore, any weed law must be closely related to a compelling state interest. While not all natural landscapes are obvious to even a casual viewer, many are. Indeed, this is often the real "problem." Symbolic speech is as protected as oral speech. One of the best ways a person can announce his or her concern for what humankind has done, and is doing, to the environment is to restore a portion of the environment to its natural state. Restoring natural vegetation can, therefore, be a form of speech and, as such, is entitled to the same protection that speech receives under the First Amendment.

7. I want the court to formally recognize that such "weed" laws are **Unconstitutionally Vague**, especially since I do not consider them to be "weeds" and such vegetation is serving me multiple purposes as documented in these documents (**https://archive.epa.gov/greenacres/web/html/jmlr.html#Weed%20Laws**):

> But "what is a weed?" is a vague and subjective determination. Its meaning varies depending on who is applying the definition and where the subject plant is located in relation to other "desired" plants. Thus a "weed" to a farmer may be a rose or iris growing in his corn or wheat field. But a rose or iris is not a "weed" to the conventional gardener, who would cite corn or wheat growing in his flower bed as "weeds."

8. I want the court to formally recognize that the enforcement of such "weed" laws are **Irrational in Violation of the Equal Protection Clause** and **Unreasonable in Violation of the Common Law** (**https://archive.epa.gov/greenacres/web/html/jmlr.html#Weed%20Laws%20as%20Irrational**):

> ... the party charged with violating a weed law may nevertheless challenge the rationale for a weed law. An ordinance must not only be rational to survive constitutional scrutiny under the Equal Protection Clause, but under the common law, municipal ordinances must pass a more exacting standard of reasonable-ness. Natural gardeners have successfully proven that local weed laws are irrational and unreasonable as applied to natural landscapes. Natural landscapes are attractive and they do not decrease property values. More directly, natural landscapes do not create a health hazard, as cases have proven. Some uninformed government officials and citizens believe that natural landscapes cause problems with pollen, fire hazards, rats, and mosquitoes. These mistaken beliefs are all soundly refuted by testimony and studies. In fact, natural landscapes reduce many of the very hazards that weed laws are intended to prevent.

9. Even though I should not need it, since I will be cultivating fully 100% all of my backyard with cultivated vegetables/groundcovers/herbs by March 2018, to be on the safe side, I would still like to formally request a variance/exception for my property as described in **[Texas Health And Safety Code, Section 343.0111]**, for all of the reasons stated in this document.

10. I want the court to formally recognize that I (and all other citizens) have the right to harvest as much rainwater as I/they would like to harvest, as long as I/they either use the appropriate "mosquito dunks" in the harvesting containers or tightly close the filled harvesting containers in order to ensure that there is no mosquito breeding potential.

Also, just so that you know about it, in the **Warning Citation** printed document that you issued to me, there is no text indicating/stating my right to a hearing before the commissioners court, as stated in **[Texas Health And Safety Code, Section 343.022]**. You are supposed to let citizens know of their right to request and receive a hearing on the issue(s) (**https://archive.epa.gov/greenacres/web/html/jmlrapndx.html**):

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET  AL.                    1696907690

> 5. The city shall notify the property owner of their rights of appeal.

I did not know about my right to a hearing until I recently checked the Statute on 2017-09-28, and if I had not checked the Statute, then I would have never known about it, and I would have obviously been prevented from formally requesting it in writing.

Also, according to common law and, for example, the College Station, Texas Landscape Ordinance (please see the attached documentation below for all of the details), I have the right to know who my accusers are (**https://archive.epa.gov/greenacres/web/html/jmlrapndx.html**):

> 2. The city shall not act upon anonymous complaints. The property owner shall have the right to face the accuser.

As such, **I am going to need to know all of the individuals who have accused me on this issue and any other issues**. You will need to provide me with the full names and addresses of each individual that has accused me. You cannot act upon anonymous complaints from anonymous individuals and furthermore, if someone makes a false allegation, I have a right to full legal recourse on any false accusations made against me. As you well know, knowingly making false accusations is not only defamation/slander/libel to the accused, but it is also a punishable offense and any individuals that make false accusations should face the appropriate penalties.

Also, in the interest of full disclosure, I even contacted the Natural Resources Defense Council (NRDC) - a national environmental organization that fights for environmental/climate justice on many issues including "no-mow" landscapes (please see the attached documentation below), and they provided me with the following advice in an email response:

---

**Subject:** RE: The "No-Mow" Battle for Environmental Justice
**From:** NRDC infobox <nrdcinfo@nrdc.org>
**Date:** Thu, 14 Sep 2017 20:59:59 +0000

Hello,

Thank you for contacting NRDC and sharing your concerns about your "no-mow" landscape. NRDC's efforts are primarily focused on the national level - through legislation, citizen action and precedent-setting court cases - in order to provide a framework for local environmental protection. However, many of our Members and activists are engaged in local and regional efforts similar to the one you've described, and we've found that there are several important steps you can take to address this problem and help your community.

If you haven't already, one of the most effective ways of solving a community problem of this nature is to organize your neighbors and attend a town meeting to voice your concerns. You should also contact a local conservation group who is familiar with the laws of your area/state and offer to work with them in trying to resolve this problem. Eco-USA (http://www.eco-usa.net/orgs/index.shtml ) is a great resource for finding local environmental groups by state.

If that doesn't work, and if you haven't done so already, you may wish to retain an attorney who specializes in environmental law. To find one, contact your local bar association and ask for a lawyer who specializes in environmental issues. You can find your local bar association in your telephone directory or by contacting:

The American Bar Association
750 North Lake Shore Drive
Chicago, IL 60611
Phone: 1-800-285-2221

The American Bar Association has a listing of pro bono legal services on their website: http://apps.americanbar.org/legalservices/findlegalhelp/home.cfm. Also, a law school in your area is another resource to turn to; most have environmental law professors who may be able to offer useful advice.

For more detailed information, please visit NRDC's guide to protecting your community:
https://www.nrdc.org/stories/how-block-big-polluters

Thanks again for writing to NRDC. We wish you the best of luck in your environmental efforts.

Sincerely,
Sam Wicks

**SAMUEL WICKS**
*Membership*
*Public Education Associate*

---

Also, please review the following attached information/documentation, as these issues of **[not mowing for environmental reasons]** and even **[harvesting rainwater to live "off-the-grid"]** are being fought by environmentalists/naturalists/conservationists and indigenous people like me throughout the country:

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

throughout the county.

**TITLE:**   More Sustainable (and Beautiful) Alternatives to a Grass Lawn

https://www.nrdc.org/stories/more-sustainable-and-beautiful-alternatives-grass-lawn

https://www.ecowatch.com/lawns-environment-sustainable-landscaping-2052211381.html

The No-Mow Movement A growing number of homeowners are converting part or all of their lawns to a less thirsty form of landscape.

These no-mow yards fall into four categories:

1. **Naturalized or unmowed turf grass** that is left to grow wild;

2. **Low-growing turf grasses** that require little grooming (most are a blend of fescues);

3. **Native or naturalized landscapes** where turf is replaced with native plants as well as noninvasive, climate-friendly ones that can thrive in local conditions; and

4. Yards where **edible plants - vegetables and fruit-bearing trees and shrubs -** replace a portion of turf. (According to the National Gardening Association, one in three families now grows some portion of the food they consume).

Making the Change

A successful lawn conversion depends on climate, terrain and of course individual taste. Of the four main no-mow strategies, Osann said, native or naturalized landscaping is likely your best option. It's adaptable to any part of the country and offers gardeners an infinite range of design possibilities.

**Check the rule books.** The no-mow movement may sound idyllic, but some practitioners have faced a surprising stumbling block: the law. In one example, Sarah Baker, a homeowner and scion of a family of horticulturalists in St. Albans Township, Ohio, decided to let her turf grass yard grow wild. Last year, she was forced to mow when authorities from her township deemed her garden, which had become a naturalized but well-tended landscape, a nuisance. Sandra Christos of Stone Harbor, New Jersey, said that after she replaced turf grass with native plants, she was delighted that cormorants, night herons and kingfishers made themselves at home alongside "every kind of butterfly you can imagine." But since receiving a letter from the town clerk, Christos has had to tame the mallow, bayberry, clethra and rosa rugosa along her walkway - or pay a fine.

While local ordinances or homeowner association bans have emergedâ—mostly out of concern over fire safety, rodent control, and noxious weedsâ—they take on aesthetic

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.   1696907690

concern over fire safety, rodent control and noxious weeds—they take on aesthetic
concerns too, often proscribing grass over eight inches tall, vegetable gardens
(especially in planned communities) or any kind of landscaping that deviates from
clipped turf.

A _recent white paper_ by students from Yale's forestry and law schools, in
collaboration with the Natural Resources Defense Council, surveyed legal obstacles
to various forms of no-mow and concluded that, for sustainable landscaping to
achieve wider adoption, some municipalities will need to adjust their policies.

That change can happen if residents push for it. Montgomery County, Maryland, for
example, amended its nuisance laws to allow for naturalized lawns after locals made
the case that their wild gardens improved air and soil quality and reduced
stormwater runoff.

Moving away from water-guzzling and chemical-hungry lawns and cultivating yards that
are diverse and self-regulating is a matter of mounting urgency worthy of that kind
of community organizing. As global temperatures rise and droughts drag on, the
demands of turf grass are likely to become untenable.

"Our existing lawns are going to get thirstier and their water requirements will
increase," Osann said.

Fortunately, with an evolving toolkit of sustainable landscaping strategies, home
gardeners can avoid such effects and help nurture the health of the planet - right
in their own backyards.

---

**TITLE:**    Toward Sustainable Landscapes: Restoring the Right NOT to Mow - Report (PDF)

https://www.nrdc.org/sites/default/files/sustainable-landscapes-20160506.pdf

**NOTE:** This academic publication by Yale University graduate students documents the struggles of environmentalists/naturalists/conservationists and indigenous people like me throughout the country who are fighting, for example, unjustified public nuisance laws, for the right of property owners to have "no-mow" landscapes. Please read it fully.

This paper analyzes legal obstacles that may prevent homeowners from implementing
various forms of No Mow. Local weed ordinances and nuisance laws reinforce
conformity to a suburban landscape of traditional mowed turf grass. While our
research identified four different forms of No Mow policies, each presents different
implementation challenges and benefits. This paper discusses each of the four forms
of No Mow and how they interact with existing nuisance ordinances. We also make
policy recommendations on how best to facilitate each of these forms of No Mow on
the local and state level. The four forms are: (1) naturalized (unmowed) turf grass;
(2) lowgrowing turf grasses; (3) native/naturalized landscaping without turf; and
(4) edible plant production. Proper implementation of these practices in any portion
of a yard can reduce the environmental impact of a traditional turf grass lawn.

We begin our paper by discussing the role of the police power and nuisance laws in the regulation of lawns to achieve health, safety, and aesthetic objectives. We also explore the prevalence of homeowner associations and their role in enforcing norms and certain aesthetics of turf grass. Then we discuss the four forms of No Mow, the opportunities and challenges for implementing each of those forms, and policy recommendations for how best to integrate them into existing nuisance regimes. Finally, we include a sample local ordinance that local governments can enact to allow various forms of No Mow and protect responsible property owners from legal action.

## The police power

States and local governments possess police power. The police power is broad and sweeping and enables state governments to "establish and enforce laws protecting the public's health, safety, and general welfare, or to delegate this right to local governments."7 In practice, police power actions often take the form of regulating private property, subject to certain due process concerns and eminent domain doctrine. As long as the actions of a state and local government are reasonably related to a legitimate governmental goal and satisfy the requirements of due process, courts are unlikely to find such actions unconstitutional. "Reasonably related" is a very low threshold for states to satisfy, and legitimate governmental goals are broadly understood by the courts. Under a "reasonably related" test, a court will assume a law is valid unless the challenger can prove that the law has no reasonable relation to the legitimate governmental goal. In the case of No Mow, aesthetic regulation is considered a valid goal. The Supreme Court established this in Berman v. Parker, and has subsequently affirmed this principle in later cases.8

In Berman, the Court established two important principles upon which aesthetic regulation of lawns can rest. First, it validated regulation based purely on visual concerns, when it stated, "It is within the power of the legislature to determine that the community should be beautiful as well as healthy, spacious as well as clean, well-balanced as well as carefully patrolled."9 In the decades since Berman, the Court has ruled several times to reaffirm the ability of state and local governments to regulate on the basis of aesthetics, further entrenching the Berman principle.10 Second, it expressed the deference given to the legislature when it uses the police power. "Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislationâ…."11 In subsequent cases, Berman is touted as granting state and local governments the authority to enact a whole host of legislation regulating private property for purely aesthetic reasons.

Nuisance laws regulate private property through the police power. The common law principle behind nuisance is that private property owners should, as much as is practicable, internalize the externalities created by their property.12 Early nuisance cases were concerned with pollution, both air and water, and a nuisance was defined and determined by courts. However, in the past century, municipalities have encoded nuisance concepts into actual legislation, defining the terms of a nuisance by statute. The majority of nuisance regulations are concerned with health and safety, although they do regulate aesthetic concerns as well.

In Little Rock, Arkansas v. Allison, with the help of wildlife biologists as well as the testimony of the city weed inspector, Allison showed that her garden was neither noxious nor likely to attract vermin. On this evidence, the court dismissed the

nuisance citation.16 Similarly, in City of New Berlin v. Hagar, Hagar successfully proved that his wildlife meadow did not create any of the safety concerns behind the city's nuisance regulations. Finding no violations of the safety concerns or effect on neighboring property values, the court dismissed the violation.17 Both of these challenges are from before 1990, and it is unclear whether or not they would be successful today as there are no more recent challenges. Furthermore, discussions about the aesthetic motives of an ordinance are not included in either of these cases. Neither of these cases was ever formally published or pursued at an appellate level, so one cannot cite to them as evidence of a trend or of the successful creation of new law. It is impossible to say if such reasoning would have held if the cities had chosen to appeal the decisions or if similar decisions would be reached in other jurisdictions. Given this uncertainty and the strength of the constitutional law on the issue, these few successful challenges cannot be read to indicate a trend.

The first type of No Mow is naturalized (unmowed) turf grass, which entails a property owner ceasing to mow their lawn all together without necessarily replacing the traditional turf grass with any other form of landscaping. This is the form of No Mow most likely to fall afoul of nuisance regulations and HOAs.

One family outside of Alexandria, Ohio, practices and advocates for this form of No Mow, and is being pursued by their local municipality for nuisance violations.26 The town expressed fear over snakes and vermin in their lawn. The homeowner acknowledges that her lawn attracts wildlife, which is for her, the benefit of practicing No Mow. The town and her neighbors see it differently. While she continues to battle her township on this issue, the law is not on her side.

Pursuing this form of No Mow may directly run afoul of nuisance laws, so a new legal framework may be needed to accommodate it. One option for facilitating naturalized turf grass is to create a permit regime.

TITLE:    Green Landscaping: Greenacres (The John Marshall Law Review, Volume 26, Summer 1993, Number 4)

https://archive.epa.gov/greenacres/web/html/jmlr.html

https://archive.epa.gov/greenacres/web/html/index-7.html

NOTE: This legal publication (written by an active, practicing attorney) that is now published by the United States Environmental Protection Agency (US EPA) also shows how this issue has been fought for many decades, but only recently - over the last decade - the "no-mow" movement has been gaining strength. It also fully disproves the false myth that such vegetation that you might consider to be "weeds" is a health/safety hazard by promoting fire, vermin, mosquitoes, pollen, etc. Please read it fully, specifically the following sections:

- III. A HISTORY OF WEED LAWS AND THE BATTLES OVER THEM

  A. Why We Have Weed Laws
  B. What Is Wrong With the Green Lawn and Weed Laws: And Those Who Proved It

D. What is wrong with the Green Lawn and Weed Laws. And those who Proved it.

- **IV. THE REASONS FOR AND RESPONSE TO THE NATURAL LANDSCAPE MOVEMENT**

    A. The Movement Officially Takes Root
    B. Why the Movement Is Taking Root
    C. What Cities Have Done in Response to the Movement

- **V. SOME VILLAGES STILL DON'T GET IT - WHAT TO DO IF YOUR VILLAGE IS ENFORCING ITS WEED LAW AGAINST YOUR NATURAL LANDSCAPE**

    A. Natural Gardening as a Fundamental Right.
        1. Landscaping as Speech and Art
        2. Landscaping as Religion
    B. Weed Laws as Unconstitutionally Vague
    C. Weed Laws as Irrational in Violation of the Equal Protection Clause and Unreasonable in Violation of the Common Law
        1. Fire
        2. Vermin
        3. Mosquitoes
        4. Pollen

Natural Landscaping - The practice of cultivating plants which are native to the bioregion without resort to artificial methods of planting and care such as chemical fertilizer, mowing, watering other than by through natural processes (rain), with the goal of harmonizing the landscape with the larger biotic community and ecosystem of the immediate and surrounding bioregion.

The positive economic consequences of natural landscaping are twofold. First, there are the direct costs. Natural landscapes are less costly to maintain than a traditional exotic lawn or exotic landscape. Once established, natural landscapes are not mowed, fertilized, treated with pesticides or herbicides, and they do not need watering. For the homeowner or office building manager, direct costs are substantially reduced.

Before humans became "civilized" there were no weed laws because in Nature there are no weeds. Weeds are a product of civilization and cultivation. As agrarian society developed, weeds became the bane of farmers because these exotic plants crowded out crops. In the United States, even before World War I, states regulated certain plants perceived harmful to agriculture. The prohibited plants were placed on noxious weed lists usually developed by the state's department of agriculture. However, agrarian weed control laws, necessary to protect crops, do not pose problems for natural landscapers. Rather, natural landscapers are confronted with the local weed laws--a recent phenomenon that is unrelated to protecting crops or livestock from exotic plant species. Local weed laws exist in the cities and the suburban lands of shopping malls and tract housing. Communities enacted weed laws aiming to protect the public from neglectful landowners whose littered yards could attract rats, mosquitoes or present a fire hazard. As a result of the misunderstanding of some charged with enforcing weed laws and poor draftsmanship, these laws are often wrongfully enforced against natural landscapes. Natural landscapes are not a threat to safety or public health. More distressing, enforcement of local weed laws fosters an unnatural aesthetic conformity, by promoting and protecting monoculture laws, that furthers the malignant notion that humankind and Nature are independent.

Natural landscapes are attractive and they do not decrease property values. More directly, natural landscapes do not create a health hazard, as cases have proven. Some uninformed government officials and citizens believe that natural landscapes cause problems with pollen, fire hazards, rats, and mosquitoes. These mistaken beliefs are all soundly refuted by testimony and studies. In fact, natural landscapes reduce many of the very hazards that weed laws are intended to prevent.

1. **Fire:** One of the most common arguments asserted in favor of local weed ordinances is fire prevention. As to natural landscapes this argument is predicated on the unproven contention that tall grass and forb stems, commonly planted as part of a prairie or meadow, constitute a fire hazard. This is not, in fact, true. In New Berlin v. Donald C Hagar, United States Forest Service expert David Seaberg testified that a grass fire can sustain high heat for only twenty seconds. In order to ignite wood and sustain a fire potentially damaging to a home, a grass fire must burn within four feet of the home for seven and a half minutes. Judge Gramling agreed, finding no rational basis for the claim that natural landscapes create a fire hazard. According to John Diekelmann, a noted landscape architect and plant ecologist, most prairie or meadow plantings contain a large portion of green leafy material at ground level during most seasons and do not sustain fire. In short, restoring an area as prairie does not create a fire hazard. Moreover, if fire prevention were the purpose, a rational ordinance would prohibit the accumulation of biomass in a given area based on some index of flammability, not merely undefined weeds.

2. **Vermin:** A second common argument raised in defense of local weed laws is that naturally vegetated areas sustain rats and other vermin. Rats and other animals commonly regarded as vermin require a steady food supply. Natural vegetation in yards does not provide the type and quantity of food required to sustain a population of rats and other creatures regarded as vermin. In short, the man-made food supply of the sort often provided by structures, especially barns or garbage dumps, is what sustains rats and other vermin. Thus, an ordinance aimed at limiting rats and other vermin should not be targeted at "weeds" but rather should prohibit the food mass-grown and openly stored on property.

3. **Mosquitoes:** A third defense of local weed ordinances is the assumption that weed-covered areas provide a breeding place for mosquitoes. In fact, however, mosquitoes require standing water to breed. Even the fastest growing mosquitoes found in the upper Midwest need standing water for ten days to complete their life cycle. Since prairie and meadow areas tend to absorb water quickly, they are less likely than frequently watered lawns to contribute to the presence of mosquitoes.

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL,                    1696907690

TITLE:     APPENDICES on Weed Laws and Natural Landscaping

https://archive.epa.gov/greenacres/web/html/jmlrapndx.html

---

APPENDIX C: COLLEGE STATION, TEXAS PROPOSED NATURAL LANDSCAPE ORDINANCE

Section 3. Managed Natural Landscaping:

It shall be lawful to grow native and naturalized plants **to any heights,** including
ferns, wildflowers, **grasses, forbs,** shrubs, and trees, in a managed landscape design
when said plants were obtained not in violation of local, state, or federal laws. No
employee of the city may undertake to damage, remove, burn, or cut vegetation on a
managed natural landscape incorporating native plants, except those specifically
prohibited herein, and except on order of a court of record following a hearing at
which it is established that noxious weeds exist in a managed natural landscape and
that a condition creating a clear and present hazard to public health or safety has
arisen. An action for a court order under this subsection shall provide that the
destruction, cutting, or removal of vegetation shall be selective unless general
cutting, destruction, or removal is necessary to eliminate the offending
conditional.

Statements of intent:

1. If a complaint is filed by a citizen or the city against a piece of property, the
burden or proof lies with the complainant to establish that a health or safety
hazard in fact exists. Natural landscapes shall be assumed to be harmless, until
proven otherwise.

2. The city **shall not** act **upon** anonymous complaints. The property owner shall have
the right to face the accuser.

3. This and the unmanaged vegetation ordinance shall be proactively and uniformly
enforced, and shall apply to all property not specifically exempted within the city
limits.

4. Aesthetic judgments shall not be a consideration nor play any role in determining
non-compliance or compliance with the ordinance.

5. The city shall notify the property owner of their rights of appeal.

6. It shall not be the policy of the city to enter upon private land and to destroy
property thereon without due process of law.

---

TITLE:     My Township Calls My Lawn 'A Nuisance.' But I Still Refuse to Mow It.

https://www.commondreams.org/views/2015/08/04/my-township-calls-my-lawn-nuisance-i-still-refuse-mow-it

https://www.washingtonpost.com/posteverything/wp/2015/08/03/my-town-calls-my-lawn-a-nuisance-but-i-still-refuse-to-mow-it

http://www.newser.com/story/210795/i-wont-mow-my-nuisance-lawn.html

http://www.dispatch.com/content/stories/local/2015/07/20/couple-fights-to-not-mow-big-yard.html

https://www.fieldandstream.com/blogs/a-sportsmans-life/an-unmowed-lawn-leads-to-social-chaos

https://grist.org/living/couple-turns-lawn-into-ecosystem-officials-threaten-to-mow-it-down/

http://www.npr.org/2015/08/05/429774004/mowing-the-law-giving-you-hard-time-let-it-grow

https://www.commondreams.org/sites/default/files/styles/cd_large/public/views-article/lawncare.jpg

**NOTE**: This article was written by an environmentalist/naturalist/conservationist just like me and it further explains the "no-mow" battle for environmental justice. Also, please note that, as indicated in the images in the article, the so-called "weeds" in their case were far more than 36 inches in height, reaching up to 80 inches in height. By comparison, the vegetation that you had considered to be "weeds" in my backyard only reached a maximum height of about 48-60 inches in height, but to be clear, the height of such vegetation has absolutely nothing to do with whether or not it is a "public nuisance". Also, while their property was fully - 100% - covered with such tall vegetation, only about 20% to 25% of my backyard was covered with such tall vegetation, while most of it was only covered with "Common Bermuda" grass that grew to about 18 inches in height. Most importantly, I should note very importantly that this couple was only threatened with a potential fine and a potential forced-mowing - they were not threatened with any criminal charges, and it was dealt with as a **civil** issue, not a **criminal** issue. So, **my question to you is: Why are you dealing with this issue with me as a potential criminal issue, when it should be, at best, a civil issue that is only punishable by a fine**?

---

*Sarah Baker and her partner stand in their yard outside Alexandria, Ohio. Town officials have declared it*
*Sarah Baker and her partner stand in their yard outside Alexandria, Ohio. Town officials have declared it "a nuisance." (Photo: Amanda Taylor)*

---

*Instead of putting nature in its place, we need to find our place in nature. Local*
*officials have told us countless times that our lawn looks bad and is a nuisance. In one public meeting, a brave young boy, Max Burton, stood up and told our critics, "What you are saying is that life itself is a nuisance." As the planet's environmental problems mount, the real nuisances are mowed lawns and the laws that enforce them.*

---

*BLOCK: And I've read through them. You're attackers there are saying, you know, this is a habitat for snakes and ticks and vermin and mosquitoes. Let me read you what one commenter said. The best thing is to buy property where you can have your own little slice of anarchy and leave those people who like the rules in peace. Are you hearing a lot of the same kinds of comments from the folks who live there with you in Ohio?*

*BAKER: It's mixed. I have a lot of support in my community. My immediate neighbors don't seem to mind I'm not sure where it's coming from, but I think it's just stemming from the fact that we just - we're really afraid of what we don't know. I've lived now with an un-mowed lawn. I don't have Lyme's disease. I don't have West Nile virus. It's hard for me now not to see mowed lawns as ugly. I see them as just an abomination. And I know for most people, the opposite is true. I mean, I used to feel that way. I used to think that it looked beautiful too. But now that I see all the nature that a mowed lawn displaces, it looks beautiful to me, my yard.*

---

*I've Long maintained that the American lawn is one of the greatest mass brainwashings of all time. How we all voluntarily signed up to spend untold hours growing and cutting a nonnative monoculture of green which we lace with poisons to kill plants and insects never ceases to amaze. And of all people, we sportsmen*

*should see through this.*

*Only in America would a property in its natural state, one that is not routinely doused with pesticides and herbicides - ones that have been linked to higher rates of cancer in children - be a risk to the health of the community.*

---

**TITLE:** Why I'll never have a lawn again: I didn't realize what a dead zone the lawn is until I lived in a meadow.

https://www.mnn.com/your-home/organic-farming-gardening/blogs/why-ill-never-have-lawn-again

https://www.buffalorising.com/2015/08/why-ill-never-have-a-lawn-again/

*The "no-mow" movement is gaining steam, and I've joined it, after I've had the luck to see firsthand how beautiful a natural meadow can be.*

*As Baker writes in her anti-mow article, "Nature preserves and parks are not enough to fix the problem; much of wildlife is migratory and needs continuous habitat to thrive. Natural yards can act as bridges between the larger natural spaces."*

*As human beings take over more and more of the natural landscape, animals, birds and insects need as many bridges as possible - and a lawn isn't one. They are noise-pollution-producing timesucks (as another writer called them), that do nothing for threatened native life, and to top it off, they're boring. I'm done with them forever.*

*And the sound of wind through tall meadow grasses? Incomparable.*

---

**TITLE:** The unbearable ubiquitousness of mowing

https://healthylandethic.com/2012/10/03/the-unbearable-ubiquitousness-of-mowing/

https://healthylandethic.com/2013/11/17/why-prairies-matter-and-lawns-dont/

https://healthylandethic.com/obsessive-american-waste/

https://healthylandethic.files.wordpress.com/2012/10/photo-2.jpg

Mowing (noun) - that droning sound that disturbs what little peace and quiet is left in this fragmented world. Without a doubt, mowing, next to indiscriminate pesticide use, is one of the most over-used land management practices. And much of it is done without any thought at all as to the changes it instantly imparts on plant communities. Just the other day, I saw a crew push-mowing a 1 acre field of 3ft tall native grass down to the nub. I bet whoever owns that lot, was complaining a year ago that there was no grass. People are strange. They complain there's no grass in a drought (a no-brainer), then they cut it down as short as possible as soon as it starts to grow. Where's the logic in that? Grass is supposed to be taller than carpet. Let it grow, see what it does; there is much to learn from observing the genesis of a prairie throughout the growing season.

"Grow it, don't mow it!"

Environmental Destruction: Before & After
This one acre vacant lot (not the one mentioned previously) was bare, gravelly soil at the end of May. By the middle of July it had become an interesting little "pocket prairie" with over 30 species inside its boundary. Buffalograss (Buchloe dactyloides), Blue Grama (Bouteloua gracilis), Sideoats Grama (B. curtipendula), Green Sprangletop (Leptochloa dubia), and Cowpen Daisy (Verbesina encelioides), among others, happily populated this lot until it was mowed short like a boring lawn.

TITLE:    The "No-Mow Zone" at the University of Illinois at Urbana-Champaign

https://www.pxleyes.com/images/contests/faulty-signs/fullsize/NO-MOw-zone-4d795863d4059_hires.jpg

No-Mow Zone
Why is the grass taller here?
This area has been designated as a
No-Mow Zone

By allowing the grass and natural vegetation to grow, we are:

- Increasing habitat for insects and wildlife
- Saving energy and reducing $CO_2$ emissions by not using mowers and equipment
- Promoting sustainable landscapes
- Encouraging native plant growth
- Providing and environment for observation

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**TITLE:**   Op-Classic, 1991: Abolish the White House Lawn

http://www.nytimes.com/ref/opinion/22op-classic.html

*Meadow. By letting the lawn go and gradually allowing so-called "weed" species to take hold, the White House lawn could be transformed into a meadow that would require only a single annual mowing or scything. This is the cheapest alternative.*

**TITLE:**   Why Mow?: The Case Against Lawns

http://www.nytimes.com/1989/05/28/magazine/why-mow-the-case-against-lawns.html?pagewanted=all

*In return for a single annual scything, I am rewarded with a field of flowers from May until frost.*

**TITLE:**   Turf War: Americans can't live without their lawns - but how long can they live with them?

https://www.newyorker.com/magazine/2008/07/21/turf-war-elizabeth-kolbert

*Mowing turfgrass quite literally cuts off the option of sexual reproduction. From the gardener's perspective, the result is a denser, thicker mat of green. From the grasses' point of view, the result is a perpetual state of vegetable adolescence. With every successive trim, the plants are forcibly rejuvenated. In his anti-Lawn essay "Why Mow?," Michael Pollan puts it this way: "Lawns are nature purged of sex and death. No wonder Americans like them so much."*

*Right around the time that Carson was writing "Silent Spring," Lorrie Otto, a mother of two from the Milwaukee suburb of Bayside, decided to restore her front lawn to prairie. One day, while she was folding laundry in her basement, some village workers arrived and, without consulting her, mowed her yard. Otto began speaking out*

against lawns, calling them, among other things, "sterile," "monotonous," and
"flagrantly wasteful." Her talks inspired the founding, in 1979, of what might be
described as the nation's first grassroots anti-grass movement, which dubbed itself
Wild Ones. (Wild Ones now has chapters in twelve states, including New York and
Connecticut.)

Over the years, many alternatives to the lawn have been proposed. Pollan, in his
book "Second Nature" (1991), suggests replacing parts - or all - of the lawn with
garden. In "Noah's Garden" (1993), Sara Stein, by contrast, advocates "ungardening"
- essentially allowing the grass to revert to thicket. Sally and Andy Wasowski, in
their "Requiem for a Lawnmower" (2004), recommend filling the yard with native trees
and wildflowers. For those who don't want to give up the look or the playing space
provided by a lawn, the Wasowskis suggest using Buffalo grass, one of the very few
turf species native to North America. Smaller American Lawns Today, or SALT, is a
concept developed by William Niering, who for many years was a professor of botany
at Connecticut College. Niering planted trees around his property, then left most of
the rest of his yard unmowed, to become a meadow. "The meadow can take as much of
your remaining lawn as you want," he observes in an essay posted on SALT's Web site.
"There are some people who prefer no lawn, which is ideal!" For the past few
decades, David Benner, a horticulturist from Bucks County, Pennsylvania, has been
touting moss as an alternative to grass: he himself has a one-acre "moss garden."
Recently, there have been several calls to make the lawnspace productive. In "Food
Not Lawns" (2006), Heather C. Flores argues that the average yard could yield
several hundred pounds of fruits and vegetables per year. (If you live in an urban
area and don't have a lawn, she suggests digging up your driveway.) "Edible Estates"
(2008) is the chronicle of a project by Fritz Haeg, an architect and artist, who
rips up conventional front yards in order to replace them with visually striking
"edible plantings." Haeg calls his approach "full-frontal gardening."

**TITLE:    Weeding Out Bad Vegetation Control Ordinances**

https://www.wildones.org/learn/weed-laws-and-native-landscaping/weeding-out-bad-vegetation-control-ordinances/

https://www.wildones.org/learn/weed-laws-and-native-landscaping/

https://www.wildones.org/wp-content/uploads/2012/01/Schindler-Banning-Lawns-2014.pdf

The telephone calls don't come as often as before. That's good. Back in the late
'80s and early '90s maybe once a week, I (Bret) would field a homeowner's call,
maybe from Sarasota, maybe Seattle, asking for assistance because a municipality was
threatening to mow down what a village official or neighbor considered "weeds." But
what is a "weed" is in the eye of the beholder, and to these homeowners yards
abounding with a rich tapestry of native grasses, forbs, shrubs and trees were not
full of weeds, these yards were a treasure.

Before I joined the battle and took on the task of fielding these calls, most were
handled through natural landscaping activists Lorrie Otto, in Milwaukee and Craig
Tufts at the National Wildlife Federation, in Washington. For almost twenty years,
these two worked tirelessly to defend natural landscapers charged with weed law
violations. Like me, Lorrie and Craig would send out information about native
plants, the benefits of natural landscaping and why such yards are not a public-

health risk. Sometimes they were successful in convincing villages to reconsider ill-conceived, Nature-hostile ordinances, but most of the time, in the early days, they were not. The mowers whizzed and roared as the ferns and forbs fell.

Although a lush green mask of Kentucky bluegrass remains the collective face of 32,000 square miles (82,500 sq. km.) of suburban and urban America, there is change in the air. The natural-landscaping "movement" has taken root and its adherents are a varied lot. They all share a common goal - to harmonize gardening and landscaping practices with Nature. Unfortunately, some municipal officials still use weed laws to prosecute natural landscapers, reflecting outdated and misinformed ideas and attitudes. I still receive calls. Last month, for example, Oberlin College Instructor Stephen Douglas called me to ask for information to fight his village after a crew mowed down his yard of wildflowers while he was out of town.

The good news is that committed pioneers and newer converts, willing to question the status quo and who recognize the ecological and monetary consequences of landscape choices, are undermining the arbitrary legal and social barriers to gardening with Nature. And since the early days, natural landscaping has advanced on two fronts-legal and social. This article chronicles both, but first some history.

### Historical Perspective

Some movements are evolutionary; others revolutionary, but as John Stuart Mill observed, every great movement must experience three stages: ridicule, discussion and adoption. Although landscaping with Nature manifests the basic principle that we are part of Her, not apart from Her, the practice of natural landscaping encountered social barriers almost from the start. **These barriers eventually took the form of land use regulations (usually weed laws) that inhibited natural landscaping and punished those who dared to grow rather than mow.**

In densely populated urban areas, it may be unrealistic to expect that pro-active fourth generation weed laws will be adopted in the near future. Lao Tzu, the Oriental philosopher, taught that the journey of a thousand miles begins with the first step. It is with that axiom in mind that the following guidelines can be used by communities in crafting new weed ordinances that represent a step toward a more benign relationship between our yards and Nature.

1. The ordinance should protect the fundamental right of residents to choose their own landscaping;
2. The ordinance should apply equally to all residents;
3. Any restrictions should have a rational basis related to the protection of public health, safety or welfare;
4. The ordinance must not legislate conformity nor allow residents to exercise control over their neighbors' landscapes;
5. The ordinance should not require the filing of an application, statement of intent or management plan and there should be no review or approval fees assessed against residents who intend to engage in legitimate natural landscaping;
6. In order to avoid harassment of natural landscapers, the city's "weed commissioners" who will enforce the ordinance, and thereby differentiate between those people who are growing permitted natural landscapes versus those with unpermitted growth, should be trained to distinguish between the two;
7. Enforcement of the ordinance should be undertaken through due process of law which guarantees individuals the right to fair adjudication of their rights; and
8. The ordinance should actively address the problems of environmental degradation

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET  AL.                    1696907690

*brought about by proliferation of high maintenance monocultural landscapes, and the indiscriminate use of toxic chemicals in landscape management. It should encourage the preservation and restoration of diverse, biologically stable natural plant communities, and environmentally sound practices.*

*From an ecological, legal and social standpoint, good, fair and workable weed ordinances embodying these guidelines are reprinted in the accompanying box. These examples are rationally based and provide protections consistent with due process.*

---

**TITLE:    Meadow and Prairie Gardens**

http://www.timberpress.com/blog/wp-content/uploads/2013/01/Spread-051.jpg

http://www.timberpress.com/blog/wp-content/uploads/2013/01/Spread-061.jpg

*Meadow and Prairie Gardens*
*Dinner in the Prairie*
**Meadow and Prairie Gardens**
*Grasses have been rediscovered, their airy structures unleashed in new meadow and prairie gardens, after a century of being relegated to lawns and weedy fields. They deserve the appreciation we are now showing them for their ability to embody a breeze, catch light, soften the view, and for their showiness in late summer and early autumn, when most traditional perennials have faded.*

---

**TITLE:    Establishing No-mow Zones: Preventing erosion, intercepting runoff and protecting lake habitat (PDF)**

https://lakedunmorefernlakeassoc.files.wordpress.com/2013/08/establishing_no-mow_zones.pdf

*Purpose:*

*To allow shoreland vegetation to maintain lake quality and wildlife habitat. A naturally vegetated zone along the shore builds up a duff layer, which is a spongy, absorbant layer of decomposing leaf and twig litter. Duff is essential for healthy lakes because it naturally filters storm runoff by intercepting and absorbing pollutants, and it provides a protective ground cover, preventing erosion. No-mow zones stabilize banks with roots from native species that grow up, and these zones benefit all wildlife.*

SIDDHARTH  KODE    V.    WILLIAMSON  COUNTY ,  ET  AL.                    1696907690

*How to:*

*Stop mowing a zone adjacent to the shoreline as wide as feasible for your property. Prioritize lawn areas and move them back from the shoreline wherever possible. For sloped banks, the no-mow zone should extend beyond the top of a bank because research shows that a minimal of 15 feet of vegetation will stabilize the shore. A "no-mow" zone allows native plants to colonize the area, but jump-starting the vegetation by planting a few favorite native species, like blueberry bushes, alternative leaf dogwood, beautiful white flowering viburnums, etc., can also be help maximize the benefits of this important zone along the lakeshore.*

*The water quality is protected by this beautiful no-mow zone.*

*This photo shows several decades of natural re-growth of native species on a shore that had previously been cleared of all its vegetation; it now serves as a family picnic grove for the shoreland owners.*

*Establishing no-mow zones naturally stabilizes the shore, filters and cleans dirty runoff, maintains greater privacy, increases property value, enhances scenic beauty, prevents erosion and allows for healthy habitat for fish, birds, and other important species. Furthermore, it is the best practice for protecting your property against storm damage.*

---

**TITLE:    ESF Converts Turfgrass to Meadow, No-Mow Zone**

http://www.esf.edu/communications/view.asp?newsID=1825

*Areas reduce maintenance, carbon emissions*

*The SUNY College of Environmental Science and Forestry (ESF) is establishing the first no-mow zones on its main campus, part of the college's efforts to make its operations more sustainable and reduce its carbon emissions.*

*Tim Toland, an associate professor in ESF's Department of Landscape Architecture, said the no-mow zones are advantageous in several ways.*

*"Aside from the issues of energy and emissions from lawn mowing, we wanted to reduce the grass areas to alleviate maintenance staff demands, monetary expenditures for fuel, oil, machinery, etc., and to begin to transform the campus landscape into a completely different aesthetic that focused on plants and plantings rather than on turfgrass and trees," Toland said.*

He said the two areas selected for this project are hillsides that are typically difficult to maintain and hazardous to mow.

**TITLE:**    College's "No Mow" Zones Promote Sustainability

https://www2.cortland.edu/news/detail.dot?id=e610077e-3931-4945-8cba-68c058e96add

An acre of turf grass surrounding the SUNY Cortland Service Group complex is not being trimmed to save energy, reduce fuel emissions and encourage natural habitats. The knee-high grass near the athletic fields on the southwest end of the main campus, now known as a **"no mow" zone**, represents the College's latest sustainability effort.

Don Moody, the grounds supervisor for Physical Plant, said "no mow" zones will eventually cover two or three more acres on campus. A dozen white signs are posted across the SUNY Cortland campus to remind people why some areas are not mowed or manicured.

"No mow" zones include the area behind the Service Group warehouse, the area across from the Service Group compound and parking lot, the wildflower area across from the Park Center loading dock, and the wildflower area across from the Tomik Fitness Facility.

Moody explained that mindful mowing accentuates the look of an ecosystem.

"The wildlife I've seen in the 'no mow' areas has been amazing," he said. He rattled off a list of animals he has encountered in the zones, including turkeys, foxes, deer, woodchucks, squirrels, raccoons and a variety of birds.

The turf grass, which includes a mix of purple, white and yellow wildflowers, will grow one to two feet before it turns to seed. Moody's staff planted the wildflowers and mowed paths surrounding the area. In time, shrubs and trees will fill in to provide plant cover.

Reduced mowing offers economic and environmental benefits in addition to aesthetic, natural beauty. A decline in fuel and equipment usage will reduce carbon dioxide emissions while saving money. And the Physical Plant expects to gain at least ten labor hours each week, which helps the College's ongoing effort to maximize its resources. Birds, butterflies and other animals will find food and habitats while native wildflowers will claim spots to bloom.

Moody said he has not received any negative feedback from the campus community. Although it often takes time for people to adjust to the appearance of unmowed grass, once they see the way "no mow" zones highlight their surroundings, they appreciate natural beauty more, he said.

> Moody first considered the idea of reduced mowing in the Late 1970s while taking
> care of his own property in LaFayette. N.Y. He experimented with the strategy during
> his previous jobs at Onondaga Community College and Syracuse University before he
> began to employ it at SUNY Cortland in 2010.

I appreciate your time,

Sid Kode.

# ¶402

From the months of {2017-02} through the middle of {2017-10}, the plaintiff had sheet-mulched [FRONTYARD] in-order-to ecologically decompose the original builder-installed bermudagrass, in-place, while adding the fertility of such decomposed bermudagrass back into the soil, in the plaintiff's effort to ecologically relandscape the [FRONTYARD] with the new *"no-mow"* grass. On or about the morning of {2017-10-16}, the plaintiff begins to remove such sheets of cardboard from the plaintiff's side-yard closest to [792KLLTX78641]. As the plaintiff is performing this task, [RSR] walks across the street towards the plaintiff, with her camera-phone in hand, walks deep into the driveway and/or side-yard of [792KLLTX78641] - as if she owned [792KLLTX78641] (a private-property which she clearly did not own) - and begins to take photograph(s) of the plaintiff's private/concealed [FRONTPORCH] (which is concealed by the trees in front of the plaintiff's [FRONTPORCH]) from deep inside the driveway and/or sideyard of [792KLLTX78641] - right in front of the plaintiff. [RSR] then walks back towards her property across the street, after she engages in such brazen act of intimidation against the plaintiff. [RSR]'s brazen action of intimidation against the plaintiff continued to show the plaintiff that [RSR] was a primary complaining-witness in not only [WCLE]'s predatory targeting of the plaintiff, but also the then-[HOA]'s predatory (and pending) lawsuit against the plaintiff. Such act of intimidation also shows [RSR]'s lameness: Clearly, [RSR] could just as easily have taken such photograph(s) at any point in time when the plaintiff was not outdoors at that location, but [RSR] only waited until the plaintiff was outdoors at that particular location in-order-to deliberately intimidate the plaintiff at such location. Any act of intimidation is only effective, if the party being intimidated actually witnesses such intimidation, and so [RSR] repeatedly acts in such overtly-intimidating manner against the plaintiff, with this common-sense knowledge about intimidation in mind. Finally, any private-property that is in the process of being re-modeled and/or re-landscaped will be in a relative-state of disarray, due to such construction/re-landscaping work. So, for [RSR] to pretend as if even private/concealed areas of the plaintiff's property (including but not limited to the [FRONTPORCH]) needed to be in pristine-condition even during such construction/re-landscaping work, just continues to demonstrate [RSR]'s predatory and far-right-wing-extremist conduct against the plaintiff. On or about the date of {2017-10-16}, the plaintiff rented a mini-skid-steer tractor used to move the soil resulting from the aforementioned decomposition process from [FRONTYARD] into [BACKYARD]. The delivery driver delivers the mini-skid-steer tractor loaded on a trailer parked onto the plaintiff's [DRIVEWAY]. The

delivery driver drives the mini-skid-steer tractor out of the trailer and spends about 15 minutes demonstrating to the plaintiff regarding how to use such mini-skid-steer tractor. The delivery-driver then leaves the plaintiff's private-property. During most, if not all, of the time in which plaintiff was speaking with such delivery-driver, [RSR] was standing in the background looking-at (and/or recording using a camera-phone) the plaintiff - again, further acts of intimidation against the plaintiff. The plaintiff then steps onto the mini-skid-steer tractor and begins to use such tractor, beginning to scoop up soil from [FRONTYARD]. As the plaintiff is driving such tractor towards [BACKYARD] to deliver such soil into [BACKYARD], [RSR] immediately starts to approach the plaintiff with her large-dog on leash and with her camera-phone in hand (presumably recording), once-again trespassing well into the property and sideyard of [792KLLTX78641], and then starts to yell at the plaintiff (with her camera-phone in hand presumably recording) that the plaintiff is not allowed to move soil into [BACKYARD], claiming - without even being a Board-Member of the [HOA], and without lawfully knowing anything about the plaintiff's [HOA] approval process - such activity to be an *"unapproved change"*. Furthermore, if the plaintiff's moving of such soil front [FRONTYARD] into [BACKYARD] was an *"unapproved-change"* as [RSR] fraudulently alleged, then [RSR] is inappropriately privy to private/confidential information exchanged between the plaintiff and the then [HOA] - which further indicates that she is engaged in an illegal conspiracy against the plaintiff with the then-[HOA] (run by the [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH]) - and which also corroborates with all of the other evidence of such illegal conspiracy that the plaintiff has against defendants [RSR],[JSP&KAP], the then-[HOA] and [WCLE]. As the plaintiff is driving the tractor through the fence-gate and into the [BACKYARD], [RSR] (while still trespassing onto the property of [792KLLTX78641]) even extends her hand up to raise her camera-phone over the plaintiff's privacy-fence to even video/photograph the plaintiff driving such tractor into the [BACKYARD], in total violation of the plaintiff's rights. Most importantly, this incident reveals the extreme lengths that [RSR] would undertake to violate the rights of the plaintiff, while committing further counts of harassment/stalking/intimidation/interference/disorderly-conduct/blackmail against the plaintiff. It is also clear from this particular unconstitutional-and-unlawful search and the multiple other unconstitutional-and-unlawful searches of the plaintiff's property that [RSR] has committed against the plaintiff, that [RSR] was fraudulently acting *"under color of law"* against the plaintiff, thus also in violation of [18-USC-PI-C13-§242] and [18-USC-PI-C43-§913] and/or [TPeC-T8-C37-§37.11] against the plaintiff. The plaintiff continues to move soil using such tractor from [FRONTYARD] into [BACKYARD]. After about 2 hours of work using such tractor, the plaintiff notices [DMP] who has arrived back in his vehicle on the driveway of [785KLLTX78641], while watching the plaintiff along with [RSR] by his side, starts to talk and conspire with [RSR] near the sidewalk across the street from the plaintiff - reminding the plaintiff yet another time, of the many ongoing hazards of an immigrant-of-color/indigenous-person living his/her natural lifestyle within a White neighborhood, where such intimidating acts of White-Supremacy go completely unchecked. Again, [DMP] would very-soon run for [HOA] Board-Member (in the following months), *"win"* the so-called *"election"*(✗) in the subsequent month of {2017-11} and use his substantial powers as [HOA] Board-Member solely for the purposes of continuing the predatory enforcement actions against the plaintiff, on behalf of plaintiff's predatory neighbors [RSR],[JSP&KAP] - whom, due to their extreme-racial-animus and far-right-wing-extremist animus against the plaintiff, could never realistically expect to win election even within such White neighborhood, and even if they did win such election, their position as [HOA] Board-Member would only serve to be a huge liability for the [HOA] (although [RSR] did try - see below at the incidents of {2019}).

# ¶403

During the following days of {2017-10-17} through {2017-10-24}, the plaintiff would continue to use such tractor to move soil from [FRONTYARD] into [BACKYARD], along with making other preparations for installing the new *"no-mow"* grass sod in [FRONTYARD]. On or about the approximate date and approximate time of {2017-10-24 15:00}, the plaintiff meets with the plaintiff's landscaping-contractor, [LC-

SR], at the plaintiff's [FRONTYARD] to briefly-discuss the plan for installing such no-mow-grass on the following date of {2017-10-25}. The plaintiff notices that as the plaintiff is talking with [LC-SR], [RSR] is staring menacingly/angrily at the plaintiff and/or using her camera-phone to record the plaintiff. During the approximate date and approximate time of {2017-10-24 17:00}, while the plaintiff continues to use such tractor to perform such preparatory work on the plaintiff's property, the plaintiff strikes one of the main-pipes of the plaintiff's automatic-sprinkler-system, causing water to gush out of such main-pipe. (The plaintiff was removing all of the pre-existing automatic-sprinkler-system on the plaintiff's privacy-property since there was simply no possibility of salvaging such automatic-sprinkler-system since the plaintiff was excavating at least 6-inches of the plaintiff's [FRONTYARD]-soil, making saving the original sprinkler-system that was buried only 3 inches into the soil both impractical and impossible.) The plaintiff immediately calls [LC-SR] who informs the plaintiff that the plaintiff simply needed to shut the valve located in the plaintiff's automatic-sprinkler-system's box off in-order to stop such water from gushing. The plaintiff then immediately rushes to such automatic-sprinkler-system's box in-order-to shut-off such valve, thus stopping the water from gushing. As the plaintiff continues to work, the plaintiff notices [JSP] walk on the road in front of the plaintiff on his way to [RSR]'s property across the street - clearly in-order-to to meet with [RSR] and discuss the temporary water-leak exclusively within the plaintiff's private-property. Approximately half an hour later, the plaintiff notices that an employee, [CoGUS-1], of the {City of Georgetown Utility Systems}, [CoGUS], (which provides water-utility-service for such subdivision) visits the plaintiff's property, while the plaintiff was in the [BACKYARD] driving such tractor. [CoGUS-1] informs the plaintiff that he had received a complaint from one-or-more neighbor(s) that the plaintiff had damaged the (public) main-water-line of the entire subdivision, causing a leak and/or a flood. The plaintiff denies such fraudulent allegation, stating that the plaintiff had only cut into the plaintiff's automatic-sprinkler-system's main-pipe (plaintiff's private-property) which was actively set (by such valve) to receive full-pressure water even when not being used. Since the main-water-line of the entire subdivision is required by code/law to be installed 18-inches-or-more into the ground, the plaintiff further explains to [CoGUS-1] that there was simply no possibility of the plaintiff damaging any such (public) main-water-line. [CoGUS-1] then, out of curiosity, asks inquisitive questions about the plaintiff's landscaping work, having noticed that many inches of the plaintiff's [FRONTYARD] soil being excavated. The plaintiff briefly explains to [CoGUS-1] that the plaintiff was installing a new-species of *"no-mow"* grass in [FRONTYARD]. [CoGUS-1] verifies that such complaint by such malicious neighbor(s) against the plaintiff was fraudulent, having noticed that there was absolutely no active water-leak anywhere on or around the plaintiff's private-property. [CoGUS-1] then agrees to leave the plaintiff's property, driving away in his government-truck. Based on the sequence of events, it was, once-again, abundantly clear to the plaintiff who had complained (yet-again) about the plaintiff to yet-another government-authority, causing another illegal search/seizure of both the plaintiff and the plaintiff's private-property. As if this fraudulent complaint to [CoGUS] was not bad enough, the plaintiff's predatory neighbors [JSP&KAP],[RSR] would also continue to check and record the water-meter on [JSP&KAP]'s property during the following day(s) - again fraudulently insinuating that the plaintiff's destruction of the plaintiff's own private automatic-sprinkler-system caused damage to their water-line. As if this fraudulent complaint to [CoGUS] was not bad enough, the plaintiff's attorney, [ATTORNEY-PS], stated to the plaintiff a few days later, that he received an angry phone-call from the then-[HOA]'s attorney, who claimed that the plaintiff had damaged, as he called it, *"the subdivision water system."* The plaintiff's predatory neighbors with extreme-racial-animus against the plaintiff - [JSP&KAP],[RSR] - would continue to lodge such fraudulent complaints against the plaintiff to all of such authorities, including, but not limited to, their co-defendants of [WCLE] - in-order-to indirectly harass/intimidate the plaintiff by proxy - with all of such efforts meant to drive the plaintiff, an immigrant-of-color/indigenous-person, out of *"their"* (exclusive-and-pure) White neighborhood.

# ¶404

During the morning of {2017-10-25}, the plaintiff schedules for such no-mow-grass sod to be delivered at approximately during noon or afternoon of the same date. During the morning of {2017-10-25} the plaintiff continues to work on such preparatory work on the plaintiff's [FRONTYARD], while [LC-SR]'s crew, [LC-Crew] - consisting of Hispanic employees - begins their preparatory work on the plaintiff's [FRONTYARD]. As the plaintiff and [LC-Crew] are performing such work, [RSR] emerges from the front-door of her house, with camera-phone in her hand, holding up her camera-phone and recording all of the plaintiff's and [LC-Crew]'s activities. At one point in time, [RSR] shouts at [LC-SR], *"HEY! - ARE YALL WITH THE [HOA]?!"* [LC-SR] politely responds to [RSR], *"No, ma'am."* [RSR] continues to loudly pester [LC-SR] if the [HOA] had ordered him and [LC-Crew] to take coercive actions against the plaintiff. [LC-SR] responds in the negative, stating that the plaintiff had hired him and [LC-Crew]. [RSR] then loudly yells at [LC-SR] about what she continued to fraudulently claim as the damaged (public) main-water-line - which she had so clearly fraudulently accused the plaintiff of damaging. [LC-SR] responds that there was absolutely no damage to the main-water-line, that the plaintiff had (intentionally) cut-into the plaintiff's own private irrigation-system while in the process of excavating soil, and that such issue had already been taken care of. [RSR] continues to pester [LC-SR], stating that there was a water-leak at the plaintiff's property, fraudulently alleging that such leak continued to exist. Due to high wind, the plaintiff cannot properly decipher the exact audio from the plaintiff's video-recording, but it appears as if [LC-SR] was getting tired of being interrogated by [RSR], and states to [RSR], *"No, I don't want to talk to you, lady!"* It became abundantly clear to the plaintiff that by holding up her camera-phone and almost dictating such fraudulent narrative about the plaintiff into her video-recording, [RSR] was trying to further harass/intimidate both the plaintiff and the plaintiff's contractors into bowing-down to her supreme authority and to the [HOA]'s supreme authority - fully exploiting and fully-capitalizing-upon the then-[HOA]'s predatory and pending lawsuit against the plaintiff. However, having noticed that she was not receiving the answers she wanted to hear from [LC-SR], [RSR] angrily and frustratingly enters back into her house. The plaintiff and [LC-Crew] would continue to work on such landscaping work. At multiple occasions during this day, [RSR] would walk over to [JSP&KAP]'s water-meter-box to take photo/video of [JSP&KAP]'s water-meter-reading as if to continue fraudulently-insinuating that plaintiff has done damage to public main-water-line and/or [JSP&KAP]'s water line. On at least one such occasion, [RSR], who had been issued a [CTW] against the plaintiff's property, would allow her large-dog, [L], to roam freely (unleashed) both onto the street (as she had done on a multi-weekly, if not almost-daily, basis), and onto the plaintiff's property - in complete violation of the restrictive-covenants of the neighborhood. As the plaintiff watches [RSR]'s unleashed large-dog, [L], roam freely and into the plaintiff's property, [RSR] delivers the usual obscene/vulgar gesture, aggressively and angrily holding-up her middle-finger towards the plaintiff - as she has done on numerous occasions documented in this lawsuit. Around noontime of the same date, the sod-delivery-driver, [SDD], driving a semi-truck with 3 pallets of the plaintiff's no-mow-grass on it, arrives in front of the plaintiff's property. As soon as [SDD] emerges out of his vehicle, [RSR] begins to angrily harass/intimidate and shout at him, which was, as the plaintiff would continue to suffer, one of [RSR]'s worst public-showings of her racist-lawlessness against both the plaintiff and [LC-Crew] (witnessed by many witnesses during this day). [LC-C-1], [LC-C-2] and [LC-C-3] refer to the three Hispanic crew members of [LC-Crew], two-or-more of whom [RSR] would continue to boss-around as if such crew members were only answerable to her. [RSR] would, on multiple occasions, harass/intimidate [LC-C-1] and/or [LC-C-2] and/or [LC-C-3] for stepping on the border-area of [JSP&KAP]'s property, while the same person(s) would also need to briefly step onto the border-area of the property on the opposite-side, [792KLLTX78641], without ever being harassed/intimidated by those property-owners:

▸  RECORDED RACIST, ABUSIVE, FRAUDULENT RANT INCLUDING HARASSMENT/STALKING/INTIMIDATION/INTERFERENCE/DISORDERLY-CONDUCT/BLACKMAIL BY [RSR] AGAINST PLAINTIFF(▸)
WITNESSED BY AT LEAST [EMP]:    (2017-10-25 12:00) (~)
▸  [ PRIVATE INFORMATION OMITTED/REDACTED TO PROTECT PRIVACY ]
▸  [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET   AL.

1696907590

〖 [SDD] GREETS PLAINTIFF, WITH PLAINTIFF STANDING AT OR NEAR THE SIDEWALK 〗

**[SDD]**        *How are you doing, sir?*

**PLAINTIFF**        *Good.*

〖 [RSR] ANGRILY WALKS TOWARDS [SDD] AND SHOUTS AT HIM TO MOVE HIS SEMI-TRUCK OUT OF HER WAY: 〗

**[RSR]**        *[MOVE THIS TRUCK OUT OF THE FRONT OF MY PROPERTY, NOW!]*

〖 [SDD] TAKEN ABACK BY SUCH DEMAND, IMMEDIATELY COMPLIES, ENTERING INTO HIS TRUCK TO DRIVE SUCH TRUCK AT LEAST 60 FEET AHEAD. 〗

〖 PLAINTIFF SARCASTICALLY STATES: 〗

**PLAINTIFF**        *Real Classy! Real Classy!*

〖 PLAINTIFF LAUGHS WITH SHOCK AND DISBELIEF: 〗
〖 [LC-C-1] APPROACHES PLAINTIFF ASKING PLAINTIFF ABOUT HOW MANY PALLETS TO BE INSTALLED: 〗

**[LC-C-1]**        *2 pallet right here, and only 1 right here... aqui?*

**PLAINTIFF**        *What?*

**[LC-C-1]**        *How many pallets*

**PLAINTIFF**        *Uh, so basically, um. ... I think, we have to work it out... basically, I think its like 1 and half here, 1 here and 1 here and then, and the remaining here, I don't know. Something like that.*

**[LC-C-1]**        *So, 2 pallet here and 1 here?*

**PLAINTIFF**        *No, its just 3 pallets total. Basically, 1 and half here, 1 here and like half here. That's what I'm thinking. I don't know.*

**[LC-C-1]**        *Ok.*

**PLAINTIFF**        *But first we got to level grade it.*

〖 PLAINTIFF APOLOGIZES TO [SDD] FOR [RSR]'S OUTRAGEOUS CONDUCT: 〗

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**        *Sir, sorry about that. Sorry about that.*

**[SDD]**        *That's ok.*

〘 [RSR] THEN STARTS REPEATEDLY YELLING AT [LC-Crew] TO GET OFF BORDER OF HER CO-CONSPIRATORS [JSP&KAP]'S PROPERTY: 〙
〘 [SDD] LOOKS BACK AT [RSR], CONTINUING TO BE TAKEN ABACK BY HER OUTRAGEOUS CONDUCT: 〙

**[RSR]**        *GET OFF THEIR PROPERTY!!*

〘 [LC-Crew] LOOKS STUNNED NOT KNOWING WHAT [RSR] IS STATING, SINCE [RSR] DID NOT OWN [JSP&KAP]'S PROPERTY: 〙
〘 PLAINTIFF TRANSLATES [RSR]'S ORDERS FOR [LC-Crew]: 〙

**PLAINTIFF**        *She's asking you to get off their property.*

〘 [LC-C-3] STEPS OUT OF BORDER OF [JSP&KAP]'S PROPERTY, BACK INTO PLAINTIFF'S PROPERTY: 〙

**[SDD]**        *Friendly Neighborhood, huh? ... Are you Sid?*

**[RSR]**        *STAY OFF OF THEIR PROPERTY! ... STAY OFF OF THEIR PROPERTY!*

〘 PLAINTIFF LAUGHS IN DISBELIEF, RESPONDING SARCASTICALLY TO [SDD]: 〙

**PLAINTIFF**        *Yeah ... You're tellin me!*

**[SDD]**        *I have um, an invoice, um. I'm going to run the card. So, I can take your credit card or...*

**PLAINTIFF**        *yeah, yeah, let me just, let me just get the credit card for now. appreciate it.*

**[SDD]**        *Where would you like to put these at?*

〘 PLAINTIFF ASKS TO SEE COPY OF INVOICE JUST TO CONFIRM CORRECT SPECIES AND QUANTITY OF GRASS: 〙

**PLAINTIFF**        *Uh... Let me just see that - I just want to confirm that its the right thing.*

**[SDD]**        *3 pallets of "Cutless"...*

**PLAINTIFF**        *3 pallets of it - yeah. you get it from "\*\*\* Farms" , is that right?*

**[SDD]**        *uh... I'm not sure where... I'm just the [delivery driver]*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**  *Oh, ok, I understand . I understand. Yeah, This sounds about right. This is for me to keep right?*

**[SDD]**  *Yeah, you can keep that part.*

**PLAINTIFF**  *Is this the only receipt? Sir... ? Is this only receipt that comes with it?*

**[SDD]**  *Huh?*

**PLAINTIFF**  *Is this the only receipt basically or is there some other other paperwork that comes with it.*

**[SDD]**  *Well, when I run the credit card - I can email and text you a copy of the credit-card receipt and you can keep that copy. [???]*

**PLAINTIFF**  *I'll get the e - email receipt then.*

**[SDD]**  *Ok.*

**PLAINTIFF**  *Alright.*

〚 PLAINTIFF HEADS BACK INTO HOUSE TO GET CREDIT-CARD: 〛
〚 PLAINTIFF ARRIVES BACK AND ASK [SDD] IF SOD-GRASS WAS FRESHLY HARVESTED: 〛

**PLAINTIFF**  *This was cut just yesterday?*

**[SDD]**  *Pardon? oh, yeah. yes.*

**PLAINTIFF**  *Alright... So, this was cut brand-new yesterday.*

**[SDD]**  *Yeah.*

**PLAINTIFF**  *Excellent.*

〚 PLAINTIFF TRIES TO HAND [SDD] CREDIT-CARD: 〛

**[SDD]**  *You'll have to wait, until after I [unload].*

SIDDHARTH  KODE   V.   WILLIAMSON  COUNTY ,  ET  AL.                     1696907690

⟦ PLAINTIFF CAUTIONS [SDD] TO AVOID SIDEWALK DUE TO SUCH MALICIOUS NEIGHBORS: ⟧

**PLAINTIFF**        *Oh, ok... Sir, try not to put in the side-walk area.. try to put it inside the driveway.. you understand.. not the sidewalk..*

**[SDD]**        *Ok.*

**PLAINTIFF**        *exactly, just a friendly neighborhood...*

⟦ PLAINTIFF LAUGHS. [SDD] LAUGHS: ⟧
⟦ [SDD] CONTINUES TO UNLATCH TIED PALLETS AND BEGINS TO USE FORK-LIFT TO TRANSPORT PALLET ONTO [DRIVEWAY]: ⟧
⟦ PLAINTIFF INSTRUCTS [SDD] TO LOAD FIRST PALLET TO ONE SIDE OF [DRIVEWAY]: ⟧
⟦ [RSR], HOLDING CAMERA-PHONE HIGH AND RECORDING, WALKS RIGHT IN BETWEEN FORK-LIFT AND PLAINTIFF, ALMOST AS IF- ⟧
⟦ -TO OBSTRUCT SUCH ACTIVITY. [RSR] ANGRILY PASSES IN FRONT OF [LC-C-2], MALICIOUSLY KICKING PART OF PLAINTIFF'S- ⟧
⟦ -PROPERTY TEMPORARILY STORED ON SIDEWALK. [LC-C-2] LOOKS SHOCKED, FAILING TO UNDERSTAND WHO THIS PERSON IS AND- ⟧
⟦ -WHAT SHE WAS TRYING TO DO. [LC-C-2] APPROACHES PLAINTIFF TO QUESTION PLAINTIFF ABOUT [RSR]'S OUTRAGEOUS CONDUCT: ⟧
⟦ [LC-C-2] FIRST QUESTIONS PLAINTIFF IF [RSR] IS OWNER OF PLAINTIFF'S PROPERTY: ⟧

**[LC-C-2]**        *She's the owner?*

**PLAINTIFF**        *What?*

**[LC-C-2]**        *[She's the owner of this house?]*

**PLAINTIFF**        *She's what?*

**[LC-C-2]**        *the owner?*

**PLAINTIFF**        *No, she's not the owner. I'm the owner.*

⟦ [RSR] ANGRILY YELLS AT [LC-C-2]: ⟧

**[RSR]**        *[YOU PUT UP WITH THIS STUFF FOR 9 YEARS! YOU'D BE PISSED-OFF TOO!]*

⟦ [LC-C-2] CONTINUES TO BE SHOCKED, CONTINUES TO STARE AT [RSR]'S OUTRAGEOUS CONDUCT. PLAINTIFF STATES SARCASTICALLY: ⟧

**PLAINTIFF**        *Oh, Ok!*

⟦ [RSR] OPENS [JSP&KAP]'S WATER-METER-BOX TO TAKE PHOTO/VIDEO OF WATER-METER-READING AS IF TO CONTINUE FRAUDULENTLY- ⟧
⟦ -INSINUATING THAT PLAINTIFF HAS DONE DAMAGE TO PUBLIC MAIN-WATER-LINE AND/OR [JSP&KAP]'S WATER LINE: ⟧
⟦ PLAINTIFF PROVIDES INSTRUCTION TO [LC-C-3] TO START INSTALLING NO-MOW-GRASS SOD ON OTHER SIDE OF PLAINTIFF'S [DRIVEWAY]~ ⟧

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                1696907690

〖 -SINCE PLAINTIFF WAS NOT DONE FULLY EXCAVATING 6-INCHES OF SOIL IN LARGER SIDE OF [FRONTYARD] . : 〗

**PLAINTIFF**     on this side. Sir - on this side... yeah. Could you turn it off. Could you start installing [grass] on this side first. Start on installing on this side, can you do that?... because, i need to little-bit- because I need to take off a little-bit more of this [side]...

〖 [LC-C-3] CROSSES [DRIVEWAY] TO START WORK ON THAT OTHER COMPLETELY-EXCAVATED SIDE. 〗

**[LC-C-3]**     [Yeah, Yeah, [???] ]

**PLAINTIFF**     Ok. Alright. Because, I need to use this here, to take off a little bit more of this [side] here. So, that's the reason why i'm asking.

**[LC-C-3]**     [Yeah, Alirte sir.]

〖 [SDD] HAS TO MANEUVER HIS SEMI-TRUCK CAREFULLY IN-ORDER-TO AVOID IRE OF [RSR]. IT WAS CLEAR THAT [SDD] WAS BEING- 〗
〖 -AT LEAST INCONVENIENCED AND/OR HASSLED BY [RSR]'S MALICIOUS DEMANDS. 〗

**[LC-C-2]**     Only [edging] on that one, or all over the place, because, we put edging [only] over there?

〖 PLAINTIFF HAD HARD TIME HEARING DUE TO [SDD]'S LOUD FORK-LIFT. DIRECTS [LC-C-2] FURTHER-AWAY: 〗

**PLAINTIFF**     come over here.

**[LC-C-2]**     both sides? put edging?

**PLAINTIFF**     Edging - Edging - Edging, yeoh around it.

**[LC-C-2]**     only on that one, or?

**PLAINTIFF**     On both sides.

**[LC-C-1]**     only for property line?

**PLAINTIFF**     only on the property line. Yes - only on the property line.

**[LC-C-2]**     Ok. Yeah, because we're making a line. both sides of property line.

**PLAINTIFF**     Yeah, yeah. it has to be flush.

**[LC-C-2]**      *She's the owner? of that one? house?*

〖 PLAINTIFF MISHEARS [LC-C-2]'S QUESTION. [LC-C-2] IS INQUIRING IF [RSR] IS OWNER OF [JSP&KAP]'S PROPERTY: 〗

**PLAINTIFF**      *No, but its on my property.*

**[LC-C-2]**      *this house.*

〖 PLAINTIFF MISHEARS [LC-C-2]'S QUESTION. PLAINTIFF CLARIFIES TO ENSURE [LC-Crew] INSTALLS BORDER-LANDSCAPE-EDGING ON
PLAINTIFF'S SIDE OF BORDER- 〗
〖 -TO AVOID CONFLICT WITH [JSP&KAP] AND/OR [RSR] AT ALL COSTS. 〗

**PLAINTIFF**      *yeah, it's on this property, along the property-*

**[LC-C-2]**      *[???] The other house - She's the owner? That other house?*

〖 PLAINTIFF CLARIFIES [RSR] LIVES ACROSS STREET AND ON THE OTHER SIDE. [LC-C-2] REMAINS DUMBFOUNDED AS TO WHY [RSR] IS
HARASSING THEM WHEN SHE IS- 〗
〖 -NOT OWNER OF [JSP&KAP]'S PROPERTY. 〗

**PLAINTIFF**      *No, no, no - she's [lives] over there.*

**[LC-C-2]**      *Oh, ... Why she's coming [over here]?*

**PLAINTIFF**      *Don't ask me- She's crazy!*

〖 PLAINTIFF HAS TO EXPLAIN [RSR]'S OUTRAGEOUS CONDUCT TO [LC-C-2], WHO REMAINS DUMBFOUNDED: 〗

**[LC-C-2]**      *She- Yeah! She's crazy!*

〖 PLAINTIFF LAUGHS: 〗

**PLAINTIFF**      *She's been doing that for the last 9 years!*

**[LC-C-2]**      *shit!*

**PLAINTIFF**      *it's crazy! - I had to put up with that for the last 9 years!*

〖 PLAINTIFF LAUGHS. [LC-C-2] LAUGHS. [LC-C-2] WALKS AWAY, RESUMES WORK. PLAINTIFF DIRECTS [SDD] TO DELIVER PALLET INTO- 〗
〖 -INSIDE OF PLAINTIFF'S DRIVEWAY SO THAT NO PART OF PALLET TOUCHES PUBLIC-SIDEWALK. 〗
〖 [RSR] IS ON PHONE-CONVERSATION WITH [KAP]. [KAP] BARKS ORDERS OVER PHONE FOR [RSR] TO RELAY ONTO [LC-C-1]. [RSR]- 〗

〚 -BRAZENLY INTERROGATES [LC-C-1] WHO WAS SIMPLY TRYING TO DO HIS JOB WHILE WITHIN PLAINTIFF'S PROPERTY, TAKING MEASUREMENTS- 〛

〚 -FOR CUTTING-AND-INSTALLING BORDER-LANDSCAPE-EDGING MATERIAL. [LC-C-2] APPROACHES [RSR] TO ASSIST [LC-C-1] IN ANSWERING- 〛

〚 -[RSR]'S AND [KAP]'S INTERROGATION. BOTH [LC-C-1],[LC-C-2] PROVIDED RESPONSES INDICATING THEY DID NOT HAVE A CLUE AS TO- 〛

〚 -WHAT SHE WAS DEMANDING OF THEM. 〛

**[RSR]**         *SHE WANTED TO KNOW- UM, WHERE ARE THE SURVEYS FOR THE PROPERTY-LINES?*

**[LC-C-1]**       *[???]*

**[LC-C-2]**       *[???] [???] [???].*

〚 [LC-C-1] CONTINUED TAKING MEASUREMENTS WITHIN PLAINTIFF'S PROPERTY, NOT KNOWING WHAT [RSR] WAS DEMANDING OF HIM. 〛

〚 [RSR]'S AND [KAP]'S PESTERING OF THE PLAINTIFF'S CONTRACTORS CONTINUE TO TAKE UP VALUABLE TIME OF THE PLAINTIFF- 〛

〚 -AS THE PLAINTIFF NEEDED TO CONTINUE WORK ON THE OTHER SIDE OF THE [FRONTYARD]. 〛

**[RSR]**         *WHERE ARE THE [???] [???]?!*

**[LC-C-2]**       *[???] [???] I don't know.*

**[RSR]**         *Go find them! Go!*

〚 IT APPEARED TO PLAINTIFF THAT [RSR] WAS PESTERING PLAINTIFF'S CONTRACTORS IN A MALICIOUS MANNER SO AS TO INCITE AN- 〛

〚 -ANGRY/VIOLENT RESPONSE FROM SUCH CONTRACTORS. HOWEVER, THEY KEPT THEIR COOL AND COMPOSURE, ANSWERING [RSR]'S/[KAP]'S QUESTIONS- 〛

〚 -TO THE BEST OF THEIR ABILITIES. [RSR] THEN TURNS TO PLAINTIFF TO INTERROGATE PLAINTIFF ON BEHALF OF CO-CONSPIRATOR [KAP]: 〛

**[RSR]**         *SHE ASKED ME TO VERIFY- WHERE'S THE SURVEY FOR PROPERTY LINES?*

**PLAINTIFF**     *I've got the survey, inside - so, what do you want with it?*

**[RSR]**         *THEY WANT THE SURVEY LINES TO VERIFY THAT YOU'RE NOT IN THEIR PROPERTY!*

〚 PLAINTIFF TRIES TO EXPLAIN TO [RSR],[KAP] THAT A STRAIGHT LINE FROM FENCE BORDER TO DEMARCATION ON SIDEWALK IS A SAFE BET FOR BEING- 〛

〚 -WITHIN PLAINTIFF'S PROPERTY. [RSR] RUDELY INTERRUPTS PLAINTIFF STATING THAT PLAINTIFF CANNOT USE THAT INACCURATE SYSTEM, SHE DEMANDS- 〛

〚 -A SURVEYOR. [LC-C-2],[LC-C-1] EXTEND TAPE-MEASURE TWO-OR-MORE INCHES WITHIN PLAINTIFF'S PRIVATE-PROPERTY TO AVOID IRE OF [RSR],[KAP]: 〛

SIDDHARTH KODE   v.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**        *Ok, you can actually use the-*

**[RSR]**            *NO, YOU DON'T USE THE FENCE!*

**PLAINTIFF**        *Alright!*

**[RSR]**            *WELL, YOU SHOULD HAVE FLAGS MARKING AND POSTED! ... KIM SAID!*

**PLAINTIFF**        *whatever they do, whatever these people do. I don't know what-*

〖 EVEN IGNORING [RSR]'S AND [KAP]'S OUTRAGEOUS DEMANDS, [RSR]'S TONE OF VOICE INDICATES HER OUTRAGEOUS SENSE OF INTELLECTUAL-SUPERIORITY OVER- 〗
〖 -PLAINTIFF. BOTH [RSR] AND [KAP] DO NOT REALIZE THAT SUCH SURVEY LINES ARE ALMOST-NEVER, IF NOT NEVER, DRAWN FOR MERE GRASS REPLACEMENT. 〗

**[RSR]**            *NO, YOU ARE THE OWNER! YOU HAVE TO HAVE SURVEY LINES DRAWN!*

**PLAINTIFF**        *that's what the landscapers are for. That's what they do!*

**[RSR]**            *NO-NO-NO-NO-NO! - YOU ARE TO GIVE THEM PROPERTY SURVEYS TO THE PROPERTY LINE! THE PROPERTY LINE NEEDS TO BE MARKED! IT'S NOT YOUR ARBITRARY- [???]!*

**PLAINTIFF**        *I didn't - I didn't draw an arbitrary line! I looked from over there! There-*

**[RSR]**            *YOU ARE TO MARK IT WITH, WITH, WITH UH - ORANGE FLAGS!*

**PLAINTIFF**        *Ok .... ?!*

**[RSR]**            *AND WHERE IS THAT?! ... THAT'S WHAT SHE WANTS ME TO ASK! ... WHERE'S THE SURVEY LINES FOR THE PROPERTY?!*

〖 PLAINTIFF RESPONDS THAT BOTH [RSR] AND [KAP] CAN CONSULT [JSP&KAP]'S OWN PROPERTY-SURVEY TO DETERMINE THOSE LINES. 〗
〖 IN OTHER WORDS, THEY DON'T NEED THE PLAINTIFF TO MARK SUCH INFORMATION. [RSR] ALSO STEPS AT LEAST A FEW INCHES INTO 〗
〖 PLAINTIFF'S PROPERTY, AND EXTENDS HER HANDS WELL INTO PLAINTIFF'S PROPERTY, ALTHOUGH SHE WAS ISSUED A [CTW] BY- 〗
〖 -THE [WC:SO] FORBIDDING HER ENTRY INTO PLAINTIFF'S PROPERTY. 〗

**PLAINTIFF**        *You can find survey for the property owner over there! - and they'd be able to give it to you! and they'd be able to tell you-*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                    1696907690

**[RSR]**          *NO-NO-NO! KIM SAYS THAT YOU ARE TO PROVIDE A SURVEY AND ITS SUPPOSED TO BE MARKED TO THE PROPERTY LINES! THIS IS JUST ARBITRARY, HERE!*

**PLAINTIFF**      *Ok ...?!*

**[RSR]**          *IT'S NOT- SID! IT'S NOT THAT YOU JUST LOOK AND GUESS! YOU HAVE TO HAVE IT MARKED AND SURVEYED! IS WHAT SHE SAID!*

**PLAINTIFF**      *That's what you hire the landscaping service for! they-*

〖 [RSR] SHOUTS AT [SDD], ASKING IF HE HAS THE SURVEY MAP FOR PLAINTIFF'S PROPERTY. 〗

**[RSR]**          *NO! DO YOU HAVE THE SURVEY MAP FOR THIS!*

**[SDD]**          *Do I?! No!*

**[RSR]**          *NO! NOBODY DOES! WELL, GET YOUR MANAGER TO CALL!*

〖 BOTH [SDD] and [LC-C-2] JUST STARE AT [RSR] AND HER OUTRAGEOUS CONDUCT WITH SHOCK AND DISBELIEF. 〗
〖 PLAINTIFF LAUGHS. PLAINTIFF APPROACHES [SDD] TO CONTINUE WITH WORK. 〗

**PLAINTIFF**      *Ok! ... Ok, Sorry, sir! I believe that-*

〖 [SDD] POINTS PLAINTIFF TO FOLLOW HIM TO HIS TRUCK SO THAT HE CAN PROCESS THE PAYMENT. 〗
〖 AS PLAINTIFF IS WALKING AWAY, [RSR] CONTINUES TO HARASS/INTIMIDATE BOTH PLAINTIFF AND [SDD]. BOTH- 〗
〖 -PLAINTIFF AND [SDD] LOOK BACK AT [RSR]'S CONTINUING, OUTRAGEOUS DEMANDS WITH DISBELIEF. 〗
〖 [RSR] POINTS TO SMALL PIECES OF DEBRIS ON SIDEWALK, WHILE CONTINUING TO VIDEO-RECORD, AND YELLS: 〗

**[RSR]**          *AND CAN YOU PLEASE MOVE THIS! THIS IS DANGEROUS! PLEASE MOVE IT OUT OF THE WAY! SO THAT I CAN WALK!*

**PLAINTIFF**      *Alright ... Sorry about that, sir!*

〖 PLAINTIFF HANDS [SDD] A CREDIT-CARD. : 〗

**[SDD]**          *Ok. Let me get that e-mail [address].*

〖 PLAINTIFF AND [SDD] WALK TOWARDS SEMI-TRUCK. [RSR] CONTINUES TO YELL AT PLAINTIFF AND/OR [SDD]. 〗

**[RSR]**          *[???] [???] [???]!*

〖 PLAINTIFF AND [SDD] LOOK BACK WITH DISBELIEF AT [RSR]'S OUTRAGEOUS CONDUCT. PLAINTIFF LAUGHS. 〗

SIDDHARTH   KODE   V.   WILLIAMSON   COUNTY ,   ET   AL.                                        1696907690

[SDD]              *I [???], Sid.*

PLAINTIFF         *I guess now you know why I have a camera on my head!*

⟪ PLAINTIFF AND [SDD] LAUGHS. ⟫

⟪ [SDD] ACKNOWLEDGES THAT [RSR]'S TARGETING OF PLAINTIFF IS RACIALLY-MOTIVATED: ⟫

[SDD]              *Oh, really! ... [I] can't stand her!... Where are you from?*

PLAINTIFF         *India.*

[SDD]              *Yeah? ... So, how long you been here?*

PLAINTIFF         *Um, about - about 16 years.*

[SDD]              *Oh, ok. ... you work, at your company?*

PLAINTIFF         *\* \*\*\*\* \*\*\*\* \*\*\*\*, \*\*\*\*\*\*\*\*, \*\*\* \* \*\*\*\*\*\*\*\*\*,*

[SDD]              *Oh, ok... Man, some people cannot [???] - just dont have anything better else to do!*

⟪ PLAINTIFF LAUGHS. ⟫

PLAINTIFF         *I've been putting up with her for 9 years, trust me! I know!*

⟪ UP UNTIL THIS POINT, [SDD] ASSUMED PLAINTIFF WAS CREW-CHIEF OF LANDSCAPING-CREW, NOT REALIZING PLAINTIFF- ⟫
⟪ -WAS HOMEOWNER OF SUCH PROPERTY. [SDD] BECOMES EVEN MORE SHOCKED THAT [RSR] WAS TREATING PLAINTIFF IN SUCH- ⟫
⟪ -OUTRAGEOUS MANNER: ⟫

[SDD]              *Oh, you live here? ... So, that's your house?!*

PLAINTIFF         *Yeah! ... Exactly!*

⟪ [SDD] LAUGHS OUT LOUD. ⟫

[SDD]              *Oh my god! ... Wow!*

PLAINTIFF         *Can you imagine the audacity! ... Yeah, that's exactly right!*

SIDDHARTH  KODE      V.     WILLIAMSON  COUNTY ,  ET  AL.                         1696907690

〖 [SDD] HANDS BACK PLAINTIFF'S CREDIT-CARD. 〗

**[SDD]**          *Here's you card back.*

**PLAINTIFF**     *She was threatening to get me kicked out of the house with the [HOA]!*

**[SDD]**          *Wow! ... What's your email?*

**PLAINTIFF**     *It's ******** ... **********

**[SDD]**          ********

**PLAINTIFF**     *Can i see it just to confirm?*

〖 [SDD] SHOWS PLAINTIFF READ-OUT OF DISPLAY SHOWING EMAIL AND OTHER INFO. 〗

**[SDD]**          *that bill is charged ...*

**PLAINTIFF**     *Ok, let me get this on, because I need this for my [HOA] stuff.*

**[SDD]**          *I'll send you an email - it will tell you, it will show you exactly what is down here..*

**PLAINTIFF**     *Oh, ok, got it. I understand, got it - send receipt. So, let me see.. ******** - yeah that's it. That's it. It's already sent?*

**[SDD]**          *Yeah, It's already sent ... Yeah ... Wow, Sid! ... Yeah, I've never heard of anybody needing to involve-*

**PLAINTIFF**     *Surveyors?*

**[SDD]**          *-surveyors to re-lot the side of your lawn.*

**PLAINTIFF**     *Yeah, i know its just crazy! - I've never heard of that!*

**[SDD]**          *I think that if you try to dig up some kind of uh.. utility pipes - something like that - that's one thing ... But i think if you're just doing irrigation or sod.*
                   *I've never heard of anybody needing surveyors.*

**PLAINTIFF**    *Right, Right, I understand ... Right! ... That's why I hired a landscaping service to do it. So, its like, You know they have all that information. So, It's crazy.*

**[SDD]**    *Yeah ... Well, good luck to you!*

〖 PLAINTIFF LAUGHS. 〗

**PLAINTIFF**    *Yeah, I'll need it! ... Alright, man! Appreciate it!*

**[SDD]**    *No problem.*

〖 PLAINTIFF WALKS BACK TOWARDS [HOUSE]. 〗
〖 PLAINTIFF MAKES QUICK PHONE-CALL TO [LC-SR]. 〗

**PLAINTIFF**    *Hey ****, This Sid from "788 Kingfisher." Um... So, basically I've been contacted by a neighbor across the street... you know the one that was talking to you. She said I need to have a ... I need to ... Mark the survey ... basically based on the survey, I need to mark the borders of the property before doing the landscaping work - are you familiar with this?*

**[LC-SR]**    *We're going to put that edging down right where there on that dirt line - over where you had your form-boards.*

**PLAINTIFF**    *Right, wherever the had, the form-boards ... right, exactly - and the form-boards actually - the way I had it - it was actually a couple of inches within my property - like, I made sure that I didn't extend any where onto their property.*

**[LC-SR]**    *So, tell the [LC-Crew] guys where you want to drop that composite edging... I would advise where you were before - if your form boards were 2 to 3 inches on your property?*

**PLAINTIFF**    *right...*

**[LC-SR]**    *then, put them in the same exact spot.*

**PLAINTIFF**    *Put them in the same exact spot - that way its [on] the safe side.*

**[LC-SR]**    *They continue complaining... They called me complaining - "HEY, YOU KNOW YOU NEED TO MOVE YOUR DIRT OFF THE SIDE-WALK RIGHT NOW! I NEED TO WALK ON THIS SIDEWALK! - MY TAX DOLLARS PAY FOR THIS SIDEWALK! BLAH BLAH BLAH!... " So... I mean, we're just here to help you out. You know what I mean?*

**PLAINTIFF**

*Yeah, right - She actually called you, is that right?!*

**[LC-SR]**   *Oh, yeah - she called me - I got an earful!*

**PLAINTIFF**   *Oh wow! Ok. Anyways - So, that's what I've had to deal with, basically! - that's what I've been dealing with, actually, for the last 8 and half years now- basically!*

**[LC-SR]**   *[that's why we're taking care of it by end of day, so... ]*

**PLAINTIFF**   *Exactly. Exactly.*

**[LC-SR]**   *Is the grass there yet?*

**PLAINTIFF**   *Yeah, the grass is already here - the grass is just delivered, so, its just um-*

**[LC-SR]**   *Alright, good deal! They should be [???] [???] [???], to get the composite edging done.*

**PLAINTIFF**   *alright. ok, that sounds great. alright. appreciate it, man. bye.*

**[LC-SR]**   *Ok.*

- 
- 
- 

❲ PLAINTIFF AND [LC-Crew] RESUME WORK. FOR A PERIOD OF APPROXIMATELY HALF-AN-HOUR (OR LESS), [GR] ❳
❲ WOULD PROVIDE PLAINTIFF WITH MINOR ASSISTANCE IN SUCH LANDSCAPING WORK. ❳

- 
- 
- 

❲ AT LATER PARTS OF AFTERNOON OR EARLY EVENING TIME, AS BOTH PLAINTIFF AND PLAINTIFF'S CONTRACTORS ARE CONTINUING TO- ❳
❲ -WORK HARD ON SUCH RE-LANDSCAPING, [RSR] WOULD ONCE-AGAIN WALK ACROSS STREET TOWARDS PLAINTIFF'S PROPERTY APPROACHING- ❳
❲ -(WHITE-AMERICAN) BOSSES OF PLAINTIFF'S [LC-Crew] AND COMPLAIN TO THEM (RIGHT IN FRONT OF PLAINTIFF) USING THAT SAME- ❳
❲ -RELENTLESSLY-RACIST PROPAGANDA AGAINST PLAINTIFF THAT SHE HAD BEEN ENGAGING IN FOR APPROXIMATELY EIGHT YEARS AT- ❳
❲ -THIS POINT IN TIME. [RSR] IS FULLY AWARE THAT EVERY EGREGIOUS ACTION OF INTIMIDATION/INTERFERENCE AND DISORDERLY- ❳
❲ -CONDUCT/HARASSMENT AGAINST PLAINTIFF THAT SHE HAS ENGAGED IN ON THIS DAY WERE EGREGIOUS VIOLATIONS OF [FHA]/[TFHA]. ❳

SIDDHARTH KODE v. WILLIAMSON COUNTY, ET AL.                    1696907690

〖 —THE MANNER IN WHICH [RSR] TREATED WHITE-AMERICAN BOSSES OF PLAINTIFF'S [LC-Crew] STANDS IN SHARP CONTRAST TO MANNER— 〗
〖 —THE MANNER IN WHICH [RSR] CRIMINALLY-ABUSED PLAINTIFF, AN IMMIGRANT-OF-COLOR/INDIGENOUS-PERSON. 〗

- 
- 
- 

〖 AT A SECOND POINT IN TIME, [LC-SR], COMPLAINS TO PLAINTIFF ABOUT OUTRAGEOUS CONDUCT OF [RSR],[JSP&KAP]: 〗

[LC-SR]        *Your neighbors! They're just! - a pain in the ass, man! ... I've gotten called [???] ... and chewed my ass off!*

〖 PLAINTIFF EXPLAINS TO [LC-SR] THAT [RSR],[JSP&KAP] ARE JUST LYING-IN-WAIT TO POUNCE ON THE PLAINTIFF: 〗

PLAINTIFF       *They're waiting... Yeah, exactly... They're waiting to get at me!*

- 
- 
- 

〖 PLAINTIFF NOTICES [KAP] AND [RSR] CONSPIRING AND SCHEMING AGAINST THE PLAINTIFF ACROSS THE STREET, PLANNING— 〗
〖 —THEIR NEXT PREDATORY COURSE-OF-ACTION(S) WITH THE THEN-[HOA] AND/OR [WCLE] AGAINST THE PLAINTIFF: 〗

- 
- 
- 

〖 AT ONE POINT IN TIME, [LC-SR], ASKS PLAINTIFF THE NEED FOR A GO-PRO ACTION CAMCORDER (BODY-WORN-CAMERA)— 〗
〖 —MOUNTED ON PLAINTIFF'S FOREHEAD, RECORDING: 〗

[LC-SR]        *Why do you have a Go-Pro?*

PLAINTIFF       *I want to- I want to have everything on record. So, if the [HOA] comes at me, or these people come at me, i have a record of everything!*

〖 [LC-SR] NODS AND GIVES PLAINTIFF TWO THUMBS-UP. 〗

[LC-SR]        *Good deal! They're a real pain-in-the-ass [to deal with]!*

PLAINTIFF       *Alright. no shit! no shit!*

〖 [LC-SR] WISHES PLAINTIFF GOODBYE, SHAKING PLAINTIFF'S HAND. 〗

[LC-SR]        *Alright dude, ... Thanks, bro!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

| PLAINTIFF | *Alright ... Appreciate your work, man!* |
|---|---|
| [LC-SR] | *You bet! You bet!* |

# ¶405

On or about the date and approximate time of {2017-10-29 12:00}, the plaintiff was using a hose to water the newly-installed *"no-mow"* sod grass that the plaintiff was forced to install due to the then [HOA]'s unreasonable predatory demands instigated by the plaintiff's predatory neighbors [RSR],[JSP&KAP]. As the plaintiff is watering the grass, [JSP] who is at the time using a hose to water the already-well-established (but water-guzzling Saint-Augustine) grass of [784KLLTX78641], unprovoked, starts to initiate a hostile conversation with the plaintiff which quickly turns into a abusive, assaultive and threatening rant from [JSP] against the plaintiff. [DMP], who would soon become a [SPOA] Board-Member not much longer after this incident - again, for the sole purpose of continuing the then [HOA]'s predatory actions against the plaintiff - witnessed most, if not all, of this incident. The hostile conversation begins with [JSP] bringing the plaintiff's attention to what he claimed to be, and what appeared to be, dog-faeces (or worse) that was located on the plaintiff's newly-installed sod grass about 30 feet away from the sidewalk - well out of reach for any dog on a leash. In bringing attention to this dog-faeces, [JSP] was all-but-admitting that he had dumped the dog-faeces onto the plaintiff's newly-installed sod grass - as the plaintiff had also noticed dog-faeces deliberately dumped onto the plaintiff's [YARD] (including the plaintiff's [BACKYARD]) on numerous occasions over the previous 7 years. With the exception of an approximately 1 year period of time ({2012},{2013}) during which the plaintiff's senior-citizen [PARENTS] were residing at the plaintiff's private-property along with their companion-dog, there was never any dog at the plaintiff's private-property - meaning that there was no reason to be any dog-faeces anywhere deep inside the plaintiff's [YARD] (including [BACKYARD]) during those periods of time - especially in areas of the plaintiff's [YARD] closest to [JSP&KAP]'s property, [784KLLTX78641]. [JSP] inserts numerous fraudulent statements and narratives against the plaintiff in his predatory, abusive, gaslighting and assaultive rant against the plaintiff - knowing, fully-well, that the plaintiff is recording all of it:

▶   RECORDED RACIST, ABUSIVE, FRAUDULENT, GASLIGHTING, ASSAULTIVE RANT INCLUDING HARASSMENT/STALKING/INTIMIDATION/INTERFERENCE/DISORDERLY-CONDUCT/BLACKMAIL BY [JSP] AGAINST PLAINTIFF(▶) WITNESSED BY AT LEAST [DMP]·   {2017-10-29 12:00}(~)

▶   [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

⟦ PLAINTIFF, WITH HOSE IN HAND, MOVES HOSE TO VARIOUS LOCATIONS TO WATER NEWLY-INSTALLED NO-MOW SOD. ⟧

| [JSP] | *Did you catch that dog on film?! I'd like to know who [???] if it was my yard!* |
|---|---|
| PLAINTIFF | *Fertilizer, right?* |
| [JSP] | *Nah.. The stank will stay like that for a long time.* |

⟦ [JSP] THEN MAKES AN OUTRAGEOUSLY FRAUDULENT ACCUSATION ABOUT PLAINTIFF WHO HAD USED A TRACTOR TO MOVE SOIL AROUND: ⟧

| [JSP] | *So... you end up on my yard into my yard [when you flipped that equipment over]?* |
|---|---|

⟦ PLAINTIFF DID NOT UNDERSTAND WHAT [JSP] MEANT BY SUCH STATEMENT: ⟧

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                    1696907690

**PLAINTIFF**          *What do you mean?*

**[JSP]**              *I saw your [thing all flipped over and that ??? all over in my yard?]*

⟦ PLAINTIFF STILL SHOCKED BY THE OUTRAGEOUSLY FRAUDULENT ACCUSATION, CORRECTS THE RECORD: ⟧
⟦ PLAINTIFF POINTS/MOTIONS TOWARDS [DRIVEWAY] AREA WHICH IS 10-FEET-AWAY FROM BORDER: ⟧

**PLAINTIFF**          *No, it was over here.*

⟦ [JSP] FINALLY ADMITS THAT HE MADE A FRAUDULENT STATEMENT: ⟧

**[JSP]**              *Oh, flipped over back there?*

⟦ PLAINTIFF, IN A FRIENDLY MANNER, TRIES TO DEFUSE THE SITUATION: ⟧

**PLAINTIFF**          *Almost flipped me over.*

⟦ [JSP] THEN RUBS-IT-IN THAT PLAINTIFF HAD SPENT SIGNIFICANT AMOUNT OF TIME/EFFORT/MONEY TO REPLACE GRASS: ⟧

**[JSP]**              *Uh-huh. Heavy equipment... So, you got a new yard - pretty nice. How much that cost you?!*

⟦ PLAINTIFF IS PAINFULLY REMINDED OF THE EXPENSE, WHILE [JSP] GLOATS AT IT: ⟧

**PLAINTIFF**          *You dont want to know.*

⟦ [JSP] CONTINUES TO RUB-IT-IN TO PLAINTIFF THAT HE SUCCESSFULLY CONSPIRED TO DEFRAUD PLAINTIFF: ⟧

**[JSP]**              *Quite a bit, huh? ... Well, I bet [???] put you in the hole a good $12-thousand, $14-thousand, $15-thousand, aren't they?! ... But hey, why would you care?! Its just money! Its your parents' money! [???]*

⟦ PLAINTIFF FRUSTRATINGLY EXPLAINS THAT PLAINTIFF DID NOT REPLACE GRASS BY CHOICE, BUT RATHER BY UNREASONABLE [HOA] DEMANDS: ⟧

**PLAINTIFF**          *I'm not doing this for myself. I'm doing this to satisfy the [HOA].*

⟦ [JSP] CONTINUES TO RUB-IT-IN TO PLAINTIFF: ⟧

**[JSP]**              *Yeah, but still, your parents are paying for it!*

**PLAINTIFF**          *I will be paying them back.*

⟦ [JSP] CONTINUES TO RUB-IT-IN TO PLAINTIFF: ⟧

**[JSP]**              *No, I know you dont care!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

**PLAINTIFF**      *No, I will be paying them back. So, its not just.. And, actually, I'm on my way to making something, so.*

**[JSP]**          *[???]*

**PLAINTIFF**      *But there's people like me doing this kind of stuff all over the country. Its not just me. I'm not the only one - there are people-*

〖 [JSP]'S STATEMENTS CONTINUE TO PROVE THAT HIS ANIMUS AGAINST PLAINTIFF WAS NOT BASED ON ANY HARM- 〗
〖 -THAT PLAINTIFF CAUSED [JSP], BUT RATHER BECAUSE [JSP] DID NOT LIKE THE PLAINTIFF'S PROPERTY APPEARANCE: 〗

**[JSP]**          *[???] [???] [???] [???] huh? So. You know when I turn around the corner [???] and I look at my yard. And I see your yard across it - It doesn't look so shitty any more!*

〖 [JSP] CONTINUES TO IMPOSE A FRAUDULENT NARRATIVE, BY REPEATEDLY INTERRUPTING PLAINTIFF: 〗

**PLAINTIFF**      *Thought you said it looks-*

**[JSP]**          *[???] It actually visually, It aesthetically pleasing for once, finally!*

〖 PLAINTIFF REJECTS [JSP]'S ARGUMENT, BECAUSE PLAINTIFF BELIEVES PREVIOUS GRASS TO BE EVEN MORE ATTRACTIVE: 〗

**PLAINTIFF**      *No sir.*

〖 [JSP] CONTINUES TO SHOW THAT [JSP]'S ANIMUS AGAINST PLAINTIFF IS BASED UPON APPEARANCE, NOT HARM: 〗

**[JSP]**          *YOU KNOW HOW LONG SINCE I'VE BEEN ABLE TO DO THAT?! [???] AND THE REST OF THE NEIGHBORS?! YOU KNOW WHAT SID?! YOUR SELFISH SHIT ATTITUDE PISSES US! PISSES THE SHIT OUT OF US!*

〖 PLAINTIFF TOTALLY REJECTS [JSP]'S FRAUDULENT, WHITE-SUPREMACIST NARRATIVE. 〗
〖 PLAINTIFF'S DEFENSE OF THE ENVIRONMENT FOR FUTURE GENERATIONS IS ANYTHING BUT SELFISH: 〗

**PLAINTIFF**      *Its not selfish! Its not selfish! There's people-*

**[JSP]**          *YOU KNOW YOU'RE AN ASSHOLE - YOU KNOW THAT RIGHT?!*

**PLAINTIFF**      *It's not selfish, there's-*

〖 [JSP] THEN SHOUTS OUT FRAUDULENT WHITE-SUPREMACIST NARRATIVE SO THAT PEOPLE FROM MANY HOUSES DOWN STREET COULD EASILY HEAR: 〗

**[JSP]**

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    1696907690

*ABSOLUTELY!! YOU'RE STICKING IT TO ALL OF US! - YOU JACKASS! - YOU ARE SELFISH! - YOU ARE GIVING EVERY SINGLE ONE OF US,*
*THE FINGER! YOU SELFISH SON OF A BITCH!*

〚 PLAINTIFF ADAMANTLY DENIES RACIST, FRAUDULENT AND GASLIGHTING NARRATIVE: 〛

**PLAINTIFF**        *I'm not doing that sir!*

〚 [JSP] CONTINUES TO SHOUT-OUT SO THAT PEOPLE FROM MANY HOUSES DOWN COULD EASILY HEAR: 〛

**[JSP]**        *YES, YOU ARE DOING IT! YOU'VE BEEN DOING IT FOR 8 GOD-DAMN YEARS! YOU ARE DOING IT!*

**PLAINTIFF**        *Sir, have you seen on the internet?... Have you seen people-*

〚 PLAINTIFF TRIES TO POINT OUT THAT PEOPLE ALL OVER THE COUNTRY WERE INSTALLING NO-MOW YARDS: 〛

**[JSP]**        *IT LOOKS LIKE SHIT! I DON'T GIVE A SHIT WHAT PEOPLE ARE DOING ON THE INTERNET!*

〚 PLAINTIFF EXPLAINS OTHERS ARE DOING MUCH MORE THAN PLAINTIFF WITH REGARDS TO PROTECTING ENVIRONMENT: 〛

**PLAINTIFF**        *Have you seen people on the internet?! They're doing things which are much more-*

〚 [JSP] APPROACHES PLAINTIFF IN A THREATENING MANNER, AND CONTINUES TO RAISE HIS VOICE: 〛
〚 [JSP] CONTINUES TO SHOW HIS INTOLERANT, WHITE-SUPREMACIST ATTITUDES, STATING NEIGHBORHOOD IS OWNED BY HIM: 〛

**[JSP]**        *I DON'T GIVE A SHIT WHAT PEOPLE ARE DOING ON THE INTERNET! I DON'T CARE WHAT [???] SOMEONE IS DOING IN CALIFORNIA!*
*THIS IS **MY NEIGHBORHOOD**! YOU LIVE RIGHT NEXTDOOR TO ME UNFORTUNATELY!*

**PLAINTIFF**        *But sir, I tried-*

〚 [JSP] CONTINUES TO DOMINATE BY IMPOSING WHITE-SUPREMACIST, FRAUDULENT NARRATIVE: 〛

**[JSP]**        *YOU DON'T TRY TO DO SHIT!*

〚 PLAINTIFF IS STUNNED THAT AFTER ALL THE TIME/EFFORT/MONEY EXPENDED, THIS IS THE REWARD: 〛

**PLAINTIFF**        *I tried to do everything to satisfy you guys-*

**[JSP]**        *YOU WHAT?!*

**PLAINTIFF**        *I tried to do everything to satisfy you guys! This is like the best-*

〚 [JSP] CONTINUES TO ADVANCE THE FRAUDULENT, WHITE-SUPREMACIST NARRATIVE: 〛

**[JSP]**       *ARE YOU KIDDING ME?!! ARE YOU KIDDING ME?!! YOU DID EVERYTHING TO SATISFY US?! ARE YOU KIDDING ME?!! YOU DID EVERYTHING YOU CAN TO PISS US OFF, MAN!*

〔 PLAINTIFF REJECTS FRAUDULENT, WHITE-SUPREMACIST NARRATIVE: 〕

**PLAINTIFF**       *Yes... I mean you can't say... This was everything that I did was to satisfy you guys-*

〔 [JSP] ADMITS THAT PLAINTIFF WENT TO GREAT LENGTHS EVEN COMPROMISING ON PLAINTIFF'S OWN RELIGIOUS/CULTURAL PRINCIPLES TO SATISFY THEM: 〕

**[JSP]**       *YOU'RE JUST DOING IT BECAUSE THEY'RE MAKING YOU DO IT - JACKASS! WHAT AM I, AN IDIOT?!*

〔 PLAINTIFF NOTES OBVIOUS FACT THAT [HOA] IS ONLY ACTING ON PREDATORY DEMANDS OF [JSP&KAP],[RSR],[DMP],ETC.: 〕

**PLAINTIFF**       *So, Exactly!... That's basically what I'm saying! They're acting on your behalf, right?! So, that's basically what I'm trying to do!*

〔 [JSP] MAKES SHOCKINGLY HYPOCRITICAL STATEMENT ABOUT ABIDING-BY CONTRACTS WHEN PLAINTIFF HAS SUBSTANTIAL PROOF [JSP&KAP], [RSR]- 〕
〔 -WERE EGREGIOUSLY VIOLATING THAT SAME CONTRACT, EXCEPT THAT IN THEIR CASE, WITHOUT ANY DEFENSE WHATSOEVER. 〕

**[JSP]**       *NO, THEY'RE ACTING ON THE LAWS OF CONTRACTS THAT YOU AGREED TO ABIDE BY!*

〔 PLAINTIFF CONTINUES TO POINT OUT THAT [JSP]'S NARRATIVE IS FRAUDULENT: 〕

**PLAINTIFF**       *The contract was written in 2005 sir! Sir- It was written in 2005! It was in 2005! In 2013, they added a new [???] in 2013, regarding drought-resistant-landscaping - they've not really updated the rules for that! I told you about that before!*

**[JSP]**       *THEY DIDN'T UPDATE SHIT!*

**PLAINTIFF**       *Exactly, they didn't update it! You're right! Because-*

**[JSP]**       *YOU HAVEN'T DONE A [???] SINCE YOU'VE MOVED IN HERE!*

〔 PLAINTIFF CONTINUES TO POINT OUT THAT [JSP]'S NARRATIVE IS FRAUDULENT: 〕

**PLAINTIFF**       *Sir! I'm not! That's false!*

〔 [JSP] CONTINUES TO REVEAL PREDATORY NATURE OF THE WHITE NEIGHBORHOOD – THAT THEY WOULD CAUSE SO MUCH– 〕
〔 –HARM TO PLAINTIFF JUST BECAUSE THEY DIDN'T LIKE THE PLAINTIFF'S PROPERTY APPEARANCE: 〕

**[JSP]**       *OH, IT IS?! WHY DON'T YOU ASK EVERYBODY?! THEY'LL ALL TELL YOU THAT YOU'RE STICKING TO US, BECAUSE YOU JUST LET YOUR PLACE LOOK LIKE DOGSHIT ALL THE TIME!*

**PLAINTIFF**

*That's not true, sir!*

[JSP]            *IT ABSOLUTELY LOOKS LIKE DOGSHIT! SERIOUSLY!*

PLAINTIFF        *That's your subjective opinion sir! That's not the opinion - that's not the opinion of like 70% of the world - 70% of the world would disagree with you!*

[JSP]            *YOU ARE IN YOUR OWN LITTLE WORLD, LITTLE BRO!*

PLAINTIFF        *70% of the world - well ok, i guess, in that area of the world!*

[JSP]            *YOU ARE IN YOUR OWN LITTLE WORLD, LITTLE BRO!*

PLAINTIFF        *70% of the world - this is a cultural issue, whether you like it or not!*

[JSP]            *ISOLATED [???] WORLD!*

〖 A WHITE COUPLE WALKING DOG UP SIDEWALK GREET [JSP] AND IGNORE PLAINTIFF, AGAIN, REVEALING- 〗
〖 -THE NATURE OF THE WHITE-NEIGHBORHOOD IN WHICH THE PLAINTIFF RESIDES. [JSP] GREETS THEM BACK. 〗
〖 PLAINTIFF' REMAINS SHOCKED THAT [JSP] WONT AGREE THAT THIS ISSUE IS A RACIAL/CULTURAL ISSUE: 〗

PLAINTIFF        *And i'm surprised that you won't even admit that it is a cultural issue!*

[JSP]            *ADMIT?! I ADMIT NOTHING!*

PLAINTIFF        *It's a cultural issue though! It's a cultural issue!*

[JSP]            *NO ITS A NEGATIVE [???] - IT'S A STANDARD!*

PLAINTIFF        *Eastern cultures don't believe in- And not only eastern cultures-*

[JSP]            *We dont [???] about anybody's culture - we've got black, white - we've got everything around here. You're the only asshole that doesn't think he has [???]...*

PLAINTIFF        *it's got everything to do with culture!*

SIDDHARTH   KODE   V.   WILLIAMSON   COUNTY ,   ET   AL.                                          1696907690

[JSP]             *YOU'RE STUPID, WHAT'S GOING ON SOUTH AMERICA BULLSHIT! RIDICULOUS! YOU'RE JUST, ABSOLUTELY RIDICULOUS!*

PLAINTIFF        *It's going on in Asia, Africa, South America... everywhere - its going on everywhere! its going on in this country as well! Its going on in Austin!*

[JSP]             *IT'S GOING ON IN AUSTIN? OK, THAT'S GREAT!- I DON'T GIVE A SHIT WHAT'S GOING ON ANYWHERE ELSE, I CARE ABOUT WHAT'S GOING ON NEXTDOOR! AND IT'S A BIG PILE OF SHIT NEXTDOOR, IS WHAT I SEE!*

PLAINTIFF        *ok, and so, that's not racist in any way?! Got it!*

[JSP]             *NO, ITS NOT YOU - IT'S HOW YOU KEEP THE PLACE BRO!*

PLAINTIFF        *oh ok, got it! you know what - you're dissing my culture basically!*

[JSP]             *RIDICULOUS MAN! - YOU'RE TRYING TO MAKE THIS A RACIST THING! YOU'RE AN ABSOLUTE IDIOT!*

PLAINTIFF        *It is a racist thing! You just called me an idiot! Basically, its a racist thing!*

[JSP]             *THAT'S WHAT YOU ARE! YOU'RE A FUCKING IDIOT!*

PLAINTIFF        *Exactly! So basically, you don't want to admit that this is a racial issue!*

〖 [JSP] COMMITS CRIME OF ASSAULT AGAINST PLAINTIFF: 〗

[JSP]             *I'M GOING TO COME ACROSS AND KICK YOUR ASS IF YOU SAY THAT ONCE MORE TIME! - YOU, [???] SON OF A BITCH!*

PLAINTIFF        *Exactly, this is the kind of... Sir!*

〖 [JSP] SHOWS BRAZENNESS - [JSP] KNOWS HE IS BEING RECORDED BY PLAINTIFF'S BODYCAM, BUT DOESN'T CARE: 〗

[JSP]             *SO, [???] BEEN AT YOU FOR 7,8 YEARS BRO. I [???] AT YOUR ???. I KNOW WHAT YOU'RE DOING WITH YOUR STUPID-ASS GOPRO ON AND RECORDING US - I'M NOT AN IDIOT - I DON'T GIVE A SHIT!*

PLAINTIFF        *I've been trying to do, be as accommodating as I can-*

〖 [JSP] FAILS TO REALIZE THAT ONE OF MAIN POINTS OF NO-MOW GRASS IS TO ELIMINATE THE NEED TO WATER: 〗

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**[JSP]**         *YOU AINT TRIED TO DO NOTHING, SID! YOU AINT TRIED TO DO ANYTHING BUT BE A JACKASS THE WHOLE TIME AND STICK IT TO EVERY - JUST, LIKE YOU'RE GOING TO TRY TO FIX THIS UP FOR ABOUT A MONTH, AND THEN QUIT WATERING IT - HUH?!*

**PLAINTIFF**     *actually, well no! actually, once it's established, it's pretty drought-tolerant!*

**[JSP]**         *YOU'RE DAMN LUCKY - THAT YOU CAN HIDE BEHIND THAT LITTLE RACE CARD OVER THERE - BECAUSE, I WOULD COME OVER THERE AND WHOOP YOUR ASS!*

**PLAINTIFF**     *sir, this is a race issue!*

**[JSP]**         *[???] MOTHERFUCKER - I TELL YOU. HMMMM.... YOU ARE OLD-ENOUGH TO GET AN ASS-WHOOPING!*

**PLAINTIFF**     *I can't believe that you would treat me like that, that's just unbelievable!*

〖 [JSP] BRAZENLY GASLIGHTS PLAINTIFF INTO THINKING THAT PLAINTIFF RECORDING [JSP]'S ABUSE AGAINST PLAINTIFF IS FUTILE: 〗

**[JSP]**         *YOU ARE [???]! YOU THINK ANYONE IS GOING TO LISTEN TO YOUR GOPRO - IS GOING TO BELIEVE [???]!*

**PLAINTIFF**     *So, you don't believe this- So, you dont' believe this is abusive treatment?! you don't believe abusive?! you don't believe this is abusive?!*

〖 [JSP] REVEALS THAT WHITE-SUPREMACY SHOULD RULE THE DAY, PERSON-OF-COLOR'S RELIGIOUS/CULTURAL VIEWS BE DAMNED: 〗

**[JSP]**         *[???] THINK THEY'RE GOING TO BELIEVE [???]? THEY'RE GOING TO BELIEVE THE GAME THAT YOU'RE PLAYING?! THEY'RE NOT AS DUMB AS YOU THINK!*

**PLAINTIFF**     *i mean this is a textbook case of abusive treatment!*

〖 [JSP] THEN MAKES A SHOCKINGLY FRAUDULENT STATEMENT - THAT PLAINTIFF, THE ONLY IMMIGRANT RACIAL-MINORITY IS ABUSING THEM: 〗

**[JSP]**         *YOU HAVE BEEN ABUSING US FOR YEARS BRO!*

**PLAINTIFF**     *abusing?!! if anything, the abuse is completely one-sided here! completely one-sided!*

〖 [JSP] LAUGHS-OUT-LOUD CONTINUING THE FRAUDULENT NARRATIVE: 〗

**[JSP]**         *THAT'S RIGHT! IT IS ABSOLUTELY ONE-SIDED!*

**PLAINTIFF**     *Exactly! Look at the words that you've been hollering at me! i mean, That's crazy!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**[JSP]**       *OH, YEAH, THAT'S CRAZY! NO, IT'S TRUE!*

**PLAINTIFF**    *calling me an idiot! calling me-*

**[JSP]**       *FOR 8 YEARS, YOU'VE BEEN STICKING IT TO US!*

**PLAINTIFF**    *it's unbelievable!*

〖 [JSP] CONTINUES GAS-LIGHTING ABUSE BY FRAUDULENTLY ACCUSING PLAINTIFF OF HAVING MENTAL ILLNESS: 〗

**[JSP]**       *I KNOW YOU'RE NOT ALL THERE! YOU'RE OBVIOUSLY DON'T FUNCTION ON ALL WAVELENGTHS!*

**PLAINTIFF**    *exactly, see - one insult after another! i mean, its just non-stop!*

〖 [JSP] CONTINUES TO COMMIT FURTHER COUNTS OF RACIALLY-MOTIVATED CRIME OF ASSAULT AGAINST PLAINTIFF: 〗

**[JSP]**       *OR I COULD COME OVER THERE AND WHOOP YOUR SCRAWNY LITTLE ASS!*

**PLAINTIFF**    *see - exactly, it's one insult after the other!*

〖 [JSP] BRAZENLY GASLIGHTS PLAINTIFF INTO THINKING THAT PLAINTIFF RECORDING [JSP]'S ABUSE AGAINST PLAINTIFF IS FUTILE: 〗

**[JSP]**       *YOU'RE STUPID SHIT! YOU PLAY THAT GOPRO FOR ANYBODY! THEY'RE ALL GOING TO LOOK AT YOU AT GO - YEAH, LOOK AT WHAT YOU DID FOR THESE POOR [???]!*

**PLAINTIFF**    *oh, ok!*

〖 [JSP] CONTINUES WHITE-SUPREMACIST, FRAUDULENT NARRATIVE; THEN MAKES SHOCKINGLY HYPOCRITICAL STATEMENT ABOUT PLAINTIFF'S FENCE: 〗
〖 OVER COURSE OF NEXT 4 MONTHS, PLAINTIFF WOULD SOON SPEND $14,000 OF PARTS, BACK-BREAKING-LABOR TO INSTALL A- 〗
〖 -PERMANENT FENCE WITHOUT CHARGING PLAINTIFF'S NEIGHBORS EVEN ONCE CENT. MEANWHILE, [JSP]'S FENCE HAS BEEN UNREPAIRED/LEANING- 〗
〖 -AGAINST PLAINTIFF'S PROPERTY FOR OVER 3 YEARS AT-THAT-POINT-IN-TIME: 〗

**[JSP]**       *[???] LOOK AT YOU DROVE THEM TO... [???] THEY'VE BEEN [???] FOR YOU FOR 8 YEARS, UNTIL THEY JUST COULDN'T TAKE IT ANYMORE! LOOK AT WHAT YOU DID TO THESE PEOPLE! THEY'RE GOING TO SEE YOU THROUGH, WITH YOUR RIDICULOUSNESS, AND THEY ARE GOING TO LAUGH AT YOU. LAUGH... [???] ALL THE STUPID STUFF YOU DO! HOW'S YOUR BACKYARD LOOKING BACK THERE?! WHAT DO YOU THINK YOU'RE DOING TO YOUR NEIGHBORS ACROSS THEY WAY... MY GOD, SID! COULD YOU BE MORE INCONSIDERATE?! I MEAN, YOU'VE HAD YOUR FENCE DOWN FOR WELL OVER 2 MONTHS NOW! DO YOU CARE ABOUT ANYBODY AROUND HERE?! YOU JUST DON'T CARE, DO YOU?!*

SIDDHARTH KODE  V.  WILLIAMSON COUNTY, ET AL.                1696907690

**PLAINTIFF**          *I'm fixing it! Sir, you saw it!... I've already fixed it!*

〖 [JSP] MAKES FRAUDULENT STATEMENT THAT PLAINTIFF HAS NEVER CALLED JP "SIR" BEFORE, WHEN PLAINTIFF'S OWN RECORDINGS PROVE OTHERWISE: 〗

**[JSP]**          *"SIR" - YOU'VE NEVER CALLED ME THAT BEFORE! YOU'RE DOING THAT NOW BECAUSE YOU'RE ON THE GOPRO! [???]*

**PLAINTIFF**          *I've called you "Sir" quite a few times!*

**[JSP]**          *[???]. YOU'RE SUCH A DUMBASS! YOU'RE RIDICULOUS! YOU'RE A [???]! THAT'S WHAT YOU ARE! NOBODY CAN BELIEVE ANY OF THE [???] YOU [???]!*

**PLAINTIFF**          *Ok!-*

〖 [JSP] ADMITS THAT HE USES CANCER-CAUSING, TOXIC CHEMICALS ON HIS YARD, AGAINST PLAINTIFF'S WILL: 〗

**[JSP]**          *[???] AS MUCH MONEY ON [???] SPRAY AND WEED-KILLER YOU COST ME, MAN?!*

**PLAINTIFF**          *That's not required by any of the rules! And not only that, it's damaging to the environment!*

**[JSP]**          *[???] YOU DON'T CARE ABOUT THAT BECAUSE YOU'RE JUST SUCH [???]!*

**PLAINTIFF**          *It's damaging to the environment! and I would be disapproving of that! So-*

〖 [JSP] LAUGHS-OUT-LOUD CONTINUING-TO-SHOW ABUSIVE, RACIST DISRESPECT TOWARDS PLAINTIFF; THEN- 〗
〖 -SHOCKINGLY REVEALS THAT ALL OF HIS,THEIR PREDATORY ABUSE WAS TO CAUSE FINANCIAL HARM TO PLAINTIFF'S- 〗
〖 -FAMILY AND DRIVE PLAINTIFF OUT OF THE WHITE-NEIGHBORHOOD BY FINANCIAL FORECLOSURE/EVICTION AS A RESULT- 〗
〖 -OF SUCH LITIGATION WITH THE [HOA] - AN EGREGIOUS [FHA] VIOLATION: 〗

**[JSP]**          *YOU'RE AN IDIOT! [???] YEAH! [???] THAT'S FINE, SID! I'M NOT WORRIED ABOUT IT! [???] **YOU'LL BE GONE! YOUR PARENTS WILL RUN OUT OF MONEY!** [???]*

〖 PLAINTIFF IS NOT DONE WATERING, BUT IS TRAUMATIZED BY [JSP]'S ABUSE. PLAINTIFF CLOSES TAP, ENTERS BACK INTO [HOUSE]. 〗
〖 PLAINTIFF NOTICES THAT [DMP] WHO WITNESSED MOST OF THIS INCIDENT, APPROACHES [JSP] AND TALKS REASSURINGLY TO [JSP],- 〗
〖 ASSURING [JSP] THEY WILL INFLICT MAXIMUM DAMAGE ONTO THE PLAINTIFF ONCE [DMP] GAINS A SEAT ON THE [HOA] BOARD,- 〗
〖 -AGAIN REVEALING THE HAZARDS OF AN INDIGENOUS-PERSON LIVING IN A WHITE-NEIGHBORHOOD WHERE WHITE-SUPREMACY DOMINATES. 〗
〖 [DMP], RUNS FOR [HOA]-BOARD-MEMBER, "WINS" SO-CALLED "ELECTION" **(x)** A MONTH LATER, AND THEN USES HIS POWER TO ENGAGE- 〗
〖 -IN PREDATORY ENFORCEMENT ACTIONS AGAINST PLAINTIFF, ON BEHALF OF PREDATORY NEIGHBORS [RSR],[JSP&KAP]. 〗

## ¶406

In the aforementioned racist, abusive, fraudulent, gaslighting and assaultive rant from [JSP] to the plaintiff, [JSP] continually rails at the plaintiff about the purely-cosmetic look of the plaintiff's property, further revealing that he, his wife, [KAP], his partner-in-crime [RSR], and the rest of their White-American co-conspirators were predatorily targeting the plaintiff solely on the aesthetics of the plaintiff's property - in other words, that the plaintiff's property allegedly did not conform to the aesthetics of the standard White-American residential property. In such rant, [JSP] even admits to the plaintiff that he doesn't care if the ideas/motivation behind the plaintiff's landscaping choices were no different (at least in principle) from at least some properties *"in California"* or even *"in Austin"*, or for that matter, that the manner in which the plaintiff lived and the plaintiff's maintenance of the plaintiff's property was fundamentally no different from, or at least, within the spectrum of, that of the majority of people-of-color around the world. Instead, as [JSP] loudly and viciously orders the plaintiff to do, the plaintiff must rigidly and unquestioningly not only conform-to, but also bow-down-to (or show great deference to), the White-American aesthetic of property-maintenance that he and his far-right-wing-extremist base manically subscribe to. However, as the plaintiff seeks to demonstrate by litigating this lawsuit, the sum-totality of all of the plaintiff's evidence (including this incident) did show and would increasingly continue to show (in numerous subsequent incidents) that the manner in which the plaintiff maintained the plaintiff's property had very little, if anything, to do with the reasons that the plaintiff was being predatorily targeted by [JSP&KAP],[RSR],[WCLE] and their co-conspirators. Instead, as [JSP]'s numerous, extremely-abusive and publicly-humiliating loud rants against the plaintiff very clearly demonstrate, [JSP&KAP],[RSR],[WCLE] and their co-conspirators fundamentally thought that the plaintiff, due to the plaintiff's racial-profile, was a low-IQ, subhuman animal that was entirely unworthy of any rights, let alone the right to private-property-ownership - especially private-property-ownership within what they always considered to be *"their"* (exclusive-and-pure) White neighborhood. [JSP]'s even maliciously states at the end of this particular malicious rant against the plaintiff, *"... I'M NOT WORRIED ABOUT IT! ... YOU'LL BE GONE! YOUR PARENTS WILL RUN OUT OF MONEY!"* - which the plaintiff asserts is an extremely-revealing and overt admission by [JSP] that all of these malicious parties - [JSP&KAP],[RSR], [WCLE] and their co-conspirators (the then-[HOA], [DMP], etc.) - were seeking to defraud the plaintiff of any-and-all of the plaintiff's and the plaintiff's senior-citizen [PARENTS]' money and property.

## ¶407

On or about the approximate date and approximate time of {2017-10-31 18:00}, the plaintiff was using a hose to water the newly-installed *"no-mow"* sod grass, while also cleaning up soil/debris (from the recently-completed re-landscaping process) on the [DRIVEWAY]. [JSP] walks angrily towards the plaintiff, stops near the border area of [788KLLTX78641], and starts another (albeit shorter) racist, abusive rant against the plaintiff:

> RECORDED RACIST, ABUSIVE RANT, HARASSMENT/STALKING/INTIMIDATION/INTERFERENCE/DISORDERLY-CONDUCT/BLACKMAIL FROM [JSP&KAP] TO PLAINTIFF(I+)
> [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]
>
> **[JSP]**        *WHAT ARE YOU GOING TO DO WITH ALL THAT DIRT PILED UP IN YOUR BACKYARD?!*
>
> 〖 PLAINTIFF DOES NOT INITIALLY RESPOND. [JSP] CONTINUES TO INTIMIDATE/CALL-AT PLAINTIFF TO GET RESPONSE: 〗
> 〖 PLAINTIFF FINALLY RESPONDS: 〗
>
> **PLAINTIFF**        *You're going to start treating me with respect? Because otherwise, I do not see any value in talking to you.*
>
> **[JSP]**

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                                    1696907690

*YOU DON'T DESERVE RESPECT! ... [???] ... WE WERE ALL ABOUT TO SUE THE [HOA], IF THE [HOA] DIDN'T SUE YOU!*

〖 [JSP] STARTS TO WALK AWAY FROM PLAINTIFF, BUT CONTINUES TO TALK: 〗

**[JSP]**          *I HOPE YOU GUYS HAVE A LOT OF MONEY, MAN! ...*

〖 [KAP] APPROACHES PLAINTIFF, AND STARTS AN INCREDIBLY HYPOCRITICAL ARGUMENT ABOUT THE FENCE: 〗

**[KAP]**          *SID, CAN YOU AT LEAST SEE THINGS FROM OUR PERSPECTIVE?!*

**PLAINTIFF**      *I'm just trying to protect my environmental values! I can't help it if you don't respect my environmental values! I can't help it if the [HOA] doesn't respect environmental values!*

〖 [KAP] ABUSIVELY INTERRUPTS PLAINTIFF BY REPEATEDLY SHOUTING PLAINTIFF'S NAME, SHOWING HER SENSE OF RACIAL-SUPERIORITY OVER PLAINTIFF: 〗

**[KAP]**          *SID! ... SID! ... SID!*

**PLAINTIFF**      *What!*

**[KAP]**          *I'M NOT TALKING ABOUT THE GRASS! I'M TALKING ABOUT THE FENCE! YOU KNOW, THE REST OF US HAVE TO WORK FOR A LIVING!*

**PLAINTIFF**      *What about the fence! The fence-posts are on your side! I can't do anything to fix those!*

〖 [KAP] ORDERS PLAINTIFF TO FIX FEW PICKETS, WHEN [JSP&KAP]'S ENTIRE FENCE HAS BEEN LEANING/DANGLING UNREPAIRED FOR 3+ YEARS: 〗

**[KAP]**          *YOU CAN STILL FIX THE BOARDS FROM YOUR SIDE!*

〖 PLAINTIFF RELUCTANTLY AGREES TO FIX PICKETS, STILL DUMBFOUNDED BY RACIST HYPOCRISY OF [JSP&KAP]'S ARGUMENTS. 〗
〖 [KAP] STARTS TO WALK AWAY FROM PLAINTIFF, WHILE PLAINTIFF CONTINUES WORK IN [DRIVEWAY]. 〗

## ¶408

In the two aforementioned racist, abusive and/or assaultive rants from [JSP&KAP] to the plaintiff, [JSP], in referring to 2 fence panels that had been blown down by Hurricane Harvey (at the end of {2017-08}) - not on the side of the plaintiff's property shared with [JSP&KAP], but rather the side of the plaintiff's property shared with the then owner of [525LSLTX78641] - fraudulently claim that the plaintiff's entire fence was down, while [KAP] hypocritically draws the plaintiff's attention to individual pickets that may be loose/dangling on the side of the fence that the plaintiff did share with [JSP&KAP]. However, in order to fully expose the racist fraud about fencing that [JSP&KAP] have perpetrated against the plaintiff in these particular incidents alone, the plaintiff must fully state the following set of facts, which includes at least some basic technical/engineering information. The fencing that the builder of the subdivision originally installed, was not only substandard by

the typical American homeowners' standards, but more importantly, was not designed to last more than 5 years - utilizing cheap 3-inch-by-3-inch (3x3) landscaping-timbers as fence-posts, and thus, not even the minimally-acceptable 4-inch-by-4-inch (4x4) lumber, that is at least originally designed for such fence-posts. [JSP&KAP] made these abusive statements against the plaintiff, even though the plaintiff is clearly not responsible for the substandard materials and/or installation of fencing installed by the builder of the subdivision. Even the average American homeowner only repairs/rebuilds their fence - typically using 4x4 lumber - to last, on average, another 15 years. 4x4 lumber fence-posts falls into two types - pressure-treated lumber which is impregnated with extremely-toxic chemicals (and is thus, not a choice made by most organic gardeners), and/also untreated cedar which is more naturally rot-resistant and insect-resistant than most other types of lumber. However, no matter the exact type of 4x4 lumber used for fence-posts, all lumber does eventually rot, and especially under high-stress (such as strong winds), such rotting will cause such fence-posts to lose integrity and thus cause the resulting fencing to become compromised. For these reasons, any fencing that is built upon the foundation of 4x4 lumber-based fence-posts is normally expected to last no more than 15 years in the Central Texas climate conditions of heavy winds and flooding rain. The statistics of the United States show that the typical American homeowner only stays a resident at a particular residence, on average, for 12 years; therefore, by installing such non-durable lumber-based fence-posts, such homeowners are simply passing the cost of such fencing onto the future homeowners, which may be economically wise for the current homeowner, but very environmentally-expensive (due to multiple replacements of fencing-materials) and at least slightly more economically-expensive in the long-run due to multiple purchases of replacement fencing-materials over the entire lifespan of such residential property. Unlike most American homeowners, the plaintiff does not believe in quick-fixes/bandaids to fix unsustainable, short-term, non-durable engineering. Instead, when the plaintiff, an engineer, tackles an engineering problem, the plaintiff tackles such problem in a manner so that such problem never has to be dealt with again - whether by the plaintiff or by any future homeowner of the plaintiff's property - the same idea that at least partially motivated the plaintiff's *"no-mow"* grass installation. So, instead of re-building a fence that lasts, on average, another 15 years, which is what most American homeowners do, the plaintiff endeavored to use the plaintiff's engineering skills to build a *"permanent fence"* that never has to be fixed again - or, at a minimum, a fence whose structure will last at least as long as the structure of the house itself (as long as a tornado or earthquake does not directly strike it). In the previous months, the plaintiff was also expending enormous amounts of back-breaking labor to re-install the aforementioned *"no-mow"* grass in the [FRONTYARD]. So, for all of the reasons and facts specified in this paragraph, [JSP&KAP]'s loudly abusive statements regarding the plaintiff's unfixed fence was very disingenuous and fraudulent to state the least - and was only intended to engender more racial-animus against the plaintiff with any others in the area that were overhearing/witnessing including, but not limited to, [DMP] - a soon-to-be [SPOA] Board-Member. The plaintiff had already purchased and would continue-to-purchase approximately $3,000 in-total worth of fence-construction materials - several fully-loaded pallets of concrete-mix, several dozens of commercial-grade-10-gauge-steel-posts (at more than triple the cost of equivalent 4x4 lumber posts), and hardware to attach such steel posts to the wooden part of the privacy-fencing. In addition to the cost of approximately $3,000 worth of aforementioned fence-construction materials, the plaintiff also spent approximately $1,000 in heavy-duty electric equipment - heavy-duty electric auger, heavy-duty electric demolition hammer - and other related tools to help in digging fence-post-holes in Central-Texas's notoriously extra-rocky, extra-heavy, clay-soil. With part of such fence construction-work already started on-or-about the month of {2017-09}, over the subsequent months of {2017-11} through {2018-04}, without the help of any tractor equipment (such as a skid-steer tractor), the plaintiff single-handedly expended an enormous amount of back-breaking labor to dig 36 post holes, 36-inches-deep, 12-inches-wide - while the typical American homeowner would have dug a maximum of 18 post holes, 18-inches-to-24-inches-deep, 6-inches-to-8-inches-wide. The plaintiff installed two additional commercial-grade-10-gauge-steel-posts per panel while the typical American homeowner installs only one replacement 4x4 lumber post per panel. Although steel is, in theory, a superior material to be used for fence posts (at least when compared to the aforementioned lumber), even most American

homeowners that do use steel posts end up using either poor-quality 15-gauge-steel (galvanized steel of 0.072-inch wall thickness) or adequate-quality 13-gauge-steel (galvanized steel of 0.095-inch wall thickness). 15-gauge-steel is generally considered to be extremely lite-duty and is not recommended for 6-feet privacy fences, while 13-gauge-steel, although adequate, is not rated to last more than 25 years - in the standard Central-Texas climate conditions of heavy winds and flooding rain. Most home-improvement stores typically only sell steel posts that are 15-gauge and/or 13-gauge, which means that most American homeowners that do choose steel typically install, at best, 13-gauge-steel fence posts. Extra-heavy-duty 10-gauge-steel (galvanized steel of 0.130-inch wall thickness) is the best quality available for such privacy-fencing and is normally only available for purchase in specialty stores dedicated to fencing - the type of specialty store that caters primarily to commercial-grade fencing contractors. The plaintiff used approximately 350 pounds to 500 pounds of concrete-mix per 10-gauge-steel-post, while the typical American homeowner uses one 80-pound bag of concrete-mix per post - which involved the plaintiff's hauling a total of almost 300 very-heavy (50-pound/60-pound) bags of concrete-mix into the [BACKYARD], again, without the use of any tractor equipment. The plaintiff completed the plaintiff's *"permanent fence"* in the month of {2018-04} - at a total expense of almost $4,000 of materials and more than $10,000 of the plaintiff's own back-breaking labor, while the typical American homeowner would have spent approximately $250 in fence-post-installation materials and approximately $2,000 in labor cost - a total cost of approximately $2,250 to $2,500 - to re-install a 15-year-fence. In addition to reinstalling the fence-posts, many (if not most) American homeowners also unnecessarily replace the fence-pickets even though such fence-pickets, if installed properly, do not actually make contact with the soil, therefore making such fence-pickets last much longer then any other lumber that does make ground-contact. After inspecting the type of fence-pickets installed by the builder of this particular subdivision, the plaintiff did not notice any significant deterioration of such fence-pickets that would warrant replacement of such fence-pickets; however, even the replacement/installation of such fence-pickets is a trivial task that is not in the least bit taxing, requiring minimal labor, and even most professional fencing-contractors would agree that 100-percent of the real, time-consuming, and back-breaking labor involved in building a fence is exclusively in the task of installing the fence-posts (rather than installing/replacing the fence-pickets). The plaintiff did not charge either of the plaintiff's two neighbors - the two property-owners at properties [792KLLTX78641],[525LSLTX78641] - even one cent for this expensive, back-breaking, and time-consuming work - even though, according to neighbor law, each of these neighbors owed the plaintiff approximately $3,945 and $3,055 respectively - a total of approximately $7,000 - for such work. The plaintiff's generous and thankless feat obliterates the totally racist and fraudulent narrative advanced by [JSP&KAP],[RSR],[WCLE] that the plaintiff was/is *"not a good neighbor"* and/or *"inconsiderate"*; instead, the plaintiff's feat shows that the plaintiff thinks *"outside the box"* with an engineer's mind to create permanent solutions to homeowners' problems, rather than resorting to quick-fixes/bandaids to make-do for 15 more years. The plaintiff's feat was/is also particularly impressive given that the plaintiff weighs approximately 105 pounds and is even described (multiple times) by defendant [JSP] as *"scrawny"*. The most outrageous and fraudulent aspect about [JSP&KAP]'s racist, abusive and/or assaultive statements to the plaintiff is the sheer hypocrisy of such statements: the fence on [JSP&KAP]'s property [784KLLTX78641], which the plaintiff cannot fix since the fence-posts are on [JSP&KAP]'s property [784KLLTX78641] - has been totally unrepaired and dangling/leaning for at least 3 years - since at least {2014} - at that point in time, and still to the day that [JSP&KAP] moved out of property [784KLLTX78641] (at the end of {2022-07}), remained totally unrepaired (for a total of approximately 8 years). [JSP&KAP] - who had mastered their manipulative ability to publicly commit such racist fraud against the plaintiff - do not reveal any of these uncomfortable/damaging facts in their aforementioned loud, racist, abusive and/or assaultive rants against the plaintiff.


## ¶409

On or about a relatively-cold evening during the month of {2017-11}, the plaintiff is in the [BACKYARD], performing some clean-up work

after the recently completed front-yard re-landscaping work. During the re-landscaping process in the previous month, the plaintiff had deposited large-heaps of soil originating from the [FRONTYARD] into the middle of [BACKYARD] (at a significant distance away from the borders of the plaintiff's property). As the plaintiff is walking around in the [BACKYARD] performing some clean-up work, [JSP], steps onto some type of step-stool along the fence within the backyard of [784KLLTX78641], peeks over the plaintiff's privacy-fence (in total violation of the plaintiff's rights) and abusively shouts to the plaintiff, so that others nearby (even inside their houses) could easily overhear, *"LOOKS LIKE A CITY DUMP IN YOUR BACKYARD! ... THAT'S UNBELIEVABLE! ... YOU'RE UNBELIEVABLE!"*. The plaintiff does not respond to the loud, abusive statements and the invasion-of-privacy. Both [JSP&KAP],[RSR] have repeatedly targeted the plaintiff not for any legitimate health/safety concerns on the plaintiff's property, but rather, for what they claim to be the non-conforming aesthetics of the [BACKYARD] - which not only has absolutely no impact on *"property-values"* (since the [BACKYARD] is not visible from the street), but also even the [HOA] does not have the enforcement authority/power to do anything about - as any such enforcement action concerning a private, enclosed backyard would be *"arbitrary, capricious, or discriminatory"* if it can be shown that [HOA]s are not inspecting every owner's backyard. The incident is just one of many dozens of incidents in which [JSP] and/or [RSR] loudly and abusively shout at the plaintiff to engender more racial-animus against the plaintiff in the plaintiff's other White-American neighbors. It is also clear from this particular unconstitutional-and-unlawful search and the multiple other unconstitutional-and-unlawful searches of the plaintiff's property that [JSP] has committed against the plaintiff over the many years, that [JSP] was fraudulently acting *"under color of law"* against the plaintiff, thus also in violation of [18-USC-PI-C13-§242] and [18-USC-PI-C43-§913] and/or [TPeC-T8-C37-§37.11] against the plaintiff.

# ¶410

On or about the date of {2017-11-18}, the plaintiff sends the following social-media-private-message to the plaintiff's other next-door-neighbors residing at [792KLLTX78641], [CB&KB], regarding two specific issues of shared interest between the properties of [792KLLTX78641] and [788KLLTX78641]. Once again, such message dismantles the defendants fraudulent narratives about the plaintiff, and instead, further demonstrates that the plaintiff was very-attentive-to and fully-committed-to-resolve (to the fullest and best extent) all issues that needed maintenance within the plaintiff's private-property, including but not limited to, the aforementioned permanent-fence-construction-work. Such message also reveals that the plaintiff was both proactive-about and genuinely-concerned-about the plaintiff's landscapers accidentally cutting a utility-connection (television/phone/internet) cable originally buried underneath the soil of the plaintiff's [FRONTYARD]/side-yard, but which actually was meant as a utility-connection cable for the neighboring-property, [792KLLTX78641]. As the plaintiff explains in such message, the plaintiff had noticed a utility-connection service-person servicing/repairing/replacing such connection, and approached such service-person to ensure that there would be no charge issued to [CB&KB] as a result of such accidental cutting due to the plaintiff's re-landscaping efforts. The plaintiff verifies in such message that [CB&KB] would not be charged a fee for such servicing/repairing/replacing, but that if such fee was charged, that the plaintiff was willing to pay the full amount of such servicing/repairing/replacing:

> ▸  "Shared-Border Utility Connection Cables ; Shared-Border Fence" ›  PRIVATE MESSAGE FROM PLAINTIFF TO [CB&KB] (I›)   (2017-11-18 18:16) (~)
> ▸  [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]
>
> PLAINTIFF          *Dear Neighbor,*
>
>
>                    *My name is Sid Kode. I am your next-door neighbor that lives at "788 Kingfisher Lane, Leander TX 78641".*
>
>                    *I would like to bring to your attention 2 issues, regarding:*

(1) utility connection cables shared along our property border.

(2) fencing shared along our property border.

(1)

After some landscaping work recently performed at my property about 3 weeks ago (2017-10-25), my landscapers and I noticed 2 loose and/or cut utility connection cables on my property. Since both of these cables were buried in my property, I assumed that both of them were tied-to and associated-with my property - one for Spectrum cable and the other for AT&T DSL. Last week (2017-11-14), I had contacted AT&T to look into this issue - however, since I do no use any AT&T services for my property, they would not be able to fix the cable connection unless I actually signed-up for their service.

More importantly, the AT&T technician ("****") who was tending to the AT&T connection cable on Saturday morning, 2017-11-18, informed me that it was your AT&T connection and not mine, even though this part of the cable (and even the AT&T box) resides on my property and not yours. Mr. **** told me that you had called for new AT&T service, and as such, there was no installation charge billed to you. However, if you have been billed by AT&T for installation/repair of this particular cable and if such charge(s) would not have occurred if not for the aforementioned landscaping work on my property, then I am willing to reimburse you for such expense as long as you provide me with a copy of the bill/statement/receipt documenting such charge(s). I also requested Mr. **** to have the AT&T crew install/bury the newly-installed AT&T cable fully on your property and not partly within my property (as was previously the case), so that we do not encounter such issues in the future, for example, if any future landscaping work were to take place either on your property or mine or both. Please note that since such wiring is installed in a very shallow manner - very close to the surface-level soil - it is virtually impossible to do any landscaping work without damaging or cutting into them.

(2)

As you probably know, our shared backyard fence along our property border is in need of some repair-work. Over the next 3 months, I will be installing additional 10-gauge (very-durable, heavy-weight) metal fence posts (secured with concrete) in addition to the existing leaning (cheap-quality, substandard) landscaping-timber posts (that have been damaged by wind-storms/hurricanes), in order to ensure that the fence stays fully upright/erect without leaning in either direction. Most of this repair-work involving fence posts and wood rails can be completed from my side of the property. However, as you know, the wood pickets can only be secured/installed from your side of the property. As such, I kindly request one of the following, either:

(*) that you use 1-5/8-inch #8 (or better) deck screws to secure those pickets onto the existing rails. Nails are not as durable, and if nails are used here, the problem of undone pickets will resurface in the not-too-distant future.

(*) that you allow me to enter into your property backyard to secure those pickets using such screws, as was the case with my previous neighbors.

If you will be fully replacing any of the pickets instead of using the existing pickets, then please use 5.5-inch Cedar pickets, since these are the most-durable, lowest-maintenance and chemical-free. I have already purchased some additional Cedar pickets in case they are needed. Please feel free to let me know how you would like to handle the issue of the loose pickets.

Also, just so that you know, I will need to temporarily tilt part of the existing fence panels onto your property in order to make room to dig holes to install the new metal fence posts.

Please feel free to let me know if you have any issues with anything I have described in this message.

Sincerely,

Sid Kode.

CONFIDENTIALITY NOTICE: This electronic transmission (including any attached files) contains information that is legally privileged and confidential. If you are not the intended recipient or an authorized representative of the intended recipient, you are hereby notified that any review, disclosure, dissemination, copying, distribution, or taking action in reliance on the contents of this information is strictly prohibited. If you have received this electronic message in error, please immediately notify the sender by return message and delete this message from your computer system. Thank you.

## ¶411

On or about the following date of {2017-11-19}, [CB] responded, via private-message, that [CB&KB] were not charged by the utility-service-provider for the servicing/repairing/replacing of such utility-connection, and so, no reimbursement would be necessary. [CB] had stated a concern about the possibility of their pet-dog entering into the plaintiff's [BACKYARD] if the plaintiff left any large opening for such dog to pass through, and the plaintiff re-assured [CB] in a follow-up private-message (on the same date) that the plaintiff would ensure that the plaintiff would be constructing such permanent-fence in a diligent manner that ensured that there would be no such opening for any extended period of time, allowing for such pet-dog to cross-over into the plaintiff's [BACKYARD]. In such follow-up private-message, the plaintiff did also apologize if the cutting of such cabling caused any interruption in services to [CB&KB] as the plaintiff had assumed that all of such cabling buried at such shallow-depth within the plaintiff's [FRONTYARD] were exclusively dedicated for the plaintiff's private-property. (Even the plaintiff's landscaper, [LC-SR], had frustratingly informed the plaintiff that such tele-communication cables were only installed by most service-providers no more than an inch-or-two underneath the soil.)

## ¶412

The so-called *"election"* (✗) of the {2017} [SPOA] Annual-Board-Meeting resulted in [DMP] *"winning"* a Board-Member position of the [SPOA]. Right after such {2017} [SPOA] Annual-Board-Meeting which was attended by [RSR], [RSR] greatly increased the mafia-godfather-like power that she already previously wielded over the neighborhood, and thus the [HOA], by installing one of her cronies, [DMP], into such powerful position, yet again, with the sole aim of all of [RSR]'s (and her co-conspirators [JSP&KAP]'s) predatory actions being to get the newly-formed [HOA-BoD]s to continue to further-escalate predatory legal action(s) against the plaintiff.

▸   "Summerlyn POA Board - Under Resident Control" :   Nextdoor Summerlyn Leander·   [RSR] et al.·   {2017-11-30}·
▸   https://nextdoor.com/news_feed/?post=71699631



## ¶413

On or about the approximate date and approximate time of {2018-02-05 14:00}, the plaintiff approached the plaintiff's water-meter located in the plaintiff's yard in-order-to take a photograph of the current-reading. [JSP], who was in the driveway of [784KLLTX78641], yells out to the plaintiff while pointing to one of the plaintiff's security-cameras, *"HEY, MAN. YOU BETTER REMOVE THAT CAMERA POINTED AT MY PROPERTY, OR I WILL COME OVER THERE AND DO IT MA-SELF! ... I'll crack your head open while I'm over there as well!"* (λ) The plaintiff, without responding to [JSP]'s terroristic-threat (including graphic death-threat), and after taking photograph of the current-reading of the water-meter on handheld camcorder, enters back into [HOUSE], further-traumatized by such experience.

## ¶414

On or about the day of {2018-02-05}, the plaintiff ordered another full-pallet of concrete-mix (over two-thousand pounds worth of concrete-mix) for the purposes of the aforementioned permanent-fence-construction from a local home-improvement/hardware store. On or about the morning of the month of {2018-02-08}, the delivery-driver uses a tractor with fork-lift to unload such pallet from the delivery semi-truck, onto the [DRIVEWAY] and then into the plaintiff's garage, which contained other partially-used pallets of similar concrete-mix. While the delivery-driver is performing this task, [RSR] steps out of her house at [789KLLTX78641], and walks towards the plaintiff to take photograph(s)/video(s) of the activity, and then after spending a minute or so doing so, steps back into her house. At this moment in time, the

plaintiff is still in pending litigation with the [HOA] to rightfully fight for the plaintiff's right and every-homeowner's right to install *"no-mow"* landscaping. The multiple pallets of concrete-mix that the plaintiff ordered was for use in the permanent-fence-construction and thus, had absolutely nothing to do with the plaintiff's legal-fight for *"no-mow"* landscaping. So, [RSR], despite seeming to have very little understanding of the law (in general), uses dirty tricks and underhanded tactics of intimidation/interference in-order-to try to intimidate the plaintiff into giving up the plaintiff's legal-fight for justice - again, not much unlike the far-right-wing-extremist people that viciously intimidated/interfered-with and stood in the way of the many people (of all races) that fought in the civil-rights movements of the previous and current generations. However, at this moment in time, the then [HOA] is still being run by the [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH] and newly *"elected"* Board-Member [DMP], all of whom are in illegal conspiracy with [RSR],[JSP&KAP] to abuse/oppress/violate the plaintiff's rights. Therefore, due to this illegal abusive/oppressive conspiracy, [RSR] feels emboldened to act with absolutely impunity and unchecked abusive/oppressive power against the plaintiff, having already achieved considerable success in her abusive/oppressive intimidation/interference tactics against the plaintiff, in-order-to maximize the amount of pain-and-suffering that she had inflicted and was continuing to inflict onto the plaintiff.

# ¶415

On or about the date and approximate time of {2018-02-12 13:00}, the plaintiff makes initial contact with the [Austin Tenants Council], [ATC], which is a local non-profit agency that coordinates official fair-housing-investigations with the [US-HUD] and/or [TWC] - the federal and state agencies (respectively) that handle such official housing discrimination complaints. In a serious of communications between plaintiff and the [ATC], the plaintiff briefly documents the approximately nine years (at that moment in time) of fair-housing-violations suffered by the plaintiff at the hands of the defendants (and also the then-[HOA] under [f-HOA-BoD]s[SPOA-P-BC], [SPOA-VP-AH],[DMP]). The [ATC] made a timeline and/or summary of the [FHA] complaint made by the plaintiff, in an effort to forward it to the [US-HUD], initially stating that they would contact the plaintiff to further coordinate such submission(s) to [US-HUD]. Also, the [ATC] had advised the plaintiff to report the repeated racially-motivated threats of violence that the plaintiff had received to local-law-enforcement, by which they meant [WCLE]. The plaintiff explained in one-or-more communications to the [ATC] that [WCLE] was actually acting in conspiracy against the plaintiff with the very-same perpetrators of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff - as the numerous incidents from the previous years illustrate. Based on the fact that the plaintiff had already retained two attorneys that exclusively represent homeowners (in [TPrC] cases) at that point in time - [ATTORNEY-PS] (for the actual litigation work against the then-[HOA]) - but also [ATTORNEY-DK] (primarily for further consultation and further legal advice) - the [ATC] was more reticent to proceed with such [US-HUD] complaint - the conventional expression being that competing attorneys do not like to step on each others' toes, and any competing litigation efforts would simply complicate the process. In retrospect, and as future incidents would continue to reveal, the plaintiff considers this reticence to be the correct decision even from the plaintiff's perspective, as the plaintiff would continue to accumulate an actually-increasing amount of evidence of fair-housing-violations in the years that followed - the conventional wisdom behind any long-term legal claim (such as an [FHA] claim) is that, the greater the amount of evidence of such violations, and the longer the period of time of such violations, the stronger the case actually is.

# ¶416

On or about the morning of the day of {2018-02-23}, the plaintiff is in [FRONTYARD], performing landscaping work. While the plaintiff is performing this task, [RSR] steps out of her house at [789KLLTX78641], and walks towards the plaintiff to take photograph(s)/video(s) of the

plaintiff's bushes/trees in the foundation-plants area in front of [FRONTPORCH] of [788KLLTX78641], stating to the plaintiff with a malicious smile on her face, *"It's a pretty big job!"* In making this statement, [RSR] was referring to the size of the bushes/trees in the plaintiff's yard, in effect, ordering the plaintiff to significantly cut those bushes/trees or else, she would continue to demand further legal action against the plaintiff from the [HOA], even though [RSR] is fully-aware that the plaintiff has deeply held religious/cultural values/practices against cutting of such vegetation. [RSR] engages in this additional predatory act of intimidation/interference/blackmail against the plaintiff despite of the fact that she knows that there is no restrictive covenant that restricts (or for that matter, even regulates) the size (length, height, or width) or shape of such bushes/trees.

## ¶417

On or about the date and approximate time of {2018-03-02 14:00}, the plaintiff was unboxing some newly-purchased trays of agricultural plant-plugs, intended for planting for agricultural use. As the plaintiff was unboxing and taking photographs to document any damage to the plant-plugs, [RSR] (who lives across the street from the plaintiff), as he has done on numerous previous occasions, allowed her large dog, [L], to roam freely (unleashed) across the street from her property, onto the sideyard area bordering the plaintiff's property [788KLLTX78641] and [792KLLTX78641]. [RSR] initially yells out to [L], prompting the plaintiff to interrupt the plaintiff's work, and take a look at where [L] is actually roaming/running - as [L] had on multiple previous occasions stepped well into the plaintiff's property, not only in clear violation of the neighborhood's restrictive-covenants, but also despite of the fact that there is also a [CTW] issued to [RSR] forbidding [RSR] from stepping onto the plaintiff's property (see above), should [RSR] need to retrieve such dog from the plaintiff's property. At the end of this incident, it is once-again revealed that defendant [RSR] has never wanted any of her criminal conduct including the retaliatory crimes of racial-intimidation/harassment/stalking/disorderly-conduct/blackmail/criminal-mischief/criminal-trespass/etc. to be captured on the record:

> ▸ RECORDED RACIST, ABUSIVE, THREATENING COMMUNICATION FROM [RSR] TO PLAINTIFF(▸) · {2018-03-02 14:00}(~)
> ▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]
>
> ⟦ PLAINTIFF IS KNEELING DOWN TO UNBOX/PHOTOGRAPHS PACKAGES. PLAINTIFF FIRST HEARS [L], THEN SEES [L] ROAMING DIRECTLY IN FRONT OF [788KLLTX78641] ⟧
> ⟦ A FEW SECONDS LATER, [L] RAN DEEP INTO THE SIDEYARD BORDER-AREA OF [792KLLTX78641],[788KLLTX78641], AND [RSR] YELLS OUT: ⟧
>
> **[RSR]**        *COME-ON MAMA! COME BACK HERE! COME BACK HERE!*
>
> ⟦ PLAINTIFF GETS UP AND WALKS TO SEE WHERE [L] IS. [RSR] YELLS OUT TO PLAINTIFF: ⟧
> **[RSR]**        *SHE'S NOT ON YOUR PROPERTY! Idiot!*
>
> ⟦ PLAINTIFF CONTINUES TO WALK DOWN SIDEWALK TO SEE WHERE [L] EXACTLY IS: ⟧
> ⟦ PLAINTIFF FINALLY NOTICES DOG IN [792KLLTX78641] SIDEYARD. [RSR] CONTINUES TO INTIMIDATE PLAINTIFF: ⟧
> **[RSR]**        *THIS HAS NOTHING TO DO WITH YOU!*
>
> ⟦ PLAINTIFF, WHILE ON SIDEWALK, WITH BODYCAM RECORDING ALSO TAKES OUT HANDHELD RECORDED TO RECORD [L] ⟧
> ⟦ [RSR] WALKS IN FRONT OF PLAINTIFF, TRESPASSES ONTO [792KLLTX78641], LOOKS BACK MENACINGLY AT PLAINTIFF ⟧
> ⟦ [RSR] WALKS DEEPER INTO [792KLLTX78641] YARD, AND [L] FINALLY RUNS TO [RSR]. [L] THEN APPROACHES PLAINTIFF'S LEGS ⟧
> ⟦ PLAINTIFF STANDS MOTIONLESS BUT STILL RECORDING, WHILE [RSR] YELLS COMMANDS TO [L]. ⟧
> ⟦ [RSR] FOLLOWS [L] WALKING AT A FEET'S DISTANCE AROUND PLAINTIFF. [RSR] REACHES DOWN TO GRAB [L]. ⟧
> **[RSR]**        *HE DOESN'T WANT TO BE AROUND YOU! COME ON, GET HOME! HE DOESN'T WANT TO BE AROUND YOU! COME ON, GET HOME! COME ON.*

SIDDHARTH KODE    V.    WILLIAMSON COUNTY, ET AL.    1696907690

⟦ [L] RUNS UNCONTROLLED WELL INTO THE PLAINTIFF'S YARD,DRIVEWAY VERY NEAR THE UNBOXED FARM PLANTS. ⟧

⟦ PLAINTIFF IS NOW WORRIED THAT [L] WILL STOMP ONTO MORE THAN $500 WORTH OF PURCHASED FARM PLANTS. ⟧

⟦ PLAINTIFF CONTINUES WALKING DOWN SIDEWALK TO CONTINUE RECORDING [L]. [RSR] CONTINUES ORDERS TO [L]: ⟧

**[RSR]**          *L****! LET'S GO!... L****!*


⟦ [L] FINALLY RUNS OUT OF PLAINTIFF'S PROPERTY, BACK ONTO SIDEWALK. [RSR] LOOKS BACK AT PLAINTIFF AND MENACINGLY STATES: ⟧

**[RSR]**          *YOU DO NOT HAVE MY CONSENT TO RECORD!*


⟦ [RSR] CONTINUES TO ORDER [L] TO ENTER BACK INTO [RSR]'S PROPERTY [789KLLTX78641]. [L] FINALLY RUNS BACK TOWARDS [789KLLTX78641]. ⟧

⟦ PLAINTIFF STOPS HANDHELD-RECORDER; WALKS BACK TOWARDS PACKAGES; QUICKLY INSPECTS UNBOXED PACKAGES FOR DAMAGE TO TRAYS/PLANT-PLUGS. ⟧

# ¶418

On or about the date and approximate time of {2018-03-08 16:00}, the plaintiff's senior-citizen [MOTHER] had driven her vehicle into the driveway of the plaintiff's property [788KLLTX78641]. [MOTHER] waits while plaintiff exits [FRONTDOOR] and enters into the back-passenger-seat of [MOTHER]'s vehicle. After plaintiff is seated in such backseat of vehicle, [MOTHER] is about to reverse vehicle out of driveway, and starts to reverse such vehicle out of [DRIVEWAY]. [MOTHER] immediately notices that [RSR] has rushed across the street from her property [789KLLTX78641] with her dog [L], in-order-to obstruct [MOTHER],plaintiff from leaving the plaintiff's property in such vehicle **(↻)** . [RSR] then passes around from behind [MOTHER]'s vehicle, stares menacingly and in an initimidating manner at the plaintiff's senior-citizen [MOTHER] (who is seated in the driver's seat), and then aggressively/menacingly raises her middle-finger - the well-known vulgar gesture - directly towards the plaintiff's senior-citizen [MOTHER]. [MOTHER] immediately drives way without responding to [RSR], fearing what [RSR] might do next, and traumatized by such experience. It is important to note that [RSR], who lived diagonally and across the street from the plaintiff, had absolutely no reason to cross the street other than to deliberately *"obstruct, delay"* [MOTHER],plaintiff from reaching the destination. [RSR] also committed such criminal act of intimidation/interference/disorderly-conduct intentionally so that she could even fraudulently accuse (senior-citizen) [MOTHER] of trying to run-over [RSR] and/or her dog [L] with [MOTHER]'s vehicle. It is important to note that both the plaintiff and [MOTHER] were directly involved in commercial activity, specifically agriculture - using products purchased through interstate commerce - on this particular trip. This incident reveals very-clearly that [RSR] would resort to the dangerous tactics of intimidation/interference - including both racial-intimidation and interference-with-commerce-by-threats-or-violence ([18-USC-PI-C95-§1951]) against the plaintiff,[MOTHER] even while there is (relatively-large) vehicle involved - threatening-to or attempting-to *"obstruct, delay"* the plaintiff,[MOTHER] and such vehicle from reaching the destination.

# ¶419

On or about the date and approximate time of {2018-03-16 16:00}, the plaintiff's senior-citizen [MOTHER] had driven her vehicle and parked it at the front curbside of the plaintiff's property [788KLLTX78641]. [MOTHER] did not want to drive into the [DRIVEWAY] precisely because [MOTHER] wanted to avoid being obstructed/accosted from behind by [RSR] which took place approximately a week prior (see above). The plaintiff begins loading [MOTHER]'s vehicle with landscaping/farming supplies/materials/equipment, finishes manually watering the recently-installed no-mow grass using a hose, and enters into back-seat of [MOTHER]'s vehicle drive away from plaintiff's property. As

[MOTHER] is driving down street, both plaintiff and [MOTHER] notices [RSR]'s vehicle stopped at the intersection. [RSR]'s vehicle remains motionless for absolutely no reason for approximately a minute. In other words, [RSR], within her vehicle, was maliciously trying to *"obstruct, delay"* [MOTHER],plaintiff from getting to the plaintiff's,[MOTHER]'s destination **(4)** . [MOTHER] eventually realizes that [RSR] was not going to move her vehicle out of the way, and [MOTHER] maneuvers [MOTHER]'s vehicle around [RSR]'s vehicle - even having to enter partially into the opposing-traffic's lane to do so. As [MOTHER] is doing this, plaintiff's action-camcorder catches the license plate of the vehicle, which the plaintiff would later see parked in [RSR]'s driveway - confirming that it was, in fact, [RSR] that obstructed [MOTHER],plaintiff. After [MOTHER]'s vehicle enters the feeder to the highway *"United States Route 183"*, a highway involved in interstate or foreign commerce, and after [MOTHER] continues to drive down this feeder road, both [MOTHER],plaintiff notice [RSR]'s vehicle pass around [MOTHER]'s vehicle on the road, and drive in front of [MOTHER]'s vehicle. While on that same feeder road of highway *"United States Route 183"*, [MOTHER] then turns into another road leading to the destination, thereby avoiding any further malicious conduct of [RSR]. It is important to note that both the plaintiff and [MOTHER] were directly involved in commercial activity, specifically agriculture - using products purchased through interstate commerce - on this particular trip. This incident reveals very-clearly that [RSR] would resort to the dangerous tactics of intimidation/interference - including both racial-intimidation and interference-with-commerce-by-threats-or-violence ([18-USC-PI-C95-§1951]) against the plaintiff,[MOTHER] even while both parties are driving vehicles (weighing several thousands of pounds) on the road/highway, threatening-to or attempting-to *"obstruct, delay"* the plaintiff,[MOTHER] from reaching the destination. It is also clear that by *"obstructing, delaying"* and *"interfering-with"* the plaintiff,[MOTHER] from traveling through two County-of-Williamson roads (Kingfisher, Hummingbird), and reaching *"United States Route 183"* and the ultimate destination, [RSR] additionally committed two counts of the crime of [18-USC-PI-C13-§245], *"Federally-Protected-Activities"*, against both the plaintiff,[MOTHER] - on the basis of both the plaintiff's racial-profile and [MOTHER]'s racial-profile - by preventing, or attempting-to-prevent, the plaintiff,[MOTHER] from lawfully:

Ⓐ *"traveling in or using any facility of interstate commerce, or using any vehicle, terminal, or facility of any common carrier by motor"*;
AND

Ⓑ *"participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof."*

## ¶420

On or about the date and approximate time of {2018-04-25 10:00}, the plaintiff is watering the plaintiff's newly-installed no-mow grass - which at this point in time is still unestablished sod - in the plaintiff's front-yard using a hose. [JSP] walks aggressively/angrily towards the plaintiff, fraudulently yelling to the plaintiff that the plaintiff had damaged one of his sprinkler-system-heads. While the plaintiff remains silent, [JSP] continues to yell loudly and abusively at the plaintiff trying to get the plaintiff to respond, even threatening to sue the plaintiff if the plaintiff did not rectify the issue. The plaintiff, initially shocked by the fraudulent allegation, timidly denies damaging any part of [JSP&KAP]'s sprinkler-system. When [JSP] responds angrily and abusively, the plaintiff asks [JSP] to show the plaintiff what [JSP] is referring to. [JSP] walks back to his garage to start-up his sprinkler-system and points to location of where the sprinkler-system-head would ordinarily pop-up above ground for irrigation. Firstly, the location that [JSP] pointed to was in the *"curbside-grass-area"*, which is, technically-speaking, considered to be public-property, and therefore, not [JSP&KAP]'s private-property. Secondly, it was not the plaintiff that had installed the border-edging of the plaintiff's no-mow-grass in that *"curbside-grass-area"*, but rather, the plaintiff's hired landscaping contractors that did such work. It appeared that the border-edging that the plaintiff's landscaping contractors installed was obstructing that particular sprinkler-system-head from popping-

up above the ground. The plaintiff reluctantly agreed to fix the issue (in-order-to avoid any potential litigation), and within a week or so from that date, the plaintiff personally spent about a half-hour of the plaintiff's own time and effort, using heavy-duty electrical-equipment to dig and fix the issue.

## ¶421

On or about the dates of {2018-07-02} and {2018-07-03}, the then [HOA-BoD]s (led by [SPOA-P-BC],[SPOA-VP-AH]) send the following email messages (see below) to all residents of the subdivision, ahead of July-Fourth, reminding all residents that the lighting of fireworks is illegal within the subdivision. The plaintiff asserts that such repeated emails from the [HOA] are truly disingenuous because neither the [HOA] nor [WCLE] truly-and-seriously intended to enforce the fireworks-ban restrictive-covenant (and the Texas law of Disorderly-Conduct) within the neighborhood. Also, while such [HOA-BoD]s disingenuously proclaimed to be against the lighting of fireworks, one-or-more persons appointed by such [HOA-BoD]s' to the top-position(s) of the [HOA] Architectural-Control-Committee ("[HOA-ACC]") - including [HOA-ACC-CEM] (also a member of one-or-more other [HOA] committees) - openly voiced their support on social-media (see below) of such residents illegal and rampant lighting of such fireworks (even during the burn ban) - even outrageously justifying just brazen disregard for the restrictive-covenants of the neighborhood - revealing once again, to the plaintiff that the [HOA] is, at best, an unprofessional-and-inconsistent organization, and at worst, a corrupt-and-racist organization. (The plaintiff has asserted that such illegal lighting-of-fireworks is done disproportionately by the White-American or non-immigrant residents of the subdivision.) As a result of this lack-of-enforcement, the rampant lighting of fireworks in the neighborhood (by countless residents of the neighborhood) continued through this year and following years (as evidenced by numerous social-media-postings by numerous residents complaining about such issue).

---

▶  "Summerlyn: Outside Burn Ban and Fireworks"  :   EMAIL FROM [HOA-BoD]s TO ALL [Summerlyn] RESIDENTS CONCERNING "FIREWORKS BAN"   {2018-07-02 13:43}(~)
▶  [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

[HOA-BoD]s        *Dear Homeowners:*

> *With the Fourth of July only a few days away, we wanted to remind everyone that*
> *the association documents strictly prohibit the use of fireworks in the*
> *community. Specifically, this language can be found in Section 3.4. "(l) Uses*
> *Specifically Prohibited," of the DCC&R's of the Declaration of Covenants,*
> *Conditions, and Restrictions.*

> *The Liberty Hill Fire Department has confirmed there is a burn ban in effect in*
> *Williamson County at this time. Fireworks are prohibited in the county during*
> *this burn ban. This may be enforced by any duly-commissioned peace officer. It*
> *is a Class C Misdemeanor that is punishable by a fine up to $500.*

> *We hope everyone has a safe and enjoyable Independence Day!*

> *Regards,*

> *Board of Directors*

---

▶  "Summerlyn: Outside Burn Ban and Fireworks"  :   EMAIL FROM [HOA-BoD]s TO ALL [Summerlyn] RESIDENTS CONCERNING "FIREWORKS BAN"   {2018-07-03 10:21}(~)
▶  [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

[HOA-BoD]s

*Dear Homeowners:*

*With the Fourth of July only a few days away, we wanted to remind everyone that the association documents strictly prohibit the use of fireworks in the community. Specifically, this language can be found in Section 3.4. "(l) Uses Specifically Prohibited," of the DCC&R's of the Declaration of Covenants, Conditions, and Restrictions.*

*The Liberty Hill Fire Department has confirmed there is a burn ban in effect in Williamson County at this time. Fireworks are prohibited in the county during this burn ban. This may be enforced by any duly-commissioned peace officer. It is a Class C Misdemeanor that is punishable by a fine up to $500.*

*We hope everyone has a safe and enjoyable Independence Day!*

*Regards,*

*Board of Directors*

---

▸ *"Re: Fireworks"* ‹ Nextdoor Summerlyn Leander‹ [HOA-ACC-CEM]‹ {2018-07-05 15:40}› .
▸ https://nextdoor.com/news_feed/?post=86335587
▸ [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

[HOA-ACC-CEM]   *C******** E******* M***** from Summerlyn Leander said:*

*I think this neighborhood is great. We have been here 2 years. I grew up shooting fireworks off now I just enjoy watching them. 360 days out 365 days a year it is relatively quite. 2 days it gets lively and a little noisy a day before and after. There is not a neighborhood anywhere in the surrounding areas that don't shoot off fireworks. Even in the city where it is illegal. I lived in downtown leander for 17y. Every where around us fireworks went off and still do. For 2-5 days I just don't see the problem. But that's just me. I understand that some have issues with it that's understandable but you do know head of time that it's coming.*

*Original post by **** **** from Summerlyn Leander (15 replies):*

*> Even though according to the fire department fireworks are not permitted in*
*> Williamson County due to the burn ban, our neighbors continue to disregard*
*> signs posted by the HOA that indicate fireworks...*

*Shared Jul 4 in General to Summerlyn Leander*

# ¶422

On one-or-more occasion(s) during the middle and/or end of the year {2018}, the plaintiff received threatening notice(s) from the [HOA], ordering the plaintiff to remove so-called *"weeds"* in the plaintiff's new *"no-mow"* grass, which the plaintiff was already doing on a monthly

basis. Since the power-structure of the then [HOA] remained the same - particularly with the President and Vice-President positions held by [SPOA-P-BC] and [SPOA-VP-AH] respectively, both [RSR],[JSP&KAP] would continue to wield enormous power over the [HOA], demanding (for example, during Board meetings) the [HOA] to take further legal action against the plaintiff regarding the plaintiff's landscaping, despite of the plaintiff's installation of a *"no-mow"* grass, which was installed at a huge expense to the plaintiff - in terms of material costs, in terms of labor costs and, most importantly, in terms of litigation expenses. [RSR],[JSP&KAP] would continue to engage not only in direct racial-intimidation/harassment/stalking/disorderly-conduct/blackmail against the plaintiff, but also, as long as the power-structure of the then [HOA] remained the same, [RSR],[JSP&KAP] would continue to wield such enormous control over such institution-of-power to engage in racial-intimidation/harassment by proxy against the plaintiff.

## ¶423

At some point in time during the year of {2018}, even though the [SPOA] Board Positions have a term of 2 years, [DMP] resigns, without even serving one full-year, as Board-Member of the then [HOA] for a few crucial reasons:

Ⓐ [DMP], acting as agent/proxy of the plaintiff's predatory neighbors [RSR],[JSP&KAP], had already successfully used his substantial power as Board-Member to maximally inflict harm, by way of predatory enforcement/legal actions, onto the plaintiff, and having already achieved tremendous success in these sadistic actions against the plaintiff, [DMP] was unlikely to be successful in inflicting any further harm, at least as [SPOA] Board-Member, onto the plaintiff.

Ⓑ [DMP] was already in the process of moving out of the neighborhood - with a *"For Lease"* yard-sign posted on his then private-property [785KLLTX78641] - further illustrating that the sole purpose of [DMP]'s successful campaign to become [SPOA] Board-Member, being to inflict maximum harm onto the plaintiff, on behalf of the plaintiff's predatory neighbors [RSR],[JSP&KAP] (who could never realistically expect to become Board-Members - see above).

Clearly, [DMP] became [SPOA] Board-Member solely to engage in such predatory enforcement/legal actions against the plaintiff - acting on behalf of the plaintiff's predatory neighbors (and racketeer co-defendants) [RSR],[JSP&KAP].

## ¶424

On or about the date and approximate time of {2018-12-31 19:30}, defendants [JSP&KAP] and/or [NP] start to light fireworks in violation of the restrictive-covenants of the subdivision - as they have done multiple times per year for every year that the plaintiff has resided at [788KLLTX78641]. On this particular occasion, [RSR] joins-in to celebrate such illegal activity. During at least one time during this incident, [JSP&KAP] and/or [NP] recklessly light a series of fireworks, in a very dangerous manner, such that the dangerous, violence, uncontrolled and potentially-lethal explosive sparks from such fireworks hit many neighboring properties - including the plaintiff's property [788KLLTX78641]. If any other persons were in the area (or pathway) where these dangerous, violent, uncontrolled and potentially-lethal sparks flew at extreme speed, such persons could have very-easily been seriously injured and/or burned and/or even killed. By mere luck, no other persons were outdoors at those hazardous locations (including the plaintiff's [FRONTYARD]) during those particular moment(s) in time. The plaintiff did observe one-or-more vehicle(s) drive up/down the street during the period of time in which such fireworks were lit by [JSP&KAP],[NP], [RSR]. The plaintiff did observe neighboring resident(s) park their vehicle(s) and exit their vehicle(s) very-close-to (or within ten-feet-of) where

such fireworks were lit by [JSP&KAP],[NP],[RSR] - a relevant fact given that such fireworks can induce fear into those who need to pass by such location(s). These fireworks were lit by [JSP&KAP],[NP],[RSR] within a relatively confined-area around which several large/expansive trees, located within 20 feet of such fireworks, could have easily caught on fire if any of such firework(s) hit them. The lighting of fireworks is strictly forbidden by the restrictive-covenants of the subdivision - not only due to the possibility of serious injury to residents (including children and the elderly) but also because the houses of the subdivision are made, in substantial part, with wood-framing and both the vegetation (grass, bushes, trees, etc.) and the wood-fencing could very-easily catch on fire - which actually has reportedly happened in the subdivision (as indicated by one-or-more social-media-posting(s)), precisely due to illegal use of fireworks. In addition, the extremely loud noise caused by such fireworks causes both short-term and long-term hearing impairments/damage to all people but especially to those people that are especially sensitive to large amounts of noise - and similarly, both the lighting+noise from such fireworks causes work and/or sleep schedules for people (including the plaintiff) in the subdivision to be needlessly disrupted. Many of the residents from the subdivision also rightfully complain that both the lighting/noise from the fireworks are traumatic to their pet animals - particularly pet dogs. Finally, use of fireworks also causes large amounts of air pollution - with large amounts of (visible) chemically-filled smoke blowing into neighboring properties - and large amounts of ground pollution - with the uncontrolled debris from such fireworks landing on, not only the public streets (in essence, the crime of littering), but also the neighboring yards. Most importantly, the lighting of fireworks is not only a civil violation of the subdivision's restrictive covenants, but also a criminal violation of several Texas Laws (see above). After [RSR] is done celebrating this illegal activity and while walking back to her property at [789KLLTX78641], [RSR] looks menacingly into one-or-more of the plaintiff's security-camera(s) to see whether her participation and/or celebration of such illegal activity was caught on such security-cameras. The plaintiff does not need to further explain the brazenly-racist fraud and hypocrisy that both [JSP&KAP],[RSR] have engaged in whenever they have complained to the [HOA],[WCLE] about alleged aesthetic/cosmetic violations from the plaintiff's property. Such incidents also reveal that both [JSP&KAP],[RSR] were/are, for over 10 years, given free license to brazenly violate such crucial health-and-safety restrictive-covenants of the subdivision, while during that same time period, the plaintiff has been constantly hounded by the [HOA],[WCLE] due to the predatory complaints over the most frivolous/trivial/petty/spiteful, yet harmless, of alleged (but almost-always disputed) aesthetic/cosmetic restrictive-covenant violations lodged by these very same hypocritical, predatory neighbors - such as, but not limited to, unmowed grass and other uncut vegetation.

## ¶425

On or about the date and approximate time of {2019-01-22 10:45}, the plaintiff was continuing to install/test security-cameras on the plaintiff's property. [JSP] walks past the plaintiff on the sidewalk in front of [788KLLTX78641] and uses his camera-phone seemingly to take photograph/video of the plaintiff's newly-installed security-cameras on one of the plaintiff's trees. [JSP] then starts to walk back on the sidewalk towards [DRIVEWAY] area where the plaintiff is kneeling down (to connect/test security-camera) and starts shouting abusively at the plaintiff. It should be noted that during this incident, [JSP] violates the [HCPA] ([18-USC-PI-C13-§249]) against the plaintiff by attempting-to cause bodily-injury to the plaintiff - using his significantly-larger body-mass against the plaintiff, and attempting to throw several punches against the plaintiff - due to the plaintiff's racial-profile and the plaintiff's (*"actual or perceived"*) gender-identity/sexual-orientation.

▸ RECORDED RACIST, ABUSIVE, FRAUDULENT, THREATENING AND ASSAULTIVE RANT FROM [JSP] TO THE PLAINTIFF(▸) ·    {2019-01-22 10:45} (~)
▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

〘 PLAINTIFF IS KNEELING DOWN ON [DRIVEWAY], INSTALLING/TESTING SECURITY CAMERAS NEAR THE GARAGE DOOR OF [788KLLTX78641]. 〙

[JSP]

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

*SID, WHEN ARE YOU GOING TO CLEAN YOUR YARD UP?! WHAT ARE YOU DOING?! ARE YOU LOSING YOUR MIND! WHAT ARE YOU DOING WITH ALL THESE CAMERAS POINTED AT OTHER PEOPLES HOUSES?! TELL YOU WHAT, CHIEF! SHIT IS ABOUT TO HIT THE FAN! AND I AINT KIDDING, BRO! YOU PSYCHOPATH! - DELUSIONAL SON OF A BITCH! DUDE, WHAT IS WRONG WITH YOU, MAN?!*

〖 WITH CAMCORDER RECORDING, PLAINTIFF GETS UP AND WALKS TO THE MIDDLE OF DRIVEWAY AND LOOKS AT [JSP]. 〗
〖 IRONICALLY, [JSP] MAKES SARCASTIC ABOUT 'THE MOB' - WHEN THAT IS PRECISELY THE TYPE OF RACKETEERING-ENTERPRISE THAT- 〗
〖 -PLAINTIFF IS ALLEGING THAT RACKETEER CO-DEFENDANTS [JSP&KAP],[RSR] ARE ENGAGED IN AGAINST PLAINTIFF: 〗

**[JSP]**          *WHAT IN THE HELL IS THIS?! WHO'S GOING TO COME AFTER YOU - THE MOB?! YOU GOT CAMERAS POINTED-*

〖 [JSP] RAISES HIS VOICE EXTREMELY-LOUDLY IN ANGER SO THAT PEOPLE IN MANY HOUSES AWAY COULD EASILY HEAR: 〗

**[JSP]**          ### *-AT MY BACKYARD!!! I'VE GOT A 16-YEAR-OLD DAUGHTER!* - *MY WIFE IS A LITTLE BOTHERED BY THAT!! WHAT'S THE DEAL WITH THAT - YOU PERVERT!! WHY DO YOU GOT CAMERAS POINTED AT MY PROPERTY! TELL ME!! HEY, I'M ON THE SIDEWALK HERE, BUD! YOU WANT SOME OF THIS?! STEP OVER HERE! MAN, I'D LOVE TO GIVE YOU SOME! COME ON OVER HERE! COME OUT HERE!*

〖 [JSP] BACKS UP TO ALLOW THE PLAINTIFF TO WALK INTO THE SIDEWALK. 〗
〖 PLAINTIFF WALKS ONTO THE PUBLIC SIDEWALK AND STOPS. 〗

**[JSP]**          *OH, YOU WANT ME TO HIT YOU, DON'T YOU - YOU JACKASS [???]!*

〖 [JSP] APPROACHES THE PLAINTIFF AND ATTEMPTS/GESTURES TO THROW HIS FIRST PUNCH(4) AT PLAINTIFF IN VIOLATION OF- 〗
〖 -[18-USC-PI-C96-§1959],[42-USC-C45-SII-§3631],[18-USC-PI-C13-§249],[18-USC-PI-C13-§242]. PLAINTIFF TRIES TO EVADE PUNCH- 〗
〖 -BY BOTH TURNING HEAD AND FACING DOWN. [JSP] CONTINUES TO USE VIOLENT THREATS, HOMOPHOBIC-SLURS, AND OTHER SLURS: 〗

**[JSP]**          *BAM! I'D KNOCK YOU SENSELESS - YOU SICK SON OF A BITCH! YOU KNOW WHAT - YOU'RE SUCH A [???] - **YOU'RE A FAGGOT!** YOU'RE A LITTLE BITCH! ALL OF THESE PEOPLE THAT [???] - THEY COULD LOOK AT YOUR PIECE-OF-SHIT HOUSE AND YOUR PERVERTED ASS! AND GET THOSE CAMERAS OFF MY BACKYARD - QUIT BEING A LITTLE PERVERT, YA FREAK!*

〖 [JSP] ATTEMPTS/GESTURES TO THROW HIS SECOND PUNCH(4) AT THE PLAINTIFF. 〗
〖 PLAINTIFF TRIES TO EVADE THE PUNCH BY TURNING HEAD AND FACING DOWN. 〗

**[JSP]**          *YEAH!!! [???]*

〖 [JSP] WALKS UP SIDEWALK TOWARDS [784KLLTX78641]. 〗
〖 PLAINTIFF CONTINUES TO WALK ON THE SIDEWALK RECORDING [JSP]. 〗
〖 [JSP] TURNS AROUND AND THE PLAINTIFF STOPS. 〗

**[JSP]**          *GET THE FUCK AWAY FROM ME BOY! YOU DON'T WANT NONE OF THIS - YOU BETTER BACK OFF!*

〖 [JSP] ATTEMPTS/GESTURES TO THROW HIS THIRD PUNCH(4) AT THE PLAINTIFF. 〗
〖 PLAINTIFF TRIES TO EVADE THE PUNCH BY TURNING HEAD AND FACING DOWN. 〗

**[JSP]**

*BOY, I'LL KNOCK YOU OUT! ... SID, YOU THINK THIS DOES ANYTHING FOR YOU?! - THESE PEOPLE AREN'T STUPID! THEY'RE NOT STUPID! THEY SEE WHAT KIND OF FREAK YOU ARE!! ... THEY SEE THIS - WHAT IS THE DEAL WITH ALL THE CAMERAS - WHAT IS THE DEAL WITH ALL THE TRASH ON YOUR LAWN. ... WHY WONT YOU CLEAN THIS PLACE UP?! ... BECAUSE YOU'RE A FUCKING IDIOT!*

〖 [JSP] WALKS BACK TOWARDS [784KLLTX78641] FRONT-HALL. 〗
〖 PLAINTIFF WALKS IN A PARALLEL LINE ALONG THE PLAINTIFF'S PROPERTY RECORDING [JSP]. 〗
〖 [JSP] CONTINUES TO YELL OUT AT THE PLAINTIFF. 〗

**[JSP]**        *JACKASS [???] ! ... YOU BETTER GET THOSE CAMERAS OFF MY PROPERTY - YOU SON OF A BITCH! ... [???] OR YOU'VE GOT SOME PROBLEMS! ... TRUST ME - YOU WILL HAVE PROBLEMS! ... YOU SLEEP WITH THAT CAMERA RECORDING, DON'T YOU, DORK!*

〖 [JSP] STARTS TO WALK BACK TOWARDS THE PLAINTIFF AND CONTINUES TO MAKE THREATS. [JSP] THREATENS TO CUT- 〗
〖 -INTERNET-SERVICE-CABLE - INVOLVED IN FOREIGN OR INTERSTATE COMMERCE - AND PROVIDING INTERNET-CONNECTION AND- 〗
〖 -INTERNET-FACILITY TO PLAINTIFF - THUS, IN VIOLATION OF BOTH: [18-USC-PI-C95-§1951],[18-USC-PI-C13-§245]. 〗

**[JSP]**        *HEY, YOU KNOW YOU HAVE A CABLE HANGING OVER THERE ON THEIR PROPERTY! I THINK I MAY GO OVER THERE AND CUT IT! OH, SHIT - I THINK I'LL DO THAT RIGHT NOW!*

〖 [JSP] STARTS TO WALK TOWARDS [792KLLTX78641] SIDEYARD WHERE THE PLAINTIFF'S INTERNET-SERVICE-CABLE IS PARTLY EXPOSED. 〗
〖 PLAINTIFF RUSHES TOWARDS THE CABLE TO ENSURE THAT [JSP] DOES NOT GET TO CUT THE CABLE, OR RECORD HIM IF HE DOES. 〗
〖 [JSP] WHISTLES AS HE IS WALKING TOWARDS SUCH INTERNET-SERVICE-CABLE. 〗

**[JSP]**        *YEAH, YOU BETTER GET OVER THERE AND [???] - YEAH, THAT'S NOT ON YOUR PROPERTY - UH OH! OH SHIT! [???] [???] [???]*

〖 [JSP] THEN WALKS BACK TOWARDS THE BORDER AREA OF [784KLLTX78641] AND [788KLLTX78641]. 〗
〖 [JSP] CONTINUES WITH ABUSIVE GASLIGHTING AND THREATS AGAINST PLAINTIFF: 〗

**[JSP]**        *YOU'RE A STUPID SON OF A BITCH - YOU KNOW THAT - YOU KNOW HOW PSYCHOPATHIC YOU ARE?! YOUR THOUGHT AND [???] PATTERN IS JUST NOT RIGHT?! DID YOU EVER THINK ABOUT THAT?!! YOU LOOK LIKE YOU'VE BEEN EATING, THAT'S GOOD - AT LEAST, YOU'RE EATING HEALTHY! ... [???]*

〖 [JSP] THEN WALKS ALONG THE BORDER AREA OF [784KLLTX78641] AND [788KLLTX78641] TOWARDS THE FENCE. 〗

**[JSP]**        *FREEZING YOUR ASS OFF IN THAT HOUSE WITH NO ELECTRICITY! OH, YOU GOT ELECTRICITY DON'T YOU - THAT'S RIGHT - YOU JUST DON'T HAVE A WORKING AC UNIT! [???]*

〖 [JSP] LOOKS AT THE AREA BEHIND THE AC-UNIT OF [788KLLTX78641]. 〗

**[JSP]**        *TRASH IN YOUR LAWN! SID, THAT [???] WHY DON'T YOU TURN YOUR LITTLE HEAD AND POINT ON - POINT ON THIS TRASH! POINT OF THE TRASH RIGHT HERE ON YOUR LAWN! YOU WON'T DO THAT, WILL YOU?!*

〖 [JSP] LAUGHS OUT LOUD, POINTING TO THE AREA BEHIND THE PLAINTIFF'S AC-UNIT. 〗
〖 PLAINTIFF TURNS TOWARDS WHERE [JSP] IS POINTING. 〗

**[JSP]**        *LOOK AT THAT YOU HAVE TRASH IN YOUR YARD! LOOK AT THIS PIECE OF SHIT!*

〖 PLAINTIFF WALKS ON THE PLAINTIFF'S PROPERTY NEAR THE BORDER AREA OF [788KLLTX78641] AND [784KLLTX78641]. 〗

〖 PLAINTIFF FACES [JSP] WHO IS APPROXIMATELY 4 FEET AWAY. 〗

〖 [JSP] CONTINUES TO MAKE VIOLENT THREATS - INCLUDING MULTIPLE THREATS OF MURDER - AGAINST PLAINTIFF: 〗

**[JSP]**  *DUDE SID, **I WILL KNOCK YOU OUT! YOU WON'T NEVER SEE TOMORROW**, BOY, I TELL YOU WHAT! YOU'RE SUCH A PUNK-ASS LITTLE BITCH! - BOOM! ... BOOM!*

〖 [JSP] ATTEMPTS/GESTURES TO THROW HIS FOURTH PUNCH **(4)** AT THE PLAINTIFF. 〗

**[JSP]**  *BOOM!*

〖 [JSP] ATTEMPTS/GESTURES TO THROW HIS FIFTH PUNCH **(5)** AT THE PLAINTIFF. 〗

**[JSP]**  *BOY, I'D LOVE TO KNOCK YOU OUT! - YOU PUNK-ASS LITTLE BITCH!*

〖 [JSP] CONTINUES TO WALK BACK TOWARDS THE FRONTHALL OF [784KLLTX78641], AND MAKES ANOTHER DEATH-THREAT TO PLAINTIFF: 〗

**[JSP]**  *FIND YOU IN THE BACKYARD, DIG HIM UP!*

〖 [JSP] POINTS THREATENINGLY AT THE PLAINTIFF. 〗

**[JSP]**  *SHIT'S GOING TO CHANGE, MOTHER-FUCKER! - I'M ABOUT TO - I'M ABOUT TO GET INVOLVED NOW! ... I'M GOING TO TALK TO THE [HOA]! ... AND IF THEY DON'T DO ANYTHING - I'M GOING TO SUE THEM AND I'M GOING TO SUE YOUR ASS! AND I'M GOING TO SUE YOUR PARENTS! ... BECAUSE YOU'RE A LAZY SACK OF SHIT THAT DOESN'T WORK!*

〖 [JSP] APPROACHES THE PLAINTIFF AND STANDS APPROXIMATELY 3 FEET AWAY FROM THE PLAINTIFF. 〗

**[JSP]**  *TELL THE PEOPLE THAT! - SAY "HEY, I'M SID. I LIVE OFF MY PARENTS BECAUSE I'M A LITTLE BITCH AND I DON'T WANT TO GET A JOB. I DON'T GET A JOB - I DON'T WORK LIKE THE REST OF EVERYBODY ELSE AROUND HERE - FOR THEIR STUFF." ... HOW'S THAT FEEL [???]?! HMMM..?! HOW DO YOU FEEL ABOUT THAT?! ... LAZY LITTLE [???] MOOCHING BITCH OFF YOUR PARENTS! - THIS GUY DOESN'T WORK! - DOESN'T HAVE JOB! - EVERYTHING HE HAS, HE GETS FROM HIS PARENTS! ... LAYS AROUND ALL DAY, DOES NOTHING!!! DOES NOTHING CAUSE HE'S A LAZY SACK OF SHIT! ... HE'S A DRAG! ... HE'S A PIECE OF DOO-DOO!!!*

〖 [JSP] LAUGHS OUT LOUD AND STARTS WALKING AWAY FROM THE PLAINTIFF. 〗

**[JSP]**  *YOU ARE! ... HE'S A STUPID PIECE OF SHIT!*

〖 [JSP] ENTERS INTO THE FRONTHALL OF [784KLLTX78641]. 〗

〖 PLAINTIFF RETURNS BACK TO SECURITY CAMERA THAT PLAINTIFF WAS TESTING AND, TRAUMATIZED, PRETENDS TO CONTINUE TO TEST. 〗

〖 PLAINTIFF THEN ENTERS INTO THE HOUSE OF [788KLLTX78641] TRAUMATIZED BY THE INCIDENT. 〗

## ¶426

On or about the date and approximate time of {2019-01-25 09:49}, the plaintiff was continuing to install/test security-cameras on the plaintiff's property. While inside the [HOUSE], the plaintiff notices, on the plaintiff's security-camera-system-monitor, what appeared to be the large pickup-truck owned by then-[HOA-BoD]-President [SPOA-P-BC] - whom the plaintiff had always known was acting predatorily against the plaintiff based upon the predatory demands of [JSP&KAP],[RSR] - drive such pickup-truck very-slowly in front of the plaintiff's property, as

if to inspect and/or record (on camera-phone) all of the new security-cameras that the plaintiff had installed at the plaintiff's property including, in particular, those security-cameras installed onto the plaintiff's [FRONTYARD] tree. These security-cameras newly-installed on the plaintiff's [FRONTYARD] tree were the same security-cameras that [JSP] was taking photograph/video of in the previous incident, once again, revealing the enormous power that such neighborhood *"mob-boss"* [JSP] (and his wife [KAP]) wielded over the then-[HOA]. The plaintiff felt and continued to feel for many years, as if the plaintiff's predatory neighbors [JSP&KAP],[RSR] had been committing serious racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff (over the course of almost 10 years at that particular moment in time), and that then-[HOA] was intimidating the plaintiff against recording any-and-all such criminal activity, perhaps to protect themselves from any liability of such criminal activity. The then-[HOA] would even send a threatening notice about such security-cameras (and/or the security-camera-cables) to the plaintiff later on that same year (see below). The plaintiff asserts that it would be an extremely-dangerous precedent to grant institutions-of-power such as governments and/or [HOA]s the power to force private-citizens to take down security-cameras installed onto private-property as such predatory actions could easily be perceived as such institutions-of-power protecting/shielding themselves from facing the consequences of their own future abusive actions(s), and that such predatory actions, at least in some cases, could be construed to be *"obstruction-of-justice"*.

## ¶427

On or about the date and approximate time of {2019-02-18 19:00} (nighttime), the plaintiff was continuing to install/test security-cameras on the plaintiff's property. [JSP], who was located approximately at the driveway of [784KLLTX78641], shouts out angrily/threateningly to the plaintiff, with a second unidentified person, [UWAM-1], listening and responding. It is abundantly clear that from [JSP]'s assaultive rant against the plaintiff that [JSP] was not only threatening to commit felonious assault against the plaintiff, but was also threatening to feloniously burglarize the plaintiff's property to break all of the plaintiff's security-camera-equipment - not only the exterior security-cameras, but also the security-camera-system located inside of the [HOUSE] - in-order-to feloniously destroy all of the evidence after such felonious-assault-and-burglary against the plaintiff - not only egregious acts of racial-intimidation but also, multiple counts of interference-with-commerce-by-threats-or-violence ([18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959]). As the record of future incidents would show, [JSP] would continue to feloniously stalk the plaintiff, continue to assaultively threaten the plaintiff with terroristic-threats/death-threats, continue to throw more punches at the plaintiff and continue to damage/destroy almost a dozen of the plaintiff's security-cameras - with the damages to the plaintiff's security-cameras/equipment alone exceeding $1,700:

> RECORDED RACIST, ABUSIVE, FRAUDULENT, THREATENING AND ASSAULTIVE RANT FROM [JSP] TO THE PLAINTIFF(⊩) WITH [UWAM-1] LISTENING/RESPONDING·     (2019-02-18 20:00)(~)
> [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

〘 PLAINTIFF THEN EXITS THE [HOUSE] AND WALKS TOWARDS SECURITY-CAMERAS ON TREE TO TEST THEM. 〙
〘 [JSP] YELLS OUT ANGRILY/THREATENINGLY TO THE PLAINTIFF WHILE ALSO TALKING TO [UWAM-1]: 〙

[JSP]          *YOU LOOKING AT MY WIFE, YOU BIG HOMO?!!! ... HUH?!!! ...* [INAUDIBLE] ... [INAUDIBLE] ... *I'M GOING TO END UP OVER THERE, AND HE'S GOING TO GET KNOCKED OUT! SO, "WHAT HAPPENED?!" ... BREAK ALL HIS DAMN CAMERA EQUIPMENT! SO, HE WOULDN'T KNOW WHAT HAPPENED! ... HE WOULDN'T - HE WOULDN'T GET SHIT OFF IT! ...* [INAUDIBLE] ... *PERVERT! ...* [INAUDIBLE] ... *HAVE YOU SEEN HOW MANY CAMERAS HE HAS UP?! IT'S INSANE! ... BUT YOU KNOW WHAT I DID FIND OUT?! ...*

[UWAM-1]       *What?*

[JSP]          *A REALLY STRONG LED LIGHT WILL BLIND* [INAUDIBLE].

[UWAM-1]        *Oh, really?*

[JSP]        *YEAH!*

〖 PLAINTIFF WALKS BACK INTO THE [HOUSE], TRAUMATIZED BY THE INCIDENT. 〗

# ¶428

On or about the approximate date and approximate time of {2019-04-30 17:00}, the plaintiff was unboxing and photographing, some new corded-electric equipment on the [DRIVEWAY]. [JSP], who was located approximately at the driveway of [784KLLTX78641], walks towards the plaintiff stopping approximately 15 feet away at the border of [784KLLTX78641] and [788KLLTX78641], and yells out angrily/threateningly and abusively to the plaintiff. Around the time of this incident, the plaintiff had recently received a notice from the then [HOA] requesting the plaintiff to cut the plaintiff's [FRONTYARD] bushes, which again the plaintiff, was and still is, religiously opposed to - especially, since there is-no (and never-was-any) restrictive-covenant that regulated/restricted the size, height, width, shape of bushes/trees. [JSP]'s racist/abusive/fraudulent/threatening rhetoric against the plaintiff and the timeline of these incidents reveal very clearly that the then [HOA] run by [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH] continued to act predatorily against the plaintiff based on the predatory demands of [JSP&KAP],[RSR] - even sending fictitious or fraudulent [DRV] notices (β) to the plaintiff - despite the fact that the plaintiff had, on numerous occasions, informed all members of the [f-HOA-BoD]s (for many years) that both [JSP&KAP],[RSR] acted, on numerous occasions, with both extreme-racial-animus and homophobic-animus against the plaintiff:

▸ RECORDED RACIST, ABUSIVE, FRAUDULENT, AND THREATENING RANT FROM [JSP] TO THE PLAINTIFF(▸) :    {2019-04-30 17:00} (~)
▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

〖 PLAINTIFF STARTS TO OPEN AND PHOTOGRAPH NEW CORDED-ELECTRIC EQUIPMENT. 〗
〖 [JSP] APPROACHES PLAINTIFF AND YELLS OUT ANGRILY/THREATENINGLY TO THE PLAINTIFF: 〗

[JSP]        *[???] OFF! ... PIECE OF LAZY SHIT! ... YOU ARE SUCH A TOTAL ASSHOLE! ... [???] ... DO EVERYTHING THEY TELL YOU TO DO - JUST - JUST WHAT YOU HAVE TO DO TO GET BY - YOU LAZY SACK OF SHIT! ... I'M SO TIRED OF LOOKING AT YOUR FUCKING PISSHOLE OVER THERE! ... [???] ... CAUSE YOU'RE A LAZY SACK OF SHIT! ... WHY DON'T YOU GET A FUCKING JOB! - AND BE A REAL [???] - INSTEAD OF SOME WEIRDO, FREAKO! ... [???] BULLSHIT!*

〖 [JSP] WALKS BACK TO THE DRIVEWAY OF [784KLLTX78641]. 〗
〖 PLAINTIFF CONTINUES TO PHOTOGRAPH/UNBOX NEW CORDED-ELECTRIC EQUIPMENT, WHILE BEING TRAUMATIZED BY INCIDENT. 〗
〖 [NP] WAS NEAR [784KLLTX78641] DRIVEWAY DURING AT LEAST PART OF THIS INCIDENT, MEANING HE WAS A WITNESS. 〗

# ¶429

At some point in time during the year {2019}, [RSR] either files-lawsuit or tries-to-litigate such lawsuit against another person in a Court within the County of Williamson. The plaintiff has not reviewed any of these particular Court documents (since, to the best of the plaintiff's knowledge, defendant [WC] does not make such Court documents available online for download), and the plaintiff has not reviewed any of the evidence involved in such case. However, it appears to the plaintiff that at some point in time after the respondent of [RSR]'s lawsuit hires an attorney for representation in such lawsuit, such lawsuit was dismissed by such Court. Without reviewing such Court documents, the

allegations, and the evidence, the plaintiff cannot make any informed comment about the merit(s) (or lack-thereof) of [RSR]'s claim(s) specified in such lawsuit, but can only point to the fact that such lawsuit was dismissed and thus, did not, at least in such specific case, appear to result unfavorably for the respondent. The plaintiff draws attention to these facts because, for over a decade, [RSR] had been predatorily blackmailing the plaintiff (including, but not limited to, menacingly threatening to sue the plaintiff), but as the records will indicate, [RSR] never did directly take any legal action(s) against the plaintiff. Instead, [RSR] (and her co-conspirators {JSP&KAP}) successfully blackmailed the [HOA] to file lawsuit against the plaintiff (in the prior year of {2017}), and [RSR] (and her co-conspirators [JSP&KAP]) would eventually and successfully demand [WCLE] (in the following years {2020,2021}) to press charges against the plaintiff for the plaintiff's failure and/or *"inability"* to maintain even private areas of the plaintiff's property (specifically [BACKYARD]) according to White-American standards, although such purely-retaliatory prosecution against the plaintiff relied upon one-or-more fraudulent statements, and one-or-more pieces of fabricated evidence (that, in and of itself, was also a result of another crime of criminal-mischief committed against the plaintiff by [RSR]'s co-conspirators, [JSP&KAP]). As these particular set of facts show, clearly, if [RSR] did have any legitimate legal claims against the plaintiff as she had fraudulently made numerous threats to sue the plaintiff about, she would have filed such lawsuit against the plaintiff. But as any reasonable observer that looks at all of [RSR]'s predatory and malicious conduct against the plaintiff (motivated by her extreme racial-animus against the plaintiff) would conclude, there would be little-to-no chance of such claims being considered reasonable by any fair-and-impartial finder-of-fact.

## ¶430

On or about nighttime during a night in the middle of the year {2019} (in the approximate month of {2019-06}), the plaintiff had parked the plaintiff's vehicle on the street in a manner so that the plaintiff could more-easily unload large pieces of lumber that the plaintiff needed to perform some landscaping work in the [BACKYARD]. [RSR] almost immediately begins to harass the plaintiff, fraudulently claiming that the plaintiff's vehicle is in her way - that [RSR] could not exit her driveway in her vehicle due to the plaintiff's vehicle, and demanding multiple times that the plaintiff immediately remove the plaintiff's vehicle out of her way. The plaintiff - fearing that [RSR] will once-again call [WCLE] on the plaintiff as she has done on multiple occasions in the past - reluctantly and frustratingly moves the plaintiff's vehicle even though the vehicle was clearly not, in any way, obstructing [RSR]'s access to drive her vehicle down the street. Despite of the fact that the plaintiff did move the plaintiff's vehicle in order to placate [RSR]'s fraudulent complaint, the plaintiff then notices that [RSR] did not drive and never intended to drive her vehicle out of her driveway at [789KLLTX78641], and thus had made such fraudulent demands of the plaintiff solely to maliciously harass the plaintiff. Instead, [RSR] walks across the street towards [JSP] who was in the front-yard of [784KLLTX78641], and initially begins a racist, abusive and surprisingly-uninformed rant about the plaintiff and the plaintiff's political yard-signs in her speech to [JSP]: *"HE HAS THIS YARD-SIGN SAYING "TAX THE WEALTHY"! ... DOES HE KNOW THAT THE WEALTHY PAY [???] IN TAXES EVERY YEAR! ... YEAH, BUT WHEN HE'S SUCKING ON HIS MOTHER'S TEAT FOR THE REST OF HIS ADULT-LIFE! ...".* [JSP] laughs in response and mutters something inaudible to [RSR] in the background. The plaintiff - without responding to the racist, abusive and surprisingly-uninformed statements - continues to work, unloading the large pieces of lumber into the [BACKYARD]. This incident reveals very-clearly that the extreme-animus against the plaintiff shared by [RSR],[JSP&KAP] is not only of extreme-racial-animus (and homophobic-animus), but also of far-right-wing-extremist political-animus. The incident also reveals very-clearly that both [RSR] and [JSP] seem to be grossly misinformed about the history - including the history of regressive tax-brackets/marginal-tax-rates, the lack of taxation on Wall-Street transactions, the trillions of dollars in tax-payer-funded bailouts injected into Wall-Street after the many financial crises (over the many decades), the various tax loopholes, the various tax havens, etc. - of unjust wealth-creation, unjust wealth-accumulation and unjust wealth-

distribution in the United States - a complete lack of understanding that is also not uncommon amongst most far-right-wing-extremist circles. The incident also reveals that [RSR] seems to be in the fringe-minority (or far-right-wing-extremist minority) when it comes to the issue of taxation - as the plaintiff is merely espousing a political view that is overwhelmingly-supported by approximately 75% of Americans, as polling data has consistently shown (ω). These racist, abusive statements made by [RSR] against the plaintiff were not only intended for [RSR] to impose [RSR]'s strong sense of racial-superiority and intellectual-superiority over the plaintiff, but also, to get the plaintiff to remove the political yard-signs, in egregious violation of the plaintiff's first-amendment rights. Not only does this incident follow a long pattern of extreme-racial-animus, homophobic-animus, far-right-wing-extremist-political-animus and deliberate-deprivation-of-political-speech by [RSR] against the plaintiff, but also further reveals very clearly to the plaintiff that the decade-long racketeering-enterprise and criminal-conspiracy against the plaintiff - with the conspiracy consisting at least of [JSP&KAP], [RSR] and [WCLE] - also includes substantial far-right-wing-extremist political-animus and not just simply extreme-racial-animus,homophobic-animus. It does not surprise the plaintiff that the plaintiff's one yard-sign-slogan (of the plaintiff's many yard-sign-slogans) that reads - *"Tax the Rich"* - generates the most anger, the most animosity and the most backlash from the plaintiff's predatory, far-right-wing-extremist neighbors [RSR],[JSP&KAP] precisely because such yard-sign-slogan is espousing the plaintiff's political view that is overwhelmingly supported by the huge mainstream-majority of Americans. Finally, on one-or-more of her malicious social-media posts against the plaintiff, [RSR] publicly identifies herself as a registered-nurse [RN] (see above). National-Nurses-United [NNU] - the nation's largest union of [RN]s - publicly endorsed Bernie Sanders' United States Presidential Campaign in {2016} - and vigorously campaigned for Bernie Sanders' democratic-socialist campaign at many nationwide campaign events. [NNU] advocates for *"Medicare-for-All"* (single-payer health-care) that is also vigorously advocated by democratic-socialists, and that is also, generally-speaking, strongly-opposed by the wealthy, financial institutions and far-right-wing-extremists. [NNU] even participated in some of the *"Occupy Wall Street"* protests - vigorously advocating for a tax on Wall-Street transactions. So, the plaintiff finds this aspect about [RSR]'s political-profile to be particularly astonishing and revealing, as it indicates that [RSR] seems to be within the fringe-minority (or far-right-wing-extremist minority), even within her own profession. Most importantly, both [RSR],[JSP&KAP] have, on numerous occasions, resorted to such malicious, underhanded tactics to get the plaintiff to remove the plaintiff's yard-signs (in total violation of the plaintiff's first-amendment rights) because such yard-signs debunk the malicious, fraudulent and defamatory (⊕) narrative of racist-propaganda that [RSR],[JSP&KAP] had been relentlessly and maliciously spreading/advancing about the plaintiff for a decade. For example, the plaintiff's yard-sign-slogan *"Tax the Rich"* debunks [RSR]'s and [JSP]'s decade of fraudulent propaganda against the plaintiff that the plaintiff is *"selfish"* and/or *"inconsiderate"*, but to the contrary, proves that the plaintiff is an altruist that strongly advocates for an egalitarian and classless world.

## ¶431

On or about an the date and approximate time of {2019-06-25 20:45}, [JSP] approaches the border of the two-properties in-order-to threaten the plaintiff about cables of the plaintiff's security cameras, which at that point in time, were still dangling and, thus, visible. Specifically, [JSP] threatened to enter onto the plaintiff's property and cut the plaintiff's security-camera-cables. On or about a day in the middle of the month of {2019-07}, the plaintiff received a notice from the then [HOA] (still run by the [f-HOA-BoD][SPOA-P-BC],[SPOA-VP-AH]) requesting the plaintiff to file approval documents for the need for *"excessive cables"* (referring to the plaintiff's security-camera-cables) which were, at that moment in time, visible from the street at the plaintiff's property. Again, the evidence clearly shows that both [JSP&KAP],[RSR] constantly threatened the [HOA] to take legal action against the plaintiff to uninstall most (if not all of) the plaintiff's security cameras - an action that is a violation of homeowners' rights, forbidden by Texas law [TPrC-T11-C202-§202.023(c)]. In other words, both [JSP&KAP],[RSR] wanted to continue committing racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff without the plaintiff's

security-cameras recording their criminal actions. To a substantial degree, the [f-HOA-BoD] - particularly [SPOA-P-BC],[SPOA-VP-AH] - were still illegally conspiring with [JSP&KAP],[RSR] (and their co-conspirators) to help-accomplish [JSP&KAP]'s,[RSR]'s predatory goals against the plaintiff. Since this earlier moment in time during the year {2019}, in the following months and following years of {2020} through {2022}, these very same security-cameras would end up capturing a huge number of racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses aggregately committed against the plaintiff by [JSP&KAP],[RSR],[WCLE] against the plaintiff. Therefore, had the plaintiff caved-into [JSP&KAP]'s,[RSR]'s predatory demands, the plaintiff would have been unable to accumulate all of this additional extremely-incriminating evidence against the defendants - all acting in such malicious conspiracy and racketeering-enterprise against the plaintiff. Thus, the plaintiff considers any existing or future action (after this moment in time) by the defendants to intimidate and/or coerce the plaintiff to remove such security-camera(s) to be a separate and distinct count of the federal crime of Obstruction-Of-Justice.

## ¶432

On or about the date and approximate time of {2019-07-03 20:00} (still daylight hours), [JSP], while in the driveway of [784KLLTX78641], and while both plaintiff,[MOTHER] were at the plaintiff's property [788KLLTX78641] working to plant some vegetation in the [BACKYARD], uses some type of projectile-weapon to aim and maliciously shoot-into one of the plaintiff's corner security-cameras, two-or-more times, shattering the front-glass and destroying the infra-red/night-vision sensor/LED(s) of such security-camera. The plaintiff did not notice the damage until the end of the month (see below) since the security-camera still continued to record, but without infra-red night-vision at night-time. Despite of the damage to such security-camera, such security-camera still did capture [JSP]'s racially-motivated criminal action of criminal-mischief against the plaintiff.

## ¶433

On or about the date of {2019-07-03}, the then [HOA-BoD]s (led by [SPOA-P-BC],[SPOA-VP-AH]) send the following email messages (see below) to all residents of the subdivision, ahead of July-Fourth, reminding all residents that the lighting of fireworks is illegal within the subdivision. The plaintiff asserts that such repeated emails from the [HOA] are truly disingenuous because neither the [HOA] nor [WCLE] truly-and-seriously intended to enforce the fireworks-ban restrictive-covenant (and the Texas law of Disorderly-Conduct) within the neighborhood. Also, while such [HOA-BoD]s disingenuously proclaimed to be against the lighting of fireworks, on or about the following date of {2019-07-07}, a resident post onto social-media asking other residents to contact her if such residents have *"suffered property damage, personal injury, loss of use of (their) property on or around July 4th, or January 1st, due to neighbors igniting aerial fireworks (in direct opposition to our DCCRs)"*. As a result of this lack-of-enforcement, the rampant lighting of fireworks in the neighborhood (by countless residents of the neighborhood) continued through this year and following years (as evidenced by numerous social-media-postings by numerous residents complaining about such issue).

> "Summerlyn: Burn Ban and Fireworks" :    EMAIL FROM [HOA-BoD]s TO ALL [Summerlyn]  RESIDENTS CONCERNING "FIREWORKS BAN"    (2019-07-03 15:40)(~)
> [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]
>
> [HOA-BoD]s

*Dear Homeowners:*

*With tomorrow being the Fourth of July, we wanted to remind everyone that the association documents strictly prohibit the use of fireworks in the community. Specifically, this language can be found in Section 3.4. "(l) Uses Specifically Prohibited," of the DCC&R's of the Declaration of Covenants, Conditions, and Restrictions.*

*The Liberty Hill Fire Department has confirmed there is a burn ban in effect in Williamson County at this time. Fireworks are prohibited in the county during this burn ban. This may be enforced by any duly-commissioned peace officer. It is a class C misdemeanor that is punishable by a fine up to $500.*

*We hope everyone has a safe and enjoyable Independence Day!*

*Regards,*

*Board of Directors*

---

▷ "Summerlyn: Correction to Burn Ban" :   EMAIL FROM [HOA-BoD]s TO ALL [Summerlyn] RESIDENTS CONCERNING "FIREWORKS BAN"   {2019-07-03 16:58} (~)
▷ [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

**[HOA-BoD]s**      *Dear Association Members:*

*An eblast was sent out earlier today stating the Liberty Hill Fire Department has confirmed there is a burn ban in effect in Williamson County. This information was sent by mistake. Please disregard.*

*However, with tomorrow being the Fourth of July, we wanted to remind everyone that the Association documents strictly prohibit the use of fireworks in the community. Specifically, this language can be found in Section 3.4. "(l) Uses Specifically Prohibited," of the DCC&Rs of the Declaration of Covenants, Conditions, and Restrictions.*

*Have a safe and enjoyable Independence Day!*

*Regards,*

*Board of Directors*

---

▷ "RE: Fireworks in Summerlyn (Only)" :   Nextdoor Summerlyn Leander:   D***** D****:   {2019-07-07 22:28}:
▷ https://nextdoor.com/news_feed/?post=117308803
▷ [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

**D***** D******      *If you've suffered property damage, personal injury, loss of use of your property on or around July 4th, or January 1st, due to neighbors igniting aerial fireworks (in direct opposition to our DCCRs), or if you want to support an effort to curtail dangerous fireworks in Summerlyn, please contact me ASAP.*

# ¶434

On or about the date and approximate time of {2019-07-11 15:00}, [WCCD-RT] and/or other [WCCD]s, once-again, visit the plaintiff's private-property while the plaintiff was not at the plaintiff's private-property. The plaintiff notices that [WCCD-RT] and/or other [WCCD]s left a pink-slip attached to the plaintiff's [FRONTDOOR]. The pink-slip, once-again, concerned a complaint concerning the alleged violation of the Public-Nuisance law within private-areas of the plaintiff's private-property - specifically, the plaintiff's private/concealed [BACKYARD]. The pink-slip required the plaintiff to take appropriate corrective/abatement action to cure such alleged Public-Nuisance either within 10 days or 30 days of {2019-07-11}. The plaintiff has yet to review the plaintiff's security-camera footage from this particular incident, but based upon both the allegation(s) and [WCLE]'s well-documented history of unconstitutional-and-unlawful searches/seizures of private/concealed/curtilage areas of the plaintiff's private-property, the plaintiff asserts that [WCCD-RT] and/or other [WCCD]s, more-likely-than-not, executed an unconstitutional-and-unlawful search/seizure of the plaintiff's private-property on this particular incident as well.

# ¶435

On or about the date and approximate time of {2019-07-16 13:38}, the plaintiff responds to the public-nuisance complaint alleged by [WCCD-RT] via email (which also included, as forwarding/attachment, the plaintiff's previous email to [WCCD-RT] from almost 2 years prior) as follows:

> "Full Compliance and Response to Warning Slip Dated: 2019-07-11 15:00" :   EMAIL FROM PLAINTIFF TO [WCCD-RT] (►)   (2019-07-16 13:38)(~)
> [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

**PLAINTIFF**        *Hello Senior Deputy Tijerina,*

*This is Sid Kode - property owner of "788 Kingfisher Lane, Leander, TX, 78641".*

*This email is in response to your pink slip left at my doorway on 2019-07-11 3PM, concerning complaint(s) made about the property.*

*Please read through this entire email not only for the important information that it contains, but also because, at the bottom, I have listed the actions I am-taking/have-taken to satisfy your request(s) to the maximum extent possible.*

*I believe we had discussed this issue in prior (my previous email to you from 2 years ago is attached below).*

*To summarize:*

*[1] Regarding mosquitoes, I can assure you that there are no mosquitoes originating from my property:*

*(A) Over the last 2 years, I have been putting mosquito dunks regularly (once a month) in all buckets used for rainwater harvesting - please see the attached photograph. These mosquito dunks are pretty effective at preventing the growth of mosquitoes, and I have not seen any mosquito larvae in any of the buckets that I use.*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                     1696907690

(B) I turn upside-down any buckets/containers that I am not currently using.

(C) I have a window-fan mounted on the one of the windows in my house - used for cooling the house. If mosquitoes were originating from my property, then I would be experiencing mosquitoes biting me inside the house, which I do not - over the decade that I have lived here, I have not even encountered even 1 mosquito inside my house.

(D) The only critter I have noticed is plenty of frogs/toads and it is important not to confuse tadpoles with mosquito larvae - tadpoles are much bigger, live on the algae, and mature frogs/toads feed on many insects including mosquito larvae.

(E) Whenever I empty the buckets to water my plants, I have not noticed any mosquito larvae.

(F) I am not the only one using buckets for rainwater harvesting - in fact, the idea was even documented in an episode of the very mainstream, local public television show "Central Texas Gardener".

(G) I am almost always without a shirt during the hot months - late Spring (May) until early Fall (October) - so, it is obviously not be in my own interest to maintain an environment that produces mosquitoes.

(H) As explained in my previous email, my harvesting of rainwater is not limited to the watering of plants, but also for all of the previously specified uses.

(I) I am also using some buckets/containers for the other purposes unrelated to harvesting rainwater, and for all of these uses, these buckets/containers have drainage holes at the bottom for excess water to drain out: growing some potted plants, collecting useful materials like stone and other re-usable debris that can be re-used for all of the uses specified in my previous email.

(J) So, the most likely possibility is that, after heavy rains, water is accumulating inside some hidden low-lying area around my property or surrounding properties, and this is the area that the mosquitoes are breeding from - again, not from within my property.

(K) It is also possible that some malicious neighbor might be intentionally breeding mosquitoes somewhere around my property and then trying to frame me for this misdeed.

[2] Regarding vegetation, there is no vegetation that I am growing that is any way non-compliant with the law:

(A) I have tortoises that feed on the grass in my backyard - so, there is no grass that is above 6 inches in height.

(B) As part of the xeriscape, I have also replaced much of the grass in both frontyard/backyard with a very low-growing, drought-tolerant grass that does not grow over 6 inches in height.

(C) The only other vegetation besides grass are: herbs, vegetables, groundcovers, forage-crops, cover-crops, shade plants, foundation plants, barrier plants, windbreaks - none of which are weeds.

(D) I have planted about half of my backyard to vegetables/herbs.

(E) Besides that, the remaining cover-crops/forage-crops/shade-plants/windbreaks are native species designed to keep the soil fertile and moist, and the forage is for when my tortoises do not have enough grass vegetation to eat (July-August).

SIDDHARTH  KODE    V.    WILLIAMSON  COUNTY ,  ET  AL.                    1696907690

(F) Much of this vegetation also provides valuable shade to my tortoises during the summer months.

(G) This vegetation makes for an effective windbreak that helps to ensure that nearby fencing does not weaken/fall-down during heavy winds - This is particularly true since my next-door neighbor has not fixed the fencing on his side for almost a decade now - leaving it in a state of significant dis-repair.

(H) The vegetation growing around the foundation of the house serves the vital function of protecting the foundation from damage and thus serves to extend the lifespan of the foundation and house - such vegetation sucks up excess moisture from the foundation area, while at the same time ensuring that the soil remains consistently moist even during the hot summer months - this is exactly what a house foundation needs.

(I) Some of this vegetation also serves as a visual and physical barrier to prevent my tortoises from entering into areas of the backyard where I do not want them to enter (for example, where my vegetables/herbs are growing, or into the backdoor concrete porch area).

(J) As documented in the extensive documentation that I provided to you in my previous email, such vegetation most certainly does not enhance the growth of mosquitoes - in fact, quite the opposite - vegetation sucks up much of the surface-level moisture that could otherwise serve as a breeding ground for mosquitoes.

(K) Also documented in the extensive documentation that I provided to you in my previous email, all landscaping including vegetation is considered to be constitutionally-protected speech. As such, no governmental authority can unjustly infringe on such constitutional rights.

(L) Also documented in the extensive documentation that I provided to you in my previous email, the growth of such vegetation is very-much tied to my eastern-indigenous cultural upbringing (since I was born in India and lived there for much of my early life) - and so, such landscaping is constitutionally-protected under freedom of religion. As such, no governmental authority can unjustly infringe on such constitutional rights.

(M) As stated in my previous email, and following along with long-standing eastern-indigenous traditions that are still practiced to this day, I grow vegetables/herbs along with naturally-occurring native plants since this: enhances the water retention in the soil, allows the vegetables/herbs to survive more extreme (hot/cold/dry/wet) conditions, increases the nutritional value of the vegetables/herbs, etc.

(N) As documented in the literature linked to in my previous email, there is plenty of online documentation for "no-mow", zero-waste, drought-tolerant, chemical-free, wildlife-friendly landscaping, and it is indeed the right of the property owner not to mow (as it still is in many farm/rural areas).

(O) In some areas of the backyard, the soil is up to 2 feet higher than the standard grading - this raised bed of additional soil allows the plants more room for their root systems to grow deep (and thus become more hardy). This also means that any vegetation that you might perceive to be of a certain height is actually up to 2 feet shorter due to growing from a higher elevation.

(P) For any vegetation that I do choose to cut, I usually spread these across certain areas of the landscape and this serves not only as forage for my tortoises but also as mulch to keep the soil moist, fertile and temperature-regulated, which are very beneficial conditions for growing vegetables/herbs.

So, as I explained to you in my previous email (from 2 years ago), the neighbors that are complaining to you about my property are doing so for very malicious reasons - and it has very little to do with the way I maintain my property, but instead, everything to do with my: race/ethnicity/culture, disability-status, politics, environmentalism, foreigner-status, etc.

Put simply, I (or anyone else in my position) should not have to compromise my native/indigenous way of life to satisfy narrow-minded/bigoted/racist neighbors that do not have any respect for me (in particular) or native/indigenous culture (in general).

But yet, over the many years, I have been bending-over-backwards trying to satisfy these neighbors' completely-unreasonable/unjustified demands.

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.

1696907690

*Also, as I documented in the documentation provided my previous email, no governmental authority can legally act upon anonymous complaints, and as such, the accused always has the right to know who his/her accusers are.*

*On the other hand, there are many horrible things that some of my neighbors have been doing that I have had to put up with for many, many years now, despite the fact that I should not have to put up with it:*

*(A) Some of my neighbors spray/spread toxic pesticides/herbicides/insecticides on their yards, and much of this spray/spread inevitably lands up on my yard as well (either directly or indirectly from the leaching of rainwater) where I am growing vegetables/herbs - many of these chemicals (including but not limited to RoundUp) have even been proven to be cancer-causing carcinogens. In some cases, this chemical spraying has been so great that it has caused me to become sick - since one window in my house has the window-fan mounted - I am being exposed to all of these very-toxic chemicals, again, by no choice of my own.*

*(B) Some of my neighbors light fireworks at various points during the year - this is a huge fire hazard, a huge damage (both acute damage and long-term/cumulative damage) to hearing of individuals nearby, a huge disruption to sleep/work schedules, and of course all of the air/land pollution that it causes - and some of the debris from these illegally-lit fireworks also lands on my yard.*

*(C) One of my neighbors even sometimes lights bon-fires in his backyard forcing me to inhale much of that toxic smoke - obviously, by no choice of my own.*

*(D) Two of my neighbors have been threatening me with violent threats for many, many years now - I weigh about 105 pounds and these people are easily up to 3 times my weight - so, I would not stand a chance of surviving if these people acted upon these violent threats directed towards me.*

*(E) I even put up many security cameras on my property to help protect me and my property, and one of my neighbors even threatened to break all of my security camera equipment in addition to beating me up, to paraphrase his words, "so that I would not even be able to remember or even prove what happened [if something did happen]".*

*(F) These neighbors have also repeatedly used extremely-derogatory and verbally-abusive language towards me including (but not limited to) extremely foul language/name-calling, racial slurs, homophobic slurs, and other racially-disrespectful/culturally-disrespectful language.*

*(G) I have also spent about $3000 in materials and $5000 of my own hard, exhausting, manual labor to fix/fortify the shared fence that I share with 2 of my neighbors at absolutely no cost ($0) to them - even though neighbors are supposed to evenly split the cost of both labor and materials.*

*So, given the above facts, I hope you can understand how I feel a strong sense of injustice/indignation that I have been thoroughly mistreated and indeed abused by some very-hostile neighbors, who very clearly, continue to act in very malicious ways towards me.*

*And surely, give these facts, you can understand how I feel very strongly that I am being discriminated against.*

*Having said all of the above, in response to this unjustified complaint, I have taken extra measures to cut a lot of (but not all of) the backyard cover-crop/forage-crop/shade-plant/foundation-plant/barrier-plant/windbreak vegetation to be feed to my tortoises, despite the fact that I should not have had to do this (as explained above).*

*I have also checked every single bucket/container multiple times to re-ensure that there are no mosquito larvae, and also that there is a dunk installed in*

*each bucket/container that is being used to harvest rainwater.*

*I will also occasionally run my electric mosquito bug-zapper to help to kill mosquitoes, despite the fact that mosquitoes are not originating from my property.*

*I sincerely hope that these additional actions that I have taken fully resolves this issue (if there was even one to begin with).*

*And as always, I hope that we can always cooperate to find a reasonable middle-ground between my indigenous/environmentalist needs/lifestyle and these neighbors extremely-unreasonable/unjustified demands.*

*Respectfully,*

*Sid Kode.*

*-------- Forwarded Message --------*

*Subject: Full Compliance and Response to "Warning Citation", Case# 2017-08-0008*

*Date: Sun, 1 Oct 2017 04:52:23 +0000*

*From: ****************** <****************>*

*To: **************@wilco.org*

*CC: ***********@wilco.org*

# ¶436

On or about the date of {2019-07-18}, [KB], the wife of [CB], electronically sends a private message (via the same *"nextdoor.com"* social-media-platform) to the plaintiff, revealing that [CB&KB] (next-door neighbors to the plaintiff) were trying to sell their property [792KLLTX78641], and as such, kindly requesting that the plaintiff handle the issue of the plaintiff's dangling security camera cables that were, at that point in time, visible from the street, so that such cables did not look like an *"eye sore"* to prospective buyers of their property. Surprisingly and very-revealingly, in such private message, [KB] states to the plaintiff, *"I would like to resolve this issue as civil as we can, as I know you have not had the most pleasant experiences with other neighbors."* This very-revealingly message shows that one-or-more of the plaintiff's other neighbors were, at least to some degree - although to a very small degree - aware of the malicious actions/behaviors of [RSR], [JSP&KAP] against the plaintiff.

# ¶437

At that point in time, the plaintiff was checking the Inbox for such social-media account roughly twice a month, and so, the plaintiff responded, via private message, on or about the subsequent date of {2019-07-21} that the plaintiff would take care of the issue, but that it would take time to do so, as it would involve *"at least 20 to 30 hours worth of work"* (see exact message posted below). The plaintiff indicated to [KB] that it would take the plaintiff *"at least 2-3 weeks"* to complete such task, but in actuality, the plaintiff was spending several more hours per day in achieving such task so that the task could be completed by the end of that same month. [KB] then replied to the plaintiff, thanking the plaintiff for being understanding and even offered to help *"in any way possible"*, although the plaintiff single-handedly completed almost all of this task, with some help from [MOTHER] (see below).

---

▷  **"Re: Seller Concerns"**  ‹  **PRIVATE MESSAGE FROM PLAINTIFF TO [KB]** (⊦)   {2019-07-21 22:52} (~)
▷  [ **PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY** ]

**PLAINTIFF**          *Hello Mrs. B\*\*\*\*\*\*\*\*\*\*\*\*,*

*Sorry for the delayed response as I have been extremely busy as of late, and did not get to check this account until tonight.*

*To answer your question/request - yes I can, but it is certainly not a quick-fix thing.*

*It is at least 20 to 30 hours worth of work.*

*I cannot really start the work until next weekend (2019-07-27) at the earliest.*

*The way the wiring is currently setup originates from that side of the property closest to your property.*

*So, fixing the issue means fixing all of the wiring - in essence, the entire job.*

*I will try my best to start the process off by next weekend, but the total job will most probably take at least 2-3 weeks from today to complete.*

*Sincerely,*
*Sid Kode.*

---

# ¶438

On or about the date of {2019-07-24}, the then [HOA-BoD]s (led by [SPOA-P-BC],[SPOA-VP-AH]) send the following email message (see below) to all residents of the subdivision, scheduling a *"Special Board Meeting"* in-order-to *"approve the Board Member Code of Conduct and the discussion of a plan that will enforce the 'no fireworks' provision of the deed restrictions."* Shortly following this email-message, one-or-more residents posted a copy of this email onto the *"nextdoor.com"* social-media-platform, in an effort to inform countless residents within the subdivision who had repeatedly demanded the [HOA-BoD]s to strictly-enforce the fireworks-ban within the neighborhood. Even in the most innocent interpretation of such email, such email also shows that the [HOA-BoD]s were beginning to enforce the fireworks-ban after over a decade in which the plaintiff resided within the subdivision - with the fireworks-ban restrictive-covenant being in place that entire period of time - dating back to when the contract was first drafted (during the {2004}/{2005}/{2006} time-period). In other words, such email shows that neither the [HOA] nor [WCLE] took any real enforcement/legal action to enforce the fireworks-ban restrictive-covenant in the first 10 years ({2009} through {2019}) that the plaintiff had resided within the neighborhood. Despite such phony efforts by the [HOA-BoD]s who pretended to be enforcing such fireworks-ban, the plaintiff noticed absolutely no difference on the street as [JSP&KAP] and/or countless other residents would continue to illegally light fireworks, unabated, in complete violation of the restrictive-covenants of the neighborhood for all of

the following years - including the current year {2023}.

> "Summerlyn: Special Board Meeting Notice" › EMAIL FROM [HOA-BoD]s TO ALL [Summerlyn] RESIDENTS CONCERNING "FIREWORKS BAN" {2019-07-24 13:31}(~)
> [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

**[HOA-BoD]s**      *Dear Association Members:*

*The Board of Directors for Summerlyn Property Owners Association Inc., has*
*scheduled a Special Meeting of the Board.*

*\*Meeting Information\**
*When: Tuesday, July 30, 2019*
*Time: 7:00 p.m.*
*Location: \*\*\* \*\*\*\* \*\*\*\*\*, Meeting Room, \*\*\*\* \*\*\*\*\* \*\*\*\* \*\*\*\*, Leander, TX 78641*

*The subject of the meeting is to approve the Board Member Code of Conduct and*
*the discussion of a plan that will enforce the "no fireworks" provision of the*
*deed restrictions.*

*Regards,*

*Board of Directors*
*Summerlyn Property Owners Association Inc.*

## ¶439

On or about the date and approximate time of {2019-07-25 15:53} - approximately 9 days after the plaintiff's email to [WCCD-RT] - [WCCD-RT] responds to such email, requesting to meet with plaintiff at plaintiff's property. On or about the date and approximate time of {2019-07-26 06:35}, the plaintiff responds to [WCCD-RT] providing [WCCD-RT] with times during which the plaintiff would be available at the property for such meeting to take place. On or about the date and approximate time of {2019-07-26 16:03}, [WCCD-RT] sends email response to plaintiff, proposing a time for such meeting. On or about the date and approximate time of {2019-07-29 06:53}, plaintiff sends email response to [WCCD-RT], agreeing to such meeting-time:



> "Re: Full Compliance and Response to Warning Slip Dated: 2019-07-11 15:00" › EMAILS AND RESPONSES TO/FROM [WCCD-RT] AND PLAINTIFF(►) {2019-07-29 06:53}(~)
> [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

**PLAINTIFF**      *Hello Senior Deputy Tijerina,*

*Tuesday (2019-07-30) at 9AM should be fine.*

*Respectfully,*
*Sid Kode.*

On 7/26/2019 6:03 PM, Robert Tijerina wrote:

> How about Tuesday the 30th at 9 am?

>

> Robert

>

> -----Original Message-----

> From: ***************** [mailto:*****************]

> Sent: Friday, July 26, 2019 6:36 AM

> To: Robert Tijerina

> Subject: Re: Full Compliance and Response to Warning Slip Dated: 2019-07-11 15:00

>

> Hello Senior Deputy Tijerina,

>

>

> From today (2019-07-26) until Wednesday (2019-07-31) of the following

> week, I should be available at the property from approximately 06:30AM -

> 10:30AM.

>

> So, please let me know which of those times is best for you, and we can

> schedule it for that date/time.

>

>

> Respectfully,

> Sid Kode.

>

>

>

>

>

>

> On 7/25/2019 3:53 PM, Robert Tijerina wrote:

>> Mr Kode,

>>

>> I have received your email. I would like to set up a date and time to meet with you concerning the environmental complaint which we received. I am

available tomorrow and next week. Thank you for your response.

>>

>> Sincerely,

>> Robert Tijerina

>> Deputy Constable

>> William County Constable Pct. 2

>>

>> -----Original Message-----

>> From: ***************** [mailto:*****************]

>> Sent: Tuesday, July 16, 2019 1:38 PM

>> To: Robert Tijerina

>> Subject: Full Compliance and Response to Warning Slip Dated: 2019-07-11 15:00

>> *EXTERNAL email: Exercise caution when opening.*
>> _____

## ¶440

On or about the date and approximate time of {2019-07-30 05:00}, the plaintiff and the plaintiff's senior-citizen [MOTHER] were continuing to re-install the security-cameras-cables at [788KLLTX78641] before daybreak, since, in addition to [KB]'s request, the plaintiff had also received yet-another threatening notice (with deadline) from the then [HOA] regarding such cables being *"excessive"* and visible, again thanks, in no small measure, to predatory complaints from the plaintiff's predatory neighbors [JSP&KAP],[RSR]. As the plaintiff and [MOTHER] were working in this early morning, with the rest of the neighborhood silent, [JSP] yells out the racist threat at the plaintiff,[MOTHER]: *"HEY, ... GET THOSE CAMERAS OFF OF MY PROPERTY!"* While the plaintiff, having suffered such racist threats for a decade (at that point in time), has developed a *"thicker skin"* to be able to cope with such racist threats, [MOTHER] has not been directly exposed to such racist threats, and thus reacts in a traumatized/shocked manner to such threat **(↯)**. Neither the plaintiff nor [MOTHER] responded to the threat. As indicated in the previous incident, [JSP] had also recently threatened the plaintiff regarding the visibility of the dangling security-cameras-cables. When plaintiff,[MOTHER] were working to fix that very issue to secure/conceal the security-cameras-cables, [JSP]'s subsequent threat reveals that [JSP]'s previous threat really had absolutely nothing to do with the security-cameras-cables, but the actual security-cameras, again, because both [JSP&KAP],[RSR] wanted to continue to commit racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff with absolute impunity, without the plaintiff being able to have recorded evidence of such racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses. Towards the very-end of securing/concealing the security-cameras-cables, the plaintiff noticed the aforementioned corner-security-camera with shattered front-glass and damaged infra-red/night-vision sensor. The plaintiff was shocked by the brazen vandalism but immediately suspected the culprit. The plaintiff went to the security-camera-system-monitor to review the recorded-camera-footage, which clearly showed, sure enough, that [JSP] had shot into the camera using some type of projectile-weapon on-or-about the previous date of {2019-07-03}. However, this initial act of criminal-mischief by [JSP] against the plaintiff would only be one of many dozens of acts of criminal-mischief against the plaintiff, resulting in a sum-total of damages exceeding $1,700 to the plaintiff's security-cameras/equipment alone. In many of the subsequent months of {2019-08} through {2021-10}, [JSP] would continue to engage in criminal-mischief against multiple of the plaintiff's security-cameras and/or the plaintiff's property, by performing malicious actions, often repeatedly, such as:

Ⓐ using the same or similar aforementioned projectile-weapon to shoot into one-or-more additional security-camera(s), once-again shattering the protective glass of such security-camera(s), and thus obstructing the view of such security-camera(s).

Ⓑ repeatedly, or on many occasions, using a garden hose delivering municipal water at full-water-pressure to douse multiple of the plaintiff's security-cameras with water for, in many cases up to a minute, and in some cases, many minutes, in-order-to permanently damage/disable the internal electronics of such security-cameras.

Ⓒ repeatedly, or for a period of approximately 10 minutes, entering into the plaintiff's property in-order-to violently hurl large chunks of hard-ice at both the security-cameras, and the surrounding fascia/soffit/rafter/gutter (house structure) onto which such security-cameras are installed.

Ⓓ on one-or-more occasions, hurling rock(s) at such security-cameras, while the plaintiff was outdoors witnessing such incident, and with the plaintiff within a few feet of such security-camera.

Ⓔ entering into the plaintiff's property to kick and break one-or-more security-camera(s), permanently destroying the base of such security-camera(s), thus preventing a stable installation of such security-camera(s).

Ⓕ repeatedly, or on many occasions, using one-or-more torch lights to shine bright light directly into the lens of such security-camera(s) for a prolonged period of time, in attempt to permanently *"blind"* such security-camera(s).

The plaintiff asserts that the [JSP&KAP] were trying to destroy the plaintiff's security-camera(s) so that they could obstruct-justice and/or freely retaliate against the plaintiff in most, if not all, of the following ways:

Ⓐ [JSP&KAP] could continue to commit racially-motivated hate-crimes, racketeering-acts and other abuses against the plaintiff with absolute impunity.

Ⓑ [WCLE] could more freely engage in further acts of retaliation against the plaintiff, such as unconstitutional-and-unlawful search(s)/seizure(s) of the plaintiff's property and/or threaten predatory enforcement action(s) against the plaintiff as a way of further intimidating the plaintiff.

Ⓒ [JSP&KAP] could continue to violate the restrictive-covenants of the neighborhood (illegally lighting fireworks, illegally parking boats, illegally parking vehicles to obstruct the public-sidewalk, illegally speeding vehicles, multiple noise-nuisances such as running loud lawn-equipment late at night and running artificially loudened vehicles late at night, etc.) without such security-camera(s) capturing such violation(s).

Ⓓ [JSP&KAP] could destroy the actual security-camera recordings (assuming that they thought such recordings were stored inside such security-camera). In this lawsuit, the plaintiff has tried to document as many acts of [JSP]'s criminal acts of vandalism against the plaintiff's property as the plaintiff has taken the time to document, but this lawsuit (at least at the time of the initial filing), will not contain every single occurrence of such criminal acts, as the number of such acts of vandalism is too large (too numerous) for the plaintiff to keep track of every single occurrence.

# ¶441

On or about the date and approximate time of {2019-07-30 09:00}, the plaintiff arrives at the plaintiff's property in his police-vehicle. Before [WCCD-RT] started his interrogation of the plaintiff, the plaintiff wanted to first verify who had complained to the plaintiff on this particular occasion. Unlike every other occasion where [WCLE] has refused to disclose the complaining party to the plaintiff, [WCCD-RT] actually does inform the plaintiff that on this particular occasion, it was [JSP&KAP]'s,[RSR]'s co-conspirators - [CB&KB] - that had informed the [WCCO] that they were trying to sell their property, and as a result of making their property as-presentable-as-possible to prospective buyers, that they had allegedly noticed, excessive and clearly-visible security-camera-cables from the plaintiff's security-cameras dangling on the plaintiff's private-property, and that certain vegetation in the plaintiff's [BACKYARD] exceeded the height limitation of such public-nuisance law (although clearly, without any knowledge whether-or-not such vegetation were deemed to be *"weeds"*). [WCCD-RT] begins by asking many intrusive questions about the plaintiff's [BACKYARD], while the plaintiff reluctantly provides such information, purely to dismantle such baseless allegations of *"public-nuisance"* originating from the plaintiff's malicious neighbors. [WCCD-RT] first asks the plaintiff if the plaintiff always grows and/or partitions the plaintiff's [BACKYARD] for the growth of vegetables and/or groundcovers. The plaintiff reluctantly explains that the plaintiff normally partitions the [BACKYARD] in such manner that approximately half of such [BACKYARD] is either dedicated-to or reserved-for the growth of vegetables and/or groundcovers, while on the other half of the [BACKYARD], the plaintiff grows grass and other native-vegetation. [WCCD-RT] explains that when he had noticed vegetation in the plaintiff's [BACKYARD] which he claimed

was up to 5-feet tall. The plaintiff responds that the plaintiff had added up to 2 feet of soil in the middle/inner-most areas of the [BACKYARD] (closest to the [HOUSE]), as a result of the aforedescribed [FRONTYARD] grass-replacement; therefore, any such vegetation that he perceived to be 5-feet tall, was in actuality, no more than 3-to-4 feet tall. Furthermore, as the plaintiff had explained in the prior email to [WCCD-RT] (see above), all of such vegetation were intentionally-grown by the plaintiff, and so could not be rightfully considered to be *"weeds"* as defined under Texas law. At least on one occasion during such conversation taking place in the plaintiff's [FRONTPORCH], [WCCD-RT] used his police-radio to radio back to [WCCO] headquarters, some information concerning the status of this meeting taking place within the plaintiff's private-property. [WCCD-RT] mentions that one-or-more of the plaintiff's neighbors complained to the [WCCO] that they had to kill rodents within their private-property, as if somehow insinuating that such rodents originated from the plaintiff's private-property, although [WCCD-RT] qualified such statement by stating that he personally does not know where such rodents might have come from. Although the plaintiff has always denied that any part of the plaintiff's private-property (including [BACKYARD]) were a harborage for any non-zero amount of rodent(s), as the plaintiff explains in a section below, the only reason that such rodent(s) might enter into neighbor's private-property is because such neighbor has items within their private-property (including backyard) that attract such rodent(s) including, but not limited to, crumbs of dog/cat food, dog/cat faeces, etc. The plaintiff has also saved social-media-posting(s) posted by other residents of the neighborhood (that live far away from the plaintiff) dating back to {2014}, were one-or-more resident(s) announces that there are a *"lot of mice"* in the subdivision, and that one particular resident caught up to 6-mice within traps located inside of their garage. Therefore all of these complaints regarding the plaintiff alleging public-nuisance violation on the plaintiff's private-property were not merely fraudulent, but actually malicious and retaliatory (since the plaintiff had documented over almost a decade of hate-crimes/civil-rights-violations/racketeering-acts/abuses suffered by the plaintiff at the hands of such malicious neighbors). [WCCD-RT] also inquired about any rainwater harvested within the plaintiff's [BACKYARD], and the plaintiff responded that the plaintiff was using the aforementioned mosquito-dunks in any-and-all container(s)/tank(s) used for harvesting of such rainwater. [WCCD-RT] then exploited this moment of vulnerability of the plaintiff to pressure the plaintiff into allowing him to inspect the plaintiff's [BACKYARD], claiming that all he intended to do was to ensure that there was no public-nuisance violation within the plaintiff's [BACKYARD]. The plaintiff, being cornered into such position of vulnerability, but also firmly believing that was no such public-nuisance violation, allows [WCCD-RT] into the plaintiff's [BACKYARD]. As soon as the plaintiff enters into the plaintiff's [BACKYARD], [WCCD-RT] asks the plaintiff if any item(s) stored in the plaintiff was *"trash"*, once-again, using such vague term that is not defined in any part of the Texas public-nuisance law - and once-again, strongly indicating to the plaintiff, that the [WCCD]s of the [WCCO] were not properly-trained to be well-versed with the Texas law that they are supposed to be regulating. The plaintiff, assuming that the [WCCD-RT] meant either *"garbage"*, *"refuse"* or *"rubbish"* - since those are the actual terms defined by the Texas Public nuisance law - stated that none of the items stored in the plaintiff's [BACKYARD] were *"trash"* (or *"waste"* of any kind). The plaintiff further explains that the brush stored at one small-location in the plaintiff's [BACKYARD] was intended as a natural barrier (and shelter) to prevent the plaintiff's companion-tortoises from escaping (while also providing such companion-tortoises space to hide under - as they instinctively tend to do). [WCCD-RT] even intrusively asks the plaintiff about the number of companion-tortoises that the plaintiff within the plaintiff's [BACKYARD], as if any part of Texas Public-Nuisance law regulated any aspect of residents' lawful right to own such companion-animals within the confines of private-property (o) . As [WCCD-RT] is checking the plaintiff's rainwater-harvesting container(s)/tank(s), [WCCD-RT] asks the plaintiff how often the plaintiff adds mosquito-dunk to such container(s)/tank(s), while the plaintiff responded that, during the warm months of the year, the plaintiff adds the appropriate-amount of mosquito-dunk at least once a month. The plaintiff shows [WCCD-RT] where the plaintiff had turned any unused containers upside down, so that there was no possibility of mosquitoes breeding in such unused containers. The plaintiff shows [WCCD-RT] that while half of the plaintiff's yard is dedicated to grass, the other half of the plaintiff's property is dedicated

to growing a combination of groundcover(s) and vegetable(s)/herb(s). As [WCCD-RT] walks along the fence within the plaintiff's

[BACKYARD], the plaintiff points to a smaller section of the plaintiff's BACKYARD where the plaintiff was growing vegetable(s) (specifically

sweet-potato). The plaintiff further explains to [WCCD-RT] that the plaintiff cut-down to under 36-inches any sparsely-growing non-vegetable

vegetation that had been growing such height. There was only one small-area of the plaintiff's [BACKYARD] - approximately 40-square-feet

along the plaintiff's privacy-fence - where intentionally-grown vegetation was slightly above the 36-inches in height. The plaintiff explains that

the only reason for such intentionally-grown vegetation was due to such privacy-fence-posts on [JSP&KAP]'s property not being

repaired/replaced/supplemented, and instead of such unrepaired fence falling over into the plaintiff's [BACKYARD] as a result of such dis-

repair, the plaintiff was intentionally-growing such vegetation along the fence-line both serving as a wind-break and to also to prevent such

fence from falling onto the plaintiff's [BACKYARD]. The plaintiff further explains that the main reason that the plaintiff allowed [WCCD-RT]

into the plaintiff's [BACKYARD] was to show [WCCD-RT] that not only that was no public-nuisance violation in the plaintiff's

[BACKYARD], but specifically, that there was not even a single rodent anywhere in the plaintiff's [BACKYARD], despite both [WCCD-RT]

and the plaintiff stepping into specific areas of the plaintiff's [BACKYARD] where such vegetation was growing to the tallest heights. The

plaintiff even walked [WCCD-RT] through areas of the plaintiff's [BACKYARD] bordering [JSP&KAP]'s property, where the plaintiff had to

place large-heavy-metal stakes/posts in such position so as to prevent [JSP&KAP]'s fence from falling over into the plaintiff's [BACKYARD],

once-again, due to [JSP&KAP]'s malicious disregard for such fence shared by both the plaintiff and [JSP&KAP]. (At the very least,

[JSP&KAP]'s failure to repair such shared-fence for over 5 years at this point in time, was the direct result of their malicious attitude towards

the plaintiff, and also, their refusal to pay for any aspect of such property-maintenance that they are responsible for maintaining.) As the

plaintiff was leaving such area, [WCCD-RT] asks the plaintiff if there was any reason the plaintiff could not cut-down that particular vegetation

over 36-inches in height, located in that very-small region of the plaintiff's [BACKYARD]. The plaintiff responded that the only reason

(besides the reason of the wind-break serving to protect the shared-fence mentioned above), was that, as part of the plaintiff's religious

practice(s), the plaintiff normally uses a manually-operated scythe (handheld tool with a blade on it, as opposed to powered equipment) to cut

such vegetation, and whenever the plaintiff cuts such vegetation using such scythe, the plaintiff would also inevitably cut down parts of the

plaintiff's vegetables (meant for food consumption), and the plaintiff did not want to sacrifice/compromise the plaintiff's vegetables in such

manner. [WCCD-RT] asks the plaintiff what are the types of vegetables that the plaintiff is growing. The plaintiff responds that the plaintiff

grows mainly sweet-potatoes as such plants, once fully-established, are well-adapted to survive most of the intense-summer-heat-and-drought

(except in rare cases where such intense-summer-heat-and-drought extends for very long periods of time without any meaningful rainfall). The

plaintiff explains that although such plants die-back during with the onset of cold weather, they usually survive mild winters, and regrow the

following year. The plaintiff further explains that one of the other reasons for the growth of such taller vegetation is to insulate such vegetables

from both temperature-extremes - with such vegetation serving to absorb and protect/cover such vegetables during the most intense periods of

summer-heat-and-drought, as well as during the winter-freezes. [WCCD-RT] asks the plaintiff how long the plaintiff would be taking to cut

down the vegetation that exceeded 36-inches in height. The plaintiff reluctantly states that the plaintiff could do so within a couple of days. As

[WCCD-RT] approaches the plaintiff's fence-gate in-order-to exit the plaintiff's [BACKYARD], [WCCD-RT] confirms that the plaintiff's use

of such brush near the fence-gate area, was only to prevent the plaintiff's companion-tortoises from escaping from underneath such fence-gate.

The plaintiff reiterates that such brush not only serves as both a visual and physical barrier that prevents such companion-tortoises from

digging-and-escaping the plaintiff's [BACKYARD], but also that such brush allows them to hide (as they instinctively do) without having to dig

- as the plaintiff did not want the area near the plaintiff's fence-gate to be dug-up in any manner. As [WCCD-RT] exits the plaintiff's

[BACKYARD] into the plaintiff side-yard, the plaintiff explains to [WCCD-RT] that the plaintiff had been receiving threats of violence from

[JSP] for many years (actually dating back to the year {2012}). The plaintiff explains to [WCCD-RT] that, in recent years, [JSP] had increased his intimidation/interference and threats of violence against the plaintiff, some of which were even graphic in nature, and almost-all, if not all, of which qualified as *"terroristic-threats"* (and/or basic *"assault"*). [WCCD-RT] informs the plaintiff that the plaintiff would need to report such issue to [WCLE]. The plaintiff further explains to [WCCD-RT] that [JSP] had used some type of projectile-weapon to repeatedly shoot into one-or-more of the plaintiff's security-camera(s), damaging such security-camera(s) to the point where the infra-red/night-vision circuitry no-longer works, making such security-camera(s) ineffective at nighttime - the specific time of day when such security-camera(s) are most essential to the resident. The plaintiff leads [WCCD-RT] over to such area, points [WCCD-RT] to the specific security-camera(s), and shows [WCCD-RT] that such security-camera(s) have clearly been damaged, with the front-glass and infra-red/night-vision sensor(s) shattered. [WCCD-RT], once-again, informs the plaintiff that the plaintiff would need to report such issue to [WCLE], and that, within this particular unincorporated area of the County of Williamson, the [WCSO] handles such crimes. [WCCD-RT] leads the plaintiff back into the shade of the plaintiff's [DRIVEWAY] area, and then acknowledges that the plaintiff has cut-down most of the vegetation that the [WCCO] had requested the plaintiff to cut. But because the plaintiff still had such 40-square-feet of area were vegetation grew slightly in excess of 36 inches within the plaintiff's private/concealed/curtilage [BACKYARD], [WCCD-RT] explained that he would be issuing the plaintiff a public-nuisance warning-citation, requiring the plaintiff to cut down such vegetation to under 36 inches in height. [WCCD-RT] explains to the plaintiff that due to the issuance of such warning-citation, the plaintiff is not in violation of any law, but that the plaintiff would need to attend to such matter in avoid to being in violation of the (public-nuisance) law. [WCCD-RT] explains that if he finds that after such 7 day time-period of warning, that any such vegetation even in the plaintiff's private/concealed/curtilage [BACKYARD] is *"well over"* 36 inches in height, that he would then issue an actual citation to the plaintiff, in which case, the plaintiff would be forced to goto Court and explain to the Judge what the plaintiff's reasons were for growing such vegetation to such heights. The plaintiff confirms with [WCCD-RT] that such public-nuisance law specifically applied to residential-property and not to, for example, agricultural-property (since the plaintiff also owned a separate-and-distinct agricultural-property at that moment in time). [WCCD-RT] states that, as far as he knew, such law applies to all private-property in Texas, but that maybe something he would need to verify. The plaintiff further explains to [WCCD-RT] that, a few years prior to this conversation, the plaintiff had spoken to an employee of Texas-Parks-and-Wildlife about the plaintiff's agricultural-property and that such employee had jokingly informed the plaintiff, specifically regarding the plaintiff's agricultural-property that if there was such a restriction on the height of such vegetation within agricultural-property, then half of Texas's farmers would either *"be in jail"* or *"be ticketed big amounts of money"* for having huge amounts of land with such persistent, widespread and overwhelming violation of such law. [WCCD-RT] stated that as far as he knew, such restriction applied to all private-property, although there may be an exception to private-property that is meant for agricultural-use, but that he would still need to verify such unknown information and get back to the plaintiff about that. [WCCD-RT] reiterates that since [CB&KB] were trying to sell their property, [WCCD-RT] felt compelled to investigate such complaint against the plaintiff's private-property. The plaintiff responds that [CB&KB] had privately-messaged the plaintiff about such security-camera-cables and that the plaintiff took care of such issue in a timely manner. The plaintiff also informs [WCCD-RT] that the plaintiff had installed the shared fence alongside [CB&KB]'s property (without charging [CB&KB] for such work that normally would have costed such neighbors approximately $3,945). In-order-to terminate such meeting, [WCCD-RT] informs the plaintiff that he would be issuing the aforementioned warning-citation to the plaintiff, further informing the plaintiff that he would return in about a week to inspect the plaintiff's [BACKYARD] (even if the plaintiff did not provide such consent) and then, if the aforementioned remaining-issue had been resolved by such time, that he would simply close such case of warning-citation. [WCCD-RT] also intrusively asked about the plaintiff's cognitive-disability, and the plaintiff reluctantly explained in as-brief and as-inconspicuous manner as possible that the plaintiff was registered as a student with disabilities at [UT-Austin], without going into much detail about the nature of such

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                         1696907690

disability (for reasons of privacy). [WCCD-RT] continued to ask for the plaintiff's Date-Of-Birth, Middle-Initial, Drivers-License-Number and other private/sensitive information that he felt necessary for filling out such paperwork. [WCCD-RT] gets the plaintiff to sign the warning-citation, further warning the plaintiff that if the plaintiff did not fix such issue, that there would be an official citation which would involve having to go resolve such issue in a [WC] Court. As he was in the process of handing over a copy of such warning-citation to the plaintiff, [WCCD-RT] very-revealingly states that his particular department/office of the [WCCO] investigates public-nuisance complaints as well as illegal-dumping complaints. Such revelation truly-hurt the plaintiff as the plaintiff had been a victim of multiple illegal-dumpings over the years - especially during the initial years of {2010}, {2011}, {2017} (and the following years of {2020,2021}), but despite of all of those illegal-dumping (instantaneous) crimes being committed against the plaintiff, the plaintiff's reporting of most of such (instantaneous) crimes to the [WCLE], and the plaintiff's insistence that the appropriate charges be pressed against the perpetrators of such (instantaneous) crimes against the plaintiff, [WCLE] never pressed charges against any of the perpetrators of those (instantaneous) crimes against the plaintiff, once-again, solely due to the racial-profiles of the perpetrators (White-American) versus the racial-profile of the plaintiff (immigrant-of-color/indigenous-person). Multiple aspects of this conversation and [WCLE]'s numerous unconstitutional-and-unlawful searches/seizures against the plaintiff's private-property spanning approximately a decade, also reveal that defendant [WC], as a municipal-corporation government, and many of its law-enforcement agencies that the plaintiff abbreviates in this lawsuit as [WCLE], have custom(s), policy(s) and/or practice(s) that allow or even encourage its law-enforcement official(s)/officer(s)/employee(s) to clearly violate these Constitutional rights and Statutory rights, thereby failing to train and/or supervise such law-enforcement official(s)/officer(s)/employee(s) properly. After issuing such warning-citation to the plaintiff, [WCCD-RT] advises the plaintiff to report such crimes of terroristic-threats and criminal-mischief to the [WCSO], and leaves the plaintiff's property. Despite being very distrustful of [WCLE] in general, but also the [WCSO], in particular (due to prior incidents of retaliation suffered by the plaintiff at the hands of the defendants), the plaintiff did ultimately decide, in the long-term interest-of-justice, to report such crimes to the [WCSO], despite fearing further acts of retaliation by [WCLE] acting predatorily against the plaintiff on behalf of the malicious perpetrators of such crimes against the plaintiff.

# ¶442

Given the increasingly intimidating, racially-motivated threats that the plaintiff (and the plaintiff's senior-citizen {MOTHER}) had suffered from [JSP] (and [RSR]), and given the fact that the plaintiff had noticed [JSP]'s brazen vandalism of the plaintiff's property, the plaintiff was left with no choice but to, once-again, report such issue to [WCLE] - even if the plaintiff feared retaliation from [WCLE] - as the plaintiff had already suffered numerous acts of retaliation from [WCLE] for the plaintiff's reporting of racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses to [WCLE] (dating back to {2011}). On or about the date and approximate time of {2019-07-30 10:30}, the plaintiff calls the [WCSO] to report such racially-motivated crimes committed by [JSP] against the plaintiff. The [WCSO] dispatches two [WCSD]s to the plaintiff's property: [WCSD-DC] and [WCSD-JD-6] (White male). [WCSD-JD-6] sat in the passenger-side of such [WCSO] vehicle during all of the time of this incident. [WCSD-DC] approached the plaintiff's [FRONTDOOR] in-order-to contact the plaintiff. The plaintiff briefly explains to [WCSD-DC] that [JSP] had shot-into one-or-more of the plaintiff's security-camera(s), pointing [WCSD-DC] at the damaged/destroyed security-camera(s). [WCSD-DC] approaches the security-camera that was clearly-vandalized by [JSP], and [WCSD-DC] immediately notices the clearly-visible damage to the shattered front-glass and the infra-red/night-vision sensor(s)/LED(s) of such security-camera - meant to protect both the internal lens and all the internal circuitry (including infra-red/night-vision circuitry) of such security-camera from the elements. [WCSD-DC] asked for the plaintiff's photo-identification and phone-number, which the plaintiff did not and does not consider to be necessary for the reporting of such crime(s), but which, the plaintiff, nonetheless, provided to [WCSD-DC]. After [WCSD-DC],

via police-radio, relays the plaintiff's identification-information back to [WCSO] headquarters, [WCSD-DC] hands back to the plaintiff the plaintiff's photo-identification. In reponse to [WCSD-DC]'s questioning about such crime, the plaintiff explains as follows. The plaintiff explains to [WCSD-DC] when the crime occurred, and what actually took place, as captured by the plaintiff security-camera-footage (see incident above). The plaintiff explains to [WCSD-DC] that [JSP] had issued multiple threats of violence against the plaintiff (including some very graphic threat(s)-of-murder against the plaintiff), dating back to the year {2012} - only three years after the plaintiff had obtained ownership of the property, [788KLLTX78641], and that such crimes only kept-escalating after the initial year of {2012}. The plaintiff explains to [WCSD-DC] that, by the plaintiff's best estimates, [JSP] is somewhere *"between 250 and 300 pounds"*, and somewhere close to 6-feet-2-inches tall. The plaintiff explains that this was the first known/detected instance of [JSP]'s malicious vandalism of the plaintiff's private-property, although also explaining that [JSP] had also repeatedly approached the plaintiff's security-camera(s) in-order-to taunt/intimidate into such security-camera(s) and/or at the plaintiff while installing such security-camera(s). At one point during the questioning, [WCSD-DC] very-fittingly asks the plaintiff if [JSP] is White-American, and the plaintiff responded that [JSP] is White-American, further indicating that such crimes are, in fact, racially-motivated. The plaintiff explains that the plaintiff had purchased each-and-every such security-camera at a estimated cost of approximately between $150 and $170 each (since these were top-of-the-line *"4K"/"Ultra-High-Definition"* security-cameras - cutting-edge technology, at least for the residential-market, during those years of {2018}/{2019}). The plaintiff had already captured [JSP]'s act of vandalism on a hand-held camcorder recording the security-camera-footage displayed onto a monitor, and so, the plaintiff showed [WCSD-DC] the playback of such recording on the camcorder, explaining to [WCSD-DC] what is occurring in such playback. The plaintiff provides to [WCSD-DC] the brand-name and model-number of the damaged security-camera(s). The plaintiff also explained to [WCSD-DC] that there were two other security-camera(s) that the plaintiff noticed were not functioning as expected, and that the plaintiff would need to further investigate if such lack-of-functioning was the result of [JSP]'s criminal actions. [WCSD-DC] even asks the plaintiff, *"just out of curiosity"* (and thus not out necessity), about the plaintiff's need for such numerous security-cameras, and the plaintiff briefly explained the numerous crimes, including the numerous crimes of vandalism/illegal-dumping at unusual - even difficult-to-detect - places of private-property that the plaintiff had suffered from the plaintiff's malicious neighbors - dating all the way back to {2011}. The plaintiff even explained the plaintiff's frustration in not being able to seek justice for those initial crimes, and so, such numerous security-cameras comprehensively covering every area the plaintiff's property were the result of not only those numerous initial-crimes committed, but also as previously explained, the escalating crimes committed by [JSP]. The plaintiff further explained to [WCSD-DC] that the security-camera-system manufacturers even sell 64-channel and 128-channel security-camera-systems for the residential-market, and so, the plaintiff's numerous security-cameras, was by no means excessive, but instead, only adequate to provide comprehensive coverage of the plaintiff's private-property. In response to [WCSD-DC]'s questioning, the plaintiff also reluctantly reveals that the plaintiff lives alone at the property - as the plaintiff never felt comfortable conveying such private/sensitive information. On at least one occasion during this incident, [WCSD-DC] looks back at his partner [WCSD-JD-6] (seated in such police-vehicle) and quietly smiles/laughs, which the plaintiff can only conclude to be mocking of the plaintiff, once-again, due to the plaintiff's racial-profile. [WCSD-DC] requested the plaintiff to send the plaintiff's security-camera-footage in an email to the [WCSO], and provided the plaintiff with his [WCSO] email-address, along with a case-number - "2019-07-01173" - for such criminal-case that would be opened with the [WCSO]. The plaintiff thanked [WCSD-DC] for his time, and entered back into [HOUSE] while [WCSD-DC] used his camera-phone to take one-or-more photograph(s)/video(s) of the damaged/destroyed security-camera. While inside the [HOUSE], the plaintiff immediately checked the file-size of such recording(s) and realized that such file(s) would not fit as email-attachment(s), due to size limitation on such email-attachment(s). So, the plaintiff immediately approached [WCSD-DC]'s vehicle and let them know that the plaintiff's evidence would not be able fit in email-attachment(s), due to the file-size(s) well-exceeding such size limitation on such email-attachment(s). The plaintiff

instead offered to load such security-camera-footage into an SD-card and provide such security-camera-footage to them via such SD-card. So, the plaintiff headed back into [HOUSE] and loaded such security-camera-footage onto an SD-card and provides such SD-card to these [WCSD]s, who then loaded such SD-Card into a laptop and copied such security-camera-footage onto such laptop. [WCSD-JD-6] then let the plaintiff know that a detective might contact the plaintiff about such case, and further that, since the plaintiff had the case-number, the plaintiff could simply add any information to such case by contacting the [WCSO]. The plaintiff thanked such [WCSD]s and walked back into [HOUSE]. Such [WCSD]s then drive away from the plaintiff's property in such police-vehicle. According to the plaintiff's recorded-footage, all of these [WCSD]s at the scene of the plaintiff's private-property during this incident did have body-worn-cameras - and as such, such body-worn-cameras should have been recording all aspects of this incident, including, but not limited to [WCSD-DC]'s and [WCSD-JD-6]'s private interactions between each other - unless, such [WCSD]s deliberately turned-off their body-worn-cameras (at any point in time) in-order-to Obstruct Justice against the plaintiff.

## ¶443

On or about the date and approximate time of {2019-08-17 21:30} (night-time), [JSP] arrives back to the driveway of [784KLLTX78641] in his pickup-truck. [JSP] approaches near the border of the two-properties, shining his torch-light directly onto the lens of one-or-more of the plaintiff's security-camera(s), in-order-to permanently *"blind"* such cameras, as he had previously threatened to do (see incident above). [JSP] approaches the tap attached to his house, opens such tap, and begins to use a hose connected to such tap in-order-to water parts of his side-yard. As he is doing this, [JSP] mutters some angry words against the plaintiff's security-cameras and begins to spray/douse two-or-more security-camera(s) full of high-pressure municipal water. [JSP] then look menacingly at another set of the plaintiff's security-cameras and begins to angrily spray/douse two-or-more of that additional set of security-camera(s) full of high-pressure municipal water - just two of over multiple dozens of times in which [JSP] has deliberately tried to damage/destroy the plaintiff's security-camera(s) and/or short-circuit the entire security-camera-system (by such inundation with high-pressure water). The plaintiff had meticulously installed such security-cameras behind and underneath the fascia area, in-order-to protect such security-cameras from the direct impact of the rain.

## ¶444

On or about the approximate date and approximate time of {2019-08-18 21:00}, the plaintiff and the plaintiff's senior-citizen [MOTHER] were unboxing a very-large LED television-set on the plaintiff's [DRIVEWAY] - a television-set that is large-enough to require two people to carry into the inside of the [HOUSE] - and a television-set that would be dedicated-to and attached-to the plaintiff's security-camera-system. As the plaintiff,[MOTHER] were performing this task, [JSP] would approach closer, while still remaining in the front-yard of his property, and continue to intimidatingly and menacingly stare at the plaintiff and [MOTHER] for a period of more than one minute. [JSP] would then enter into his pickup-truck, drive down the road, pause right in front of the plaintiff's property for a period of at almost one minute, in-order-to continue to intimidate and harass/stalk both the plaintiff and [MOTHER]. [JSP] would then continue to drive the road at regular speed. The plaintiff,[MOTHER] would continue to perform such labor-intensive work which took considerable time due to the size and weight of such television-set. [MOTHER] had expressed her strong desire to the plaintiff to leave the property before [JSP] arrives back, in-order-to avoid [JSP]'s uncivilized, uncouth, barbaric intimidation and harassment/stalking tactics against the plaintiff and [MOTHER]. Approximately 40 minutes later, when the plaintiff and [MOTHER] were just cleaning up after finishing the performance of such work, [JSP] arrives back in his pickup-truck, very-slowly driving in front of the plaintiff's property, on at least one occasion, briefly pausing, for no other reason than to

continue intimidating and harassing/stalking the plaintiff and [MOTHER]. The plaintiff would then wish [MOTHER] goodbye as [MOTHER] was eager to leave the property in-order-to avoid having to be intimidated/harassed/stalked by [JSP]. As the plaintiff was reversing the plaintiff's vehicle back into the plaintiff's [DRIVEWAY], in-order-to resume other work on the plaintiff's property, [JSP] would approach closer to the plaintiff, while remaining in his front-yard, and continue to intimidatingly and menacingly stare at the plaintiff. As the plaintiff ignores [JSP] and walks away from [JSP] and enter into [HOUSE], [JSP] would shout at the plaintiff, *"PERVERT!"* [JSP], noticing that the plaintiff did not respond in any manner, would then walk away and enter back into his house.

## ¶445

On or about the afternoon of the date of {2019-08-19}, the plaintiff was performing some yard-work, manually picking the so-called *"weeds"* in [FRONTYARD] - a more labor-intensive and time-consuming task that the plaintiff must resort to, since the plaintiff's strongly held religious/cultural views/practices are strongly against the use of any chemicals. Next-door neighbor [CB] approaches the plaintiff and asks the plaintiff, that since they were putting their property for sale, if the plaintiff could clear some of the items stored on the plaintiff's [FRONTPORCH] - since such [FRONTPORCH] was at least partly visible from some area(s) of [CB]'s then property [792KLLTX78641] - in-order-to make their property and surrounding properties more presentable to prospective buyers. The plaintiff responded that the plaintiff would move such items into the (private) [BACKYARD] and/or (private) [GARAGE], and began the process of moving such items. [CB] thanked the plaintiff and even offered the plaintiff a bottle of water, since the weather was very unkind during that intensely hot summer afternoon. It took the plaintiff approximately an hour or more of labor-intensive work of moving such items.

## ¶446

On or about the following morning - the date of {2019-08-20}, the plaintiff received another private-message from [KB], in which, [KB] thanked the plaintiff for performing the aforementioned requested tasks. The plaintiff replied that it was not a problem and that the plaintiff had also performed some additional clean-up work around the [HOUSE] in-order-to make the property as presentable as possible. The plaintiff also expressed willingness that, if there were any other issues that needed to be resolved, the plaintiff would try the best compromise to help resolve the issue. This dialogue between the plaintiff and next-door neighbors [CB&KB] stands in sharp, almost diametrically-opposite, contrast to the utterly dehumanizing manner in which the plaintiff was treated by [RSR] (who lived further away and across the street from the plaintiff), [JSP&KAP] and [WCLE] - for a period of approximately 10 years. This dialogue also dismantles the extremely fraudulent and racist narrative and propaganda that [RSR],[JSP&KAP] had relentlessly proliferated against the plaintiff - to the [HOA], to [WCLE], to other neighbors - again, for a period of approximately 10 years.

## ¶447

The [SPOA] had scheduled a Board-Meeting for the date and time of {2019-08-20 19:00}. On or about the date and approximate time of {2019-08-20 19:00}, the plaintiff attends the meeting with a body-worn-camera recording. The plaintiff enters into the building and large conference-room in which such Board-Meeting is being held. The plaintiff notices numerous persons from the subdivision (including the then [SPOA] board members and [RSR] seated in chairs) with one-or-more empty chairs. The plaintiff almost immediately notices that [RSR], who is seated in one of the chairs, looks back menacingly and angrily at the plaintiff. The plaintiff is immediately instructed to sign-in on the sign-in-sheet. After the plaintiff signs in, the plaintiff takes a seat in the final row of arranged seats. The plaintiff hears the then Board-Members state

some preliminary information about the meeting. The plaintiff takes note that [f-HOA-BoD][SPOA-P-BC] authoritarianly demands that no homeowner who did not register to speak in advance (by sending an email to [SPOA-CM-CD]) will be allowed to speak at the meeting. The plaintiff also notices that [f-HOA-BoD][SPOA-P-BC] authoritarianly states that no homeowner is allowed to record the meeting - even demanding homeowners to put away any recording devices. The plaintiff asserts that at least one of the ways in which the then [HOA] under [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH] maintained monopoly-control over the [HOA], while running the [HOA] in a tyrannical/oligarchic manner (with an iron-fist) was to only allow the demands of the most powerful residents of the neighborhood to be voiced (perhaps most importantly, [RSR]), and ideally, with most of the *"business"* of the [HOA] run in private/secret (without a *"virtual"* option, allowing homeowners to attend such meetings remotely/online/virtually), thus, without the public scrutiny of all of the residents of the neighborhood. Many of such asinine, and in at least some cases, unlawful, rules imposed particularly by those [f-HOA-BoD]s were imposed precisely to facilitate such secrecy and the entrenchment of such undemocratic, top-down hierarchy/power-structure. The plaintiff, who is well-informed in not only [HOA] law, but also Texas' One-Party-Consent law is fully aware that, contrary to [f-HOA-BoD][SPOA-P-BC]'s demands, the plaintiff, as a homeowner of the subdivision, is entirely within the plaintiff's rights to video-record and/or audio-record the meeting - which even some attorneys that represent [HOA]s will admit is a lawful act; therefore, the plaintiff does not stop the plaintiff's camcorder recording. However, as the record will show, [f-HOA-BoD][SPOA-P-BC] soon confronts the plaintiff about video-recording, and after that moment in time, a majority of the [f-HOA-BoD]s and [SPOA-CM-CD] also join in to demand that the plaintiff stop video-recording. [SPOA-CM-CD] even justifies such unlawful demand against the plaintiff by stating words-to-the-effect that the contract that renters and guests of the facility, *"Liberty Hill Learning and Event Center"*, in this case - the [SPOA] and its guest homeowners - agreed-to, forbids use of such recording devices. However, the plaintiff later reviewed such contract (see PDF-Document link below) and did not find any text in that contract that forbids use of such recording devices. The plaintiff is thus fraudulently and unlawfully forced, through no choice of the plaintiff's own, to stop the video-recording, but the plaintiff's laptop computer, which, unbeknownst to the plaintiff, was also set to audio-record automatically, is still audio-recording in the background as the plaintiff would only later discover after the meeting ends. (Even in following incident(s), the [HOA] finally admits that homeowners are legally allowed to record such meetings - see below.) The plaintiff asserts that the [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH],[SPOA-MaL-ML] and [SPOA-CM-CD] engaged in Witness-Intimidation and Obstruction-of-Justice against the plaintiff when they fraudulently demanded that the plaintiff stop the plaintiff's lawful video-recording, as they were knowingly and fraudulently preventing the plaintiff from recording [RSR]'s intimidation/interference/harassment/disorderly-conduct/blackmail/fraud and illegal conspiracy that the plaintiff had, for a long-time, known existed between [RSR] - her other cronies [JSP&KAP],[DMP], her other White-American co-conspirators - and the then [HOA], and [WCLE]. The plaintiff further asserts that the [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH],[SPOA-MaL-ML] and [SPOA-CM-CD] committed the crimes of Obstruction-Of-Justice, Witness-Intimidation against the plaintiff (and in doing so, totally violated the plaintiff's rights) in this clearly unlawful and corrupt manner in-order-to also protect and insulate themselves, [RSR] and her other co-conspirators ([JSP&KAP],[DMP],[WCLE]) from liability - both civil liability and criminal liability. Additionally by threatening to remove the plaintiff from such publicly-accessible conference-room, [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH] committed the crime of [18-USC-PI-C13-§245], *"Federally Protected Activities"*, against the plaintiff, by - on the basis of the plaintiff's racial-profile - preventing, attempting-to-prevent, or interfering-with the plaintiff from lawfully:

Ⓐ *"enjoying the goods, services, facilities, privileges, advantages, or accommodations of any inn, hotel, motel, or other establishment"*;
AND/OR

Ⓑ *"participating in or enjoying any benefit, service, privilege, program, facility or activity provided or administered by any State or subdivision thereof."*

[RSR]'s mafia-godfather-like power, her extreme manipulativeness, her extreme ego, her extreme narcissism, her extreme hypocrisy, her extremely racist opinion of people-of-color, and her decade-long con-game to defraud the plaintiff is abundantly revealed by the blackmailing words that [RSR] loudly, authoritarianly and manipulatively speaks towards the then [HOA] at this meeting (and probably at many other [HOA] meetings - as [RSR] even admitted to doing the same in other such [HOA] meetings). [RSR] first admits to being in *"a lot of meetings"* solely to blackmail the then [HOA] to take further predatory enforcement/legal actions against the plaintiff. When [RSR] states *"my neighbor"* and *"my nextdoor neighbor"*, [RSR] fails to disclose that [RSR] is referring to [DMP] - one of [RSR]'s cronies - who, as the record does show, had repeatedly conspired with [RSR] to predatorily target the plaintiff. Not much unlike Hitler who used extremely inflammatory and racist rhetoric to scapegoat entire races of innocent people as being the sole cause of problems within society, [RSR] scapegoats the plaintiff, fraudulently claiming that the plaintiff is the only reason that, Ⓐ the aforementioned neighbor and [RSR] are not able to obtain a *"good price"* for selling their respective properties, and Ⓑ this [HOA] meeting was being held to begin with - in other words, that this entire [HOA] meeting was solely to ensure that the all of the White-American residents of the neighborhood could complain-about the plaintiff and demonstrate their collective anger at the plaintiff (see below). [RSR] mentions that she spoke to one-or-more realtor(s), "UNIDENTIFIED-REALTOR-1" ("[UR-1]") , who [RSR] claimed also placed all of the blame on the plaintiff. If this Court grants the plaintiff the opportunity to litigate this case, the plaintiff would seek to depose and/or cross-examine these particular unidentified realtor witness(s), and any other witness(s) that [RSR] is referring to in her numerous venomous rants against the plaintiff. As the previous incident(s) and this incident reveal, [RSR] has claimed to be putting her house on the market or is ready to put her house on the market for over two-and-a-half years at this point - again, all indications of a skilled con-artist that has mastered her skills of defrauding the plaintiff. [RSR] uses the culturally-insensitive/religiously-insensitive and ethnocentric term *"overgrown"* to describe the vegetation on the plaintiff's property, when she fully knows that the plaintiff has deeply held religious views/practices that forbids the cutting of any-and-all vegetation, and when she fully knows that the plaintiff has spent an enormous amount of time, effort and money (including litigation expenses) in installing a *"no-mow"* grass in [FRONTYARD] (during the previous year of {2017}) solely in order to placate the predatory demands of the then [HOA], puppeteered by none-other than [RSR],[JSP&KAP] and their cronies. [RSR] states that the plaintiff has installed security-cameras *"all over"* the plaintiff's property, failing to disclose to her overwhelmingly White-American audience that since the plaintiff, an immigrant-of-color/indigenous-person, has a obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise predatorily committing, with absolute impunity, hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, that the plaintiff has every right to record every aspect of such egregious racial-oppression and racketeering-activity using security-cameras, especially since the installation of such security-cameras is a fully-protected homeowners' right under Texas law [TPrC-T11-C202-§202.023(c)]. In this particular meeting, [RSR] fails to disclose to her overwhelmingly White-American audience that [RSR],[JSP&KAP] and their cronies had already succeeded in blackmailing the [HOA] to get the [HOA] to sue the plaintiff in the prior years of {2017}/{2018}, even acknowledging these predatory actions by saying, *"I KNOW THAT LITTLE THINGS HAVE CHANGED"* and even fraudulently claiming that the plaintiff is still in *"pending litigation"* with the [HOA] (see below). In other words, it was not good enough for [RSR],[JSP&KAP] and their cronies to blackmail the [HOA] to inflict maximum harm onto the plaintiff via the stress and expense of litigation, but rather, the real goals of [RSR],[JSP&KAP] (and co-conspirator [WCLE]) was to entirely defraud the plaintiff out of the plaintiff's right to private-property ownership within such White neighborhood. In this meeting, [RSR] even admits to making late dues payments - with such late payments alone being a substantial ground for [HOA]s to sue homeowners; yet, to the best of the plaintiff's knowledge, [RSR] was never sued by the [HOA] for late payments nor for her many serious violations of the restrictive-covenants (as substantially documented in this lawsuit). In an act of extreme selfishness, hypocrisy, ego and narcissism, [RSR] repeatedly makes it seem as if she is the only dues-paying member of the neighborhood (while even admitting to making late payments), and that as *"reciprocation"* for being such dues-paying member of the

neighborhood, [RSR] demanded that the [HOA] further-escalate predatory legal action(s) against the plaintiff. The manner in which [RSR]'s repeatedly expresses this demand is almost as if [RSR] is attempting to bribe the [HOA] to further-escalate predatory legal action(s) against the plaintiff. [RSR]'s allegation of *"capital loss"* is not only fraudulent but further reveals that she has little-to-no understanding of the law (in general), and [HOA] law, in particular. For example, [RSR] seems to be completely unaware of the fact that no petitioner in the State of Texas can expect to obtain a damages judgment against an adversary without proving harm caused by such adversary onto such petitioner, and it is not merely difficult, but actually impossible for even any petitioner-homeowner, let alone petitioner-[HOA], to attribute any such *"capital-loss"* (even if such *"capital-loss"* is considered to be *"harm"*) to one-or-more adversary-homeowner(s) that allegedly fails to maintain property according to standard(s). Furthermore, the recent case law concerning [HOA]s in Texas is clear that [HOA]s cannot reasonably expect to win a damages judgment against any homeowner unless the [HOA] can successfully prove to the respective Judge and/or Jury that such homeowner caused harm onto the [HOA] itself, which again, is in almost all cases, impossible to do; for this reason, in the State of Texas, [HOA]s can in almost all cases, at best, only reasonably expect to win injunctive-relief and/or reasonable-attorneys-fee(s) without the possibility of any damages even though the actual text of Texas law authorizes damages. (The plaintiff had consulted with at least three highly-reputable attorneys exclusively representing Texas homeowners against [HOA]s that all provided the plaintiff with the same information.) [RSR] clearly engages in blackmail against the [HOA] when she states, *"I'VE DONE MY HOMEWORK, AND I'M DANGEROUS ENOUGH TO KNOW JUST A LITTLE AND TO MAKE IT WORSE!"*. [RSR] states, *"I KNOW YOU CAN'T SPEAK TO WHAT'S GOING ON"* indicating that the [HOA] has, on multiple occasions, warned [RSR] that neither [RSR] nor the [HOA] is legally permitted to talk about any individual homeowner(s) in public settings, as such speech would be clear indication of an illegal conspiracy. Shockingly, [RSR] even states, *"YOUR LAWYER CAN'T SPEAK TO WHAT'S GOING ON"* clearly revealing that [RSR], despite being a non-Board-member resident of the neighborhood, was inappropriately granted access to speak directly to the [HOA]'s attorney - an extremely revealing and incriminating fact which was even corroborated by [SPOA-CM-CD]'s following statement(s). [RSR] fraudulently (and repeatedly) states that she wanted the plaintiff to *"mow"* the *"grass"* when both she and the [HOA] are fully-aware that the plaintiff even underwent the expense of litigation to fight for the plaintiff's right to install and maintain a *"no-mow"* grass. [RSR] uses the extremely racist term *"pig-pen"* to describe the plaintiff's private/concealed/curtilage [BACKYARD]. [RSR] repeatedly calls attention to the plaintiff's private/concealed/curtilage [BACKYARD], while failing to explain how any allegation regarding the plaintiff's private/concealed/curtilage [BACKYARD] - which is not in the least bit visible from the street - negatively affects so-called *"property-values"* and/or the ability for any other homeowner to sell his/her property. In particular, [RSR] fraudulently claimed that both [RSR] and [RSR]'s *"nextdoor neighbor"* crony, [DMP], were not able to sell their respective private-properties because of the plaintiff's private/concealed/curtilage [BACKYARD], when they both lived across the street from the plaintiff, and when the plaintiff's private/concealed/curtilage [BACKYARD] is not even in the least bit visible from her property, [789KLLTX78641] or [DMP]'s property, [785KLLTX78641] - and is approximately 150 feet (or more) in open-space distance from both of these two properties. Almost-exactly-like, or almost-verbatim-to, the fraudulent and racist statements made by White-Supremacists/White-Nationalists in their publicly-visible social-media postings in the [SBPDL] blog (see section below for examples), [RSR] uses the same fraudulent White-Supremacist/White-Nationalist statement about the plaintiff: *"I WANT HIM TO BE A NEIGHBOR!"* [RSR] makes the highly-revealing statement, *"I DON'T WANT TO BE CALLED A RACIST!"* - although clearly, if [RSR]'s multiple predatory, abusive and even criminal (retaliatory witness-tampering, retaliatory blackmail, retaliatory disorderly-conduct, intimidation/interference, etc.) statements against the plaintiff truly had nothing to do with racism, then there would be absolutely no need for [RSR] to even be making such defensive statement. [RSR], an extremely-privileged and egregiously-entitled White-American woman, residing within an overwhelmingly White-American neighborhood - where both she and the rest of the White-American residents of the neighborhood grossly outnumber - by a factor of almost 9-

to-1 - the plaintiff, an immigrant-of-color/indigenous-person - then outrageously claims to be a victim of so-called *"REVERSE-DISCRIMINATION"* with the plaintiff apparently being the beneficiary of such *"reverse-discrimination"*, when the plaintiff has never, in actuality, benefited from any type of *"reverse-discrimination"* nor *"affirmative-action"* at any point in the plaintiff's life. Even the plaintiff's academic credentials (see above) were obtained solely by the plaintiff's actual merit, and thus, not by any *"reverse-discrimination"* nor any *"affirmative-action"*. (To the best of the plaintiff's knowledge, none of the plaintiff's other family members ever benefited from any *"reverse-discrimination"* nor any *"affirmative-action"*.) [RSR] concludes her initial racist rant against the plaintiff with a statement that is indisputably and extremely offensive to almost-all, if not all, people-of-color, and a statement that demonstrates both her extreme racial-animus and her extreme sense of racial-superiority: *"RACE IS AN ISSUE WHEN THE - WHEN THEY DON'T HAVE A BETTER ARGUMENT!"* [RSR] has such a racist opinion of people-of-color when she derogatorily refers to all people-of-color (*"THEY"*) as not having a *"BETTER ARGUMENT"* - as if all people-of-color are too low-IQ (according to her high-IQ standards) to make a sound argument. More importantly, such racist statement is a complete slap-in-the-face of the hundreds-of-millions of people (of all races) that have collectively fought over the course of many centuries for racial-justice in-order-to secure the rights that people-of-color have today - and the tens-of-millions of people (of all races) who continue the ongoing and seemingly never-ending battle for racial-justice - as the (subsequent) massive, nationwide {Summer-2020} racial-justice protests clearly showed - in which a racially-diverse group of more than 20-million people in the United States - almost 1-in-10 Americans - actively engaged in peaceful, nonviolent social-justice/anti-racism protests in some manner, shape or form (source: 《The New York Times》,  "Black Lives Matter May Be the Largest Movement in U.S. History" ). [RSR] fraudulently claims that the plaintiff has not gone by *"the rules of the [HOA]"* - a purely-racist fraud that is abundantly revealed in the many of the defendants' prior and future (see above, see below) actions - in which the defendants conveniently ignore all of the restrictive-covenant violations that the White-American (and/or non-immigrant) residents of the neighborhood overwhelmingly violate. [RSR] repeated references to *"rules of the [HOA]"* clearly shows, once-again, her lack of understanding of the law, as the restrictive-covenants of the neighborhood (codified within the [DCCR]s) are not *"rules of the [HOA]"* - because the [HOA] does not have any authority to arbitrarily make their own rules. As part of her fraud, [RSR] uses inflated words like *"fiduciary responsibility"*, *"reciprocation"*, and *"capital loss"* to once again, flaunt her intellectual-superiority and superior legal-wisdom over the rest of the audience and towards the plaintiff, whom due to the plaintiff's racial-profile, [RSR] has, throughout the period of time documented in this lawsuit, ridiculed to be a *"powerless"*, low-IQ, subhuman animal ( 🔒 ). Perhaps the most shocking and revealing aspect of [RSR]'s racist rant against the plaintiff is that [RSR] admits that the [HOA] has repeatedly warned [RSR] that [RSR]'s outrageously-oppressive demands against the plaintiff are *"illegal"* - that is, egregiously violative of the plaintiff's civil-rights, egregiously discriminatory in clear violation of the [FHA]/[TFHA], and an egregious abuse of power and authority. [RSR] counters the [HOA]'s response by stating that she is *"tired of hearing"* that her outrageously-oppressive demands against the plaintiff are *"illegal"*. In other words, [RSR] repeatedly demanded that the [HOA] continue with clearly illegal actions against the plaintiff in spite of such clear illegality - in which case, both [RSR] and the [HOA] would be clearly liable to the plaintiff for such civil-rights-violations and conspiracy-to-interfere-with-civil-rights. This extremely-revealing statement is just one of many statements by [RSR] that clearly shows either that [RSR] does not care about the law, or more accurately that [RSR] believes that both she and the [HOA] are above-the-law. Throughout much of her racist rant against the plaintiff, [RSR] almost had trouble controlling herself from breaking-out into euphoric laughter. In other words, throughout much of her racist rant against the plaintiff, [RSR]'s tone of voice also revealed that she was thoroughly-enjoying her public-humiliation, egregious invasion-of-privacy and intimidation of the plaintiff - further consistent with the plaintiff's claim that [RSR] (and the other defendants), throughout the period of time documented in this lawsuit, thoroughly-enjoyed violating the plaintiff's rights, and considered their predatory targeting of the plaintiff to be a fun sport that all of the defendants could predatorily join in on. It would appear to the plaintiff that [SPOA-P-BC] was a little shell-shocked and

had a tough time dealing with the numerous extremely-revealing, damaging and/or incriminating statements made by [RSR] in the plaintiff's presence, but given the unfortunate circumstances, made the best out of the situation by responding to [RSR], *"Ok, if that is you all you want - we'll get you that - the steps."* To that response, [RSR], just like a mafia-godfather, authoritarianly responds, *"NO! I JUST WANT - I JUST WANT THAT HOUSE TAKEN CARE OF!"* - a type of flippant statement that a reasonable observer would only expect in a Hollywood movie depicting the kingpin of a criminal-enterprise. Once again, such statement clearly reveals [RSR]'s racist opinion that the plaintiff - a low-IQ, subhuman animal, without any rights - was not the rightful owner of any such property, and [RSR] had repeatedly demanded that the [HOA] take and expedite any-and-all necessary enforcement-actions to foreclose on the plaintiff's private-property, thus defrauding the plaintiff of such (relatively-profitable) private-property-ownership. [SPOA-P-BC], once-again trying to engage in *"damage control"*, states, *"We'll get you the steps. You have to go step-by-step."* To that response, [RSR] states, *"YEAH, I'VE BEEN TOLD THAT A COUPLE OF TIMES, SIR!"* - a statement that, once-again, reveals that [RSR] has repeatedly blackmailed the [HOA] in-order-to get the [HOA] to take escalating levels of predatory legal-actions (including legal action) against the plaintiff. As if to break the extremely uncomfortable dialogue between the two, [SPOA-CM-CD] chimes in and surprisingly admits that she has talked to [RSR] on numerous occasions about this topic - that she has repeatedly explained to [RSR] that she is not allowed to discuss with [RSR] about matters concerning any individual homeowner(s), even suggesting that [RSR], a non-Board-member resident of the neighborhood, be permitted direct access to the [HOA]'s attorney, which is truly revealing of the extra-legal, mafia-godfather-like power that [RSR] wielded over the entire neighborhood, but in particular, over the plaintiff. In response, [RSR] even admits to directly-contacting and/or trying-to-contact the [HOA]'s attorney on multiple occasions - with words-to-the-effect indicating that she had left voice-messages or email-messages for the [HOA]'s attorney on the topic of the plaintiff. [RSR] manipulatively pretends to defend [SPOA-CM-CD], stating that it is not [SPOA-CM-CD]'s responsibility, but rather the Board's responsibility. Once again, [RSR] refers to the Board that is ostensibly intended for all homeowners of the neighborhood, as *"my Board"* - that is to say, that the Board is a private organization, entirely owned and controlled by [RSR], and thus only answerable/accountable to [RSR], further revealing [RSR]'s mafia-godfather-like power over the entire neighborhood, but in particular, over the plaintiff. In a remarkable feat of Orwellian doublespeak, [RSR] refers to the Board's responsibility to act in homeowner's (singular) best interest, when in actuality, the Board's responsibility is to act in all of the homeowners' (plural) best interest, doubling-down on this statement of Orwellian doublespeak with, *"And my interests are not being protected"*. In a remarkable statement of hypocrisy that would make even the worst hypocrites cringe, [RSR] manipulatively states, *"I'm not asking for you know, for you to stop the fireworks"*, without disclosing to her audience that she has repeatedly engaged in the illegal act of lighting fireworks, along with her racketeer co-conspirators [JSP&KAP]. In a remarkable statement that reveals [RSR] (and her co-conspirators) knowingly conspired to violate the plaintiff's first amendment rights, [RSR], referencing the plaintiff's political yard-signs, demands that the [HOA] force the plaintiff to *"take off those stupid signs"*. [RSR]'s characterization of the plaintiff's political yard-signs - which stated (and continue-to-state), *"[AOC] for President"*, *"Tax the Rich"*, *"Make Racism Wrong Again"*, *"Green New Deal"* - as *"stupid"*, yet again, reveals the incredibly racist and low-opinion that [RSR] had of the plaintiff and other persons-of-color such as [AOC] - always operating with such strong sense of racial-superiority over both the plaintiff and the entire movement of racially-diverse, political-activists of which the plaintiff is just one minute part. [RSR] admits to making these threats of blackmail against the [HOA] for 9 years - with the plaintiff always being the sole and ultimate victim of such blackmail - once again referring to her quarterly dues-payment as some sort of bribe. [RSR] reiterates, *"I WANT TO SELL MY HOUSE!"*, but as later incidents would reveal, it would appear that [RSR] would eventually sell her house - not as a matter of desire (*"want"*), but as a matter of necessity (*"need"*) - see below. In a statement not much unlike the extremely inflammatory and racist rhetoric used by White-Supremacists/White-Nationalists in their publicly visible messages in the [SBPDL] blog (see section below for examples), [RSR] states about the plaintiff, while trying to control herself from breaking out into euphoric laughter, *"I DON'T*

*WANT TO LIVE ACROSS THAT GUY! I DON'T! HE'S BAD NEWS! HE'S INCONSIDERATE! ..."* In the following, surprisingly-revealing statement of admission, [RSR] states, *"HE DOESN'T CARE ABOUT- IF HE WANTS TO LIVE LIKE THAT- THAT'S FINE! LET HIM BUY A PIECE OF LAND!"* [RSR] ostensibly is referring to farm-land, as she has repeatedly demanded that the plaintiff move out of the neighborhood, and *"TO THE COUNTRY!"* (see above) - numerous egregious violations of the [FHA]. Even in the most innocent interpretation of [RSR]'s revealing statement, [RSR] is conveying to her audience that farmers are not welcome in such residential neighborhood. But [RSR]'s subsequent statement further clarifies her meaning, describing the neighborhood as *"OUR NEIGHBORHOOD"* by which she meant, their exclusively White-American neighborhood, at the very least of which, means that immigrant(s)-of-color/indigenous-person(s) that live according to immigrant/indigenous (religious/cultural) values/practices (such as the plaintiff) are not allowed. The plaintiff does not need to further-explain [RSR]'s racist hypocrisy when she states, *"YOU SIGNED THE COVENANTS - AND YOU ARE CONTRACTUALLY OBLIGATED TO THAT!"* as some of [RSR]'s own social-media postings show that she has repeatedly intimidated others who reported on White-American residents' restrictive-covenant-violation(s) of, for example, the fireworks ban (and the entire list of other violations) - with [RSR] being clearly guilty of such restrictive-covenant-violations (along with her racketeer co-conspirators [JSP&KAP]). [RSR] is not only blackmailing the [HOA] but also perpetrating a fraud when she threatens the [HOA] with the statement - again, not much unlike a kingpin of a criminal-enterprise, *"BUT I NEED YOU TO LET HIM KNOW, IN NO UNCERTAIN TERMS, THAT HE HAS TO ABIDE BY THEM!"* when both she and the [HOA] know that the plaintiff has installed a *"no-mow"* grass in the plaintiff's [FRONTYARD] during the prior year of {2017}. [RSR] complains that she got another notice of violation for her *"garbage can"*, which the plaintiff agrees is an unsightly eye-sore, often haphazardly, placed on the road for everybody to see, in some instances, with such *"garbage can(s)"* overflowing (and sometimes over-spilling) with such unsightly contents - not to mention, that such garbage can is a toxic symbol of virtually-limitless societal waste. But in [RSR]'s reference to her *"garbage can"* violation, [RSR] is manipulatively pretending not to understand the huge difference between the two situations - that neither she, nor any other resident, is allowed to keep an eye-sore out on the public road (for everyone to see), whereas, the plaintiff's private [BACKYARD] is entirely enclosed by a 6-feet-tall-privacy-fence, and thus, not even in the least bit visible from the street. [RSR] manipulatively repeats her fraudulent statements, as if enhancing her con-game against the plaintiff by such use of repetition, that she has waited 9 years for the [HOA] to take action against the plaintiff, when she knows fully-well (see social-media postings above and below) that she and her cronies had already successfully blackmailed the [HOA] to engage in predatory litigation against the plaintiff in the previous years. But perhaps the most revealing aspect of [RSR]'s racist attitude towards the plaintiff is revealed in the following sequence of dialogue including [RSR], then [SPOA-P-BC], and (White-American) [HOMEOWNER-3]. [RSR] pretends to show that she does not have a totally-racist attitude towards the plaintiff, by then shifting her focus onto the issue of *"trucks, campers"* illegally parked in the neighborhood, by which she means *"commercial trucks of 1-ton or larger"* and *"trailers"*. [RSR] fails to disclose the hypocrisy of this statement to the audience - that her partners in crime, [JSP&KAP], have repeatedly and illegally parked a boat on the road, often right in front of the plaintiff's property - a boat that [RSR] has surely never complained about. [SPOA-P-BC] states that, as the plaintiff already knew fully-well, the problem of illegal vehicles - trailers, boats and commercial trucks - parked in the subdivision had existed *"for years"* - without any enforcement/legal action taken by the [HOA] against such violations that the plaintiff asserts is disproportionately committed by White-American (and/or non-immigrant) homeowners within the subdivision. [SPOA-P-BC] actually mentions the issue of *"boats"*, but to this, [RSR] simply responds without acknowledging [JSP&KAP]'s aforementioned violations, *"It's just been happening a lot lately"*, without any evidence, even blaming people that have newly moved into the neighborhood. Surprisingly, another White-American male homeowner, [HOMEOWNER-3], angrily responds out loud to the [HOA-BoD]s, *"YOU DON'T OWN THE STREETS THOUGH! THE [HOA] DOES NOT OWN THE STREETS! THAT'S WILLIAMSON COUNTY! YOU DO NOT OWN THE STREET! YOU HAVE NO JURISDICTION!"* [SPOA-VP-AH] warns [HOMEOWNER-

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                1696907690

3] stating that he is not allowed to interrupt [RSR], again, reaffirming that the power-structure in the neighborhood is a tyrannical oligarchy (with [RSR] playing the informal role of mafia-godfather), without even any pretense of being a democracy. Shockingly, [RSR] shows great deference to [HOMEOWNER-3] due to the fact that [HOMEOWNER-3] is a White-American male, backpedaling in apology to [HOMEOWNER-3], *"No, listen - if that's an expectation - that I'm wrong about - that [???] - then ok, but I just want to know, so I don't..."* The plaintiff strongly asserts that if the plaintiff had even muttered a few words, even without interrupting the meeting, which the plaintiff, at no point did, [RSR] would have demanded that the plaintiff be ejected from the meeting. So, the sharp, in fact diametrically-opposite, contrast in attitude of [RSR] towards her fellow White-Americans who so-clearly and so-boldly defy the rules, versus her extremely-racist attitude towards the plaintiff, an immigrant-of-color/indigenous-person, whom [RSR] is only fraudulently alleging is violating certain modern-day-Jim-Crow rules could not be greater - once again, fully-revealing that the [RSR]'s decade of predatory targeting of the plaintiff was solely based on her extreme racial-animus towards the plaintiff, arising from her strong sense of racial superiority over the plaintiff. [RSR] even admits that there is a large tow-truck persistently (and illegally) parked on Kingfisher that she has to drive around - while at the same time, deliberately refusing to admit that her racketeer co-conspirators [JSP&KAP] have routinely (and illegally) parked a boat on the street - often in front of the plaintiff's property - and that such illegally-parked boat also, at least partly, obstructs the passage of legal traffic - while at the same time, inconveniencing neighboring property-owners (including the plaintiff) who have to maneuver around such illegally-parked obstacles. In addition to the many other restrictive-covenants that both [RSR] and her racketeer co-conspirators [JSP&KAP] have routinely violated, [RSR] refuses to admit that her racketeer co-conspirators [JSP&KAP] are routinely - or even daily - violating at least two restrictive-covenants - the parking of (any) vehicle overnight on the street, and the illegal parking of a boat - anywhere that is visible from the street. Perhaps most importantly, [RSR] refuses to admit that all of these particular restrictive-covenant violations are almost-exclusively committed by White-American (and/or non-immigrant) residents of the neighborhood - and thus, any lack of enforcement of such restrictive-covenants would be an egregiously racially-discriminatory housing practice - in clear violation of the [FHA]/[TFHA]. At the end of the meeting, the plaintiff noticed [SPOA-MaL-AB] walked near the plaintiff, and the plaintiff took such opportunity to ask [SPOA-MaL-AB] if [SPOA-MaL-AB] was a Board-Member, which [SPOA-MaL-AB] did acknowledge. The plaintiff asked [SPOA-MaL-AB] if the plaintiff could speak to the Board in private, especially to address [RSR]'s racist statements about the plaintiff, to which, [SPOA-MaL-AB] responded that sometimes Board-Members do allow homeowners to speak directly to the Board during Executive-Session, and directs the plaintiff to speak to [SPOA-CM-CD]. The plaintiff approaches the table at which the Board and [SPOA-CM-CD] were seated, but noticed [RSR] in front of the plaintiff, speaking to the Board and/or [SPOA-CM-CD]. In response to [RSR]'s questioning, [SPOA-MaL-ML] starts asking questions of her fellow Board-Members and/or [SPOA-CM-CD]. Despite the fact that the plaintiff was just standing in front of the table, waiting to speak to the [SPOA-CM-CD] and/or the Board, [RSR] suddenly accosts the plaintiff, directly stating with a menacingly look of racist-contempt on her face - and in the presence of the Board - to the plaintiff, *"Are you happy that all of this is about your inability to follow the rules!"* This extremely-revealing statement by [RSR] clearly indicates that [RSR] was, in a very intimidating and threatening manner, trying to gaslight the plaintiff into thinking that this entire [HOA] meeting was held solely to address the *"problem"* of the plaintiff, as if the plaintiff - an immigrant-of-color/indigenous-person - is the one-and-only problem in such White neighborhood. But the other extremely-revealing, and actually very honest, aspect of [RSR]'s statement was her use of the word *"inability"*. Clearly, no person can be sued, prosecuted, or otherwise found liable for anything that they are unable-to-do and/or incapable-of-doing. Despite of these facts, [RSR] (and her cronies) viciously and successfully blackmailed the [HOA] to sue the plaintiff (which did happen in {2017}/{2018}), and [RSR] viciously and successfully worked with her co-conspirators, [JSP&KAP],[WCLE] to prosecute the plaintiff purely in retaliation for all of the extremely-incriminating evidence that the plaintiff had accumulated about these parties, and the plaintiff's intention to use such extremely-incriminating in legal action(s) against the defendants - a purely retaliatory prosecution

that did nothing else but obstruct justice - and a purely retaliatory action that was also in clear violation of the [FHA] (see below). The plaintiff does not dignify [RSR]'s abusively-racist statement of witness-intimidation and retaliatory disorderly-conduct with a response. The plaintiff instead asks [SPOA-P-BC] if the plaintiff could address the Board, but [SPOA-P-BC] denied the plaintiff this opportunity, claiming that unless the plaintiff requested, in advance of the meeting, to speak to the Board, that the plaintiff was not allowed to speak to the Board. As the plaintiff walks out of the building and towards the plaintiff's vehicle parked in the parking-lot, the plaintiff notices [RSR] menacingly stare and shake her head in disapproval at the plaintiff, but again, with a look of restrained-jubilation (φ) on her face, further indicating that she had, yet-again, thoroughly-enjoyed violating the plaintiff's rights, particularly by publicly-humiliating and invading-the-privacy-of the plaintiff - while at the same time freely enagaging in blackmail of the [HOA], and retaliatory witness-tampering (against the plaintiff) of the other witness homeowners present at such meeting. It is indisputable that [RSR] was not only blackmailing the [HOA] in-order-to coerce the [HOA] to take further predatory legal action against the plaintiff, but also overtly and retaliatorily witness-tampering with many potential witnesses at this meeting in-order-to *"corruptly persuade"* them to testify unfavorably against the plaintiff in such legal proceedings - if any such legal action were to be undertaken by the [HOA] and/or [WCLE] against the plaintiff - which actually did take place (see below). Finally, and of least importance, the contract of the facility, *"Liberty Hill Learning and Event Center"* - which hosted this conference-room meeting, states in part (see PDF-Document link below):

*"Disparaging remarks ... will not be tolerated and will be cause for immediate expulsion. Renter and guests shall use the premises in a considerate manner at all times ... Conduct deemed disorderly ... shall be grounds for immediate expulsion from the premises and conclusion of the rental period."*

The plaintiff asserts that [RSR] additionally and egregiously violated such contract by:

Ⓐ making numerous *"disparaging remarks"* against both plaintiff and all people-of-color ; AND

Ⓑ using the premises in an inconsiderate manner, against both plaintiff and all people-of-color ; AND

Ⓒ engaging in multiple counts of *"disorderly"* conduct against the plaintiff.

Ironically, [RSR] was egregiously violating the contract of this facility in which she was a speaking guest, while at the same time, [RSR] was fraudulently, hypocritically and racistly accusing the plaintiff of violating the contract of the neighborhood (as already abundantly documented in much of this lawsuit).

▶ RECORDED (INITIALLY VIDEO+AUDIO, BUT THEN AUDIO-ONLY) [SPOA] BOARD-MEETING(▶): (2019-08-20 19:00)(~)
▶ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]
▶ [ SPEECH AND IDENTITIES OF SOME PERSONS ARE OMITTED/REDACTED TO PROTECT THEIR PRIVACY. ]

●
●
●

〘 PLAINTIFF IS SEATED IN CHAIR LOOKING AT THE THEN BOARD-MEMBER(S) SPEAKING WHILE SEATED AT A DESK. 〙
〘 [RSR] IS SEATED IN ANOTHER CHAIR AT THE SECOND ROW APPROXIMATELY 15 FEET FROM THE PLAINTIFF. 〙
〘 BOARD-MEMBERS START 'HOMEOWNERS FORUM' BUT ONLY HOMEOWNERS THAT REGISTERED IN ADVANCE TO SPEAK ARE ALLOWED TO SPEAK. 〙

**[SPOA-P-BC]**    〘TO [HOMEOWNER-1]:〙 *Would you like to come up here and... [???] Or Do you mind standing up so we can all hear you...*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                    1696907690

〖 [HOMEOWNER-1] STANDS UP TO SPEAK AND STARTS TO SPEAK. 〗

〖 [HOMEOWNER-1] STANDS UP TO STARTS TO SPEAK. 〗

〖 [SPOA-P-BC] LOOKS AT THE PLAINTIFF, INTERRUPTS [HOMEOWNER-1] AND TALKS LOUDLY TO THE PLAINTIFF. 〗

[SPOA-P-BC]          〘TO [HOMEOWNER-1]:〙 *Just, Just a minute please -* 〘TO PLAINTIFF:〙 *SIR, DO YOU HAVE A CAMERA ON YOUR HEAD?!*

PLAINTIFF          *Yes I do, sir.*

[SPOA-P-BC]          〘TO PLAINTIFF:〙 *COULD YOU TURN IT OFF?!*

PLAINTIFF          *Um, Sir I believe that ... Texas....*

[SPOA-P-BC]          〘TO PLAINTIFF:〙 *IF YOU DON'T TURN IT OFF, I'M GOING TO HAVE TO ASK YOU TO LEAVE!*

PLAINTIFF          *I see... Is there a reason why recordings cannot be allowed in Texas Homeowners- Basically, Texas Homeowners Association Meetings are allowed to be recorded - If I'm not mistaken - is that not correct?*

[SPOA-VP-AH]          〘TO PLAINTIFF:〙 *This is a Board-Meeting!*

[SPOA-P-BC]          〘TO PLAINTIFF:〙 *THIS IS A BOARD-MEETING!*

PLAINTIFF          *Correct, uh but...*

[SPOA-VP-AH]          〘TO PLAINTIFF:〙 *This is not the annual association meeting. It's a Board-Meeting! There's a difference between the two.*

PLAINTIFF          *I see, ok, ond so - but, as part of - as part of Open Meetings Act - It's supposed to be-*

[SPOA-VP-AH]          〘TO PLAINTIFF:〙 *It's an open meeting...*

[SPOA-P-BC]          〘TO PLAINTIFF:〙 *YOU'RE OPEN TO ATTEND BUT YOU'RE NOT ALLOWED TO RECORD!*

PLAINTIFF          *Oh no, the Open Meeting Act states that you're allowed to record... um, the meeting... um, its pretty clear-*

〖 Then [SPOA] Community-Manager [SPOA-CM-CD] interjects to the plaintiff: 〗

SIDDHARTH KODE  V.  WILLIAMSON COUNTY , ET AL.                    1696907690

**[SPOA-CM-CD]**   ⟪TO PLAINTIFF:⟫ *But not in this facility as well sir. So, if you could please turn it off, we greatly appreciate it.*

**PLAINTIFF**   *Ok, um-*

**[SPOA-VP-AH]**   ⟪TO PLAINTIFF:⟫ *You're options are to turn it off, or you can leave the room! Those are your options!*

**PLAINTIFF**   *Sure. Ok. Ok, I see. Alright.*

⟦ PLAINTIFF TURNS OFF CAMCORDER BUT PLAINTIFF'S LAPTOP IS STILL AUDIO-RECORDING IN THE BACKGROUND. ⟧

**[SPOA-MaL-ML]**   *The light is still - You know what, that light is still flashing red to me.*

**PLAINTIFF**   *It's charged. It's not flashing-*

**[SPOA-VP-AH]**   ⟪TO PLAINTIFF:⟫ *Yeah, why don't you just take it off!*

⟦ PLAINTIFF REMOVES STRAPPED CAMCORDER. ⟧

**[SPOA-MaL-ML]**   *Thank you so much.*

⟦ [HOMEOWNER-1] CONTINUES TALKING/ASKING-QUESTIONS TO THEN BOARD. THEN BOARD CONTINUES TALKING WITH [HOMEOWNER-1]. ⟧

• 
• 
• 

⟦ [HOMEOWNER-2] STARTS TALKING/ASKING-QUESTIONS TO THEN BOARD. THEN BOARD CONTINUES TALKING WITH [HOMEOWNER-2]. ⟧

• 
• 
• 

⟦ [RSR] THEN STANDS UP TO START SPEAKING. ⟧

**[SPOA-P-BC]**   ⟪TO [RSR]:⟫ *Go Ahead.*

**[RSR]**

*UM, BECKY. SO, UM - I AGREE WITH YOU THAT I'M VERY FRUSTRATED! AND I'VE BEEN TO A LOT OF MEETINGS! MY NEIGHBOR IS TRYING TO SELL HIS HOUSE, AND HE HAS NOT BEEN ABLE TO GET A GOOD PRICE, BECAUSE FOR 9 YEARS - AT LEAST - THIS PERSON HAS NOT GONE BY THE RULES OF THE [HOA]! 9 YEARS! YOU HAVE A FIDUCIARY RESPONSIBILITY - AND I - **I'M SO TIRED OF HEARING [THAT] IT'S ILLEGAL!** BUT I DO KNOW SOME PEOPLE THAT HAVE [???]. AND THIS HAS BEEN GOING ON FOR A FEW YEARS NOW, AND I'M REALLY - I'M GOING TO PUT MY HOUSE ON THE MARKET - I TALKED TO A REALTOR - AND THEY SAID "GOOD LUCK!" WITH THE HOUSE ACROSS THE STREET FROM YOU - I LIVE ON 789 KINGFISHER LANE - AND YOU GO ACROSS THE STREET BACK THERE - AND YOU'LL SEE THE HOUSE I'M TALKING ABOUT! THE YARD IS A MESS! THE BACKYARD - HE HAD CABLES - WITH CAMERAS ALL OVER THE PLACE! OVERGROWTH IN ATTACHED PORCH! ALL OF THAT - AND **FOR 9 YEARS, I'VE ASKED YOU GUYS TO DO SOMETHING!** I UNDERSTAND SPECTRUM HAS JUST COME ONBOARD FOR 2-3 YEARS - AND I KNOW THAT LITTLE THINGS HAVE CHANGED - BUT, I'M NOT - I'M AT A LOSS AS TO WHY - I AM PAYING MY DUES - LATE SOMETIMES BUT I'M PAYING IT! BUT I AM NOT GETTING A RECIPROCATION HERE! BECAUSE, IF I SHOW, AND MY NEIGHBOR CAN SHOW - THAT HE LOST A SALE - THAT IS A 'CAPITAL LOSS' - THAT YOU, THEN WOULD BE RESPONSIBLE - AND IN TURN, THAT HOMEOWNER WOULD BE RESPONSIBLE! I'VE DONE MY HOMEWORK, AND **I'M DANGEROUS ENOUGH TO KNOW JUST A LITTLE AND TO MAKE IT WORSE!** - BUT I'M IMPLORING YOU TO TAKE SOME ACTION! I KNOW YOU CAN'T SPEAK TO WHAT'S GOING ON - AND YOUR LAWYER CAN'T SPEAK TO WHAT'S GOING ON. BUT I... AND I'VE ASKED YOU - TIME AFTER TIME - PLEASE LET ME KNOW YOU'RE MOVING IN THE RIGHT DIRECTION - I'VE BEEN ASKED [???] - "WE HAVE 5 STEPS. WE'RE ON STEP 4..." - I DON'T NEED TO KNOW THE KNITTY-GRITTY! [???] I JUST WANT TO - **I JUST WANT HIM TO MOW HIS GRASS! I JUST WANT HIM TO CLEAN UP THE PIG-PEN IN HIS BACKYARD!** I WANT HIM TO BE A NEIGHBOR! **I DON'T WANT TO BE CALLED A RACIST!** I AND IN FACT, I THINK THAT IT'S LIKE REVERSE-DISCRIMINATION! BECAUSE YOU'RE SO CAREFUL BECAUSE OF SOMEBODY'S RACE - RACE IS AN ISSUE WHEN THE - WHEN **THEY DON'T HAVE A BETTER ARGUMENT!***

**[SPOA-P-BC]**  《TO [RSR]:》 *Ok, if that is you all you want - we'll get you that - the steps.*

**[RSR]**  *NO! I JUST WANT - **I JUST WANT THAT HOUSE TAKEN CARE OF!***

**[SPOA-P-BC]**  《TO [RSR]:》 *We'll get you the steps. You have to go step-by-step.*

**[RSR]**  *YEAH, I'VE BEEN TOLD THAT A COUPLE OF TIMES, SIR!*

**[SPOA-CM-CD]**  *And also, to her point, I know Becky, has called me numerous times about this, and-*

**[???]**  *[???]*

**[SPOA-P-BC]**  *[???]*

**[RSR]**  *He's my nextdoor neighbor.*

**[SPOA-CM-CD]**

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    16969076gg

*One thing I have asked Becky numerous times - or suggested that she do - is that if is a homeowner issue [???] I cannot speak... [???] certain issues that homeowners [???] regarding homeowners... But I have asked Becky to contact - the Board - the attorney directly and see if they are willing to discuss with her things that I cannot.... And I'm actually kept from that... So, I-*

**[RSR]**    *And I've actually left messages for Mr. *****. If you could just send these out to-*

**[SPOA-VP-AH]**    *[???]*

**[RSR]**    *[???] It's just that.... Its not C*******'s job! - It's **my** Board's job!*

**[SPOA-MaL-ML]**    *[???]*

**[???]**    *[???]*

**[RSR]**    *BUT WHAT I'M SAYING IS THAT THE BOARD HAS THE RESPONSIBILITY TO ACT IN THE HOMEOWNER'S BEST INTEREST. AND MY INTERESTS ARE NOT BEING PROTECTED! - I'M NOT ASKING FOR YOU KNOW, FOR YOU TO STOP THE FIREWORKS! I'M ASKING YOU TO GET THE GUY TO MOW HIS GRASS, AND TAKE OFF THOSE STUPID SIGNS, AND CLEAN OUT HIS BACKYARD. I ASKED YOU THIS FOR 9 YEARS - AND I'VE PAID MY $88 [???] SOMETIMES, SOMETIMES NOT... AND I STILL DON'T GET ANYTHING BACK OTHER THAN [???]. AND I - YOU HAVE THAT FIDUCIARY RESPONSIBILITY - AND JUST IN THE LAST YEAR - I NEED TO KNOW! I WANT TO SELL MY HOUSE! I DON'T WANT TO LIVE ACROSS THAT GUY! I DON'T! HE'S BAD NEWS! HE'S INCONSIDERATE! HE DOESN'T CARE ABOUT- IF HE WANTS TO LIVE LIKE THAT - THAT'S FINE! LET HIM BUY A PIECE OF LAND! BUT WHEN YOU COME INTO **OUR NEIGHBORHOOD**, YOU SIGNED THE COVENANTS - AND YOU ARE CONTRACTUALLY OBLIGATED TO THAT! SO, AS AN EXAMPLE.. [???] BUT THAT'S NOT SO... BUT **I NEED YOU TO LET HIM KNOW, IN NO UNCERTAIN TERMS, THAT HE HAS TO ABIDE BY THEM!** I GOT ANOTHER LETTER FOR MY GARBAGE CAN! - I DIDN'T LIKE IT BUT I NEEDED TO MOVE IT IN - SO I'M [???] - [???] 9 YEARS! - AND I'M NOT PATIENT! ... OK, ANOTHER ISSUE IS - UM, I'VE SEEN A LOT OF TRUCKS, CAMPERS HANGING OUT IN THE NEIGHBORHOOD - I'M NOT REALLY SURE WHAT OUR RE-ENFORCEMENT POLICY - I MEAN, OBVIOUSLY.... [???] [???], I DON'T KNOW WHAT... [???] BUT... UM, WHAT IS - WHAT IS YOUR RE-ENFORCEMENT POLICY ON [???]*

**[SPOA-CM-CD]**    *[???] So...*

**[SPOA-P-BC]**    *(To [RSR]:) Been like that for years. Take a picture of it - hopefully you can get the house number in it. [???] Send it to us. And also, a Boat parked in the street - Boat parked in the driveway. [???]*

**[RSR]**    *It's just been happening a lot lately.*

**[SPOA-P-BC]**    *[???] parked in the street.*

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.

1696907690

**[RSR]**    *Tow trucks.*

**[SPOA-P-BC]**    *Exactly.*

**[HOMEOWNER-3]**    *YOU DON'T OWN THE STREETS THOUGH! THE [HOA] DOES NOT OWN THE STREETS! THAT'S WILLIAMSON COUNTY! YOU DO NOT OWN THE STREET! YOU HAVE NO JURISDICTION! IF SOMEBODY WANTED TO PARK THEIR BOAT ON THE STREET - THEY CAN PUT THEIR BOAT IN THE STREET!*

**[SPOA-VP-AH]**    《TO [HOMEOWNER-3]:》*Sir, I'm going to ask you to respect the fact that this is her opportunity to speak, and to also [???]*

**[HOMEOWNER-3]**    *How are you [???] again?!*

**[SPOA-VP-AH]**    《TO [HOMEOWNER-3]:》*Sir, again, I'm going to ask you to respect that this is her opportunity to speak.*

**[RSR]**    *No, listen - if that's an expectation - that I'm wrong about - that [???] - then ok, but I just want to know, so I don't...*

**[SPOA-P-BC]**    *The deed restrictions say 1 ton or larger.*

**[******]**    *It also says - 72 hours or less - I don't know [???]*

**[SPOA-VP-AH]**    *So, I'm going to respectfully say the same-thing to you - ****** - and again, this is her opportunity to speak - not that I'm trying to be rude to anybody - or [???] - she did [sign up to speak]. [???] I'm trying to give her the opportunity to talk here. So, when you say trucks, are you saying like... [???]*

**[RSR]**    *On Kingfisher, there's this huge tow-truck and I don't know who [???] I just know I have to go around it - or... [???]*

**[SPOA-VP-AH]**    *It's not the Traditional Trucks.. [???] Tow Trucks [???]*

**[RSR]**    *[I know some people park their campers here and there, but] it just seems like it's been happening a lot lately... and it's like some new people in the neighborhood.*

**[SPOA-P-BC]**    *[???]*

**[SPOA-CM-CD]**    *[???]*

〖 AFTER SOME RANDOM CHATTER IN THE ROOM, THE NEXT REGISTERED HOMEOWNER STANDS UP TO SPEAK. 〗

〖 AFTER ALL OTHER REGISTERED HOMEOWNERS SPEAK, THE MEETING MOVES INTO OTHER AGENDA ITEMS. 〗

- 
- 
- 

〖 THE MEETING ENDS AND PEOPLE START TO TALK AND/OR LEAVE THE ROOM. 〗

〖 PLAINTIFF NOTICES THE NEWEST BOARD MEMBER [SPOA-MaL-AB] SPEAKING TO ANOTHER HOMEOWNER CLOSE BY 〗

〖 AFTER [SPOA-MaL-AB] IS DONE SPEAKING TO THE HOMEOWNER, PLAINTIFF STARTS TO SPEAK TO [SPOA-MaL-AB]: 〗

**PLAINTIFF**     *Hey, may I speak, - are you a board member?*

**[SPOA-MaL-AB]**     *What's that?*

**PLAINTIFF**     *Are you a board member?*

**[SPOA-MaL-AB]**     *I am.*

**PLAINTIFF**     *Um... I believe that my voice is not being heard on a certain issue. I believe that a homeowner in this forum addressed me and my property... um, but I did get a chance to respond about the allegations made and..*

**[SPOA-MaL-AB]**     *Do you want to speak to the Board?*

**PLAINTIFF**     *Yeah.. I could.... I guess.*

**[SPOA-MaL-AB]**     *Because we do allow another voice to be heard from the community at the Executive Session - if it is something you would want to to, to discuss with the board...*

**PLAINTIFF**     *Right. And I, I feel I do... in this case...*

**[SPOA-MaL-AB]**     *Well, yeah - ask - ask C****** -*

**PLAINTIFF**     *right now?*

**[SPOA-MaL-AB]**     *right now.*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                      1696907590

**PLAINTIFF**        *right now. ok - so, for this executive session right now - correct?*

**[SPOA-MaL-AB]**    *yes sir.*

**PLAINTIFF**        *ok, got it. alright.*

〖 [SPOA-MaL-AB] WALKS BACK TOWARDS THE BOARD DESK. 〗
〖 [RSR] IS STILL TALKING TO THE OTHER BOARD MEMBERS AND [SPOA-CM-CD]. 〗
〖 SO, PLAINTIFF SITS IN A FRONT-ROW CHAIR, WAITING UNTIL PLAINTIFF CAN SPEAK TO [SPOA-CM-CD]. 〗
〖 [RSR] MOVES TO SPEAK TO [SPOA-MaL-ML]. PLAINTIFF STANDS UP TO SPEAK TO BOARD. 〗
〖 PLAINTIFF WAITS UNTIL [RSR] IS DONE SPEAKING TO BOARD. 〗

**[SPOA-MaL-ML]**    *Are we or are we not told as board members to not contact the Attorney directly?*

**[SPOA-CM-CD]**     *Um, the Board members - yes.*

**[SPOA-P-BC]**      *Yeah, Board members - yes...*

**[SPOA-MaL-ML]**    *And being a Board Member, Are we or are we not told to not contact the Attorney directly?*

〖 AS PLAINTIFF WAITS TO SPEAK TO BOARD, [RSR] SUDDENLY ACCOSTS PLAINTIFF IN TOTALLY UNPROVOKED MANNER: 〗

**[RSR]**            〖TO PLAINTIFF:〗*ARE YOU HAPPY THAT ALL OF THIS IS ABOUT YOUR INABILITY TO FOLLOW THE RULES!*

〖 PLAINTIFF LOOKS AT [RSR], BUT DOES NOT DIGNIFY RACIST INSULT WITH A RESPONSE. 〗
〖 SO, [RSR] TURNS AROUND AND CONTINUES TO WALK BACK TOWARDS [F-HOA-BOD][SPOA-MaL-ML]. 〗
〖 [F-HOA-BOD][SPOA-MaL-ML] TAPS [RSR] AND INDICATES HER RESPONSE TO [RSR]. 〗

**[SPOA-MaL-ML]**    〖TO [RSR]:〗 *Did you hear - cause I just asked and - they said we can't even contact the attorney...*

**PLAINTIFF**        〖TO [SPOA-P-BC]:〗 *Sir, I was told that I would be able to address the Board during or before the Executive Session.*

**[SPOA-P-BC]**      〖TO PLAINTIFF:〗 *Did you sign up to speak?*

**PLAINTIFF**        *Um.. No, I did not. But...*

**[SPOA-VP-AH]**     〖TO PLAINTIFF:〗 *Then no, you cannot.*

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    1696907690

**[SPOA-P-BC]**        ⟪TO PLAINTIFF:⟫ *Then no, you cannot.*

**PLAINTIFF**        *I see - I was told.. that in some cases-*

**[SPOA-MaL-AB]**        ⟪TO [SPOA-VP-AH]:⟫ *[In Executive Session, dont we sometimes allow homeowners to speak?]*

**[SPOA-VP-AH]**        ⟪TO [SPOA-MaL-AB]:⟫ *You have to request to speak... You can't just show up and speak without [requesting]...*

**PLAINTIFF**        *Should I schedule a hearing before the Board then?*

**[SPOA-P-BC]**        *Huh?*

**PLAINTIFF**        *Should I schedule a hearing before the Board - On an issue? Or does it need to be?*

**[SPOA-P-BC]**        *You can talk to C****** - you can signup to talk during the meeting in November.*

**PLAINTIFF**        *November, ok. Alright - Ok. Thanks.*

⟪ PLAINTIFF WALKS TO EXIT DOOR, NOTICES [SPOA-CM-CD] AT DOOR: ⟫

**PLAINTIFF**        ⟪TO [SPOA-CM-CD]:⟫ *Um, Do you know when the next board meeting will be?*

**[SPOA-CM-CD]**        ⟪TO PLAINTIFF:⟫ *Um, the next meeting is going to be the annual meeting which is the 17th-*

**PLAINTIFF**        ⟪TO [SPOA-CM-CD]:⟫ *On ... so that's the November meeting.... at the end ... 17th..*

**[SPOA-CM-CD]**        ⟪TO PLAINTIFF:⟫ *Yes, November 17th.*

**PLAINTIFF**        ⟪TO [SPOA-CM-CD]:⟫ *Ok, Thank you.*

⟪ PLAINTIFF WALKS TOWARDS VEHICLE. BEFORE PLAINTIFF GETS TO VEHICLE, PLAINTIFF NOTICES [RSR]. ⟫
⟪ [RSR] MENACINGLY STARES AT PLAINTIFF, AND NODS WITH DISAPPROVAL, ALTHOUGH JUBILANT (☻) AND CAN- ⟫
⟪ -BARELY CONTROL HERSELF FROM LAUGHING-OUT-LOUD. PLAINTIFF ENTERS INTO VEHICLE AND DRIVES AWAY. ⟫

▹ "Black Lives Matter May Be the Largest Movement in U.S. History" :
▹ (The New York Times) : Larry Buchanan, Quoctrung Bui, Jugal K. Patel : (2020-07-03) :
▹ https://www.nytimes.com/interactive/2020/07/03/us/george-floyd-protests-crowd-size.html

<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

▹ "EVENT SPACE RENTAL AGREEMENT AND CONTRACT" :
▹ (Liberty Hill Learning And Event Center) : (2017-04-07) :
▹ https://web.archive.org/web/20190226025526/http://www.lheventcenter.com/wp-content/uploads/2017/03/LH-LearningEventCenterContract.pdf

<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

## ¶448

After the Board Meeting which left the plaintiff indignant and which also left a large fraction of the neighborhood's homeowners angry with the authoritarian/iron-fisted behavior/actions of the then primary [HOA] Board members [SPOA-P-BC],[SPOA-VP-AH], a homeowner posted onto the *"nextdoor.com"* Summerlyn Leander social-media-platform, a legal document that was drafted related to the [HOA], ironically titled *"Board Member Code of Conduct"* . The posting quickly sidetracks into criticism of the recent Board-Meeting and specifically, to criticism, of the top then-Board-Members [SPOA-P-BC],[SPOA-VP-AH]. In this posting, [RSR] initially defends the then [HOA] Board run by [SPOA-P-BC],[SPOA-VP-AH] but also criticizes them for not being iron-fisted enough - however, only with regards to the plaintiff. Meanwhile, most of the residents on this forum are criticizing the then-Board for being too iron-fisted and/or too draconian and/or unanswerable/unaccountable and/or totally-lacking in transparency. While most of the residents in this forum supported the plaintiff's right to video-record the meeting, [RSR] defends the Board's lack-of-transparency by denying the plaintiff the right to video-record the meeting - obviously because she did not want her racist rant against the plaintiff to be captured on a video-recording. For once, [RSR], who has until this point, played the informal role of the neighborhood's mafia-godfather, exercising virtually monopoly-control over the Board at least on the issue of demanding predatory legal actions against the plaintiff, now begins to see her control eroding as more homeowners of the subdivision begin to see her as drunk with unchecked, abusive power - unchecked, abusive power that has left the plaintiff suffering (at that moment in time) a decade of irreparable harm. While most of the residents in question are angry at the then Board for being authoritarian/iron-fisted and lacking-in-transparency, [RSR] manipulatively exploits/capitalizes-on this popular anger by claiming that she too is angry at the then Board, but instead, for not being authoritarian/iron-fisted enough, but only with regards to the plaintiff, while fully justifying the then Board's complete lack-of-transparency. For once, [RSR] - who has deviously committed several hate-crimes/civil-rights-violations/racketeering-acts/abuses and a decade of racist fraud against the plaintiff - in the process, perfecting her skills of deceptive manipulation and indoctrination for defrauding the plaintiff - begins to realize that her decade-long con-game of relentlessly-racist propaganda against the plaintiff is no longer working as well as she is expecting it to. In response to the scathing critique of the Board, and in particular, [f-HOA-BOD]s [SPOA-P-BC],[SPOA-VP-AH], [RSR] fraudulently begins her message by stating, *"This is not constructive."* By [RSR]'s definition, any stance that does not perfectly align with [RSR]'s racist and far-right-wing-extremist view of the world, is considered by [RSR] to be *"not constructive."* (In the following, the plaintiff will refer to the then [HOA] Board as [RSR]'s Board, because although [RSR] did not own the Board, [RSR], like a mafia-godfather, exercised virtual monopoly-control over the Board, at the very least, when it came to any issue concerning the plaintiff.) In this particular case, [RSR]'s Board has performed adequately, but not good enough, by following [RSR]'s orders and taking predatory legal actions against the plaintiff. Therefore, in [RSR]'s extremely-manipulative, egotistical and authoritarian mind, [RSR] must defend [RSR]'s Board for the *"good"* that it has done - which is exactly what [RSR] tries to do in these particular postings. If, on the other hand, any other resident posted even the most minor critique of

the plaintiff, [RSR] would have massively doubled-down on such trivial critique by taking-over the entire thread and single-handedly launching

tirade-after-tirade against the plaintiff, as again, by [RSR]'s definition, that actually is considered to be *"constructive"*. [RSR] condescendingly

explains to her audience that they have to follow the (voting) process to *"get"* a new Board, while failing to explain to her audience that in

many, if not most cases, less than 25% of the neighborhood actually votes in the [HOA] Board *"elections"* - which in many cases, results in

extremist and/or fringe candidates being *"elected"*. Furthermore, without a thorough profile and resumé of each candidate, and without the

voters' thorough vetting of each candidate, it is extremely difficult even for those that do vote to ascertain what they are actually voting for

when they vote for any particular candidate. But more importantly, for all of (but not limited to) the reasons specified in this lawsuit, and at

least some of the academic literature that documents how [HOA]s actually operate in practice, no reasonable observer would consider an

[HOA] - or, at the very least, the manner in which [HOA]s, in practice, are allowed to conduct themselves - to be democracies. Instead, any

reasonable observer that studies [HOA]s in practice (and reads the academic literature about [HOA]s) would come to the realization that

[HOA]s, in practice, operate far more like an unanswerable-and-unaccountable oligarchy than a responsive-and-representative democracy, with

[RSR]'s Board being a notorious example of such oligarchy. (Unless and until robust legislation is enacted to fully-regulate [HOA]s in-order-to

force them to act like democracies, [HOA]s will more-likely-than-not, deviate significantly from the ideals of democracy.) After defending

[RSR]'s Board for the *"good"* that it has done, [RSR] then manipulatively starts to refocus that popular anger towards [RSR]'s Board, by

blaming [RSR]'s Board for not doing enough to, figuratively-speaking, *"bring down the hammer"* on the plaintiff. Trying to fully-exploit and

capitalize-on that popular anger towards [RSR]'s Board, [RSR] then manipulatively tries to shift all her audience's attention onto the plaintiff,

by stating, *"I too am frustrated by events and the neighbor (who wanted to record) who hasnt mowed his grass in 10 years and alot of other*

*non-pleasant stuff amd continues to do so till this day."* As any skilled con-artist would deliberately fail-to-do, nowhere in any of her postings,

does [RSR] reveal to her audience, the numerous racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses that she has

committed against the plaintiff, or that all of her racist and venomous rhetoric against the plaintiff was purely intended both to cause maximum

harm onto the plaintiff, and to defraud the plaintiff out of both money and the plaintiff's right to private-property within such White

neighborhood. As any skilled con-artist would deliberately fail-to-do, nowhere in any of her postings, does [RSR] reveal to her audience that, in

the prior years, [RSR] (and her co-conspirators [JSP&KAP]) blackmailed [RSR]'s Board to sue the plaintiff, forcing the plaintiff, by no choice

of the plaintiff's own, to install a *"no-mow"* grass in the plaintiff's [FRONTYARD]. As any skilled con-artist would deliberately fail-to-do,

nowhere in any of her postings, does [RSR] reveal to her audience that [RSR], having already inflicted untold amounts of irreparable harm

onto the plaintiff, is now demanding that the [HOA] take further predatory legal actions against the plaintiff for the plaintiff's failure to mow the

plaintiff's *"no-mow"* grass. According to [RSR]'s racist and far-right-wing-extremist view of the world, every predatory, malicious and abusive

action that [RSR] (and her co-conspirators) have personally undertaken against the plaintiff (or the plaintiff's family-members) is apparently

considered to be *"pleasant"*, whereas, every action in which the plaintiff has innocently exercised the plaintiff's Constitutionally-protected first-

amendment rights - entirely within the confines of the plaintiff's private-property (and was viciously victimized by [RSR] and her co-

conspirators for doing just that) - is considered to be *"non-pleasant"*. [RSR] ends that particular message fully-meant to defraud the plaintiff by

stating, *"My ever so humble two cents worth"*, although no reasonable observer that studies any of [RSR]'s predatory, malicious and abusive

actions against the plaintiff, would consider [RSR] to be anything that even remotely resembles *"humble"*. To [RSR]'s absolute shock, another

White-American resident, [CR], scathingly questions [RSR] as to how any person's (let alone, the plaintiff's) lack of mowing of his/her grass is

relevant to such person's need to video-record such [HOA] meeting, sarcastically questioning to [RSR], *"Is there a pre requisite to be able to*

*be transparent now?"* (The plaintiff would like to make it clear that the plaintiff does not know [CR], and to the best of the plaintiff's

knowledge, the plaintiff has never met [CR] nor has the plaintiff ever contacted [CR]; therefore, [CR] clearly stated all of these responses to

[RSR] out of his own volition.) [RSR] demonstrates her shock that another White-American resident would dare to question her ill-gotten, mafia-godfather-like authority, beginning her next message to [CR] with, *"Wow, C****!"* A skilled con-artist that has mastered her art of defrauding the plaintiff, [RSR], once again, doubles-down on her extremely-manipulative tactic of fully-exploiting the popular anger against [RSR]'s Board, stating that she *"shares in the frustation with the board"*, referring to the plaintiff in the most derogatorily racist manner, that she has *"had to watch and deal with this 'neighbor' for 10 years."* [RSR] fraudulently notifies her audience that she wishes to *"enlighten"* her audience as to who the plaintiff really is, by providing *"some background"*, when any reasonable observer who studies all of [RSR]'s predatory actions against the plaintiff would reach the objective conclusion that [RSR] appears to be a demagogue and skilled con-artist that is prepared to use *"every trick in the book"* to manipulate and indoctrinate her audience in-order-to engender more racial-animus against the plaintiff in the overwhelmingly White neighborhood. [RSR] fraudulently states that the plaintiff has *"an agenda"* - not only denying that an immigrant-of-color/indigenous-person who maintains his/her private-property according to his/her racial/religious/cultural standards is legitimately exercising a fundamental Constitutionally-protected first-amendment right, but instead, also conveying that the plaintiff, due to the plaintiff's racial-profile, has some sinister motive(s). [RSR] then states the words of a guilty person, showing her *"Consciousness-of-Guilt"* about her unlawful conduct against the plaintiff (with *"he"* referring to the plaintiff): *"FIRST let me say ALLEDGEDLY, so he doesn't sue me too!"* This extremely-revealing statement by [RSR] also show that [RSR] is fully-aware that she, the then-[HOA] and [WCLE] have, for approximately 10 years, been engaging in egregiously-predatory and unlawful actions against the plaintiff, all as part of an illegal conspiracy and racketeering-enterprise against the plaintiff, that she, the then-[HOA], and [WCLE] know fully-well are likely to get themselves sued by the plaintiff as a result of these egregiously-predatory and unlawful actions against the plaintiff. Not surprisingly, the statement also further reveals [RSR]'s lack of understanding of the law, with [RSR] claiming that, by her use of the word *"ALLEDGEDLY"*, she somehow magically evades liability for her criminal actions of wire-fraud and online harassment/stalking, intimidation/interference, disorderly-conduct, and blackmail against the plaintiff. This statement is just one of two aspects of this particular sequence of incidents that reveal [RSR]'s, and by extension, [RSR]'s co-conspirators', *"Consciousness-of-Guilt"* - for the decade of hate-crimes/civil-rights-violations/racketeering-acts/abuses that [RSR] and her co-conspirators had perpetrated against the plaintiff (as part of their racketeering-enterprise against the plaintiff) - the second aspect of *"Consciousness-of-Guilt"* being [RSR]'s malicious deletion of this social-media-account (Evidence-Tampering) which occurs within a day after this posting (see below). [RSR] fraudulently focuses her audience's attention onto the plaintiff's many security-cameras, failing to disclose that those numerous security-cameras were installed on the plaintiff's private-property precisely to capture the racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses that the plaintiff has suffered from none-other than [RSR] and her co-conspirators [JSP&KAP], [WCLE] - for, at that point in time, a decade. [RSR] has repeatedly fought the allegations of racism - lodged against both her and her co-conspirators - claiming that the plaintiff has absolutely no right to accuse anyone of racism, despite of the fact that, as this lawsuit seeks to document, the plaintiff has innocently suffered some of the most vicious forms of interpersonal racism (from [RSR],[JSP&KAP],[JJB], and some members of [WCLE]) and institutional racism (from defendant [WC], from the [HOA]) without, in any way, instigating such racist wrath. Once again, [RSR] draws attention to the fact that she has repeatedly and fraudulently demanded the [HOA] to take legal action against the plaintiff, for the plaintiff's deliberate failure to mow the plaintiff's *"no-mow"* grass, yet again, failing to disclose to her audience that the plaintiff installed such *"no-mow"* grass at considerable expense - the plaintiff's back-breaking effort, time, stress, money (including litigation expenses) - precisely because the plaintiff, through no choice of the plaintiff's own, was forced to do so, ultimately, by the blackmailing demands of [RSR],[JSP&KAP] and their co-conspirators. As she has done on numerous prior occasions, [RSR], once-again, fraudulently states that the plaintiff *"buries all his trash and waste"* in the [BACKYARD], when she knows that this is both physically and logistically impossible to do, especially when one considers the amount of *"trash and waste"* that the average American family generates on a weekly

basis. In so doing, [RSR] is fraudulently denying that it is possible for any person in the United States to live an anti-consumerist, *"zero-waste"* lifestyle, when the evidence of people (from all around the world) living such lifestyle is ample and ubiquitous. [RSR] fraudulently accuses the plaintiff of creating *"health hazards"*, without providing any evidence of such *"health hazards"* (especially given that there is a 6-feet-tall-privacy-fence that completely encloses the [BACKYARD]) and without identifying what such *"health hazards"* actually are. This decade-long fraud, in particular, was key to [RSR] and her co-conspirator [JSP&KAP] enlisting [WCLE] to fraudulently charge the plaintiff with Class-C-Misdemeanor-Public-Nuisance in the following year, {2020} - see below. The plaintiff could make an overwhelmingly stronger argument that White-Americans' use of toxic pesticides/herbicides/insecticides (such has [JSP]'s admitted use of such toxic pesticides/herbicides/insecticides) does, in fact, actually create serious health-hazard, both to human health - cancer, Parkinsons-Disease, organ-failure, poisoning, etc. - and to environmental-health - killing of wildlife, land-pollution, and pollution of nearby bodies of water (via runoff), etc. (One-or-more courts in the United States have actually awarded substantial monetary damages to those person(s) who have suffered the aforementioned disease(s)/injury(s) from exposure to some of the most widely-used, toxic pesticides/herbicides/insecticides.) The plaintiff could make an overwhelmingly stronger argument that White-Americans' (such as [RSR]'s, [JSP&KAP]'s) illegal lighting of fireworks in such residential neighborhood causes serious human health-hazards - possibility of injury/death; both short-term and long-term damage to hearing (*"hearing loss"*); post-traumatic-stress; inhalation of toxic, chemically-filled smoke; disturbance to sleep schedule and work schedule - environmental health-hazard (toxic debris polluting the land) - and the serious possibility of property-damages ranging from minor to major. The plaintiff could make an overwhelmingly stronger argument that White-Americans' (such as [RSR]'s) unleashing of dogs and/or cats to roam freely onto others' properties (including the plaintiff's garage, attic, and [BACKYARD]) could cause the possibility of injurious bites/scratches and the potential for transmission of diseases, even ignoring the unpleasant issue of such animals' defecation. The plaintiff could make an overwhelmingly stronger argument that White-Americans' (such as [JSP&KAP]'s, [BR]'s, [NP]'s) speeding vehicles driving through the neighborhood causes hazards with the serious possibility of injury/death and property-damages, and the plaintiff is unaware of any tickets issued for the almost-routine speeding vehicles driving up/down the street. Once again, all of these issues concerning health-and-sanitation, indisputably, have race, color, religion/culture, ethnicity and national-origin written all over it; therefore, adopting any ethnocentric view(s) and/or policy(s) concerning the topic of health-and-sanitation would be egregiously unjust and racially-discriminatory, especially when such ethnocentric view(s) and/or racially-discriminatory policy(s) result in intimidation, threats, coercion, penalization and/or criminalization of any kind. But yet, when [RSR], [JSP&KAP], the [HOA] and/or [WCLE] unjustly (and discriminatorily) intimidate, blackmail, coerce, penalize, sue and/or even criminally-charge the plaintiff for the plaintiff's failure and/or *"inability"* to maintain the plaintiff's private-property according to White-American standards, the plaintiff is still denied the opportunity to make any accusation of racism. [RSR] engages in brazen fraud against the plaintiff when she states that the plaintiff, *"turns spot light on at nite that shine in your window."* The only few times that the plaintiff had been forced, by no choice of the plaintiff's own, to turn on any form of supplemental outdoor-lighting at night, was so that the plaintiff could, Ⓐ spend time installing and/or tending-to the aforementioned *"no-mow"* grass, in response to the predatory litigation efforts of the defendants, and Ⓑ spend time securing security-camera-cables so that they were not visible from the street, again in response to the predatory demands of defendants, [RSR],[JSP&KAP] and their co-conspirators; in all such cases, such lighting was exclusively directed towards the plaintiff's property. By sharp contrast, [RSR]'s partner-in-crime, [JSP], has on numerous occasions, used his hands to maliciously shine torch-light(s) directly into the plaintiff's security-cameras' lens, even admitting to doing so, in-order-to permanently *"blind"* such security-cameras, with the express intent to deprive the plaintiff of recording all of the defendants' criminal acts against the plaintiff - thus, the indisputable criminal acts of racially-motivated criminal-mischief and Obstruction-of-Justice, with one-or-more of [JSP]'s criminal-acts against the plaintiff done alongside [RSR] and/or at the command of [RSR]. By sharp contrast, [RSR]'s partner-in-crime, [JSP], committed one-or-more count(s) of felonious

stalking and [18-USC-PI-C13-§242],[18-USC-PI-C43-§913]/[TPeC-T8-C37-§37.11] against the plaintiff, by fraudulently acting *"under color of law"*, shining a spot-light directly into the interior of the plaintiff's [HOUSE] on one-or-more occasions, while the plaintiff's [FRONTDOOR] was open. Again, not much unlike Hitler who used extremely inflammatory and racist rhetoric to scapegoat entire races of innocent people as being the sole cause of problems within society, [RSR] scapegoats the plaintiff, fraudulently claiming that the plaintiff is the only reason that [RSR] and/or her neighbor were not able to sell their respective properties. As later incidents would reveal, it would appear that [RSR] would eventually sell her property, not as a matter of desire (*"want">*), but as a matter of necessity (*"need"*) - see below. [RSR] encourages her audience to drive by the plaintiff's property to discriminatorily inspect the plaintiff's property - in total violation of the plaintiff's right to privacy. Like a demagogue and con-artist that is skilled at manipulative indoctrination in-order-to defraud the plaintiff, [RSR] states, *"I am sure you know the house"* - as if it was a foregone conclusion to every other resident of the neighborhood that the plaintiff is to blame for all of what [RSR] is fraudulently accusing the plaintiff of. A classic tactic of a con-artist trying to defraud another person is to paint, onto a canvas, only the picture that such con-artist wants the audience to see. By stating *"so you have to look at the entire situation"*, [RSR] makes all of these fraudulent and extremely-misleading statements against the plaintiff, fraudulently pretending that she is providing her audience with the entire picture of the plaintiff, supposedly exposing the plaintiff for the *"villain"* that the plaintiff so clearly is. [RSR] fraudulently states that the plaintiff is in *"pending litigation"* with the [HOA], Ⓐ which as even publicly-accessible court records at this point in time show, is pure fraud, and Ⓑ which, even if true, would reveal that [RSR], a non-Board-member, has illegal access to extremely private/privileged/confidential information about another homeowner, the plaintiff, that she has absolutely no right to have - once-again, revealing the illegal, mafia-godfather-like power that [RSR] wielded over the entire neighborhood, with [RSR] effectively exercising virtual monopoly-control over the Board, at least on any issue concerning the plaintiff. [RSR] goes on to state that due to such *"pending litigation"*, [RSR]'s Board was justified in Obstruction-of-Justice and Witness-Intimidation against the plaintiff by shutting-down the plaintiff's video-recording of such [HOA] meeting. If anything, if the plaintiff was truly in *"pending litigation"* with the [HOA], then the plaintiff would have been even-more justified in video-recording any-and-all [HOA] meeting(s), and likewise, the [HOA] would have been even more guilty of Obstruction-of-Justice/Witness-Tampering by denying the plaintiff the opportunity to video-record any such meeting(s) - especially if such denial was, in any way, intended to prevent the plaintiff from recording evidence of crimes and/or otherwise unlawful actions. Furthermore, if the plaintiff was truly in *"pending litigation"* with the [HOA], then [RSR] and all witnesses would know that the plaintiff would be unable to make any extra-judicial statements to correct [RSR]'s dissemination of such fraudulent and racist narratives against the plaintiff. In other words, if the plaintiff was truly in *"pending litigation"* with the [HOA], [RSR] is fully-exploiting and capitalizing-upon the plaintiff's inability to make any statement, let alone, mount a vigorous defense by fully exposing [RSR]'s fraudulent and racist narratives against the plaintiff. [RSR], skilled at extremely-manipulative indoctrination, once-again, engages in such extremely-manipulative indoctrination to channel the popular anger against [RSR]'s board, by fraudulently stating, *"my goal is that i wanted to offer an option to those people who are frustrated."* [RSR] then fraudulently accuses [CR] of *"misconstruing"* her statements. While [CR] is completely oblivious to the decade-long campaign of relentlessly-racist propaganda that [RSR] has perpetrated against the plaintiff, [CR] was, nonetheless, innocently interpreting [RSR]'s statements against the plaintiff to be irrational and illogical; therefore, there was no possibility that [CR], in any way, *"misconstrued"* anything [RSR] had stated. [RSR] fraudulently states, that [RSR]'s statements were *"made in caution."* There is absolutely nothing in [RSR]'s numerous racist rants against the plaintiff that indicates that any of [RSR]'s statements in these particular social-media postings (and/or at the recent Board-Meeting) were *"made in caution"*; rather, all of [RSR]'s predatory statements against the plaintiff - over the course of over 10 years - were made maliciously both, Ⓐ to defraud the plaintiff of money and property, and Ⓑ as pure retaliation for the decade of highly-incriminating evidence of the defendants' hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff that the plaintiff had accumulated for at least 8

years at that point in time. So, quite to the contrary of [RSR]'s words being *"made in caution"*, almost-all, if not all, of [RSR]'s words against the plaintiff have been brazenly incriminating and/or revealing of her malicious conspiracy and racketeering-enterprise against the plaintiff, with [RSR] serving as the *"kingpin"* of such racketeering-enterprise against the plaintiff. [RSR] protests to [CR], *"I am not sure how you drew such a conclusion"*, when any reasonable observer would realize [RSR]'s arguments as irrational and illogical - in other words, the arguments of a demagogue. [RSR] concludes the previous statement, by stating, *"... hopefully my explanation was helpful."*; again, any skilled con-artist will speak as if such person is operating with the best of intentions, when those that do any serious analysis will fully-realize the con-game. [RSR] pretends as if she has been somehow victimized by [CR]'s sarcastic, yet innocent, questioning of [RSR]'s irrational and illogical arguments, stating in protest to [CR], *"But why such an aggressive tone towards me?"* [RSR] concludes her rant by stating, *"I will heed my intuition from now own and just not post in the future. Who needs this?"* Again like any skilled con-artist whose con-game has been exposed, [RSR] pretends as if she has somehow been victimized by such exposure, when the true victim of all of [RSR]'s viciously predatory actions has been the plaintiff. In other words, when [RSR], for once during the entire decade of incidents documented by the plaintiff, realizes that she is both outnumbered and outed as a con-artist that was, yet-again, acting to defraud the plaintiff, she immediately retreats and agrees to stop posting - another typical characteristic of the standard con-artist. (The typical con-artist knows when to escape and cover-up-their-tracks when their con-game has been exposed.) Despite of [RSR]'s intimidating rant, [CR] calmly reiterates his prior question to [RSR], as to how any of [RSR]'s statements that were viciously made to character-assassinate ( ⊕ ) the plaintiff were in any way relevant to the plaintiff's right to video-record the [HOA] meeting, once again, bringing attention to the completely illogical and irrational nature of [RSR]'s arguments. Again, [CR], acting on his own volition, follows his sarcastic question to [RSR], by making another revealing statement - that the plaintiff's *"rights can't be infringed because of what he may not be doing"* - fully revealing that [RSR]'s predatory attacks against the plaintiff were fully violative of the plaintiff's rights. It is indisputable, that [RSR]'s racist, fraudulent messages against the plaintiff in this social-media-posting (and in previous social-media-postings) is very-similar-to the overtly-racist messages posted by White-Supremacists/White-Nationalists in, for example, the [SBPDL] blog (see section below for examples). Needless to state, the plaintiff remains indignant and extremely-violated that the plaintiff was, yet-again, publicly humiliated/defamed ( ⊕ ) and privacy-invaded by this racist, fraudulent narrative in such public-setting by [RSR]. The second screenshot posted below is another social-media posting following this [HOA] board-meeting in which multiple residents protest then [HOA] Board members [SPOA-P-BC]'s,[SPOA-VP-AH]'s,[SPOA-MaL-ML]'s and [SPOA-CM-CD]'s iron-fisted behavior/actions and violation of homeowners rights - in particular, stating that by refusing to allow the plaintiff or any other homeowner to record such meeting, these Board Members and Community-Manager also violated the rights of all homeowners of the subdivision who are fully entitled to know about what their [HOA] is doing - whether or not they able to attend the meeting in person. In this social-media posting initiated by another resident, [SM], [SM] scathingly critiques [RSR]'s Board, stating that [RSR]'s Board *"picked on"* the plaintiff for no good reason, as Texas, by default, is a one-party-consent State, and furthermore, there is no law that explicitly forbids the recording of such meetings. (The plaintiff would like to make it clear that the plaintiff does not know [SM], and to the best of the plaintiff's knowledge, the plaintiff has never met [SM] nor has the plaintiff ever contacted [SM]; therefore, [SM] clearly stated all of these statements out of his own volition.) In this two particular social-media-postings, three-or-more residents expressed their opinion that the residents should have been allowed to record the [HOA] meeting, criticizing [RSR]'s Board for deliberately stopping the plaintiff from video-recording such meeting in-order-to corruptly evade liability, which even [SPOA-VP-AH] admits was the real (and thus, illegal) reason for such prohibition - see subsequent meeting below. Most importantly, as the third screenshot shows, after this exchange of public messages that turned out very unfavorably for [RSR], [RSR] immediately and deliberately deletes her *"nextdoor.com"* account - a social-media account that she had owned since as early as {2014} (more than 5 years prior to deletion) - knowing that she has incriminated herself multiple times on this social-media-platform by, at the very least, committing multiple counts of the

SIDDHARTH KODE     V.     WILLIAMSON COUNTY , ET   AL.                                                 1696907690

crimes of harassment/stalking, witness-tampering and wire-fraud against the plaintiff - in an attempt to conceal/destroy evidence of such major crimes against the plaintiff - which is considered to be the even-more-severe criminal action of felony/racketeering-act evidence-tampering (falling under the category of Obstruction-Of-Justice). In particular, [RSR]'s felony/racketeering-act evidence-tampering concealment/destruction action of account deletion prevents the plaintiff (or any other law-enforcement investigator) from seeing all of [RSR]'s public posts on the platform, as the profile page normally displays a list of these postings - forcing the plaintiff to have to subpoena/depose *"nextdoor.com"* in a legal-proceeding (such as one pertaining to this lawsuit), and/or forcing law-enforcement to obtain a search-warrant, in in-order-to obtain all of [RSR]'s now-inaccessible, incriminating posts against the plaintiff on this social-media-platform. As [RSR]'s profile page did show at the end of day of {2019-08-21} (after [RSR] deliberately deleted her account), and continued to show until her final day of residence at [789KLLTX78641] - almost 2 years later - on-or-about the month of {2021-03} - *"Becky Robertson is no longer a member of Summerlyn Leander."* Besides this text, this profile page is empty instead of showing the full listing of [RSR]'s public social-media postings. It is important to note that [RSR] remained an owner and resident of [789KLLTX78641] well after the month of {2019-08} and through the end of the month of {2021-02}; therefore, [RSR] immediately deleted her *"nextdoor.com"* account - a social-media account that she had owned since as early as {2014} (more than 5 years prior to deletion) - after this final posting in {2019-08-21} as a deliberate felony/racketeering-act evidence-tampering in-order-to cover-up/conceal her crimes (including witness-tampering/wire-fraud/harassment/stalking) against the plaintiff, and in so doing, [RSR] additionally committed the crime of Obstruction-Of-Justice against the plaintiff. In fact, the only reason that plaintiff found and saved [RSR]'s now-defunct social-media messages is because the plaintiff was, at that moment in time (right after that specific [HOA] Board-Meeting), closely-monitoring the social-media-platform for evidence of [RSR]'s crimes (including witness-tampering/wire-fraud/harassment/stalking) against the plaintiff. It is indisputable that, by her deliberate and malicious deletion of this particular *"nextdoor.com"* social-media-account, thus removing all evidence of her numerous fraudulent and defamatory (⊕) social-media-postings against the plaintiff on such social-media-platform, [RSR] also committed numerous counts of the Texas crime of *"fraud"* (specified in [TPeC-T7-C32-§32.47]), against the plaintiff. It is also indisputable that, in every one of social-media-postings and/or private-messages directly targeting the plaintiff for the purposes of initiating predatory legal-action(s) against the plaintiff (dating back to the month of {2016-08}) - either with the [HOA] and/or [WCLE] (see below) - [RSR] has directly engaged in the most overt forms of retaliatory witness-tampering against the plaintiff. As a reference example, the fourth screenshot shows a snapshot of [RSR]'s (active, non-defunct) profile page as of the date of {2017-07-20} - with this active profile page showing all of her publicly visible information including public-postings (but none of her private messages) as of that date in time. This snapshot of [RSR]'s profile page dated {2017-07-20} showed that [RSR] created this social-media account during the year {2014}, and since that year until the date of the snapshot, [RSR] created a total of 4 posts on this social-media-platform - 1 of them to introduce herself to the neighborhood, 1 of them to advertise a lost dog, and 2 of them to demand that the [HOA] take predatory enforcement-actions - in particular, legal-action - against the plaintiff. This snapshot of [RSR]'s profile page dated {2017-07-20} also shows that, during that same time period, [RSR] replied to other residents' posting a total of 111 times, and as is already illustrated by the number of responses posted in this lawsuit, many of these responses were part of [RSR]'s predatory targeting of the plaintiff (along with her co-conspirators), and many of these postings also showed the extremely-racist hypocrisy under which [RSR] operated. These statistics further establish that, despite of the fact that the neighborhood had over 1200 residential-properties at that moment in time - overwhelmingly owned by White-American property-owners - [RSR] was only laser-focused (along with her co-conspirators) on predatorily (and thus discriminatorily) targeting the plaintiff - exclusively due to the plaintiff's minority-of-one racial-profile - causing severe and long-term psychological-trauma onto the plaintiff, causing crippling financial/economic harm onto the plaintiff, with her ultimate goal being to get the plaintiff's property foreclosed-on (as she has directly threatened to the plaintiff - see above). The plaintiff emphasizes that this is the manner in which [RSR] was using multiple public social-media-

platforms (involved in interstate or foreign commerce) to publicly and maliciously character-assassinate , defraud and conspire-against the plaintiff - engaging in fraudulent, racist propaganda to engender more racial-animus against the plaintiff in the White neighborhood's other residents. The plaintiff asserts that, if this the manner in which [RSR] abused the plaintiff in public settings, then [RSR]'s private-messages on private-messaging platforms (also involved in interstate or foreign commerce) are sure to reveal more incriminating evidence of her (and her co-conspirators) conspiracy and scheme to defraud the plaintiff. Additionally, in one-or-more social-media postings (see below), [RSR] also admits to using the *"facebook.com"* social-media-platform (also involved in interstate or foreign commerce) to rant against the plaintiff, and thus, in-order-to engage in the same conspiracy and scheme to defraud the plaintiff - the messages of which, to this day, plaintiff has not been able to access. Almost-all, if not all, offensive postings - including postings that are indicative of conspiracy, fraud, witness-tampering, harassment/stalking, and racial-discrimination - are almost immediately removed by the moderators/administrators of such social-media-platforms, and for this reason, the plaintiff is unable to access such removed postings (on all of the relevant social-media-platforms) further revealing the defendants' conspiracy and scheme to defraud the plaintiff. Thus, although the plaintiff already has sufficient evidence to litigate the plaintiff's claims against the defendants, only through the legal processes of Discovery and Depositions (achieved by litigating this case) can the plaintiff attempt to uncover/obtain any-and-all of [RSR]'s (and her co-conspirators') private-messages and other inaccessible social-media-postings that further-reveal the full range and scope of [RSR] (and her co-conspirators') conspiracy and scheme to defraud the plaintiff - and in particular, all of [RSR]'s (and her co-conspirators') acts of racial-discrimination against the plaintiff and all of [RSR]'s (and her co-conspirators') criminal acts of Conspiracy and/or Wire-Fraud and/or Witness-Tampering and/or online Harassment/Stalking against the plaintiff.





anyone else. I just want to serve the community and the position I have volunteered for.

5 days ago   Thank   Reply

**Chris Rembowski**, Summerlyn Leander

**Alicia Hynum**, you're right, we don't know you but we do KNOW that you don't care about this neighborhood.

5 days ago   Thank   Reply                                          😠 3

**Alicia Hynum**, Summerlyn Leander

And the sad thing is that THIS type of behavior right here is why people who would be WONDERFUL board members don't want to serve, and why people don't want to make comments on any social media sites.

5 days ago   Thank   Reply                                          😠 1

**Steve Marlett**, Summerlyn Leander

**Alicia Hynum** then that's not being transparent then is it? Like it or not, people want to know what is going on. Take the lumps with the smiles...It goes both ways. If you aren't good with dealing with criticism then walk away, you can't please everyone

5 days ago   Thank   Reply                                          😠 1

**Becky Robertson**, Summerlyn Leander

[highlighted text block]

5 days ago   Thank   Reply                                          😠 3

**Chris Rembowski**, Summerlyn Leander

**Steve Marlett** the damage is already done. The whole board knows it. Come election time, anyone who is up for re election will be gone. She knows it. They all know it

5 days ago   Thank   Reply                                          😠 2

**Chris Rembowski**, Summerlyn Leander

[highlighted text block]

5 days ago   Thank   Reply

**Becky Robertson**, Summerlyn Leander

[highlighted text block]

5 days ago   Thank   Reply                                          😠 2

**Chris Rembowski**, Summerlyn Leander

[highlighted text block]

5 days ago   Thank   Reply

**Chris Rembowski**, Summerlyn Leander

[highlighted text block]

5 days ago   Thank   Reply

**Jeremy Reno**, Summerlyn Leander

Any of the board members who were rude, unprofessional, and unwelcoming to the public at the last meeting needs to go away immediately. If there was additional video of that meeting, which should be done and openly shared to the community for every meeting going forward, the outrage over their behavior would be even worse than it already is.

5 days ago   Thank   Reply

**Jessica Katt**, Summerlyn Leander

**Jeremy Reno** while removing all those board members who were rude, we'd practically have nobody left. Having a fresh board with no knowledge of how things work isn't exactly a good idea.
As much as I think it would be nice, we should replace the members as they

come up for re-election.

5 days ago   Thank   Reply                                    😊 1

**Jeremy Reno**, Summerlyn Leander                              ∨

> **Jessica Katt** I don't completely disagree, especially since recent events seems
> to have motivated an amazing amount of new communication from certain
> board members. Aaron was the only one I really ever heard from prior to this
> last meeting, and I believe he was president of the HOA in his last
> neighborhood, so I'm hoping his presence and influence increases.... a lot.
>
> Also, Candace and spectrum are being paid for their services, as poor as they
> seem to be.  Is it wrong to expect that they would be helping with a transition,
> no matter how many board members are replaced?
>
> 5 days ago   Thank   Reply                                  😊 1

**Jessica Katt**, Summerlyn Leander                            ∨

> Jeremy, I agree with Aaron and he was the only to communicate.
>
> As for Spectrum, I personally don't know if we can depend on them too much.
>
> 5 days ago   Thank   Reply                                  😊❤ 2

**Renee Daniels**, Summerlyn Leander                           ∨

> **Alicia Hynum** the board minus Aaron showed in body language and your
> matter of fact attitude when it came to asking if we as homeowners got a vote.
> You know very well if the live feed was on until the end, everyone would see
> your true colors. I'm sure you're a nice person and you are right, I will never
> know your true intentions because you waited up to now. I tried talking to you
> and the board about my concerns in over charging my account and Bernie told
> Candace to handle it. She said absolutely, I even showed my 8 emails to her
> and Bernie when she only responded, twice. The second email was a social
> committee form and never addressed the actual issues 😊. Thank you for
> hanging in there and fulfilling your obligations. I wish this wasn't a thing but
> obviously it is
>
> 4 days ago   Thank   Reply                                  😊 1

**Daniel Stitz**, Summerlyn Leander                            ∨

> I was going to write a longer reply, but I don't have the energy.  Did anyone read
> this Code of Conduct document?  In my opinion, it is not very well written.  I
> really hope this does not get recorded at WILCO.  I think this should be thrown
> out entirely.  I do not believe the second "WHEREAS" in the preamble is
> technically correct with our DCCR's.
>
> 4 days ago   Thank   Reply                                  😊 2

**Connie Moore**, Summerlyn Leander                            ∨

> **Jessica Katt** This is a critically important point that the community needs to
> fully understand and communicate. It's not about overthrowing the English 200+
> years ago. This is about understanding all of the rules, regulations, legal
> requirements, insurance's required and carried at will, deductibles for said
> insurance's, neighborhood assets, debt service, current financial scope
> including a detailed description of every single line item, and every other nuance
> involved in managing a community of approx. 1300 family's. If our average
> home size is only 4 people, that's 52,000 people. There are Mayor's of towns
> smaller than our neighborhood. Vis-a-Vis my statement of August 21, 2019.
> "Don't throw the baby out with the bathwater".
>
> What we seek is long overdue.  The fact we have demanded transparency is
> not a new request. I have been bringing it up since my first Board Meeting in
> 2017. The response of the Board Majority gives the appearance that this is
> "NEW NEWS" to them. It simply is not. I offer personal testimony to that.
>
> 4 days ago   Thank   Reply                                  😊 1

**Connie Moore**, Summerlyn Leander                            ∨

> **Jessica Katt Jessica Katt** I believe they would contractually obligated to be an
> active partner in any transition that may occur.
>
> 4 days ago   Thank   Reply

**Daniel Stitz**, Summerlyn Leander                            ∨

> **Connie Moore** is right.  We even did a survey on here asking for more
> transparency and better access to the board meetings.  I think it was 98%
> agreement. I really don't know why the GENERAL part of the meetings cannot
> be recorded / posted on a private part of You Tube -- or at least allow people to
> call into the meetings to listen in.  What is so secretive that if we cannot make
> it, we must be punished and left in the dark?  The meeting minutes should be
> more detailed, in my opinion.  And I have been pulling teeth at Spectrum to see
> Q2's meeting minutes for weeks now.  Ironically, the special board meeting is
> posted -- but not the draft or final Q2 meeting minutes.  I know Alicia the FINAL
> Q2 minutes addressed above -- but why not post the draft minutes soon after
> the meeting?  We, who cannot attend. end up in the dark for months.  This has
> been a problem for years with Candace.
>
> My personal opinion, I think Spectrum AM is salvageable -- as I don't want to
> pay to break any contract we may or may not have.  But maybe it is time for a
> different Candace?
>
> 4 days ago   Thank   Reply                                  😊 1

**Steve Marlett**, Summerlyn Leander                           ∨

> Surveys and polls can constantly be manipulated or skewed for one way or the
> other. We should not be basing our entire community on a poll, or a survey that
> 5 to 12% of the entire community even sees. Many of us are not on Facebook,
> many of us are not on here. unless there is an accurate count of exactly how
> many people live in this community and I see exactly that amount of people
> voted yes no or NA then I'm not going to believe it. Sorry just being pessimistic
> but duly and truly honestly.
>
> 4 days ago   Thank   Reply



SIDDHARTH   KODE   V.   WILLIAMSON   COUNTY ,   ET   AL .                                          1696907690



**Daniel Stitz**, Summerlyn Leander

i did they survey here on Nextdoor. You have to be registered here to vote and
be a legit member of the community. Some may have been renters. It was
anonymous. But we each only got 1 vote. Until we have a better system -- that
is the only way to do it. No one tried to influence that I am aware. Still when
over 100 people vote overwhelmingly one way, that is at least pretty telling... it
is the best I know how to do until we get a better way. There are supposed to
be 1668 people here on ND -- but the most I have ever seen (+300) was on the
online Change.org poll. THAT may have been manipulated .. as people could
have used aliases or other e-mail addresses to post. At least here on ND - you
got 1 vote per login, which are all verified by the LEEDS. But also, there were
people on FB which may not have been on ND or neighbors voting on
Change.org that aren't on either... legit votes.

4 days ago   Thank   Reply                                                          😊 1

**Steve Marlett**, Summerlyn Leander

Daniel Stitz I'd knock on doors if I knew no one would shoot me lol. I also don't
look approachable now that I think of it...

4 days ago   Thank   Reply                                                          😊 1

**Daniel Stitz**, Summerlyn Leander

You should see what I did to the ADT guy the other day... Ha ha! :-)

4 days ago   Thank   Reply

**Renee Daniels**, Summerlyn Leander

Daniel Stitz no

4 days ago   Thank   Reply                                                          😊 1

**Tray Cushing**, Summerlyn Leander

Correct Connie Moore . Nothing here is new. I brought these issue up when I
served on the board and everything I offered and suggested was dismissed.
And it goes back even further. I work with a former board member who served
before we moved here(pre 2014) who tried to pursue the same changes
without success

4 days ago   Thank   Reply                                                          😊 4

**Renee Daniels**, Summerlyn Leander

Tray Cushing would you consider being on the board again?

4 days ago   Thank   Reply

**Christina Ellinger Mosher**, Summerlyn Leander

Please all that have concerns please come for a little bit more information on
how we can legally get a change to this board for our community. All of the
concerns are correct. The needs of this community are not being met and that
needs to change.

4 days ago   Thank   Reply                                                          😊 1

**Christina Ellinger Mosher**, Summerlyn Leander

Hello, I know a lot of this community has been very upset with the goings on
with our current board. How do we change that - a lot of you ask. One - we
need to new board members. How to do that. You need to run for the board.
How do we make this community great? We need to fill up our committees. If
we can get the right people in there and we can work together then we have
the making of something great. There is a team of us that have gotten together
to try and help with as much information as we can. We have set a few times
and days to help with schedules. Please come out to learn how you can help.
Sept 3-5 at 7pm
Sept 4th at 10am
Sept 7th at 2pm
205 Talon Grasp Tel

4 days ago   Thank   Reply                                                          😊 1

**Christina Ellinger Mosher**, Summerlyn Leander

Jeremy Reno exactly I agree with you. Use there own code of conduct. Last
sentence

4 days ago   Thank   Reply

**Tray Cushing**, Summerlyn Leander

Renee Daniels Unfortunately, I cannot. With my health issues right now, I do
not want to take on more and be unable to follow through later on. Thank you
though!

4 days ago   Thank   Reply                                                          😊 3

**Connie Moore**, Summerlyn Leander

Daniel Stitz I second that. I wrote contracts for ATT for many years and this is
a pitiful excuse for a legally binding document. I'm embarrassed that we
actually paid a lawyer to draft, proof and publish a document like that. That is
not an example of the Board acting in the best interest of the community. In
fact, per your own document, it's actually grounds for discharge for
inappropriate use of Association resources. Time and money. Everyone on the
Board except Aaron voted in favor of adoption so there you have it. If everyone
is to be held to the same standard, I see this as a big "shoot yourself in the
foot". MAJOR Gaffe!

4 days ago   Thank   Reply                                                          😊 1

**Renee Daniels**, Summerlyn Leander

Tray Cushing please let me know if you need anything! Im PMing  you

4 days ago   Thank   Reply                                                          😊 1

**Connie Moore**, Summerlyn Leander

Daniel Stitz While I don't disagree regarding consideration to requesting a new



Community Manager, I would hope we see the merit in maintaining the continuity Candace would provide during the initial transition and until the "smoke settles". I would actually be prone to believe that Candace would request reassignment eventually since as a professional, I'm sure she knows her credibility has been irreparably damaged here. Regardless, a new CM within the first six months post transition or whatever timeframe the Board deems appropriate is fundamental to this initiative, IMHO.

4 days ago   Thank   Reply                                        😊 2

**Daniel Stitz**, Summerlyn Leander

**Connie Moore** I totally agree with that.  I just know many people are fed up with Spectrum AM — and I think they might be salvageable if we get a different "Candace."  In good time.

4 days ago   Thank   Reply                                        😊 1

**Jeremy Reno**, Summerlyn Leander

Spectrum is a large company and Candice is a spoke in the tire.  Just like with the security company at the pool, landscaping contractors, and any other business associated with communities like ours, there are plenty of competitors ready to take over if needed.  Let's put the right people on our board and then, with the expected improvements in communication and community involvement, we can make a much more rational and improved decision.

Spectrum could be an amazing company, let's make sure Candace and her boss, and her boss's boss, know exactly what's happening.  Social media and LinkedIn can point us in the right direction.  No company wants to lose income, better to move a problem child than write off guaranteed income from us.  Ya know?

4 days ago   Thank   Reply                                        😊 1

**Daniel Stitz**, Summerlyn Leander

Jennie, her boss, is very aware.  The owner (her boss) has NEVER responded to any of my e-mails.  FYI  But I think it would carry more weight from a board member.  So it is back to getting the right people on the board.

4 days ago   Thank   Reply

**Renee Daniels**, Summerlyn Leander

**Daniel Stitz** Jennie defends Candace because Candace "is a good person"

4 days ago   Thank   Reply                                        😊 1

**Jeremy Reno**, Summerlyn Leander

**Daniel Stitz** yeah so that's the sort of stuff that needs to be communicated.  Who is her boss and what's their email address and position with spectrum?  Let's get it all out in public!

4 days ago   Thank   Reply

**Daniel Stitz**, Summerlyn Leander

**Renee Daniels** Oh well, I guess that makes up for it.  Seriously, that is a problem..... In business -- you have to deliver.  And that is what the POA is -- a business.  People can make mistakes, things can fall through the cracks -- but in the long term, the management company is paid to do its duties.  That isn't an excuse, but you know that.  Thanks Renee.

4 days ago   Thank   Reply                                        😊 1

**Daniel Stitz**, Summerlyn Leander

**Jeremy Reno** I have posted them on here before... so no harm in posting again... I am sure you can search of them here on ND.

Candace Davison - cdavison@spectrumam.com
Jennie Saldana - JSaldana@spectrumam.com  (Candace's Boss)
Andy Hill AHill@spectrumam.com  (Owner)

Please consider first what I write below:

Jennie, I do believe, is trying to do a good job.  I really do -- but she is also loyal to her company and protective of her employees.  This is why I would like to see the new POA try to work with Spectrum AM in the long-run.  We paid something like $30,000 to break with RealManage AND they refused to hand over documents!  The POA should have sued for specific performance to get the docs turned over (maybe they did?  I doubt it -- this is a question they never answered).  This is why, I later found, the firing policy was delayed for months on end... as no one knew which owners in violation, what was sent in regards to warnings.  Again, I think we make a long-term strategy as Christina Ellinger Mosher rightly suggested.  Make decisions as a group and proceed as a group.  This is VERY important once we select new people for the POA.  If we get 20 people running against each other, we will accomplish nothing but splitting the vote.  This is where homeowner proxy are key.

I suggest, for now, we tread lightly with Spectrum AM.  Andy Hill, the owner, after multiple e-mails and exposing things that are NOT good -- he never ONCE responded to any of my e-mails.  Again, maybe because I was not on the board?

Thanks for consideration.

4 days ago   Thank   Reply                                        😊 3

**Debbie Davis**, Summerlyn Leander

Just so that everyone who is (for whatever your reasoning) fired up for wholesale change is aware—

* We have Bylaws. They are available for you to read. They are registered with the county for public consumption and posted on the Spectrum website under governing documents. The bylaws describe how and when Board members are elected and/or removed.

Obviously, most of the people posting on this thread are aware of that. However, this isnt the first time, and it certainly isnt going to be the last time a group of Summerlyn homeowners get fired up about something and start demanding that Board members step down, or threaten group action/consensus to replace them. One of the (many) issues with Summerlyn is that people dont seek to understand our governing documents, dont follow them, and have very short memories and next to no follow-through. I can pretty much promise you that at the annual meeting, the same 32-33 of us will show up, representing less than 1% of the homeowners in Summerlyn.

It's important to understand that the Board Members (duly elected), this group, the next group, etc ... are human beings and your neighbors. You can criticize their actions taken as Board Members, but leave the emotion out of it. I can absolutely promise you that no matter who the Board Members are, they will endure a large amount of criticism from members of the community who are unwilling to commit to the service of our community themselves. That's how the game is played.

A good number of people who have grievances and have signed petitions have never attended a Board Meeting, are getting their information 2nd, and 3rd hand, have not endeavored to understand the issues that impact our community, the history of some long-standing issues, have not read our governing documents, have not personally looked at our financials or endeavored to understand them, have not researched our legal standing on issues, have not volunteered on a committee, has never cast a single vote in relation to our POA. I know this concretely, because the exact same hand full of people, year after year, are engaged. The exact same THOUSANDS of people are not. I wasn't even in attendance at the last Board Meeting (scheduling conflict), and I fielded 47 calls, texts, and PMs, mostly from other people who were not in attendance (and NEVER have been), and a few from people who no longer live or own property in Summerlyn, but are being fed through the rumor mill.

I have probably been one of the most vocal members of this community for the last 7+ years, and one of the most critical (if not the most) of the Builder controlled POA Board, the previous management company (RealManage), the current homeowner controlled POA Board, and the Summerlyn POA members (all of us). I'm an equal opportunity critic, and I hold "everyone" responsible. However, before I start to criticize, I'm going to "understand" and make sure that the position that I'm taking is valid, and in the best interest of the community.

While I absolutely love the community engagement, let it be the right actions, for the right reasons, in our collective best interests-- not more self-serving agendas self-propelled by blind ignorance & groupthink, and nurtured by misguided one-sided stories, that dont even remotely tell the whole story. I'm not seeing a whole lot of the former yet, and way too much of the latter.

4 days ago    Thank    Reply                                          😊 4

**Connie Moore**, Summerlyn Leander                                   ⌄

Debbie Davis I couldn't agree with you more. The road to hell is paved with good intentions!

Very well stated, Debbie. I always appreciate your highly THOUGHTFUL insight.

4 days ago    Thank    Reply                                          😊 2

**Karen Davis**, Summerlyn Leander                                    ⌄

Daniel Stitz I read the Code of Conduct. Im not a lawyer but to me they seem very subjective. Can be applied in any situation because its all "in my opinion you did this..." Type of thing. Also, why couldnt these be sent to homeowners for vote. They affect the behavior of the board. We are the board's "employer" so shouldn't we have a say in the rules of conduct?

4 days ago    Thank    Reply                                          😊 3

**Nickolaus Poling**, Summerlyn Leander                               ⌄

Daniel Stitz signed

4 days ago    Thank    Reply                                          😊 1

**Renee Daniels**, Summerlyn Leander                                  ⌄

Debbie Davis I promise if you were there you would had been just as upset. The whole thing was ridiculous and then letting homeowners that its not Candace it's our fault for being misinformed on her email. I could agree with this but she had responded to my emails twice in two years. If you would had heard the way the board talked to all of us as homeowners, again you would had been disgusted as the rest of us. Alicia is very lucky that the video stopped when it did because the Callus response she gave was disgusting. This isnt about past board members this is about the now. I'm huge on show me this was a bad day but this wasn't this is on going. Now we all are aware and very much awake.

3 days ago    Thank    Reply                                          😊 2

**Daniel Stitz**, Summerlyn Leander                                   ⌄

Here is what bothers me most about this "Code of Conduct" document. I "assume" this will become a governing document and posted at WILCO for the world to see. The board adopted this code of conduct without floating this document or ideas out to the members of the association for feedback ... which this document reads to possibly PENALIZE this behavior of transparency? This is so open-ended in legality. I still question the legality of the document how the board can remove an elected member when that contradicts the CICCRs. Isn't this is a great example of lack of transparency? Owners knew nothing of this until it was approved. I am assuming Summerlyn is now stuck with this. Does it not also exceed its authority by definition when it begins to include owners as part of the conduct when it is not called that? At best, this should be a "guiding principles" or "mission statement" of the board / interaction at meetings. This should not be an enforceable governing document that is posted or adopted as part of our association. That is my opinion.



SIDDHARTH KODE V. WILLIAMSON COUNTY, ET AL. 1696907690



hoa-board?recruiter=9961600808utm_source=share_petition&
utm_medium=facebook&utm_campaign=share_petition&
utm_term=share_petition&recruited_by_id=e7c84cf0-c412-11e9-
bf8d-011f659bb827

21 Aug   Thank   Reply

**Steve Marlett**, Summerlyn Leander
How many signatures are needed to kick everyone off of the board? I can't find that in the paperwork

21 Aug   Thank   Reply

**David Herbert**, Summerlyn Leander   ⌄
1/10th of the members

21 Aug   Thank   Reply       1

**Daniel Stilz**, Summerlyn Leander                                           ⌄

David, with respect, are you sure about 1/10th?

I reached out to Jennie at Spectrum AM. We might not be able to just sign a petition (I did sign it anyway!)… we might need people to sign proxy forms to give their vote to someone who will vote on their behalf if they cannot attend a meeting. She said she just got back from vacation and would let me know by Friday. She is pretty good about these things. She is Candace's boss. I was certain it was more like 2/3 or 3/4 of all OWNERS – which makes it tricky since we have rentals in here. We need to track down the owners or management companies who can give over their proxy. I don't know. With 1300+ homes, that could me almost 1000 people we need to get on board.

21 Aug   Thank   Reply

**David Herbert**, Summerlyn Leander                                          ⌄
Sorry to clarify, 50.1% of home owners must sign the petition to remove, 10% is needed to vote at a meeting (in person or by proxy)

21 Aug   Thank   Reply

**Steve Marlett**, Summerlyn Leander                                          ⌄
So we need half the owners in summerlyn to kick out the entire board? Ok… Then what? We get a new management company, re-write the CCNRs?

21 Aug   Thank   Reply

**David Herbert**, Summerlyn Leander   ⌄
New board, not management company

21 Aug   Thank   Reply       2

**Renee Daniels**, Summerlyn Leander   ⌄
**Steve Marlett** 601 votes period for or against

21 Aug   Thank   Reply       1

**Renee Daniels**, Summerlyn Leander                                          ⌄
**David Herbert** if we don't replace Spectrum, Candace is a huge problem

21 Aug   Thank   Reply       1

**Jessica Katt**, Summerlyn Leander                                           ⌄
**Daniel** as for the basketball goal, they said it's now too hot to finish the project during the day because the paint won't dry right. Supposedly they'll do some painting in the mornings?

21 Aug   Thank   Reply

**Renee Daniels**, Summerlyn Leander                                          ⌄
**Jessica Katt** don't forget about adding more parking to an area where the homeowners paid $10,000 more so there wouldn't be a build but there, but I guess since it's not a "building"

21 Aug   Thank   Reply

**Jessica Katt**, Summerlyn Leander                                           ⌄
**Renee** yes!!! Again I didn't buy my lot to have a parking lot behind my house. They passed the additional parking issue without having ANY details on how it'll look or work too. Again, Aaron was trying to delay this till it was reviewed by an engineer, but he was shut down. UGH

21 Aug   Thank   Reply

**Renee Daniels**, Summerlyn Leander                                          ⌄
**Jessica Katt** and NOVEMBER where we all have a say so! I'd like to know who played morning dove not to be a median evil! I'm furious, I'm on Hoot Owl Ln !! It was ridiculous last year until the police came out to actually see the problem. This year I'm grateful it's not so bad, but redirecting traffic further up, brings more my way 😊

21 Aug   Thank   Reply

**Jessica Katt**, Summerlyn Leander   ⌄
Shady Shady Shady

21 Aug   Thank   Reply

See 9 more comments

Add a comment…

▸  "Becky Robertson"  (defunct profile due to deliberate account-deletion on-or-about the date of {2019-08-21}) ·  Nextdoor Summerlyn Leander ·  [RSR] ·  {2019-08-21} ·

PAGE 559 OF 956

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.    1696907690



▷  https://nextdoor.com/profile/2221918/

**Becky Robertson**

Summerlyn Leander · Member since 2014

Becky Robertson is no longer a member of Summerlyn Leander.

▷  "Becky Robertson"  (active profile as of the date of {2017-07-20}):   Nextdoor Summerlyn Leander:   [RSR]:   (2017-07-20):
▷  https://summerlynleander.nextdoor.com/profile/221918?tab=activity

**Becky Robertson**
Summerlyn Leander · Member since 2014

Message

About me    Activity    Recommendations

Recent activity

4 posts, 111 replies, and 20 thanks and welcomes.

## ¶449

On or about the date and approximate time of {2019-08-23 20:30} (night-time), [JSP] while uses his lawn-mower to mow the front-yard-grass

of [784KLLTX78641], hauls and pushes such heavy lawn-mower deep into the plaintiff's [FRONTYARD] (and side-yard) *"no-mow"* grass

and begins to mow over such *"no-mow"* grass at the lowest height setting of such lawn-mower, during one of the worst and most-intense (at that moment in time) hot-summer-droughts in Central-Texas history. To put matters into perspective, during that month of {2019-08}, the ⟨Electric Reliability Council of Texas⟩, [ERCoT], had recorded the greatest electricity usage ever, in Central Texas history, due to air-conditioning units in Texas running almost non-stop (at the very least, during the hottest parts of the day) to cool buildings during this unusually hot and dry summer (⌘). Furthermore, [JSP] is also fully aware of the fact that,

Ⓐ the plaintiff had take out the pre-existing sprinkler-system during the installation of this *"no-mow"* grass, and as a result of removing such sprinkler-system on the plaintiff's property, there is no automatic watering to keep the grass alive during such extreme heat and drought; AND the fact that

Ⓑ the plaintiff was not residing at the plaintiff's property at this particular moment in time, only visiting [788KLLTX78641] on a weekly basis to manually water such grass using a hose in-order-to keep such grass alive; AND the fact that

Ⓒ the plaintiff was entirely relying upon the benefit that such *"no-mow"* grass is left completely-unmowed so that such lack of mowing keeps the grass alive - only requiring minimal watering - during such extreme and intensely-hot-droughts.

During various times of his malicious mowing of the plaintiff's expensively-installed *"no-mow"* grass, [JSP] joyfully looks into many of the plaintiff's security-camera(s), even taunting at such security-camera(s), and/or shining his torch-light directly onto the lens of such security-camera(s). Thus, [JSP] maliciously intended to destroy the plaintiff's *"no-mow"* grass and the huge amount of time, effort and money (including litigation) that the plaintiff had invested into installing such *"no-mow"* grass, with subsequent incidents further confirming his malicious motives and intent (see below). After [JSP] engages in such malicious vandalism of the plaintiff's private-property, [JSP] then begins to use a hose to water areas of his frontyard and sideyard grass - as if only his property is worthy of such proper-care, and with complete disregard to the private-property rights of the plaintiff - adding further insult to already substantial injury. After approximately two-and-a-half days of these areas of the plaintiff's expensively-installed *"no-mow"* grass being mowed to the lowest height, while not being watered, such grass looked completely parched, and thus completely destroyed (see incident below). The amount of the plaintiff's expensively-installed *"no-mow"* grass destroyed by [JSP] during this incident (and during subsequent incident(s)) is at least or approximately one pallet, with a pallet of grass being approximately 450-square-feet of surface-area. By sharp contrast, on the other-side of the plaintiff's [DRIVEWAY] (further away from [JSP&KAP]'s property [784KLLTX78641]) - such *"no-mow"* grass has been maintained by the plaintiff entirely (or at least, almost entirely) in its pristine condition without any damage, thanks to the fact that [JSP] never attempted to destroy such other area of the plaintiff's *"no-mow"* grass.

# ¶450

On or about the date and approximate time of {2019-08-24 19:00}, [JSP], who is in the front-yard of [784KLLTX78641], with his wife [KAP], yells out to his co-conspirator [CB] (then owner of [792KLLTX78641]) who is in the side-yard of [792KLLTX78641] - bragging that [JSP] had illegally stepped-into the plaintiff's property [788KLLTX78641] to destroy the plaintiff's no-mow-grass, which, at that moment in time, had already caused over one pallet-worth of damages, by killing much of such grass - since there is no automatic-irrigation system to

water such grass - and it is precisely the fact that the grass is not mowed that allows the grass to survive not only the intensely hot summer droughts but also the winter freezes without irrigation (or at worst, with minimal irrigation to address prolonged droughts). These incidents take place at the middle of the month of August - the absolute worst time of the year to mow (especially to the lowest-height-setting) an un-irrigated (or minimally-irrigated) grass, since temperatures remain at their highest points and rainfall, if any, is at best, minimal (especially given the fact that plants' need for water only increases when the temperature increases). Clearly, neither [JSP] nor [CB] seem to respect the plaintiff's right to the plaintiff's own private property nor the plaintiff's right to maintain the plaintiff's property according to the plaintiff's cultural/religious practices/standards. [JSP] also indicates to [CB] that [JSP] will finish the job of vandalizing the plaintiff's property by further-destroying the plaintiff's no-mow-grass that the plaintiff had spent well-over $20,000 to install (including litigation-related expenses caused by their blackmail of the then-[HOA] against the plaintiff). In other words, neither [JSP] nor [CB] seem to be, in any way, respectful of the fact that the plaintiff had spent an excruciatingly-painful amount of time, back-breaking effort and money in fighting-for-the-right-to-install and installing the no-mow-grass on the plaintiff's own private-property, only to have substantial portions of such grass destroyed within a matter of days by [JSP]'s abusive criminal-mischief actions - which, as the record will show, would eventually result in a felonious dollar-amount in damages to the plaintiff. In this dialogue, [CB] makes some rather eyebrow-raising allegations about the plaintiff and/or plaintiff's property, that the plaintiff will need to fully examine by way of Discovery and/or Deposition(s) of [CB] and his wife [KB], should this Court grant the plaintiff the opportunity to do so. The specific allegations by [CB] regarding property-values not only are not supported by the evidence, which show that in just one single-year transition alone - from the year {2021} to {2022} - the value of almost-all, if not all, of the residential properties within this subdivision rose by well over $100,000, but also are very revealing as to [CB]'s lack-of-credibility, lack-of-integrity and complete lack-of-knowledge of how property-values and market-forces - specifically, nationwide and regional shifts in housing supply/demand (which are in-turn driven largely by nationwide and regional shifts in interstate migration) - actually work. All of these totally fraudulent allegations and complaints against the plaintiff about an alleged $11,000 devaluation in *"property-values"* lodged by [JSP&KAP],[RSR] and all of their cronies/co-conspirators for over almost a decade (at this point in time) would be absolutely dismantled and rendered foolish in the following years of {2021} and {2022}. In particular, if [CB&KB] had simply waited to sell their property in the middle/end of the year {2022} or beginning of the year {2023} (instead of selling their property in the month of {2019-09}), they would have made a hefty profit of approximately $150,000 (or more) on such delayed sale, rather than selling their property at considerably lower value due to such inopportune timing. In sharp contrast to [CB&KB]'s fraudulent/misleading allegations, and as already explained above, according to neighbor-law, [CB&KB] actually did owe the plaintiff approximately $3,945 in material-plus-labor costs as a result of the plaintiff's single-handed permanent fortification of the *"permanent"* privacy-fence shared by [788KLLTX78641] and [792KLLTX78641] - although the plaintiff never raised such issue to [CB&KB] about such amount owed to the plaintiff. In this dialogue, [CB] also reveals that most of the animus towards the then [HOA-BoD]s was actually, in full display on the *"facebook.com"* social-media-platform - including private-messaging on such platform, which the plaintiff will need to fully investigate through the processes of Discovery and/or Deposition(s), should this Court grant the plaintiff the opportunity to do so. This casual conversation also reveals a very depressing fact of vile human behavior: that both [CB] and his wife [KB] would act in a civilized and amicable manner towards the plaintiff, even thanking the plaintiff for the plaintiff's work in the aforementioned incidents, but then resort to backstabbing and badmonthing the plaintiff behind the plaintiff's back in these conversations with malicious far-right-wing-extremists, [JSP&KAP]. But to be fair to [CB&KB], the plaintiff must also state that [CB&KB] would not have secretly engaged in this malicious conspiracy against the plaintiff if not for the toxic-environment of racist-lawlessness created by the defendants - particularly, far-right-wing-extremist defendants, [JSP&KAP], [RSR], who had already engendered substantial racial-animus against the plaintiff in many of the neighborhood's White-American residents, thanks to their relentless campaign of racist propaganda against the plaintiff for almost a decade at this point in time. [CB] then cautiously alerts

[JSP] about the recent [HOA] Board-Meeting, warning [JSP] that both [RSR] **and** the plaintiff had attended. [JSP] is immediately alarmed and distressed because, up until that point in time, since the plaintiff had not been attending such [HOA] Board-Meetings, the illegal conspiracy against the plaintiff that consisted of [JSP&KAP],[RSR],[WCLE] and the then [HOA] - run by the [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH] - was allowed to run unchecked predatory actions against the plaintiff without the plaintiff's supervision and/or recording. Perhaps the most shockingly revealing aspect of this conversations, [JSP] then speaks almost in secretive, criminal-enterprise code to [CB], indicating that [JSP] needs to secretly re-discuss strategy with [RSR] because their previous, devious and secret strategy along with malicious conspiracy against the plaintiff had now been exposed to the plaintiff: *"OH, SHIT! I'M GOING TO HAVE TO TALK TO BECKY ABOUT THAT!"*.

This casual conversation once-again reveals a common theme expressed in this lawsuit, about the ongoing hazards for a person-of-color living his/her natural lifestyle within a White-neighborhood - that such person-of-color could easily be predatorily targeted with the most vicious forms of racial-oppression and/or racketeering-activity by even less than a handful of far-right-wing-extremist and/or White-supremacist neighboring residents, while at the same time, at least some significant fraction of the rest of such White neighborhood - whether knowingly or unknowingly - provides at least tacit, if not overt, support of such criminally-abusive and predatory actions. Another common theme expressed in this lawsuit is the scapegoating that far-right-wing-extremists (such as [JSP&KAP]) and/or far-right-wing-extremist-sympathizers (such as [CB]) so-maliciously engage in, in this particular instance, in-order-to fraudulently demonize, dehumanize, humiliate, disparage, belittle, backstab and badmouth the plaintiff - fraudulently pretending that the plaintiff is the sole cause of all of their economic problem(s) - when the real and actual cause of their economic problem(s) is that they are at the mercy of a merciless, uncooperative market that radically shifts up-and-down with the passage of time, based upon completely uncontrollable forces of such market system(s). (More generally speaking, such far-right-wing-extremists and far-right-wing-extremist-sympathizers never want to blame the merciless and uncooperative economic-system that causes all of their economic problems, but rather the scapegoats within society, including but not limited to, immigrant(s)-of-color/indigenous-person(s), that they wish to fraudulently blame all of their problems on.)

> RECORDED RACIST, ABUSIVE, THREATENING, FRAUDULENT, GASLIGHTING AND CONSPIRATORIAL DIALOGUE BETWEEN [JSP] AND [CB](⊢) : (2019-08-24 19:00)(~)
> [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

〖 [JSP] IS INITIALLY WATERING HIS YARD WITH WIFE [KAP] CLOSE BY HIS SIDE. [JSP] NOTICES [CB] ON [CB]'S YARD AND YELLS AT [CB]- 〗
〖 -SUMMONING [CB] TO THE FOLLOWING DIALOGUE: 〗

**[JSP]**    *HEY! HEY! SEE WHAT I DID! HEY! ... SEE THAT ! YEAH, I MOWED IT TILL I RAN OUT OF GAS!*

〖 [CB] APPROACHES CLOSER TO [JSP]: 〗

**[CB]**    *WHAT'S THAT?!*

**[JSP]**    *... I MOWED IT OVER HERE TILL I RAN OUT OF GAS IN THE DARK LAST NIGHT!*

**[CB]**    *I CAN SEE!*

**[JSP]**    *YOU CAN SEE MY YARD AGAIN!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.

1696907690

**[CB]**        *OH, WATCH OUT!*

〘 [JSP] LAUGHS OUT LOUD: 〙

**[JSP]**       *[I'LL] GET THE REST LATER!*

**[CB]**        *SOUNDS GOOD TO ME!*

**[JSP]**       *YEAH, I WAS LIKE MAN! I JUST CAN'T TAKE IT ANYMORE! - I CAN'T! COME RIGHT NEXT, ALL I SEE IS HIS LONG-GRASS, AND I'M LIKE, THAT AIN'T RIGHT!*

**[CB]**        *YEAH.*

**[JSP]**       *IT AIN'T RIGHT!*

〘 [CB] IGNORES THE FACT THAT THE PLAINTIFF'S GRASS HAS BEEN PARCHED AND DESTROYED BY [JSP], INSTEAD COMMENTING ON [JSP]'S GRASS: 〙

**[CB]**        *LOOKS REAL GOOD NOW!*

〘 [JSP] COMMITS FRAUD STATING IT TOOK AN HOUR, WHEN IN FACT, HE SPENT NO MORE THAN 20 MINUTES TO MALICIOUSLY KILL APPROXIMATELY 1 PALLET OF THE PLAINTIFF'S NO-MOW GRASS: 〙

**[JSP]**       *IT TOOK ABOUT AN HOUR JUST TO DO THAT LITTLE BIT!*

**[CB]**        *OH, REALLY?!*

〘 [JSP] COMMITS FRAUD PRETENDING THAT HE HAS BEEN VICTIMIZED BY PLAINTIFF, WHEN HE HAS COMMITTED A RACIALLY-MOTIVATED HATE-CRIME OF CRIMINAL-MISCHIEF AGAINST PLAINTIFF: 〙

**[JSP]**       *KILLING MY MOWER! JUST KILLING IT!*

〘 [CB] LAUGHS OUT LOUD: 〙

**[JSP]**       *BUT ... YEAH, I'LL FINISH THAT OFF TONIGHT!*

**[CB]**        *SOUNDS GOOD TO ME!*

- 
-

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

• 

〚 [JSP] AND [CB] ENGAGE IN AN UNRELATED CONVERSATION ABOUT SPORTS: 〛

• 
• 
• 


**[JSP]**        *... I JUST WANTED YOU TO SEE THAT!*


**[CB]**         *YEAH, FOR SURE!*


**[JSP]**        *IT WILL - HOPEFULLY, IT WILL HELP YOU A LITTLE BIT!*


**[CB]**         *YEAH HOPEFULLY - WE DROPPED OUR PRICE, BY LIKE ELEVEN-GRAND. SO-*


**[JSP]**        *OH MY GOD, MAN!*


**[CB]**         *SEE WHAT HAPPENS.*


**[JSP]**        *YEAH, THAT'S AWFUL!*


**[CB]**         *[???] [???].*

〚 [JSP] ONCE-AGAIN ALLUDES TO [JSP&KAP]'S,[RSR]'S AND THEIR CRONIES' ILLEGAL CONSPIRACY AGAINST PLAINTIFF WITH THE [HOA]: 〛

**[JSP]**        *THAT'S UNBELIEVABLE! ... I GUESS THEY'RE NOT GOING TO DO ANYTHING ABOUT IT, HUH?!*


**[CB]**         *I DON'T KNOW - WITH AS MUCH OF THE B.S. THAT'S GOING ON WITH THE BOARD RIGHT NOW! I DON'T KNOW WHAT'S GOING TO HAPPEN!*


**[JSP]**        *WHAT DO YOU MEAN, "B.S."?*


**[CB]**         *SO, LIKE THE PRESIDENT STEPPED DOWN AFTER LAST WEEKS MEETING! JUST LIKE, HALF THE NEIGHBORHOOD'S GONE CRAZY ON FACEBOOK - TRYING TO OVERTHROW THE WHOLE BOARD!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

[JSP]          *GO FIGURE! ... YEAH, GO FIGURE! ... OK SO, THERE'S ALL KINDS OF STUFF GOING ON!*

[CB]           *OH YEAH!*

[JSP]          *OK, MAYBE I SHOULD PAY ATTENTION TO THAT, SOMEHOW!*

〘 [CB] LAUGHS OUT LOUD: 〙

[CB]           *I WAS GONNA GO, BUT THEN I HAD TO GOTO WORK LIKE TWO TO SIX A.M. AND THEN GO BACK IN AT ELEVEN ... AT THE SAME DAY, IT WAS ABSOLUTELY [???] ... DIDN'T FEEL LIKE IT!*

[JSP]          *YEAH, I KNOW!*

〘 [CB] POINTS AT PLAINTIFF'S PROPERTY INDICATING PLAINTIFF WAS AT THE [HOA] MEETING: 〙

[CB]           *HE WAS THERE THOUGH!*

[JSP]          ***HE WAS THERE!***

[CB]           *YEAH! CAUSE BECKY WENT, SHE TOLD ME, HE WAS THERE!*

[JSP]          ***OH SHIT, I'M GOING TO HAVE TO TALK TO BECKY ABOUT THAT!***

[CB]           *YEAH!*

[JSP]          *AL-RIGHTY! - ALRIGHT, TAKE CARE MAN!*

[CB]           *TAKE CARE! HAVE A GOOD DAY!*

[JSP]          *YOU TOO, MAN! YOU TOO!*

# ¶451

On or about the date and approximate time of {2019-08-25 21:00} (night-time), as if the existing damage to the plaintiff's no-mow-grass was not good enough, and just as [JSP] had promised [CB] in the prior conversation, [JSP] enters into the plaintiff's [FRONTYARD] with a heavy gasoline-powered string-trimmer in hand, and begins to cut, again to a very-low height, any remaining parts of that side of the plaintiff's

[FRONTYARD] no-mow-grass. As he is performing such criminally-abusive act of vandalism against the plaintiff, [JSP] approaches within a few feet of the plaintiff's [GARAGE], and is at one point, almost standing near the deepest-edge of the plaintiff's [DRIVEWAY] handling such obnoxiously-loud yard-equipment, again, at a time of 21:30 at night - which is considered to be within sleeping hours for at least some residents.

## ¶452

On or about the date and approximate time of {2019-08-26 08:00}, the plaintiff, who was not at the property of [788KLLTX78641] for several days, returns to property [788KLLTX78641] and discovers, with great shock and indignation, that the plaintiff's no-mow-grass had been vandalized - with a substantial area of such grass having been completely-parched as a result of mowing to a very-low height, when such grass, by its very design, was not intended to be mowed (to any height) in the first place. The plaintiff almost immediately drags two of the plaintiff's hoses towards the large area of the plaintiff's no-mow-grass that had been vandalized, opens the two taps connected to those hoses and immediately starts to water such damaged no-mow-grass with both hoses, in a desperate attempt to revive/recover any grass that has not died due to such damage. While the plaintiff was watering such grass, [JSP] emerges from his pickup-truck and briefly looks at the plaintiff's watering of such grass - then realizing that the plaintiff was trying to undo the extreme damage that [JSP] had caused to such expensively-installed no-mow-grass, that the plaintiff had worked so hard to install, and that the plaintiff even litigated for the right to install. The plaintiff would also take high-resolution photographs of all of the damaged areas, knowing that the plaintiff will need to use all of this evidence to expose just one additional, tiny part of the defendants' conspiracy and racketeering-enterprise against the plaintiff. As the plaintiff would later realize, the irreparable damage done to this substantial area of grass - at least 1 pallet (450 square-feet) of such grass - had already been done and could not be undone, since the damaged grass in this substantial area had already died due to the intense summer heat/drought without immediate and sufficient soil-moisture to help the grass heal/repair/recover. Much of this now-damaged no-mow-grass was delicately installed and established, with an excruciatingly-painful amount of the plaintiff's time, effort and money (including litigation-related expenses) during the cooler months of {2017-10} through {2018-05}, along with careful maintenance in the following months of {2018-05} through {2019-08} - with each passing month, such no-mow-grass extending its roots deeper and more-expansively into the soil, thus causing such no-mow-grass to become more hardy, resilient and drought-tolerant. The original breeders of this particular cultivar of no-mow-grass had informed the plaintiff in the year {2017} that, once fully-established, such no-mow-grass could have roots as deep as two-feet-deep or more - but once again, such full-establishment takes many years of careful maintenance to develop.

## ¶453

On or about the date and approximate time of {2019-08-26 21:20} (night-time), [JSP] arrives back to his property [784KLLTX78641] in his pickup-truck, and after parking such pickup-truck in the driveway of [784KLLTX78641], walks towards the border-area between the two-properties. At the border of the two-properties, [JSP] shines his torch-light into various areas of the plaintiff's no-mow-grass to inspect such grass in-order-to determine if he was successful in killing such grass, which the plaintiff had spent an excruciating amount of time, effort and money (including litigation) to install. As the plaintiff's security-cameras would continue-to-capture, [JSP] would continue to inspect such grass at later moments in time, once-again in-order-to determine if he was successful in killing such grass (see below).

## ¶454

On or about the date and approximate time of {2019-08-28 21:51} (night-time), after he spends some time using a hose to water areas of his front-yard grass, [JSP] angrily looks into one-or-more of the plaintiff's security-camera(s) and angrily raises his hand to issue the obscene/vulgar gesture of his middle-finger pointed directly to such security-camera(s). [JSP] then deliberately walks towards two-or-more of the plaintiff's security-camera(s), and uses such hose to run municipal water at full-water-pressure to douse numerous of the plaintiff's security-cameras full of such municipal water for a period of more than one minute, in-order-to permanently damage/disable the internal electronics of such individual security-cameras and/or short-circuit the entire security-camera-system, since all of such security-camera-equipment (including internally-placed electrical hub and digital-video-recorder) are electrical in nature and require the use of hard-wired electrical wires for connection and operation. After this particular dousing, at least 2 of the plaintiff's security-cameras - both *"4K"/"Ultra-High-Definition"*, and of the same make/model, each valued at between $150 to $170 - become permanently damaged, causing further, much-larger expenses to the plaintiff in terms of inflated, faulty recordings recorded onto the recording-medium (hard-disk-drives).

## ¶455

On or about the date and approximate time of {2019-08-29 19:05} (day-time), [JSP] arrives back to his property [784KLLTX78641] in his pickup-truck, and after parking such pickup-truck in the driveway of [784KLLTX78641], walks towards the plaintiff's property, looking at the no-mow-grass that he maliciously destroyed in the previous days of {2019-08-23} and {2019-08-25}. While on the sidewalk in front of the plaintiff's property, [JSP] carefully spends more than half-a-minute inspecting such no-mow-grass in-order-to determine if he was successful in killing such no-mow-grass, which the plaintiff had spent an excruciating amount of time, effort and money (including litigation) to install. In particular, [JSP] notices that such no-mow-grass that [JSP] maliciously mowed-over at the lowest-height-setting of such lawn-mower, is completely-parched and yellow-brown in color, whereas the completely-unmowed no-mow-grass on the other-side of the plaintiff's [DRIVEWAY] has an extremely bright and vivid green color - indicating that even in the most excruciatingly-hot-midst-of-summer-drought, such no-mow-grass is in full health and vitality, without any damage whatsoever - precisely because it is not mowed. These multiple incidents where [JSP] carefully inspects the area of the plaintiff's private-property that he maliciously vandalized, show that [JSP&KAP] continued to have malicious-intent against the plaintiff, hoping that all of the grass in such area of the plaintiff's property would die, a fact which, both [JSP&KAP],[RSR] could then exploit in-order-to demand that the [HOA] take further predatory and/or legal actions against the plaintiff.

## ¶456

On or about the date and approximate time of {2019-08-30 19:45} (day-time), [JSP] arrives back to his property [784KLLTX78641] in his pickup-truck, and after parking such pickup-truck in the driveway of [784KLLTX78641], walks towards the plaintiff's property, looking at the no-mow-grass that he had maliciously destroyed in the previous days of {2019-08-23} and {2019-08-25}. While on the side-yard-area closest to border of the two-properties, [JSP] spends approximately five seconds inspecting such no-mow-grass in-order-to determine if he was successful in killing such no-mow-grass, which the plaintiff had spent an excruciating amount of time, effort and money (including litigation) to install. In particular, [JSP] notices that such no-mow-grass that [JSP] maliciously mowed-over at the lowest-height-setting of such lawn-mower, is completely-parched and yellow-brown in color, whereas the completely-unmowed no-mow-grass on the other-side of the plaintiff's [DRIVEWAY] has an extremely bright and vivid green color - indicating that even in the most excruciatingly-hot-midst-of-summer-drought,

such no-mow-grass is in full health and vitality, without any damage whatsoever - precisely because it is not mowed. These multiple incidents where [JSP] carefully inspects the area of the plaintiff's private-property that he maliciously vandalized, show that [JSP&KAP] continued to have malicious-intent against the plaintiff, hoping that all of the grass in such area of the plaintiff's property would die, a fact which, both [JSP&KAP],[RSR] could then exploit in-order-to demand that the [HOA] take further predatory and/or legal actions against the plaintiff. [JSP] then stare menacingly/angrily into multiple of the plaintiff's security-cameras and begins to mutter some angry words. [JSP] then begins using his hands to count the number of security-cameras out loud. [JSP] then stares directly into one-or-more of the plaintiff's security-camera(s) and continues to make angry statements, indicating his anger due to the number of the plaintiff's security-cameras - even the plaintiff had strategically installed such security-cameras in an evenly-distributed-manner (pointing in all directions) throughout all-areas around the plaintiff's [HOUSE] - including, but not limited to, the opposite side of the [HOUSE] - along which [JSP&KAP] did not share a border with the plaintiff.

## ¶457

On or about the approximate date and approximate time of {2019-09-01 15:30}, the plaintiff notices one of [RSR]'s pet-cat(s) roaming freely in-and-around the surrounding property(s) in front of [RSR]'s partly-open garage. During numerous occasions over the period of many years, the plaintiff would notice that [RSR] would leave her front-garage-door partly-open, in such manner and/or as a practice, so that her pet-cat(s) can roam freely throughout the neighborhood (including sometimes in the plaintiff's [BACKYARD]) - while the restrictive-covenants of the neighborhood, as a matter of safety, explicitly prohibits residents from allowing such dogs and cats to roam freely throughout the neighborhood. The plaintiff would also spend at least an hour on this day, using two hoses to water the side of the yard containing no-mow-grass that [JSP] tried to destroy, hoping that at least some of such no-mow-grass would eventually revive/recover as result of such additional watering.

## ¶458

On or about the date and approximate time of {2019-09-02 17:00}, [SPOA-VP-AH] holds an informal meeting outdoors within the neighborhood, in which a few of the residents (including the plaintiff) attended. During this informal meeting, several topics were discussed, the most revealing of which was homeowners' ability to record Board meetings. [SPOA-VP-AH] states that the Board (including herself) does not permit homeowners to record Board meetings because such recording(s) would expose the [HOA] to liability. In so stating, [SPOA-VP-AH] has made-it-very-clear both to the plaintiff and all other residents in attendance that the real reason for such [HOA] secrecy and non-transparency was to evade liability for potentially illegal and/or abusive actions committed by the [HOA]. The plaintiff would also spend at least an hour on this day, using two hoses to water the side of the yard containing no-mow-grass that [JSP] tried to destroy, hoping that at least some of such no-mow-grass would eventually revive/recover as result of such additional watering. While the plaintiff was watering such grass, [JSP] emerges from his house and stares at the plaintiff's watering of such grass - even using two hoses to water such grass - then realizing that the plaintiff was trying to undo the extreme damage that [JSP] had caused to such expensively-installed no-mow-grass, that the plaintiff had worked so hard to install, and that the plaintiff even litigated for the right to install.

## ¶459

On or about the date and approximate time of {2019-09-04 20:52} (night-time), [JSP] approaches close to the plaintiff's panel-of-fencing closest to the plaintiff's outdoor air-conditioning-unit. [JSP] shines his torch-light rapidly and/or repeatedly into multiple of the plaintiff's security-camera(s) located in such area, in-order-to rapidly trigger on-and-off the infra-red/night-vision circuitry of such security-camera(s).

Right after [JSP] performs this malicious action, [JSP] then kicks (with considerable force/violence) a separate and dedicated infra-red/night-vision illuminator (used to enhance the night-vision of any security-camera(s) in the area) located at ground-level within the plaintiff's side-yard. Such illuminator, valued at approximately $75, would then become faulty and/or inoperable shortly after this incident.

## ¶460

On or about the date of {2019-09-09}, the [HOA] formally announces [SPOA-P-BC]'s resignation as [SPOA] Board-President (although, [SPOA-P-BC] may have personally made such announcement at an earlier date). At that moment in time, [SPOA-P-BC] had served as [SPOA] Board member for a period of approximately 10 years or more. [SPOA-P-BC]'s term as [SPOA] Board-President actually expired at the end of the year {2020}, and it is very unusual for any [HOA] Board-Member (let alone the [HOA] Board-President) to resign prior to the expiration of his/her term in office unless that particular [HOA] Board-Member is moving out of the neighborhood - which was not true in this particular case - as to the best of the plaintiff's limited knowledge and/or public-records, [f-HOA-BoD][SPOA-P-BC] still remains homeowner and resident of the neighborhood. It is indisputable that the recent incidents involving the plaintiff and the [SPOA] Board particularly at the most-recent [SPOA] Board-Meeting and all of the fallout from this [HOA] Board-Meeting, inevitably and ultimately led to the [SPOA-P-BC]'s resignation as [SPOA] Board-President. Therefore, the plaintiff, without even intending to do so, played a crucial role in the overthrowing of an abusive [HOA] Board-Member from his official [HOA] Board position as [SPOA] Board-President. Conversely, [RSR]'s abusive actions and fraudulent rhetoric during that [HOA] Board-Meeting and [RSR]'s abusive, fraudulent online-postings after that [HOA] Board-Meeting, which were in support of the then [HOA] Board, only led to [SPOA-P-BC]'s resignation - and as future events would show, also led to then [HOA] Board-Members [SPOA-VP-AH] (Vice-President) and [SPOA-MaL-ML] (Member-at-Large) being voted out of office (despite both of these Board members filing and campaigning for re-election).

## ¶461

On or about approximate date and approximate time of {2019-09-14 01:00} (past midnight), at a moment in time during which the plaintiff was not at the plaintiff's property, [JSP] uses the same or similar aforementioned projectile-weapon to shoot into one-or-more additional security-camera(s) one-or-more times, once-again shattering the protective glass of at least one such security-camera, and thus obstructing the view of such security-camera. While the infra-red/night-vision sensor on such security-camera still works, such security-camera has effectively been rendered nonfunctional at nighttime, due to the shattered protective glass that almost fully obstructs the view of such security-camera at nighttime. Since such security-camera is also *"4K"/"Ultra-High-Definition"*, and of the same make/model, the dollar-value ranges from $150 to $170.

## ¶462

On or about approximate date and approximate time of {2019-09-14 23:00}, the plaintiff arrives back at the plaintiff's private-property, discovering, by watching the plaintiff's security-camera-system-monitor, that yet-another of the plaintiff's security-cameras had become damaged. Upon reviewing the security-camera footage, the plaintiff realizes that this was, at a minimum, [JSP]'s third brazen act of vandalism against the plaintiff's private-property. The plaintiff decided yet-again, that despite the plaintiff's fear of retaliation by the [WCLE] acting in malicious conspiracy against the plaintiff (as [WCLE] had repeatedly done on numerous occasions dating back to the month of {2011-08}), the

plaintiff still had to, in the long-term interest-of-justice, report such escalating and never-ending stream of crimes committed by [JSP&KAP] against the plaintiff. Upon calling the [WCSO], one-or-more employee(s) of the [WCSO] informs the plaintiff that unless the plaintiff has a clear view of who is committing such crimes during the pitch-dark of nighttime, the [WCSO] could not do anything about such crimes. The plaintiff explains to the [WCSO] that on this particular occasion (approximate date and time of {2019-09-14 01:00}) as well as on the original occasion (approximate date and time of {2019-07-03 20:00}), both security-cameras that had been destroyed by such projectile-weapon were pointed in the general-direction of frontyard of [JSP&KAP]'s private-property. Such employee(s) of the [WCSO] informs the plaintiff that despite of the fact that only the security-cameras pointed in one-direction had been destroyed and despite of the fact that the shots from the projectile-weapon originated from the location of [JSP&KAP]'s property, those facts alone do not implicate [JSP] or [KAP] in such crimes against the plaintiff, and that the plaintiff's security-cameras would need to have definitive-proof that it was either [JSP] or [KAP] or some other clearly-visible perpetrator(s) committing such crimes. The plaintiff was disappointed that the [WCSO] would not be dispatching any [WCSD] to investigate the issue, and instead, such employee of the [WCSO] simply added such information to either a new or existing case file: [2019-09-00561].

## ¶463

On or about the date of {2019-09-26}, a resident posted a public message on the same social-media-platform revealing that [SPOA-CM-CD] was no longer serving as [SPOA-CM]. That same resident posts the question as to who the new [SPOA-CM] would be. Clearly, the public-backlash against the previous toxic Board-Meeting was so serious that even one-or-more property-management-company-employee(s) either, did not want to continue serving in such position, or was otherwise forced out of such position.

## ¶464

On a day in the month of {2019-10}, [RSR] files her application for Board-Member of [SPOA]. [RSR], has on multiple occasions, indicated to the plaintiff and the [HOA] that she has contacted a realtor to put her property for sale - which would indicate to the plaintiff (and the [HOA]) that she intended to move out of the neighborhood, in the near future. Yet, despite the fact that a [SPOA] Board-Member term is two years in length, [RSR] files for Board-Member of [SPOA], solely for the purpose of using her substantial powers as Board-Member to directly engage in predatory litigation actions against the plaintiff - just as her close crony/proxy [DMP] had done approximately two years prior to this particular moment in time. The plaintiff asserts that, more-likely-than-not, [RSR] submitted the following candidate profile to the [SPOA] property-management-company either electronically (through online communications) or hardcopy through the [USPS] (or alternative mail delivery service) within the deadline of {2019-10-11}. If it is true that [RSR] did, in fact, electronically submit and/or mail such candidate profile to the [SPOA] property-management-company, then in so doing, [RSR] would have, indisputably, committed yet another count of the racketeering-act of either wire-fraud and/or mail-fraud (respectively) against the plaintiff, that was part of her scheme to defraud the plaintiff, along with her co-conspirators [JSP&KAP],[WCLE]. (Such candidate profile did get posted in scanned/digital electronic format as a publicly-visible document and/or social-media-posting onto the *"nextdoor.com"* social-media-platform, which is where the plaintiff had originally downloaded such document from; therefore, due to this online, electronic transmission, [RSR] committed this count of wire-fraud against the plaintiff whether-or-not she mailed, electronically submitted, or even hand-delivered such document to the [SPOA] property-management-company.) [RSR]'s candidate profile is posted in both its original (digitally-scanned) image format, and has also been transcribed from original image into text - see below. As a master manipulator and con-artist whose primary goal in such actions is to defraud the plaintiff, [RSR] paints

a very different picture and public-image of herself, than the one she has demonstrated to the plaintiff - namely, the ten years of racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses that she - in conspiracy with the other co-defendants - has committed against the plaintiff, as substantially documented in this lawsuit. Much, if not most, of the language that [RSR] uses in her candidate profile is pure fraud - as already explained above. [RSR], [JSP&KAP], the plaintiff, the [HOA] and [WCLE] all knew fully-well that [RSR] was planning on becoming [HOA] Board-Member solely to use her substantial powers as [HOA] Board-Member exclusively in-order-to directly engage in predatory and discriminatory litigation actions against the plaintiff - with all of these parties knowing fully-well that she did not plan on remaining as homeowner within the subdivision for the full two-year term period (see below for further proof). In other words, [RSR] submitted her candidate application for [SPOA] Board member solely to abuse such authority and power in-order-to engage in predatory legal action(s) against the plaintiff, with the ideal goal of, as she herself has admitted directly to the plaintiff, getting the plaintiff's property foreclosed-upon, or if that extreme measure was unachievable, then simply engaging in sufficient predatory litigation action(s) against the plaintiff, so as to intimidate the plaintiff into moving out of the White neighborhood. [RSR] was planning on following the same model and procedure as her predecessor and co-conspirator, [DMP], who, two years prior, had become Board member of the [SPOA] solely to use his Board position to initiate and/or vote-for predatory litigation action(s) against the plaintiff, on behalf of his puppeteers - [RSR],[JSP&KAP]. However, as soon as [DMP] realized that he had inflicted as much harm as he could against the plaintiff (through the [HOA]'s predatory litigation actions), while acting as Board member of the [SPOA], [DMP], then moved out of the neighborhood, while still remaining owner of his property [785KLLTX78641], and placing such property for leasing to renters (although, not for much longer - see below). Clearly, even [RSR]'s (and her co-conspirators [JSP&KAP]'s) puppet, [DMP], never did have any intention of serving that entire two-year term as [HOA] Board member, and even [DMP] clearly had only had one purpose in becoming Board member. Social-justice activists engage in their political-activism in-order-to change society for the better - in other words, to make the world a more fair and just place to live. Following along those same lines, [RSR], fraudulently pretending to be a crusader for justice, states, *"If I would like things to change, then I have to participate in that change."* Clearly, from the pattern of [RSR]'s outrageous, racially-oppressive and racketeering-activity conduct against the plaintiff, if there is any *"change"* that [RSR] wishes to enact, that change is to move what she considered to be *"her"* (exclusive-and-pure) White neighborhood towards a more regressive, reactionary, totalitarian, fascist, tyrannical and racially-oppressive direction. In her previous social-media postings, [RSR] showed her strong approval of the then Board's prohibition of the plaintiff's right to video-record the aforementioned [HOA] meeting - even justifying the Board's abusive actions of Obstruction-Of-Justice and Witness-Tampering against the plaintiff; yet, in this candidate profile, she fraudulently states that she would advocate for *"transparency of board activities & decisions."* [RSR] fraudulently states that she would, *"Allow the homeowners a voice in decisions affecting our neighborhood"*, when any reasonable observer that studies all of [RSR]'s (and her co-conspirators [JSP&KAP]'s) predatory actions against the plaintiff would reach the objective conclusion that [RSR] was fully-depriving the plaintiff of the voice that she fraudulently claims to be advocated-for in this statement - unless, by *"homeowners"*, [RSR] was exclusively referring to the White-American homeowners of the subdivision. Clearly, all of these fraudulent statements by [RSR] were a direct result of the intense public-backlash and community-outrage against the previous toxic Board-Meeting. [RSR], an extremely-manipulative con-artist and demagogue that had mastered her skills of defrauding the plaintiff, decided to fully exploit and capitalize-on such fallout - a well known pattern of so-called *"Disaster Capitalism"*. (The plaintiff was reminded of then internationally-renowned journalist, now professor, Naomi Klein's book, ✒*The Shock Doctrine: The Rise of Disaster Capitalism* ✒, which at least to substantial degree, documents how some malicious wealthy/powerful people fully-exploit the shock of disaster situations in-order-to greatly profit from money and/or power - something that they could not have done if not for such disaster.)

▸  *"Rebecca Robertson"* :  Submitted Candidate Profile for [SPOA] Board-Member:  [RSR]:  (2019-10-11):

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    1696907690

**10 |** P a g e

# Rebecca Robertson



I have been a homeowner in Summerlyn for over 10 years. Over these many years like many homeowners, I have been frustrated and concerned with the BOARD's decisions lack of action through out the years. If I would like things to change, then I have to participate in that change. The goals I would share with our community are:

(1) transparency of board activities & decisions.

(2) develop a better method for communication by homeowners & the board.

(3) Develop expediting process so we can answer to the actions the board is undertaking.

(4) Allow the homeowners a voice in decisions affecting our neighborhood.

(5) Revisit the HOA assessments.

(6) BE ACCOUNTABLE to the HOMEOWNERS.

## ¶465

During the first week of the month of {2019-10}, the plaintiff notices that a Detective from the [WCSO], [WCSDet-WP], left one-or-more voicemail(s) for the plaintiff, in response to the criminal-mischief cases that the plaintiff was attempting to file. [WCSDet-WP] provided the

plaintiff with his email contact information in one-or-more voicemail(s). On or about the date and approximate time of {2019-10-09 08:05}, the plaintiff sends the following email-message to [WCSDet-WP], briefly outlining only some of the racially-motivated hate-crimes that plaintiff had suffered from [JSP]. On or about the date and approximate time of {2019-10-16 08:36}, [WCSDet-WP] responds in the following email-message to the plaintiff. In these initial emails, the plaintiff still does not name the perpetrator of such racially-motivated hate-crimes as [JSP], instead referring to [JSP] as *"the suspect"*: In order to ensure that [WCLE] is fully-aware that these are not the only crimes that the plaintiff has suffered from [JSP], the plaintiff even states, *"These are the incidents that I can recollect as of right now. I'm sure there were other incidents that have escaped my memory."*: The plaintiff is unsure as to why [WCSDet-WP] states that he needs all of the evidence, as the plaintiff had at least provided one clear piece of evidence of such criminal-mischief identifying [JSP] (on the date of {2019-07-03}) as the perpetrator (via SD-Card) to the [WCSO] on-or-about the date of {2019-07-30} - when [WCSD-DC] and [WCSD-JD-6] visited the plaintiff at the plaintiff's property. Also, [WCSDet-WP] states that such information provided by the plaintiff was added to case "2019-09-00561" - which was different from the case number "2019-07-01173" provided to the plaintiff by [WCSD-DC] (see previous incident above). These facts suggest that [WCSDet-WP] was either unaware of the other case number "2019-07-01173" provided to the plaintiff by [WCSD-DC], or did know about such other case, and deliberately decided to ignore the evidence of the {2019-07-03} hate-crime incident that the plaintiff had already provided for that particular case number.

> "RE: Evidence for criminal mischief and threatening communications" ›   EMAIL AND RESPONSE TO/FROM PLAINTIFF AND [WCSDet-WP] (⊢)    [2019-10-09 08:05),{2019-10-16 08:36) (~)

> [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

[WCSDet-WP]        *Sir:*

> *I have received your email and it has been added to this case file (Case No. 2019-09-00561). Both cases that you had filed with through the Sheriff's Office are being worked under this case number. I have conducted an interview with the suspect in this case and have an idea of what's going on. The physical evidence (digital recordings) is paramount in this case and I will be waiting for your response to go further in this case. If you have any questions please feel free to reach out by email or phone.*

> *Thank You,*

> *Detective W. Passailaigue #13122*
> *Criminal Investigation Division*
> *Williamson County Sheriff's Office*
> *508 S. Rock St. Georgetown, TX 78626*
> *Office: 512-943-5274*

> *This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.*

> *-----Original Message-----*
> *From: \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\* <\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*>*
> *Sent: Wednesday, October 9, 2019 8:05 AM*
> *To: Wayne Passailaigue <\*\*\*\*\*\*\*\*\*\*\*\*\*@wilco.org>*
> *Subject: Evidence for criminal mischief and threatening communications*

> *EXTERNAL email: Exercise caution when opening.*

*Hello Detective Passailaigue.*

*This is Sid Kode (property owner of "788 Kingfisher Lane, Leander, TX 78641"), responding to your voicemails about the criminal mischief and threatening communications that we've experiencing at our property from the suspect (next-door neighbor that lives at "784 Kingfisher Lane, Leander, TX 78641").*

*I do still have the footage stored on our security camera system's DVR hard-drives, but I have not yet figured out how to transfer the data onto an external hard-drive.*

*Unfortunately, as of late, I have not had the time to figure this out, but hopefully I should be able to get it done sometime this month.*

*Once I have this done, I will let you know so that you can obtain that evidence.*

*So, to briefly summarize the sequence of incidents:*

*(1) In approximately October 2017, I received the first threatening communication from the suspect.*

*(2) In approximately February 2018, I received the second threatening communication from the suspect (I still have to find the footage for this).*

*(3) In approximately January 2019, I received the third threatening communication from the suspect.*

*(4) In approximately February 2019, I received the fourth threatening communication from the suspect.*

*(5) In approximately May 2019, I received the fifth threatening communication from the suspect (I still have to find the footage for this).*

*(6) In approximately June 2019, I received the sixth threatening communication from the suspect (I still have to find the footage for this).*

*(7) On July 3rd 2019, the suspect shot into one of our cameras damaging and breaking the front glass and IR illuminators so that the IR night vision no longer works.*

*(8) On August 23rd 2019, the suspect stepped onto our yard with a lawnmower and mowed our landscape which we had specifically designed not to be mowed, thus damaging the plants and needing it to be repeatedly watered (flooded) until most of it recovered - however, some of the landscape did die due to the severe summer heat/drought and the damage already done. On approximately September 2017, I had filed for approval and received approval from our HOA for this "no-mow", drought-tolerant landscape, and I had installed this landscape on October 2017 and diligently watered it regularly until it took 1 year to establish.*

*(9) On September ?? 2019, at night time, the suspect shined his flash-light directly onto one of of our cameras, then kicked an object (IR illuminator) placed on our landscape along the fence.*

*(10) On September 14th 2019, the suspect shot into a second camera damaging and breaking the front glass - the IR still technically works, but the shattered glass makes the camera's image blurry, especially at night.*

*These are the incidents that I can recollect as of right now. I'm sure there were other incidents that have escaped my memory.*

*As soon as I have accumulated all of the footage onto the portable hard-drive, I will let you know - I still also have to find much of it since they are stored on multiple different hard-drives.*

*Thanks,*
*Sid Kode.*

# ¶466

The [SPOA] scheduled a total of two-or-more Board-Meetings during the month of {2019-10}, at least two of which, seemingly occurred within the short span of ten days. It would appear to the plaintiff that all of the fallout from the previous toxic Board-Meeting left the [HOA] and its then Board in a state of disarray, requiring multiple Board-Meetings to remedy such disarray. The [SPOA] schedules the second Board-Meeting for the date and time of {2019-10-23 17:00}. Unbeknownst to the plaintiff, on the very-same scheduled date of such Board-Meeting - {2019-10-23} - the [SPOA] announces that it has cancelled such meeting. However, in the initial email notification, the [SPOA] had provided a phone number and numerical access code for homeowners to attend such meeting by teleconference. Not knowing that such Board-Meeting had been cancelled, the plaintiff called into that provided phone number, and after entering the provided numerical access code, was able to enter into what the plaintiff thought was a regular Board-Meeting (thus, open to all homeowners), but what the plaintiff did not know was actually a publicly-cancelled, yet privately-held secret Board-Meeting. While the plaintiff remains silent throughout the teleconference (as the plaintiff normally does during such Board-Meetings), the plaintiff hears the [SPOA-CM] and several [SPOA] Board-Members - including [SPOA-VP-AH] and [SPOA-MaL-ML] - calling in to attend. Then, the [SPOA-CM] and/or other meeting administrator announces that an unknown and/or unidentified phone-number has called into the meeting, even asking if any of the Board-Members were calling in from what appeared to be the plaintiff's phone number - presumably since they did not know that such phone number belonged to the plaintiff. Once again, the plaintiff remained silent - not knowing why the plaintiff was being singled out in such manner. After none of the other Board-Members identified this unidentified phone number, the plaintiff notices that the plaintiff's phonecall had been terminated; clearly, the plaintiff had been booted from such secret Board-Meeting. Only after the plaintiff was booted from such secret Board-Meeting did the plaintiff read the subsequent email notification, only-then realizing that such Board-Meeting had been cancelled. According to the plaintiff's limited understanding of [HOA] law (codified within the [TPrC]), it is illegal for [HOA]s and their Board-Members to conduct any secret meeting, and that furthermore, [HOA]s are also, required by Texas law to provide written notice of any [HOA] meeting to all homeowners at least 3 days in advance of such meeting.

# ¶467

On or about the approximate date and approximate time of {2019-11-11 19:00}, [RSR] attends a *"Meet the Candidate Night"* [SPOA] meeting where at least some of the Candidates (including [RSR]) running for the upcoming [SPOA] Board *"election"* (✗) present themselves and campaign for their respective Board positions in front of other property-owners that chose to attend the meeting. The plaintiff attends the meeting in time, again with the same body-worn-camera recording video, but realizes that the meeting has already been initiated prior to the proposed start time of the meeting - with several residents of the neighborhood already seated. The plaintiff takes a seat in the final row of the arranged chairs at one corner of the room, and notices that [RSR] is seated in the opposite corner of the meeting room. A few other residents of the neighborhood continue to enter into the meeting-room as the meeting is already in progress. The meeting is hosted by the [SPOA-CM]

and/or other employees of the [SPOA] property-management-company (especially [SPOA-PMCE-1]), with these employees spending about 10 minutes explaining the basics of how a [HOA] Board works. During this meeting, a few residents ask questions to these property-management-company employees about how the Board works. The employees then transition the meeting over to the individual Board candidates who will individually present themselves to other attendees. A few candidates speak before the attendees for a few minutes and explain why they would each serve as an effective Board-Members. Since the plaintiff had wanted to video-record a prior [SPOA] meeting, but was prevented from doing so (see above) - rightfully garnering the alarm/attention of many of the neighborhood's residents - one of the candidates even campaigned to openly-broadcast future meetings (via live video) so that other property-owners who are not in in-person attendance could also view/attend such meeting remotely and/or view the meeting even after the meeting has been completed. [f-HOA-BoD] [SPOA-VP-AH] - then serving as [SPOA-VP] - also campaigns for a few minutes as she is running for re-election. [f-HOA-BoD][SPOA-VP-AH] speaks very highly of herself - apparently disagreeing with at least 319 other residents who signed a petition to completely overthrow all of the existing Board-Members (including [f-HOA-BoD][SPOA-VP-AH]) - while also pretending as if she never took any predatory, abusive enforcement actions against homeowners (including the plaintiff). [SPOA-MaL-ML] also speaks very highly of herself even though she was not *"elected"* by the residents of the neighborhood but was appointed to her position (by other existing Board-Members) - apparently disagreeing with at least 319 other residents who wanted to totally overthrow all of the existing Board-Members (including [SPOA-MaL-ML]) - while also pretending as if she never obstructed the plaintiff from video-recording the previous [HOA] meeting in total violation of not only the plaintiff's rights, but the rights of every other owner of the subdivision who were fully entitled to view such meeting. Both [f-HOA-BoD] [SPOA-VP-AH] and [SPOA-MaL-ML] also reject/deny/fight-back-against the numerous complaints made against them by numerous residents for engaging in abusive enforcement actions against homeowners (including the plaintiff) and/or for running the Board in a completely non-transparent/unaccountable manner. Other candidates who speak, recognizing that a large number of the subdivision's residents are outraged at the then Board, try to distance themselves from the then Board, even condemning the then Board's actions at the previous meeting, in which, the plaintiff was obstructed from video-recording the meeting. It is crucial to note that although the plaintiff was obstructed from video-recording all aspects of the previous [SPOA] meeting (see above), nobody at this [SPOA] meeting (or any future [SPOA] meeting, for that matter) would stop the plaintiff from video-recording such meeting due to the backlash the then Board received for their previous obstruction of the plaintiff (see above). The plaintiff strongly asserts that if no other resident supported the plaintiff's right to video-record such [HOA] meeting(s), then there would have been no change in such illegal policy, and the [SPOA] would have continued to operate in secrecy in-order-to, as even [SPOA-VP-AH] openly-admitted, evade liability. After a few other candidates campaign for such [SPOA] Board-Member positions, [RSR] then stands up to campaign for a position on the [SPOA] Board. [RSR] starts her speech by making an inappropriate joke about property-taxes, apparently suggesting that the property-owner residents of this subdivision should not be forced to pay-for and fund the public services that the residents of the County of Williamson are entitled to - a selfish sentiment that is shared by a surprisingly-large percentage of the right-wing (δ) . Both [RSR] and [JSP] have fraudulently accused the plaintiff of being *"selfish"* for even what they fully admit is the plaintiff's *"inability"* to the maintain the plaintiff's private-property according to their hypocritically-enforced White-American standards; yet, their twisted view of taxation, both expressed in this incident and in prior incident(s) (see above), clearly shows where the real selfishness lies. Since the plaintiff is attempting to prove both a fraud (racketeering-act) and racial-discrimination claim against the defendants (in general) and [RSR] (in particular), it is crucial for the plaintiff's analysis of [RSR]'s fraudulent speech, to emphasize that [RSR] had, on multiple previous occasions, stated that she has repeatedly wanted to sell her property and move out of the neighborhood, thus showing that much of the rhetoric that [RSR] uses in such speech as brazen and pure fraud - as newly-elected [SPOA] Board members are normally required to serve 2 year terms, which [RSR] clearly had absolutely no intention of doing. [RSR] begins her speech feigning humbleness,

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    1696907690

stating, *"I know you guys are a hard act to follow... I say this humbly because... if I was privileged to be in this position ..."*, despite of the fact that a huge fraction of the neighborhood expressed either strong dissatisfaction or worse, outrage, at at least two of the existing Board Members [SPOA-VP-AH],[SPOA-MaL-ML], and despite of the fact that no reasonable observer would describe [RSR]'s numerous predatory actions against the plaintiff as *"humble"*. [RSR], once again, taking a page straight out of the book of social-justice activists that genuinely aspire to change the world for the better, then fraudulently states, *"But one of the things that somebody said to me, is that: Why don't you get involved? And you know, if you wanted to see change, you can be part of the change..."* The plaintiff does not actually doubt that [RSR] was told such words by *"somebody"*, but the plaintiff is endlessly amazed that far-right-wing-extremists can fraudulently use the same rhetoric that social-justice activists use, but for the exact opposite reasons - to move society in the exact-opposite (and regressive) direction of injustice. [RSR] admits that she has never been on the Board before, but much of her predatory actions against the plaintiff makes it abundantly clear to any reasonable observer that she actually played a more powerful role than the Board itself, actually pulling the Board's strings as the mafia-godfather or the puppeteer (at the very least, on any issue regarding the plaintiff), at it was only after her enormous and predatory power was exposed, and only after she could, thus, no longer pull the Board's strings, did she decide to run for Board member. [RSR] states that she would, *"like to see an engaged social-media-platform"*, although her prior engagement in the *"nextdoor.com"* social-media-platform had been primarily (or at the very least, substantially) focused upon spreading racist and fraudulent propaganda about the plaintiff, in-order-to engender more racial-animus against the plaintiff in the overwhelmingly White neighborhood's other residents. In yet another fraudulent statement fraught with hypocrisy, [RSR] expresses her desire to *"communicate freely with each other"* and *"allow homeowners a voice in decisions affecting our community"*, when [RSR] has, as the record above shows, viciously lashed back against other residents' postings when such postings do not perfectly align with her racist and/or far-right-wing-extremist view of the world, and as the record also shows, viciously conspired to ensure that the plaintiff has absolutely no voice - not only on social media, not only during [HOA] meetings - but even within the plaintiff's private-property (for example, the plaintiff's first-amendment right to post political yard-signs, and the plaintiff's first-amendment right to maintain the plaintiff's private-property according to the plaintiff's religious/cultural views/practices and/or political views and/or artistic expression.) When [RSR] states, *"we're all on the same team"*, [RSR] is ostensibly referring to all of the homeowners, but clearly, no reasonable observer that studies all of [RSR]'s predatory actions against the plaintiff, as documented in this lawsuit, would reach the conclusion that the plaintiff was included in that same *"team"*, unless by *"we"* and *"team"*, [RSR] is only referring to the White-American residents of the neighborhood. As the record does show, [RSR] has engaged in numerous acts of racial-oppression and racketeering-activity against the plaintiff, while claiming to *"be a good neighbor."* As the record does show, [RSR] has viciously dehumanized the plaintiff using the most derogatory and racist rhetoric, portraying the plaintiff as a low-IQ, subhuman animal, while at the same time, aspiring in this speech to *"be human to each other."* As the record does show, [RSR] has never been held accountable for any of the racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses that she has viciously committed against the plaintiff, but yet, in this particular speech, [RSR] aspires to be *"accountable to the homeowners"*. After [RSR] engages in such fraudulent speech in front of the other attendees to obtain a seat on the Board purely for using her Board power solely in-order-to engage in predatory litigation actions against the plaintiff, [RSR] sits down and the meeting continues with [SPOA-PMCE-1] answering further questions from residents. In this meeting, another resident wanted to confirm if it was in-fact legal for resident(s) to video-record [HOA] Meetings (including Board-Meetings) - which is exactly what the plaintiff was illegally obstructed from doing at the previous meeting. [SPOA-PMCE-1] responds that it is in-fact legal for any resident to record any [HOA] Meeting - basically, admitting to the plaintiff that [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH],[SPOA-MaL-ML] and former [SPOA-CM-CD] did commit the crime of Obstruction-of-Justice and/or Witness-Tampering against the plaintiff by threatening to kick the plaintiff out of the meeting for trying to record [RSR]'s illegal and racially-motivated disorderly-conduct/harassment/stalking/intimidation/interference/blackmail hate-crimes

against the plaintiff at such meeting, and also, for trying to record evidence of the decade-long, illegal conspiracy that [RSR] had with the

[HOA] against the plaintiff - which [RSR], acting like the mafia-godfather over the entire neighborhood, even admitted to at that meeting. At

one-or-more point(s) in time during this meeting, other resident(s) even question the management as to what is being done about the unlawful

lighting of fireworks in the neighborhood. At one-or-more point(s) in time during this meeting, other resident(s) question the management as to

what is being done about unlawfully parked vehicles (such as trailers, boats, and commercial-trucks) in the neighborhood. The management

does not offer any reasonable explanation to these particular questions, instead explaining that if they went after any individual person's

violation, then they would also have to go after every other person's same/similar violation - essentially letting the plaintiff know, at the very

least, that the [HOA] (especially under those [f-HOA-BoDs]) gets to arbitrarily and capriciously pick-and-choose (according to their own

whims and fancies), in essence *"cherry-pick"*, which of the neighborhood's rules they are going to enforce, even if these arbitrary/capricious

enforcement actions are racially-discriminatory and/or ended up violating the rights of the plaintiff. At one-or-more other times during this

meeting, [RSR] derogatorily refers to the plaintiff by making multiple fraudulent statements such as, *"like the guy across the street from me

that hasn't mowed his grass in 10 years."* During this meeting, [RSR] does not, for very obvious reasons, show any displeasure nor make any

comment regarding the other restrictive-covenant violations (fireworks, illegal vehicles, etc.), but instead remains hypocritically laser-focused on

what she alleges to be the plaintiff's refusal to mow the plaintiff's grass - despite the fact that both [RSR] and the [HOA] know fully-well that

the plaintiff has, since the prior month of {2017-10}, installed a *"no-mow"* grass on the plaintiff's [FRONTYARD]. After the very end of the

meeting, some of the attendees had left the building, while some other attendees continued to converse with each other and/or the property-

management-company employee(s). The plaintiff notices [SPOA-VP-AH] look towards the plaintiff with a malicious smile on her face, while

patting [RSR] on the back - the symbolic gesture of *"attagirl!"* - as a show of strong affection and/or approval towards [RSR] - the kingpin (or

mafia-godfather) of such corrupt-malicious-predatory-and-retaliatory racketeering-enterprise against the plaintiff. The plaintiff asserts that this is

the type of unapologetic, modern-day-Jim-Crow institutional-racism that the plaintiff had suffered from the then [HOA] and [WCLE], both

acting in-conspiracy-with - or under the command of the plaintiff's predatory neighbors and racketeer co-defendants [RSR],[JSP&KAP] - for

eight or more years (at that point in time), in-order-to predatorily violate the rights of the plaintiff.

---

▸ RECORDED [SPOA] MEET-THE-CANDIDATE-NIGHT MEETING(▸) :   {2019-11-11 19:00}(~)
▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]
▸ [ SPEECH AND IDENTITIES OF OTHER HOMEOWNERS ARE OMITTED/REDACTED TO PROTECT THEIR PRIVACY. ]


• 
• 
• 


〖 PLAINTIFF IS SEATED IN A CORNER CHAIR LOOKING AT FRONT OF ROOM WHERE CANDIDATES ARE PRESENTING THEMSELVES. 〗

〖 [RSR] IS SEATED AT THE OPPOSITE-CORNER OF THE ROOM. 〗


• 
• 
• 


〖 [RSR] IS CALLED-ON TO SPEAK AS A CANDIDATE. [RSR] STANDS UP TO SPEAK, INITIALLY MAKING A JOKE ABOUT PROPERTY-TAXES. 〗


[RSR]          *So, ... if I could only change our property-taxes...*

---

〖 SOME OTHER ATTENDEES LAUGH. 〗

**[SPOA-PMCE-1]**    *That's a whole [another] forum!...*

**[RSR]**    *I know... You guys are a hard act to follow... But one of the things that somebody said to me, is that: Why don't you get involved? And you know, if you wanted to see change, you can be part of the change... And, I say this humbly because I've not been on the Board before... So, it's nice to have good ideas, and I understand we have to marry them practically, but I would like to see an engaged social-media-platform, so that it's kind of hard to know, all the time... if we could get it to work with virtual meetings... if we could have for, like for instance, decisions that are being made - how they're voted on, and like, gazebo - I'm just going to say gazebo - how many residents really want that and how many don't. And having votes on those things. And having a way to communicate freely with each other - and keep-in-mind, we're all on the same team. And trying to be good neighbors, and be human to each other. And Um. Um, so... So, develop at an expedited process to answer to the actions, um... So that the Board may answer to the, um, can answer for the actions they've taken in the community. To allow homeowners a voice in decisions affecting our community. Um, I'd like to revisit [HOA] assessments - I want to be accountable to the homeowners - because, I kind of look at - if I was privileged to be in this position, I would see you as my customer. You know, and respect you as that - and I want us to, you know, open communication, in a positive way, in order to [???] - and try to grow together, and have a neighborhood that everybody wants to live in. ... And, that's about it...*

- 
- 
- 

# ¶468

Despite the fact that [RSR] runs for Board-Member of the [SPOA], [RSR] does not show up for the [SPOA] annual-meeting where the so-called *"votes"* are *"counted"* by the [SPOA] property-management-company without any resident oversight. In this year's so-called [SPOA] [BoD] *"election"* (✗) , the 〖Summerlyn〗 Property-Owners were to choose 4 Board-Members - due to 1 resignation mentioned above and 3 term-expirations. During this meeting, not only is it revealed that [RSR] did not win any of the 4 seats on the [SPOA] Board, but it is also revealed that all of the former abusive Board members that engaged in predatory enforcement actions against the plaintiff - including [SPOA-VP-AH],[SPOA-MaL-ML] - did not win their re-elections, and in effect, were voted out of office. It is important to note that both [SPOA-VP-AH] and [SPOA-P-BC] (who previously resigned) had served in those powerful Board positions for approximately a decade (or more); therefore, overthrowing them was no small feat. At this point, the plaintiff feels a combination of intense joy but also intense pain. The plaintiff feels the intense joy that any citizen feels when an oppressive/unaccountable dictator/tyrant/strongman and/or oppressive/unaccountable government is overthrown by the people. Again, while the plaintiff's muckraking actions during the previous Board-Meeting inadvertently exposed the truly abusive, predatory, corrupt, non-transparent and unaccountable nature of those [f-HOA-BoD]s, [RSR]'s monopolistic, mafia-godfather-like predatory-actions in support of those same [f-HOA-BoD]s during and after the previous Board-Meeting further re-enforced the neighborhood's outrage at those [f-HOA-BoD]s, only serving to seal the fates of those [f-HOA-BoD]s. From such *"election"* (✗) results, it would appear to the plaintiff that the residents of the subdivision not-only wanted to oust the existing dictators/tyrants/strongmen on the Board, but also keep-out the candidates that they believed to be most likely to continue the pattern of such predatory, unaccountable and non-transparent dictatorship. It would further appear to the plaintiff, that [RSR], in particular, was not voted into such position-of-power, because at least some significant fraction of residents of the subdivision recognized that [RSR] had her own ulterior, malicious agenda and campaign of predatorily targeting the plaintiff. It is also indisputable to the plaintiff that, it was not even in the [HOA]'s best interest for [RSR] to be elected,

as [RSR]'s position as a [HOA-BoD] would only tremendously increase the [HOA]'s exposure to liability - if to no-one else, then at least to the plaintiff. (The plaintiff had already alerted the [HOA] of [RSR]'s long pattern of hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, dating all the way back to {2011} - see initial incidents of {2011} above.) However, the plaintiff also feels the intense pain that the plaintiff was sued two years prior to these incidents in {2017} by the [SPOA] solely due to the predatory, abusive [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH],[DMP], that acted predatorily against the plaintiff, purely on the predatory demands of the plaintiff's predatory neighbors [RSR],[JSP&KAP] (and their co-conspirators) - costing the plaintiff (and the plaintiff's family) large amounts of severe emotional distress, time, effort and money (in both litigation and re-landscaping) - and had these particular abusive, predatory, corrupt, non-transparent, unaccountable [f-HOA-BoD]s not been in such positions of power at that moment in time, there would not have been any such lawsuit filed against the plaintiff at that moment in time - a painful lesson in corrupt-power-politics that at least some people that work within a corrupt, unjust political system are likely-to-be-familiar-with. Most importantly, the lawsuit from the [SPOA] run by these abusive, predatory [f-HOA-BoD]s against the plaintiff in {2017} only served to further embolden the defendants that they could feel free to continue engaging in escalating and retaliatory hate-crimes/civil-rights-violations/racketeering-acts/abuses - facilitated by blackmail - against the plaintiff with absolute impunity.

## ¶469

Almost immediately after [RSR] realizes that she has not won any of the 4 open positions on the [SPOA] Board, on or about a day in the month of {2019-11} or {2019-12}, [RSR] posts a *"Coming Soon"* yard-sign in the frontyard of her property [789KLLTX78641] - indicating to prospective buyers that she is soon to put her property for sale. [RSR]'s fraud and abuse against the plaintiff is thus abundantly clear and obvious from these sequence-of-actions. It is indisputable that [RSR] applied to become [SPOA] Board-Member solely to egregiously abuse those substantial Board-Member powers in-order-to directly engage in more-egregious-and-predatory litigation actions against the plaintiff, as [RSR] was clearly not intending to serve the entire 2-year term as Board-Member of the [SPOA].

## ¶470

On or about the date and approximate time of {2020-02-04 19:30} (nighttime), [JSP] drives back towards his property in his pickup-truck, with such pickup-truck blaring loud music. While directly in front of the plaintiff's property, [JSP] pauses such pickup-truck on the road, and spends over a minute inspecting/surveilling several aspects of the plaintiff's property, with loud music continuing to blare from such pickup-truck. After over a minute of such surveillance of the plaintiff's property, [JSP] then parks his pickup-truck on the driveway of his property [784KLLTX78641]. [JSP] exits his pickup-truck, angrily approaches the front of plaintiff's property on the sidewalk with camera-phone in hand, and uses his camera-phone to take several flash-photographs (from various angles) of the various parts of the plaintiff's (completely-unlit) property - at nighttime, thus in total violations of the plaintiff's rights. At one point, [JSP] even approaches closer to one of the plaintiff's [FRONTYARD]-tree (which has security-cameras installed onto it), and holds his hands out threateningly/menaceingly, with an angry look on his face - again, to engage in such brazen racial intimidation/interference against the plaintiff. It appeared as if [JSP] was actually searching for the plaintiff in addition to conducting illegal surveillance on various aspects of the plaintiff's property. After [JSP] fails to find the plaintiff, [JSP] enters back into this property. This was just one of numerous counts of felony stalking that the plaintiff would suffer from [JSP] - with [JSP]'s acts of brazen, felonious stalking against the plaintiff spanning several years - from at least {2019} through {2022}.

## ¶471

On or about the date and approximate time of {2020-02-05 20:15} (nighttime), [JSP] drives back towards his property in his pickup-truck, with such pickup-truck blaring loud music. While directly in front of the plaintiff's property, [JSP] pauses such pickup-truck on the road, and spends approximately 15 seconds inspecting/surveilling several aspects of the plaintiff's property, with loud music continuing to blare from such pickup-truck. After approximately 15 seconds of such surveillance of the plaintiff's property, [JSP] then parks his pickup-truck on the driveway of his property [784KLLTX78641].

## ¶472

On or about the date and approximate time of {2020-02-06 19:40} (nighttime), a [WCSD] police-cruiser-vehicle drives slowly on the street in front of the plaintiff's property, shining the bright spotlight of such cruiser directly into all of the frontal regions of the plaintiff's property, including directly at one-or-more of the plaintiff's security-cameras - not only in violation of the plaintiff's right to privacy, but also, as the plaintiff would later find out, as an intimidation tactic that both [WCSD]s and [WCCD]s would, on many occasions, during the following two years, perpetrate against the plaintiff in-order-to intimidate the plaintiff. After crossing the plaintiff's property, such police-cruiser-vehicle then makes a u-turn and deliberately parks at a location further down the street, at a sufficient distance away from the plaintiff's security-cameras so that the plaintiff's security-cameras could not capture information like the license-plate, etc. Then, [WCSO] Sheriff Deputy JOHN-DOE-8, [WCSD-JD-8], steps out of such vehicle, trespassed onto the plaintiff's property initially stepping onto the plaintiff's sideyard at nighttime (when there was no sunlight whatsoever). From the plaintiff's sideyard, [WCSD-JD-8] enters into the [FRONTPORCH]-area, and in total violation of the plaintiff's rights, leans into the plaintiff's front-window multiple times in-order-to look into the front-room of the plaintiff's [HOUSE]. (As a security measure, the plaintiff almost-always leaves the interior window-blinds on the front-room open.) Although the interior window-blinds of such front-window were open, there were no lights turned on inside the [HOUSE] at this moment in time, and since the expectation of privacy exists in any case with regards to the government's handling of the interior of a home, this action by [WCSD-JD-8] alone is both an egregious violation of the plaintiff's fourth-amendment right to be free from unreasonable-search-and-seizure, and the plaintiff's fifth-amendment-due-process right to privacy. (Again, the [SCOTUS] has ruled that [WCSD-JD-8]'s action is clearly unconstitutional-and-unlawful even if it occurred during daytime, and the [SCOTUS] has expressly ruled that nonconsensual-and-warrantless nighttime searches are especially egregious civil-rights-violations.) On at least one point in time, [WCSD-JD-8] even raises his hand to shine a torch light into the front-window before deciding against it. [WCSD-JD-8] then very-briefly inspects items stored on the [FRONTPORCH] (which was completely unlit at the time). Almost all, if not all, of the aforementioned actions by [WCSD-JD-8] are clearly unlawful (both unconstitutional and discriminatory), not only because they were performed at night, but because the [SCOTUS] has clearly ruled in one-or-more precedent-setting case(s) (see section below) that law-enforcement is only allowed to walk from the shortest straight-line path, or *"baseball-path"*, from the nearest part of public-property to the resident's front-door, without conducting any type of search along the way - especially, in private/curtilage areas of private-property. [WCSD-JD-8] then announces his presence as he proceeds to the [FRONTDOOR] which was at that moment in time was partly open, and demands to know if anyone is inside of [HOUSE], shining his bright-torch-light not only into the exterior-front-hallway area where certain items were stored, but also directly into the plaintiff's [HOUSE], since the [FRONTDOOR] was open at that moment in time. The plaintiff, having noticed on the plaintiff's security-camera-system-monitor that [WCSD-JD-8] was illegally inspecting the [FRONTPORCH], front-room and the interior hallway of the house, reluctantly walks towards the [FRONTDOOR] area - terrified of what the plaintiff may encounter. (When a White-American police-officer encounters a person-of-color at nighttime especially when

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

there is no lighting to clarify the situation, such situation has been known to, at least in some cases, result in unreasonable and unjustified police shooting(s), and so, the plaintiff is, thus, rightfully terrified and under extreme duress.) The plaintiff reluctantly meets with [WCSD-JD-8] at the exterior-front-hallway in front of the front-door, at which point, [WCSD-JD-8] begins a totally unconstitutional-and-unlawful interrogation of the plaintiff - asking many privacy-invading questions to the plaintiff. At one point in time, [WCSD-JD-8] demands to see the plaintiff's drivers-license because he did not believe the plaintiff to be the rightful owner and/or lawful resident of the property - obviously, due to the plaintiff's racial profile. During this incident, besides demanding the plaintiff's personal identification information and photo-identification proving that the private-property [788KLLTX78641] was the plaintiff's lawful place of residence, which the plaintiff was initially reticent to provide solely because the plaintiff considered such disclosure to be an invasion of the plaintiff's privacy, [WCSD-JD-8] continued to pester the plaintiff with other privacy-invading questions to the plaintiff - at least some of which, indicated that [WCSD-JD-8] had a very-difficult time believing (again, due to the plaintiff's racial-profile) that the plaintiff was the lawful resident of [788KLLTX78641] - such as:

Ⓐ how long the plaintiff lived at [788KLLTX78641]

Ⓑ where the plaintiff lived at before the plaintiff lived at this residence

Ⓒ whether the plaintiff had electricity at [788KLLTX78641], because according to [WCSD-JD-8], there did not appear to be electricity at [788KLLTX78641] - so as if to fraudulently intimidate the plaintiff into thinking that living without electricity (or other utility services) was a crime, when the plaintiff clearly knows otherwise.

Ⓓ if the plaintiff lived alone at [788KLLTX78641] or if there were other residents

Ⓔ why, and/or for how long, the door was *"wide open"*, even though, since the entire place was unlit, there would be no way for [WCSD-JD-8] to have known this information without receiving a complaint from someone else.

Ⓕ if he place knew that the place's [GARAGE]-door was open.

Ⓖ how long the plaintiff's [GARAGE]-door had been open.

Ⓗ where the plaintiff works and/or who the plaintiff's employer is

Ⓘ what is the plaintiff's phone-number.

Ⓙ when the plaintiff last ate food

Ⓚ whether the plaintiff normally made food at home or if the plaintiff usually went out to get something to eat

Ⓛ if the plaintiff had a wife, or girlfriend or kids.

Ⓜ why the plaintiff has so many security-cameras.


Ⓝ how-often and/or at-what-times the plaintiff leaves the [HOUSE]


The plaintiff declined to answer one-or-more of these questions, letting [WCSD-JD-8] know that the plaintiff felt very uncomfortable answering such privacy-invading questions. It was abundantly clear from [WCSD-JD-8]'s unlawful interrogation of the plaintiff, that since the plaintiff was initially reticent about providing him with the plaintiff's photo-identification, [WCSD-JD-8] decided to further-punish the plaintiff by interrogating the plaintiff at the plaintiff's own private-property. When the plaintiff, who was under duress, finally decided that it would be better for the plaintiff to simply present such photo-identification in-order-to stop this intrusive interrogation, [WCSD-JD-8] agreed that such disclosure would be the only confirmation that he needed to get out of the plaintiff's property. The plaintiff considers all of these detainment/interrogation and/or search/seizure techniques executed by [WCSD-JD-8] against the plaintiff to be clearly unlawful, especially at the plaintiff's own private-property, especially at nighttime, and especially since the plaintiff never *"knowingly, freely and voluntarily"* consented to such detainment/interrogation and/or search/seizure. Since the plaintiff is terrified and could not immediately remember if the drivers-license was inside the plaintiff's vehicle parked in the [DRIVEWAY] or inside the [HOUSE], the plaintiff indicates to [WCSD-JD-8] that the drivers-license is likely to be inside the vehicle, and the plaintiff walks towards the vehicle in the [DRIVEWAY], especially since the plaintiff felt very violated with [WCSD-JD-8] sbining his light into the interior of the completely-unlit [HOUSE]. [WCSD-JD-8] brazenly demands to know where the plaintiff works and/or who the plaintiff's employer is - an incredibly privacy-invading question that the plaintiff was shocked-at and did not see the relevance to, especially since the government has absolutely no right to obtain this information without a valid search-warrant. After the plaintiff fails to find the plaintiff's drivers-license anywhere around the front-seats of the vehicle, the plaintiff explains to [WCSD-JD-8] that the plaintiff cannot find the plaintiff's drivers-license inside the vehicle and that the drivers-license was most-likely inside the [HOUSE]. The plaintiff then walks towards the [FRONTDOOR] and enters into the [HOUSE] in-order-to search for the drivers-license. [WCSD-JD-8], who has been shining his torch-light directly onto the plaintiff at all of these times, then follows behind the plaintiff, and the plaintiff stops after the plaintiff has stepped inside of the [HOUSE], and asks [WCSD-JD-8] if [WCSD-JD-8] was planning to enter into the [HOUSE] - again, without presenting any evidence of a search-warrant. [WCSD-JD-8] responded that he did plan to enter into the [HOUSE], to which, the plaintiff remains stunned and shocked - but yet, cannot question, because any *"wrong move"* by the plaintiff in dealing with a White-male police office can be lethal for the plaintiff. The plaintiff continues to walk inside the [HOUSE] in search of the drivers-license, with [WCSD-JD-8] stopping at the [FRONTDOOR] and still shining his torch-light into the interior of the [HOUSE] (and with his body-worn-camera recording the interior contents of the [HOUSE]). As one-or-more of the plaintiff's security-camera(s) would capture, [WCSD-JD-8] had his hand on the holster of the gun attached to his waist, getting ready to use such gun if the plaintiff made any *"wrong move"*. The plaintiff tries to make the plaintiff's hands visible to the [WCSD-JD-8] at all times, because again, the plaintiff, knowing the history of policing in the United States - particularly towards racial minorities - is trying to ensure that the plaintiff does not commit any action that could be misinterpreted, and thus be met with a lethal use-of-force by [WCSD-JD-8]. Since the plaintiff could not locate the plaintiff's current drivers-license, the plaintiff instead finds an older and expired drivers-license (from the year {2009}) and presents such expired drivers-license to [WCSD-JD-8] - at which point, [WCSD-JD-8] verifies that the plaintiff is the rightful owner of the property [788KLLTX78641] (as documented in the drivers-license). [WCSD-JD-8] is shocked to realize that the plaintiff has been such a long-time resident/owner of such property - again, solely due to the racial-profile of the plaintiff. However, despite of [WCSD-JD-8] confirming that the plaintiff was such a

long-time resident/owner of such property, [WCSD-JD-8] still uses his police-radio to radio back to [WCSO] police-headquarters, the plaintiff's drivers-license number, so as if to perform a background-check on the plaintiff - again, all without even any pretense of a search-warrant, and thus, in total violation of the plaintiff's rights. [WCSD-JD-8] questions the plaintiff as to why the plaintiff had so many security cameras installed on the plaintiff's property, to which the plaintiff responded that the plaintiff is living next to malicious and predatory people that have committed several racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff - none of which were even charged, let alone prosecuted by [WCLE]. [WCSD-JD-8] stares at the plaintiff and treats the plaintiff's response as if the plaintiff's response is not credible, again pretending as if the plaintiff is crazy - a similar reaction of malicious gaslighting that the plaintiff has received from many other members of [WCLE] who have maliciously used such techniques of gaslighting to deliberately ignore the plaintiff's several crime-reports - dating back to {2011} - in-order-to deliberately and maliciously protect the White-American perpetrators ([RSR],[JSP&KAP],[JJB]) of those hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff. At some point in time, [WCSD-JD-8] even makes an abusive, racist and irrelevant comment that the plaintiff's [HOUSE] was *"in shambles"* - which, in retrospect, the plaintiff considers to be eerily reminiscent to the similarly abusive and racist comment made by police officer Aaron Dean about Atatiana Jefferson's home during the high-profile trial of 《TEXAS V. AARON DEAN》, ironically, with both the plaintiff and Ms. Jefferson being relatively-educated persons-of-color (see section below). [WCSD-JD-8] even asks for the plaintiff's phone-number, and the plaintiff declined to provide such information stating that such information was private, not only because the plaintiff saw no necessity for such disclosure, but also because, as a long-time-member of highly-reputed privacy-organizations such as the [EFF] and the [FSF], the plaintiff has always considered it to be very-suspicious for police-officer(s) to be asking private-citizen(s) for their phone number - almost as if the police are requesting such private information for some sinister purpose such as unlawful phone-location-tracking/surveillance and/or unlawful eavesdropping/wiretapping of private conversations. Very shortly thereafter, a second [WCSD], JOHN-DOE-20 [WCSD-JD-20] is also at the plaintiff's front-hallway behind [WCSD-JD-8] - probably because [WCSD-JD-8] had unreasonably called in for backup - especially unreasonable, given the fact that [WCSD-JD-8] was approximately twice the physical size of the plaintiff, who was living alone at the residence. [WCSD-JD-8]'s final question to the plaintiff were words-to-the-effect of *"how-often and/or at-what-times the plaintiff leaves the [HOUSE]"*, and the plaintiff, once-again felt extremely uncomfortable answering such question, declining to provide such information due to that information being private, not only because the plaintiff saw no necessity for such disclosure, but also because, as a long-time-member of highly-reputed privacy-organizations such as the [EFF] and the [FSF], the plaintiff has always considered it to be very-suspicious for police-officer(s) to be asking private-citizen(s) for their comings-and-goings - almost as if the police are requesting such private information for some sinister purpose such as unlawful property-surveillance, or even worse, unlawful entering into such private-citizen(s)' private-property at time(s) when they know that such private-citizen(s) were not at the property. Shortly after interrogating the plaintiff in such abusive and intrusive manner, [WCSD-JD-8] lets the plaintiff know that both he and [WCSD-JD-20] would be leaving the plaintiff's property, for which the plaintiff reluctantly thanks them - an involuntary, reflexive response of a terrified person-of-color, acting under extreme duress caused by White police-officers. On one-or-more occasions during this incident, both [WCSD-JD-8] and [WCSD-JD-20] would also shine their torch-light into the plaintiff's open (but unlit) [GARAGE], thus performing a search of such [GARAGE], with the [GARAGE] being considered a part of the [HOUSE] or curtilage-area - both equally-protected search areas for fourth-amendment purposes. As [WCSD-JD-8] and [WCSD-JD-20] walk down the sidewalk towards their respective vehicles, [WCSD-JD-8] points in a menacing manner at one of the plaintiff's security cameras attached to the plaintiff's front tree - which can only be interpreted as his final act of racial intimidation/interference against the plaintiff. The plaintiff felt extremely violated and terrified by the entire incident - the unlawful interrogation, and the entire unconstitutional-and-unlawful search of the plaintiff's property - with the plaintiff knowing fully well that at any point in time, any move by the plaintiff interpreted to be a *"wrong move"* by such White police-

officers, could result in serious injury, if not death, to the plaintiff. It should also be noted that [WCSD-JD-8] had a body-worn-camera on and recording, and while the plaintiff fully supports the use of such body-worn-camera in-order-to deter police-misconduct, the plaintiff felt very violated by the fact that [WCSD-JD-8] was standing directly in front of of the [FRONTDOOR] recording the interior of the [HOUSE] while the plaintiff was searching for the plaintiff's drivers-license, and while the plaintiff was being interrogated. Yet, again, the plaintiff could not question/protest [WCSD-JD-8]'s violative actions, nor could the plaintiff act in any defiant manner, nor could the plaintiff make any potentially *"wrong move"* in any action during this entire incident because any such action could easily result in a lethal use-of-force by [WCSD-JD-8], a White-American police-officer, against the plaintiff, an immigrant-of-color/indigenous-person (with very-dark-brown skin color). So, once again, just like the many other incidents of racial-oppression suffered by the plaintiff at the hands of the [WCLE], the plaintiff had no choice but to submit to this particular, totally unconstitutional-and-unlawful search/seizure/interrogation/detention by [WCSD-JD-8] - and during the total darkness of nighttime - a time of day that the [SCOTUS] has ruled that is not permissible for any such nonconsensual-and-warrantless search/seizure/interrogation/detention. The plaintiff did not know at this moment in time that [WCLE] would further exploit/capitalize-upon the private-information unlawfully-gleaned from [WCSD-JD-8]'s egregiously unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff and plaintiff's property as a fraudulent pretext and foundation for multiple further (and retaliatory) unconstitutional-and-unlawful searches/seizures/interrogation/detentions of the plaintiff and plaintiff's property in the year {2020} and at least one more unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff in the year {2021} - with all of these civil-rights-violations/racketeering-acts/abuses against the plaintiff playing an integral part to further intimidate/interfere-with/harass the plaintiff in-order-to unlawfully pressure/coerce the plaintiff to plead *"guilty"* to [WCLE]'s purely-retaliatory, Class-C-Misdemeanor-Public-Nuisance prosecution of the plaintiff from the time-period of {2020-10-12} through {2021-11-01} (see subsequent incidents below). According to the plaintiff's recorded-footage, all of these [WCSD]s at the scene of the plaintiff's private-property during this incident did have body-worn-cameras - and as such, such body-worn-cameras should have been recording all aspects of this unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff and the plaintiff's private-property - unless, such [WCSD]s deliberately turned-off their body-worn-cameras (at any point in time) in-order-to Obstruct Justice against the plaintiff.

# ¶473

On or about the date and approximate time of {2020-02-09 09:00}, [WCSD-MD] parks his police vehicle further up the street and approaches the [FRONTDOOR], with [WCSD-CP] walking behind him. [WCSD-CP] actually walks towards and stops in front of the plaintiff's political yard-signs as if to read the messages on such yard-signs. While on the [DRIVEWAY], [WCSD-MD] takes out a torch-light and shines such torch-light into the plaintiff's vehicle parked well inside the plaintiff's [DRIVEWAY] (curtilage), in-order-to view the interior contents of the plaintiff's vehicle - in total violation of the plaintiff's rights (as the [SCOTUS] has ruled that such act(s) are considered a search for fourth-amendment purposes). While on the [DRIVEWAY], [WCSD-CP] reads and radios back to [WCSO] police-headquarters the license-plate number of the plaintiff's vehicle - once again, as if to run a background-check on such vehicle and/or the registered driver(s) of such vehicle. [WCSD-MD],[WCSD-CP] then proceed to the [FRONTDOOR], which at that moment in time, was open - but again, this information about the plaintiff's [FRONTDOOR] being open could not have been known to anybody from the street, since both the plaintiff's vehicle and the plaintiff's [FRONTYARD] trees are obstructing the view into the plaintiff's [FRONTPORCH]. [WCSD-MD] looks into the plaintiff's open (but unlit) [GARAGE] as if to briefly inspect the item(s) stored in the plaintiff's [GARAGE]. [WCSD-MD] also spends a few seconds looking down at one of the plaintiff's security-camera(s) located close to ground level attached to the exterior of the plaintiff's [GARAGE]. Upon entering the plaintiff's [FRONTPORCH], [WCSD-MD] first uses his torch-light to shine such bright light directly-into (and deep-into) the

plaintiff's unlit [HOUSE], in total violation of the plaintiff's rights. [WCSD-MD] then turns off such torch-light, loudly announcing his presence to the plaintiff, as if realizing that such intrusive shining of such bright light into one's private, unlit [HOUSE] is a clear violation of both the fourth-amendment and the fifth-amendment (in addition to being a discriminatory practice in violation of the [FHA]/[TFHA]). [WCSD-CP], who is behind [WCSD-MD], continues to look into the interior of the plaintiff's open (but unlit) [GARAGE]. Within approximately 10 seconds, the plaintiff appears at the [FRONTDOOR] in-order-to respond to [WCSD-MD]. The plaintiff had asked if there was any complaint lodged against the plaintiff, and if so, by whom. [WCSD-MD] stated that he did not know who had complained about the plaintiff. Despite of the fact that [WCSD-JD-8] had already intrusively interrogated the plaintiff at the plaintiff's property not more than 3 days prior to this moment in time, [WCSD-MD] requests at least some of the very same information, asking the plaintiff's name and whether-or-not the plaintiff was the lawful resident of the plaintiff's property - once-again, because all of these White-American police-officers of defendant [WC] (dating back to the year {2011}) had a very-difficult time believing and/or accepting the fact that someone with the plaintiff's racial-profile actually belonged in such White neighborhood. The plaintiff requested some privacy, and [WCSD-MD] ironically responded that he's going to respect the plaintiff's *"fourth-amendment"* rights, despite having already violating such right by shining such torch-light into the plaintiff's vehicle, and into the interior of the plaintiff's unlit [HOUSE]. [WCSD-MD] was talking a little loudly, and so the plaintiff clarified that the plaintiff requested if [WCSD-MD] could approach a little closer so that the neighbors would not overhear any private-conversation between the plaintiff and [WCSD-MD]. [WCSD-MD] stepped closer towards the plaintiff. [WCSD-MD] justifies his interrogation of the plaintiff, stating that the plaintiff should not take anything that [WCSD-MD] states personally, as he is only making such statements and performing such interrogation *"to make the bosses happy at work"* - which may actually be an accurate statement, reflecting the fact that the top-level-leadership of [WCLE] want such intrusive interrogations of the plaintiff to be conducted by such [WCSD]s. During the course of this interrogation, [WCSD-MD] would ask the plaintiff, at the very least:

Ⓐ if the plaintiff lived with anybody else at the plaintiff's property.

Ⓑ when the plaintiff last slept.

Ⓒ if the plaintiff works anywhere.

Ⓓ what the plaintiff does for a living.

Ⓔ how long the plaintiff had lived at the property.

Ⓕ if the plaintiff had food, water, place-to-sleep, etc.

Ⓖ if the plaintiff needed the assistance of *"Adult Protective Services"*.

Ⓗ if the plaintiff heard any *"voices"*, in other words, to determine if the plaintiff was schizophrenic

Ⓘ if the plaintiff was taking any medication(s).

Ⓙ if the plaintiff seeks doctor's care for anything.

Ⓚ if the plaintiff was an otherwise pretty-healthy, young guy.

Ⓛ if the plaintiff planned on any self-harm.

Ⓜ if the plaintiff had any homicidal thoughts, or thoughts to hurt somebody else.

Ⓝ if there was any suspicious activities around the plaintiff's [HOUSE].

Ⓞ if the plaintiff had any form of identification or if the plaintiff could provide both the plaintiff's full-name and date-of-birth.

Ⓟ if the plaintiff had all the items in the plaintiff's [FRONTPORCH] belonging to the plaintiff.

Ⓠ if the plaintiff always lived in Leander area.

Ⓠ if the plaintiff graduated from University.

Ⓡ what type of degree the plaintiff graduated with.

Ⓢ which version of the GoPro body-worn-camera that plaintiff was wearing.

Somewhere during the middle of this interrogation, the plaintiff, once-again, interrupts [WCSD-MD] asking who had complained about the plaintiff, because the plaintiff felt very uncomfortable answering such privacy-invading questions, especially to a government-authority, when the government has absolutely no justifiable right to almost-all, if not all, of this private-information. [WCSD-MD] stated that he did not know but that he could find out for the plaintiff at some later point in time. The plaintiff informs [WCSD-MD] that the accused (the plaintiff) has the right to know who the accuser(s) are, to which [WCSD-MD] responds that no-one is accusing the plaintiff of anything. Once again, the plaintiff is frustrated that the plaintiff has to answer these questions to [WCSD-MD] about the plaintiff's private-property while the plaintiff is within the plaintiff's property and not causing any harm to anybody. Without any further questioning of the plaintiff, [WCSD-MD] further states to the plaintiff that neither he nor [WCSD-CP] have been sent to the plaintiff's property by the [HOA] - which the plaintiff thought was a very suspicious and revealing statement, because the plaintiff had known for a very long time, that the [HOA] - especially under [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH] - was, in at least some manner, involved in the malicious conspiracy against the plaintiff consisting of [JSP&KAP],[RSR] and [WCLE]. The plaintiff also considers such statement of [WCSD-MD] to be an implicit act of intimidation and/or blackmail, as if to indicate to the plaintiff that all of these authorities' eyes were on the plaintiff, despite of the fact that the plaintiff had done absolutely nothing wrong, and despite of the fact that [WCSD-MD] even fully-admitted that the plaintiff was *"not in any trouble, at all."* [WCSD-MD] surprisingly-states that *"everybody is entitled to their own happiness"*, and therefore, *"if this is how [the plaintiff]] wanted to*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

*live, that is how [the plaintiff gets to live]."* However, [WCSD-MD] follows up that very accurate and reasonable statement by making a more abusive statement that the items scattered in the plaintiff's [FRONTPORCH] is *"not normal"*, further clarifying that it is *"not the normal societal way to live"* - even though none of the items on the plaintiff's [FRONTPORCH] are in any way visible to those on the public-street and/or public-sidewalk - again, since such items are obstructed from view by a combination of the plaintiff's vehicle and the plaintiff's large fully-grown trees in front of the [FRONTPORCH]. [WCSD-MD] surprisingly admits to the plaintiff that people call the [WCSO] for all types of complaints, some of which are *"B.S."* and some of which are *"genuine"*. This statement by [WCSD-MD] is just one of many shockingly fitting microcosms for this lawsuit, because while the plaintiff's malicious neighbors with extreme-racial-animus against the plaintiff - [JSP&KAP],[RSR] (and their cronies) - have routinely and successfully called upon both [WCLE] and the [HOA], for approximately a decade at this moment in time, demanding that such institutions-of-power take increasingly predatory action(s) against the plaintiff, for the plaintiff's failure and/or *"inability"* to maintain the plaintiff's property according to their (hypocritically-enforced) White-American standards, the plaintiff has *"genuinely"* reported racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses committed against the plaintiff not only by [JSP&KAP],[RSR] but also by some individual employee(s) of [WCLE] - none of which were fully-investigated, almost-all of which were completely-uninvestigated, let alone charged or prosecuted. [WCSD-MD] asked if the plaintiff *"heard any voices"*, in other words, to determine if the plaintiff was schizophrenic, and the plaintiff laughed in outrage at such statement of gaslighting, even stating that [WCSD-MD] should never *"judge somebody by the way they look."* [WCSD-MD] strongly-agreed, further stating that the plaintiff *"is the [plaintiff's] own person... [the plaintiff is] entitled to every liberty the United States has to offer - this is one of them"*, although any reasonable observer that fully-analyzes all of the plaintiff's evidence would have never reached that conclusion based upon the malicious and predatory manner in which plaintiff had been treated by defendants [WCLE],[RSR],[JSP&KAP] and the former-[HOA] under [f-HOA-BoD]s[SPOA-VP-AH],[SPOA-P-BC]. [WCSD-MD] asked the plaintiff if the plaintiff was taking any medications - again, engaging in the same pattern of egregious gaslighting against the plaintiff, parroting some of the same racist-rhetoric that the plaintiff has heard particularly from the plaintiff's predatory neighbors, [RSR],[JSP&KAP]. Once again, the plaintiff strongly denied that the plaintiff was on any medications (especially since the plaintiff deliberately lives a chemical-free lifestyle fully in-line with the plaintiff's indigenous religious/cultural views/practices). [WCSD-MD] asks the plaintiff if the plaintiff had any thoughts of self-harm, or of if the plaintiff had any homicidal thoughts, or thoughts to hurt somebody else, to which the plaintiff, once again, laughed in outrage, stating that the plaintiff was a *"nonviolent person"* and that the plaintiff practices *"nonviolence"* (following in-line-with both the plaintiff's deeply-help religious views/practices and the plaintiff's political views). [WCSD-MD] asks the plaintiff if there were *"any suspicions activities"* around the plaintiff's [HOUSE], further questioning the plaintiff about the huge-number of security-cameras, at which point the plaintiff notifies [WCSD-MD] about the many racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses that the plaintiff has suffered from the plaintiff's predatory neighbors, particularly [JSP&KAP],[RSR]. Once again, [WCSD-MD], just like so many other members of [WCLE], does not show any significant concern about such serious criminal activity, since the victim of such criminal activity is only the lowly plaintiff - with the plaintiff's lowly status entirely attributed to the plaintiff's racial-profile. [WCSD-MD] and/or [WCSD-CP] ask the plaintiff if the plaintiff needed the assistance of *"Adult Protective Services"*. The plaintiff questioned what types of services were offered by *"Adult Protective Services"* because the plaintiff was curious if *"Adult Protective Services"* would, in any way, be more concerned regarding the aforementioned racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses committed against the plaintiff. [WCSD-MD] responded that he did not know the types of services that *"Adult Protective Services"* offered. After asking the plaintiff a few more privacy-invading questions regarding where the plaintiff was from, where the plaintiff graduated from, and what type of degree the plaintiff graduated with, [WCSD-MD] signals that they would be leaving the plaintiff alone, and both [WCSD-MD],[WCSD-CP], then proceed to walk back towards their respective police vehicles parked up the street. Both [WCSD-MD] and [WCSD-CP] briefly look into

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.

the interior of the plaintiff's open (but unlit) [GARAGE], in-order-to, once-again, inspect item(s) stored inside the plaintiff's [GARAGE] as they are on their way out of the plaintiff's property. Even ignoring [WCSD-MD]'s,[WCSD-CP]'s unconstitutional-and-unlawful search/seizure and detention/interrogation of the plaintiff, these two [WC] police-officers were just two of at-least (or approximately) two-dozen [WC] police-officers/employees that the plaintiff had directly notified about the many racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses that the plaintiff had suffered by [JSP&KAP],[RSR]. Despite of the fact that the plaintiff had directly notified so many members of [WCLE] about these racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, as the record of over 10 years will show, neither [JSP&KAP] nor [RSR] were ever fully-investigated for any of these hate-crimes/civil-rights-violations/racketeering-acts/abuses, and neither [JSP&KAP] nor [RSR] were ever charged for any of these hate-crimes/civil-rights-violations/racketeering-acts/abuses that they committed against the plaintiff, precisely due to defendant's [WCLE]'s malicious, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise (including co-conspirators [JSP&KAP],[RSR]) against the plaintiff, which in turn was only possible precisely due to the racial-profiles of all parties involved. Again, [WCLE]'s deliberate failure to fully-investigate, charge and prosecute [JSP&KAP], [RSR] for their many-dozen counts of racially-motivated and mostly retaliatory (thus mostly felonious) hate-crimes/civil-rights-violations/racketeering-acts/abuses aggregately against the plaintiff, would only continue to embolden both [JSP&KAP],[RSR] to act with an increasing sense of absolute-impunity and racist-lawlessness against the plaintiff, with the plaintiff continuing to suffer an escalation of such racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses by both [JSP&KAP],[RSR] - and especially [JSP&KAP] in the following 2 years (after this incident). According to the plaintiff's recorded-footage, all of these [WCSD]s at the scene of the plaintiff's private-property during this incident did have body-worn-cameras - and as such, such body-worn-cameras should have been recording all aspects of this unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff and the plaintiff's private-property - unless, such [WCSD]s deliberately turned-off their body-worn-cameras (at any point in time) in-order-to Obstruct Justice against the plaintiff.

## ¶474

On or about the approximate date and approximate time of {2020-02-11 19:04} (nighttime), [JSP] driving in his pickup-truck up the street, with such pickup-truck blaring either loud-talk-radio and/or loud-music, pauses such pickup-truck on the road directly in front of the plaintiff's property [788KLLTX78641], perfectly aligned with the plaintiff's [FRONTDOOR], takes out a torch-light and for a period of almost one whole minute, shines the bright-light of such torch-light not only into the plaintiff's security cameras (in-order-to permanently *"blind"* such cameras) but also, upon discovering that the plaintiff's [FRONTDOOR] was open, then directly into the interior of the plaintiff's unlit [HOUSE] in-order-to see the contents of the interior of the plaintiff's unlit [HOUSE] - in total violation of the plaintiff's rights. Perhaps even more shockingly, one-or-more other vehicle(s) pass by [JSP]'s pickup-truck on the street as [JSP] is committing such criminal action against the plaintiff, clearly noticing that [JSP] is engaging in such criminal action against the plaintiff. [JSP], noticing that his invasive shining of such torch-light into private/unlit areas of the plaintiff's property is not eliciting a response from the plaintiff, then continues driving up the street, parking such vehicle in the driveway of his property, [784KLLTX78641]. While still inside or around his vehicle, [JSP], once-again uses such torch-light to shine such bright light into the plaintiff's (unlit) [FRONTPORCH] area for a period of approximately half a minute, once-again, in total violation of the plaintiff's rights. Generally speaking, when a private-citizen such as [JSP] (who does not even have the authority of law-enforcement) maliciously shines a bright light into the interior of another person's residence in order to see the interior contents of such residence, that action alone is considered an action of felony stalking, especially if there is a history of prior actions of harassment/stalking. Additionally, if such unlawful search by private-citizen was done *"under color of law"* - as is true in this particular case, because [JSP&KAP], [RSR] have always maliciously acted against the plaintiff *"under color of law"* despite never being any member of law-enforcement - such

unlawful action is also considered to be the federal crimes of [18-USC-PI-C13-§242] and [18-USC-PI-C43-§913] and/or [TPeC-T8-C37-§37.11].

# ¶475

On or about the approximate date and approximate time of {2020-02-12 21:10} (late-nighttime), [JSP] driving in his pickup-truck up the street, pauses such truck on the road directly in front of the plaintiff's property [788KLLTX78641], perfectly aligned with the plaintiff's [FRONTDOOR], but on this particular occasion, for a period of more than 1 minute, simply conducts surveillance on the plaintiff's property without actually shining any torch-light. [JSP] then continues driving up the street, parking such vehicle in the driveway of his property [784KLLTX78641]. After exiting his vehicle, [JSP] then approaches the plaintiff's side-yard with torch-light shining directly onto one-or-more of the plaintiff's security-camera(s) and into the plaintiff's (unlit) [FRONTPORCH]. While standing near the border of the two-properties for a period of more than 1 minute, [JSP] continues to shine such torch-light directly onto one-or-more of the plaintiff's security-camera(s) and into the plaintiff's (unlit) [FRONTPORCH] area, once-again, in total violation of the plaintiff's rights. [JSP], noticing that his invasive shining of such torch-light into private/unlit areas of the plaintiff's property is not eliciting a response from the plaintiff, then walks back towards the front of his house.

# ¶476

On or about the approximate date and approximate time of {2020-02-13 10:30}, both [WCSD-MD] and another unidentified [WCSD], [WCSD-JD-22], visit the plaintiff at the plaintiff's property [788KLLTX78641], approaching the plaintiff's [FRONTDOOR], this time for a much shorter period of time. [WCSD-JD-22] would look into the plaintiff's open (but unlit) [GARAGE] at very-close-range, while [WCSD-MD] asked some very brief question(s) of the plaintiff - mainly, whether-or-not the plaintiff remained in good health. Shortly after such very-brief-questioning which took less than a minute, both [WCSD]s would walk away from the plaintiff's property. According to the plaintiff's recorded-footage, all of these [WCSD]s at the scene of the plaintiff's private-property during this incident did have body-worn-cameras - and as such, such body-worn-cameras should have been recording all aspects of this unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff and the plaintiff's private-property - unless, such [WCSD]s deliberately turned-off their body-worn-cameras (at any point in time) in-order-to Obstruct Justice against the plaintiff.

# ¶477

On or about the approximate date and approximate time of {2020-02-14 21:13} (late-nighttime), [JSP] driving in his pickup-truck up the street, pauses such truck on the road directly in front of the plaintiff's property [788KLLTX78641], perfectly aligned with the plaintiff's [FRONTDOOR], this time anticipating that the plaintiff's [FRONTDOOR] is once-again open, takes out a torch-light and for a period of almost-exactly one minute, shines the bright-light of such torch-light not only into the plaintiff's security-cameras (in-order-to permanently *"blind"* such cameras) but also directly into the interior of the plaintiff's [HOUSE] in-order-to see the interior contents of the inside of the plaintiff's [HOUSE] - in total violation of the plaintiff's rights. [JSP], noticing that his invasive shining of such torch-light into private/unlit areas of the plaintiff's property is not eliciting a response from the plaintiff, then continues driving up the street, parking such vehicle in the driveway of his property [784KLLTX78641]. Generally speaking, when a private-citizen such as [JSP] (who does not even have the authority of law-

enforcement) maliciously shines a bright light into the interior of another person's residence in order to see the interior contents of such residence, that action alone is considered an action of felony stalking, especially if there is a history of prior actions of harassment/stalking. Additionally, if such unlawful search by private-citizen was done *"under color of law"* - as is true in this particular case, because [JSP&KAP], [RSR] have always maliciously acted against the plaintiff *"under color of law"* despite never being any member of law-enforcement - such unlawful action is also considered to be the federal crimes of [18-USC-P1-C13-§242] and [18-USC-P1-C43-§913] and/or [TPeC-T8-C37-§37.11].

## ¶478

On or about the approximate date and approximate time of {2020-02-19 18:03} (near dusk), [JSP] driving in his pickup-truck up the street, with such pickup-truck blaring either loud-talk-radio and/or loud-music, pauses such pickup-truck on the road directly in front of the plaintiff's property [788KLLTX78641], perfectly aligned with the plaintiff's [FRONTDOOR], in-order-to look into the plaintiff's concealed [FRONTPORCH] and [FRONTDOOR] area - following, a relentless and never-ending pattern of racially-motivated intimidation and harassment/stalking against the plaintiff. After about 37 seconds or remaining in such paused state (with loud-speaker-system of such pickup-truck continuing to blare), [JSP] then continues to drive such pickup-truck up the street and park at his property [784KLLTX78641].

## ¶479

On or about the date and approximate time of {2020-02-28 17:19}, [RSR], initially at her house, walks across the street and towards the plaintiff's property, holding what appears to be either a recording camera-phone or some other object in her raised hand pointed towards the plaintiff's property. [RSR] looks into the plaintiff's open (but unlit) [GARAGE] area, and into the plaintiff's side-yard area, as she continues to walk on the sidewalk, finally reaching her destination: the front-door of [JSP&KAP]'s property, [784KLLTX78641], presumably to conspire with her co-conspirators [JSP&KAP]. After spending approximately 2 minutes at the [JSP&KAP]'s property, [RSR] then walks towards the edge of the plaintiff's property, stopping at the edge of such property, while continuing to angrily look into one-or-more of the plaintiff's security-cameras, also raising her hand towards the plaintiff's property and/or mumbling some words as if to demonstrate her anger and/or disapproval towards such security-camera(s) and/or the plaintiff's property (in general). [RSR] then deliberately stomps onto the plaintiff's [FRONTYARD] grass, and as if to defiantly show the plaintiff that she did not care about violating the criminal-trespass-warning [CTW] that was issued to her against the plaintiff's property on or about the date of {2011-08-30}. [RSR] continues to criminally-trespass well into the plaintiff's property, then enters back onto the public-sidewalk, approaching the plaintiff's political yard-signs which read: *"Alexandria Ocasio-Cortez [AOC] for President"*, *"Tax the Rich"*, *"Make Racism Wrong Again"* and *"Green New Deal"*. As soon as she is in front of the such yard-signs, [RSR] sarcastically nods after spending approximately ten seconds reading (or re-reading) such yard-signs, as if to show scorn for the plaintiff's anti-White-Supremacist political messages. [RSR] continues to walk along the sidewalk while angrily staring into another set of the plaintiff's security-cameras (that are attached to the plaintiff's front-tree) so as if to show the plaintiff that she knows that the plaintiff is watching her every move - including her criminal-trespass, but that she does not care for her brazen violation of law. [RSR] then continues to walk back across the street towards her property at [789KLLTX78641]. This entire incident shows that [RSR] feels not only that she is above-the-law especially when it comes to violating the plaintiff's rights, but also that she is fully protected by the obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise and conspiracy against the plaintiff consisting of [JSP&KAP],[RSR],[WCLE]. By acting in such brazen matter, [RSR] is brazenly daring the plaintiff to report her crime to the [WCLE] - just has she has done for all of the other crimes

that she committed against the plaintiff - knowing fully-well that the obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff consisting of [JSP&KAP],[RSR],[WCLE] will viciously retaliate against the plaintiff if the plaintiff dared to do so.

## ¶480

On or about the approximate date and approximate time of {2020-03-02 14:00}, the plaintiff was cleaning and clearing-space in the plaintiff's garage. The plaintiff noticed two expired 50-pound (but still sealed/unopened) bags of poultry-feed that the plaintiff had purchased almost 5 years before (back in {2015}) since the plaintiff was, at that moment in time, planning to raise/farm poultry on the plaintiff's agricultural-private-property. The plaintiff realized that the plaintiff could not use such poultry-feed anymore since the feed had long-since expired, and the bags had even become partly moist (and thus spoiled) due to being at least partly exposed to rainfall. As both the plaintiff's security-camera video-evidence and the plaintiff's body-worn-camera video-evidence does show, the plaintiff dragged these 2 bags of expired poultry-feed onto the plaintiff's sideyard close to the plaintiff's air-conditioner unit, cut open these initially unopened/sealed bags, and emptied the contents of these bags into the plaintiff's side-yard. The plaintiff used the plaintiff's feet and/or a hoe to stomp on the poultry-feed to spread the contents of the bag as-evenly-as-possible onto the grass in the plaintiff's side-yard. The plaintiff mindset was/is that, if the plaintiff could no-longer use the expired poultry-feed, then such poultry-feed could at least be used to fertilize the soil in the plaintiff's side-yard. This incident is crucial because, as the record of future incidents will show, [JSP&KAP] would take photograph(s)/video(s) of this area of the plaintiff's side-yard, and would fraudulently report to [WCLE] and/or the [HOA] that the plaintiff had dumped human-faeces into the plaintiff's side-yard - one of many criminal acts of malicious *"false-report"* that the plaintiff would suffer at the hands of both [JSP&KAP],[RSR] over the course of over a decade. This criminal act of malicious *"false-report"* by [JSP&KAP] would then lead to the most-invasive, most-intrusive, most-violative, most-humiliative, most-oppressive, most-abusive, unconstitutional-and-unlawful search of the plaintiff's entire property ([788KLLTX78641]) that the plaintiff would suffer from extremely malicious, abusive/oppressive employees of the defendants [WCCHD],[WCCO] on the day of {2020-04-28} from [WCCHDS-VD],[WCCD-Harrell] - see below.

## ¶481

On or about the date and approximate time of {2020-03-07 16:23}, the plaintiff notices that [RSR]'s dog, [L], once-again unleashed, is illegally allowed by [RSR] to run freely across the street, entangling with another leashed dog walked on by other two other residents on the sidewalk in front of the plaintiff's property. It appeared to the plaintiff that these other residents were uncomfortable with [RSR]'s dog, [L], getting into a skirmish with their dog - with both large dogs easily capable of biting/mauling each-other, if not humans. [RSR] would slowly walk across the street to retrieve her dog [L], while such residents continue walking up the street, after carefully preventing and ensuring that no injuries occurred. Once again, the rules of the subdivision clearly prohibit such hazardous activity as there are potentially huge liabilities associated with large dogs that are allowed to roam freely. Throughout the over decade of her stay at [789KLLTX78641], [RSR] would continue to defiantly flaunt the rules of the subdivision, repeatedly rubbing-it-in to the plaintiff that as a privileged White-American person (that is significantly older than the plaintiff), [RSR] is immune from the rules of the neighborhood and that such rules do not apply to her, especially thanks to her role as the kingpin/mafia-godfather of the racketeering-enterprise including [JSP&KAP], [WCLE], and the [HOA]. On or about the date and approximate time of {2020-03-07 18:00}, the plaintiff notices that [JSP]'s red-colored pickup-truck which had been permanently parked (without being used) on the curbside in front of the plaintiff's property for multiple years was finally being driven away by what appeared to be

contractor(s) and/or buyer(s). Prior to this truck permanently parked by [JSP] at such location (for multiple years) being driven away by contractor(s) and/or buyer(s), [JSP&KAP] had a total of 4 vehicles clearly-visible from the street with two of such vehicles parked on the road/curbside, while the restrictive-covenants of the subdivision explicitly prohibit more than 2 vehicles visible from the street (for a period of more than 72 hours) and while the restrictive-covenants of the subdivision also prohibit parking any vehicle on the road overnight (for even one night). Once again, while the defendants were laser-focused on predatorily targeting the plaintiff for over 10 years, in-order-to evict the plaintiff, by any means necessary, from what they considered to be *"their"* (exclusive-and-pure) White neighborhood, defendants [JSP&KAP], [RSR] were freely, openly and brazenly allowed to flaunt the rules of the neighborhood, pretending as if, by virtue of being privileged White-American person(s), that they are free to brazenly violate the rules with absolute impunity. On or about the approximate date and approximate time of {2020-03-07 18:00}, the plaintiff was working inside of the plaintiff's [GARAGE], and was moving items in-and-out of the [GARAGE] right after such contractor(s) and/or buyer(s) departed, at which point, [JSP], with wife [KAP] in the same outdoor area, shifted his predatory focus onto the plaintiff. [JSP] loudly yells at the plaintiff, while picking up small pieces of debris on his yard and/or kicking such debris into the plaintiff's side-yard-area, *"GET THIS SHIT OUT OF MY YARD, DUDE!"* The plaintiff remains inside and around the [GARAGE] occupied with the aforementioned work. [JSP] approaches the aforementioned area where the plaintiff had opened and spread the contents of the two 50-pound bags of expired poultry-feed onto the plaintiff's side-yard, spends over a minute menacingly inspecting such area, and formulates (or having already formulated) a fraudulent narrative of fraudulently accusing the plaintiff of dumping human-faeces in that area of the plaintiff's side-yard. [JSP] initially shouts, *"YOU NEED TO KEEP YOU TRASH OUT OF MY FRICKING YARD, DUDE! ... SMELLS LIKE ASS OVER THERE! ... "* while continuing to kick debris from his side-yard into the plaintiff's side-yard. The plaintiff briefly exits the [GARAGE], and [JSP] uses such opportunity to angrily accost the plaintiff, pointing to such area and shouting, *"HEY DUDE, DUMPING ALL THIS STUFF ON THE SIDE OF THE HOUSE! WHAT IS THAT! WHAT IS THAT STUFF! ... IS THAT POOP! WHAT IS THAT STUFF OVER THERE!"* The plaintiff, initially shocked at the fraudulent accusation, does not respond to [JSP], instead walking back towards the [FRONTDOOR]. [JSP] noticing that the plaintiff has ignored [JSP] and is walking away from him, angrily and abusively shouts at the plaintiff, *"YA FREAK!"*. A few minutes later, [JSP] fraudulently complains to his wife [KAP] that the plaintiff has dumped human-faeces onto the plaintiff's side-yard, with [KAP] fraudulently responding to [JSP] that they (that is, [JSP&KAP]) cannot do anything about it, fraudulently acting along with her husband [JSP], as if it was human-faeces that the plaintiff had dumped into the plaintiff's own side-yard, and furthermore, fraudulently pretending that they (that is, [JSP&KAP]) had somehow been victimized by the plaintiff's such use of the plaintiff's own private-property. It is commonly known that when at least some fraudster(s) repeatedly lie about some issue, they eventually begin to *"believe"*, or *"internalize"*, their own lie(s), and then, after that point, they simply justify all of their abusive, fraudulent action(s) based upon their *"belief"* of those internalized lie(s). Therefore, from at least this point in time onwards, [JSP&KAP] fraudulently pretend as if the aforementioned expired poultry-feed spread on the plaintiff's side-yard is human-faeces - despite the fact that the plaintiff never admitted it was/is human-faeces - and [JSP&KAP] initiate one-or-more fraudulent complaints against the plaintiff to [WCLE] and/or the [HOA] based upon this fraudulent accusation. It is also important to reiterate that this poultry-feed is well within the plaintiff's property [788KLLTX78641] and does not even touch any part of [JSP&KAP]'s property [784KLLTX78641], with the two-properties separated by a physically-visible, landscape-edging divider that the plaintiff's landscapers had installed (actually one-or-more inches within the boundary of the plaintiff's property) over 2 years prior to this incident.


## ¶482

On or about the approximate date and approximate time of {2020-03-16 17:00}, the plaintiff was unboxing packages of newly-purchased items

storing some of the assembly-components of these items inside the plaintiff's garage. [JSP] arrives back in his pickup-truck which is blaring either loud-talk-radio and/or loud-music, parking in the driveway of [784KLLTX78641], continuing to blare such loud-talk-radio and/or loud-music for a minute or so. [JSP] then walks towards the plaintiff, approaching the border of the two-properties. As the plaintiff walks out of the plaintiff's [GARAGE], the plaintiff is startled to see [JSP] suddenly near the border of the two-properties, staring menacingly at the plaintiff. The plaintiff initially pauses due to being startled by [JSP]'s sudden and menacing appearance, but then continues to perform the task of unboxing, trying not to be affected by [JSP]'s intimidation/stalking of the plaintiff. [JSP], then initiates another loud, racist, abusive, threatening, fraudulent and gaslighting rant against the plaintiff, again making several fraudulent/misleading accusations about the plaintiff's property:

---

▶ **RECORDED RACIST, ABUSIVE, THREATENING, FRAUDULENT AND GASLIGHTING RANT FROM [JSP] TO PLAINTIFF** (¬)   (2020-03-16 17:00) (~)

▶ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]


〚 PLAINTIFF CONTINUES TO UNBOX PACKAGES IN [DRIVEWAY]. [JSP] STARTS TO SHOUT ABUSIVELY AT PLAINTIFF: 〛


**[JSP]**      *I'VE GOT THE HEALTH DEPARTMENT COMING UP HERE! JUST DUMPING SHIT ANYWHERE, DOG! ... ALREADY HAD A SHERIFF SMELL IT! ... GOD WE WERE ALL PRAYING, [THAT] YOU WERE MOVING! ... WHO'S GOING TO LEAVE ALL THIS CRAP ON THE SIDE OF THE HOUSE, LIKE THIS! ... I SAW ALL THAT HUMONGOUS PILE OF CRAP IN YOUR BACKYARD! THAT'S UNBELIEVABLE, DUDE! UNBELIEVABLE! ... WHY DON'T YOU TAKE ALL THIS SHIT, AND GO SOMEWHERE ELSE! ... IT'S DISGUSTING! THERE'S NO REASON WHY WE ALL HAVE TO DEAL WITH IT! ... SUCH A JACKASS! ... WHY DON'T YOU JUST CLEAN YOUR ACT UP! GET A JOB! AND ACT LIKE THE REST OF US! ... [???] FREAK!*


〚 PLAINTIFF DOES NOT RESPOND TO [JSP]'S ABUSIVE, FRAUDULENT RANT AND CONTINUES TO UNBOX PACKAGES IN [DRIVEWAY]. 〛
〚 NOTICING THAT THE PLAINTIFF WILL NOT RESPOND, [JSP] EVENTUALLY WALKS AWAY FROM THE PLAINTIFF. 〛

---

# ¶483

On or about the date and approximate time of {2020-03-17 18:00}, [RSR]'s large dog, [L], unleashed and roaming freely initially around the front of [RSR]'s property, runs aggressively and at full-speed across the street towards deep into the interior of the front-yard of [792KLLTX78641], and roams in-and-around the property of [792KLLTX78641] for many minutes until [RSR] finally calls such dog bag towards her many minutes later. On or about the date and approximate time of {2020-03-17 18:40}, [RSR]'s large dog, [L], unleashed and roaming freely initially around the front of [RSR]'s property, runs aggressively and at full-speed across the street, this time towards the front of the plaintiff's property, while [RSR] only slowly walks towards such dog, and continues to slowly follow such dog as such dog continues to roam freely and unleashed. In the over 13 years of the plaintiff's residence at [788KLLTX78641], the plaintiff has never noticed any other resident of the subdivision recklessly allowing their large dog to roam unleashed and run aggressively in such an uncontrolled manner, even across the street, while the restrictive-covenants of the subdivision explicitly prohibit the unleashing of dogs into unconfined areas - as a commonsense health-and-safety measure. More importantly, [RSR] had maliciously complained to the [HOA] (and possibly even [WCLE]) about a tortoise (○) and/or hens entirely within the confines of the plaintiff's [BACKYARD] in the year {2016} (see incident(s) above) - even racistly alleging that such clearly-harmless and common companion-animals on the plaintiff's property constituted a *"dangerous situation"* in her successful attempt to blackmail the then-[HOA] to sue the plaintiff - while during most of her residence at [789KLLTX78641], [RSR] was unlawfully allowing her large dog, [L], to roam freely and aggressively, in such manner, often across the street (at least on some occasions, into the plaintiff's [FRONTYARD]).

## ¶484

On or about the date and approximate time of {2020-03-18 10:25}, a truck with defendant [WC]'s logo stops on the street at the opposite-curbside in front of [RSR]'s property, [789KLLTX78641]. [RSR] - while initially on the other side of her front-yard and with her large dog, [L], left unleashed and roaming freely - as if anticipating such person inside such truck to arrive at her property, walks over to such person inside such truck to speak for one-or-more minute(s) with such government employee and/or contractor of defendant [WC]. After [RSR] is done speaking with such employee and/or contractor of defendant [WC], [RSR] and her unleashed large dog, [L], walk away from the truck and back into her house. Such employee and/or contractor of defendant [WC], who remained seated inside the truck during this entire incident, then continues to drive such truck up the street. The plaintiff notices that such employee and/or contractor of defendant [WC] looks at the plaintiff's property as he is passing the plaintiff's property. Although the plaintiff cannot glean much solely from this interaction, it is still, however, possible that, based on this interaction, [RSR] has *"inside-connection(s)"* to government employee(s) of defendant [WC] or perhaps even has family-member(s) and/or friend(s) that are [WC] government-employee(s), which if true, would further help to explain how and/or why she and her co-conspirators [JSP&KAP] were protected from prosecution by [WCLE] from the decade of conspiracy and racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses that both she (and her co-conspirators [JSP&KAP]) committed against the plaintiff.

## ¶485

On or about the approximate date and approximate time of {2020-03-24 18:56}, [JSP], as he is using a lawn-mower to mow the grass near the border-area of the two-properties, picks up a few items of debris in the side-yard of [784KLLTX78641] and angrily throws such debris into the plaintiff's side-yard. [JSP] then angrily issues the obscene/vulgar gesture of his middle-finger raised directly to one-or-more of the plaintiff's security-camera(s) - once again, demonstrating the extreme malice that [JSP] (and his co-conspirators) operated with against the plaintiff over the period of approximately a decade (at that moment in time). A few moments later, as [JSP] continues to mow other areas of the side-yard of [784KLLTX78641] bordering the two-properties, [JSP] stops the lawn-mower, angrily enters deep into the plaintiff's property, picks up some relatively-large and/or heavy items stored by the plaintiff behind the plaintiff's outdoor-air-conditioner unit, and violently throws in an extremely malicious manner, those parts of the plaintiff's property over the plaintiff's 6-feet-tall privacy-fence and into the plaintiff's [BACKYARD]. The plaintiff's property thrown by [JSP] in such violent and malicious manner included:

Ⓐ two-or-more very-heavy, spare, ten-gauge 8-feet-tall steel-posts (valued at approximately $80) - which the plaintiff could-have used as future fence-posts - should such circumstance/need present itself.

Ⓑ one heavy step-ladder (valued at approximately $150)

Ⓒ one-or-more large cardboard-box(s) with many miscellaneous item(s) stored inside such cardboard-box(s) (with the total value of such item(s) difficult to estimate).

The plaintiff's items that [JSP] lifted and hurled in such violent manner were so heavy, and [JSP] threw such heavy items over the plaintiff's fence with such violent force that [JSP] was actually panting, struggling to catch his breath, as such violent action required a lot of energy for

even this approximately 240-pound man, in excess of 6-feet-tall. Although [JSP]'s violent hurling of such heavy-metal items made very-loud impact noises, it is unclear (at least to the plaintiff) by the angle in which [JSP] violently-hurls the aforementioned very-heavy steel-posts whether such violently-hurled steel-posts made contact with that particular (brick-and-mortar) side of the plaintiff's [HOUSE], but if such steel-posts did make such contact, then there would surely be other unaccounted damage(s), at the very least, to that (brick-and-mortar) side of the plaintiff's [HOUSE]. Amongst the other item(s) violently-hurled in such angry manner by [JSP] were one-or-more large cardboard-box(s) with many miscellaneous item(s) stored inside such cardboard-box(s), thus haphazardly scattering such miscellaneous item(s) into the plaintiff's [BACKYARD] as a result of such brazen act of vandalism. [JSP] then continues lawn-mowing as if no crime was committed, because as an unquestioned mob-boss of the neighborhood (along with his co-conspirator [RSR]), [JSP] was never held accountable for any of his serious prior crimes against the plaintiff, thanks to the remarkable, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise involving [WCLE]. This particularly brazen act of vandalism - however, just one of many such brazen acts of [JSP]'s vandalism of the plaintiff - would prove to be crucial to the plaintiff's fabricated-evidence (racketeering-act) claim against the defendants because, while the plaintiff would later hire hauling contractors to transport many of the other items then-temporarily stored in the plaintiff's [BACKYARD] to the plaintiff's agricultural-private-property, the plaintiff specifically instructed such hauling contractors to leave these particular items thrown by [JSP] alone, as these items are part of a crime scene - one of many such crime-scene(s) - that defendant [WCLE] never investigated (despite of the fact that the plaintiff reported the crimes - see below), thanks to defendant [WCLE]'s obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff, in conspiracy with co-defendants [JSP&KAP],[RSR]. As a subsequent incident would show (see below), [JSP]'s wife, [KAP], while at the border of [JSP&KAP]'s backyard, would, from behind the shared privacy-fence along the two-properties, hold up her camera-phone over such 6-feet-tall privacy-fence (in total violation of the plaintiff's rights), snap one-or-more photograph(s) and/or video(s) of such items in the plaintiff's [BACKYARD] violently thrown and scattered by her husband [JSP] into the plaintiff's [BACKYARD] in this particular incident, and then brazenly use such photograph(s)/video(s) (or at least conspire to do so) as part of her Class-C-Misdemeanor-Public-Nuisance criminal complaint against the plaintiff - just one of the many brazen, coordinated and retaliatory acts of racketeering-activity against the plaintiff, as part of the overall conspiracy, scheme and racketeering-enterprise against the plaintiff involving all of the defendants - see subsequent incident(s) below. The plaintiff did also notice that [JSP]'s violently-hurling of one-or-more of the aforementioned heavy-steel-posts broke approximately the top-18-inches of at least one of the plaintiff's fence-pickets (well within the plaintiff's property), and also partially dislodged such fence-picket from the fence-rails, leaving such fence-picket partially dangling in the air. While such privacy-fence is at least 6-feet-tall, intentionally disallowing neighbors, other institutions-of-power such as the [HOA], and the government from surveilling on residents' private backyards, when such fence-picket(s) are intentionally broken and/or dislodged in such malicious manner, such privacy is intentionally breached, allowing for future unconstitutional-and-unlawful searches/seizures by government (and/or agents of the government) to more easily occur. These facts are also crucial as just one small part of both the plaintiff's conspiracy and fabricated-evidence (racketeering-act) claims against the defendants, as [JSP] deliberately broke such top-of-fence-picket and partially-dislodged such fence-picket, so that his co-conspirator malicious employees of [WCLE], especially [WCCD-Harrell] and [WCCHDS-VD] (but also [WCCD-F]), could then more-easily (but illegally) look into the plaintiff's [BACKYARD] in their subsequent unconstitutional-and-unlawful searches/seizures of such private/curtilage areas of the plaintiff's private-property. [JSP] also committed all of these malicious criminal actions against the plaintiff during still daylight hours, while neighbor residents from across the street, at [781KLLTX78641] and [785KLLTX78641], could easily see [JSP]'s brazenly criminal acts against the plaintiff. After [JSP] is done lawn-mowing the rest of his yard, [JSP] pushes such lawnmower (at nighttime) back towards the side-yard and before he opens the fence-gate to put such lawnmower into his backyard, [JSP], once-again, angrily issues the obscene/vulgar gesture of his middle-finger raised directly to one-or-more of the plaintiff's security-camera(s).

[JSP] then picks up numerous very-large-stones on the side-yard of his property and angrily throws such very-large-stones onto the plaintiff's side-yard, and as he committing such criminal action(s) of illegal-dumping and criminal-mischief against the plaintiff, angrily stating threats of burglary and felonious assault against the plaintiff, *"Fuckin asshole!... [???] Boy, I'm telling you [???] pulling your ass out of that shithole [???]! ... Really want to hurt you man! You fuckin piece-of-shit! ... [???] [???] [???] ... Ohhhh, fuck! ... Damn [???]! [???]! [???]! ... [???] piece of shit! [???] [???] "* Once again, such very-large-stones were so heavy that [JSP] was actually panting and angrily stating expletives, in part, due to the enormous effort that it took to lift such very-heave-stones and hurl them into the plaintiff's side-yard. After such malicious actions, [JSP] walks behind the lawnmower in-order-to push such lawnmower into his backyard, and once-again, angrily issues the obscene/vulgar gesture of his middle-finger raised directly to one-or-more of the plaintiff's security-camera(s). The plaintiff continues to hear very-loud/violent noises originating from behind the fence, indicating that [JSP] could have engaged in some further act(s) of vandalism from behind such fence. [JSP], while behind the privacy-fence in the backyard of [784KLLTX78641], also peeks over such privacy-fence and stares into one-or-more of the plaintiff's security-camera(s), as he appears to be performing some action with his other hand(s) behind such privacy-fence. Due to such area being unlit, it is unclear to the plaintiff what [JSP] is doing during these moments of this particular incident, but it appears to be that [JSP] is pointing a camera-phone through a small hole in the fence in-order-to snap photograph(s) and/or video(s) of the aforementioned item(s) that he had angrily and violently dumped over the fence-posts and into the plaintiff's [BACKYARD], so that he could then brazenly use such photograph(s) and/or video(s) of such scattered items in a malicious complaint against the plaintiff (see below).

## ¶486

On or about the date and approximate time of {2020-03-25 18:00}, [JSP&KAP] have illegally parked an SUV on the public-sidewalk in front of their property, totally blocking access to the public-sidewalk in that particular-area - just one of many [JSP&KAP]'s routine/constant parking-violations and inconsiderate-behavior that the plaintiff has continued to notice for over 10 years. (The plaintiff notices that even around noontime of the following day, {2020-03-26}, such SUV is still illegally parked on the public-sidewalk, forcing people using such sidewalk - including at least one elderly person in a wheelchair - to enter onto the street to avoid such SUV.) [JSP] enters into the sideyard area of [784KLLTX78641], opens a tap and handles a hose near the house of [784KLLTX78641]. [JSP] immediately starts to yell overtly racist and fraudulent statements about the plaintiff and/or plaintiff's property directly into two of the plaintiff's corner security-cameras, while continuing to engage in just one more of the numerous acts of vandalism against the plaintiff's many security-cameras. [KAP] witnesses part of [JSP]'s criminal actions, and also makes some racist, abusive statements about the plaintiff and/or plaintiff's property. (The final part of this abusive conversation appears to be [JSP] and [KAP] talking about matters unrelated to the plaintiff, although the plaintiff cannot be sure, because this final part is too inaudible for the plaintiff to decipher, at least without audio amplification/enhancement):

> ▸ RECORDED RACIST, ABUSIVE, THREATENING AND VANDALIZING RANT FROM [JSP&KAP] TO PLAINTIFF(P) : {2020-03-25 18:00}(~)
> ▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]
>
> 〖 [JSP] WALKS FROM [784KLLTX78641] DRIVEWAY TO [784KLLTX78641] SIDE-YARD TO OPEN TAP AND HANDLE A HOSE. 〗
> 〖 [JSP] THEN STARTS SHOUTING A RACIST, ABUSIVE, FRAUDULENT, THREATENING AND VANDALIZING RANT TO PLAINTIFF'S SECURITY CAMERAS. 〗
>
> **[JSP]**   *[???] SID, YOU FUCKING DOUCHE-BAG! YOU CAN'T JUST DO THAT - YOU FUCKING IDIOT! ARE YOU REALLY THAT FRICKING STUPID?! OH, FUCK - YOU ARE RETARDED! ARE YOU REALLY GOING TO PUT THOSE RAGS IN YOUR FRONT PORCH - YOU STUPID FUCK - YOU CAN'T DO THAT! GOD! ... SID, YOU'RE AN ABSOLUTE RE-TARD! ... REEE - TARDDD!!! ... I'M GOING TO SPRAY YOUR SON-OF-A-BITCHES CAMERAS! HOW BOUT THAT - [???] - YOU FRICKING IDIOT!*

⟦ [JSP] USES HOSE TO SPRAY/DOUSE UP TO 5 SECURITY-CAMERAS FULL OF HIGH-PRESSURE MUNICIPAL WATER, AS HE HAS DONE MULTIPLE TIMES IN PAST. ⟧

⟦ PLAINTIFF HAS ALREADY REPORTED [JSP]'S PRIOR VANDALISM OF SUCH CAMERAS TO [WCLE]; SO, THIS ACT IS ALSO ANOTHER OF MANY COUNTS OF EVIDENCE-TAMPERING. ⟧

⟦ ALL 5 OF THESE SECURITY CAMERAS HAVE BEEN DAMAGED NOT ONLY BY THIS ACTION, BUT DUE TO MANY DOZEN ACTS OF VANDALISM BY [JSP]. ⟧

⟦ [KAP] WALKS INTO THE SCENE TO TALK TO [JSP]. [JSP] ALERTS [KAP] TO ITEMS STORED ON PLAINTIFF'S [FRONTPORCH]: ⟧

[JSP]  *LOOK AT THIS, RIGHT HERE - YOU CAN SEE HIS GOD DAMN RAGS SETUP BY HIS FRONT PORCH!*

[KAP]  *[???]*

[JSP]  *HE'S GOT HIS RAGS SETUP BY HIS FRONT-PORCH! ... YOU CAN'T DO THAT!*

⟦ [KAP] POINTS TO PLAINTIFF'S SIDE-YARD WHERE PLAINTIFF EMPTIED, SPREAD 2 EXPIRED 50-POUND BAGS OF POULTRY-FEED, AND SAYS: ⟧

[KAP]  *YEAH, AND THAT STINKS LIKE HELL!*

[JSP]  *YEAH, IT SMELLS LIKE ASS! IT'S SMELLS LIKE A SHIT - WELL, ACTUALLY, AFTER I [???] [???]!*

[KAP]  *[???] ... Um...*

[JSP]  *I JUST GOT TO FILE [???] - **I'M GOING TO GET THE HEALTH DEPARTMENT OUT HERE AS SOON AS POSSIBLE!** - I KNOW THEY PROBABLY HAVE THEIR HANDS FULL RIGHT NOW, BUT ...! STILL AN ASSHOLE, HUH?! ... [???]!*

[KAP]  *[???] [???] [???]*

[JSP]  *[???] [???] [???]*

[KAP]  *[???] [???] [???]*

[JSP]  *[???] Yes please, [???]. thank you.*

⟦ [KAP] WALKS AWAY FROM [JSP]. [JSP] CONTINUES TO USE HOSE TO WATER PARTS OF [784KLLTX78641] YARD. ⟧

# ¶487

On or about the date and approximate time of {2020-03-27 18:55} (close to nighttime), the plaintiff is inside the [HOUSE], while [JSP] is

running a loud-gasoline-powered-string-trimmer to cut front-yard grass on the property of [784KLLTX78641]. On multiple occasions, [JSP] deliberately kicks debris from his property [784KLLTX78641] onto the plaintiff's property [788KLLTX78641]. On at least one occasion, [JSP] aggressively and angrily holds up his middle-finger - the well-known obscene/vulgar gesture - to one of the plaintiff's security-cameras. On several occasions, [JSP] steps into the plaintiff's property to cut (to a very low height) the plaintiff's *"no-mow"* grass - thus, causing further irreparable damage to such *"no-mow"* grass (on top of one-pallet's worth of damage to such grass already caused by [JSP]'s prior acts of vandalism against the plaintiff). Most importantly, [JSP] originally standing with a heavy-duty, gasoline-powered string-trimmer in hand on the front-yard of [784KLLTX78641] enters, without wearing a face-mask as a safety precaution against COVID-19, well-into the plaintiff's property, even entering into plaintiff's [DRIVEWAY] (still with such heavy-duty string-trimmer in hand), raises his hands (as if to initiate a fight), thus displaying such threatening hand-gestures towards the plaintiff's security-cameras and, while standing right in front of the plaintiff's garage-door (still with such heavy-duty string-trimmer in hand), stares for about 10 seconds into the interior of the plaintiff's garage and concealed [FRONTPORCH] - all, in total violation of the plaintiff's rights. [JSP], who is searching for the plaintiff, realizing that the plaintiff is nowhere to be seen and probably inside [HOUSE], then turns back and walks back out of the plaintiff's property and back into his property [784KLLTX78641]. This act of stalking/intimidation/interference/assault/disorderly-conduct/criminal-trespass was only one of many dozens of such uncharged-and-unprosecuted counts of such criminal acts committed by [JSP] against the plaintiff (especially during the years {2017} through {mid-2022}). It is also clear from this particular unconstitutional-and-unlawful search and the multiple other unconstitutional-and-unlawful searches of the plaintiff's property that [JSP] has committed against the plaintiff over the many years, that [JSP] was fraudulently acting *"under color of law"* against the plaintiff, thus also in violation of [18-USC-PI-C13-§242] and [18-USC-PI-C43-§913] and/or [TPeC-T8-C37-§37.11] against the plaintiff.

## ¶488

On or about the same date and approximate time of {2020-03-27 19:52}, the plaintiff is inside the [HOUSE], while still occasionally monitoring the plaintiff's security-camera-system-monitor. [JSP], just as he engaged in this and other types of noise-nuisance-violation at nighttime, is running loud lawn-equipment at nighttime to perform some yard-work on the front-yard of [784KLLTX78641]. [JSP] uses some type of long broom to brush yard-clippings from the sidewalk back into the grass-area and/or onto the street. At some point in time during such activity, [JSP] deliberately crosses the plaintiff's [DRIVEWAY] in-order-to approach the plaintiff's [FRONTYARD] political yard-signs, with long-broom in hand. While looking into one-or-more of the plaintiff's security-camera(s), [JSP] uses the top-handle-tip of such long-broom to violently strike-directly-at and/or stab such yard-sign(s). [JSP] raises his hands laterally as a form of threatening intimidation towards one-or-more of the plaintiff's security-camera(s), and then repeats the action of violently striking/stabbing the plaintiff's yard-sign(s). [JSP] continues in this pattern of violent action two-or-more times, or at least until one of the yard-signs is damaged/tilting/torn due to such vandalism. [JSP]'s striking/stabbing actions against such yard-sign(s) were so violent that the loud noises from such striking/stabbing were fully-captured by the plaintiff's security-camera(s) approximately 30 feet (or more) away. When [JSP] realizes that such action(s) are not inciting the plaintiff to respond in any way, [JSP] finally walks back towards [784KLLTX78641] and resumes yard-work. This incident, just like many other incidents documented in this lawsuit, reveals that [JSP]'s animus towards the plaintiff is not based purely upon extreme-racial-animus but instead, also upon far-right-wing-extremist political-animus, as [JSP] is infuriated by the anti-White-Supremacist and/or democratic-socialist message(s) posted on the plaintiff's yard-signs.

## ¶489

On or about the date and approximate time of {2020-03-31 15:28}, [KAP], with a camera-phone in hand, walks from the front of her house, close to the plaintiff's side-yard area, with a malicious smile on her face - a malicious smile that the plaintiff has noticed on multiple occasions whenever [KAP] has engaged in malicious conduct against the plaintiff (see other incident(s) below). [KAP] walks right in front of the area where the plaintiff emptied and spread the two aforementioned expired 50-pound bags of poultry-feed, and with that same malicious smile on her face, uses such camera-phone to take photograph(s)/video(s) of this area, in-order-to make a fraudulent false-report to the [WCLE] that the plaintiff had dumped human-faeces onto the plaintiff's side-yard - all the while, using this photograph(s)/video(s) as a piece of fabricated evidence against the plaintiff - at least one of two separate occasions in which [KAP] would use fabricated evidence in a fraudulent criminal-complaint against the plaintiff (see below). This criminal act of false-report (and fabricated-evidence) by [JSP&KAP] would then lead to the most-egregious, most-invasive, most-intrusive, most-violative, most-humiliative, most-oppressive, most-abusive, unconstitutional-and-unlawful search of the plaintiff's entire property ([788KLLTX78641]) that the plaintiff would suffer from extremely malicious, abusive/oppressive employees of the defendants [WCCHD],[WCCO] on the day of {2020-04-28} from [WCCHDS-VD] and [WCCD-Harrell] - see below. Ironically, the false-report (and fabricated-evidence) that [KAP] was filing against the plaintiff also indisputably included at least some evidence of her husband [JSP]'s criminal and retaliatory (thus felonious) acts of illegal-dumping and vandalism against the plaintiff, as [JSP] had illegal-dumped multiple very-large-stones on that same area where the plaintiff had spread the aforementioned expired poultry-feed. [KAP], with that same malicious smile on her face, then walks away from the area, and walks back towards the front of her house, clearly indicating that [KAP]'s sole purpose of approaching this area was in conspiracy-to and process-of committing these criminal acts against the plaintiff - which, as future incident(s) would demonstrate, she did actually fully follow-through upon - by submitting such false-report and fabricated-evidence to her co-conspirators, [WCLE] and/or the [HOA].

## ¶490

On or about the same date and approximate time of {2020-03-31 18:50} (still during daylight), [KAP] appears to trimming a minor part the now-fully-grown tree blocking more than half of the public-sidewalk, that [JSP&KAP] planted very close to the plaintiff's property without seeking approval from the plaintiff (since such tree also extends into the plaintiff's property) and more-likely-than-not, without seeking approval from the [HOA]. (It should be noted that, even after [KAP]'s trimming, such tree that [JSP&KAP] inappropriately planted so close to the public-sidewalk still blocked approximately half of the public-sidewalk.) The relatively-new owner of [781LLTX78641], [781KL-2019-1] - a White-American male from the family that had newly-moved into [781KLLTX78641] on-or-about the month of {2019-10} (less than a year prior to this incident) - arrives back to his property, and parks his vehicle on the opposite-curbside across the street from [KAP]. [781KL-2019-1] originally greeted and initiated a friendly conversation with [KAP], without mentioning anything about the plaintiff, but [KAP] almost-immediately focuses [781KL-2019-1]'s attention onto the plaintiff with hateful, venomous speech against the plaintiff. [KAP], much like her co-conspirator [RSR] has done on numerous occasions (as documented in this lawsuit), uses fraudulent, racist propaganda against the plaintiff - including but not limited to, fraudulent/misleading statement(s) about the plaintiff's private [BACKYARD] - to indoctrinate and engender more racial-animus against the plaintiff by complaining about the plaintiff and/or plaintiff's property to [781KL-2019-1]. At multiple points in time, [KAP] points [781KL-2019-1] at and looks-in-the-direction-of the plaintiff's [BACKYARD], showing that she does not care that she is brazenly slandering and badmouthing the plaintiff right in front of the plaintiff's numerous security-camera(s). It appeared to the plaintiff that [781KL-2019-1] felt at least slightly uncomfortable with [KAP]'s brazen, slanderous badmouthing of the plaintiff, as [781KL-2019-1], who

was originally speaking in his usual volume/tone of voice, started to significantly-reduce the volume/tone of his voice, whispering some of his response(s) to [KAP]'s vitriol against the plaintiff, presumably because he did not want the plaintiff to overhear such defamatory ( ⊕ ) and privacy-invading speech and/or because he feared that such defamatory and privacy-invading speech would be caught on the plaintiff's numerous security-camera(s). Both [JSP&KAP] and [RSR] - had for approximately 10 years at this point in time - engaged in this relentlessly-racist propaganda against the plaintiff, in-order-to engender more racial-animus against the plaintiff in such White neighborhood's other White-American residents (including, but definitely not limited to [781KL-2019-1]). Once again, all of these actions were-part-of, leading-up-to and fraudulent-justification-for [JSP&KAP]'s,[RSR]'s,[WCLE]'s larger malicious strategy to engage in egregiously unconstitutional-and-unlawful searches/seizures of the plaintiff's property - specifically, the plaintiff's curtilage areas: concealed [FRONTPORCH] and [BACKYARD] - which in turn would then be used to justify the purely-retaliatory prosecution of the plaintiff (which did happen from {2020-10-12} through {2021-11-01}), with these conspirators' ultimate goal being to either, drive the plaintiff out of such White neighborhood, or better yet, cause the plaintiff to lose the plaintiff's property through the process of foreclosure. The property owned by [781KL-2019-1], [781KLLTX78641], just like [RSR]'s property [789KLLTX78641], is across the street from the plaintiff (approximately 120 feet away). So, there was absolutely no justifiable reason (other than the aforementioned malicious intent and predatory strategy) for [KAP] to be complaining about the plaintiff to [781KL-2019-1], even making [781KL-2019-1] uncomfortable with such racist complaint. [KAP], just like her co-conspirators [JSP],[RSR], [WCLE], engages in this type of relentlessly-racist propaganda against the plaintiff so that she and her co-conspirators could enlist/recruit more indoctrinated *"witnesses"* into their purely-retaliatory prosecution of the plaintiff (which did happen from {2020-10-12} through {2021-11-01}) - which, as the plaintiff asserts in this lawsuit, is one of the more subtle forms of witness-tampering that all of these defendants engaged in against the plaintiff (for almost a decade at this point in time). [KAP] eventually ends her conversation amicably with [781KL-2019-1], walking away from [781KL-2019-1], acting in such friendly, yet manipulative, manner to her White-American neighbors, while treating the plaintiff, an immigrant-of-color/indigenous-person, with such extremely-racist contempt - again, as if the plaintiff was a sub-human, low-IQ animal, not worthy of any rights, let-alone the right to private-property-ownership within such White neighborhood. Most importantly, at no point in time would [KAP] reveal to [781KL-2019-1] all of the malicious hate-crimes/civil-rights-violations/racketeering-acts/abuses that both [JSP&KAP] (or, for that matter, her co-conspirators [RSR], [WCLE]) had perpetrated-against the plaintiff during their conspiracy and racketeering-enterprise against the plaintiff, lasting approximately 9 years (at this particular moment in time). This casual conversation once-again reveals a common theme expressed in this lawsuit, about the ongoing hazards for a person-of-color living his/her natural lifestyle within a White-neighborhood - that such person-of-color could easily be predatorily targeted with the most vicious forms of racial-oppression and/or racketeering-activity by even less than a handful of far-right-wing-extremist and/or White-supremacist neighboring residents, while at the same time, at least some significant fraction of the rest of such White neighborhood - whether knowingly or unknowingly - provides at least tacit, if not overt, support of such criminally-abusive and predatory actions.

## ¶491

On or about the date and approximate time of {2020-03-31 21:00}, the plaintiff is inside the [HOUSE]. [JSP] uses a hand-held scooping-tool to scoop-up large amounts of debris/clippings from yard-work, walks well into the plaintiff's property, and deliberately dumps such debris/clippings onto the plaintiff's [YARD] - in essence, committing the hate-crimes of both criminal-mischief and illegal-dumping against the plaintiff.

## ¶492

On or about the date and approximate time of {2020-04-02 17:37}, the plaintiff is inside the [HOUSE]. The plaintiff notices that a [WCSD] police-vehicle driving up the street, pauses in front of the plaintiff's property, reverses, as it appears, so that such police-officer could spend approximately 10 seconds reading the plaintiff's political-yard-signs and/or inspecting other aspect(s) of the plaintiff's property, and then continues driving up the street.

## ¶493

On or about the approximate date and approximate time of {2020-04-13}, the plaintiff is inside the [HOUSE], while [JSP] is running a loud-gasoline-powered-yard-equipment to cut the grass of [784KLLTX78641]. As [JSP] approaches near the border-area of the two-properties, [JSP] takes out his camera-phone to take photograph and/or video of item(s) stored on the plaintiff's [DRIVEWAY]. While running the lawn-mower on the side-yard area of [784KLLTX78641], [JSP] menacingly/angrily yells words and uses threatening hand-gestures in-order-to threaten the plaintiff via one-or-more of the plaintiff's security-cameras. [JSP] runs his lawn-mower over the plaintiff's property to cut (to a very low height) parts of the plaintiff's *"no-mow"* grass, thus, causing further irreparable damage to such now-mow grass. Approximately an hour later, [JSP] would angrily throw and dump huge stones - one of which probably weighs more than 50 pounds - (and other debris) onto the plaintiff's side-yard - just as he had done on at least one occasion during the previous month (see previous incident above). [JSP] even looks directly into one of the plaintiff's security-cameras, and angrily spits into the plaintiff's side-yard, right in front of the plaintiff's security-cameras - once again, demonstrating [JSP]'s extreme-racial-animus against the plaintiff. [JSP] crosses the newly-installed landscape-edging divider demarking the front-yard boundaries between the two-properties, in-order-to unlawfully mow at least one strip of the plaintiff's [FRONTYARD] *"no-mow"* grass - an unlawful activity that [JSP] has repeatedly done (over many years) even after the plaintiff finished-installing such *"no-mow"* grass along with landscape-edging divider on/about the previous month of {2017-10}. On one-or-more occasions during this incident, [JSP] issues the obscene/vulgar gesture of his middle-finger raised to one-or-more of the plaintiff's security-camera(s). These huge stones still exist to this {PRESENT-DAY} on the plaintiff's side-yard. The plaintiff knows to never alter a crime-scene in any way, but since [WCLE] has been, for over a decade, very adamant about protecting both [JSP&KAP],[RSR] from prosecution for the many dozens of hate-crimes/civil-rights-violations/racketeering-acts/abuses that [JSP&KAP],[RSR] had committed against the plaintiff, as part of their conspiracy and racketeering-enterprise against the plaintiff, the evidence of most of these crimes (including broken/damaged security-cameras, damaged newly-installed *"no-mow"* grass and even such large objects illegal-dumped onto the plaintiff's property) remains largely unchanged even to the {PRESENT-DAY}.

## ¶494

On or about the approximate date and approximate time of {2020-04-15 14:15}, [RSR] approaches one of the relatively-new residents of [785KLLTX78641], [785KL-2018-1], at least in part, in-order-to manipulatively badmouth the plaintiff. [785KL-2018-1] does not seem to be too receptive to [RSR]'s manipulative badmouthing of the plaintiff. [RSR] walks past [785KL-2018-1], as if disgruntled that [785KL-2018-1], unlike the previous resident of [785KLLTX78641], [DMP], did not share in [RSR]'s extreme-animus against the plaintiff.

## ¶495

On or about the approximate date and approximate time of {2020-04-18 14:00}, the plaintiff walks into the plaintiff's garage in-order-to grab hardware-screws for constructing shelves in the [BACKYARD]. [JSP] - who had earlier on that same day, Ⓐ illegally peaked into the plaintiff's [BACKYARD] through a small hole in the plaintiff's fence (which, as the record will show, [JSP] has done on numerous other occasions in total violation of the plaintiff's rights), Ⓑ repeatedly approached the border between the two-properties in-order-to stare angrily/menacingly into the plaintiff's security cameras (even muttering angry words directed at such security-cameras) and stare (for multiple minutes) into the plaintiff's open-[GARAGE]/[DRIVEWAY]/[FRONTPORCH]-areas as if to look (or lie-in-wait) for the plaintiff, and also Ⓒ used his spray-hose to angrily spray municipal water onto the plaintiff's security-cameras, the plaintiff's vehicle and/or other items stored on the plaintiff's [DRIVEWAY] (all in-order-to entice the plaintiff to come outside of the [HOUSE]) - now sees the plaintiff in the front of the plaintiff's [GARAGE], aggressively/angrily approaches the plaintiff from his pickup-truck located in the driveway of [784KLLTX78641] and uses this opportunity to engage in another count of felony stalking against the plaintiff, starting yet another racist, abusive, threatening, fraudulent, and gaslighting rant against the plaintiff. The plaintiff rightfully remains silent, yet traumatized, throughout the entire encounter (see excerpt below). It is important to note that, on one-or-more occasions during this day, [KAP] from within her backyard (of [784KLLTX78641]), approaches the shared 6-feet-tall opaque privacy-fence separating the two-properties, and holds up her camera-phone above such privacy-fence and - in total violation of the plaintiff's rights - snaps photograph(s) and/or video(s) of private-areas of the plaintiff's property - namely the plaintiff's private [BACKYARD]. The plaintiff asserts that [KAP] would illegally submit such photograph(s) and/or video(s) - again, in total violation of the plaintiff's rights - to the [HOA] and/or [WCLE] - resulting in multiple further, egregiously Unconstitutional-And-Unlawful searches/seizures of the plaintiff from government defendants [WCCO] and [WCCHD], in the same year of {2020} - even resulting in the purely-retaliatory Class-C-Misdemeanor-Public-Nuisance charge and prosecution against the plaintiff. In doing so, [KAP] has, *"under color of law"*, executed a clearly Unconstitutional-And-Unlawful search/seizure of private-areas of the plaintiff's private-property - a violation of: [18-USC-PI-C13-§242] and [18-USC-PI-C43-§913] and/or [TPeC-T8-C37-§37.11]. It is also clear that all of [KAP]'s crimes against the plaintiff after the month of {2019-10} were committed purely in retaliation for the plaintiff's reporting (to [WCLE]) of racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses committed by her husband [JSP] against the plaintiff, thus making any-and-all of such crimes felonious under Texas law and racketeering-acts under federal law. It is also clear that [JSP] was engaging in these brazen tactics of intimidation/interference and harassment/stalking against the plaintiff in the front/side of the plaintiff's property in-order-to distract attention from the plaintiff away from his wife [KAP]'s more sinister crime of illegal search/seizure of the plaintiff's private [BACKYARD]. After [JSP] steps into the plaintiff's property in-order-to peek through a very-small hole in the plaintiff's 6-feet-tall opaque privacy-fence, [JSP] angrily shouts into one-or-more of the plaintiff's security-camera(s), *"ARE YOU KIDDING ME, MAN! STUPID IDIOT! STUPID [???] [???]!"* In doing so, [JSP] has, *"under color of law"*, executed a clearly Unconstitutional-And-Unlawful search/seizure of private-areas of the plaintiff's private-property - a violation of: [18-USC-PI-C13-§242] and [18-USC-PI-C43-§913] and/or [TPeC-T8-C37-§37.11]. After repeatedly and/or periodically conducting illegal surveillance *"under color of law"* over the plaintiff's private-property (including private-areas of the plaintiff's property such as the [BACKYARD],[GARAGE] and concealed [FRONTPORCH]), [JSP] realizes that he is initially not able to find the plaintiff anywhere at those locations. [JSP] thus decides to open a tap and start watering his yard, thus lying-in-wait for the plaintiff to eventually appear at the front of the [HOUSE]. As [JSP] is watering his yard with such hose, [JSP] angrily shouts, *"JESUS! IT STINKS OVER THERE! FREAK! ... SID, YOU ARE A FUCKING WORTHLESS PIECE OF DOGSHIT! YOU STINK LIKE ASS! STUPID [???]! "*, and as he does this, on numerous occasions, (three-or-more-times) sprays/douses three-or-more of the plaintiff's security-camera(s) along with the plaintiff's vehicle and/or other items temporarily stored in the plaintiff's [DRIVEWAY] with full-pressure municipal water from such hose. Realizing that such criminal-activity is not successfully inciting the plaintiff to confront [JSP], [JSP] stops using the hose on this side

of his yard, and resumes other work in his driveway, while predominantly still lying-in-wait for the plaintiff to emerge from the front of [FRONTDOOR]. It is also important to note that while [JSP] so-clearly, feloniously stalked the plaintiff during such incident, and [KAP] so-clearly violated the plaintiff's right to privacy during this incident, for substantial period(s) of time during this day, large plumes of smoke where emanating from the property directly behind [JSP&KAP]'s property, [521LSLTX78641], which shares a large border with [JSP&KAP]'s property, [784KLLTX78641] - and the plaintiff asserts that [JSP&KAP] never harassed/stalked such White-American neighbors over such large and menacing plumes of smoke - or for that matter, for any other issue - by virtue of those neighbors' White-American racial-profile.

▷   RECORDED RACIST, ABUSIVE, THREATENING, FRAUDULENT AND GASLIGHTING RANT FROM [JSP] TO PLAINTIFF (⊢):   {2020-04-18 14:00} (↩)

▷   [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

〔 [JSP] IS INITIALLY INSIDE HIS PICKUP-TRUCK BLARING LOUD-TALK-RADIO OR LOUD-MUSIC LOCATED IN DRIVEWAY OF [784KLLTX78641]. 〕

〔 PLAINTIFF OPENS [FRONTDOOR], WALKS INTO [GARAGE] TO GRAB SOME HARDWARE-SCREWS NEEDED FOR CONSTRUCTING SHELVES. 〕

〔 [JSP], STALKING AND LYING-IN-WAIT-FOR PLAINTIFF, WALKS AGGRESSIVELY/ANGRILY FROM [784KLLTX78641] DRIVEWAY TO BORDER TO CONFRONT PLAINTIFF: 〕

**[JSP]**          *jackass!*

〔 [JSP], AFTER APPROACHING BORDER OF TWO-PROPERTIES, STARTS SHOUTING RACIST, ABUSIVE, THREATENING, FRAUDULENT & GASLIGHTING RANT TO PLAINTIFF. 〕

**[JSP]**          *HEY DOUCHE! WHEN ARE YOU GOING TO CLEAN UP THE SHIT ON THE SIDE OF THE HOUSE, OVER HERE! ... HUH?! ... YOU THINK YOU CAN JUST PULL ALL THIS SHIT OUT AND LEAVE IT OUT, JUST FOREVER?! YOU [???]! ... DO YOU GIVE A SHIT ABOUT ANYBODY EXCEPT YOURSELF THERE, SID?!! ... I MEAN, AND YOU COULD'VE-*

〔 AFTER GRABBING SUFFICIENT NUMBER OF HARDWARE-SCREWS, PLAINTIFF WALKS BACK TOWARDS [FRONTDOOR] OF [HOUSE]. 〕

〔 [JSP] REALIZING THAT PLAINTIFF IS WALKING BACK INTO [HOUSE], LOUDLY YELLS ANOTHER FRAUDULENT, RACIST STATEMENT TO PLAINTIFF: 〕

**[JSP]**          *-AND YOU'RE DUMPING SHIT ON THE SIDE OF MY HOUSE TOO - OVER HERE! WHAT THE HELL IS THAT ABOUT! YOU DISGUSTING FUCK!*

〔 AS PLAINTIFF IS ENTERING [HOUSE], [JSP] ANGRILY WALKS AWAY FROM PLAINTIFF BACK TO [784KLLTX78641] DRIVEWAY. 〕

〔 PLAINTIFF ENTERS BACK INTO THE [HOUSE], TRAUMATIZED BY THE INCIDENT. 〕

〔 [JSP] THREATENS PLAINTIFF THAT PLAINTIFF IS WISE TO WALK BACK INTO [HOUSE] TO AVOID [JSP]'S VIOLENCE: 〕

**[JSP]**          *YOU BETTER TAKE OFF! PUNK-ASS [???] [???]!*

〔 [JSP] ANGRILY WALKS BACK TOWARDS HIS DRIVEWAY AFTER PLAINTIFF ENTERS BACK INTO [HOUSE] 〕

〔 [JSP] ENTERS BACK INTO HIS PICKUP-TRUCK, ONCE-AGAIN, BLARING LOUD-MUSIC FROM SUCH PICKUP-TRUCK. 〕

〔 PLAINTIFF NOTICES THAT SUCH LOUD-MUSIC FORM [JSP]'S PICKUP-TRUCK CONTINUES TO BLARE FOR OVER 10 MINUTES, IN TOTAL- 〕

〔 -VIOLATION OF THE RESTRICTIVE-COVENANTS OF THE SUBDIVISION THAT DISALLOW SUCH NOISE-NUISANCE. 〕

# ¶496

On or about the approximate date and approximate time of {2020-04-19 14:22}, [RSR]'s unleashed large-dog, [L], runs across the street towards the plaintiff's [FRONTYARD], and starts sniffing around the plaintiff's [FRONTYARD] *"no-mow"* grass - just one of many occasions

when [RSR] has, in clear violation of the neighborhood's restrictive-covenants, allowed her unleashed large-dog to cross the street and enter into and/or near the plaintiff's [FRONTYARD], despite of the fact that there is also a [CTW] issued to [RSR] forbidding [RSR] from stepping onto the plaintiff's property (see above), should [RSR] need to retrieve such dog from the plaintiff's property.

## ¶497

## ¶498

On or about the date and approximate time of {2020-04-21 12:30} (noontime), the plaintiff notices on the plaintiff security-camera-system-monitor that a young White-American teenager riding his bicycle, rides such bicycle all the way through the plaintiff's [DRIVEWAY], stopping at the plaintiff's [GARAGE], and appears to look inside such open (but unlit) [GARAGE] area, before riding such bicycle back out of the plaintiff's property. On or about the date and approximate time of {2020-04-27 08:12} (morning daylight time), the plaintiff notices on the plaintiff security-camera-system-monitor that the same young White-American teenager riding his bicycle, rides such bicycle all the way through the plaintiff's [DRIVEWAY], stopping at the plaintiff's [GARAGE], and appears to look inside such open (but unlit) [GARAGE] area, before riding such bicycle back out of the plaintiff's property. On or about the following date and approximate time of {2020-04-28 07:50} (morning daylight time), the plaintiff notices on the plaintiff security-camera-system-monitor that the same young White-American teenager riding his bicycle, rides such bicycle all the way through the plaintiff's [DRIVEWAY], stopping at the plaintiff's [GARAGE], and appears to look inside such open (but unlit) [GARAGE] area, before riding such bicycle back out of the plaintiff's property. It is still unclear to the plaintiff whether any of the named co-conspirators in this lawsuit, or any of the other unnamed and/or yet-to-be-known co-conspirators and/or cronies alluded to in this lawsuit, somehow instructed such underage person to conduct such surveillance on the plaintiff's property, leading up to [WCLE]'s most-egregious, most-invasive, most-intrusive, most-violative, most-humiliative, most-oppressive, most-abusive, unconstitutional-and-unlawful search of the plaintiff's entire property ([788KLLTX78641]) on the afternoon of {2020-04-28}.

## ¶499

On or about the approximate date and approximate time of {2020-04-25 08:15}, the plaintiff notices on the plaintiff's security-camera-system-monitor, what appeared to be a newly-elected [HOA-BoD], [SPOA-MaL-KR], walk up the sidewalk in front of the plaintiff's property. As [SPOA-MaL-KR] is directly in front of the plaintiff's [HOUSE], [SPOA-MaL-KR] briefly-pauses and tries to peer-into the plaintiff's private/concealed/curtilage [FRONTPORCH] area. [SPOA-MaL-KR] then continues to walk up the sidewalk and as [SPOA-MaL-KR] passes the plaintiff's property on such sidewalk, [SPOA-MaL-KR] uses what appears to be a camera-phone to take one-or-more photographs/videos of the plaintiff's side-yard area, where the plaintiff had temporarily stored certain items behind the plaintiff's outdoor-air-conditioner-unit. Approximately a minute or so later, the plaintiff notices [SPOA-MaL-KR] walk back in the opposite-direction on the opposite-sidewalk - clearly indicating to the plaintiff that the sole reason of [SPOA-MaL-KR]'s trip across the plaintiff's private-property was to photograph/video areas of the plaintiff's private-property, and thus, not to inspect any other properties. The plaintiff is shocked, and deeply-wounded, that such newly-elected powerful member of such a powerful institution-of-power - the [HOA] - can continue such long-term pattern of predatory conspiracy against the plaintiff along with those malicious persons that they know to be racketeers in a racketeering-enterprise against the plaintiff - specifically [JSP&KAP],[RSR]. On the other hand, the plaintiff had just recently, but inadvertently, played such a crucial role, during the previous 9 months, in overthrowing all-but-one member of the [HOA-BoD]s, and even the property-management-company community-

manager. So, at least to that limited extent, it does-not and would-not surprise the plaintiff even in the least bit that the [HOA] - and especially its property-management-company (which did not change) - wanted to exert revenge upon the plaintiff, for the plaintiff's *"audacity"* to have acted in such muckraking manner - even if inadvertently - against the [HOA].

## ¶500

On or about the approximate date and approximate time of {2020-04-27 14:24}, the plaintiff is inside the [HOUSE], while [JSP] is using a hose to water the front-yard and side-yard grass of [784KLLTX78641]. The plaintiff notices on the plaintiff's security-camera-system-monitor that when [JSP] enters into a certain area of the side-yard, [JSP] picks up some object from his side-yard, turns around and throws it towards the side of the plaintiff's [HOUSE]. Other than this relatively minor infraction, however, it is clear from the plaintiff's evidence that there is a noticeable lack of (at least observed) criminal activity committed by [JSP] against the plaintiff from the days after {2020-04-18}, leading up to the afternoon of {2020-04-28} - the time of [WCLE]'s most-egregious, most-invasive, most-intrusive, most-violative, most-humiliative, most-oppressive, most-abusive, unconstitutional-and-unlawful search of the plaintiff's entire property ([788KLLTX78641]). During these 10 days, the plaintiff notices that [JSP] is unusually controlled and/or tempers his extreme-racial-animus against the plaintiff, since during such period of time, both [JSP&KAP],[RSR] have determined that the best way to evict the plaintiff from what they always considered to be *"their"* (exclusive-and-pure) White neighborhood is by using their favorite institutions-of-power, namely: [WCLE] and the [HOA]. [JSP&KAP],[RSR] and [WCLE] had already formulated a plan and course-of-action as to how to go about evicting the plaintiff, without egregiously running afoul of the anti-discrimination laws (the [FHA],[TFHA]) and other anti-racketeering-activity laws (the [RIaCOA]). It is clear to the plaintiff that one of the following is true about these 10 days leading up to the afternoon of {2020-04-28}:

Ⓐ [JSP&KAP],[RSR] were instructed by [WCLE] (and/or the [HOA]) to be on their best behavior, as all of these parties wanted to evict the plaintiff from *"their"* (exclusive-and-pure) White neighborhood, *"by the book"*, and not leave any room for misinterpretation as running afoul of the aforementioned federal/state laws.

Ⓑ [JSP&KAP],[RSR] realizing that they must be intelligent, patient and surgically-precise in the way they go about evicting the plaintiff from *"their"* (exclusive-and-pure) White neighborhood, and in such realization, acted out of their own volition or better-judgment, to control and/or temper their extreme-racial-animus against the plaintiff, at the very least, during these 10 days of lead-up to the afternoon of {2020-04-28}.

Both of the aforementioned possibilities, while seeming to be an otherwise intelligent course-of-action, fails to take into account the fact that the plaintiff had already amassed, even prior to the date of {2020-04-28}, a mountain of incriminating evidence against all of the primary-defendants involved in this case.

## ¶501

During the months of {2020-04} the plaintiff was placing all items that the plaintiff needed to transport to the plaintiff's agricultural-private-property in the plaintiff's [BACKYARD]. Therefore, several areas of the plaintiff's [BACKYARD] were filled with such materials - most of which were stored in large-bags that the plaintiff needed the help of a hauling-trailer to transport to the plaintiff's agricultural-private-property. The plaintiff was beginning to construct shelves in the [BACKYARD] in-order-to store some other items, above ground-level, that were not

SIDDHARTH KODE  V.  WILLIAMSON COUNTY, ET AL.                                    1696907690

intended for the plaintiff's agricultural-private-property - as [WCCHDTL-SG] had advised the plaintiff in a previous phonecall dating back to {2013}. On or about the date and approximate time of {2020-04-28 14:10}, while all four of the private-citizens named as litigants in this lawsuit - the plaintiff, [JSP&KAP],[RSR] - are within their respective homes, the plaintiff notices a [WCCHD] pickup-truck drive up the street, pausing in front of the plaintiff's property, before continuing to drive up the street. Approximately a minute or so later, the same [WCCHD] pickup-truck would drive down the street, parking at the opposite-curbside (in front of {781KLLTX78641}) across the street and diagonal from the plaintiff's property. The plaintiff asserts that whenever employee(s)/officer(s)/official(s) of [WC], specifically [WCLE], have parked across the street from the plaintiff (and diagonal from the plaintiff's property), it is almost always because such employee(s)/official(s)/official(s) want to maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff, as far away as practically possible in-order-to evade being captured/recorded on the plaintiff's numerous security-cameras. Shortly after such [WCCHD] pickup-truck is parked at such location, the plaintiff notices a person who, only at the end of this incident (see below), identifies himself as [WCCHDS-VD] exit such [WCCHD] pickup-truck. [WCCHDS-VD] then opens the passenger-side-door of his pickup-truck and conduct some preliminary surveillance of the plaintiff's private-property from behind such passenger-side-door. Shortly after this preliminary surveillance, the plaintiff notices [WCCHDS-VD] walk back towards the drivers-side-door and stands behind his pickup-truck, not only since such pickup-truck blocks the view of [WCCHDS-VD], but also as the plaintiff would very-shortly find out - so that he could speak to another extremely-malicious employee(s)/officer(s)/official(s) of the [WCLE], [WCCD-Harrell] - who had already made multiple malicious and/or threatening statements to the plaintiff (see above) - in a more secretive manner, thus maliciously-predatorily-and-secretly conspiring/colluding/strategizing and fully-planning their predatory, unconstitutional-and-unlawful course-of-action(s) to be undertaken in-short-order against the plaintiff. The plaintiff notices a [WCCO] police-vehicle park as far away as practically possible - in front of [RSR]'s property, [789KLLTX78641]. The plaintiff notices what clearly appeared to be [WCCD-Harrell] exit such vehicle and walk with what appeared to be a clipboard towards [WCCHDS-VD] (located behind the [WCCHD] pickup-truck), again, so that both of such [WCLE] employees/officers/officials could maliciously-predatorily-and-secretly conspire/collude/strategize and fully-plan their predatory, unconstitutional-and-unlawful course-of-action(s) to be undertaken in-short-order against the plaintiff. The plaintiff then notices [RSR]'s now-adult son [BR], followed by [RSR] - the *"kingpin"* of the obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise named as a co-defendant in this lawsuit - both emerge out of the house of [789KLLTX78641] with complete euphoric joy at the absolutely-vicious and predatory actions that [WCLE] would soon be performing against the plaintiff (upon their predatory demands). Both [BR] and [RSR] walk towards such [WCLE] employees/officers/officials, to exert their predatory demands as to what needed to be done the plaintiff, once-again, for the plaintiff's *"audacity"* to document and record all of the racial-oppression and racketeering-activity that the plaintiff had already suffered from the defendants up to such moment in time. As [BR] and [RSR] approach [WCCHDS-VD] and [WCCD-Harrell], [WCCHDS-VD] and/or [WCCD-Harrell] instruct them to stay back, as the plaintiff has numerous security-camera(s), and such security-camera(s) must only capture as little as possible about such modern-day-Jim-Crow (racially-motivated) racketeering-enterprise against the plaintiff involving all of the defendants. [BR] euphorically gestures with his hand, assuring [WCCD-Harrell] and [WCCD-Harrell] that he has completely understands that all such acts of racial-oppression and/or racketeering-activity have to be done *"by the book"* as the whole world could eventually be watching any event of racial-oppression and/or racketeering-activity, with just a few clicks of the mouse-button, or just a few strokes/swipes on the modern smart-phone (as was the case with the brutal murder of Mr. George Floyd). [BR] starts walking back towards [RSR]'s house while [RSR] was more disappointed, almost insisting to speak with [WCCD-Harrell],[WCCHDS-VD], as she clearly wanted to be actively participating in [WCLE]'s racial-oppression and racketeering-act(s) against the plaintiff. [RSR] reluctantly starts walking back only to realize that [785KL-2018-1] is outside her house. Both [RSR] and [BR] then approach [785KL-2018-1] in-order-to, once again, attempt to manipulatively indoctrinate [785KL-2018-1] with their usual racist-propaganda

against the plaintiff - that the plaintiff needed to be dragged out of the plaintiff's [HOUSE] and evicted from what all of the defendants considered to be *"their"* (exclusive-and-pure) White neighborhood. It was not good enough for [RSR] and [JSP&KAP] to commit overt-actions of racial-oppression and racketeering-activity against the plaintiff by themselves; instead, they needed to recruit and seek the support and justification of as many other White-American residents of the neighborhood as possible to inflict maximum harm onto the plaintiff via a modern-day-Jim-Crow public-oppression of the plaintiff. After that relatively short, but failed, attempt to recruit [785KL-2018-1] into their racist racketeering-enterprise against the plaintiff, [785KL-2018-1] appears to head back into her house, whereas, [RSR], and her now-adult son, [BR] walked back towards their house, entering back into such house, slightly disappointed that they had failed to recruit [785KL-2018-1] into their racist racketeering-enterprise against the plaintiff, and disappointed that they could not more-actively participate in such modern-day-Jim-Crow public-oppression of the plaintiff. Once again, since [RSR] lived diagonally and across-the-street from the plaintiff, with the two houses separated by approximately 110 feet of open-space, [RSR] had absolutely no legal claim to any goings-on within the confines of the plaintiff's private-property. However, such fact is irrelevant to [RSR], as [RSR] was simply laser-focused on getting the plaintiff, an immigrant-of-color/indigenous-person, evicted from what she considered to be her (exclusive-and-pure) White neighborhood. All of the evidence of these pre-incident interactions should have been captured by [WCCD-Harrell]'s body-worn-camera recording(s), unless [WCCD-Harrell] deliberately did not turn on such recorder or turned-off such body-worn-camera as yet another deliberate act of Obstruction-of-Justice against the plaintiff. Based on all of the evidence of the plaintiff's non-stop security-camera-system, it appeared that [JSP] was clearly within his house at this moment in time, whereas [KAP] - the *"second-in-command"* of such racketeering-enterprise named as a co-defendant in this lawsuit - was somewhere in her backyard with camera-phone in hand, lying-in-wait, in-order-to to unconstitutionally-and-unlawfully fully-record the sequence of events that unfolded between the plaintiff and [WCLE] during this incident. As part of the defendants thoughtful and deliberate malicious-predatory-and-secret conspiracy/strategy/plan against the plaintiff, it was absolutely crucial for [JSP] - the *"chief-enforcer"* racketeer named as a co-defendant in this lawsuit - to not make himself visible at any point during this incident, as [JSP] had already committed numerous, overt, racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, and once-again, [WCLE] must execute such action(s) (in conspiracy with [JSP&KAP],[RSR]) of racial-oppression and racketeering-activity against the plaintiff, *"by the book"* (or without any room for error) - without too-much/overt involvement of the other racketeers named as co-defendants in this lawsuit - especially since the plaintiff has numerous security-cameras watching and recording. After spending approximately 5 minutes behind such [WCCHD] pickup-truck, maliciously-predatorily-and-secretly conspiring/colluding/strategizing and sufficiently-planning their predatory course-of-actions against the plaintiff, [WCCHDS-VD] and [WCCD-Harrell] then begin to thuggishly walk toward the plaintiff's [FRONTDOOR]. [WCCHDS-VD] wears a face-mask after he enters into [DRIVEWAY], while [WCCD-Harrell] enters the plaintiff's property without any such COVID-19 safety measures - at a time when COVID-19 infections were ramping-up throughout the United States. [WCCHDS-VD] rings the [FRONTDOOR]-bell, while [WCCD-Harrell] thuggishly begins a clearly Unconstitutional-And-Unlawful search/seizure of private/curtilage areas of the plaintiff's private-property - using a government camera/camcorder to illegally take multiple photographs/videos of the interior of the plaintiff's [GARAGE], and the plaintiff concealed [FRONTPORCH] (concealed by a combination of the plaintiff's trees, and the plaintiff's vehicle parked in the [DRIVEWAY]) - both ruled by the [SCOTUS] as a private/curtilage with the same fourth-amendment (and fifth-amendment-privacy) protections as the interior of the [HOUSE]. After ringing the [FRONTDOOR]-bell two-or-three times, with each ring spaced approximately a minute or so between each other, [WCCHDS-VD] then thuggishly decides to execute an Unconstitutional-And-Unlawful search of his own, entering deep inside the plaintiff's private/curtilage concealed [FRONTPORCH] and looking directly at one-or-more item(s) stored on the plaintiff's [FRONTPORCH] shelves. [WCCD-Harrell] follows behind [WCCHDS-VD] with government camera/camcorder in hand, as [WCCHDS-VD] continues his unconstitutional-and-unlawful search of multiple items stored on the plaintiff's

concealed [FRONTPORCH]. [WCCD-Harrell] then thuggishly holds up such government camera/camcorder up-above to unconstitutionally-and-unlawfully take more up-close photographs/videos of the items (7-feet-above-ground) stored on the top-shelf of the plaintiff's [FRONTPORCH] shelves - once-again, private/curtilage that is not only not be visible from the public street, but also not even visible without some type of stepping-tool (stool, step-ladder, etc.). As part of the plaintiff's fraud (racketeering-act) claim against the defendants, the plaintiff must demonstrate all of the fraudulent actions undertaken not just by the private-citizen racketeer defendants - [JSP&KAP],[RSR] - but also the agencies of [WCLE], specifically the [WCCHD] and the [WCCO]. The plaintiff has an audio-recording of [WCCHDTL-SG] (from the year {2013} - see above) clearly stating to the plaintiff, words-to-the-effect that any items stored on shelves (located above ground-level) cannot possibly be considered to be part of any public-nuisance allegation, due to the impossibility of any harborage for rodents/vermin/disease-carrying-pests above ground-level; yet, in this incident, [WCCD-Harrell] is maliciously and unlawfully (unconstitutionally-and-unlawfully) taking photographs/videos of items stored (within in a private/curtilage location) on the topmost shelf of such shelves as part of a public-nuisance complaint lodged by racketeer co-defendants [JSP&KAP],[RSR]. [WCCHDS-VD] then thuggishly enters the plaintiff's side-yard (fence-gate-side), pauses, and looks at the plaintiff's fence-gate for approximately 5 seconds. In particular, [WCCHDS-VD] is analyzing how he can execute a (unconstitutional-and-unlawful) search/seizure of the plaintiff's [BACKYARD] with such (locked) fence-gate in the way. [WCCHDS-VD] decides to thuggishly move deeper into the plaintiff's side-yard (private/curtilage) and start looking into the tiny crevices in the plaintiff's fence-gate, in-order-to at least witness the contents of the plaintiff's private [BACKYARD]. [WCCHDS-VD] holds up his camera-phone in-order-to capture photographs/videos of the interior of the plaintiff's private/concealed/curtilage [BACKYARD] through a very-small-hole in the plaintiff's 6-feet-tall-privacy-fence - the same type of very-small-hole that exists in almost all such wood-picket-fencing. [WCCHDS-VD] even holds down his camera-phone and uses one of his eyes to peek through such very-small-hole in the plaintiff's 6-feet-tall-privacy-fence to see into the plaintiff's private/concealed/curtilage [BACKYARD]. [WCCHDS-VD] even drops his clipboard onto the grass, so that he can use both hands to carefully position his camera-phone to take more accurate photographs/videos of the plaintiff's private/concealed/curtilage [BACKYARD]. [WCCD-Harrell] thuggishly follows behind [WCCHDS-VD] and positions the aforementioned government camera/camcorder or a government-issued body-worn-camera over another very-small-hole within the plaintiff's 6-feet-tall-privacy-fence in-order-to capture photographs/videos of the plaintiff's private/concealed/curtilage [BACKYARD]. As the plaintiff has continued to document in this lawsuit (dating back to the year {2013}), such employees of [WCLE] - particularly, the [WCCHD] and the [WCCO] - routinely engage in such preemptive unconstitutional-and-unlawful searches/seizures in-order-to incite/outrage the resident(s) that maybe inside the house, watching all of such malicious actions perpetrated by such malicious government-officials within private/concealed/curtilage areas of their private-property - their own private sanctuary - their own *"castle"* (per the *"castle doctrine"*). The plaintiff would like to make absolutely clear: **Even if** [WCLE] did have a valid search warrant lawfully-obtained with sufficient probable-cause for a crime *"already having been committed"* - not possible with such public-nuisance law since such public-nuisance law requires the issuance of warning-citations, and a public-nuisance complaint does not constitute an instantaneous crime (due the requirement of such warning-citations) - then they could have proceeded with such search/seizure **only after** loudly-announcing *"SEARCH WARRANT"* (at the [FRONTDOOR]) **and,** at a minimum, placing a copy of such search-warrant at the [FRONTDOOR], if nobody is answering the [FRONTDOOR] - as is required by Texas law. As the plaintiff would later find out at the end of this incident, neither the [WCCHD] nor the [WCCO] obtained any valid search-warrant to search the plaintiff's private-property **and even if** they did have a valid search-warrant, they would still be required by Texas law to execute such search-warrant exactly as specified under Texas law - which they also clearly did not do; therefore, all of these actions were clearly unconstitutional-and-unlawful both under Texas law and under federal law (as determined by one-or-more [SCOTUS] rulings - particularly ⟪FLORIDA V. JARDINES⟫ and ⟪COLLINS V. VIRGINIA⟫). To put all of these matters into proper perspective and context:

Ⓐ The government cannot even unconstitutionally-and-unlawfully search the private-property of murder-suspects in such an egregious manner - and all of [WCLE]'s such predatory and retaliatory actions against the plaintiff were ultimately committed in-order-to (eventually) viciously-punish the plaintiff via Class-C-Misdemeanor-Public-Nuisance prosecution (maximum $500 fine, no jail-time).

Ⓑ Setting aside the common-sense fact that law-enforcement agencies need to have *"clean hands"* in their dealings with a citizen before they attempt to prosecute such citizen, the law-enforcement agencies of [WCLE] had anything but *"clean hands"* in their dealings with the plaintiff - as they had - in maliciously-predatorily-and-secretly conspiring/colluding/strategizing with racketeer co-defendants [RSR],[JSP&KAP] - engaged in almost a decade of racial-oppression and racketeering-activity against the plaintiff (at this point in time).

Ⓒ Far more importantly, these particular malicious government employees/officers/officials have already - at this relatively early point in time of such unconstitutional-and-unlawful search/seizure - already committed the crimes of Abuse-of-official-capacity and Official-Oppression against the plaintiff and these crimes are, at a minimum, Class-A-Misdemeanors under Texas law - far worse than the Class-C-Misdemeanor-Public-Nuisance that these government employees/officers/officials are trying to pin the plaintiff on - and the government cannot even pin that Class-C-Misdemeanor-Public-Nuisance on the plaintiff without first issuing the plaintiff with a warning-citation providing the plaintiff with 30 days (or 10 days depending upon the circumstance) to cure/abate the alleged public-nuisance (which was done at the end of this incident - see below).

Ⓓ Similarly, such crimes committed by [WCCHDS-VD] and [WCCD-Harrell] against the plaintiff were also federal crimes of Deprivation-of-Rights-Under-Color-of-Law ([18-USC-PI-C13-§242]), Conspiracy-Against-Rights ([18-USC-PI-C13-§241]), Intimidation/Interference ([42-USC-C45-SI-§3617],[42-USC-C45-SII-§3631]).

Ⓔ These particular malicious government employees/officers/officials committed these crimes in pure retaliation against the plaintiff for the plaintiff's *"audacity"* to report the racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses of both racketeer co-defendants [JSP],[RSR] dating back to {2011}, along with the plaintiff's *"audacity"* to record and/or report the retaliatory crimes committed against the plaintiff by several employees/officers/officials of [WCLE] in the past: [WCSD-PP], [WCSD-SP], [WCCHDS-ST], [WCCD-DM], [WCCD-Harrell], [WCCD-RT] and [WCCD-Holt] (just to name a few of the primary culprits, even at this relatively-early point in time); therefore, such retaliatory crimes committed by [WCCHDS-VD] and [WCCD-Harrell] against the plaintiff are felonious under Texas law and racketeering-act(s) under federal law.

The plaintiff - both indignant and under duress of such clearly unconstitutional-and-unlawful search of the plaintiff's private-property (the plaintiff's *"castle"* under the *"castle doctrine"*) - decides that the plaintiff must confront such government employees/officers/officials. The plaintiff opens the [FRONTDOOR], walks through the plaintiff's [FRONTPORCH], towards the plaintiff's side-yard, and asks such government intruders what they are doing (without having presented any evidence of a search warrant). The plaintiff need not remind any party named in this lawsuit that, after an unconstitutional-and-unlawful search has already been initiated, any *"consent"* received after such point, is considered *"tainted"* and made *"under duress"*. In particular, such coerced *"consent"* clearly cannot be said to have been done *"knowingly, freely and voluntarily"*, and any search/seizure continued after such point remains unconstitutional-and-unlawful. The plaintiff's

constant stuttering during most of this incident, shows that the plaintiff was under extreme duress, caused by such, very-aggressive and intimidating White-American law-enforcement officers invading into the private home (private *"castle"*) of an immigrant-of-color/indigenous-person. Another malicious tactic that the plaintiff has routinely noticed from such agencies of [WCLE] - particularly the [WCCO] and the [WCCHD] - is that they consistently protected both themselves and their co-defendant racketeers - [JSP&KAP],[RSR] - from facing the consequences of their retaliatory (thus felonious) crimes and overall racketeering-enterprise against the plaintiff. Therefore, rather than further-implicate themselves in such racketeering-enterprise and conspiracy to defraud the plaintiff, [WCLE] keeps stating in this incident that the [HOA] sent them to do unconstitutionally-and-unlawfully search/seize the plaintiff's private-property, when in fact the actual complaining witnesses are the co-defendant racketeers: [JSP&KAP],[RSR]. At a minimum, [WCLE]'s malicious tactic of naming the [HOA] as a complaining witness to circumvent the revelation of the **actual** complaining witnesses is simply a convenient way for such government to clearly-violate (or at least circumvent) a plaintiff's sixth-amendment Constitutional right to know who the plaintiff's accusers are. At least some of the injunctive relief (see sections below) that the plaintiff seeks from this court is to ensure that [WCLE] is hereby forbidden from naming any Property-Owners-Association as a complaining witness in any public-nuisance (property-maintenance) complaint, and/or allowing any Property-Owners-Association from serving as a complaining witness in any public-nuisance (property-maintenance) complaint, unless:

Ⓐ such Property-Owners-Association is a direct and actual witness to the alleged public-nuisance; OR

Ⓑ such Property-Owners-Association has suffered demonstrable-harm or is very-likely to suffer harm as a result of such alleged public-nuisance - which can only be true, if such Property-Owners-Association owns property that shares a non-zero-length border with the accused-person's private-property.

On the other hand, the plaintiff had just recently, but inadvertently, played such a crucial role, during the previous 9 months, in overthrowing all-but-one member of the [HOA-BoD]s, and even the property-management-company community-manager. So, at least to that limited extent, it does-not and would-not surprise the plaintiff even in the least bit that the [HOA] - and especially its property-management-company (which did not change) - wanted to exert revenge upon the plaintiff, for the plaintiff's *"audacity"* to have acted in such muckraking manner - even if inadvertently - against the [HOA]. During this incident, [WCCHDS-VD] repeatedly refers to the [HOA] (including the property-management-company representing the [HOA]) is as if the [HOA] - just like a municipal-corporation local-government - is a saintly organization that is incapable of any misconduct or wrongdoing - when the huge number of Court records - including successful civil-lawsuits and/or successful criminal-prosecutions against [HOA]s and/or [HOA] Board-Members and/or municipal-corporations and/or municipal-corporation employees/officials - proves otherwise. Even the property-management-companies that represents [HOA]s (and the law-firms that represent [HOA]s) are for-profit businesses that profiteer from such petty/spiteful neighborhood conflicts; thus, there is no absolutely reason to consider any property-management-company (or any law-firm that represents [HOA]s), of all things, to be a saintly organization that is incapable of any misconduct or wrongdoing. However, even though [WCCHDS-VD] maliciously hides the identity of the **actual** malicious complaining witnesses, as if the plaintiff even needed such proof, both the lead-up to this incident and the final-parts of this incident (respectively) fully reveal who such **actual** and primary complaining witnesses truly are - racketeer co-defendants [RSR] and [JSP&KAP] respectively (see transcript below). This incident also includes several statements of blackmail by [WCCHDS-VD] and [WCCD-Harrell] against the plaintiff - following a decade-long pattern of blackmail that the plaintiff has suffered from the defendants - with all of these statements of blackmail meant to, Ⓐ keep the plaintiff silent about all of the abundance of evidence of racial-oppression and racketeering-activity that the plaintiff

continued to accumulate (for approximately a decade at such point in time) against the defendants, AND Ⓑ coerce, via racial-intimidation, the plaintiff to move out of such White-neighborhood - as even racketeer co-defendants [RSR],[JSP] have overtly demanded on in numerous other incidents - both prior-to and after this incident. The plaintiff seeks injunctive relief from this court to ensure that all agencies of [WCLE] are prohibited from abusively weaponizing the property-maintenance-laws to blackmail any resident of the County of Williamson (for any reason) - but especially such blackmail of any resident of the County of Williamson that has suffered serious, actual crimes - including but not limited to racially-motivated hate-crimes or retaliatory, thus felonious, crimes. [WCCHDS-VD] asks if the plaintiff has electricity and running-water at the plaintiff's private-property, despite of the fact that a significant, non-zero fraction of Texans (including White-American Texans) live off-grid at their residences, and as a result of living off-grid, do not have (grid) electricity and/or (grid) running-water: for example, those that live in solar-panel-powered trailers and/or other motor-homes without attached running-water service. [WCCHDS-VD] even demands that the plaintiff open a tap inside of the plaintiff's [HOUSE] in-order-to prove that the plaintiff had running-water inside of the plaintiff's [HOUSE]. Every question/demand concerning the plaintiff's alleged lack-of-electricity and/or lack-of-running-water was [WCLE]'s brazen attempt to blackmail the plaintiff. After this incident passed, and upon reviewing the security-camera-footage of this incident, the plaintiff noticed another [WCLE] vehicle - what appeared to be a [WCSO] vehicle - parked behind [WCCD-Harrell]'s vehicle for a period of approximately 20 minutes or more - meaning that [WCCHDS-VD] and/or [WCCD-Harrell] called for backup in case violent force was needed to restrain the plaintiff. After such [WCSD] in such [WCSO] vehicle receives indication that both [WCCD-Harrell] and [WCCHDS-VD] are on the plaintiff's [FRONTPORCH], such [WCSO] vehicle drives slowly up street, as [WCCD-Harrell] looks back at such [WCSD]. This is the type of racially-oppressive, modern-day-Jim-Crow police-state around the plaintiff that the plaintiff - a lifelong-unarmed, 100-pound, immigrant-of-color/indigenous-person - has had to suffer from [WCLE] for over a decade. On one-or-more occasions during this incident, the plaintiff would notice [WCCD-Harrell] laughing while thuggishly taking photographs/videos of private/concealed/curtilage areas of the plaintiff's private-property and/or the interior of the plaintiff's [HOUSE] - once again indicating a long pattern of malicious conduct that showed that such employees and agencies of [WCLE] thoroughly-enjoyed violating the plaintiff's rights. On one-or-more occasions during this incident, [WCCD-Harrell] fully-admits that either [WCCD-Harrell] and/or other members of the [WCLE] had executed clearly unconstitutional-and-unlawful searches/seizures of private/concealed/curtilage areas of the plaintiff's private-property in previous year(s), including but not limited to the year {2017} - even brazenly using the illegally seized evidence of those previous unconstitutional-and-unlawful searches/seizures in-order-to further blackmail the plaintiff, and/or in-order-to coerce the plaintiff to admit to fraudulent allegations lodged against the plaintiff and/or the plaintiff's private-property. On one-or-more occasions during this incident, [WCCHDS-VD] outrageously justified the decade of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses committed against the plaintiff by [JSP&KAP],[RSR] - even claiming that if the plaintiff maintained the plaintiff's private-property in such allegedly non-conformant manner, that the plaintiff deserved to suffer the decade of such racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses. [WCCD-Harrell] maliciously interrogates the plaintiff that all of such items then-stored in the plaintiff's private/concealed/curtilage [BACKYARD] originated from the **inside** of the plaintiff's [HOUSE] - maliciously emphasizing the word **inside**, as if to blackmail the plaintiff that the plaintiff was not allowed to live according to the plaintiff's deeply-held religious views/values/practices even within the four-walls of the plaintiff's own [HOUSE]. In other words, [WCCD-Harrell] appeared to be threatening to criminalize the off-grid manner in which the plaintiff lived even in the indoor-environment-of, or the inside-of, the plaintiff's own [HOUSE] - which, the plaintiff, still to the {PRESENT-DAY}, considers to be an outrageous violation of the plaintiff's rights. On multiple occasions during this incident, [WCCD-Harrell] refers to items then-stored in the plaintiff's [BACKYARD] using the undefined term *"trash"*. Such vague term *"trash"* is not defined in any part of the Texas public-nuisance law, and once-again, such malicious use of improper terminology strongly indicated to the plaintiff, that the [WCCD]s of the [WCCO] were deliberately and maliciously interpreting many

of the crucial terms in the Texas Public-Nuisance law that they are supposed to be lawfully (not Unconstitutionally-And-Unlawfully) regulating. The plaintiff, assuming that the [WCCD-Harrell] meant either *"garbage"*, *"refuse"* or *"rubbish"* - since those are the actual terms defined by the Texas Public-Nuisance law - stated that none of the items stored in the plaintiff's [BACKYARD] were *"trash"* or *"waste"* of any kind. In other words, the plaintiff asserted that none of the items stored in the plaintiff's private/concealed/curtilage [BACKYARD] fell into any one of the categories *"garbage"*, *"refuse"* or *"rubbish"* - since none of such items were *"waste"* products of any kind. The plaintiff began to increasingly-realize that [WCCD-Harrell]'s and other [WCCD]s' malicious use of the undefined term *"trash"* was such [WCCD]s' malicious attempts to fraudulently indicate potential violations of the Texas public-nuisance law - apparently with such [WCCD]s having never even read any of these key terms defined in such law that they are illegally (unconstitutionally-and-unlawfully) trying to regulate. In particular, while *"garbage"* and *"refuse"* are required by Texas law to be stored within *"closed receptacle(s)"*, *"rubbish"* (non-decayable waste of any kind - including, but not limited to: plastics, metals, glasses, ceramics, and paper-based products such as *"cardboard"*) are not required by Texas law to be stored in such *"closed receptacle(s)"* - just as long as such *"rubbish"* is not stored at a location that is visible from a public street for a period of 10 days or longer - which is clearly not the case for any of the items stored in the plaintiff's private/concealed/curtilage [BACKYARD] - and once again, the plaintiff stated clearly that none of such items constituted any waste-product of any kind; thus, even *"rubbish"* is not a possibility. [WCCD-Harrell] even parrots the same racist-narrative lodged against the plaintiff by [JSP&KAP],[RSR] - about the alleged *"stench"* coming from the plaintiff's private/concealed/curtilage [BACKYARD], further explaining that they would need to confirm whether such alleged *"stench"* is coming from the plaintiff's companion-tortoises, claiming that they did not know what the plaintiff's companion-tortoises smelled like. In doing so, [WCCD-Harrell] was, at the very least, implicitly threatening the plaintiff that the [WCCO] and/or the [WCCHD] may need to seize/confiscate the plaintiff's companion-tortoises away from the plaintiff - once-again, parroting the same predatory demands of the racketeer co-defendants [JSP&KAP],[RSR] in numerous incidents - both prior-to and after this date (○) . Since the plaintiff stated that the plaintiff eventually intended to move almost-all of such materials in [BACKYARD] onto the plaintiff's agricultural-private-property, [WCCD-Harrell] then spent a substantial amount of time - in excess of 5 minutes - interrogating the plaintiff on the plaintiff's use and/or business-operation of such agricultural-private-property - even asking very-specific and irrelevant questions about the plaintiff's use and/or business-operation of such agricultural-private-property. Once again, if [WCCD-Harrell] was at the plaintiff's (residential) private-property to supposedly investigate an alleged public-nuisance complaint, then [WCCD-Harrell], clearly had no authority - not in her official-capacity as a [WCCD] nor in her individual-capacity - to question the plaintiff on the plaintiff's use and/or business-operation of the plaintiff's agricultural-private-property - to which, Texas's public-nuisance-law would never apply to. While the plaintiff asserts in this lawsuit that [WCLE]'s predatory actions - in conspiracy with racketeer co-defendants [JSP&KAP],[RSR] - against the plaintiff was ultimately aimed at defrauding the plaintiff out of the plaintiff's right to private-property-ownership within such White (residential) neighborhood, due to [WCCD-Harrell]'s lengthy interrogation of the plaintiff regarding the plaintiff's use and/or business-operation of the plaintiff's agricultural-private-property, the plaintiff leaves open the possibility of an additional claim against defendants, for such defendants' conspiracy to defraud the plaintiff out of the plaintiff's right to such agricultural-private-property. (The plaintiff will need to conduct Discovery and Depositions of the defendants and/or other implicated parties in-order-to fully investigate such additional, potential claim regarding the plaintiff's agricultural-private-property.) Another primary goal of [WCCD-Harrell]'s interrogation of the plaintiff was simply to distract/divert the plaintiff's attention, while [WCCHDS-VD] freely continued with his unconstitutional-and-unlawful search/seizure of the plaintiff's private/concealed/curtilage [BACKYARD]. The plaintiff had noticed this malicious strategy employed by [WCLE] even on previous occasions: By sending more-than-one government-employee onto the plaintiff's private-property, [WCLE] was instructing one government-employee to distract/divert the plaintiff's attention in such unconstitutional-and-unlawful interrogation tactics, while the other government-employee(s) could more-freely engage in such

unconstitutional-and-unlawful search/seizure of private/concealed/curtilage parts of the plaintiff's private-property, with the plaintiff being under significant duress of such intrusive interrogation. At least part of the injunctive relief that the plaintiff seeks from this Court is to ensure that [WCLE] is prohibited from dispatching more than one government-employee to investigate any alleged property-maintenance complaint. [WCCHDS-VD] makes a very-revealing comment about the *"unusual"*-ly large amount of clutter **inside** of the plaintiff's [HOUSE]. When the plaintiff asked how such clutter on the **inside** of the plaintiff's [HOUSE] is illegal and/or hazardous, [WCCHDS-VD] admitted that such clutter was not illegal and/or hazardous but that it was *"unusual"*. The plaintiff indignantly, but yet very-aptly, responded, *"... in totalitarian societies, they used to put people in prison for things that are 'unusual'!"* By such statements, [WCCHDS-VD] was also acknowledging that this was simply the natural and off-grid manner in which the plaintiff lived, and by basic logic and reasoning, the manner in which the plaintiff was maintaining the plaintiff's private/concealed/curtilage [BACKYARD] was not only not any malicious or reckless act by the plaintiff, but instead, just simply an innocent part of the plaintiff's natural, off-grid, zero-waste lifestyle - and temporary conditions to help accomodate such lifestyle. Both [WCCHDS-VD] and [WCCD-Harrell] continue their unconstitutional-and-unlawful search/seizure of the interior of the plaintiff's [HOUSE] - illegally taking photographs/videos and/or interrogating the plaintiff about various items stored **inside** of the plaintiff's [HOUSE] - including the plaintiff's kitchen-pantry. At one point in time, [WCCHDS-VD] even demanded to see the contents of the interior of the plaintiff's refrigerator(s) - and when the plaintiff, under duress, opened one-or-more such refrigerator(s), [WCCHDS-VD] even used his camera-phone to take photographs/videos of the interior contents of such refrigerator(s). [WCCD-Harrell] even questions the plaintiff regarding the contents of bottles stored **inside** of the plaintiff's [HOUSE] - once again, almost as if threatening to criminalize the off-grid manner in which the plaintiff lived even in the indoor-environment-of, or the inside-of, the plaintiff's own [HOUSE] - which, the plaintiff, still to the {PRESENT-DAY}, considers to be an outrageous violation of the plaintiff's rights. Throughout most of this incident, both [WCCHDS-VD] and [WCCD-Harrell] thuggishly took photographs/videos right in front of the plaintiff of numerous private areas of the plaintiff's private-property that are not even in the least bit visible from the street - a slap in the face of the plaintiff - indicating that:

Ⓐ they truly did not care that the plaintiff - the actual owner of such private-property would have such clear opposition to such egregious governmental intrusion into the private life of a private-citizen; AND

Ⓑ they were blackmailing the plaintiff to keep the plaintiff silent about the decade of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses aggregately committed against the plaintiff by both, the plaintiff's accusers - [JSP&KAP],[RSR] - and several members of [WCLE] (not limited to [WCCHDS-VD], [WCCD-Harrell]) acting in such corrupt-malicious-predatory-and-retaliatory conspiracy with [JSP&KAP],[RSR] - dating back to [WCLE]'s initial acts of racial-oppression and racketeering-activity against the plaintiff in the month of {2011-08}; AND

Ⓒ they could then rely upon such blackmail of the plaintiff to coerce the plaintiff (who is under duress) to sign a warning-citation - despite having no authority to do so since they had executed such a brazenly unconstitutional-and-unlawful search/seizure of private-areas of the plaintiff's private-property.

Ⓓ they, and their employers - the [WCCHD],[WCCO] - were illegally conspiring to use such illegally-seized *"evidence"* either as part of (eventual) foreclosure/eviction proceedings against the plaintiff, or as part of (eventual) condemnation proceedings against the plaintiff - all, not only in egregious violation of not only the plaintiff's due-process rights, the plaintiff's fourteenth-amendment-rights, the plaintiff's first-

amendment-rights, and the plaintiff's sixth-amendment-rights, but also in egregious violation of the [FHA] and the [RIaCOA] (as part of a decade-long conspiracy/scheme to obstruct-justice against, retaliate-against and defraud the plaintiff).

As this incident reveals, both [WCCHDS-VD] and [WCCD-Harrell] spent a substantial amount of time - approximately 10 minutes - illegally coercing the plaintiff to sign such warning-citation, despite of the fact that their entire operation against the plaintiff on this particular incident - as was also true for multiple previous incidents involving the [WCCO] - were clearly unconstitutional-and-unlawful - in total violation of the plaintiff's rights. Since both [WCCD-Harrell] and [WCCHDS-VD] also acted in such unconstitutional-and-unlawful manner against the plaintiff, by also committing such coercive document execution against the plaintiff, [WCCD-Harrell] and [WCCHDS-VD] also additionally committed Texas-Fraud ([TPeC-T7-C32-§32.46]) against the plaintiff - with this additional crime also being a retaliatory, thus felonious, crime committed against the plaintiff. [WCCHDS-VD] fraudulently mis-characterizes the plaintiff's sheets of cardboard spread over one-or-more section(s) of the plaintiff's private/concealed/curtilage [BACKYARD] and used for the aforementioned *"sheet-mulching"* purpose - as *"debris"* (even though *"debris"* is yet another term that is not defined by the Texas Public-Nuisance-Law) - when the plaintiff had made it clear to all parties, including, but not limited to - the [WCCO], the [WCSO], the [WCCHD] (and the [HOA]) - dating back to as early as {2011} - that the plaintiff was using such sheets of cardboard for such ecological re-landscaping purposes - since as early as the year {2011}. Even [WCCD-RT] had admitted to the plaintiff during the incident dated {2017-08-31} that the plaintiff's use of such sheets-of-cardboard for ecological re-landscaping purposes was entirely within the plaintiff's rights - even if done in the plaintiff's [FRONTYARD]. Therefore, such agencies of [WCLE] were engaging in such brazen fraud, deception and entrapment against the plaintiff with one employee of one agency of [WCLE] - the [WCCO] - admitting that the plaintiff was entirely within the plaintiff's rights, but with another employee of another agency of [WCLE] - the [WCCHD] - claiming the exact-opposite. In trying to cite alleged violation(s), [WCCHDS-VD] makes reference(s) to an entirely fictitious legal document which he referred to as the *"[HOA] Code of Tenants"*, claiming that the plaintiff was in violation of the *"[HOA] Code of Tenants"*. To the contrary, the plaintiff was never a *"tenant"* of the property [788KLLTX78641], and defendant [WC]'s own publicly-available property-records (for example, the publicly-accessible [WCAD] appraisal records) indicated that the plaintiff was always the property-owner of the property [788KLLTX78641]. Indeed, much of [WCCHDS-VD]'s authoritarian rhetoric against the plaintiff made it seem that the [HOA]'s relationship to the plaintiff was a landlord-tenant relationship, when that is completely false - as the [HOA] did not own (and never did own) the plaintiff's private-property, the [HOA] was never the landlord of the plaintiff, and finally, the plaintiff was never the *"tenant"* of the [HOA]. Later on, [WCCHDS-VD] repeatedly makes references to the [HOA] *"bylaws"* when such bylaws do not have anything to do with the restrictive-covenants of the neighborhood. As if the plaintiff was some illiterate fool, [WCCHDS-VD] outrageously and racistly demands that the plaintiff read the [HOA] bylaws. The plaintiff had already read - even in the initial year of {2009} - and multiple additional times since that initial year - the Declaration-of-Covenants-Conditions-and-Restrictions ("[DCCR]s") of the neighborhood - which is what [WCCHDS-VD] was actually referencing. However, such statement clearly shows that [WCCHDS-VD], himself, had not read such [DCCR]s - as he clearly did not even know the difference between the bylaws and the [DCCR]s, while at the same time, citing some fictitious document titled the *"Code of Tenants"*. [WCCHDS-VD] also erroneously refers to the restrictive-covenants of the neighborhood as *"[HOA] GUIDELINES"*, when the restrictive-covenants of the neighborhood are not *"[HOA] GUIDELINES"*, and the [TPrC] (which regulates restrictive-covenants) does not allow the [HOA]s to arbitrarily, capriciously or discriminatorily set its own arbibrary guidelines - once again, revealing, that both [WCCHDS-VD] and his employer, the [WCCHD], are at best, grossly misinformed about the Texas law ([TPrC-T11-C202],[TPrC-T11-C209]) regulating both [HOA]s and restrictive-covenants, and at worst, egregiously abusing their position of trust as government officials in-order-to railroad the plaintiff into foreclosure/eviction proceedings by acting in furtherance of such corrupt-malicious-predatory-and-retaliatory conspiracy with the

plaintiff's predatory neighbors [JSP&KAP],[RSR]. In fact, if [WCCHDS-VD] had, indeed, read the [DCCR]s of the neighborhood - he would come to the realization that countless White-American residents of the neighborhood were routinely violating numerous restrictive-covenants - many of such violations of which actually cause serious harm or, at the very least, the serious potential for serious harm - the illegal lighting of fireworks, the illegal unleashing of large dogs/cats to roam freely, the illegal speeding vehicles, the constant/daily illegal-vehicle/parking-violations, the countless and persistent noise-nuisances, etc. - just to name a few. In fact, if [WCCHDS-VD] had, indeed, read the [DCCR]s of the neighborhood - he would come to the realization that racketeer co-defendants [JSP&KAP],[RSR] - the two primary complaining-witnesses of such malicious public-nuisance-complaint against the plaintiff - were routinely violating some of the aforementioned restrictive-covenants for over a decade - without having faced any legal consquences for such decade of (serious and harmful) violations. All of aforementioned damaging facts even ignores the so-called *"elephant in the room"*: that law-enforcement of the government has absolutely no authority, short of a Court order, to enforce the (private contract) restrictive-covenants of a neighborhood, as that authority is strictly relegated to the [HOA]. If [WCLE] did have the authority to enforce the restrictive-covenants of the neighborhood, then they would have to thoroughly explain to this Court, why they were not enforcing violations of restrictive-covenants committed by White-American residents that were fully visible and/or audible from the street - the illegal lighting of fireworks ; the illegal unleashing of large dogs/cats to roam freely onto public-property and onto other's private-property ; the illegal speeding vehicles ; the constant/daily illegal-vehicle/parking-violations ; the countless and persistent noise-nuisances ; etc. - just to name a few. In particualar, if [WCLE] did have the authority to enforce the restrictive-covenants of the neighborhood, then they would have to further explain to this Court, why all of those aforementioned violations of such clearly unenforced restrictive-covenants that the plaintiff has cited, out of no coincidence, are disproportionately committed by the White-American (and/or non-immigrant) residents of the neighborhood - as any such *"cherry-picking"* of which restrictive-covenants to enforce and how to enforce such restrictive-covenants would be an egregious racially-discriminatory housing-practice. [WCCHDS-VD] additionally violated the plaintiff's due-process rights by citing non-existent Texas law - *"SECTION ... 347 OF THE TEXAS HEALTH-AND-SAFETY-CODE"* - when there is no such *"SECTION 347"* nor *"CHAPTER 347"* nor *"TITLE 347"* in the [THaSC] - even writing this non-existent Texas law in the warning citation issued to the plaintiff. The citing of non-existent Texas law was yet another indication to the plaintiff that [WCLE], in general - and the [WCCHD],[WCCO] in particualar - were maliciously and fraudulently interpreting and enforcing the property-maintenance-laws of the State-of-Texas - once again, all in retaliation against the plaintiff - an innocent victim (and witness) of a decade of racial-oppression and racketeering-activity committed by the defendants acting in such predatory conspiracy against the plaintiff. Despite citing non-existent Texas law, when almost 6 months later (see below), [WCLE] - acting in furtherance of such corrupt-malicious-predatory-and-retaliatory conspiracy with racketeer co-defendants [JSP&KAP],[RSR] - randomly - and in their typical ambushing manner - decides to fraudulently and purely-retaliatorily charge the plaintiff, they charge the plaintiff for violation of *"Chapter 343"* of the [THaSC] (according to publicly-available Court-records) - which the plaintiff was not provided such Warning-Citation for. Thus, such sequence of incidents clearly documents yet another (of the many) violation of the plaintiff's Due-Process rights. One of the most revealing aspects of this entire incident is that [WCCHDS-VD] even provides the plaintiff with *"30 days"* to cure/abate the alleged public-nuisance - as he is required to do by the Texas-Public-Nuisance-Law. If an alleged Public-Nuisance was any serious violation that posed any actual threat to the health-and-safety of the neighbors - requiring immediate health-and-safety curing/abatement - then, the {Texas Legislature} would not have provided the accused private-property-owners 30 days to cure/abate such alleged violation. The {Texas Legislature} were reasonable enough to respect the private-property rights of the accused private-property-owners - that such conditions do not constitute any immediate health-and-safety concern - even providing the accused private-property-owners a month to cure/abate such alleged issue(s). Therefore, none of [WCCHDS-VD]'s,[WCCD-Harrell]'s brazenly thuggish, unconstitutional-and-unlawful search/seizure of the plaintiff's private-property and none of their unconstitutional-and-unlawful

interrogation/detention of the plaintiff were, in any way, justified by any *"exigent circumstance"*, as even an actual uncured/unabated Public-Nuisance (30 days after a public-nuisance-warning-citation has been issued), by its very nature as an alleged Class-C-Misdemeanor, could never involve any such *"exigent circumstance"* circumventing law-enforcement's requirement of lawfully obtaining a search-warrant and lawfully executing such search-warrant in-order-to lawfully search/seize the accused person(s)' private-property. All aspects of this modern-day-Jim-Crow public-oppression of the plaintiff were captured by a combination of the plaintiff's security-camera-system and the plaintiff's body-worn-camera. According to the plaintiff's recorded-footage, [WCCD-Harrell] did have a body-worn-camera - and as such, such body-worn-camera should have been recording not only all aspects of this unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff and the plaintiff's private-property, but also all of [WCCD-Harrell]'s and [WCCHDS-VD]'s initial and terminating interactions with racketeer co-defendant [RSR] (and her now-adult son [BR]) and racketeer co-defendant [KAP] (respectively) - unless, [WCCD-Harrell] deliberately turned-off such body-worn-camera (at any point in time) in-order-to further obstruct-justice against the plaintiff. (While the plaintiff is extremely in favor of the general-public's requirement of police's use of body-worn-camera in-order-to protect private citizens against police-misconduct, the plaintiff is just as strongly opposed to the unlawful use of such body-worn-camera(s) to illegally search-and-seize evidence within or related-to private/concealed/curtilage areas of a private citizen's private-property.) [WCLE]'s predatory and criminally-abusive actions of racial-oppression and racketeering-activity against the plaintiff (documented throughout this lawsuit) continue-to-show their knowledge that the plaintiff is powerless to do anything to stop it ( 🔒 ) . This entire incident of predatory, modern-day-Jim-Crow public-oppression against the plaintiff had been motivated by pure-fraud on the part of [WCLE], acting on the predatory-demands of racketeer co-defendants [JSP&KAP],[RSR], because, as the plaintiff explained to such [WC] government-employees during such predatory, modern-day-Jim-Crow public-oppression, besides any temporary conditions regarding items meant to be transported to the plaintiff's agricultural-private-property temporarily stored in the plaintiff's [BACKYARD], the plaintiff is not doing *"anything out of the ordinary when it comes to indigenous cultures ... indigenous cultures in Africa, South-America and ... Asia. ... indigenous cultures have a distinct ... traditional way of living, that"* all of such White-Americans *"might consider to be 'primitive'"*. Despite the fact that the plaintiff was fully reluctant to sign such warning-citation - given the lengthy history of extreme-racial-animus that has motivated all of such predatory, modern-day-Jim-Crow public-oppression against the plaintiff, and given the fact that [WCCD-Harrell] and [WCCHDS-VD] had just executed such egregiously Unconstitutional-And-Unlawful search/seizure/interrogation/detention of the plaintiff and the plaintiff's property in-order-to maliciously coerce the plaintiff to sign such warning-citation - the plaintiff, under extreme duress and mental-anguish, only signed such warning-citation after [WCCHDS-VD] stated that, by signing such warning-citation, the plaintiff is not agreeing-to nor admitting-to any of the allegations being made by [WCCHDS-VD] on such warning-citation, and because [WCCHDS-VD] aggressively/angrily slammed his pen down on the clipboard, repeatedly demanding that the plaintiff sign such warning-citation. As traumatizing as this incident was (and still is) to the plaintiff, this predatory incident would be just one of numerous predatory incidents (documented in this lawsuit) involving the defendants [RSR], [KAP] (and/or [JSP]), and [WCLE] - almost always involving White-American police-officers/government-employees of defendant [WC] - against the plaintiff in which all of such defendants acted in a shamelessly (and overtly) racist and predatory manner against the plaintiff - as if they were not even in the least bit ashamed or concerned that they would be accused of modern-day-Jim-Crow predatory-racism by the plaintiff - as if proudly wearing and flaunting their modern-day-Jim-Crow predatory-racism against the plaintiff as a badge-of-honor, that they will never apologize for.

> RECORDED ACTS OF RACIAL-OPPRESSION AND RACKETEERING-ACTIVITY BY [WCCHD] AND [WCCO] AGAINST PLAINTIFF(H) ›   (2020-04-28 14:38) (~)
> [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

【 PLAINTIFF, WHILE ON THE EDGE OF THE [FRONTPORCH], STATES TO [WCCHDS-VD] AND [WCCD-Harrell]: 】

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**          *Excuse me, Sir!*

**[WCCHDS-VD]**        *Yes!*

**PLAINTIFF**          *Can I help you?!*

**[WCCHDS-VD]**        *You the owner? You live here?*

**PLAINTIFF**          *Uh, yes I do!*

**[WCCHDS-VD]**        *Yeah, then you can help me. Mr. Kode?*

**PLAINTIFF**          *Yes.*

**[WCCHDS-VD]**        *How are you?*

〖 PLAINTIFF STUTTERS, CLEARLY UNDER DURESS OF SUCH WHITE-AMERICAN LAW-ENFORCEMENT AGGRESSIVELY APPROACHING PLAINTIFF WITHOUT COVID-19 SAFETY PRECAUTIONS: 〗

〖 PLAINTIFF WALKS BACK AWAY A FEW FEET AS THEY AGGRESSIVELY APPROACH PLAINTIFF: 〗

**PLAINTIFF**          *I'm alright. ... What is this about? ... Um, do you mind if I stand a few feet away?*

**[WCCHDS-VD]**        *Oh, sure. It's about a complaint that we've received [about] this property - and um, So, this is is from the property-management-company - or the [HOA] ... and your property could be producing a public-health-nuisance condition. ... I'm with the health department, I'm here to investigate that. ...*

**PLAINTIFF**          *Ok. .... Ok. ... Ok. ... So, basically, what um? basically i'm having to re-organize a whole bunch of stuff in my house. so, i moved a lot of stuff into he backyard. and so, i'm just reorganizing that.*

**[WCCHDS-VD]**        *do you mind if i look in your backyard?*

〖 PLAINTIFF RELUCTANT TO ALLOW [WCCHDS-VD] INTO PLAINTIFF'S PRIVATE BACKYARD, DIRECTS [WCCHDS-VD] TO LOOK THROUGH FENCE: 〗

**PLAINTIFF**          *You can see it - you can see it through here.*

**[WCCHDS-VD]**        *Would you allow me to go in the backyard?*

〖 PLAINTIFF RELUCTANT TO ALLOW [WCCHDS-VD] INTO PLAINTIFF'S PRIVATE BACKYARD, DIRECTS [WCCHDS-VD] TO LOOK THROUGH FENCE: 〗

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**        *Um, Is there a reason to - i mean, you can see whatever-*

〚 PLAINTIFF RELUCTANT TO ALLOW [WCCHDS-VD] INTO PLAINTIFF'S PRIVATE BACKYARD, DIRECTS [WCCHDS-VD] TO LOOK THROUGH FENCE: 〛

**[WCCHDS-VD]**      *well, in-order-to complete my investigation.*

〚 [WCCD-Harrell] TRIES TO INTIMIDATE/INTERFERE-WITH/HARASS THE PLAINTIFF TO FULLY SUBMIT TO SUCH UNCONSTITUTIONAL-AND-
UNLAWFUL SEARCH: 〛

**[WCCD-Harrell]**   *[???] [???]!*

〚 BOTH COERCED, TAINTED AND DONE VIA INTIMIDATION/INTERFERENCE/HARASSMENT - THEREFORE, NON-CONSENSUAL: 〛

**PLAINTIFF**        *sure, i can do that.*

**[WCCHDS-VD]**      *alright, thank you.*

**PLAINTIFF**        *You wanna go in through here?*

**[WCCHDS-VD]**      *I'd rather not go through the house. if that's alright, can we go-in around through the side?*

〚 ALL ASPECTS OF PLAINTIFF'S SPEECH INDICATE DURESS AND PLAINTIFF IS ACTING SUBMISSIVELY TO AUTHORITY - THEREFORE, NON-
CONSENSUAL: 〛

**PLAINTIFF**        *um, it's up to you, i guess. like i said-*

**[WCCHDS-VD]**      *are you in construction in here too? are you re-modeling?*

〚 PLAINTIFF CONTINUES TO STUTTER, ONCE-AGAIN INDICATING PLAINTIFF IS UNDER EXTREME DURESS OF HAVING PRIVACY INVADED BY
GOVERNMENT: 〛

**PLAINTIFF**        *um no, like i said, i was re-organizing a lot of stuff in my house, that's the only reason ... and there's nothing in here that you should be afraid of. if that's
                     your concern?*

〚 [WCCHDS-VD] 'S HESITATION SHOWS THAT HE KNOWS THAT HE IS PUTTING HIMSELF IN LEGAL JEOPARDY BY EXECUTING SUCH BRAZENLY
UNCONSTITUTIONAL-AND-UNLAWFUL SEARCH OF A PRIVATE CITIZEN'S PRIVATE-PROPERTY: 〛

**[WCCHDS-VD]**      *WELL, I'M JUST NOT SURE, I WANNA GO IN RIGHT NOW! ... UM-*

**PLAINTIFF**        *you can - you can - there's nothing in here that you should be concerned about. i can-*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

〖 [WCCD-Harrell] FRAUDULENTLY PRETENDS AS IF NOT-INTENDING TO SEARCH HOUSE WHEN BOTH [WCCHDS-VD] AND [WCCD-Harrell] DO IN FACT DO PERFORM SEARCH/SEIZURE OF INTERIOR OF PLAINTIFF'S [HOUSE]: 〗

**[WCCD-Harrell]**   *We can go straight through there..*

**[WCCHDS-VD]**   *Ok ... Ok...*

**PLAINTIFF**   *Right, we're just going straight through there, is all.*

**[WCCHDS-VD]**   *I WANNA MAKE SURE, YOU DON'T HAVE ANY LIVE WIRES HERE. ... DO YOU HAVE ELECTRICITY HERE, SIR?!*

**PLAINTIFF**   *yeah, yeah, yeah, i understand. ... yeah.*

**[WCCHDS-VD]**   *DO YOU HAVE RUNNING WATER?!*

**PLAINTIFF**   *yes.*

〖 [WCCHDS-VD]'S COERCES PLAINTIFF TO OPEN A TAP INSIDE THE HOUSE: 〗

**[WCCHDS-VD]**   *CAN YOU SHOW ME THAT YOU HAVE RUNNING WATER?!*

**PLAINTIFF**   *sure.*

**[WCCHDS-VD]**   *OK, ARE YOUR TOILETS WORKING?!*

**PLAINTIFF**   *yes.*

**[WCCHDS-VD]**   *OK!*

**PLAINTIFF**   *And so this is from the neighbors directly? or the [HOA], or?*

〖 [WCCHDS-VD]'S CLEARLY USES [HOA]'S PRIOR LAWSUIT AGAINST PLAINTIFF TO FURTHER BLACKMAIL PLAINTIFF: 〗

**[WCCHDS-VD]**   *THE [HOA]! ... YEAH THE [HOA] HAS COMPLAINED! UM, APPARENTLY THIS IS NOT THE FIRST TIME! SO, UM-*

**PLAINTIFF**   *ok, yeah. maybe not.*

**[WCCHDS-VD]**   *ARE YOU AWARE OF THE HISTORY THERE, SIR!*

**PLAINTIFF**   *sure, sure, sure. there's a history, definitely.*

**[WCCHDS-VD]**   *RIGHT, SO YOU'RE NOT SURPRISED THAT I'M ACTUALLY HERE?!*

**PLAINTIFF**   *um- pretty much, to be honest with you, not much. but there's always been, various [HOA]s acting on behalf of a couple of rudely antagonistic neighbors - I've been having death threats from the neighbor across, right [over] there-*

〚 [WCCHDS-VD] SHUTS DOWN THE PLAINTIFF'S COMPLAINT ABOUT THE RACIALLY-MOTIVATED HATE-CRIMES: 〛
〚 PLAINTIFF HAS HEARD THIS SAME RACIST-FRAUD REITERATED BY [WCLE] SINCE {2011}: 〛

**[WCCHDS-VD]**   *Well..... , ok, that would be a matter for you to take to the law, but...*

〚 PLAINTIFF SARCASTICALLY STATES, SURE, AS [WCLE]'S RACIST-FRAUD AGAINST PLAINTIFF NEVER STOPPED AMAZING PLAINTIFF: 〛

**PLAINTIFF**   *sure, sure i understand....*

〚 [WCCHDS-VD] OUTRAGEOUSLY JUSTIFIES CO-DEFENDANT RACKETEERS [JSP&KAP],[RSR]'S HATE-CRIMES/CIVIL-RIGHTS-VIOLATIONS/RACKETEERING-ACTS/ABUSES AGAINST PLAINTIFF: 〛

**[WCCHDS-VD]**   *I WILL TELL YOU THAT IF, UM, IF THIS WAS IN MY NEIGHBOR'S BACKYARD, I WOULD HAVE A PROBLEM WITH THIS TOO!*

**PLAINTIFF**   *Ok, but like I said, i'm re-organizing and i'm just having to get everything back-*

〚 [WCCD-Harrell] WANTS TO CRIMINALIZE HOW THE PLAINTIFF LIVES INSIDE OF THE PLAINTIFF'S OWN HOME: 〛

**[WCCD-Harrell]**   *SO, THIS IS STUFF YOU WERE STORING **INSIDE** YOUR HOME!*

**PLAINTIFF**   *well, i mean, it was just in a very unorganized manner, but yeah. but if had to [???] I could bring it back in. i mean-*

**[WCCD-Harrell]**   *So, all of these boxes, the bags of trash - all of that-*

**PLAINTIFF**   *they're not trash! wanna make absolutely clear, there's no trash here! this stuff right here, this, cardboard right here is meant for composting-*

〚 [WCCHDS-VD] AND [WCCD-Harrell] CONTINUE TO BRAZENLY TAKE PHOTOGRAPHS/VIDEOS IN FRONT OF PLAINTIFF, KNOWING PLAINTIFF IS POWERLESS TO STOP THEM: 〛
〚 [WCCD-Harrell] SARCASTICALLY ACKNOWLEDGES: 〛

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**[WCCD-Harrell]**  *Um-hmmm.*

**PLAINTIFF**  *So, basically, what i'm going to have to do. is basically take this, and re-organize it, that's all i'm trying to do here.*

**[WCCD-Harrell]**  *How long has it been out there for?*

**PLAINTIFF**  *Um, the whole i mean ... I've been working on it for a couple of weeks now. but i would say, i mean ... i would say, a couple of weeks.*

**[WCCHDS-VD]**  *HOW LONG HAS YOUR PROPERTY [???] BACK HERE? ... I NEED YOU TO BE HONEST WITH ME!*

**PLAINTIFF**  *Um... Sure, I understand, I understand. But, like i said it's a lot of work that I've been- I've been working on it for the last couple of weeks.*

**[WCCHDS-VD]**  *i'M UNDER THE IMPRESSION THAT THIS HAS BEEN GOING FOR FOR SEVERAL YEARS!*

**PLAINTIFF**  *oh, no - no- absolutely not!*

**[WCCD-Harrell]**  *[???] [???]*

**PLAINTIFF**

**[WCCHDS-VD]**  *THERE'S NO EVIDENCE OF THAT?!*

**PLAINTIFF**  *i can show you evidence form a month or two ago that this was not!*

**[WCCD-Harrell]**  *I actually was out here in {2017}. About three years ago, and took photographs.*

**PLAINTIFF**  *uh-huh? that was a different thing altogether.*

**[WCCD-Harrell]**  *Do you still have the tortoises?*

**PLAINTIFF**  *Yeah, the tortoises are back there, on the other side.*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                1696907690

[WCCHDS-VD]        WHAT'S UH, WHAT'S WITH THE MATTRESSES BACK THERE?

PLAINTIFF         they're the frames, i'm building shelves there.

[WCCHDS-VD]        THE MATTRESSES? - THE BOXSPRINGS?

PLAINTIFF         I'm building shelves, um for the- for the-

[WCCHDS-VD]        DO YOU MIND IF I TAKE A STEP OR TWO BACK HERE!

PLAINTIFF         SURE!

[WCCD-Harrell]    YOU'RE BUILDING SHELVES BACK HERE?

PLAINTIFF         i'm building shelves all across there, yes. and, so-

[WCCHDS-VD]        WHAT'S UNDERNEATH THE TARP?

PLAINTIFF         unopened boxes, you can take a look if you want. Again, none of that is trash! I can assure you!

[WCCHDS-VD]        SO YOU'RE RECYCLING ALL THE MATERIALS?

PLAINTIFF         i'm recycling. i'm reusing. i'm repurposing.

[WCCHDS-VD]        IN THE MEAN TIME, COULD BE HARBORING RODENTS! COULD BE BREEDING MOSQUITOES!

PLAINTIFF         um- ... sure, first of all, let me just - the whole point of what i'm trying to do here is organize that. you can see the shelves there, right?

[WCCHDS-VD]        UNDERSTOOD! IN THE MEANTIME WHAT I'M TELLING YOU THOUGH, IS THE LONGER THIS STAYS OUT HERE, CONTAINERS LIKE THIS.

PLAINTIFF         and that's why i'm trying to get a move on-

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**[WCCHDS-VD]**   *It's a [???] and it's also a mosquito breeding*

**PLAINTIFF**   *I understand the concern. what i mean to say is- well- mosquitoes can - you need to have-*

**[WCCHDS-VD]**   *WATER CAN BE ACCUMULATING IN ALL OF THESE - AROUND YOUR HOUSE.*

**PLAINTIFF**   *sure, i understand. but what i mean to say is - i can go ahead and, when you see this- basically you'll understand- basically, it's going to be in shelves. so, that's the whole point of constructing the shelves there - yeah, i mean*

**[WCCHDS-VD]**   *[???] DO HAVE YOUR TORTOISES OUT?*

**PLAINTIFF**   *yes, they're over there, they're in the other -*

**[WCCHDS-VD]**   *ARE THEY [???] OR ARE THEY [???]*

**PLAINTIFF**   *they're either underneath the- when you move the boards, they're underneath in there. you can check-*

**[WCCHDS-VD]**

**PLAINTIFF**   *so, right now, there's- i have more of them- right now, here, there's just two.*

**[WCCD-Harrell]**   *And where do you keep the other ones?*

**PLAINTIFF**   *um- they're in a relative's house.*

**[WCCD-Harrell]**   *At a relative's?*

**PLAINTIFF**   *I can assure you that none of this - for example, this is just pallets - you cannot consider pallets [as trash]. ... none of this here is trash. i can assure you of that. you can even look underneath the tarp, there's nothing there. you see this-*

**[WCCD-Harrell]**   *are these the holes for tortoises?*

**PLAINTIFF**   *yeah- that's basically it. ... may i ask why you're photographing?*

**[WCCD-Harrell]**   *because, as he said, we have received a complaint. of the smell. the trash. the rodents.*

**PLAINTIFF**   *wow! - i don't know about rodents!*

**[WCCD-Harrell]**   *increase in insect activity. … watch for holes, because i just -*

**PLAINTIFF**   *yeah, there might be holes in there.*

**[WCCD-Harrell]**   *so, where's your compost pile? you say here? you're using to compost all of this?*

**PLAINTIFF**   *well, part of it is back over there- I mean, and so, part of is back over there.*

**[WCCD-Harrell]**

**PLAINTIFF**   *I mean, i'm not understanding - besides the fact that I'm trying to reorganize all of this stuff- I'm not understanding what the concern is? … you know, after I re-organize and put up everything on shelves? there's not going to be any concern.*

**[WCCD-Harrell]**   *so, the public-nuisance complaint - is the stench coming from everything back here-*

**PLAINTIFF**   *sure! um-*

**[WCCD-Harrell]**   *and which part of that, i don't know what tortoises smell like. so, i don't know if part of that comes from that. um-*

**PLAINTIFF**   *sure, i understand.*

**[WCCD-Harrell]**   *the -*

**PLAINTIFF**   *yeah, i can even open that -*

**[WCCD-Harrell]**   *what your step there! the uh- rodent activity. the uptick in insect activity. so, that's what we're here, today.*

**PLAINTIFF**   *sure. … i understand.*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                          1696907690

[WCCD-Harrell]   *this has been ongoing since, to my knowledge, at least 2017.*

PLAINTIFF   *to be honest, its not an ongoing issue. this stuff, like i said lot of stuff, is from the house. moved it out here. reorganize- i mean, it's just a matter of reorganization. and there's no way for me to do it inside the house - there's not enough, there's not enough , what do you call it-?*

[WCCD-Harrell]   *storage?*

PLAINTIFF   *yeah, i mean, there's not enough light in there first of all to do all this storage-*

[WCCD-Harrell]   *uh-huh.*

PLAINTIFF   *i can do all the re-organization, and not only that- its- ... pretty impractical for me to be able to do it-*

[WCCD-Harrell]   *do you [????] .... what is in these bags?*

PLAINTIFF   *um, you can check - you can open it up and check-*

[WCCD-Harrell]   *that's alright, i'll just [???]-*

PLAINTIFF

[WCCHDS-VD]   *WHAT DO YOU HAVE IN THESE BUCKETS OVER HERE?! ... Huh?! ... Huh?!*

PLAINTIFF   *compost. ... compost. ... compost.*

[WCCHDS-VD]   *LIQUID COMPOST?!*

PLAINTIFF   *well, you add liquid to it, yeah.*

[WCCHDS-VD]   *THIS IS UM- THIS IS ALL COMPOST?*

PLAINTIFF   *that's compost.*

SIDDHARTH KODE   v.   WILLIAMSON COUNTY , ET AL.                    1696907690

**[WCCHDS-VD]**   *WHAT DO YOU HAVE IN THERE- WHAT LIQUID IS THIS? ... MADE UP OF WHAT?!*

**PLAINTIFF**   *well i mean, vegetable matter and everything that- vegetable matter, yes.*

**[WCCHDS-VD]**   *OK, SO, IT'S FERMENTING, VEGETABLE MATTER? ... WITH VERY STRONG SMELL.*

**PLAINTIFF**   *well, you opened it! so, there's a reason why there's a smell- so, basically if you take it down, if you put it back in- so, is there a smell after you? i mean - you opened it, so, i mean-*

**[WCCHDS-VD]**   *ALRIGHT .... WELL THAT'S GOOD, BUT AREN'T YOU GOING' TO OPEN IT AT SOME POINT?! ... WHAT IS THE PURPOSE OF THIS?!*

**PLAINTIFF**   *yeah, i mean- we have a- .... we have a farm- ... let me just wait back here-*

**[WCCHDS-VD]**   *EXPLAIN TO ME WHAT THIS IS ALL ABOUT!*

**PLAINTIFF**   *are you familiar with the fact that - i explained this to a previous person who came through here-*

**[WCCHDS-VD]**   *i haven't talked to anybody else that's [???]*

**PLAINTIFF**   *she said {2017}. so, i explained this to-*

**[WCCD-Harrell]**   *he's never been here before! he has no [???]*

**PLAINTIFF**   *Ok, {2017} somebody came over here, i told the people that i was doing composting, for my farm! there's no- the whole purpose of the compost is for the farm! i have a farm-*

**[WCCD-Harrell]**   *Where is your farm at?!*

**PLAINTIFF**   *in Taylor.*

**[WCCD-Harrell]**   *What's the address to your farm?*

SIDDHARTH KODE    V.    WILLIAMSON COUNTY, ET AL.                    1696907690

**PLAINTIFF**        *It doesn't have a street address, but it's in FM-112.*

**[WCCD-Harrell]**   *On FM-112?*

**PLAINTIFF**        *You can look it up!*

**[WCCHDS-VD]**      *How long you've been there?*

**[WCCD-Harrell]**   *is it property that's in your name?!*

**PLAINTIFF**        *Yes, it's in my name and a co-owner's name.*

**[WCCD-Harrell]**   *Who's the co-owner?*

**PLAINTIFF**        *That would be my pare- my mom, in particular.*

**[WCCD-Harrell]**   *so they're property out there-*

**PLAINTIFF**        *she's just - she just owns it for- you know like-*

**[WCCD-Harrell]**   *But like it's a working farm?*

**PLAINTIFF**        *It's a working farm! you can check it out!*

**[WCCD-Harrell]**   *What do you farm?!*

**PLAINTIFF**        *Well first of all, 20 acres is for bees, and the rest is in orchard and also herbs. ... herbs of various kinds - it's on ag-exemption at the moment.*

**[WCCD-Harrell]**   *For the bees?*

**PLAINTIFF**        *No, no, no. the bees is like i said - 20 acres. there's 11 acres for -orchard and herbs and other, you know-*

SIDDHARTH KODE   v.   WILLIAMSON COUNTY , ET AL.                1696907690

**[WCCD-Harrell]**   *What kind of herbs?*

**PLAINTIFF**   *rosemary, mint, that kind of stuff-*

**[WCCD-Harrell]**   *and what you doing with those herbs?*

**PLAINTIFF**   *well, i mean, i eventually - well, first of all, rosemary takes 4 years to establish- i mean, all these are perennials, um-*

**[WCCD-Harrell]**   *so, when did you purchase this farm?!*

**PLAINTIFF**   *This farm is purchased in 2015, but- it took a while for us to actually get it set-up.*

**[WCCD-Harrell]**   *uh-huh. …. uh-huh*

**PLAINTIFF**   *we're just - it's been mainly me that's been doing all the work. … um, so, we're looking at up to end of next year to actually. you can like i said, check the property records. you'd be able to see, that there's a working farm, that's all of this stuff is meant for- and by the way, I've taken a lot of stuff and including compost and actually used it in the farm. … so, it's not an immediate thing that I've done in the recent past - it's at least something that I've been doing in a semi-yearly basis.*

**[WCCD-Harrell]**   *So, what's you're growing out there in the farm - that was for your own personal consumption, or? are you own business?*

**PLAINTIFF**   *i mean, i haven't, i mean, the business is still in the process of being setup. so, if you can imagine-*

**[WCCD-Harrell]**   *what do you mean setup? being setup with?*

**PLAINTIFF**   *well i'm doing most of the work. like my, like i said, my mom is mainly financing it. she's not really-*

**[WCCD-Harrell]**   *what do you mean being setup? you mean with an entity?*

**PLAINTIFF**   *No, no, no, no! Setting it up, so i can - sell at - so i can sell at the farmer's market and so on. the issue is, um-*

**[WCCD-Harrell]**   *So, have you filed any paperwork with the Secretary of State or the Clerk's office?*

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                                    1696907690

**PLAINTIFF**      *I've filed it with the appraisal district- i mean the appraisal district that we're farming there.*

**[WCCD-Harrell]**      *what [???] of your business?*

**PLAINTIFF**      *i wont' even be able to sell until, not even next year - we're talking two years from now - first of all- an orchard i'm not sure if you know, but if grow a tree from orchard, you're talking about 10 years. for a tree to be productive.*

**[WCCD-Harrell]**      *uh-hmmm...*

**PLAINTIFF**      *and besides the 10 years, after the 10 year period, you're still looking at very limited production.*

**[WCCD-Harrell]**      *so what kind of trees do you have out there?*

**PLAINTIFF**      *well, its intended to be a pomegranate farm but. but, what- the main crop that we ordered for, like i said, is rosemary. which is what we planned on planting.*

**[WCCD-Harrell]**      *so, but in the orchard? ... rosemary in your orchard?*

**PLAINTIFF**      *rosemary is a bush ... rosemary is a bush.*

**[WCCD-Harrell]**      *ok, so then what do you have on the herb-side? ... you said you got orchard, and they you got herbs? ... so, where do you get the rosemary at?*

**PLAINTIFF**      *well, so- actually, i got like a 10 pound box of garlic-chives. that's mainly the herbs that we're going to planting. we've also invested a little bit in mint. um- mint, what else is there. mint and- oregano- thyme-*

**[WCCD-Harrell]**      *tell me, um- yeah, tell me again, the county road that's on?*

**PLAINTIFF**      *FM-112. You can look it up right now. if you have a- you can look it up on your-*

**[WCCD-Harrell]**      *how many acres is it?*

**PLAINTIFF**      *31 acres.*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**[WCCD-Harrell]**   *3l?*

**PLAINTIFF**   *right.*

**[WCCD-Harrell]**   *so, how many acres, would you say, of rosemary have you planted?*

**PLAINTIFF**   *um, we planted about at least 2 acres about them- i mean that's so-far- i mean it's not, yeah, i mean it's one person doing all the thing-*

**[WCCD-Harrell]**   *HOw many acres of garlic-chives.*

**PLAINTIFF**   *Oh, garlic-chives - the box is still there, i haven't planted it yet.*

**[WCCD-Harrell]**   *not yet planted, any?*

**PLAINTIFF**   *first of all, let me just explain, the land right there is- was harvested by hay repeatedly. nothing is growing there! so, it need serious amount of work- to get it running again. even the person is familiar with that, and that's why they've sort of, cutting me some slack here-*

**[WCCD-Harrell]**   *Ok.*

**[WCCHDS-VD]**   *Can you please provide me the address of your mother?*

**PLAINTIFF**

**[WCCHDS-VD]**   *Can you please provide me the address of your mother?*

**PLAINTIFF**   *Sure, its **** ******** *****.*

**[WCCHDS-VD]**   ***** ********?*

**PLAINTIFF**   *correct.*

**[WCCHDS-VD]**   *And what city is that?*

SIDDHARTH  KODE   V.   WILLIAMSON  COUNTY ,  ET  AL.                                    1696907690

**PLAINTIFF**      *it's right here, in leander.*

**[WCCHDS-VD]**    *in Leander?*

**PLAINTIFF**      *right... is there a reason- i mean is something involved with her?*

**[WCCHDS-VD]**    *well, she's the property owner of this property?*

**PLAINTIFF**      *co- co-property- , oh yeah, i guess so, yeah. co-property-owner.*

**[WCCHDS-VD]**    *Who's the other property-owner?*

**PLAINTIFF**      *of which property?*

**[WCCHDS-VD]**    *this one.*

**PLAINTIFF**      *yes it's - co-prop- i mean, i don't know if you- if you look at the property-records, it show my name and it shows her name. i'm not sure.*

**[WCCHDS-VD]**    *yeah ok...*

**PLAINTIFF**      *same thing with the farm as well.*

**[WCCD-Harrell]**   *so, what all is planted out there, right now?*

**PLAINTIFF**      *rosemary, mainly. rosemary, and also like i said- we just recently invested in a tractor for which- for me to be able to plant the garlic chives seeds. i think, i can bring out the garlic-chives box, if you want... garlic-chive seeds i can show it to you right now.*

**[WCCD-Harrell]**   *[???] [???]*

**PLAINTIFF**      *garlic chives. garlic chives.*

**[WCCD-Harrell]**   *what all have you planted out there? ... you told me that you haven't planted any garlic-chives. that they're all here.*

**PLAINTIFF**          *no, no, no- so garlic chives are here, but- right now, its just rosemary*

**[WCCD-Harrell]**     *So, its not rosemary mainly- its only rosemary? there's no pomegranates? there's nothing in the orchard?*

**PLAINTIFF**          *for right now, it's - ... well, no the pomegranates- is what we put in our proposal to the appraisal district... in addition to the rosemary, but-*

**[WCCD-Harrell]**     *but you don't have any planted? is that what you're saying?*

**PLAINTIFF**          *not yet. but we do have rosemary. like i said - ... plan to get that 11 acres in shape. if you go out there and see, there's nothing - grass is growing 6 inches apart. if you know what i mean.*

**[WCCD-Harrell]**     *no-*

**PLAINTIFF**          *so, if grass is growing 6 inches apart, that tells you how .... weak that soil has become. i'm not sure the reasons behind that - most likely its because of repeated hay-harvesting.*

**[WCCHDS-VD]**        *so, do you have any more questions - because i'm ready to go back out-*

**PLAINTIFF**          *Yeah i'm just wondering... sure i understand, like um- may i ask-*

**[WCCHDS-VD]**        *can we go out here and finish?*

**PLAINTIFF**          *i understand, that's fine.*

**[WCCHDS-VD]**        *[???] i'm going to have to ask you to lead the way.*

**PLAINTIFF**          *sure. did i already bring in my-? let me see what i did with- and like i said-*

**[WCCHDS-VD]**        *DO YOU HAVE FOOD HERE, SIR?!*

**PLAINTIFF**          *yeah, why?*

SIDDHARTH KODE   v.   WILLIAMSON COUNTY , ET AL.                    1696907690

**[WCCHDS-VD]**   *CAN YOU SHOW ME THAT YOU HAVE FOOD? I'D LIKE TO BE ABLE TO SAY THAT YOU'RE TAKING CARE OF YOURSELF!*

**PLAINTIFF**   *let me just, before i get to that, let me just- ... say a little bit of what i need to say here, ok?* **i would like to point out that the people around me are a different race than i am. i happen to be living in a way that is in congruence, i guess, with my cultural background.** *and as you can see, even the inside of the house is pretty shabby - actually, it was much more shabby before- and like i said, a lot of this stuff was-*

**[WCCHDS-VD]**   *THERE'S NO PLACE TO SIT OR PUT MY CLIPBOARD DOWN! EVERY SURFACE IS COVERED!*

**PLAINTIFF**   *uh-huh. is that- and how is that a hazard, or?*

**[WCCHDS-VD]**   *IT'S NOT A HAZARD, IT'S JUST UNUSUAL!*

〚 [WCCHDS-VD] CONTINUES TO ILLEGALLY TAKE PHOTOGRAPHS/VIDEOS OF INTERIOR OF PLAINTIFF'S [HOUSE]- 〛
〚 -INCLUDING BUT NOT LIMITED TO INTERIOR OF PLAINTIFF'S KITCHEN-PANTRY. 〛

**PLAINTIFF**   *i mean! sir, it's um- in totalitarian societies, they used to put people in prison for things that are 'unusual'!*

**[WCCD-Harrell]**   *What's in those mayonnaise?*

**PLAINTIFF**   *that's just um fermented stuff, that i just keep in, whatever, like vinegar, i just add in there.*

**[WCCD-Harrell]**   *Ok.*

**[WCCD-Harrell]**   *so, it doesn't appear that you do have any food.*

〚 [WCCHDS-VD] ILLEGALLY DEMANDS TO SEE INTERIOR OF PLAINTIFF'S REFRIGERATOR (INSIDE OF PLAINTIFF'S [HOUSE]). 〛

**[WCCHDS-VD]**   *CAN YOU OPEN UP YOUR REFRIGERATOR FOR ME?*

**PLAINTIFF**   *Ssshhh- Not this one here. i can open up-*

**[WCCHDS-VD]**   *THERE'S NOTHING IN THERE?*

**PLAINTIFF**   *I can open up this refrigerator right here..*

**[WCCHDS-VD]**

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907590

OK.

**PLAINTIFF**     *So, you're thinking that i survive without food, is that it?*

**[WCCD-Harrell]**     *Well, clearly you're not surviving with-*

**PLAINTIFF**     *let me just open it up right here. there's actually another one back there, as well- so that way i can- ok, let me just open up, this one i guess, right-here- you want me to just?*

**[WCCHDS-VD]**     *I'D LIKE YOU TO SHOW ME THAT YOU HAVE ADEQUATE FOOD FOR YOURSELF.*

**PLAINTIFF**     *well, this is the bread i just baked.*

**[WCCHDS-VD]**     *IS THIS PLUGGED IN? ... IS THIS PLUGGED IN?*

**PLAINTIFF**     *so, yeah- ... so, yes, it is. you can, you can - it wouldn't be lit up if it wasn't plugged in.*

⟦ [WCCHDS-VD] ILLEGALLY TAKES PHOTOGRAPHS/VIDEOS OF INTERIOR OF PLAINTIFF'S REFRIGERATOR DESPITE, SAYING IT'S FINE. ⟧

**[WCCHDS-VD]**     *WELL, I DON'T KNOW IF ITS HOLDING PROPER TEMPERATURE, BUT THAT'S FINE. OK.*

**PLAINTIFF**     *ok sure! so, basically my main concern here is to figure out, how it is that- how it is the case that- aside from the organizing that i need to do in the backyard.*

⟦ [WCCHDS-VD] WANTS TO CONTINUE ENGAGING IN SUCH MODERN-DAY-JIM-CROW PUBLIC-OPPRESSION OF PLAINTIFF - HUMILIATING PLAINTIFF IN-FRONT-OF-RACKETEER CO-DEFENDANTS [JSP&KAP],[RSR]. ⟧

**[WCCHDS-VD]**     *WELL, I'M GOING TO STEP BACK OUT HERE ON THE PORCH. I'M HAPPY TO CONTINUE TALKING WITH YOU OUT HERE.*

⟦ PLAINTIFF INSISTS UPON AT LEAST MINIMAL PRIVACY - CALLING [WCCHDS-VD] TO SPEAK AT [FRONTDOOR] ⟧

**PLAINTIFF**     *ok. ... sure, sure, um - do you mind if we talk - if i stand right here and you stand right here?*

**[WCCD-Harrell]**     *Yeah, that's fine.*

⟦ [WCCD-Harrell],[WCCHDS-VD] BEGIN TO ENGAGE IN APPROXIMATELY 10 MINUTES OF COERCING PLAINTIFF, UNDER DURESS, TO SIGN- ⟧
⟦ - WARNING-CITATION ESPECIALLY SINCE THEY SO-EGREGIOUSLY VIOLATED PLAINTIFF'S RIGHTS IN ENGAGING SUCH UNCONSTITUTIONAL- ⟧
⟦ -,UNLAWFUL SEARCH,SEIZURE OF PRIVATE/CONCEALED/CURTILAGE AREAS OF PLAINTIFF'S PRIVATE-PROPERTY (INCLUDING [HOUSE]-
INTERIOR). ⟧

〖 [WCCHDS-VD],[WCCD-Harrell] ALSO ENGAGE IN FRAUD ([TPeC~T7-C32-§32.46]) AGAINST PLAINTIFF WHEN ENGAGING IN SUCH BRAZEN- 〗

〖 -AND-UNLAWFUL COERCIVE *FRAUDULENT SECURING OF DOCUMENT EXECUTION* AGAINST PLAINTIFF. 〗

**[WCCHDS-VD]**        *LET ME JUST LAY IT OUT FOR YOU. ...*

**PLAINTIFF**        *but before you do, before you lay it out- um ... what is this?*

**[WCCHDS-VD]**        *MY CARD, YOU CAN HAVE MY CARD.*

**PLAINTIFF**        *ok, before you lay it out - i would just ask that you respect the cultural values of other cultures?*

**[WCCHDS-VD]**        *WHAT CULTURE ARE WE TALKING ABOUT?*

**PLAINTIFF**        *Indigenous cultures. **Every Indigenous culture**. I'm not doing anything out of the ordinary when it comes to indigenous cultures. ok, so- we're talking about the people that used that live on this land- I mean, but still do to very minute extent. and also, indigenous cultures in Africa, South-America and, you know, Asia as well. And, I happen to be from the Asian cultures. But what I mean to say is, indigenous cultures have a distinct, I mean very traditional way of living, that you might consider to be 'primitive'.*

**[WCCHDS-VD]**        *I UNDERSTAND. LET ME STOP YOU THOUGH. BECAUSE THIS HAS NOTHING TO DO WITH YOUR CULTURE, YOUR RACE.*

**PLAINTIFF**        *How is it - how is it not?*

**[WCCHDS-VD]**        *WHAT THIS HAS TO DO WITH IS YOU VIOLATING THE HOMEOWNERS ASSOCIATION CODE OF TENANTS THAT YOUR OWNERSHIP SIGNED ON TO. WHEN YOU BOUGHT THIS PROPERTY.*

**PLAINTIFF**        *but its only temporary!*

**[WCCHDS-VD]**        *YOU ARE IN AGREEMENT THAT YOU WOULD ABIDE BY THE HOMEOWNERS ASSOCIATION CODES. AND I BELIEVE YOU ARE IN VIOLATION OF THOSE CODES.*

**PLAINTIFF**        *if it is- ok, i understand what you're saying. if that is the case, it is a temporary situation, and i'm going to be remediating that by-*

**[WCCHDS-VD]**        *THIS DOES NOT SEEM LIKE A TEMPORARY SITUATION, TO ME SIR.*

**PLAINTIFF**

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

*in what way, like i said - I've put everything in bags, and-*

**[WCCHDS-VD]**   *DISCUSSIONS I'VE HAD WITH OTHER INDIVIDUALS, THAT THIS HAS BEEN GOING ON FOR A LONG TIME!*

**PLAINTIFF**   *that's what i'm talking about! well, that's what i'm talking about!*

**[WCCHDS-VD]**   *AND THAT SCENE IN THE BACKYARD DIDN'T HAPPEN OVERNIGHT.*

**PLAINTIFF**   *ok, let me just ask, who are the individuals? i mean, it's basically...*

**[WCCHDS-VD]**   *PROPERTY-OWNERS-ASSOCIATION. PROPERTY-MANAGEMENT-COMPANY. FILED A COMPLAINT.*

**PLAINTIFF**   *ok.*

**[WCCHDS-VD]**   *WITH THE HEALTH DEPARTMENT. I DO BELIEVE THAT YOU HAVE A PUBLIC-NUISANCE CONDITION, IN THE PROPERTY, IN THE BACK.*

**PLAINTIFF**   *i understand.*

**[WCCHDS-VD]**   *IT NEEDS TO BE ABATED, WHICH MEANS YOU NEED TO GET RID OF IT.*

**PLAINTIFF**   *ok, no that's what i'm saying- that's what i'm going to be doing. you can see the shelves that are being created.*

**[WCCHDS-VD]**   *OK. VERY GOOD. I'M GONNA GIVE YOU 30 DAYS TO DO IT.*

**PLAINTIFF**   *i understand. i understand.*

**[WCCHDS-VD]**   *I NEED YOU TO SIGN THIS REPORT RIGHT HERE FOR ME. AND THAT'S ALL IT SAYS - JUST SOME OBSERVATIONS. I'D BE HAPPY TO READ IT TO YA. THIS DEPARTMENT RECEIVED A COMPLAINT FROM THE PROPERTY-MANAGEMENT OF THIS COMMUNITY. THE COMPLAINT STATES THE DEBRIS ON THIS PROPERTY MAY BE RODENT-HARBORAGE OR CREATE A PUBLIC-HEALTH-NUISANCE. I OBSERVED FLIES. I OBSERVED EXCESSIVE DEBRIS, WET CARDBOARD. FOOD CONTAINERS. BAGS OF PLASTIC. DOORS, SHELVES, BOX-SPRINGS. SOME SMELL OBSERVED WHEN CONTAINERS WERE OPENED. STAGNANT WATER WAS OBSERVED IN BUCKETS, WHICH CAN BE MOSQUITO HARBORAGE. YOUR INSTRUCTIONS ARE TO MAINTAIN PROPERTY IN A CONDITION TO ELIMINATE ANY TYPE OF PUBLIC-HEALTH-NUISANCE. SUBJECT TO SECTION 341. 347 OF THE TEXAS HEALTH-AND-SAFETY-CODE. THOSE ARE STATE LAWS THAT APPLY TO YOU ON THIS PROPERTY. YOU ARE INSTRUCTED TO CLEAN AND REMOVE ALL DEBRIS FROM THE PROPERTY TO ABATE THE PUBLIC-HEALTH-NUISANCE WITHIN 30 DAYS!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                    1696907690

PLAINTIFF        ok. ... ok ... well, yeah... sure ... sure ... ok ... sure, i understand. I understand. I understand, sir. ... ok, i understand that, but what i need, ok, but-

[WCCHDS-VD]      IF I CAN GET YOU TO SIGN THAT!

[[ [WCCHDS-VD] FORCEFULLY SLAMS HIS PEN ONTO CLIPBOARD TO DEMAND/COERCE PLAINTIFF TO SIGN WARNING-CITATION; ]]

PLAINTIFF        Sir, um, let me-

[WCCHDS-VD]      I DON'T REALLY HAVE TIME TO REALLY DISCUSS A WHOLE LOT MORE, SIR. AND THERE'S NOT A WHOLE LOT MORE THAT'S RELEVANT, HERE! WHAT'S RELEVANT IS YOU HAVE A LOT OF DEBRIS, WHICH I BELIEVE CREATES A PUBLIC-HEALTH-NUISANCE.

PLAINTIFF        are you talking about inside the house?

[WCCHDS-VD]      OUTSIDE THE HOUSE.

PLAINTIFF        ok, outside the house. so, inside the house, there's -

[WCCHDS-VD]      I'M CONCERNED ABOUT YOUR WELFARE INSIDE OF THIS HOUSE, BUT I'M NOT HERE TO ADDRESS THAT AT THIS TIME!

PLAINTIFF        Ok.

[WCCHDS-VD]      ALRIGHT?

PLAINTIFF        sir-

[WCCHDS-VD]      IF YOU CAN JUST SIGN HERE!

PLAINTIFF        let me just, but before we get to that-

[WCCHDS-VD]      I REALLY NEED YOU TO SIGN IT!

PLAINTIFF        sir, i understand that. i will go ahead and sign it. i'm just trying to understand, and just to be clear, it's 30 days? is that correct?

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.                    1696907690

[WCCHDS-VD]    *THAT'S CORRECT?P*

PLAINTIFF    *i just would like a list of the - i think it's um- the accuser, i mean the accused has the right [???] his accuser.*

[WCCHDS-VD]    *WELL I GAVE YOU A LIST ON THERE! SO, IF YOU REMOVE ALL OF THAT STUFF-*

PLAINTIFF    *no, i'm not talking about the list, i'm talking about the list of peop- um property-owners [that complained]-*

[WCCD-Harrell]    *YOU CAN FILE AN OPEN-RECORDS REQUEST FOR THAT! THERE'S A PROCESS. THAT'S NOT SOMETHING THAT EITHER ONE OF US CAN RELEASE FROM ANY ENTITY! SO, YOU HAVE TO FILE AN OPEN-RECORDS REQUEST! THERE'S A PROCESS, IT'S NOT-*

PLAINTIFF    *ok, ok so, let me just make sure. as long as i put stuff on shelves - and organize everything- and make sure that everything is in a manner that's not um-causing any problem.*

[WCCD-Harrell]    *JUST AS ITS NO LONGER A PUBLIC NUISANCE!*

PLAINTIFF    *So, just to be clear. i have shelves up there all along the walls, i mean - about, say about 6 feet away all the way from-*

[WCCHDS-VD]    *GET RID OF ALL YOU EXTRA STUFF! AND TAKE IT OUT TO THE FARM! IF YOU DON'T WANT TO KEEP IT - YOU CAN'T KEEP IT HERE! GET IT OUT THERE! AND CLEAN UP THE BACKYARD!*

PLAINTIFF    *ok, so-*

[WCCHDS-VD]    *YOU'RE GOING TO HAVE TO COMPLY WITH THE HOMEOWNER'S ASSOCIATION GUIDELINES HERE!*

PLAINTIFF    *i understand that!*

[WCCHDS-VD]    *as well ax... state law!*

PLAINTIFF    *no, listen-*

[WCCHDS-VD]    *SO, IF YOU'LL SIGN HERE PLEASE, SIR! GO AHEAD AND DO THAT [RIGHT NOW]! GO AHEAD AND SIGN THAT NOW FOR ME!*

SIDDHARTH  KODE    V.    WILLIAMSON  COUNTY ,  ET  AL.                                    1696907690

**PLAINTIFF**       i understand that! so, what - i just wanna be clear that i will go ahead and do exactly what you're- first, of all is there a requirement that i sign it? if i
                    agree to whatever you're saying? is there a requirement that i sign it?

**[WCCHDS-VD]**      I WILL SAY THAT YOU REFUSED TO SIGN IT. AND THERE'S NO REASON FOR YOU TO REFUSE TO SIGN IT - BECAUSE IT DOESN'T TELL
                    YOU THAT YOU'RE IN VIOLATION OF- ALL IT TELLS YOU IS THAT THIS IS THE VIOLATIONS THAT I'M CITING YOU, BUT IT DOESN'T
                    MEAN YOU AGREE TO ANY OF IT. YOU DON'T HAVE TO AGREE TO ANY OF THIS. THIS IS JUST THAT I NOTIFIED YOU. YOU'RE SIGNING
                    THAT I GAVE YOU A PIECE OF PAPER.

**PLAINTIFF**       Ok .... sure ... ok, ok ... ok, got it. so basically- ... sure i understand, so basically - i just want to make it clear that there's a disagreement between you and
                    me. but i'm going to comply with it - as soon as possible.

**[WCCHDS-VD]**      YOU HAVE EVERY OPPORTUNITY FOR DUE PROCESS!

**PLAINTIFF**       sure, sure, sure. i understand.

**[WCCHDS-VD]**      IF YOU'LL SIGN THERE PLEASE! I NEED TO GO ABOUT MY BUSINESS!

**PLAINTIFF**       sure, in understand sir! what i mean to say is-

**[WCCD-Harrell]**  MR. KODE, WE HAVE OTHER CALLS THAT WE HAVE TO DEAL WITH!

**PLAINTIFF**       I understand. i just, i completely understand that- i just want to be clear as to what i'm signing to- i want to make clear, that when i put stuff on shelves,
                    ok? and everything is neatly organized.

⟦ [WCCHDS-VD] ⟧REFERS TO "BYLAWS" EVEN THOUGH BYLAWS DO NOT INCLUDE ANY OF RESTRICTIVE-COVENANTS: ⟧
⟦ [WCCHDS-VD] ⟧OUTRAGEOUSLY CONTINUES-TO-TREAT PLAINTIFF WITH RACIST-DISRESPECT AS IF PLAINTIFF IS ILLITERATE: ⟧

**[WCCHDS-VD]**      I'M NOT MAKING YOU ANY PROMISES. I'M TELLING YOU THAT YOU NEED TO READ THE HOMEOWNERS ASSOCIATION BYLAWS.

**PLAINTIFF**       ok, but that's definitely the case- so, so,

**[WCCHDS-VD]**      READ THE HEALTH AND SAFETY CODE. MAKE SURE YOU ARE COMPLYING WITH THE HEALTH AND SAFETY CODE AND THE
                    HOMEOWNERS ASSOCIATION BYLAWS.

**PLAINTIFF**       sure... its' that's all ... sure....

[WCCHDS-VD]     *IF YOU DO THAT, AND YOU TAKE CARE OF YOUR OF YOUR PROPERTY, THEN THESE COMPLAINTS WILL STOP, AND THE KNOCKING ON THE DOOR WILL STOP!*

PLAINTIFF     *um, regarding the complaints. many of my neighbors-*

[WCCHDS-VD]     *YOU SEEM LIKE AN INTELLIGENT GUY! YOU SEEM VERY INTELLIGENT! SO YOU GOTTO UNDERSTAND REASON. THAT IF YOU TAKE CARE OF YOUR PROBLEM, WE WON'T COME AROUND ANYMORE!* ·

PLAINTIFF     *i understand that, i completely understand that. ok-*

[WCCHDS-VD]     *SO, IF YOU'LL SIGN HERE, PLEASE, SIR! RIGHT NOW, PLEASE! BECAUSE, WE'RE GOING TO LEAVE!*

PLAINTIFF     *ok- i understand. i'm going to sign it, but i just want-to make it clear that I've been getting threats against myself, including having my head broken open! somebody said, i'll crack your head open, something like that. and also, um-*

[WCCD-Harrell]     *Here at your home?*

PLAINTIFF     *Yes, right here!*

[WCCD-Harrell]     *with all these cameras? do you have some evidence?*

PLAINTIFF     *Yes! I do have evidence of it- in fact i filed -*

[WCCHDS-VD]     *YOU CAN FILE A CLAIM AGAINST THAT INDIVIDUAL, HERE AT THE COURTHOUSE!*

PLAINTIFF     *Sure. well, its actually one individual... but there's also, multiple-*

[WCCHDS-VD]     *I'M NOT HERE TO TALK ABOUT THAT! BECAUSE I'M NOT A LAW-ENFORCEMENT OFFICER! ALRIGHT?! SO, IF YOU CAN JUST SIGN RIGHT THERE?!*

PLAINTIFF     *ok,*

[WCCHDS-VD]     *I'LL HOLD IT FOR YOU ... YOU SIGN AT THE TOP AND JUST PRINT YOUR NAME UNDERNEATH.*

**PLAINTIFF**     *Ok, let me just - let me just- i'll go ahead and sign it, i just want to bring my- just to make sure.*

【 PLAINTIFF TRIES TO FIND MISPLACED HANDHELD CAMCORDER TO TAKE PHOTOGRAPH OF SUCH WARNING-CITATION. 】

**PLAINTIFF**     *if i get-*

**[WCCHDS-VD]**     *HURRY! [???]*

**PLAINTIFF**     *yeah, i understand, i understand. i'm going to contact my mom about-*

**[WCCHDS-VD]**     *iS THE CAMERA WORKING ON YOUR HEAD?*

**PLAINTIFF**     *i'm sorry.*

**[WCCHDS-VD]**     *IS THE CAMERA WORKING ON YOUR HEAD?*

**PLAINTIFF**     *yeah, it is, why?*

**[WCCHDS-VD]**     *WELL, THEN - !*

**PLAINTIFF**     *no, yeah, i understand. i understand. no but the text of it- do you mind if-*

【 [WCCHDS-VD] and [WCCD-Harrell] refuse to speak to plaintiff's [MOTHER]. 】

**[WCCHDS-VD]**     *NO! I DON'T WANT TO DO THAT! I'M JUST GOING TO WRITE THAT YOU REFUSED TO SIGN!*

**[WCCD-Harrell]**     *[???]!*

**PLAINTIFF**     *no, no, no, actually- so, so! what i meant to say is, my mom is a - if i sign for something, shouldn't the co-owner of the property-*

**[WCCD-Harrell]**     *NO! ... NO!*

**[WCCHDS-VD]**     *NO! ... I JUST NEED YOU TO SIGN THAT YOU RECEIVED IT, AND I'LL GIVE A PIECE OF PAPER, AND I'M OUT-OF-HERE.*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

**PLAINTIFF**      *ok.*

**[WCCHDS-VD]**    *IF YOU DON'T SIGN IT RIGHT NOW, I'M JUST GOING TO SAY REFUSED TO SIGN.*

**PLAINTIFF**      *ok, ok, ok, and what is it by-the-way- i'm not saying that i refu- i'm going to sign it-*

**[WCCD-Harrell]**  *SID COME-ON! LIKE HE SAID! YOU KNOW, EXACTLY WHAT YOU'RE DOING RIGHT NOW, IS STALLING AND TRYING TO- JUST PROLONG THIS THING OUT-*

**[WCCHDS-VD]**    *YEAH...*

**PLAINTIFF**      *shh.. ok, ok, ok .... No, i'm not - i'm not stalling! i'm just -*

**[WCCD-Harrell]**  *EITHER YOU SIGN IT OR YOU'RE NOT GOING TO SIGN IT! BUT WE'RE NOT GOING TO SIT HERE AND ARGUE WITH YOU FOR ANOTHER 30 MINUTES ABOUT IT!*

〖 [WCCHDS-VD] FORCEFULLY SLAMS HIS PEN ONTO CLIPBOARD TO DEMAND/COERCE PLAINTIFF TO SIGN WARNING-CITATION: 〗

**PLAINTIFF**      *sure. ok. alright, oh after i sign it, like, can i just take a photograph of it?*

**[WCCHDS-VD]**    *YOU'RE GOING TO GET A COPY OF IT!*

**[WCCD-Harrell]**  *YOU'RE GOING TO GET A COPY OF IT!*

〖 PLAINTIFF REGRETS THE FACT THAT PLAINTIFF CANNOT FIND HANDHELD CAMCORDER: 〗

**PLAINTIFF**      *owwwww! ok.*

**[WCCHDS-VD]**    *YOU'RE NOT AGREEING TO ANYTHING, DO IT! YOU'RE NOT AGREEEING TO ANYTHING! YOU HAVEN'T AGREED TO ANYTHING! YOU HAVEN'T ADMITTED TO ANYTHING!*

**PLAINTIFF**      *ok.*

**[WCCHDS-VD]**    *YOU HAVEN'T AGREED WITH ME - YOU HAVEN'T SIGNED ON ANY CONTRACT. WHAT YOU'RE TELLING- WHAT I'M TELLING YOU IS THAT I HAVE NOTIFIED YOU THAT I BELIEVE THERE ARE VIOLATIONS OF THE LAW THAT YOU NEED TO TAKE CARE OF. AND YOU'VE RECEIVED THAT NOTIFICATION , AND THAT'S ALL YOU'RE SIGNING ABOUT!*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                                1696907690

**PLAINTIFF**        *ok. i understand. ok.*

〖 PLAINTIFF PAINFULLY SIGNS. PLAINTIFF'S EYES ARE FILLED WITH TEARS DUE TO MENTAL ANGUISH AND STRESS CAUSED BY SIGNING SUCH FORM: 〗

**[WCCHDS-VD]**      *ALRIGHT! ... Please put your name underneath.*

**PLAINTIFF**        *ok, now that I've signed it, let me just- before you take the carbon copy of that- sir, sir! you don't have to take the carbon copy!*

**[WCCHDS-VD]**      *THE CAMERA ON YOUR HEAD!*

**PLAINTIFF**        *No, the camera is not going to capture the text. so, that's what i'm saying. give me a second.*

**[WCCHDS-VD]**      *I'LL GIVE YOU 10 SECONDS.*

**PLAINTIFF**        *uh, ok! sir, i need to find my camera! sir, let me just find it - hold on a second! give me a second.*

〖 PLAINTIFF DESPERATELY SEARCHES FOR CAMERA: 〗

**[WCCHDS-VD]**      *[???] IT'S A NON-CARBON COPY, OF EXACTLY WHAT I WROTE.*

〖 [WCCHDS-VD] HANDS PLAINTIFF THE TORN-COPY : 〗

**PLAINTIFF**        *Like i said, Like i said, sir.*

**[WCCD-Harrell]**   *YOU CAN DO AN OPEN-RECORDS REQUEST! AND GET ANOTHER COPY LATER.*

〖 [WCCHDS-VD] :STARTS WALKING AWAY FROM PLAINTIFF: 〗

**PLAINTIFF**        *now that, I've signed it- I've cooperated. can i just please get a minute with you, i just want to explain my side of the situation!*

**[WCCHDS-VD]**      *I DON'T NEED TO HEAR YOUR SIDE OF THE SITUATION, SIR! I'VE ALREADY HEARD QUITE A BIT FROM YOU! AND I UNDERSTAND WHERE YOU'RE COME FROM. BUT I'M GONNA TELL YA THAT YOU'RE NOT IN COMPLIANCE WITH WHAT THE NEIGHBORHOOD IS REQUIRING YOU TO DO, IN ORDER TO OWN THIS PROPERTY!*

**PLAINTIFF**        *ok, first of all, let me-*

SIDDHARTH  KODE   V.   WILLIAMSON  COUNTY , ET  AL.                    1696907690

[WCCHDS-VD]     YOU AND YOUR MOTHER ARE IN VIOLATION CAUSE YOU'RE NOT COMPLYING WITH THE HOMEOWNERS ASSOCIATION BY-LAWS THAT YOU AGREED TO WHEN YOU BOUGHT TO PROPERTY!

PLAINTIFF      sure, what i mean to say-

[WCCHDS-VD]     MAKE SURE THAT - DON'T VIOLATE ANY HEALTH-AND-SAFETY-CODE. AND YOU'LL BE OK!

PLAINTIFF      i understand that.

[WCCHDS-VD]     ALRIGHT! THAT'S IT! HAVE A GOOD DAY!

PLAINTIFF      ok, let me. alirte, um- sir, may I have a card!

[WCCHDS-VD]     YOU HAVE A CARD!

PLAINTIFF      actually, I don't know where i kept it, could you please-

[WCCHDS-VD]     OK, READY! ... THERE YOU GO!

PLAINTIFF      um yes, hold on a second. sir, do you happen to know where i left my camera?

[WCCHDS-VD]     NO SIR, I SURE DON'T!

PLAINTIFF      Alright, thank you.

• 
• 
• 

**[[[TRANSCRIPT INCOMPLETE: TO BE COMPLETED]]]**

• 
• 
• 

〖 PLAINTIFF NOTICES ON SECURITY-CAMERA-FOOTAGE THAT AFTER LEAVING PLAINTIFF'S PROPERTY, [WCCHDS-VD] WOULD CRACK JOKE(S)- 〗
〖 -ABOUT PLAINTIFF, AND [WCCD-Harrell] LAUGHS-OUT-LOUD, ALMOST UNCONTROLLABLY - AS THEY BOTH THOROUGHLY ENJOYED- 〗

〖 –VIOLATING PLAINTIFF'S RIGHTS. SHORTLY AFTER, PLAINTIFF NOTICES RACKETEER-CO-DEFENDANT [KAP] APPROACH [WCCD-Harrell]– 〗
〖 –AND BOTH [KAP] AND [WCCD-Harrell] BRAZENLY CONSPIRE AGAINST PLAINTIFF FOR UP TO 35 MINUTES, DESPITE THE FACT– 〗
〖 –THAT BOTH RACKETEERS [KAP] AND [WCCD-Harrell] HAVE FULL KNOWLEDGE THAT PLAINTIFF'S SECURITY-CAMERAS ARE RECORDING– 〗
〖 –SUCH CONSPIRACY. AT THE END OF SUCH CONVERSATION, [KAP] EITHER REQUESTS OR DEMANDS PRIVATE INFORMATION FROM ALL– 〗
〖 –OF [WCCD-Harrell]'S MALICIOUS AND ILLEGAL SEARCHES OF PLAINTIFF'S PRIVATE-PROPERTY DATING BACK TO {2017}. 〗
〖 –[WCCD-Harrell] COMMITS ADDED CRIME OF MISUSE-OF-OFFICIAL-INFORMATION BY PROVIDING A HUGE STACK OF PAPERS WITH SUCH– 〗
〖 –PRIVATE/CONFIDENTIAL INFORMATION TO [KAP], FURTHER REVEALING THE BRAZENNESS OF THE RACKETEERS IN THIS RACKETEERING– 〗
〖 –ENTERPRISE AGAINST PLAINTIFF. [KAP] RETURNS TO HER HOUSE WITH SUCH HUGE STACK OF INFORMATION CONTAINING SUCH– 〗
〖 –PRIVATE/CONFIDENTIAL INFORMATION ABOUT PLAINTIFF. [WCCD-Harrell] LEAVES PROPERTY APPROXIMATELY 45 MINUTES AFTER– 〗
〖 –TALKING TO PLAINTIFF, THUS MALICIOUSLY MAKING A FRAUDULENT STATEMENT TO PLAINTIFF, STATING THAT THEY NEEDED– 〗
〖 –TO GET TO OTHER PHONE-CALLS ABOUT OTHER PROPERTIES, INSTEAD SPENDING APPROXIMATELY 35 MINUTES MALICIOUSLY CONSPIRING 〗
〖 –AGAINST PLAINTIFF WITH RACKETEER-CO-DEFENDANT [KAP]. PLAINTIFF IS LEFT WITH EXTREME MENTAL-ANGUISH FROM THIS INCIDENT– 〗
〖 –AS RETALIATION, ESPECIALLY FROM A GOVERNMENT AND/OR [HOA], ACTING ON BEHALF A MALICIOUS PRIVATE-CITIZENS IS EXTREMELY 〗
〖 –DIFFICULT TO COMPREHEND AND ACCEPT. PLAINTIFF ASSERTS THAT ALL OF [WCCD-Harrell]'S INTERACTIONS WITH RACKETEER-CO– 〗
〖 –DEFENDANT [KAP] DURING THIS INCIDENT SHOULD BE CAPTURED BY [WCCD-Harrell]'S BODY-WORN-CAMERA RECORDING, UNLESS 〗
〖 –[WCCD-Harrell] FURTHER OBSTRUCTED-JUSTICE AGAINST PLAINTIFF BY MALICIOUSLY TURNING OFF SUCH BODY-WORN-CAMERA WHILE 〗
〖 –INTERACTING WITH RACKETEER-CO-DEFENDANT [KAP]. 〗

## ¶502

On or about the approximate date and approximate time of {2020-05-01 20:42}, [JSP] approaches the security-cameras located at the side of the plaintiff's [HOUSE] and angrily issues the obscene/vulgar gesture of his middle-finger raised to one-or-more of such security-camera(s), overwhelmingly reaffirming to the plaintiff, yet again, that all of the [WCLE]'s predatory actions against the plaintiff - including the most recent predatory actions a few days earlier - were instigated purely by the extreme-racial-animus of [JSP&KAP] (and co-conspirator [RSR]) against the plaintiff, who have repeatedly summoned [WCLE] to act in such modern-day-Jim-Crow, brazenly-retaliatory manner against the plaintiff for the plaintiff's *"audacity"* to report (to [WCLE]) their more-direct racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses committed against the plaintiff.

## ¶503

On or about the month of {2020-05}, [RSR] is sued in a court of [WC] by a financial-institution/creditor/lender. Although the plaintiff has not reviewed such court documents, nor the evidence, nor the allegations made in such lawsuit (since, to the best of the plaintiff's knowledge, defendant [WC] does not make such Court documents available online for download), the plaintiff has strong reason to believe that [RSR] was sued due to non-payment(s) or inadequate-payment(s) of contractual debt owed to such petitioner financial-institution/creditor/lender. The plaintiff highlights this issue because [RSR] has been publicly and fraudulently accusing the plaintiff, in the most brazen, defamatory (⊕ ) and privacy-invading manner, of contractual violation(s) of restrictive-covenants even within private areas of the plaintiff's private-property (such as the [BACKYARD]), all-the-while, pretending as if she, herself, is a model citizen that follows all of the rules/laws/contracts of society, which as this lawsuit tries to document, is purely-racist fraud. A substantial part of this lawsuit is thus dedicated to exposing every aspect of the malicious, racially-motivated fraud that [RSR] was perpetrating against the plaintiff (for over a decade).

## ¶504

On or about the approximate date and approximate time of {2020-05-05 10:00}, the plaintiff meets with hauling contractors (a crew of three people) at the plaintiff's property to show such hauling contractors the materials that needed to be transported from the plaintiff's (residential) property, [788KLLTX78641], to the plaintiff's agricultural-private-property - since once again, none of such materials were waste of any kind, and the plaintiff, the owner of such material(s) - and not the government - is the sole determiner of the value of such item(s). (Additionally, the plaintiff was willing to spend significantly more money to have those materials transported to another property as opposed to having those materials sent to the landfill, which further indicates that the plaintiff placed sufficiently high value on all of such material(s), never to be considered waste of any kind.) The plaintiff allowed the hauling contractors to enter into the plaintiff's [BACKYARD] in order to review and take-inventory of the items that needed to be transported. While such contractors were doing this task, the plaintiff is taking photographs of the [FRONTYARD] from multiple angles across the street - something that the plaintiff has routinely done once or twice a month, in-order-to protect the plaintiff from potentially predatory and/or malicious actions from the [HOA]. As the plaintiff is taking a photograph, [RSR] approaches from her house, accosts the plaintiff, and while behind the plaintiff, angrily yells at the plaintiff, *"WHY DON'T YOU JUST MOVE!"*. The plaintiff briefly looks back in the direction of [RSR], and she continues, *"IF YOU CAN'T FOLLOW THE RULES, JUST MOVE!"* Once again, [RSR] uses the word *"cannot"*, inadvertently, but actually honestly, indicating very clearly that the plaintiff is not guilty of any wrongdoing; clearly, the plaintiff cannot be held legally responsible (liable) for any action(s) that the plaintiff *"cannot"* do. (Once again, if the plaintiff is *"unable"* or *"incapable"* of maintaining the plaintiff's property according to White-American standards, then, indisputably, that *"inability"* is a clear indication that the plaintiff has never committed any crime when it comes to the these ethnocentric property-maintenance laws, or at the very least, the abusive interpretation and/or abusive enforcement of such property-maintenance laws.) After a decade of racist abuse suffered by the plaintiff at the hands of [RSR], at this point in time, the plaintiff knows better than to dignify [RSR]'s racist and fraudulent narratives against the plaintiff with a response. Thus, the plaintiff does not respond to [RSR]'s racist and fraudulent statements, although [RSR] continues, entirely unprovoked, to fraudulently state to the plaintiff, *"[CAUSING ALL SORTS OF PROBLEMS] FOR YOUR NEIGHBORS [???], CAUSE OF RATS! [???]! PESTS! ... "* Once again, [RSR] lives across the street from the plaintiff and has thus never had any valid legal claim against the plaintiff; so, [RSR] must fraudulently refer to plaintiff's next-door-neighbors (including her malicious, racketeer co-conspirators [JSP&KAP]), instead of herself, as the so-called *"victims"* of the plaintiff. The plaintiff ignores all of [RSR]'s fraudulent statements and, after taking the necessary photographs, walks back towards the plaintiff's property. One of the hauling contractors, the chief of such crew, explained to the plaintiff, that the plaintiff would need to agree to remove a fence-panel and allow such hauling contractors to drive a truck and/or trailer (in reverse direction) over the plaintiff's relatively-new *"no-mow"* grass, so that such materials could be more easily and efficiently transported from the [BACKYARD] onto such truck. While the chief was speaking to the plaintiff, [RSR] who had been monitoring all of the activity on the plaintiff's property, approaches two of the other hauling contractors on the street, indisputably to start manipulatively backstabbing and badmouthing the plaintiff - as the chief would later confirm (see below). The plaintiff has noticed that [RSR] seems to have summoned even another of her co-conspirators, an unidentified White-American woman, [UWAW-6], to also speak derisively and angrily against the plaintiff to such contractors, so as to collectively shame them for assisting the plaintiff, who again, due to the plaintiff's racial-profile was not worthy of any such assistance - again, just one more of [RSR]'s countless and egregious [FHA]/[TFHA] violations against the plaintiff. If this Court grants the plaintiff the opportunity to litigate this case, the plaintiff would seek to depose and/or cross-examine this particular witness, [UWAW-6]. Although the hauling contractors were ready to perform such work on that particular day, at least at that moment in time, the plaintiff was not in the least bit agreeable to either of those aforementioned conditions stated by the chief, and let the chief know that the plaintiff will think about their offer and let them know if the plaintiff seeks to continue with their services at some point in the future. The chief returns to the other two hauling contractors on the street, who are still speaking with [RSR], and at that moment

in time, [RSR] then even begins to speak derisively about the plaintiff with the chief. This is, at the very least, the second time in which the plaintiff has summoned/hired contractors to the plaintiff's property, and [RSR], like the mafia-godfather of the neighborhood, has, yet again, found the audacity to approach the plaintiff's contractors, as if to show them that she is the real boss of the neighborhood, at the very least, when it comes to any issue involving the plaintiff. After [RSR] continues to speak with such crew for a relatively shorter amount of time, the hauling contractors leave the plaintiff's property, and the plaintiff enters back into [HOUSE], having already finished some landscaping work in the [FRONTYARD]. The plaintiff would speak with the chief of such crew over the phone either later on that same day or on a following day, and the chief informs the plaintiff that [RSR] was, indeed, viciously badmouthing the plaintiff, that [RSR] was *"telling everybody"* that, all of the plaintiff's bills are paid for by the plaintiff's parents, and that the plaintiff lives off-grid without water (utility) service. The chief informs the plaintiff that he had to request [RSR] to leave him and his crew alone, as any-and-all of [RSR]'s spiteful allegations regarding the plaintiff had absolutely no influence on the plaintiff's right to hire such contractors, and furthermore, that [RSR] had no business in interfering with the plaintiff or such contractors in such predatory manner. The plaintiff emphasizes such extreme-racial-animus that [RSR] has exhibited against the plaintiff for over a decade at this point - that all of [RSR]'s animus against the plaintiff had absolutely nothing to do with the allegedly *"non-conformant"* manner in which the plaintiff was maintaining the plaintiff's private-property, but rather, that [RSR] did not believe that the plaintiff - whom, solely due to the plaintiff's racial-profile, [RSR] has always considered to be a low-IQ, powerless, subhuman animal - was worthy of any rights, let alone the right to private-property-ownership, especially within *"their"* (exclusive-and-pure) White neighborhood (🏡) . Despite the fact that [RSR] was previously warned by at least two-or-more other resident(s) of the subdivision (during two-or-more separate incident(s)) that she is violating the plaintiff's rights, [RSR] brazenly continues, unfazed, in such extremely-manipulative and malicious action(s) against the plaintiff.

## ¶505

On or about the approximate date and approximate time of {2020-05-09 08:00}, [JSP] enters the side-yard of [784KLLTX78641], picks up a few small pieces of debris from such side-yard and throws it into the plaintiff's property (right in front of one-or-more of the plaintiff's security-cameras). [JSP] then opens the tap and begins to use a hose to water the front-yard-grass of [784KLLTX78641]. Approximately 15 minutes later, an unidentified White-American woman, [UWAW-5], walks up the sidewalk, looking at the plaintiff's yard-signs as she continues walking up the sidewalk. Then, [UWAW-5] greets [JSP], and starts a very brief conversation about the plaintiff - as if, by looking into the plaintiff's yard-signs, [UWAW-5] was able to get a sufficient picture of who the plaintiff was. [JSP] engages in the same relentlessly-racist propaganda against the plaintiff, once again painting the plaintiff as a crazy person, because according to [JSP], [UWAW-5] and many of the other right-wing residents of the neighborhood, any person-of-color that has yard-signs that state anti-White-Supremacist language like *"Make Racism Wrong Again"* and *"Tax the Rich"* is crazy and/or worthy of scorn and humiliation. [JSP] states to [UWAW-5], words-to-the-effect of *"Very unusual person! ... Wish he would go away!"* [UWAW-5] laughs, responds *"Yeah, I bet!",* and continues walking up the sidewalk. If this Court grants the plaintiff the opportunity to litigate this case, the plaintiff would seek to depose and/or cross-examine this particular witness, [UWAW-5]. A common theme expressed in this lawsuit is that the predatory-actions of racial-oppression and racketeering-activity that the plaintiff has directly suffered from the defendants would not have been made possible if not for the subtle, implicit racism that exists within at least some fraction of the neighborhood - the existence of such subtle racism within the neighborhood making the overall environment more hospitable to the more-overt predatory racism directly suffered by the plaintiff at the hands of the defendants.

## ¶506

Since the plaintiff was not in the least bit agreeable to removing the aforementioned fence-panels to complete the hauling work, the plaintiff shortly contacted other hauling-contractors since such other hauling-contractors were willing to perform such work without the need for such fence-panel-removal. On or about the date and approximate time of {2020-05-09 10:30}, such hauling contractors arrive at the plaintiff's property, reversing their hauling-trailer onto the plaintiff's [DRIVEWAY]. The plaintiff would instruct such hauling-contractors on the work that needed to be performed, allowing such contractors into the plaintiff's private [BACKYARD], and showing them exactly the materials and/or types of materials that needed to be hauled to the plaintiff's agricultural-private-property. The plaintiff specifically instructed such contractors not to remove certain items, because such items were the result of [JSP]'s malicious vandalism of the plaintiff's property in the prior incident from {2020-03-24} - see previous incident above. The plaintiff also instructed such contractors to stay within the borders of the plaintiff's property as a result of the fact that the plaintiff has hostile neighbors with extreme-racial-animus against the plaintiff, [JSP&KAP] - especially since [RSR] had yelled at the plaintiff's other (Hispanic) contractors for even briefly entering into the border-area (side-yard) of [JSP&KAP]'s property. Since almost all of the materials stored in the plaintiff's [BACKYARD] that needed to be hauled to the plaintiff's agricultural-private-property were relatively light-weight, one of the contractors stayed inside of the [BACKYARD] handing over each and every one of such items over the plaintiff's fence to the other contractor in the plaintiff's side-yard as they continued to collectively load such items into the hauling-trailer. While such hauling-contractors were performing such work, the plaintiff was also loading the plaintiff's own vehicle with the aforementioned, sealed compost-buckets, since such sealed compost-buckets required more care in-order-to avoid spilling of such contents (which may have occurred within such hauling-trailer). After filling up such hauling-trailer with one full load of items to be transported to the plaintiff's agricultural-private-property, such hauling-contractors would drive over to the plaintiff's agricultural-private-property, where the plaintiff would meet with such hauling-contractors again to begin the process of unloading all of such items. After filling the plaintiff's vehicle full of one full load of such compost buckets, the plaintiff would drive over to the plaintiff's agricultural-private-property, where the plaintiff would meet with such hauling-contractors again to begin the process of unloading all of such items. During this particular incident, the plaintiff spent approximately $500 (in material and labor costs), and approximately 4 hours of the plaintiff's own time, to haul these items from the plaintiff's residential property to the plaintiff's agricultural-private-property - solely due to the predatory demands of defendants [JSP&KAP], [RSR], [WCCO] and [WCCHD] - who had maliciously demanded that the plaintiff dispose of all such items stored entirely within the confines of the plaintiff's private-property to the landfill - when, as the plaintiff had already tried to explain to the defendants, such items were intended for the plaintiff's agricultural use, and furthermore, that the defendants never had any right to determine what items are *"of value"* to the plaintiff and what items are considered to be *"waste"* (of any kind) to the plaintiff. There was substantial rainfall during the preceding days, and the soil on the plaintiff's agricultural-private-property may have been saturated with such rain, thus making such hauling work deep-into the plaintiff's agricultural-private-property potentially hazardous. The plaintiff, left with no choice by the predatory demands and deadline imposed by the defendants, performed such work during a non-ideal time of the year, despite of the potential hazards of driving all of these materials deep into the plaintiff's agricultural-private-property - where both of such vehicles and/or hauling-trailer could easily have become stuck on such wet soil - thanks, in large part, to the willingness, acceptance and skills of such hauling contractors. Unlike malicious neighbors [JSP&KAP],[RSR], whom the plaintiff never observed wearing a face-mask during the entire COVID-19 pandemic, both the plaintiff and at least one of the plaintiff's hauling contractors were wearing face-masks, despite of the discomfort of wearing face-masks during such labor-intensive work, because of the fact that the plaintiff and the plaintiff's contractors rightfully considered the COVID-19 pandemic to be a serious threat to human health and safety. On at least two other subsequent days during the month of {2020-05}, the plaintiff would spend a total of approximately 12 hours of the plaintiff's own exhausting labor (especially given the small physical-stature and very-limited-

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

strength of the plaintiff), make a total of three total trips - hauling well over three trailer loads full of materials - along with compost buckets (within the plaintiff's own vehicle), from the plaintiff's residential property to the plaintiff's agricultural-private-property - with the total cost of such trips (material and labor) estimated to be approximately $1,300. It is important to note that, due to the County-wide and/or state-wide partial or full lockdown measures resulting from the COVID-19 pandemic, all residents including [JSP&KAP],[RSR] were forced to stay at home during most, if not all, of these particular periods of time. Additionally, while the plaintiff was performing most of this hauling work with the help of such hauling-contractors, the plaintiff witnessed both [JSP&KAP]'s and [RSR]'s respective vehicles in the driveways of their respective properties - meaning that they were at their properties fully aware of the plaintiff's diligence in attending to this matter. Therefore, [JSP&KAP] and [RSR] were fully aware, along with their co-conspirator defendants [WCLE], that the plaintiff expended all of this additional labor-intensive work, spending all of this additional money, hauling such huge amounts of agricultural materials away from the plaintiff's residential property and onto the plaintiff's agricultural-private-property. In particular, the plaintiff had cleared out the storage of all such agricultural items within the plaintiff's [BACKYARD] near the borders of all surrounding properties, and had placed all remaining items on shelves and/or above ground level - at sufficient distance from neighboring properties - as advised by a previous employee [WCCHDTL-SG] in a previous incident from {2013} (see above) - with the only exception being any-and-all items angrily hurled by [JSP] in the aforedescribed brazen acts of vandalism against the plaintiff (as the plaintiff did not want to alter such crime scene). Despite of their awareness of the plaintiff's diligence in attending to this matter - which was never a crime to begin with - both [JSP&KAP] and [RSR] would still maliciously conspire with [WCLE] in-order-to fully exploit this time-sensitive limited-and-short window-of-opportunity of vulnerability against the plaintiff in-order-to retaliatorily charge and prosecute the plaintiff for Class-C-Misdemeanor-Public-Nuisance as the following incidents from all of the year {2020} and almost all of the year {2021} would continue to reveal - with all of these criminally-abusive retaliatorily actions taken as part of the defendants' larger conspiracy and scheme to evict the plaintiff, an immigrant-of-color/indigenous-person, out of *"their"* (exclusive-and-pure) White neighborhood.

## ¶507

On or about the approximate date and approximate time of {2020-05-20 20:45} (near nighttime), [JSP] angrily kicks some small pieces of debris on the side-yard of [784KLLTX78641] onto the side-yard of the plaintiff's property [788KLLTX78641]. [JSP] then, in the process of mowing the grass on his property, also unlawfully enters deep into the plaintiff's property with such lawnmower to mow, at the extremely low-height of less than 2-inches, significant part (approximately 100 square-feet or more) of the plaintiff's *"no-mow"* grass despite of the fact that temperatures are starting to rise to intense-summer-heat-and-drought conditions during this moment in time, and despite of his knowledge that such *"no-mow"* grass is not intended to be mowed, and despite of the fact that he knows that there is no automatic-sprinkler-system on the plaintiff's property (as a direct result of the plaintiff's relandscaping during the prior year of {2017}) to repair the irreparable damage done to such grass caused by such particularly-destructive mowing. [JSP] also intentionally mows only part of the plaintiff's *"no-mow"* grass to such destructively-low height, leaving the rest of the plaintiff's *"no-mow"* grass at regular/fully-grown height, thus in his malicious attempt onto draw the [HOA]'s attention to the plaintiff's uneven [FRONTYARD] grass (even though the restrictive-covenants of the neighborhood do not specify any requirement for evenness of grass). The following morning, the plaintiff frantically spends almost an hour watering the mowed area with water in-order-to at least reduce the damage done to such *"no-mow"* grass. (When fully-established and grown to its full-height, such *"no-mow"* grass requires only very-minimal watering during the extreme-drought-period of the hot-summer-months.) [JSP], after the aforedescribed lawnmowing, approaches one-or-more of the plaintiff's security-camera(s) and uses a torch-light to shine such light directly into the lens of

such security-camera(s), again, in one more of his repeated attempts to permanently *"blind"* such security-camera(s) and/or destroy the night-vision circuitry and functionality of such security-camera(s).

## ¶508

On or about the approximate date and approximate time of {2020-05-31 10:40}, [RSR]'s unleashed large-dog, [L], runs across the street towards the plaintiff's [FRONTYARD], enters into the plaintiff's [FRONTYARD] *"no-mow"* grass and even urinates on such grass - just one of many occasions when [RSR] has, in clear violation of the neighborhood's restrictive-covenants, allowed her unleashed large-dog to cross the street and enter into and/or near the plaintiff's [FRONTYARD], despite of the fact that there is also a [CTW] issued to [RSR] forbidding [RSR] from stepping onto the plaintiff's property (see above), should [RSR] need to retrieve such dog from the plaintiff's property. On or about the same date and approximate time of {2020-05-31 13:05}, another resident walks a pet-dog down the sidewalk, while, [RSR]'s unleashed large-dog, [L], rushes towards such resident-and-dog. Such resident is alarmed by [RSR]'s large dog, [L], and recognizing the possibility for injury to his pet-dog, frustratingly picks up his pet-dog, and continues carrying his pet-dog at least until [L] runs in other direction(s) and thus, no longer poses a threat. This incident is just one of multiple incidents where other resident(s) - not even the plaintiff - are truly concerned and/or aggravated by [RSR]'s routinely-reckless actions of leaving her large dog, [L], not only unleashed, but roaming freely even onto the opposite side of the street.

## ¶509

During the nationwide {summer-2020} mass social-justice, anti-racism and anti-police-misconduct protests (from the end of the month of {2020-05} through {2020-08}) the plaintiff would notice one-or-more social-media posting(s) on the *"nextdoor.com"* social-media-platform for the 〖Summerlyn〗 subdivision, in which the poster and/or responder(s) made disparaging comment(s) about such social-justice protesters - and at least some of which the plaintiff describes as racist. It would appear to the plaintiff that one-or-more of these disparaging social-media posting(s) were removed by moderators of such social-media-platform due to being offensive and/or insensitive. These message(s) would be just one of many emails/social-media-messages that would serve as a painful reminder to the plaintiff that racial-bias, or at the very least, the widespread use of racially-insensitive language - if not overt, then at least subtle - is alive-and-well within the neighborhood. It is within this backdrop of subtle racism existing within the 〖Summerlyn〗 subdivision that the plaintiff has suffered the more-overt predatory racism of the defendants - the existence of subtle racism within the neighborhood making the overall environment more hospitable to the more-overt predatory racism directly suffered by the plaintiff at the hands of the defendants.

## ¶510

On or about the date and approximate time of {2020-06-04 17:49}, [RSR] deliberately and brazenly steps onto the plaintiff's [FRONTYARD]-grass, once again, as if to show the plaintiff that she did not care about the [CTW] that was issued to her against the plaintiff's property on or about the date of {2011-08-30}, due to the racketeering-enterprise consisting of [RSR],[JSP&KAP],[WCLE]. [RSR] continues to criminally-trespass many feet into the plaintiff's property on her way to visit her co-conspirators [JSP&KAP] at [784KLLTX78641]. This time, the plaintiff did choose to report the crime immediately to the [WCLE], since the plaintiff's failure to report these crimes could also result in escalating crimes committed by [RSR] against the plaintiff. The plaintiff first made a phonecall to the [WCSO] police-dispatch describing the criminal-trespass. The plaintiff was instructed that the plaintiff would receive a phonecall back from a [WCSO] police-officer. The plaintiff did

receive a call a few minutes later, tried to pickup the call, but the call seemed to have dropped and/or the plaintiff missed the call by failing to answer in time. So, the plaintiff called the same number back to continue reporting the crime to [WCSD] Conner [WCSD-C]. Within five minutes of the end of this phonecall, the plaintiff would hear [RSR], who was in the backyard of [JSP&KAP]'s property, [784KLLTX78641], angrily and very-loudly, shout at the plaintiff, *"ASSHOLE!"* It is abundantly clear from this sequence-of-events that after [WCLE] informed [RSR] that the plaintiff had made a criminal-trespass complaint against [RSR], further indicating that the plaintiff had evidence of such criminal-trespass, [RSR] retaliates and/or engages in witness-intimidation against the plaintiff by shouting that vulgar insult at the plaintiff - so, as if to deter and/or intimidate the plaintiff from continuing to serve as a witness of such crime.

> ▶ RECORDED PHONECALL BETWEEN PLAINTIFF AND [WCSD-C] (⊢) : {2020-06-04 18:00} (~)
> ▶ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]
>
> 〖 PLAINTIFF MAKES PHONECALL TO SAME NUMBER OF DROPPED/MISSED CALL FROM [WCSD-C] A FEW SECONDS AFTER DROPPED/MISSED CALL: 〗
>
> **[WCSD-C]**   *Hi, this Deputy Conner calling from the Williamson County Sheriff's Office.*
>
> **PLAINTIFF**   *Um Hello, I received a call from this number - um in particular regarding an incident that I reported I guess... Um, wanting to know if I'm calling the right place?*
>
> **[WCSD-C]**   *Yes Sir - what's going on?*
>
> **PLAINTIFF**   *Oh, Right - So, reported it about 10 minutes ago. So, basically there's a criminal-trespass-warning issued to an individual - a neighbor in my subdivision where I live, and so, that individual happened to violate that trespass warning by stepping on my - on the property.*
>
> **[WCSD-C]**   *ok, when was this trespass warning issued?*
>
> **PLAINTIFF**   *Um ... why does it expire after a certain amount of time, or?*
>
> **[WCSD-C]**   *No, I'm just trying to find it in our system.*
>
> **PLAINTIFF**   *Oh, ok. Yeah, Its {2011}.*
>
> **[WCSD-C]**   *{2011}?*
>
> **PLAINTIFF**   *Correct ... Um, If I... it's in August of {2011}. End of August - so, it's August 20th - I mean 20 something.*
>
> **[WCSD-C]**   *Ok, yeah, I just having to find it... Did you happen to get her on camera?*

SIDDHARTH  KODE     V.     WILLIAMSON  COUNTY ,  ET  AL.                    1696907690

**PLAINTIFF**        *Yes. Yes. Yes. I did.*

**[WCSD-C]**         *Ok. Ok. Um... Where is she at right now?*

**PLAINTIFF**        *Do not know. Um. most likely in 1 of 2 properties - um, she basically stepped on the property on the way to another property - so, i'm guessing she might be on that property, or she might be in the property where she resides - her property.*

**[WCSD-C]**         *Ok, she stepped on your grass, when she was going to your neighbor?*

**PLAINTIFF**        *Correct. Yes - right, that's not - I wouldn't say it's like a major infraction. I mean, but it's still a violation of the criminal trespass - and, you wanna, at the very least, wanna let the individual that she is not permitted to step on the property.*

**[WCSD-C]**         *Yeah, I can get in contact with her, for sure. I'll give her a call - i'm just trying to verify that you have it actually given in our system. I'm just waiting on that... I do... I have her phone number, her name is Rebecca - right - Robertson?*

**PLAINTIFF**        *Correct.*

**[WCSD-C]**         *Ok. Yeah, I can give her a call - and let her know that she um... when's the last time she went on your property?*

**PLAINTIFF**        *Um, you mean, when I noticed the criminal trespass occurred? Is that correct?*

**[WCSD-C]**         *Um - any um. yeah, when the criminal trespass warning - between then and now, has she been allowed to step foot on your property?*

**PLAINTIFF**        *No, I mean - my understanding of what a criminal trespass is that - once the criminal trespass is issued to an individual - they're not allowed to step foot on that particular property.*

**[WCSD-C]**         *Well, let take one step back... I'm actually not showing CTW for your property for her - do you have the paper work?*

**PLAINTIFF**        *um, well, I would have to find it - i mean, it's 11 - um, 9 years ago. um, but um.. it should be there. the deputy when they issued it, if i recollect correctly, she refused to sign it. But, its nonetheless still valid - the deputy issued it to her, there's a carbon-copy that the deputy took back, with um, to the Williamson County Sheriff's Department. So, I'm assuming that um, they did, um, still have it on copy - on file there.*

**[WCSD-C]**

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.

So, I don't have it - So, if you can find that piece of paper... I mean, at this point, its not in the system... So, I can make contact with her, and let her know that you dont want her on that property, and then, if you have her cross again, can give her another trespass warning... but, i'm going to give her a call.

**PLAINTIFF**   If you could just... Are you sure that you checked {2011}, August of {2011}? Because that's pretty much.

**[WCSD-C]**   Yes sir, I checked her name, and I checked your property. It's not in our system.

**PLAINTIFF**   Ok, .... hmmm....

**[WCSD-C]**   So, if you can find it, we can always issue another one. if she crosses onto your property and I, [???] its not an issue. But I'm going to make contact with her - If I can't get her by phone - I'll come look for her, so I can at least tell her that you don't want her on your property - um, and if she comes there again, she's going to get another criminal trespass warning issued - and we'll go from there... has she made any threats to you or anything like that?

**PLAINTIFF**   Well, she's been repeatedly harassing me over the years - um, you know, I mean, basically by coming over to the street and constantly, you know, initiating some sort of, um, you know, not - if not, physical threats or anything - but just threat - just animosity, and just anger towards me - basically, over the years. It's been continuous since, since forever - I mean since I've lived here.

**[WCSD-C]**   Yeah, so, if you see her on your property again - obviously call us...

**PLAINTIFF**   right.

**[WCSD-C]**   but i'm going to give her a call. We'd have to come out and look at the property line - the grass line - and because, in your neighborhood, the grass is connected... so, there's a whole lot of factors that go into this.

**PLAINTIFF**   right.

**[WCSD-C]**   so, if she clearly is onto your property, and coming up to your residence. versus her crossing over on the grass. that might be part of the neighbor's yard. So, i'm going to get in - make contact with her, and let her know to not step anywhere into your residence.n

**PLAINTIFF**   right.

**[WCSD-C]**   and if there's any issues from there - i'll give you a call back. if you wanna... I would look for that paperwork. unfortunately i'm sorry, I don't know if it wasn't put in the system or whatnot. but i have to honor what we have in the system.

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.

**PLAINTIFF**    right. right. So, I understand. So, it's possible that like I said, that I might still be able to find it. But it's just probably um, in a file somewhere... um, and so, so basically, can I just confirm, so basically - there's basically there's a strip of grass, in front of the sidewalk, obviously, that's sort of public-property that property-owners still maintain. But there's actually the main part of the grass that's inside the sidewalk area - into the property itself - that's still considered private property - correct?

**[WCSD-C]**    if she stepped on your grass - not the grass on the outside of the sidewalk where its private - or its public property... if she stepped onto your grass, clearly onto your grass, because yall houses are close together, and your neighbor's grass connects to your grass. and there's no clear property line. then yes, that is trespassing. but we'd have to look at video footage - if she stepped one foot onto your grass.... I mean that's not a very good case.

**PLAINTIFF**    right... right... oh, yeah she stepped more than 1 foot - she stepped... right, right, I understand. no, she stepped about 10 feet into the property - she basically just crossed 10 feet - um through the property, um ..

**[WCSD-C]**    yeah... yeah yeah yeah yeah, so it's clear...

**PLAINTIFF**    right, so... it's pretty clear that she stepped onto our property. Yeah, like I said-

**[WCSD-C]**    Ok...

**PLAINTIFF**    its the inner grass - not the, not the public grass in the - beyond the sidewalk, but the inner grass.

**[WCSD-C]**    right... the inner grass. so, let me contact with her. i'm going to give her a warning, but if there's any other issues, then we'll get back to you - but just try to find that paperwork. but if not...

**PLAINTIFF**    right...

**[WCSD-C]**    if not, then when you see her on your property, contact us. and we'll come issue a criminal trespass warning for her.

**PLAINTIFF**    Ok. Alright. Sounds Good, then. Appreciate it.

**[WCSD-C]**    Alright, thank you sir. You too. Bye. Bye.

**PLAINTIFF**    Thanks. Bye.

〖 PHONECALL ENDS 〗

# ¶511

Given the violent history of policing in the United States (of which people-of-color indisputably suffer the most), the plaintiff does not dare to show any anger when speaking to police officers, but the plaintiff was absolutely indignant by the end of this phonecall:

01. There is no second warning for a criminal-trespass. The whole point of a [CTW] is that, if a person who has been issued a [CTW] violates the [CTW] at any time after the [CTW] is issued, that is an automatic-charge-and-prosecution for criminal-trespass. The law is crystal-clear on this issue, and there are no exceptions to this rule that the plaintiff is aware of. So, for [WCSD-C] to claim that [RSR] would be issued a [CTW] the next time (after this incident) that she trespasses onto the plaintiff's property, is in effect, letting the plaintiff know that [RSR] actually has at least 3 free-passes to unauthorized-trespass onto the plaintiff's property without facing any penalty even if the plaintiff has video of all three unauthorized-trespasses. Again, this is not the nature of the law - there are no multiple warnings, or multiple free-passes given for criminal-trespass.

02. After [WCSD-PP] illegally forced the plaintiff to sign a [CTW] back in {2011-08-30} - and in doing so, committed various Abuse-Of-Office/Intimidation/Interference crimes against the plaintiff - all on the promise that [WCSD-PP] would issue a [CTW] to [RSR] as well, the plaintiff was expecting [WCLE] to, at the very least, honor that promise - even though [WCLE] totally violated the plaintiff's rights to even grant that promise. So, for the plaintiff to find out that the plaintiff was illegally forced to sign a [CTW], only to later on, not be able to use this promise against [RSR] when she did in fact - at least twice - violate this [CTW], can only be described as infuriating.

03. [WCSD-C] tried to provide many excuses to convince the plaintiff that [RSR] might not have trespassed (by claiming for example that *"grass is connected"*), when the plaintiff's video-recordings are crystal-clear that [RSR] indisputably and criminally trespassed well into the plaintiff's property at least twice (on at least two different occasions - {2020-02-28} and {2020-06-04}). Again, such excuses can only be described as deliberate *"denial of service"* (redlining) by an overwhelmingly majority-White government, defendant [WC], located within the overwhelmingly majority-White County of Williamson, against an immigrant-of-color/indigenous-person, the plaintiff.

04. As the plaintiff's audio-recording reveals (see above for transcript), [RSR] was actually issued 2 [CTW]s on that day of {2011-08-30} - one for the plaintiff's property [788KLLTX78641] (which [RSR] refused to sign), and another for [AJC]'s then property [773KLLTX78641]. If it is true that [RSR]'s [CTW] against the plaintiff's property was never recorded into *"the system"* (as [WCSD-C] describes it), then the plaintiff can only interpret this fact to be further evidence of the malicious-acts of obstruction-of-justice/evidence-tampering either on the part of [WCSD-PP] and/or the [WCLE] as an organization.

05. Since this incident can only be interpreted by the plaintiff as malicious *"denial of service"* (redlining) and malicious *"obstruction of justice"* (racketeering-act), then this further establishes the plaintiff's claim for both egregious racial-discrimination under the [FHA] and obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise under the [RIaCOA] (in addition to egregious violation of the plaintiff's fourteenth-amendment (⭐) rights to equal-protection under the law).

06. The plaintiff is left pondering the very-obvious questions - what if the situation was reversed? - what if the plaintiff was caught on video trespassing into [RSR]'s property? This question does not need to be answered explicitly as most people-of-color in the United States know the answer to this question. The answer is especially troubling, in the plaintiff's case, given that the plaintiff never stepped-foot on [RSR]'s property at any point in time - but yet, was forced to sign a [CTW] by an extremely-abusive police-officer of [WCLE], [WCSD-PP], that clearly thought that he was above the law.

07. The plaintiff mistakenly states to [WCSD-C] that [RSR] had not physically threatened the plaintiff, when in fact, the plaintiff's own audio recording from {2011-08-30} shows [WCSD-PP] revealing that [RSR] had made a terroristic-threat (of physical assault) against

the plaintiff. Also, [RSR], who is more than twice the plaintiff's size/weight, has deliberately approached just feet away from the plaintiff and senior-citizen [FATHER] (who was even kneeling down at the time) to physically intimidate/interfere-with the plaintiff and also to maliciously throw/kick tantrums against the plaintiff's property. As [WCLE] already knows, it is also indisputable not only that [RSR] has committed the assaultive crimes of terroristic-threat/assault against the plaintiff, but also multiple counts of the crimes of intimidation/interference, disorderly-conduct, harassment/stalking, false-report, blackmail against the plaintiff. As [WCLE] already knows, it is also indisputable that all of these crimes that [RSR] committed against the plaintiff were hate-crimes motivated by both extreme-racial-animus, homophobic-animus and far-right-wing-extremist political-animus.

08.    At the end of this phonecall, the plaintiff felt an intense feeling of pain that this phonecall to the [WCSO] had done nothing but place the plaintiff in an extremely compromised/exposed/vulnerable position. Now, the plaintiff's long-time abusers - [JSP&KAP],[RSR] - have full knowledge that the plaintiff reported yet another one of their crimes to the [WCLE] which the [WCLE] did not do anything of substance about - instead, simply emboldening them even further with the sense that [WCLE] has effectively granted them with full-immunity for the crimes that they have continued to commit against the plaintiff. The end result is that, yet again, the plaintiff was punished by the [WCLE] for reporting another crime - and the full-scope of the punishment would only be revealed, as the record will show, in more than a year of malicious incidents involving the racketeering-enterprise of [JSP&KAP],[RSR],[WCLE].


# ¶512

On or about the approximate date and approximate time of {2020-06-04 21:15} (nighttime), [JSP] uses loud lawnmowing equipment late at night in-order-to mow the grass on the front-yard of [784KLLTX78641]. [JSP] crosses the newly-installed landscape-edging divider demarking the front-yard boundaries between the two-properties, in-order-to unlawfully mow at least one strip of the plaintiff's [FRONTYARD] *"no-mow"* grass - an unlawful activity that [JSP] has repeatedly done (over many years) even after the plaintiff finished-installing such *"no-mow"* grass along with landscape-edging divider on/about the previous month of {2017-10}.


# ¶513

On or about the approximate date and approximate time of {2020-06-07 17:55}, [RSR] and [KAP] continue to conspire and scheme against the plaintiff, planning on the best course-of-action in their decade-long conspiracy with [WCLE] to once-again retaliate, this time with full-force, against the plaintiff for the plaintiff's *"audacity"* to record, report and/or provide-the-mountain-of-evidence-of their racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff to [WCLE] (dating back to {2011}). On or about the same time, [RSR]'s unleashed large-dog, [L], roams freely across the street and onto the plaintiff's [FRONTYARD] *"no-mow"* grass - just one of many occasions when [RSR] has, in clear violation of the neighborhood's restrictive-covenants, allowed her unleashed large-dog to cross the street and enter into and/or near the plaintiff's [FRONTYARD], despite of the fact that there is also a [CTW] issued to [RSR] forbidding [RSR] from stepping onto the plaintiff's property (see above), should [RSR] need to retrieve such dog from the plaintiff's property.


# ¶514

On or about the approximate date and approximate time of {2020-06-08 20:26}, [JSP] picks up a small piece of debris from the yard of [784KLLTX78641] and angrily throws it onto the plaintiff's [YARD].

# ¶515

On or about the approximate date and approximate time of {2020-06-11 22:45} (late-night), [JSP] opens the tap attached to the side of his house at [784KLLTX78641], and uses a hose at full-water-pressure to spray and douse with municipal water, multiple of the plaintiff's security-camera(s) for a period of approximately 3 continuous minutes. Here, the purpose of [JSP]'s actions of dousing such security-camera(s) with full-pressure municipal water is not-simply to *"blind"* such security-camera(s), and not-simply to destroy the internal circuitry of those particular security-camera(s), but since such security-camera(s) are hard-wired (using electrical cables) to a central, electrical hub, in-order-to short-circuit such electrical hub and all other equipment (including all other security-camera(s) and the actual digital-video-recording computer) - thus, destroying all of such recording equipment. While [JSP] was not successful in accomplishing this ultimate goal, [JSP] was successful in destroying and/or damaging at least 6 of the plaintiff's security-cameras.

# ¶516

On or about the approximate date and approximate times of {2020-06-12 22:39} (late-night) and {2020-06-12 23:08} (late-night), [JSP] uses a torch-light to shine such light directly into the lens of one-or-more of the plaintiff's security-camera(s), again, in more of his repeated attempts to permanently *"blind"* such security-camera(s) and/or destroy the night-vision circuitry and functionality of such security-camera(s).

# ¶517

On or about the date and approximate time of {2020-06-17 08:00}, the plaintiff takes multiple photographs of [FRONTYARD], after which the plaintiff begins to manually hand-pick/cut weeds on such [FRONTYARD] - a routine that the plaintiff does in-order-to protect the plaintiff from any-and-all potential predatory actions of the [HOA]. [JSP], while on the driveway of [784KLLTX78641], angrily/threateningly yells out a threat-of-murder (yet another count of such racketeering-act) at the plaintiff, within yet another abusive, threatening, fraudulent, assaultive, blackmailing, extortive and gaslighting rant against the plaintiff:

---

▶ RECORDED RACIST, ABUSIVE, THREATENING, FRAUDULENT, ASSAULTIVE, BLACKMAILING, EXTORTIVE AND GASLIGHTING RANT FROM [JSP] TO PLAINTIFF(ⁱ) :   (2020-06-16 08:00)(~)

▶ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

⟦ PLAINTIFF BEGINS TO WALK FROM SIDEWALK TO DRIVEWAY WHEN PLAINTIFF HEARS [JSP] YELLS THREAT-OF-MURDER: ⟧


**[JSP]**      *[???] PERVERT! [???] I SWEAR TO GOD! I SEE YOU, I SEE YOU POINTING (THOSE CAMERAS) AT MY GIRLS!* **I'LL COME KILL YOU!**

⟦ PLAINTIFF, WHILE WALKING ON [DRIVEWAY], LOOKS IN SHOCK TOWARDS [JSP], DUE TO [JSP]'S BRAZEN DEATH-THREAT AGAINST PLAINTIFF.
⟧


**[JSP]**      *YOU HEARD ME BROTHER! I'M WARNING YOU [???] ... YA FAG! ... [???], PERVERT!*

⟦ PLAINTIFF CONTINUES TO PICK UP A BUCKET TO CONTINUE THE YARDWORK OF PICKING SO-CALLED "WEEDS". ABOUT 5 MINUTES LATER,
[JSP]- ⟧

⟦ -WALKS FROM THE DRIVEWAY OF [784KLLTX78641] TOWARDS THE BORDER OF THE TWO-PROPERTIES, PICKING UP A HOSE TO- ⟧

⟦ -BEGIN WATERING THE SIDE-YARD OF HIS PROPERTY CLOSE TO THE LOCATION WHERE THE PLAINTIFF WAS PICKING SO-CALLED "WEEDS",- ⟧

⟦ -SINCE A MAJORITY OF THE SO-CALLED "WEEDS" WERE IN SUCH LOCATION WHERE [JSP] DAMAGED THE PLAINTIFF'S "NO-MOW" GRASS. ⟧

---

SIDDHARTH KODE  V.  WILLIAMSON COUNTY , ET AL.                              1696907690

**[JSP]**        *[???] [???] WHEN'S THE NEXT COURT DATE?! I'LL [???]*

〘 PLAINTIFF STARTS TO PICK WEEDS ON [YARD]. 〙

〘 [JSP] APPROACHES THE PLAINTIFF WITH A HOSE IN HAND WATERING HIS YARD. 〙

**[JSP]**        *YOU HAVE YOUR CAMERA RECORDING THIS ON FILM - GETTING READY FOR COURT. [???] ONLY [???] THE TOPS OFF [???] - SO, YOU*
            *CAN FAKE IT!*

〘 [JSP] LAUGHS OUT LOUD. 〙

**[JSP]**        *YOU'RE ABSOLUTELY RIDICULOUS!*

〘 [JSP] THEN MAKES INCRIMINATING STATEMENTS ABOUT HIS ILLEGAL CONSPIRACY WITH [WCLE] AGAINST PLAINTIFF: 〙

〘 [JSP] CONTINUES WITH FRAUDULENT STATEMENTS AND ABUSIVE GASLIGHTING AGAINST PLAINTIFF: 〙

**[JSP]**        *I TELL YOU WHAT! - YOU SPYING ON MY PROPERTY, IS REALLY GETTING OUT OF HAND! REALLY NOT LIKING IT! ... ARE YOU THAT BIG*
            *A PERVERT?! CAUSE I KNOW YOU MUST JERK 12 TO 15 TIMES A DAY! ... YOU MUST - [???] - PERVERT - [???] I DON'T WANT YOU*
            *LOOKING AT MY WOMEN, [IN DOING THAT]! ... I'VE GOT A PROBLEM WITH THAT! - A BIG PROBLEM WITH THAT! YOU BIG FAG! IT*
            *ONLY SPEAKS TO YOU BEING A PERVERT! LIKE YOU [???]! I GUESS THAT'S ALL YOU CAN DO, HUH?! I HAVE A PROBLEM WITH THAT! ...*
            *I GOT A BIG PROBLEM! THE NEXT TIME YOU DUMP SHIT OVER HERE IN THE FRONTYARD, I WILL HAVE THE HEALTH DEPARTMENT*
            *RIGHT UP THE MIDDLE OF YOUR ASS-HOLE! BET THAT! OR WILLIAMSON COUNTY OR SOMEONE ELSE YOU DON'T WANT TO TALK TO!*
            *SO, MAKE SURE YOU DON'T DO THAT AGAIN! ... SID - YOU CAN'T TAKE CARE OF THIS PLACE! WHY DON'T YOU JUST MOVE! GET AN*
            *APARTMENT OR SOMETHING! ... YOU CAN'T HANDLE IT! - IT'S OBVIOUS! ALL YOU'RE DOING IS COSTING YOUR PARENTS MONEY! IT'S*
            *RIDICULOUS! ... WHY DO YOU CARE SO VERY LITTLE ABOUT YOUR PARENTS! ... CAUSE, YOU DON'T WORK! - YOU'VE NEVER EARNED*
            *ANY MONEY!*

〘 [JSP] LAUGHS OUT LOUD. 〙

〘 [JSP] CONTINUES WITH ABUSIVE GASLIGHTING AGAINST PLAINTIFF: 〙

**[JSP]**        *THAT MUST BE EMBARRASSING! - TO SAY TO ANYBODY THAT YOU'VE NEVER WORKED! ... AND THEN YOU HAVE ALL THESE SIGNS OUT*
            *THERE - TALKING ABOUT "RACISM" AND "TAX THE WEALTHY", AND ALL THAT KIND OF BULLSHIT! ... YOU DON'T EVEN WORK! - WHO*
            *ARE YOU TO SAY ANYTHING ABOUT ANYTHING! YOU PIECE OF SHIT! ... YOU'RE A NOBODY! - YOU SHOULD HAVE NO SAY! YOU DO*
            *HAVE NO SAY, THANK GOD! ... YOU RIDICULOUS SON OF A BITCH! YOU SHOULD HAVE NO SAY! GET A FUCKING JOB! BE A REAL*
            *PERSON! YOU KNOW, REAL PEOPLE, YOU KNOW, THEY WORK! ... WE ALL GOTO WORK! ITS NOT FUN, BUT WE HAVE TO DO IT! BECAUSE*
            *THAT'S WHAT YOU DO, WHEN YOU'RE A GROWN-UP! ... BUT I GUESS YOU'RE NEVER GOING TO GROW UP! YOU'RE JUST GOING TO RIDE*
            *ON MOMMY AND DADDY'S TITTY - ALL YOUR FUCKING LIFE! ... THAT MUST BE EMBARRASSING! [????] THAT MUST BE REALLY*
            *EMBARRASSING! ... "WHAT ARE YOU [???]?" "OH, I LIVE ON MY MOMMY AND DADDY - I'M LIKE 30 ... DERRR!"*

〘 [JSP] MAKES DEROGATORY LANGUAGE/SOUND COMMONLY ATTRIBUTED AS THE MOCKING OF MENTALLY-DISABLED PEOPLE. 〙

**[JSP]**        *ARE YOU THAT UNEDUCATED THAT YOU CAN'T GET A JOB! SAD! SAD! - I THOUGHT YOU AT LEAST SOME SOME [???]! ... [???]*
            *EVERYDAY! ... WHAT DO YOU GET UP FOR EVERYDAY?! I DON'T EVEN KNOW IF YOU GO TO SLEEP WITH THIS [???]! [???] ON YOUR*
            *[???] MONITORS, PERVERT STUFF, JUST LOOK AT YOUR COMPUTER ALL THE TIME! WATCHING [CAMERAS]!*

〘 [JSP] THEN IMMEDIATELY STARTS TO COMMIT FELONY CRIMES OF WITNESS-TAMPERING,OBSTRUCTION/RETALIATION AGAINST PLAINTIFF: 〙

**[JSP]**    *WHAT ARE YOU CALLING [THE POLICE] ON BECKY FOR, THE OTHER DAY?! WHAT A RIDICULOUS DICKLESS MOVE THAT WAS?!! ... ARE YOU KIDDING ME?!! YOU LITTLE CHICKEN-SHIT! BECAUSE SHE WALKED ACROSS THE FRONT OF YOUR YARD! ... YOU KNOW HOW PISSED OFF THE COPS WERE ABOUT THAT?! YOU KNOW WHAT'S GOING TO HAPPEN IF YOU KEEP DOING THAT?! ... YOU KNOW WHEN THAT COP HAD YOU BACKED UP AGAINST THE WALL THAT DAY! - THAT'S GOING TO HAPPEN AGAIN, SOON! PREPARE YOURSELF! AND IT AINT GOING TO BE NO 'RODNEY KING' OR ANY OF THAT KIND OF JACK SHIT! THEY JUST DON'T CARE ABOUT YOU!*

⟦ PLAINTIFF LOOKS UP AT [JSP], STUNNED AT [JSP]'S RACIAL-SLUR AND FELONY-CRIMES AGAINST PLAINTIFF. ⟧

⟦ [JSP] NOTICES THAT PLAINTIFF TOOK PARTICULAR OFFENSE TO THE RACIAL SLUR: ⟧

⟦ [JSP] CONTINUES WITH ABUSIVE GASLIGHTING AGAINST PLAINTIFF: ⟧

**[JSP]**    *YEAH - DOES THAT BOTHER YOU?! OHHHH, I'M SORRY! I HURT YOUR FEELINGS? I'M SORRY SID! ... WHY DON'T YOU BE A CONTRIBUTING MEMBER OF SOCIETY, AND I WOULDN'T HAVE TO HURT YOUR FEELINGS! - I DON'T LIKE TO THAT TO ANYBODY, HONESTLY! [???] ... [???] SUCH A [???] . 'MR. GREEN' THEY CALL YOU OUT HERE! 'MR. GREEN' - "OH, I'M NOT GOING TO LEAVE ANY FOOTPRINT. COMMIE GREEN. I TELL YOU WHAT - LOOK AT ME GO. I SURE AS-HELL AM NOT GOING TO WORK EITHER! ... YEAH - WHY SHOULD I WORK, MY PARENTS GIVE ME MONEY! - I'M JUST GOING TO BE A BIG BABY MY WHOLE LIFE! I DON'T HAVE TO BE A GROWN-UP! I'LL JUST PLAY AT HOUSE ALL DAY!"*

⟦ [JSP] LAUGHS OUT LOUD. ⟧

⟦ [JSP] CONTINUES WITH ABUSIVE GASLIGHTING AGAINST PLAINTIFF: ⟧

**[JSP]**    *THAT MUST BE EMBARRASSING! ... REALLY, MUST BE EMBARRASSING! BUT I KNOW YOU GET ON THE COMPUTER, AND TALK TO YOU OTHER GREEN-FRIENDS HUH?! ... THEY MAKE YOU FEEL BETTER?! THEY STROKE YA?! I KNOW YOU [???]! ... HOW YOU'RE GETTING BY - IS A SHOCKER! IT'S A SHOCK! BUT YOU KNOW, GRANTED, YOU'RE NOT HAVING TO PAY FOR IT! SO, IT DOESN'T REALLY MATTER! ... YOU SHOULD BE ASHAMED OF YOURSELF! [???] ABSOLUTELY - BUT YOU DO NOT SEEM TO BE ASHAMED OF ANYTHING ELSE! ... SO, I GUESS THAT'S JUST A STRETCH - THAT'S A STRETCH! ...*

⟦ [JSP] THEN STARTS TALKING ABOUT HIS ILLEGAL CONSPIRACY WITH THE [HOA] AGAINST THE PLAINTIFF. [JSP] EVEN- ⟧

⟦ -LAUGHS OUT LOUD THAT HE HAD CONSPIRED WITH THE [HOA] IN PREVIOUS YEARS, ESPECIALLY WITH [DMP] ON THE [HOA] BOARD. ⟧

⟦ [JSP] CONTINUES WITH ABUSIVE GASLIGHTING AGAINST PLAINTIFF: ⟧

**[JSP]**    *YOU KNOW, THE [HOA] IS NOT SUPPOSED TO TALK ABOUT THE COURT CASE, BUT GUESS WHAT, I KNOW ABOUT IT! I HEAR ABOUT IT! ... I KNOW WHAT'S GOING ON! - I KNOW HOW MUCH MONEY YOU COST YOUR PARENTS! - YOU RIDICULOUS PIECE OF SHIT! THAT'S UNBELIEVABLE! YOU ARE AN UNBELIEVABLE SACK OF SHIT! - YOU'RE PARENTS ARE STUPID TOO, BY THE WAY, I MUST SAY! THEY'RE SOME DUMB SONS OF BITCHES! STICKING BY YOUR STUPID SIDE! - I'D THROW YOU IN THE ASYLUM AND [???] ANY [???] COST ME THAT MUCH MONEY! ... IF YOUR DAD WAS YOUNG ENOUGH, HE'D COME BY AND WHOOP YOUR ASS! I CAN'T BELIEVE YOUR BROTHER LETS YOU GO ON! ... YOUR BROTHER MUST NOT LIKE YOU AT ALL ANY MORE! YALL MUST BE COMPLETELY [???]! I HAVEN'T SEEN HIM IN A LONG TIME! ... SO, I'M SURE YALL DON'T TALK AT ALL! ... OH YEAH, THE BROTHER - HE'S THE NORMAL ONE - HE'S GOT THE WIFE AND KIDS, AND WORKS AND THAT KIND OF STUFF JUST LIKE ALL OF US! [???] ... WHAT ABOUT THE INHERITANCE! - YOU'RE COSTING HIM HIS INHERITANCE!*

⟦ [JSP] LAUGHS OUT LOUD, THEN CONTINUES THREATS/ABUSE AGAINST THE PLAINTIFF: ⟧

⟦ [JSP] CONTINUES TO ADMIT DETAILS OF HIS ILLEGAL CONSPIRACY WITH [WCLE] AGAINST THE PLAINTIFF. ⟧

⟦ [JSP] CONTINUES WITH ABUSIVE GASLIGHTING AGAINST PLAINTIFF: ⟧

**[JSP]**

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.                    1696907690

*[???] [???]! [???] [???]! [???] [???]! THAT'S HIS MONEY THAT YOUR PARENTS ARE SPENDING ON YOUR DUMBASS! YOU KNOW, [???] COSTING YOUR PARENTS! [???] YOU KNOW WHAT, I MIGHT GET A HOLD OF YOUR BROTHER, [???]! [???] [???] [???]! [???] YOU ARE A [???] THAT'S WHAT MAKES YOU WHAT YOU ARE! [???] YOU'RE NOT A GOOD PERSON! ANYBODY THAT CAN DO THAT TO THEIR FAMILY IS NOT A GOOD PERSON! [???] YOU'RE LUCKY THEY'RE [???] ... THEY'RE NOT GOING TO [???] ... YOU ARE UNLIKE MOST PEOPLE THAT [???] [FOR LIFE] [???] ... YOU'RE LIKE A- YOU'RE LIKE A 'COMMIE GREEN GUY'! [???] [???]! TELL YOU WHAT, MAN! YOU BETTER WATCH YOUR CAMERAS, BRUH! [???] ON MY PROPERTY, YOU BIG FUCKING PERVERT! ... KEEP IT UP! [???] .... YOU BETTER SHUT DOWN THAT [???]! I AIN'T GOING TO PUT UP WITH THAT MUCH LONGER! NOT WITH MY GIRLS GOING OUT TO MY POOL EVERYDAY! AS YOU JERKING OFF WATCHING EM! BIG PERVERT! HOW MANY TIMES A DAY, DO YOU JERK OFF, SID?! TWELVE? THIRTEEN? IS IT UP IN THE TWENTYS? ALL YOU GOT TO DO IS PULL IT RIGHT [???]! [???] INSTEAD OF JERKING OFF, LIKE A NORMAL PERSON - [WHY DON'T YOU JUST GET ???], IT'S MUCH BETTER, TRUST ME! [???] [???]! YOU WILL DIE A VIRGIN!*

〖 [JSP] LAUGHS OUT LOUD, THEN CONTINUES THREATS/ABUSE/GASLIGHTING AGAINST THE PLAINTIFF: 〗

〖 [JSP] COMMITS ONE-OR-MORE COUNT(S) OF EXTORTION AGAINST PLAINTIFF: 〗

**[JSP]**        *THAT DOESN'T HAPPEN VERY OFTEN, I DON'T THINK! EVERYBODY IS GOING TO BE TALKING ABOUT IT! YOU MIGHT EVEN LIVE TO BE NINETY, SOMEHOW OR ANOTHER! TALKING ABOUT THAT! NINETY-YEAR-OLD-VIRGIN! THAT'S ALL WE GOT TO SAY ABUT THIS MAN! HE DID NOT [???] OR [???]! HE ANNOYED THE HELL OUT OF HIS NEIGHBORS, DAILY! [???] QUITE ANNOYING! RIDICULOUS! YOU'RE ABSOLUTELY RIDICULOUS! [???]! ... [???] [???]! [???] ... BIG PERVERT! [???] RIDICULOUS! ITS AMAZING THAT I CAN HAVE SUCH A NICE YARD, NEXT TO SUCH A PIECE OF SHIT! AND, I DO APPRECIATE LIVING NEXT YOU, SID! I TELL YOU WHAT! **ALL THE - AS MUCH MONEY AS YOU'RE COSTING ME, TOWARDS MY PROPERTY!- OH, MAN, I TELL YOU WHAT! YOU'RE GOING TO HAVE TO MAKE IT UP! ... YOU'RE GONG TO HAVE TO MAKE IT' UP SOMEWHERE UP YOUR ASS! ... BECAUSE I'M GOING TO PULL IT, RIGHT OUT OF YOUR ASS!** ... BAM! ... YOU KNOW MUCH YOUR PIECE OF SHIT COST ME! BAM! BAM! BAM! BAM! BAM! ... BAM! ... BAM! BAM! BAM! BAM! BAM! ... BAM! BAM! ... DUDE, SID - YOUR HEAD! **YOUR HAIR IS RIDICULOUS!** ARE YOU KIDDING ME?! WHAT IS THAT ABOUT?! **YOU CAN'T CUT YOUR HAIR?!** THAT IS RIDICULOUS! - THAT MUST SMELL LIKE SOMEBODY'S ASS HOLE! MY GOD - ARE YOU KIDDING ME?! PROBABLY WHAT I SMELL ALL THE TIME! ... BOY, IT STINKS OVER THERE! WHAT'S UP WITH THAT! - CAN YOU DO SOMETHING ABOUT THE SMELL! ... **I DON'T WANT TO HAVE TO CALL THE HEALTH DEPARTMENT OUT HERE AGAIN!** - THEY'VE GOT MORE IMPORTANT THINGS TO DO THAN TO DICK WITH YOU! ... BUT YOU KNOW, I DON'T HAVE A CHOICE, BECAUSE YOU'RE SUCH A DISGUSTING SON OF A BITCH! ... YOU KNOW!... YOU GETTIN BY! [???] ... HOW MUCH MONEY YOU SPEND ON ALL OF THESE CAMERAS, BY THE WAY?!! ... **AND YOU KNOW WITH ALL THESE CAMERAS, YOU KNOW THE POLICE ARE LIKE, '[???] [???]', YOU KNOW HOW MANY TIMES I'VE BEEN ASKED ABOUT [THEM]?!***

〖 [JSP] MAKES RACIST STATEMENTS DUE TO PLAINTIFF'S MIDDLE-EASTERN-MUSLIM APPEARANCE/ACCENT: 〗

〖 [JSP] CONTINUES TO MAKE STATEMENTS ABOUT HIS ILLEGAL CONSPIRACY WITH THE [HOA]/[WCLE] AGAINST THE PLAINTIFF: 〗

〖 [JSP] CONTINUES TO ENGAGE IN FRAUDULENT, ABUSIVE AND GASLIGHTING STATEMENTS AGAINST THE PLAINTIFF: 〗

**[JSP]**

*"[???] DOES THIS GUY GET BIG DELIVERIES OF FERTILIZER? DO YOU SEE HIM BLOWING UP A BUILDING?" ... YEAH! YOU BET I COULD! YEAH! ... I COULD! I COULD! ... HE ACTS LIKE HE'S A 'GREEN GUY', BUT HE JUST [SITS AT HOME] [???] [???] [???] ...! YOU BET I COULD! HE HAS NO [???]! NEVER BEEN LAID! SHIT, I'D BLOW SOMETHING UP! YEAH, JUST STRAIGHT OUT OF THE .... OUT OF THE ... WELL, LET'S SEE, [???] I DON'T KNOW.... [???] I DON'T KNOW IF [???] AND I COULD SEE THAT TOO! HE ONLY WEIGHS LIKE 50 POUNDS! THEY THINK YOU'RE GREEN!... [???]! ... [???] ... [???] ... [???] ... [???] ... BUT YOU ARE JUST PULLING THE TOPS OFF THE GRASS! YOU KNOW WHAT YOU'RE DOING RIGHT NOW IS [???] YOU KNOW WHAT YOU'RE DOING RIGHT NOW IS SO COMPLETELY DISHONEST! YOU'RE JUST PULLING THE TOPS OFF THE GRASS! [???] [???] THAT'S ALL IT IS! JUST [???] THAT'S UNBELIEVABLE! LIKE A GREEN KIND OF THING! LIKE [???]! YOU KNOW, EVERYBODY IN THE WORLD WORKS! THEY [???] LIVE OFF THEIR PARENTS! YOU COULDN'T BE A BIGGER PUSSY! I MEAN HONESTLY - YOU REALLY COULDN'T BE A BIGGER PUSSY! YOU KNOW WHAT SID - YOU KNOW, WHAT IT IS, IN ALL HONESTY - YOU'RE BROTHER IS EMBARRASSED OF YOU! I GUARANTEE YOU THAT! I CALLED YOUR BROTHER! YOUR BROTHER IS COOL! YOUR BROTHER'S A NORMAL DUDE - HE'S GOT A WIFE AND KIDS AND FAMILY AND WORKS, LIKE THE REST OF US DO! [???] TO YOU!! YOU'RE JUST GOING TO TO LIVE HOWEVER YOU WANT TO LIVE! NO MATTER WHAT EVERYBODY ELSE DOES IN [???]! CAUSE WE ALL SIGNED CONTRACTS THAT MEANS WE ABIDE BY THE RULES! [???] THINK YOU'RE SPECIAL, FOR SOME GOD DAMN REASON! "I'M SPECIAL! I'M SID! LOOK AT ME! I'M SPECIAL! OH, NO - THEY'RE ALL RACIST! THEY'RE RACIST!" ... OH, THAT'S WHAT IT IS! YEAH! [???] [???] PROPERTY. [???] THAT'S ALL WE ASK! ... AINT NOTHING RACIST ABOUT THAT! ... [???] AS A GOD-DAMN COURTESY! ... I'VE BEEN HERE [???] YOU'RE DUMB ASS FOR 10 YEARS. YOUR DUMB ASS! ... THAT'S ALL I CAN DO, BECAUSE OUR [HOA] SUCKS SO GOD-DAMN BAD! SONS OF BITCHES! I HOPE THEY GET YOU TOO! AND, I HOPE YOUR PARENTS GET TIRED OF PAYING FOR YOUR GOD-DAMN FINES! ... [???] YOU KNOW HOW MUCH YOU COST YOUR PARENTS OVER FUCKING $20-GRAND. OH, NO NO NO! [???] ... WHY DON'T YOU GET YOUR LAZY ASS UP AND GET A JOB! - YOU MOTHERFUCKER! AND PAY FOR IT YOURSELF! YOU PIECE OF SHIT! ... YOU ARE A PIECE OF SHIT! - YOU KNOW THAT! YOU ARE A PIECE OF SHIT! ... ANYBODY THAT CAN BE OK WITH TREATING THEIR PARENTS LIKE THAT IS A PIECE OF SHITT! ...*

⟦ [JSP] LAUGHS AND OBJECTS TO PLAINTIFF'S WEARING OF A FACEMASK. ⟧

⟦ [JSP] THEN EITHER MAKES GROSSLY-UNINFORMED STATEMENTS ABOUT THE COVID-19 PANDEMIC WIDELY REPORTED IN FAR-RIGHT-WING MEDIA- ⟧

⟦ -OR [JSP] MAKES AN ABUSIVE STATEMENT THAT NOBODY CARES ABOUT HEALTH/WELFARE OF PLAINTIFF. ⟧

**[JSP]**      *NOBODY IS WORRIED ABOUT YOU HAVING ANYTHING, FOOL! WHAT ARE YOU WEARING A GOD-DAMN MASK FOR RIGHT NOW?! ... IT DON'T FLY, IT DON'T FLY AROUND IN THE AIR - YOU DUMB BASTARD! AT LEAST, AT LEAST, AT LEAST, WATCH THE STUFF THAT YOU CAN ACTUALLY LEARN SOMETHING ABOUT!* ...

⟦ [JSP] CONTINUES TO WATER YARD FOR A FEW MORE MINUTES AND THEN PUTS HOSE DOWN. ⟧

⟦ [JSP] ANGRILY/AGGRESSIVELY HOLDS-UP HIS MIDDLE-FINGER TO THE PLAINTIFF AS HE WALKS AWAY. ⟧

**[JSP]**      *SHIT! "KEEP IT REAL, BABY!" [???] [???]! REAL RIDICULOUS!*

⟦ [JSP] ENTERS BACK INTO THE (UNCONCEALED) FRONT-PORCH AREA OF HIS PROPERTY, [784KLLTX78641]. ⟧

⟦ PLAINTIFF CONTINUES TO PICK WEEDS IN [YARD], PSYCHOLOGICALLY-TORTURED AND TRAUMATIZED BY THE INCIDENT. ⟧

# ¶518

Extremely alarmed by the multiple and increasingly-ominous threats-of-murder and other threats of racist police-violence that the plaintiff has received from [JSP], and the increasing realization that the plaintiff is the victim of a relentless and vicious obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise - the conspiracy of which, included [JSP&KAP],[RSR], and [WCLE] - with [WCLE], acting as a corrupt governmental organization, not only protecting co-conspirators [JSP&KAP],[RSR] from the consequences of their hate-

crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff, but also encouraging and inciting such brazenly-criminal racketeering-activity via the modern-day-Jim-Crow toxic environment of racist-lawlessness that [WCLE] created (for approximately a decade) against the plaintiff - the plaintiff decides to do at least the following:

Ⓐ contact the plaintiff's senior-citizen [MOTHER], alerting her, should the plaintiff become critically-injured and/or killed as a result of the aforementioned violence, to alert federal-law-enforcement of all of the information of the hate-crimes/racketeering-acts/civil-rights-violations/abuses that the plaintiff accumulated in the plaintiff's possession - much of which, the plaintiff would also eventually upload onto private, secure (online) cloud-storage (in case one-or-more of the defendants were to also follow-through on their threats of burglary for the purposes of evidence-destruction).

Ⓑ use the anonymous and secure communication network, *"SecureDrop"*, to privately, anonymously, and securely contact *"Global Witness"* - an international [NGO] established in {1993} that serves to witness and expose international human-rights abuses caused-by or enabled-by governmental corruption and/or impunity. However, the plaintiff fails to mention, in this particular secure-message to *"Global Witness"*, that the plaintiff actually has recorded-evidence of such corrupt racketeering-enterprise against the plaintiff involving the defendants, spanning almost a decade (at this particular point in time), and that the threats also included explicit threats of blackmail/extortion. The plaintiff's anonymous and secure-message to *"Global Witness"*, referring to the plaintiff in the third-person, includes as a secure attachment, the plaintiff's body-worn-camera video-recording of the incident documented in the previous paragraph, along with the following text:

---

▸   **""** :   PRIVATE, SECURE AND ANONYMOUS MESSAGE FROM PLAINTIFF TO [NGO]  "GLOBAL WITNESS"     (2020-06-17 21:52){~}
▸   [ PRIVATE INFORMATION IN MESSAGE OMITTED/REDACTED TO PROTECT PRIVACY ]

**PLAINTIFF**        *Hello, we have a video (file size 490MB) that documents the following:*

*death threats, terroristic threats, hate speech, threats of racist violence, threats of brutal police violence, racial/xenophobic/homophobic slurs, extreme psychological abuse, public slander/defamation, intimidation/retaliation for the reporting of crimes, by racist/xenophobic/homophobic white neighbors against an immigrant person of color (dark skin color; long uncut hair/beard) with a documented cognitive disability - and the racist County and HOA that allows such criminal abusive behavior to continue - and in fact, these institutions are even encouraging/instigating such abuse.*

*This video is only one of many documented incident videos over the course of several years dating back to 2016 (other videos also document - in addition to the above - criminal vandalism and property destruction).*

*Please do not share this video without the victim's prior consent.*

*The victim wants to know how to seek justice.*

---

# ¶519

On or about the approximate date and approximate time of {2020-06-18 10:00}, the plaintiff notices on the plaintiff's security-camera-system-monitor that [JSP] steps into the plaintiff's side-yard to peer through a small hole in the plaintiff's privacy-fence in-order-to see into the plaintiff's [BACKYARD], once again, in total violation of the plaintiff's rights. It is clear from this particular unconstitutional-and-unlawful search and the multiple other unconstitutional-and-unlawful searches of the plaintiff's property that [JSP] has committed against the plaintiff

over the many years, that [JSP] was fraudulently acting *"under color of law"* against the plaintiff, thus also in violation of [18-USC-PI-C13-§242] and [18-USC-PI-C43-§913] and/or [TPeC-T8-C37-§37.11] against the plaintiff. Shortly after this unlawful act and after entering back into his property, [JSP] then takes a spray-can of what appeared to be pesticide and uses such spray-can to menacingly/angrily spray such pesticide over the plaintiff's privacy-fence, despite of his knowledge of the plaintiff's strong opposition to the use of such lethal chemicals - lethal to human health, to environmental health, and to the health of wildlife.

# ¶520

On or about the date of {2020-06-20}, the [NGO] *"Global Witness"* responds to the plaintiff's original message (but the plaintiff only reads this message on-or-about a few days after {2020-06-20}) with the following brief response, again, in the form of a secure and private message via *"SecureDrop"* from *"Global Witness"*:

> ►  **"** : PRIVATE, SECURE AND ANONYMOUS MESSAGE FROM [NGO] "GLOBAL WITNESS" TO PLAINTIFF   {2020-06-20}(~)
> ► [ PRIVATE INFORMATION IN MESSAGE OMITTED/REDACTED TO PROTECT PRIVACY ]
>
> **"GLOBAL WITNESS"** *Thank you for sending this. I am not sure we are able to help in this scenario, but will endeavour to. Could supply more information on who is in the video and where and when this footage was taken?*

# ¶521

On or about the date and approximate time of {2020-06-22 08:44}, the plaintiff sends an email to [WCSDet-WP], following up on the plaintiff's previous email from {2019}, further informing such Detective and the [WCSO] about the plaintiff's evidence of [JSP&KAP]'s, [RSR]'s continuing and/or escalating hate-crimes (including felony crimes) against the plaintiff. In this particular email, the plaintiff makes it clear to [WCLE] that based upon the plaintiff's evidence, the plaintiff expects the appropriate charges to be filed against both [JSP] and [RSR]. In this email, the plaintiff makes a typographical error by stating *"more than $1500 in damages"*, when the plaintiff meant to state *"more than $2500 in damages"*. In this email, although the plaintiff reports the crimes as felony crimes, the plaintiff does not make it clear enough in such email that such crimes committed by [JSP] and/or [RSR] against the plaintiff are felonious because they were committed in retaliation for the plaintiff's initial reporting of their racially-motivated hate-crimes against the plaintiff. Since [WCCHDS-VD], who acted in a very malicious manner towards the plaintiff, refused to hear about any of the racially-motivated and retaliatory-hate-crimes/racketeering-acts/civil-rights-violations/abuses committed against the plaintiff by racketeer co-defendants [JSP&KAP],[RSR] - the plaintiff included [WCCHDS-VD] as a recipient of such email. This email also includes a copy of the previous email-correspondence between the plaintiff and [WCLE] concerning this matter:

> ► EMAIL FROM PLAINTIFF TO [WCSDet-WP], ALSO CC'D TO [MOTHER], [WCCHDS-VD] AND THE [SPLC](+) :
> ► {2020-06-22 08:14}(~) : [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]
>
> **PLAINTIFF** *Hello Detective Passailaigue,*
>
>
> *This is Sid Kode, homeowner at "788 Kingfisher Lane".*
>
> *I have 3 questions/comments, as a follow-up to our previous conversation:*
>
>
> *(1)*

I continue to receive death threats, other terroristic threats, other references to brutal violence, intimidation/retaliation for the reporting of their crimes, racial/xenophobic/homophobic slurs, other hate-speech and psychologically-abusive-speech (and not to forget, public slander/defamation) from the suspect - again, "Joseph Pargin" of "784 Kingfisher Lane".

The suspect continues to tamper-with or try to disable/damage my security cameras by spraying them with water and by shining bright-light directly into them for long periods of time.

The suspect also continues to step well-into my property to mow the very-low-growing "no-mow" grass (a grass that is not intended to be mowed) which I installed - in one case, mowing the entire side of the front-yard during the midst of an intense summer drought - forcing me to flood the mowed area with water in the hopes that it will recover.

Unfortunately, there is permanent/irrecoverable damage/death to a large area of this "no-mow" grass that he mowed last year during the midst of the summer drought (I tried flooding the area to the best of my ability but it was "too little, too late" since I was not at the property for more than 3 days after the mowing took place) - while that same "no-mow" grass, if left unmowed, survives the Texas summer droughts just fine.

Again, the suspect is well aware that this is a "no-mow" grass that is not intended to be mowed, and did so (and continues to do so) despite of this knowledge.

In particular, the other side of the front-yard that is fully under my control has not been mowed in 3 years (it has only been manually-weeded by me on a regular basis) - and as a result of this intelligent maintenance, is in perfect condition/appearance.

The suspect is also aware of the fact that there is no sprinkler system on the property (since the grass, when left unmowed, really does not need watering even during the summer droughts except in certain small areas where it has not fully established yet and/or where the water in the soil tends to evaporate faster, for example, due to higher elevation).

On at least one occasion, the suspect poked at and damaged the political yard signs on my property.

I was hoping that your interview with the suspect would serve to deter and stop this violent/abusive criminal behavior, but unfortunately, the suspect has not shown any indication of change, and to the contrary, might only have been emboldened.

I still do have all of the previously-mentioned evidence, and new evidence of the above incidents - with the most recent incident being at approximately 2020-06-16 08:00.

And so, I wanted to confirm the possible charges associated with such criminal conduct:
(*) felony terroristic threats (including death threats)
(*) felony obstruction of justice (tampering/disabling/damaging of cameras; threats for reporting of crimes)
(*) felony intimidation of witness and retaliation against witness
(*) felony vandalism and criminal mischief (more than $1500 in damages - for damage to grass and security cameras)

Again, I do have every reason to believe and that the evidence I have does clearly show that these crimes are based on racial/xenophobic hatred and homophobic hatred, and as such, should be classified as hate crimes.

Also, as a former student at the University of Texas at Austin, I was registered as a student with disabilities, having a cognitive disability - which the suspect is fully aware of, but despite knowledge of this, maliciously chooses to exploit.

As a minor side-note to the above, the suspect also continues to light fireworks every year (multiple times per year) - a well-known violation of HOA rules - an act that remains very dangerous due to the close proximity of houses/structures/trees/bushes/etc. and due to the great public nuisance that such loud fireworks cause (especially during the middle of the night), and not to forget, the resulting air pollution/debris.

*(2)*

*In an issue that is slightly unrelated to the above - the property owner of "789 Kingfisher Lane" - Rebecca Sue Robertson - has trespassed on my property at approximately [2020-06-04 17:49] - I do have video evidence of this as well.*

*Since this individual also threatened me back in 2010/2011 at my doorstep, there was a criminal-trespass-warning issued to this individual on August 2011 by the Williamson County Sheriff's Department - a warning that she refused to sign, but that the WCSD Deputy assured me that it is still valid - in fact, there were 2 trespass warnings issued to this individual on that same day (one from another neighboring property owner as well).*

*This individual has repeatedly harassed me over the course of the 11 years that I have lived here - in some cases, kicking and throwing tantrums against my property and also, referring to me on some occasions, using racial/xenophobic/homophobic slurs, and also committing slander/defamation/libel against me in multiple public settings.*

*She also leaves her large dog unleashed on a daily basis - the dog is never on leash (which is also a violation of HOA rules) and occasionally does bark very loudly - this dog occasionally does step will into my frontyard.*

*So, please confirm that you do have this criminal-trespass-warning on file, so that we can begin processing charges against this individual as well.*

*(3)*

*As a relatively minor side-note to the above, I should also point out that neither of these individuals are practicing social distancing, and are never wearing face masks in encountering me while I'm at my property.*

*I am the only one wearing a face mask, and they also ridicule/shame me for doing so - they even sneeze/cough around me without wearing a mask, leading me to wonder if they are doing it on purpose.*

*They are surely aware that people are spreading the disease without showing symptoms of it - (in other words, carriers not sufferers) - and that people of color (such as myself) are particularly vulnerable to the lethal disease.*

*NOTE:*

*I do want to pursue pressing charges against these individuals, but I do need to stress that I will need police protection - these individuals (especially "Joseph Pargin") have shown themselves to be capable of violence (in fact, brutal violence), and there are countless cases where vulnerable victims of hate crimes that have reported crimes have been retaliated against - and in some cases, severely injured or even murdered.*

*So, it takes significant courage for a person like me (of my racial profile) and of my physical stature (I weigh about 100 pounds) to be able to report these hate crimes, against the possibility of violent retaliation from people more than twice my size, and in all likelihood, are armed with lethal weapons.*

*In fact, the suspects' terrorizing behavior towards me has intentionally served to instill fear/terror in me, so that I will remain quiet and allow such injustice to continue (which I have done until this point).*

*I will be compiling the video evidence and I should have most of it on an SD card within two weeks from now (since video files are too big to transfer over email).*

*Please confirm if/when you are available for meeting me at the property ("788 Kingfisher Lane") sometime during the weeks of June-29th/July-6th, so*

*that I can provide you with this evidence – I will send a follow-up email confirming the exact date/time.*

*Thanks,*

*Sid Kode.*

*On 10/16/2019 8:36 AM, Wayne Passailaigue wrote:*

*> Sir,*

*>*

*> I have received your email and it has been added to this case file (Case No. 2019-09-00561). Both cases that you had filed with through the Sheriff's Office are being worked under this case number. I have conducted an interview with the suspect in this case and have an idea of what's going on. The physical evidence (digital recordings) is paramount in this case and I will be waiting for your response to go further in this case. If you have any questions please feel free to reach out by email or phone.*

*>*

*> Thank You,*

*>*

*> Detective W. Passailaigue #13122*

*> Criminal Investigation Division*

*> Williamson County Sheriff's Office*

*> 508 S. Rock St. Georgetown, TX 78626*

*> Office: 512-943-5274*

*>*

*> This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.*

*>*

*> -----Original Message-----*

*> From: ****************** <*******************>*

*> Sent: Wednesday, October 9, 2019 8:05 AM*

*> To: Wayne Passailaigue <*************@wilco.org>*

*> Subject: Evidence for criminal mischief and threatening communications*

*>*

*> EXTERNAL email: Exercise caution when opening.*

*> _____*

*>*

*> Hello Detective Passailaigue,*

*>*

*>*

*> This is Sid Kode (property owner of "788 Kingfisher Lane, Leander, TX 78641"), responding to your voicemails about the criminal mischief and threatening communications that we're experiencing at our property from the suspect (next-door neighbor that lives at "784 Kingfisher Lane, Leander, TX 78641").*

*>*

*> I do still have the footage stored on our security camera system's DVR hard-drives, but I have not yet figured out how to transfer the data onto an external hard-drive.*

*>*

*> Unfortunately, as of late, I have not had the time to figure this out, but hopefully I should be able to get it done sometime this month.*

> Once I have this done, I will let you know so that you can obtain that evidence.

>

>

> So, to briefly summarize the sequence of incidents:

>

> (1) In approximately October 2017, I received the first threatening communication from the suspect.

>

> (2) In approximately February 2018, I received the second threatening communication from the suspect (I still have to find the footage for this).

>

> (3) In approximately January 2019, I received the third threatening communication from the suspect.

>

> (4) In approximately February 2019, I received the fourth threatening communication from the suspect.

>

> (5) In approximately May 2019, I received the fifth threatening communication from the suspect (I still have to find the footage for this).

>

> (6) In approximately June 2019, I received the sixth threatening communication from the suspect (I still have to find the footage for this).

>

> (7) On July 3rd 2019, the suspect shot into one of our cameras damaging and breaking the front glass and IR illuminators so that the IR night vision no longer works.

>

> (8) On August 23rd 2019, the suspect stepped onto our yard with a lawnmower and mowed our landscape which we had specifically designed not to be mowed, thus damaging the plants and needing it to be repeatedly watered (flooded) until most of it recovered - however, some of the landscape did die due to the severe summer heat/drought and the damage already done. On approximately September 2017, I had filed for approval and received approval from our HOA for this "no-mow", drought-tolerant landscape, and I had installed this landscape on October 2017 and diligently watered it regularly until it took 1 year to establish.

>

> (9) On September ?? 2019, at night time, the suspect shined his flash-light directly onto one of of our cameras, then kicked an object (IR illuminator) placed on our landscape along the fence.

>

> (10) On September 14th 2019, the suspect shot into a second camera damaging and breaking the front glass - the IR still technically works, but the shattered glass makes the camera's image blurry, especially at night.

>

>

> These are the incidents that I can recollect as of right now. I'm sure there were other incidents that have escaped my memory.

>

>

> As soon as I have accumulated all of the footage onto the portable hard-drive, I will let you know - I still also have to find much of it since they are stored on multiple different hard-drives.

>

>

> Thanks,

> Sid Kode.

>

¶522

On or about the approximate date and approximate time of {2020-06-22 21:00}, the plaintiff notices on the plaintiff's security-camera-system-monitor that [JSP] is either standing near the border of the plaintiff's property, or on the plaintiff's property, while committing yet another action of criminal-mischief against the plaintiff, by intentionally shining his torch-light directly onto the lens of one-or-more of the plaintiff's security-camera(s), again, as [JSP] himself admits, in-order-to permanently *"blind"* such security-camera(s). As [JSP] is committing this criminal-act, [JSP] summons [RSR] (who is across the street) in-order-to furter conspire with her about the plaintiff. As [JSP] is committing this criminal-act, [RSR] starts walking towards [JSP]. [JSP] laughs and derisively states to [RSR] about the plaintiff, *"[HE'LL] WANT TO CALL THE LAW ON YOU AGAIN!"*. [RSR], in her usual tone of racist-contempt towards the plaintiff, states to [JSP], *"WHAT IS HIS PROPERTY?! ARE YOU SURE THAT THAT'S HIS PROPERTY?!"* [RSR] makes this brazen statement and the following brazen statement(s) because [WCLE] refused to charge [RSR] for [RSR]'s brazen criminal-act of criminal-trespass against the plaintiff, which, as documented above, had actually occurred on at least two different occasions during the year {2020}. [JSP] remains on the border of the two-properties, instructing [RSR] to step into the plaintiff's property - essentially, daring [RSR] to commit what would be, at the very least, her third-criminal-act of criminal-trespass against the plaintiff. As [RSR] walks on the sidewalk, at least contemplating [JSP]'s dare, [RSR] boldly states with such racist-contempt against the plaintiff to [JSP], *"I MEAN, WHO KNOWS IF THAT'S EVEN HIS PROPERTY?!"*, pretending as if she was not informed on multiple occasions by [WCLE] - and at the very least, by [WCSD-PP] by way of the aforementioned [CTW], but also by the subsequent phone-call from [WCLE] earlier in the month (see above) - that the property [788KLLTX78641] did, in fact, always belong to the plaintiff since the date of {2009-03-06}. [JSP] frustratingly and disappointingly responds to [RSR], *"IT IS! I'VE CHECKED! ... I'VE CHECKED!"* [RSR] disappointingly responds, *"Have you?!"* Despite making such brazen statements documenting her extremely-low opinion of the *"low-IQ, powerless"* plaintiff, [RSR], at the very least, on this particular occasion, avoids the plaintiff's property, walking around [JSP&KAP] protruding tree (which blocks at least half of the sidewalk) and enters near the border area of the two-properties (🔒). As [JSP] conspires with [RSR] against the plaintiff, [JSP] continues for a period of approximately 2 additional minutes, to point his torch-light directly into one-or-more of the plaintiff's security-camera(s) in-order-to permanently *"blind"* such cameras, while [RSR] clearly approves of such retaliatory criminal conduct - specifically, criminal-mischief, felony evidence-tampering and intimidation/interference. After such 2 minutes, both [JSP] and [RSR] walk towards the hose/tap area of [JSP]'s property, and resume their conspiratorial/colluding conversation against the plaintiff at such location - in total, for a period of approximately 20 minutes. During one-or-more occasions during such 20-minute-period, [JSP] would look back at one-or-more of the plaintiff's security-camera(s) and shine his torch-light at such security-camera(s). [RSR], the kingpin (or mafia-godfather) of the obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff, is thus not only fully-approving of [JSP]'s criminal-mischief, evidence-tampering and intimidation/interference against the plaintiff, but also has acted as the chief conspirator (or kingpin/mafia-godfather) in such racketeering-enterprise against the plaintiff - in conspiracy not only with [JSP&KAP], but also [WCLE] for approximately a decade (at this moment in time) against the plaintiff. During at least some of this conspiratorial dialogue between the two conspirators, both [RSR] and [JSP] express their mutual anger and enormous frustration against the plaintiff to one-another. In particular, both [RSR] and [JSP] express their mutual anger and enormous frustration that the plaintiff had amassed such a mountain of extremely incriminating evidence against them, and as a result of such mountain of extremely incriminating evidence, that they would need to formulate a thorough and carefully-executed plan along with their co-conspirators at [WCLE], in-order-to make sure that the plaintiff is fully obstructed from seeking justice and/or exposing the defendants' criminal conspiracy and racketeering-enterprise against the plaintiff. At the very end of such conspiratorial dialogue which also demonstrated their anger and frustration at the plaintiff, [RSR] departs [JSP], again walking around the [JSP&KAP]'s protruding tree, thereby avoiding walking on the plaintiff's property. As [RSR] walks further-and-further away from the [JSP], [JSP] yells at [RSR], much like a top-level enforcer or mob-boss would re-assure the kingpin (or mafia-

SIDDHARTH KODE V. WILLIAMSON COUNTY, ET AL.

1696907690

godfather) that such top-enforcer/mob-boss has got such kingpin's back, *"IF YOU EVER NEED ANYTHING, JUST HOLLER AT US!"* [RSR], the kingpin, finding comfort in [JSP]'s reassuring statement, responds, *"OH, I WILL! THANK YOU!"* [JSP] responds, again just like a top-level enforcer/mob-boss would reassure such kingpin, *"NO PROBLEM!"* [RSR], the kingpin, finding comfort in [JSP]'s reassuring statements, responds again, *"YALL ARE GOOD TO ME! ... "* [JSP] responds, again just like a top-level enforcer/mob-boss would reassure such kingpin, *"YOU'RE GOOD PEOPLE, TOO, BECKY!"* [RSR], the kingpin, finding comfort in [JSP]'s reassuring statements, responds again, *"OH! THANK YOU! ... "*, as she enters back into her property and house. The timing of this incident cannot be emphasized enough, and there is simply no other manner in which any reasonable observer that looks at all of the evidence that the plaintiff has accumulated could interpret this situation. It became abundantly clear to the plaintiff, that even though the plaintiff had sent private email(s) to the [WCLE] describing [RSR]'s, [JSP&KAP]'s retaliatory (thus felonious) crimes against the plaintiff, as described in the previous incident, one-or-more person(s) within [WCLE] informed [RSR],[JSP&KAP] of these private emails - in total violation of the plaintiff's right to privacy, considered to be the Abuse-of-Office crime of *"Misuse-Of-Official-Information"* - and furthermore, completely-indicative of the malicious conspiracy (and associated racketeering-enterprise) between [RSR],[JSP&KAP] and [WCLE] against the plaintiff. Although no part of the plaintiff's lawsuit actually relies-upon, rests-upon or hinges-upon this particular assertion, the plaintiff asserts that this incident - along with many other incidents - further reveals that [WCLE] was not only protecting White-American private-citizen racketeer co-defendants [RSR],[JSP&KAP] (and some of their own employees involved in such conspiracy and racketeering-enterprise against the plaintiff) from prosecution for the decade of serious, racially-motivated hate-crimes that [RSR],[JSP&KAP] (and those specific employees of [WCLE]) had aggregately committed against the plaintiff (just like [WCLE] did during those initial years with the plaintiff's initial White-American neighbor [JJB]), but also that [WCLE] was closely-coordinating and planning the course of predatory and retaliatory actions that [WCLE] would be initiating against the plaintiff, in conspiracy with racketeer co-defendants [RSR],[JSP&KAP].

## ¶523

On or about the date of {2020-06-23}, the plaintiff anonymously responds to the [NGO] *"Global Witness"*, trying-to-maintain anonymity by referring to the plaintiff in the third-person, thanking such [NGO] for their response and providing such [NGO] with more details as such [NGO] had requested:

> ** :  PRIVATE, SECURE AND ANONYMOUS MESSAGE FROM PLAINTIFF TO [NGO]  "GLOBAL WITNESS"     {2020-06-23 17:16}(~)
> [ PRIVATE INFORMATION IN MESSAGE OMITTED/REDACTED TO PROTECT PRIVACY ]

**PLAINTIFF**      *Thank you for your response.*

*This video is only one of many such incident videos, dating back to 2016.*

*This particular video was taken at approximately 2020-06-16 08:00 CST in the Central-Texas area of the United States.*

*The victim (the one picking the weeds into the bucket) is an environmental-justice/economic-justice/social-justice activist who also happens to be a foreign-born immigrant of color.*

*The victim looks like a Muslim immigrant (with very-dark skin color, long-uncut hair), and is thus a constant target of extreme anti-Muslim racism/xenophobia from 4 neighboring (white) homeowners.*

*The victim was also a former student at the University of Texas at Austin, where he was registered as a student with disabilities - a cognitive disability.*

*To put the threats of violence into context, the victim is a small-statured individual weighing about 100 pounds, while the vicious neighbors are much*

*larger (weighing well over 200 pounds) and given their reactionary politics (and crazed gun culture), in all likelihood, are armed with lethal weapons.*

*The victim has been a constant target of vicious propaganda by these white homeowners, that together conspire/collude to get law enforcement to act against him citing so-called "nuisance" laws concerning "weeds" and cardboard used as mulch, when these neighbors themselves are committing actual crimes - to be specific, serious hate crimes - such as:*

*(\*) terroristic threats (including death threats)*

*(\*) other hate speech*

*(\*) threats of brutal police/racist violence (reference to "Rodney King")*

*(\*) racial/xenophobic/homophobic slurs*

*(\*) extreme psychological abuse*

*(\*) public slander/defamation*

*(\*) intimidation/retaliation for the reporting of crimes*

*(\*) vandalism (destruction of the security cameras, tampering/disabling of security cameras, destruction of vegetation that the victim took great efforts and paid to install, damage to political yard signs - all on the victim's property).*

*(\*) criminal trespassing*

*One of the white homeowners was given a criminal-trespass-warning against the victim's property about 9 years ago (in 2011).*

*Despite the fact that one of these white homeowners has violated the trespass warning by trespassing on the victim's property earlier this month, law enforcement claims that they cannot find the criminal-trespass-warning on file, and as such, at least as of right now, is not willing to take any action by charging the perpetrator.*

*(The victim's security camera recordings show proof of the trespassing).*

*The victim also lives within a "Homeowners Association (HOA)" - a housing subdivision run by a private corporation - where the all-white board members enforce the neighborhood's (culturally-insensitive, racially-insensitive) rules in a highly discriminatory manner - and just like law enforcement - they only target homeowners who they receive complains from - and this is inherently predatory and abusive - especially given the racial demographics of the nearly-all-white subdivision.*

*For example, the video shows the victim picking weeds in a "no-mow" grass - a specialty low-growing grass that the victim took great effort and money to install - to eliminate the need for the environmentally-destructive lawnmowing, and allow for a truly drought-resistant unmowed grass that has the least environmental impact (and to the contrary, has a net-positive environmental impact):*

*https://www.nrdc.org/stories/more-sustainable-and-beautiful-alternatives-grass-lawn*

*https://www.nrdc.org/resources/toward-sustainable-landscapes-restoring-right-not-mow*

*https://www.nrdc.org/sites/default/files/sustainable-landscapes-20160506.pdf*

*https://archive.epa.gov/greenacres/web/html/jmlr.html*

*For his substantial efforts in campaigning and fighting for the right to install this alternative "no-mow" grass (as documented in the links above), the victim is constantly threatened by his white neighbors who complain to law enforcement and threaten to sue - using the HOA as their preferred weapon of choice - since that prevents them from having to spend any money fighting the costly legal battles that the victim really does not have the financial resources to spend (the victim cannot match the million-dollar financial/legal resources of the HOA or the county/state law enforcement).*

*This grass is severely damaged since the perpetrator (also shown in the video) mowed over it multiple times using a lawnmower (during the midst of last year's intense summer drought August 2019, and in May 2020) - the perpetrator knows that this is a "no-mow" grass that is not intended to be mowed, but that clearly will not stop this openly-racist man from imposing his racist views on property that he does not even own.*

*The victim also has video evidence of much of the above crimes, but does not know if he should release it to law enforcement to pursue charges due to violent retaliation from the neighbors or financial/legal retaliation from the HOA.*

*The victim also has every reason to be distrustful of the county law enforcement, which has a long track record for not respecting minority rights, and which still has remnants of the old Southern-US racist politics - the victim himself has been mistreated on multiple occasions by racist cops.*

*Due to all of these reasons, the victim lives a life of constant stress and fear - but nonetheless, wishes to remain living at this location not only to continue documenting the injustice, but also because moving would be a cowardly act that allows such institutionally-racist terror to win.*

*Due to privacy reasons, the victim does not currently want to reveal the exact location and identity, but does want to know about any possible avenues for justice.*

*Also, in case the victim is seriously wounded or killed, the victim would not like to be yet another hate-crime statistic, but rather, that his injury/death would serve to advance social justice and prevent such injustice from happening to anyone else.*

*The victim can share more videos documenting the injustice in case you are interested.*

# ¶524

On or about the approximate date and approximate time of {2020-06-26 21:15}, [RSR] and [KAP] continue to maliciously-predatorily-and-secretly conspire/collude/strategize and scheme against the plaintiff, planning on the best course-of-action in their decade-long conspiracy with [WCLE] to once-again retaliate, this time with full-force, against the plaintiff for the plaintiff's *"audacity"* to record, report and/or plan-to-provide-the-mountain-of-evidence-of their racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses against the plaintiff to [WCLE] (dating back to {2011}), especially since the plaintiff has already made the plaintiff's intentions of doing so in the aforespecified email to [WCLE].

# ¶525

During the late-night of of {2020-07-04} (and possibly even during the preceding nonholiday late-night of {2020-07-03}), [JSP] and/or [NP] and/or [KAP] illegally light fireworks, with at least some of the debris from such fireworks landing on the plaintiff's property [788KLLTX78641].

# ¶526

On or about the approximate date and approximate time of {2020-07-06 22:15} (late-night), [RSR] shouts out *"L****"* one-or-more time(s) to call her unleashed large-dog, [L], which was, as usual, roaming freely, in violation of the restrictive-covenants, outside of [RSR]'s property [784KLLTX78641] - even at nighttime.

# ¶527

On or about the approximate date and approximate time of {2020-07-07 11:20}, [RSR]'s unleashed large-dog, [L], enters into the plaintiff's [YARD] one-or-more times, in violation of the restrictive-covenants. On or about the approximate date and approximate time of {2020-07-07

20:42}, [RSR]'s unleashed large-dog, [L], runs up the street one-or-more times, in violation of the restrictive-covenants. On or about the approximate date and approximate time of {2020-07-07 23:56} (late-night), [JSP] uses a torch-light to shine such light directly into the lens of one-or-more of the plaintiff's security-camera(s), again, in more of his repeated attempts to permanently *"blind"* such security-camera(s) and/or destroy the night-vision circuitry and functionality of such security-camera(s).

## ¶528

On or about the approximate date and approximate time of {2020-07-08 21:44} (night), the plaintiff notices that [RSR]'s unleashed large-dog, [L], has crossed the street and is roaming freely onto the sidewalk in front of the plaintiff's property.

## ¶529

On or about the approximate date and approximate time of {2020-07-11 19:00}, the plaintiff starts watering the plaintiff's *"no-mow"* grass using a hose. The plaintiff notices that [JSP]'s boat is illegally parked for many days in front of the plaintiff's property, just as it had been, more-often-than-not, during this year of {2020} and the following years of {2021},{2022} - when the restrictive-covenants of the neighborhood explicitly prohibit the parking of any boat, anywhere that is visible from the street. [JSP] is walking around with a string-trimmer in hand, trimming the vegetation of various areas of the [784KLLTX78641] yard, but then also trimming substantial parts of the plaintiff's *"no-mow"* grass, even trespassing into the plaintiff's property to illegally trim such grass (as he has also done on numerous previous occasions). After [JSP] realizes that plaintiff is watering the plaintiff's [FRONTYARD]-grass close-by, [JSP] starts another racist, abusive and threatening rant against the plaintiff. Both large-teenage son [NP] (approximately 6-feet-tall - thus significantly larger than the plaintiff) and wife [KAP] are around the area of [JSP], fully witnessing (or at least hearing), all of [JSP]'s loud, racist, abusive and threatening words against the plaintiff:

▷ RECORDED RACIST, ABUSIVE, FRAUDULENT, THREATENING AND FRAUDULENT RANT FROM [JSP] TO PLAINTIFF(⊩):    {2020-07-11 19:00} (~)
▷ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

⟦ PLAINTIFF MOVES HOSE FROM ONE AREA TO ANOTHER TO FLOOD AREAS OF NO-MOW GRASS DAMAGED BY SUMMER DROUGHT AND BY [JSP]'S CRIMINAL VANDALISM OF SUCH GRASS IN {2019-08}. ⟧
⟦ [JSP], WHILE [NP] IS IN THE BACKGROUND WITNESSING, STARTS SHOUTING ANOTHER RACIST, ABUSIVE, FRAUDULENT, THREATENING AND FRAUDULENT RANT TO PLAINTIFF: ⟧

[JSP]          *HEY, PERV BOY! YOU NEED TO KEEP THAT CAMERA OFF MY YARD, MAN! ... WHAT THE HELL IS WRONG WITH YOU?! ARE YOU SOME*
               *KIND OF PERVERT OR SOMETHING?! ... ARE YOU A PERVERT?! - IS THAT WHAT YOU ARE?! [IS THAT WHAT YOU DO?!] ... YOU NEED TO*
               *KEEP YOUR GOD-DAMN CAMERAS OUT OF MY BACKYARD - YOU BIG PERVERT!-*

⟦ PLAINTIFF, AFTER PLACING HOSE TO FLOOD A DAMAGED AREA OF NO-MOW GRASS, LEAVES TO AREA TO ESCAPE [JSP]'S ABUSE. ⟧
⟦ [JSP] YELLS OUT LOUD AT THE TOP OF HIS VOICE SO THAT PEOPLE FROM MANY HOUSES AWAY COULD EASILY HEAR: ⟧

[JSP]          *-PERRRRRVERTTTTT!*

⟦ PLAINTIFF ENTERS BACK INTO THE [HOUSE], TRAUMATIZED BY THE INCIDENT. ⟧
⟦ APPROXIMATELY A FEW MINUTES LATER, PLAINTIFF WALKS BACK TOWARDS HOSE TO MOVE THE HOSE TO ANOTHER DAMAGED AREA OF NO-MOW GRASS. ⟧
⟦ [JSP], WHO IS ALSO NOW WATERING GRASS OF [784KLLTX78641], LOOKS AT PLAINTIFF AND STARTS SINGING A DEROGATORY SONG AGAINST PLAINTIFF. ⟧

1696907690

〘 BOTH [KAP] AND [NP] ARE ALSO IN THE BACKGROUND WITNESSING ALL OR PART OF THE FOLLOWING: 〙

[JSP]     *Spying on us - big pervert! ... 'I'M PERV BOY! ... I LIKE TO SPY ON PEO-PLE! ... I LIKE TO LOOK AT PEO-PLE! ... THROUGH ALL MY CAM-ER-AS... BECAUSE I'M A BIG PERVVV-ERTT! THAT'S WHY I DO LIKE A PERVV-ERTT! BECAUSE I AM PERVVV-ERTT!' YOU'RE A PERV!*

〘 AS PLAINTIFF RESUMES OTHER WORK IN (FRONTPORCH) AREA, [JSP] CONTINUES TO YELL RACIST INSULTS AT PLAINTIFF, THEN RIDICULES- 〙

〘 -PLAINTIFF ABOUT PLAINTIFF'S WEARING OF A FACE-MASK, WHILE CONTINUING TO MAKE GROSSLY-UNINFORMED AND SELFISH/INCONSIDERATE- 〙

〘 -STATEMENTS ABOUT THE COVID-19 PANDEMIC WIDELY REPORTED IN FAR-RIGHT-WING MEDIA: 〙

[JSP]     *PERVERT! ... PERVERT! ... PERVERT! ... WHAT THE HELL IS HE WEARING! HOW DO YOU THINK YOU'RE GOING TO GET COVID BY! GET OUT OF HERE! [???]! YOU DON'T KNOW HOW TO GET COVID BY! DON'T BE A DUMBASS! CAUSE EVERYBODY ELSE IS WEARING A MASK, DON'T MEAN YOU NEED TO!*

〘 [JSP] LAUGHS OUT LOUD DERISIVELY, STATING THAT THE PLAINTIFF IS NOT WORTHY OF ANY RIGHTS AFFORDED TO EVERY OTHER PERSON: 〙

[JSP]     *BUT YOU AIN'T EVERYBODY ELSE!*

## ¶530

On or about the date and approximate time of {2020-07-26 17:15}, [JSP], while in his pickup-truck near the plaintiff's private-property, yells some angry words into the plaintiff's security cameras. Approximately 15 minutes later, [JSP] while watering his yard, issues the obscene/vulgar gesture of his middle-finger raised to one-or-more of the plaintiff's security-camera(s).

## ¶531

On or about the date and approximate time of {2020-08-01 06:15}, [JSP] throws some debris or other waste-product onto the plaintiff's [FRONTYARD]. On or about the date and approximate time of {2020-08-01 16:42}, [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641].

## ¶532

On or about the date and approximate time of {2020-08-03 11:00}, a contractor hired by [RSR] drives his contractor's truck slightly into the plaintiff's [DRIVEWAY] in-order-to take a three-point-u-turn. The plaintiff had noticed the same contractor use the plaintiff's [DRIVEWAY] in such manner on at least one prior occasion in the previous week. By sharp contrast, [RSR] would not even allow a delivery-driver delivering sod to the plaintiff's private-property to temporarily pause his semi-truck even for a minute on the (public) street in front of her property on or about the date of {2017-10-25} - and would continue to harass multiple of the plaintiff's contractors on that particular day and on other days - for example, the date of {2020-05-05}.

SIDDHARTH KODE V. WILLIAMSON COUNTY, ET AL.                                    1696907690

## ¶533

On or about the date and approximate time of {2020-08-04 18:45}, [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641].

## ¶534

On or about the date and approximate time of {2020-08-08 10:45}, [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard during a period of time spanning up to 4 minutes - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641].

## ¶535

On or about the date and approximate time of {2020-08-15 13:18}, [RSR] steps at at least partially into the plaintiff's private-property ([DRIVEWAY]) while she is walking towards her co-conspirators [JSP&KAP]'s property, [784KLLTX78641] - despite of the fact that a [CTW] has been issued against her, forbidding her from trespassing onto the plaintiff's private-property.

## ¶536

On or about the date and approximate time of {2020-08-19 11:35}, [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641]. On or about the date and approximate time of {2020-08-19 16:52}, [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641]. On or about the date and approximate time of {2020-08-19 19:52}, [RSR]'s unleashed large-dog, [L], runs uncontrollably towards a truck driven by [785KL-2018-1] (which was being driven up the street), forcing [785KL-2018-1], through no choice of her own, to stop such vehicle abruptly on the street, in-order-to avoid such truck running over such dog.

## ¶537

On or about the date and approximate time of {2020-08-19 22:43}, a [WC] police-vehicle - either from the [WCSO] or the [WCCO] - drives down Hummingbird. Within a minute or so later, as the plaintiff is watering grass in the [FRONTYARD], the plaintiff notices what appears to be the same [WC] police-vehicle drive past the plaintiff as the plaintiff is watering such grass.

## ¶538

On or about the date and approximate time of {2020-08-20 11:40}, two police-vehicles - which, more-likely-than-not, were [WC] police-vehicles - speed up the street spaced approximately 20 seconds apart from each other.

## ¶539

On or about the date and approximate time of {2020-08-21 13:50}, two police-vehicles - which, more-likely-than-not, were [WC] police-vehicles - speed down the street spaced approximately 10 seconds apart from each other.

## ¶540

On or about the date and approximate time of {2020-08-21 00:06} (past-midnight), one police-vehicle - which, more-likely-than-not, was a [WC] police-vehicle - drives unusually slowly up the street as passing the plaintiff's private-property on such street. A few minutes later, the plaintiff notices what appears to be the same police-vehicle drive slowly down the street as passing the plaintiff's private-property on such street.

## ¶541

On or about the date and approximate time of {2020-08-22 20:15}, [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641].

## ¶542

On or about the date and approximate time of {2020-09-09 13:19}, one police-vehicle - which, more-likely-than-not, was a [WC] police-vehicle - drives unusually slowly up the street as passing the plaintiff's private-property on such street.

## ¶543

On or about the date and approximate time of {2020-09-10 21:37} (nighttime), [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641].

## ¶544

On or about the date and approximate time of {2020-09-13 21:55} (nighttime), [JSP] steps 3-to-4 feet into the plaintiff's [YARD] in-order-to water grass in a certain corner of his yard - with [JSP]'s continued trespassings onto the plaintiff's private-property occurring despite [JSP] having already been interviewed by [WCSDet-WP] about alleged hate-crimes committed by [JSP] against the plaintiff.

## ¶545

On or about the date and approximate time of {2020-09-17 22:35} (nighttime), [JSP] intentionally beeps the loud truck-lock on his pickup-truck 5-or-more times consecutively (for no justifiable reason) - at a time during which most residents (including the plaintiff) would, more-likely-than-not, be sleeping.

## ¶546

On or about the date and approximate time of {2020-09-19 18:30}, [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641].

## ¶547

On or about the date and approximate time of {2020-09-20 23:54} (nighttime), [JSP] intentionally beeps the loud truck-lock on his pickup-truck 5-or-more times consecutively (for no justifiable reason) - at a time during which most residents (including the plaintiff) would, more-likely-than-not, be sleeping.

## ¶548

On or about the date and approximate time of {2020-09-25 15:40}, racketeer co-defendant [KAP] walks from her property, [784KLLTX78641], towards racketeer co-defendant [RSR]'s front-door, one of several meetings in which racketeer co-defendants [KAP], [RSR] maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff - especially leading up to the predatory incident of racial-oppression and racketeering-activity occurring on the following date of {2020-10-12} (see below).

## ¶549

On or about the date and approximate time of {2020-10-12 11:45} - the date on which the plaintiff, an indigenous person, celebrates *"Indigenous Peoples' Day"* - the plaintiff notices that a [WCCO] police-vehicle parks at the opposite-curbside of [RSR]'s property diagonally and across the street from the plaintiff. Approximately 13 minutes later, the plaintiff notices another [WCCO] police-vehicle park in front of the curbside of the plaintiff's property. Shortly after this point in time, [WCCD-Harrell] emerges from the first [WCCO] police-vehicle parked at the opposite-curbside of [RSR]'s property and walks towards the other police-vehicle, while [WCCD-F] emerges from that police-vehicle and meets with [WCCD-Harrell] on the street. As [WCCD-F] walks behind [WCCD-Harrell] towards the plaintiff's [FRONTDOOR], the plaintiff notices that [WCCD-F] puts on his sun-glasses, so as if to slightly conceal his identity, while also wearing a *"Blue-Lives-Matter"* face-mask. It should be noted that at least some fraction of the people of the United States and/or some reputable organizations within the United States consider *"Blue-Lives-Matter"* to either be a racist movement and/or organization, at least in part due to the fact that, on at least some occasions, members of far-right-wing-extremist and/or White-Supremacist groups such as the *"Proud Boys"* show up at *"Blue-Lives-Matter"* rallies in support of *"Blue-Lives-Matter"*. As [WCCD-F] passes the plaintiff's [FRONTYARD]-political-yard-signs, [WCCD-F] looks into such [FRONTYARD]-political-yard-signs with anger and contempt. [WCCD-Harrell] and [WCCD-F] then approach the plaintiff's [FRONTDOOR]. [WCCD-F] stands on the edge of the plaintiff's [FRONTPORCH] with his hands on or near the holster, as if to get ready to use such service-weapon in case the plaintiff answered the [FRONTDOOR] and made any *"wrong move"*. [WCCD-Harrell] knocks on the plaintiff's [FRONTDOOR] several times. Since no-one is answering, approximately 20 seconds later, [WCCD-Harrell] then rings the plaintiff's [FRONTDOOR]-bell. Since no-one is answering, approximately 20 seconds later, [WCCD-Harrell] knocks on the plaintiff's [FRONTDOOR], yelling, *"MR. KODE! IT'S THE CONSTABLE'S OFFICE!"* During this entire time, [WCCD-F] is either looking into the plaintiff's

[FRONTPORCH] (private/concealed/curtilage area), or is looking into the interior of the plaintiff's open (but unlit) [GARAGE] (private/curtilage) area. After 30 seconds of more time of waiting near the plaintiff's [FRONTDOOR], both [WCCD-Harrell] and [WCCD-F] then walk out of the [FRONTPORCH] and into [DRIVEWAY], spend a few seconds, paused, looking into the plaintiff's open (but unlit) [GARAGE], and then walks towards the side-yard area closest to the plaintiff's 6-feet-tall-privacy-fence's fence-gate. Once again, **even if** the [WCCO] had obtained a valid search warrant to search the plaintiff's private-property, Texas law required them to leave a copy of such search-warrant at the [FRONTDOOR] while continuing to execute such search. No such copy was left at the [FRONTDOOR], leading the plaintiff to immediately suspect that they, once-again, were acting in a malicious-and-predatory, unconstitutional-and-unlawful search of the plaintiff's private-property. Both [WCCD-Harrell] and [WCCD-F] walk through deep inside the plaintiff's [FRONTYARD] (also considered to be curtilage) - with [WCCD-F] looking into various private/concealed/curtilage areas of the plaintiff's property. [WCCD-Harrell] and [WCCD-F] then walk around the plaintiff's [FRONTYARD] trees, in-order-to get to the plaintiff's 6-feet-tall-privacy-fence's fence-gate (located deep within private/curtilage side-yard). Both in the process of approaching the plaintiff's 6-feet-tall-privacy-fence's fence-gate and in the process of returning to the [DRIVEWAY] of the plaintiff's private-property, [WCCD-Harrell] and/or [WCCD-F] repeatedly bend one-or-more of the branches of the plaintiff's [FRONTYARD]-tree, because again, according to the employees/officials of [WCLE], the plaintiff was not the rightful owner of the property [788KLLTX78641], and so, even if the plaintiff did not want government intruders nonconsensually touching any aspects of the plaintiff's private-property (including such vegetation), such strong-preferences of the plaintiff did not concern them. [WCCD-Harrell] approaches the plaintiff's 6-feet-tall-privacy-fence's fence-gate and peeks through a very-small-hole in such fence-gate in-order-to search and/or seize-evidence-about (using a body-worn-camera) the plaintiff's private/concealed/curtilage [BACKYARD]. [WCCD-F] stands back closer to the plaintiff's private/concealed/curtilage [FRONTPORCH], as if to play lookout for the plaintiff. Both, while approaching the plaintiff's 6-feet-tall-privacy-fence's fence-gate and after departing the plaintiff's 6-feet-tall-privacy-fence's fence-gate, [WCCD-Harrell] looks into the plaintiff's private/concealed/curtilage [FRONTPORCH]. As [WCCD-Harrell] and [WCCD-F] are performing this malicious-and-predatory, unconstitutional-and-unlawful search of the plaintiff's private-property, far-right-wing-extremist, racketeer co-defendant [RSR] - who played the role of the *"kingpin"* in such racketeering-enterprise against the plaintiff - opens her garage door, and appears to emerge from her house. [RSR] appears to check the control-panel of her automatic-sprinkler-system, then walk towards an unidentified White-American male, [UWAM-8] - either a contractor-of or a resident-of property [800KLLTX78641] - asking for his assistance with some aspect of such automatic-sprinkler-system. On their way to such control-panel, both [RSR] and [UWAM-8] briefly glance at these two [WCCD]s as such [WCCD]s are executing such clearly unconstitutional-and-unlawful search of the plaintiff's private-property. [RSR] even motions her hand at least one time towards such [WCCD]s - once again, revealing that she was hell-bent on engaging in her usual, relentlessly-racist propaganda against the plaintiff in-order-to engender more racial-animus against the plaintiff in as many White-American residents of the subdivision as she could. During most of the time that [RSR] is outdoors during this incident, [RSR]'s large dog, [L], is roaming freely across the street, unleashed, even sniffing at the tips of the plaintiff's private-property - because once again, according to the [HOA], [WCLE] and [RSR], the restrictive-covenants of the subdivision do not apply to [RSR] - the *"kingpin"* of such racketeering-enterprise against the plaintiff. As [WCCD-Harrell] and [WCCD-F] walk away from the plaintiff's 6-feet-tall-privacy-fence's fence-gate and return to the front of the plaintiff's [FRONTYARD]-political-yard-signs, [WCCD-F] once again looks into the plaintiff's [FRONTYARD]-political-yard-signs with anger and contempt. [WCCD-Harrell] and [WCCD-F] then walk towards the 6-feet-tall-privacy-fence at other side of the plaintiff's side-yard, apparently hell-bent on trampling roughshod on the plaintiff's rights - with complete disregard of the fact that the plaintiff has never wanted such government intruders anywhere within the plaintiff's private-property (or *"castle"*). The plaintiff also notices far-right-wing-extremist, racketeer co-defendant [KAP] - who played the role of the *"second-in-command"* in such racketeering-enterprise against the plaintiff - in her backyard,

excitedly looks-at and hears such [WCCD]s that are acting on her command and the command of racketeer co-defendant [RSR] in such brazenly oppressive manner against the plaintiff - by continuing-to-execute such clearly unconstitutional-and-unlawful search of the plaintiff's private/concealed/curtilage [BACKYARD]. [WCCD-Harrell] peaks through a very-small-hole and/or slightly-tilted-picket in the plaintiff's 6-feet-tall-privacy-fence in-order-to search and/or seize-evidence-about (using a body-worn-camera) the plaintiff's private/concealed/curtilage [BACKYARD]. However, both [WCCD-Harrell] and [KAP] fully know that any items scattered near this particular area of the plaintiff's private/concealed/curtilage [BACKYARD] have been maliciously dumped at such location by [KAP]'s husband, [JSP], during [JSP]'s brazen vandalism of the plaintiff's private-property on-or-about the date of {2020-03-24}. After inspecting such area, and one-or-more of the plaintiff's companion-tortoises (o) that happen to be walking around in such area, [WCCD-Harrell] then takes a step back and instructs [WCCD-F] to follow along and similarly look into the plaintiff's private/concealed/curtilage [BACKYARD] through such very-small-hole and/or slightly-tilted-picket. It appeared to the plaintiff that [WCCD-Harrell] was in a supervisory role with respect to [WCCD-F] - that [WCCD-F] was below the rank of [WCCD-Harrell] and that [WCCD-F] was following the commands of [WCCD-Harrell]. If this suspicion by the plaintiff is confirmed to be true, then it would appear to suggest that [WCLE] truly operates in a brazenly-unlawful manner not always due to the malicious actions of lowest-ranking-members, acting out of their own abuse-of-official-capacity, but rather, that such lowest-ranking-members are actually instructed to act in such brazenly-unlawful manner by higher-ranking-members. Again, if such suspicion by the plaintiff is confirmed to be true, then [WCLE]'s pattern of abuse-of-official-capacity against the plaintiff that the plaintiff seeks to expose is not limited to such lowest-ranking-members, but rather to some of the brass and perhaps, even the top-level-leadership. [WCCD-Harrell] and [WCCD-F] appear to speak to each-other, with [WCCD-F] speaking loudly. As soon as [WCCD-F] indicates that he is done searching the plaintiff's private/concealed/curtilage [BACKYARD], and as soon as [WCCD-F] and [WCCD-Harrell] motion to leave such side-yard area, [KAP] - upon realizing that the plaintiff is not going to nonconsensually-allow such government intruders into the plaintiff's [BACKYARD] again, and upon hearing that such [WCCD]s are done executing such unconstitutional-and-unlawful search/seizure of the plaintiff's private/concealed/curtilage [BACKYARD], immediately and rapidly walks back inside her house on her way way to walk through the front-door of her house, so that she can meet with such [WCCD]s at the street in front of the plaintiff's property. The plaintiff notices that [KAP] does not walk through her side-yard and through her fence-fate - which would have been the shortest path, the fastest path and the most convenient path to meet with such [WCCD]s - but instead, [KAP] enters back into her house and emerges through her front-door. However, [KAP] does not immediately approach such [WCCD]s, instead waiting a minute or more to see if the plaintiff emerges from within the plaintiff's [HOUSE]. It would have been absolutely disastrous for [KAP] to walk towards such [WCCD]s only to notice that the plaintiff was doing the same - as [KAP] wanted to keep all aspects of her conspiracy against the plaintiff as secretive and inconspicuous as possible. As soon as [WCCD-Harrell] and [WCCD-F] walk back towards the street, [RSR]'s large dog, [L], runs towards them, even crossing the street, and [WCCD-Harrell] bends down to pet such dog, while [WCCD-F] playfully watches along. [RSR]'s dog, [L], then runs past such [WCCD]s and starts sniffing at a border of the plaintiff's private-property. [RSR] then approaches such [WCCD]s, pretending as if she is retrieving her dog, when what she really intended to do was to maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff with such [WCCD]s. Both [WCCD]s speak very affectionately towards [RSR], who clearly deserves the utmost reverence, as the *"kingpin"* of such racketeering-enterprise against the plaintiff. Almost every aspect of [WCLE]'s criminally-abusive interactions with the plaintiff and [WCLE]'s criminally-abusive actions against the plaintiff in-and-around the plaintiff's private-property were meant to additionally convey to the plaintiff that the plaintiff's far-right-wing-extremist, White-American neighbors were free to violate the restrictive-covenants as they pleased, and instead, it was only the plaintiff, the immigrant-of-color/indigenous-person (and political-activist), that [WCLE] was predatorily after - if not by placing the plaintiff's property under foreclosure (which was the defendants' ultimate goal), then, at the very least, by driving the plaintiff out of

such White neighborhood via such decade of racial-oppression and racketeering-activity. Both [WCCD-Harrell] and [WCCD-F] then move closer to [RSR]'s property, with [WCCD-F] issuing some final statements to [WCCD-Harrell]. [WCCD-F] bids [WCCD-Harrell] farewell, enters into his [WCCO] police-vehicle. [WCCD-Harrell] then begins to approach [RSR] at [RSR]'s property, [789KLLTX78641], and bends down to pet [RSR]'s large-dog, [L], one more time. At this point in time, [KAP] feels fully confident that the plaintiff was not going to approach [WCCD-Harrell] and [KAP] also feels more-free to maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff with co-racketeers [WCCD-Harrell],[RSR] at such greater-distance from the plaintiff's numerous security-cameras. [KAP] begins to walk towards co-racketeers [WCCD-Harrell],[RSR], but once-again, in a round-about path to avoid the plaintiff's numerous security-cameras - even crossing the street at the earliest point to avoid the plaintiff's numerous security-cameras. It became abundantly clear to the plaintiff that [KAP] was avoiding the plaintiff's numerous security-cameras at all costs, and in particular, [KAP] wanted to be as far as possible from the plaintiff's security-cameras' audio-recording-capabilities when she walked towards such co-racketeers [WCCD-Harrell],[RSR] in-order-to maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff. [WCCD-Harrell] approaches [RSR]'s property, [789KLLTX78641], across the street and further away from the plaintiff's property, [788KLLTX78641], in such manner because, as a lower-ranking racketeer in such racketeering-enterprise against the plaintiff, [WCCD-Harrell] must also avoid the plaintiff's security-cameras at all costs - and in particular, all of such racketeers must be as far away as possible from the audio-recording-capabilities of the plaintiff's numerous security-cameras - as they maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff. The plaintiff must reiterate, once again, that since [RSR] lived diagonally and across-the-street from the plaintiff, with the two houses separated by approximately 110 feet of open-space, [RSR] had absolutely no legal claim to any goings-on within the confines of the plaintiff's private-property. But such facts are simply irrelevant to such racketeers, as such racketeers have almost-always, if not always, felt a brazen sense of impunity when the victim of their predatory conspiracy is only the lowly plaintiff - whom they had always considered to be a powerless, *"low-IQ"*, sub-human animal ( 🐒 ). As [WCCD-Harrell] is talking to [RSR] at the sidewalk in front of [RSR]'s street with [UWAM-8] hearing/witnessing just a few feet away, on one-or-more occasions, [WCCD-Harrell] even points at the plaintiff's property. [WCCD-F], driving inside of his [WCCO] police-vehicle drives towards [WCCD-Harrell], pauses in front of [RSR] and [WCCD-Harrell], making some playful statements - because after all, it was only the lowly plaintiff's rights that they were all predatorily violating - before bidding his final farewell to all of these individuals and driving away in such police-vehicle. [WCCD-Harrell] then continues communicating with [RSR] with [UWAM-8] hearing/witnessing all of such initial conspiratorial/colluding dialogue between the such racketeers against the plaintiff. The plaintiff asserts that since neither [RSR] nor [UWAM-8] are either valid witness(s) or valid complaining-party(s) to any of the alleged complaint regarding private/concealed/curtilage areas of the plaintiff's private-property, [WCCD-Harrell] is once again, committing yet another count of the Texas crimes of Misuse-Of-Official-Information, Abuse-Of-Official-Capacity and Official-Oppression (along with the associated federal crimes of [18-USC-PI-C13-§242], [18-USC-PI-C13-§241]) against the plaintiff, by communicating alleged private/confidential details about private/concealed/curtilage areas of the plaintiff's private-property to unauthorized third-parties - in complete violation of the plaintiff's rights. Furthermore, all of [WCCD-Harrell]'s crimes against the plaintiff are retaliatory crimes - thus making them felonies under Texas law and racketeering-acts under federal law. (Such is also obviously also true for all of the crimes against the plaintiff committed by racketeer co-defendants [JSP&KAP],[RSR] since the month of {2011-08} - but the plaintiff tries to highlight the egregious government misconduct in this lawsuit, because the plaintiff considers such egregious government-misconduct to be far more unacceptable both - to the plaintiff and the general-public - than the overt racketeering-acts of private-citizen, far-right-wing-extremist racketeer co-defendants [JSP&KAP],[RSR].) As [WCCD-Harrell] and [RSR] appear to be in such conspiratorial/colluding dialogue with each other, [RSR]'s large-dog, [L], begins running at full-pace towards [KAP] who is crossing the street to meet with [WCCD-Harrell] and [RSR]. As [KAP] approaches closer, [UWAM-8] starts to hesitantly walk away from the scene. As [KAP]

approaches even closer, [UWAM-8] then raises his hand to bid farewell to [RSR], while both [RSR] and/or [WCCD-Harrell] raise their hand to bid farewell to [UWAM-8], after which point, [UWAM-8] turns his back and starts walking back across the street in the other direction towards either his property or the property he was initially hired as a contractor for. The plaintiff cannot confirm this particular assertion without reviewing [WCCD-Harrell]'s body-worn-camera footage, but it appeared to the plaintiff, that [UWAM-8] felt uncomfortable being a party to such conspiratorial/colluding conversation against the plaintiff, especially since numerous of the plaintiff's security-cameras are recording such malicious-predatory-and-secret conspiracy/collusion between a White-American police-officer (who is part of a overwhelmingly-majority-White-government located in the overwhelmingly-majority-White-American County-of-Williamson) and two other White-American private-citizens ([KAP] and [RSR]). [WCCD-Harrell] turns to [KAP] and it appears to the plaintiff that [KAP] offers to, by herself, execute an unconstitutional-and-unlawful search/seizure of the plaintiff's private/concealed/curtilage [BACKYARD] - as an *"agent of the government"* - with any *"evidence"* seized from such search to be used in a purely-retaliatory prosecution against the plaintiff. [WCCD-Harrell] approves of [KAP]'s offer - unlawfully deputizing White-American private-citizen racketeer co-defendant [KAP] to execute such unconstitutional-and-unlawful search/seizure of such private-areas of the plaintiff's private-property - with [WCCD-Harrell] even making the hand-gesture of point-and-click - unlawfully deputizing [KAP] to act as an *"agent of the government"*, authorizing [KAP] to take photographs/videos of such private areas of the plaintiff's private-property. [KAP] turns around and walks back across the street - once again, taking the most round-about path to achieve this goal, in-order-to avoid the plaintiff's security-cameras at all costs. In the meantime, [WCCD-Harrell] and [RSR] continue to maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff, with [RSR] angrily gesturing and pointing (multiple times) towards the plaintiff's private-property - almost as if to indicate that she has been demanding this (purely-retaliatory) prosecution against the plaintiff for approximately a decade at this point - especially since the plaintiff had the *"audacity"* to continue to report her (and her co-conspirators [JJB]'s,[JSP]'s) racially-motivated hate-crimes against the plaintiff to [WCLE] dating all the way back to month of {2011-08}. [WCCD-Harrell] appears to nod and/or respond-in-the-affirmative, even pointing at the plaintiff's private-property one-or-more times, appearing to acknowledge the outrageousness of the *"audacity"* originating from such a lowly immigrant-of-color/indigenous-person that has no right to own private-property within *"their"* (exclusive-and-pure) White neighborhood. Rather than entering into her backyard via her fence-gate, which would have a much shorter and more convenient path towards achieving this goal, [KAP] actually enters into the more-distantly-located front-hallway of her property, then entering into the interior of her house (through her front-door), and then, emerges into her backyard from the backdoor of her house, in-order-to execute such unconstitutional-and-unlawful search/seizure of private/concealed/curtilage areas of the plaintiff's private-property. Once again, all of these deliberate actions by [KAP] to avoid the plaintiff's security-cameras fully demonstrate [KAP]'s *"consciousness-of-guilt"* - that she fully-knows that what she and her co-racketeers [WCCD-Harrell],[RSR] are doing against the plaintiff is illegal, that she fully-knows that what she and her co-racketeers [WCCD-Harrell],[RSR] are doing is egregiously-violative of the plaintiff's rights. [KAP] extends her hands over the plaintiff's 6-feet-tall-privacy-fence and holds up her camera-phone over such 6-feet-tall-privacy-fence in-order-to take photograph(s)/video(s) of the items stored above ground-level at the **middle** of the plaintiff's private/concealed/curtilage [BACKYARD] - far away from the borders with [KAP]'s property. As previously detailed, the plaintiff had transported over 90% of items initially stored in the plaintiff's private/concealed/curtilage [BACKYARD] - during [WCLE]'s previous unconstitutional-and-unlawful search/seizure of the plaintiff's private/concealed/curtilage [BACKYARD] on-or-about the date of {2020-04-28} - over to the plaintiff's agricultural-private-property - a fact that all of the defendants (who acted in such corrupt-malicious-predatory-and-retaliatory conspiracy against the plaintiff) were fully aware of. Clearly, any items stored at the **middle** of the plaintiff's private/concealed/curtilage [BACKYARD] cannot possibly constitute any public-nuisance, since such items are located at such great distance from the borders of the plaintiff's private-property - and in particular, very far away from [JSP&KAP]'s private-property. Additionally, the

overwhelming majority of such items that are stored at the **middle** of the plaintiff's private/concealed/curtilage [BACKYARD] are stored (at least 12 inches or higher) above ground-level - meaning that there is, once again, no possibility of any public-nuisance arising from any such items - and the plaintiff was even advised by an employee of the [WCCHD] - [WCCHDTL-SG] - to store such items in such manner - so that they would could not constitute a public-nuisance (see above). Additionally, according to the Texas Public Nuisance Law, the only items stored in a potentially unsafe manner that could potentially be considered to be a public nuisance are such items that are of one of two types of *"waste"* that are defined under such law: *"garbage"*, *"refuse"*. Even *"garbage"* and *"refuse"* stored within a person's private-property are not considered to be a public-nuisance if such items are stored in *"closed receptacle(s)"*. While the plaintiff did not have any compost within the plaintiff's private/concealed/curtilage [BACKYARD] at this particular moment in time, the plaintiff would also like to make clear that organic/biodegradable compost - including all organic/biodegradable items deliberately maintained within composting containers/piles/heaps - are never to be considered *"waste"* - as compost has *"value"* to the owner's of such compost - and such compost is intentionally generated for use to enrich the soil on a person's private-property. The plaintiff had strongly-maintained (in the past) and continued to maintain that of any-and-all of the items stored in the plaintiff's private/concealed/curtilage [BACKYARD] were not *"waste"* of any type - and that all of such items were considered by the plaintiff to be private-property items *"of value"* to the plaintiff. The plaintiff had (and continues to have) multiple companion-tortoises (○) - actively, excitedly and eagerly patroling through almost-all, if not all, of the ground-level areas of the plaintiff's private/concealed/curtilage [BACKYARD]. Although completely out of the plaintiff's control, several residents of the subdivision (including, but not limited to, [RSR]) were illegally - in violation of the restrictive-covenants of the neighborhood - allowing their (large, adult) cats to roam freely in the neighborhood, and the plaintiff would notice (and to this day, continues-to-notice) multiple of such large cats jump into the plaintiff's private/concealed/curtilage [BACKYARD] numerous times per week - if not on a daily basis - effectively patroling all areas of the plaintiff's private/concealed/curtilage [BACKYARD]. (On the same day of this incident, {2020-10-12}, the plaintiff had noticed one-or-more large-cats patroling multiple regions around the plaintiff's [HOUSE].) (On the following morning of {2020-10-13}, the plaintiff had noticed a large-cat or medium-sized-dog approach from behind the plaintiff's outdoor-air-conditioner-unit and patrol other areas around the plaintiff's [HOUSE], indicating that such animals that naturally prey upon rodents were almost constantly patroling around the plaintiff's [HOUSE].) As all parties involved in this case know fully-well, cats are carnivorous animals whose natural prey is rodents and cats have, at the very least, hundreds-of-thousands of years of evolutionary-skills and natural-instincts to detect (including smell) and hunt rodents. In addition to such large cats ensuring that the plaintiff's private/concealed/curtilage [BACKYARD] was free of rodents, there simply was no feline hunting of rodents in the plaintiff's private/concealed/curtilage [BACKYARD] for the very simple reason that the plaintiff's private/concealed/curtilage [BACKYARD] never served as harborage for any rodents. Since the middle of the year {2020}, the plaintiff had also noticed numerous giant lizards - approximately 1 feet long, 2-inches thick - (and numerous other chameleons) residing directly around the plaintiff's [HOUSE] including, but not limited to, the plaintiff's private/concealed/curtilage [BACKYARD] - and such giant lizards (and numerous other chameleons) were keeping the insect population around the plaintiff's [HOUSE] in check. In almost all of the warm months during which the plaintiff has resided at [788KLLTX78641], the plaintiff noticed (and continues to notice) numerous frogs/toads residing directly around the plaintiff's [HOUSE] - and such frogs/toads were keeping the insect population around the plaintiff's [HOUSE] in check. In almost all of the warm months during which the plaintiff has resided at [788KLLTX78641], the plaintiff has had one-or-more (active-and-undisturbed) wasp-nests around the plaintiff's [HOUSE] where such wasps were keeping the insect population around the plaintiff's [HOUSE] in check. For all of, but not limited to, these reasons, there was simply no possibility for any rodent-harborage, vermin-harborage, pest-harborage or even mosquito-harborage (since the plaintiff also did not have any containers with standing water) of any kind - anywhere within the plaintiff's private/concealed/curtilage [BACKYARD] - meaning that there was no possibility of any public-nuisance in the plaintiff's [BACKYARD]. The

plaintiff immediately-realized, even at the middle of [KAP]'s unconstitutional-and-unlawful search of the plaintiff's private/concealed/curtilage [BACKYARD], that all of these co-conspirator racketeers against the plaintiff - [JSP&KAP],[RSR] and [WCCD-Harrell] - had fully read the public-nuisance law, but despite of their full-knowledge of such public-nuisance law, were deliberately mis-interpreting, weaponizing and maliciously-exploiting such law against the plaintiff, fully-abusing their authority and the legal-process, while at the same-time, executing such clearly unconstitutional-and-unlawful searches-and-seizures of private/concealed/curtilage areas of the plaintiff's private-property - purely in-order-to retaliate against the plaintiff. The plaintiff was truly shocked by what the plaintiff witnessed immediately after this point in time. [KAP] once again, extends her hands over the plaintiff's 6-feet-tall-privacy-fence and holds up her camera-phone in-order-to take photograph(s)/video(s) of items that her husband, [JSP], had maliciously dumped into the plaintiff's private/concealed/curtilage [BACKYARD] on the previous date of {2020-03-24} - and included such unconstitutionally-and-unlawfully seized fabricated-evidence as part of her purely-retaliatory public-nuisance criminal complaint - along with co-conspirator racketeers [RSR],[WCCD-Harrell] - against the plaintiff. The plaintiff had, for a very long time, known [KAP] to be a malicious racketeer in such racketeering-enterprise against the plaintiff, but the plaintiff did not believe that [KAP] was brazen-enough to engage in such an extreme level of egregious racketeering-activity against the plaintiff. After having unconstitutionally-and-unlawfully seized such fraudulent/misleading/invalid evidence and fabricated-evidence against the plaintiff, [KAP] then enters back into her house through her backdoor, emerges from the front-door of her house, and takes approximately the same round-about path, in-order-to deliberately avoid the plaintiff's security-cameras, on her way to submit such unconstitutionally-and-unlawfully seized fraudulent/misleading/invalid evidence and fabricated-evidence to her co-conspirator racketeers [WCCD-Harrell] and [RSR]. As [KAP] is talking with [WCCD-Harrell] (who is standing next to [RSR]) and showing [WCCD-Harrell] such unconstitutionally-and-unlawfully seized fraudulent/misleading/invalid evidence and fabricated-evidence on her camera-phone, another unidentified White-American woman, [UWAW-9] (accompanied by some minor children), approaches [RSR] and greets [RSR] and initiates a short conversation with [RSR] as they pet [RSR]'s large-dog - which is still roaming freely onto the street and surrounding areas. Therefore, [UWAW-9] witnessed at least part of such corrupt-malicious-predatory-and-retaliatory dialogue (against the plaintiff) between the co-conspirator racketeers [KAP], [WCCD-Harrell] and [RSR]. Also, it appears to the plaintiff that [RSR] may have started to badmouth the plaintiff to [UWAW-9] as [UWAW-9] appears to point in the direction of the plaintiff's private-property and/or briefly look back toward the plaintiff's private-property, as [RSR] engages in such badmouthing against the plaintiff; however, the plaintiff cannot currently verify this assertion, without proper noise-cancellation on the plaintiff's security-camera recordings, and without also reviewing [WCCD-Harrell]'s body-worn-camera recordings - which, due to being in much-closer proximity to such conversation - would have picked up such audio without any issues (ⵏ) . Again, the plaintiff would like to reiterate that the only reason that such co-conspirator racketeers against the plaintiff - [KAP], [RSR] and [WCCD-Harrell] - are talking at [RSR]'s property (diagonally and across-the-street from the plaintiff) is because they deliberately wanted to be out of range of any audio-recording-capabilities of the plaintiff's security-cameras - so that they could corruptly-maliciously-predatorily-and-retaliatorily conspire against the plaintiff without the audio-evidence of such corrupt-malicious-predatory-and-retaliatory conspiracy being recorded on the plaintiff's security-cameras. Approximately a minute later, [UWAW-9] would leave the scene with her minor children. Co-conspirator racketeers [KAP], [RSR] and [WCCD-Harrell] engage in such corrupt-malicious-predatory-and-retaliatory conspiratorial/colluding/strategizing dialogue against the plaintiff for a period of time in excess of 15 minutes. At one point in time, both [RSR] and [KAP] wave at a White-American couple driving a golf-cart up the street - once again, showing the mafia-godfather-like power that such racketeers wielded over the plaintiff - and once-again showing that all of these co-conspirator racketeers were hell-bent on predatorily fully-exploiting the overwhelmingly White-American racial-majority of such White neighborhood against the plaintiff. [WCCD-Harrell] finally starts to back away from her co-conspirators [KAP] and [RSR] - departing while giving such co-conspirators some final words regarding the predatory course-of-action(s) that the [WCCO], the

[WCCHD] and the [WCSO] would need to initiate, regarding their filing of Class-C-Misdemeanor-Public-Nuisance criminal-charge against the plaintiff. While the [WCSO] is noticeably absent at this incident, the [WCSO] would play a crucial role (of Obstruction-Of-Justice/Evidence-Concealment) in hiding from the [WC] prosecutors - the decade of racially-motivated hate-crimes/racketeering-acts/civil-rights-violations/abuses that [RSR],[JSP] and some of its own employees had engaged in against the plaintiff - during a period of time spanning almost a decade at this point in time. [WCCD-Harrell] then waves goodbye to her co-conspirator racketeers [KAP] and [RSR] - walking back to the driver's seat of her [WCCO] police-vehicle, driving up the street and away from the plaintiff's private-property. [KAP] and [RSR] continue to joyfully conspire/collude/strategize against the plaintiff for a period of approximately 1 more minute, knowing fully well, at this point in time, that all of such private-citizen co-conspirator racketeers - [JSP], [KAP], [RSR] - have effectively been granted immunity from prosecution, thanks to [WCLE]'s active-participation in such obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff. [KAP] walks back towards her property with a malicious smile on her face. Throughout this incident, [JSP&KAP] had illegally parked a boat at the curbside of the street - just as it had been for prolonged periods of time on countless occasions spanning from the years {2019} through {2022} - covering at least part of the street directly in front of the plaintiff's private-property - in complete violation of the restrictive-covenants of the neighborhood. Both [WCCD-Harrell] and [WCCD-F] were fully aware of this violation, but took no enforcement action despite of their knowledge of this clear and overt violation - fully-visible from the public street. At a minimum, and in this particular incident alone, [KAP] had already committed additional counts of the crimes of [18-USC-PI-C13-§242] and [18-USC-PI-C13-§241] and [18-USC-PI-C43-§913] and/or [TPeC-T8-C37-§37.11] against the plaintiff. At a minimum, and in this particular incident alone, [RSR], [WCCD-Harrell] had already committed additional counts of the crimes of [18-USC-PI-C13-§242], [18-USC-PI-C13-§241] against the plaintiff, while [WCCD-F] committed his first count of the crimes of [18-USC-PI-C13-§242], [18-USC-PI-C13-§241] against the plaintiff. It is indisputable that both [WCCD-Harrell] and [WCCD-F] committed the Texas crimes of Abuse-of-Official-Capacity and Official-Oppression against the plaintiff. It is indisputable that [WCCD-Harrell] committed another count of the Texas crime of Misuse-Of-Official-Information against the plaintiff. It is indisputable that all of the aforementioned crimes against the plaintiff are retaliatory in nature - thus felonious under Texas law and racketeering-acts under federal law. A little over one hour after [KAP] and [WCCD-Harrell] leave the scene of her property, [RSR] walks down the street, this time with her large-dog on leash, crosses the street to enter into the side of the street on which the plaintiff resides, and continues to walk around the neighborhood-block in the direction towards the properties directly behind the plaintiff's private-property - [525LSLTX78641] (which shares a border with the plaintiff's private-property) and [521LSLTX78641] (back-of and diagonal-to the plaintiff's private-property) - so that she can conspire/collude/strategize and coordinate with these White-American property-owners - the fraudulent/misleading/invalid narrative(s) and course-of-action(s) that they and [WCLE] would all be predatorily engaging in such upcoming purely-retaliatory, Class-C-Misdemeanor-Public-Nuisance prosecution against the plaintiff. In so doing, [RSR] has committed yet further actions of witness-tampering against the plaintiff. However, without conducting a thorough investigation, Discovery and Depositions - which includes a thorough review of all social-media-postings and private-messages regarding the plaintiff and/or plaintiff's private-property between such co-conspirators - the plaintiff will not, as of the moment of filing of this lawsuit (including any amended complaints), be able to specify the full range and scope of the entire campaign of retaliatory witness-tampering that [RSR],[KAP], and [JSP] engaged in against the plaintiff - dating back to the year {2016} in the lead-up to the then-[HOA]'s predatory lawsuit against the plaintiff - which was also fully-instigated by very-same defendants [RSR],[JSP&KAP] and their cronies/co-conspirators (such as [DMP]). Approximately a half hour after [RSR] initiating such walk, [RSR] returns walking from the opposite side of the street (apparently having circled the neighborhood-block) - with her large-dog unleashed and roaming freely - enters in [JSP&KAP]'s front-yard to move a hose, and then stares menacingly/angrily for approximately 5 seconds into one-or-more areas of the plaintiff's private-property, as if to signal to the plaintiff that she has, once-again, succeeded in fully-

abusing the legal process and the justice system in-order-to retaliatorily entangle-and-ensnare the plaintiff in yet another legal battle, this time -

directly with [WCLE]. As traumatizing as this incident was (and still is) to the plaintiff, this predatory incident would be just one of numerous

predatory incidents (documented in this lawsuit) involving the defendants [RSR], [KAP] (and/or [JSP]), and [WCLE] - almost always

involving White-American police-officers/government-employees of defendant [WC] - against the plaintiff in which all of such defendants acted

in a shamelessly (and overtly) racist and predatory manner against the plaintiff - as if they were not even in the least bit ashamed or concerned

that they would be accused of modern-day-Jim-Crow predatory-racism by the plaintiff - as if proudly wearing and flaunting their modern-day-

Jim-Crow predatory-racism against the plaintiff as a badge-of-honor, that they will never apologize for.

## ¶550

On or about the date and approximate time of {2020-10-20 20:30} (at nighttime), the plaintiff approaches the plaintiff's chest-freezer located

inside of [GARAGE] in-order-to obtain some food items. As the plaintiff is walking towards such chest-freezer, [JSP], at that moment in time

using a hose to water the grass on the front-yard of [784KLLTX78641], starts yelling overtly-racist threats against the plaintiff, reminiscent of

the old Jim-Crow era, where malicious White-Americans with racial-animus would routinely summon law-enforcement to violate the rights of

person(s)-of-color. These particular brazenly-racist threats are clearly referencing the aforedescribed purely-retaliatory frame-job that

[JSP&KAP],[RSR] had recently initiated (in conspiracy with [WCLE], particularly [WCCD-Harrell]) against the plaintiff, showing that

[JSP&KAP],[RSR] and [WCLE] will brazenly resort to the most vicious forms of obstruction-of-justice in-order-to retaliate against the plaintiff,

for the plaintiff's *"audacity"* to report racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against these

defendants, and the plaintiff's *"audacity"* to capture [WCLE]'s police-misconduct (and other government-misconduct) on-the-record (via

security-cameras, body-worn-camera, and previously, audio-recorder). By *"TAKE CARE OF YOUR BUSINESS!"*, [JSP] is clearly ordering the

plaintiff to answer to the outrageously-retaliatory Class-C-Misdemeanor-Public-Nuisance charge resulting from the remarkable frame-job that

[JSP&KAP],[RSR] and [WCLE], specifically [WCCD-Harrell], had orchestrated against the plaintiff, thus forcing the plaintiff to have to hire

an attorney to fight a legal-battle against the defendants to expose such fraud (see subsequent incidents in the year {2021} below):

> RECORDED RACIST, ABUSIVE, FRAUDULENT, THREATENING AND RETALIATORY RANT FROM [JSP] TO THE PLAINTIFF(ⱶ):   {2020-10-20 20:30}(~)
> [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]


[JSP]          *HEY SID - COPS CAME BY [???] LOOKING FOR YOU!*

⟦ PLAINTIFF DOES NOT RESPOND AND CONTINUES WALKING TOWARDS CHEST-FREEZER. ⟧
[JSP]          *I KNOW YOU WERE HOME! WHY DIDN'T YOU ANSWER THE DOOR?!*

⟦ PLAINTIFF OPENS CHEST-FREEZER AND CONTINUES TO IGNORE [JSP]. ⟧
[JSP]          *I'M GOING TO CALL EM NEXT TIME - AND NEXT TIME, [???] I'M GOING TO TELL THEM! I'M BOUT TO CALL EM RIGHT NOW AND LET
                EM KNOW YOU'RE HERE!*

⟦ PLAINTIFF CONTINUES TO OBTAIN FOOD-ITEMS FROM CHEST-FREEZER AND CONTINUES TO IGNORE [JSP]. ⟧
[JSP]          *YEAH - ALRIGHT?! ... [???] ... [???] ... [???]*

⟦ PLAINTIFF CONTINUES TO OBTAIN FOOD-ITEMS FROM CHEST-FREEZER AND CONTINUES TO IGNORE [JSP]. ⟧
[JSP]          *TAKE CARE OF YOUR BUSINESS! ... 'NATURE BOY'! ... [???] ... [???] ... [???]*

⟦ PLAINTIFF CONTINUES TO IGNORE [JSP], CLOSES CHEST-FREEZER AND WALKS BACK TOWARDS [FRONTDOOR]. ⟧

SIDDHARTH NODE V. WILLIAMSON COUNTY, ET AL.                                    1696901690

---

**[JSP]**          *I'LL TELLING EM SID! - I'M TELLING EM YOU'RE HERE!*

《 PLAINTIFF CONTINUES TO IGNORE [JSP] AND ENTERS BACK INTO [HOUSE]. 》

---

# ¶551

On or about the date and approximate time of {2020-10-31 11:30}, [JSP] uses some yard-equipment to cut not only the front-yard grass of [784KLLTX78641], but also unlawfully, at least some of the *"no-mow"* grass that the plaintiff took enormous amount of time, back-breaking labor, and money (including litigation expenses) to install. In addition to the fact that the plaintiff never did authorize such activity, [JSP] knows that such *"no-mow"* grass is was never intended to be mowed using such yard-equipment, and so, [JSP] has repeatedly engaged in such unlawful action against the plaintiff solely to destroy at least some, if not all, of the plaintiff's hard-work. At some point in time during this incident, [JSP] looks menacingly/angrily at parts of the plaintiff's [YARD] and/or security-cameras, and illegally dumps one-or-more item(s) of his property - including a large hose - onto the plaintiff's side-yard. [JSP]'s unauthorized dumping of such property onto the plaintiff's side-yard would remain unabated for period of several days, if not weeks, once again, showing that [JSP] did not believe the plaintiff to be the rightful owner of [788KLLTX78641], and that furthermore, he could continue-to-use the plaintiff's private-property as he saw fit.

# ¶552

On or about the date of {2020-11-03}, the plaintiff is manually (by-hand) picking and/or cutting so-called *"weeds"* in [FRONTYARD]. As the plaintiff is walking across the [DRIVEWAY], [JSP] located at the driveway of his property [784KLLTX78641], yells at the plaintiff, as if to startle the plaintiff, *"BOO!"*. (It should be noted that *"BOO!"* is a known expression of the far-right-wing-extremist *"boogaloo boys"*, although the plaintiff has no proof that [JSP] is a member of such far-right-wing-extremist group.) [JSP], in the presence of his son [NP], then continues to intimidate the plaintiff with threatening words that included, *"YOU CAN'T HIDE FROM THE LONG ARM OF THE LAW!"*, once again, in modern-day-Jim-Crow manner, clearly and predatorily referencing the aforedescribed purely-retaliatory frame-job that [JSP&KAP],[RSR] had recently initiated (in conspiracy with [WCLE], particularly [WCCD-Harrell]) against the plaintiff. Shortly thereafter, [JSP] enters into his pickup truck with son [NP] in the front-passenger seat (with passenger window open), drive on the street, pause in front of the plaintiff's property, in-order-to intimidate the plaintiff and/or mock the plaintiff's political yard-signs.

# ¶553

On or about the approximate date and approximate time of {2020-11-19 05:00}, the plaintiff is starting to unload some items attached to the roof-rails of the plaintiff's vehicle, parked in the [DRIVEWAY]. Prior to unloading such items, the plaintiff takes photograph(s) of such items as the plaintiff almost-always documents such activity to catch any signs of damage to such items, whenever such potential damage become first known to the plaintiff. As the plaintiff is taking these photographs from multiple angles, [JSP], then standing in the front-yard of [784KLLTX78641], approaches the plaintiff, stops near the border of the plaintiff's property, and once again, starts to intimidate the plaintiff, stating: *"HOW'S IT LOOKING?!"* The plaintiff, once again, ignores [JSP], and continues to work on the aforementioned tasks. [JSP], realizing again that he cannot expect a response back from the plaintiff, issues one-or-more racist insult(s) at the plaintiff, *"PERVERT!"*. The plaintiff, once again, ignores [JSP]. After approximately ten seconds, [JSP], realizing again that he cannot expect a response back from the plaintiff, walks back towards his pickup-truck, enters the truck and drives away in such vehicle, shortly thereafter.

# ¶554

On or about the approximate date of {2020-11-24}, the plaintiff notices two pink slips of paper, indicating certified-mail-return-receipt-requested [CMRRR], within the stack of mail recently-collected from the plaintiff's [USPS] mailbox. Normally, since the plaintiff had received multiple such pink slips from the [HOA] in the prior decade, the plaintiff knew that such pink slips along with the actual [CMRRR] are supposed to be hand-delivered by the mail-delivery-person to the recipient(s) at the front-door, in order for such mail-delivery-person to obtain the required signature of the recipient(s). However, the plaintiff had noticed that, at least on some occasions, there would be no attempt at hand-delivering such pink slip(s), and instead, the mail-delivery-person would simply leave the copy of such pink slip(s) in the plaintiff's mailbox (located approximately 1 mile away from the plaintiff's [HOUSE]). Since the plaintiff was only checking the plaintiff's mailbox at a frequency of once-every-three-weeks at that particular moment in time, the deadline dates on both of the pink-slips had expired, thus, making the possibility of re-delivery impossible (since such [CMRRR] was already redirected back to the sender). As noted on the pink slips, the sender of the [CMRRR] was the [WCCO], making it abundantly clear to the plaintiff that this particular article(s) of mail delivered via the [USPS] involved the fraudulent Class-C-Misdemeanor-Public-Nuisance charge that [WCLE] (and specifically [WCCD-Harrell]), acting in conspiracy with [JSP&KAP],[RSR], had predatorily orchestrated against the plaintiff, again, as part of their larger scheme to drive the plaintiff, an immigrant-of-color/indigenous-person out of the White neighborhood, thus defrauding the plaintiff of private-property-ownership within such White neighborhood. Even though the plaintiff did not receive the physical hard-copy of this mail, the plaintiff still has the two associated pink slips, and the plaintiff further asserts that the mailing of this article(s) is at least one count of the racketeering-act of *"mail-fraud"* committed by [WCLE],[JSP&KAP],[RSR] against the plaintiff - especially since the entire Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff was done purely in retaliation against the plaintiff, and such charge also involved the use of one-or-more piece(s) of fabricated-evidence along with fraudulent/misleading testimony against the plaintiff from [JSP&KAP],[RSR] and [WCCD-Harrell] - all with the ultimate goal to drive the plaintiff, an immigrant-of-color/indigenous-person out of what they considered to be *"their"* (exclusive-and-pure) White neighborhood, thus in a brazen conspiracy/scheme to defraud the plaintiff out of private-property-ownership within such White neighborhood.

> MAIL-FRAUD EXHIBIT #3: [CMRRR] UNDELIVERED TO PLAINTIFF CONCERNING CLASS-C-MISDEMEANOR-PUBLIC-NUISANCE CHARGE AGAINST PLAINTIFF·
> [WCCO],[WCCHD],[WCSO],[JSP&KAP],[RSR]·   {2020-11-09} (DATE OF MAILING VIA [USPS])

**UNITED STATES POSTAL SERVICE®**   We ℞ Deliver for You!

Download Informed Delivery® APP to manage your redeliveries

**Sorry we missed you while you were out.**

Date: 11/09

The item was sent by: Cons. Stofle Wilco

It was sent to: S. Kode

At this address: 788 Kingfisher

**About the missed delivery:**

It was a:

____ Package   (✓) Letter   ____ Large envelope

Available for pickup after:

Date: 11/10

This is the:

(✓) First attempt   ☐ Final notice

**To Schedule a Redelivery:**

Scan the QR Code or go to usps.com/redelivery

Article Number:

5293 0619 1745 7465

**We have item/s for you which we could not deliver because:**

☐ It requires a payment of $_____ for:
____ Postage due   ____ Customs

☐ Receptacle full/item oversized

☐ No secure location available

☐ No authorized recipient available

(✓) Signature required
____ (✓) must be 18+ years old   ____ must be 21+ years old

☐ Other: _____

*Please see reverse for redelivery or pickup options.*
PS Form 3849, October 2019

**Sorry we missed you while you were out.**

Date: _____

The item ____

It was se ____   KEVIN STOFLE

At this a ____   SIDDHARTH KODE
788 KINGFISHER LANE
2070   NOV 1 3 2020

**About** ____

It was a:

____ Package   (✓) Letter   ____ Large envelope

Available for pickup after:

Date: _____

This is the:

☐ First attempt   ☐ Final no   NOV 2 3 2020

**To Schedule a Redelivery:**

Scan the QR Code or go to usps.com/redelivery

Article Number:

5293 0615 7876 2540

**We have item/s for you which we could not deliver because:**

☐ It requires a payment of $_____ for:
____ Postage due   ____ Customs

☐ Receptacle full/item oversized

☐ No secure location available

☐ No authorized recipient available

☐ Signature required
____ must be 18+ years old   ____ must be 21+ years old

☐ Other: _____

*Please see reverse for redelivery or pickup options.*
PS Form 3849, October 2019

## ¶555

Given the outrageous sequence of malicious incidents against the plaintiff involving defendants [JSP&KAP],[RSR] and [WCLE] that unfolded in almost-all of the months of the year {2020}, the plaintiff felt the strong need to install more security-cameras around key-areas of the plaintiff's property to more easily catch such illegal conspiracy on the record. During one-or-more day(s) at the end of the month of {2020-11}, the plaintiff installed such additional security-cameras in such key-areas. The plaintiff notices on the plaintiff's security-camera-system-monitor that, as soon as [JSP] realizes that the plaintiff has installed additional security-cameras at such additional locations, [JSP] angrily yells-

out into one-or-more of such security-camera(s), continuing to demonstrate his anger that the plaintiff was increasingly recording the egregious racketeering-activities of the conspiracy and racketeering-enterprise against the plaintiff involving [JSP&KAP],[RSR] and [WCLE]. One-or-more of these additional security-cameras would be future targets of the [JSP]'s criminal vandalism, with [JSP] actually entering into the plaintiff's property in-order-to break one-or-more of such additional security-cameras (see below).

## ¶556

On or about the date and approximate time of {2020-12-05 17:08}, racketeer co-defendant [KAP] walks from her property, [784KLLTX78641], towards racketeer co-defendant [RSR]'s front-door, one of several meetings in which racketeer co-defendants [KAP], [RSR] maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff - in particular, in-order-to fully-plan the already-initiated, purely-retaliatory Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff. On her way to [RSR]'s property, [KAP] interrupts [785KL-2018-1], who was performing some maintenance-work on the street, and speaks with [785KL-2018-1], once-again trying to manipulatively curry-favor-with such relatively-new-resident, with [KAP]'s ultimate goal being to recruit [785KL-2018-1] to play the role of another adversarial witness against the plaintiff. This brief interaction between [KAP] and [785KL-2018-1] stands in-sharp-contrast to [785KL-2018-1]'s confronting of [KAP]'s husband, [JSP], as [JSP] was maliciously vandalizing the plaintiff's [HOUSE] along with his almost-adult son, [NP], approximately two months after this incident (see below).

## ¶557

On or about the date and approximate time of {2020-12-06 14:10}, racketeer co-defendant [KAP] walks from her property, [784KLLTX78641], towards racketeer co-defendant [RSR]'s front-door, one of several meetings in which racketeer co-defendants [KAP], [RSR] maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff - in particular, in-order-to fully-plan the already-initiated, purely-retaliatory Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff.

## ¶558

On or about the date and approximate time of {2020-12-17 20:00}, [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641].

## ¶559

On or about the approximate date and approximate time of {2020-12-20 14:25}, the plaintiff notices that [RSR]'s unleashed large-dog, [L], has crossed the street and is roaming freely onto the sidewalk in front of the plaintiff's property.

## ¶560

On or about the approximate date and approximate time of {2020-12-21 13:29}, the plaintiff notices that [RSR]'s unleashed large-dog, [L], is, during one-or-more times during this day, roaming freely on the street.

## ¶561

On or about the date and approximate time of {2020-12-22 23:00} (near-midnight), [JSP] is using very-loud-yard-equipment late at night for at least half-an-hour or more - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [JSP]'s property, especially at nighttime.

## ¶562

On or about the date and approximate time of {2021-01-01 18:56} (nighttime), [JSP] shines his torch-light at one-or-more of the plaintiff's security-cameras, menacingly/angrily issues the obscene/vulgar gesture of the middle-finger raised to such security-cameras, and angrily states, *"FUCK YOU!"* towards such security-cameras.

## ¶563

On or about the date and approximate time-period of {2021-01-02 22:00} through {2021-01-02 23:00}, [JSP] and [NP] illegally light extremely-loud fireworks as they have done on multiple occasions of almost every single year (if not every year) on the street directly in front of their residence at [784KLLTX78641], undoubtedly disturbing the sleep-schedules and/or work-schedules of neighboring resident(s) (including the plaintiff). Again, the lighting of loud fireworks (especially late at night) in such residential subdivisions is not only a violation of the subdivision's restrictive-covenants (under civil contract law), and not only a violation of County-wide burn-ban(s) (whenever such burn-ban(s) are in effect), but also, and at a minimum, a violation of the Texas criminal law, Disorderly-Conduct [TPeC-T9-C42-§42.01(5)].

## ¶564

During the night immediately following the {2021-01-06} United-States-Capitol-Insurrection, at approximately {2021-01-06 20:00}, the plaintiff notices on the plaintiff's security-camera-system-monitor, that [JSP], who has repeatedly demonstrated far-right-wing-extremist political-animus against the plaintiff, further emboldened by the far-right-wing-extremists that had violently stormed and infiltrated the United-States-Capitol building on this particular day, approaches some of the plaintiff's security-cameras in-order-to engage in further acts of racial-intimidation, criminal-mischief and disorderly-conduct against the plaintiff. [JSP] uses one-or-more bright torch-lights to shine-onto and/or flash-on-and-off-onto the lens of more-than-one of the plaintiff's security-cameras, again, in-order-to permanently *"blind"* (or disable/damage/destroy) such security-cameras' lens and/or internal circuitry - particularly, such security-cameras' night-vision circuitry. Although [JSP] has used a torch-light in-order-to *"blind"* the plaintiff's security-cameras on numerous previous occasions dating back to {2019}, the plaintiff notices that [JSP] is trying to use various strategies and/or techniques to achieve this goal. In this particular occasion, [JSP] is deliberately flashing the bright light onto and then off-of such security-cameras rapidly and for long period(s) of time, so that such security-cameras' night-vision is triggered on-and-off rapidly; in other words, [JSP] was trying to overload the circuitry and/or software of such security-cameras by tampering in this manner with such security-cameras' infrared night-vision capabilities. On one-or-more occasions, [JSP] actually stomps into the plaintiff's property - thus, within the plaintiff's property - while engaging in this criminal activity against the plaintiff. On one-or-more occasions, [JSP] menacingly/angrily issues the obscene/vulgar gesture of the middle-finger raised to the plaintiff's security-cameras. On one-or-more occasions, [JSP] menacingly/angrily yells into one-or-more of the plaintiff's security-cameras and spits into the plaintiff's property - all as additional act(s) of racial-intimidation, criminal-mischief and disorderly-conduct against the plaintiff. The plaintiff

asserts that when large-cell(s) of far-right-wing-extremists are allowed to engage in egregious, extremely-high-profile, nationally-televised acts of brazen lawlessness, as was the case with the {2021-01-06} United-States-Capitol-Insurrection, such extremely-high-profile acts of lawlessness only emboldens smaller-cell(s) or even single-cell(s) of far-right-wing-extremists around the United States - such as, but not limited to [JSP&KAP],[RSR] - to ratchet-up their criminal activities.

## ¶565

On or about the date and approximate time of {2021-01-21 16:14}, the plaintiff sends an *"URGENT"* followup email to [WCSDet-WP] providing the [WCSO] with one (of the many dozens of) critical piece of evidence of [JSP&KAP]'s hate-crimes against the plaintiff. In this followup email, the plaintiff makes it clear to the [WCLE] that the plaintiff expects these appropriate initial charges to be filed against [JSP] - with the plaintiff ready to submit more evidence after those initial charges have been filed. This email also includes a copy of the previous email-correspondence between the plaintiff and [WCLE] concerning this matter. In this email, the plaintiff also makes clear that although the plaintiff's seeks to press-charges under state law, especially since, but not only since, the crimes committed against the plaintiff by the perpetrators were racially-motivated, such crimes are also federal hate-crimes and/or federal civil-rights-violations. Also, in this email and the previous email, since the plaintiff specified a pattern of criminal activity that either fall under the category of obstruction-of-justice and/or retaliation, the plaintiff had provided sufficient information to indicate that those crimes are, likewise, not only felony crimes under state law, but also racketeering-acts under federal law. Since the plaintiff did not receive a speedy response, the plaintiff also forwarded a copy of this *"URGENT"* email to the general Criminal-Investigations-Division [WCSO-CID] of the [WCSO] on or about the date and appropriate time of {2021-01-22 07:27}:

> EMAIL FROM PLAINTIFF TO [WCSDet-WP],[WCSO-CID] (CC'D TO [MOTHER],[FATHER]) WITH 1 CRUCIAL PIECE OF EVIDENCE OF HATE-CRIMES COMMITTED BY [JSP] AGAINST PLAINTIFF(⊢):
> ORIGINAL {2021-01-21 16:14}, FORWARDED {2021-01-22 07:27} (¬): [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

**PLAINTIFF**      *Hello Detective Passailaigue,*

*We are "Siddharth Kode and ******* Kode" - property owners of "788 Kingfisher Lane, Leander, TX 78641."*

*As a followup to our previous conversation, I have assembled much (but not all) of the evidence for the pending hate-crimes charges, but I need initial charges to be filed for 1 particular piece of evidence as soon as possible - in essence, immediately - for 1 particular incident that took place on 2019-01-22.*

*This piece of video evidence that I have uploaded to a secure, private cloud-storage website:*

*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\**

*Since it will be 2 years for that date tomorrow, it is imperative that this particular piece of evidence be reviewed immediately, and that assuming the charges are valid, that these initial charges be filed immediately - in essence, preferably today, but no later than by tomorrow morning - against "Joseph Pargin" of "784 Kingfisher Lane".*

*These initial charges reflect the fact that these are hate crimes - so 1 level up for Misdemeanors - I'll explain that and more in a separate email that includes all of the extracted evidence (thus far):*

*Multiple Count(s) of Class A Misdemeanor "Assault" https://texas.public.law/statutes/tex._penal_code_section_22.01*

*Multiple Count(s) of Class A Misdemeanor "Terroristic Threat" https://texas.public.law/statutes/tex._penal_code_section_22.07*

*Multiple Count(s) of Class A Misdemeanor "Intimidation or Interference" https://texas.public.law/statutes/tex._prop._code_section_301.171*

*Multiple Count(s) of Class A Misdemeanor "Harassment" https://texas.public.law/statutes/tex._penal_code_section_42.07*

*Multiple Count(s) of Class B Misdemeanor "Disorderly Conduct" https://texas.public.law/statutes/tex._penal_code_section_42.01*

*A FEW MORE NOTES:*

*[1] Of course, these are not the most serious charges that we wish to file - as I have evidence of felonies being committed against us and our property - much more on that in that subsequent email that hopefully I should have ready by Friday (or Monday at the latest).*

*[2] We are only requesting charges to be filed for this incident within the 2 year deadline - as a matter of precaution - however, we do realize that if a criminal issue is ongoing for many years - then, the statute of limitations does not really apply due to the continuing nature of the crime (which is the case in our case - as our evidence overwhelmingly shows).*

*[3] I have kept this email as brief/concise as possible and have saved all of the details for that subsequent email that includes much more of the evidence.*

*[4] The total number of pieces of evidence is approximately 50 or more.*

*[5] As I will explain in further detail in that subsequent email, due to the substantial amount of evidence that we have, and the severity of crimes being committed, we still reserve the right to pursue Federal hate crimes charges against the suspects in this case. So, please also confirm that by pressing charges at the state/local level, that this does not prevent us from also pursuing the federal hate crimes charges as well.*

*But for now, please contact me as soon as possible (or if you prefer, please have a Deputy contact me to process these charges as soon as possible), so that these more urgent charges can be filed as soon as possible.*

*Respectfully submitted,*

*Siddharth Kode and ******* Kode.*

*Wayne Passailaigue:*

*> Sir*

*>*

*> For any emergency that you feel needs immediate response please call 911 and report the incident. If you have the evidence from the original criminal mischief case feel free to call and have a deputy pick up the evidence who will then submit the evidence, you can also mail the video footage to the Williamson County Sheriff's Office if you prefer that; please place "ATTN: DET. PASSAILAIGUE" on the letter head as well as the case number. If there is a new offense (other than the Criminal Mischief complaint) that you would like to report, please contact the non-emergency line for our Williamson County Communications who will then dispatch a deputy to take the initial information and file the offense under the proper offense title. This will help speed up the process as the case will then be assigned directly to a detective within a unit that investigates that certain offense or severity of offense.*

*>*

*> Thank You,*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

>

> *Detective W. Passailaigue #13122*

> *Criminal Investigation Division*

> *Williamson County Sheriff's Office*

> *508 S. Rock St. Georgetown, TX 78626*

> *Office: 512-943-5274*

>

> *This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.*

>

> *-----Original Message-----*

> *From: ******************** <******************>*

> *Sent: Monday, June 22, 2020 8:44 AM*

> *To: Wayne Passailaigue <************@wilco.org>*

> *Cc: Lori Murphy <***********@wilco.org>; ********************; *********@splcenter.org*

> *Subject: Hate Crimes Continue Unabated ; Re: Evidence for criminal mischief and threatening communications*

>

> *Hello Detective Passailaigue,*

>

>

> *This is Sid Kode, homeowner at "788 Kingfisher Lane".*

>

> *I have 3 questions/comments, as a follow-up to our previous conversation:*

>

>

> *(1)*

> *I continue to receive death threats, other terroristic threats, other references to brutal violence, intimidation/retaliation for the reporting of their crimes, racial/xenophobic/homophobic slurs, other hate-speech and psychologically-abusive-speech (and not to forget, public slander/defamation) from the suspect - again, "Joseph Pargin" of*

> *"784 Kingfisher Lane".*

>

> *The suspect continues to tamper-with or try to disable/damage my security cameras by spraying them with water and by shining bright-light directly into them for long periods of time.*

>

> *The suspect also continues to step well-into my property to mow the very-low-growing "no-mow" grass (a grass that is not intended to be*

> *mowed) which I installed - in one case, mowing the entire side of the front-yard during the midst of an intense summer drought - forcing me to flood the mowed area with water in the hopes that it will recover.*

>

> *Unfortunately, there is permanent/irrecoverable damage/death to a large area of this "no-mow" grass that he mowed last year during the midst of the summer drought (I tried flooding the area to the best of my ability but it was "too little, too late" since I was not at the property for more than 3 days after the mowing took place) - while that same "no-mow"*

> *grass, if left unmowed, survives the Texas summer droughts just fine.*

>

> *Again, the suspect is well aware that this is a "no-mow" grass that is not intended to be mowed, and did so (and continues to do so) despite of this knowledge.*

>

> In particular, the other side of the front-yard that is fully under my control has not been mowed in 3 years (it has only been manually-weeded by me on a regular basis) - and as a result of this intelligent maintenance, is in perfect condition/appearance.
>
> The suspect is also aware of the fact that there is no sprinkler system on the property (since the grass, when left unmowed, really does not need watering even during the summer droughts except in certain small areas where it has not fully established yet and/or where the water in the soil tends to evaporate faster, for example, due to higher elevation).
>
> On at least one occasion, the suspect poked at and damaged the political yard signs on my property.
>
> I was hoping that your interview with the suspect would serve to deter and stop this violent/abusive criminal behavior, but unfortunately, the suspect has not shown any indication of change, and to the contrary, might only have been emboldened.
>
> I still do have all of the previously-mentioned evidence, and new evidence of the above incidents - with the most recent incident being at approximately 2020-06-16 08:00.
>
> And so, I wanted to confirm the possible charges associated with such criminal conduct:
> (*) felony terroristic threats (including death threats)
> (*) felony obstruction of justice (tampering/disabling/damaging of cameras; threats for reporting of crimes)
> (*) felony intimidation of witness and retaliation against witness
> (*) felony vandalism and criminal mischief (more than $1500 in damages
> - for damage to grass and security cameras)
>
> Again, I do have every reason to believe and that the evidence I have does clearly show that these crimes are based on racial/xenophobic hatred and homophobic hatred, and as such, should be classified as hate crimes.
>
> Also, as a former student at the University of Texas at Austin, I was registered as a student with disabilities, having a cognitive disability
> - which the suspect is fully aware of, but despite knowledge of this, maliciously chooses to exploit.
>
> As a minor side-note to the above, the suspect also continues to light fireworks every year (multiple times per year) - a well-known violation of HOA rules - an act that remains very dangerous due to the close proximity of houses/structures/trees/bushes/etc. and due to the great public nuisance that such loud fireworks cause (especially during the middle of the night), and not to forget, the resulting air pollution/debris.
>
>
>
>
> (2)
> In an issue that is slightly unrelated to the above - the property owner of "789 Kingfisher Lane" - Rebecca Sue Robertson - has trespassed on my property at approximately [2020-06-04 17:49] - I do have video evidence of this as well.
>
> Since this individual also threatened me back in 2010/2011 at my doorstep, there was a criminal-trespass-warning issued to this individual on August 2011 by the Williamson County Sheriff's Department
> - a warning that she refused to sign, but that the WCSD Deputy assured me that it is still valid - in fact, there were 2 trespass warnings issued to this individual on that same day (one from another neighboring property owner as well).
>
> This individual has repeatedly harassed me over the course of the 11 years that I have lived here - in some cases, kicking and throwing tantrums against my property and also, referring to me on some occasions, using racial/xenophobic/homophobic slurs, and also committing slander/defamation/libel against me in multiple public settings.
>

> She also leaves her large dog unleashed on a daily basis - the dog is never on leash (which is also a violation of HOA rules) and occasionally does bark very loudly - this dog occasionally does step with into my frontyard.

>

> So, please confirm that you do have this criminal-trespass-warning on file, so that we can begin processing charges against this individual as well.

>

>

>

> (3)

> As a relatively minor side-note to the above, I should also point out that neither of these individuals are practicing social distancing, and are never wearing face masks in encountering me while I'm at my property.

>

> I am the only one wearing a face mask, and they also ridicule/shame me for doing so - they even sneeze/cough around me without wearing a mask, leading me to wonder if they are doing it on purpose.

>

> They are surely aware that people are spreading the disease without showing symptoms of it - (in other words, carriers not sufferers) - and that people of color (such as myself) are particularly vulnerable to the lethal disease.

>

>

>

>

> NOTE:

>

> I do want to pursue pressing charges against these individuals, but I do need to stress that I will need police protection - these individuals (especially "Joseph Pargin") have shown themselves to be capable of violence (in fact, brutal violence), and there are countless cases where vulnerable victims of hate crimes that have reported crimes have been retaliated against - and in some cases, severely injured or even murdered.

>

> So, it takes significant courage for a person like me (of my racial

> profile) and of my physical stature (I weigh about 100 pounds) to be able to report these hate crimes, against the possibility of violent retaliation from people more than twice my size, and in all likelihood, are armed with lethal weapons.

>

> In fact, the suspects' terrorizing behavior towards me has intentionally served to instill fear/terror in me, so that I will remain quiet and allow such injustice to continue (which I have done until this point).

>

>

>

>

> I will be compiling the video evidence and I should have most of it on an SD card within two weeks from now (since video files are too big to transfer over email).

>

> Please confirm if/when you are available for meeting me at the property

> ("788 Kingfisher Lane") sometime during the weeks of June-29th/July-6th, so that I can provide you with this evidence - I will send a follow-up email confirming the exact date/time.

>

>

>

>

> Thanks,

SIDDHARTH KODE  V.  WILLIAMSON COUNTY, ET AL.                                     1696907690

> Sid Kode.

>

>

>

>

>

> On 10/16/2019 8:36 AM, Wayne Passailaigue wrote:

>> Sir,

>>

>> I have received your email and it has been added to this case file (Case No. 2019-09-00561). Both cases that you had filed with through the Sheriff's Office are being worked under this case number. I have conducted an interview with the suspect in this case and have an idea of what's going on. The physical evidence (digital recordings) is paramount in this case and I will be waiting for your response to go further in this case. If you have any questions please feel free to reach out by email or phone.

>>

>> Thank You,

>>

>> Detective W. Passailaigue #13122

>> Criminal Investigation Division

>> Williamson County Sheriff's Office

>> 508 S. Rock St. Georgetown, TX 78626

>> Office: 512-943-5274

>>

>> This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.

>>

>> -----Original Message-----

>> From: ***************** <*****************>

>> Sent: Wednesday, October 9, 2019 8:05 AM

>> To: Wayne Passailaigue <************@wilco.org>

>> Subject: Evidence for criminal mischief and threatening communications

>>

>> EXTERNAL email: Exercise caution when opening.

>> _____

>>

>> Hello Detective Passailaigue,

>>

>>

>> This is Sid Kode (property owner of "788 Kingfisher Lane, Leander, TX 78641"), responding to your voicemails about the criminal mischief and threatening communications that we're experiencing at our property from the suspect (next-door neighbor that lives at "784 Kingfisher Lane, Leander, TX 78641").

>>

>> I do still have the footage stored on our security camera system's DVR hard-drives, but I have not yet figured out how to transfer the data onto an external hard-drive.

>>

>> Unfortunately, as of late, I have not had the time to figure this out, but hopefully I should be able to get it done sometime this month.

>>

>> Once I have this done, I will let you know so that you can obtain that evidence.

>>

>>

>> *So, to briefly summarize the sequence of incidents:*

>>

>> *(1) In approximately October 2017, I received the first threatening communication from the suspect.*

>>

>> *(2) In approximately February 2018, I received the second threatening communication from the suspect (I still have to find the footage for this).*

>>

>> *(3) In approximately January 2019, I received the third threatening communication from the suspect.*

>>

>> *(4) In approximately February 2019, I received the fourth threatening communication from the suspect.*

>>

>> *(5) In approximately May 2019, I received the fifth threatening communication from the suspect (I still have to find the footage for this).*

>>

>> *(6) In approximately June 2019, I received the sixth threatening communication from the suspect (I still have to find the footage for this).*

>>

>> *(7) On July 3rd 2019, the suspect shot into one of our cameras damaging and breaking the front glass and IR illuminators so that the IR night vision no longer works.*

>>

>> *(8) On August 23rd 2019, the suspect stepped onto our yard with a lawnmower and mowed our landscape which we had specifically designed not to be mowed, thus damaging the plants and needing it to be repeatedly watered (flooded) until most of it recovered - however, some of the landscape did die due to the severe summer heat/drought and the damage already done. On approximately September 2017, I had filed for approval and received approval from our HOA for this "no-mow", drought-tolerant landscape, and I had installed this landscape on October 2017 and diligently watered it regularly until it took 1 year to establish.*

>>

>> *(9) On September ?? 2019, at night time, the suspect shined his flash-light directly onto one of of our cameras, then kicked an object (IR illuminator) placed on our landscape along the fence.*

>>

>> *(10) On September 14th 2019, the suspect shot into a second camera damaging and breaking the front glass - the IR still technically works, but the shattered glass makes the camera's image blurry, especially at night.*

>>

>>

>> *These are the incidents that I can recollect as of right now. I'm sure there were other incidents that have escaped my memory.*

>>

>>

>> *As soon as I have accumulated all of the footage onto the portable hard-drive, I will let you know - I still also have to find much of it since they are stored on multiple different hard-drives.*

>>

>>

>> *Thanks,*

>> *Sid Kode.*

>>

# ¶566

Since the plaintiff had not received a rapid email response from the [WCSDet-WP],[WCSO-CID], the plaintiff also made a phonecall to the [WCSO-CID] on or about the date and approximate time of {2021-01-22 08:00}, notifying them about the evidence in the email. On or about

SIDDHARTH   KODE   V.   WILLIAMSON   COUNTY ,   ET   AL.                                          1696907690

the date and approximate time of {2021-01-22 12:00}, the plaintiff received a phonecall back from another Detective of the [WCSO],

[WCSDet-JD-23]. [WCSDet-JD-23] informed the plaintiff that he had not seen the plaintiff's email, but instead, shifted the blame to the

plaintiff, questioning the plaintiff as to why it was taking so long for the plaintiff to submit all of such evidence. In other words, [WCSDet-JD-

23] was focusing on the fact that the plaintiff had a large volume of evidence that was yet to be submitted, but yet completely ignoring at least

the two pieces of evidence (representing two different racially-motivated hate-crimes committed by [JSP] against the plaintiff) that the plaintiff

had already submitted to the [WCSO]. He stated that he and/or the [WCSO] would review the plaintiff's email and get back to the plaintiff.

[WCSDet-JD-23] asked the plaintiff, in a manner that was very suspicious to the plaintiff, whether-or-not the plaintiff's security-cameras

recorded audio, and the plaintiff responded that such security-cameras did record audio. The plaintiff immediately suspected that [WCSDet-

JD-23] was not asking this question for any reason beneficial to the plaintiff, but quite to the contrary, [WCSDet-JD-23] was asking this

question because he wanted to determine whether the plaintiff's security-cameras captured all (or any) of the audio of the corrupt-malicious-

predatory-and-retaliatory conspiracy and racketeering-enterprise that [WCLE] was engaged in and had been engaging in - in conspiracy with

the very same malicious racketeers - [JSP&KAP],[RSR] - that had committed the hate-crimes/racketeering-acts/civil-rights-violations/abuses of

which the plaintiff was trying to press-charges about. Not once during this phonecall did [WCSDet-JD-23] reveal to the plaintiff that the

plaintiff had already been charged in such fraudulent and purely-retaliatory manner with Class-C-Misdemeanor-Public-Nuisance by the very

same persons - racketeer co-defendants [JSP&KAP],[RSR] (acting in furtherance of such corrupt-malicious-predatory-and-retaliatory

conspiracy with [WCLE] against the plaintiff) - that the plaintiff has long since-intended to press charges (including felony charges) against (see

all of the relevant incidents dating back to {2009} above).

## ¶567

On or about the date and approximate time of {2021-01-22 14:11}, the plaintiff received the following email response from [WCSDet-WP].

Nowhere in this email to the plaintiff, did [WCSDet-WP] reveal to the plaintiff that the plaintiff had already been charged in such fraudulent

and purely-retaliatory manner with Class-C-Misdemeanor-Public-Nuisance by the very same persons - racketeer co-defendants [JSP&KAP],

[RSR] (acting in furtherance of such corrupt-malicious-predatory-and-retaliatory conspiracy with [WCLE] against the plaintiff) - that the

plaintiff had long since-intended to press charges (including felony charges) against (see all of the relevant incidents dating back to {2009}

above). Furthermore, [WCSDet-WP] does not provide any explanation to the plaintiff as to why the initial charge of criminal-mischief (for

which, the plaintiff had already provided one crucial piece of evidence) could not proceed to begin with - as, charges can always be upgraded

and/or modified at any future point in time after law-enforcement continues to receive more evidence of the larger pattern-of-criminal-activity:

▶  EMAIL RESPONSE FROM [WCSDet-WP] TO PLAINTIFF(▶):
▶  (2021-01-22 14:11)(~):   [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]

**[WCSDet-WP]**    *I attempted to view this video evidence you have using multiple different bowsers and received an error on all of them. If you would like I can come by*
*your residence and you can place the video on a hard drive for me.*

*Thank You,*

*Detective W. Passailaigue #13122*
*Criminal Investigation Division*
*Williamson County Sheriff's Office*
*508 S. Rock St. Georgetown, TX 78626*

*This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you*

*may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.*


*-----Original Message-----*

*From: ****************** <*******************>*

*Sent: Thursday, January 21, 2021 4:14 PM*

*To: Wayne Passailaigue <*************@wilco.org>*

*Cc: ***********************, **************************

*Subject: URGENT: Re: Hate Crimes Continue Unabated ; Re: Evidence for criminal mischief and threatening communications*


*Hello Detective Passailaigue,*



*We are "Siddharth Kode and ****** Kode" - property owners of "788 Kingfisher Lane, Leander, TX 78641."*



*As a followup to our previous conversation, I have assembled much (but not all) of the evidence for the pending hate-crimes charges, but I need initial charges to be filed for 1 particular piece of evidence as soon as possible - in essence, immediately - for 1 particular incident that took place on 2019-01-22.*


*This piece of video evidence that I have uploaded to a secure, private cloud-storage website:*



*https://gcc02.safelinks.protection.outlook.com/?url=*********************************************** &data=********************************************************************************************** *******************************************************************************************&sdata= =*******************************************&reserved=0*



*Since it will be 2 years for that date tomorrow, it is imperative that this particular piece of evidence be reviewed immediately, and that assuming the charges are valid, that these initial charges be filed immediately - in essence, preferably today, but no later than by tomorrow morning - against "Joseph Pargin" of "784 Kingfisher Lane".*


*These initial charges reflect the fact that these are hate crimes - so 1 level up for Misdemeanors - I'll explain that and more in a separate email that includes all of the extracted evidence (thus far):*


*Multiple Count(s) of Class A Misdemeanor "Assault"*
*https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Ftexas.public.law%2Fstatutes%2Ftex._penal_code_section_22.01&data= ****************************************************************************************** ********************************************************************************&sdata=*********** **********************************&reserved=0*


*Multiple Count(s) of Class A Misdemeanor "Terroristic Threat"*
*https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Ftexas.public.law%2Fstatutes%2Ftex._penal_code_section_22.07&data= ****************************************************************************************** ********************************************************************************&sdata=*********** **********************************&reserved=0*

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.

Multiple Count(s) of Class A Misdemeanor "Intimidation or Interference"

https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Ftexas.public.law%2Fstatutes%2Ftex._prop._code_section_301.171&data=

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*&sdata=\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*&reserved=0

Multiple Count(s) of Class A Misdemeanor "Harassment"

https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Ftexas.public.law%2Fstatutes%2Ftex._penal_code_section_42.07&data=

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*&sdata=\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*&reserved=0

Multiple Count(s) of Class B Misdemeanor "Disorderly Conduct"

https://gcc02.safelinks.protection.outlook.com/?url=https%3A%2F%2Ftexas.public.law%2Fstatutes%2Ftex._penal_code_section_42.01&data=

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*&sdata=\*\*\*\*\*\*\*\*\*\*\*\*

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*&reserved=0

A FEW MORE NOTES:

[1] Of course, these are not the most serious charges that we wish to file - as I have evidence of felonies being committed against us and our property - much more on that in that subsequent email that hopefully I should have ready by Friday (or Monday at the latest).

[2] We are only requesting charges to be filed for this incident within the 2 year deadline - as a matter of precaution - however, we do realize that if a criminal issue is ongoing for many years - then, the statute of limitations does not really apply due to the continuing nature of the crime (which is the case in our case - as our evidence overwhelmingly shows).

[3] I have kept this email as brief/concise as possible and have saved all of the details for that subsequent email that includes much more of the evidence.

[4] The total number of pieces of evidence is approximately 50 or more.

[5] As I will explain in further detail in that subsequent email, due to the substantial amount of evidence that we have, and the severity of crimes being committed, we still reserve the right to pursue Federal hate crimes charges against the suspects in this case. So, please also confirm that by pressing charges at the state/local level, that this does not prevent us from also pursuing the federal hate crimes charges as well.

But for now, please contact me as soon as possible (or if you prefer, please have a Deputy contact me to process these charges as soon as possible), so that these more urgent charges can be filed as soon as possible.

Respectfully submitted,

*Siddharth Kode and ******* Kode.*

*Wayne Passailaigue:*

> Sir

>

> For any emergency that you feel needs immediate response please call 911 and report the incident. If you have the evidence from the original criminal mischief case feel free to call and have a deputy pick up the evidence who will then submit the evidence, you can also mail the video footage to the Williamson County Sheriff's Office if you prefer that; please place "ATTN: DET. PASSAILAIGUE" on the letter head as well as the case number. If there is a new offense (other than the Criminal Mischief complaint) that you would like to report, please contact the non-emergency line for our Williamson County Communications who will then dispatch a deputy to take the initial information and file the offense under the proper offense title. This will help speed up the process as the case will then be assigned directly to a detective within a unit that investigates that certain offense or severity of offense.

>

> Thank You,

>

> Detective W. Passailaigue #13122

> Criminal Investigation Division

> Williamson County Sheriff's Office

> 508 S. Rock St. Georgetown, TX 78626

> Office: 512-943-5274

>

> This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.

>

> -----Original Message-----

> From: ****************** <******************>

> Sent: Monday, June 22, 2020 8:44 AM

> To: Wayne Passailaigue <************@wilco.org>

> Cc: Lori Murphy <**********@wilco.org>; *********************;

> webcontact@splcenter.org

> Subject: Hate Crimes Continue Unabated ; Re: Evidence for criminal

> mischief and threatening communications

>

> Hello Detective Passailaigue,

>

>

> This is Sid Kode, homeowner at "788 Kingfisher Lane".

>

> I have 3 questions/comments, as a follow-up to our previous conversation:

>

>

> (1)

> I continue to receive death threats, other terroristic threats, other

> references to brutal violence, intimidation/retaliotion for the

> reporting of their crimes, racial/xenophobic/homophobic slurs, other

> hate-speech and psychologically-abusive-speech (and not to forget,

> public slander/defamation) from the suspect - again, "Joseph Pargin"

> of

> "784 Kingfisher Lane".

>

> The suspect continues to tamper-with or try to disable/damage my security cameras by spraying them with water and by shining bright-light directly into them for long periods of time.

>

> The suspect also continues to step well-into my property to mow the

> very-low-growing "no-mow" grass (a grass that is not intended to be

> mowed) which I installed - in one case, mowing the entire side of the front-yard during the midst of an intense summer drought - forcing me to flood the mowed area with water in the hopes that it will recover.

>

> Unfortunately, there is permanent/irrecoverable damage/death to a large area of this "no-mow" grass that he mowed last year during the midst of the summer drought (I tried flooding the area to the best of my ability but it was "too little, too late" since I was not at the property for more than 3 days after the mowing took place) - while that same "no-mow"

> grass, if left unmowed, survives the Texas summer droughts just fine.

>

> Again, the suspect is well aware that this is a "no-mow" grass that is not intended to be mowed, and did so (and continues to do so) despite of this knowledge.

>

> In particular, the other side of the front-yard that is fully under my control has not been mowed in 3 years (it has only been manually-weeded by me on a regular basis) - and as a result of this intelligent maintenance, is in perfect condition/appearance.

>

> The suspect is also aware of the fact that there is no sprinkler system on the property (since the grass, when left unmowed, really does not need watering even during the summer droughts except in certain small areas where it has not fully established yet and/or where the water in the soil tends to evaporate faster, for example, due to higher elevation).

>

> On at least one occasion, the suspect poked at and damaged the political yard signs on my property.

>

> I was hoping that your interview with the suspect would serve to deter and stop this violent/abusive criminal behavior, but unfortunately, the suspect has not shown any indication of change, and to the contrary, might only have been emboldened.

>

> I still do have all of the previously-mentioned evidence, and new evidence of the above incidents - with the most recent incident being at approximately 2020-06-16 08:00.

>

> And so, I wanted to confirm the possible charges associated with such criminal conduct:

> (*) felony terroristic threats (including death threats)

> (*) felony obstruction of justice (tampering/disabling/damaging of

> cameras; threats for reporting of crimes)

> (*) felony intimidation of witness and retaliation against witness

> (*) felony vandalism and criminal mischief (more than $1500 in

> damages

> - for damage to grass and security cameras)

>

> Again, I do have every reason to believe and that the evidence I have does clearly show that these crimes are based on racial/xenophobic hatred and homophobic hatred, and as such, should be classified as hate crimes.

>

> *Also, as a former student at the University of Texas at Austin, I was*

> *registered as a student with disabilities, having a cognitive*

> *disability*

> *- which the suspect is fully aware of, but despite knowledge of this, maliciously chooses to exploit.*

>

> *As a minor side-note to the above, the suspect also continues to light fireworks every year (multiple times per year) - a well-known violation of HOA rules - an act that remains very dangerous due to the close proximity of houses/structures/trees/bushes/etc. and due to the great public nuisance that such loud fireworks cause (especially during the middle of the night), and not to forget, the resulting air pollution/debris.*

>

>

>

> *(2)*

> *In an issue that is slightly unrelated to the above - the property owner of "789 Kingfisher Lane" - Rebecca Sue Robertson - has trespassed on my property at approximately [2020-06-04 17:49] - I do have video evidence of this as well.*

>

> *Since this individual also threatened me back in 2010/2011 at my*

> *doorstep, there was a criminal-trespass-warning issued to this*

> *individual on August 2011 by the Williamson County Sheriff's*

> *Department*

> *- o warning that she refused to sign, but that the WCSD Deputy assured me that it is still valid - in fact, there were 2 trespass warnings issued to this individual on that same day (one from another neighboring property owner as well).*

>

> *This individual has repeatedly harassed me over the course of the 11 years that I have lived here - in some cases, kicking and throwing tantrums against my property and also, referring to me on some occasions, using racial/xenophobic/homophobic slurs, and also committing slander/defamation/libel against me in multiple public settings.*

>

> *She also leaves her large dog unleashed on a daily basis - the dog is never on leash (which is also a violation of HOA rules) and occasionally does bark very loudly - this dog occasionally does step will into my frontyard.*

>

> *So, please confirm that you do have this criminal-trespass-warning on file, so that we can begin processing charges against this individual as well.*

>

>

>

> *(3)*

> *As a relatively minor side-note to the above, I should also point out that neither of these individuals are practicing social distancing, and are never wearing face masks in encountering me while I'm at my property.*

>

> *I am the only one wearing a face mask, and they also ridicule/shame me for doing so - they even sneeze/cough around me without wearing a mask, leading me to wonder if they are doing it on purpose.*

>

> *They are surely aware that people are spreading the disease without showing symptoms of it - (in other words, carriers not sufferers) - and that people of color (such as myself) are particularly vulnerable to the lethal disease.*

>

>

>

>

> *NOTE:*

>

> I do want to pursue pressing charges against these individuals, but I do need to stress that I will need police protection - these individuals (especially "Joseph Pargin") have shown themselves to be capable of violence (in fact, brutal violence), and there are countless cases where vulnerable victims of hate crimes that have reported crimes have been retaliated against - and in some cases, severely injured or even murdered.

>

> So, it takes significant courage for a person like me (of my racial

> profile) and of my physical stature (I weigh about 100 pounds) to be able to report these hate crimes, against the possibility of violent retaliation from people more than twice my size, and in all likelihood, are armed with lethal weapons.

>

> In fact, the suspects' terrorizing behavior towards me has intentionally served to instill fear/terror in me, so that I will remain quiet and allow such injustice to continue (which I have done until this point).

>

>

>

>

>

> I will be compiling the video evidence and I should have most of it on an SD card within two weeks from now (since video files are too big to transfer over email).

>

> Please confirm if/when you are available for meeting me at the

> property

> ("788 Kingfisher Lane") sometime during the weeks of June 29th/July 6th, so that I can provide you with this evidence - I will send a follow-up email confirming the exact date/time.

>

>

>

>

> Thanks,

> Sid Kode.

>

>

>

>

>

> On 10/16/2019 8:36 AM, Wayne Passailaigue wrote:

>> Sir,

>>

>> I have received your email and it has been added to this case file (Case No. 2019-09-00561). Both cases that you had filed with through the Sheriff's Office are being worked under this case number. I have conducted an interview with the suspect in this case and have an idea of what's going on. The physical evidence (digital recordings) is paramount in this case and I will be waiting for your response to go further in this case. If you have any questions please feel free to reach out by email or phone.

>>

>> Thank You,

>>

>> Detective W. Passailaigue #13122

>> Criminal Investigation Division

>> Williamson County Sheriff's Office

>> 508 S. Rock St. Georgetown, TX 78626

>> Office: 512-943-5274

>>

>> This message contains information which may be confidential and privileged. Unless you are the addressee (or authorized to receive for the addressee), you may not use, copy or disclose to anyone the message or any information contained in the message. If you have received the message in error, please advise the sender by reply e-mail and delete the message.

>>

>> -----Original Message-----

>> From: ******************* <*******************>

>> Sent: Wednesday, October 9, 2019 8:05 AM

>> To: Wayne Passailaigue <*************@wilco.org>

>> Subject: Evidence for criminal mischief and threatening

>> communications

>>

>> EXTERNAL email: Exercise caution when opening.

>> _____

>>

>> Hello Detective Passailaigue,

>>

>>

>> This is Sid Kode (property owner of "788 Kingfisher Lane, Leander, TX 78641"), responding to your voicemails about the criminal mischief and threatening communications that we're experiencing at our property from the suspect (next-door neighbor that lives at "784 Kingfisher Lane, Leander, TX 78641").

>>

>> I do still have the footage stored on our security camera system's DVR hard-drives, but I have not yet figured out how to transfer the data onto an external hard-drive.

>>

>> Unfortunately, as of late, I have not had the time to figure this out, but hopefully I should be able to get it done sometime this month.

>>

>> Once I have this done, I will let you know so that you can obtain that evidence.

>>

>>

>> So, to briefly summarize the sequence of incidents:

>>

>> (1) In approximately October 2017, I received the first threatening communication from the suspect.

>>

>> (2) In approximately February 2018, I received the second threatening communication from the suspect (I still have to find the footage for this).

>>

>> (3) In approximately January 2019, I received the third threatening communication from the suspect.

>>

>> (4) In approximately February 2019, I received the fourth threatening communication from the suspect.

>>

>> (5) In approximately May 2019, I received the fifth threatening communication from the suspect (I still have to find the footage for this).

>>

>> (6) In approximately June 2019, I received the sixth threatening communication from the suspect (I still have to find the footage for this).

>>

>> (7) On July 3rd 2019, the suspect shot into one of our cameras damaging and breaking the front glass and IR illuminators so that the IR night vision no longer works.

>>

>> (8) On August 23rd 2019, the suspect stepped onto our yard with a lawnmower and mowed our landscape which we had specifically designed not to be mowed, thus damaging the plants and needing it to be repeatedly watered (flooded) until most of it recovered - however, some of the landscape did die due to the severe summer heat/drought and the damage already done. On approximately September 2017, I had filed for approval and received approval from our HOA for this "no-mow", drought-tolerant landscape, and I had installed this landscape on October 2017 and diligently watered it regularly until it took 1 year to establish.

>>

>> (9) On September ?? 2019, at night time, the suspect shined his flash-light directly onto one of of our cameras, then kicked an object (IR illuminator) placed on our landscape along the fence.

>>

>> (10) On September 14th 2019, the suspect shot into a second camera damaging and breaking the front glass - the IR still technically works, but the shattered glass makes the camera's image blurry, especially at night.

>>

>>

>> These are the incidents that I can recollect as of right now. I'm sure there were other incidents that have escaped my memory.

>>

>>

>> As soon as I have accumulated all of the footage onto the portable hard-drive, I will let you know - I still also have to find much of it since they are stored on multiple different hard-drives.

>>

>>

>> Thanks,

>> Sid Kode.

>>

# ¶568

On or about the date and approximate time of {2021-02-17 15:15}, [JSP] and his almost-adult son, [NP], maliciously capitalize on the unprecedented week-long winter-freeze (which took out electricity for most people in Central Texas for very-long periods of time) in-order-to engage in the felony-crime/racketeering-act of evidence-tampering and continue their felony-crime of criminal-mischief against the plaintiff. (It should be noted that at this point in time, [NP], although still a minor, is within a year or two of reaching the age of eighteen - thus, very close to adult age.) This act of malicious criminal-mischief against the plaintiff is considered to be a felonious act because the total accumulated value of destruction/damage to the plaintiff's property has already exceeded $2,500. Both [JSP] and [NP] knew that electricity would be out for long periods of time in all houses (including the plaintiff's [HOUSE]) due to such unprecedented winter-freeze. Both [JSP] and [NP] mistakenly suspected that since electricity would be out for long periods of time at the plaintiff's [HOUSE], that the plaintiff's security-camera(s) were not powered-up to record their criminal activities. With this mistaken knowledge, [JSP] and [NP], for a period of approximately 10 minutes, maliciously throw large chunks of hard-ice at the plaintiff's security-cameras not only to destroy/damage the cameras' recording capabilities, but more importantly, to destroy/damage any incriminating evidence of prior crimes that they had committed against the plaintiff. Both [JSP] and [NP] committed this evidence-tampering felony-crime/racketeering-act against the plaintiff with the knowledge that the plaintiff had already reported some of [JSP]'s prior crimes of criminal-mischief against the plaintiff - for which [WCSDet-WP] had already claimed to have interviewed [JSP] about. This criminal action is also considered to be felony/racketeering-act evidence-tampering because [JSP] had already shot a projectile into one of these cameras, shattering the front-glass of the camera, and damaging/destroying the infrared/nightvision of this camera. Both [JSP] and [NP] knew that the plaintiff had already reported this particular component of the criminal-mischief to the [WCLE].

Thus, with this knowledge, both [JSP] and [NP] sought to exploit the widespread electric-power-outage to completely, yet *"secretly"*, destroy the evidence of prior damage to the plaintiff's private-property so that such incriminating evidence could not be used against them. Therefore, [JSP] cannot deny the indisputable fact that both [JSP] and [NP] were deliberately trying to destroy evidence of previous crimes that [JSP] had committed against the plaintiff in-order-to avoid criminal-liability for such crime(s) - the very definition of felony/racketeering-act evidence-tampering ([TPeC-T8-C37-§37.09], [18-USC-P1-C73-§1519], [18-USC-P1-C73-§1512]). Also, both [JSP] and [NP] wanted to eliminate the possibility of these camera(s) recording future hate-crimes/civil-rights-violations/racketeering-acts/abuses that both [JSP&KAP] and [NP] undoubtedly planned to commit against the plaintiff (as the record would continue to show). Most importantly, both [JSP] and [NP] committed these felony-crimes/racketeering-act because they were under the mistaken impression that the cameras were not recording due to the long-periods of power-outage. Fortunately for the plaintiff, since the plaintiff had an Uninterruptible-Power-Supply [UPS] system installed dedicated for the security-camera system, both the system and cameras did record the entire 12-minute incident, which was only cut-short because a neighboring resident confronted them and took out her camera-phone to record the last minutes of such crimes (see below). The incident begins with both [JSP] and [NP] deliberately walking to the side-yard border of [784KLLTX78641] and [788KLLTX78641] - and actually crossing the border into the plaintiff's property - in-order-to commit these crimes. Then, [NP] uses a camera-phone to photograph/record what the plaintiff's cameras looked like prior to their egregious acts of felony-evidence-tampering/felony-criminal-mischief that they would soon be engaging in - because they wanted to have both before-and-after *"trophy"* photographs of their felony-crimes/racketeering-acts. Then, [JSP] makes the obscene/vulgar gesture of using both of his hands to point to his genitals directed directly towards two-or-more of the plaintiff's security-cameras. Both [JSP] and [NP], expressing pure pleasure/joy (φ) , then being to pickup large chunks of hard-ice and violently throw such hard-ice at full-speed (like a pro-baseball-pitcher throwing baseballs) onto the plaintiff's security-cameras and surrounding fascia/soffit/rafter/gutter area of the [HOUSE]. As they are performing these egregious actions of felony-evidence-tampering/felony-criminal-mischief against the plaintiff, [JSP] and [NP] continue to cheerfully talk with each other as they rejoice in the thrill of their criminal actions (φ) . It should be noted that these felony/racketeering-act criminal actions not only damaged the plaintiff's security-cameras, but also damaged the [HOUSE]-fascia/soffit/rafter/gutter around which the plaintiff's security-cameras are installed, and/or the area of the [HOUSE]-roof very-close to such security-cameras. It should also be noted that during much of this incident, [JSP] had actually crossed the property-boundary and was actually on the plaintiff's property [788KLLTX78641] while he was committing these felony-crimes/racketeering-acts against the plaintiff. After approximately 10 minutes of violently throwing large chunks of hard-ice onto the plaintiff's security-cameras, much of such hard-ice also damaging that part of the [HOUSE]-fascia/soffit/rafter/gutter and/or [HOUSE]-roof, [785KL-2018-1] arrives back in her vehicle with her other young children family-members. It is also important to note that the last few minutes of these felony-crimes/racketeering-acts were also witnessed by those young children. (Normally, when crimes by adults are committed with the knowledge that the crimes are being witnessed by children, the sentencing for such crimes is enhanced due to this aggravating factor - as this exposure is very damaging to the children whose minds are not mature-enough to handle such criminally-abusive actions.) [785KL-2018-1] almost immediately notices that both [JSP] and [NP] are vandalizing the plaintiff's [HOUSE]. She confronts them by yelling out to them from across the street, and as this incident reveals, [JSP] even brazenly engages in felonious witness-intimidation against [785KL-2018-1] - while her young children family-members, [785KL-2018-CHILDREN], are also witnessing both the initial crimes and such witness-intimidation:

> ▸ SECURITY-CAMERA RECORDING OF [JSP]'S,[NP]'S FELONY CRIMES: EVIDENCE-TAMPERING/CRIMINAL-MISCHIEF AGAINST PLAINTIFF, WITNESS-INTIMIDATION AGAINST [785KL-2018-1] (▸)
> ▸ (2021-02-17 16:24) (~)
> ▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]
>
> ⟦ AFTER SPENDING 8 MINUTES VANDALIZING PLAINTIFF'S [HOUSE], [JSP] TELLS [NP] THAT IT WILL ONLY TAKE A FEW MORE THROWS OF HARD-ICE- ⟧

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.

〔 -TO BREAK/DISLODGE EITHER PLAINTIFF'S SECURITY-CAMERAS OR THE ENTIRE [HOUSE]-FASCIA/SOFFIT/RAFTER/GUTTER-STRUCTURE ONTO WHICH- 〕

〔 -SUCH SECURITY-CAMERAS WERE MOUNTED: 〕

**[JSP]**  *My hand is so damn cold! We get this, just one more time- I think, we got to keep going! Until that middle [???] [???]!... One more shot! We gotto get on it!*

〔 [JSP] BENDS DOWN TO PICK UP MORE HARD-ICE BUT IS INTERRUPTED BY [785KL-2018-1]. 〕

〔 [785KL-2018-1] - WITNESSING [JSP]'S,[NP]'S VANDALISM FOR APPROXIMATELY 30 SECONDS OR MORE - YELLS OUT TO [JSP],[NP]: 〕

**[785KL-2018-1]**  *HEY, WHY ARE YOU GUYS THROWING STUFF AT HIS HOUSE?!*

〔 [JSP], WHO WAS BENDING OVER TO PICKUP ANOTHER LARGE CHUNK OF HARD-ICE, IS STARTLED AND LOOKS UP AT [785KL-2018-1]: 〕

**[JSP]**  *WHAT?! BECAUSE I DON'T LIKE HIS CAMERA ON MY YARD!*

**[785KL-2018-1]**  *BUT, THAT [???]!*

〔 [JSP] AGAIN SHOWS HIS BRAZEN DISREGARD FOR SUCH WITNESS AND THE PLAINTIFF'S RIGHTS, JOYFULLY SHOUTING: 〕

**[JSP]**  *I CAN DO WHATEVER I WANNA DO!*

〔 [JSP] TRIES TO SHOW THAT HE IS NOT FAZED-EVEN-ONE-BIT BY OTHERS WITNESSING HIS CRIME. 〕

〔 HOWEVER, [JSP] DOES FUMBLE ICE-CHUNK IN HIS HAND, WHICH PLAINTIFF ASSERTS IS SHELL-SHOCK. AS AN UNQUESTIONED MOB-BOSS- 〕

〔 -[JSP] HAD BEEN COMMITTING CRIMES AGAINST PLAINTIFF FOR SO LONG THAT HE DID NOT EXPECT TO BE CHALLENGED BY OTHERS: 〕

**[785KL-2018-1]**  *WELL NO, BECAUSE... OK, WELL YOU KNOW WHAT I CAN DO?!*

**[JSP]**  *YOU DO WHATEVER YOU WANNA DO! ... YOU DO WHATEVER YOU GOTTA DO!*

〔 [785KL-2018-1] PULLS OUT HER CAMERA-PHONE AND STARTS RECORDING [JSP]: 〕

**[785KL-2018-1]**  *[???]*

〔 [JSP] PICKS UP ANOTHER CHUCK OF HARD-ICE, EMBARRASSED THAT HE HAD FUMBLED THE PREVIOUS ONE. 〕

〔 REALIZING THAT THIS SITUATION IS NOT LOOKING GOOD FOR HIM, [JSP] TRIES TO JUSTIFY HIS CRIMINAL ACTIONS- 〕

〔 -ENGAGING IN FURTHER FELONIOUS ACT(S) OF WITNESS-INTIMIDATION AGAINST [785KL-2018-1]: 〕

**[JSP]**  *HEY, I'VE LIVED NEXT TO THIS GUY FOR 10 YEARS! OK?!*

〔 [785KL-2018-1], WITH PHONE RECORDING, DARES [JSP] TO CONTINUE HIS CRIMINAL ACTION SO THAT SHE COULD RECORD IT: 〕

**[785KL-2018-1]**  *Do it!*

〔 [JSP] CONTINUES TO ENGAGE IN FURTHER FELONIOUS ACT(S) OF WITNESS-INTIMIDATION AGAINST [785KL-2018-1]: 〕

**[JSP]**　　　　　*TRUST ME, YOU DON'T HAVE TO LIVE BY HIM! HAVE YOU SEEN HIS BACKYARD?!*

⟦ [785KL-2018-1], WITH PHONE RECORDING, AGAIN TRIES TO GET [JSP] TO CONTINUE HIS CRIMINAL ACTION SO THAT SHE COULD RECORD IT: ⟧

**[785KL-2018-1]**　　*DO IT AGAIN!*

**[JSP]**　　　　　*OK!*

⟦ ONE OF [785KL-2018-1]'S CHILDREN FAMILY MEMBERS TURNS AROUND TO LOOK AT [JSP]. ⟧
⟦ YET [JSP] IS COMPLETELY UNFAZED THAT OTHER PEOPLES' CHILDREN ARE WITNESSING HIS CRIMES AGAINST PLAINTIFF. ⟧
⟦ IN AN UNBELIEVABLE ACTION OF BRAZENNESS, [JSP] SOLIDIFIES HIS GRIP OF THE LARGE-CHUNK OF HARD-ICE. ⟧
⟦ [JSP] THEN THROWS THE LARGE-CHUNK OF HARD-ICE LIKE A PRO-PITCHER WOULD THROW A BASEBALL VIOLENTLY ONTO SECURITY-CAMERA. ⟧
⟦ [JSP] THEN CELEBRATES THE FACT THAT THE HARD-ICE HIT THE SECURITY-CAMERA RIGHT-ON-TARGET BY DOING A LITTLE DANCE. ⟧
⟦ [JSP] EVEN BRAZENLY TAUNTS [785KL-2018-1], MAKING SURE THAT SHE PROPERLY RECORDED SUCH CRIME, AS IF HER RECORDING OF-: ⟧
⟦ -[JSP]'S CRIMES IS FUTILE, DUE TO [JSP]'S UNQUESTIONED STATUS AS A MOB-BOSS OF THE NEIGHBORHOOD: ⟧

**[JSP]**　　　　　*THAT ONE GOOD?! DID YOU GET ME?!*

⟦ [785KL-2018-1], WITH PHONE RECORDING, TRIES TO GET [JSP] TO IDENTIFY HIMSELF: ⟧

**[785KL-2018-1]**　　*WHAT IS YOUR NAME?!*

**[JSP]**　　　　　*OH MY NAME'S JOEY PARGIN!...*

**[785KL-2018-1]**　　*[???]*

⟦ BOTH [JSP] AND [NP], REALIZING THAT THEY ARE IN SERIOUS LEGAL TROUBLE, DECIDE TO CALL IT QUITS. ⟧
⟦ [JSP] STILL MAKES AN ASTONISHING FINAL STATEMENT AS THEY BOTH FLEE SCENE BY ENTERING BACK INTO [784KLLTX78641] HOUSE: ⟧

**[JSP]**　　　　　*YEAH, I'M SURE THEY HAVE MUCH MORE SERIOUS PROBLEMS THAN ME THROWING SNOWBALLS [AT THEIR HOUSE]!*

## ¶569

[785KL-2018-1], despite witnessing only the last 2 minutes of this incident, within an hour of this incident, submits the video that she had recorded in an email to the plaintiff:

> ▸ "HOUSE VANDALISM" ·  EMAIL FROM [785KL-2018-1] TO PLAINTIFF CONCERNING [JSP],[NP] FELONY CRIMES OF EVIDENCE-TAMPERING/WITNESS-INTIMIDATION/CRIMINAL-MISCHIEF(⊢)
> ▸ (2021-02-17 16:00)(~)  [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT THE PRIVACY OF SENDER [785KL-2018-1] ]
>
> **[785KL-2018-1]**

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.                    1696907690

*Hi Sid I caught your neighbor throwing ice at your camera so I confronted him and got him on video telling me his name and what not.*

*I asked him what he was doing and he told me whatever he wants and let me video him doing it.*

*If you would like to call the police I'm more then happy to help, cause that's not right.*

******* *******

*785 Kingfisher lane*

**** **** ** ******

# ¶570

The plaintiff does not consider these three felony crimes of evidence-tampering/witness-intimidation/criminal-mischief committed by [JSP] and [NP] to be the most shocking aspect of this incident. Instead, the plaintiff considers [JSP]'s statements during this incident to a third-party witness to be the most-shocking and most-revealing aspects of this incident. Of these shocking statements, the least shocking statement is, *"I CAN DO WHATEVER I WANNA DO!"* This statement, which is very-shocking to an uninformed third-party observer, is not very shocking to the plaintiff. The plaintiff had already suffered many dozens of hate-crimes/civil-rights-violations/racketeering-acts/abuses motivated by extreme-racial-animus and homophobic-animus from [JSP&KAP] for 10 years, and yet, none of those hate-crimes/civil-rights-violations/racketeering-acts/abuses had even been charged, let alone prosecuted, by [WCLE] despite of the plaintiff reporting such hate-crimes/civil-rights-violations/racketeering-acts/abuses to [WCLE], thanks to the obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise documented in this lawsuit involving [WCLE], and both [JSP&KAP]'s,[RSR]'s statuses as the unofficial mob-bosses of the neighborhood. So, the fact that [JSP] and [NP] feel an absolute sense of impunity for [JSP&KAP]'s crimes against the plaintiff does not shock the plaintiff, as both [JSP&KAP], their son [NP], and their co-conspirator [RSR], have been deliberately protected from prosecution by [WCLE] for over 10 years, by virtue of this racketeering-enterprise. As another very-revealing statement, [JSP] brazenly admits that [JSP&KAP],[RSR] and [WCLE] had been predatorily targeting the plaintiff purely based upon the nonaesthetic and cosmetic appearance of the plaintiff's private [BACKYARD], and thus, not based upon any actual health-and-safety violation causing any actual harm to such neighbors, angrily shouting to [785KL-2018-1], *"... HAVE YOU SEEN HIS BACKYARD?!"*. However, as revealing as those statements may be, the plaintiff instead considers the most shocking statement and the most revealing statement to be [JSP]'s final statement during this incident, *"YEAH, I'M SURE THEY HAVE MUCH MORE SERIOUS PROBLEMS THAN ME THROWING SNOWBALLS [AT THEIR HOUSE]!"*. It should be noted that both [JSP&KAP] and [RSR] had recently initiated a remarkable and purely-retaliatory frame-job against the plaintiff with the help of the [WCLE], particularly [WCCD-Harrell], framing the plaintiff for the Class-C-Misdemeanor-Public-Nuisance crime that the plaintiff clearly did not commit using one-or-more piece(s) of fabricated/planted evidence (another violation of felony/racketeering-act [TPeC-T8-C36-§36.06],[18-USC-PI-C73-§1513]) along with fraudulent/misleading testimony (possibly including in sworn-statements), and in the process, egregiously violating the plaintiff's fourth-amendment and fifth-amendment rights by executing an unconstitutional-and-unlawful search/seizure of the plaintiff's private-property, also in violation of the plaintiff's due-process right-to-privacy. At this moment in time, this Class-C-Misdemeanor-Public-Nuisance charge had not yet been served to the plaintiff, but [JSP&KAP] were obviously fully aware of such charge, and that such charge would soon be served by [WCLE] onto the plaintiff. So, by making this statement, [JSP] reveals his brazen thought-process to the plaintiff - that not only would [JSP&KAP] and [NP] be fully protected/immunized by [WCLE],

but furthermore, that it is only the plaintiff that would have to suffer the legal consequences of both the predatory frame-job and the unconstitutional-and-unlawful search/seizure that [JSP&KAP],[RSR][WCLE] had predatorily orchestrated against the plaintiff.

## ¶571

On or about the date and approximate time of {2021-02-19 13:16}, [RSR]'s unleashed large-dog, [L], barks loudly and uncontrollably on or near [RSR]'s frontyard - a recurring noise-nuisance-violation that the plaintiff had noticed on countless occasions from [RSR]'s property, [789KLLTX78641].

## ¶572

In their previous felonious actions against the plaintiff, neither [JSP] nor [NP] could verify that the plaintiff's security-cameras had been damaged/destroyed since sch security-cameras' infrared/nightvision light were not on, due to the fact that these crimes were committed in broad-daylight (and such infrared/nightvision light only turns on at dark). Thus, on or about the nighttime of {2021-02-19 21:30}, [JSP] approaches these security-cameras to inspect and verify that they had been damaged/destroyed as they had intended, only to realize that one-or-more of such security-camera(s) infrared/nightvision light is lit-up indicating that they seem to continue functioning. [JSP], who does not seem to be fazed even-one-bit from his felony-crimes being witnessed and recorded by neighboring residents, raises his hands laterally as a form of threatening intimidation towards one-or-more of the plaintiff's security-camera(s). [JSP] looks around to see if anyone is watching, then bends down in-order-to pick-up another chunk of hard-ice (since the ice on the yard still had not melted at that point in time), and violently hurls snch hard-ice towards one of the plaintiff's other security-camera(s), with such hard-ice hitting a side of the plaintiff's [HOUSE]. It is important to reiterate that none of [JSP&KAP]'s nor [RSR]'s numerous, substantial, numerous and repeated criminal actions against the plaintiff would have been possible, if not for [WCLE]'s decade-long obstructive-and-retaliatory, blackmailing-and-defranding racketeering-enterprise against the plaintiff, that has very-effectively served to protect/immunize [JSP&KAP],[RSR] (and all of the involved employees/agencies of [WCLE]) from the substantial crimes that they aggregately committed against the plaintiff - over the period of approximately a decade (at this point in time).

## ¶573

On or about the late-nighttime of {2021-02-19 23:21}, the plaintiff notices on the plaintiff's security-camera-system-monitor, what appeared to be a police-cruiser-vehicle of defendant [WCLE] drive np the street, with the bright spotlight of such cruiser deliberately and/or maliciously shining into the frontal regions of the plaintiff's (unlit) property - as if to conduct illegal surveillance of the plaintiff's property/[HOUSE], and/or to intimidate the plaintiff - an unlawful practice of surveillance and/or intimidation that plaintiff had noticed on multiple occasions dating back to as early as the beginning of the year {2020} (see above).

## ¶574

On or about the date of {2021-02-24}, [WCLE] and/or a Justice-Court of defendant [WC], [WC] Precinct 2 Justice-of-the-Peace Court [WCP2JotPC], in which [WCLE] filed charge against the plaintiff mailed a document form (see attached below) via the [USPS] to the plaintiff at [788KLLTX78641] establishing that [WCLE] - in particular, the [WCCO], [WCCHD] and the [WCSO] - had, indeed, charged the plaintiff

for Class-C-Misdemeanor-Public-Nuisance. The form indicated that the plaintiff should make a choice between *"Not Guilty"*, *"Guilty"* and *"No Contest"*. The form included the threat to the plaintiff, that if the plaintiff failed to respond with one of those three choices by the stated 28-day deadline (from the date of mailing of such document form), that the plaintiff would face additional criminal-charge(s) and/or suffer other penalties (such as, but not limited to, the suspension of the plaintiff's drivers-license) and/or a warrant for the plaintiff's arrest. The form included a demand that the plaintiff pay a fine amount of approximately $131, if the plaintiff made the choice of *"Guilty"* or *"No Contest"* (*"Nolo Contendere"*). In this form, there is also a very ominous warning that it is a felony-crime to *"influence or coerce a witness to testify or to elude legal process"* along with the additional ominous warning that it is a felony-crime to *"harm or threaten to harm a witness in retaliation for or on account of the serve of the person as a witness or to prevent or delay the person's service as a witness to a crime."* It stating these two ominous warnings, [WCLE] was fraudulently insinuating that the plaintiff is likely to engage in such felony-crimes, when in fact, it was the complaining witnesses of this particular fraudulent Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff that had repeatedly engaged in those very same felony-crimes (and racketeering-acts) against the plaintiff (but not only against the plaintiff) - dating all the way back to the month of {2011-08} (see above), and as the plaintiff had also reported to [WCLE] in prior phonecalls/emails during the months of {2019-07},{2019-09},{2019-10},{2020-06},{2021-01} (see above). It is indisputable, that by mailing, or by causing to be mailed, via the [USPS], this document form to defraud the plaintiff, [WCLE] committed an egregious violation of the plaintiff's due-process rights. At no point in time, was the plaintiff provided with any evidence from [WCLE] - let alone all exculpatory/mitigating/impeachment information (pursuant to 《BRADY V. MARYLAND》 and its progeny) - of the alleged crime. Therefore, [WCLE] was demanding that the plaintiff make a plea without showing any inculpatory evidence or exculpatory evidence of the alleged crime - an violative tactic that is commonly referred to as *"trial by ambush"*. In fact, [WCLE] deliberately declined to provide any evidence to the plaintiff precisely because such evidence would be clear indication of both a retaliatory frame-job and an unconstitutional-and-unlawful search/seizure that was committed by [JSP&KAP],[RSR], [WCLE] against the plaintiff, and all of these racketeer co-defendants - [JSP&KAP],[RSR],[WCLE] - wanted to avoid all liability/fallout from these civil-rights-violations/racketeering-acts against the plaintiff. At the very least, [WCLE] did not provide any evidence to the plaintiff because they wanted to avoid naming any complaining witnesses along with the accusation(s) of such complaining witnesses, in direct violation of the plaintiff's sixth-amendment rights - both the plaintiff's right to notice-of-accusation, and the plaintiff's right to know/confront the witnesses. At this point in time, [WCLE] already knew that the three primary complaining witnesses - [JSP&KAP],[RSR] - had already aggregately committed many dozen count of hate-crimes/civil-rights-violations/racketeering-acts/abuses (including felonious-crimes) against the plaintiff prior to this incident. So, providing the plaintiff with any evidence that reveals these witnesses would only be a huge-liability-for and very-damaging-to [WCLE], and in particular, very revealing of such obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff. This document form also did not specify under what specific text or line-item(s) of the vast Public-Nuisance law that the plaintiff was charged under. Due to this complete lack of information that provided no details of the criminal-complaint filed against the plaintiff, the plaintiff looked up the online (publicly-available) Court records of the [WCP2JotPC], and found out that the plaintiff had been charged under *"Chapter 343"* of the [THaSC] - despite the fact that, during the prior incident of {2020-04-28}, the plaintiff was provided a Warning-Citation that did not even state *"Chapter 343"* - let alone, the specific text or line-item(s) in *"Chapter 343"* that the plaintiff was alleged to have violated. It is indisputable, that by mailing, or by causing to be mailed, via the [USPS], this document form to defraud the plaintiff, defendant [WC] and its law-enforcement agencies ([WCLE]), as a municipal corporation (person), and also in particular, the four co-conspirator racketeers in such racketeering-enterprise against the plaintiff - [KAP], [RSR], [JSP] and [WCCD-Harrell] - not only committed the racketeering-acts of *"mail-fraud"* and *"blackmail/extortion"* against the plaintiff but also the felony/racketeering-act of obstruction/retaliation against the plaintiff - as the elapsed events at this point in time have already revealed but as the upcoming events in

{2021} would continue-to-confirm. Despite initiating this retaliatory frame-job on the plaintiff in conspiracy with [RSR] and [WCLE] (particularly, [WCCD-Harrell]), throughout much of the rest of the year {2021} and most of the following year of {2022}, [JSP&KAP], and in some cases, their son [NP], would continue to engage in more retaliatory crimes of intimidation/interference/blackmail/harassment/stalking/criminal-mischief against the plaintiff. In multiple documented incidents during the year {2021}, [JSP&KAP] would also continue to retaliatorily engage in the same never-ending campaign of relentlessly-racist propaganda against the plaintiff, in-order-to engender more racial-animus against the plaintiff in the White neighborhood's other residents, especially now that they have proof to show such residents that they got [WCLE] to (fraudulently) charge the plaintiff with Class-C-Misdemeanor-Public-Nuisance. [JSP&KAP] - acting in conspiracy with [RSR] and [WCLE] (particularly, [WCCD-Harrell]) - continued to engage in this pattern of malicious and criminal activity against the plaintiff during the years {2021}/{2022}, in substantial part, in-order-to deter the plaintiff from continuing-to-report and/or provide-evidence-for the large count of hate-crimes/civil-rights-violations/racketeering-acts/abuses that they had already aggregately committed against the plaintiff (in conspiracy with [RSR] and [WCLE]) - during the previous decade. However, this part of [JSP&KAP]'s plan was truly unnecessary and actually overkill, because as soon as [WCLE], acting in conspiracy with [JSP&KAP],[RSR], charged the plaintiff with Class-C-Misdemeanor-Public-Nuisance and followed-through on such purely-retaliatory charge by mailing the aforedescribed charge/plea document to the plaintiff, [WCLE] had not only irreversibly locked themselves into an adversarial role with the plaintiff, but [WCLE] had also provided the plaintiff with a mountain of evidence - almost a decade's worth (and counting) of extremely-incriminating evidence - of racial-oppression and pattern-of-racketeering-activity. At numerous points in time during the previous decade, the plaintiff provided [WCLE] with ample opportunity to make amends, only to repeatedly realize that [WCLE] was simply hellbent on acting predatorily, retaliatorily - in conspiracy with [JSP&KAP],[RSR] (and initially [JJB]) - against the plaintiff, in-order-to deprive the plaintiff of the plaintiff's rights and defraud the plaintiff, an immigrant-of-color/indigenous-person, out of the private-property-ownership within such White neighborhood (by such brazen attempts to evict the plaintiff out of such White neighborhood). In other words, at this point in time, [WCLE] had made this lawsuit truly unavoidable - with the legal threshold for *"exhaustion"* far exceeded - and any further actions of retaliation against the plaintiff - as the continuation of the purely-retaliatory Class-C-Misdemeanor-Public-Nuisance prosecution against the plaintiff in the year {2021} would continue-to-demonstrate - simply deepened already irreparable, core wounds, that could only be remedied by the plaintiff's [FHA], [KKKA] and [RIaCOA] lawsuit against all of the defendants.

> MAIL-FRAUD EXHIBIT #4: CLASS-C-MISDEMEANOR-PUBLIC-NUISANCE CHARGE AGAINST PLAINTIFF, PLEA FORM:
> [WCCO],[WCCHD],[WCSO],[JSP&KAP],[RSR]:   {2021-02-24} (DATE OF MAILING VIA [USPS])

1696907690

Honorable Edna Staudt
Justice of the Peace
Williamson County Precinct Two



350 Discovery Blvd., Suite 204
Cedar Park, Texas 78613
512-260-4210    Fax 512-260-4215

**02/24/2021**
**DOCKET # 2CR-20-01434**

**THE STATE OF TEXAS**
**VS**

**Siddharth Choudhary Kode**
**788 Kingfisher Lane**
**Leander TX 78641**

You are hereby NOTIFIED TO APPEAR before the Justice Court, Pct. 2, of Williamson County, Texas on or before **3:00 P.M.** on **MARCH 23, 2021** to then and there answer to the State of Texas for an Offense against the laws of the State, to wit:

| | |
|---|---|
| Offense: | PUBLIC NUISANCE |
| Offense Date: | 10/12/2020 |
| Fine: | $131.00 |

**FAILURE TO APPEAR MAY RESULT IN ADDITIONAL CHARGES, DRIVER LICENSE SUSPENSION, AND/OR A WARRANT FOR YOUR ARREST.**

You may dispose of these charges by appearing in person or by counsel at the address above, or you may dispose of these charges by forwarding the following to the address above:

**PLEA**

_____ I enter a plea of NOT GUILTY, and request a trial.

_____ I enter a plea of GUILTY, and enclose $131.00. No Personal or Business checks accepted. Online pay at www.wilco.org/payJP2.

_____ I enter a plea of GUILTY, and request a Standard Payment Plan of 30 days to pay the fine of $131.00. (Please fill out, sign, and return the application enclosed.)

_____ I do not admit Guilt; however, I do not wish to contest the charge. Therefore, I enter a plea of NOLO CONTENDERE (No Contest) and enclose $131.00. No Personal or Business Checks Accepted. Online pay at www.wilco.org/payJP2.

_____ I enter a plea of NOLO CONTENDERE and request a Standard Payment Plan of 30 days to pay the fine of $131.00. (Please fill out, sign, and return the application enclosed.)

IF YOU ARE UNABLE TO PAY THE AMOUNT OWED IN FULL, PLEASE CONTACT THE COURT FOR ALTERNATIVE OPTIONS AVAILABLE.

I FURTHER UNDERSTAND that all future correspondence from the court will be sent to the address provided below my signature.

_____       _____
Signature                                Date

_____       _____
Address                                  City, State              Zip

_____
Phone Number

NOTICE PURSUANT TO ARTICLE 23.02 CODE OF CRIMINAL PROCEDURE. It is an offense for a person to intentionally influence or coerce a witness to testify or to elude legal process. It is also a felony offense to harm or threaten to harm a witness or prospective witness in retaliation for or on account of the serve of the person as a witness or to prevent or delay the person's service as a witness to a crime.

Es una ofensa que unal persona trate de influir intensionalmento o coercer a un testigo que de falso testimonio o que huya el proceso legal. Tambien es un crimen danar a un testigo o a un testigo eventual como represalias para o en cuenta del servicio de esa persona como testigo o impedir o retrasar el servicio de esa persona como testigo de un crimen.

## ¶575

On or about the date and approximate time of {2021-02-27 12:03}, racketeer co-defendant [RSR] and her now-adult son, [BR], walk towards [KAP]'s property, [784KLLTX78641], and they speak with racketeer co-defendant [KAP] near the sidewalk in front of [784KLLTX78641] - one of several meetings in which racketeer co-defendants [KAP],[RSR] maliciously-predatorily-and-secretly conspire/collude/strategize against the plaintiff - in particular, in-order-to fully-plan the already-initiated, purely-retaliatory Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff. During such incident, [RSR]'s unleashed large-dog, [L], is roaming freely on or near the street and/or sidewalk in front of the plaintiff's property.

## ¶576

On or about the nighttime of {2021-02-27 19:00}, the plaintiff notices on the plaintiff's security-camera-system-monitor, that [JSP] approaches the side-yard area, near the fence-gate of [784KLLTX78641], and spends approximately ten-or-more second(s) staring at the plaintiff's security-camera(s). [JSP] walks away from the side-yard area, and a few moments later, [JSP] walks back into the same side-yard area with two bright lights. [JSP] raises his hand to angrily issue the obscene/vulgar gesture of his middle-finger to one-or-more of the plaintiff's security-camera(s). Then, [JSP] uses such two bright lights - one handheld spot-light and another cap-mounted light - to shine such lights directly onto two-or-more of the plaintiff's security-cameras at the same time - even rotating the direction of such lights and/or moving such lights onto-and-off-of such security-camera(s), so as if to overload the infrared/nightvision mechanisms of the plaintiff's security-camera-system - a malicious practice that [JSP] has engaged in, on numerous occasions, dating all the way back to the year {2015}. On one-or-more occasion(s) [JSP] even laughs-out-loud/taunts into such security-camera(s). After more than a minute of engaging in this malicious activity, [JSP] then resumes other work around the fence-gate area.

## ¶577

On or about the afternoon/evening hours of the date of {2021-03-03}, there are many interactions between [RSR], [KAP], [JSP] and [NP], as [KAP],[JSP] and/or [NP] assist in [RSR]'s moving-items-out of her then-house located at [789KLLTX78641], in preparation for [RSR]'s upcoming relocation out of the neighborhood, with these individuals walking back-and-forth, multiple times between their respective-properties, [789KLLTX78641] and [784KLLTX78641]. During a significant fraction of this time, [RSR]'s large unleashed large-dog, [L], is also roaming freely and wildly, even crossing the street onto the sidewalk directly in front of the plaintiff's property. There are also similar interactions between these individuals, named as co-conspirators in this lawsuit, in the subsequent days of the month of {2021-03-03} - what appeared to be, [RSR]'s final month of property-ownership and residence at [789KLLTX78641].

## ¶578

On or about a morning of the date of {2021-03-07}, [JSP&KAP] converse with certain White-American guests at the front-yard of their property [784KLLTX78641]. During at least some part of this conversation, [JSP] leads one of his guests (a White male, approximately 190 pounds, approximately 6-feet-tall) towards the border area of the two properties, points such guest at the plaintiff's newly-installed corner security-cameras and expresses his outrage at the plaintiff's installation of such additional security-camera(s). (Later on in the same year, [JSP] would end up entering into the plaintiff's property to break one-or-more of such security-camera(s) that [JSP] points his guest at - see below.)

[JSP] then mocks the fact that they - meaning [JSP&KAP],[RSR] - coerced the [HOA] to sue the plaintiff in prior years ({2017},{2018}), coercing the plaintiff, through no choice of the plaintiff's own, to install a *"no-mow"* grass and that all of such burdensome work and litigation cost the plaintiff's family in excess of $17,000 (when in actuality, all of the expenses to the plaintiff actually totaled to well-over $20,000). This incident reveals that even during a casual and friendly get-together with known acquaintance(s), [JSP] manages to make the plaintiff a target of his vitriol, even if the such acquaintance(s) never brought up the issue of the plaintiff to begin with.

## ¶579

On or about the date and approximate time of {2021-03-08 04:36} (early-morning), [JSP] intentionally beeps the loud truck-lock on his pickup-truck 11-or-more times consecutively (for no justifiable reason), and then blares the loud horn on his pickup-truck one-or-more times (for no justifiable reason) - at a time during which most residents (including the plaintiff) would, more-likely-than-not, be sleeping.

## ¶580

On or about the date and approximate time of {2021-03-14 01:10} (early-morning), [JSP] intentionally beeps the loud truck-lock on his pickup-truck 6-or-more times consecutively (for no justifiable reason) - at a time during which most residents (including the plaintiff) would, more-likely-than-not, be sleeping.

## ¶581

On or about the date and approximate time of {2021-03-21 01:17} (early-morning), [JSP] uses his pickup-truck to illegally park his boat onto the curbside of the street. In the process, [NP] and [JSP] yell at each other to coordinate the illegal parking of such boat. [JSP] and/or [NP] then make very-loud hammering noises in-order-to detach such boat from the pickup-truck - with all of these very-loud noises occurring at a time during which most residents (including the plaintiff) would, more-likely-than-not, be sleeping.

## ¶582

During the several points in the month of {2021-03} [RSR] hires hauling-contractor(s) (and/or contacts personal friends who happen to be hauling-contractor(s)) in-order-to haul item(s) out of her house/garage, in preparation for [RSR]'s upcoming relocation out of the neighborhood. The plaintiff would notice that these hauling-contractor(s) would, more-often-than-not, drive their vehicle(s) into the plaintiff's [DRIVEWAY] while they were in the process of parking on the street or exiting the neighborhood. By sharp contrast, during the end of the month of {2017-10}, when a grass-sod delivery-driver delivering *"no-mow"* grass-sod to the plaintiff's property, momentarily paused his semi-truck on the (public) road near the plaintiff's property (without even entering into any aspect of [RSR]'s property), [RSR] angrily yells at such delivery-driver to move his vehicle away from her property - once again, showing her, mafia-godfather-like attitude to all of those that are even merely assisting the plaintiff (see previous incident above).

## ¶583

During the month of {2021-03}, he plaintiff hires and retains [ATTORNEY-TK] to represent the plaintiff in such Class-C-Misdemeanor-Public-Nuisance case. On or about the approximate date of {2021-03-22}, [ATTORNEY-TK] submits a letter of representation, affirming her

law-firm's representation of the plaintiff, to the aforementioned Justice-Court, [WCP2JotPC], of defendant [WC]. On or about the approximate date of {2021-03-22}, [ATTORNEY-TK], acting as the plaintiff's attorney, submits a plea of *"Not Guilty"* and specifies a jury-trial-demand, on behalf of the plaintiff.

## ¶584

On or about the date and approximate time of {2021-04-17 21:13} (nighttime), the plaintiff is performing some work in the plaintiff's private/concealed [FRONTPORCH], which is not visible from the street - obstructed from view by trees in the front/side along with a motor-vehicle on the other side. As he walks towards the fence-gate of [784KLLTX78641] and back towards the border-area between the two-properties, [JSP] stops and stares, angrily and intimidatingly, at the plaintiff for a period of almost half-a-minute, angrily mumbling some words as he walks away from the plaintiff. As the plaintiff is in such private/concealed [FRONTPORCH] area continuing to perform such work, [JSP] from deep-inside the frontyard and/or sideyard of his property, [784KLLTX78641], shines his torch-light at the plaintiff and one-or-more of the plaintiff's security-camera(s). As he is shining such bright light, [JSP] yells or mutters some vulgar obscenity(s) at the plaintiff and/or one-or-more of the plaintiff's security-camera(s) - with words that also included, *"CRAZY!"*, *"PERVERT!"*.

## ¶585

On or about the date and approximate time of {2021-04-20 09:00} (morning), the plaintiff is picking so-called *"weeds"* from the plaintiff's [FRONTYARD], noticing an ever-increasing quantity of such so-called *"weeds"* in the former area of no-mow-grass fully-damaged and/or destroyed by [JSP]'s repeated, malicious acts of vandalism against the plaintiff. As the plaintiff is spending over half-an-hour performing this task (primarily in the fully-damaged area), [JSP] reverses his pickup-truck from his driveway, and as he passes the plaintiff on the road, maliciously blares the loud horn of such pickup-truck, so as if to scare/startle and intimidate/interfere-with the plaintiff.

## ¶586

On or about the date and approximate time of {2021-04-23 01:21} (late-nighttime), [JSP] arrives back to his property in his pickup-truck, blaring loud-music on such pickup-truck's speaker system as he has repeatedly-done on numerous other occasions, while the restrictive-covenants of the subdivision strictly prohibit any noise-nuisance at any time of day, but particularly during the traditional sleeping hours of 10PM to 6AM. This particular type of noise-nuisance-violation complaint has been lodged by one-or-more other resident(s) of the neighborhood (for example, at [HOA] Board-Meetings) who believe that the [HOA] and/or [WCLE] should be taking at least some type of enforcement-action(s) against such activity, as it may not only be a noise-nuisance-violation, but also, at least in some cases, *"age-inappropriate"* (especially with young-children in such residential neighborhood).

## ¶587

On or about the date and approximate time of {2021-04-23 20:51} (nighttime), [JSP] intentionally beeps the loud truck-lock on his pickup-truck 16-or-more times consecutively (for no justifiable reason) within an approximately 20 second period of time - a type of noise-nuisance-violation at nighttime that [JSP] has repeatedly engaged in for multiple years at this point in time.

## ¶588

On or about the date and approximate time of {2021-04-24 18:30} (evening), [KAP] attaches a canister filled with liquid pesticide(s) to the garden-hose in the side-yard of [784KLLTX78641] near the two-properties, and uses such spray-attachment and hose to spray highly-toxic pesticides not only around the side of their house but also on part of the fence bordering the plaintiff's property. One-or-more court(s) in this country have ruled that some of the most widely-used pesticide(s) are known cause(s) of cancer, Parkinsons-Disease, organ-failure, poisoning, etc. The plaintiff, just like most environmentalists and almost-all indigenous-peoples, assert that such pesticides cause extreme damage not only to human-health, but also to environmental-health. While [KAP] and her-conspirator defendants [JSP],[RSR], and [WCLE] - especially [WCCD-Harrell] - fraudulently initiated a Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff, fraudulently citing biological health-and-safety violation(s), using one-or-more piece(s) of fabricated/planted evidence and multiple misleading statements - without even reading all of the terms-and-conditions of the Texas Public-Nuisance-Law that regulates such property-maintenance - even the fraudulent biological health-and-safety violation(s) that they fraudulently accused the plaintiff of, are trivial compared to the exponentially-larger harm caused by the chemical health-and-safety violation(s) of [JSP&KAP] asserted by the plaintiff in this lawsuit. While the human body has at least hundreds-of-thousands-of-years of evolutionary defense mechanisms and/or immunity (particularly, the human immune-system) substantially-protecting both the human body from ordinary biological nuisances, the human body has little-to-no defense mechanisms and/or immunity, from the artificial, extremely-toxic, manufactured chemicals that are used in such pesticide(s). In most, if not all, cases when there exists biological pest(s) that are a threat to the overall environmental-health, there also exist predators of such pest(s) that naturally consume and/or kill such pest(s), thus eventually mitigating, if not eliminating the threat posed to the environment by such biological pest(s). For these reasons, the plaintiff, like most environmentalists and indigenous-peoples, assert that any-and-all use of such pesticides is clearly a case where the so-called *"solution"* is exponentially-worse than the original *"problem"*.

## ¶589

On or about the date and approximate time of {2021-04-26 15:00}, the plaintiff is securing a shallow enclosure in the plaintiff's side-yard bordering [JSP&KAP]'s property [784KLLTX78641]. The plaintiff periodically walks inside and outside of the [HOUSE] to get supplies/equipment needed to complete this task. The plaintiff notices that when the plaintiff is temporarily inside of [HOUSE], [KAP] approaches that area of the plaintiff's side-yard with a camera-phone in hand, and with a malicious smile on her face, holding up such camera-phone to record the plaintiff's side-yard area. (It is important to note that [KAP] was only notified about this enclosure by her son, [NP], who, moments earlier, while walking near the border of the plaintiff's property, clearly noticed such enclosure.) [KAP] then opens her fence-gate (of property [784KLLTX78641]), and while hiding behind such fence-gate, continues to more-secretly record the plaintiff's side-yard area. The plaintiff walks back outside the [HOUSE] and back into the plaintiff's side-yard with more supplies/equipment in hand. The plaintiff kneels down onto the grass, and continues to work of securing such enclosure on the plaintiff's side-yard. [KAP] suddenly re-opens her fence-gate, and walks out of her backyard in-order-to ambush and/or accost the plaintiff - which is at least the second time that [KAP] has accosted the plaintiff (the first occurrence being on-or-about the date of {2017-10-31}). (It should be noted that [NP] is also partially behind the partially-opened fence-gate of [784KLLTX78641], not only hearing and witnessing all of [KAP]'s harassment/stalking of the plaintiff, but also, since [NP] is significantly larger in physical size - both height and weight - than the plaintiff, [NP] plays the role of the intimidating enforcer/muscle of such racketeering-enterprise.) This incident is most shocking due to its context: [KAP], on or about the date of {2020-10-12}, acting in

SIDDHARTH BODE   V.   WILLIAMSON COUNTY , ET AL    1696907690

conspiracy with [RSR],[JSP],[WCLE] (specifically [WCCD-Harrell]), had masterfully used one-or-more piece(s) of fabricated-evidence along with fraudulent/misleading statements in-order-to frame the plaintiff for the crime of Class-C-Misdemeanor-Public-Nuisance that the plaintiff did not commit. As previously indicated, the plaintiff had already retained [ATTORNEY-TK] (in the previous month) and demanded a jury-trial for this fraudulent charge that was predatorily initiated by [JSP&KAP],[RSR], which also would not have been possible if not for the predatory maliciousness of [WCLE], and specifically [WCCD-Harrell] (see above). The plaintiff had since that incident in {2020-10-12} suffered several additional crimes from [JSP], [NP]. But apparently, none of these egregious injustices that [JSP&KAP], their son, [NP], their co-conspirator [RSR], and their government co-conspirator [WCLE], perpetrated against the plaintiff were good enough, and [KAP] still feels the strong need to continue to torment and harass/stalk the plaintiff, adding substantial injury to the plaintiff's already-deep wounds. It should also be noted that, in the prior year of {2020}, the plaintiff had also secured a similar, if not identical, shallow enclosure on the opposite side of the plaintiff's [HOUSE], bordering the property of [792KLLTX78641]. However, the plaintiff never received any such complaint or harassment from those (relatively-new) property owners of property [792KLLTX78641]. These facts further reveal and illustrate that the behaviors/actions of [JSP&KAP], [RSR] and [WCLE] were not merely unreasonable, illogical and irrational, but instead, purely predatory, malicious and retaliatory - that all of the defendants' references to property-maintenance-laws were merely just a pretext under which the defendants could, via the modern-day-Jim-Crow interpretation and enforcement of such laws, engage in a virtually-limitless stream of racial-oppression and racketeering-activity against the plaintiff. Throughout much of [KAP]'s accosting and harassment/stalking of the plaintiff, [KAP] tries to incite/elicit/instigate an angry-response from the plaintiff, while she is recording the plaintiff with the camera-phone. [KAP] engages in these deliberate acts of incitement against the plaintiff, especially because she has formally (and publicly) filed the aforementioned Class-C-Misdemeanor-Public-Nuisance criminal-complaint against the plaintiff (in conspiracy with her co-conspirators [RSR],[JSP] and [WCLE] - specifically [WCCD-Harrell]), and the aforementioned Class-C-Misdemeanor-Public-Nuisance plea-form had warned the plaintiff that, under Texas law, it is a felony crime to engage in any type of witness-intimidation. So, in other words, [KAP] was trying to further exploit, further capitalize-upon, and further build-upon, her fraudulent and purely-retaliatory Class-C-Misdemeanor-Public-Nuisance criminal-complaint that she had filed against the plaintiff (in conspiracy with her co-conspirators [RSR],[JSP] and [WCLE] - specifically [WCCD-Harrell]) - hoping that any angry response that she incites from the plaintiff could then be maliciously used by her co-conspirator, [WCLE], to charge/prosecute the plaintiff with felony witness-intimidation. [KAP]'s malicious act of entrapping/baiting the plaintiff is particularly egregious, given that all of these co-conspirators - [JSP],[KAP], [RSR] along with some employees of [WCLE] (such as [WCCD-Harrell] and [WCSD-PP]) - had aggregately committed not only multiple acts of witness-intimidation against the plaintiff, but far more egregiously, countless criminal-acts of retaliation-against-witness against the plaintiff. As this incident reveals, the plaintiff does not take [KAP]'s bait, does not, in any manner, respond to [KAP]'s verbal-battering of the plaintiff, and instead, the plaintiff continues kneeling-down on the grass, while completing such work:

▷ SECURITY-CAMERA RECORDING, BODY-WORN-CAMERA RECORDING OF [KAP] HARASSING/STALKING, THREATENING PLAINTIFF(⊢)    {2021-04-26 15:00}(~)
▷ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]


〘 PLAINTIFF IS KNEELING-DOWN ON GRASS, WORKING IN SIDE-YARD, LOOKING DOWN AT SUCH WORK BEING DONE. 〙
〘 [KAP] OPENS FENCE-GATE AND ACCOSTS PLAINTIFF AND IMMEDIATELY BEGINS TO THREATEN THE PLAINTIFF: 〙


**[KAP]**        *SO EXACTLY, WHAT MAKES YOU THINK THAT'S ACCEPTABLE?!*


〘 [KAP] STARES MENACINGLY AT PLAINTIFF, AND WAITS FOR RESPONSE FROM PLAINTIFF. 〙
〘 PLAINTIFF, SHOCKED, BRIEFLY LOOKS UP AT [KAP], DOES NOT RESPOND, AND LOOKS BACK DOWN TO CONTINUE WORKING. 〙
〘 [KAP] CONTINUES TO INTIMIDATE, BLACKMAIL AND DEMAND A RESPONSE FROM PLAINTIFF: 〙

**[KAP]**          *HAVE YOU DECIDED WITH THE [HOA] THAT THAT'S ACCEPTABLE, SID?! ...*

〖 [KAP] CONTINUES TO PAUSE & DEMAND RESPONSE FROM PLAINTIFF. PLAINTIFF WHILE KNEELING ON GRASS, DOES NOT RESPOND, CONTINUING TO WORK: 〗

**[KAP]**          *HAVE YOU?!!! ...*

〖 [KAP] MAKES AN ABSURD COMPARISON BETWEEN AN UNSIGHTLY, FILLED (OFTEN SMELLING) GARBAGE-CAN VERSUS PLAINTIFF'S SHALLOW SIDE-YARD ENCLOSURE: 〗
〖 [KAP] CONTINUES TO PAUSE & DEMAND RESPONSE FROM PLAINTIFF. PLAINTIFF WHILE KNEELING ON GRASS, DOES NOT RESPOND, CONTINUING TO WORK: 〗

**[KAP]**          *WE CAN'T EVEN LEAVE OUR TRASH-CAN UP FRONT! [???] ...*

〖 [KAP] CONTINUES TO PAUSE & DEMAND RESPONSE FROM PLAINTIFF. PLAINTIFF WHILE KNEELING ON GRASS, DOES NOT RESPOND, CONTINUING TO WORK: 〗

**[KAP]**          *SO, YOU'RE NOT GOING TO RESPOND TO ME?! ...*

〖 [KAP] CONTINUES TO PAUSE & DEMAND RESPONSE FROM PLAINTIFF. PLAINTIFF WHILE KNEELING ON GRASS, DOES NOT RESPOND, CONTINUING TO WORK: 〗

**[KAP]**          *I'M NOT TRYING TO BE RUDE! I'M JUST [???] ...*

〖 [KAP] CONTINUES TO PAUSE & DEMAND RESPONSE FROM PLAINTIFF. PLAINTIFF WHILE KNEELING ON GRASS, DOES NOT RESPOND, CONTINUING TO WORK: 〗

**[KAP]**          *SO, I CAN'T EVEN ASK YOU A SIMPLE QUESTION, AND GET A RESPONSE?! ...*

〖 [KAP] WAITS A FEW SECONDS LONGER FOR PLAINTIFF TO RESPOND. PLAINTIFF DOES NOT RESPOND, CONTINUING TO KNEEL WHILE WORKING ON ENCLOSURE. 〗
〖 [KAP], SEEING THAT PLAINTIFF IS NOT RESPONDING, WALKS BACK TOWARDS FRONT OF HER HOUSE. 〗
〖 PLAINTIFF CONTINUES KNEELING WHILE WORKING ON ENCLOSURE IN SIDE-YARD. 〗
〖 ABOUT A MINUTE LATER, [KAP] WALKS BACK FROM FRONT OF HER HOUSE TOWARDS HER FENCE-GATE, WHILE PLAINTIFF IS CONTINUING WORK. 〗
〖 [KAP] STATES HER FINAL HYPOCRITICAL WORDS OF ANGER ABOUT THIS ISSUE TO PLAINTIFF, ADDING FURTHER INSULT TO INJURY: 〗

**[KAP]**          *VERY NEIGHBORLY OF YOU!*

〖 PLAINTIFF REMAINS INDIGNANT AT [KAP]'S FELONY STALKING OF PLAINTIFF & AT [KAP]'S TOTALLY HYPOCRITICAL SPEECH, BUT, AS USUAL, PLAINTIFF- 〗
〖 -CAN DO NOTHING BUT REMAIN SILENT & SUFFER HAZARDS OF CHOOSING TO LIVE IN A WHITE NEIGHBORHOOD, WHERE SUCH WHITE-SUPREMACY DOMINATES. 〗

¶590

During the night of the same date, at approximately {2021-04-26 21:00}, the plaintiff notices on the plaintiff's security-camera-system-monitor that [JSP] approaches the newly secured enclosure in the side-yard of the plaintiff's property closest to [JSP&KAP]'s property, shining his torch-light at such enclosure, and angrily shouting into one-or-more of the plaintiff's security-camera(s), *"HAVE YOU LOST YOUR FUCKIN MIND! ARE YOU CRAZY [???]?!"*. [JSP] even walks within a feet or so of such enclosure and shines his torch-light, at such close proximity, directly at such enclosure to further inspect/search it at close-range. [JSP] shines his torch-light at various aspects of this enclosure, and then shines such torch-light directly into two-or-more of the plaintiff's security-cameras. After spending a minute or so intimidating/interfering-with the plaintiff in this manner, the plaintiff then notices [JSP] walk along the border of the two-properties, but facing towards the front of the plaintiff's [HOUSE]. [JSP] then shines his torch-light into the interior of the plaintiff's open, but unlit, [GARAGE] and [FRONTPORCH], again, in total violation of the plaintiff's rights. [JSP] then walks away and resumes other activity. It should be noted that [JSP] was not present at his property during daylight hours during which the plaintiff was securing such enclosure, and [JSP] had only arrived back at his property at night-time, when such enclosure is clearly not visible, due to that area of the plaintiff's [HOUSE] being completely unlit at night-time. For this reason, it is clear that [KAP] had informed [JSP] of this newly secured enclosure, and/or, as the second-in-command of such racketeering-enterprise against the plaintiff, instructed [JSP], the chief-enforcer/muscle of such racketeering-enterprise, to intimidate/interfere-with the plaintiff in such manner. The plaintiff also hears loud, almost-uncontrolled, laughter from [KAP] in the background, further illustrating that all of [JSP&KAP]'s intimidation/interfere-with the plaintiff, and other violations of the plaintiff's rights, was simply a *"fun sport"* (φ), that their family took great pleasure/enjoyment out of - along with their co-conspirators [RSR] and [WCLE].

# ¶591

On or about the date of {2021-05-04 10:20}, the plaintiff is sitting on a chair located in the plaintiff's [DRIVEWAY], working on a laptop. [JSP], originally walking towards his pickup-truck parked in the driveway of [784KLLTX78641], notices the plaintiff on the plaintiff's [DRIVEWAY], approaches closer to the plaintiff with a camera-phone in hand, and as he holds up the camera-phone to take photograph/video of the plaintiff sitting on such chair with such laptop near one of the plaintiff's companion-tortoises (which on the [YARD]), angrily yells out some additional words of intimidation (some of which is inaudible in the plaintiff's recordings): *"HOPE YOU DON'T GET THAT [???] MAN! [???] ..."* [JSP] then walks backs towards his pickup-truck, enters back into his pickup-truck, and from inside his pickup-truck, angrily yells out at the plaintiff, *"... THE REST OF US HAVE TO GOTO WORK!"* [JSP] then reverses his pickup-truck out of the driveway of [784KLLTX78641], passes the plaintiff on the street, and with the passenger windows of such pickup-truck open, angrily yells out some additional words of intimidation towards the plaintiff. Within a week after this incident, the plaintiff receives a notice in the regular-mail (via the [USPS], but not by [CMRRR]) from the [HOA] dated the same date of {2021-05-04} - once again, parroting [JSP&KAP]'s fraudulent claim that the plaintiff's timid, shy, quiet and extremely-docile companion-tortoises were a violation of the restrictive-covenants of the subdivision - even requesting the plaintiff to remove such companion-tortoises from the plaintiff's property. Approximately a month after this incident, the plaintiff would receive a second notice in the regular-mail (via the [USPS], but not by [CMRRR]) from the [HOA] - once again, parroting [JSP&KAP]'s fraudulent claim that the plaintiff's timid, shy, quiet and extremely-docile companion-tortoises were a violation of the restrictive-covenants of the subdivision - even requesting the plaintiff to remove such companion-tortoises from the plaintiff's property. The plaintiff had owned these companion-tortoises on the plaintiff's private-property since the year of {2014}, and the [HOA] along with all of the defendants, knew about the plaintiff's companion-tortoises on the plaintiff's property since the month of {2015-06}. The plaintiff had always strongly-denied that such companion-tortoises were a violation of the restrictive-covenants of the subdivision, and in any case, the plaintiff had made a firm decision back in the month of {2015-06} to fight the [HOA] in Court if necessary - if any of these parties threatened to deprive the

plaintiff of the plaintiff's right to have companion-tortoises on the plaintiff's property ( ⊙ ) .

## ¶592

On or about the date and approximate time of {2021-05-06 21:57} (late-nighttime), [JSP] arrives back to his property in his pickup-truck, blaring loud-music on such pickup-truck's speaker system as he has repeatedly-done on numerous other occasions, while the restrictive-covenants of the subdivision strictly prohibit any noise-nuisance at any time of day, but particularly during the traditional sleeping hours of 10PM to 6AM. This particular type of noise-nuisance-violation complaint has been lodged by one-or-more other resident(s) of the neighborhood (for example, at [HOA] Board-Meetings) who believe that the [HOA] and/or [WCLE] should be taking at least some type of enforcement-action(s) against such activity, as it may not only be a noise-nuisance-violation, but also, at least in some cases, *"age-inappropriate"* (especially with young-children in such residential neighborhood).

## ¶593

On or about the date of {2021-05-15 08:57}, the plaintiff is inside of [HOUSE]. The plaintiff notices on the plaintiff's security-camera-system-monitor that [JSP], with a heavy-duty gasoline-powered string-trimmer in hand, approaches one of the plaintiff's companion-tortoises, almost as if to scare such tortoise, and/or intimidate into the security-camera(s) attached to the plaintiff's [HOUSE] that is monitoring such hostile activity. Then, as he is still watching such tortoise, [JSP] starts angrily walking away with such string-trimmer in hand. On or about the same date, but later time of {2021-05-15 09:29}, the plaintiff notices, on the plaintiff's security-camera-system-monitor, that [JSP] approaches one of the plaintiff's security-cameras with the end of a hose running water in his hand, and while near the border of the two properties, angrily yells out into such camera, *"WHAT THE HELL ARE YOU POINTING THAT IN MY YARD FOR, YOU DICKHEAD! ... pervert! ... NICE, THAT'S GORGEOUS OUT HERE! NICE GIGANTIC, FRICKING TURTLE-TURDS! GOOD-STUFF BUDDY! ... [???] ... THEY STINK TOO! ... [???] ... DAMN! ... SHIT! ... **FRICK**-ING-TURTLES! ... [???] HE AIN'T ALL THERE! ... AIN'T ALL THERE! ... AIN'T RIGHT! ... "* [JSP] then closes the tap, starts to place the hose onto the mount, continuing to mutter angry words about the plaintiff. [JSP] then angrily walks back towards the front of [784KLLTX78641], and resumes other activity over in that area. On or about the same date, but later approximate time of {2021-05-15 10:30}, the plaintiff notices, on the plaintiff's security-camera-system-monitor, a semi-truck loudly deliver what appeared to be an empty shipping-container onto the driveway of [784KLLTX78641]. At various points in time during this day, [JSP] and his other family members start to transfer items from their backyard into such originally-empty shipping-container, at least on some occasions, recklessly making very-loud-noise (for no justifiable reason). Amongst the materials were various pieces of construction-materials, brush, and at least some other types of items that [JSP&KAP],[RSR] had repeatedly and fraudulently complained to [WCLE] and/or the [HOA] that the plaintiff was *"illegally"* storing in the plaintiff's [BACKYARD]. To the best of the plaintiff's knowledge, at no point in time during the over 13 years of their residence at [784KLLTX78641] did [WCLE] ever execute any type of search of [JSP&KAP]'s property, and [WCLE] would always initiate, over the decade, numerous unconstitutional-and-unlawful (and clearly racially-discriminatory) search(s)/seizure(s) of private areas of the plaintiff's private-property - often for alleged items stored in the plaintiff's [BACKYARD], all the while ignoring all of these items stored in [JSP&KAP]'s backyard, or for that matter, any of the other White-neighborhood-residents' backyards. On or about the same date, but later approximate time of {2021-05-15 20:10}, the plaintiff notices, on the plaintiff's security-camera-system-monitor, that [JSP] while using a lawnmower to mow the sideyard-grass of [784KLLTX78641], uses such lawnmower to also mow parts of the plaintiff's *"no-mow"* grass and other wildflowers that the plaintiff was intentionally growing in the sideyard of the plaintiff's

property. After the end of this activity, [JSP] approaches near the border of the two-properties with a torch in hand, and shines such torch-light at an area in the plaintiff's sideyard, again, to scare the plaintiff's companion-tortoise(s). Shortly thereafter, while operating a hose with running water near the border of the two-properties, [JSP] asks his wife, [KAP], as if to continue intimidating the plaintiff, *"HAVE YOU SEEN THE SIZE OF THE TURDS THESE TURTLES ARE LAYING?!"* [KAP] responds, *"Yeah!"* [JSP] angrily responds, *"JESUS CHRIST MAN! AND THEY STINK TOO! AND I CAN SEE THAT, AS USUAL, OUR [HOA] IS GOING TO [???], BUT YOU KNOW WHAT! I'M ABOUT TO CALL THEM AND GIVE THEM A REAL, **REAL** PIECE OF MY MIND! ... AND THEN, I'M GOING TO TELL THEM WHAT I'M GOING TO DO TO THEM! ... DUDE, HONESTLY, **ALL THAT MONEY YOU SPENT ON [???] - OH MY GOD! WORTHLESS- ABSOLUTELY WORTHLESS! ... THE MONEY THAT THEY MADE, THAT THEY'RE MAKING OFF OF SID? WHAT ARE THEY DOING WITH THAT MONEY?! THEY SHOULD BE GIVING IT TO US! ... WHAT THE HELL YOU [???] , YOU DUMBASS!"* Such statement reveals that [JSP] conspired-to or attempted-to extort money out of the plaintiff, by collecting on alleged fines/fees and/or other sum(s)-of-money paid by the plaintiff to the [HOA]. After wrapping the hose back onto the mount, [JSP] starts to walk away from the plaintiff's security-camera(s), angrily and sarcastically yelling, *"AND THIS LADY OVER [ACROSS THE STREET] IS YELLING AT US, BECAUSE WE WERE THROWING SNOWBALLS [AT HIS HOUSE]!"* This final piece of dialogue further reveals crucial aspects of the plaintiff's claims, as presented in this lawsuit:

Ⓐ [JSP] repeatedly denied having any involvement in the predatory lawsuit filed by the [HOA] against the plaintiff in the previous years of {2017}/{2018}, but these statements strongly indicate, as the plaintiff had always known, that the then [HOA] under [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH] were predatorily acting against the plaintiff, almost-exclusively, if not exclusively, based upon the predatory blackmail of [JSP&KAP] (and [RSR]).

Ⓑ Clearly, as this dialogue reveals, [JSP&KAP] were not happy-enough that the plaintiff had to spend huge amounts of money in the plaintiff's fight for installing a *"no-mow"* grass, while involuntarily engaging in the risky/burdensome/unpleasant/stressful work of litigation to fight to secure such right.

Ⓒ Instead, [JSP&KAP] were still hellbent upon getting the [HOA], and more-recently, [WCLE], to engage in further predatory actions against the plaintiff, in-order-to achieve their actual ultimate goals: evict the plaintiff out of the White neighborhood, and thus defraud the plaintiff out of private-property-ownership within such White neighborhood.

Ⓓ The derogatory manner in which [JSP] refers to the [HOA] also shows that [JSP&KAP] (along with [RSR]) wielded extreme and undue influence over the [HOA], at the very least, on any matter involving the plaintiff - with [JSP&KAP] acting like a mob-boss over the [HOA].

Ⓔ [JSP] dialogue shows that he is aware that the [HOA] made money off of the plaintiff, via litigation and/or fines/fees - yet another indication that [JSP] has inappropriate access to private/confidential information between the [HOA] and the plaintiff, thanks, at least in part, to [DMP]'s direct involvement as a temporary Board-Member of the then-[HOA].

Ⓕ [JSP] dialogue shows that any-and-all money paid by the plaintiff to the [HOA] should be instead directed towards [JSP&KAP] - once again, like a mob-boss that expects the entire-pie, and not even just a slice-of-the-pie.

Ⓖ [JSP], who was given free reign by both [WCLE] and the [HOA] to commit a virtually-limitless stream of hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff for over a decade, once again, expresses his disdain that a neighbor from across the street actually confronted him and his son [NP] about only one of such numerous hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff - and once again, revealing [JSP]'s mob-boss mentality of absolute impunity.

## ¶594

On or about the date and approximate time of {2021-05-20 09:30}, [KAP] invite guest(s) onto their frontyard. While [KAP] and such guest(s) are in their frontyard, a huge dog of such guest(s) - easily weighing over 80 pounds - roams freely around their sideyard, and makes its way to the plaintiff's [DRIVEWAY] AND [GARAGE]-area (on multiple occasions), almost entering into the plaintiff's (open) [GARAGE] before being loudly called-back by such guest(s). Both [JSP&KAP] and [RSR] had many years prior (in the years {2015}/{2016}), maliciously complained to the [HOA] and/or [WCLE] about the plaintiff's companion-tortoise(s):

Ⓐ with a member of [WCLE], [WCCD-DM], even illegally entering into the plaintiff's private/curtilage-area side-yard, using a camera-phone over the plaintiff's 6-feet-tall-privacy-fence to illegally take photograph/video of such tortoise(s) in the plaintiff's private/concealed [BACKYARD], which he then illegally submitted to the [HOA]- all in total violation of the plaintiff's rights; AND

Ⓑ with [RSR] fraudulently claiming in one-or-more social-media-posting(s) that the plaintiff's tortoise(s) were a *"dangerous situation"*; AND

Ⓒ despite the fact that, many homeowners within the Central-Texas area - most of whom also live within very-similar deed-restricted neighborhoods - owning companion-tortoise(s) within their private-properties (as even widely-reported by the local news media).

For at least over 6 years, [RSR] routinely left her large dog, [L], to bark loudly in the front of her house, and roam freely across the street, numerous times, onto the plaintiff's [FRONTYARD]. However, just like every other act of racist hypocrisy by [JSP&KAP],[RSR], these particular hypocritical actions, once-again, demonstrate that [JSP&KAP],[RSR], as privileged White-Americans of *"their"* (exclusive-and-pure) White neighborhood, are free to violate as many rules of the neighborhood as they saw fit, while the plaintiff, an immigrant-of-color/indigenous-person, is not allowed to have/own companion-tortoise(s) on the plaintiff's property (○) .

## ¶595

On or about the date and approximate time of {2021-05-26 21:15} (nighttime to late-nighttime), [JSP] starts to operate a very-loud gasoline-powered heavy-duty string-trimmer to cut grass along the edges of their property, while during this process, also cutting at least some of the plaintiff's *"no-mow"* grass. [JSP] continues with this very-loud work past 22:30 (late-nighttime), despite of the fact that the neighborhood's restrictive-covenants prohibit any type of noise-nuisance-violation - especially during the traditional sleeping hours of 10PM-to-6AM.

# ¶596

On or about the date and approximate time of {2021-06-13 19:45}, [JSP] is using his lawnmower near the border area of the two-properties. The plaintiff notices, on the plaintiff's security-camera-system-monitor, that [JSP] while using a lawnmower to mow the sideyard-grass of [784KLLTX78641], violently rams such lawnmower, one-or-more times, into a side of the shallow-enclosure in the plaintiff's side-yard that the plaintiff had secured in the previous month of {2021-04}, almost as if to dislodge, or at least damage, such enclosure. [JSP] looks menacingly/angrily into the plaintiff's security-camera(s), as if to indicate his dissatisfaction of such shallow-enclosure. At one-or-more points during this activity, [JSP] kicks-debris-onto and/or picks-up-and-throws-such-debris-onto the sideyard of plaintiff's property, once again, staring menacingly/angrily at the plaintiff security-camera(s), while also muttering some angry words at such security-camera(s). Later on that same night, at about the time of {2021-06-13 23:52} (late-nighttime), as [JSP] is moving the lawnmower from side-yard to back-yard, and as [JSP] walks away from the side-yard back onto the front-yard, [JSP] (twice) raises his hand to angrily issue the obscene/vulgar gesture of his middle-finger to two-or-more of the plaintiff's security-camera(s).

# ¶597

On or about the date and approximate time of {2021-06-18 20:00}, the plaintiff was working in the plaintiff's [GARAGE]/[DRIVEWAY]. The White-SUV driven by [KAP] enters into to the driveway of [784KLLTX78641]. [JSP] exits the vehicle from the front-passenger side, and approaches the plaintiff. [JSP] is approximately 20 feet away from the plaintiff when he yells, with [KAP] near the [784KLLTX78641] driveway/front-hall witnessing/hearing most of [JSP]'s abusive yelling:

> ▷   RECORDED RACIST, ABUSIVE, FRAUDULENT, GASLIGHTING AND ASSAULTIVE RANT FROM [JSP] TO THE PLAINTIFF(⊦):   {2021-06-18 20:00}(~)
> ▷   [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

**[JSP]**          *HEY DICKHEAD!*

⟦ PLAINTIFF TURNS TO LOOK AT [JSP]. ⟧
⟦ [JSP] POINTS AT THE CORNER OF THE PLAINTIFF'S SIDEYARD NEAR THE AC-UNIT. ⟧

**[JSP]**          *DUDE, THAT STINKS LIKE ASS, MAN! ... YOU NEED TO DO SOMETHING ABOUT THAT SHIT! ... IT'S AWFUL! ... IT'S COMING INTO MY HOUSE! ... YEAH! ... ARE YOU THAT MUCH OF AN ASSHOLE THAT YOU CAN JUST DO THAT?! ... THAT YOU CAN JUST DO THAT TO PEOPLE, THAT IT DOESN'T BOTHER YOU?! ... WITH THE STENCH COMING FROM THERE IS GETTING INTO MY HOUSE?! ... YEAH, LOOK AT ME! WHY DON'T YOU WALK OVER HERE AND LOOK AT ME LIKE THAT! ... WHY DON'T YOU COME ON OVER HERE AND LOOK AT ME LIKE THAT, TOUGH GUY, COME-ON!*

⟦ PLAINTIFF WALKS TOWARDS [JSP] WITH CAMCORDER RECORDING AND WALKS INTO THE PLAINTIFF'S SIDEYARD. ⟧

**[JSP]**          *COME ON, BABY - STEP RIGHT OVER HERE!*

⟦ PLAINTIFF STOPS ABOUT 4 FEET AWAY FROM [JSP] WHO IS RIGHT AT THE BORDER OF [784KLLTX78641] AND [788KLLTX78641]. ⟧

**[JSP]**          *I WILL KNOCK YOU OUT BOY! LOOKING THERE, SITTING THERE WITH YOUR STUPID CAMERA!*

⟦ [JSP] ATTEMPTS/GESTURES TO THROW A PUNCH(4) AT PLAINTIFF, IN VIOLATION OF [18-USC-PI-C96-§1959], [42-USC-C45-SII-§3631]- ⟧
⟦ -[18-USC-PI-C13-§249], [18-USC-PI-C13-§242], BUT PLAINTIFF IS BARELY OUT-OF-RANGE AT APPROXIMATELY 4 FEET AWAY. ⟧

SIDDHARTH  KODE  V.  WILLIAMSON  COUNTY,  ET  AL.                    1696907690

**[JSP]**    *DO YOU KNOW HOW MUCH OF A BITCH YOU ARE! ... YOU INCONSIDERATE PIECE OF SHIT! ... WHY DON'T YOU - YOU THINK YOU'RE GOING TO STEP IN HERE AND GET TOUGH?! ... YOU WANT TO GO AT IT?! ... WHY DON'T YOU TAKE THOSE OFF, AND LET'S GO! ... I'LL GO AT IT - I'M 51 YEARS OLD! LET'S GO! ... LET'S GO! ... YOU'RE SUCH AN INCONSIDERATE SACK OF SHIT! ... DO YOU KNOW HOW BAD THAT SHIT SMELLS! ... I KNOW THAT YOU'RE USED TO THE STENCH! ... BUT, THE REST OF US AREN'T! ... THAT'S JUST FUCKING RUDE MAN! ... GOT ANYTHING TO SAY FOR, ABOUT THAT?! ...*

〖 [JSP] GESTURES AS IF HE DEMANDS AN ANSWER FROM PLAINTIFF; WHEN PLAINTIFF REMAINS SILENT, [JSP] CONTINUES WITH RACIST- 〗
〖 -ABUSIVE, FRAUDULENT, GASLIGHTING AND ASSAULTIVE RANT AGAINST PLAINTIFF. 〗

**[JSP]**    *YOU DON'T MIND BEING RUDE, DO YOU?! ... YOU DON'T CARE - YOU WORRY ABOUT SID! ... IT'S ALL ABOUT SID! ... JUST AS LONG AS EVERYTHING'S GOOD FOR SID! ... I'M GOOD! ... THE WORLD DOESN'T REVOLVE AROUND SID! ... YOU GOT TO CONSIDER OTHER PEOPLE! ... YOU REALLY SHOULD! ... WHAT- I GUESS YOUR PARENTS, YOUR PARENTS - THEY'RE IDIOTS! I KNOW THAT MUCH, THAT'S FOR SURE! ... THEY RAISED YOU, I KNOW YOUR BROTHER TURNED OUT GOOD THOUGH! ... HE SEEMS LIKE A GOOD, WELL ADJUSTED GUY! ... WITH A FAMILY, ACTS NORMAL ... ACTUALLY HAD SOME PUSSY, HOW ABOUT THAT! ... MAYBE SOME DAY ... NAH!!*

〖 [JSP] THEN POINTS TO THE GRASS. 〗

**[JSP]**    *AND YOUR GRASS LOOKS FANTASTIC TOO! ... COULD THAT LOOK MORE LIKE SHIT, ALSO?! ... YOU'RE UNBELIEVABLE! ... HOW DID THEY LET YOU GET AWAY WITH THIS?! ... THIS IS OUTRAGEOUS! ... WHAT ARE YOU GOING TO DO ABOUT THE STENCH?! ... I MEAN, **I'LL HAVE THE HEALTH DEPARTMENT OVER HERE REAL QUICK IF YOU DON'T HANDLE THAT SOON! ... THEY'LL BE UP YOUR BUTT! ... I'LL HAVE THE POLICE UP YOUR BUTT! ... I'LL HAVE EVERYBODY UP YOUR BUTT!** ... AND I KNOW YOU DON'T LIKE PEOPLE UP YOUR BUTT! ... SO, YOU BETTER GET A HANDLE! ... I'VE TAKEN PICTURES OF ALL OF THIS! - I'VE TOOK PICTURES OF YOUR BACKYARD WITH THE WEEDS UP TO HERE! ... YOU KNOW ... MMMMM!*

〖 [JSP] MAKES SUDDEN LUNGING ACTION TOWARDS PLAINTIFF, THREATENING/GESTURING TO THROW ANOTHER PUNCH **(4)** AT PLAINTIFF. 〗

**[JSP]**    *YOU KNOW IT LOOKS LIKE COMPLETE DOGSHIT! ... I MEAN DUDE WHAT IS WRONG WITH YOU! ... DO YOU CARE ABOUT ANYBODY IN THE WORLD EXCEPT YOURSELF! ... ARE YOU THE ONLY PERSON IN YOUR WORLD! I GUESS YOU ARE! ... THAT'S RIDICULOUS! WE SHOULDN'T HAVE TO SMELL THAT SHIT!*

〖 [KAP] SAYS SOMETHING [INAUDIBLE] IN THE BACKGROUND. [JSP] LOOKS BACK AT [KAP]. 〗

**[JSP]**

*IT STINKS! ... I KNOW YOU CAN'T SMELL IT BUT IT STINKS TO THE REST OF US! ... WHAT ARE YOU GOING TO DO, GET COVID? ... LOOK AT THAT DIRTY THING YOU'RE WEARING! ... YOU'RE GOING TO GET SOMETHING ELSE FROM WEARING THAT DAMN THING! ... SID, I JUST WANT YOU TO BE - TAKE CARE OF YOUR BUSINESS, MAN! - JUST KEEP THINGS FROM STINKING! ... I'VE GOT NO, I WON'T HAVE NO PROBLEMS WITH YOU, IF YOU JUST MAKE THINGS DECENT! ... THAT'S ALL I WANT! ... BUT IT MAKES ME ANGRY WHEN YOU DON'T! ... YOU KNOW! ... YOU'VE GOT TURTLES OUT HERE! ... TURTLES! THAT TAKE GIANT SHITS THIS BIG! ... IN THE FRONTYARD! ... AND IT STINKS! ... GOT ANYTHING TO SAY?! CAN YOU SAY ANYTHING?! I KNOW YOU CAN TALK! I'VE HEARD YOU SPEAK BEFORE! ... THAT DOES NOT BOTHER YOU, THAT IT GETS INTO MY HOUSE - THE SMELL! ... IS THAT FAIR?! ... IS THAT FAIR?! ... I MEAN REALLY, SHOULD I HAVE TO SMELL YOUR TURTLE'S POOP IN MY HOUSE?! ... DOES IT SEEM FAIR?! ... I DON'T DO THAT TO YOU! ... I DON'T PUT ANY STINK IN YOUR HOUSE! ... NOT VERY FAIR, IS IT?! ... DOESN'T MATTER TO YOU, DOES IT?! ... CAUSE YOU'RE A PUNK! ... YOU'RE INCONSIDERATE, MAN! ... I MEAN, OUT OF, AFTER EVERYTHING IS SAID AND DONE, YOU'RE JUST AN INCONSIDERATE SHIT! ... AND YOU'RE OBVIOUSLY, ONLY - ONLY WORRIED ABOUT SID! ... I WOULD THINK, MAYBE YOU MIGHT, 'MR. GREEN GUY' WOULD CARE ABOUT OTHER PEOPLE TOO! BUT I GUESS YOU ONLY CARE ABOUT TREES AND PLANTS - IS THAT IT! ... PEOPLE DON'T COUNT?! ... I MEAN, DO YOU, DOES IT, DO YOU EVER THINK ABOUT HOW YOU AFFECT OTHER PEOPLE?! DOES IT BOTHER YOU AT ALL?! ... YOU DON'T REALLY CARE! ... YOU JUST WANT TO DO SID - YOU WANT TO DO YOUR THING AND IT DOESN'T MATTER! ... DOES IT BOTHER YOU THAT YOU LIVE OFF YOUR PARENTS! ... YOU DON'T WORK! YOU CAN'T SUPPORT YOURSELF! ... **AND WHY ARE YOU EVEN ALLOWED TO LIVE BY YOURSELF, BLOWS MY MIND!** ... BECAUSE, I KNOW YOUR PARENTS SUPPORT YOU, OBVIOUSLY! ... DOESN'T THAT EMBARRASS YOU! ... THAT WOULD EMBARRASS THE SHIT OUT OF ME! ... A GROWN MAN! IS SUPPORTED BY THEIR PARENTS! ... THAT'S GOT TO BE EMBARRASSING! ... NOTHING AFFECTS YOU! YOU'RE NOT EVEN EMBARRASSED THAT YOUR PARENTS SUPPORT YOU! ... YOU DON'T EVEN TRY TO WORK! ... THAT'S AWFUL! ... YOU SHOULD BE ASHAMED OF YOURSELF! ... ASHAMED! THAT YOU CAN'T SUPPORT YOURSELF! ... AND THEY GIVE YOU EVERYTHING! ...*

〚 [JSP] LAUGHS OUT LOUD. 〛

**[JSP]**

*YOU OUGHT TO BE EMBARRASSED! ... BUT THAT DOESN'T MEAN THAT YOU GET TO DO WHATEVER YOU WANT TO DO, AND MAKE OTHER PEOPLE SUFFER FOR IT! ... CAUSE I GUARANTEE YOU! **WHEN I GET THE HEALTH DEPARTMENT IN HERE, THEY'RE GOING TO BE SO FAR UP YOUR BUTT!** ... THAT YOU'RE GOING TO BE VERY UNCOMFORTABLE! ... AND I KNOW YOU DON'T LIKE BEING UNCOMFORTABLE! ... SO, WHY DON'T YOU JUST MAKE THIS GO AWAY! ... MAKE THIS GO AWAY, AND I'LL BE HAPPY! ... AND GOD, DID YOU BREAK YOUR GARAGE-DOOR, IS THAT WHY YOU CAN'T SHUT IT!! ... IS THE CHAIN NOT WORKING! ... CAN YOU NOT SHUT IT - IS THAT WHY IT'S NOT DOWN! ... I'M JUST ASKING?! ... IS THAT WHY YOU CAN'T ... I KNOW YOU'D WANT TO SHUT IT! ... IS IT BROKEN?! ... IS IT BROKEN?! ... CAN YOU NOT TALK ANYMORE?! ... IS IT BROKEN?! ... I MIGHT BE ABLE TO FIX IT FOR YOU! ... CAUSE YOU WANT TO GET THAT - I WOULD LOVE FOR YOU TO BE ABLE TO SHUT IT! ... I WOULD BE MORE THAN HAPPY TO SEE THAT DOOR SHUT! ... I WOULD ABSOLUTELY HELP YOU FIX IT! ... IF THAT'S WHAT THE PROBLEM IS! ... YOU GOT STUFF STACKED REAL HIGH - NEXT-TO-THAT, SITTING DOOR - LOOKS REAL BENT - SO, IT'S BROKEN, AIN'T IT?! ...*

〚 [JSP] NODS IN AGREEMENT. 〛

**[JSP]**

SIDDHARTH  KODE   V.   WILLIAMSON  COUNTY,  ET  AL.
1696907690

*Sid!... I Mean ... I really don't ask for much from you, man!... I just don't want the stink from getting into my house!... It's yours, if you deal with that, that's fine!... We shouldn't have to deal with it!... You know, we just shouldn't!... You should have enough courtesy just to, so we don't have to deal with the smell!... It's just decent!... It's just being pure decent!... A little decency about you, that's it!... That's all we care about!... And just, get that garage door shut, that'd be nice as well!... That'd be be great!... I really don't have anything, personally against you, Sid!... I don't! I just ask for a few minor things, just to have a few things looks things decent - and yet, I don't have to smell big giant turtle poops!... I shouldn't!... Not in my own damn house!... Really don't ask for too much!... And **lord knows you don't have the funnest life in the world, obviously!**... I just ask a few things, man!... Just to!... And I've got nothing against your turtles - You're turtles are cool!... I think they're cool!... But, in the frontyard!... No!... Not so cool!... And I'm sure you've got a lot of crap in the back, that's probably that's injuring where they're living!... And I know you brought em up here to try to eat your grass up - and I'm sure you did that! Which is fine, I don't have a problem with that either!... But I can't - can you smell that!... You don't smell it anymore do you! ... Even if you have that mask on!... Lord, Sid - you got to get a new mask, that thing is trashed - I mean, that's doing you more harm than it could be doing any good!... You understand that, right?... It's dirty as hell!... That's really bad for you!... But, it just smells awful, man!... It smells awful!... You don't care - do you?!... Doesn't affect you at all, huh?!...*

〚 [JSP] NODS IN SCORN, THEN LAUGHS. 〛

**[JSP]**     *People wonder why - this is why I talk to you the way I do, Sid! Because, you don't care! You just don't care!*

〚 [JSP] WALKS ALONG THE BORDER OF [784KLLTX78641] and [788KLLTX78641] TO SEE THE AREA NEAR THE PLAINTIFF'S AC-UNIT. 〛
〚 PLAINTIFF WALKS ON HIS PROPERTY ABOUT 4-FEET-AWAY ALONG THE BORDER OF [788KLLTX78641] AND [784KLLTX78641]. 〛
〚 PLAINTIFF WALKS AND ONTO THE AREA NEAR THE AC-UNIT AND FACES [JSP]. 〛

**[JSP]**     *You're stepping on poop, too, that's nasty!... WHAT ARE YOU DOING, YOU'RE GUARDING SOMETHING?!... YOU'RE GOING TO GUARD ME FROM GETTING ONTO YOUR PROPERTY?!... I'M NOT COMING OVER THERE SID, YOU DORK!...*

〚 [JSP] MAKES AN AGGRESSIVE/THREATENING PHYSICAL GESTURE TOWARDS THE PLAINTIFF. 〛
〚 [JSP] THEN WALKS TOWARDS FENCE TO SEE THE AREA BEHIND THE PLAINTIFF'S AC-UNIT. 〛
〚 PLAINTIFF WALKS FURTHER ON HIS PROPERTY ABOUT 4-FEET-AWAY ALONG THE BORDER OF [788KLLTX78641] AND [784KLLTX78641]. 〛
〚 PLAINTIFF WALKS ONTO THE AREA BEHIND THE AC-UNIT AND FACES [JSP]. 〛
〚 [JSP] ISSUES AT LEAST HIS FIFTH THREAT-OF-MURDER TO PLAINTIFF: 〛

**[JSP]**     *YOU - FIRST, SHOULD KNOW MORE THAN ANYBODY THAT, YOUR SCRAWNY ASS COULDN'T STOP ME FROM ANYTHING! YOU COULDN'T STOP THIS ONE HAND FROM DOING ANYTHING!... TRUST ME, **I COULD CHOKE YOU OFF WITH MY ONE LITTLE BITTY HAND!... PROBABLY ONLY TAKE ABOUT TWO FINGERS!** ... You Idiot!*

〚 [JSP] THEN WALKS BACK TOWARDS THE FRONT OF [784KLLTX78641] AND STOPS AGAIN, POINTING AT THE GRASS. 〛

**[JSP]**     *LOOK AT THAT!... SEE LOOK AT MY - I've GOT MY GRASS, LOOKS NICE, THIS LOOKS ALL NICE, LOOKS GOOD!... WHAT DOES THIS LOOK LIKE?! IT LOOKS LIKE TOTAL-*

〚 [JSP] THEN AGGRESSIVELY/THREATENINGLY GESTURES TOWARDS PLAINTIFF AS IF TO POUNCE-ON/PUNCH(**4**) THE PLAINTIFF. 〛
〚 [JSP] YELLS OUT EXTREMELY LOUDLY SO THAT EVEN PEOPLE SEVERAL HOUSES DOWN THE STREET COULD EASILY HEAR: 〛

**[JSP]**     ## *-DOGSHITTT!!!*

〚 [JSP] THEN STARES AGGRESSIVELY/THREATENINGLY AT THE PLAINTIFF FOR 5+ SECONDS. 〛
〚 [JSP] THEN WALKS TOWARDS THE FRONTHALL OF [784KLLTX78641]. 〛

⟦ PLAINTIFF WALKS BACK INTO THE PLAINTIFF'S GARAGE. ⟧

⟦ PLAINTIFF THEN WALKS BACK INTO THE [HOUSE] TRAUMATIZED BY THE INCIDENT. ⟧

# ¶598

Towards the end of the same day, at the approximate time of {2021-06-18 21:15}, the plaintiff notices, on the plaintiff's security-camera-system-monitor, that a tow-truck is towing [JSP]'s then pickup-truck back onto the driveway of [784KLLTX78641]. (As revealed in the previous paragraph, the plaintiff had noticed that [JSP] arrived back to [784KLLTX78641] approximately 2 hours earlier as a passenger in his wife [KAP]'s vehicle.) During such activity, [JSP] walks up and down the sidewalk in front of the plaintiff's property, providing instruction to the tow-truck-driver while on one-or-more occasion(s), staring menacingly/angrily at the plaintiff's security-camera(s), as if to indicate, that [JSP] did not want any information about [JSP]'s potentially wrongful and/or reckless activities to be captured on such security-camera-recordings.

# ¶599

On or about the date and approximate time of {2021-06-21 10:00}, [KAP], once-again, sprays extremely-toxic pesticide(s) over the side-yard area and/or the area around the house and fence of [784KLLTX78641] that is closest to the plaintiff's property.

# ¶600

On or about the date and approximate time of {2021-06-22 19:30}, for a period of almost 2 minutes, [JSP] places what appears to be a can of pesticide and a towel on top of the shallow-enclosure of the plaintiff's property, once again, treating the plaintiff's property as if it was his own. [JSP] also steps well-into the plaintiff's property (as he has done on numerous occasions prior to this date and after this date) for a period of approximately 20 seconds, in-order-to look-at the roof of his house at [784KLLTX78641] from such location on the plaintiff's property.

# ¶601

On or about the approximate date and approximate time of {2021-06-24 19:00}, the plaintiff is in the [DRIVEWAY], once again, unboxing and/or photographing previously unopened package(s). [JSP], while using a hose to water the grass in the front-yard of [784KLLTX78641], angrily yells at the plaintiff, demanding the plaintiff to take the plaintiff's political yard-signs down, claiming that such *"stupid"* and *"ridiculous"* yard-signs have been up for more than 2 years. In referring to [AOC] - the United-States-Congresswoman and person-of-color depicted in the plaintiff's yard-signs - [JSP] loudly yells with extreme-racial-animus, sexism and misogyny to the plaintiff, *"SHE'S AN IDIOT! ... SHE DIDN'T WIN ... TAKE THOSE STUPID SIGNS DOWN, DUMBASS! ... SUCH AN IDIOT!"* During this incident, it appears that [JSP]'s wife, [KAP], is also in the background not merely witnessing, but actually, in full support of her husband [JSP]'s racist, sexist, misogynistic and abusive rhetoric against the plaintiff. This incident not only follows a long pattern of extreme-racial-animus, far-right-wing-extremist political-animus and deliberate-deprivation-of-political-speech by [JSP&KAP] (and [RSR]) against the plaintiff, but also further reveals very clearly to the plaintiff that the decade-long racketeering-enterprise and criminal-conspiracy against the plaintiff - with the conspiracy consisting at least of [JSP&KAP], [RSR] and [WCLE] - also includes substantial far-right-wing-extremist political-animus and not just simply extreme-racial-animus. These are the same yard-signs that [JSP] had vandalized (by poking violently with a long stick) in the month of {2020-03}, and these

are also the same yard-signs that [RSR] has also repeatedly referenced in her multiple racist rants against the plaintiff - even demanding that the [HOA] force, via intimidating legal-action(s) if necessary, the plaintiff to remove such political yard-signs. Whenever there is a crime committed, the victim(s)/witness(s) of such crime are not supposed to modify the crime-scene and/or items-of-evidence in any way. When [JSP] demands plaintiff to remove such piece-of-evidence, [JSP] is, thus, engaging in Witness-Tampering against the plaintiff. [JSP]'s threatening statements also further reveal to the plaintiff that [JSP] engages in the similar malicious, fraudulent and defamatory (⊕) narrative that many far-right-wing-extremists in the United States have spread about [AOC] and the democratic-socialist movement initially led by United-States-Senator Bernie Sanders. The racism and misogyny in [JSP]'s far-right-wing-extremist characterization of [AOC] as *"stupid"* lies in the fact that [AOC] graduated *"cum laude"* with a Bachelor-of-Arts Degree from [Boston University] - ranked in the top-50 universities nationally - and amongst the *"most selective"* universities in the United States. (The [Massachusetts Institute of Technology Lincoln Laboratory] also named a small asteroid after [AOC] because of [AOC]'s academic excellence and/or research.) The fraud in [JSP]'s far-right-wing-extremist statements lie in the facts behind [AOC]'s unprecedented success, not only in [AOC]'s electoral victories but also in [AOC]'s strong and principled policy-advocacy of democratic-socialist positions: Not only did [AOC] win her initial insurgent primary-election-campaign in {2018} raising only approximately $83,000 - beating the overwhelmingly and seemingly-insurmountable odds by taking down a long-time, moneyed Democratic-party incumbent (who raised approximately $1.5 million) that was fully-endorsed and heavily-backed by the dominant, moneyed, corporate-wing of the Democratic-party - but [AOC] won her general-election and re-election campaigns in {2018},{2020},{2022} by an approximately three-to-one (or better) margin, winning more than 70% of the total vote in each of those elections - unusual for most high-profile elections that tend to be much closer - signifying very-clearly that the democratic-socialist policy positions strongly-advocated and fought-for by [AOC] are overwhelmingly popular. This unprecedented success is particularly remarkable given that extremely powerful and moneyed political-action-committee(s) - almost entirely funded by large corporations and the wealthy - spend untold sums of political-advertising money and other resources to publicly smear/character-assassinate (⊕) democratic-socialist candidates such as [AOC], while far-right-wing individuals and groups do the so-called *"trolling"* work of smearing/character-assassinating such democratic-socialist candidates, particularly on social-media. The same unprecedented success of [AOC] has also been replicated in many areas across the United States (including Central-Texas) with democratic-socialist candidates, who lack both corporate-funding and funding from the wealthy (especially when compared to their competitors), overcoming overwhelming odds, fighting an uphill-battle and surprisingly, winning their elections, all due to their extremely-popular, egalitarian positions and the so-called *"army"* of grassroots-democracy volunteers (including the plaintiff) dedicated to fighting for democracy and social-justice (in all of its forms). (For example, former Austin City Council member Greg Casar, a Central-Texas-based democratic-socialist candidate for the United States House of Representatives won his first federal election campaign by a similar three-to-one margin.) Throughout most of the last century of American history in particular, social-justice movements consisting almost-entirely of grassroots-democracy volunteers/activists including, most recently and currently, the large democratic-socialist movement initially led by United-States-Senator Bernie Sanders, have sought to move the United States, and, by extension, the entire world, in the direction towards the egalitarian ideal of greater democracy, greater equality, greater freedom, greater independence, greater equity, greater solidarity, while through much of that same period of time, group-narcissistic-and-misanthropic far-right-wing-extremist individuals and groups have maliciously sought to subvert and reverse even those limited gains made by many decades of such social-justice movements. The plaintiff, just an extremely-minute part of such social-justice movement, has been viciously targeted by the far-right-wing defendants, not only due to the plaintiff's own racial-profile, but also because of the *"dangerous"* ideals of democracy and social-justice that the plaintiff represents - especially, since such *"dangerous"* ideals of democracy and social-justice would benefit, to the greatest extent, people-of-color throughout the United States (see section above concerning far-right-wing-extremism in the United States).

## ¶602

On or about the date and morning of {2021-06-25}, [JSP&KAP] hire (White-American) contractors to inspect the roof of [784KLLTX78641]. With [KAP] outdoors, supervising and/or instructing such contractors, such contractor(s) walk-on/through the plaintiff's [YARD] on multiple occasions, even hauling equipment through the plaintiff's [YARD], despite of the fact that there was no reason for such contractor(s) to enter onto the plaintiff's property. In sharp contrast, when the plaintiff hired landscaping contractors to re-landscape the plaintiff's [FRONTYARD] with a *"no-mow"* grass on-or-about the date of {2017-10-25}, both the plaintiff and the plaintiff's (Hispanic) contractors, also persons-of-color, were viciously yelled-at, harassed and intimidated/interfered-with by [RSR], acting in conspiracy with [JSP&KAP], not to step onto even the border-edge of [JSP&KAP]'s property - particularly egregious harassment, given that such landscapers needed to install border-edging on the property border, in-order-to prevent the different species of grass from growing into each other (see-above).

## ¶603

On or about the date and approximate time of {2021-06-26 19:00}, the plaintiff is on or near the [DRIVEWAY] area. [JSP] approaches the tap in the side-yard of [784KLLTX78641], and after noticing the plaintiff near the [DRIVEWAY] area, abusively shouts at the plaintiff in-order-to get the plaintiff's attention, pointing to a few-small-pieces-of-debris in the side-yard of [784KLLTX78641], with statements that included, *"DUDE, GET ALL THESE- HEY! HEY! HEY! HEY! HEY, GET ALL YOUR LITTLE THINGS OUT OF MY YARD, DUDE! GET ALL THESE PEANUTS OUT OF MY YARD! I WANT THIS TRASH OUT OF MY YARD, SID! YOU BETTER PICK IT UP, TOO! I KNOW IT'S YOURS! ..."* Since [JSP] does not get a response from the plaintiff, [JSP] then walks away angrily, continuing to yell statements regarding the aforementioned few-small-pieces-of-debris, *"GET THESE PEANUTS OUT OF [???]! ... [???]! [???]! I KNOW THOSE ARE YOUR PEANUTS- YOU BETTER TAKE CARE OF IT!"* [JSP] then enters into his pickup-truck located in the driveway of [784KLLTX78641]. [JSP] reverses his pickup-truck onto the street, and as [JSP] drives down the street with passenger-window half-open, abusively yells some other threatening/intimidating words towards the plaintiff, *"YOU NEED TO GET THAT TRASH OUT OF MY YARD!"* - so that even other residents several houses away could easily overhear. Approximately 12 minutes later, [JSP] arrives back in his pickup-truck, parking such pickup-truck back in the driveway of [784KLLTX78641], exits such pickup-truck, walks towards the plaintiff (still on or near [DRIVEWAY] area), and upon noticing that the aforementioned few-small-pieces-of-debris have not been picked-up by the plaintiff, continues to point at such debris and abusively shouts at the plaintiff, *"SID, GET THIS TRASH OUT OF MY YARD, MAN! YOU KNOW THAT'S YOUR TRASH! I EXPECT IT TO BE GONE WHEN I COME BACK AND LOOK AT IT! ... YOU NEED TO PICK THAT TRASH UP!"*. [JSP] then walks away as he notices that the plaintiff is not responding to such abusive statements.

## ¶604

On or about the date and approximate time of {2021-06-30 10:00}, the plaintiff begins to pick so-called *"weeds"* in the [FRONTYARD], once-again, noticing an ever-increasing quantity of such so-called *"weeds"* in the former area of no-mow-grass fully-damaged and/or destroyed by [JSP]'s repeated, malicious acts of vandalism against the plaintiff. As the plaintiff is performing this work, [JSP] starts to use a very-loud gasoline-powered string-trimmer to cut grass on his yard. Once [JSP] enters near the border-of the two-properties, [JSP] extends such very-

loud gasoline-powered string-trimmer up to 3-feet into the plaintiff's [YARD], and begins to cut such vegetation on the plaintiff's [YARD] (as he has done in numerous occasions prior to this date, and on at least some other occasions after this date). After [JSP] notices the same few-small-pieces-of-debris from the previous incident (see above), [JSP] starts to abusively yells further fraudulent and gaslighting statements at the plaintiff that are very reminiscent of the abusive statements made by White-Supremacists/White-Nationalists in the [SBPDL] blog (see section below): *"HEY [???]! GET ALL THIS TRASH IN MY YARD! [???]! IF YOU DON'T GET ALL YOUR [???] , [???]! I'MA TAKE A PICTURE OF ALL OF IT, CALL YOU IN TO ALL YOUR BUDDIES, THAT THINK YOU'RE 'GREEN'! YOU'RE ACTUALLY **BLACK**'! STUPID [???] FUCKER! LITTERING SON-OF-A-BITCH! YOU KNOW HOW BAD THESE ARE FOR THE ENVIRONMENT, SID?! THESE PEANUTS! YOU DON'T CARE! YOU DON'T CARE ABOUT NOTHING, FOOL! YOU AIN'T NOTHIN BUT A LIAR! YOU'RE A-YOU'RE A POSER! POSER WANNA BE A 'GREEN' GUY! YOU AIN'T REAL. REAL DON'T HAVE THESE! THEY SURE DON'T LITTER IN PEOPLES' YARDS! FUCKER!"* [JSP] bends down multiple times picking up such few-small-pieces-of-debris, walks towards the plaintiff's side-yard and throws such debris deep into the plaintiff's side-yard area, while continuing to yell abusive statements, *"GOD SID, COME-ON MAN! YOU'RE NOTHING BUT A [???] FUCK! ASS-HOLE! [???] [???] [???] "* [JSP] then approaches his very-loud gasoline-powered string-trimmer while shouting at the plaintiff, *"GETTIN IN THERE, PULLIN THE TOPS OFF TRYING TO MAKE IT LOOK LIKE YOU'VE DONE SOMETHIN! I'M WARNING YOU [???] [???]!"* [JSP] then powers up his very-loud gasoline-powered string-trimmer and continues to operate such equipment to cut more grass around other areas of his yard. [JSP] then powers up his very-loud gasoline-powered lawnmower and continues to operate such equipment to cut more grass around other areas of his yard, at least at one point in time, raises his hand to angrily issue the obscene/vulgar gesture of his middle-finger to one-or-more of the plaintiff's security-camera(s). Shortly after [JSP] finishes such work, [JSP] enters into his pickup-truck in the driveway of [784KLLTX78641], reverses such pickup-truck out onto the street, while the plaintiff continues to pick so-called *"weeds"* in the so-called *"curbside-grass-area"* in front of the public-side-walk area. While [KAP] is speaking with one-or-more White-American contractor(s) and/or guest(s) in their frontyard, [JSP] passes the plaintiff in his pickup-truck on the street, blaring the loud-horn of such pickup-truck in-order-to scare/startle the plaintiff, as he has intimidatingly done on numerous occasions prior to this date. It is important to note that during at least some, if not most of the time documented in this incident, [JSP]'s son, [NP], and [JSP]'s wife, [KAP] are also outdoors in the area, listening-to and in full support of [JSP]'s abusive rants and actions against the plaintiff.

# ¶605

On or about an evening in the end of the month of {2021-06}, the plaintiff is unboxing a package of hard-disk-drives on the driveway of the plaintiff's property [788KLLTX78641]. Each of the hard-disk-drives had been individually wrapped by the seller in a thick layer of foam/bubble-wrap in-order-to ensure that the hard-disk-drives would not be damaged during delivery. As the plaintiff is unboxing/unwrapping the package and photographing each wrapped hard-disk-drive, [JSP], who had apparently been stalking the plaintiff as he had done on countless occasions, yells out to the plaintiff, *"IS THAT COCAINE?!"*, as if threatening to report the plaintiff's unboxing/unwrapping of such packages to local and/or federal law-enforcement. The plaintiff does not respond in any way and instead continues to unbox/unwrap and photograph the wrapped hard-disk-drives. According to [JSP], if a person-of-color such as the plaintiff handles such wrapped packages, and those wrapped packages have a white color, then the item(s) must be illegal narcotics of some kind. As this lawsuit tries to document, this incident is clearly not the first time that [JSP] uses racist stereotypes in racist rhetoric/threats against the plaintiff while in a public setting in-order-to intimidate/interfere-with/dehumanize/humiliate the plaintiff.

## ¶606

On or about the date of {2021-07-01}, the then Community-Manager of the [HOA] Property-Management-Company, [SPOA-CM-JH], sends the following email message (see below) to all residents of the subdivision, ahead of July-Fourth, reminding all residents that the lighting of fireworks is illegal within the subdivision. The plaintiff asserts that such repeated emails from the [HOA] are truly disingenuous because neither the [HOA] nor [WCLE] truly-and-seriously intended to enforce the fireworks-ban restrictive-covenant (and the Texas law of Disorderly-Conduct) within the neighborhood. As a result of this lack-of-enforcement, the rampant lighting of fireworks in the neighborhood by countless residents of the neighborhood (including [JSP],[NP]) continued through this year and following years (as evidenced by numerous social-media-postings by numerous residents complaining about such issue).



> ▷  "Summerlyn: REMINDER – Fire Work" ›  EMAIL FROM [SPOA-CM-JH]  [Summerlyn]  RESIDENTS CONCERNING "FIREWORKS BAN"   (2021-07-01 12:34) (~)
> ▷  [ PRIVATE INFORMATION IN EMAIL OMITTED/REDACTED TO PROTECT PRIVACY ]
>
> [SPOA-CM-JH]        *With the Fourth of July only a few days away, I wanted to remind everyone that the association's documents strictly prohibit the use of fireworks within the Summerlyn POA community.*
>
> *Specifically, this language can be found in Section 3.4 (l) of CC&Rs of the Declaration of Covenants, Conditions, and Restrictions.*
>
> *You may review Williamson County fireworks rules and safety tips at:*
> *https://www.wilco.org/williamson-county-fire-marshals-office-offers-fireworks-safety-tips-ahead-of-the-holidays*
>
> *Residents can also check the county map with the fireworks free buffer zone area to find out where fireworks are allowed by visiting:*
> *https://gis.wilco.org/maps/?viewer=countymap*
>
> *If you believe that there may be a fire and/or medical emergency related to the use of fireworks, please call 911 and request the local Fire Department.*
>
> *I hope everyone has a safe and enjoyable Independence Day!*
>
> *Regards,*
> *J******** H****
> *Community Manager*
> *Spectrum Association Management*
> *IMPORTANT NOTE: This email is not monitored. Do not reply.*
> *Powered by CINC Community Association Management Software*

## ¶607

On or about the date and approximate time-period of {2021-07-02 02:48} (early morning-time), [JSP], after using a hose to water parts of the side-yard area of his property, faces one-or-more of the plaintiff's security-camera(s), and with both of his hands held up high, angrily issues the obscene/vulgar gesture of the middle-fingers raised to each of these security-camera(s).

## ¶608

On or about the date and approximate time-period of {2021-07-04 22:30} through {2021-07-05 00:00}, [JSP], [NP] (and/or [KAP]) illegally light very-loud fireworks as they have done on multiple occasions of almost every single year (if not every year) on the street directly in front

of their residence at [784KLLTX78641], undoubtedly disturbing the sleep-schedules and/or work-schedules of neighboring resident(s) (including the plaintiff). On the morning of the following day ({2021-07-05} 07:30), the plaintiff notices a large pile of the debris and other waste-products from these fireworks on the street directly in front of the [JSP&KAP]'s property [784KLLTX78641]. Again, the lighting of loud fireworks (especially late at night) in such deed-restricted residential subdivisions is not only a violation of the subdivision's restrictive-covenants (under civil contract law), and not only a violation of County-wide burn-ban(s) (whenever such burn-ban(s) are in effect), but at a minimum, also a violation of the Texas criminal law Disorderly-Conduct [TPeC-T9-C42-§42.01(5)].

## ¶609

On or about the date and approximate time of {2021-07-05 07:00}, the plaintiff takes a walk on some of the public sidewalks of the neighborhood. On the way to and from the mailbox, the plaintiff holds a camera to record evidence of the debris from the illegal lighting of fireworks left on the road/sidewalk/other-public-property. The plaintiff notices what the plaintiff would later find out to be [WCSD-O-Neil]'s police-vehicle drive past the plaintiff on one street. Right before the plaintiff reaches the mailbox on another street, the plaintiff notices [WCSD-O-Neil] drive up to the plaintiff again, stopping the plaintiff on the road in-order-to question the plaintiff. [WCSD-O-Neil] informs the plaintiff that he had not seen the plaintiff around in this neighborhood, and asked the plaintiff if the plaintiff lived in the neighborhood. The plaintiff responded that the plaintiff was a resident of the neighborhood, although the plaintiff failed to inform [WCSD-O-Neil] that the plaintiff was, at-that-moment-in-time, a more-than-12-year resident of the neighborhood. [WCSD-O-Neil] questions the plaintiff as to why the plaintiff was holding a camera, and the plaintiff explained to [WCSD-O-Neil] that the lighting fireworks was/is against the rules of the subdivision (and also a violation of Texas law, Disorderly-Conduct [TPeC-T9-C42-§42.01(5)]), and that the plaintiff was merely recording further evidence of such violations left on the road and other public-property. After [WCSD-O-Neil] determined that the plaintiff was only acting lawfully, [WCSD-O-Neil] returned to his vehicle and drove his vehicle away from the plaintiff. On the plaintiff's way back to the plaintiff's property, the plaintiff noticed a large pile of debris and other waste-products on the road in front of [784KLLTX78641], from the fireworks, illegally lit the night before by [JSP], [NP] (and/or [KAP]). According to the plaintiff's recorded-footage, [WCSD-O-Neil] did have a body-worn-camera - and as such, such body-worn-camera should have been recording all aspects of this Unconstitutional-And-Unlawful search/seizure/interrogation/detention of the plaintiff - unless, [WCSD-O-Neil] deliberately turned-off such body-worn-camera (at any point in time) in-order-to Obstruct Justice against the plaintiff.

## ¶610

On or about the approximate date and approximate time of {2021-07-09 19:00}, [JSP] walks from the driveway area of [784KLLTX78641] to the side-yard area of [784KLLTX78641] to open the tap and handle a hose. [JSP] has always vandalized the plaintiff's security cameras, not only to destroy evidence/recording-equipment of [JSP&KAP]'s numerous racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, but also to prevent the plaintiff from recording the numerous/constant, and completely-unpunished, violations of restrictive-covenants that [JSP&KAP] had committed while residing at [784KLLTX78641]:

▸ RECORDED RACIST, ABUSIVE, FRAUDULENT, THREATENING AND VANDALIZING RANT FROM [JSP] TO PLAINTIFF(▸):   (2021-07-09 18:00)(~)
▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

《 [JSP] WALKS FROM [784KLLTX78641] DRIVEWAY TO [784KLLTX78641] SIDE-YARD TO OPEN TAP AND HANDLE A HOSE. 》

**[JSP]**   *Stupid douchebag!*

⟦ PLAINTIFF ENTERS INTO [FRONTPORCH], AND AS SOON AS [JSP] SEES PLAINTIFF, STARTS TO YELL OBSCENITIES AT PLAINTIFF: ⟧

**[JSP]**   *HEY DOUCHEBAG- YOU THINK YOU CAN JUST LEAVE YOUR TURTLES HERE, HUH?!*

⟦ [JSP] ANGRILY MUTTERS SOME OTHER INAUDIBLE WORDS. ⟧

**[JSP]**   *Fuckin douche-ball! ... [???] ... [???] shit!*

⟦ [JSP] USES HOSE TO SPRAY/DOUSE 5 CORNER SECURITY-CAMERAS WITH WATER, AS HE HAS DONE MULTIPLE TIMES IN PAST. ⟧
⟦ PLAINTIFF HAS ALREADY REPORTED [JSP]'S VANDALISM OF SUCH CAMERAS TO [WCLE]; SO, THIS ACT IS ALSO ANOTHER OF MANY COUNTS OF EVIDENCE-TAMPERING. ⟧
⟦ [JSP] ANGRILY RAISES HIS HAND TO ISSUE OBSCENE/VULGAR GESTURE OF HIS MIDDLE FINGER AT ONE-OR-MORE SECURITY CAMERAS. ⟧
⟦ [JSP] THEN STARTS SHOUTING A RACIST, ABUSIVE, FRAUDULENT, AND THREATENING RANT TO PLAINTIFF'S SECURITY CAMERAS. ⟧

**[JSP]**   *'PEEPING TOM'! YOU'RE A 'PEEPING TOM'! ... DIRTY BASTARD! ... FRICKING 'PEEPING TOM'!*

⟦ [JSP] ABUSIVELY LAUGHS, MOCKS AND CONTINUES TO YELL OBSCENITIES AT PLAINTIFF: ⟧

**[JSP]**   *YOU'RE A 'PEEPING [???]'! Asshole!*

⟦ [JSP] THEN YELLS OUT IN A MANNER SO THAT EVEN PERSON(S) MANY RESIDENCES AWAY COULD EASILY OVERHEAR: ⟧

**[JSP]**   *FREAK-O! ... YOU'RE A FREAK! [???] DAMN [???]! YOU ARE A* **FREAK** *TO BE ABLE TO LIVE BY YOURSELF! FUCKING*

*WEIRDO! [???]! [???]! [???] shit! [!!!]!*

⟦ [JSP] CONTINUES TO MUTTER OTHER ANGRY WORDS AT PLAINTIFF. ⟧
⟦ [JSP] CONTINUES TO ANGRILY STARE AT ONE-OR-MORE OF PLAINTIFF'S SECURITY-CAMERAS. ⟧
⟦ [JSP] USES HOSE TO SPRAY/DOUSE 3 ADDITIONAL SECURITY-CAMERAS WITH WATER, AS HE HAS DONE MULTIPLE TIMES IN PAST. ⟧
⟦ AT LEAST 5 OF SUCH SECURITY CAMERAS HAVE BEEN DAMAGED IF NOT BY THIS ACTION, BY NUMEROUS CUMULATIVE ACTS OF VANDALISM BY [JSP]. ⟧
⟦ [JSP] THEN CLOSES THE TAP, WRAPS THE HOSE BACK UP ON THE MOUNT, AND WALKS AWAY FROM THE PLAINTIFF. ⟧

# ¶611

On or about the day and approximate time of {2021-07-15 10:30}, the plaintiff notices a light-brown-pickup-truck drive up and down the street multiple times, each time pausing on the road in front of the plaintiff's property [788KLLTX78641]. The truck seems to eventually park near [784KLLTX78641], and the occupants of this truck, which appeared to be an Unidentified White-man and Unidentified White-American woman [UWAW-4], exit the truck and enter into the exterior-front-hallway of [JSP&KAP]'s property [784KLLTX78641]. Approximately 30 minutes later, these individuals exit the house of [784KLLTX78641] and initially walk back towards the truck. [UWAW-4] walks down the sidewalk in front of the plaintiff's property [788KLLTX78641] and takes approximately 20 seconds to look-at/read the plaintiff's political yard-signs. [UWAW-4] then stares at the [GARAGE]/exterior-front-hallway area of the plaintiff's property for a few more seconds, and then walks back towards the light-brown-pickup-truck. The light-brown-pickup-truck drives away shortly thereafter. If this Court grants the plaintiff the

opportunity to litigate this case, the plaintiff would seek to depose and/or cross-examine this particular witness, [UWAW-4].

## ¶612

On or about the day and approximate time of {2021-07-15 14:00}, the plaintiff notices a *"For Sale"* yard-sign newly installed on the frontyard of [JSP&KAP]'s property [784KLLTX78641].

## ¶613

On or about the day and approximate time of {2021-07-15 14:00}, the plaintiff notices that certain guests of [784KLLTX78641], park their vehicle at the curbside directly in front of the plaintiff's property [788KLLTX78641]. The plaintiff notices that at least one of these guests, an Unidentified White-American man, [UWAM-3], approximately 200 pounds, approximately 5-feet-10-inches-tall, takes 10 seconds or more to look-at/read the plaintiff's political yard-signs. These guests - all of the White/Caueasian/American color/race/nationality - appear to walk to the front-door area of [JSP&KAP]'s property [784KLLTX78641]. Then, approximately half an hour later, the same guests exit from the house of [784KLLTX78641], and approach their vehicle, which is still parked at the curbside directly in front of the plaintiff's property. [UWAM-3], walks onto the driveway of the plaintiff's property [788KLLTX78641], without wearing a face-mask as a safety precaution against COVID-19, and is initially told/signaled by one of the other guests not to enter into the plaintiff's property. [UWAM-3] looks back at them, makes hand gestures towards them to calm them down, and then continues to walk towards the [FRONTDOOR]. [UWAM-3] has a photographer's camera (not a camera-phone) on his chest which is strapped around his neck. [UWAM-3] briefly looks into the plaintiff's garage which is open at that time. [UWAM-3] enters into the exterior-front-hallway of the plaintiff's property [788KLLTX78641] and rings the front-doorbell of the [HOUSE]. [UWAM-3] continues to look-around/observe various items stored on/around the plaintiff's front-porch and garage. After [UWAM-3] waits without any response in the exterior-front-hallway area of [788KLLTX78641], for about 30 seconds, [UWAM-3] walks back toward the sidewalk, making one last cursory inspection of the plaintiff's garage before he walks out of the [DRIVEWAY]. [UWAM-3] makes some comments about what he observed to the other guests near the vehicle, and then, all of these guests enter back into the vehicle, and drive away from the plaintiff's property within a few minutes of such time. If this Court grants the plaintiff the opportunity to litigate this case, the plaintiff would seek to depose and/or cross-examine this particular witness, [UWAM-3].

## ¶614

On or about the day and approximate time of {2021-07-15 19:30}, the plaintiff is in the plaintiff's [DRIVEWAY] unboxing and photographing some new package(s). [JSP] drives up the street in his pickup-truck and parks the vehicle in the driveway of [784KLLTX78641]. Shortly after that point, [JSP] approaches the plaintiff as the plaintiff is still unboxing and taking photographs of such package(s). Then, [JSP] yells some words at the plaintiff so as if to get the plaintiff to identify the items that the plaintiff is unboxing. The plaintiff does not respond and does not look up at [JSP]. [JSP] continues to stare and intimidate the plaintiff for more than a minute as the plaintiff continues to work. [NP], then pushes a lawn-mower from the backyard of [784KLLTX78641] into the front-yard of [784KLLTX78641]. This action from [NP] distracts [JSP] from [JSP]'s act of intimidation/interference/harassment/stalking against the plaintiff. [JSP] eventually walks away from the plaintiff, while the plaintiff simply continues to work in the [DRIVEWAY].

## ¶615

On or about the day and approximate time of {2021-07-16 20:00}, the plaintiff is working in the plaintiff's front-porch area. [JSP] drives up the street in his pickup-truck and parks the vehicle in the driveway of [784KLLTX78641]. Almost immediately thereafter, [JSP] approaches the plaintiff, angrily and aggressively, and beings an abusive and threatening rant against the plaintiff:

▸ RECORDED RACIST, ABUSIVE, THREATENING AND ASSAULTIVE RANT FROM [JSP] TO THE PLAINTIFF(⊢)·   {2021-07-16 20:00}(~)
▸ [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]

⟦ [JSP] WALKS AGGRESSIVELY/ANGRILY TOWARDS PLAINTIFF STOPPING NEAR THE BORDER OF [784KLLTX78641]: ⟧

**[JSP]**        *HEY SHIT-FOR-BRAIN! YOU THINK YOU COULD SHUT YOUR DAMN, YOUR GARAGE-DOOR! SO WHEN PEOPLE COME BY, IT DOESN'T LOOK LIKE SUCH A PIECE OF SHIT!*

⟦ PLAINTIFF DOES NOT LOOK-AT NOR RESPOND-TO [JSP]. ⟧

**[JSP]**        *YOU HEAR ME, DICK-WEED! SHUT YOUR GOD-DAMN GARAGE-DOOR, YOU ASS-HOLE!*

⟦ PLAINTIFF DOES NOT LOOK-AT OR RESPOND-TO [JSP]. [JSP] TEMPORARILY WALKS AWAY FROM THE PLAINTIFF. ⟧
⟦ PLAINTIFF CONTINUES TO WORK IN/AROUND [FRONTPORCH] AREA OF [788KLLTX78641]. ⟧
⟦ MANY MINUTES LATER, [JSP] WALKS BACK TOWARDS PLAINTIFF, THIS TIME APPROACHING THE SIDE SIDE-TAP OF [784KLLTX78641] HOUSE. ⟧
⟦ [JSP] OPENS THE TAP TO WATER THE [784KLLTX78641] YARD. [JSP] SPRAYS WATER ON [784KLLTX78641] YARD. ⟧
⟦ PLAINTIFF BRIEFLY LOOKS IN THE DIRECTION OF [JSP] TO SEE IF [JSP] IS SPRAYING WATER ONTO PLAINTIFF'S SECURITY-CAMERA(S). ⟧
⟦ [JSP] MAKES EYE-CONTACT WITH THE PLAINTIFF, AND AGGRESSIVELY/ANGRILY/VULGARLY HOLDS UP HIS MIDDLE-FINGER TO PLAINTIFF. ⟧
⟦ [JSP], WITH HOSE IN HAND, CONTINUES WATERING YARD OF [784KLLTX78641] PERIODICALLY LOOKING MENACINGLY/ANGRILY AT PLAINTIFF. ⟧
⟦ [JSP], AFTER A MINUTE OF WATERING YARD OF [784KLLTX78641] WALKS TO MORE-EASILY LOOK-AT/YELL-AT PLAINTIFF. ⟧
⟦ [JSP] MAKES AN ANGRY GESTURE WITH HIS HAND TOWARDS THE PLAINTIFF AND STARTS TO MUTTER OBSCENE/VULGAR WORDS. ⟧
⟦ [JSP] LOOKS DIRECTLY INTO ONE OF PLAINTIFF'S SECURITY-CAMERAS AND AGGRESSIVELY/ANGRILY/VULGARLY HOLDS UP HIS MIDDLE-FINGER. ⟧
⟦ [JSP] CONTINUES TO WATER [784KLLTX78641] YARD, AND PERIODICALLY LOOKS-AT/YELLS-AT BACK AT THE PLAINTIFF. ⟧
⟦ [JSP] THEN MAKES GROSSLY-UNINFORMED STATEMENTS ABOUT THE COVID-19 PANDEMIC WIDELY REPORTED IN FAR-RIGHT-WING MEDIA: ⟧

**[JSP]**        *Guarantee you, [???] ... WHAT ARE YOU, GOING TO GET COVID, MAN?!! WHAT THE HELL YOU WEARING THAT FOR, YOU DUMBASS! ... WHO THE HELL YOU GOING TO GET IT FROM?! AIN'T NO-ONE COMIN BY YOU, YOU DUMBASS! ... ARE YOU REALLY THAT DUMB?! ... CAN'T GET COVID LIKE THAT, YA MORON! ...*

⟦ [JSP] CONTINUES TO WATER [784KLLTX78641] YARD, AND PERIODICALLY LOOKS-AT/YELLS-AT BACK AT THE PLAINTIFF- ⟧
⟦ -WHILE CONTINUING TO MAKE ANGRY THREAT(S) OF BLACKMAIL/RETALIATION AGAINST THE PLAINTIFF. ⟧

**[JSP]**        *HEY DUDE! SHUT YOUR GOD-DAMN GARAGE, MAN! IT LOOKS LIKE ASS! ... YOU BETTER SHUT IT, OR I'M GONNA! ... YOU CAN TAKE THAT TO THE BANK, DOG! ... I WILL COME OVER THERE, AND I WILL SHUT IT! ... I GOT TO FIX IT! BECAUSE I'M SURE IT'S BROKEN! ... THAT DOOR'S GETTIN SHUT! ... IT'S BAD ENOUGH THAT YOUR PLACE LOOKS LIKE A PILE OF SHIT! ... You motherfucker! ... You know what, Sid?! We're going to play [???], if you're going to play [???]! [???] I'm [???] to BRING IT DOWN ON YOUR ASS! [???] ...*

⟦ [JSP] CONTINUES TO WATER [784KLLTX78641] YARD, AND IN DOING SO, TEMPORARILY TURNS HIS BACK TOWARDS PLAINTIFF. ⟧
⟦ [JSP], WHILE WATERING YARD, CONTINUES TO PERIODICALLY LOOK-MENACINGLY-BACK-AT PLAINTIFF. ⟧

⟦ [JSP], WHILE WATERING YARD, NOTICES A PIECE-OF-PLASTIC ON THE BORDER OF [784KLLTX78641]. ⟧

⟦ [JSP] UNLAWFULLY ENTERS INTO PLAINTIFF'S [YARD], BENDS DOWN TO PICK UP SUCH PIECE-OF-PLASTIC, ANGRILY THROWS– ⟧

⟦ –IT INTO PLAINTIFF'S [YARD], ANGRILY YELLING: ⟧


**[JSP]**        *[???] [???] CRAP OUT OF MY YARD! [???]!*


⟦ PLAINTIFF DOES NOT RESPOND IN ANY MANNER. ⟧

⟦ [JSP] CONTINUES TO MOVE AND WATER OTHER AREAS OF [784KLLTX78641] FRONT-YARD GRASS. ⟧

⟦ AFTER [JSP] FINISHES SUCH WATERING, AND CLOSES THE TAP, [JSP] PICKS UP TWO-OR-MORE PIECES OF DEBRIS ON THE YARD OF– ⟧

⟦ –[784KLLTX78641] AND HURLS SUCH DEBRIS ONTO OR IN THE DIRECTION OF THE PLAINTIFF'S PROPERTY [788KLLTX78641]. ⟧

⟦ [JSP] THEN WALKS AWAY AND TOWARDS THE FRONT OF [784KLLTX78641]. ⟧


# ¶616

On or about the date and approximate nighttime of {2021-07-24 21:30} (nighttime), [JSP] is near his boat parked illegally on the street (in clear violation of the neighborhood's restrictive covenants). Another unidentified White-American woman [UWAW-2] walks her dog up the sidewalk and encounters [JSP] near his boat. [UWAW-2] notices the *"For Sale"* yard-sign on [JSP&KAP]'s property [784KLLTX78641] and starts a conversation with [JSP] about the sale of their property. The conversation quickly switches to focus on the plaintiff and plaintiff's property, with [UWAW-2] clearly showing her shameless support of [JSP], despite of [JSP]'s admissions of committing felony crimes against the plaintiff (for which [JSP] was even confronted by a resident of [785KLLTX78641] - see above): If this Court grants the plaintiff the opportunity to litigate this case, the plaintiff would seek to depose and/or cross-examine this particular witness, [UWAW-2]. The most important aspects of this extremely-revealing and abusive conversation is that:

Ⓐ In his casual dialogue with [UWAW-2], [JSP] clearly expresses his extreme anger that another neighbor, [785KL-2018-1], actually confronted and questioned [JSP] about [JSP]'s engagement in such felonious criminal actions of retaliation, vandalism and evidence-tampering against the plaintiff, once again, revealing that [JSP] clearly considered himself to be the unquestioned mob-boss of the neighborhood - to quote the conventional expression: *"The godfather does not tolerate disobedience [or disloyalty]."*

Ⓑ As [UWAW-2] and [JSP] were talking, if not loudly, still at a sufficiently-high volume for people across the street to hear, the residents of [785KLLTX78641], including [785KL-2018-1] appeared to be within or near the open-garage area of [785KL-2018-1], which means that they could have overheard such brazen words of impunity from [JSP] and his co-conspirator, [UWAW-2], once again, indicating that [JSP], acting like the mob-boss of the neighborhood, truly did not care that his continuing pattern of criminal actions (along with his absurd justification(s) for those criminal actions) against the plaintiff were being witnessed by multiple of the neighborhood's residents, solely due to the *"powerlessness"* of the plaintiff, which in turn was the direct result of the plaintiff's racial-profile ( 🔒 ).

Ⓒ One of the many absurd (but also clearly fraudulent) justifications that [JSP] provides for vandalizing the plaintiff's property is that, according to [JSP], *"all"* of the plaintiff's security-cameras are only pointed at [JSP]'s property, when both [JSP] and [UWAW-2] know fully-well, that the security-cameras on the plaintiff's property are evenly distributed throughout the plaintiff's property, with the sum of all such security-cameras pointed at all directions, comprehensively covering all areas surrounding the plaintiff's [HOUSE], and thus, clearly not only pointed towards [JSP]'s property; this statement clearly shows the brazen narcissism of [JSP], that according to [JSP], [JSP] belongs to a

unique, specialized-class of unanswerable-and-unaccountable mob-boss(s) whose criminal behaviors/actions cannot be recorded, even by such lawfully installed security-cameras.

Ⓓ Even though [UWAW-2] does not know that [JSP]'s admission of such vandalism simply represented only one of the many dozen counts of mostly-retaliatory (thus mostly-felonious) hate-crimes/civil-rights-violations/racketeering-acts/abuses that [JSP&KAP] (and their co-conspirator [RSR]) had aggregately committed against the plaintiff during a period spanning more than a decade, [UWAW-2] still, nonetheless, actually warns [JSP] that [JSP]'s (single act of) vandalism of the plaintiff's property could be used against [JSP] at some later point in time, to which [JSP] responds, *"I don't care!"* and words-to-the-effect that the plaintiff is powerless - even laughing out loud along with [UWAW-2], essentially acknowledging that he gets to commit racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff with absolute impunity, thanks to the obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise enabled-by and involving government defendant [WCLE].

Ⓔ Even though [UWAW-2] issues this warning to [JSP], at no point in time did [JSP] actually reveal to [UWAW-2] the full-extent of the ten minutes worth of malicious vandalism that [JSP] and [NP] had engaged in on that particular day, with significant damage caused not only to such security-camera(s) but also to the surrounding surfaces of the plaintiff's [HOUSE] onto which such security-camera(s) were mounted, or for that matter, that [JSP] actually issued a vulgar-and-sexist gesture by using both of his hands to point to his genitals directed towards such security-camera(s).

Ⓕ [UWAW-2] states that she had thought that the plaintiff once wore or used to wear a *"dress-shirt and a tie"*, showing the type of *"ultra-conservative"* and/or far-right-wing neighborhood that the plaintiff is living in. In other words, the plaintiff could just-as-easily have had the most distinguished Doctorate degree from an Ivy-League University, but as long as the plaintiff is dressed in rags and/or ethnic clothing of any kind, with long/uncut hair/beard, at least some fraction of such neighbors would continue to treat the plaintiff as if the plaintiff was a low-IQ, powerless, subhuman animal. (At least part of the injunctive-relief that the plaintiff seeks - see below - seeks to ensure that no person-of-color can be, in any way, intimidated, interfered-with, or otherwise-pressured-to dress/groom according to any White-American standards in-order-to own and/or reside-in private-property located within a White neighborhood.)

Ⓖ [JSP], very-revealingly, admits that neither he nor his family ever saw the plaintiff dumping/burying human faeces in the plaintiff's [YARD] at any point in time, but this is precisely what [JSP] and his wife [KAP] have on more-than-one occasion fraudulently complained to law-enforcement-agencies about - first to the [TCEQ] in the incident that occurred on-or-about {2017-05-28} (see above), and then also to [WCLE], at least in the years {2020}/{2021}. Therefore, both [JSP] and [KAP] knowingly made multiple fraudulent statements about the plaintiff on multiple occasions to all of these law-enforcement-agencies, thereby committing several counts of the crime of *"False-Report"* against the plaintiff, which even prompted both of these agencies - the [TCEQ] and [WCLE] to execute egregiously unconstitutional-and-unlawful searches/seizures of private areas of the plaintiff's property - thus, further count(s) of retaliatory (thus felonious) crimes and racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff - as all of these crimes against the plaintiff were committed both due to [JSP&KAP]'s extreme-racial-animus against the plaintiff, and due to their strong desire to retaliate against the plaintiff for the plaintiff's (video-)recording and reporting of their hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff.

Ⓗ [JSP], just like co-defendants [RSR] and [WCLE], deliberately uses the term *"trash"* in referring to item(s) stored in the plaintiff's [BACKYARD], when none of the [THaSC] defines this term. Instead, the [THaSC] has defined the terms, *"garbage"*, *"refuse"* and *"rubbish"* all with specific meaning (along with examples of each) - but not *"trash"*. The plaintiff has always maintained that there is absolutely no waste material of any kind stored in the plaintiff's [BACKYARD]. Thus, none of the item(s) stored into the plaintiff's [BACKYARD] have fallen into those aforementioned categories. Furthermore, the government does not have the authority to determine what item(s) have value, and what item(s) are waste, as this determination can only be made by the owner(s) of such item(s) - with the conventional idiom, *"One man's 'trash' is another man's treasure"*. Nonetheless, the law regulating *"rubbish"* (exclusively non-decayable waste) is substantially different from the law regulating *"garbage/refuse"* (which includes decayable waste) and even *"garbage/refuse"* is legally allowed to be stored in *"closed receptacle(s)"*, while none of the material(s) used for *"composting"* fall into any of the aforementioned categories. The defendants' deliberate avoidance of use of the proper legal-terminology was always to circumvent the law and violate the plaintiff's rights. A common theme expressed in this lawsuit is that the defendants did not bother to even read the State/Local law(s)/covenant(s) that they were, for over a decade, fraudulently accusing the plaintiff of violating - once again, revealing to any reasonable observer that the defendants were acting solely under the fraudulent pretext of law-enforcement, maliciously mis-interpreting and predatorily enforcing property-maintenance-laws, for the sole purpose of defrauding the plaintiff, an immigrant-of-color/indigenous-person, out of the plaintiff's right to private-property-ownership within such White neighborhood.

Ⓘ [JSP] states to [UWAW-2] that the plaintiff has had so-called *"weeds"* growing *"up to almost the roof"* in the [BACKYARD], when the Texas law does not properly/sufficiently define the culturally-insensitive/religiously-insensitive and ethnocentric term *"weeds"* (see section below), and furthermore, this particular issue of the intentional growing of wild-vegetation (unjustly deemed to be so-called *"weeds"*) is known to be a Constitutionally-protected first-amendment practice (see section below) under Freedom-of-Religion, Freedom-of-Expression, Art, and Political-Speech - even ignoring the numerous benefits - including both to humans and to the environment - of intentionally growing such wild vegetation entirely within the confines of a person's own private backyard.

Ⓙ [JSP] states that the *"[HOA] has done nothing about it!"* which is both a fraudulent statement and a misleading statement. Such statement is brazenly fraudulent because both [JSP&KAP] and [RSR] relentlessly, aggressively and successfully blackmailed the [HOA] in-order-to get the [HOA] to sue the plaintiff back in the years {2016}/{2017}/{2018}, which even [JSP] shockingly admits in previous incident(s), cost the plaintiff well in excess of $20,000 when factoring the litigation-related expenses, while the [HOA] never sued either [JSP&KAP] nor [RSR] for their numerous and repeated violation(s) of the covenants - as already sufficiently documented in this lawsuit. Such statement is misleading because, as all of the defendants are fully-aware, unless the [HOA] can prove in Court that it is inspecting every property-owner's backyard, the [HOA] has absolutely no authority to inspect the plaintiff's [BACKYARD], because such practice would be *"arbitrary, capricious, or discriminatory"* in violation of the [TPrC] in addition to being a violation of the [FHA]/[TFHA] with respect to the plaintiff. (The [HOA] has personally admitted to the plaintiff that they do not inspect backyards, and has even admitted in one-or-more Board-Meetings that they are not allowed even to enter into any part of any property-owner's private-property.)

Ⓚ [UWAW-2] reminds [JSP] that the plaintiff had grass and so-called *"weeds"* growing onto the sidewalk two years prior (which actually was four years prior), all the while completely ignoring that [JSP]'s tree had been, in an approximately 10-feet long area, constantly (for at least 5 years) blocking half of the width of sidewalk, preventing two-or-more people from walking side-by-side, and often prompting even single

persons (walking alone) to walk off the sidewalk onto the street in order to avoid such obstructive tree - which was not originally planted by the
builder of the subdivision, but rather, was planted by [JSP&KAP] without seeking prior-approval from the plaintiff (since such tree also
extends into the plaintiff's property), and more-likely-than-not, without even seeking prior-approval from the [HOA]. Residents walking on the
sidewalk (on a daily basis) routinely have to cross onto the *"curbside-grass-area"* or onto the street in-order-to avoid such obstructive tree. A
child riding a scooter on the sidewalk was also recently injured, trying to avoid colliding into such obstructive tree. (To be clear, as a *"no-mow"*
activist, the plaintiff is not advocating against the planting of trees, nor that such trees should be cut, but is simply highlighting such extremely-
racist hypocrisy that both [JSP] and his White-American co-conspirators so-freely subscribe to.)

Ⓛ [UWAW-2] complains to [JSP] that the [HOA] did nothing about the plaintiff's grass and/or so-called *"weeds"* growing onto the sidewalk
two years prior (which actually was four years prior), and [JSP] does not in any way inform [UWAW-2] that the then-[HOA] had actually
sued the plaintiff due to the relentlessly-racist blackmail that [JSP&KAP],[RSR] engaged in against the then-[HOA], not only coercing the
then-[HOA] to sue the plaintiff, but also to issue a subsequent threat of a Court-Ordered [TRO] to stop all landscaping-related work - thus
leaving the plaintiff with no choice but to allow such incomplete landscaping alone. Clearly, according to [UWAW-2], [JSP] and [JSP]'s other
White-American co-conspirators within such White neighborhood, it was not good enough that the [HOA] sued the plaintiff over such
immature, petty nonsense, and instead, what [JSP&KAP],[RSR] and their other White-American co-conspirators really demanded of such
institutions-of-power (in particular, the [HOA] and [WCLE]) is that the plaintiff, an immigrant-of-color/indigenous-person, be forcefully evicted
from what they consider to be *"their"* (exclusive-and-pure) White neighborhood.

Ⓜ While [UWAW-2] and [JSP] fraudulently complain about the plaintiff's so-called *"weeds"* growing onto the sidewalk four years prior, and
how the [HOA] did *"nothing"* about it, [JSP] has been illegally parking his boat on the street for many years - including at this particular
moment in time - but clearly, according to both [UWAW-2] and [JSP], [JSP], as a White-American man, has free-license to brazenly and
openly violate the rules of the subdivision.

Ⓝ While [UWAW-2] and [JSP] fraudulently complain about one-or-more pallets of *"no-mow"* grass (weighing in excess of 2500 pounds)
delivered to the plaintiff via a tractor-fork-lift onto the sidewalk by sod-farmers (which the plaintiff clearly was not culpable for), thus
temporarily blocking such area of sidewalk many years ago in front of the plaintiff's property, on numerous occasions, [JSP], [KAP] and/or
their teenage-children have intentionally and illegally parked their vehicle(s) in such a manner that substantially or fully blocks the sidewalk for
a period of half-a-day or more - for no good reason, other than the fact that they believe that they can use the public-sidewalk as they saw fit.
Additionally, the tree that [JSP&KAP] intentionally planted near the sidewalk - to the best of the plaintiff's limited knowledge, without seeking
approval from the [HOA] nor the plaintiff - has been blocking at least half of the sidewalk and extending into the plaintiff's property for a
period of 4 or more years (at this particular moment in time). The plaintiff has never knowingly nor intentionally blocked the sidewalk for any
period of time during the plaintiff's entire residence at [788KLLTX78641]. So, once-again, the brazen and racist hypocrisy of such speech
would be immediately apparent to any reasonable observer that has witnessed what the plaintiff has witnessed in such neighborhood for over a
decade.

Ⓞ Throughout most of this dialogue, [JSP] engages in the same pattern of relentlessly-racist propaganda and gaslighting - even stating *"He
ain't all there!"* as if to indicate that the plaintiff is crazy and/or mentally-disabled - in-order-to further indoctrinate [UWAW-2] and in-order-to

further engender more racial-animus against the plaintiff in [UWAW-2] - the very same pattern of relentlessly-racist propaganda and gaslighting that [JSP&KAP],[RSR] had been engaging in against the plaintiff for over a decade, as part of their predatory racketeering-enterprise against the plaintiff, ultimately focused on evicting the plaintiff, an immigrant-of-color/indigenous-person, out of *"their"* (exclusive-and-pure) White neighborhood, thus in a conspiracy and scheme to defraud the plaintiff out of private-property-ownership within such White neighborhood.

ⓅA primary purpose of this rather casual conversation done, very deliberately, right in front of the plaintiff's security-camera(s) was to intimidate, gaslight, blackmail and coerce the plaintiff to submit-to - that is, plead guilty (or *"Nolo Contendere"*) to - the pending and fraudulent Class-C-Misdemeanor-Public-Nuisance charge and prosecution that [JSP&KAP],[RSR] and [WCLE] were continuing to predatorily orchestrate against the plaintiff since the final quarter of the previous year.

ⓆA primary purpose of this rather casual conversation done, very deliberately, right in front of the plaintiff's security-camera(s) was to intimidate, gaslight, blackmail and coerce the plaintiff to abandon any plan to expose the predatory racketeering-enterprise of the defendants against the plaintiff, because any such exposure by the plaintiff would lead to further acts of predatory retaliation against the plaintiff.

ⓇIn other words, [JSP] (and his co-conspirators [RSR],[KAP]) are acting with such incredible impunity and brazenness in the numerous incidents documented in this lawsuit, thanks in no-small-part to the toxic environment of racist-lawlessness created by [WCLE] (and to a smaller degree, the [HOA] under [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH]), that they truly believe, in their twisted minds, that engaging in these brazen act(s) of intimidation/interference, gaslighting and blackmail - over property-maintenance-laws of all things - will somehow save them from facing the consequences of their numerous, felonious hate-crimes and predatory racketeering-acts aggregately committed against the plaintiff during the period of over a decade. By sharp contrast, most other criminals, including hardened criminals would not dare to so-brazenly brag to other witness(s) about their felony crime(s) committed right in front of the actively-recording, recording-device(s) of their victim(s).

ⓈThis casual conversation once-again reveals a common theme expressed in this lawsuit, about the ongoing hazards for a person-of-color living his/her natural lifestyle within a White-neighborhood - that such person-of-color could easily be predatorily targeted with the most vicious forms of racial-oppression and/or racketeering-activity by even less than a handful of far-right-wing-extremist and/or White-supremacist neighboring residents, while at the same time, at least some significant fraction of the rest of such White neighborhood - whether knowingly or unknowingly - provides at least tacit, if not overt, support of such criminally-abusive and predatory actions.

> RECORDED RACIST, ABUSIVE, INVASIVE AND INTRUSIVE RANT BETWEEN [JSP] & [UWAW-2] (▶)   (2021-07-24 21:30) (~)
> [ PRIVATE URL LINK TO BE SUBMITTED IN DISCOVERY ]


〖 [JSP],[UWAW-2] INITIALLY TALK ABOUT "FOR SALE" YARD-SIGN ON [784KLLTX78641], BUT CONVERSATION SHIFTS TOPIC TO PLAINTIFF. 〗
〖 [JSP] MOTIONS AND/OR POINTS TOWARDS PLAINTIFF'S SIDE-YARD AREA: 〗


**[JSP]**          *[???]. He's got his turtles right here - in the front-yard.*


**[UWAW-2]**       *I've seen them! I've-*

〖 [JSP] THEN WALKS TOWARDS PLAINTIFF'S SIDE-YARD WITH [UWAW-2] FOLLOWING [JSP] ALONG BORDER OF [784KLLTX78641] CONTINUING TO-

〚 -RANT ABOUT PLAINTIFF. BOTH [JSP],[UWAW-2] SHINE THEIR RESPECTIVE TORCH LIGHTS INTO VARIOUS AREAS OF PLAINTIFF'S PROPERTY,-
〛
〚 -IN TOTAL VIOLATION OF THE PLAINTIFF'S RIGHTS. [JSP] CONTINUES TO POINT/SHINE-LIGHT TOWARDS PLAINTIFF'S SIDE-YARD: 〛

**[JSP]**          *Yeah, he keeps em right over there. He keeps em in there. You see that [???] back there?*

**[UWAW-2]**      *Yeah - Yeah.*

**[JSP]**          *They stay in there. [???] He keeps em in the front, over here. ... He's got some kind of container that he's put something over here. And [???], I watched him pull em out of.*

**[UWAW-2]**      *[???] They all dig [???]*

**[JSP]**          *Yeah - yeah, you see that it's all dug out - Really [???]. But he's got some kind of container here up front - he keeps em - I've [???] - I've watched him- he reaches over there and picks em up and pulls em out and brings them over here. And he lets them walk around and eat the grass.*

〚 [JSP],[UWAW-2] CONTINUE TO SHINE LIGHT INTO PRIVATE/CURTILAGE AREAS OF PLAINTIFF'S PROPERTY IN TOTAL VIOLATION OF
PLAINTIFF"S RIGHTS. 〛

**[UWAW-2]**      *Yeah, I was just [???]- And I just saw em moving - and I was like - Huh! What in the hell is that?*

**[JSP]**          *He's got 5 of em- Yeah, and they [???]. And then, here you've got this, unfortunately got [???]. [???] We were over here [???] day, when it was snowing, [???] throwing snow balls at these cameras, because they're all pointed at my property. She starts yelling at us - she starts yelling at me and my son!-*

〚 [UWAW-2] LAUGHS OUT LOUD - ANOTHER HAZARD OF INDIGENOUS-PERSON(S) LIVING IN WHITE-NEIGHBORHOOD WHERE WHITE-SUPREMACY
DOMINATES . 〛
〚 [JSP] CONTINUES TO JUSTIFY HIS FELONY CRIME(S) AGAINST PLAINTIFF - AND HIS BELIEF THAT HE IS ABOVE-THE-LAW REGARDING
PLAINTIFF : 〛

**[JSP]**          *"YOU GOTTA KNOW THAT THAT'S PRIVATE PROPERTY!" And I was like, "What!" You have no idea what's going on up here! You don't need to be stepping in here! Not - you do not have a clue what we've been dealing with for so long! [???]*

〚 [UWAW-2] TRIES TO WARN [JSP] THAT PLAINTIFF,[785KL-2018-1] COULD USE SUCH INCRIMINATING EVIDENCE AGAINST [JSP]: 〛

**[UWAW-2]**      *Yeah, ... But [???] [???]*

〚 [JSP] CONTINUES TO SHOW HIS BRAZEN LAWLESS BEHAVIOR AGAINST PLAINTIFF, BECAUSE HE PERCEIVES PLAINTIFF TO BE POWERLESS: 〛

**[JSP]**          *I don't care! I don't care! He's [???]*

〚 [JSP] LAUGHS OUT LOUD. [UWAW-2] LAUGHS UNCOMFORTABLY, RECOGNIZING [JSP]'S BEHAVIOR TO BE BRAZENLY LAWLESS. 〛

〖 [JSP] CONTINUES TO PERIODICALLY SHINE LIGHT INTO PLAINTIFF'S CAMERAS,CURTILAGE AREAS. 〗

[JSP]          *Jesus Christ! But yeah - they have absolutely no idea, what's going on here - So yeah, totally - it's awful. I think that's why [???]-*

[UWAW-2]      *[???] I figured. He didn't use to always do that! He was always - really [???] , he would have everything mowed down.*

〖 [JSP] CONTINUES TO PERIODICALLY SHINE LIGHT INTO PLAINTIFF'S CURTILAGE & ABUSIVELY COMMENT ON ITEMS STORED IN CURTILAGE: 〗

[JSP]          *Yeah, It is! It's unbelievable! [???] [???] He's cookin dinner - that's his microwave there- That's how you see [???]! [???] That's on his patio! Yeah! -*
               *Yep! - He ain't all there! - It should even matter [???]. He has no job! His parents are still support him completely!-*

[UWAW-2]      *Oh, [???]*

[JSP]          *He doesn't work! He doesn't!-*

[UWAW-2]      *He used to work?*

[JSP]          *No! - No! - No!*

[UWAW-2]      *I used to see him! He would come home, and he would be wearing like a dress-shirt and a tie!*

[JSP]          *Yeah, that must be the - wrooong home!*

〖 [JSP] LAUGHS OUT LOUD: 〗

[UWAW-2]      *I've only [???]-*

[JSP]          *I've been - We've watched him [???] We've watched him [???] [???]*

[UWAW-2]      *[???]*

[JSP]          *[???]*

[UWAW-2]      *[???]*

[JSP]          *[???] Yeah - He doesn't work! He doesn't [???], and he's 30 years old!*

SIDDHARTH KODE   V.   WILLIAMSON   COUNTY, ET AL.           1696907690

**[UWAW-2]**          *[???]*

**[JSP]**          *No, he doesn't do anything! [???]*

〚 [JSP] AND [UWAW-2] LAUGHS OUT LOUD: 〛

**[UWAW-2]**          *Are you shocked by that?*

〚 [JSP] REVEALS SINISTER PLAN: WISHES FOR [PARENTS] TO DIE/RUN-OUT-OF-MONEY, SO THAT HE CAN UNLEASH REVENGE ONTO PLAINTIFF: 〛

**[JSP]**          *No, not at all! But I'm telling [???], you know some day [???] - when everything's [???] [???] [???] And- we do!*

**[UWAW-2]**          *[???]*

〚 [JSP] POINTS TO THE PLAINTIFF'S AIR-CONDITIONING/HEATING UNIT: 〛

**[JSP]**          *And as you can also see, that does not work - does not work - he doesn't have central-air.*

**[UWAW-2]**          *But the [???]*

**[JSP]**          *And .. [???] No - no that's the thing - he doesn't have no water either! [???] He only has electricity. [???] But he still has no [???]. He's doing the-*

**[UWAW-2]**          *[???] He digging it and burying it out in the back?*

**[JSP]**          *Yeah, or in the house - somewhere in the house. But we've watched the back, and we don't see him doing that, or anything like that going on, but, the back's got trash all over it, and [???] [???] [???] - and it's usually grown up to about almost the roof sometimes - and the [HOA] has done nothing about it!*

**[UWAW-2]**          *They do nothing! I hate them!*

**[JSP]**          *[???] Yeah, they're worthless!*

〚 [UWAW-2] FRAUDULENTLY SAYS [HOA] DOES NOTHING TO PLAINTIFF, WHEN [HOA] SUED PLAINTIFF BASED ON PREDATORY BLACKMAIL OF [JSP&KAP],[RSR]- 〛
〚 -BACK IN {2017} WHILE NONE OF [UWAW-2],[JSP&KAP],[RSR] HAVE EVER BEEN SUED BY [HOA]. APPARENTLY, PREDATORY WHITE PEOPLE LIKE- 〛

〘 –[JSP&KAP],[UWAW-2] WILL TOLERATE NOTHING LESS THAN INDIGENOUS-PERSON(S) (SUCH AS PLAINTIFF) TO BE KICKED-OUT OF WHITE-NEIGHBORHOOD– 〙

〘 –FOR SUCH INDIGENOUS-PERSON(S)' AUDACITY TO EXERCISE THEIR RIGHTS, AND FOR DARING TO QUESTION WHITE-SUPREMACY: 〙

**[UWAW-2]**   *Yeah, they are! I get so mad because- you know, Remember, um 2 years ago - when he got his grass, and he left the pallets blocking the sidewalk-*

〘 BOTH [JSP],[UWAW-2] TALK ABOUT PLAINTIFF'S VEGETATION THAT WAS TEMPORARILY CREEPING ONTO SIDEWALK BACK IN {2017}, WHEN [JSP&KAP]'S– 〙

〘 –UNAPPROVED TREE HAS BEEN CONSTANTLY OBSTRUCTING MORE THAN HALF OF THE PUBLIC-SIDEWALK SINCE AT LEAST {2018}. [UWAW-2] ALSO DOES– 〙

〘 –NOT MENTION [JSP]'S BOAT ILLEGALLY PARKED ON THE STREET – ALSO IN TOTAL VIOLATION OF THE RULES OF THE SUBDIVISION: 〙

**[JSP]**   *Yep!*

〘 BOTH [JSP] and [UWAW-2] START TO WALK AWAY FROM THE PLAINTIFF'S SIDE-YARD AREA AND BACK TOWARDS THE SIDEWALK: 〙

**[UWAW-2]**   *And they did nothing! And they had the nerve to send me a violation notice [about the grass] [???]! I went up to their [???] and [???]!*

**[JSP]**   *You gotta be kiddin me! [???]!*

**[UWAW-2]**   *I was like, 'What!' ... I was so [pissed off]! I could not believe it, and at the time, that was when I had torn my ankle - I jammed it. I, let me tell you! I ran up there [???] and walked in there, and I told them! [???] you can see I'm a little handicapped right now, and you're talking about grass that's tall - [???] - are you kidding?! ... [???] [???]*

**[JSP]**   *Oh, god! ... [???] ... Take care!*

〘 [UWAW-2] EVENTUALLY DEPARTS [JSP], CONTINUING TO WALK UP THE SIDEWALK. 〙

# ¶617

On or about a day in the last week of {2021-07}, the plaintiff notices that the *"For Sale"* yard-sign on [JSP&KAP]'s property [784KLLTX78641] has been replaced with a *"Contract Pending"* or *"Under Contract"* yard-sign. On or about a day in the following month of {2021-08}, the plaintiff notices that, according to public appraisal records from [WCAD], the ownership of [784KLLTX78641] has been transferred from [JSP&KAP] to an incorporated-business-entity during the first two weeks of the month of {2021-08}. Based on the plaintiff's limited knowledge and online research, it does not appear to the plaintiff that [JSP&KAP] own any share and/or stake in such incorporated-business-entity, which if true, means that the property [784KLLTX78641] is no longer owned by [JSP&KAP] as of the month of {2021-08}. This incident is extremely significant because both [JSP&KAP],[RSR] each committed several dozens of hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff under the fraudulent guise of *"protecting property values"*, even fraudulently alleging that the plaintiff was the sole reason that they were not able to sell their respective properties. Within two weeks, [JSP&KAP] were able to sell their property [784KLLTX78641] to another private party - meaning that there was absolutely no delay in [JSP&KAP]'s ability to sell such property. Most importantly, such events reveal the outrageous, massive, racist fraud that both [JSP&KAP],[RSR] orchestrated against the

plaintiff for over 10 years: Nobody, in their right mind, who is genuinely concerned about *"protecting property values"* would sell their property located in this highly-sought area of Central-Texas - especially when the value of such property in this highly-sought area of Central-Texas is rising sharply in recent years due to many socio-economic factors. People who are genuinely concerned about *"protecting property values"* would continue-to-maintain ownership of their highly-sought property, so that the value of such highly-sought property would continue to rise sharply, and so that they could either profit much-more-greatly from a sale of such highly-sought property at a later stage in their life, or transfer ownership of such highly-valuable,highly-sought property onto their children. For example, in the single tax year transition from {2021} to {2022}, the appraised property-values of most, if not all, homes in the subdivision rose by more than 40% or more than $100,000; yet, both [JSP&KAP],[RSR] sold their respective properties in the year {2021} prior to this sky-rocketing increase in appraised property-values. Both [RSR],[JSP&KAP], on numerous occasions, even threatened to sue the plaintiff back in {2017},{2019} - and even blackmailed the [HOA] to sue the plaintiff - over what they fraudulently claimed to be a $15,000 devaluation of their respective properties caused by what they alleged to be the plaintiff's failure and/or *"inability"* to maintain the plaintiff's private-property according to their (hypocritically-enforced) White-American standards. That fraudulent $15,000 figure claimed by [RSR] and/or [JSP&KAP] has not only been rendered totally meaningless and totally foolish by such sky-rocketing appraisal values, but it also fully demonstrates the massively racist fraud that both [JSP&KAP],[RSR] perpetrated against the plaintiff with the substantial help of the [WCLE],[f-HOA-BoD]s. Even more surprisingly, and as the following record will show, [JSP&KAP] would continue to remain as tenants of [784KLLTX78641] for a year after the sale of this property to the new owners (an incorporated-business-entity), despite transferring ownership of this property to such new owners. This fact clearly shows that [JSP&KAP] did not sell their property [784KLLTX78641] to move away from the plaintiff due to any of the many outrageously fraudulent, racist claims that they had made against the plaintiff for over 10 years - but instead, they chose to remain as tenant-residents of their former private-property. [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH],[DMP] are substantially liable but [WCLE] is fully liable for this massively racist fraud that they all perpetrated against the plaintiff, because they fraudulently legitimized [JSP&KAP]'s,[RSR]'s fraudulent claims about *"protecting property values"* - claims that both [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH],[DMP] and [WCLE] knew were part of a massively racist fraud against the plaintiff - and used this massively racist fraud to justify their many predatory enforcement actions against the plaintiff for over a decade, on behalf of the plaintiff's predatory neighbors [JSP&KAP],[RSR] - including the then [HOA]'s outrageously frivolous/trivial/petty/spiteful lawsuit against the plaintiff in {2017}, and [WCLE]'s fraudulent and purely-retaliatory Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff from {2020} through almost-all of the year {2021}. The plaintiff continues to be extremely indignant that the plaintiff was a target of many vicious, predatory enforcement actions of the then [HOA] (run by [f-HOA-BoD]s [SPOA-P-BC],[SPOA-VP-AH],[DMP]) and [WCLE] over the course of over a decade - both of whom predatorily targeted the plaintiff based on what they fully-knew to be massively racist fraud by [JSP&KAP],[RSR] - predatory actions that the plaintiff can only accurately describe as egregious institutional-racism, racial-oppression and racketeering-activity, as part of a pattern of modern-day-Jim-Crow enforcement of White-supremacy. Both of these institutions - the then [HOA] (under the [f-HOA-BoD]s) and [WCLE] - knew about the many dozens of hate-crimes/civil-rights-violations/racketeering-acts/abuses that [JSP&KAP],[RSR] committed against the plaintiff, because the plaintiff had informed both of these institutions on numerous occasions about such hate-crimes/civil-rights-violations/racketeering-acts/abuses and extreme-racial-animus during the course of over a decade - and yet, to this date, neither [JSP&KAP],[RSR] nor those [f-HOA-BoD]s nor [WCLE] have faced any legal consequences for any of those hate-crimes/civil-rights-violations/racketeering-acts/abuses that they maliciously committed against the plaintiff. Both [JSP&KAP] and [RSR] committed several dozens of hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff in-order-to illegally (in egregious violation of the [FHA]/[TFHA]) and forcefully kick the plaintiff out-of (through the process of foreclosure) or, alternatively, in-order-to drive the plaintiff out-of such White neighborhood via such racial-oppression

and racketeering-activity - despite the fact that neither [JSP&KAP] nor [RSR] ever planned to continue-to-maintain ownership of their respective 〖Summerlyn〗 properties. In other words, both [JSP&KAP]'s and [RSR]'s brazenly malicious mindset was that, if neither [JSP&KAP] nor [RSR] could continue-to-maintain ownership of (and thus continue-to-profit from) their respective 〖Summerlyn〗 properties in the long-run, then they were, at the very least, going to inflict maximum damage onto the plaintiff and commit these many dozens of hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff in-order-to, and at the very least, ensure that the plaintiff would also not remain as property-owner within the same White neighborhood. In addition to illegally kicking the plaintiff out of *"their"* (exclusive-and-pure) White neighborhood (in egregious violation of the [FHA]/[TFHA]), both [JSP&KAP] and [RSR] wanted to also ensure that the plaintiff, due to the plaintiff's racial profile, would not, in any way, profit/benefit from such sky-rocketing property-values of the subdivision, with (real-property) private-property-ownership being a substantial component of a family's (and/or an individual's) wealth creation. Therefore, the massively-racist fraud that both [JSP&KAP] and [RSR] maliciously perpetrated - with substantial help and coordination from the [f-HOA-BoD]s,[WCLE] - against the plaintiff over the course of over a decade cannot be understated.

## ¶618

On or about the approximate date and approximate time of {2021-07-29 11:00}, [JSP], without authorization or permission from the plaintiff, drives his heavy pickup-truck (of half-ton or three-quarter-ton rating) into the plaintiff's [DRIVEWAY] and parks on the [DRIVEWAY] with such truck running for approximately 10 minutes. [JSP] is inside the driver's seat of such truck the whole time while such truck is illegally parked (and running) on the [DRIVEWAY] - thus, [JSP] is physically within the plaintiff's property for a period of approximately 10 minutes. This incident shows, yet again, that [JSP] has operated as if the private-property [788KLLTX78641] did not belong to the plaintiff, and as if he could use the plaintiff's private-property [788KLLTX78641] at any moment in time, and as he saw fit.

## ¶619

On or about the approximate date and approximate time period of {2021-07-31 07:00} to {2021-07-31 15:00}, roofing-contractors that seem to be hired either by [JSP&KAP] or the new-owners of [784KLLTX78641] perform repair and/or replacement of the roof of [784KLLTX78641]. During this time period, the plaintiff notices that at least some of debris from such work falls into the plaintiff's yard, and a tarp that such contractors have spread-out at ground level is also extending into the side-yard of plaintiff's property [788KLLTX78641]. The plaintiff notices that these roofing-contractors walk, on numerous occasions, deeply into-and-out-of the plaintiff's [FRONTYARD]/[DRIVEWAY], even though there was absolutely no reason for such contractors to step into-and-out-of any part of the plaintiff's property. In sharp contrast, when the plaintiff hired landscaping contractors to re-landscape the plaintiff's [FRONTYARD] with a *"no-mow"* grass on-or-about the date of {2017-10-25}, both the plaintiff and the plaintiff's (Hispanic) contractors, also persons-of-color, were viciously yelled-at and harassed by [RSR], acting in conspiracy with [JSP&KAP], not to step onto even the border-edge of [JSP&KAP]'s property - particularly egregious harassment, given that such landscapers needed to install border-edging on the property border, in-order-to prevent the different species of grass from growing into each other (see previous incident above).

## ¶620

During the month of {2021-07} or {2021-08}, [JSP&KAP] purchase a pickup truck, as an apparent replacement for their older pickup truck. The plaintiff notices that initially, within the first week(s) or so, such pickup truck does not have a loud noise. However before the end of the

month of {2021-08}, the plaintiff notices that such pickup truck has been made louder by some type of artificial loudening mechanism. Therefore, every time that [JSP&KAP] would drive this pickup truck after such date, including and in particular, late at nighttime, such truck would continue to make such (artificially) loud noise. The restrictive covenants of the neighborhood strictly prohibit any type of noise-nuisance-violation (any type of activity considered to be an *"annoyance or nuisance"*), and furthermore, all of the defendants - [JSP&KAP], [RSR],[WCLE] - had repeatedly over the course of a decade, just like the White-Supremacists/White-Nationalists in the [SBPDL] blog (see section below), accused the plaintiff of being *"inconsiderate"*, solely due to the plaintiff's alleged failure and/or *"inability"* to maintain the plaintiff's property according to their (hypocritically-enforced) White-American standards - and at all times, entirely within the confines of the plaintiff's private-property. This minor example is just one of numerous examples of the defendants' modern-day-Jim-Crow interpretation and/or enforcement of the property-maintenance-laws against the plaintiff.

# ¶621

On or about the date and approximate time of {2021-08-13 14:00}, an Unidentified White-American Package Delivery Person [UWAPDP-1] (White male, approximately 180 pounds, approximately 6-feet-tall, wearing a bandana on his head), approaches the [FRONTDOOR] to deliver package(s) to the [FRONTDOOR]. [UWAPDP-1] looks suspiciously at multiple packages at [FRONTDOOR]. [UWAPDP-1] walks back towards his delivery-truck. Approximately 30 seconds later, [UWAPDP-1] walks back towards the [FRONTDOOR], rings the door bell and/or loudly calls-out towards the door, in-order-to get someone from inside the plaintiff's [HOUSE] to respond. The plaintiff does not respond as the plaintiff is taking a nap at this moment in time. The plaintiff is however awakened by the noise of the incident. By this time, [UWAPDP-1] appears to be back in his delivery-truck making a phonecall to someone. Shortly thereafter, [UWAPDP-1] drives away in his delivery-truck.

# ¶622

On or about the midnight of {2021-08-14 00:00}, [WCSD-JD-9] parks his [WCSO] police-vehicle on the opposite-curbside directly across the street from the plaintiff. [WCSD-JD-9] enters into the plaintiff's property without a search warrant, without even wearing a face-mask as a safety precaution against COVID-19, and starts to execute a clearly unconstitutional-and-unlawful search/seizure of the plaintiff's property [788KLLTX78641] with various aspects of such clearly unconstitutional-and-unlawful search/seizure of the plaintiff's property documented as follows. [WCSD-JD-9] shines his torch-light into the windows of the plaintiff's vehicle in-order-to view the interior content(s) of the plaintiff's unlit vehicle. [WCSD-JD-9] shines his torch-light directly into the plaintiff's private-curtilage-area [GARAGE] (which was completely unlit at the time) in-order-to view the interior content(s) of the plaintiff's unlit [GARAGE]. [WCSD-JD-9] shines his torch-light into the plaintiff's private-curtilage-area front-porch (which was completely unlit at the time), in-order-to view the content(s) of the plaintiff's unlit [FRONTPORCH]. [WCSD-JD-9] loudly knocks on the plaintiff's [FRONTDOOR] at least 7 times. After determining that no-one is answering the [FRONTDOOR], approximately 30 seconds later, [WCSD-JD-9] walks back towards the front of the plaintiff's vehicle, shines his torch-light onto the plaintiff's vehicle-license-plate and radios back to [WCSO] headquarters the plaintiff's vehicle-license-plate-number and/or other vehicle identification information, in-order-to run a background check on such vehicle and/or the registered driver(s) of such vehicle. [WCSD-JD-9] knocks two-or-more times at the plaintiff's [GARAGE]-door which was open at that time, and loudly yells, *"Hello"*, in the middle of the night when others in nearby homes could easily overhear, but without providing any identification information (as is typically required by policy). [WCSD-JD-9] then walks into the plaintiff's private-curtilage-area side-yard and shines his torch light deep into the plaintiff's private-curtilage-area side-yard - such as, but not limited to, behind the plaintiff's outdoor-air-conditioner-unit - in-order-to see these particular areas of

the plaintiff's unlit private-curtilage. [WCSD-JD-9] then walks back towards the plaintiff's [FRONTPORCH], once-again, shining his torch-light into the unlit areas of the plaintiff's [FRONTPORCH] and/or [GARAGE]. When [WCSD-JD-9] determines that he is not getting a response from the plaintiff, [WCSD-JD-9] continues to walk back to his vehicle parked across the street. The plaintiff, who was initially asleep, was awakened and alarmed by [WCSD-JD-9]'s clearly intrusive and invasive unconstitutional-and-unlawful search of the plaintiff's private property - including the loud knocks on the [FRONTDOOR], the [GARAGE]-door, and the loud yelling. The plaintiff finally walks to the [DRIVEWAY] to respond to [WCSD-JD-9] with a hand-held camera/camcorder. The plaintiff announces the plaintiff's presence to [WCSD-JD-9] and signals with one hand held up high above the plaintiff's head to [WCSD-JD-9] in-order-to inquire regarding the search/seizure of the plaintiff's property. [WCSD-JD-9] walks towards the plaintiff with his torch-light shining towards the plaintiff. [WCSD-JD-9] stops approximately mid-way and asks the plaintiff regarding what the plaintiff is holding in the plaintiff's hand - and the plaintiff traumatically responds that it is only a (handheld) camera/camcorder. The plaintiff, under duress, opens up the camera/camcorder's LCD display to convince [WCSD-JD-9] that it is only a camera/camcorder so as to avoid any possibility of misinterpretation. [WCSD-JD-9] continues to walk towards the plaintiff, enters deep into the plaintiff's [DRIVEWAY], and informs the plaintiff that the [WCSO] had received a complaint and/or suspicious-report from [UWAPDP-1] regarding the plaintiff's open-garage-door and/or multiple unopened packages left in front of the [FRONTDOOR]. [WCSD-JD-9] asks the plaintiff regarding what the plaintiff had strapped onto the plaintiff's chest, and the plaintiff explained that it was the holder for a USB-battery-bank that was in turn attached to the plaintiff's recording body-worn-camera (so that such body-worn-camera could receive power from such external USB-battery-bank). [WCSD-JD-9] then starts to ask inappropriately private-questions concerning the plaintiff and/or plaintiff's property - also making an inappropriate and suspicious comment regarding what he alleged to be the large number of security-cameras on the plaintiff's property - even periodically shining such torch-light into one-or-more of the plaintiff's security-cameras. The plaintiff responds to [WCSD-JD-9] that the plaintiff has suffered many crimes at the plaintiff's property. At no point in time does [WCSD-JD-9] inquire about such crimes, or attempt to file report(s) on behalf of the plaintiff about such crimes (although the plaintiff had already provided ample information about such crimes to the [WCSO] in multiple prior incidents involving the [WCSO] - dating back to {2011}). [WCSD-JD-9] asked for the plaintiff's identification card - again, despite the fact that [WCSD-JD-9] had already admitted that the plaintiff was not a suspect in any crime - not that even being a suspect in any crime would automatically allow a police-officer to demand photo-identification at such suspect's private-property. The plaintiff responds that such identification card is inside the [HOUSE]. [WCSD-JD-9] asks for the plaintiff's last-name, and the plaintiff, under duress, unwilling provides the plaintiff's last-name. [WCSD-JD-9] asks for the plaintiff's first-name along with the spelling of the plaintiff's first-name, and the plaintiff, under duress, unwilling spells the plaintiff's first-name. [WCSD-JD-9] asks for the plaintiff's date-of-birth, and the plaintiff, under duress, unwilling whispers the plaintiff's date-of-birth (as this is private information that is not available in public-records). [WCSD-JD-9] radios back to [WCSO] headquarters, the exact spelling of the plaintiff's name along with the plaintiff's date-of-birth, so as if to, once-again, run a background-check on the plaintiff, despite of the fact that [WCSD-JD-9] has already admitted that the plaintiff was not a suspect in any crime - not that even being a suspect in any crime would automatically allow a police-officer to demand to know such suspect's name, especially when such suspect is within the confines of such suspect's private-property. [WCSD-JD-9] asks for the plaintiff's phone-number, justifying the need for such private/sensitive information, by stating that the same delivery-driver or a different delivery-driver could complain again regarding the plaintiff, and that a phonecall to the plaintiff would be more expedient (instead of such intrusive night-search). The plaintiff declined to provide the plaintiff's phone-number since the plaintiff felt very violated with [WCSD-JD-9]'s unconstitutional-and-unlawful search of the plaintiff's property and his subsequent interrogation of the plaintiff, along with the potential for inappropriate use of the plaintiff's private information (as the plaintiff had repeatedly suffered in the preceding decade). Even ignoring all of the predatory abuse that the plaintiff has suffered from [WC] police-officers and and

other [WCLE] employees for over a decade, the plaintiff asserts that it is entirely inappropriate for a police-officer to ask any private-citizen - especially a private-citizen who is not a suspect in any crime - for their private phone-number, because such private-citizen can suspect that the police is requesting such private information for some sinister purpose such as unlawful phone-location-tracking/surveillance and/or unlawful eavesdropping/wiretapping of private conversations. [WCSD-JD-9] then agrees to leave the plaintiff alone, once again, shining his torch-light into the windows of the plaintiff's vehicle. The plaintiff confirms with [WCSD-JD-9] that it was only [UWAPDP-1] that had complained about the plaintiff on this particular occasion. The plaintiff, purely as a matter of reflexive habit and courtesy, then thanks [WCSD-JD-9] for the end of such unconstitutional-and-unlawful search/interrogation and walks back inside the [HOUSE], as [WCSD-JD-9] continues to walk back towards his vehicle parked across the street. [WCSD-JD-9] then drives away in such vehicle. Needless to state, the plaintiff felt extremely-violated, humiliated and at least partly traumatized by this experience. In one-or-more precedent-setting cases (see section below), the [SCOTUS] had not only ruled against such unconstitutional-and-unlawful searches of private-curtilage-areas of private-property but also strongly ruled against any warrantless-and-nonconsensual night visits - deeming warrantless-and-nonconsensual night visits to be particularly egregious civil-rights-violations. The plaintiff had suspected, but could not initially prove, that [JSP&KAP] were somehow involved in instigating this unconstitutional-and-unlawful search of the plaintiff's property, but a subsequent incident did provide the plaintiff with such indication (see below). The plaintiff realized that this was simply one additional malicious incident of [WCLE]'s intimidation against the plaintiff, in-order-to coerce, by way of such intimidation, the plaintiff to submit-to the (still pending) Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff. At the very least, and even disregarding the decade of malicious and predatory actions of [WCLE] against the plaintiff, all of the unconstitutional-and-unlawful search(s)/seizure(s) that the plaintiff had suffered from [WCLE], almost-always, if not always, acting on the malicious complaints of predatory neighbors [JSP&KAP],[RSR], clearly show that defendant [WC] and its law-enforcement-agencies, [WCLE], have acted for at least a decade, based upon government policy(s) and/or practice(s) that allow for such civil-rights-violations - not only in violation of Constitutional law (fourth-amendment, fifth-amendment, fourteenth-amendment (⭐)), but also in violation of the [FHA]/[TFHA] and other state laws banning racial-discrimination and racial-profiling by police-officer(s)/government-employee(s) (see section above). Upon analysis of this incident in retrospect, the plaintiff is painfully reminded of the closing arguments of the recent high-profile trial of 《TEXAS V. AARON DEAN》, during which, even a prosecutor of such case - a top-ranking member of law-enforcement - scathingly rebuked police-officer Dean's (eerily-similar) unconstitutional-and-unlawful search of Ms. Jefferson's home, ultimately leading to Ms. Jefferson's death at the hands of Mr. Dean (see section below). The plaintiff asserts that a primary purpose of the aforecited [SCOTUS] rulings against such unconstitutional-and-unlawful searches/seizures of private/curtilage areas of private-property along with the [SCOTUS]'s prohibition on such unwarranted night-visits is not only to protect private-citizen(s)' Constitutional rights, but also to protect all parties involved (including the police) from all of the potential consequences of such unauthorized use-of-force, including, but not limited to, the possibility of police-involved shooting(s). According to the plaintiff's recorded-footage, [WCSD-JD-9] did have a body-worn-camera - and as such, such body-worn-camera should have been recording all aspects of this unconstitutional-and-unlawful search/seizure/interrogation/detention of the plaintiff and the plaintiff's private-property - unless, [WCSD-JD-9] deliberately turned-off such body-worn-camera (at any point in time) in-order-to Obstruct Justice against the plaintiff.

## ¶623

On multiple subsequent occasions in months of {2021-08},{2021-09}, [UWAPDP-1], while delivering packages to neighboring properties, walks towards the [FRONTDOOR] area to check on the packages left at the [FRONTDOOR] and/or inspect the plaintiff's [GARAGE]. Each time after conducting such unauthorized search of the plaintiff's property, [UWAPDP-1] would then approach back into his delivery-truck to

continue his work. In particular, on or about the approximate date and approximate time of {2021-08-18 15:45}, [UWAPDP-1] walks towards the [FRONTDOOR] area to check on the packages left at the [FRONTDOOR]. [UWAPDP-1] then approaches back into his delivery-truck parked at the opposite-curbside across the street from [784KLLTX78641]. [JSP], noticing [UWAPDP-1] depart from the plaintiff's [FRONTDOOR], drives his vehicle towards [UWAPDP-1]'s delivery-truck and pauses his vehicle in-order-to speak to [UWAPDP-1] - on this occasions, to spread his usual racist-propaganda and fraudulent-narratives about the plaintiff to [UWAPDP-1]. [UWAPDP-1] even responds by saying to [JSP], *"I'm not surprised."*, indicating to the plaintiff that [JSP] has successfully engendered such hatred against the plaintiff in [UWAPDP-1]. After approximately 2-minutes-worth of a dialogue with [UWAPDP-1] that, at the very least, substantially-involved smearing/character-assassinating (⏺) the plaintiff, [JSP] then continues to drive away in his new, artificially-loudened pickup-truck, while [UWAPDP-1] continues with his work.

## ¶624

On or about the approximate date and approximate time of {2021-09-08 14:00}, [UWAPDP-1] walks on the sidewalk in front of the plaintiff's property [788KLLTX78641] to, once again, take a look towards the plaintiff's [FRONTDOOR] area. [UWAPDP-1] then walks back towards his delivery-truck and drives a little further up the street, stopping across the street from the plaintiff's property. Since the plaintiff had noticed [UWAPDP-1], on numerous previous occasions, walk towards the [FRONTDOOR] in-order-to check-up on the [FRONTDOOR] area, without even wearing a face-mask as a safety precaution against COVID-19, the plaintiff feels aggravated/annoyed/alarmed and thus decides to confront [UWAPDP-1] about this privacy-invading and unabated harassment activity. [UWAPDP-1] was walking back from the front-door of the property [781KLLTX78641] across the street, when the plaintiff (while on the street) courteously announces the plaintiff's presence to [UWAPDP-1]. The plaintiff informs [UWAPDP-1] that the plaintiff noticed [UWAPDP-1] had, on multiple occasions, visited the [FRONTDOOR] just to inspect items at the [FRONTDOOR] area and/or call-out to the plaintiff. The plaintiff courteously questions [UWAPDP-1] as to the reason for such (unauthorized) activity. [UWAPDP-1] informs the plaintiff that he was concerned that he had always noticed the plaintiff's garage-door-open, and that he had always noticed multiple packages left at the [FRONTDOOR] area. The plaintiff informs [UWAPDP-1] that the plaintiff was questioned by [WCSD-JD-9] regarding an alleged complaint that the [WCSO] had received from [UWAPDP-1]. [UWAPDP-1] denies that it was a complaint, and instead, informs the plaintiff that it was merely a genuine concern for whomever was living inside the residence. [UWAPDP-1] further explains that he was not intending to harass the plaintiff by such activity, and that he would stop such activity from this point forwards. The plaintiff courteously thanks [UWAPDP-1] and walks back into the [HOUSE], while [UWAPDP-1] continues on with his work. If this Court grants the plaintiff the opportunity to litigate this case, the plaintiff would seek to depose and/or cross-examine this particular witness, [UWAPDP-1].

## ¶625

Despite the fact that the plaintiff's attorney [ATTORNEY-TK] had requested Discovery from [WCLE] on or about the date of {2021-07-01}, the plaintiff had not received any Discovery (or any evidence for that matter) on or about the approximate date and approximate time of {2021-09-15 13:00} - the date and approximate time of the first pre-trial hearing for the alleged Class-C-Misdemeanor-Public-Nuisance against the plaintiff. Since [WCLE] had not provided the plaintiff with any evidence - at best, trying to execute trial-by-ambush against the plaintiff (in total violation of the plaintiff's due-process rights), and at worst, trying to cover-up a decade of egregious police-misconduct (and health-district-misconduct) committed against the plaintiff - [ATTORNEY-TK] was forced to file 2 motions on behalf of the plaintiff with such

Justice-Court, [WCP2JotPC] - one motion-to-suppress - to suppress any alleged evidence that was illegally seized of private/curtilage (or other fourth-amendment-protected) areas of the plaintiff's property and/or to assert other affirmative-defenses such as entrapment, statute-of-limitations, exceptions-to-form-or-substance-of-the-charge and/or facial-insufficiency - and another motion-to-compel - to compel [WCLE] to turn-over to the plaintiff, all exculpatory/mitigating/impeachment evidence as required by both State and Federal law, including, but not limited to:

Ⓐ all recorded information from any of the plaintiff's accusers/complainants (past and present) dating back to {2009};

Ⓑ all complaints, allegations and records of police-misconduct, health-district-misconduct, prosecutorial-misconduct and other government-employee-misconduct from anyone (employee/officer/official) from [WCLE] that interacted with the plaintiff and/or handled any case-work about the plaintiff since the year {2009} (the initial year of the plaintiff's private-property-ownership within the County of Williamson);

Ⓒ historical statistics/demographics regarding those charged with Public-Nuisance (and/or other property-maintenance-laws) within the county; etc.

(Although both federal-law and state-law did/does require [WC] prosecutors to turn over to the plaintiff all exculpatory/mitigating/impeachment evidence regardless of whether the plaintiff explicitly requested it, state-law did require the plaintiff to explicitly file one-or-more of the aforementioned motions prior to the pre-trial hearing in-order-to protect the plaintiff's rights and assert some of those applicable affirmative-defenses.) Despite the fact that the plaintiff had already entered a plea of *"Not Guilty"* on or about the date of {2021-03-23}, [WCCAOP-CW] demanded at this pre-trial conference, almost 6 months later, that the plaintiff plead guilty to the charge without providing any evidence to the plaintiff, and without, in any way, addressing the plaintiff's motions. The Judge of such Justice-Court ruled that the plaintiff is entitled to Discovery, and planned to reschedule the pre-trial hearing to approximately one month later.

# ¶626

On or about the date and approximate time of {2021-09-16 20:00}, [JSP] while using a loud gasoline-powered string-trimmer late at nighttime to cut grass, deliberately enters into the plaintiff's property to kick one of the plaintiff's corner security cameras breaking the base of the camera which even exposed the internal wiring of the camera. According to the plaintiff's recollection, the plaintiff had purchased such high-definition/2K infrared/nightvision camera for approximately $75 on-or-about the prior year of {2015} or {2016}. The total value of damage to the plaintiff's property caused by [JSP] had already exceeded $2,500 prior to this incident. Therefore, this particular crime does not change the fact that [JSP] has already committed the crime of felony criminal-mischief against the plaintiff even prior to this point in time. It is also important to emphasize that all of [JSP]'s criminal-mischief crimes against the plaintiff are not only hate-crimes against the plaintiff based upon [JSP]'s extreme-racial-animus and homophobic-animus against the plaintiff, but also based upon [JSP]'s far-right-wing-extremist political-animus against the plaintiff (as documented by one-or-more of the relevant studies of far-right-wing-extremists in the United States - see section above). This was at least the sixth of the plaintiff's security cameras (a total of 4 ultra-high-definition/4K cameras purchased at approximately $150 plus sales-tax each, and total of 2 high-definition/2K cameras purchased at approximately $75 plus sales-tax each) that [JSP] had damaged/destroyed and at least the thirteenth of the plaintiff's security cameras that [JSP] had attempted to damage/destroy. The amounts in damages to the actual security-cameras also does not include the added/accumulated expenses to the recording-equipment

(specifically hard-disk-drive expenses) as a result of faulty/defective/damaged cameras recording faulty recordings consuming significantly larger amounts of hard-disk-space. The amounts in damages does to the actual security-cameras also does not include any-and-all damages to the [HOUSE]-fascia/soffit/rafter/gutter-structure or other mount-points for such security-cameras. The amounts in damages stated are also conservative-estimates (on the lower end - the absolute minimum in damages) due to [JSP]'s multiple attempts to damage/destroy such security-cameras, associated infrastructure, and additional expenses to the recording-equipment.

## ¶627

On or about the date and approximate time of {2021-09-26 16:23}, as [JSP] is in the side-yard of [784KLLTX78641], [JSP] looks directly at one-or-more of the plaintiff's security-camera(s) using both of his hands held up high, angrily issues the obscene/vulgar gesture of the middle-fingers raised to each of these security-camera(s). [JSP] continues walking towards the front-yard of [784KLLTX78641], and while looking directly at one-or-more of the plaintiff's other security-camera(s), uses both of his hands held up high, angrily issuing the obscene/vulgar gesture of the middle-fingers raised to each of these additional security-camera(s).

## ¶628

On or about the date and approximate time of {2021-10-10 12:00} - one day before the plaintiff, an indigenous-person, celebrates *"Indigenous Peoples' Day"* - while the plaintiff was on the plaintiff's [FRONTYARD], near the border of the two-properties, [JSP], while on the frontyard of [784KLLTX78641], approximately 30 feet away from the plaintiff, angrily states to the plaintiff that the plaintiff's tortoise is too close to his property, demanding to the plaintiff that the plaintiff should remove the tortoise. It is important to note that at this point in time, the [WCAD] property appraisal records indicate that [JSP&KAP] are no longer the owners of [784KLLTX78641]; so, [JSP] was clearly making a fraudulent statement to the plaintiff. [JSP] then makes racist, abusive and derogatory statements about the plaintiff's indigenous appearance/grooming by yelling sarcastically, *"WHY DON'T YOU JUST WEAR A RAG! THAT WOULD BE MORE APROPOS! ... LIKE TARZAN!"* 〚 MIMICS THE SOUND OF THE TARZAN YELL, AND THEN LAUGHS OUT LOUD 〛 . The plaintiff does not respond, entering back into the plaintiff's [DRIVEWAY] to continue working. [JSP] then yells out to that plaintiff, *"WHY DON'T YOU GET THOSE CAMERAS OFF MY PROPERTY! ..."* 〚 [JSP] PICKS UP A LARGE ROCK FROM [784KLLTX78641] AND THROWS IT TOWARDS ONE OF THE PLAINTIFF'S CORNER SECURITY CAMERAS. THE LARGE ROCK LANDS ON THE PLAINTIFF'S [YARD] UNDERNEATH THOSE SECURITY CAMERAS. 〛 In addition to committing yet another act of the hate-crimes of criminal-mischief/illegal-dumping and intimidation/interference/disorderly-conduct/harassment/stalking against the plaintiff, this was also [JSP]'s second fraudulent statement to the plaintiff during this incident. (σ) This incident documents only one indication of countless indications of the purely-racist fraud perpetrated by the co-conspirators - [JSP&KAP],[RSR],[WCLE] - against the plaintiff for more than a decade.

## ¶629

On or about the date and approximate time of {2021-10-27 13:00}, the second pre-trial hearing regarding the Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff commences with [WCLE], again, failing to provide the plaintiff with any evidence. During the hearing, [WCCAOP-CW] tells the plaintiff and [ATTORNEY-TK], *"We're not going to be to be wasting anymore of your time. We're going to be*

*dismissing this charge...".* It was clear from [WCCAOP-CW]'s statement made directly to the plaintiff - that he was trying to distance himself from what he knew to be the decade of racial-oppression and racketeering-activity committed by [WCLE] against the plaintiff. The fraudulent and purely-retaliatory Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff was formally dismissed by the [WC] prosecutors on a following date shortly thereafter ({2021-11-01}). It is extremely revealing to the plaintiff that the plaintiff was not provided with any evidence regarding this Class-C-Misdemeanor-Public-Nuisance criminal charge against the plaintiff. At the very least, [WCLE]'s refusal to provide any evidence to the plaintiff shows the plaintiff that whatever the [WCLE] did against the plaintiff (and plaintiff's private-property) - in conspiracy with co-conspirators [JSP&KAP],[RSR] - was such an egregious act of police-misconduct, health-district-misconduct and prosecutorial-misconduct that [WCLE] did not want to provide any information to the plaintiff to further-implicate themselves in that misconduct. Fortunately for the plaintiff, all of the relevant incidents regarding this fraudulent and purely-retaliatory criminal-charge against the plaintiff were captured by the plaintiff's security cameras and/or body-worn-camera. In this security-camera footage, the plaintiff also noticed that the [WC] police were wearing Body-Worn-Cameras (while they were on/around the plaintiff's property) - the evidence of which should, if not maliciously destroyed/tampered-with, also undoubtedly reveal further insight into the [WCLE]'s malicious, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise (along with co-conspirators [JSP&KAP],[RSR]) against the plaintiff.

# ¶630

On or about the date of {2021-11-01}, the aforementioned Justice-Court, [WCP2JotPC], issued a formal order of dismissal for the Class-C-Misdemeanor-Public-Nuisance charge against the plaintiff, thus terminating [WCLE]'s fraudulent and purely-retaliatory Class-C-Misdemeanor-Public-Nuisance prosecution of the plaintiff. At this point in time, the plaintiff is made substantially-aware (although not completely-aware) that [WCLE] engaged in this fraudulent, purely-retaliatory, Class-C-Misdemeanor-Public-Nuisance prosecution of the plaintiff not only to:

Ⓐ punish the plaintiff, for the plaintiff's *"audacity"* to report and/or record racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses aggregately committed by the defendants (including [WCLE]) against the plaintiff (for over a decade) ; AND not only to

Ⓑ obstruct justice for such serious crimes that the plaintiff had suffered from the defendants (for over a decade) ; AND not only to

Ⓒ publicly-humiliate and defame/discredit/character-assassinate the plaintiff, both an immigrant-of-color/indigenous-person and political-activist, by smearing (⊙) the plaintiff with such fraudulent Class-C-Misdemeanor-Public-Nuisance charge along with exposing, to the public, private aspects of the plaintiff's extremely-private life and/or lifestyle ; AND not only to

Ⓓ try to extort a relatively small amount of money ($131) from the plaintiff ; BUT, far more importantly, in-order-to

Ⓔ drive the plaintiff, an immigrant-of-color/indigenous-person, out of a White neighborhood, (as part of modern-day-Jim-Crow racial-segregation); AND thus

Ⓕ ultimately in a conspiracy and scheme to defraud the plaintiff out of (relatively-profitable) private-property-ownership within such White neighborhood.

The defendants knew that anti-discrimination laws (particularly, the [FHA]/[THFA] and the fourteenth-amendment ( ☆ ) to the United States Constitution) strongly-prohibit any overtly-racist actions to evict person(s)-of-color from White neighborhoods, and so, they determined that the quickest and surest way to circumvent such anti-discrimination laws and evict the plaintiff, an immigrant-of-color/indigenous-person, from such White neighborhood was through the alternative channel(s) of repeatedly and collectively engaging in the aforedescribed pattern of modern-day-Jim-Crow racial-oppression and racketeering-activity against the plaintiff, the culmination of which, was such Class-C-Misdemeanor-Public-Nuisance charge and prosecution of the plaintiff. In addition to the common goals listed above of the decade of purely-retaliatory prosecution against the plaintiff that were shared by all of the defendants, private-citizen racketeer co-defendants [JSP&KAP], [RSR] had the additional private goals of wanting to further extort money from the plaintiff by piggybacking their own private civil lawsuit(s) against the plaintiff on top of such purely-retaliatory prosecution of the plaintiff, by fraudulently claiming in such prospective civil lawsuit(s) that the plaintiff had harmed them through such Class-C-Misdemeanor-Public-Nuisance. As multiple previous incidents documented above already show, private-citizen racketeer co-defendants [JSP&KAP],[RSR] had repeatedly made directly-extortive and malicious threats to sue the plaintiff on those multiple previous occasions - see above. It was only the plaintiff's successful legal-battle against the defendants fought in-order-to dismiss the defendants' fraudulent criminal complaint against the plaintiff that put an end to any plan by racketeer co-defendants [JSP&KAP],[RSR] to follow-through on such private civil lawsuit(s). (It is a well established fact that, at least in some cases nationwide, one-or-more civil lawsuit(s) accompany fraudulent criminal complaint(s) where malicious accusers try to further exploit such fraudulent criminal complaint(s) by extorting money from their innocent accused victim(s) in such piggybacked civil-lawsuit(s).) Since the laws of the State of Texas affords victims of crimes, both restitution and victims-compensation for such crimes committed against such victims, the plaintiff further asserts that racketeer co-defendants - [JSP&KAP],[RSR] - intended to further-profit from such potential Class-C-Misdemeanor-Public-Nuisance criminal conviction against the plaintiff - once-again, by egregiously abusing the legal/justice system in such predatory manner against the plaintiff. On the other side of the equation, the law-enforcement officials of the [WCCO], the [WCCHD] and the [WCSO] - who, acting in furtherance of such corrupt-malicious-predatory-and-retaliatory conspiracy with racketeer co-defendants [JSP&KAP],[RSR], against the plaintiff, had criminally-abused the plaintiff with absolute impunity for over a decade, even flaunting themselves as untouchable racketeers towards the plaintiff - instead, found themselves, during most of the time period of their fraudulent and purely-retaliatory Class-C-Misdemeanor-Public-Nuisance charge and prosecution against the plaintiff, in the uncomfortable position of trying to hide their decade-long pattern-of-racketeering-activity and racial-oppression against the plaintiff from the [WC] prosecutors, who ended up dismissing such fraudulent and purely-retaliatory charge against the plaintiff. Specifically, the [WCCO], the [WCCHD] and the [WCSO] refused to submit to the plaintiff any evidence - inculpatory or exculpatory/mitigating/impeachment - of the *"crime"* that they accused the plaintiff of when they initially charged the plaintiff with Class-C-Misdemeanor-Public-Nuisance on-or-about the date of {2020-10-22}. The [WCCO], the [WCCHD] and the [WCSO] refused to submit any of evidence to the plaintiff, specifically because **all** of the evidence that [WCCO], [WCCHD] and the [WCSO] had captured and/or obtained about the plaintiff - in conspiracy with racketeer co-defendants [JSP&KAP],[RSR] - was highly incriminating against the defendants - of such conspiracy and associated racketeering-enterprise against the plaintiff. In particular, [WCCO], the [WCCHD] and the [WCSO] refused to submit any evidence to the plaintiff because such evidence could be used as part of federal criminal investigation(s) into these law-enforcement agencies, and because some employees/officers/officials of these law-enforcement agencies could face federal criminal investigation and/or federal criminal charges, for so-actively participating in this criminal conspiracy and associated racketeering-enterprise - along with racketeer co-defendants [JSP&KAP],[RSR] - against the plaintiff. In other words, [WCCO], [WCCHD] and the [WCSO] overtly and actively obstructed justice ([18-USC-PI-C73-§1503]) by failing to turn over to the plaintiff such highly-incriminating evidence ([18-USC-PI-C73-§1519]) - again, not for any reason having to do with the plaintiff and/or the plaintiff's private-property - but

instead, for every reason of protecting themselves from facing federal criminal investigation and/or federal criminal charges. As the record will show, although the [WC] prosecutor's offices - the [WCCAO] and the [WCDAO], who were fully aware of almost-all, if not all, of the decade of [WCLE]'s racial-oppression and racketeering-activity against the plaintiff - deliberately decided not to investigate and uncover - as they are legally-bound to do, by the Texas law that states Prosecutor's *"primary duty"* is *"to see that justice is done"* - instead, not only deliberately turning a blind-eye to the decade of [WCLE]'s racial-oppression and racketeering-activity against the plaintiff, but even more egregiously, actively working to cover-up/conceal and/or deny the existence of the decade of [WCLE]'s racial-oppression and racketeering-activity - in conspiracy with racketeer co-defendants [JSP&KAP],[RSR] - against the plaintiff. The plaintiff has thus been forced, by no choice of the plaintiff's own, to include the [WCCAO] and the [WCDAO] as secondary-defendants to this lawsuit - if nothing else, purely for the sake of declaratory-relief and injunctive-relief against these secondary-defendants (see sections concerning requested-relief below). To be clear, [WCLE] and racketeer co-defendants [JSP&KAP],[RSR] - egregiously violated and continued-to-violate the [FHA] against the plaintiff - a complaining party in numerous fair-housing-complaints and/or fair-housing-investigations dating back to {2011-08} - by engaging in the decade of such purely-retaliatory actions (including, but not limited to such purely-retaliatory prosecution) against the plaintiff, even abusing (and conspiring-to-abuse) the virtually-unlimited taxpayer-funded resources of defendant [WC] in-order-to engage in the decade of such purely-retaliatory actions (including, but not limited to such purely-retaliatory prosecution) against the plaintiff. To be clear, [WCLE] and racketeer co-defendants [JSP&KAP],[RSR] - also egregiously violated and continued-to-violate the [FHA] against the plaintiff by unlawfully *"coercing, intimidating, threatening, and interfering-with"* the plaintiff's *"exercise or enjoyment of, or on account of ⟨plaintiff's⟩ having exercised or enjoyed, or on account of ⟨numerous persons⟩ having aided or encouraged ⟨the plaintiff⟩ in the exercise or enjoyment of, any right"* guaranteed under the [FHA]. To be clear, [WCLE] and racketeer co-defendants [JSP&KAP],[RSR] - also egregiously continued to violate the [FHA], the [TFHA] and the [KKKA]:§1983 (the plaintiff's fourteenth-amendment (⭐) right to equal-protection under the law) against the plaintiff in such decade-long, egregiously racially-discriminatory housing practices (including, but not limited to, a decade of the defendants Constitutional rights violations against the plaintiff) and egregiously racially-discriminatory interpretation and enforcement of the laws of the State of Texas and egregiously racially-discriminatory interpretation and enforcement of the restrictive-covenants of the subdivision - including, but not limited to, the egregiously racially-discriminatory *"cherry-picking"* of the enforcement of the restrictive-covenants of the subdivision in-order-to advantage/favor White-American residents (such as, but not limited to, [JSP&KAP],[RSR]) and to disadvantage/disfavor at least some immigrant(s)-of-color/indigenous-person(s) (such as, but not limited to, the plaintiff) - with all of such egregiously discriminatory housing practices meant to intimidate/interfere-with/harass/threaten/blackmail/retaliate-against the plaintiff, with the defendants' ultimate goal being to drive the plaintiff out of what they considered to be *"their"* (exclusive-and-pure) White neighborhood - the most egregious type of [FHA]/[TFHA] violation. To be clear, [WCLE] and racketeer co-defendants [JSP&KAP],[RSR] - egregiously violated both the [KKKA]:§1985 and the [RIaCOA] against the plaintiff by further obstructing-justice (and further conspiring to obstruct-justice) via such retaliation - intimidating-with and retaliating-against the plaintiff - acting in the capacity of a witness to the decade of such egregious acts of racial-oppression and racketeering-activity against the plaintiff - none of the many-dozen criminal-acts (including racketeering-acts) of which were even charged, let alone prosecuted, by [WCLE], acting in such obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff with racketeer co-defendants [JSP&KAP],[RSR] - all occurring in furtherance of the defendants' ultimate conspiracy and scheme to deprive the plaintiff of the plaintiff's rights **and** defraud the plaintiff, an immigrant-of-color/indigenous-person, out of both, the plaintiff's money and the plaintiff's private-property-ownership within such White neighborhood - as aforestated, the most egregious violation of the [FHA] and the [TFHA].

## ¶631

On or about the date and approximate time of {2021-12-15 19:45} (nighttime), [JSP] is on his then rental-property, [784KLLTX78641], assembling and/or putting-together holiday-lighting on various areas of such rental-property. When the plaintiff is outside for brief moments in time, [JSP], on at least one occasion, would angrily shout at the plaintiff, although, due to the distance, it is either, unclear to the plaintiff, the exact abusive words that [JSP] is yelling at the plaintiff on this particular occasion, or the plaintiff has not had the time to review the plaintiff's security-camera-footage in-order-to carefully transcribe [JSP]'s abusive words shouted towards the plaintiff.

## ¶632

On or about the date and approximate time of {2022-01-01 19:30} (nighttime), [UWAW-2], accompanied by another Unidentified White-American woman, [UWAW-7], enter into the plaintiff's property and into the plaintiff's [FRONTPORCH], with [UWAW-7] shining her torch-light into the plaintiff's open (but unlit) [GARAGE], and into the more private-areas of the plaintiff's unlit [FRONTPORCH]. [UWAW-2] knocks on the plaintiff's [FRONTDOOR] and/or rings the plaintiff's [FRONTDOOR]-bell. Since the plaintiff had noticed that [UWAW-2] engaged in the aforedescribed malicious, conspiratorial and racist conversation against the plaintiff with the plaintiff's malicious neighbor (and defendant) [JSP], the plaintiff did not feel comfortable opening the [FRONTDOOR] and speaking with these individuals. It is unclear to the plaintiff what these individuals wanted from the plaintiff, but based upon their dialogue recorded on the plaintiff's security-camera-footage, it appeared as if they intended to interrogate the plaintiff about the plaintiff's companion-tortoises. [UWAW-2] and/or [UWAW-7] also make inappropriate and/or suspicious comment(s) about the plaintiff's numerous security-cameras. After about 2 minutes at the plaintiff's [FRONTDOOR] and recognizing that no-one is opening such [FRONTDOOR], both [UWAW-2] and [UWAW-7] walk away from the plaintiff's [FRONTDOOR], apparently disappointed that the plaintiff was unwilling to speak to them, with [UWAW-7] shining her torch-light one-or-more additional times into the plaintiff's open (but unlit) [GARAGE]. The plaintiff asserts that the plaintiff would not have faced these additional incidences of harassment and invasions-of-privacy (especially at nighttime) if not for the aforedescribed malicious and racist propaganda spread against the plaintiff by [JSP] during the night of {2021-07-24}.

## ¶633

On or about the date and approximate time of {2022-01-25 13:00}, the plaintiff takes photographs from multiple angles on the street of the plaintiff's [FRONTYARD] - a regular activity that the plaintiff performs at least once a month (and often twice a month) in-order-to protect the plaintiff from fraudulent claims made by the [HOA],[WCLE], who, in the past, have clearly acted predatorily against the plaintiff based upon the predatory demands of the plaintiff's predatory, malicious neighbors [JSP&KAP],[RSR]. As the plaintiff is at the edge of the street closest to the sidewalk opposite of the [HOUSE], [JSP] driving his very-loud pickup-truck drives up to the plaintiff, and stops right in front of the plaintiff - essentially hindering the plaintiff from taking the current photograph. The plaintiff is shell-shocked as the plaintiff does not know what [JSP] is intending to do - especially given [JSP]'s extreme-racial-animus, homophobic-animus and violent tendencies towards the plaintiff. Both the plaintiff and the truck remain relatively motionless (but with the truck still loud from running) for approximately 20 seconds, and approximately 20 seconds later, [JSP] loudly and suddenly accelerates such very-loud pickup-truck up the street, further startling and traumatizing the plaintiff, and then continues to park such very-loud pickup-truck in the driveway of [784KLLTX78641].

## ¶634

On or about the date and approximate time of {2022-02-19 14:22}, [NP] arrives as a back-seat passenger in a dark-grey-or-black-pickup-truck, then exits the running (but paused) dark-grey-or-black-pickup-truck with what appears to be a rifle and/or shotgun of some type. [NP] runs towards the front-door of [784KLLTX78641], then a few minutes later, walks back towards the running (but paused) dark-grey-or-black-pickup-truck (which the driver and/or other passengers still in the vehicle) and enters back into the back-seat. Then as the dark-grey-or-black-pickup-truck is slowly driving-away, [NP] lowers the back-seat passenger window, and yells out to the plaintiff and plaintiff's security-cameras, *"FUCK YOU, SID!"*. This fact also shows that the driver and other passengers of that vehicle (whether they are friends/relatives/associations of [NP]) are, at the very least, fully-approving of the extreme-racial-animus of [NP] against the plaintiff, further signifying the culture of racist lawlessness that the plaintiff has been suffering for more than 10 years, thanks to defendant [WC]'s actions/inactions **(σ)**.

## ¶635

On or about the date and approximate time of {2022-02-22 19:04}, [JSP] looks into one of the plaintiff's security-cameras located in the plaintiff's side-yard, and then aggressively invokes the obscene/vulgar gesture of the middle-finger pointed directly to the plaintiff's security-camera, while mumbling words of anger that are too inaudible for the plaintiff's security-cameras to pickup (at least, without any enhancement) **(σ)**.

## ¶636

On or about the date and approximate time of {2022-03-22 19:46}, [JSP] drags a step-ladder close to the fence bordering [788KLLTX78641] and [784KLLTX78641]. [JSP] extends the step-ladder and then steps onto the step-ladder in-order-to view the contents of the plaintiff's private [BACKYARD] - thus, in total violation of the plaintiff's rights. [JSP] spends a total of approximately 2 (or more) minutes on the step-ladder, shaking his head with disapproval, and pointing to items in the [BACKYARD] while mumbling words that are too inaudible for the plaintiff's security-cameras to pickup (at least, without any amplification/enhancement) **(σ)**.

## ¶637

On or about the date and approximate time of {2022-07-18 13:00}, an employee (and/or contractor) of defendant [WC] - White male, approximately 6-feet-tall, approximately 250 pounds - looks for several seconds into the plaintiff's [FRONTYARD] political yard-signs on his way to the plaintiff's [FRONTPORCH], without wearing a face-mask as a safety precaution against COVID-19, where he attaches a road-repair notice onto a bin stored on the plaintiff's [FRONTPORCH]. The employee would then walk onto the plaintiff's sideyard on his way to the neighboring property [784KLLTX78641].

## ¶638

On or about the date and approximate time of {2022-07-20 08:00}, several employees (and/or contractors) of defendant [WC] begin their road-repair of the road in front of the plaintiff's property. Throughout this entire day, [JSP]'s boat is illegally parked on the road obstructing the road-repair work despite of the fact that both [JSP&KAP] were given ample notice by defendant [WC] of this road-repair work. The [WC]

employees (and/or contractors) driving several types of contractor trucks (with the logo of defendant [WC] painted onto them) have to maneuver around the obstruction caused by [JSP]'s boat. Such road-repair work continues for several hours, and at a later point in time during the day, a [WC] employee (or contractor) drives up to [JSP]'s boat, and places another notice of repair-work onto the trailer-hitch of [JSP]'s boat.

## ¶639

On or about the date and approximate time of {2022-07-20 23:30}, [JSP] drives his loud-pickup-truck in front of his boat parked on the road. [JSP] attaches the boat to his truck, and leaves the loud-pickup-truck running for approximately 1 hour. At approximately {2022-07-21 00:30} (past midnight), drives his attached boat away in his loud-pickup-truck. This sequence of incidents is not only an example of [JSP] ignoring notices sent by the local government, but is also just one of many examples of [JSP] being inconsiderate of all of the nearby neighbors, by causing large amounts of noise in the middle of the night. These facts are particularly relevant to this case because for a period of over 10 years, defendants [JSP&KAP],[RSR] and [WCLE] fraudulently, and in the most racist manner, accused the plaintiff of being *"inconsiderate"*, solely due to what they alleged to be the plaintiff's failure and/or *"inability"* to maintain the plaintiff's private-property according to their (hypocritically-enforced) White-American standards. .

## ¶640

On or about the date and approximate time of {2022-07-21 08:00}, several White-male employees (and/or contractors) of defendant [WC] resume road-repair work in front of the [HOUSE] - now concentrating on the area of the road, that they could not previously work on due to [JSP]'s boat obstructing their work on the previous day. One of the [WC] employees (and/or contractors), walking on the sidewalk in front of the [HOUSE], stops and stares for approximately 30 seconds at the plaintiff's political yard-signs, and then continues to walk down the sidewalk, also looking into one of the plaintiff's security-cameras. A very-short amount of time later, the same [WC] employee (and/or contractor) would then point the other [WC] employees (and/or contractors) at the plaintiff's yard-signs (including the [AOC] yard-sign), sarcastically yelling out to them, *"VOTE HER FOR PRESIDENT!"*. Approximately half an hour later, several of those [WC] employees (and/or contractors) gather in front of the plaintiff's political yard-signs discussing the yard-signs and what they allege to be the large number of security-cameras on the plaintiff's property. While this lawsuit seeks to focus attention on the decade-long abuse that the plaintiff has suffered from [WCLE], the plaintiff also documents this incident since it shows a general culture of abusive, right-wing political-animus and racial-animus that seems to be shared even by some non-law-enforcement agencies of defendant [WC]. The plaintiff is also constantly amazed of the Orwellian irony of the situation - that there exists so much political-animus by what appears to be members of defendant [WC]'s working-class employees (and/or contractors) against the one segment of American politics that most-strongly advocates for genuine working-class (and union) values - namely, democratic-socialists. The plaintiff is unaware for the reason why such heavy road-repair needed to occur in the first place, as the plaintiff did not notice any significant disrepair of such roads prior to such road-repair. Additionally, as a result of the very-darker-gray (almost black) colored roads caused by such road-repair, such roads store (and thus radiate) significantly more heat during summer time, then when the roads used to be very-light-gray (almost white), prior to such road-repair. It is estimated that a significant amount of harmful, man-made global-warming is caused by artificially dark surfaces such as newly constructed/repaired blacktop roads. It is also an established fact that excessive heat causes greater long-term wear-and-tear on tires and/or hazardous conditions for such tires. Therefore, by engaging in such unnecessary road-repair, defendant [WC] is also passing further hidden cost(s) of such road-repair onto the drivers of vehicles, whose

tires will wear-out at a faster rate and/or become compromised at a faster rate - all due to the greater heat stored on such *"repaired"* roads. Finally, a significant amount of the rock-hard debris from this road-repair still remains (even a year after such road-repair) along the sidewalks of the neighborhood. The plaintiff almost always walks barefoot as a deeply held religious/cultural practice. Thus, the rock-hard debris on the side of the sidewalk causes at least some amount of pain/discomfort when the plaintiff walks barefoot over such area (for example, when irrigation sprinklers cause the sidewalk to become wet). If it is true that such road-repair occurred since defendant [WC] obtained federal funds for road-repair, then this fact does not necessarily mean that such federal money should be spent needlessly without actual necessity, with resources being needlessly consumed. The plaintiff asserts that the plaintiff is a democratic-socialist, but like most democratic-socialists, the plaintiff is strongly against unnecessary government spending and unnecessary waste of resources (material, equipment and labor). The plaintiff asserts that, at a minimum, defendant [WC] should have sent a questionnaire to the residents of the neighborhood (also informing residents about the aforementioned facts concerning roads), asking of every resident if such resident deems road-repair necessary, and only if a majority of residents voted in-favor-of such road-repair, should defendant [WC] have opted to proceed with such road-repair.

## ¶641

On or about the date of {2022-07-31} - the final day of [JSP&KAP]'s residence and/or lease of [784KLLTX78641] that is known to the plaintiff - [JSP] dumps many items from the backyard of [784KLLTX78641] onto the sideyard area of [784KLLTX78641] (in the process of loading such items onto a trailer) with at least some of the items/debris from these dumpings falling into the sideyard area of the plaintiff's property [788KLLTX78641]. For example, the plaintiff discovers that [JSP&KAP] had stored a large amount of brush - yard-cuttings from the trees/bushes - stored in the backyard of [784KLLTX78641] that [JSP] is only now removing from the backyard of [784KLLTX78641]; this fact is also important because for over 9 years, [JSP&KAP] and/or [RSR] hypocritically demanded that the [WCLE] and the [HOA] force the plaintiff to remove any-and-all items from [BACKYARD], including cut vegetation (as evidenced by the audio-recordings and email messages that the plaintiff has in the plaintiff's possession). During much of this day that [JSP] spends emptying the backyard of [784KLLTX78641], [JSP] periodically stares into the plaintiff's security-cameras, mumbling, expressing anger, presumably because neither he nor his co-conspirators [KAP],[RSR],[WCLE] and former co-conspirators [f-HOA-BoD]s[SPOA-P-BC],[SPOA-VP-AH], despite resorting to all of the many types of racial-oppression and racketeering-activity substantially documented in this lawsuit, were successfully able to evict the plaintiff out of what they had always considered to be *"their"* (exclusive-and-pure) White neighborhood.

## ¶642

As one of the final social-media-postings by [KAP] onto the *"facebook.com"* social-media-platform's 【Summerlyn】 group, [KAP] makes many extremely-revealing statements about her family's *"13+"* years of residence within the 【Summerlyn】 subdivision. Although many statements made by [KAP] in such social-media-posting are extremely-revealing, the plaintiff will dissect such statements in the order of least-revealing to most-revealing. [KAP] states that when [JSP&KAP]'s family first moved into 【Summerlyn】 , they could *"hear the cows, goats, roosters"* - all of which are animals that, according to the restrictive-covenants of the 【Summerlyn】 subdivision, no resident of the 【Summerlyn】 subdivision is allowed to have. [KAP] further states that, upon moving out of 【Summerlyn】 , and moving into her new residence in Belton (also located in Central-Texas), she hears *"roosters, goats and pass by horses, donkeys and cows"*, further explaining that hearing such animals *"makes 〈her〉 soul better."* Yet, [JSP&KAP], along with their racketeer co-defendant [RSR], repeatedly complained to the [HOA] and/or [WCLE] about the timid, shy, quiet and extremely-docile hens (not roosters) that the plaintiff had on the plaintiff's property

for a very short amount of time during the years {2014},{2015} - only to trial-run what it takes to raise poultry for agricultural purposes (since the plaintiff had recently purchased the plaintiff's agricultural-private-property during the month of {2015-03}). Additionally, [JSP&KAP], along with their racketeer co-defendant [RSR], repeatedly complained to the [HOA] and/or [WCLE] about the timid, shy, quiet and extremly-docile companion-tortoises that the plaintiff had on the plaintiff's private-property since the year {2014} - despite the fact that no rule in the ⟦Summerlyn⟧ subdivision's restrictive-covenants explicitly forbids ⟦Summerlyn⟧ residents from having companion-tortoises, and despite of the fact that many other residents of the ⟦Summerlyn⟧ subdivision did have companion-tortoises, and despite of the fact that countless, similarly-situated residents within very-similarly-deed-restricted subdivisions throughout the Austin-area did have companion-tortoises on their residential properties for at least a decade (○). One-or-more of [KAP]'s statements reveal that both [JSP&KAP] are deeply-religious people of the Christian faith, making the religion-aspect of the plaintiff's discrimination complaint against the defendants even clearer. Far more importantly, it becomes abundantly clear to the plaintiff that [JSP&KAP] fully-justified their decade of racial-oppression and racketeering-activity against the plaintiff - in conspiracy with their co-defendant racketeers [RSR],[WCLE] - based upon their strong religious convictions - a pattern of abuse of religion that is clearly evidenced by:

Ⓐ countless far-right-wing-extremist criminals, for example: Anders Behring Breivik, Timothy McVeigh, David Koresh, Frank Silva Roque, Dylann Roof, Phillip Skipper, Daniel Perry, Lori Vallow Daybell, Warren Jeffs, countless Ku-Klux-Klan members, countless Christian-Identity-Movement members, many of the far-right-wing-extremists that participated in the {2021-01-06} United-States-Capitol-Insurrection, etc.; AND

Ⓑ numerous cult-leader criminals, for example: Keith Raniere, Jim Jones, Charles Manson, etc.; AND

Ⓒ countless other individuals that commit crimes under the protection of religion, for example: Danny Masterson, Fred Neulander.

[KAP] reveals that the true reason for [JSP&KAP] to sell their ⟦Summerlyn⟧ property, [784KLLTX78641], was not, in-order-to get away from the plaintiff - as all of [JSP&KAP]'s decade of predatory racial-oppression and racketeering-activity against the plaintiff would lead any reasonable observer to believe - but rather, in-order-to *"take advantage of a (extremely-profitable real-estate) market that was making headlines and would give (them) an opportunity that (they) might not have otherwise been able to have."* For a decade, [JSP&KAP] - acting in conspiracy with co-defendant racketeers [RSR],[WCLE] - had repeatedly made numerous fraudulent complaints against the plaintiff - both to the [HOA] and to [WCLE] - and which even lead to the [HOA]'s {2017} predatory lawsuit against the plaintiff and [WCLE]'s purely-retaliatory Class-C-Misdemeanor-Public-Nuisance prosecution against the plaintiff - that the plaintiff's private-property was driving down not only their private-property's value, but also the values of all of the private-properties surrounding the plaintiff's private-property; yet, this statement clearly reveals that [JSP&KAP] made a huge profit in selling their ⟦Summerlyn⟧ property, [784KLLTX78641]. [KAP] admits that even after selling their ⟦Summerlyn⟧ property, [784KLLTX78641], on-or-about the month of {2021-08}, they continued to rent such property for a year after such moment-in-time - continuing to *"make some final memories in the home (they)'ve loved for so long."* In numerous statements, [KAP] expresses her euphoric joy and strong gratitude of the (fond) *"memories in the home"* that [JSP&KAP]'s family has *"known and loved for so long"* - having lived in such home, [784KLLTX78641], located within the ⟦Summerlyn⟧ subdivision for over 13 years - further stating that such home was a *"great place to live"* for that entire time-period - that such home, neighborhood and city *"will hold a very special place in (their) hearts."* [KAP] states that she had, on numerous occasions, cried over the thought of moving out of such

home - filled with fond memories - and that she *"cried (again) and had to pull over numerous times to bawl as 〈she〉 left one last time."* All of these extremely-revealing statements made by [KAP] stand in sharp contrast to the extremely-fraudulent-narratives that racketeer co-defendants [JSP&KAP],[RSR] and [WCLE] had been making against the plaintiff for over a decade. For over a decade, [JSP&KAP],[RSR] and [WCLE] fully exploited and capitalized-upon such extremely-fraudulent-narratives against the plaintiff, thereby using such extremely-fraudulent-narratives against the plaintiff as a fraudulent pretext to justify their decade of racial-oppression and racketeering-activity against the plaintiff - with the ultimate goal of all such predatory actions undertaken against the plaintiff being, not only to cause untold amounts of permanent, irreparable harm (deep-psychological-trauma, extreme-mental-anguish, etc.) onto the plaintiff, but also to drive the plaintiff - an immigrant-of-color/indigenous-person - out of *"their"* (exclusive-and-pure) White neighborhood, thus defrauding the plaintiff out of private-property-ownership within such White neighborhood. Of equal importance, such final social-media-posting by [KAP] also reveals the deeply respectful, gracious and hospitable manner in which [JSP&KAP] treated the other residents of the overwhelmingly-White-American neighborhood, versus the extremely malicious and predatory manner in which [JSP&KAP] treated the plaintiff (due to the plaintiff's minority-of-one racial-profile) - for over a decade. Most importantly, it brings immense pain and mental-anguish (resulting in permanent psychological trauma) to the plaintiff for the plaintiff to reveal to this Court that [JSP&KAP] thoroughly enjoyed violating the plaintiff's rights for over a decade - even having (fond) memories (as indiciated in this social-media-posting) during which they rejoiced in the violation of the plaintiff's rights - which they clearly regarded as a fun sport in which all of the defendants could joyfully participate in. The plaintiff asserts that, until the plaintiff discovers this social-media-posting in the following year ({2023}), the full range and scope of the plaintiff's injury caused by the defendants had not been made fully aware to the plaintiff.

▷  ** :  FINAL SOCIAL-MEDIA-POSTING BY [KAP] ON *"facebook.com"* [Summerlyn] GROUP:  [KAP]:  {2022-08-01}:

**Kimberly Ingalls Pargin ▸ Summerlyn in Leander**
August 1, 2022 · 🌐                                                                                        •••

Warning - long post...feel free to skip. 🙂 I think I'm putting this out there more for my benefit and peace of mind.

Hi folks...I don't personally know any of you (we're 'home bodies'...not too social anymore), but through this page, I've come to know more about the wonderful people that live in Summerlyn. I've also obtained garage door repair, mechanic repair, dump removal and received great suggestions for other services. Summerlyn is a great little community and I appreciate the pride that so many have in their properties - homeowners and renters alike.

That said, after 13+ years, the book of Summerlyn in our lives has come to a close. Our kids were 8 & 5 when we moved in - they went to Jim Plain Elementary, Wiley Middle and my daughter went her freshman year at Rouse, then moved to the "new cool high school in the area", Glenn, for the remainder of her high schooling - graduated in the inaugural class of 2019. She since went to UT-Austin and graduated a year early...just 6 days before my son graduated from Glenn too, in May of this year. I could go on and on about how many huge milestones we've experienced in our first home as a family while in Summerlyn - I'm sure it would resonate with many of you. A LOT has changed over those 13 years in the community as well, which is why we felt it was time to move on. When we first moved 'out' to Summerlyn - you could see and hear the cows, goats, roosters and coyotes. The stars were brighter and there were more of them. I had originally told our realtor I didn't want to look past Crystal Falls for our first home - but fell in love with how far out, but still close we would be here. And the house was perfect for what we were looking for. Skip ahead 12 years and the city was quickly establishing itself around us with SO much more to come. We decided to sell and take advantage of a market that was making headlines and would give us an opportunity that we might not have otherwise been able to have. We were able to negotiate a long term lease back and make some final memories in the home we've known and loved for so long. The Lord blessed us with good timing to start the next book of our lives - daughter has moved to San Antonio area for first 'big girl' job, son about to move to Waco to go to TSTC... so we're all in transition at the same time. We built a beautiful new home up the road in Belton so we'll be closer to my husband's family, but still close enough for him to drive to Austin for work if needed. On the outskirts of town...I hear roosters, goats and pass by horses, donkeys and cows...and it makes my soul better. I'm sure the 'growth' will probably follow us again, but for now, we'll be working on the new memories of these next phases of our lives.

All this to say - THANK YOU - thank you for being a great group of folks that will carry Summerlyn for many more years as an overall great place to live. This neighborhood, and Leander, will hold a very special place in our hearts. As I handed the keys over to the new owner yesterday, I cried (again) and had to pull over numerous times to bawl as I left one last time - if you saw a crying lady in a white vehicle out front of your house yesterday...sorry. 😥

Adios, au revoir, sayonara, arrivederci...see ya later alligator. Take care of Summerlyn for us! 

---

## ¶643

On or about the date and approximate time of {2022-10-15 13:00}, an unidentified package-delivery-person, [UWAPDP-2] - White-American female, approximately 5-feet-6-inches-tall, approximately 170 pounds - rings the plaintiff's [FRONTDOOR] bell. When the plaintiff answers

the [FRONTDOOR], [UWAPDP-2] states to the plaintiff that she has a package to deliver to the plaintiff requiring the plaintiff's signature. The plaintiff uses the plaintiff's finger to electronically-sign for the package, and apologizes if the signature didn't register properly. [UWAPDP-2] says that the signature was fine, hand-delivers the package to the plaintiff and then leaves. The plaintiff did not notice any unusual event or occurrence, other than the minor fact that [UWAPDP-2] noticed multiple packages in the plaintiff's front-porch area, and picked an additional package already delivered on a previous occasion to hand-deliver to the plaintiff. Within an hour of this incident, the plaintiff notices that [WCSD-O-Neil] parks his vehicle on the road in front of the plaintiff's property, walks into the plaintiff's property without wearing a face-mask as a safety precaution against COVID-19, knocks on the plaintiff's [FRONTDOOR] and/or rings the plaintiff's [FRONTDOOR] bell. [WCSD-O-Neil] said that he received a complaint from [UWAPDP-2] that she heard loud/screaming noises and/or voices-of-distress from inside and/or around the plaintiff's [HOUSE]. The plaintiff explained to [WCSD-O-Neil] that the plaintiff was the only person inside of [HOUSE] on that particular day, and furthermore, that the plaintiff had been living alone at such residence for the overwhelming majority of the almost 14 years that the plaintiff was owner of such property. [WCSD-O-Neil] asked if the plaintiff had any companion-animal whose name starting with the letter 'H', because according to him, the complainant said that someone was screaming the distress-signal of *"HELP!"*, or somebody whose name started with the letter 'H'. The plaintiff says that the plaintiff does have companion-tortoises, that such companion-tortoises live outside of [HOUSE], but none with a name starting with the letter 'H'. [WCSD-O-Neil] is satisfied with the plaintiff's response, and upon reviewing that nobody is in distress within the plaintiff's property, informs the plaintiff that he would be leaving the property. As a matter of reflexive habit and courtesy, the plaintiff thanks [WCSD-O-Neil] and closes the [FRONTDOOR]. This incident, once again, reveals that [WCLE] has, for over a decade, been laser-focused on any allegation - even if without any merit, even if without any shred of evidence - of harm that the plaintiff is alleged to have caused onto other person(s), but during that same period of time, [WCLE] has shown little-to-no concern to the decade of racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses that the plaintiff suffered from the plaintiff's former predatory neighbors [JSP&KAP],[RSR], and some other members of [WCLE] that acted in conspiracy with those predatory former neighbors - despite the fact that the plaintiff had amassed a mountain of evidence of those racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses suffered by the plaintiff. According to the plaintiff's recorded-footage, [WCSD-O-Neil] did have a body-worn-camera - and as such, such body-worn-camera should have been recording all aspects of this Unconstitutional-And-Unlawful search/seizure/interrogation/detention of the plaintiff and the plaintiff's private-property - unless, [WCSD-O-Neil] deliberately turned-off such body-worn-camera (at any point in time) in-order-to Obstruct Justice against the plaintiff. It should also be noted that this incident takes place during *"Indigenous Peoples' Week"* - the second week of October (as declared by the ⟨Texas Legislature⟩) - a weeklong event which the plaintiff, an indigenous person, celebrates.

# ¶644

At the {PRESENT-DAY}, and to the best of the plaintiff's knowledge, none of the racketeer defendants directly-involved in the decade-long, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise - ultimately meant to defraud the plaintiff out of the plaintiff's right to private-property-ownership - against the plaintiff have faced justice for those criminally-abusive and predatory actions against the plaintiff. In particular, and to the best of the plaintiff's knowledge, none of such racketeer defendants that directly-engaged in egregious acts of racial-oppression against the plaintiff within the context of this decade-long, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise (ultimately meant to defraud the plaintiff) against the plaintiff have faced justice for those criminally-abusive and predatory actions against the plaintiff. The [WC] Prosecutors of the [WCDAO] and the [WCCAO] - the same prosecutors who are legally-bound by Texas law to see that *"justice is done"* - and the same prosecutors who are at least substantially-aware, if not full-aware, of the

defendants' decade of racial-oppression and racketeering-enterprise against the plaintiff, not only deliberately turned a blind-eye to all such racial-oppression and pattern-of-racketeering-activity against the plaintiff, but even more egregiously, actively worked to cover-up/conceal such racial-oppression and pattern-of-racketeering-activity - despite of the fact that most, if not almost-all, of such racial-oppression and pattern-of-racketeering-activity has been captured by [WCLE]'s own recorded-evidence (Body-Worn-Camera, Dash-Camera, emails, phone-calls, voice-mails, sworn-statements, interviews, verbal-statements, social-media-messages, online-form-submissions, physical/electronic documents/images/forms, etc). In so doing, such [WC] Prosecutors of the [WCDAO],[WCCAO] have, at an absolute minimum, violated [TCoCP-T1-C2-A2.01], [TDRoPC-III-Rule-3.09], [TDRoPC-VIII-Rule-8.04], [TDRoPC-VIII-Rule-8.03] against the plaintiff - by not only retaliating-against the plaintiff (in conspiracy with the other defendants), but also actively obstructing justice against the plaintiff - causing untold amounts of severe-emotional-distress/psychological-trauma/mental-anguish - extreme pain-and-suffering spanning almost 3 years (in addition to the 9 years of extreme and irreparable harm caused by the other defendants acting in conspiracy against the plaintiff). Therefore, the plaintiff has been left with no choice but to, at a minimum, include the [WC] Prosecutors offices - the [WCDAO] and the [WCCAO] - as secondary-defendants in this lawsuit - only for the sole purpose of much-needed declaratory-relief and injunctive-relief (see sections below). [WC] District-Attorney Shawn Dick ("[WCDA-SD]") also has (or had) the following mission statement posted onto defendant [WC]'s website, which the plaintiff can only interpret as extremely disingenuous with respect to the plaintiff (see below). However, in fairness to [WCDA-SD], the plaintiff also partly suffered some of the racial-oppression and pattern-of-racketeering-activity documented in this lawsuit under [WCDA-SD]'s predecessor, former [WC] District-Attorney Jana Duty (now deceased).

▷ Texas Code of Criminal Procedure [TCoCP]:   Title 1:   Chapter 2:   General Duties of Officers - Art. 2.01 Duties of District Attorneys:
▷ https://statutes.capitol.texas.gov/Docs/CR/htm/CR.2.htm

*Art. 2.01. DUTIES OF DISTRICT ATTORNEYS. Each district attorney shall represent the State in all criminal cases in the district courts of his district and in appeals therefrom, except in cases where he has been, before his election, employed adversely. When any criminal proceeding is had before an examining court in his district or before a judge upon habeas corpus, and he is notified of the same, and is at the time within his district, he shall represent the State therein, unless prevented by other official duties.* **It shall be the primary duty of all prosecuting attorneys, including any special prosecutors, not to convict, but to see that justice is done. They shall not suppress facts or secrete witnesses capable of establishing the innocence of the accused.**

▷ Texas Disciplinary Rules of Professional Conduct [TDRoPC]:   III. Advocate. Rule 3.09 Special Responsibilities of a Prosecutor:
▷ https://www.txcourts.gov/media/1452745/tdrpc-effective-september-1-2021.pdf

*The prosecutor in a criminal case shall:*

*(a) refrain from prosecuting or threatening to prosecute a charge that the prosecutor knows is not supported by probable cause;*

*(b) refrain from conducting or assisting in a custodial interrogation of an accused unless the prosecutor has made reasonable efforts to be assured that the accused has been advised of any right to, and the procedure for obtaining, counsel and has been given reasonable opportunity to obtain counsel;*

*(c) not initiate or encourage efforts to obtain from an unrepresented accused a waiver of important pre-trial, trial or post-trial rights;*

*(d) make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense, and, in connection with sentencing, disclose to the defense and to the tribunal all unprivileged mitigating information known to the prosecutor, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; and*

*(e) exercise reasonable care to prevent persons employed or controlled by the prosecutor in a criminal case from making an extrajudicial statement that the prosecutor would be prohibited from making under Rule 3.07.*

*Comment:*

*Source and Scope of Obligations*

*1. A prosecutor has the responsibility to see that **justice is done**, and not simply to be an advocate. This responsibility carries with it a number of specific obligations. Among these is to see that **no person is threatened with or subjected to the rigors of a criminal prosecution without good cause**. See paragraph (a). In addition a prosecutor should not initiate or exploit any violation of a suspect's right to counsel, **nor should he initiate or encourage efforts to obtain waivers of important pre-trial, trial, or post-trial rights from unrepresented persons.** See paragraphs (b) and (c). In addition, a prosecutor is obliged to see that the **defendant is accorded procedural justice, that the defendant's guilt is decided upon the basis of sufficient evidence, and that any sentence imposed is based on all unprivileged information known to the prosecutor.** See paragraph (d). Finally, a prosecutor is obliged by this rule to take reasonable measures to see that persons employed or controlled by him refrain from making extrajudicial statements that are prejudicial to the accused. See paragraph (e) and Rule 3.07. See also Rule 3.03(a)(3), governing ex parte proceedings, among which grand jury proceedings are included. Applicable law may require other measures by the prosecutor and knowing disregard of those obligations or a systematic abuse of prosecutorial discretion could constitute a violation of Rule 8.04. ...*

▸  Texas Disciplinary Rules of Professional Conduct (TDRoPC):   VIII. Maintaining the Integrity of the Profession‹
⋄  https://www.txcourts.gov/media/1452745/tdrpc-effective-september-1-2021.pdf

...

*Rule 8.03 Reporting Professional Misconduct*

*(a) Except as permitted in paragraphs (c) or (d), a lawyer having knowledge that another lawyer has committed a violation of applicable rules of professional conduct that raises a substantial question as to that lawyers honesty, trustworthiness or fitness as a lawyer in other respects, shall inform the appropriate disciplinary authority. ...*

*Rule 8.04 Misconduct*

*(a) A lawyer shall not:*

*(1) violate these rules, knowingly assist or induce another to do so, or do so through the acts of another, whether or not such violation occurred in the course of a client-lawyer relationship;*

*(2) commit a serious crime or commit any other criminal act that reflects adversely on the lawyers honesty, trustworthiness or fitness as a lawyer in other respects;*

*(3) **engage in conduct involving dishonesty, fraud, deceit or misrepresentation;***

*(4) **engage in conduct constituting obstruction of justice;***

*(5) state or imply an ability to influence improperly a government agency or official;*

*(6) knowingly assist a judge or judicial officer in conduct that is a violation of applicable rules of judicial conduct or other law;*

*(7) violate any disciplinary or disability order or judgment;*

*(8) fail to timely furnish to the Chief Disciplinary Counsels office or a district grievance committee a response or other information as required by the Texas Rules of Disciplinary Procedure, unless he or she in good faith timely asserts a privilege or other legal ground for failure to do so;*

*(9) engage in conduct that constitutes barratry as defined by the law of this state;*

*(10) fail to comply with section 13.01 of the Texas Rules of Disciplinary Procedure relating to notification of an attorneys cessation of practice;*

*(11) engage in the practice of law when the lawyer is on inactive status, except as permitted by section 81.053 of the Government Code and Article XIII of the State Bar Rules,*

*or when the lawyers right to practice has been suspended or terminated, including but not limited to situations where a lawyers right to practice has been administratively suspended for failure to timely pay required fees or assessments or for failure to comply with Article XII of the State Bar Rules relating to Mandatory Continuing Legal Education; or*

*(12) violate any other laws of this state relating to the professional conduct of lawyers and to the practice of law ...*

⊳ **[WCDAO] Mission Statement: [WCDA-SD]:**
⊳ **https://www.wilco.org/Elected-Officials/Attorneys/District-Attorney**

*I am honored to lead the District Attorney's Office in the pursuit of justice and to fulfill the mandate to keep Williamson County safe.*

*Government is built on a system of laws, by and for the people. Whenever we allow egos, personal agendas, or politics to affect the outcome of a criminal case, we erode the public's confidence in our system of laws. We must hold those guilty of harming our society accountable, but do so fairly, honestly, and openly or we risk fracturing the public's trust.*

*My office will preserve the integrity of the criminal justice system with a staff of professional and experienced prosecutors. The District Attorney's Office will restore Williamson County's proud tradition of integrity in justice. I believe that our citizens deserve nothing less.*

# §XXI

# DEEP-SEATED CULTURE OF RACISM, SEXISM, CORRUPTION, HYPOCRISY AND IMPUNITY FOSTERED BY TOP-LEVEL LEADERSHIP OF DEFENDANT [WC]

## ¶645

During the plaintiff's residence at [788KLLTX78641] (located within the County of Williamson), the plaintiff has received a few indications (for example, reputable media reports) that the racial-oppression and racketeering-activity that the plaintiff has repeatedly suffered from [WCLE] (as substantially documented in this lawsuit) is part of larger pattern and culture of institutional-racism (and sexism), corruption, hypocrisy and impunity that is at least tacitly supported by some of the top-level leadership of defendant [WC]:

⊳ **"Texas sheriff who stars on reality show fails to publicly address sexist images posted on Facebook by one of his top officers"** :
⊳ **[The Southern Poverty Law Center] ("[SPLC]"): Kathryn Casteel: (2019-08-01)**
⊳ **https://www.splcenter.org/news/2019/08/01/texas-sheriff-who-stars-reality-show-fails-publicly-address-sexist-images-posted-facebook**
⊳ **https://www.splcenter.org/sites/default/files/tx_sheriff_emails_redacted.pdf**

August 01, 2019                                                                                           by Kathryn Casteel

## Stories about law enforcement officers disciplined for posting offensive images or words on Facebook are

SIDDHARTH KODE v. WILLIAMSON COUNTY, et al.

increasingly popping up in the news.

*This story contains images that may be upsetting to some viewers.*

In early July, a secret Facebook group was discovered where border patrol agents joked about the deaths of migrants and posted lewd comments about members of Congress. Three weeks later, two Louisiana police officers were fired after one of them wrote that U.S. Rep. Alexandria Ocasio-Cortez was a "vile idiot" and "needs a round."

But in one Central Texas county just outside of Austin, the local sheriff – a lottery-winning millionaire whose department is featured on the popular A&E network show "Live PD" – has resisted calls to publicly address complaints about racist, sexist and violent images posted by a high-ranking officer in his department.

Images found on the now-deleted Facebook page of Commander Steve Deaton, who oversees the patrol division of the Williamson County Sheriff's Department, include posts that make light of rape and murder. Some of them include photographs of scenes created with Barbies and Elf on the Shelf dolls.

One image, dated Nov. 28, 2017, depicts a black football player being dismembered at the knees by an elf with a chainsaw. An American flag is in the background. The post, apparently written by Deaton, says: "And here's the start … Our Patriotic elf grew angrier all season. He finally snapped and decided to show the NFL how he goes about taking knees for not standing during our national anthem."

Other posts show scenes in which the Elf dolls are alluding to sexually assaulting Barbies.

 **Steve Deaton** added a new photo.
November 28, 2017 · 🌐                                      •••

And here's the start......Our patriotic elf grew angrier all season. He finally snapped and decided to show the NFL how he goes about taking knees for not standing during our national anthem. #thankavet

 





☐ *Sheriff Chody liking Steven Deaton's Facebook post*







After partying hard with the elves last
night, Barbie woke up confu... See More

👍😆 3

👍 Like          💬 Comment          ➤ Share

**Steve Deaton**
December 16 · 🌐

Sticking to etiquette our elf holds the hair of his date
to the party while she pukes. Silently though he
wonders whether the roofie he slipped her earlier will
still be effective.



☐ *Screen shots of Shaw Deaton's Facebook posts.*

Some residents of this county just north of Austin, including some former department employees, find the images deeply disturbing, especially coming from one of the county's top law enforcement officers. Yet, no one knows where to turn for accountability. Appeals to Sheriff Robert Chody have gone nowhere, according to messages and emails reviewed by the SPLC.

And because Chody is an elected official who hires his own employees, the county's Commissioners Court appears to be powerless.

A woman who survived being raped on New Year's Eve – by two male acquaintances when she was in high school 30 years ago – said she felt violated all over again when she saw the images.

During the holidays, "Sarah" (her real name is being withheld to protect her privacy) stumbled upon the images shared on Facebook by Commander Deaton. One of them depicts an elf holding the hair of a Barbie that appears to have vomit on its face. The caption reads: "Sticking to etiquette our elf holds the hair of his date to the party while she pukes. Silently though he wonders whether the roofie he slipped her earlier will still be effective."

Earlier this year, Deaton was reprimanded for sexual harassment, though not for his Facebook posts.

According to a grievance filed by other officers, Deaton told about 20 officers during a shift briefing that it was his goal for one of them to have sex with a female producer of "Live PD," which began airing shows featuring the department last November.

In response, Sheriff Chody ordered a "verbal reprimand" of Deaton. In an interview with a local news

station in Austin, Chody said the department has "zero tolerance policy" for that type of conduct and that he was reaching out to "corporate human resources" for sensitivity training for his officers, as well as for himself.

Some residents believe the sheriff, who has garnered a large social media following, is more concerned about his fame on "Live PD" than managing his department.

"The more I saw, the murder scene, the date rape, I kept thinking to myself, this takes a lot of effort to make," Sarah said. "He's making outfits for them. He's thinking these thoughts and he's putting them down. It's almost like he's taking crimes against people and making a joke about it."

In one post from November 2018, an elf is shown with a ransom note while a Barbie lies nearby wrapped in tape. The caption reads: "Our elf is searching for just the right words to convince Ted he wasn't fooling around and to pay the ransom. While he didn't mind burying another body, it was time to get paid."

A screenshot of the image involving the dismemberment of a football player shows that it was "liked" by someone using Sheriff Chody's personal Facebook account as well as that of County Judge Bill Gravell, who is the chief administrative officer of the county and presides over the Commissioners Court.

A spokesperson for the sheriff's department said in an email to the SPLC that the department would have no comment for this story.





**Steve Deaton**
NOVEMBER 13, 2018

👍 Like   💬 Comment   ↗ Share

Steve's Post





☐ *Screen shots of Shawn Deaton's Facebook posts*

Some in the community say Chody's engagement with Deaton's Facebook post is concerning because of his past behavior.

In early 2001, Chody was the subject of a police brutality lawsuit while he was an officer with the Austin Police Department. The suit claimed he used excessive force against a 15-year-old black male and put him into a "full nelson" hold that caused the teen to have a seizure. According to *The Austin Chronicle*, the lawsuit was quietly settled roughly a month after Chody and his wife collected $51 million in lottery winnings.

For Rhonda Gilchrist, a licensed counselor who previously worked as the victims assistant director under the former sheriff, enough was enough when reports surfaced of Chody's lax discipline of Deaton following the incident with the "Live PD" producer in April.

"I get it," she said. "I understand cops have a macabre sense of humor. I understand that. But there's a disturbing difference between a bad joke and going through the detailed pain of setting up some of those scenarios."

Around the same time as the reprimand of Deaton, Chody fired two other officers for text messages on their private cell phones. Aaron Skinner, one of the deputies fired, said the private text thread was a place where K9 officers discussed what was going on in the department.

"A lot of those text messages were venting against the chain of command, and about what was going on," Skinner told the SPLC.

A complaint affidavit regarding Skinner's dismissal, reviewed by the SPLC, states that it was "alleged that on or before March 12, 2019, Deputy Aaron Skinner, sent electronic messages to other employees criticizing The Williams County Sheriff's Office." If true, the affidavit states, this would be in violation of the department's policy regarding "Restrictions on Behavior."

"That's all it said on my complaint affidavit," Skinner said. "I actually asked, where's the message? What

message are you talking about? I'll tell you this, as far as making any racial or any type of slurs that would offend the general public, no, we didn't direct any messages like that, like [Chody] insisted we did when he was interviewed."

Yet even though criticizing the department falls under internal policies on "restricted behavior," Deaton remains employed for outwardly racist and sexist comments and posts.

Messages reviewed by the SPLC show that Gilchrist contacted the sheriff through Facebook on April 17 and said she was disappointed in his decision to only reprimand Deaton. "Have you ever seen his Facebook post which was open to the public, he has a very disparaging view of women and some of his post were disturbing and offensive," her message reads.

Chody responded that he would like to discuss the matter further but that Gilchrist "seemed to have made a decision without all the facts already" and he hoped he trusted him as her sheriff. Gilchrist continued to send images of Deaton's posts, but Chody stopped responding.

6:33 

   



# Robert Chody

JUL 13, 2016 AT 10:19 PM

Say hi to your new Facebook friend, Robert.

1696907690

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.

APR 17 AT 7:05 PM

Very disappointed in your decision concerning your commander a reprimand? Have you ever seen his Facebook post which was open to the public
He has a very disparaging view of women and some of his post were disturbing and offensive
Should he really be a leader in Williamson County please revisit your decision

APR 17 AT 7:37 PM

I would love to discuss further but you seemed to have made a decision without all the facts already. I would've hoped for your trust as your sheriff. Sometimes we are uanable to give the full account, in this case we gave a great deal of information and still

1696907690

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.



it did not air.

😊+

APR 17 AT 8:47 PM

I voted for you and I did trust you to do right thing however whom ever did the IA investigation on Deaton failed to see the pattern of disrespect for women and victims in his Facebook post and his comments about sleeping with the producer of Live PD. You have a serious problem on your hands that transcends his flippant remarks about sleeping with female producers I will send one of the pic after this post and by the way I did look up what a #rustytrambone meant that is disgusting ! You should be embarrassed one if your leaders posted that and

many more equally disgusting post and it is indicative of a character flaw.



After partying hard with the elves last night, Barbie woke up confu... See More

👍💙 3

👍 Like        💬 Comment        ↪ Share



**Steve Deaton**
After partying hard with the elves last night, Barbie woke up confused. She couldn't understand why the elfs were so busy laughing at her and she was really wondering,,,,,what smelled so bad. #rustytrombonenext
NOVEMBER 13, 2018 🌐

👍💙 3



In Texas you have to be sober to consent so in essence this was a post about rape

There are more equally disgusting

APR 17 AT 9:13 PM

Really, he took the time to make it look like Barbie had poop under her nose? That is disgusting....

👍 1 

    Aa  

<



☐ *Screen shots of Robert Chody's Facebook messages*

The next day, Gilchrist said, Deaton's Facebook page was deleted entirely.

Sarah also decided to come forward to other public officials about the images. She emailed members of the

Commissioners Court on April 18 after the news about Deaton's reprimand surfaced and asked that his Facebook posts be taken more seriously. "Deaton took painstaking measures to create Elf on a Shelf depictions of gang rape, domestic abuse, murder, kidnapping, ISIS references, drug usage and many other scenarios to demean women," she wrote.

Only one member of the Commissioner's Court responded. Terry Cook wrote that she was also disappointed about the sheriff's response to Deaton's comments regarding the "Live PD" producer. "I thought the County could dismiss this employee of the Sheriff's dept based on our employee policy manual. But I learned on Tuesday that as a hire by an elected official, we can do nothing." Cook added, "I'm horrified that he is in a leadership position."



In response to an inquiry from the SPLC, Cook said in an email that, while the Commissioners Court has authority over the sheriff's budget, under Texas law "the sheriff, as an elected official, controls who to hire and who to terminate under his 'sphere of control.'"

"At the end of the day, I don't want to ruin this guy's life," Sarah told the SPLC. "I don't want to get him fired. He needs training, he needs something so this behavior stops. But I don't know that it ever will. I don't know that Chody will ever hold people accountable for behavior that he doesn't want them to be accountable for."

One criminology expert said Deaton's posts had the potential to undermine public trust in law enforcement.

"This is a very specific case that I'm kind of just shocked and horrified by, and that really takes a lot at this point for me," said Erin Kearns, an assistant professor in the Department of Criminology and Criminal Justice at the University of Alabama. "Posting those sorts of things, I would imagine, would make minorities in the community less likely to trust this sheriff and make women who have been sexually assaulted more hesitant to report anything to law enforcement."

As more scenarios regarding disparaging posts from law enforcement come to light, researchers are starting to find ways to collect and document each occurrence. The Plain View Project, established in 2017, identifies Facebook posts from current and former officers that contain offensive statements regarding race, religion and acceptability of violent policing, and collects them in a publicly accessible database.

"To be clear, our concern is not whether these posts and comments are protected by the First Amendment," the project's website states. "Rather, we believe that because fairness, equal treatment, and integrity are essential to the legitimacy of policing, these posts and comments should be part of a national dialogue about police."

But the Williamson County Sheriff's Department already lives in plain view on "Live PD," which has turned some of the department's figures into social media stars.

Sheriff Chody, who often tweets about the department's presence on "Live PD" and holds watch parties for the show, has amassed more than 38,000 followers on Twitter. Lt. Grayson Kennedy, one of the most frequently featured officers on the show, has more than 27,000.

"I think it does influence the public," said Gilchrist. "I don't think the public knows really what the dynamics are at the sheriff's department. I think they just see what's on the show and are like 'yeah, look how tough they are.' They don't know one side of policing is to also care about your community."

In May, following the incident with Deaton and the show's producer, the Commissioner's Court voted 3-2 to retain the contract with Big Fish Entertainment to continue shooting "Live PD," despite the concerns of some commissioners about the risks and liability for the county.

Shows like "Live PD" and "Cops" have been often criticized for targeting and exploiting people of color and the poor.

In July, Williamson County commissioners heard allegations that some of Chody's deputies used excessive force in a traffic stop and arrest in June that was featured on "Live PD." Video from the arrest shows the man pinned to the ground, being Tasered and hit by the deputies' fists, and saying he can't breathe. He is also shown unresponsive and lying in a pool of blood, according to *the Austin American-Statesman*. The man's lawyer told the newspaper that his client "suffered serious injuries for the sake of reality TV" and "had to see multiple medical specialists while in custody."

In an interview about the contract renewal with "Live PD," Sheriff Chody said, "Liability is liability no matter what, no matter whether there's a camera present or not."

*Photo by iStock*

SIDDHARTH KODE    V.    WILLIAMSON COUNTY , ET AL.

**From:** ████████████

**Sent:** Thursday, April 18, 2019 2:31 PM

**To:** commissioner1@wilco.org <commissioner1@wilco.org>

**Subject:** Williamson County Sheriff Department - Steve Deaton

Dear Commissioner Cook,

I am emailing you as a concerned resident of Williamson County. As I am sure, you are very well aware of the media surrounding the Williamson County Sheriff's Department and Commander Deaton. I took the opportunity last night to reach out in a private message to Sheriff Chody to which he has yet to reply. ████████████████████ ████████████ I am horrified at the photographs that Cmdr. Deaton created and posted on his Facebook account - which has since been deleted. I saved some of the photos when I originally viewed them, so I will be more than happy to provide if needed. Cmdr. Deaton took painstaking measures to create Elf on a Shelf depictions of gang rape, domestic abuse, murder, kidnapping, ISIS references, drug usage and many other scenarios to demean women. ████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████ I am not on a witch hunt here, I was hoping that after Sheriff Chody read my message he would have given me the courtesy of a response, but he has shown me that my concerns are not his.

Sheriff Chody is/was his friend on now deleted social media account, so each post that was made, he saw it and chose not to address the postings. There are many concerns now regarding the decision making process of the Sheriff's Department, especially since Commander Deaton only received a "verbal" reprimand for his "Live PD" behavior. I am fully aware of what a verbal reprimand is and it is nothing more than a slap on the wrist. To have Sheriff Chody go on the news yesterday and say that the department "won't tolerate" this behavior, provide a slap on the wrist and then blatantly ignore the disgusting images that one of their officers proudly parades on his social media account with not even an acknowledgement to a concerned citizen is sad and disturbing on too many levels. Is Commander Deaton the type of leader that we as tax paying residents of Williamson County deserve? I would almost bet with all certainty that if the residents were fully aware of the images depicted there would be more people complaining. I am sure that Sheriff Chody is hoping that the removal of his social media happened quickly enough yesterday that people were not able to see his images. Unfortunately I was one that did see them.

Again, I am not looking to ruin lives, I would just like to see some accountability on behalf of Sheriff Chody and Commander Deaton and maybe some remorse for this horrible behavior and lack of integrity!

Thank you for your time and your service to Williamson County. If there are any questions or you would like to see some of the photos, please advise and I will forward.

Sincerely,

████████

SIDDHARTH KODE  V.  WILLIAMSON COUNTY , ET AL.

1696907690

**From:** Terry Cook <terry.cook@wilco.org>
**Sent:** Thursday, April 18, 2019 2:45 PM
**To:** ████████████
**Subject:** Sheriff Dept Issues

████████

I'm with you 100%.  I too was disappointed with the apparent response of Chody to the incident.
Now, sending this to the press ahead of an Internal Affairs investigation is an issue with this lawyer.

I thought the County could dismiss this employee of the Sheriff's dept based on our employee policy manual.
But I learned on Tuesday that as a hire by an elected official, we can do nothing.

I'm horrified that he is in a leadership position.  One other commissioner is also angry about him.
I am planning a meeting with Chody in near future; would love
IA investigation to be completed, although this is not the only thing we will be discussing.

Be patient, let's see how this plays out.  Social media could rule in the end if the public shames.

Sincerely,


Terry Cook
Commissioner Precinct 1
Jester Annex
1801 E. Old Settlers Blvd, Suite 110
Round Rock, TX 78664
512-244-8610

**From:** ███████████████████████
**Sent:** Thursday, April 18, 2019 3:18 PM
**To:** Terry Cook <terry.cook@wilco.org>
**Subject:** Re: Sheriff Dept Issues

Dear Commissioner Cook,

Thank you for taking the time out of your busy schedule to read my email and respond.  It is refreshing to know that somebody truly listens!  ████████████████████████████████
knowing people in the Sheriff's Department in Williamson County, I am very aware of the umbrella of shelter that comes with Sheriff Chody's hires, etc.  I Also, wanted to let you know that I did send the same email to the other Commisioner's as well under separate emails.  I just wanted to be heard and you have given me that piece of mind.  I will rest on my latest emails and say my prayers that in the end what is just and right will occur.

Thank you again and Happy Easter to you and your family.

████████

**From:** ██████████████████████
**Sent:** Tuesday, April 23, 2019 5:12 PM
**To:** Terry Cook <terry.cook@wilco.org>
**Subject:** Re: Sheriff Dept Issues

EXTERNAL email: Exercise caution when opening.

Dear Commissioner Cook,

I hope that you and your family had a blessed Easter. I have been spending too much time thinking about this issue with Chody and Deaton and become more and more frustrated with the situation. ████████████████████████████████
████████████████████████████████████████████████████████████
███████████████████████ I have spoken with quite a few Williamson County residents and they like us are shocked that nothing has and probably will be done. It is a repeated belief that the reason Deaton did not get in any more trouble about the Live PD issue is because Chody told his higher ups to do "whatever needed to be done" to make sure that the department was shown on the show. Because the law enforcement world is pretty tight knit and people talk, some of the information comes from inside his own department, but because he fires people there simply because he does not like them, people are afraid to speak up. I would like to think that I could be the voice of some of them and help out, but I know my hands are tied. I wanted to send you a few of the photos that were taken from Deaton's Facebook before he took it down (in case you hadn't see them) and then I promise I will let this go and let the Lord handle it in His way. I really do appreciate your time and comments in this and know that you are doing what you can to help rectify any negative behavior that is going on in the department as well as the County. The first two photos depict a disgusting sexual act that involves feces and other demeaning acts for a woman. I had to have them both explained to me and again I was appalled. The first photo - he took the time to put a dark brown color under Barbie's nose to mimic the feces. He is a very disturbed individual and the fact that Chody saw each of these posts and never had him take them down until this issue came up makes me think the same of him.

Again, thank you for your time!

██████████

On Apr 23, 2019, at 5:29 PM, Terry Cook <terry.cook@wilco.org> wrote:

Disturbing.
After conferring with 2 lawyers, we can't (as a Court) do anything until that first lawsuit shows up.
Judge has talked with Chody and Chody claims they are following their process.  We're stuck for now.

Nothing like feeling totally helpless.

<image005.jpg>Terry Cook
Commissioner Precinct 1
Jester Annex
1801 E. Old Settlers Blvd, Suite 110
Round Rock, TX 78664
512-244-8610

## ¶646

The plaintiff asserts that former [WCS] Robert Chody's [WCS-RC] Facebook-liking of the extremely-offensive, racist, sexist Facebook postings by former [WCSO] Commander Steve Deaton [WCSO-SD] should not surprise any reasonable observer (see below). But the plaintiff finds Chief County-Commissioner Bill Gravell's Facebook-liking of this extremely-offensive, racist, sexist posting to be truly-informative and truly-revealing as to the underlying culture of institutional-racism and sexism fostered by some of even the top-level leadership of [WC].

## ¶647

The media-report states that defendant [WC]'s *"Commissioner's Court voted 3-2 to retain the contract with Big Fish Entertainment to continue shooting "Live PD," despite the concerns of some commissioners about the risks and liability for the county … In an interview about the contract renewal with "Live PD," Sheriff Chody said, "Liability is liability no matter what, no matter whether there's a camera present or not." "*. The plaintiff asserts that these truthful and very-revealing statements further indicate at least 2 crucial aspects about the thought-processes of the leadership of defendant [WC] concerning *"liability"*:

Ⓐ If there is a television-crew broadcasting (live) at least some of [WC] police operations to the public, then such (live) broadcasting could pose serious liability because [WC] police-officers, at least some of whom tend-to-operate in a not-so-legal manner, would be caught acting unlawfully on live public video;

Ⓑ In making such decision, the leadership of defendant [WC] has also clearly disregarded the taxpayers of the County of Williamson, who would be the ones paying for all of the legal consequences (either directly or indirectly) that result from defendant [WC]'s government-misconduct - which did happen as a result of defendant [WC]'s involvement with *"Live PD"* (see below).

## ¶648

Remarkably, former [WCSC-SD]'s horrifying and abusive behaviors/actions documented in the aforementioned media-report was not the only controversy that former [WCSC-SD] was allegedly directly-involved in:

> "Officers rewarded for use of force with steakhouse gift cards, former Williamson County Deputies say" ┊ (Austin American-Statesman)┊ Tony Plohetski┊ (2020-09-17)┊
> https://www.statesman.com/story/news/crime/2020/09/17/officers-rewarded-for-use-of-force-with-steakhouse-gift-cards-former-williamson-deputies-say/114052044/
>
> *Williamson County sheriff's office leaders rewarded deputies who used force on the job with steakhouse gift cards, according to two former employees, one of whom made the admission to Texas Rangers investigating the agency's aggressive tactics.*
>
> …
>
> **<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

## ¶649

Remarkably, former [WCSC-SD] was not fired by [WC] due to any of the above, but instead, former [WCSC-SD] retired from the department, thereby fully-preserving any pension/benefits that he might not have been preserved if he was fired. Perhaps even more

remarkably, former [WCSC-SD] was not the only person of questionable integrity, hired under former [WCS-RC]:

- "Williamson County Sheriff Robert Chody's history of deputy hires: How Sheriff Robert Chody hired, promoted deputies with tarnished badges" :
- ⟪KVUE-TV⟫ : Tony Plohetski : {2020-08-13} :
- https://www.kvue.com/article/news/investigations/defenders/williamson-county-sheriffs-office-robert-chody-deputies/269-534311bb-e3aa-48fd-96d8-7e364c939f39

<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

## ¶650

The plaintiff asserts that the record of, to put it mildly, extremely-controversial biring/promotion practices by former [WCS-RC] should not surprise any reasonable person that looks into former [WCS-RC]'s own history, for example, with his previous employer - the ⟪Austin Police Department⟫, [APD]:

- "The Millionaire Who Would Be Constable: Former APD cop wins lottery, settles brutality lawsuit, and embarks on dream of becoming a ... constable?" :
- ⟪The Austin Chronicle⟫ : Patricia J. Ruland : {2007-09-28} :
- https://www.austinchronicle.com/news/2007-09-28/543325/
- https://www.austinchronicle.com/media/content/543325/sparkschodyorder.pdf

<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

SIDDHARTH KODE   V.   WILLIAMSON COUNTY , ET AL.

1696907690

SEP-17-2007 MON 03:24 PM    WINDSOR @ BARTON CREEK    FAX No. 512 327 0846             P. 002

Case 1:00-cv-00474-SS    Document 19    Filed 03/28/2001    Page 1 of 10    King-1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

FILED
MAR 2 8 2001
U. S. DISTRICT COURT
BY _____ CLERK'S OFFICE
_____ DEPUTY

| | | |
|---|---|---|
| CHOYCE PERKINS, individually and as next friend of MARCUS DEWAYNE FRANK, a minor child, Plaintiff | § § § § § | |
| vs. | § § | NO. A 00 CA 474 SS |
| OFFICER ROBERT CHODY, in his official and individual capacity, and OFFICER JERRY SULLIVAN, in his official and individual capacity, Defendants | § § § § § | *March 25* |

### O R D E R

This action is brought pursuant to 42 U.S.C. § 1983 by plaintiff Choyce Perkins and her minor son, Marcus DeWayne Frank, to redress the alleged deprivation of constitutional rights by defendants Robert Chody and Jerry Sullivan, two officers of the Austin Police Department. Plaintiffs allege they were assaulted and struck without probable cause by the officers and were injured by the use of excessive force. Furthermore, plaintiff Frank alleges he was falsely arrested, subjected to malicious prosecution, subjected to an illegal search and seizure by defendants without probable cause. Defendants Chody and Sullivan filed a Motion for Summary Judgment based on the defense of qualified immunity, while plaintiffs contend genuine issues of material fact remain that render summary judgment inappropriate. After considering the case file, the applicable law, and the arguments of the parties, the Court enters the following order and opinion.

### I. Background

On August 30, 1998, plaintiff Frank, a fifteen-year-old black male, was walking home from a neighbor's house in the 6300 block of Thurgood Avenue in Austin, Travis County, Texas. At

19

1696907690

SIDDHARTH  KODE   V.   WILLIAMSON COUNTY , ET AL.

SEP-17-2007 MON 03:24 PM    WINDSOR @ BARTON CREEK    FAX No. 512 327 0846              P. 003

Case 1:00-cv-00474-SS   Document 19   Filed 03/28/2001   Page 2 of 10    *Kitg-2*

10:34 p.m. that evening, the 911 emergency center received a call reporting a fight between a young black male and young black female in the vicinity of 6316 Thurgood. The caller stated the combatants had left in a green car, but had returned and resumed fighting. Responding to the 911 call, defendant Chody was dispatched to the area, and saw a young black male and young black female standing in the middle of the road. *See Defendant's Motion for Summary Judgment, Exhibit 8, Affidavit of Robert Chody*. At 10:40 p.m., Chody reported he was on the scene, and then radioed he had found a suspect, which made him the primary officer.

The parties offer widely differing views as to what occurred next. According to Chody, it seemed to him that the black female pointed to the black male, later identified as plaintiff Frank, who began to walk away. Chody contends he requested Frank to "come here", but Frank continued to walk away. At one point, Frank turned around facing Chody and "flailed his arms in the air", stating he did not do anything. *Id.* Chody then proceeding to grab Frank's arm, and a struggle ensued, with Chody placing Frank in a full-nelson hold. While holding Frank in this manner, Chody contends he walked Frank approximately 30 feet back to the patrol car, and put him face down over the hood. Frank, on the other hand, contends he did not see a police car and did not hear anyone tell him (to "come here"), and thus his first indication he was being pursued by Chody was when he was grabbed in a bear hug by Chody. *See Plaintiff's Response, Exhibit 1, Deposition of Marcus DeWayne Frank.* Then, Frank contends he was lifted up by Chody, held in a full-nelson hold, and slammed onto the hood of the car. Frank further contends that Chody did not speak to him prior to being placed in a full nelson, and the first indication he had that he was attacked by a police officer was when he was slammed onto the hood of the police vehicle. *Id.*

-2-

1696907690

SIDDHARTH KODE   V.   WILLIAMSON COUNTY, ET AL.

SEP-17-2007 MON 03:25 PM    WINDSOR @ BARTON CREEK    FAX No. 512 327 0846              P. 004

Case 1:00-cv-00474-SS    Document 19    Filed 03/28/2001    Page 3 of 10    King-3

Approximately one minute later, as a crowd of onlookers had congregated, Chody engaged

his emergency button, and an Officer Needs Assistance ("ONA") dispatch was sent to other units.

It is undisputed that, around this time, a black female told Chody "that's not him," and that Chody

responded with a statement, "that ain't him[?]" (or words to that effect) that indicated he had heard

the black female. Frank also expressed his opinion that Chody had mistaken him for somebody else,

and tried to break free from the full-nelson hold.. After another struggle that spilled over onto the

adjacent yard, Chody was on one knee, with Frank on both knees and still in Chody's grasp. At this

point, Frank asked someone in the crowd to get his mother, plaintiff Perkins.

When Perkins arrived, she heard Frank calling for her and heard Chody instruct her to stay

back or get down. *Plaintiffs' Response, Exhibit 4, Deposition of Choyce Perkins; see also

Defendants' Motion, Exhibit 8.* There is no indication she said anything to Chody, but rather

instructed Frank to do what Chody told him to do. At that point, Frank relaxed a little, but began

to convulse and shake. Perkins then informed Chody that her son was having a seizure, which he

prone to do when in a stressful situation such as the one he was in. *Plaintiffs' Response, Exhibit 4.*

Chody then released Frank from the full-nelson hold but continued to hold Frank down, in part due

to the suspicion that Frank may be bluffing a seizure in order to be released from Chody's grasp.

*Defendant's Motion, Exhibit 8.*

Right after Perkins had approached the scene, defendant Sullivan was the first backup unit

to arrive. Chody reported to Sullivan that Frank was having a seizure. Perkins states she was

standing more than seven feet away from Chody – and did not approach closer than this at any time.

In contrast, Sullivan contends he saw Perkins standing within close proximity of Chody, and that her

hands were six inches to twelve inches from Officer Chody's gun. *Defendants' Motion, Exhibit 7.*

-3-

At this time, however, Sullivan states he was at least 30 feet away from the scene. *Id.* Based on his observation of Perkins near Chody, and that he was responding to an ONA dispatch, Sullivan states he believed Chody was in danger from Perkins and quickly approached, although Perkins had not moved in this time. *Plaintiff's Response, Exhibit 5, Deposition of Jeremiah Sullivan.*

Without further investigation upon arriving at the scene, Sullivan struck Perkins with his SL-20 flashlight in the right buttock/thigh area and then pushed her to the ground with his left hand. *Defendant's Motion, Exhibit 7.* Chody, who observed Perkins getting knocked to the ground, but did not actually see Sullivan strike Perkins, told Sullivan, "Not her. The crowd." indicating to him that Perkins was not a source of danger. *Id.* Perkins swears she was unaware of any officers at the scene (other than Chody), any sirens, or flashing lights, and that Sullivan said nothing to her before striking her. *See Plaintiffs' Response, Exhibit 4.* When she asked Sullivan why he struck her, Perkins contends she heard Chody tell him "she's not doing anything." *Id.*

Defendants then called EMS to the scene, and issued a "Code 4," indicating to other officers that they were no longer needed and the situation was under control. *See Defendant's Motion, Exhibit 4.* Plaintiffs refused transport to the hospital, but were treated for injuries by EMS. After speaking with his supervisor and an arrest review detective, Chody arrested Frank for the offense of evading arrest. Frank contends he suffered bruised ribs and severe psychological problems as a result of defendants' actions, which have forced him to see a psychiatrist and negatively affected his ability to sleep at night. Furthermore, upon his arrest, Frank was taken to Gardner Betts Juvenile Detention Center by defendants Chody and Sullivan, and was forced to defend himself in Juvenile Court, though that charge was subsequently dropped by Christopher Duggan, an assistant district attorney for Travis County.

-4-

King-5

## II. Summary Judgment Standard

Summary judgment may be appropriate if the moving party shows there is no genuine issue of material fact, and it is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). When considering a summary judgment motion, the Court should "construe all facts and inferences in the light most favorable to the nonmoving party." *Hart v. O'Brien*, 127 F.3d 424, 435 (5th Cir. 1997), *cert. denied*, 525 U.S. 1103 (1999). Summary judgment is not appropriate if there is a genuine factual dispute, i.e., when a reasonable jury could return a verdict for the nonmovant based on the record evidence before the Court. *Crowe v. Henry*, 115 F.3d 294, 296 (5th Cir. 1997); *see also James v. Sadler* , 909 F.2d 834, 837 (5th Cir. 1990).

Both the movant and the nonmoving party bear burdens of producing evidence in the summary judgment process. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). First, the movant must show that "if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof." *Hart*, 127 F.3d at 435, *citing Celotex*, 475 U.S. at 325. At that point, the burden shifts to the nonmoving party to establish "specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings." *Id.*; *see* FED. R. CIV. P. 56(e); *Anderson*, 477 U.S. at 250. However, "[n]either conclusory allegations nor unsubstantiated assertions will satisfy the nonmovant's burden." *Wallace v. Texas Tech Univ.*, 80 F.3d 1042, 1047 (5th Cir. 1996).

## III. Discussion

### A. Qualified Immunity

Defendants have moved for summary judgment on the grounds defendants Chody and Sullivan, both officers of the Austin Police Department acting within the scope of their employment,

-5-

are entitled to qualified immunity. The doctrine of qualified immunity shields a government official from civil liability for damages based upon the performance of discretionary functions if the official's acts were objectively reasonable in light of clearly established law at that time. *Harlow v. Fitzgerald*, 457 U.S. 800 (1982); *see Thomson v. Upshur Co.*, 2001 WL 258032 (5th Cir., March 15, 2001). When, as in this case, the defendants plead qualified immunity and show employment in a position involving the exercise of discretion, the burden is on the plaintiff (or plaintiffs) to rebut the defense by establishing the officials' allegedly wrongful conduct violated "clearly established law." *Pierce v. Smith*, 117 F.3d 866, 871-72 (5th Cir. 1997); *see also Salas v. Carpenter*, 980 F.2d 299 (5th Cir. 1992).

The Court must analyze the affirmative defense of qualified immunity using the two-prong test as outlined by the Supreme Court in *Siegert v. Gilley*, 500 U.S. 226 (1991). In the first prong, the Court must determine whether plaintiffs have alleged the violation of a clearly established federal constitutional or statutory right. *Hare v. City of Corinth*, 135 F.3d 320, 325 (5th Cir. 1998). If so, the Court then must determine whether the defendant's (or defendants') conduct was objectively reasonable in light of clearly established law. *Id.* at 326. "Clearly established" is defined in this Circuit that the constitutional or statutory right must be sufficiently clear so that a reasonable official understands that his action violates that right. *See Anderson v. Creighton*, 483 U.S. 635 (1987). Because the focus of qualified immunity analysis is on the objective reasonableness of the defendant's acts, a particular defendant's subjective state of mind is not relevant. *Thomson v. Upshur Co.*, 2001 WL 258032 at *5. Therefore, "[e]ven law enforcement officials who 'reasonably but mistakenly [commit a constitutional violation]' are entitled to immunity." *Hunter v. Bryant*, 502 U.S. 224 (1991); *see Goodson v. City of Corpus Christi*, 202 F.3d 730 (5th Cir. 2000).

-6-

Case 1:23-cv-01223-RP   Document 1   Filed 10/10/23   Page 801 of 944

1696507690

SIDDHARTH  KODE   V.   WILLIAMSON  COUNTY , ET AL.

SEP-17-2007 MON 03:25 PM    WINDSOR @ BARTON CREEK    FAX No. 512 327 0846        P. 008

Case 1:00-cv-00474-SS    Document 19    Filed 03/28/2001    Page 7 of 10

Kiy-7

### J. Officer Sullivan

In the defendants' motion for summary judgment, Sullivan argues he is entitled to qualified immunity from plaintiff Perkins' allegations of excessive force. Also, he argues any causes of action brought by plaintiff Frank against him should be dismissed, as there is no evidence in the record that would substantiate Frank's claims of false arrest, malicious prosecution, illegal search and seizure, or excessive force against him. The Court agrees with Sullivan to the extent that the record does not contain any evidence to support Frank's claims against him. The Court disagrees with Sullivan, however, by holding that Sullivan is not entitled to qualified immunity from plaintiff Perkins' allegations of excessive force because several genuine issues of material fact remain that preclude summary judgment.

To succeed on a claim of excessive force, the plaintiff bears the burden of showing an injury which resulted directly and only from the use of force that was clearly excessive to the need, and that the force used was objectively unreasonable." *Goodson v. City of Corpus Christi*, 202 F.3d 730, 740; *see also Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999). In this case, it is undisputed that Perkins suffered an injury when she was struck in the thigh/buttock area by Sullivan and was knocked to the ground. Sullivan contends the force applied was not clearly excessive to the need, and that is was not objectively unreasonable based on the circumstances as he saw them – i.e., responding to an ONA call, observing defendant Chody grappling with Frank, and seeing Perkins in proximity to Chody.

The Court finds that genuine issues of material fact remain as to the excessiveness of force applied by Sullivan, and whether the use of such force was objectively unreasonable. Sullivan contends he observed Perkins to be within six to twelve inches of Chody's firearm, but this

-7-

observation was made when Sullivan was almost 30 feet away from the scene. Both Perkins and Chody, however, attest that Perkins was either seven or eight feet away from Chody, and all parties agree she did not move toward Chody. Furthermore, it is undisputed that Sullivan did not say anything to Perkins or investigate before swinging – and striking – Perkins with the flashlight and knocking her to the ground. The testimony in the record from defendant Chody indicates he was not concerned about Perkins at all, and did not realize Sullivan was on the scene until he saw Perkins hit the ground, at which time he informed Sullivan that Perkins was not a threat. As it is indeed plausible for a reasonable fact finder to find for plaintiffs on Perkins' excessive force claim based on the record, this Court denies defendants' motion for summary judgment on this issue.

2. Officer Chody

There are no allegations or causes of action asserted by plaintiff Perkins in her individual capacity against defendant Chody; instead, all of the claims against Chody arise from his actions towards plaintiff Frank, Perkins' minor child. The asserted causes of action are false arrest, malicious prosecution, unreasonable search and seizure, and excessive force. Chody asserts he is entitled to qualified immunity from these claims, and moves for summary judgment. The Court disagrees, and finds instead that genuine issues of material fact remain that require a denial of summary judgment.

Because the facts surrounding the claims of false arrest, malicious prosecution, and unreasonable search and seizure are intertwined, the Court addresses these issues together. It is undisputed that Chody was responding to a 911 call reporting a fight between a young black male and young black female, and that Frank, a fifteen-year-old black male, was in the vicinity of where the fight had allegedly occurred. Chody contends these facts by themselves created a valid

-8-

1696907690

SIDDHARTH  KODE  v.  WILLIAMSON  COUNTY,  ET  AL.

SEP-17-2007 MON 03:26 PM    WINDSOR @ BARTON CREEK    FAX No. 512 327 0846    P. 010

King

reasonable suspicion that Frank was either a suspect or could provide information regarding the fight. When Chody approached the area, he spotted Frank and a young black female in the street, and it appeared to him that the latter gestured towards Frank. In his deposition testimony, however, Chody states he saw only a "real quick faint point" by the female from nearly 100 feet away, and the female stated later that she was gesturing to Chody to have him approach her, not Frank.

Chody also states he observed Frank walking in "normal fashion," and that his only response to Chody was to raise his hands in the air. *See Plaintiff's Response, Exhibit 2.* While Chody claims he verbally instructed Frank to "come here" and that Frank saw the police car (and Chody's uniform), both of these assertions are disputed by Frank. Indeed, Frank swears he did not hear Chody, and first became aware Chody was a police officer when Chody had him in a full-nelson and placed his head on the police car. After Chody had Frank in a submissive posture, i.e., the full-nelson, he admits he was told by bystanders that Frank was not the individual Chody was seeking in relation to the 911 call, and that Chody responded by asking "not him?". It is undisputed, however, that Chody continued to wrestle Frank to the ground, and did not release Frank from the full-nelson until Frank began suffering from a seizure; even then, Chody did not let Frank go fully but rather only relaxed the grip on him.

The record clearly indicates Frank was arrested by defendants Chody and Sullivan and taken in custody to the juvenile detention facility for evading detention. Also, the record contains the order of dismissal from the state court proceeding against Frank. *Plaintiff's Response, Exhibit 3.* There remains a material dispute as to whether Frank was evading detention, as Frank's testimony indicates he was unaware of Chody's presence until he was apprehended. Furthermore, the record is ambiguous as to whether Chody had probable cause to arrest Frank, especially given the fact Chody

-9-

Case 1:00-cv-00474-SS    Document 19    Filed 03/28/2001    Page 10 of 10

was aware during – if not before -- the struggle with Frank that he was not a suspect to the 911 call. Indeed, Chody admits there was a question in his mind, and in the mind of his supervisor, as to whether there was probable cause to arrest Frank. *Plaintiff's Response, Exhibit 4.*

Finally, the Court considers the excessive force claim against defendant Chody. Chody argues that even if the plaintiffs' descriptions of the facts are accurate, he is entitled to qualified immunity because the force he applied was not excessive to the need and was objectively reasonable. The Court disagrees for several reasons. First of all, there is a material dispute as to whether Frank was even aware of Chody's presence until Chody had grabbed him, and as to the force applied by Chody when he pushed Frank onto the police car. Furthermore, the record reflects a dispute as to whether Frank ever resisted arrest -- at most, he attempted to escape after Chody was informed by others that he had mistaken Frank for someone else -- or did anything to warrant the continuous use of a full nelson hold until he suffered a seizure.

For the foregoing reasons, the Court enters the following order:

IT IS ORDERED that Defendants' Motion for Summary Judgment [#14] is DENIED, subject to being reasserted as a Rule 50 motion at the appropriate time during trial.

SIGNED this the 28ᵗʰ day of March 2001.

_____
UNITED STATES DISTRICT JUDGE

SEP-17-2007 MON 03:26 PM      WINDSOR @ BARTON CREEK      FAX No. 512 327 0846         P. 012
CM/ECF LIVE - U.S. District Court:txwd - Docket Report                        Page 4 of 4

K-11

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 09/11/2007 11:26:23 | | | |
| PACER Login: | ac1556 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:00-cv-00474-SS |
| Billable Pages: | 2 | Cost: | 0.16 |

# ¶651

The fact that former [WCS-RC] was hired by defendant [WC] as a [WC]-Police-Officer (approximately 2 decades ago) after the alleged [APD] police-brutality incident directly-involving former [WCS-RC] - with the alleged victim of such incident being an African-American teenager - is also truly-informative and truly-revealing not only regarding the hiring policies/practices of defendant [WC], but also regarding the culture of policing at [WCLE]. The then-[WC]-Police-Officer would run for and win election for [WC]-Constable-Precinct-1, serving in that position from {2009} through {2016} (according to publicly available information). The then [WC]-Constable-Precinct-1 would then run for [WC]-Sheriff, win the election, serve as [WCS] from {2017} through {2020}, and then lose his subsequent {2020} re-election campaign, with at least some media report(s) attributing his election-loss mainly to all of the fallout from the death of African-American man Javier Ambler at the hands of [WCSD]s - much (or all) of which was allegedly video-recorded during the taping of the police reality television show 《Live PD》. [WCS-RC] was charged with felony evidence-tampering, a type of racketeering-act, for allegedly participating-in and/or ordering the destruction of one-or-more pieces evidence of the aforementioned incident. [WCS-RC] was photographed smiling in the mugshot taken for such felony evidence-tampering charge. In addition to such alleged evidence-destruction, the [WCSO] has also allegedly refused to release body-worn-camera-recordings of multiple incidents involving alleged excessive-use-of-force. The plaintiff asserts that former [WCS-RC] would, more-likely-than-not, never have become [WC]-Constable-Precinct-1 or [WC]-Sheriff if he was not initially hired by defendant [WC] as a [WC]-Police-Officer approximately 2 decades ago (following the aforedescribed [APD] police-brutality incident):

- "Texas sheriff and former county attorney indicted on evidence tampering charges in Javier Ambler's death, a Black man who died during arrest" :
- 《Cable News Network》 [CNN] : Ashley Killough, Raja Razek : {2020-09-29} :
- https://edition.cnn.com/2020/09/29/us/javier-ambler-death-evidence-tampering-charge-trnd/index.html

**<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

# ¶652

To reiterate, according to publicly available information, after his resignation from the [APD] (following the aforementioned police-brutality incident over 2 decades ago), [WCS-RC] was employed as a:

Ⓐ [WC]-Police-Officer from the years {2004} through {2008} ; AND

Ⓑ [WC]-Constable-Precinct-1 (elected official) from the years {2009} through {2016} ; AND

Ⓒ [WC]-Sheriff (elected official) from the years {2017} through {2020}.

Over the course of those 16 years from {2004} through {2020}, [WCS-RC] donated at least $109,654 - although more-likely-than-not, far more than that amount (since the records posted below are, more-likely-than-not, to be incomplete) - of publicly-disclosed political-donations exclusively to (either local, state or federal):

Ⓐ Republican Party ; AND/OR

Ⓑ Republican Party Candidates ; AND/OR

Ⓒ Republican Party Political-Action-Committee(s).

According to such publicly-disclosed political-donation records, despite being a regular public-donor to such Republican Party causes, [WCS-RC] stopped publicly-donating to such Republican Party causes approximately around the same time he was charged with the felony of Evidence-Tampering on-or-about the month of {2020-09}:

SIDDHARTH KODE V. WILLIAMSON COUNTY, ET AL.   1696907690

- "Donor Lookup" :
- [OpenSecrets] : requests@crp.org: [2023-10-07]:
- https://www.opensecrets.org/donor-lookup/results?name=Robert+Chody&order=desc&sort=0
- https://www.opensecrets.org/donor-lookup/results?name=Robert+Chody&order=desc&page=2&sort=0

| Category | Contributor | Employer | Occupation | Date | Amount | Recipient | Recipient Jurisdiction |
|---|---|---|---|---|---|---|---|
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78613 | BLANK | SHERIFF | 08-17-2020 | $301 | GEORGETOWN AREA REPUBLICAN WOMEN PA | TX |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | RETIRED | RETIRED | 03-27-2020 | $1,000 | WILSON, TERRY (R) | TX |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | SHERIFF | 03-06-2020 | $1,000 | VALDEZ, LUCIO (R) | TX |
| Money to Candidates | CHODY, ROBERT JOHN MR CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 03-02-2020 | $2,800 | John Carter (R) | Federal |
| Money to Candidates | CHODY, ROBERT AUSTIN, TX 78717 | WILLIAMSON COUNTY | SHERIFF | 02-14-2020 | $1,000 | BERRY, JUSTIN (R) | TX |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | SHERIFF | 01-31-2020 | $153 | WILLIAMSON COUNTY REPUBLICAN PARTY | TX |
| Money to Candidates | ROBERT CHODY CAMPAIGN ACCOUNT CEDAR PARK, TX 78630 | BLANK | | 01-06-2020 | $2,500 | WILLIAMSON COUNTY REPUBLICAN PARTY | TX |
| Money to Candidates | CHODY, ROBERT AUSTIN, TX 78717 | BLANK | | 12-21-2019 | $100 | BERRY, JUSTIN (R) | TX |
| Money to Candidates | CHODY, ROBERT AUSTIN, TX 78717 | BLANK | | 12-21-2019 | $100 | BERRY, JUSTIN (R) | TX |
| Money to Candidates | CHODY, ROBERT AUSTIN, TX 78717 | WILLIAMSON COUNTY | SHERIFF | 09-27-2019 | $550 | SCHWERTNER, CHARLES J (R) | TX |
| Money to Parties | CHODY, ROBERT CEDAR PARK, TX 78613 | WILLIAMSON COUNTY | SHERIFF | 02-07-2018 | $900 | Republican Party of Williamson County (R) | Federal |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | SHERIFF | 01-30-2018 | $1,500 | WILLIAMSON COUNTY REPUBLICAN PARTY | TX |
| Money to Candidates | CHODY, ROBERT ROUND ROCK, TX 78664 | WILLIAMSON COUNTY | SHERIFF | 09-25-2017 | $2,000 | SCHWERTNER, CHARLES J (R) | TX |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE PCT 1 | 11-11-2016 | $250 | WILLIAMSON COUNTY REPUBLICAN PARTY | TX |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | PEACE OFFICER | 11-02-2016 | $5,000 | ABBOTT, GREG (R) | TX |
| Money to Candidates | CHODY, ROBERT ROUND ROCK, TX 78664 | WILLIAMSON COUNTY | SHERIFF | 09-19-2016 | $1,500 | SCHWERTNER, CHARLES J (R) | TX |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE PCT 1 | 09-18-2016 | $300 | WILLIAMSON COUNTY REPUBLICAN PARTY | TX |
| Money to Parties | CHODY, ROBERT JOHN MR CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | PEACE OFFICER | 04-22-2016 | $5,000 | National Republican Congressional Cmte (R) | Federal |
| Money to Parties | CHODY, ROBERT CEDAR PARK, TX 78613 | WILLIAMSON COUNTY | CONSTABLE | 03-29-2016 | $500 | Republican Party of Williamson County (R) | Federal |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE PCT 1 | 02-09-2016 | $400 | WILLIAMSON COUNTY REPUBLICAN PARTY | TX |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE PCT 1 | 02-09-2016 | $5,000 | WILLIAMSON COUNTY REPUBLICAN PARTY | TX |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | Williamson County Precinct 1 | CONSTABLE | 10-20-2015 | $500 | GONZALES, LARRY (R) | TX |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 08-22-2015 | $2,500 | SCHWERTNER, CHARLES J (R) | TX |
| Money to | CHODY, ROBERT | WILLIAMSON COUNTY | PEACE OFFICER | 07-15-2015 | $1,000 | DALE, TONY (R) | TX |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Money to Candidates | CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | PEACE OFFICER | 07-15-2015 | $2,700 | Steve Scalise (R) | R |
| Money to Candidates | CHODY, ROBERT JOHN MR CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 06-25-2015 | $2,700 | John Carter (R) | Federal |
| Money to Candidates | CHODY, ROBERT CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | PEACE OFFICER | 04-01-2015 | $2,700 | Steve Scalise (R) | Federal |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | PEACE OFFICER | 04-01-2015 | $2,300 | Steve Scalise (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>AUSTIN, TX 78717 | | | 09-18-2014 | $250 | SCHWERTNER, CHARLES J (R) | TX |
| Money to PACs | CHODY, ROBERT JOHN<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 08-18-2014 | $5,000 | CARTER PAC (R) | Federal |
| Money to Candidates | CHODY, BEVERLY & ROBERT<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | PEACE OFFICER | 08-15-2014 | $5,000 | ABBOTT, GREG (R) | TX |
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 08-02-2014 | $1,000 | DALE, TONY (R) | TX |
| Money to Parties | CHODY, ROBERT JOHN MR<br>CEDAR PARK, TX 78630 | | | 05-30-2014 | $5,000 | National Republican Congressional Cmte (R) | Federal |
| Money to Candidates | CHODY, ROBERT JOHN MR<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 05-05-2014 | $2,600 | John Carter (R) | Federal |
| Money to Candidates | CHODY, BEVERLY & ROBERT<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | PEACE OFFICER | 12-16-2013 | $1,000 | ABBOTT, GREG (R) | TX |
| Money to Candidates | CHODY, ROBERT JOHN MR<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 11-22-2013 | $2,500 | John Carter (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY<br>PCT 1 | | 11-19-2013 | $500 | GONZALES, LARRY (R) | TX |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78664 | WILLIAMSON COUNTY | CONSTABLE | 09-24-2013 | $500 | SCHWERTNER, CHARLES J (R) | TX |
| Money to Candidates | CHODY, ROBERT<br>, 00000 | WILLIAMSON COUNTY | CONSTABLE | 06-27-2013 | $250 | DALE, TONY (R) | TX |
| Money to Candidates | CHODY, ROBERT<br>AUSTIN, TX 78717 | WILLIAMSON COUNTY | ELECTED LAW ENFORCEMENT OFFICIAL | 10-19-2012 | $1,000 | Mitt Romney (R) | Federal |
| Money to Candidates | ROBERT, CHODY<br>AUSTIN, TX 78717 | WILLIAMSON COUNTY | CONSTABLE PCT 1 | 09-20-2012 | $500 | SCHWERTNER, CHARLES J (R) | TX |
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 09-20-2012 | $1,000 | DALE, TONY (R) | TX |
| Money to Candidates | CHODY, ROBERT JOHN MR<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 03-08-2012 | $2,500 | John Carter (R) | Federal |
| Money to Candidates | CHODY, ROBERT JOHN<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | PEACE OFFICER | 02-27-2012 | $500 | SCHWERTNER, CHARLES J (R) | TX |
| Money to Candidates | CHODY, ROBERT J MR<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 10-31-2011 | $2,500 | John Boehner (R) | Federal |
| Money to Candidates | CHODY, ROBERT J MR<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 10-31-2011 | $2,500 | John Boehner (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | | | 09-13-2011 | $250 | DALE, TONY (R) | TX |
| Money to Candidates | CHODY, ROBERT JOHN MR<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 06-17-2011 | $2,500 | John Carter (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | ELECTED CONSTABLE | 08-12-2010 | $2,000 | PERRY, JAMES RICHARD (RICK) (R) | TX |
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | RETIRED | RETIRED | 07-28-2010 | $2,400 | Dennis Ross (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | | INFORMATION REQUESTED | 07-23-2010 | $2,400 | Andy Harris (R) | Federal |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Money to Candidates | CHODY, ROBERT J MR<br>CEDAR PARK, TX 78630 | RETIRED | RETIRED | 07-23-2010 | $2,400 | Allen B West (R) | Federal |
| Money to Candidates | CHODY, ROBERT J HON<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | CONSTABLE | 09-23-2009 | $250 | Michael Williams (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | WILLIAMSON COUNTY | | 09-19-2008 | $2,000 | DANIEL, BRYAN (R) | TX |
| Money to Candidates | CHODY, ROBERT J MR<br>CEDAR PARK, TX 78630 | RETIRED | RETIRED | 09-15-2008 | $2,300 | John McCain (R) | Federal |
| Money to Parties | CHODY, ROBERT<br>CEDAR PARK, TX 78613 | WILLIAMSON COUNTY | CONSTABLE | 09-09-2008 | $2,500 | Republican Party of Williamson County (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>AUSTIN, TX 78717 | | | 03-03-2008 | $1,000 | SULLIVAN, VIVIAN (R) | TX |
| Money to Candidates | CHODY, ROBERT<br>CEDAR PARK, TX 78630 | SELF EMPLOYED | LAW ENFORCEMENT | 12-07-2007 | $1,500 | DEWHURST III, DAVID H (R) | TX |
| Money to Candidates | CHODY, ROBERT J<br>ROUND ROCK, TX 78681 | WILLIAMSON COUNTY | PEACE OFFICER | 09-13-2007 | $1,500 | John Carter (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | | WILLIAMSON COUNTY | 10-05-2004 | $500 | Jim Bunning (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | WILLIAMSON COUNTY | PEACE OFFICER | 10-01-2004 | $500 | Randy Neugebauer (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | | WILLIAMSON COUNTY | 10-01-2004 | $500 | Lisa Murkowski (R) | Federal |
| Money to Parties | CHODY, ROBERT J MR<br>ROUND ROCK, TX 78881 | WILLIAMSON COUNTY | PEACE OFFICER | 10-01-2004 | $2,000 | Republican National Cmte (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78680 | | BUSINESS MAN | 09-29-2004 | $500 | BRISTER, SCOTT (R) | TX |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | WILLIAMSON COUNTY | PEACE OFFICER | 09-29-2004 | $500 | Arlene Wohlgemuth (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | | WILLIAMSON COUNTY TX | 09-28-2004 | $500 | Richard Burr (R) | Federal |
| Money to Candidates | CHODY, ROBERT J<br>ROUND ROCK, TX 78681 | WILLIAMSON COUNTY | PEACE OFFICER | 09-28-2004 | $500 | James W DeMint (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | | WILLIAMSON COUNTY | 09-28-2004 | $1,000 | John Thune (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | INFORMATION REQUESTED | INFORMATION REQUESTED | 09-27-2004 | $500 | Pete Sessions (R) | Federal |
| Money to Candidates | CHODY, ROBERT J<br>ROUND ROCK, TX 78681 | WILLIAMSON COUNTY | PEACE OFFICER | 09-27-2004 | $500 | John Carter (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | WILLIAMSON COUNTY | PEACE OFFICER | 09-27-2004 | $500 | Ted Poe (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | | WILLIAMSON COUNTY | 09-27-2004 | $500 | Peter Coors (R) | Federal |
| Money to Candidates | CHODY, ROBERT<br>ROUND ROCK, TX 78681 | WILLIAMSON COUNTY | PEACE OFFICER | 09-27-2004 | $500 | Mel Martinez (R) | Federal |

## ¶653

On or about the date of {2020-11-24}, [WC] Commissioner Bill Gravell, the Chief Commissioner that presides over [WC] Commissioners' Court, plead guilty to violating his own Stay-At-Home order on or about the date of {2020-04-07}. As a result of this incident, Commissioner

Gravell was initially charged with *"Official Oppression"* [TPeC-T8-C39-§39.03] and *"Abuse of Official Capacity"* [TPeC-T8-C39-§39.02], but these charges were dropped as a result of the plea agreement. It is important to note that Commissioner Gravell did not act alone in committing these alleged criminal offenses, but instead, did act with the help of other employees of defendant [WC]/[WCLE]. Even though the citizen-journalist's Facebook-posting photographs appear to show Commissioner Gravell in public areas and/or publicly-visible areas of private-property, Commissioner Gravell is alleged to have, Ⓐ *"sent the account a private message asking for the post to be taken down"* and, Ⓑ *"contact(ed) the district attorney to contact an attorney to ask to have the post removed."* Based on the seriousness of the allegations, the plaintiff asserts that a substantial fraction of the citizens of the County of Williamson are entirely unsatisfied and/or completely disappointed that the fully-appropriate initial charges of *"Official Oppression"* and *"Abuse of Official Capacity"* against Commissioner Gravell were dropped. The plaintiff asserts that, in this particular case, Commissioner Gravell did not simply receive preferential treatment from the [WCDAO]/[WCCAO] led by [WC] District-Attorney Shawn Dick ("[WCDA-SD]"), but rather, Commissioner Gravell was treated as if he was part of a political royalty that was impervious from prosecution for those serious crimes (and abuse-of-authority-and-power) that he committed. The plaintiff further asserts that, by deliberately failing to prosecute [WC] Commissioner Gravell for the aforementioned Abuse-of-Office crimes, [WCLE] and specifically, [WCDA-SD], have sent and are continuing to send a powerful message, loud-and-clear, to all government employees/officials of defendant [WC] that they are free to abuse their authority and power as government employees/officials with absolute impunity - without facing actual consequences:

> "Investigation ordered into Williamson County judge for violating his own stay at home order" :
> (KXAN Austin): Jody Barr: (2020-04-10):
> https://www.kxan.com/investigations/investigation-ordered-into-williamson-county-judge-for-violating-his-own-stay-at-home-order/

### << POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

> "Williamson County judge pleads guilty for violating his own stay-at-home order, will pay $1,000 fine:  In exchange for the
>   guilty plea, two charges related to the incident — abuse of official capacity and official oppression — are being dropped." :
> (The Texas Tribune): Dan Rosenzweig-Ziff: (2020-11-24):
> https://www.texastribune.org/2020/11/24/williamson-texas-grandson-birthday-stay-at-home/

*Williamson County Judge Bill Gravell pleaded guilty to a misdemeanor Tuesday for violating his own stay-at-home order this spring and will pay a $1,000 fine, court documents show.*

*During the stay-at-home order in April, Gravell was caught on camera going to his grandson's birthday party wearing firefighting equipment from the county, an act for which a fire chief later apologized because he provided a suit to the judge that he could "not provide everyone."*

*The order, issued in March, ceased all public and private gatherings outside a household or apartment unit, closed all nonessential businesses and asked residents not to travel on public transportation unless it was for essential activities. Residents faced threats of jail time or fines if they left their homes for anything other than essential business.*

*The incident prompted the appointment of a special prosecutor, Milam County District Attorney Bill Torrey, and an investigation by the Texas Rangers.*

*Torrey's office said it could not comment on the case since it was unresolved. Bill Hines, Gravell's lawyer, said that Gravell is the only person in the county to be prosecuted for violating the stay-at-home order.*

*"He does accept responsibility," Hines said. "He made a mistake as a grandfather. He's paying the maximum penalty for that."*

*In exchange for the guilty plea, the special prosecutor is dropping two other charges related to the incident of abuse of official capacity and official oppression.*

*Williamson County, located north of Austin, has had just over 1,100 COVID-19 cases in the last two weeks.*

1696907690

*"While I carry the heavy public burden of guiding the policies that best protect our citizens, I am also a husband, father and grandfather," Gravell said in a statement. "It was in this role that I visited my 5-year-old grandson on his birthday. Pawpaw Bill made an error in judgement that County Judge Gravell deeply regrets."*

*The Texas Tribune is a nonpartisan, nonprofit media organization that informs Texans — and engages with them — about public policy, politics, government and statewide issues.*

# ¶654

On or about the day of {2021-12-14}, the [WC] Commissioners voted 4-to-1 to withhold federal (CARES-Act) funding from the {Round Rock Independent School District}, [RRISD], and [LISD] allegedly because most of the [WC] Commissioners were opposed to the school districts allegedly allowing books about *"critical race theory"* ("[CRT]") or books that they would consider *"X-rated"* in their libraries. (The one [WC] commissioner who voted against this resolution voted against the resolution not because he was opposed to the censorship, but instead, only voted against it because he believed that such decisions of censorship should be left to the individual school districts.) The plaintiff asserts that the top-level leadership of defendant [WC] is sending the public message that, it is not good enough that most, if not all, people-of-color have to continue to suffer the cumulative effects of institutional-racism/White-Supremacy/racial-oppression/modern-day-Jim-Crow, but to add further-insult on top of substantial-injury (and substantial-handicap), the youngest residents of the County of Williamson are not supposed to know anything about the continuing and cumulative effects of such institutional-racism/White-Supremacy/racial-oppression/modern-day-Jim-Crow (such as that documented in this lawsuit). The plaintiff asserts that a common feature of most totalitarian states is to censor/suppress facts/information that are uncomfortable/damaging/incriminating to the state - as a substantial component of a larger system of state-indoctrination and state-propaganda - in-order-to control the population, justify abusive/oppressive/intrusive/invasive state actions, while remaining in power. The plaintiff highlights two crucial aspects of this censorship - Ⓐ the fact that [WC] Commissioners censor some types of literature (but not others) in total violation of both the first-amendment and the fourteenth-amendment, and Ⓑ the fact that [WC] Commissioners equated literature documenting institutional-racism/White-Supremacy/racial-oppression/modern-day-Jim-Crow ([CRT]) with *"X-rated"* literature - with both apparently being equally worthy of censorship, and with both apparently considered by such [WC] Commissioner(s) to be *"smut"*. The plaintiff further asserts that, while there may be ample justification for banning books of sexually-explicit nature in children's library, there is absolutely no justification to ban (or even censor) any (non-sexually-explicit) books about [LGBTQIA+] or institutional-racism/White-Supremacy/racial-oppression/modern-day-Jim-Crow ([CRT]) - or for that matter, books that are anti-capitalist and/or pro-socialist - as none of those topics is *"age inappropriate"*. As such, the plaintiff asserts that any efforts by the leadership of [WC] undertaken in this type of censorship to unduly influence young minds are simply clear indications of Orwellian indoctrination, cunning manipulation, fraud, hypocrisy, corruption, abuse-of-authority and political-repression (in clear violation of both the first-amendment and fourteenth-amendment):

▸ "Williamson County withholds CARES funds from Round Rock and Leander school districts over 'X-rated' books" ˏ
▸ {KUT Radio}ˏ  Allyson Ortegonˏ  {2021-12-14}ˏ
▸ https://www.kut.org/education/2021-12-14/williamson-county-withholds-cares-funds-from-round-rock-and-leander-school-districts-over-x-rated-books

Williamson County commissioners decided to withhold federal money from the Leander ISD because of books in schools that they deem inappropriate.

## Williamson County commissioners voted to withhold federal funds from the Round Rock

and Leander school districts because of their reading book selections.

The county has leftover CARES Act money to distribute within the next two weeks. At the court's meeting Tuesday, County Treasurer Scott Heselmeyer suggested $14 million go toward school districts.

But Commissioner Valerie Covey said she would not agree with sending the money to schools "that put smut in the rooms of the kids."

"I'm not OK with giving money to school districts that teach critical race theory or that allow books in their library ... books that we would consider X-rated," she said.

Covey was referring to the controversy surrounding books in Leander's high school English classes. Each year, high schoolers can select books from a list for book clubs and peer reading groups.

Parents began protesting some of the books on the list last year, arguing they contained depictions of graphic violence, inappropriate language and sexual content. The books were put under review by a group of staff, parents and community members called the Community Curriculum Advisory Committee.

As of last month, 11 books were removed from classrooms and libraries. Other books in question were returned to shelves after the review.

But some parents and organizations have advocated for all of the books to be allowed, arguing the titles offer diverse voices and experiences.

PEN America, a nonprofit that promotes literature and free expression, has repeatedly called on Leander ISD to allow these books to remain in schools. The organization says their removal is "an unwarranted exercise in censorship."

On Tuesday, Commissioner Cynthia Long echoed Covey's views and said she believed the books were also available at Round Rock schools.

She suggested the November LISD bond election, which largely failed, showed the community had lost confidence in the school board.

"I think the voters of Leander ISD spoke very loudly, not so much that they were against building schools, but it was their only opportunity to say, 'We don't agree with what you're doing,'" she said.

In a 4-1 vote, the court approved giving funds to all the other districts, including

In a 4-1 vote, the court approved giving funds to all the other districts, including Georgetown, Hutto, Liberty Hill and Taylor.

Commissioner Terry Cook was the dissenting voice in that vote.

"We are outside of our lane if we try to micromanage the ISDs," Cook said. "We can use the bully pulpit to stress what we think is important, but it's ultimately the school boards and the administration that makes those decisions."

Williamson County commissioners said they plan to meet with RRISD and LISD leaders to discuss the issue before the court's meeting next week, at which time they may choose to distribute the money.

LISD released a statement saying it would coordinate those discussions.

"The CARES Act was intended to help fund economic relief during the pandemic, including offsetting the costs incurred by school districts to keep classrooms open for in-person instruction and to provide remote learning opportunities for students," the statement said. "Our teachers and staff have worked tirelessly to go above and beyond for students during this time, and we hope to minimize the financial impact and improve the long-term stability of our district with tools such as the CARES funding."

RRISD spokesperson Jenny LaCoste-Caputo shared a statement saying the district was "disappointed" by the exclusion, but hopeful and happy to address concerns with the commissioners. The district already met with Commissioner Russ Boles to discuss the book selection process.

"All parents and members of the public in Round Rock ISD have complete access to the entirety of our school library catalogue," the statement said. "Parents always have the right to determine what books their students are able to access. Round Rock ISD has an established process for addressing parental objections to instructional resources."

The two districts could receive about $9 million combined. The districts did receive money from a previous round of funding from the CARES Act.

## ¶655

The *"Confederate Soldiers and Sailors Monument"*, [CSaSM], is an outdoor Confederate memorial installed outside the [WC] Court located in Georgetown, Texas. Currently, another plaque sits outside the courthouse referring to African-Americans as *"pioneer settlers"* allegedly during the years {1850} through {1860}, which if the allegation is true, is a clearly false depiction. An anti-racism group, [Courageous

Conversations], wanted to *"put a plaque next to the statue addressing slavery as part of the Civil War. Members say the statue, in its current state, represents slavery."* On or about the date of {2017-11-14}, the [WC] Commissioners voted 4–1 not to allow the aforementioned plaque sought by *"Courageous Conversations"* (source: ⟪KXAN Austin⟫, "Confederate monument plaque voted down by Williamson County commissioners" ). One-or-more federal civil-rights lawsuits (in the past or present) filed against defendant [WC], have argued that such statute clearly violates the federal civil rights of Black residents. On or about the date of {2022-09-02}, in response to questions regarding this issue from the ⟪Austin American-Statesman⟫, two [WC] Commissioners *"declined to discuss the Confederate statue because of the pending lawsuit"*, whereas two other [WC] Commissioners *"did not respond to a request for comment about whether they would agree to a discussion in court about the statue."* Over the last decade or so, social-justice protesters throughout many areas of the United States have vigorously campaigned and/or protested to have any-and-all Confederate monuments removed, as such monuments indisputably represent White-Supremacy and the institution of (race-based) slavery. The plaintiff strongly asserts that the utter hypocrisy of the actions by the leadership of defendant [WC] should not be lost of the reasonable observer. Here, the leadership of defendant [WC] is telling not only all of the citizens of the County of Williamson, but also all of the people of the world, that it deems books about so-called [CRT] to be *"age inappropriate"*, but that same leadership of defendant [WC] deems such Confederate monument(s) - which is, indisputably, a glorification of White-Supremacy and (race-based) slavery - as *"age appropriate"*.

- "Confederate monument plaque voted down by Williamson County commissioners" :
- ⟪KXAN Austin⟫: Kate Winkle: {2017-11-14}:
- https://www.kxan.com/news/local/confederate-monument-plaque-voted-down-by-williamson-county-commissioners_20180312074447927/1031403392

<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

- "Federal lawsuit seeks removal of Confederate statue outside Georgetown courthouse" :
- ⟪Austin American-Statesman⟫: Claire Osborn: {2022-09-02}:
- https://www.statesman.com/story/news/local/2022/09/02/confederate-statue-outside-georgetown-courthouse-targeted-in-lawsuit/65465069007/

<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

## ¶656

The plaintiff asserts that the relatively-small number of media reports cited in this lawsuit reveal only some (but not all) of the deep-seated culture of racism, sexism, corruption, hypocrisy and impunity fostered by even some of the top-level leadership of defendant [WC]. The plaintiff emphasizes that the information posted above depict the manner in which some of the top-level [WC] officials act in public settings, and as such, any reasonable observer can leave it to their own imagination, how such officials conduct themselves in private settings, such as in private/off-the-record conversations/meetings. The plaintiff further asserts that this deep-seated culture of racism, sexism, corruption, hypocrisy and impunity would, at best, serve to desensitize/demoralize rank-and-file/lower-ranking members of [WCLE], but at worst, embolden such members to act in a brazenly racist, sexist, corrupt and/or hypocritical manner that would not have been possible if not for this deep-seated culture of racism, sexism, corruption, hypocrisy and impunity. The plaintiff would like to emphasize that this is the type of public-image and reputation that at least some of the top-level leadership of defendant [WC] stands behind, without any apparent intentions to change that public-image and reputation. The plaintiff asserts that, in response to this publicly-disseminated information about defendant [WC], any reasonable observer would pose the common-sense question: What type of message is the leadership of defendant [WC] sending to the residents of the County of Williamson - in particular, the County of Williamson's people-of-color residents - by these behaviors/actions?

## ¶657

Most importantly, the plaintiff asserts that when there exists a deep-seated culture of racism, corruption, hypocrisy and impunity in any local-law-enforcement and/or government-administration, and this deep-seated culture of racism, corruption, hypocrisy and impunity is even reported by the media, then, as even explained and/or hinted-to by some of the publications cited in this lawsuit, it follows from basic logic and reasoning that:

01.  at least some person(s)-of-color will, at best, deeply-distrust, and at worst, expect-maliciousness-from that local-law-enforcement/government-administration.

02.  at least some person(s)-of-color will be very-unlikely-to report racially-motivated hate-crime(s) to that local-law-enforcement, regardless of the seriousness/severity of the crime(s) committed against them because such person(s)-of-color will rightfully believe, at best, that their reports will not be taken seriously, and at worst, that they will be retaliated against - if not by the local-law-enforcement/government-administration, then by the persons(s) who committed the hate-crime(s).

03.  White-Supremacists and other predatory White-American people will feel at least some level of emboldenment and protection from local-law-enforcement/government-administration, making it more likely for such people to act in hypocritical, abusive and/or criminal manner towards at least some person(s)-of-color.

04.  due to the well-known, well-documented and impenetrable Blue-Wall-Of-Silence, even well-meaning police-officers/government-employees that do not harbor racial-animus and that do recognize racist/hypocritical misconduct will be unwilling to report such misconduct to superiors/internal-affairs.

05.  the local-law-enforcement's/government-administration's public messages of *"tough-on-crime"/"law-and-order"* are, in actuality, hypocritical and racist dog-whistles for (metaphorically-speaking) bringing-down-the-hammer-on at least some person(s)-of-color - for example, via the abusive/oppressive/intrusive/invasive modern-day-Jim-Crow interpretation/enforcement of laws - while turning-a-blind-eye-to the misconduct/abuses/crimes of government official(s)/employee(s), White-Supremacists and other predatory people, especially when the victims of the misconduct/abuses/crimes are person(s)-of-color.

06.  at least some substantial segments of the local-population (not limited to racial-minorities) will rightfully question the legitimacy and integrity of the entire justice-system, leading to more cynical attitudes towards law-enforcement/government and, in general, other institutions-of-power.

## ¶658

Finally, the plaintiff asserts that all of the six aforementioned listed-items, not surprisingly, hold-true and corroborates-with the plaintiff's own traumatizing experiences in dealing with [WCLE], acting in conspiracy with the plaintiff's predatory White-American, far-right-wing-extremist neighbors [JSP&KAP],[RSR] for over 10 years (and also the plaintiff's predatory White-American neighbor [JJB] for a period of over 3 years), as substantially documented in this lawsuit.

## ¶659

Although no part of the plaintiff's claims against the defendants relies-upon, rests-upon or hinges-upon this particular assertion, the plaintiff

asserts that this deep-seated culture of racism, corruption, hypocrisy and impunity fostered by some of the top-level leadership of defendant [WC] has not only made possible, but actually encouraged, the decade of racial-oppression and racketeering-activity that the plaintiff has suffered from [WCLE], acting in conspiracy with the plaintiff's predatory White-American, far-right-wing-extremist neighbors [JSP&KAP], [RSR] for over 10 years (and also the plaintiff's predatory White-American neighbor [JJB] for a period of over 3 years), as substantially documented in this lawsuit.

# §XXII

# SHRINKING FAR-RIGHT CONTINUES TO EXERT EXTREMELY-UNDUE POWER, INFLUENCE AND CONTROL OVER [WC] AND OTHER LOCAL INSTITUTIONS WITHIN COUNTY OF WILLIAMSON

## ¶660

Defendant [WC] and its law-enforcement-agencies, [WCLE], are also fully-aware of the extremely-undue power-influence-and-control that the shrinking, yet hostile, disproportionately-vocal and unrepresentative *"far-right"* continues to exert over [WC] and several local institutions ([RRISD] School-Board, 《City of Hutto》, 《City of Liberty Hill》, 《Thrall Police Department》, etc.) within the County of Williamson - despite the fact that the political demographics of the County of Williamson has changed in the last decade, from being more-fully *"far-right"* (a decade ago) to being more-moderately *"center-right"* (currently):

## ¶661

Despite the fact that [WC] officials declared that there were no known cases of voter-fraud in the {2020-11-03} general election, Lori Gallagher - founder of the far-right group and/or political-action-committee, 〔Texas Constitutionalists〕, who spoke during the public comment portion of a [WC] Commissioners-Court meeting immediately following such election - requested [WC] to *"do an audit of its electoral process, citing allegations of the casting of fraudulent ballots."* Ms. Gallagher continued to state, without providing any actual evidence, *"There's enough national evidence that's in the public sphere right now that could show that there is a possibility for not only fraud locally, but statewide and across the country."* According to Ms. Gallagher, the [WC] elections office informed Ms. Gallagher that she would need to file lawsuit against [WC] in-order-to prove her, then unsubstantiated, claim of alleged voter-fraud. According to election data, [WC] *"reported its highest voter turnout in history, at about 75%"* (source: 《Community Impact Newspaper》, "Officials: No known cases of voter fraud in Williamson County"). Despite continuing-not-to-present any actual evidence of voter fraud, Ms. Gallagher and/or her far-right organization, 〔Texas Constitutionalists〕, continued to vigorously campaign in the year {2021} - posting many messages onto social-media - urging other residents of the County of Williamson to protest at [WC] Commissioners-Court meetings for their lack of an election-audit and/or for not doing

enough to overturn the {2020-11-03} election results and/or for the Republican Party leadership of [WC] allegedly *"selling out"* the Republican voting-base (🔵). For example, in one of her numerous social media postings in the year {2021}, Ms. Gallagher posted, with a [NAUSEATED-FACE-EMOJI]:

> *"Williamson County Judge Gravell accepted "ZuckBucks". Honorable Judge Gravell must RESIGN OR be primaried out. You want to know something you can do? Are you feeling helpless? Do not know where to start? Tell everyone you know about the County Commissioners Court and tell them every single one of them must be pushed out of primaries, or pressured to resign. Your Republican leadership accepted $265k+ from Mark Zuckerberg. Judge Gravell Ctyjudge@wilco.org Precinct 2 Commissioner Long Clong@wilco.org Precinct 1 Commissioner Cook Tcook@wilco.org Precinct 3 Commissioner Valerie Covey Vcovey@wilco.org Precinct 4 Commissioner Russ Bowles. Rbowles@wilco.org GOP Chairman Steve Armbruster Democrat Chairman Kim Gilby County CLERK Nancy Rister These are your Republican Party elected officials that sold your vote to Mark Zuckerberg. Our Republican party and leadership sold us out for Zuckbucks. We must unite and take OUR Party back through the primaries. Join us⌐___⌐ Txconstitutionalists.com".*

The plaintiff asserts that this particular posting by Ms. Gallagher is very indiciative of the extremely-undue power-influence-and-control that the shrinking, yet hostile, disproportionately-vocal and unrepresentative far-right continues-to-exert over [WC] and/or other local institutions within the County of Williamson - unduly pushing the already-right-wing politics of the County of Williamson and the government of [WC], even further to the far-right. In clear violation of the *"Separation of Church and State"*, Ms. Gallagher is further quoted to having stated the mission of her far-right organization, [Texas Constitutionalists], which even some of the mainstream-media describe as a *"voter suppression"* organization, as follows:

> *"I believe that the divine hand of providence was present when our constitutional and founding documents were formed ... I believe that's the divine intersection between voting rights. The people's voice — that comes from God. Your freedom comes from God. Liberty comes from God."*

While many people demonstrated *"on the statehouse grounds"* opposing the *"voter suppression"* legislation enacted in the {2021} Texas-Legislature Legislative-Session, Ms. Gallagher, *"of Williamson County, Texas, was there to show her support"* of such *"voter suppression"* legislation (source: 《Vox》, "How the Christian right embraced voter suppression"). The plaintiff asserts that all of such efforts by the shrinking, yet hostile, disproportionately-vocal and unrepresentative far-right within the County of Williamson, are thinly-veiled, yet successful, actions by the far-right to subvert democracy by overtly-suppressing the vote, while at the same time, intimidating the large political opposition to the far-right from voting - along with other forms of voter-intimidation. The plaintiff asserts that no municipal-corporation that is genuinely concerned about democracy would entertain-baseless-arguments-from and/or sympathize-with those person(s) and/or political-group(s) (such as far-right political-groups) that are actively conspiring to suppress the vote, under the fraudulent pretext of combatting *"voter fraud"*.

# ¶662

During the peak of the COVID-19 pandemic, a relatively-small group of *"far-right"* residents of Round Rock (located within the County of Williamson), while *"furiously protesting the mask mandate ordered by the 〈[RRISD]〉 district's recently hired superintendent, 〈Dr.〉 Hafedh Azaiez"* - who, out of no coincidence, happens to be an immigrant-of-color - *"were campaigning to overturn the 〈[RRISD]〉 district's mask mandate, **fire** Azaiez, ban books 〈about so-called [CRT]〉, and, generally, bring **Christian Nationalist** values to the district."* As further reported by the 《The Austin Chronicle》, *"the far-right candidates were trounced in the November 〈{2022}〉 election and an even more*

*progressive ([RRISD]) board was seated"* - once again, fully demonstrating the extremely-undue power-influence-and-control that the shrinking, yet hostile, disproportionately-vocal and unrepresentative *"far-right"* continues to exert over local institutions within the County of Williamson - despite the changing political demographics of the County of Williamson. These sequence of events also demonstrate that, while the [WC] Commissioners - almost all of the Republican Party - are actively punishing and/or coercing School-Districts such as [RRISD] for allowing books in the library about [CRT] and/or [LGBTQIA+], the voters in those specific districts of the County of Williamson are going in the opposite direction by electing increasingly *"more progressive"* School-Boards.

## ¶663

During a {2023} {City of Hutto} City-Council meeting, a resident of Hutto, a once [HOA]-President, and a former candidate for City-Council-member in the {City of Hutto}, Nicole Calderone, was allowed by the Hutto Mayor, Mike Snyder, to make racist statements with references to *"bananas"* and *"monkeys"* - with Ms. Calderone making one-or-more social-media-postings also deemed to be racist. Additionally, a federal-court ruling in the month of {2023-05} authorized $12.5 million in damages assessed to the {City of Hutto} stemming from racially-discriminatory conduct attributed largerly to Mayor Snyder (source: 《CBS Austin News》, "Hutto Mayor Under Fire After Racial Innuendo During City Council Meeting" ). During a {City of Hutto} City-Council meeting, Onnesha Williams, founder of 【Black Families of Hutto】, rightfully stated with anger to Mayor Snyder,

> *"In what world do I live in where I can cost this city, as a black woman, $12.5 million for being discriminatory, and still keep my job? In what world could I say the things that you say, Mr. Mayor, and still keep my job? ... If you're a leader, you should be held accountable and you should hold yourself accountable. Please resign ... We have a systemic problem with racism in this town, We have a systemic problem of underrepresented people in this town. We are not represented on the dais, and we are not represented by our mayor ... It's clear that Mr. Snyder is not a leader of integrity. He has consistently violated civil rights laws against Black people and women and I think it's clear he needs to forfeit his seat ... I've been harmed by his racism and misogyny. It's a horrible feeling. You live in this town and have to keep living in this town pretending. Its kind of being a cancer in the place that you love."* (source: 《Taylor Press》, "Hutto mayor faces community backlash" )

Ms. Williams continued to state,

> *"It's haunting. It's Taunting. It's Harassing. It's the same as going to work and having a noose hanging at your desk. Having bananas and a monkey sitting where you reside to do the work. A Black man nor a Black woman nor any other citizen should be subjected to that."*

## ¶664

During a {2023} {City of Liberty Hill} City-Council meeting, the Mayor of the {City of Liberty Hill} officially declared the month of {June} *"Pride Month"*, at least in part, in support of a Liberty Hill resident, *"Amanda Crossland, who lost her son Jaycee to suicide shortly after he came out as gay."* Ms. Crossland, who coordinated with the Mayor over this proclamation, stated, *"I promised him after he died I would do everything I can to make sure this doesn't happen to someone else ... To make sure people like him know they have support."* The proclamation reads as follows:

*"Whereas, Liberty Hill is a Loving, Wholesome and Family-centered community; and Whereas, Liberty Hill is an inclusive and supportive community; and Whereas, We value all of our citizens because of the unique and precious nature of all of God's children; and Whereas, We oppose hate, abuse, discrimination or bullying of any person, Now Therefore, I, Liz Branigan, as Mayor, do proclaim the month of June as Pride Month in Liberty Hill, in harmony with the larger community of the United States."*

To the best of the plaintiff's understanding, such proclamation was not substantively different than similar *"Pride"* proclamations made by at least some other Cities across the United States. However, such meeting was met with vigorous hostility by residents of the far-right, with the meeting-room, *"packed with people participating in public comment to oppose the proclamation"*, and *"as the mayor read it, many residents booed while others clapped."* Ms. Crossland *"stood in front of"* the mostly hostile far-right crowd *"with two others as the mayor read the proclamation."* Ms. Crossland stated with considerable disappointment, having just lost her son to suicide as a result of societal homophobia,

*"This was supposed to be a day of acceptance but it's not even a celebration because it's a fight ... I didn't expect when I showed up today that there would be a huge amount of hatred."*

Due to the extremely-undue power-influence-and-control, exerted by the shrinking, yet hostile, disproportionately-vocal and unrepresentative far-right in Liberty Hill, at least one member of the ⟨City of Liberty Hill⟩ City-Council, *"Angela Jones, spoke at the beginning of the meeting in opposition to"* such proclamation.        (source: ⟨KXAN Austin⟩, "Liberty Hill Pride proclamation met with boos")

# ¶665

A police-officer of the ⟨Thrall Police Department⟩ [TPD] (located within the County of Williamson), recently posted onto a social-media-posting, a celebratory selfie-photograph with Kyle Rittenhouse - the young White-American man appearing at one-or-more far-right-wing-extremist gatherings and/or rallies, who has been photographed celebrating with members of the far-right-wing-extremist *"Proud Boys"*, that, despite shooting three persons resulting in the deaths of two persons, was acquitted by an almost all-White Wisconsin jury in ⟪WISCONSIN V. KYLE HOWARD RITTENHOUSE⟫ of all charges including, *"First degree intentional homicide"*, *"First degree reckless homicide"*, *"Attempted first degree intentional homicide"*, *"First degree recklessly endangering safety (2 counts)"* (source: ⟪The New York Times⟫, "Kyle Rittenhouse and the New Era of Political Violence"). Despite the fact that Mr. Rittenhouse has been characterized by some members of the mainstream-media, and the then-candidate-now-President of the United States, as either *"far-right"* or *"White-supremacist"*, and despite the fact that there were large nationwide social-justice protests in the United States immediately-following and in-response-to Mr. Rittenhouse's acquittal, and despite of the fact that such social-media-posting by the [TPD] garnered much backlash and outrage, according to some journalist-media, neither such police-officer of the [TPD], nor the [TPD] will apologize for such conduct (source: ⟪Snopes⟫, ⟪San Antonio Express-News⟫, ⟪Washington Examiner⟫). Some of the social-media-postings of indignation expressed over [TPD]'s conduct included the following:

*"Is this a joke? You're welcoming a known killer into our state? This is completely disgusting."*

- *Phoenix Woods*

*"Sick you are making him out as a hero ... Shame on your officer and this department."*

- *Kari Ashpaugh*

*"What a joke of a police department."*

*- Nai Roberts*

*"Get pulled over for a traffic violation, get a selfie taken instead. Is that service extended to everyone?"*

*- [UNKNOWN]*

The last cited social-media response, in particular, highlights at least some of such police-departments' (located within the County-of-Williamson) deferential treatment afforded to even the most scandalous persons associated with the *"far-right"*, as opposed to the relatively-poor treatement of most members of society, and the sometimes vicious treatment of social-justice-activists and racial-minorities.

> "Officials: No known cases of voter fraud in Williamson County" ;
> (Community Impact Newspaper); Ali Linan; (2020-11-10);
> https://communityimpact.com/austin/georgetown/election/2020/11/10/officials-no-known-cases-of-voter-fraud-in-williamson-county/
>
> **<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

> "How the Christian right embraced voter suppression" ;
> (Vox); Sarah Posner; (2021-09-28);
> https://www.vox.com/22696286/evangelicals-texas-georgia-voting-law-trump
>
> **<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

> "How Round Rock ISD Finally Lost Their State-Assigned Monitor" ;
> (The Austin Chronicle); Brant Bingamon; (2023-07-14);
> https://www.austinchronicle.com/news/2023-07-14/how-round-rock-isd-finally-lost-their-state-assigned-monitor/
>
> **<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

> "Hutto Mayor Under Fire After Racial Innuendo During City Council Meeting" ;
> (CBS Austin News); Paige Hubbard; (2023-09-08);
> https://cbsaustin.com/news/local/hutto-mayor-asked-to-resign-after-tensions-rise-over-racial-trope-during-city-council-meeting
>
> **<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

> "Hutto mayor faces community backlash" ;
> (Taylor Press); News Staff; (2023-09-08);
> https://www.taylorpress.net/news-hutto/hutto-mayor-faces-community-backlash
>
> **<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

> "Liberty Hill Pride proclamation met with boos" ;
> (KXAN Austin); Brianna Hollis; (2023-06-15);
> https://www.kxan.com/news/liberty-hill-to-make-pride-proclamation/
>
> **<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

> "Kyle Rittenhouse and the New Era of Political Violence" ;
> (The New York Times); Charles Homans; (2021-11-19);
> https://www.nytimes.com/2021/10/26/magazine/kyle-rittenhouse-kenosha-wisconsin.html
>
> **<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

> "Did Joe Biden Call Kyle Rittenhouse a 'White Supremacist'?" ;
> (Snopes); Dan MacGuill; (2021-11-24);
> https://www.snopes.com/fact-check/kyle-rittenhouse-biden/
>
> **<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>**

> "Kyle Rittenhouse selfie with Texas police officer sparks outrage on department's Facebook page" ;

- (San Antonio Express-News): Timothy Fanning: (2022-08-12):
- https://www.expressnews.com/news/texas/article/Kyle-Rittenhouse-Thrall-police-selfie-17369319.php

<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

- "Texas police won't apologize for Rittenhouse selfie: 'Is this not how our country works?'" :
- (Washington Examiner): Heather Hamilton: (2022-08-15):
- https://www.washingtonexaminer.com/news/texas-police-wont-apologize-rittenhouse-selfie

<< POSTING OMITTED DUE TO COPYRIGHT PROTECTIONS THAT MAY NOT PERMIT UNAUTHORIZED PUBLICATION >>

United States presidential election results for Williamson County, Texas[30]

[hide]

| Year | Republican | | Democratic | | Third party | |
|---|---|---|---|---|---|---|
| | No. | % | No. | % | No. | % |
| 2020 | 139,729 | 48.15% | 143,795 | **49.56%** | 6,644 | 2.29% |
| 2016 | 104,175 | **50.90%** | 84,468 | 41.27% | 16,016 | 7.83% |
| 2012 | 97,006 | **59.22%** | 61,875 | 37.77% | 4,923 | 3.01% |
| 2008 | 88,323 | **55.49%** | 67,691 | 42.53% | 3,152 | 1.98% |
| 2004 | 83,284 | **64.97%** | 43,117 | 33.63% | 1,797 | 1.40% |
| 2000 | 65,041 | **67.80%** | 26,591 | 27.72% | 4,303 | 4.49% |
| 1996 | 36,836 | **55.37%** | 24,175 | 36.34% | 5,511 | 8.28% |
| 1992 | 26,208 | **42.79%** | 19,437 | 31.73% | 15,609 | 25.48% |
| 1988 | 27,322 | **57.85%** | 19,589 | 41.48% | 319 | 0.68% |
| 1984 | 25,774 | **72.03%** | 9,911 | 27.70% | 99 | 0.28% |
| 1980 | 15,035 | **56.39%** | 10,408 | 39.04% | 1,218 | 4.57% |

# §XXIII

# TOTALITARIAN/FASCIST TENDENCIES WITHIN FREE SOCIETIES

## ¶666

George Orwell's *"Animal Farm"* is often popularly cited in the so-called *"free societies"* (including Western-European-society and American-society) for the typical demonization of the totalitarian enemy: for example, the former Soviet Union, or today's Russia. However, almost all people are unaware of the fact that Orwell wrote an introduction (essay) to *"Animal Farm"* that remained unpublished even after his death. In this essay, which he addresses to the people of England, Orwell warns the people of England that they should not feel too self-righteous, because even in England (and other so-called *"free societies"*), unpopular ideas can be suppressed/censored without the use of force. Orwell further provides at least two major reasons to explain why and how unpopular ideas can be suppressed/censored without the use of force:

1. Orwell explains that the press - his day's equivalent of today's big-media corporations - is owned by wealthy men who have every (self-preserving and status-quo-preserving) reason not to want certain ideas to be expressed.

2. Orwell explains that when people are raised through the educational system - even the elite educational system of elite Universities - this process internalizes their understanding that there are certain things that one must not say (or even think). It is a type of self-censorship that is created through indoctrination.

## ¶667

The plaintiff raises this issue, because certain aspects of the property-maintenance-laws - especially, the requirement(s) to cut vegetation - are typical of this totalitarian, irrational and unreasonable mindset of absolute conformity - which most people are unable to even question due to the systems of power and indoctrination mentioned above. When people allow governments (or other institutions-of-power) the power to enforce this totalitarian, irrational and unreasonable mindset of absolute conformity - for no justifiable reason, whatsoever - governments (or other institutions-of-power) will inevitably abuse that power, with the end result being a slippery-slope to totalitarianism/fascism, even within so-called *"free societies"*.

## §XXIV

## PROPERTY-MAINTENANCE-LAWS AND MODERN-DAY-JIM-CROW

## ¶668

The plaintiff focuses this lawsuit on the racial-oppression and pattern-of-racketeering-activity that the plaintiff has suffered as substantially documented in this lawsuit, and so, the plaintiff does not focus too much attention onto the property-maintenance-laws. However, the defendants' malicious mis-interpretation and predatory enforcement of these property-maintenance-laws against the plaintiff have served to allow the defendants' racial-oppression and racketeering-activity against the plaintiff to continue unchecked for a period of over 10 years, and

has even allowed the defendants to blackmail, retaliate-against, humiliate and obstruct-justice against the plaintiff, in-order-to keep the plaintiff silent about all of defendants' racial-oppression and racketeering-activity against the plaintiff. Therefore, the plaintiff must, in the interest-of-justice, be allowed to at least minimally address the issue of the property-maintenance-laws, or at the very least, how such laws are being abusively weaponized (both as a *"sword and shield"*) as modern-day-Jim-Crow law against the plaintiff. The plaintiff has consulted with multiple attorneys that have admitted to the plaintiff that the selective interpretation and enforcement of these property-maintenance-laws coercively impose White-American/White-European standards onto everybody including people-of-color, whether or not this is was the original intention of the {Texas Legislature} and/or the lawyers (representing the builders' industry and/or the [HOA] industry) that wrote the original [HOA] restrictive-covenant contracts. In fact, one attorney even explained to the plaintiff that many [HOA]s expected bushes to be trimmed according to the British style or the French style, even if there were no rule(s) that explicitly specified such standards (limiting height, width, depth and/or shape of such bushes). Another attorney explained to the plaintiff that [HOA]s expect all residents to maintain their property, the manner in which an *"old White lady"* would want such property to look. Based on the plaintiff's own suffering experiences at the hands of the defendants for over a decade, the plaintiff strongly agrees with these assessments.

## ¶669

The most indisputable example of this White-ethnocentrism is the viewpoint towards growth of vegetation. It is indisputable that the mowed lawn (and bushes trimmed to specific shapes) are a White-American construct and originally a White-European construct - thus, a typical example of White-ethnocentrism within North-America, Europe, Australia and the rest of the so-called *"Anglosphere"*. In medieval Europe, wealthy White-European landowners used to force their servants to cut their grass (and trim their bushes into specific shapes) as a status symbol to show-off their wealth. That rather destructive and wasteful White-European tradition transferred over onto White-American society and clearly still exists to this day. As already documented in some of the academic/legal literature (see section below), people of at least some Eastern religions/cultures and many, if not most, indigenous-peoples are strongly against the artificial cutting of vegetation - including any-and-all wild vegetation, especially for aesthetic/cosmetic reasons. Furthermore, in at least some countries where indigenous-peoples are the majority, such countries have even codified into law what is known as *"Rights of Nature"* or *"Rights of Mother Earth"* - wherein Nature has inalienable rights that humans cannot infringe upon. The plaintiff asserts that the artificial-cutting of vegetation (especially for an aesthetic/cosmetic reasons) is an egregious violation of such *"Rights of Nature"*. So, if it is true that the mowed-lawn (and trimmed bushes) is a White-European/White-American construct, then the plaintiff asks a very simple question: Why is it acceptable in the year {2023} (or, for that matter, any of the years documented in this lawsuit) for White-Americans (and institutions-of-power such as the [HOA] and the local-government) to impose such White-American/White-European standards onto person(s)-of-color, and in particular, immigrant(s)-of-color/indigenous-person(s) - especially those that are religiously/culturally opposed to such standards? Furthermore, as early as the year {2013}, the plaintiff was even advised by a (White-American) *"Master Gardener"* that *"unless you are willing to go to court to defend your beliefs then you are at the mercy of the HOA"* - which is exactly what the plaintiff has suffered throughout most of the plaintiff's residence at [788KLLTX78641], but especially during the intial years {2009} through {2020} - thanks to the then [HOA]'s predatory lawsuit against the plaintiff, driven in substantial part by the predatory demands and/or blackmail of malicious neighbors [JSP&KAP],[RSR],[DMP] and co-conspirator [WCLE]. So, the plaintiff asks a very simple second question: Why is it necessary for at least some person(s)-of-color (such as the plaintiff) to be forced into the risky/burdensome/unpleasant/expensive task of litigation to fight for the most basic/common-sense homeowner rights that every similarly-situated person-of-color should be automatically (or by default) entitled to?

## ¶670

Over 60 years ago, prior to the enactment of the Fair-Housing laws, restrictive covenants explicitly prohibited person(s)-of-color from residing within White neighborhoods. It would appear to the plaintiff that the only difference between that previous era and the current era, is that now, person(s)-of-color are allowed to reside within White neighborhoods, but only if such person(s)-of-color maintain their private-property strictly according to White-American/White-European standards. The plaintiff asserts that this coercion is neither a meaningful nor substantive improvement from that previous era, as such coercion is still a modern-day manifestation of White-supremacy, and would at least in some cases, serve to reinforce modern-day racial segregation (and/or political segregation - see below). When considering the American neighborhood/subdivision, the question to be asked is: Is law-enforcement/local-government (and [HOA]s) adopting the so-called *"melting-pot"* model of White-supremacy wherein people-of-color are forced (by no choice of their own) to assimilate into White-American culture, or is law-enforcement/local-government (and [HOA]s) adopting the so-called *"salad-bowl"* model of multiculturalism wherein people-of-color are allowed to freely express and maintain their cultural/religious traditions/values without coercion, while still co-existing within majority-White society? The plaintiff asserts that even within the framework of existing laws and contracts, there is a lawful method, namely *"variances"*, to accommodate those immigrant(s)-of-color/indigenous-person(s) that do not, due to Constitutionally-protected religious-practice(s), conform their lifestyle and/or property-maintenance to White-American standards. For example, both the Texas Public-Nuisance-Law and the restrictive-covenant contracts of most [HOA]s allow the granting of so-called *"variances"* to allow, in the interest of justice, for such accommodation.

## ¶671

The plaintiff asserts that if White-Americans are allowed to maintain their private-properties according their subjective White-American cultural/religious standards, then people-of-color should likewise, be equally allowed to maintain their private-properties according to their subjective people-of-color cultural/religious standards. The plaintiff further asserts that, at the very least, if people-of-color are not imposing their subjective people-of-color cultural/religious standards of property-maintenance onto White-Americans, then White-Americans should not have any right to impose their subjective White-American standards of property-maintenance onto any person-of-color. The plaintiff asserts that this basic *"live and let live"* philosophy is the actual and truthful application of the *"golden rule"* as it applies to peoples of different cultures: *"Treat others in the way that you would like to be treated"*. The plaintiff asserts that this basic *"live and let live"* philosophy is the actual and truthful application of the fourteenth (⭐) amendment's guarantee to *"equal protection of the laws"* and *"freedom from discrimination"* as it applies to peoples of different cultures. The plaintiff asserts that this basic *"live and let live"* philosophy is the actual and truthful application of the first amendment's guarantee to freedom-of-religion and freedom-of-expression, as it applies to peoples of different cultures.

## ¶672

It is already well-established and well-documented that at least some significant percentage of White-Americans strongly oppose the notions of multiculturalism and race-mixing, and much of the strong anti-immigrant sentiment (especially in the States bordering Mexico including Texas) is indicative of these oppositions. The predatory, abusive interpretation/enforcement of these property-maintenance laws not only serves to deter at least some people-of-color from moving into White neighborhoods and/or remaining within White neighborhoods (and thus serves as a

significant obstacle to multiculturalism and racially integrated neighborhoods), but also serves to ensure that such neighborhoods are hospitable only to the people-of-color that most-conform to White-American standards and that fully-accept White-supremacy as the norm. The end result is that such neighborhoods turn out to be neither racially-diverse (in essence, not multicultural) nor politically-diverse, because it creates a toxic environment in which such neighborhoods are only hospitable to a small-fraction of people-of-color - the most-right-wing (the most-conforming) of people-of-color. The plaintiff asserts that these tendencies undoubtedly harm society by making society, as a whole, significantly less pluralistic, significantly less democratic, significantly more polarized, significantly more stratified, significantly more fragmented, and significantly more divided by both race and politics.

## ¶673

Another, and perhaps more significant, motive for the prevention of racially-diverse neighborhoods is an economic one. There is already a well-documented pattern of so-called *"White-flight"* wherein large fractions of White-Americans move out of neighborhoods within the big-city (or closer to the big-city) that are becoming more-racially diverse and into outer suburb/exurb neighborhoods that are more-exclusively White. This move is also a profitable investment strategy since property outside of the big-city is much less expensive, and more-importantly, tends to rapidly increase in value as the big-city expands and as the population in the larger metropolitan-area increases. Even with inflation, cost-of-living and the value-of-the-dollar taken into account, property values in the outer suburb/exurb neighborhoods (that tend to be White neighborhoods) located around the top metropolitan areas often increase in value by over 100% in just a decade, while at the same time, property-tax increases are capped at 10% per year by Texas homestead law. Even much-older houses and houses that are in need of repair located with the big-city sell at a much higher prices than comparable (similar square-footage, similar building-materials, etc.) newer modern houses (built to the latest safety/structural building codes, and built with, generally-speaking, better-quality construction materials) located in the outer suburbs/exurbs - and the Austin-metropolitan-area is definitely not an exception. So, the obvious investment strategy that large fractions of White-Americans benefit from is to purchase property in such outer suburb/exurb neighborhoods and simply wait for it to rapidly increase in value. By weaponizing/abusing/exploiting such property-maintenance-laws in-order-to prevent at least some persons-of-color from purchasing property in such White neighborhoods and/or intimidating at least some persons-of-color in-order-to drive such persons-of-color out of such White neighborhoods, some predatory White-Americans - and local-law-enforcement (and/or [HOA]s) that act in a predatory/abusive manner on their behalf - are maliciously depriving and defrauding such persons-of-color from this profitable investment and wealth-creation. This malicious deprivation is particularly egregious, given the huge wealth gap between the average White-American family and the average person-of-color family in the United States.

## ¶674

In addition to the significant percentage of White-American people that are opposed to the ideals of racially-diverse, culturally-diverse, religiously-diverse neighborhoods, there are also powerful-economic-forces that, although such powerful-economic-forces do not play a direct role in the enforcement of modern-day-Jim-Crow, do financially benefit from the enforcement of modern-day-Jim-Crow. For example, both the attorneys/law-firms and the management-companies that represent [HOA] could easily be exploiting and profiteering-out-of conflicts between neighbors: whenever neighbors have conflicts/disputes regarding restrictive covenants, then the big-business industry of lawyers/law-firms representing [HOA]s and the big-business industry of management-companies representing [HOA]s may step in to exploit and profiteer-out-of such conflicts/disputes between neighbors. Whenever multiple/large-number-of neighbors gang-up on one particular neighbor especially

due to any type(s) of animus (not limited to racial-animus), then this exploitation/profiteering should be considered to be predatory. Additionally, the big-business lawn-care industry exploits and profiteers out of writing, preserving and enforcing [HOA] restrictive covenants and other property-maintenance-laws that require White/Caucasian standards of vegetation-maintenance to secure the current and future profits of their big-business industry. One of the plaintiff's attorneys even advised the plaintiff that at least some [HOA]s are known to pay police officers overtime for the enforcement of certain restrictive covenants, which if true, would mean that even public officials could easily be exploiting and profiteering-out-of the enforcement of modern-day-Jim-Crow.

## ¶675

Other subtle forms of racial discrimination are now, just of recent, being prohibited by law. For example, the [United States Creating a Respectful and Open World for Natural Hair Act of 2022] ("[CROWN] Act"), has only recently passed - in the year {2022} - by the {United States House of Representatives}. Since the original [Create a Respectful and Open Workplace for Natural Hair Act] was adopted in the State of California in the year {2019}, numerous similar statutes have passed by twenty-or-more states (including the State of Texas), and thirty-or-more cities. Legislatures at all of such levels of government have passed such much-needed legislation to prohibit any-and-all discrimination based of hair-style and/or hair-texture - finally allowing all people-of-color to maintain their natural hair-styles without having to conform their hair-styles according to White-American standards. An uninformed and neutral third-party observer may rightfully question: If there were already multiple existing civil-rights laws that prohibit discrimination, then, why is the [CROWN]-Act needed? Clearly, the [CROWN]-Act was/is needed because at least some persons of the dominant-majority White/Caucasian/American color/race/nationality were/are able to circumvent such civil-rights laws, by exploiting hair-style and/or hair-texture as their preferred form of discrimination, even though they knew fully-well that a person's hair-style and/or hair-texture is intricately-tied-to such person's racial-profile and racial-identity. (Not coincidentally, both defendants [JSP] and [RSR] have made racist statements and/or racial slurs about the plaintiff's natural, ethnic/cultural/indigenous hair-style and/or hair-texture - with [JSP] even demanding the plaintiff to cut the plaintiff's hair.) The plaintiff asserts that the same type of protection from discrimination should also apply to the interpretation/enforcement of these property-maintenance-laws, for reasons already specified above. Towards this end, at least some of the injunctive-relief that the plaintiff seeks, seeks to prohibit the predatory, abusive and/or racist interpretation/enforcement of these property-maintenance-laws.

## ¶676

Even if every single one of the defendants' allegations regarding property-maintenance of the plaintiff's property were true - which the plaintiff vehemently denies - then, all of the plaintiff's claims of the defendants' hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff would still hold true. The defendants had absolutely no right to repeatedly - and for over a decade - single-out, blackmail, intimidate/interfere-with, invade-the-privacy-of, abuse, oppress, humiliate, harass/stalk, predatorily-target, retaliate-against, obstruct-justice-against and defraud the plaintiff in the malicious-and-predatory manner that they did - and for over 10 years. The plaintiff has painfully discovered through over-a-decade of the plaintiff's suffering at the hands of the defendants', the untold truth behind living in an [HOA] subdivision: that neither [HOA] rules enforcement nor the enforcement of other property-maintenance-law (such as the public-nuisance-law) is based upon fair, unbiased, non-discriminatory, application of the rules/law. Instead, the enforcement of such property-maintenance-laws - and specifically, the escalation of enforcement action into legal action - is more-often-than-not - driven by the demands of malicious, predatory neighbors rather than by fair, unbiased, non-discriminatory application of law to curb harmful conditions - with any legal action taken for

alleged aesthetic/cosmetic issues being the most egregious, since such alleged aesthetic/cosmetic issues, even if true, never caused any harm to anyone. Whenever and wherever these malicious, predatory, discriminatory behaviors/actions are driven by any type of racial-bias (not limited to racial-animus) or homophobic-bias (not limited to homophobic-animus), the resulting violations of the fair-housing-laws are clear and indisputable. Whenever and wherever these malicious, predatory, discriminatory behaviors/actions are driven by any type of political-bias (not limited to political-animus), the resulting violations of the *"equal protection clause"* are clear and indisputable.

---

# §XXV

# THE GRASS DILEMMA

## ¶677

The plaintiff focuses this lawsuit on the racial-oppression and pattern-of-racketeering-activity that the plaintiff has suffered at the hands of the defendants, as substantially documented in this lawsuit, and so, the plaintiff does not focus too much attention onto the topic of grass. However, the plaintiff needs to address the issue not only of the plaintiff's general religious opposition to the artificial-cutting of any-and-all vegetation, but also more specifically, the issue of the attitudes towards grass and other native/naturalized vegetation.

## ¶678

As already explained in multiple sections above and below, the plaintiff is a part-time permaculture gardener/farmer that, for example, uses the ecological technique of *"sheet-mulching"* to clear a patch of land for planting new vegetation. More importantly, the plaintiff is a *"grass farmer"* - a subcategory of permaculture farmers that grows grass (and associated native/naturalized vegetation) to keep soil fertile. There is no other type of vegetation - other than grass - that keeps more soil consistently fertile, maintains such consistent soil-fertility, and enhances such consistent soil-fertility in the long-run - to the same high-degree as native/naturalized landscapes of grasses - particularly prairie grasses, native/naturalized grasses and other native/naturalized vegetation growing amongst such grasses. The former prairie grasslands of central North-America including the *"blackland prairie"* region of Central Texas - a central region that spans from Central-Canada to Central-Texas (east of Interstate-Highway I-35) - has been determined to having housed some of the most fertile soil in the world, with much of the fertile soil in Iowa being more than 10 feet deep as little as 75 years ago - although much of that original soil fertility has now been depleted due to conventional big-business factory-farming methods (especially, after the highly industrialized agriculture following the advent of synthetic fertilizers and pesticides). The reasons for this exceptional soil-fertility and deep-soil are a combination of the prairie grasses - including buffalograss, switchgrass, bluestem grasses, grama grasses - along with several *"keystone species"* including the American bison, that grazed on such grasses or whose food-web revolved around such grasses, thus, contributing greatly to the long-term soil-fertility, soil-structure and soil-depth. Grazing animals like the bison, the buffalo, the zebra, the pronghorn, the deer and even the tortoise, can serve to enhance soil-fertility especially if they migrate from one geographical location to another and/or if they are intelligently rotated (by farmers/ranchers/wildlife-management) from one pasture of grass to another (allowing grazed areas of grass to recover by adequate rainfall). Due to the deep and dense roots of unmowed grass,

with some prairie grasses having roots 5 to 15 feet deep, such unmowed grasses are a superior store of Carbon - with unmowed prairie-grasslands being second only to dense, pristine rainforests - in terms of total carbon sequestered per unit of land - thus combating, or at least mitigating, the harmful effects of man-made climate-change.

# ¶679

Because of the fact that the plaintiff is a permaculture-farmer and a grass-farmer, for over 6 years, the plaintiff has received multiple unsolicited offers by farmers that are willing to pay the plaintiff to cut the wild/native vegetation on the plaintiff's agricultural-private-property for hay production, but the plaintiff has always either denied and/or ignored such offers despite of the fact that the plaintiff could easily make much more money with such hay production, while expending no effort in maintaining such agricultural-private-property. The plaintiff has instead chosen the more expensive - both in terms of monetary expenses and personal labor cost - option of beekeeping and native-pasture on the plaintiff's agricultural-private-property as such operation is fully consistent with the plaintiff's strong religious views/values. The plaintiff asserts that, to the best of the plaintiff's knowledge and publicly-available information, the previous land-owner of the plaintiff's agricultural-private-property repeatedly and/or aggressively and/or excessively extracted hay on such property, thus depleting such land of its fertility and resulting in less-than-average growth of grass and associated pasture. For these reasons, the plaintiff has undertaken to restore the plaintiff's agricultural-private-property to pristine pasture, with beekeeping being the closest agricultural activity that would accommodate such restoration.

# ¶680

Because of the plaintiff's knowledge as both a permaculture-farmer and a grass-farmer, and because of the plaintiff's strong religious views/values, the plaintiff has wanted to *"grow"* grass - not *"mow"* grass - on the plaintiff's residential property, because growing grass preserves and enhances soil-fertility, especially in the long-run, whereas mowing grass depletes soil fertility - both in the short-run and the long-run. Defendants [JSP&KAP],[RSR] and [WCLE] have acted *"under color of law"* exploiting both the Texas Public-Nuisance-Law and certain antiquated and/or obsolete restrictive covenants requiring the cutting of grass and/or other vegetation, at least from the years {2009} through {2017}, in a malicious and predatory conspiracy to deprive the plaintiff, of the plaintiff's fundamental first-amendment right to grow grass, without the wasteful-and-destructive practice of cutting grass, especially for aesthetic reasons. Even though this particular issue became a non-issue when the plaintiff was forced, by no choice of the plaintiff's own, to install a *"no-mow"* grass in the [FRONTYARD] during the year {2017}, both of racketeer co-defendants [RSR],[JSP&KAP] continued-to-demand that the [HOA] take legal-action against the plaintiff for the plaintiff's refusal to mow the *"no-mow"* grass installed in [FRONTYARD] - as documented some of the incidents above. As documented in the incidents above, [JSP] maliciously destroyed a large fraction of the plaintiff's *"no-mow"* grass by mowing over such grass at what appears to be the lowest-height-setting of the lawn-mower during the peak of the {2019} summer-drought - one of the hottest and driest summers in Central-Texas history - despite of [JSP]'s knowledge that the plaintiff did not have an automatic sprinkler system to irrigate such grass (as a result of removing the sprinkler system during the re-landscaping process in {2017}) - thus fully parching and destroying a significant area of grass that the plaintiff spent a huge amount of time, money and back-breaking effort to install. [RSR] even once demanded that if the plaintiff did not plan on mowing the grass on the plaintiff's frontyard, that the plaintiff should replace all of such grass with a landscape of stones, once again, depriving the plaintiff of the plaintiff's fundamental first-amendment-right to cultivate and grow grass (and/or other native/naturalized vegetation). The plaintiff strongly asserts that no persons, including the plaintiff, should be deprived of their fundamental first-amendment-

rights - their environmentalist/naturalist ideals, their religious/cultural practices, their political-expression, their art - in-order-to satisfy the rigidly-conforming aesthetic requirements of an ethnocentric, intolerant society that wastefully and destructively sees grass as nothing other than a manicured carpet.

# §XXVI

# SIMILARITIES TO OTHER NATIONAL HIGH-PROFILE CASES

## ¶681

Every case is very unique and nuanced. As such, the plaintiff does not seek to, in any way, trivialize or lessen-the-significance-of any of the other national high-profile cases cited in this section. However, the plaintiff's case does present at least some similarities to some national high-profile cases of racial-oppression and/or political-repression and/or racketeering-activity and/or abuse of authority/power. The plaintiff presents these cases not only to document the similarities but also to provide crucial context and/or supplemental justification concerning the filing of this lawsuit.

## ¶682

**《LOUISIANA V. PHILLIP SKIPPER》 ; 《LOUISIANA V. JOHNNY HOYT》 ; 《LOUISIANA V. LISA HOYT》 ; 《LOUISIANA V. JOHN BAILLIO》 : Murder of Genore Guillory:**

Jane Nora *"Genore"* Guillory was an African-American woman that resided alone at her residence in the town of Clinton, Louisiana, after her husband died. Following the death of her husband, Ms. Guillory was warned by those closest to her that it was not safe for an African-American woman to be living alone in a house located within the Old-Jim-Crow-South. Ms. Guillory ignored those warnings, even allowing a neighboring White family - the Skippers - to stay with her at her residence while providing for them financially. Ms. Guillory did not, at at any moment in time, suspect that the Skippers were actually, in secret, a White-supremacist gang that was simply manipulating her, pretending to be cordial to her, and taking full advantage of her generosity. In fact, since the Skippers were living on the financial-edge of society, Ms. Guillory was even generous enough to add the Skippers as beneficiaries to her life-insurance policy. When a dog owned by Ms. Guillory allegedly ended up either killing or injuring a goat owned by the Skippers, a strong disagreement between Ms. Guillory and the Skippers developed, and as a result of this disagreement, the Skippers had to move out of Ms. Guillory's house. Shortly after this incident, the Skippers, perhaps fearing that Ms. Guillory would remove them as beneficiaries of her life-insurance policy, would eventually break into Ms. Guillory's house in the middle of the night, and brutally kill her in one of the most savage manners. Prior to moving into the 【Summerlyn】 subdivision, the plaintiff was similarly warned by those closest to the plaintiff that it would not be wise for the plaintiff to reside alone at a property in an area lacking in racial-diversity within the Old-Jim-Crow-South, for fairly obvious reasons involving both race and politics. (When the plaintiff initially moved into the 【Summerlyn】 subdivision, and during the first few years of the plaintiff's residence at the 【Summerlyn】 subdivision, the plaintiff did notice at least one large Confederate-Flag flying high above a property located along the highway extremely-close

to the 〖Summerlyn〗 subdivision.) The plaintiff ignored those warnings because the plaintiff, perhaps foolishly but certainly naively, gave every person the benefit-of-the-doubt. The plaintiff was instead very attracted to the low cost of housing further outside of the City-of-Austin [CoA], relative to high cost of housing located within and directly-around the [CoA]. (Even after moving into the 〖Summerlyn〗 subdivision, the plaintiff was informed by at least one other person-of-color that *"people can be pretty narrow-minded up here"*.) At various points of the plaintiff's residence at [788KLLTX78641], [PARENTS] have repeatedly advised the plaintiff to cut the plaintiff's (uncut) facial hair and beard, but obviously not because they didn't like the appearance of such uncut hair. Instead, they have, on multiple occasions, warned the plaintiff that at least some White-supremacists in the United States have viciously harmed and, in some cases, even murdered person(s) who are perceived to be of the Muslim religion, even when such person(s) are not of the Muslim religion (for example, person(s) of the Sikh religion). Additionally, most Muslim people and most of those who look like Muslim people also continue to face racism (Islamophobic-animus) and discrimination even from institutions within American society - especially, in areas of the United States lacking in racial-diversity. It was only after ignoring all of these warnings that the plaintiff began to realize the true cost that the plaintiff would suffer as a result of ignoring such crucial warnings. The end result of ignoring these crucial warnings is documented, at least to a certain extent, in this lawsuit. It would appear to the plaintiff that the crucial mistake that both the plaintiff and Ms. Guillory made was placing blind-trust in people with extreme-racial-animus that are truly malicious. Although the plaintiff has not (yet) been killed like Ms. Guillory was, the plaintiff's suffering at the hands of the defendants is even more extreme in at least two crucial aspects:

Ⓐ In the case of Ms. Guillory, local-law-enforcement never did conspire nor act with the Skippers against her, whereas, in the case of the plaintiff, local-law-enforcement ([WCLE]) did maliciously conspire and did predatorily act with perpetrators of serious crimes against the plaintiff - primarily, defendants [JSP&KAP],[RSR] - to viciously and egregiously violate the plaintiff's rights, repeatedly and on numerous occasions, over the course of over a decade - all in a concerted, premeditated, and orchestrated effort to inflict great pain-and-suffering onto the plaintiff and, with the ultimate goal being, to drive the plaintiff out of the White neighborhood.

Ⓑ The plaintiff has suffered over a decade of hate-crimes/civil-rights-violations/racketeering-acts/abuses by the defendants whereas, to the best of the plaintiff's knowledge, Ms. Guillory suffered one horrific and brutal incident from the predators that ended her life.

## ¶683

**《COLORADO V. NATHAN WOODYARD》 ; 《COLORADO V. RANDY ROEDEMA》 ; 《COLORADO V. JASON ROSENBLATT》 ; 《COLORADO V. JEREMY COOPER》 ; 《COLORADO V. PETER CICHUNIEC》:**

Elijah McClain was a 23-year-old African-American man walking home with a face-mask after shopping at a local store. Some person(s) called the Aurora police on Mr. McClain claiming that he was acting suspiciously, perhaps due to his face-mask, as this incident occurred in {2019} prior to the COVID-19 pandemic. Two-or-more White-American Aurora police-officers stopped Mr. McClain while he was walking home on the sidewalk, with one police-officer ordering him, *"I HAVE A RIGHT TO STOP YOU, BECAUSE YOU'RE ACTING SUSPICIOUS!"* Mr. McClain apparently did not like any person invading his private-space by approaching close to him and pleaded with the police as they apprehended him, *"I'm just different. I'm just different, that's all. That's all I was doing. I'm so sorry. I have no gun. I don't do that stuff. I don't do any fighting. Why were you attacking me? I don't do guns. I don't even kill flies. I don't eat meat. ... I am a vegetarian ... "* Within a matter of a minute, the police-officers had Mr. McClain pinned-down to the ground, causing Mr. McClain to even vomit, most likely due to extreme-fear and/or and/or extreme-stress and/or inability to breathe properly. One of the police-officers, even acted angrily demonstrating substantial racial-animus towards Mr. McClain vomiting, ordering him not to vomit on the police. The police-officers would end up calling in

Aurora Fire Rescue paramedics, at least two of whom, ended up injecting Mr. McClain with what they all surely knew (especially due to Mr. McClain's weight) to be a fatal dose of ketamine. The one striking similarity that the plaintiff shares with Mr. McClain is Mr. McClain's desperate admission that he was *"different"* and an *"introvert"* and a *"vegetarian"* - that he felt violated when others invaded into his private-space. It would appear to the plaintiff that the real *"crime"* that both the plaintiff and Mr. McClain committed was not any actual violation of the law, but rather, the *"crime"* of being *"different"*, the *"crime"* of being *"eccentric"*, the *"crime"* of being *"introverted"*, the *"crime"* of being a *"vegetarian"*, and the *"crime"* of being a non-conforming person-of-color - at least in the plaintiff's case, living within a White neighborhood. Exclusively in the plaintiff's case, the worst and unforgivable *"crime"* that the plaintiff ever committed was the plaintiff's *"audacity"* to report racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses committed against the plaintiff by far-right-wing-extremist, racketeer co-defendants [JSP&KAP],[RSR], and for recording extremely-incriminating information about [WCLE] (and some of its most abusive employees/officials). It should also be noted that most (if not all) totalitarian/Orwellian and/or far-right-wing-extremist and/or fascist governments criminalize truly-innocent characteristics - like being *"different"*, being *"eccentric"*, being *"unusual"*, being *"introverted"*, being an *"educated intellectual"*, being an *"activist"*, being *"non-conformant"*, being [LGBTQIA+], being a person-of-color, etc. - and that no truly-free-society criminalizes those truly-innocent characteristics. Again, while the plaintiff did not (yet) end up being killed by any of the defendants, the plaintiff's suffering is even more extreme in at least two crucial aspects:

Ⓐ In the case of Mr. McClain, Mr. McClain was walking home on a public sidewalk which was located some distance away from his home, whereas, the plaintiff's rights have been viciously, and on numerous occasions, egregiously violated by the defendants while the plaintiff was within the confines of the plaintiff's own private-property - in many cases, while the plaintiff was within the comfort of [HOUSE] - the most sacred of private space that is even protected by both the *"castle-doctrine"* and *"stand-your-ground"* - within one's own private sanctuary.
Ⓑ The plaintiff has suffered over a decade of (non-lethal) hate-crimes/civil-rights-violations/racketeering-acts/abuses by the defendants whereas, to the best of the plaintiff's knowledge, Mr. McClain suffered one horrife, lethal incident from the predators that ended his life.

# ¶684

## 《UNITED STATES V. TRAVIS MCMICHAEL, GREGORY MCMICHAEL, AND WILLAM "RODDIE" BRYAN》:

Both the brutal murder of Ahmaud Arbery at the hands of former-law-enforcement White-Supremacists Travis McMichael and Gregory McMichael, and 《Glynn-County-Law-Enforcement》's ([GCLE]'s) subsequent cover-up of this egregious hate-crime are, at least in some aspects, eerily similar to the hate-crimes/civil-rights-violations/racketeering-acts/abuses suffered by plaintiff at the hands of the defendants. While Mr. Arbery was lying on the street, unconscious and bleeding-to-death, many White [GCLE] police-officers are observed on their own body-worn-camera-recordings consoling Mr. Arbery's killers, treating the killers as if the killers were the victims of Mr. Arbery. Despite of the fact that the [GCLE] police had full access to the cell-phone-video of the hate-crime recorded by co-conspirator William Bryan even on the day of the murder, not only were the killers not arrested and not held-in-jail, but [GCLE] police fraudulently accepted the killer's self-defense claims on brazenly-racist grounds. While Mr. Arbery's mother repeatedly demanded more information and justice for her son's death - [GCLE] (including the [GCDA]) deliberately conspired and acted (for several months) to deprive the Arbery family of justice for their family member's death. It was only after this cell-phone-video was released onto social-media and public outcry became unstoppable that [GCLE] was forced to react, by no choice of their own, to arrest and prosecute the perpetrators of this vicious hate-crime. Thus, even with this cell-phone-video, the Arbery family, people-of-color and activists had to fight tooth-and-nail to ensure that both the racist criminals and some of those within [GCLE] (including the [GCDA] Jaekie Johnson) that aided the criminals in the cover-up were brought to justice. It is obvious to any reasonable

person that if there was no cell-phone-video, not only would there have been no justice, but rather, the racist criminals would have been paraded with the same racist fraud: that these racist criminals were the *"heroes"* that were *"saving their White-neighborhood"* from the Black-male that was committing the real *"crime"* - by entering into *"their"* (exclusive-and-pure) White neighborhood. Marcus Arbery, the father of Ahmaud Arbery, has made the allegation even on national television, that the African-American community in Glynn County has been suffering the racism of the [GCLE] for a long time. Despite the fact that the plaintiff has suffered the many hate-crimes/civil-rights-violations/racketeering-acts/abuses from racketeer co-defendants [JSP&KAP],[RSR] (and former neighbor [JJB]), as substantially documented in this lawsuit, and despite the fact that the plaintiff is significantly smaller in physical-size than [JSP],[KAP],[RSR],[JJB] (with the plaintiff being less than half the physical-size of defendants [JSP],[RSR]), [WCLE] has fraudulently conspired and acted with defendants [JSP&KAP], [RSR] to portray defendants [JSP&KAP],[RSR] as victims of the plaintiff - on brazenly-racist grounds - purely under the fraudulent pretext that the plaintiff did not maintain the plaintiff's private-property according their (hypocritically-enforced) White-American standards. For over 10 years and at every occasion when the plaintiff has reported hate-crimes/civil-rights-violations/racketeering-acts/abuses suffered by the plaintiff at the hands of [JSP&KAP],[RSR], initial-neighbor [JJB], and some members of [WCLE], [WCLE] has not only conspired and acted to cover-up these hate-crimes/civil-rights-violations/racketeering-acts/abuses, but even more egregiously, [WCLE] has conspired and acted with co-conspirators [JSP&KAP],[RSR] to blackmail, defraud, humiliate and retaliate-against the plaintiff, in-order-to silence the plaintiff and in-order-to punish the plaintiff for the plaintiff's *"audacity"* to gather all of this highly incriminating evidence against co-conspirators [JSP&KAP], [RSR] and [WCLE]. Therefore, while nothing in more unjust than the violent murder of innocent person(s), the huge amount of injustice that the plaintiff has suffered from the defendants (over the course of over 10 years) is even more extreme compared to [GCLE]'s deprivation of the Arbery family's rights in at least 3 crucial aspects:

Ⓐ According to the plaintiff's limited knowledge, while [GCLE] did clearly obstruct the Arbery family from justice, it does not appear to the plaintiff that [GCLE] blackmailed, retaliated-against or publicly-humiliated the Arbery family in-order-to silence the Arbery family;

Ⓑ According to the plaintiff's limited knowledge, the Arbery family suffered one extreme act of injustice and the aftermath coverup of that injustice (spanning several months), whereas the plaintiff has suffered over 10 years of hate-crimes/civil-rights-violations/racketeering-acts/abuses from the defendants that aggregately conspired and acted to deprive the plaintiff of the plaintiff's rights.

Ⓒ In the case of Mr. Arbery, Mr. Arbery was jogging on public streets that were located some distance away from his home when he was viciously hunted down by the racist predators that ended his life, whereas, the plaintiff's rights have been viciously, and on countless occasions, egregiously violated by the defendants while the plaintiff was within the confines of the plaintiff's own private-property - in many cases, while the plaintiff was within the comfort of the plaintiff's own [HOUSE] - the most sacred of private space that is even protected by the *"castle-doctrine"* and *"stand-your-ground"* - within one's own private-castle (or private-sanctuary).

## ¶685

### ⟨ARIZONA V. FRANK SILVA ROQUE⟩:

Balbir Singh Sodhi was an Arizona business-owner that was part of a North-Indian-immigrant family, of the Sikh religion. Mr. Sodhi, a devout member of the Sikh religion, would wear the Sikh turban in accordance with his family's Sikh faith. Because of his appearance as a middle-eastern Muslim, Mr. Sodhi, was bruttally gunned-down by White-Supremacist Frank Silva Roque on or about the date of {2001-09-15} - a few days after the {2001-09-11} attacks. Mr. Roque also shot his gun at a Lebanese-American clerk from his truck but missed his target. Mr. Roque then drove to his former residence, which was purchased by an Afghan (Muslim) immigrant, and fired multiple rounds from his gun at

that house. At that moment in time, these racially-motivated and religiously-motivated brutal hate-crimes following the {2001-09-11} attacks were just one the many high-profile hate-crimes targeted at Muslim immigrants and those that look like Muslim immigrants. The jury in the trial of 《ARIZONA V. ROQUE》 convicted Mr. Roque of first-degree murder and sentenced Mr. Roque to death, which, according to at least some member(s) of the Sodhi family, was not the penalty that the Sodhi family was seeking, since those member(s) of the Sodhi family said that their Sikh religion is opposed to the death-penalty. Right before the brutal-murder of Mr. Sodhi, Mr. Sodhi was discussing with his family whether he should go to work following the {2001-09-11} attacks, due to the substantial anti-Muslim (Islamophobic) animus that had swept across the United States, especially at that particular moment in time, but also the aftermath. At least some member(s) of the Sodhi family warned Mr. Sodhi against going to work, but Mr. Sodhi insisted to go to work. Mr. Sodhi's decision to go to work, which he had every right to do, ultimately resulted in his death. The plaintiff has a middle-eastern-Muslim appearance similar to Mr. Sodhi - long-uncut-hair-and-beard, strong middle-eastern/Indian accent - although originating from South-India, the plaintiff has a much darker skin color than Mr. Sodhi. The plaintiff was similarly warned by those closest to the plaintiff not to move into a White neighborhood lacking in racial-diversity, especially due to the plaintiff's racial-profile and the plaintiff's political-profile. Both the plaintiff and the plaintiff's senior-citizen [PARENTS] were attracted to purchasing property further away from the big-city ([CoA]) due to lower property prices, not realizing all of the other unintended negative consequences that might follow from that naive decision. Even during the plaintiff's initial months living within [788KLLTX78641] in early-{2009}, the plaintiff gave all of the plaintiff's White-American neighbors the benefit-of-the-doubt and placed blind-trust in all of the plaintiff's neighbors. However, as even the initial incidents in {2009}, as substantially documented in this lawsuit reveal, this trust was viciously broken in a very-short amount of time, and it became apparent to the plaintiff that the plaintiff was living in a hostile neighborhood, grossly outnumbered by the dominant-White-Caucasian-racial-majority of the neighborhood, in which some of its most predatory residents with extreme racial animus - [JSP&KAP],[RSR],[JJB] in particular - and the predatory institutions that exclusively-represent them - the then-[HOA] under Board members [SPOA-P-BC],[SPOA-VP-AH] and [WCLE] - were all hellbent on predatorily targeting the plaintiff, acting under-color-of-law, using the property-maintenance-laws, of all things, as their favorite tool of predation against the plaintiff. Thus, while no crime against a victim is worse than such victim that suffers the hate-crime of brutal-murder, the plaintiff did suffer many-dozen counts of, uncharged and unprosecuted, hate-crimes/civil-rights-violations/racketeering-acts/abuses aggregately committed by the defendants against the plaintiff during the years {2009} through {2022} - almost all, if not all, were the direct result of extreme-racial-animus (and/or homophobic-animus) against the plaintiff. On several occasions during which the plaintiff has resided in this 【Summerlyn】 neighborhood, the plaintiff has been similarly advised/warned by those closest to the plaintiff, to move out of the this White neighborhood - for no other reason but to escape that extreme-racial-animus (and/or homophobic-animus) of the defendants. The plaintiff has always responded that if the plaintiff gave-in-to the predatory actions and demands of the defendants, then the plaintiff would be allowing such predators to achieve their goals of creating/maintaining a pure-White-neighborhood with residents that strictly and exclusively live-and-maintain-private-property-according-to their (hypocritically-enforced) White-American standards. In other words, the plaintiff responded that if the plaintiff gave-in-to to the predatory actions and demands of the defendants, then the plaintiff would be doing an extreme injustice not only to the plaintiff, but to the overall goals of the civil-rights-movements, and in particular - to all those persons-of-color similarly-situated as the plaintiff that could just-as-easily be predatorily targeted due to extreme-racial-animus (and/or homophobic-animus). There is an expression voiced by many peoples (including Americans) that are targeted by acts of terrorism. The plaintiff loosely paraphrases the expression as follows: *"If we change the way we live in response to acts of terrorism, then the terrorists will have won, because the terrorists will have achieved their goals of changing our lifestyle, which is what the terrorists sought to do."* The plaintiff follows the same logic: If the plaintiff caves-into or submits-to White-Supremacist tyranny, terror (or any other abusive acts of White-Supremacy) - for example, by moving out of an overwhelming White neighborhood in response to such White-

Supremacist tyranny, terror (or any other abusive acts of White-Supremacy) - then the White-Supremacists will have won, and the plaintiff will have done an extreme injustice not only to the plaintiff, but to all those people-of-color and social-justice-activists who have fought many centuries to secure the rights that people-of-color have today.

# ¶686

**Unlawful arrest of Professor Henry Louis Gates, Jr.:**

Dr. Gates is a highly-esteemed and internationally-renowned African-American Harvard University professor who was, during an infamous incident in {2009}, arrested at his own property because local-law-enforcement falsely accused him of attempting to burglarize into a house that they alleged that he was not the rightful owner of. The plaintiff's suffering is even more extreme in at least two crucial aspects:

Ⓐ In the case of Professor Gates, local-law-enforcement - for obviously racist reasons - did not believe Dr. Gates to be the lawful owner of the house that he was trying to enter into, and thus arrested him, whereas in most of the incidents documented in this lawsuit - and with a few major exceptions - [WCLE] did know fully-well that the plaintiff was the lawful resident and owner of the plaintiff's property, but despite of this knowledge, deliberately and maliciously chose to violate the plaintiff's rights.

Ⓑ The plaintiff has suffered over a decade of abuse by the primary defendants whereas, to the best of the plaintiff's knowledge, Dr. Gates suffered one abusive and humiliating incident from the predators that falsely arrested him.

# ¶687

**《FLORIDA V. COURTNEY CLENNEY》:**

As some attorneys have pointed out, in cases of White-On-Black/White-On-Brown crimes, the White perpetrators are sometimes able to get away with the crimes that they committed against their Black/Brown victims because law-enforcement is either much more likely to believe the White perpetrators rather than the Black/Brown victims or much more likely to ignore the Black/Brown victims because of their perception that Black/Brown people have very-little power within society - in either case, resulting from well-known and well-documented racial biases of many law-enforcement departments across the United States - especially law-enforcement departments in areas of the United States lacking in racial diversity. As some attorneys have pointed out, due to these well-known and well-documented racial biases, even when there are competing domestic-violence allegations regarding an interracial couple, law-enforcement are much more likely to side-with the White woman rather than the Black/Brown man. As some attorneys have pointed out, due to this reason, many Black/Brown domestic-violence victims of White perpetrators do not even bother to contact the police because they know that they will not only, not be taken-seriously by law-enforcement, but far-more importantly, suffer further injustice by such law-enforcement. See for example, the recent high-profile case of 《FLORIDA V. CLENNEY》 which involves the alleged stabbing death of a Black man, Christian Tobechukwu Obumseli, where both the police and prosecutors were initially (for several months - approximately 128 days) unwilling to charge Ms. Clenney, a very-wealthy White woman, until after the family of Mr. Obumseli applied enough pressure onto them to act. The plaintiff has been well aware of these racial biases that exist within law-enforcement, but despite this knowledge, did report, for over a decade, to [WCLE] many of the crimes committed against the plaintiff by [JSP&KAP],[RSR],[JJB] and even some members of [WCLE]. Again, while the plaintiff did not suffer death, the plaintiff's case is still more egregious than the unjust death and delayed justice of 《FLORIDA V. CLENNEY》 for at least two crucial reasons:

Ⓐ It is not true that the [WCLE] did not believe the plaintiff, but rather, [WCLE] knew the plaintiff to be speaking the truth regarding the crimes committed against the plaintiff, even from the initial incidents dating back to {2011}, and despite of this knowledge, [WCLE] maliciously conspired-with and acted-with the perpetrators of such crimes - primarily [JSP&KAP],[RSR] (and initially [JJB]) - to aggregately commit many of the hate-crimes/civil-rights-violations/racketeering-acts/abuses substantially documented in this lawsuit - as retaliation against the plaintiff for the plaintiff's *"audacity"* to gather such highly incriminating evidence against [WCLE] and for the plaintiff's *"audacity"* to report such hate-crimes/civil-rights-violations/racketeering-acts/abuses committed by White-American perpetrators.

Ⓐ To this date, not even one of the many dozen counts of racially-motivated hate-crimes/civil-rights-violations/racketeering-acts committed against the plaintiff by the defendants have even been charged, let alone prosecuted, again, due to the racial profile of the plaintiff, and the racial profile of the defendants.


## ¶688

**⟨JOE PETITO & NICHOLE SCHMIDT V. CHRISTOPHER & ROBERTA LAUNDRIE, STEVEN BERTOLINO⟩:**

The huge amount of national attention, law-enforcement resources and manhours dedictated to the national high-profile domestic-violence, missing-person and eventual murder case involving Gabrielle Petito, also brought some of the national focus to the extremely disproportionate amount of national attention and resources provided to just one missing-person - who happened, out of no coincidence, to be White/Caucasian/American, blonde and blue-eyed - commonly referred to as the *"Missing White Woman Syndrome"*. While so much of the national mainstream-media's attention and the federal-state-and-local law-enforcement's resources was directed towards this one missing-person, a significant fraction of people who were genuinely concerned about justice in the United States began to loudly question such disproportionate amount of attention and resources that were dedicated to this one missing-person, when there were countless missing-persons-of-color who never got and continue not-to-get any attention by the national mainstream-media and all-levels of law-enforcement - with some of such people accusing both the mainstream-media and/or law-enforcement of racism and/or racial-discrimination (which was also reported by some of such mainstream-media). If such allegations of racism and/or racial-discrimination are valid, then the plaintiff's allegations of the defendants' racist treatment of the plaintiff have exponentially-more merit - for all of the reasons that are abundantly-documented in this lawsuit. While the mainstream-media's lack-of-attention and law-enforcement's lack-of-resources dedicated towards missing persons-of-color are deliberate acts of omission - instead, the defendants' decade of racial-oppression and racketeering-activity against the plaintiff were clearly predatory acts of commission - which, in and of itself, caused severe, irreparable harm against the plaintiff. Furthermore, such decade of predatory acts were ultimately in furtherance of the defendants' corrupt-malicious-predatory-and-retaliatory conspiracy and scheme to defraud the plaintiff out of both the plaintiff's money and the plaintiff's private-property within one-or-more such White neighborhood(s) - again, one of the most egregious acts of commission.


## ¶689

**⟨SOUTH CAROLINA V. RICHARD ALEXANDER MURDAUGH⟩ ; ⟨UNITED STATES V. RICHARD ALEXANDER MURDAUGH⟩ ; ⟨SOUTH CAROLINA V. CORY HOWERTON FLEMING⟩ ; ⟨UNITED STATES V. CORY HOWERTON FLEMING⟩:**

Richard Alexander Murdaugh was one of South Carolina Low-Country's most powerful lawyers, with Mr. Murdaugh being born into a family

of very-powerful lawyers and judges - dating back over a century. Mr. Murdaugh was one of the most highly paid lawyers in that area of South Carolina with Mr. Murdaugh earning substantial amounts of money in legitimate work. However, despite Mr. Murdaugh earning substantial amounts of money in legitimate work, and despite Mr. Murdaugh owning thousands of acres of property, for a period of approximately ten years, Mr. Murdaugh also stole large sums of money from clients and/or the law-firm that bore the Murdaugh family name. It was only after his son Paul's boating accident resulting in the death of at least one person, that Mr. Murdaugh's many crimes begin to become unraveled, culminating in the murders of his wife and son Paul - the double-murder trial in which Mr. Murdaugh was convicted. Despite 《SOUTH CAROLINA V. MURDAUGH》 being a double-murder trial, much of such murder trial was focused upon Mr. Murdaugh's alleged financial crimes as such alleged financial crimes were perceived as the motive for Mr. Murdaugh's alleged murder crimes. To most reasonable observers, the most shocking aspect about Mr. Murdaugh's financial crimes was that he was able to get away with committing those serious financial crimes for approximately ten years, despite of the fact that victims of those serious financial crimes were fully-aware that Mr. Murdaugh was the perpetrator of such crimes. When the average person steals even a relatively small amount of money and/or property - for example, by shoplifting - such person is almost-always immediately apprehended and the full weight of the law hammers down upon them. So, the only reasonable explanation that explains how Mr. Murdaugh was able to steal such large amounts of money, for such a large amount of time, from victims who knew that he was the perpetrator, is that Mr. Murdaugh was an extremely-powerful and wealthy White-American attorney from an extremely-powerful and wealthy family of lawyers and judges - that, because of his enormous wealth and power, all of his victims could not, figuratively-speaking, touch him. It was only after his son Paul's boating accident, resulting in a death, did Mr. Murdaugh's *"house of cards"* become unraveled and collapsed. Prior to the collapse of the Murdaugh dynasty, the Murdaugh family wielded extreme power and control over the Justice-System in that area of South Carolina - even determining who would be prosecuted and who would not be prosecuted. A close attorney associate of Mr. Murdaugh, Mr. Fleming also pleaded guilty to all state and federal charges stemming from his conspiracy (with Mr. Murdaugh) to steal such large sums of money from clients. One-or-more attorneys has commented on national-television that, if Mr. Murdaugh had never been charged and convicted for the aforementioned double-murder, Mr. Fleming would have never been charged and prosecuted for his crimes. The purpose of the plaintiff's lawsuit is, thus, to uncover and unravel over a decade of racial-oppression and pattern-of-racketeering-activity that the plaintiff has suffered from the defendants, by virtue of the defendants extreme power, and extreme abuse of such power, over the powerless, lowly plaintiff (🔒) .


# ¶690

## 《UTAH V. KOURI RICHINS》:

Kouri Richins was a real-estate agent that engaged in the extremely-risky business of *"flipping"* very expensive properties. She was married to a man, Eric, who built a very successful and profitable masonry business - a man that was, thus, the real bread-winner for the family. According to the allegations made by the State of Utah, Kouri became increasingly angry that Eric would not continue to fund her failed, extremely-risky and extremely-expensive enterprise. Eric began to lose trust in Kouri due to one-or-more occasions in which he suffered food-poisoning, all the while, suspecting that his wife was trying to poison him to death - even warning at least some of his other adult family members of these suspicions. Eric began shifting the assets of his business so that such assets were out of Kouri's reach, and also shifted the beneficiaries of his business and/or estate and/or life-insurance-policies to his siblings and/or children. According to the allegations made by the State of Utah, Kouri was eventually successful in obtaining, fentanyl, an extremely lethal drug, to poison Eric to death, but in an actually-failed attempt to profit from his business assets and/or estate assets and/or life-insurance-policies. Kouri was even alleged to having physically assaulted Eric's sister, Amy, after Amy showed up at a party at the property that Kouri was hosting one or two days after her husband Eric's

death, even though Amy was then the rightful owner of such property (due to Eric's death). Shortly thereafter, Kouri brazenly filed a lawsuit against one-or-more of the Richins family and/or estate, claiming that Kouri was the rightful beneficiary of Eric's business assets and/or estate assets and/or life-insurance-policies. Approximately a year after the death of Eric, Kouri publishes a children's book, fraudulently promoting it as a tool to help children grieve the loss of parent(s). Kouri then appears on one-or-more local television programs promoting her new book, but also fraudulently pretending to be a victim of tragedy - her husband Eric's death. All of Eric's other family members had to suffer over a year of Kouri's outrageous conduct as she painted herself to the entire world as the victim, when, as the State of Utah now alleges, she actually murdered her husband for profit. Assuming that all of the allegations and overwhelmingly incriminating evidence gathered by State of Utah against Kouri is true, without in any way downplaying Kouri's shockingly brazen behavior/actions that resulted in the death of her husband Eric, at least some of this shocking brazenness is similar to what the plaintiff has suffered, for over a decade, from the defendants. For over a decade, the plaintiff has recorded what the plaintiff considers to be a *"mountain"* of highly incriminating evidence against the defendants - including the agencies of [WCLE] named in this lawsuit. At not one point in time during that over decade-long period of time was the plaintiff ever provided an opportunity to present this *"mountain"* of highly incriminating evidence, showing what clearly appears to be the defendants' brazen racketeering-enterprise against the plaintiff - a racketeering-enterprise that engaged in a seemingly endless stream of racial-oppression and racketeering-activity against the plaintiff. During that same period of time, one-or-more of the defendants (along with their co-conspirators) publicly paraded themselves as the high-IQ, vigilante-rightdoers, all the while, racistly painting the plaintiff as the low-IQ, subhuman-wrongdoer. The plaintiff has had to suffer through over a decade of mostly retaliatory (thus felonious) hate-crimes, civil-rights-violations and/or racketeering-acts from the defendants, all the while, the defendants (and one-or-more of the defendants' co-conspirators) were fraudulently (in-order-to retaliate and obstruct-justice), accusing the plaintiff, an immigrant-of-color/indigenous-person, of failing to maintain the plaintiff's private-property according to their (hypocritically-enforced) White-American standards - which even by in the defendants' twisted and fraudulent logic was, at best, an alleged civil breach-of-contract (only if the enforcement was proven to be non-capricious, non-arbitrary and non-discriminatory), and at worst, an alleged Class-C-Misdemeanor-Public-Nuisance (only if the defendants could prove the plaintiff's *"Mens rea"* along with all the elements of the so-called *"crime"*). The plaintiff does not have sufficient words to describe the extreme and ever-increasing mental anguish of the plaintiff having to suffer such ever-escalating injustice that was directly caused by the defendants' decade-long obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff.

## ¶691

### ⟨NEW YORK V. HARVEY WEINSTEIN⟩ ; ⟨CALIFORNIA V. HARVEY WEINSTEIN⟩ ; ⟨CALIFORNIA V. DANIEL PETER MASTERSON⟩

The relatively-recent high-profile trials of both Mr. Weinstein and Mr. Masterson revealed to the world, in much greater detail, that both Mr. Weinstein and Mr. Masterson were allegedly protected, for a substantial period of time, from facing justice for the crimes that they committed. Mr. Weinstein, who once had an alleged net-worth of as much as approximately $300 million, is alleged to have been protected by *"a powerful industry"* - the Hollywood industry - in which Mr. Weinstein played the role of a top Hollywood boss. Due to such protection, Mr. Weinstein was able to continue the same (or similar) pattern of his crimes with many more victims - for a substantially longer period of time - than any other criminal (who does not have the power and wealth of Mr. Weinstein) would have been allowed to get away with. Mr. Masterson, a once highly-regarded Hollywood actor who once had an alleged net-worth of as much as approximately $25 million, is alleged to have been protected by the Church of Scientology, which for over a decade, allegedly played a very powerful role in shielding Mr. Masterson from facing justice for serious rape allegations from Mr. Masterson's rape victims. At Mr. Masterson's sentencing hearing, one-or-more of Mr. Masterson's

rape vicitms expressed their extreme anguish that they were denied justice for almost two decades - having to live with that extreme pain-and-suffering for that extraordinarily-long amount of time. Leah Remini, an actress engaged in a civil lawsuit against the Church of Scientology, stated, in part, about the Church of Scientology,

> "This is just one of many cases that Scientology has been involved in - in attempting to obstruct justice - and Mike could also speak to that, but it's the absolute policy of Scientology. And um, I think they should be held accountable, which is some of the basis of - part of the basis of my lawsuit, so that people can come forward, victims can come forward. People are allowed to report crimes concerning Scientologists, Sea-Org members and as well as civilian scientologists - people should not be in fear of retaliation from a multi-billion-dollar organization calling itself a church, for fear of what they do to people - when they do. And that was, very much came out in this trial and it is not the first time - Scientology has a history of doing this as part of their policy - it's part of their practices ... and so, it's not just about me. People have a right. We live here in America. We have rights. We should be able to report crimes - we should be able to report stories - do welfare checks without fear that a multi-billion-dollar organization is going to use all of its resources to destroy your life."

While both the Hollywood-Industry and the Church-of-Scientology are not government institutions, it brings immense pain and mental-anguish (resulting in permanent psychological trauma) to the plaintiff for the plaintiff to reveal to this Court that private-citizen racketeer co-defendants [JSP&KAP],[RSR] were protected for the decade of racial-oppression and racketeering-activity that they committed against the plaintiff by a municipal-corporation government - defendant [WC] - and specifically such municipal-corporation's law-enforcement agencies - [WCLE] - which acted in-conspiracy-with and in-concert-with such racketeers, in furtherance of their corrupt-malicious-predatory-and-retaliatory conspiracy against the plaintiff, not only to obstruct-justice against the plaintiff, and not only to inflict immense amount of irreparable harm onto the plaintiff, but more importantly, to (fully) defraud the plaintiff out of the plaintiff's money and private-property-ownership within one-or-more White neighborhood(s). Thus, in the plaintiff's particular case, the *"multi-billion-dollar organization"* that Ms. Remini refers to is not a private-organization Church, but rather a public-municipal-corporation-government - namely, defendant [WC], and specifically defendant [WC]'s law-enforcement-agencies, [WCLE]. Unlike Mr. Masterson who was allegedly protected by the Church-of-Scientology due to both Mr. Masterson's wealth and Mr. Masterson's high-ranking-membership-status in such Church, both private-citizen racketeer co-defendants [JSP&KAP] and [RSR] - acting in-concert-with [WCLE] in furtherance of their malicious-and-predatory conspiracy against the plaintiff - were protected by [WCLE] by virtue of their dominant racial-profile - White/Caucasian/American/Christian - from the decade of racial-oppression and racketeering-activity that they committed against a *"low-IQ"*, powerless immigrant-of-color/indigenous-person, namely the plaintiff (🧍).

# ¶692

**{2023} Tennessee House of Representatives expulsions of Black lawmakers:**

On or about the date of {2023-04-06}, the overwhelmingly Republican-Party dominated Tennessee House of Representatives voted on resolutions to expel three of its Democratic-Party lawmakers, two of whom were Black, one of whom was White - because these lawmakers were alleged to have engaged in *"protests for gun reform"* on the House floor (🔫). The votes resulted in only the two Black lawmakers being expelled, while one of these Black lawmakers expressed indignation that some of the real crimes committed by past White-American Tennessee lawmakers did not result in such expulsion. The plaintiff asserts that this type of racial oppression can only happen when the people-in-power - in this particular case, the Tennessee lawmakers - think that the world is not watching the injustice that such people-in-power are perpetrating.

It was only after this incident became a national high-profile story did Tennessee lawmakers rightfully face the well-deserved ridicule and outrage of the majority of the American public. The plaintiff asserts that most successful (unrighted) injustice remains successful (and unrighted) because such successful injustice happens *"in the dark"*: *"Power remains strong when it remains in the dark; exposed to the sunlight, it begins to evaporate."* A primary purpose of the plaintiff's lawsuit is, thus, to expose into sunlight, the defendants decade of racial-oppression and racketeering-activity against the plaintiff, with *"sunlight being the best disinfectant."*

## ¶693

**《TEXAS V. DANIEL PERRY》: Texas Governor's intentions to pardon convicted murderer and far-right-wing-extremist Daniel Perry:**

Former United States Army Sergeant Daniel Perry was accused of willfully attending a [BLM] protest in Austin, and when confronted by a [BLM] protester, Garrett Foster, Mr. Perry fired multiple bullets from his gun towards Mr. Foster, thus killing Mr. Foster. For these actions, Mr. Perry was convicted by a Texas jury of the crime of murder. Prior to these actions, Mr. Perry had posted onto social-media, what even local media organizations have described as racist and/or far-right-wing-extremist messages about [BLM], with Mr. Perry even referring to [BLM] protesters using the racial-slur, *"monkeys"*. Despite of Mr. Perry's conviction on perhaps one of the worst felony crimes that a person can commit in the State-of-Texas, and despite of passionate victim-impact statements from the victim's family in support of such conviction, the Governor of Texas has announced his intentions to pardon Mr. Perry - a move that one-or-more seasoned criminal-defense/civil-rights attorneys have deemed to be an unprecedented overriding of *"rule of law"*, and a move that a juror on such case described as a *"travesty"*. In a public statement, the Texas Governor proclaimed, *"Texas has one of the strongest 'Stand Your Ground' laws of self-defense that cannot be nullified by a jury or a progressive District Attorney."* It is under these oppressive conditions for both rule-of-law and civil-rights within the State-of-Texas, and the clear favoritism towards far-right-wing-extremism shown by the State-of-Texas, that the plaintiff has filed this civil-rights lawsuit in Federal District Court. The plaintiff asserts that despite of the fact that the plaintiff has suffered not only racial-oppression (and racketeering-activity), but also crimes of far-right-wing-extremism by the defendants (including local government defendant [WC]), the plaintiff cannot turn even to the State-of-Texas (for example, the Texas-Rangers) for any justice for such racially-motivated crimes (including racketeering-activity) committed against the plaintiff - due to the State-of-Texas's clear intentions and/or other indications of where the State-of-Texas stands on these particular issues. Thus, by filing this federal lawsuit, the plaintiff can only turn to federal authorities, in the hopes that the plaintiff can seek justice from the only remaining system of justice known to the plaintiff - the United States Federal system of justice.

## ¶694

**{Summer-2020} social-justice-protests VERSUS {2021-01-06} Far-Right-Wing-Extremist violent insurrection:**

There have been multiple prominent examples in the recent decades that document how law-enforcement treats an almost-exclusively White/Caucasian/American group of violent far-right-wing-extremists in one manner, while treating a racially-diverse-group of non-violent social-justice activists in a radically different manner. The nationwide {Summer-2020} social-justice-protests versus the {2021-01-06} far-right-wing-extremist violent insurrection at the United States Capitol are simply a very-recent example of this truism. Here, the social-justice-protests were primarily done on public streets - where social-justice-activists have every right to peacefully protest. But the response to such overwhelmingly peaceful social-justice-protests on public streets by local-law-enforcement, state-law-enforcement (and in at least some cases, even federal-law-enforcement) was absolutely vicious, especially, in the extremely heavy-handed use-of-force. By sharp contrast, there was

not a sufficiently heavy response by law-enforcement to combat the huge group of far-right-wing-extremists that successfully infiltrated and vandalized the United States Capitol, resulting in numerous deaths and a large amount of serious injuries. Furthermore, it is clear to any reasonable observer that the federal prosecutorial response in the aftermath of the {2021-01-06} far-right-wing-extremists' violent insurrection at the United States Capitol, was primarily driven by the huge pressures of the extreme, and fully-justified, public outrage that law-enforcement treats the aforementioned different racial and/or political groups in such a radically different manner. Even the extremely-successful, professional-basketball head-coach, Doc Rivers, stated a rhetorical question on the minds of most (if not all) of those that are genuinely interested in living in a racially-just world: *"Could you imagine ... if those were all Black people storming the Capitol?"* It is that sentiment expressed by even an extremely-successful, professional-basketball head-coach that truly conveys the very legitimate and fully-justified deep-distrust that most people-of-color (including the plaintiff) have in institutions of power (including but not limited-to, the government).

## ¶695

**⟪WALLER V. BUTKOVICH⟫:** *"The Greensboro Massacre"*:

A more distant example of how law-enforcement treats the aforementioned political groups *"differently"* includes the massacre of the ⟦Communist Workers Party⟧ ("[CWP]") by the ⟦Ku Klux Klan⟧ ("[KKK]") and the ⟦American Nazi Party⟧ ("[ANP]") that left 5 people dead and more than 12 injured on the date of {1979-11-03} in the ⟪City of Greensboro, North Carolina⟫. Among the dead/injured [CWP] members were highly-educated ⟦Duke University⟧ graduate(s), multiple doctors and a ⟦Harvard University⟧ graduate who were humbly working to organize mostly-Black textile workers to collectively (as a union) fight for their rights. The ⟪Greensboro Police Department⟫, [GPD], had an informant within the [KKK]/[ANP] group who notified the [GPD] that these violent far-right-wing-extremist groups were prepared for armed violence. It would appear from the sequence of events that unfolded that the [GPD] not only deliberately allowed, but even encouraged/egged-on the violence that resulted in these deaths/injuries - while being deliberately absent at the scene of such violence. A civil lawsuit in Federal District Court filed by an Institute that represented members of the [CWP] resulted favorably for those petitioners. The ⟪City of Greensboro, North Carolina⟫ has since issued a *"statement of regret"* and a formal apology for the incident. While the plaintiff's more-than-a-decade-long suffering at the hands of the defendants did not result in the plaintiff's death, the plaintiff suffering has been more egregious in a few crucial aspects:

Ⓐ The plaintiff has suffered alone, the malicious and predatory actions of the defendants, AND

Ⓑ [WCLE] actively and maliciously conspired with the defendants [JSP&KAP],[RSR] (and other co-conspirators) to violate the plaintiff's rights, AND

Ⓒ All of the defendants, including non-law-enforcement racketeer co-defendants [JSP&KAP],[RSR], acted not only in conspiracy with one-another, but even more egregiously, *"under color of law"*, to maliciously and predatorily violate the plaintiff's rights, AND

Ⓓ The plaintiff is a single immigrant-of-color/indigenous-person that has suffered some of the hate-crimes/civil-rights-violations/racketeering-acts/abuses of White/Caucasian/Americans [JSP&KAP],[RSR] and majority-White angency of law-enforcement, [WCLE], although the plaintiff's senior-citizen [PARENTS] have also suffered a much smaller number of such hate-crimes/civil-rights-violations/racketeering-acts/abuses from defendants [JSP],[RSR].

## ¶696

**《CERVINI ET AL V. STAPP ET AL》:**

The pending federal lawsuit filed in this Federal District Court involves the now infamous *"highway confrontation between a Biden bus and Trump supporters"* that *"made national news in the final days of the heated 2020 presidential campaign. The incident involved at least one minor collision and led to Texas Democrats canceling three scheduled campaign events"* (source: 《The Texas Tribune》, "Texas "Trump Train" highway skirmish lawsuit says police dismissed danger" ). The lawsuit alleges that the 《San Marcos Police Department》 (" [SMPD]") not only refused to help the alleged victims in their moments of distress, but with allegations that [SMPD] officers *"privately laughed ... joked about the victims and their distress."*. Without in any way downplaying the alleged injustice suffered by the alleged victims in that particular lawsuit, even if all of the allegations made in that lawsuit are true to the fullest extent, then the plaintiff still asserts that the plaintiff's more-than-a-decade-long suffering at the hands of the defendants has been more egregious in at least a few crucial aspects:

Ⓐ The plaintiff asserts that the defendant [WC]'s law-enforcement, [WCLE], did not merely deliberate-fail-to and/or refuse-to to fully-investigate, charge and prosecute any of the racially-motivated hate-crimes/civil-rights-violations/racketeering-acts/abuses committed against the plaintiff by [JSP&KAP],[RSR],[JJB] and some of its own employees - over the course of over 10 years - but far-more-egregiously, [WCLE] actually conspired with those individuals - [JSP&KAP],[RSR],[JJB] (and their co-conspirators) - in the decade-long, obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise substantially documented in this lawsuit.

Ⓑ Additionally, the plaintiff is not aware of any racial-discrimination and/or racial-oppression component/claims of that particular lawsuit; on the other hand, the plaintiff has primarily filed the plaintiff's lawsuit as a racial-discrimination, racial-oppression and anti-retaliation lawsuit under the [FHA]/[TFHA].

Without in any way commenting on the merits of that particular lawsuit's claims, at least on surface level, the one similarity between the two lawsuits is that both lawsuits allege violation(s) of the [KKKA], with the plaintiff's lawsuit filing claims under both [KKKA]:§1983 and [KKKA]:§1985.

# ¶697

**《UNITED STATES V. HENRY "ENRIQUE" TARRIO》**

The federal prosecution of the leader of the far-right-wing-extremist organization *"Proud Boys"*, Henry "Enrique" Tarrio, resulted in Mr. Tarrio not only being convicted of Seditious-Conspiracy, but being sentenced to longest sentence (yet) - 22 years - stemming from the {2021-01-06} United-States-Capitol-Insurrection. Mr. Tarrio's criminal actions leading up to that particular day have been captured on one-or-more videos, showing Mr. Tarrio proudly and *"zealously"* acting, with supreme-confidence and extreme-recalcitrance, as one of the brazen leaders and/or planners of such {2021-01-06} United-States-Capitol-Insurrection. While Mr. Tarrio showed extreme-pride, *"zeal"*, supreme-confidence and extreme-recalcitrance in his actions leading up to that particular day, at his sentencing hearing, Mr. Tarrio asked for mercy of the Federal Court in which he was prosecuted, fully admitting that the {2021-01-06} United-States-Capitol-Insurrection was a *"national embarrassment"*. Similar statements of regret were also issued by at least some other prosecuted participants of the {2021-01-06} United-States-Capitol-Insurrection - who acted with extreme-pride, *"zeal"*, supreme-confidence and extreme-recalcitrance on that particular day. Thus, the plaintiff asserts that due to the extreme-pride, *"zeal"*, supreme-confidence and extreme-recalcitrance that most, if not almost-all, far-right-wing-extremists criminals have and operate-under, unless such far-right-wing-extremist criminals - more so than any other type of criminal - are made to answer for their

criminal actions before this Court, they will not only never admit to their wrongdoing, but even worse, they will continue in such pattern of criminally-abusive conduct without facing justice. The plaintiff asserts that the plaintiff has a moral and ethical duty and responsibility, as a citizen-journalist, to expose the extreme-pride, *"zeal"*, supreme-confidence and extreme-recalcitrance in which the defendants - especially, racketeer co-defendants [JSP&KAP],[RSR] - engaged in their decade of racial-oppression and racketeering-activity against the plaintiff - in the hopes that such exposure will:

Ⓐ result in the defendants finally facing justice for such decade of their criminally-abusive actions committed against the plaintiff.

Ⓑ deter other far-right-wing-extremists from engaging in any type of oppression or racketeering-activity - especially in conspiracy with a municipal-corporation government - against any other potential victims. However, as this lawsuit clearly documents, the aforementioned recalcitrance is not limited to the far-right-wing-extremist racketeer co-defendants [JSP&KAP], and [RSR]. [WCLE]'s decade of racial-oppression and pattern-of-racketeering-activity against the plaintiff has demonstrated the remarkable recalcitrance of [WCLE] - that [WCLE] firmly believes, with supreme-confidence, that the anti-discrimination laws, the civil-rights laws, the abuse-of-office laws, and the anti-racketeering-activity laws of both the United States and the State of Texas do not apply to them and they are free to violate such laws with absolute impunity - at the very least, in cases where the victim(s) of such violations are perceived to be *"powerless"*, such as the plaintiff (🏠) . Thus, the plaintiff asserts that due to [WCLE]'s remarkable recalcitrance, unless [WCLE] is made to answer for their decade of criminal and otherwise unlawful conduct - in conspiracy with racketeer co-defendants [JSP&KAP],[RSR] - against the plaintiff before this Court, they will not only never admit to their wrongdoing, but even worse, they will continue in such pattern of criminally-abusive conduct without facing justice.

---

# §XXVII

# COMPARISON TO OTHER NOTEWORTHY LOCAL CASES

## ¶698

The case(s) cited in this section may not be as high-profile as those cited in the previous section, but the plaintiff asserts that they further indicate, and/or put-into-context, the sheer amount of extreme racial-oppression and racketeering-activity that the plaintiff has suffered from the defendants.

## ¶699

**Widely reported {2023} County of Hays Public-Nuisance Complaint(s):**

As reported by one-or-more local news-media organizations, a private-property in the County of Hays (also located in the Western-District-of-Texas) was the subject of one-or-more public-nuisance complaints, not against the property-owner(s) of such private-property, but rather, against one-or-more person(s) illegally squatting and illegally-dumping materials all over the property, including even, but not limited to, the front-yard of such property. For many months, such property was constantly-and-continuously documented (including one-or-more video-

recording(s)) to have some combination of garbage and/or refuse and/or rubbish and/or faeces and/or dead-animals (including dead-rats) littered, over almost-all surfaces of the property - including the front-yard of such property - with complainant(s) reporting that person(s) could not even walk through such property without stepping on such litter. A neighbor of such property worked with the prior property-owner of the property to purchase the property and clean it up. To the best of the plaintiff's knowledge, no criminal charge of public-nuisance was filed against the prior property-owner. The plaintiff asserts that this case truly highlights the decade of racial-oppression and racketeering-activity committed by the defendants against the plaintiff. Since the approximate date of {2009-03-06}, the plaintiff has always been, not merely the lawful resident, but the actual property-owner of [788KLLTX78641]. Similar to, but also more egregiously compared to, the aforedescribed case in the County of Hays, the plaintiff had suffered direct acts of both - malicious vandalism against the plaintiff's private-property and malicious intimidation/interference/disorderly-conduct/harassment/stalking/blackmail/etc. - by initial neighbor [JJB] and defendants [JSP&KAP],[RSR] - but not only were these malicious conspirators and perpetrators not punished for any of their crimes aggregately committed against the plaintiff, but more importantly, the government of [WC], specifically [WCLE], repeatedly conspired with most of these very same perpetrators to viciously retaliate against the plaintiff for the plaintiff's *"audacity"* to report and/or record most, if not all, of the decade of the defendants' acts of racial-oppression and racketeering-activity against the plaintiff. The defendants, thus, abusively weaponized (both as a *"sword and shield"*) the property-maintenance-laws as modern-day-Jim-Crow against the plaintiff, either for temporary conditions on the plaintiff's [BACKYARD] (not even visible from the street) or for the plaintiff's Constitutionally protected religious practices - specifically the plaintiff's Constitutionally-protected zero-waste lifestyle (including but not limited to *"no-mow"* landscapes and/or *"no-dig"* gardening), the plaintiff's Constitutionally-protected off-grid lifestyle - all lawfully practiced fully within the confines of the plaintiff's private-property, and furthermore, secured by a 6-feet-tall-privacy-fence - unlike the aforedescribed property in the County of Hays which, to the best of the plaintiff's knowledge, did not have any such tall privacy-fence. Unlike the aforedescribed Public-Nuisance complaint(s) in the County of Hays in which the prior property-owner was not charged, the defendants did knowingly conspire with each other, and did knowingly act with each other - using a combination of one-or-more pieces of fraudulent and/or misleading testimony, one-or-more pieces of fabricated-evidence, and one-or-more pieces of evidence obtained from numerous unconstitutional-and-unlawful searches/seizures of the plaintiff and plaintiff's property - to criminally-charge the plaintiff for Class-C-Misdemeanor-Public-Nuisance, in pure retaliation against the plaintiff for the plaintiff's *"audacity"* to report and/or record most, if not all, of the decade of the defendants' acts of racially-motivated (including felonious) hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff. Furthermore, the malicious conspirators and perpetrators against the plaintiff - malicious White-American private-citizen defendants [RSR],[JSP&KAP], the plaintiff's initial neighbor [JJB], and the overwhelmingly majority-White government of [WC], specifically the agencies of [WCLE] - all acting with extreme-racial-animus against the plaintiff, engaged in the aforedescribed pattern of numerous criminally-abusive acts of racial-oppression and racketeering-activity against the plaintiff, an immigrant-of-color/indigenous-person, precisely in-order-to deprive and defraud the plaintiff out of the plaintiff's right to private-property within the overwhelmingly White neighborhood in which [788KLLTX78641] is located, by driving the plaintiff out of such White neighborhood, thus in violation of both the [FHA] and [RIaCOA]. The plaintiff asserts that the comparison between these two cases is, figuratively-speaking, *"night-and-day"*, and truly epitomizes modern-day-Jim-Crow and the extreme abuse of the criminal justice system - all done in order to obstruct-justice by protecting the perpetrators of the racially-motivated (including felonious) hate-crimes/civil-rights-violations/racketeering-acts/abuses (and conspiracy thereof) committed against the plaintiff.

# §XXXVIII

# TEXAS PUBLIC NUISANCE LAW, 《FLORIDA V. JARDINES》, 《COLLINS V. VIRGINIA》 AND THE FOURTH AMENDMENT

---

▸ United States Constitution: Bill of Rights: Amendment IV. Search and Seizure (1791)
▸ https://www.law.cornell.edu/constitution/fourth_amendment

*The Fourth Amendment originally enforced the notion that "each man's home is his castle", secure from unreasonable searches and seizures of property by the government. It protects against arbitrary arrests, and is the basis of the law regarding search warrants, stop-and-frisk, safety inspections, wiretaps, and other forms of surveillance, as well as being central to many other criminal law topics and to privacy law.*

*"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."*

---

## ¶700

The relationship of the Texas Public-Nuisance Law to the Fourth Amendment of the United States Constitution prohibiting *"unreasonable searches and seizures"* is revealed in 【Texas Health and Safety Code: Title 5. Sanitation and Environmental Quality: Subtitle A. Sanitation: Chapter 343. Abatement of Public Nuisances: Sec. 343.024. AUTHORITY TO ENTER PREMISES.】 [THaSC-T5-SA-C343-SC-§343.024], but it is crucial to note that this section was authored/amended in the years {1989}/{1991}, and since that time, the [SCOTUS] has made some crucial rulings concerning the Fourth Amendment. However, even at the time that this law was authored back in {1989}/{1991}, the 《Texas Legislature》 ensured to word the law in careful manner such that if the owner(s)/occupant(s)/manager(s)/appropriate-person(s) were not available to view the identification exhibited by the county official/agent/employee, then the county official/agent/employee is not authorized to enter the *"premises"* - and premises is defined as any part of the private property including all of the outdoor areas. Since the plaintiff, in addition to owning, maintaining and residing-in residential-property, also owns and maintains agricultural-private-property (or "farm"), for the purposes of this lawsuit, it is also crucial to note that the Texas Public-Nuisance law does not apply to *"agricultural land"*:

---

▸ Texas Health and Safety Code: Title 5. Sanitation and Environmental Quality: Subtitle A. Sanitation: Chapter 343. Abatement of Public Nuisances
▸ https://statutes.capitol.texas.gov/Docs/HS/htm/HS.343.htm

*Sec. 343.002. DEFINITIONS.*

*In this chapter: ...*

*(6) "Premises" means all privately owned property, including vacant land or a building designed or used for residential, commercial, business, industrial, or religious purposes. The term includes a yard, ground, walk, driveway, fence, porch, steps, or other structure appurtenant to the property. ...*

*Sec. 343.011. PUBLIC NUISANCE.*

*(a) This section applies only to the unincorporated area of a county. ...*

*(d) This section does not apply to: ...*

*(2) agricultural land. ...*

---

SIDDHARTH KOUL   V.   WILLIAMSON COUNTY   ET AL.

*(e) In Subsection (d), "agricultural land" means land that qualifies for tax appraisal under Subchapter C or D, Chapter 23, Tax Code. ...*

*Sec. 343.024. AUTHORITY TO ENTER PREMISES.*

*(a) A county official, agent, or employee charged with the enforcement of health, environmental, safety, or fire laws may enter any premises in the unincorporated area of the county at a reasonable time to inspect, investigate, or abate a nuisance or to enforce this chapter.*

*(b) Before entering the premises, the official, agent, or employee must exhibit proper identification to the occupant, manager, or other appropriate person. ...*

## ¶701

While the law quoted above only applies to *"unincorporated area of the county"*, most city ordinances including the {City of Austin} have statutes to the same effect. In other words, a Health-Inspector or Code-Compliance-Officer is free to inspect (using his/her own unaided eyes) a private property from the public street or sidewalk - anything that is in *"plain view"* - but is not authorized to enter into any part of private property before obtaining consent from the owner(s)/occupant(s)/manager(s)/appropriate-person(s), or at the very least, before *"exhibit(ing) proper identification"* to the owner(s)/occupant(s)/manager(s)/appropriate-person(s). Any violation of this *"exhibit proper identification"* protocol specified in [THaSC-T5-SA-C343-SC-§343.024(b)] is a violation of [CEL].

## ¶702

A police-officer (and/or Constable-Deputy and/or Sheriff-Deputy) is a little less restricted in terms of what he/she is licensed to do, but only marginally so. In {FLORIDA V. JARDINES}, the [SCOTUS] ruled ({2013-03-26}) that police-officers have a license to *"knock and talk"* (or *"knock and announce"*) - sometimes referred to as a *"trick-or-treaters"* license to approach a private-property's front-door - but only in a *"baseball path"* or shortest path from the nearest public property (for example, sidewalk) to the front-door - and only during daylight hours (never at night). Upon approaching the front-door, the police-officer is free to ring-the-door-bell or (gently) knock-on-the-door in-order-to ask the owner(s)/occupant(s)/manager(s)/appropriate-person(s) for consent to inspect/search any part of the private-property. While outside the front-door, the police officer is free to announce his/her presence, but in a non-intrusive manner - and in a manner that does not violate the privacy of the owner(s)/occupant(s)/manager(s)/appropriate-person(s). In terms of privacy, for example, the owner(s)/occupant(s)/manager(s)/appropriate-person(s) might not want neighboring person(s) to know that a police officer is visiting their front door and/or announcing his/her presence - so, the police officer needs to do this in a inconspicuous, private manner, as only the property's owner(s)/occupant(s)/manager(s)/appropriate-person(s) need to know about the police officer's presence. If there is no response or if the owner(s)/occupant(s)/manager(s)/appropriate-person(s) refuses, then the police-officer must assume that no consent was authorized, and so, the police-officer must then walk back to the nearest public property following the same *"baseball path"*. Most importantly, the police-officer cannot go outside of the *"baseball path"* and/or snoop-into/inspect/search any areas that are not in *"plain view"*. Additionally, even when walking along this *"baseball path"*, if items located/stored within/along this *"baseball path"* are covered/concealed, for examples, by a tarp, vegetation or other shielding/material(s), then police-officers are not allowed to uncover or look-behind/look-underneath the covering as this act of uncovering is considered an inspection/search, in violation of the fourth-amendment. In other words, while walking along this *"baseball path"*, police-officers are allowed to observe (using their own unaided eyes) but are not allowed to touch. The [SCOTUS] ruled that while

police-officers do have this license to *"knock and talk"*, this license does not permit them to conduct an inspection/search even while staying on this *"baseball path"* to-and-from the property's front-door. The purpose of the [SCOTUS] ruling in 《FLORIDA V. JARDINES》 was to re-affirm the Fourth Amendment protection from inspection(s)/search(es)/seizure(s) to the *"curtilage"* - with courts across the United States ruling that porches, garages, carports, car patios, backyards, all areas *"immediately surrounding and associated with the home"* - even *"partially covered"* parts of a front-driveway are all considered to be *"curtilage"*:

> [SCOTUS]:  State of Florida, Petitioner v. Joelis Jardines, Respondent:  Decided {2013-03-26}
> https://www.supremecourt.gov/opinions/12pdf/11-564_5426.pdf

**OPINION OF THE COURT** ...

The Fourth Amendment provides in relevant part that the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." The Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." United States v. Jones, 565 U. S. ___, ___, n. 3 (2012) (slip op., at 6, n. 3). By reason of our decision in Katz v. United States, 389 U. S. 347 (1967), property rights "are not the sole measure of Fourth Amendment violations," Soldal v. Cook County, 506 U. S. 56, 64 (1992)—but though Katz may add to the baseline, it does not subtract anything from the Amendment's protections "when the Government does engage in [a] physical intrusion of a constitutionally protected area," United States v. Knotts, 460 U. S. 276, 286 (1983) (Brennan, J., concurring in the judgment). That principle renders this case a straightforward one. **The officers were gathering information in an area belonging to Jardines and immediately surrounding his house—in the curtilage of the house, which we have held enjoys protection as part of the home itself.** And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner. ...

when it comes to the Fourth Amendment, the home is first among equals. At the Amendment's "very core" stands "the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." Silverman v. United States, 365 U. S. 505, 511 (1961). This right would be of little practical value if the State's agents could stand in a home's porch or side garden and trawl for evidence with impunity; the right to retreat would be significantly diminished if the police could enter a man's property to observe his repose from just outside the front window. **We therefore regard the area "immediately surrounding and associated with the home"—what our cases call the curtilage—as "part of the home itself for Fourth Amendment purposes."** Oliver, supra, at 180. That principle has ancient and durable roots. Just as the distinction between the home and the open fields is "as old as the common law," Hester, supra, at 59, so too is the identity of home and what Blackstone called the "curtilage or homestall," for the "house protects and privileges all its branches and appurtenants." 4 W. Blackstone, Commentaries on the Laws of England 223, 225 (1769). This area around the home is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened." California v. Ciraolo, 476 U. S. 207, 213 (1986). While the boundaries of the curtilage are generally "clearly marked," the "conception defining the curtilage" is at any rate familiar enough that it is "easily understood from our daily experience." Oliver, 466 U. S., at 182, n. 12. Here there is no doubt that the officers entered it: The **front porch is the classic exemplar of an area adjacent to the home and "to which the activity of home life extends."** Ibid. ...

states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave." 2 Wils. K. B., at 291, 95 Eng. Rep., at 817. ...

We have accordingly recognized that "the knocker on the front door is treated as an invitation or license to attempt an entry, justifying ingress to the home by solicitors, hawkers and peddlers of all kinds." Breard v. Alexandria, 341 U. S. 622, 626 (1951). This implicit license typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave. Complying with the terms of that traditional invitation does not require fine-grained legal knowledge; it is generally managed without incident by the Nation's Girl Scouts and trick-or-treaters.(2) Thus, a police officer not armed with a warrant may approach a home and knock, precisely because that is "no more than any private citizen might do." Kentucky v. King, 563 U. S. ___, ___ (2011) (slip op., at 16). ...

To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to—well, call the police. **The scope of a license—express or implied—is limited not only to a particular area but also to a specific purpose.** ...

Here, **the background social norms that invite a visitor to the front door do not invite him there to conduct a search.**(4) ...

Here, however, the question before the court is precisely whether the officer's conduct was an objectively reasonable search. As we have described, that depends upon whether

*the officers had an implied license to enter the porch, which in turn depends upon the purpose for which they entered. Here, **their behavior objectively reveals a purpose to conduct a search, which is not what anyone would think he had license to do.** ...*

*Just last Term, we considered an argument much like this. Jones held that tracking an automobile's whereabouts using a physically-mounted GPS receiver is a Fourth Amendment search. The Government argued that the Katz standard "show[ed] that no search occurred," as the defendant had "no 'reasonable expectation of privacy'" in his whereabouts on the public roads, Jones, 565 U. S., at ___ (slip op., at 5)—a proposition with at least as much support in our case law as the one the State marshals here. See, e.g., United States v. Knotts, 460 U. S. 276, 278 (1983). But because the GPS receiver had been physically mounted on the defendant's automobile (thus intruding on his "effects"), we held that tracking the vehicle's movements was a search: a person's "Fourth Amendment rights do not rise or fall with the Katz formulation." Jones, supra, at ___ (slip op., at 5). The Katz reasonable-expectations test "has been added to, not substituted for," the traditional property-based understanding of the Fourth Amendment, and so is unnecessary to consider when the government gains evidence by physically intruding on constitutionally protected areas. Jones, supra, at ___ (slip op., at 8). Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. **That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.** For a related reason we find irrelevant the State's argument (echoed by the dissent) that forensic dogs have been commonly used by police for centuries. This argument is apparently directed to our holding in Kyllo v. United States, 533 U. S. 27 (2001), that surveillance of the home is a search where "the Government uses a device that is not in general public use" to "explore details of the home that would previously have been unknowable without physical intrusion." Id., at 40 (emphasis added). **But the implication of that statement (inclusio unius est exclusio alterius) is that when the government uses a physical intrusion to explore details of the home (including its curtilage), the antiquity of the tools that they bring along is irrelevant.** The government's use of trained police dogs to investigate the home and its immediate surroundings is a "search" within the meaning of the Fourth Amendment. The judgment of the Supreme Court of Florida is therefore affirmed. ...*

*It is not the dog that is the problem, but the behavior that here involved use of the dog. **We think a typical person would find it " 'a cause for great alarm' " (the kind of reaction the dissent quite rightly relies upon to justify its no-night-visits rule, post, at 5) to find a stranger snooping about his front porch with or without a dog. The dissent would let the police do whatever they want by way of gathering evidence so long as they stay on the base-path, to use a baseball analogy—so long as they "stick to the path that is typically used to approach a front door, such as a paved walkway." Ibid. From that vantage point they can presumably peer into the house through binoculars with impunity. That is not the law, as even the State concedes.** See Tr. of Oral Arg. 6. ...*

*The dissent argues, citing King, that "gathering evidence—even damning evidence—is a lawful activity that falls within the scope of the license to approach." Post, at 7. That is a false generalization. What King establishes is that it is not a Fourth Amendment search to approach the home in order to speak with the occupant, because all are invited to do that. The mere "purpose of discovering information," post, at 8, in the course of engaging in that permitted conduct does not cause it to violate the Fourth Amendment. **But no one is impliedly invited to enter the protected premises of the home in order to do nothing but conduct a search.** ...*

***Nor, as a general matter, may a visitor come to the front door in the middle of the night without an express invitation.** See State v. Cada, 129 Idaho 224, 233, 923 P. 2d 469, 478 (App. 1996) ("Furtive intrusion late at night or in the predawn hours is not conduct that is expected from ordinary visitors. Indeed, if observed by a resident of the premises, it could be a cause for great alarm"). Similarly, **a visitor may not linger at the front door for an extended period.** See 9 So. 3d 1, 11 (Fla. App. 2008) (case below) (Cope, J., concurring in part and dissenting in part) ("[T]here is no such thing as squatter's rights on a front porch. A stranger may not plop down uninvited to spend the afternoon in the front porch rocking chair, or throw down a sleeping bag to spend the night, or lurk on the front porch, looking in the windows"). The license is limited to the amount of time it would customarily take to approach the door, pause long enough to see if someone is home, and (if not expressly invited to stay longer), leave. ...*

*Detective Bartelt did not exceed the scope of the license to approach respondent's front door. He adhered to the customary path; he did not approach in the middle of the night; and he remained at the front door for only a very short period **(less than a minute or two).** ...*

# ¶703

Any violation of this *"knock and talk"* protocol specified by the [SCOTUS] ruling in 《FLORIDA V. JARDINES》 (which reaffirmed the curtilage protection) is a violation of [CEL]. The [SCOTUS] ruled that while engaging in this already-intrusive *"knock and talk"* protocol, the

government is forbidden from using any *"device that is not in general public use"*, and is also forbidden from conducting an inspection/search of any kind. The only purpose of police-officers engaging in this *"knock and talk"* protocol is to try to contact the owner(s)/occupant(s) in-order-to seek consent to inspection/search any part of the private property. This means that they must use only their own unaided eyes, and cannot, for example (but not limited to):

01. use binoculars or any other tools/technologies to aid in observation.

02. shine a torch-light into areas of the curtilage, or even worse, into the interior of the house.

03. use a selfie-stick or any similar device.

04. use a ladder or any other stepping-tool.

05. use a metal-detector or any other detection tool.

06. use dogs or other animals of any kind for inspection/search/detection purposes.

07. use their hands, feet or any body-part to uncover/move-aside/look-behind any object(s) that may be shielding their view.

08. crouch, lean or jump in-order-to observe/view something that would otherwise not have been visible.

## ¶704

In 《COLLINS V. VIRGINIA》 {2018-05-29}, the [SCOTUS] further strengthened the curtilage protection by nullifying the *"Motor Vehicle Exception"* for vehicles parked within a private-property - including the front-driveway - prohibiting law-enforcement from entering into any part of a private-property (even including the front-driveway) to inspect/search any part of vehicle without a search-warrant. Before this [SCOTUS] ruling, the motor-vehicle-exception had lowered the probable-cause threshold for law-enforcement to lawfully search a motor-vehicle without a search-warrant:

> ▸ [SCOTUS]: Ryan Austin Collins, Petitioner v. Virginia, Respondent·  Decided {2018-05-29}·
> ▸ https://www.supremecourt.gov/opinions/17pdf/16-1027_7lio.pdf
>
> *SYLLABUS ...*
>
> *Held: The automobile exception does not permit the warrantless entry of a home or its curtilage in order to search a vehicle therein. Pp. 3–14.*
>
> *(a) This case arises at the intersection of two components of the Court's Fourth Amendment jurisprudence: the automobile exception to the warrant requirement and the protection extended to the curtilage of a home. In announcing each of the automobile exception's justifications—i.e., the "ready mobility of the automobile" and "the pervasive regulation of vehicles capable of traveling on the public highways," California v. Carney, 471 U. S. 386, 390, 392—the Court emphasized that the rationales applied only to automobiles and not to houses, and therefore supported their different treatment as a constitutional matter. When these justifications are present, officers may search an automobile without a warrant so long as they have probable cause. Curtilage—"the area 'immediately surrounding and associated with the home' "—is considered " 'part of the home itself for Fourth Amendment purposes.' " Florida v. Jardines, 569 U. S. 1, 6. Thus, when an officer physically intrudes on the curtilage to gather evidence, a Fourth Amendment search has occurred and is presumptively unreasonable absent a warrant. Pp. 3–6.*
>
> *(b) As an initial matter, the part of the driveway where Collins' motorcycle was parked and subsequently searched is curtilage. When Officer Rhodes searched the motorcycle, it was parked inside a partially enclosed top portion of the driveway that abuts the house. Just like the front porch, side garden, or area "outside the front window," that enclosure constitutes "an area adjacent to the home and 'to which the activity of home life extends' " Jardines, 569 U. S., at 6, 7. Because the scope of the automobile exception extends no further than the automobile itself, it did not justify Officer Rhodes' invasion of the curtilage. Nothing in this Court's case law suggests that the automobile exception gives an officer the right to enter a home or its curtilage to access a vehicle without a warrant. Such an expansion would both undervalue the core Fourth Amendment protection afforded to the home and its curtilage and " 'untether' " the exception " 'from the justifications underlying' " it. Riley v. California, 573 U. S. ___, ___. This Court has similarly declined to expand the scope of other exceptions to the warrant requirement. Thus, just as an officer must have a lawful right of access to any contraband he discovers in plain view in order to seize it without a warrant—see Horton v. California, 496 U. S. 128, 136–137—and just as an officer must have a lawful right of access in*

SIDDHARTH KODE    V.    WILLIAMSON COUNTY, ET AL.    1696907690

order to arrest a person in his home—see Payton v. New York, 445 U. S. 573, 587–590—so, too, an officer must have a lawful right of access to a vehicle in order to search it pursuant to the automobile exception. To allow otherwise would unmoor the exception from its justifications, render hollow the core Fourth Amendment protection the Constitution extends to the house and its curtilage, and transform what was meant to be an exception into a tool with far broader application. Pp. 6–11.

(c) Contrary to Virginia's claim, the automobile exception is not a categorical one that permits the warrantless search of a vehicle anytime, anywhere, including in a home or curtilage. Scher v. United States, 305 U. S. 251; Pennsylvania v. Labron, 518 U. S. 938, distinguished. Also unpersuasive is Virginia's proposed bright line rule for an automobile exception that would not permit warrantless entry only of the house itself or another fixed structure, e.g., a garage, inside the curtilage. This Court has long been clear that curtilage is afforded constitutional protection, and creating a carveout for certain types of curtilage seems more likely to create confusion than does uniform application of the Court's doctrine. Virginia's rule also rests on a mistaken premise, for the ability to observe inside curtilage from a lawful vantage point is not the same as the right to enter curtilage without a warrant to search for information not otherwise accessible. Finally, Virginia's rule automatically would grant constitutional rights to those persons with the financial means to afford residences with garages but deprive those persons without such resources of any individualized consideration as to whether the areas in which they store their vehicles qualify as curtilage. Pp. 11–14. ...

# ¶705

Furthermore, if a property has sign(s) posted forbidding trespassing - sometimes referred to as *"posted property"* - then, law-enforcement must take even more precautions to ensure that they do not infringe upon the private-property/privacy rights of owner(s)/occupant(s) - as the owner(s)/occupant(s) have made it abundantly-clear (through such posting) that they take their property/privacy rights seriously. In particular, such *"no trespassing"* signs on a private property are considered to be an indication to all person(s) - including law-enforcement - that the owner(s)/occupant(s) have asserted their *"expectation of privacy"* to every part of that private property.

# ¶706

Law-enforcement cannot take-advantage-of or exploit disaster situations to invade the privacy of owner(s)/occupant(s). So, for example, if a hurricane, tornado and/or extremely-strong-winds blow-down a privacy-fence on a property (which was originally-installed to provide backyard-privacy to the owner(s)/occupant(s)), then this does not mean that law-enforcement can exploit this situation to immediately take photographs of the otherwise-concealed backyard for prosecution purposes, especially if the owner(s)/occupant(s) took reasonable steps to remedy the temporary breach-of-privacy. The key issue here is again, whether or not, the owner(s)/occupant(s) had a *"reasonable expectation of privacy"* in a concealed backyard, and in making this determination, it is not reasonable to expect owner(s)/occupant(s) to take such unexpected and temporary disaster situations into account.

# ¶707

Additionally, the government employee(s) must take every precaution to ensure that consent to an inspection/search/seizure has been lawfully obtained - and that consent is maintained *"at all times"*. Consent to an inspection/search/seizure must be given by an owner or person-in-legal-dominion-over or control-of the premises - and it must be given *"knowingly, freely and voluntarily"* - *"without duress or coercion, express or implied"* - *"prior"* to the inspection/search/seizure being initiated. Needless to state, if government employee(s) initiate an inspection/search/seizure without first obtaining consent - and then, as the inspection/search/seizure is already in progress, are confronted by the owner(s)/occupant(s) and have to explain the actions that they are taking, then clearly, consent cannot be said to have been made

voluntarily - *"without duress or coercion, express or implied"* - because the owner(s)/occupant(s) are pressured into accepting the already-initiated inspection/search/seizure as if it were lawful and legitimate:

> *"Unreasonable Suspicion: Relying on Refusals to Support Terry Stops"* : University of Chicago Law Review, 62 (3): 1161-1185; Rachel Karen Laser, (1995);
> https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=4882&context=uclrev

*... The Supreme Court has held that "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given."(16) Consent, to be valid, "must be unequivocal, specific and intelligently given, uncontaminated by any duress or coercion."(17) ...*

*In addition, whether the suspect was advised of the right to refuse consent is "highly relevant" and may result in a determination that consent was not voluntary, although it does not preclude a finding of voluntariness.(21) When a person has been unconstitutionally seized prior to giving consent, any consent given thereafter is generally considered tainted, and thus involuntary.(22) ...*

> *"Knock and Talks"* : Alameda County District Attorney's Office, MHutchin: (2006-09-27):
> https://le.alcoda.org/publications/files/KNOCKandTALKS.pdf

*... after hundreds of years of knocking and talking, officers in America decided the tactic needed a catchy name—thus, "knock and talk."2 Ironically, by this time the phrase no longer accurately described the officers' primary objective which had switched from "talking" with the suspect to obtaining his consent to search his house.3*

*THEY'RE LEGAL, BUT . . .*

*There is, of course, nothing inherently unlawful about knock and talks.4 In fact, they have been described as "a reasonable investigative tool," and a "legitimate method of investigation."5 Still, many courts are leery of them.6 Here's why. First, any warrantless entry into a residence by officers naturally causes heightened concern.7 Second, because knock and talks occur in private, there are no neutral observers. As the Ninth Circuit pointed out, "[T]he nonpublic setting substantially increase[s] the coercive nature of the encounter."8 Third, judges may view knock and talks as an attempt to obtain the suspect's consent through the deliberate use of fear and surprise. This seems to be the view of the Washington Supreme Court which observed, "[A]ny knock and talk is inherently coercive to some degree."9 Fourth, there is legitimate concern that knock and talks may take on the character of the "dreaded knock on the door" that is associated with police states. Just consider how most people would probably feel when, upon answering the door (maybe late at night) they see several strangers on the porch (knock and talks are never conducted by a lone officer). To make matters worse, many of these people (maybe all) are dressed in plain clothes, sometimes the shabby garb of the drug culture. And, even though they identify themselves and seem friendly, it quickly becomes apparent that they want something. Eventually it comes out: they want to come in and search the house. Commenting on situations such as these, the court in United States v. Morgan pointed out, "The right of officers to thrust themselves into a home is a grave concern, not only to the individual but to society which chooses to dwell in reasonable security and freedom from surveillance."10 Consequently, when the courts are called upon to evaluate the lawfulness of knock and talks they tend to carefully scrutinize everything the officers said and did, looking closely for any evidence of coercion. It is therefore important that officers who conduct knock and talks appreciate the sensitive nature of these undertakings. To put it another way, it is a job best suited for officers who have experience, sound judgment, and a good understanding what they can and cannot do. As we will explain in this article, there are two legal requirements. First, the encounter between the officers and the occupants* **must have been consensual at all times**, *at least until the incriminating evidence was discovered. If, on the other hand, a court finds that the officers conducted themselves in a manner that reasonably indicated that the occupants were not free to refuse their requests, the encounter will be deemed an illegal seizure; i.e., a de facto detention or arrest. If this happens, evidence that was deemed the "fruit" of the illegal seizure will be suppressed. Second, the occupant's consent to enter and search must have been voluntary. Although these are technically separate issues, it all boils down to this: Did the officers make it clear that they were seeking the occupant's voluntary consent and cooperation? If so, the evidence should be admissible. On the other hand, if the officers conducted themselves in a way that reasonably indicated they were asserting their authority—if they behaved in an "officious and authoritative" manner11—the consent will be invalid and any seized evidence will be suppressed. ...*

# ¶708

Again, it is important to note that, if any part of a property inspection/search/seizure is defective or unlawful in any way, not only can any evidence/testimony gathered by those defective parts not be used in any Court proceeding (as per the *"exclusionary rule"*), but all evidence/testimony gathered after the defective parts - even if otherwise lawful - cannot be used, since the entire inspection/search/seizure after the defective part(s) has been *"tainted"*. Most importantly, the unlawful inspection/search/seizure is a violation of the accused's Fourth

Amendment Rights and Due Process Rights - addressable by a civil lawsuit for damages under both State Law ([TCPaRC-T5-C101], [TCPaRC-T5-C106]) and Federal law ([42-USC-C21-SI-§1983], [42-USC-C45-SI-§3613]) - in which case, the involved government employee(s), the involved government(s) (for example, city/county and/or its offices/departments/agencies/bureaus/divisions/districts) and any other involved non-governmental person(s) (such as neighbors) are all liable:

- "Walking the Fine Line:  Code Enforcement and the Fourth Amendment" :  Municipal Lawyer- The Journal of Local Government Law, Jan Feb 2019, Vol 60, No. 01:
- Robert D. Pritt, Roetzel & Andress, L.P.A. / City Attorney, Naples, Florida:   (2019-05-09):
- https://face-online.org/wp-content/uploads/Personal-Liability-4th-Ammend.pdf

*Illegal searches under the Fourth Amendment can be one of the biggest risks for a code enforcement officer. …*

*First, inspections can be dangerous. …*

*Second, inspections can be legally complicated. The Fourth Amendment, and to a lesser extent the Substantive Due Process provision of the Fourteenth Amendment, provide arcane limits upon the code inspection process. State constitutions, statutes, and even local regulations often impose additional limitations upon inspections. Knowing whether an inspection is required or appropriate, where the code enforcement officer may be located when viewing a violation, whether consent is required or effective, whether a warrant is needed or justified, and whether the evidence can be used in an enforcement case—are all examples of the legal complexity of inspections.*

*Third, if wrongful, inspections can have major adverse consequences.*

*For the case--Evidence gained by a defective inspection cannot be admitted or considered.*

*For the government--A lawsuit alleging deprivation of civil rights under 42 U.S.C. Sec. 1983 can be brought for violation of federal constitutional or statutory prohibitions. States have similar causes of action for wrongful inspections. A civil rights suit against the city or county will claim existence of a policy or practice of allowing illegal searches, deliberate indifference to the rights of citizens,1 or failure to train or supervise properly. Compensatory damages and attorneys' fees can be awarded.*

*For the code enforcement officer--A civil rights action against the municipality will normally include a claim against the code enforcement officer individually, based upon the actual illegal inspection. The officer will likely have qualified immunity, but that could be lost if the inspection was clearly unlawful.2 In the worst-case scenario, the code enforcement officer can be subject to individual liability for damages, including compensatory and even punitive damages--plus attorneys' fees …*

*Castle Doctrine--The legal concept of the home being one's "castle" was analyzed in England at least as long ago as 1604. "The house of every one is to him as his castle and fortress as well as for his defence against injury and violence as for his repose."3 …*

*Curtilage has essentially the same level of protection from searches and inspections as the "house" itself. "Curtilage" or "homestall" is the area immediately surrounding and associated with the home and is considered part of the home for Fourth Amendment purposes. For the house and curtilage, the property owner has the right to determine who is allowed upon the property and to grant or withhold consent to those the owner wishes to exclude, including government "intruders." Thus, the "curtilage" protection ("No man may set his foot upon his neighbor's close without his permission") has permeated court decisions in England from at least 1765 to U.S. Supreme Court case law as of May 29, 2018.6 Without consent (or an exception), the government must obtain a search warrant or inspection warrant. The identity of home and what Blackstone called the "curtilage or homestall," thereby "protects and privileges all its branches and appurtenants."7 This area around the home is "intimately linked to the home, both physically and psychologically," and is where "privacy expectations are most heightened."8 Areas that have been deemed by courts to be* **"curtilage" include: porches, garages, carports, car patios, back yards—and even a drive-way next to a house** *where the code violation was partially covered. In Florida v. Jardines, a 2013 Supreme Court case,9 the Court determined that a police officer who was on the* **front porch** *ostensibly to ask permission to search, but was accompanied by a drug-sniffing dog, needed consent or a warrant to search the house.10 In the most recent case, in 2018, the Court invalidated a search for a stolen motorcycle that was covered with a white tarp, located at the top of the driveway, in a partly enclosed car patio. The officer had received a tip that the motorcycle might be at that location; when the officer lifted the tarp to verify the Vehicle Identification Number and license plates on the motorcycle, the search was held to be illegal. Code enforcement officers routinely do the same thing in order to identify inoperable vehicles. It is now clear that this cannot be done without consent or a warrant.11 …*

*Is a Code Enforcement Inspection a Search? Yes. In the seminal cases of Camara v. Municipal Court of City & County of San Francisco17 and See v. Seattle 18 the Supreme Court held that civil code enforcement inspections are a type of "search" within the meaning of the Fourth Amendment. …*

## ¶709

If non-governmental actor(s) - including, but not limited to, neighboring property owner(s)/occupant(s)/manager(s) - conduct an inspection/search of private parts of a private property (not accessible or viewable by law-enforcement), and submits such evidence/testimony to the Government, such evidence/testimony cannot be used in any Court proceeding because such actor(s) are considered to be *"agents of the government"* - also deemed to be a violation of the Fourth Amendment. Such actors would also be liable (for damages) to the accused not only under civil *"invasion of privacy"* laws, but more importantly, under [42-USC-C21-SI-§1983], the [FHA]/[TFHA], and the [RIaCOA] - all of which also applies to non-governmental person(s):

> ▸   "Section 1983 Lawsuit - How to Bring a Civil Rights Claim"   ▸   Shouse Law Group, A.P.C. ▸   (2021-07-26) ▸
> ▸   https://www.shouselaw.com/ca/civil-rights/1983-lawsuits/
>
> *2. What does "under color of law" mean?* ...
>
> *On the other hand, people who do not work for the government can still act under color of law. This can happen if they conspire with government officials to deprive someone of their civil rights.* ...

## ¶710

These Constitutional and Statutory rights protect those suspected/accused of the most heinous of violent charged-crimes - such as mass murder - and those that are suspected/accused of the lowest of non-violent charged-crimes - such as Class-C-Misdemeanor-Public-Nuisance. But clearly, it is particularly egregious if these Constitutional/Statutory rights were violated for the lowest-level of questionable, non-violent charged-crimes (such as an alleged Class-C-Misdemeanor), and even more so, if these rights-violation(s) and/or fraudulent-charge(s) were motivated by predatory/retaliatory intentions and racial/religious/xenophobic/homophobic/political animus.

# §XXIX

# TEXAS PUBLIC-NUISANCE LAW DIFFERS SUBSTANTIALLY FROM OTHER LAWS THAT REQUIRE USE OF SEARCH WARRANT(S)

## ¶711

All laws that involve an inspection/search on private property require lawfully-obtained and lawfully-executed search-warrant(s), but even so, Texas's Public-Nuisance law is substantially different from most of these laws in many crucial respects. In particular, unlike Texas's Public-Nuisance law, most of these laws meet all of the following criteria:

**01.**   are binary or black-or-white in nature - in other words, the interpretation/enforcement of the law is not subjective and there is no grey-

area

02. do not need to meet a time-element or time-threshold

03. do not need to meet a quantity-element or quantity-threshold

04. do not need to meet a quality-element or quality-threshold

05. do not require law-enforcement to prove either culpable-mental-state (malicious-intent OR recklessness), or in the absence of culpable-mental-state, criminal-negligence.

06. do not require application of the reasonable-person-standard

07. can be enforced throughout the year (including the winter months)

08. if allegedly violated, are considered to be felonies, not Class-C-Misdemeanors.

09. if allegedly violated, have potentially widespread negative/harmful impact on the community - the quantitative harm is potentially great.

10. if allegedly violated, have potentially lethal impact on individuals (including very-vulnerable individuals) of the community - the qualitative harm is potentially great.

11. if there is sufficient probable-cause, a search may, under certain exceptional circumstances, be conducted without a search-warrant - such as *"hot pursuit"*, *"special needs"*, and *"exigent circumstances"*.

12. do not require law-enforcement to issue warning-citation(s) prior to initiating a criminal-charge.

13. residents' privacy-fence or residents' erecting of a privacy-fence, for example, to conceal illegal activity does not change the fact that such laws are violated.

14. do not cut-into or sacrifice core Constitutional/Statutory rights.

15. external surveillance on a private property (in particular, a private residence), although always controversial, may under certain extreme cases be justified.

# ¶712

For example, consider the case of the unlawful act of growing/storing illegal narcotics on a private property:

01. There is no grey-area regarding the growing/storing of illegal narcotics on a private property: Such activity is strictly illegal and if such activity is lawfully observed by the police from a public vantage point - even from a large distance, then such lawful observation could be used as a valid-basis for law-enforcement to lawfully obtain and execute a search warrant to confirm their suspicions about the clearly-illegal activity.

02. There is no time-element: A newly-planted or newly-sowed narcotics plant is illegal just as a fully-grown narcotics plant is illegal. Narcotics that has just been transferred/introduced into a private-property is illegal just as narcotics that has been stored at such private-property for many years. There is no time-threshold to overcome in such case.

03. There is no quantity-element: 1 newly-planted or newly-sowed narcotics plant is illegal just as a fully-established large farm of fully-grown narcotics plants is illegal. 1 gram of fentanyl stored at a private-property is illegal just as thousands of kilograms of fentanyl stored at such private-property is illegal. There is no quantity-threshold to overcome in such case.

04. There is no quality-element: 1 poorly-growing or failing narcotics plant is illegal just as a thriving, fully-established large farm of fully-grown narcotics plants is illegal. Inefficient, leaky or messy storage of illegal narcotics at a private-property is illegal just as neat-and-

efficient storage of such illegal narcotics at a private-property. There is no quality-threshold to overcome in such case.

05. There is no need to prove culpable-mental-state - malicious-intent OR recklessness: Even people with good intentions (and with no intentions to cause harm) who grow such narcotics plants are guilty of violating the anti-narcotics laws. Even people who knowingly and deliberately gift/donate (free-of-charge) 100% of their illegal painkilling narcotics to victims of acute/chronic pain (in-order-to help such victims alleviate such pain) are guilty of violating the anti-narcotics laws.

06. There is no need for the Police/Prosecutor/Judge/Jury to evaluate what a *"reasonable person"* would have done is the same circumstance, as would be the case in alleged crimes of negligence and/or recklessness and/or endangerment - growing/storing of illegal narcotics is an intentional act that any *"reasonable person"* (of any race/culture/religion/politics) knows is unlawful in every circumstance (whether-or-not they agree with the law).

07. The growing/storing of narcotics on private-property is illegal at any time of the year.

08. Depending upon the amount of narcotics grown/stored, the charge could be a high-level felony.

09. Large amounts of Narcotics could be efficiently stored/grown - for the prospective sale/distribution and consumption of millions of people - in a relatively-small residential lot. So, the quantitative aspect of harm caused could be great.

10. Narcotics could be sold/distributed to minors. Consumption of even extremely-small amounts of certain types of narcotics (such as Fentanyl) can be lethal. Consumption of even less-lethal narcotics can have otherwise negative/harmful impact(s) on community/society due to the various intoxication effects of such substances (such as driving a vehicle while intoxicated). Consumption of methamphetamines could cause unpredictable, violent behavior/action. Therefore, it could be argued - especially in terms of the qualitative aspect of the harm - that anti-narcotics laws do, at least in theory (◊), serve a valid societal purpose, as long as they are not being interpreted and enforced in a discriminatory manner, and as long as the law is itself not discriminatory (for example, the discriminatory crack-cocaine versus powder-cocaine laws).

11. When there is sufficient probable-cause, a search/seizure may, under certain exceptional circumstances such as *"hot pursuit"*, *"special needs"* and *"exigent circumstances"*, be conducted without law-enforcement lawfully obtaining and executing search-warrant(s). If a suspect tries to escape a law-enforcement officer who is trying to question him/her, then the *"hot pursuit"* exception applies, and any illegal narcotics discovered as a result of this *"hot pursuit"* may be lawfully used for prosecution purposes. If a property is suddenly-suspected to house violent activity such as someone repeatedly screaming *"Help!"* from a property's enclosed backyard, law-enforcement officer(s) may lawfully enter into the backyard without a search-warrant to investigate, and, if during this investigation, the officer(s) notices illegal narcotics, then the appropriate person(s) can be prosecuted for those illegal narcotics (in addition to any other violent crimes) due to this particular *"exigent circumstances"* exception. A *"special needs"* exception to obtaining a search-warrant, based upon national, homeland or domestic security, may be applicable when law-enforcement receives brand-new information that substantial immediate violent threat(s) are originating from a property which, when searched, also happens to house illegal narcotics. In all of these exceptional cases, the government will argue that the observed substantial immediate threats override the government's need to fill-out-paperwork, present the evidence of sufficient probable-cause under oath to the Judge, and then upon Judge's approval, lawfully-execute-the-search-warrant - all of which introduce delays that may result in substantial immediate harm to people. But even in such exceptional cases, if a defendant files a motion to suppress evidence based upon the lack of search-warrant(s), then the government would still need to present valid justification to the appropriate Judge for the exceptional warrantless search/seizure, and it would be the exact circumstances of a particular situation that determines whether-or-not the government was justified in conducting the exceptional

warrantless search/seizure, and whether-or-not all/particular pieces of searched/seized evidence may, or may not, need to be suppressed at trial. Obviously, if any warrantless raid on a private-property results in unnecessary property-damage, mental-anguish, bodily-injury or death of any of the owner(s)/occupant(s)/guest(s), then that law-enforcement and/or government would be even-more liable - if not under criminal-law, then certainly under civil-law - to the injured (or to the family of the deceased), than they would have been if they had lawfully-executed a lawfully-obtained search-warrant.

12. Law-Enforcement does not need to issue a warning-citation for possession, growth and/or distribution of illegal narcotics - such acts are instantaneous crimes.

13. The growth and/or storage of illegal narcotics on private-property is clearly-illegal whether or not the perpetrator has erected a privacy-fence to conceal and confine the clearly-illegal activity.

14. A resident does not have a Constitutional/Statutory right to grow/store (or even consume) of illegal narcotics - especially dangerous/lethal narcotics - on private-property, and especially if it can be shown that such resident's activity causes harm onto others.

15. When extremely-dangerous and/or lethal narcotics (such as crystal-meth or fentanyl) that are being trafficked is suspected to be stashed/stored at a particular private residence, law-enforcement may be justified in using at least some limited forms of pre-search-warrant external surveillance of the property in-order-to confirm their suspicions. If this short-term external surveillance then produces sufficient probable cause of serious crime(s) being committed, then law-enforcement can obtain and execute search-warrant(s). However, in 《CARPENTER V. UNITED STATES》 for example, the [SCOTUS] ruled that *"Government acquisition of cell-site records is a Fourth Amendment search, and, thus, generally requires a warrant."* Since that {2018-06-22} [SCOTUS] ruling, lower courts have expanded the ruling to include any type of long-term (external) government surveillance of private property even from public areas (such as streets/sidewalks), strongly indicating that any long-term (external) government surveillance of a private residence does infringe upon person(s) fourth-amendment rights, and therefore does require law-enforcement to lawfully obtain search warrant(s) prior to engaging in such surveillance.


# ¶713

However, Texas's Public-Nuisance-Law does not meet any of the aforementioned criteria, and the wording, interpretation and enforcement of this law requires law-enforcement to, Ⓐ conduct a lawful, prolonged observation of the property in question AND, Ⓑ make several attempts to contact the owner(s)/occupant(s) in-order-to further-investigate/resolve the issue without searching/charging/prosecution AND, Ⓒ as the last resort, perform a lawful up-close inspection/search - using a lawfully-obtained search warrant - prior to even issuing a warning citation for such alleged public-nuisance. In comparison:

01. The law is not binary or black-or-white in nature, and to the contrary, the law is intending to regulate one big grey-area with many contradictions, much irrationality, much arbitrariness, and much capriciousness (see the next section). The law's wording is rather vague - even unconstitutionally vague as the plaintiff argues (see the next section) - the interpretation of the law is extremely-subjective and open-to diverging opinions/interpretations - especially to those of differing racial/cultural/religious/political backgrounds. Furthermore, law-enforcement may be able to lawfully-observe (from a public vantage point) objects or conditions on a private property that might constitute a public-nuisance, but without making several attempts to question the owner(s)/occupant(s) about this issue and, if possible, consensually inspecting/searching at least some of the objects/conditions up-close, they would not even have sufficient probable-cause to obtain a search warrant to verify the alleged public-nuisance - let alone, proceed with issuing a warning citation.

02.   There is a time-element or time-threshold - generally speaking, a public-nuisance takes time to develop and cannot be determined by one snapshot in time. Additionally, a public-nuisance involves a prolonged-dumping-of-specific-types-of-objects and/or other prolonged conditions on a private property that could constitute harm to neighboring owner(s)/occupant(s) - with the length of time usually explicitly specified by the law - for example, *"for 10 days or more"* - see [THaSC-T5-SA-C343-SB-§343.011(c)(2)]. Thus, at a minimum, law-enforcement would need to lawfully observe (again, from a public vantage point) these alleged conditions for a period of *"10 days or more"* - prior to questioning the owner(s)/occupant(s) about this issue and, as a last resort, lawfully obtaining-and-executing a search warrant to confirm their suspicions - and even a warning citation cannot be issued until, at a minimum, after their suspicions have been confirmed.

03.   There is a quantity-element or quantity-threshold - for the dumping-of-objects or other-conditions on a private-property to be considered a public-nuisance, the quantity of items dumped must be large-enough and/or the conditions must be so severe so as to be considered unsafe/hazardous to neighboring owner(s)/occupant(s). Again, this criteria cannot be confirmed without law-enforcement lawfully questioning the owner(s)/occupant(s) about this issue and, as a last resort, performing an up-close lawful inspection/search.

04.   There is a quality-element or quality-threshold - purely-aesthetic or purely-cosmetic issues are not to be considered a public-nuisance - if a part of private property *"looks ugly"* or is an *"eye sore"* to some people, then that subjective opinion alone clearly cannot be considered a public nuisance, and governments have absolutely no authority over purely-aesthetic or purely-cosmetic issues of a private property (ε). Again, without an up-close inspection/search and/or questioning the owner(s)/occupant(s) about this issue, there would be no way for law-enforcement to determine if an issue on a private property is a purely-cosmetic/purely-aesthetic issue or an issue that could be a public-nuisance (in essence, a legitimate health/safety issue).

05.   More importantly, there is a need for law-enforcement to prove either culpable-mental-state (malicious-intent OR recklessness) or in the absence of culpable-mental-state, criminal-negligence. Owner(s)/Occupant(s) that willfully maintain their property in a certain manner - but without any malicious intent - cannot be charged with violating the public-nuisance law - especially if their property maintenance is closely tied to their constitutionally-protected racial/cultural/religious/political practice(s)/speech (see the next section). If the owner(s)/occupant(s) are in disagreement with law-enforcement - denying that conditions on their property constitute a public-nuisance - then, at a minimum, those owner(s)/occupant(s) must be afforded, at a minimum, a due-process right to a formal hearing, as is guaranteed by [THaSC-T5-SA-C343-SC-§343.022] (*"ABATEMENT PROCEDURES"*). The only way in which owner(s)/occupant(s) can be criminally-negligent when it comes to the public-nuisance law is if they, through their actions(s)/inaction(s), allowed their property to develop conditions so severe so as to be unsafe/harmful to the neighboring owner(s)/occupant(s). But in any case, if the owner(s)/occupant(s) are perpetually living/residing at the property in question, then it would be very-difficult, if not impossible, for law-enforcement to prove either malicious-intent or recklessness or criminal-negligence since the owner(s)/occupant(s) themselves would be suffering the same (or worse) harmful effects of the allegedly harmful conditions on the property as the neighboring owner(s)/occupant(s). One of the major differences between some types of public-nuisance (certain types of objects dumped on one's own property/land/residence) and littering/illegal-dumping/criminal-mischief (any objects dumped on another's property/land/residence) is that only the former requires law-enforcement to prove either culpable-mental-state (either malicious-intent OR recklessness) or in the absence of culpable-mental-state, criminal-negligence.

06.   In alleged crimes of negligence and/or recklessness and/or endangerment, where a person does not intend to commit a crime, the Police/Prosecutor/Judge/Jury is required to evaluate what a reasonable-person would have done in the same circumstance. In a case of

property-maintenance/sanitation standards such as the public-nuisance law, since people of different races/cultures/religions/politics have substantially different standards of property-maintenance/sanitation and diverging opinions of what constitutes a public-nuisance (see the next section), the Police/Prosecutor/Judge/Jury would be required to evaluate what a *"reasonable person of the same race/culture/religion/politics"* as the accused would have done in the same circumstance - and in particular, whether-or-not that person would-have-considered or should-have-considered the conditions on their property/residence to be unlawful.

07. During the Winter months and early-Spring months (beginning-of-November through the beginning-of-April in Central-Texas), there is no possibility of a Public-Nuisance. The Public-Nuisance law involves the potential harm caused by *"mosquitoes, rodents, vermin, or other disease-carrying pests"* - and none of these potentially harmful elements are active and/or harmful during these relatively-cold months. Most vegetation considered to be *"weeds"* do not survive the onset of the winter. Also, public-nuisances take time (usually several weeks) to develop - they do not happen overnight.

08. The charge for an alleged violation of the Public-Nuisance law is almost always a Class-C-Misdemeanor - which, even with a conviction, is punishable only by up to a $500 fine - and is rarely a higher-level Misdemeanor (for repeat offenders). Especially given the other factors mentioned above, it is totally unreasonable and entirely unfair for law-enforcement to be able to obtain and execute a search-warrant - to violate one's privacy - in search of a Class-C-Misdemeanor rather than what search warrants are primarily intended for: felonies such as narcotics, financial fraud, robbery, racketeering-acts, major property crimes, violent crimes, etc.

09. Even if an alleged violation appears to be true, a Public-Nuisance only potentially affects, at best, certain immediate neighbors. So, due to the manner in which most residential subdivisions are designed - a valid Public-Nuisance allegation could potentially impact 1 to, at most, 3 neighboring property owners. Furthermore, in neighborhoods where each property's backyard is enclosed by a privacy-fence, rodents and vermin would have to crawl and/or jump over the tall fence to get to neighboring property, making it difficult, if not impossible, for law-enforcement to prove that there were any actual victim(s) in the alleged crime. Therefore, the quantitative harm of a valid Public-Nuisance allegation is trivial/minute compared to most other laws that require lawful use of search-warrants.

10. Even if an alleged violation appears to be true, a Public-Nuisance only causes, at best, an annoyance and/or discomfort to certain immediate neighbors. Therefore, the qualitative harm is as low as can possibly be as far as criminal laws are concerned. So, even the decision for obtaining a search-warrant to investigate an alleged Public-Nnisance must be reserved to the most severe alleged violations that pose severe health-and-safety hazards.

11. Even when an alleged violation is confirmed to be true by law-enforcement conducting a lawful up-close inspection/search, law-enforcement is required by law to give the owner(s)/occupant(s) 10-business-days (a minimum of 2 weeks) to 30-days to abate the alleged Public-Nuisance in-order-to avoid prosecution (see [THaSC-T5-SA-C343-SC-§343.022]). So clearly, in the case of a Public-Nuisance, there is never an immediate threat to any person(s), and thus, there is no *"exigent circumstance"* that law-enforcement can claim to execute a nonconsensual warrantless inspection/search/seizure solely for the purpose of investigating an alleged Public-Nnisance.

12. Law-Enforcement does need to issue a warning-citation to an accused-party for an alleged Public-Nuisance prior to initiating a criminal-charge against that accused-party - Public-Nuisance is not an instantaneous crime. Also, in no way does the issuing of a Public-Nuisance citation signify the guilt of the accused party. If the accused party rectifies the alleged issue within the deadline, then the case is closed, and any subsequent allegation of Public-Nuisance would need to re-start the warning-citation procedure again from a blank-slate.

13. A resident can eliminate the possibility of an alleged public-nuisance violation by erecting a (6-feet-tall-or-taller) closed privacy-fence

within or directly-on the property-boundary, thereby, not only confining any items/conditions exclusively within the confines of of such private-property, but also concealing any items/conditions from being visible from a public street. In other words, the creation of such privacy-fence confers builtin protection against public-nuisance allegations.

14. At least some parts of the Public-Nuisance law - or at least the abusive interpretation/enforcement of this law - cuts into core Constitutional/Statutory rights, depriving at least some resident(s) of such resident(s)' legitimate uses of his/her own private-property, and as as more-verbosely documented in the following section.

15. Due to all of the reasons specified above, a government that engages in any type of external surveillance - with or without a search warrant, either long-term or short-term - to determine alleged Public-Nuisance violations is completely unjustified because it egregiously infringes upon owner(s)/occupant(s) fundamental right-to-privacy and fundamental right-to-be-free-from-unreasonable-search-and-seizure over the grey-area issue of sanitation.

# ¶714

Moreover, as alluded-to above, an up-close inspection/search is required to confirm whether or not a Public-Nuisance exists, due to the manner in which the law defines various objects/conditions, for example:

01. Even if plants growing on private property are alleged by neighbors/law-enforcement to be *"rank and uncultivated"* - which is disputable (see the next section concerning Constitutional rights) - whether or not these are *"weeds"* depends, at a minimum, upon if they exceed 36-inches in height - the only way for law enforcement to confirm this is to visit the plants up-close and take height measurement(s). If a private property contains elevated soil - for example, in a raised-bed garden and/or large/tall pots - then, clearly some plants may appear taller than they actually are - especially when lawfully-observed from a public vantage point.

02. Scrap-materials are re-usable, repurposable and/or recyclable *"nondecayable"* materials left over from product manufacturing and consumption. Scrap-materials have monetary value and are not considered to be *"waste"* of any kind; thus, scrap materials can be legally stored by the owner(s)/occupant(s) in any part of a private property. For example, many types of plastic can be melted and molded into new objects to serve various new functions, and machines do exist to melt and mold plastics into, for example, plastic lumber for landscaping use. Glass and ceramics can be crushed into fine particles and used as the sand ingredient/substitute in concrete mix - especially important since the sand used in concrete mix is a very-limited/scarce resource. Larger pieces of glass and ceramics can also be used as a gravel/stone substitute especially in cases where gravel/stones are buried underground for drainage purposes; for example, a few inches of gravel/stones are used at the bottom of postholes, so that fence-posts that are made of wood do not rot from the bottom, and so that fence-posts that are made of steel do not rust from the bottom. Re-using such scrap materials for these purposes is not only an environmentally-friendly practice that reduces consumption of materials/energy-resources, but such practice is also a Constitutionally protected form of religious practice, political speech and art (see the next section concerning other Constitutional rights). Therefore, government cannot regulate/restrict the storage of scrap materials anywhere on private property as long as the person(s) doing the storage are owner(s) of the property - see for example [THaSC-T5-SB-C365-SB-§365.012(l)].

03. As defined in [THaSC-T5-SB-C365-SB-§365.011(6)] and [THaSC-T5-SA-C343-SB-§343.011(c:2)], *"rubbish"* is *"nondecayable"* waste - including plastics, metals, glass, rubber, wood, and even paper products such as cardboard - but only if the owner(s)/occupant(s) agree/admit that such materials are *"waste"*. According to Texas law, Rubbish may be legally stored in an enclosed building or in any

area above ground level (for example, on shelves) that *"is not visible from the street"*. *"Garbage"* is defined as *"decayable"* waste -
including *"vegetable, animal, and fish offal and animal and fish carcasses"*. According to Texas law, Garbage must be stored in a
*"closed receptacle"*, where *"receptacle"* is defined as: *"container that is composed of durable material and designed to prevent the
discharge of its contents and to make its contents inaccessible to animals, vermin, or other pests."* According to Texas law, *"Refuse"*
is simply an unsorted/uncategorized/unseparated mixture of Rubbish and Garbage, and since Refuse contains Garbage, Refuse must also
be stored in a *"closed receptacle"*. Especially when considering materials of the *"nondecayable"* type, governments do not have the
authority to arbitrarily-determine what constitutes waste (Rubbish) and what is not waste (including, but not limited to, Scrap) - as that
determination is exclusively made by the owner(s)/occupant(s). Archivists/collectors archive/preserve/collect large amounts of materials
(physical and/or digital) for archiving/preservation/antique/collectible/political purposes **(ꝛ)**. (The idiom - *"One man's trash is another
man's treasure"* - comes to mind.) Even if law-enforcement lawfully observes objects stored/deposited/dumped on a private property
that could potentially be considered a violation of the Public-Nuisance law, the only way for such law-enforcement to verify that there is
a violation is to make several attempts to question the owner(s)/occupant(s) and, only if unsuccessful at contacting the
owner(s)/occupant(s) (only as a last resort), lawfully obtain and execute a search-warrant to look-at-up-close, uncover, open and/or
unbag such items.

04.  If owner(s)/occupant(s) are using either sheets-of-cardboard/sheets-of-newspaper for the permacultural landscaping technique of sheet-
mulching on their surrounding landscapes, or sheets-of-black-plastic/sheets-of-clear-plastic for the technique of solarization on their
surrounding landscapes, then clearly law-enforcement cannot consider the use of such legitimate, intentional landscaping
materials/techniques to be a Public-Nuisance of any kind **(π)**.

05.  In the State of Texas, it is not unlawful for residential owner(s)/occupant(s) to harvest rainwater in improvised containers including, but
not limited to: buckets and barrels. Indeed, even local public television programs such as 《Central Texas Gardener》 document cases in
which residential owner(s)/occupant(s) use such improvised containers for rainwater harvesting. Therefore, rainwater collected in such
containers cannot be blindly assumed by law-enforcement to be stagnant-water likely to *"harbor mosquitoes"*. First, mosquitoes emerge
from water after a week, sometimes many weeks (based upon average temperature) - not immediately after rainwater has accumulated.
Second, residential owner(s)/occupant(s) could have installed mosquito-dunks in such containers in-order-to eliminate the possibility of
mosquitoes. Third, the owner(s)/occupant(s) may be utilizing each collected batch of harvested rainwater after a set amount of time (for
example, a week) from the most-recent significant rainfall (It is pointless to water plants immediately after it has just rained). Again, the
only way for law-enforcement to confirm if such containers actually *"harbor mosquitoes"* is to (lawfully) inspect them up-close to verify
the existence of mosquito larvae. Improvised containers are the cheapest and least-expensive tools for rainwater harvesting - and law-
enforcement cannot
arbitrarily/discriminatorily/capriciously/retaliatorily/predatorily/hypocritically/abusively/oppressively/selectively/biasedly target/penalize
owner(s)/occupant(s) of limited income/wealth, who do not have the finances for professional rainwater-harvesting installations (which
can easily cost in excess of $20,000). Even in terms of pure logistics, it is almost-impossible for the typical small-lot residential private-
property to be the source of mosquito breeding/harborage given that there are much larger public sources: storm-drains, street-gutters,
and all other low-lying areas where exponentially larger amounts of rainwater easily accumulates (and even persists) after a substantial
rain.

06.  As of {2013-09-01}, the Texas Property Code, [TPrC], allows owner(s)/occupant(s) to compost by preventing [HOA]s from

prohibiting/restricting solid-waste composting of materials that may otherwise be considered to be *"decayable waste"*. Therefore, the existence-of and even the visibility-of what appears to be *"decayable waste"* - outside of *"closed receptacle(s)"* - does not automatically mean that an owner(s)/occupant(s) are guilty of violating the Public-Nuisance law concerning garbage (*"decayable waste"*) - since, technically, such materials could be composting material(s) and not *"garbage"* (in essence, not *"waste"*). Furthermore, if a residential property owner also owns additional agricultural-private-property (which is true in the case of the plaintiff), then clearly such property-owner is fully-entitled to collect and temporarily-store composting materials (and any other farming-related materials) at the residential property, so that such materials can be transported-to and used at the agricultural-private-property. Finally, the practice of composting is, to many racial/religious minorities, a form of Constitutionally-protected religious practice - for example, as part of larger religious practice of leading a *"zero-waste"* lifestyle - thereby barring the Government's regulation/restriction of such practice (see the next section concerning other Constitutional rights).

## ¶715

Due to the substantial differences in all of these crucially-important criteria, the interpretation and enforcement of Texas's Public-Nuisance law is substantially-more-restricted and substantially-more-controversial than most other laws that also require lawful inspection(s)/search(es)/seizure(s) - and so, law-enforcement must take every precaution to avoid infringing upon civil rights by, at a minimum, fully taking-into-account all of the substantive legal issues raised in this lawsuit.

# §XXX

# TEXAS PUBLIC-NUISANCE LAW VIOLATES THE FIRST-AMENDMENT, DUE-PROCESS AND EQUAL-PROTECTION CLAUSES

## ¶716

The term *"unsanitary condition(s) likely to attract or harbor mosquitoes, rodents, vermin, or other disease-carrying pests"* mentioned in several places of Texas's Public-Nuisance-law is extremely vague (in violation of the due process clause), extremely subjective, extremely hypocritical and open to diverging interpretations - especially to those of differing racial/cultural/religious/political backgrounds. Additionally, it is a fact that *"rodents"* and *"vermin"* are attracted to high-calorie sources of food rather than the undefined term *"unsanitary condition(s)"* (see excerpt below). So, for example, a *"neatly-maintained"* (or *"sanitarily-maintained"*) and *"aesthetically-beautiful"* backyard containing an abundance of high-calorie fruit plants (like blueberry, blackberry, strawberry, grapes, peaches), high-calorie vegetable plants (like potato, sweet-potato), high-calorie nut/seed plants (like sunflower, peanuts, pecans, corn, beans) is far more likely to attract rodents and vermin than *"unsanitary condition(s)"*. So, it makes absolutely no sense that only the latter is penalized and not the former - and, without question, a

majority of Americans would be strongly-opposed to penalizing the former. (In fact, many people that grow a large amount of food in their backyard often resort to using traps or electric zappers to trap or deter such animals.) The plaintiff has noticed one-or-more mice (see below) at a significantly greater frequency at the plaintiff's [PARENTS]' property, than at the plaintiff's property - all due to the greater number of fruit trees/bushes in the plaintiff's [PARENTS]' backyard. Also, there are many widely-used landscaping plants/trees/shrubs - like the Elaeagnus in the [FRONTYARD] - that produce fruit that are sweet/edible to both rodents/vermin and humans.

## ¶717

Since rodents and vermin require high-calorie sources of food, rodents and vermin can also survive on the faeces of dogs/cats that eat high-calorie food. In many, if not most, residential subdivisions, owner(s)/occupant(s) are allowed to have up to 4 dogs and/or cats. In the case of 4 large dogs, for example, not only is the amount (volume/mass) of dog faeces going to be large, but if these dogs are being fed outdoors, then there is inevitably going to be residue/crumbs or even sizable chunks of the dog food scattered where rodents and vermin can access such food at night. The plaintiff is unaware of any Government in Texas inspecting peoples' backyards for the existence of dog/cat faeces and/or dog food and prosecuting such peoples for this rodent/vermin attractant. Furthermore, there do exist small-lot (densely-populated) residential subdivisions in Texas where residents are legally allowed to own poultry - particularly hens. It is abundantly clear that chicken-coops and any other location where chicken-feed is stored or dispensed is often patroled, if not raided, by rodents/vermin that thrive on such high-calorie food sources. Since domesticated chicken eat a high-calorie, grain/seed-based diet, even chicken faeces are a valuable food source for rodents/vermin. The plaintiff is unaware of any Government in Texas inspecting peoples' backyards and chicken-coops for the existence of chicken-feed and/or chicken-faeces and prosecuting such peoples for these rodent/vermin attractants.

## ¶718

Law-enforcement's interpretation and enforcement of what constitutes rodent/vermin harborage is also yet another example of arbitrary/capricious/discriminatory/retaliatory/predatory/hypocritical/abusive/oppressive/selective/biased enforcement - for example, rodents can easily live under any structure or object stored on one's yard - and can also live inside or underneath sheds. The plaintiff is unaware of any Government in Texas thoroughly inspecting frontyards or backyards for any-and-all structures/objects that could be rodent/vermin harborage. Again, even in the case of harborage, it is not *"unsanitary condition(s)"* that harbor rodents/vermin, but rather any structures/objects/medium in-which or under-which rodents/vermin can live/hide/burrow.

## ¶719

The use of the term *"rodent"* is also extremely hypocritical, as the plaintiff is unaware of any prosecution of any owner(s)/occupant(s) for attracting and harboring squirrels onto their property. There is undoubtedly an abundance of Oak trees generating enough acorns to attract large amounts of squirrels onto the frontyards and backyards of residential properties - in fact, large amounts of squirrels live in such trees situated in countless residential properties in Texas. So, at a minimum, the law is hypocritically interpreted and enforced in this regard as well.

## ¶720

Also, there is a substantive difference between *"rats"* and *"mice"* - mice are substantially smaller in size and considered to be ubiquitous, even in the most *"neatly-maintained"* of *"carefully-manicured"* lawns. Indeed, there are television advertisements for products/services to keep mice from entering **into the house**. The surest way to eliminate (or at least minimize) any possibility of even mice on one's property is to simply get rid of all soil and vegetation - and simply install a surrounding landscape of 100% gravel/stones/concrete. But it is more-likely-than-not true that most White-American homeowners, in particular, prefer a *"lawn"*. The idiom - *"You can't have your cake and eat it too"* - comes to mind. With soil, comes all of the living species that live in/on soil. So, if certain owner(s)/occupant(s) were so concerned about rodents/vermin that they fraudulently claim are only originating from another neighbor's property, then such people would be much-better-off converting their own yard into 100% gravel/stones/concrete - and daily picking-up every single bit of dog/cat faeces/food - instead of fraudulently complaining about their neighbor to law-enforcement. Alternatively, the builders of such residential subdivisions could easily provide home-buyers with the option to install a landscape of gravel/stones/concrete instead of *"lawn"* - thus eliminating the need for any conversion.

## ¶721

Along those same lines, the complaining owner(s)/occupant(s) could, instead of fraudulently complaining to law-enforcement about their neighbor, also easily and at minimal/marginal expense, install motion-activated LED lighting comprehensively covering all surrounding areas of their home including backyard. Such motion-activated LED lighting is not only inexpensive, but also, has minimal/marginal operating costs and high durability/longevity due to being motion-activated. Rodents/Vermin will not enter into any areas that are adequately lit-up by such motion-activated LED lighting. Thus, the responsibility for deterring such animals from their residence lies with both the accusing party and the accused party. If the accusing party is not taking such minimal/necessary precautions, then they are not entitled to make complaints about the accused party to law-enforcement. Almost all, if not all, of the Texas-Public-Nuisance-Law was written/updated in {1989}/{1991}, but in the many decades since those years, there have been many innovations in inexpensive technology that, when such inexpensive technology is effectively used, simplifies the attainment of the original goals of the Texas-Public-Nuisance-Law, without resorting to legal action; in other words, a person should never be fraudulently charged and prosecuted for violating the Texas-Public-Nuisance-law, when such inexpensive technology could easily be utilized by the complaining residents to eliminate any-and-all alleged public-nuisances from their property.

## ¶722

Privacy-fences (6-feet-tall or taller) are not a feature of many, if not most, residential subdivisions in Texas - and the Public-Nuisance-Law applies to all residential subdivisions - those with and without such privacy-fences. When the {Texas Legislature} wrote the Public-Nuisance-Law, they were writing such law with the impression of unenclosed/open backyards where the item(s)/condition(s) of one property could spill-over onto neighboring property due to the lack of such privacy-fences. So, residential subdivisions that do have such privacy-fences offer some built-in protection from alleged public-nuisances since, while rodents and vermin, can climb/jump-over such privacy-fence, such animals are not likely to do this often since it expends limited-energy of such animals. So, even if the accusing party accuses a neighboring property owner of maintaining property in a manner that could constitute an alleged public-nuisance, then the existence of such privacy-fence

will, to a great extent, render the accusations to be illegitimate or overly-exaggerated. As mentioned above, such animals are only likely to climb and cross the fence if they detect a food source on the other side of the fence; so, again, the responsibility for deterring such animals lies with both the accusing party and the accused party.

## ¶723

If it is the case that residents allow their domestic cats to roam freely at nighttime, as is the case in many residential subdivisions (often in violation of such subdivisions' restrictive covenants), then these cats inevitably jump into other residents' backyards. It goes without saying that a backyard that is regularly patroled (during both daytime and nighttime) by a neighborhood's freely-roaming domestic cats cannot possibly be considered to be a public-nuisance as such cats have hundreds-of-thousands-of-years of evolutionary skills to detect, hunt and chase rodents - and such rodents are the natural prey of such cats.

## ¶724

Finally, it is widely known, at least amongst diverse, educated and open-minded circles, that rodents, including rats, are also not perceived in the same manner across peoples of different races/cultures/religions/politics. While White-American (and White-European) cultures generally consider the rat as an unwanted pest, Asian cultures and religions, in particular, tend to have a diametrically-opposite view. For example, many peoples of South Asia - including South India where the plaintiff is originally-from - worship the rat as a religiously-sacred animal, and even feed milk and grains to wild rats. In many cultures, wild rats are even caught for food, and domesticated rats are even farmed for food. Many wild rodents (including mice) are known to prey-upon other unwanted pests such as cockroaches; so, again, if residents want a chemical-free solution to eliminate cockroaches and other unwanted insects around their house, then the only way is do so (other than replacing all soil and vegetation from the property with deep-layers of stone/concrete) is to allow habitat on the property for the natural predators of cockroaches - including mice, frogs and large-lizards (lizards that are 1 foot or longer and that are approximately 2-inches thick - see below).

## ¶725

Since the crucial term *"unsanitary condition(s)"* is totally undefined, it is open to very-diverging interpretations and is prone to extremely arbitrary/capricious/discriminatory/retaliatory/predatory/hypocritical/abusive/oppressive/selective/biased enforcement by law-enforcement. For example, consider the (non-hypothetical) scenario of a family with 4 babies. Such family would have a garbage-bin substantially-filled with dirty-diapers (thus human faeces) from each of those babies. In this scenario, suppose that the garbage pickup service only picks up garbage once a week. Since garbage bins (and garbage bags) are not sealed/airtight containers, such human faeces will undoubtedly attract flies/other-insects and is also likely to generate a substantial amount of maggots (especially during the summer months). Such garbage bins might easily attract large vermin - such as raccoons, possums, etc. - that are capable of rummaging through this unsanitary waste in search of food. The plaintiff is unaware of any Government in Texas inspecting garbage bins and/or criminalizing people for such unsanitary storage and/or disposal of human faeces:

▸ Texas Health and Safety Code: Title 5. Sanitation and Environmental Quality: Subtitle A. Sanitation:
▸ Chapter 341. Minimum Standards of Sanitation and Health Protection Measures
▸ https://statutes.capitol.texas.gov/Docs/HS/htm/HS.341.htm

*Sec. 341.011. NUISANCE.*

*Each of the following is a public health nuisance:*

*(1) a condition or place that is a breeding place for flies and that is in a populous area; ...*

*(5) sewage, human excreta, wastewater, garbage, or other organic wastes deposited, stored, discharged, or exposed in such a way as to be a potential instrument or medium in disease transmission to a person or between persons; ...*

*Sec. 341.014. DISPOSAL OF HUMAN EXCRETA.*

*(a) Human excreta in a populous area shall be disposed of through properly managed sewers, treatment tanks, chemical toilets, or privies constructed and maintained in conformity with the department's specifications, or by other methods approved by the department. The disposal system shall be sufficient to prevent the pollution of surface soil, the contamination of a drinking water supply, the infection of flies or cockroaches, or the creation of any other public health nuisance. ...*

*(e) Material and human excreta removed from a privy vault or from any other place shall be handled in a manner that does not create a public health nuisance. The material and human excreta may not be deposited within 300 feet of a highway unless buried or treated in accordance with the instructions of the local health authority or the department. ...*

# ¶726

Food preferences of peoples of differing races/cultures also highlight differences in standards of sanitation and disgust. For example, best-selling author, journalist and University of California-Berkeley Graduate School Professor Michael Pollan points out that almost every culture considers some food-choice(s) of another culture to be disgusting. Many peoples of Asia consider *"stinky cheese"* (including cheddar) to be disgusting - yet, many peoples of Western cultures (including White-Americans) joyfully consume *"stinky cheese"*. Lobsters are sometimes referred to as *"cockroaches of the sea"* - yet, many peoples of Western cultures (including White-Americans) consume them, while still considering the consumption of insects by many other ethnic cultures around the world to be disgusting. The plaintiff personally considers oysters, clams and snails to be disgusting - yet, many peoples of Western cultures handle and consume them - in some cases, even raw. (Additionally, seawater contains at least trace amounts of the excreta of all the animals living in the sea/ocean and when oysters are consumed raw, some amount of that animal-excreta is ingested.) The crucial difference is that the plaintiff - and all other people who follow the *"golden rule"* - are not imposing their subjective opinions/standards about standards of sanitation (or disgust) onto other people who have every right to handle and consume such food. The same differences also apply to the manner in which *"unsanitary"* is interpreted and enforced by law-enforcement: people, especially of one race/culture/religion, cannot rightfully impose their own subjective opinions/standards of sanitation on other people, especially of a different race/culture/religion, and this is particularly-true if the complaining-party(s) are all of the dominant/majority race/culture/religion and the accused-party is of a minority race/culture/religion.

# ¶727

Even disregarding the fact that differing races/cultures have differing standards of sanitation and/or disgust, such standards of sanitation and/or disgust even vary from individual person to person (including such persons of the same race/culture). For example, as a policy of personal sanitation and hygiene, the plaintiff does-not and will-never - unless the plaintiff's survival requires it - enter into swimming pools or into other bodies of water (lake, stream, river, pond, sea, ocean, etc.) because such bodies of water contain, at the very least, trace amounts of human faecal-matter/urine and/or other-animal faecal-matter/urine; yet, people all around the world enter into such bodies of water. Swimming pools

are almost-always chemically treated with large amounts of toxic chemicals like chlorine - and the plaintiff will never knowingly expose the plaintiff to such toxic chemicals. Untreated bodies of water (lake, stream, river, pond, sea, ocean, etc.) are also a major source of many water-borne diseases and infections usually caused by harmful microbes, and the plaintiff will never knowingly increase the plaintiff's exposure to such harmful water-borne pathogens. (Water, including moisture/droplets in the air, is the primary medium by which pathogens, diseases and viruses are spread.) The plaintiff never owned a pet-dog or a pet-cat, and so, the plaintiff never had the need to pickup dog-faeces/cat-faeces, although the plaintiff considers such pickup to be disgusting and unsanitary. The plaintiff considers the use of diapers - both infant diapers and adult diapers - to be very disgusting and unsanitary, because, firstly, the faeces and urine actually stick to the human-skin (or remain in very-close-proximity to human-skin) for a significant period of time. Secondly, the plaintiff considers the cleanup associated with the use of diapers to be another disgusting and unsanitary practice. Both the (unsustainable) manufacture of new diapers and the disposal of dirty diapers into landfills causes huge costs/damages to the environment and the climate - due to the emissions caused by such human waste. So, even disregarding the real issue of racial/religious/cultural differences when it comes to standards of hygiene, sanitation and disgust, even imposing one person's subjective standard of hygiene, sanitation and/or disgust onto another accused-person (such as the plaintiff) is, simply-put: irrational, arbitrary, capricious, discriminatory, hypocritical, authoritarian, unjust and unreasonable - all in violation of such accused-person's fundamental Constitutional rights. When a legislature writes (often-vague) laws concerning sanitation that do not represent a world-view (especially when it comes to different races/religions/cultures), or even worse, when the executive-branch of government irrationally/arbitrarily/discriminatorily/capriciously/hypocritically/abusively/oppressively/selectively/biasedly/unreasonably interprets and enforces such poorly-written and/or ethnocentric/culturally-insensitive sanitation laws, then these are significant Constitutional rights violations: *"Irrational in Violation of the Equal Protection Clause", "Unreasonable in Violation of the Common Law", "Vague in violation of the Due-Process-Clause"* (see below) - and in cases where a person's private-property/personal-space and/or home (*"castle"*) is searched and/or seized as part of the unreasonable enforcement of such law: *"Unreasonable search and/or seizure in violation of the Fourth-Amendment, "Invasion of Privacy in violation of the Due-Process-Clause", "Deprivation of Procedural-Due-Process in violation of the Due-Process-Clause".*

## ¶728

During the beginning of the COVID-19 pandemic, former United States Health and Human Services Secretary Alex Azar told lawmakers and/or one-or-more media organization(s) that immigrant workers' lifestyles exacerbated the spread of the of the disease inside meat-packing plants, while the spokesperson for Smithfield-Foods told one-or-more media organization(s) that the COVID-19 outbreak in its Sioux Falls pork-processing plant was so severe as it was, in part because, among the plant's many immigrant workers, *"living circumstances in certain cultures are different than they are with your traditional American family"*. It was only after the statement was widely reported in the mainstream media that the company denied that it blamed the burst of cases on national-origin/race/ethnicity. For over two years, many politicians around the United States have, according to media reports and/or according to their own political-campaign advertisements, peddled the same racist dog-whistle that immigrants-of-color are to blame for the spread of the disease. While many politicians have also irresponsibly blamed China as the origin of the disease, some even going so far as to call it the *"China virus"*, racial-animus and hate-crimes against Asian-immigrants and Asian-Americans have drastically increased. During the closing arguments of the recent high-profile trial of 《GEORGIA V. TRAVIS MCMICHAEL, GREGORY MCMICHAEL AND WILLIAM BRYAN》, a White-American attorney for White-American defendant Gregory McMichael described the deceased victim of such brutal hate-crime, African-American male Ahmaud Arbery, as having *"long dirty toenails"*, in a trial in which recorded evidence also showed a White-American witness describing Mr. Arbery as having *"curly, messed-up*

hair". During the recent high-profile trial of (TEXAS V. AARON DEAN), White-American (former) Fort Worth police officer defendant Aaron Dean testified that, upon approaching 28-year-old African-American woman Atatiana Jefferson's home during the middle of the night, he saw trash scattered at various areas of the property, and used that claim to determine that such house was being burglarized. Based, at least partly, upon this determination, Mr. Dean then shot to death, the first person he saw inside the house, Ms. Jefferson - the legal resident of the property. In other words, Mr. Dean, in substantial part, blamed the victim of his crimes, Ms. Jefferson - a highly-educated pre-medical graduate student - for not maintaining her own home according to his White-American standards. The jury convicted Mr. Dean of manslaughter and sentenced Mr. Dean to almost 12 years in prison, while the family of Ms. Jefferson was indignant that Mr. Dean did not get convicted on the top-charge of murder, especially since, as a prosecutor on the case noted, Mr. Dean conducted a clearly unconstitutional-and-unlawful search of the private-property. In response to Mr. Dean's racist justification of his crimes, a Haitian-American attorney scathingly refuted Mr. Dean's claim, stating that Ms. Jefferson was living her *"ethnic lifestyle"* within that private-property which was entirely *"her right"* as it was her home. In the documentary, *"Born Behind Bars"*, documenting female inmates in an unusual program that allows such inmates to raise babies in prison, one-or-more of the White-American inmates complained that an African-American inmate was not taking showers and was not cleaning up like all the White-American inmates were, and lodged that abusive complaint as justification that such inmate should not be allowed to touch *"their"* children. Recently, one-or-more local-media organization(s) reported that one-or-more White-American(s) complained that a historic Black cemetery just outside of the City of La Grange, in the Texas County of Fayette has essentially been *"abandoned"*, claiming it to be *"unkempt"*, further elaborating that it contained *"rickety, rusted chain link fence, and just trees and brush everywhere."* The City of Baltimore, Maryland was recently (in the year {2023}) ranked the *"Dirties City in America"*, while it is not lost on any knowledgable person that the racial-demographics of the City of Baltimore is over 70% people-of-color - leading to at least some persons-of-color (such as the plaintiff) to raise their eyebrows, questioning whether such rankings are motivated, at least in part, by racism. The aforementioned cases are just a minute fraction of countless similar examples, but in general, such dehumanization, incendiary rhetoric and fraudulent justifications regarding first-amendment-protected lifestyle-choices and private-property-maintenance-choices - all arising from a strong sense of racial superiority - only fuel already-racist tendencies amongst certain segments of the population, and even worse, allows/encourages majority-White law-enforcement agencies to engage in egregious acts of racial-oppression, and furthermore, irrational/arbitrary/capricious/discriminatory/retaliatory/predatory/hypocritical/abusive/oppressive/selective/biased/unreasonable enforcement of law(s), in general, but in particular, those law(s) dealing with health, sanitation and private-property-maintenance.

# ¶729

As the record does show, it is unfortunately not uncommon for, at least some, predatory White-Americans with racial-animus to abuse/weaponize/manipulate property-maintenance-laws as a powerful tool of discrimination/predation/oppression/subjugation/obstruction/retaliation to eliminate or at least deter at least some person(s)-of-color from residing within White neighborhoods and/or target at least some person(s)-of-color living in historically colored neighborhoods. The abusive/oppressive language that far-right-wing-extremists and White-supremacists often use is clearly just a small part of a larger pattern of predatory behavior(s)/action(s) that seeks to, for example, abuse/weaponize/manipulate these property-maintenance-laws - as a new form of modern-day-Jim-Crow law - so as to cause severe harm to people of color, allowing such predatory people to do what they could not ordinarily do in the post-civil-rights-era (due to anti-discrimination laws such as the fair-housing-laws). Such abusive/oppressive language also further illustrates a sharp-divide and/or substantial-difference in standards of property-maintenance between White-Americans and people-of-color -

especially when one considers people-of-color residing outside of the United States. The plaintiff is not, in any way, suggesting that any particular standard is superior to any other, but rather that person(s) of one race/culture - especially the dominant/majority race/culture - cannot rightly impose their subjective standards of property-maintenance on person(s) of another race/culture - especially any minority race/culture. (A perfect example of where indigenous-peoples, generally-speaking, have a higher and/or safer standard of health and sanitation than White-people is the use of pesticides - see below). So, as long as residents - of all races/cultures - conduct their own private affairs in good faith while sticking within their own property boundaries, there is no harm done. Therefore, law-enforcement (and other institutions-of-power such as the [HOA]) cannot, in the interest of justice, act upon the outrageously abusive/oppressive/coercive/violative/intrusive/invasive/humiliative demands of such predatory White-Americans with racial-animus in-order-to violate the rights of any person(s)-of-color. For example, the [SBPDL] blog is (or was) a well-known White-Supremacist/White-Nationalist blog in which such White-Supremacists/White-Nationalists dedicated at least some time and effort, targeting person(s)-of-color for failing to live a lifestyle according to, and/or for failing to maintain property according to their White-American standards. The plaintiff only posts these extremely offensive and racist messages in-order-to directly compare the defendants' predatory conduct (and statements) against the plaintiff to such racist messages posted by White-Supremacists/White-Nationalists:

> "'A Richer Life' -- the Department of Housing and Urban Development wants you to 'Live life in full color' with diversity" [SBPDL]{¡} blog comment:
> "Stuff That Black People Don't Like" [SBPDL]{¡} blog: [Anonymous] poster: (2013-08-19 04:57PM):
> https://stuffblackpeopledontlike.blogspot.com/2013/08/a-richer-life-department-of-housing-and.html

*… You have no idea how these violent, dangerous **pigs** live. And they have found your hiding places.*

*I have so many stories that make me sick to this day. **They live like filthy animals.** One day a shitty rusted pickup truck will drive onto the lawn next door and a mob of poor blacks will start unloading **pee-stained mattresses, broken furniture, dirty children and hundreds of black plastic trash bags.***

*And you won't know whom to call. No one will tell you anything. Not the police, not the landlord, not the mayor, no one.*

*They are awake all night and sleep all day. They fuck and fight. Loudly. They consume and destroy, yell, raise hell, rap, rape, and roam around. **They never work.***

*Their trash rots, they have roaches and rats. The weeds grow higher and higher.*

*They are fully funded, entitled, yet unsupervised, unchecked, underreported, unaccountable, unaccounted for.*

*They take what they want BY FORCE.*

*You will NEVER HAVE PEACE AND QUIET AGAIN.*

*You will awaken one morning and all of the stuff you worked so hard for will be GONE. POOF! Just like that. Your wife will cry herself to sleep. Your life will turn upside down.*

*They will break down your doors and windows while you are at work to wait for you, or take your stuff, or hurt you.*

*You will fear for your children's lives and safety. **You will experience PTSD just from living near them.** You will NEVER BE THE SAME AGAIN. It is over.*

*Warn your loved ones NOW. Start making plans to fight for your life. …*

> "Have You Forgotten When Those (Row) Towers Fell?" [SBPDL]{¡} blog comment:
> "Stuff That Black People Don't Like" [SBPDL]{¡} blog: [Anonymous] poster: (2013-09-12 10:21AM):
> https://stuffblackpeopledontlike.blogspot.com/2013/09/have-you-forgotten-when-those-row.html
> [ OVERT RACIAL SLURS REDACTED ]

... *Anon. 8:58..Right on ! No television show,stories from those who have seen firsthand,news article,etc. can begin to describe the **absolute shock,revulsion,and disgust that any White person will experience living anywhere near ****.**It is truly surreal,unbelievable. Loud,**dirty,**rude,dishonest,spiteful,angry(?),vain,**inconsiderate,stupid** people. One *** **family** ruins the whole dynamic of any neighborhood.**These fucks will keep you up all night,**not giving the slightest thought of you having to work the next day.Your stuff will come up missing. Creeps will peep in your windows. God help you if you have young daughters.**Soon your once-clean street will be littered** with malt liquor bottles,empty cigarette packs,cigarette butts,half-eaten fast food and wrappers,you name it. Stuff that can be directly traced to them. They will laugh at you as you clean it up. Every other word you hear will be 'M-F' and '*****'. Used condoms will start appearing. **They won't cut their lawn,**or if they do they will not bag the clippings,(if they are feeling energetic they will rake them into the street for 'someone else' to deal with). They **won't** paint,**trim bushes,**sweep sidewalks,**or do anything to improve their surroundings in any way.**The disfunction,laziness,sense of entitlement,etc. has no limit-they have no shame. As I said earlier,most people will not believe this,or dismiss it as exaggeration. That is the problem. We,the White people who know better,want to prevent the rest if the country from becoming Detroit.A lot of needless disaster could be avoided if every ****** lover had to spend a week housing and feeding a *** family in their own house. Unfortunately,(at this rate) by the time the majority of Whites wake up,it may be too late.Somehow,some way,average Whites need to learn the truth. It is plain as day,almost impossible to avoid to me ...*

---

▸  "The "Shelley House" at 4600 Labadie Avenue in North St. Louis:  For $45,000, You Can Own America's Future"  [SBPDL]({;) blog comment:
▸  "Stuff That Black People Don't Like"  [SBPDL]({;) blog:  [Anonymous] poster:  (2014-08-29 06:54AM):
▸  https://stuffblackpeopledontlike.blogspot.com/2014/08/the-shelley-house-at-4600-labadie.html

*... Do homeowner's associations keep out blacks for, say, fining them $200 if they keep the garage door open longer than a half hour?*

*So....i should not chafe at ridiculous conformist demands of a homeowner's association.*

*The rules should be demands that call for future time orientation to keep blacks out.*

*Let's see...*

*1. Suggestions for future improvements must be submitted by residents twice a year or $500 fine.*

*2. Trash cans must be put away within 20 minutes of trash pick -up (they would have to look ahead and hire someone to do it) or $200 fine.*

*3. Each home must have flower boxes under the windows with certain color flowers healthy and in bloom at all times like lucerne switzerland.*

*4. Foul language or pants underneath butt crack $200 fine.*

*5. Zero weeds. Grass always 1.5 inches tall.*

*Anybody else got ideas to create restrictive cavenants through rules? ...*

---

▸  "The Death of Public Housing (The Law of Unintended Consequences)"  [SBPDL]({;) blog comment:
▸  "Stuff That Black People Don't Like"  [SBPDL]({;) blog:  [Anonymous] poster:  (2012-10-06 05:46AM):
▸  https://stuffblackpeopledontlike.blogspot.com/2012/07/death-of-public-housing-law-of.html

*... I have **lived next door to these voucher blacks**. They are always loud-mouthed women with terrible kids.*

*They all "entertain" violent black males.*

*They get their new place, decorate, put Scooby-Doo sheets up in the windows and the fun begins. The kids get new bikes and trampolines, RTO delivery, satellite dish TV, a new pit-bull puppy that they forget to feed and allow to bark all night, pot smoking on the porch, basketball goal in the streets, boyfriends and parties, new visitors every day, miscellaneous people staying over..then it all starts to crack and fall apart. It is the black way.*

*But these blacks can not keep a household going. Not even with a voucher.*

*Soon, **the grass gets high, trash piles up**, the repo man comes to take back the rentals, cars and bikes, **the police arrive**, a shooting or two, inoperable vehicles on the lawn, the domestic violence and yelling starts, child abuse, **utilities shut off**, desperate for money, prostitution and **drug dealing**, stolen goods, CPS and **social worker visits**, black women screaming and fighting on the lawn, and then, they load up the black trash bags and disappear into the night, **leaving the house full of rotting garbage and clogged toilets.***

*White landlord or property management company comes weeks later to clean it out and do the same dumb thing again. Neighbors suffer.*

*What is wrong with white people????? ...*

---

▸  "Does Milwaukee Have America's Worst Black Population?"  [SBPDL]({;) blog comment:

▷  "Stuff That Black People Don't Like"  [SBPDL]{¡} blog:  [Anonymous] poster:  (2015-07-08 02:35PM):
▷  https://stuffblackpeopledontlike.blogspot.com/2015/07/does-milwaukee-have-americas-worst.html
▷  [ OVERT RACIAL SLURS REDACTED ]

*... Anonymous at 9:21 am. You referenced a tree planting in Detroit and not a black face in sight. This happens every time there is any kind of cleanup project in Detroit.* **Grass cutting, litter pickup,** *tree planting, it's always suburban whites.* **Blacks will literally sit on their front porches watching whitey clean up their mess. And believe me it is a HUGE mess.** *Now a few fine black men of the cloth have zeroed in on 'kid rock'. They want him to stop using the confederate flag during his concerts. The reverend said , that if the flags not gone , he and other black church leaders in Detroit will stop driving Cadillacs. I kid you not! I guess General Motors is a sponsor of the concerts. My head spins from this nonsense. Hey rev....* **Stop worrying about the flag, and start cleaning up your 40 year \*\*\*\*\* out in Detroit.** *Next time your out marching to protest some deemed injustice, bend over and pick up some of the crap all over the streets, alleys, and roadways.* **Your people are a bunch of slobs!!!!** *...*

▷  "Sorry Hillary Clinton, White America is on the Verge of Tuning Out African Americans"  [SBPDL]{¡} blog comment:
▷  "Stuff That Black People Don't Like"  [SBPDL]{¡} blog:  [Anonymous] poster:  (2016-07-09 01:26PM):
▷  https://stuffblackpeopledontlike.blogspot.com/2016/07/sorry-hillary-clinton-white-america-is.html

*... Mrs. Clinton, if you really want to listen to black people move your entire family into an all black neighborhood. That would include your two grandchildren and your daughter and son in law. Remember you must also send your grandchildren to an inner city public school. No more private education or immaculate houses in upscale areas. I'm sure you will get an earful, Mrs Clinton. Filthy language, rap crap music, gun shots, screaming, loud talking, screeching tires at 2:00am. Then to top it off, you will also be able to see.* **Unmowed lawns, litter by the ton,** *abandoned cars, abandoned dogs, abandoned kids. Enjoy your new surroundings Mrs. Clinton. I am sure you're going to love the vibrancy and diversity. Also sure it will be your very first time. Idiot! ...*

▷  "Free Speech isn't Getting Freer:  Growing Number of Americans Fired, Suspended, Forced to Resign for Criticizing Black Lives Matter"  [SBPDL]{¡} blog comment:
▷  "Stuff That Black People Don't Like"  [SBPDL]{¡} blog:  [Anonymous] poster:  (2016-08-01 01:16PM):
▷  https://stuffblackpeopledontlike.blogspot.com/2016/08/free-speech-isnt-getting-freer-growing.html

*... A week long clean up, of another Detroit neighborhood by white people from the suburbs. It's amazing to see,* **grass being mowed, litter being picked up**, *streets swept, flowers planted,* **abandoned houses** *being boarded up,* **of course, they were abandoned by blacks.** *I'm waiting for the optics of this endeavor, so I can count ( on one hand) the black Detroiters that pitched in. Sip that grape koolaid while you watch whitey clean up your mess. At least when you change a babies dioper, or clean the spit up, you know that it doesn't go on forever. In the case of cleaning up cities, after they've been decimated by blacks, I'm afraid that's a never ending undertaking, Carry on whitey ...*

▷  "Affirmative Action for White Athletes in College Football and Basketball; 'Special Admission' into College for Black Athletes:
▷      Why is Richard Lapchick Quiet on HBCU Football Graduation Rates?" [SBPDL]{¡} blog comment:
▷  "Stuff That Black People Don't Like"  [SBPDL]{¡} blog:  [Anonymous] poster:  (2011-06-17 04:33PM):
▷  https://stuffblackpeopledontlike.blogspot.com/2011/06/affirmative-action-for-white-athletes.html

*... Please, by all means, find your nearest black neighbor, ring his/her doorbell, and, when he/she opens the door, say to them exactly what you say on this site.*

*How far must one physically be in proximity to be considered* **a neighbor**?

**I want to do what you said but unfortunately for me I live in a nice White neighborhood. The grass is mowed,** *children play outside after school, and people greet each other.*

*On second thought why would I take the time to drive to an urban shit hole, to step over a dead crack addict, to bang on the door of a section 8 house answered by a welfare queen with 4 kids by three different daddies to tell her she sucks?*

*Oh, guess your threat would be for me to speak to a male? Well visiting hours at the local Federal Prison are over ...*

▷  "Why are the Whitest States so Peaceful?"  [SBPDL]{¡} blog comments:
▷  "Stuff That Black People Don't Like"  [SBPDL]{¡} blog:  [Anonymous] posters:  (2012-09-17 04:02PM) (2016-08-22 11:18AM):
▷  https://stuffblackpeopledontlike.blogspot.com/2011/04/why-are-whitest-states-so-peaceful.html

*... I am 53 years old and have had some live experiences that might shed some light on this debate. I believe* **the problem is cultural** *rather than a matter of intellect. I have been in work related training with black people and found them to be of equal intelligence. But here is were we differ. At that time I lived in a mixed neighborhood,mostly hispanics,but whites and blacks also. So One day it was raining and I brought my German shepherd dog inside overnight from my fenced in yard. My new bike was gone in the morning. At work and I was told that I deserved to have my bike stolen since I was stupid enough to take my dog in and not my bike also.*

*I currently live in the Mid West(white)and for 3 years 3 bikes and no fence or dogs and rain or shine we still have our bikes.*

*When I was a child we moved from the Midwest to La Puente,CA. We bought a newly built house in a beautiful neighborhood. Years passed and then* **some Puerto Ricans moved in on our block. My dad right away put the house up for sale.** *Us kids protested. Why would we leave our beautiful home. My father responded.* **In 5 years I will bring you back here and show you why. So he did. All the Whites had moved out. The grass was gone. The flower beds were destroyed.The garage and it's door were stove in from a car crash. Our house and the whole neighborhood were trashed. That wasn't from poor. That was from trashy.** *We learned a big lesson that day. During the discussion that ensued our father told us about the Japanese,who in WW2 were put into concentration camps for years. All their wealth and property were confiscated by the U. S.Govt. After the war they were released with nothing. They didn't complain or make any demands. They just got to work. Inspite of the prejudice and distrust of all Asians at that time, they prospered and gained respect.*

*This discussion brings to mind the TV program where Oprah finds her roots in Africa and sees the squalor and suffering of her ancestral cousins.She didn't say it but it was obvious she cried because that should have been her fate. That caused me to remember a documentary I once saw where kids from The U.S. raised money to go to Africa to dig wells to make life easier for tribal people. What made it seem ridiculous was that the wells they were digging were being dug just with the use of ropes and shovels. They didn't see the irony of sending a bunch of kids over seas to dig holes for people that were able to carry water on their heads for miles, but; were not capable of digging their own well. Insane ...*

*... Thank-you for your concise, simple, and accurate statement. I am 62 and have lived all over the world. I never even knew a black person until about 15 years ago.Most places I lived there just weren't any. It wasn't a matter of racism or avoiding them, there just weren't any around. One of the places I lived in the '60s and '70s was London - and there were few black people.I* **can't believe what I see there now - it breaks my heart. Why do they have to wreck everywhere they go? It's almost as if they WANT to destroy and despotic anything that is civilized and lovely. If they want to live their own way - fine, but why spoil and destroy other people's environment and way of life? It's disgusting. I am not racist, I just don't like how they live and the ghettos they create.**I am the only white person in a black neighborhood, so, yes, I can speak from the trenches. I moved here from another state and didn't know there was a large black population here. It is a suburban area, so on the surface looks kind of nice - older turn of the century houses on large lots, trees, etc. The houses are mostly owned and have been in the families for generations. They basically keep the grass cut but - **everything is just shabby - rusty chain-link fencing, litter blowing around, stained, nasty mattresses and broken furniture dumped along the road. And - what the friggin is it with black people and the damned shopping carts?!** They are everywhere! Not one single flowering tree anywhere in the springtime. No flowers anywhere. No one out gardening in the summer. Absolutely zero desire to make a pleasant environment to live in.You don't have to have money or a college education to want a nice environment to live in, and for your children to grow up in.**There's just a big piece of their brains missing that they have evolved without.Because we want to live among other people who share the same fundamental value system doesn't make us "racists".** ...

> "Lawsuit: Florida Parents Partner with IJ to Shut Down Dystopian "Predictive Policing" Program"
> "Institute for Justice lawsuit alleges that Pasco police harass and fine homeowners to make their "lives miserable until they move or sue." Today, they sued." :
> Institute for Justice:    J. Justin Wilson:    Senior Director of Communications:    (2021-03-11)
> https://ij.org/press-release/lawsuit-florida-parents-partner-with-ij-to-shut-down-dystopian-predictive-policing-program/

*Pasco County, Florida's future policing program is as dystopian as it is unconstitutional. Under the guise of "predictive policing," for the last 10 years the Pasco County sheriff's department has used a crude computer algorithm to identify and target supposed "future criminals." Once identified, these supposed "prolific offenders"—many of whom are minors—are relentlessly surveilled and harassed. As a Tampa Bay Times in-depth investigation uncovered, police regularly show up at their homes unannounced and demand entry. If they or their parents don't cooperate, police write tickets for* petty violations, *like missing house numbers or having* **grass that is too tall.** *As one former Pasco County deputy put it, they were under orders to* **"make their lives miserable until they move or sue."**

*After weathering years of misery, today a group of Pasco residents partnered with the Institute for Justice—a nonprofit public interest law firm—to sue the county and put an end to its predictive policing program once and for all. The lawsuit, which was filed in federal court, argues that the county violated residents' First, Fourth and Fourteenth Amendment rights.*

*"Pasco's program seems like it was ripped from the pages of a dystopian sci-fi novel and not a manual on effective police strategies," said Institute for Justice Attorney Ari Bargil. "This program isn't just unethical, it's patently unconstitutional to use a crude computer calculation to* **target, harass, fine, and even arrest citizens who have done nothing wrong."**

*Robert Jones, a plaintiff in the lawsuit, knows the cruelties of Pasco's program firsthand. In 2015, Robert's teenage son had a number of run-ins with the law. That landed his son on Pasco's "prolific offender" list. Shortly thereafter deputies started to conduct "prolific offender checks." These warrantless "checks" involved repeated, unannounced visits to Robert's home at all hours of the day. Robert grew tired of the harassment and stopped cooperating with police. That only made matters worse.*

STEDMARTH   KODE   v.   WILLIAMSON COUNTY , ET AL.

*Code enforcement is a common tactic to compel cooperation. One deputy said they would "literally go out there and take a tape measure and **measure the grass if somebody didn't want to cooperate with us.**" In Robert's case, **deputies cited him for tall grass,** but failed to notify him of the citation. Then, when he failed to appear for a hearing that he was never told was happening, they arrested him for failure to appear.*

*All told, Robert was arrested five times by Pasco deputies. Although the bogus charges never stuck—they were all dropped—the harassment accomplished its goal: Robert ultimately moved his family out of Pasco County to escape the constant harassment from the Sheriff's Office.*

*"I lived through a living hell because a computer program said my family didn't belong in Pasco," said Robert Jones. "I only thought this kind of thing happened in movies, not in America. We've got rights. And I'm going to stand up for them and shut this program down."*

*Predictive policing gained prominence in the late 2000s as a way for police to use data to better allocate resources. Cities including Los Angeles and Chicago experimented with predictive policing but have subsequently scrapped their programs because of civil rights and effectiveness concerns. In most cases, police departments used data to identify geographic areas in need of additional resources. But Pasco took it one step further by using data to target specific individuals.*

*"Pasco defends its program as a crime fighting tool," said Institute for Justice Attorney Robert Johnson. "But in America, there is no such thing as 'innocent until predicted guilty.' The government cannot harass people at their homes just because it thinks they might commit some unspecified future crime."*

*Robert is joined in the lawsuit by Tammy Heilman, Dalanea Taylor, and Dolly Deegan. Like Robert, their families have all suffered unconscionable harassment by the Pasco deputies. Their lawsuit alleges that the county's prolific offender checks violate the plaintiffs' constitutional right to be protected from unreasonable searches and seizures. Beyond that, it argues that the due-process and equal-protection guarantees of the Fourteenth Amendment guard against arbitrary or irrational government actions. In this case, law enforcement officials cannot use a legitimate law, like code enforcement, to achieve an illegitimate purpose, like harassing and forcing prolific offenders and their families to "cooperate" during prolific offender checks.*

*For nearly three decades, the Institute for Justice has represented homeowners and others to stand up for their constitutional rights. Earlier this month, for instance, IJ filed a lawsuit against the city of Lantana, Florida, after it fined a homeowner more than $100,000 for parking violations. In Pagedale, Missouri, IJ won a class action lawsuit and shut down the city's program of **using fines and fees for trivial issues to raise revenue for the city.** And in Dunedin, Florida, IJ filed a lawsuit on behalf of homeowner who was **driven into foreclosure after the city fined him nearly $30,000 for having grass that was too long.***

*...*

# ¶730

Property-maintenance laws such as Texas's Public-Nuisance law, or at the very least, the abusive/oppressive interpretation and enforcement of such law, are at least one component of the modern-day-Jim-Crow version of *"redlining"* that is documented in this lawsuit and that is simply a more-subtle and inconspicuous form of the former, more-prominent version of *"redlining"* (originating in the 1930s) and that is, for example, briefly documented in the Public-Television documentary ⟪Independent Lens: Decade of Fire⟫:

‣ ⟪Independent Lens: Decade of Fire⟫:   (2019-11-04)
⚬ https://www.pbs.org/video/decade-of-fire-uotyld/

• 
• 
• 

[NARRATOR]

*Our families were setting roots down here - our neighborhoods were being targeted by government policies, based on race ... It started with "redlining".*

**[EXPERT-1]**   *Redlining: this first starts in the 1930s. Any neighborhood that has five, ten percent Black or Puerto-Rican population is seen as a declining neighborhood.*

- 
- 
- 

**[WHITE-WOMAN-1]**  *I think they have to learn to live the way we do - and take care of things.*

- 
- 
- 

**[REPORTER-1]**     *But what about some of those criticisms that the \*\*\*\*\* is dirty - that the \*\*\*\*\* is more violent? Therefore, the \*\*\*\*\* doesn't make as good a neighbor?*

**[BLACK-WOMAN-1]**  *Well, that's because they have never given the \*\*\*\*\* the chance...*

- 
- 
- 

# ¶731

Other parts of the Public-Nuisance-law are also arbitrarily/discriminatorily/capriciously/retaliatorily/predatorily/hypocritically/abusively/oppressively/selectively/biasedly interpreted and enforced. For example, Chapter 341 - the other chapter of the [THaSC] concerning public nuisances - contains the following text:

▸ Texas Health and Safety Code,   Title 5. Sanitation and Environmental Quality,   Subtitle A. Sanitation,
▸ Chapter 341. Minimum Standards of Sanitation and Health Protection Measures
▸ https://statutes.capitol.texas.gov/Docs/HS/htm/HS.341.htm

*Sec. 341.011. NUISANCE.*

*Each of the following is a public health nuisance: ...*

*(12) an object, place, or condition that is a possible and probable medium of disease transmission to or between humans.*

# ¶732

In one-or-more precedent-setting cases, court(s) in the United States have ruled that exposure to certain widely-used pesticides is a known/probable cause(s) of cancer(s), Parkinson's disease (and other neurological diseases), organ failure, birth defects, fetal death, altered fetal growth, impaired fertility, and/or other serious long-term, debilitating and potentially life-threatening injuries/diseases. (In addition to the

long-term/chronic conditions stated above, such exposure also causes acute health problems such as: abdominal pain, dizziness, headaches, nausea, vomiting, as well as skin and eye problems. Some chemicals commonly used in common insecticides, can cause a potentially deadly condition in humans if breathed in, while in general, exposure to pesticides is known to cause poisoning in humans, in numerous cases, even resulting in death.) Such court(s) have awarded relatively-large amounts of money in damages to those who have suffered exposure to such chemicals. Yet, law-enforcement continues to allow residential owner(s)/occupant(s) (living in densely-populated subdivisions) to spray and/or broadcast such toxic, disease-causing chemicals onto their yards - exposing their neighbors - many, if not most, of whom do not want to be exposed for very obvious reasons - to such chemicals. In Europe, governments have codified and enforced the *"precautionary principle"* when it comes to such chemicals - manufacturers have to prove that the chemicals are safe before they are allowed to even enter into the market - and many chemicals widely-used in the United States have already been banned in Europe. Indigenous peoples of color around the world (including the plaintiff) - at least those that are allowed to maintain their indigenous traditions/values - never use such chemicals, and generally-speaking, are strongly-opposed to the use of such chemicals due to the harm that such use of chemicals causes to the environment and to any peoples living in/around the area of application. In the United States, approximately half of all males and approximately a third of all females contracts some form of cancer at some stage in their life - a shocking statistic that is largely attributed to Americans' extremely-large exposure to toxic chemicals including, but not limited to, pesticides. Meanwhile, studies of indigenous-peoples have shown that indigenous-peoples that are allowed to live their traditional/indigenous (chemical-free) lifestyles - very-rarely get any of the so-called *"Diseases of Western Civilization"*: cancer, heart-disease, stroke, obesity, diabetes, hypertension, dementia, dental caries, etc. By sharp contrast, indigenous-peoples that are forced to assimilate into White-Western culture (extremely-high exposure to chemicals, non-traditional White-American diet, non-traditional sedentary lifestyle) get those very same *"Diseases of Western Civilization"* at a much-faster and much-higher rate than even non-indigenous peoples. It has been theorized that when an indigenous population that has lived their natural lifestyle is forced to assimilate into an unnatural (for example, White-American) lifestyle, such population gets those very-same lifestyle-related diseases at a much-faster and much-higher rate because their bodies have very little genetic resistance to such lifestyle-related diseases. (By analogy, a large fraction of the Native-American population died from the highly infectious diseases from Europe that the invading White-European population forced onto them - again, since this indigenous population had very little genetic resistance to such diseases that their bodies had never been exposed to.)

## ¶733

Additionally, during the COVID-19 pandemic, any reasonable person would assume, and indeed demand, that local governments would be enforcing strict adherence to the COVID-19 safety protocols - *"wearing a facemask"* and *"practicing social-distancing"* - so as to minimize spread of the disease - especially, since this is precisely what [THaSC-T5-SA-C341-SB-§341.011(12)] requires local governments to do. However, law-enforcement throughout many areas of Texas had allowed residents of their Counties (including the County of Williamson) to completely violate those safety protocols - leading to unnecessary hospitalizations and death - raising even further, valid claims of arbitrary/capricious/discriminatory/retaliatory/predatory/hypocritical/abusive/oppressive/selective/biased enforcement of laws concerning health and sanitation.

## ¶734

According to the Texas Public-Nuisance law, the term *"weeds"* is defined as *"all rank and uncultivated vegetable growth or matter that has*

grown to more than 36 inches in height". However, the verb *"cultivate"* is defined as *"to grow plants"* and/or *"to nurture/foster/tend"*; so, owner(s)/occupant(s) might notice many wild plant(s) sprouting in their backyards and might intentionally/willfully choose to *"cultivate"* (grow/nurture) them for a variety of reasons that could include racial/cultural/religious/political practices; therefore, such plants cannot legally be considered to be *"weeds"* (see excerpt below). More importantly, the word *"rank"* is defined as *"Strong in growth; growing with vigour or rapidity, hence, coarse or gross"*, but that definition does not specify any particular - or minimum threshold of - growth-speed of such vegetation. Furthermore, the use of the term *"rank"* is also very vague because *"rank"* does not adequately specify whether such term means only vertical-growth, only horizontal-growth, or a combination of vertical-growth and horizontal-growth. Also, the law does not provide any rational explanation or justification as to why property owner(s)/occupant(s) are allowed to grow other vegetation (including trees, bushes, hedges, shrubs, vines, etc.) to any height (and/or width and/or depth), but not so-called *"weeds"*. The definition of *"weeds"* is thus unreasonable, arbitrary, capricious and irrational (*"Irrational in Violation of the Equal Protection Clause and Unreasonable in Violation of the Common Law"* - see excerpt below), while both of the terms *"uncultivated"* and *"rank"* are thus vague and insufficiently-defined, in violation of the fifth-amendment Constitutional prohibition on Unconstitutionally vague laws:

> "Green Landscaping: Greenacres" (*) :   The John Marshall Law Review, Volume 26, Summer 1993, Number 4 :   Brett Rappaport, J.D. :
> Republished by the {United States Environmental Protection Agency} ("[US-EPA]") :
> https://archive.epa.gov/greenacres/web/html/jmlr.html
> https://archive.epa.gov/greenacres/web/html/jmlrapndx.html

> *A thing is right when it tends to preserve the integrity, stability, and beauty of the biotic community. It is wrong when it tends otherwise.*
>
> *—— The Land Ethic*

## I. INTRODUCTION ...

*Natural Landscaping - The practice of cultivating plants which are native to the bioregion without resort to artificial methods of planting and care such as chemical fertilizer, mowing, watering other than by through natural processes (rain), with the goal of harmonizing the landscape with the larger biotic community and ecosystem of the immediate and surrounding bioregion.8 ...*

*Weed Law - Any federal, state, county and local, statute, regulation or ordinance which limits the type or size of vegetation which grows or is cultivated on land within the jurisdiction.12 ...*

## IV. THE REASONS FOR AND RESPONSE TO THE NATURAL LANDSCAPE MOVEMENT

### A. The Movement Officially Takes Root

*Cook County and Chicago are not the only governments embracing natural landscaping - interest in the practice is global.103 In the London borough of Richmond upon Thames, for example, there is a sprawling "hay meadow" resplendent with such wildflowers as buttercups and red clover.104*

*In 1990, Congress mandated that 25% of all funds spent on highway landscaping projects be used to plant native wildflowers along the easements and rights-of-way of the Nation's highways.105 The Clinton Department of Interior is working with the Nature Conservancy and state and local governments to restore ancient American landscapes including the Park Savanna in the Midwest, the coastal sage scrub ecosystem in Southern California and the Hill Country region landscape in Texas.106*

*Remarkably, even the conservative, anti-environment Bush Administration strongly advocated natural landscaping - which it called "the New American Garden Style."107 According to the United States Department of Agriculture Director of the National Arboretum:*

*In the past, wildlife was thought of as the enemy of gardening and agriculture. Everyone has stories of destruction and ruin of valued plants and crops. These concerns no longer have to be reasons why wildlife cannot be welcomed back into our living space. A new gardening style, first designed by Oehme and Van Sweden, landscape architects of Washington D.C., was created on the grounds of the U.S National Arboretum as the New American Garden Style. The design, the plants, the preparation of the site, the maintenance schedule and the year-round display all work together to reclaim a disturbed site and restore it as to habitat where wildlife and humans can coexist.108*

*According to the Bush Administration, a homeowner with a New American Garden should "overseed the entire area with native wildflowers."109*

*Canada has officially embraced natural landscaping. The Ottawa City Council, for example, has approved plans to let nature take its course by reclaiming the city's 56 parks with natural landscaping. The idea is to naturalize the public parks by planting trees, creating woodlots and plowing up existing grass to replant selected wildflowers and native grasses.110*

*The actions of national, state, and local governments demonstrate that natural landscaping and the goal of harmonizing our yard with Nature and attracting backyard wildlife has officially taken hold. Natural landscaping is even termed "fashionable."111 The actions of governments and the acceptance of natural landscaping is not without cause. There are good reasons for this trend.*

## B. Why the Movement Is Taking Root

*Prairie ecologist Neil Diboll, a natural landscaping advocate and expert for nearly two decades, cites three primary reasons for the rapidly growing acceptance of natural landscaping: (1) ecologic; (2) economic; and (3) spiritual.112*

*Ecologically there is no doubt that natural landscapes are preferable particularly when compared to traditional suburban exotic lawns. Since natural landscapes do not require pesticides, herbicides or fertilizers, the harmful effects of these chemicals are eliminated.113 In light of water shortages and problems with non-point source Pollution, natural landscaping has profoundly positive ecologic effects. Xeriscaping, the practice of planting native low-water-consuming plants, is the law in many cities and one of the most compelling ecological bases for natural landscaping.114*

*The positive economic consequences of natural landscaping are twofold. First, there are the direct costs. Natural landscapes are less costly to maintain than a traditional exotic lawn or exotic landscape. Once established, **natural landscapes are not mowed, fertilized, treated with pesticides or herbicides, and they do not need watering.**115 For the homeowner or office building manager, direct costs are substantially reduced.116*

*State departments of transportation across the nation are some of the strongest advocates of natural landscaping. They recognize the benefits of natural landscaping and plant native plants on roadsides and rights of way throughout their jurisdictions.117 The Minnesota DOT is perhaps the most notable in its efforts. The MDOT Wildflower Program is involved in preserving and planting prairie wildflowers at many rest areas and along roadsides throughout the state. In addition to beautification of the state, a tourist attraction, the MDOT cites many discernable benefits from its program.118*

*Natural landscaping also reduces the costs of pollution cleanup. For example, water pollution in inland lakes and rivers could be reduced when those living within the watershed naturally landscape their yard. The result would be reduced run-off and a reduction in non-point source pollution attributed to fertilizers and herbicides used for maintenance of mono-culture lawns.119*

*The second economic argument for natural landscaping is the doctrine of diminishing marginal value - the less of an asset that remains the more valuable it becomes. As suburban sprawl continues to consume open space, the elements of Nature that remain and can be preserved increase in value. Accordingly, many developers are citing to the natural landscapes retained in their developments as a positive asset. Prices of homes in such sub-divisions often cost more than similar homes in areas without natural landscaping.120*

*The final reason for the movement towards natural landscaping - the manifestation of the Land Ethic through our yards - is spiritual. Diboll's argument is that insofar as we view ourselves as external and, therefore, not a part of Nature, we do not share the universal energy and soul of the "Great Spirit" whether the spirit be God, in the Judeo-Christian view, or some other metaphysical being. This disconnection from the life of the planet and universe deprives humankind of the security of belonging to the big picture. The resultant "insecurity" or lack of connection drives humankind to seek other forms of security, such as financial security, in an attempt to insulate ourselves from the chaos of*

*everyday life.*

*To achieve financial security, humankind despoils the Earth by converting natural resources into capital - an unnatural concept. In the process, humans have become unbalanced, and are willing to damage the very systems upon which they rely for sustenance. This devastation transcends economic models, from capitalism to communism to tribalism. It is not so much a problem of systems as it is a problem of spirit and culture.*

*Ultimately, economics drives culture and religion. Humankind can no longer pursue a pattern of destroying the Earth; this is now uneconomical. No organism can survive in a medium of its own waste. Therefore, we must develop spiritual systems that reflect this new reality and reward better nature in non-economic terms, i.e., spiritual growth rather than monetary growth. Spiritual development will be a growth market of the future - that spirituality is the Land Ethic and is manifested by homeowners through natural landscaping.121 ...*

## V. SOME VILLAGES STILL DON'T GET IT - WHAT TO DO IF YOUR VILLAGE IS ENFORCING ITS WEED LAW AGAINST YOUR NATURAL LANDSCAPE

*The types of old weed laws used by municipalities to prosecute natural landscapers generally suffer from a variety of legal flaws. These flaws can be exploited by natural landscapers who are targeted for prosecution in order to win his or her case, or hopefully, convince his or her village that the weed law should not be applied to natural landscapes. The flaws are constitutional, practical and evidentiary.*

### A. Natural Gardening as a Fundamental Right.

*1. Landscaping as Speech and Art*

*Natural gardening can be constitutionally protected speech and, therefore, any weed law must be closely related to a compelling state interest. While not all natural landscapes are obvious to even a casual viewer, many are. Indeed, this is often the real "problem." Symbolic speech is as protected as oral speech. One of the best ways a person can announce his or her concern for what humankind has done, and is doing, to the environment is to restore a portion of the environment to its natural state. Restoring natural vegetation can, therefore, be a form of speech and, as such, is entitled to the same protection that speech receives under the First Amendment.129*

*The attempt made by natural landscapers to politically express themselves through the cultivation of wild plants is one that parallels historical and traditional precedents.130 The political use of flowers as symbols is as important today as it has been in the past. The red rose is the symbol of the Socialist Party in France and the British Arbor Party. In the War of the Roses, opposing sides took roses of different colors as their symbols.131*

*Natural landscaping can also be artistic expression protected by the First Amendment.132 State law recognizes the beauty, artistic expression and virtue of landscape gardening.133 Landscape architecture is defined as "the art and science of arranging land together with the spaces and objects upon it, for the purpose of creating a safe, efficient, healthful, and aesthetically pleasing physical environment for human use and enjoyment."134 A weed law, as applied to natural landscapers, denies the landscapers' ability to express themselves, through an activity statutorily recognized as art.*

*Neighbors and government officials need not concur that the natural landscape is "art" before First Amendment protection attaches. In interpreting art as speech protected by the First Amendment, the court in Piarowski V. Illinois Community College 135 stated, "[t]he freedom of speech and of the press protected by the First Amendment has been interpreted to embrace purely artistic as well as political expression (and entertainment that falls short of anyone's idea or art...)..."136*

*One of the most spectacular examples of natural landscaping as art lies in the heart of Chicago's Grant Park. The Wild Flower Works II is the creation of Chicago artist Chapman Kelly.137 Kelly sees his garden of wildflowers, legumes and other native plants not merely as dirt and flowers, but rather a giant canvas on which he does his "most spectacular work."138 The ecological painting is a socio-political work that symbolizes the proper role of humankind within Nature.*

*In 1988, when the Park District sought to have the Wild Flower Works plowed under, Kelly went to court and obtained a temporary restraining order arguing his First Amendment rights. The lawsuit was later settled by allowing the Wild Flower Works to remain in Grant Park and the Park District to receive regular reports on its maintenance.*

*"Gardening is the art that uses flowers and plants as paint and the soil and air as the canvas - working with nature provides the technique."139 More remarkable examples of gardening as art are the efforts of the French Impressionist, Claude Monet. Following the death of his wife, Monet moved to Giverny, France in 1883. There he planted the gardens that were the subject of his most famous paintings. Focusing on color relationships and the effects of light, Monet carefully arranged pure colors in the abstract form of flowering plants to "create richly patterned textures and mood by contrasting or homonizing color relationships."140 In the later, and most productive part of his career, Monet used his flower and water gardens at Giverny as a living studio. "With the living, growing and changing plants, always subject to light and weather, Monet created an organized concentrated color environment where he could live, breathe, observe and walk, forever having his painter's eye challenged by the effects of light."141 Many of the plants Monet employed, and much of the layout of the gardens, are the same or similar to many of today's natural landscapes.*

*Enforcement of a weed law denies the artist the tools of her art, Nature. A city's weed law enforcement is as devastating to a natural landscaper as declaring music a nuisance would be to a musician. Absent a showing of some compelling municipal interest, a city does not have the power to restrain a natural landscaper's freedom of expression. The unjustified restraint of freedom of expression consitutes a violation of the First Amendment.*

*2. Landscaping as Religion*

*Natural landscaping, for some, can be a constitutionally protected form of religious practice. Courts essentially recognize religious practices subjectively, the only test being whether the individual asserts his belief in good faith and that belief could arguably be religious.142 Therefore, not only would the established **Native American religions**143 and **Eastern religions**144 which preach the oneness of humankind and Nature be entitled to First Amendment protection for natural landscaping, but those who hold **"nontraditional" religious beliefs** would also be entitled to such protection. Certainly, the adherents of Deep Ecology145 would be entitled to First Amendment protection for natural landscaping practices.*

*Beyond First Amendment protection to these less-common religions, the fundamental teachings of the Bible and Judeo-Christian theology encourage a stewardship approach to humankind's interaction with Nature.146 Vice President Gore narrows the focus and strongly supports the premise that traditional Judeo-Christian religions counsel for a harmonic relationship between humankind and Nature 147*

*Enforcement of weed laws can be an impediment to the free exercise of these religions. Whatever protection the Constitution affords that free exercise would apply to the practice of natural landscaping for those individuals engaged in it as a result of or in furtherance of their religion.148*

## *B. Weed Laws as Unconstitutionally Vague*

*Even if not a constitutionally protected fundamental right, natural landscaping can escape attack from out-dated weed laws because such laws generally do not define the term "weed" and are, therefore, unconstitutionally vague. The Chicago Ordinance, like many, merely outlaws "weeds" or an accumulation of weeds.149 As such, these laws provide a subjective and relative standard, which violates the Due Process Clause.*

*A law is void for vagueness where it does not clearly define what it prohibits.150 A law is void on its face if it is "perfectly vague"; to sustain the challenge the statute must be one which provides no "ascertainable standard for inclusion or exclusion."151 Weed laws that fail to define "weed" suffer from such a constitutional infirmity.152*

*The term "weed," where not statutorily defined, must be ascribed its dictionary definition. But "what is a weed?" is a vague and subjective determination. Its meaning varies depending on who is applying the definition and where the subject plant is located in relation to other "desired" plants. Thus a "weed" to a farmer may be a rose or iris growing in his corn or wheat field. But a rose or iris is not a "weed" to the conventional gardener, who would cite corn or wheat growing in his flower bed as "weeds."153 As Justice Douglas wrote: "Words which are vague and fluid may be as much a trap for the innocent as the ancient laws of Caligula."154 Weed laws can clearly be such a trap.*

*In Newark V. Garfield Development Corp.,155 one court ad-dressed the issue directly. In that case, the court struck down an ordinance that stated "all areas shall be kept free from weeds or plant growth which are noxious or detrimental to public health and welfare or a public nuisance defined in article 2." Article 2 defined public nuisance as "any premises which are unsanitary, or littered with rubbish or garbage, or which has an uncontrolled growth of weeds." The court held:*

*That which appears to be contained without exception in all weed control legislation but which is lacking in the ordinance in question is the definition of the particular vegetation which is sought to be controlled or a mechanism by which the particular vegetation is designated to be noxious and therefore subject to government control. 156*

SIDDHARTH  KODE   v.   WILLIAMSON  COUNTY, ET AL.

The court summarized the reason for the ruling as follows:

[I]t seems clear to this court to be utterly repugnant to our system of law to punish a person for an act, the criminality of which depends not on any standard erected by the law which could be known to the defendant in advance, but one erected by a judge or jury after the trial has been completed.157

Even if weed ordinances are not void on their face, they can often be vague-as-applied to those who engage in natural landscaping. Across the nation, all levels of governments are actively pursuing natural landscaping.158 The most remarkable, and perhaps ironic, example of a government natural landscaping is Chicago's prairie on the southside at the David R. Lee Animal Control Center. The city planted hundreds of pounds of wildflower, native grass and legumes seeds at the site. Marie Wojciechowski, who is being prosecuted by Chicago for violating its weed ordinance, gathered seeds from the city's prairie garden and grew plants from those seeds on her property.159 She even received a letter from a city landscape architect asking her to call if she needed any further assistance or information about the prairie.160 Ms. Wojciechowski now defends herself in a criminal case brought by the city for growing the offspring of the city's own plants.

Without an exact definition of what type of vegetation is prohibited, weed laws violate due process because they allow law enforcement officials and judges to rely on their own notions of what is right and what is wrong.161 The primary thrust of the void-for-vagueness doctrine is:

The requirement that a legislature must establish guidelines to govern law enforcement.... Where a legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors and juries to pursue their personal predilections.162

Weed laws create such a result. Absent guidelines within the text of the weed law itself as to what plant species are prohibited, an enforcement officer is free to decide, strictly on his own, whether the plant complained of in a given situation is illegal. Since weed inspectors have no guidelines to determine if a homeowner violates the weed law, this is unfair and unconstitutional.

C. Weed Laws as Irrational in Violation of the Equal Protection Clause and Unreasonable in Violation of the Common Law

If natural gardening is not a fundamental right and the weed law is not vague, the party charged with violating a weed law may nevertheless challenge the rationale for o weed law. An ordinance must not only be rational to survive constitutional scrutiny under the Equal Protection Clause,163 but under the common law, municipal ordinances must pass a more exacting standard of reasonable-ness.164 Natural gardeners have successfully proven that local weed laws are irrational and unreasonable as applied to natural landscapes.165

**Natural landscapes are attractive and they do not decrease property values. More directly, natural landscapes do not create a health hazard, as cases have proven.** Some uninformed government officials and citizens believe that natural landscapes cause problems with pollen, fire hazards, rats, and mosquitoes. These mistaken beliefs are all soundly refuted by testimony and studies. In fact, natural landscapes reduce many of the very hazards that weed laws are intended to prevent.

1. Fire

One of the most common arguments asserted in favor of local weed ordinances is fire prevention. As to natural landscapes this argument is predicated on the unproven contention that tall grass and forb stems, commonly planted as part of a prairie or meadow, constitute a fire hazard. This is not, in fact, true. In New Berlin v. Donald C Hagar,166 United States Forest Service expert David Seaberg testified that a grass fire can sustain high heat for only twenty seconds. In order to ignite wood and sustain a fire potentially damaging to a home, a grass fire must burn within four feet of the home for seven and a half minutes. Judge Gramling agreed, finding no rational basis for the claim that natural landscapes create a fire hazard.167

According to John Diekelmann, a noted landscape architect and plant ecologist, most prairie or meadow plantings contain a large portion of green leafy material at ground level during most seasons and do not sustain fire.168 In short, restoring an area as prairie does not create a fire hazard. Moreover, if fire prevention were the purpose, a rational ordinance would prohibit the accumulation of biomass in a given area based on some index of flammability, not merely undefined weeds.

2. Vermin

A second common argument raised in defense of local weed laws is that naturally vegetated areas sustain rats and other vermin. Rats and other animals commonly regarded as vermin require a steady food supply. Natural vegetation in yards does not provide the type and quantity of food required to sustain a population of rats and other creatures regarded as vermin.169

*In short, the man-made food supply of the sort often provided by structures, especially barns or garbage dumps, is what sustains rats and other vermin. Thus, an ordinance aimed at limiting rats and other vermin should not be targeted at "weeds" but rather should prohibit the food mass-grown and openly stored on property.*

*3. Mosquitoes*

*A third defense of local weed ordinances is the assumption that weed-covered areas provide a breeding place for mosquitoes. In fact, however, mosquitoes require standing water to breed. Even the fastest growing mosquitoes found in the upper Midwest need standing water for ten days to complete their life cycle. Since prairie and meadow areas tend to absorb water quickly, they are less likely than frequently watered lawns to contribute to the presence of mosquitoes. If mosquitoes are the problem, it is standing water and not weeds that should be prohibited.170*

*4. Pollen*

*A fourth justification for local weed laws is the belief that weeds produce pollen which contributes to the suffering of people with allergies. As with the other defenses of out-dated local weed laws, this is also mistaken. Herbaceous plants responsible for pollen allergens fall into two general types: (1) plants such as ragweeds which characterize environments subject to repeated disturbances such as erosion or cultivation, and (2) areas characterized by a permanent cover of non-indigenous turf and pasture grasses such as bluegrass, perennial rye, and timothy.171*

*Traditional lawn and landscape maintenance procedures in urban and suburban areas of the United States, which are often the antithesis of natural landscaping and Land Ethic, are more likely to be a significant source of community health problems than landscapes most often cited for "weed" law violations 172*

*This issue was at the center of the litigation that led to the Fairfax County, Virginia "Weed Law" finding that the law was unconstitutional in 1976 in Board of Supervisors of Fairfax County, Virginia v. Wills and Van Metre, Inc. 173 The decision was based in large measure on the testimony of Dr. Stanwyn Shetler, now the Assistant Director of the National Museum of Natural History at the Smithsonian Institute. Dr. Shetler testified that wind-borne pollen may travel hundreds of miles so that a local weed ordinance has virtually no effect in reducing allergy causing pollens. In his decision, Judge Richard J. Jamborsky found:*

> *Shetler's testimony [regarding pollen allergies and some other assumptions about weeds] challenges and refutes some of the old notions about weeds and nuisances enunciated 73 years ago in City of St. Louis V. Galt. In the absence of a showing that its tracts are a health hazard, the defendant should be permitted to maintain the meadows.174*

*Similarly, in New Berlin V. Hagar,175 Judge Gramling found that a city's weed ordinance applied to natural landscapes lacks a rational basis for the elimination of allergenic, wind-borne pollen that affects people with hayfever and other allergies.176*

*5. Enforcement of Weed ordinances Against Natural Landscapes Increases Wind-Borne Allergenic Pollen and Other Health Hazards*

*The primary cause of hayfever is ragweed.177 Ragweeds are a pioneer species in the normal course of plant succession that thrive in disturbed soil found in recently developed or degraded areas.178 In the normal course of plant succession, weedy pioneer plants would, if the soil remains undisturbed by cutting or other activity, be succeeded by grasses and herbaceous plants. All plants produce pollen, but perennial native plants and native grasses, the primary components of natural landscapes, are generally not producers of wind-borne, allergenic pollen. Allowing these plants to grow, operates to crowd out the weedy pioneer species that create the health hazard. Based on these facts, Judge Gramling concluded that the weed ordinance, as applied to natural landscapes, was counterproductive.179*

*Even more ominous than the health problems associated with some wind-borne pollens, is the likelihood that the chemicals used to establish and maintain mono-turf yards pose a serious health risk to the environment and to people and their pets, not to mention whatever wildlife remains in the area. Homeowners apply more than 67,000,000 pounds of active lawn chemicals each year, more pounds per acre than are applied by farmers.180*

*The damage to human health attendant to such landscaping practices is well-documented. For example in Fairfax County, Virginia officials blame the high levels of phosphorus in streams on lawn fertilizer run-off.181 The United States Environmental Protection Agency found potentially harmful levels of nitrate in more than half the drinking water wells tested nationwide. High nitrate levels can cause "blue baby" syndrome, a potentially fatal oxygen-depriving disorder in infants.182 Finally, researchers at the National Cancer Institute have linked frequent chemical-lawn treatments to an increased incidence of deadly cancer in dogs and suggest a link between the weed killer, 2, 4-D, and cancer*

*in humans.183*

*By prosecuting natural landscapers, and either implicitly or expressly promoting exotic mono-turf yards, villages increasingly harm the public health. The connection between the prosecution of natural landscapers under weed laws and enhancing public health, safety and welfare is not well-founded. Prosecutor claims rest on convenient assumptions that have not withstood judicial or scientific scrutiny. Even more frightening is the likelihood that the correlation is inverse----that these weed laws are, if not mandating, certainly encouraging turf grass lawns established and maintained with chemicals that seriously endanger the public health, safety, and welfare.*

*6. Aesthetics*

*The final recurrent criticism of natural landscapes is that such yards simply "don't look nice." Neighbors wish to live next door to neighbors who have yards of "beauty." To some, natural landscapes look unattended and "messy." Such shallow arguments demonstrate the underlying motivation that some feel to control the actions of those who dare to be different.*

*"What beauty is I know not, but it dependeth upon many things."184 Although some believe that beauty is visual, the Land Ethic teaches that beauty is determined by how an activity, plant or species fits within the natural world.185 Humankind must conform its yards with nature, not some artificial model. Natural landscapes conform to nature and are things of beauty.*

*On a perceptual level, a yard ablaze with colorful wildflowers and majestic flowing native grasses impresses the viewer and attracts positive responses from passersby. For example, Chicago's Grant Park, contains the two-acre "The Wildflower Works."186 The Chicago Park District is planting native coneflowers and day lilies along the 4½ mile-long median of Lake Shore Drive, Chicago's most famous street. The program is considered the first of its kind in the nation and if the planting proves successful, the Chicago Park District plans to naturally landscape other major streets in the city.187 The State of Illinois ripped out the tulip and rose garden on the grounds of the State Capitol and replaced it with native Illinois prairie plants. Illinois believes the aesthetic appeal of native landscapes is more pleasing then traditional exotic landscapes and with respect to the claim that natural landscapes are ugly and decrease neighboring property values, the opposite appears to be true.188*

*These aesthetic qualities of natural landscapes have been embraced by corporate America. Sears, Roebuck & Company is planting a landscape of prairie grasses and forbes around its new headquarters in Hoffman Estates, Illinois.189 Not only does Sears view the use of a natural landscape as an ecologic end economic benefit, but Sears plans to use the natural landscaping as a marketing tool to attract other corporate office users to the 786 acre site. Sears' plans have been called a "landmark" in the natural landscaping movement.190 Other corporations, large and small, utilize natural landscaping at their corporate headquarters for ecologic, economic and aesthetic reasons. These include: McDonald's in Oak Brook, Illinois; Westbend Mutual Insurance in Westbend, Wisconsin; Schneider Tracking in Greenbay, Wisconsin; and Promega Corporation, a biotech company in Madison, Wisconsin.191*

*Ultimately, the aesthetic argument against natural landscaping is illogical. One man's weed is another man's rose.192 To some, pink plastic flamingoes, polka-dotted bloomered cardboard ladies, twirling plastic sunflowers, astro-turf-covered front stoops, end perfectly sculpted evergreens look simply ridiculous; but to others, such landscaping is beautiful. People have a right to astro-turf-covered stoops, closely cropped evergreens, end spinning plastic sunflowers in their yards. That is the American way. But individuals also have the right to a natural stone walkway, free-flowing native shrubs and forbs, end real sunflowers reaching to the sky in a blaze of gold. ...*

*COLLEGE STATION, TEXAS PROPOSED NATURAL LANDSCAPE ORDINANCE ...*

*Section 3. Managed Natural Landscaping:*

*It shall be lawful to grow native and naturalized plants to any heights, including ferns, wildflowers, grasses, forbs, shrubs, and trees ...*

*Statements of intent:*

*1. If a complaint is filed by a citizen or the city against a piece of property, the burden or proof lies with the complainant to establish that a health or safety hazard in fact exists.*

*Natural landscapes shall be assumed to be harmless, until proven otherwise.*

*2. The city shall not act upon anonymous complaints. The property owner shall have the right to face the accuser.*

*3. This and the unmanaged vegetation ordinance shall be proactively and uniformly enforced, and shall apply to all property not specifically exempted within the city limits.*

*4. Aesthetic judgments shall not be a consideration nor play any role in determining non-compliance or compliance with the ordinance.*

*5. The city shall notify the property owner of their rights of appeal.*

*6. It shall not be the policy of the city to enter upon private land and to destroy property thereon without due process of law. ...*

"More Sustainable (and Beautiful) Alternatives to a Grass Lawn" (#) · [NRDC] · Mary Talbot · (2016-09-30) ·
https://www.nrdc.org/stories/more-sustainable-and-beautiful-alternatives-grass-lawn

# More Sustainable (and Beautiful) Alternatives to a Grass Lawn

Manicured turf grass lawns cover up to 50 million acres of land in America. But a new, no-mow movement is challenging this conformity—and helping the environment.

September 30, 2016    Mary Talbot



1696907690

Adams County PA Master Gardener, BBG Graduate, and NRDC Member, Audrey Hillman

In a case of taking "the grass is always greener" a bit too literally, American homeowners have long strived to make their lawns brighter, lusher, and more velvety than their neighbors'. But all that competition has a devastating environmental impact. Every year across the country, lawns consume nearly 3 trillion gallons of water a year, 200 million gallons of gas (for all that mowing), and 70 million pounds of pesticides.

You may also know that turf grass, however welcoming it looks for our bare feet, provides virtually no habitat for pollinators and other animals and plants that make up a healthy, diverse ecosystem. In fact, these lawns can do substantial harm to the environment and to both vertebrates and insects. Birds, for instance, may ingest berries and seeds that have absorbed pesticides from the ground. Likewise, rainwater runoff from lawns can carry pesticides and fertilizers into rivers, lakes, streams, and oceans via the sewer system. This can poison fish and other aquatic animals and harm humans who swim, surf, and eat seafood that may be contaminated. And then, of course, lawn mowers can pollute the air.

Luckily, today more Americans are ready for a change. "We're on the cusp of a transition that will likely take place over the next 10 to 15 years, away from the conformity of mowed turf," says Ed Osann, senior policy analyst and water efficiency project director with NRDC's Water program. He adds that eradication of all grass isn't the goal. "We're not declaring war on turf or suggesting that we remove every square foot of it. But we want to encourage people to think about whether there are places in their yards that can be converted to allow for a more diverse and sustainable landscape."

sustainable landscape.

## The No-Mow Movement

A growing number of homeowners are converting part or all of their lawns to a less thirsty form of landscape. These no-mow yards fall into four categories: 1) naturalized or unmowed turf grass that is left to grow wild; 2) low-growing turf grasses that require little grooming (most are a blend of fescues); 3) native or naturalized landscapes where turf is replaced with native plants as well as noninvasive, climate-friendly ones that can thrive in local conditions; and 4) yards where edible plants —vegetables and fruit-bearing trees and shrubs—replace a portion of turf. (According to the National Gardening Association, one in three families now grows some portion of the food they consume.)

## Making the Change

A successful lawn conversion depends on climate, terrain, and of course individual taste. Of the four main no-mow strategies, Osann says, native or naturalized landscaping is likely your best option. It's adaptable to any part of the country and offers gardeners an infinite range of design possibilities. If you want to join the no-mow movement, here are some pointers to get you started:

- **Get expert advice.** Begin by talking with a landscaper who has experience with lawn conversions, or even a neighbor who has naturalized all or part of his yard. A landscaper can help remove existing grass and recommend native plants to use in its place. Depending on water and weather, a low-growing turf lawn will "green up" about two weeks after seeding. Another alternative is a wildflower garden grown from seed. (Just make sure you choose a wildflower mix that fits your climate, and weed out existing vegetation that would compete for moisture and sun.) After the seeds germinate and the flowers bloom (in 6 to 12 weeks), they don't require watering unless there's a prolonged drought.

**Do your weeding.** Invasive plants like ragweed, thistle, and burdock can crowd out their native neighbors and may run afoul of local ordinances (as noted below). For most no-mow advocates, the payoff in natural beauty and habitat are well worth the effort.

**Check for incentives.** Not surprisingly, western states such as Arizona and California, which have been in the throes of extreme drought for more than four years, have taken the lead in spurring homeowners to do lawn conversions. California, in fact, launched a turf replacement initiative that offers rebates of up to $500 per yard for homeowners who convert turf lawns to native, drought-resistant xeriscaping. On a more grass-roots level, organizations like the Surfriders Foundation, a national environmental group made up of surfing aficionados, have helped transform turf lawns in Southern California parks and homes into ocean-friendly gardens, using succulents and other indigenous plants along with hardscape materials like rocks and gravel that increase filtration, conserve water, and reduce runoff.

**Check the rule books.** The no-mow movement may sound idyllic, but some practitioners have faced a surprising stumbling block: the law. In one example, Sarah Baker, a homeowner and scion of a family of horticulturalists in St. Albans Township, Ohio, decided to let her turf grass yard grow wild. Last year, she was forced to mow when authorities from her township deemed her garden, which had become a naturalized but well-tended landscape, a nuisance. Sandra Christos of Stone Harbor, New Jersey, says that after she replaced turf grass with native plants, she was delighted that cormorants, night herons, and kingfishers made themselves at home alongside "every kind of butterfly you can imagine." But since receiving a letter from the town clerk, Christos has had to tame the mallow, bayberry, clethra, and rosa rugosa along her walkway—or pay a fine.



Sarah Baker in her yard

Amanda Mae Taylor

While local ordinances or homeowner association bans have emerged—mostly out of concern over fire safety, rodent control, and noxious weeds—they take on aesthetic concerns too, often proscribing grass over eight inches tall, vegetable gardens (especially in planned communities), or any kind of landscaping that deviates from clipped turf.

A recent white paper by students from Yale's forestry and law schools, in collaboration with NRDC, surveyed legal obstacles to various forms of no-mow and concluded that, for sustainable landscaping to achieve wider adoption, some municipalities will need to adjust their policies.

That change can happen if residents push for it. Montgomery County, Maryland, for

example, amended its nuisance laws to allow for naturalized lawns after locals made the case that their wild gardens improved air and soil quality and reduced stormwater runoff

Moving away from water-guzzling and chemical-hungry lawns and cultivating yards that are diverse and self-regulating is a matter of mounting urgency worthy of that kind of community organizing. As global temperatures rise and droughts drag on, the demands of turf grass are likely to become untenable.

"Our existing lawns are going to get thirstier and their water requirements will increase," Osann says. Fortunately, with an evolving toolkit of sustainable landscaping strategies, home gardeners can avoid such effects and help nurture the health of the planet—right in their own backyards.

## ¶735

A perfect example of the irrational and abusive interpretation of the term *"weeds"*, as defined in the Texas-Public-Nuisance-Law, is the bamboo plant. Bamboo, classified as a species of grass, is one of the fastest growing species of plants; there are some cultivars of bamboo that grow up to 3 feet (up to 36 inches) per day. If one were to abusively mis-interepret bamboo as a *"weed"* according to the Texas-Public-Nuisance-Law, then a resident of a property growing such bamboo could be in violation of this law, potentially every one or two days, and would be required, at least during some times of the year, to cut such bamboo every one or two days. The plaintiff is fully-confident that this not what the {Texas Legislature} intended when they wrote this law, but even if it was, at least some peoples-of-color and most indigenous-peoples would be strongly opposed to abusing the Texas-Public-Nuisance-Law to prohibit the growth of bamboo on private-property, as bamboo, even when growing densely, is totally harmless to human habitation, and serves many useful functions. Again, given that the {Texas Legislature} did not define the terms *"rank"* and *"uncultivated"*, the only reasonable interpretation of this law is to limit the definition of *"weeds"* to a very minute fraction of vegetation that actually does cause demonstrable harm (health or safety hazard) to human habitation. However, by default, as the law-review-article above states, *"it shall be lawful to grow native and naturalized plants to any heights, including ferns, wildflowers, grasses, forbs, shrubs, and trees"* and *"Natural landscapes shall be assumed to be harmless, until proven otherwise."*

## ¶736

A resident could be intentionally/willfully growing vegetation (including, but not limited to, wild-vegetation) in the enclosed/private backyard for feeding such vegetation to companion animals/pets - particularly, animals whose native diet is such grasses/wild-vegetation such as tortoises. A resident could also be intentionally/willfully growing vegetation (including, but not limited to, wild-vegetation) for harvesting such vegetation as a crop when such vegetation has reached a certain tall height - such as bamboo and/or hay. Therefore, in addition to unjustly depriving a resident's other first-amendment-protected uses of their private-property to grow such vegetation (see above), the public-nuisance law is also unjustly depriving a resident's legitimate use of their private-property for these other purposes.

## ¶737

Property owner(s)/occupant(s) could be intentionally/willfully growing vegetation (including, but not limited to, wild-vegetation) in the enclosed/private backyard which is part of a larger pollinator-garden and/or vegetable-garden and/or wildlife-habitat and/or vegetation that serves as wind-breaks (to mitigate damage to fence/building structures from high winds) and/or vegetation that serves as flood-control (since most vegetation absorb large amounts of water from the soil during floods) and/or vegetation that serves to provide more privacy. There are are some vegetables that grow very-rapidly to tall-heights like so-called *"weeds"*; for example, the okra plant grows very-rapidly and densely up to 8-feet-tall and large amounts of okra plants, can even looks like a tall, dense *"weeds"* - see relevant incident below; the fruit, seeds and leaves of the okra plant are all not only edible but nutritious. Without fully-investigating and questioning the owner(s)/occupant(s) about the vegetation alleged to be *"weeds"*, and, at a minimum, without providing the owner(s)/occupant(s) an opportunity for a hearing on this issue, law-enforcement would not even have sufficient probable-cause to obtain a search-warrant, let alone charge a person for violating the Public-Nuisance law for this particular issue. At least with a hearing, the *"commissioners court or any board, commission, or official designated by the commissioners court"* may, after hearing the owner(s)/occupant(s) on this issue, rule that an alleged violation is not an actual violation, or may choose to grant a *"Special Exception or Variance to Public Nuisance Classification"* [THaSC-T5-SA-C343-SB-§343.0111]. So, in addition to the fact this particular aspect of this law is Unconstitutionally vague, when there is a disagreement between the owner(s)/occupant(s) and law-enforcement, denying such person(s) their minimal right to a hearing (and proceeding with a search warrant and/or criminal charge) is also a clear and additional violation of Due-Process rights.

## ¶738

Yards with wild vegetation that are alleged to be *"weeds"* also have much-greater forensic value during criminal investigations than a mowed grass lawn. Forensic scientists sometimes study the vegetation in/around a crime scene for clues concerning the crime(s), and a meadow/prairie/wildlife garden with such wild vegetation provides much more forensic information (clues) to be able to solve serious crime(s) - especially violent crime(s). So, the alleged *"compelling state interest"* to stop/control the growth of wild vegetation on private-property (for no reasonable/rational purpose) is laughable when one considers that there is a much-more-significant *"compelling state interest"* to solve serious crime(s).

## ¶739

It is widely known that many, if not most, homeowners (and [HOA]s) use chemical means (pesticides) to reduce/eliminate so-called *"weeds"*

on property. The application of such toxic chemicals, although causing extreme harm as already explained above, also reduces the physical workload for homeowners, since the use of such chemicals is much less labor-intensive (and much less time-consuming) than the manual cutting/pulling of so-called *"weeds"* - especially in the cumulative long-term. If it is the case that people of certain minority races/cultures/religions (especially immigrants-of-color/indigenous-persons) are more-inclined not use pesticides (due to racial/cultural/religious views/practices) relative to the White-American majority, then it could easily be argued that the enforcement of such *"weed"* laws puts undue and discriminatory burden(s) on people of those minority races/cultures/religions, who due to their strongly held religious/cultural views/practices, have to expend more time and effort in manually picking so-called *"weeds"* compared to White-American homeowners that much-more-easily broadcast/spray pesticides.

## ¶740

There is at least some evidence that suggests that the mowing of grass (or cutting of other vegetation), especially for aesthetic reasons, is seen as a patriotic (thus, political) act, especially since the institution of lawn-mowing has its roots in White-American culture (and prior to White-American culture, White-European culture). If the evidence is conclusive that the mowing of grass (or cutting of other vegetation), especially for aesthetic reasons, is a patriotic (thus, political) act, then any peoples - for example, those people of a counterculture movement - who are politically opposed to demonstrating any form of patriotism, should be, in the interest of justice, allowed to refrain from demonstrating any such form of patriotism, as a fundamental first-amendment-protected right.

## ¶741

In the United States, there is now a national-movement of people advocating for what is known as *"No-Mow May"* - replicating similar movements and efforts in Europe. This national-movement taking place in recent years would have been inconceivable just ten years ago - when the plaintiff, out of the plaintiff's own deeply-held religious/cultural views/practices, began to start advocating for such lack of mowing. Ten years ago, if the plaintiff asserted the right not-to-mow the plaintiff's [FRONTYARD] to the [HOA], the [HOA] would have laughed at the plaintiff, claiming that the plaintiff had no such right. The situation today is clearly not as clear-cut as it used to be, with younger-generations in particular, rightfully questioning the legitimacy of such antiquated laws/covenants that are driven more by powerful-and-highly-profitable industries (the lawn-care industry, the property-management industry, the law-firms that represent [HOA]s, etc.), White-American-Ideals and Christian-Conservative-Orthodoxy - all concerned with maintaining a certain image or aesthetics/cosmetics, rather than any actual, genuine concern for health-and-safety.

## ¶742

If it can be demonstrated that at least some (minority) immigrants-of-color (of *"Eastern religions"* mentioned in the law-review-article above) and/or indigenous peoples are more likely to cultivate wild vegetation due to religious/cultural practices than the majority non-immigrant/non-indigenous-peoples population, then not only would parts of the Public-Nuisance law concerning *"weeds"* be a violation of such peoples first-amendment rights, but also a violation of such peoples Fourteenth-Amendment *"equal protection"* (★) rights and Due-Process rights protecting *"discrete and insular minorities"* who do not have sufficient numbers to change the law through the political process (see 《UNITED STATES V. CAROLENE PRODUCTS CO.》):

▸  [SCOTUS]:  Yick Wo v. Hopkins, Sheriff:  Decided (1886-05-10):

Case 1:23-cv-01223-RP  Document 1  Filed 10/10/23  Page 890 of 944
SIDDHARTH  KOBE  WILLIAMSON  COUNTY, ST  et al.
1696907690

▷  https://tile.loc.gov/storage-services/service/ll/usrep/usrep118/usrep118356/usrep118356.pdf

*OPINION OF THE COURT ...*

*A municipal ordinance to regulate ... within the limits of the municipality violates the provisions of the Constitution of the United States, if it confers upon the municipal authorities arbitrary power, at their own will, and without regard to discretion in the legal sense of the term, to give or withhold consent as to persons or places, without regard to the competency of the persons applying, or the propriety of the place selected, for the carrying on of the business.*

*An administration of a municipal ordinance for the carrying on of a lawful business within the corporate limits violates the provisions of the Constitution of the United States, if it makes arbitrary and unjust discriminations, founded on differences of race, between persons otherwise in similar circumstances.*

*The guarantees of protection contained in the Fourteenth Amendment to the Constitution extend to all persons within the territorial jurisdiction of the United States, without regard to differences of race, of color, or of nationality ...*

*The Fourteenth Amendment to the Constitution is not confined to the protection of citizens. It says: "Nor shall any State deprive any person of life, liberty, or property without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." These provisions are universal in their application, to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality; and the equal protection of the laws is a pledge of the protection of equal laws ...*

*For the cases present the ordinances in actual operation, and the facts shown establish an administration directed so exclusively against a particular class of persons as to warrant and require the conclusion, that, whatever may have been the intent of the ordinances as adopted, they are applied by the public authorities charged with their administration, and thus representing the State itself, with a mind so unequal and oppressive as to amount to a practical denial by the State of that equal protection of the laws which is secured to the petitioners, as to all other persons, by the broad and benign provisions of the Fourteenth Amendment to the Constitution of the United States. Though the law itself be fair on its face and impartial in appearance, yet, if it is applied and administered by public authority with an evil eye and an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the Constitution ...*

*The fact of this discrimination is admitted. No reason for it is shown, and the conclusion cannot be resisted, that no reason for it exists except hostility to the race and nationality to which the petitioners belong, and which in the eye of the law is not justified. The discrimination is, therefore, illegal, and the public administration which enforces it is a denial of the equal protection of the laws and a violation of the Fourteenth Amendment of the Constitution.*

▷  [SCOTUS]:  United States v. Carolene Products Company:  Decided (1938-04-25):
▷  https://cdn.loc.gov/service/ll/usrep/usrep304/usrep304144/usrep304144.pdf

*OPINION OF THE COURT ...*

*There may be narrower scope for operation of the presumption of constitutionality when legislation appears on its face to be within a specific prohibition of the Constitution, such as those of the first ten Amendments, which are deemed equally specific when held to be embraced within the Fourteenth. See Stromberg v. California, 283 U.S. 359, 369, 370, 51 S.Ct. 532, 535, 536, 75 L.Ed. 1117, 73 A.L.R. 1484; Lovell v. Griffin, 303 U.S. 444, 58 S.Ct. 666, 82 L.Ed. 949, decided March 28, 1938.*

*It is unnecessary to consider now whether legislation which restricts those political processes which can ordinarily be expected to bring about repeal of undesirable legislation, is to be subjected to more exacting judicial scrutiny under the general prohibitions of the Fourteenth Amendment than are most other types of legislation. On restrictions upon the right to vote, see Nixon v. Herndon, 273 U.S. 536, 47 S.Ct. 446, 71 L.Ed. 759; Nixon v. Condon, 286 U.S. 73, 52 S.Ct. 484, 76 L.Ed. 984, 88 A.L.R. 458; on restraints upon the dissemination of information, see Near v. Minnesota, 283 U.S. 697, 713-714, 718-720, 722, 51 S.Ct. 625, 630, 632, 633, 75 L.Ed. 1357; Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660; Lovell v. Griffin, supra; on interferences with political organizations, see Stromberg v. California, supra, 283 U.S. 359, 369, 51 S.Ct. 532, 535, 75 L.Ed. 1117, 73 A.L.R. 1484; Fiske v. Kansas, 274 U.S. 380, 47 S.Ct. 655, 71 L.Ed. 1108; Whitney v. California, 274 U.S. 357, 373-378, 47 S.Ct. 641, 647, 649, 71 L.Ed. 1095; Herndon v. Lowry, 301 U.S. 242, 57 S.Ct. 732, 81 L.Ed. 1066; and see Holmes, J., in Gitlow v. New York, 268 U.S. 652, 673, 45 S.Ct. 625, 69 L.Ed. 1138; as to prohibition of peaceable assembly, see De Jonge v. Oregon, 299 U.S. 353, 365, 57 S.Ct. 255, 260, 81 L.Ed. 278.*

*Nor need we enquire whether similar considerations enter into the review of statutes directed at particular religions, Pierce v. Society of Sisters, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070, 39 A.L.R. 468, or national, Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042, 29 A.L.R. 1446; Bartels v. Iowa, 262 U.S. 404, 43 S.Ct. 628, 67*

*L.Ed. 1047; Farrington v. Tokushige, 273 U.S. 284, 47 S.Ct. 406, 71 L.Ed. 646, or racial minorities. Nixon v. Herndon, supra; Nixon v. Condon, supra; whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry.*

## ¶743

One-or-more very-recent {2023} study(s) published by researchers from [Tel Aviv University], [Massachusetts Institute of Technology], and [Harvard University] found that *"plants let out an ultrasonic scream when their leaves are cut"*. Although the researchers stopped short of claiming that plants *"feel pain"* from being cut, the fact still remains that plants emit a stress response after experiencing such stress. Thus, even ignoring a person's constitutionally-protected religious opposition to the artificial cutting of vegetation, even persons who are aware of such science and who follow the *"Hippocratic oath"* - *"FIRST, DO NO HARM"* - should not be coerced to violate such Hippocratic-oath.

## ¶744

Regarding the property-maintenance laws - both the Texas-Public-Nuisance-Law and restrictive-covenants - the statute-of-limitations applies to object(s) and/or condition(s) of a private-property. So, if object(s) have existed on a private-property for a period of private-property for over 2 years in the case of Texas-Public-Nuisance-Law, or over 3 years in the case of restrictive-covenants, then the government is barred by the statute-of-limitations from pursuing any public-nuisance prosecution as a result of such object(s), and the [HOA] is barred by the statute-of-limitations from pursuing any breach-of-contract lawsuit as a result of such object(s), respectively. Similarly, if condition(s), including but not limited to - uncut vegetation, have existed on a private-property for a period of over 2 years in the case of Texas-Public-Nuisance-Law, or over 3 years in the case of restrictive-covenants, then the government is barred by the statute-of-limitations from pursuing any public-nuisance prosecution as a result of such condition(s), and the [HOA] is barred by the statute-of-limitations from pursuing any breach-of-contract lawsuit as a result of such condition(s), respectively. So, for example, when handling public-nuisance complaints, government agencies/employees must first inquire whether the alleged object(s) and/or condition(s) have existed for a period of over 2 years; if the answer to this question is yes, then that fact alone short-circuits any further inspection/enforcement action(s). It is incumbent upon the complaining party to ensure that they are raising the complaint within the statute-of-limitations.

## ¶745

Short of having sufficient probable-cause necessary to lawfully obtain and execute a search-warrant, law-enforcement cannot inspect/search any individual property without being able to prove (in Court) that they are equally inspecting/searching all properties - as this would be an egregious violation of the *"Equal Protection"* clause (in essence, the Constitutional right to *"Freedom from Discrimination"*), and if applicable, the [FHA]/[TFHA] that strictly prohibits any-and-all discriminatory practices against any member(s) of the protected minority classes. The *"Equal Protection"* clause would also guarantee that if White-American people are allowed to maintain their properties under their subjective White-American standards, then person(s)-of-color, in particular immigrant(s)-of-color/indigenous-person(s), should be equally allowed to maintain their property under their subjective person(s)-of-color standard. As documented in the excerpts above, this is especially true for the manner in which vegetation is grown and maintained on private-property, but it also applies to permacultural and/or indigenous gardening techniques (π), as well as off-grid and/or zero-waste lifestyle(s).

## ¶746

Even disregarding the substantial racial/cultural/religious/political differences in property-maintenance partially described above, the public-nuisance-law is also *"Irrational in Violation of the Equal Protection Clause and Unreasonable in Violation of the Common Law"* for at least some people that are not in any of the following protected categories: racial-minorities, environmentalists/naturalists, political libertarians. For example, even without irrigation, wild-vegetation grows from some combination of favorable circumstances for life present on planet-earth: fertile-soil, rainwater, temperature, atmospheric-pressure, pollinators (both living and nonliving), atmospheric-composition (carbon-dioxide, nitrogen, oxygen, etc.), and sunlight - summarized by the term *"nature"*. To punish a property-owner for what *"nature"* does (naturally) on his/her private-property is extremely irrational and unreasonable in violation of such person's Constitutional rights. For example, a physically-disabled property-owner living alone at his/her private-property may not even have the physically-capability to cut vegetation on his/her private-property: Is the local/state government going to criminalize that physically-disabled person for the wild-vegetation that is growing outside of his/her house? Is the local/state government going to force that physically-disabled person to hire another capable person to cut the wild-vegetation that is growing outside of his/her house? Is the local/state government going to forcefully enter into the private-property of that physically-disabled person to nonconsensually cut the wild-vegetation that is growing outside of his/her house? Whether or not a person is physically-disabled and incapable of cutting vegetation is actually irrelevant to the much-larger, fundamental issues of extreme irrationality and unreasonableness.

## ¶747

The constitutionality of a law is sometimes determined by an evidentiary-standard test. If the evidentiary-standard that accompanies a law is consistently or inherently too low to be considered to be reliable/demonstrable/provable - for example, consistently below the *"beyond any-and-all reasonable doubt"* standard required of criminal law - then such law can be challenged as being unconstitutional on this basis. For example, the result(s) of a polygraph test are not admissible in Court because they are considered to be too unreliable and polygraph-testing is not an exact science - considered by many lawyers to be *"junk science"*. A coerced confession is often not admissible in Court because the confession was made under duress and thus, there is at least some significant possibility (causing reasonable doubt) that the confession was false. Evidence from jailhouse bragging is sometimes not admissible in Court because, on at least some occasions, defendants brag to other inmates that they committed such-and-such crime(s) solely in-order-to boost their power/status/fame/etc within the social circles of the jail/prison. Evidence from contaminated crime-scene-investigations is sometimes not admissible in Court when law-enforcement makes missteps/accidents that contaminate the crime-scene with faulty/misleading evidence. The Texas Public-Nuisance-Law uses certain terms such as *"rank and uncultivated"*, *"unsanitary condition(s)"*, *"likely to attract or harbor mosquitoes, rodents, vermin, or other disease-carrying pests"* that are not only vague/undefined (in violation of the Due-Process-clause), but also do not meet the minimal threshold of evidentiary-standard required of criminal-law (*"beyond any-and-all reasonable doubt"*) to be considered Constitutional. For example, without thorough scientific testing of every property in a residential-subdivision and also all public-property located within and directly-around such residential-subdivision and also all (unoccupied) vacant-land within and surrounding such residential-subdivision, it would be impossible to reasonably determine, *"beyond any-and-all reasonable doubt"*, which property(s) (if any) are actually causing legitimate public-nuisance(s). Furthermore it could very easily be the case that the greatest amount of public-nuisance is actually originating from public-property (storm-drains, street-gutters, etc.), or on (unoccupied) vacant-land within or surrounding such residential-subdivision, which could easily, for example, be housing exponentially-larger

amounts of stagnant water within low-lying areas that serves as an unmitigated breeding-ground and harborage for mosquitoes. So, in this particular case, it is entirely unreasonable and unjust to punish (fine and/or charge/prosecute) a resident for conditions within their private-property that might look like it could potentially be a public-nuisance, when in fact, the actual public-nuisance is predominantly originating from outside of that resident's property. The Public-Nuisance law can thus easily be considered to be Unconstitutional by its consistent/inherent failure to meet the minimum evidentiary standard required of criminal law: *"beyond any-and-all reasonable doubt"*.

## ¶748

The actual terminology used in the naming of this law itself is also legally problematic to say the least. The word *"public"* in the term *"public nuisance"* implies that a person has caused at least some harm, disturbance or annoyance to a significant fraction of the entire public. This means one of two things, or a combination of these two things: Ⓐ Either the ⟨Texas Legislature⟩ have used inappropriate terminology to define this law - this law should really be called *"private nuisance"* rather than *"public nuisance"* AND/OR Ⓑ At least some Law-Enforcement is weaponizing/abusing/exploiting or at least misinterpreting this law even when the harm, disturbance or annoyance is alleged to be against less than a handful of neighboring residents. If Ⓐ is not-true - in other words, if the ⟨Texas Legislature⟩ fully intended this terminology - then the Public-Nuisance law can only be enforced were harm has been caused to significant fraction of the public, like when the *"unsanitary condition(s)"* of a private-property causes harm to many hundreds (if not thousands) of people. However, if Ⓐ is not true, then, given the manner in which many, if not most, residential-subdivisions are designed and constructed (with privacy-fences along much of the property borders), it is impossible for a person to violate this law by harming that large amount of people unless, for example, such property has a large pond (or other large body) of untreated water that is an open and unmitigated breeding ground for millions of rampant mosquitoes. If Ⓐ is true, then the Texas-Public-Nuisance-Law is also clearly Unconstitutional (in addition to other reasons specified in this lawsuit) because it violates a person(s) fifth-amendment right to due-process by making a false/misleading/fraudulent accusation against such person using an inappropriately worded law. When a person is criminally-charged with *"Public nuisance"*, the reasonable third-party observer that has not read this law (and thus has no understanding or knowledge of this law) has to infer that such person is alleged to having caused harm, disturbance or annoyance to a significant fraction of the public - which would be a fraudulent accusation if the harm, disturbance or annoyance is actually alleged to have occurred against less than a handful of neighboring residents. The law is thus also unjust in its very name.

## ¶749

Disregarding the unjust use of the word *"public"* in the term *"public nuisance"*, even the use of the word *"nuisance"* is legally problematic. The use of the word *"nuisance"* implies that some person(s), through their willful, deliberate and direct action(s), is/are alleged to have caused harm, disturbance or annoyance onto other person(s). When a resident is alleged to have failed-to-maintain their residential property according to certain standards, in most (if not almost-all) cases, that is neither a willful nor deliberate nor direct action but rather, at best (even if the allegation is true), an act of omission. Generally speaking, criminal laws are meant to punish people for commission (their willful, deliberate and direct actions), not omission. The only cases under which criminal law does reasonably punish omission is when the omission causes significant harm to other person(s) or harm to vulnerable/helpless persons such as child-neglect that causes harm to the child. An omission of this type (property-maintenance on the standard residential lot with a privacy fence) - even if true - is only reasonably punished by a civil penalty - like a fine for a parking violation - that does not appear on a person's criminal record, but rather is only a relatively-minor financial penalty. The actual *"nuisance"* is directly caused by rampant mosquitoes, rodents, vermin or other forces of nature, and thus, neither by the willful nor

direct nor deliberate action(s) of the accused person(s). Punishing a person using criminal law for what nature does naturally is extremely irrational, unreasonable and thus unjust in violation of such person's Constitutional rights. Regarding property-maintenance, a more appropriate measure for a government would be to issue a ticket (like a parking violation ticket) and handle the issue as a minor civil issue, not a criminal issue.

# ¶750

In order to further establish the irrationality, unreasonableness, unfairness and discriminatory-nature of the Texas-Public-Nuisance-Law, it is also important to put-into-context and compare the Texas-Public-Nuisance-Law to other laws enacted by the ⟨Texas Legislature⟩. For example, the ⟨Texas Legislature⟩ have recently enacted into law the right/freedom of citizens to openly carry guns in public areas within Texas without a permit or training - a move that is supported primarily by the far-right-wing in both the State of Texas and the United States, but is even opposed by most police groups/associations (which are also of the right-wing). So, in this particular example, the ⟨Texas Legislature⟩ have enacted into law a right/freedom that is primarily supported by a relatively small and far-right-wing-extremist fringe minority in the State of Texas and the United States. The statistics have consistently-shown (for many decades) that when the United States is compared to most other developed countries (where there is no *"second amendment"*), deaths and serious injuries caused by guns in the United States far-exceeds levels in those most of other developed countries. Other crimes are committed by some gun owners who threaten others with guns. For decades, many lawmakers of the right-wing (not limited to Texas) have peddled this fraudulent narrative that the only way to mitigate gun-violence (and other crimes) from the so-called *"bad guys"* is to enable the so-called *"good guys"* to carry guns: a fraudulent narrative that is not only unproven and completely unsupported-by-the-evidence, but that would be laughable if it did not lead to so much tragic harm. Today, most second-amendment supporters (including lawmakers) justify the second-amendment almost-exclusively for individual-liberty/self-defense purposes. However, the framers of the Constitution justified the second-amendment not merely on individual-liberty/self-defense purposes, but rather, for the more extremist and radical purposes of citizen-militia(s) holding government-power in check (the militia-threat of insurrection thereby preventing government-tyranny) and also to maintain the institution of chattel-slavery (with slaves needing to be controlled by guns). Today, very few, if any, second-amendment supporters will publicly justify the second-amendment using the framers' more extreme and radical purposes, because it would be far-too-controversial to do so in today's society: Ⓐ In today's society, most people rightfully have a negative-stigma and fear against violent-insurrections, violent-revolutions and/or violent-overthrowing-of-governments ; Ⓑ most of today's society (and all of today's civilized-society) has long since renounced chattel-slavery ; Ⓒ most state/local governments and the federal government would consider any citizen-militia to be akin to a violent-extremist-group, if not a terrorist organization. Clearly, perceptions, justifications and public support regarding at least some laws - including whether such laws are rational, reasonable, fair and non-discriminatory - tend-to-change radically as time passes. So, even ignoring the fundamental issues of racial/religious differences regarding standards of property-maintenance raised in this lawsuit, and to further judge the irrationality, unreasonableness, unfairness and/or discriminatory-nature of the Texas-Public-Nuisance-Law by putting this law into perspective and context, it would appear to the plaintiff that the ⟨Texas Legislature⟩ (as a whole body and institution) wants to, for example, deprive Texas residents of their fundamental Constitutional right to grow certain types of (non-narcotics-related) vegetation on their own private-property, but at the same time, that same ⟨Texas Legislature⟩ (as a whole body and institution) wants to allow citizens the unmitigated right to openly-carry firearms even in public settings within Texas, despite of the already alarming and far-unrivaled statistics concerning gun-violence (and other crimes involving firearms) - both, in State of Texas and in the United States.

## ¶751

Iu summation, thc law leaves several crucial terms/phrases - such as *"unsanitary conditions"*, *"unsanitary condition likely to"* - completely undefined or very-ambiguously/vaguely defined - such as *"weed"* - or hypocritically-defined - such as *"rodent"*. The law also makes false assumptions for which there is no scientific evidence - such as *"weeds"* being a food-source and/or harborage for rodents/vermin/mosquitoes. The result is that a reasonable person - of any race/rcligion/color/national-origin - accused of a violation of this law - despite having full knowledge of this law - might strongly-and-rightfully deny that any violation ever occurred. Due to this disagreemcnt with law-enforcemcnt, putting such a reasonable person through the rigors of a criminal trial using such a poorly-worded, outdated, draconian law as thc basis, and allowing a Judge and/or Jury (at trial) to fully-definc and determine what those terms actually mean to any particular circumstance - according to thcir own subjective opinions/standards/predilections/prcferences/whims and according to their own unique racial/cultural/religious/political backgrounds/praetices - is entirely unfair, unreasonable and totally in violation of such person's *"due process"* rights, *"first amendment"* rights and *"equal protection"* rights. Multiple aspects of the public-nuisance-law not only infringe on the fundamcntal rights of at least certain classes of property-owncr (as documcnted above), but also, as is already illustrated by some the legal arguments abovc, diverge from the most basic notions of equity and morality, in particular, the *"golden rule"*: a person should treat others in the same manner that such person would like to be treated.

## ¶752

Furthcrmore, when the public-nuisance-law leaves such crucial terms/phrases undefined or poorly-defined, then this opens thc door wide-open to many types of arbitrary/capricious/discriminatory/retaliatory/predatory/hypocritical/abusive/oppressive/selective/biased actions by law-cnforcement (health-district-inspectors, code-compliance-officers, police-officers and prosecutors), that are, at least on at lcast somc occasions, acting on behalf of malicious neighbors with hidden animus unrelated to property-maintenance. In general, the public-nuisance law cannot be abused by law-enforcement to impose arbitrary or whimsical standards of property-maintenance on any person, especially if the enforcement is driven by the predatory demands of predatory/malicious neighbors. And in particular, the public-nuisance law cannot be abused by law-enforcement to impose White-American standards of property-maintenancc on any person(s)-of-color, cspecially if such person(s)-of-color are asserting their first-amendment rights, due-process rights and equal-protection rights on their own private-property. As legal-commentators have pointed-out, we, collectivcly, as individual humans and as a society living in the 21st-century, cannot allow and must not tolerate antiquated and/or insensitive and/or irrational laws and, in particular, culturally/racially discriminatory/predatory/abusive/oppressive interpretation/enforcement of such laws.

## ¶753

If any type of nuisance law is to fall under the category of criminal law, then the intent of such law must be to climinate (or at least minimize) harm caused by a person - to other people or to the environment. If it is the case that any aspects of such law that, instead of targeting harmful conditions (where harm must be proven), only targets purely aesthetic/cosmetic issues of a private-property and not actual harmful conditions, then at the very least, those aspects of such criminal law are Unconstitutional, especially since issues of pure aesthetics/cosmetics are harmless, subjective and Constitutionally-protected. The plaintiff asserts that, at the very least, the part of the public-nuisance law prohibiting so-called *"weeds"* is Unconstitutional because it is prohibiting a purely aesthetic/cosmetic, and thus harmless, condition within private-property.

Furthermore, the corrective action required by this law - the cutting of so-called *"weeds"* - is harmful to the environment which is why many (if not most) eastern/indigenous religions are strictly against the cutting of vegetation for aesthetic/cosmetic reasons (see *"rights of nature"* in section below). So, the plaintiff asserts that at least this aspect of the law concerning so-called *"weeds"* is actually requiring citizens to cause harm rather than eliminate/reduce harm (see section below for the benefits of uncut vegetation).

## ¶754

Despite the fact that the plaintiff asserts several aspects of the Texas Public Nuisance law to be Unconstitutional, and to the credit of the ⟨Texas Legislature⟩, the ⟨Texas Legislature⟩ did also have the common-sense to incorporate the *"Special Exception or Variance to Public Nuisance Classification"* [THaSC-T5-SA-C343-SB-§343.0111] into the law. This common-sense aspect of the Texas Public Nuisance law illustrates the ⟨Texas Legislature⟩'s libertarian notion that private-property-maintenance should, in the interest of justice, not be governed by a *"one-size-fits-all"* absolute-drive-to-conformity mindset, but rather, a more open-minded framework wherein people of certain minority races/ethnicities/cultures/religions/backgrounds, people of certain professions (for example - permaculture farmers), certain political dissidents, and certain artists should not be forced to conform the maintenance of their private-propery to the dominant/majority culture and/or politics. Whenever a public-nuisance allegation is made, local-governments should, at the very least, utilize this feature of the public-nuisance-law and, in the interest of justice, grant such exception(s)/variance(s) to those residents that legitimately, and in good faith, assert their Constitutional-rights entirely and exclusively within the confines of their private-property, thereby saving all parties the rigors and burdens of a trial.

# §XXXI

# ABUSIVE INTERPRETATION/ENFORCEMENT OF PROPERTY-MAINTENANCE-LAWS CAUSES SUBSTANTIAL HARM TO THE ENVIRONMENT AND DEPRIVES PERSON(S) OF FUNDAMENTAL RIGHTS

## ¶755

*"REDUCE, REUSE, RECYCLE"* **(in that order)**: This oath is meant to guide a person regarding the order-of-operations a person must follow in-order-to live an environmentally-responsible, minimal-carbon-footprint and harmless-life. It is the environmentalists' and indigenous-peoples' version of the doctor's Hippocratic oath: *"FIRST, DO NO HARM"*.

## ¶756

The greatest priority in that order-of-operations is *"REDUCE"*. With the exception of the first year of the plaintiff's residence at the plaintiff's property, and as long as the plaintiff has lived alone at the property, the plaintiff, living in conformance-to the plaintiff's zero-waste lifestyle and religious/cultural practices, has not had (nor used) garbage service at the plaintiff's property. (There was no recycling service offered by the utility provider for almost five years after the plaintiff initially moved into the property.) In other words, since at least the year {2010}, the plaintiff has never sent any items into the landfill or to any recycling-center. The plaintiff is able to live in this manner primarily because the plaintiff consumes less than 1/100th of the (non-food-and-drink) material resources than the average American. According to at least some studies from the United States, if all of the people of planet-earth consumed the same amount of resources as Americans, then 5 planet-earths would be needed to sustain that level of consumption. According to at least some studies from the United States, if all of the people of planet-earth consumed the same amount of resources as Europeans, then 3 planet-earths would be needed to sustain that level of consumption. So, according to such studies, on average, the European way-of-life is only marginally more-sustainable than the American way-of-life (⌘).

## ¶757

The second priority in that order-of-operations is *"REUSE"*. This term is meant to signify that, from the items already manufactured/produced/purchased, when the initial use(s) of those items has already occurred, then, one must continue to reuse and/or repurpose those items for other legitimate harmless use(s) - and continue this pattern of reuse for as long as possible - in-order-to live an environmentally-responsible, minimal-carbon-footprint and harmless-life.

## ¶758

The final priority in that order-of-operations is *"RECYCLE"*. This term is meant to signify that, only after a person has exhausted all possibilities of *"REUSE"* of material(s), can such person consider the last-resort choice of sending such material(s) to the recycling center. However, it should be noted that, for example, only 9% of plastics sent to the recycling-center is actually recycled (with over 90% of such plastics being redirected to the landfill). So, most Americans have a false-sense-of-satisfaction when they blindly send increasingly-more materials to the recycling center, failing to realize that the overwhelming-majority of such materials are not being recycled.

## ¶759

The cutting of vegetation not only generates huge amounts of emissions from lawnmowers (which are much less regulated compared to vehicles), but also generates huge amounts of methane gas from the dead-and-decomposing cut vegetation - with methane being an extremely potent greenhouse-gas that is over 20 times more harmful to the environment than Carbon-Dioxide. Throwing unnecessary organic matter into the landfill - including, but not limited-to, yard-clippings and food-waste - generates even larger amounts of methane emissions. The cutting of vegetation - especially grasses - also necessitates the watering of such vegetation in-order-to keep such vegetation alive - whereas leaving that same vegetation uncut allows for such vegetation to survive both extreme droughts (during both summer and winter) and prolonged frosts (during winter) - not only since the greater plant biomass stores greater amounts of water but also because that greater biomass insulates both the plants and the soil from extreme temperatures (both extreme heat and extreme cold). Conversely, leaving vegetation uncut provides enormous benefits to both the environment and to human-habitation with the larger biomass of such uncut vegetation sequestering much more

Carbon, thus cooling the planet that has been rapidly increasing in average global temperatures due to man-made climate-change. In addition to the rapid-increase in global temperatures fully-attributed to man-made activity, large population centers such as major-cities are also known to suffer from the so-called *"urban-heat-island-effect"* due to the fact that such cities are full of artificial, non-living landscapes that both absorb and radiate heat such as, but not limited to, asphalt, concrete, and stone surfaces. Conversely, if residents, businesses, governments and other organizations simply allowed for natural-landscapes (within such cities) filled with uncut plants, such uncut plants (with greater biomass) would absorb such heat, without radiating as much heat, and cool the planet through the natural biological processes of photosynthesis and evapotranspiration (⌘) . Leaving vegetation uncut also allows such vegetation to absorb larger amounts of water during floods, thus mitigating flood damage. Leaving vegetation uncut also allows for such vegetation to serve as windbreaks to protect property from damage, with such vegetation absorbing a larger fraction of impact of high winds. Leaving vegetation uncut also detoxifies the environment, and improves air quality, with the greater biomass absorbing a larger amount of environmental pollutants - both above ground and below ground. Leaving vegetation uncut, in many cases, also allows residents to enjoy better privacy on their private property. Leaving vegetation uncut, in many cases, also allows residents to benefit from free passive cooling during summer - with the interior of homes getting greater shade, and thus lesser heat from solar radiation. Leaving vegetation uncut also eliminates the prolonged loud-noises and noise-pollution that is created by the loud yard-equipment: gasoline/diesel powered (ride-on and push) lawnmowers, string-trimmers, edgers, etc. (It is well-documented that neighboring persons' sleep and work are unjustly disturbed by the prolonged running of such loud yard-equipment.) Leaving vegetation uncut also eliminates the possibilities of any fires caused by use of such equipment on parched vegetation: in extremely hot-and-dry environments (for example during an extremely-long summer drought), the cutting of vegetation has been, at least in some cases, known to spark a fire that then rages uncontrollably - burning up to many hundreds (if not thousands) of acres that is covered with such parched vegetation. For example, the Austin area recently suffered a large uncontrollable fire that was caused by spark(s) lit by lawn-mowing equipment during the extreme summer-drought of {2022}. Not coincidentally, the Austin area very-recently suffered a large uncontrollable fire that was caused by spark(s) from a person operating a saw during the extreme summer-drought of {2023-07}. It is often falsely alleged that uncut vegetation is a primary cause of uncontrolled fires, but not only is there no evidence to substantiate this false claim, but also to the contrary, there is ample evidence to substantiate that most uncontrolled fires are caused by accidental, reckless or malicious human activity - the only known exception (natural-cause) being lightning striking dead trees and/or other flammable object(s). As documented in the law-review-article above, the greater moisture content within uncut vegetation prevents/hinders fires, whereas cut vegetation almost immediately loses its moisture, greatly heightening the possibility of fire. Leaving vegetation uncut also eliminates not only the huge amount of environmentally-destructive emissions but also the harmful fumes caused by the running of gasoline/diesel powered lawn-mowing equipment, again, since there is no significant law regulating the emissions/fumes from lawn-mowing equipment like there are law(s) that do regulate the emissions/fumes from vehicles. These harmful fumes are known to cause certain types of cancer (such as lung cancer), and any person(s) who are around such running lawn-mowing equipment (including the operator(s)) are unwillingly forced (through no choice of their own) to inhale all of those toxic fumes released from such lawn-mowing equipment. Leaving vegetation uncut enhances soil-structure, due to the lack of people and heavy lawnmowing-equipment harmfully compacting such soil. Leaving vegetation uncut enhances both soil-fertility and soil-depth, since the roots of uncut vegetation occupy greater biomass extending more-densely and more-deeply (into the deeper-levels) within the soil. Leaving vegetation uncut also provides much-needed habitat for wildlife - especially endangered wildlife - with man-made-species-extinction reaching levels of global disasters - with humans now responsible for almost as much percentage species extinction as the massive asteroid(s) (and/or massive volcanic activity) that ended the reign of the dinosaurs: a massive-extinction-event which is estimated to have extincted approximately 75% of species on earth at that moment in time. The text above is an extremely-brief and simplified summary of the rationale and science behind advocating for (unmowed) native-and-

naturalized-landscapes and zero-waste-lifestyles, but one does not need to understand any of the science to do good. (For example, one does not need to know any of the nutritional science that explains why consuming apples, carrots, spinach and other unprocessed, natural foods are good for human health, in order to benefit from consuming such beneficial unprocessed, natural foods.) So, in addition to the plaintiff's own religious/cultural opposition to the cutting of vegetation, the plaintiff wrote and submitted to both the [HOA] and to [WCLE], a much more-thorough [HOA] architectural-approval document (which one of the plaintiff's then-lawyers jokingly described as a *"doctoral dissertation"*) (original exhibit available) documenting why it is wasteful, destructive, immoral, illogical, impractical, uneconomical and unjust to cut vegetation - especially for alleged aesthetic/cosmetic reasons.

## ¶760

Nowhere in the aforementioned oath is it permitted to send any materials to the landfill. It is clearly possible for all persons to live an environmentally-responsible, minimal-carbon-footprint, zero-waste and harmless-life - but this requires more time, effort and thought from such persons, and this requires such persons to give-up the consumerist lifestyle. It has been fraudulently alleged (for example, by the defendants and by White-Supremacists/White-Nationalists - see above) that those (for example, the plaintiff) who live a zero-waste/minimalist lifestyle are living such lifestyle as a form of *"laziness"* or *"inconsiderate-ness"*, but as already explained, nothing could be further from the truth. Persons who live such zero-waste/minimalist lifestyle have to put-more-thought and work-harder (than those who live the wasteful/destructive consumerist lifestyle) in-order-to make such lifestyle work, and such persons are doing so, not only for the benefit of all current-and-future generations of life on earth, but also in-solidarity-with all those indigent people throughout the world who do not even have the financial means to live a consumerist lifestyle. If the plaintiff was truly lazy, then the plaintiff would have simply purchased a robotic mower to cut the grass on [YARD] in a fully automated manner. (To the best of the plaintiff's knowledge robotic mowers have been available for approximately ten years - during most of the incidents alleged in this lawsuit.) Instead, as the plaintiff has always maintained, this issue of refusal to cut vegetation has absolutely nothing to do with laziness, and the plaintiff, like many environmentalists and/or indigenous-peoples, is morally/religiously/culturally opposed to the artificial-cutting of any-and-all vegetation, especially for alleged aesthetic/cosmetic reasons. Person(s) who engage in this environmentally-responsible, minimal-carbon-footprint and harmless-lifestyle, should not be punished, or in any way penalized, by predatory/abusive/oppressive government(s) that abuse/weaponize and/or deliberately-misinterpret poorly-worded (Unconstitutionally-Vague or otherwise Unconstitutional) property-maintenance-laws (such as the Texas-Public-Nuisance-Law). It is indisputable that a government's punishing or penalizing a person's zero-waste/minimalist lifestyle is not only a clear violation of such person's Constitutionally-protected first-amendment-rights, but is also a morally-obscene action because such action incentivizes/rewards wasteful and destructive behavior, and most-importantly, as this lawsuit tries to document, this morally-obscene action opens-the-door-wide-open for predatory people (for example, malicious neighbors) to victimize those person(s) (environmentalists, indigenous-peoples, etc.) who live a zero-waste/minimalist lifestyle.

---

## §XXXII

# MARION STOKES: A POLITICAL ARCHIVIST ; NOT A SO-

# CALLED "HOARDER"

## ¶761

In this lawsuit, the plaintiff will not use the abusive term *"hoarding"*, because firstly, this term reflects a rather ethnocentric, culturally-insensitive view, and at the very least, does not represent a world-view. Secondly, the use of such term abusively implies that those person(s) who engage in practice(s) of so-called *"hoarding"* are abnormal, weird, strange or suspicious. In any case, a government cannot eriminalize so-called *"hoarding"* - a first-amendment-protected activity - and no part of any law(s) of the State of Texas (including the property-maintenance-laws) criminalize (or in any way penalize) so-called *"hoarding"*, especially within the confines of a person's fourth-amendment-protected residence(s).

## ¶762

More importantly, at least some person(s) who are abusively accused of so-called *"hoarding"*, are in-actuality, *"archiving"*. The plaintiff, an archivist, does not *"hoard"* materials, but rather, makes the best attempt within the plaintiff's limited resources (time, effort, money, etc.) to *"archive"* (preserve) at least some types of materials, including but not limited to so-called *"junk mail"*, as a political and documentary act for future generations of humans to benefit-from. By *"archiving"* materials, a person is, at least to some degree, preserving a snapshot of the current moment in time, for future generations to study and analyze. Clearly, this study and analysis by future generations is not possible when items get sent to the landfill and/or recycling-center.

## ¶763

Many items *"archived"* may very-well become valuable antiques in the future. So, the government cannot, in any way, deprive citizens from *"archiving"* any material(s) for future business/re-sale purposes (*"Tortious interference"*, *"Restraint of trade"*).

## ¶764

Not only is *"Archiving"* a first-amendment-right and political-act, but also of equal importance, the material(s) being archived within private-property are subject to fourth-amendment-protections from unreasonable-search-and-seizure, and fundamental due-process privacy-protections. Once a person puts item(s) into the garbage-bin or recycle-bin and moves such bin(s) onto the public-curb, the item(s) thrown into those bin(s) are no longer the private-propery of such person, and such item(s) become part of the public-domain. This means that any malicious-third-party ean rummage through those item(s) to research/study/analyze private and sensitive information stored in those item(s) thrown away by such person(s). So, every person should be very cautious as to what information they are potentially revealing to malicious-third-party(s) by throwing such item(s) away into the public-domain. Additionally, governments do not even need a search warrant to search/seize anything that a person throws away into the public-domain. Therefore, political-activists, political-dissidents, persecuted-religious-minorities, persecuted-racial-minorities and other persecuted-minorities, in particular - if such persons are, even in the least bit, concerned about their privacy and safety - should be very-cautious about all of the information they are putting into the public-domain because malicious

government(s) and/or malicious private-parties can easily conduct surveillance for malicious reasons by searching/seizing item(s) in this manner. As the record does show, malicious government(s) do search/seize such item(s) to conduct such malicious surveillance of hated political-enemies (including non-violent political-activists).

## ¶765

Marion Stokes was an African-American, Philadelphia access-television producer, civil rights demonstrator, political-activist (democratic-socialist), librarian, and prolific archivist that archived (*"hoarded"*) large amounts of materials at one-or-more of her properties for political purposes. A recent public-television documentary documenting her life, showed not only that she lived a relatively private, almost secretive, life, but also that she rarely threw anything away, again, for political/archivist reasons.

## ¶766

Other items that are intentionally/willfully stored on private-property, that do not fall into the category of archiving, may be stored/preserved for their reuse and/or monetary value. Even private citizens can accumulate plastics, which most Americans might consider to be *"trash"*, that can be melted and molded into shaped items to be used for other purposes. Scrap glass and scrap metal are raw-materials have monetary value to at least some persons accumulating such materials even if governments and/or neighbors consider such items to be *"trash"*. Cardboard, a natural product, can be used for permacultural gardening purposes (as documented above), and as such, is not *"trash"*. (*"One man's trash is another man's treasure."*)

## ¶767

Thus, a government that abusively interprets and/or enforces any law, including but not limited to the property-maintenance-laws, to force citizen(s) to unwillingly throw-away/dispose (into the public-domain) any-such material(s) stored within private-property is egregiously violating several fundamental Constitutional rights of such citizen(s).

---

# §XXXIII

# ORIGINAL DATE OF FILING: INDIGENOUS PEOPLES' DAY

## ¶768

*"Indigenous Peoples' Day"* has just recently - since the year {2021} - been recognized as a federal holiday by the President of the {United States}.

## ¶769

The {Texas Legislature} has just recently - since the year {2021} - recognized *"Indigenous Peoples' Day"*, with the second week of October being deemed *"Indigenous Peoples' Week"*.

## ¶770

The plaintiff, an indigenous person, has filed the very first version of this complaint to coincide with *"Indigenous Peoples' Day"* and *"Indigenous Peoples' Week"*.

# §XXXIV

# ENDNOTES

(4) This lawsuit documents many dozens of hate-crimes, racketeering-acts and other abusive/oppressive actions including, but not limited to: racial/ethnic intimidation/interference, homophobic intimidation/interference, witness-intimidation, witness-tampering, evidence-tampering, fabricated-evidence, obstruction/retaliation, threat (including terroristic-threat and threats-of-murder), assault, blackmail/extortion, harassment, stalking, criminal-conspiracy, mail-fraud, wire-fraud, Texas-Fraud, false-report, disorderly-conduct, criminal-mischief, illegal-dumping, and criminal-trespass. This lawsuit also documents several civil-rights-violations, abuses-of-office committed by government-employees including: abuse-of-official-capacity, official-oppression, misuse-of-official-information, discrimination. Therefore, it is crucial to consider the relative physical sizes - heights, weights - of the perpetrators versus the victims. In almost all cases, the stated heights/weights are only approximate - to the best of the plaintiff's estimates - and, in some cases (especially for the initial years of {2009} through {2014}), the stated physical characteristics are to the best of the plaintiff's recollection. The plaintiff's senior-citizen [MOTHER] - who was a senior-citizen through almost-all of the incidents documented in this lawsuit - and who has been a victim (along with the plaintiff) of three-or-more crimes committed, is approximately 4-feet-11-inches-tall and weighs approximately 120 pounds. The plaintiff's senior-citizen [FATHER] - who was a senior-citizen through all of the incidents documented in this lawsuit - and who has been a victim (along with the plaintiff) of one-or-more crimes committed, is approximately 5-feet-6-inches-tall and weighs approximately 150 pounds.

(φ) This lawsuit documents several incidents during which malicious police-officers and/or other government-employees (for example, health-district employees) of [WCLE] have expressed great pleasure/joy/euphoria (smiling, laughing-out-loud, etc.) while-violating or right-after-violating or right-before-violating the plaintiff's rights - adding further insult to already substantial injury, by way of further humiliating and traumatizing the plaintiff. These extremely-painful experiences that the plaintiff has suffered from [WCLE] employees remind the plaintiff of other national high-profile cases. The closest national-profile case/incident that the plaintiff can compare this euphoria to, is the euphoric statements by then-[LAPD]-Officer Laurence M. Powell as he was recorded (both audio and video) brutally-beating African-American man Rodney King and stating: *"Oops ... I haven't beaten anyone this bad in a long time."* Similarly, after the recent high-profile criminal case of (MINNESOTA V. KIMBERLY ANN POTTER) that resulted in the first-degree manslaughter conviction of former Police-Officer Kimberly Ann Potter for causing the death of 20-year-old African-American man Daunte Wright, Mrs. Potter is seen smiling in her mugshot - causing further pain-and-suffering to Mr. Wright's family and to political-activists that beleived Mrs. Potter was also awarded an unusually light sentence after the jury convicted her

both first-degree and second-degree manslaughter in such case. Not surprisingly, the plaintiff has noticed the same (or similar) euphoria during/after/before many of [RSR]'s,[JSP]'s,[KAP]'s abusive actions against the plaintiff – since they too thoroughly-enjoyed violating the plaintiff's rights in many of the incidents spanning over 10 years. In every such case, both the intentions and motives of these abusive persons ([RSR],[JSP&KAP],[WCLE]) is clear: They knew they were targeting a defenseless and *"powerless"* victim in the plaintiff (due to the plaintiff's racial-profile and the plaintiff's political-profile), and they knew that they were going to get away with the hate-crimes/racketeering-acts/civil-rights-violations/abuses that they were committing against the plaintiff, thanks in large part, due to the toxic-environment of modern-day-Jim-Crow racist-lawlessness surrounding the plaintiff that was created and fostered by [WCLE] as early as the month of {2011-08}. As part of their decade-long predatory conspiracy against the plaintiff and their predatory actions taken against the plaintiff in furtherance of that conspiracy, the defendants expertly – not much unlike extremely skilled-and-intelligent con-artists – weaponized the property-maintenance-laws and/or other property-laws both as modern-day-Jim-Crow law and as fraudulent pretext under which they could not only freely, collaboratively and rejoicefully engage in the *"fun sport"* of the virtually endless stream of hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff, but more importantly, with the ultimate goal of such conspiracy being to deprive and defraud the plaintiff out of the plaintiff's money and (relatively-profitable) private-property-ownership within one-or-more White neighborhood(s).

(1)  [Stuff That Black People Don't Like] [SBPDL] (https://stuffblackpeopledontlike.blogspot.com/) is a well-known White-Nationalist, White-Supremacist blog website. The plaintiff only refers to some of the extremely offensive and racist messages posted onto [SBPDL] in-order-to compare the defendants' outrageous and predatory conduct (including statements) against the plaintiff to such racist messages posted by such White-Supremacists/White-Nationalists on [SBPDL] (and/or other White-Supremacist/White-Nationalist websites).

(2)  The plaintiff humbly requests this Court to – in each documented case of hate-crime, racketeering-act, civil-rights-violation, and/or other predatory/abusive action – conduct a simple thought-experiment to evaluate how the incident would have been interpreted, evaluated, and responded-to if the perpetrator(s) were immigrant(s)-of-color and the victim(s) where White/Caucasian/American – in other words, if the roles were reversed. The same thought-experiment has at least been contemplated, for example, for the {2021-01-06} far-right-wing-extremist United-States-Capitol-Insurrection (see section below).

(‡)  Person(s) name(s) and physical-description(s) used in this lawsuit are based on plaintiff's best knowledge, understanding and/or recollection.

(★)  Under the standard claim of fourteenth-amendment-violation to *"equal protection"* (freedom-from-discrimination), the plaintiff asserts that:

ⓐ plaintiff is a member of a *"protected class"* based upon plaintiff's racial-profile; AND
ⓑ plaintiff was treated differently than another similarly situated person not belonging to that protected-class; AND
ⓒ the difference in treatment was due to plaintiff's membership of that protected-class.

However, although the plaintiff fully asserts that the defendants' egregiously discriminatory housing practice(s) against the plaintiff were precisely due to the plaintiff's racial-profile, under the plaintiff's fourteenth-amendment(★) right to freedom-from-discrimination, the plaintiff also additionally asserts the *"class of one"* theory of *"equal protection"* under which, the plaintiff does not have to be a member of any such protected-class, but instead, that the defendants singled-out the plaintiff for discriminatory treatment on an *"irrational and wholly arbitrary"* basis, and that the defendants' conduct was motivated by a *"spiteful effort to get (the plaintiff) for reasons wholly unrelated to any legitimate state objective."* Furthermore, in [YICK WO V. HOPKINS, SHERIFF], the [SCOTUS] ruled that racially

discriminatory application of a racially neutral statute also violates the *"equal protection"* clause of the Fourteenth-Amendment. Thus, the plaintiff additionally asserts that the defendants' racially discriminatory application against the plaintiff of what the defendants (fraudulently) claimed to be a racially neutral statute, also violated the plaintiff's fourteenth-amendment *"equal protection"* rights. Finally, and most importantly, in **(**CITY OF CLEBURNE, TEXAS, ET AL. V. CLEBURNE LIVING CENTER, ET AL.**)**, the [SCOTUS] ruled that it is a violation of equal protection for government officials to take action against people with disabilities (or people of any other protected-class) based on **prejudice that the citizenry may harbor against them.**

(⊢)  The plaintiff has made a best attempt to decipher the conversation(s) in the audio-recorded incidents – also based upon the plaintiff's recollection of such incidents and/or notes about such incidents – but due to the variable quality of the audio, background noise (such as wind), etc., some parts of the conversation are are either inaudible or harder to decipher without audio-enhancement, noise-cancellation, etc. Whenever and wherever the plaintiff is unable to decipher or hear such relatively small segments of audio, the plaintiff indicates so by inserting the text: [INDECIPHERABLE] OR [INAUDIBLE] OR *"[???]"*.

(✱)  *"No-mow"* landscapes, sometimes referred to as *"natural"* or *"naturalized"* landscapes, and their associated legal arguments, are described in, amongst other publications, "More Sustainable (and Beautiful) Alternatives to a Grass Lawn" by the **(**Natural Resources Defense Council**)** ("[NRDC]"), and "Green Landscaping: Greenacres" by Brett Rappaport, J.D., republished by the **(United States Environmental Protection Agency)** ("[US-EPA]").

(Ω)  Most drought-tolerant turf-grasses that are well-adapted for Central-Texas only need to be watered from installation to establishment. Once established (in essence, once the turf-grasses' roots have reached a certain depth throughout), such turf-grasses can survive on their own with one-time/case-by-case/as-necessary irrigation during periods of extreme drought, as long as the maintainer does not cut the turf-grass, especially to a low-height. Morever, such established turf-grasses, when left completely uncut/unmowed (to grow to a maximum height of approximately 12-inches), will survive even the most extreme Central-Texas droughts without any irrigation whatsoever(✱). Shaggy-grass is dense grass that is either trimmed once or twice per year or left-unmowed (and, if necessary, only weeded for aesthetics), so as to insulate the soil and prevent evaporation from the soil in times of extreme drought – serving to protect the grass both during the intense summer heat and prolonged winter freezes. (Lack of soil moisture can kill grass even during prolonged winter freezes.)

(Ψ)  Since [2013-09-01] – [TPrC-T11-C202-§202.007(a)(4)], [TPrC-T11-C202-§202.007(d)(5)] – prohibits a [HOA] from requiring a homeowner to water/irrigate vegetation, and as described in (✱)(Ω), turfgrasses that are mowed are not capable of surviving prolonged droughts (especially in conditions of extreme summer heat and extreme winter frosts) without substantial-supplemental-irrigation.

(~)  Unless otherwise specified, all dates and/or times cited in this lawsuit should be assumed to be approximate and not exact.

(β)  [DRV] is short for (alleged) Deed-Restriction-Violation – an (alleged) violation of a restrictive-covenant. A [DRV] is only alleged by an accusing-party, and not actual, unless admitted-to by the accused-party, or deemed to be a violation by the final verdict of the relevant Civil Courts – including any-and-all higher-level appeals Courts – and **only** if the accusing-party timely files lawsuit against the accused-party within the statute-of-limitations (for actionable breach-of-contract) regarding such alleged [DRV] after following the proper legal procedure/timelines and exhausting all other non-litigation options. According to Texas law, in-order-for a particular, valid (and non-discriminatory) breach-of-contract claim regarding a restrictive-covenant to be actionable, such valid (and non-discriminatory) breach-of-contract claim regarding such restrictive-covenant must be filed in the appropriate Court by the accusing-party(s) – after following all

of the other necessary legal procedures and timelines such as proper and precise notification of such alleged restrictive-covenant-violation by [CMRRR] - against the accused-party within 3 years of when the actual breach-of-contract is alleged to have first-occurred. If the accusing-party(s) fail to timely file such valid (and non-discriminatory) breach-of-contract claim regarding such restrictive-covenant against the accused-party(s) within such time period, the accusing-party(s) are permanently barred by the statute-of-limitations from filing such alleged breach-of-contract claim regarding such restrictive-covenant against such accused-party(s).

(Φ)  As a social-justice-activist - belonging to the class of all social-justice-activists - and as an indigenous-person - belonging to the class of all indigenous-persons - and as an immigrant-of-color - belonging to the class of all immigrants-of-color - the plaintiff has always been extremely conscientious about the plaintiff's reputation-and-image as a member of all of those classes of people. The plaintiff strongly believes that powerful institutions in American society - governments, mainstream-media-corporations, etc. - often unjustly smear the reputation-and-image of those classes of people. As a member of those classes of people, the plaintiff does not want to perform and, for the entire duration of time-period documented in this lawsuit, has never wanted to perform any behavior/action that could sully the reputation-and-image of such classes of people. For example, as a social-justice-activist and as an indigenous-person, the plaintiff has very-strong political views and very-strong religious views (respectively) that both actively and passively advocates for peace and nonviolence. There are countless injustices committed against the plaintiff by the defendants - as substantially documented in this lawsuit - that completely-destroyed and/or attempted-to-completely-destroy and/or conspired-to-completely-destroy the plaintiff's peaceful and nonviolent reputation-and-image - and by extension, such reputation-and-image of those aforementioned classes of people that the plaintiff belongs to.

(δ)  This hypocrisy and extreme selfishness is demonstrated by the mentality of most, if not almost-all, far-right-wing-extremists. Many far-right-wing-extremists vigorously demand to get *"government off (their) backs"* and selfishly demand *"individual liberty"* when it comes to, for example, the issues of taxation, environmental-regulations, or their rights to bear even the most dangerous types of firearms. However, those same far-right-wing-extremists demand that the government acts oppressively when it comes to other issues that do not affect themselves. For example, they demand that government ban people-of-certain-races (in particular, Black/Brown people) or people-of-certain-religions (in particular, Muslim people) from entering into the United States (even building a border-wall if that is what it takes) and they demand that government completely-deny a woman's fundamental right-to-chose how she handles an unexpected-and-unwanted pregnancy (even if such pregnancy was caused by rape or incest).

(Λ)  The plaintiff was-born-in and emigrated-from a country of people-of-color, India, that suffered what economist and philosopher Adam Smith called *"the savage injustice of the Europeans ... ruinous and destructive to several of those unfortunate countries."* In this statement, Smith is referring, in part, to the extreme looting (estimated at $45-trillion in today's dollars), oppression, subjugation and enslavement of the Indian people by the (now-former) British empire, turning India - formerly one of the major economic powers and commercial centers of the world - into a country of extreme poverty.

(Ж)  A [HOA] so-called "election" cannot truthfully be considered to be an actual "election" in the democratic sense, because in the majority of such "elections", approximately 25% or less of eligible voters (property-owners) actually vote to "elect" [HOA] Board-Of-Directors. When the turnout for such an "election" is so low, the outcome of the "election" is likely to skew heavily towards an extremist end of the actual electorate - for example, with the most far-right-wing residents "electing" the most authoritarian/iron-fisted/oppressive/abusive residents into such positions solely to fulfill their own ulterior/predatory agendas. Also, the property-management-company that is contracted to represent the [HOA] typically "counts" the votes - with the residents having little-to-no oversight whether the votes are actually being counted correctly. While governments and their officials are, generally-speaking, required by law and/or the court of public-opinion, to be more-inclusive, more-participatory, more-democratic, more-transparent, more-heavily-scrutinized,

more-accountable and respectful-of-civil-rights, [HOA]s in general, and [HOA] Boards in particular, are, generally-speaking, more-exclusive, more-undemocratic, more-opaque, more-shielded-from-scrutiny, more-unaccountable and not required-by-law (with the exception of anti-SLAPP law and some other religious exceptions) to be fully-respectful of civil-rights. While governments are, generally-speaking, required by law to be fully-respectful of minority rights - especially the rights of racial/religious/sexual/national minorities - the current law regulating [HOA]s (with the exception of the [FHA]/[TFHA]) does not require [HOA]s to be fully-respectful of such minority rights. While many, if not most, local governments offer yearly referendums where the voters vote to make key decisions of government/policy/law by direct-democracy, [HOA]s, generally-speaking, never offer referendums where the residents make such key decisions by direct-democracy. For these reasons and other reasons, [HOA]s are, generally-speaking and as at least some legal commentator(s) have pointed out, not considered to be actual democracies, although, both in-theory and in-practice, [HOA]s could potentially and very-easily function as democracies - especially if the law regulating [HOA]s were amended to require them to act as democracies. University of Illinois at Chicago Professor Evan McKenzie's book, *Privatopia: Homeowner Associations and the Rise of Residential Private Government*, more-fully-and-thoroughly, and in great detail, scholarly documents the undemocratic and anti-civil-rights nature of [HOA]s.

(٨)   For example, Marion Stokes was a Philadelphia, Pennsylvania, access television producer, civil rights demonstrator, activist, librarian, and prolific archivist that archived and *"hoarded"* large amounts of materials at one-or-more of her properties for political purposes.

(O)   In order for a property-owner to be in violation of the restrictive-covenant of the subdivision concerning prohibited animal(s), such animal(s):

Ⓐ must be not considered to be *"other household pets"*, **AND**
Ⓑ must be explicitly listed in the list of prohibited animals; **OR**
Ⓒ are threatening the *"quietude, health or safety of the community"*.

However, condition Ⓐ was never applicable to the plaintiff's companion-tortoises, and the plaintiff additionally asserts that condition Ⓑ never held true either, since *"tortoise"* is not explicitly listed. Regardless of the applicability of condition Ⓑ, the inapplicability of condition Ⓐ short-circuits any further evaluation of condition Ⓑ. The plaintiff further asserts that the true reason behind (or *"spirit of"*) this restrictive-covenant is to disallow residents of the subdivision from quartering any type of commercial animals in the subdivision, any breeding-operation within the subdivision, or any other animals (including at least some *"dogs, cats"*) that could threaten the *"quietude, health or safety of the community"* - which is why drafters of the [DCCR]s allowed for *"other household pets"*. Once again, a resident's quartering of such companion-tortoises is neither a violation of the actual sprit of such restrictive-covenant nor the actual letter of such restrictive-covenant. Given the plaintiff's disability/handicap, the plaintiff has found such companion-tortoises to be the most appropriate type of companion-animal to help manage and mitigate the plaintiff's disability/handicap. The plaintiff was 100% confident in the year (2015) - the first year of the plaintiff's receipt of notice of [DRV] regarding such companion-tortoises - and remains 100% confident that no impartial Judge nor impartial Jury would consider timid, shy, quiet and extremely-docile companion-tortoises be a threat to the *"quietude, health or safety of the community"*, especially since there exist residents' dogs and cats in the subdivision that do, in fact, threaten the *"quietude, health or safety of the community"*. For example, it was reported in the local television news media during a day in the summer of {2019} that a tortoise in the Benbrook-Ranch [BBR] subdivision - another neighboring [HOA] subdivision in Leander, Texas - was lost and roaming freely on public property - and that this tortoise was finally returned to the owner - with the [BBR] subdivision having restrictive-covenants very-similar-to, if not almost-identical-to, the restrictive covenants of the 【Summerlyn】 subdivision. Additionally, since the first year ({2014}) of the plaintiff's ownership of companion-tortoises on the plaintiff's property, the plaintiff has documented evidence that one-or-more other resident(s) of the 【Summerlyn】 subdivision also owning such tortoise(s) on their 【Summerlyn】 property(s).

SIDDHARTH KODE v. WILLIAMSON COUNTY, ET AL

Additionally, since the first year ({2014}) of the plaintiff's ownership of companion-tortoises on the plaintiff's property, the plaintiff has documented evidence that one-or-more other resident(s) of the 【Summerlyn】 subdivision also owning some other animals that could potentially be in violation of condition ⑧, such as: rabbits. Therefore, since the year ({2015}), not once did the plaintiff even consider the possibility of parting with the plaintiff's companion-tortoises, and at that moment in time, the plaintiff made a firm determination that if the [HOA] took any legal action against the plaintiff over the issue of the plaintiff's companion-tortoises, then the plaintiff vowed to vigorously fight a legal-battle in Court to defend/secure the plaintiff's right to maintain the plaintiff's companion-tortoises on the plaintiff's property – a right that many White-American homeowners residing within [HOA] subdivisions – at least some of which have almost identical rules to the 【Summerlyn】 subdivision – within Central-Texas already enjoy and have enjoyed for at least a decade. Since the year {2014}, many of the subdivision's residents have taken a liking to the plaintiff's companion-tortoises, contributing to the ire of racketeer co-defendants [RSR],[JSP&KAP] – who have not only wanted a monopoly of their malicious and racist thoughts against the plaintiff over the rest of the subdivision's residents, but who have also always wanted to portray the plaintiff in the most unfavorable, defamatory(⑨) and racist light to the rest of the subdivision's residents. Despite the fact that the plaintiff has always strongly denied that owning companion-tortoises within the 【Summerlyn】 subdivision is a violation of the 【Summerlyn】 subdivision's restrictive-covenants, as the record does show, [JSP&KAP] (and/or [RSR]) continued to complain to the [HOA] and/or [WCLE] about the plaintiff's companion-tortoises even well past the statute-of-limitations for any potential breach-of-contract claim regarding such companion-tortoises(β).

(⌘) This lawsuit primarily documents the racial-oppression and pattern-of-racketeering-activity committed by the defendants against the plaintiff. However, it is also important to note one relatively-minor and tertiary-aspect of the fraud committed by racketeer co-defendants [JSP&KAP],[RSR] against the plaintiff – and that is their denial of man-made-climate-change, or at the very least, their absolute refusal to accomodate necessary changes (or, at the very least, the necessary granting of variances) to the property-maintenance-laws (or the harmful/abusive interpretation/enforcement of such property-maintenance-laws) that would serve to mitigate man-made-climate-change. All three of racketeer co-defendants [JSP&KAP],[RSR] are non-immigrants of an older generation than the plaintiff – more-likely-than-not, having lived in the State of Texas for a considerably longer period-of-time than the plaintiff. Therefore, [JSP&KAP],[RSR] are all surely aware that average summer temperatures in Central Texas are significantly greater today then they used to be just as recently as two decades ago. As miserable as the extreme-heat-and-drought of {Summer-2011} was, there was at least some talk (at least amongst those who continue-to-deny man-made-climate-change) about {Summer-2011} being a once-in-a-hundred-year unusual summer that Central-Texas was unlikely to experience again. {Summer-2011} in Central-Texas was particularly unique in that there were at least 90 days during which temperatures in Central-Texas exceeded 100-degrees-fahrenheit. However, the extreme-heat-and-drought of {Summer-2011} has now, just twelve years later, been surpassed by {Summer-2023}, at the very least, in terms of the average-temperature. The overwhelming majority of the approximately-eighty so-called *triple-digit-days* of {Summer-2023} actually exceeded 105-degrees-fahrenheit, which cannot be stated about the then-miserable {Summer-2011}. The chart that documents the average summer temperatures in Texas over the last five decades shows a significant increase in such average summer temperatures with each passing decade. Older and longer-term residents of the State of Texas – including but not limited to [JSP&KAP],[RSR] – cannot rightfully continue-to-deny that such increasing average summer temperatures must be immediately dealt with appropriate changes to many aspects of the status-quo, business-as-usual, American way-of-life, including, but not limited to, changes to the property-maintenance-laws, and/or the harmful/abusive interpretation/enforcement of such property-maintenance-laws – wherever such harmful/abusive interpretation/enforcement of such property-maintenance-laws exacerbates man-made-climate-change. The same logic of man-made-climate-change also applies to extreme winters in Central-Texas. The extreme-and-prolonged winter-freeze of {February-2021} was described by the Texas Governor as a once-in-a-hundred-year occurrence. However, that characterization by the Texas Governor is unlikely to be true due to the simple reason that both temperature extremes are driven by man-made-climate-change – for which, there does not appear to be any end in sight. Due to both of these temperature extremes, the electric-grid of Texas – managed-by and/or overseen-by 《Electric Reliability Council of Texas》, [ERCoT] – is, at least in some crucial cases, not able to meet the "unexpected" demand – leading to increasing-number-of and/or

length-of power outage(s) during those particular extreme period(s)-of-time when people are in most need of such grid-electricity. In recent years, during one-or-more occurrences per year, [ERCoT] has advised residents of Texas to voluntarily conserve in usage of the electric-grid due to the electric-grid not-able-to (or struggling to) meet the demand. Such temperature extremes caused by man-made-climate-change are also devastating to Texas agriculture – with Texas farmers unable to keep their crops and/or livestock alive – causing billions-of-dollars in losses to Texas agriculture (as a whole). The most-vulnerable and/or hardest-hit Texas farmers are those farmers that have long-term investments such as orchards and/or other perennial crops and/or long-living livestock.

(≡) Since (2016), the [College Board] changed the manner in which the scores on the Scholastic-Aptitude-Test ("[SAT]") were calculated – resulting in an inflated [SAT] score in the ("new") (post-2016) [SAT] relative to the ("old") (pre-2016) [SAT]. According to a reputable (The Washington Post) news-article titled *"Why your new SAT score is not as strong as you think it is"*, the result of this change is summarized as follows (quoted verbatim):

*A new 1200 corresponds to an old 1130.*

*A new 1300 corresponds to an old 1230.*

*A new 1400 corresponds to an old 1340.*

*A new 1500 corresponds to an old 1460.*

*But a new 1600 is just as perfect as an old 1600.*

(🐕) The plaintiff asserts that none of the huge volume of hate-crimes/civil-rights-violations/racketeering-acts/abuses committed against the plaintiff (for over a decade) both by far-right-wing-extremist racketeer co-defendants [JSP&KAP], [RSR] nor any of those individual members of [WCLE] were even charged, let alone prosecuted, precisely because the Republican Party leadership of defendant [WC] has an implicit policy and/or practice of denying and/or ignoring and/or circumventing the enforcement of the hate-crimes laws, the civil-rights laws, the abuse-of-office laws of the State of Texas – at the very least, in cases where the victim(s) of such crimes are perceived by defendant [WC] to be *"powerless"*, such as the plaintiff(🐕). The plaintiff further asserts that the reason that the Republican Party leadership of defendant [WC] has acted in this brazenly unlawful manner (for over a decade) against the plaintiff is because they believe that, by virtue of being elected into office, they have been given some type of implicit mandate from the Republican Party voting-base – not to enforce those particular laws – at the very least, in cases where:

Ⓐ the perpetrators of such crimes are White-American ; AND

Ⓑ the victim(s) of such crimes are perceived to be *"powerless"* and are:

① person(s)-of-color ; AND/OR

② immigrant(s); AND/OR

③ [LGBTQIA+] (*"actual or perceived"*); AND/OR

④ member(s) of the (opposition) left-wing.

Finally, the plaintiff asserts that, not only did the Republican Party leadership of defendant [WC] fully-authorize, or at the very least fully-allow, such denial and/or ignorement and/or circumvention of the enforcement of those particular laws to the extreme detriment of the plaintiff, but also, even more egregiously, the Republican Party leadership of defendant [WC] fully-authorized, or at the very least fully-allowed, [WCLE]'s brazen acts of retaliation against the plaintiff for the plaintiff's reporting of those hate-crimes/civil-rights-violations/racketeering-acts/abuses committed against the plaintiff. Therefore, for all of these reasons, at least part of both the declaratory-relief and injunctive-relief that the plaintiff seeks from this Court is to ensure that:

Ⓐ No-matter-what political party is in those positions of power of municipal-corporation defendant [WC] – the Sheriff, the Constables, the District-Attorney, the County-Commissioners – that [WCLE] is fully responsible for fully enforcing **all** of the laws of the State of Texas – and that includes the hate-crimes laws, the civil-rights laws, and the abuse-of-office laws of the State of Texas.

Ⓑ  A declaration that: *"Justice Delayed is Justice Denied"* – even if justice is delayed until after the crime-victim is forced to take legal-action against defendant [WC] for such egregiously discriminatory enforcement (or lack thereof).

Ⓒ  Every single act of retaliation against a crime-victim who has reported such crime is a serious:

    ① felony-crime under Texas law, and a racketeering-act if the crime was a federal-crime ; AND

    ② civil-rights violation (under fourteenth-amendment) and fair-housing violation if the crime was a hate-crime ; AND

    ③ conspiracy-to-interfere-with-civil-rights and obstruction-of-justice

– whether such act of retaliation is committed by any private-citizen(s) **or any employee(s)/official(s) of any government**.

(**2**)  In addition to the numerous subclaims that the plaintiff asserts against the defendants, the plaintiff also asserts that the defendants operated under two fundmanental abusive, oppressive and predatory guiding-principles or maxims against the plaintiff:

Ⓐ  First, the defendants operated under the Maxim-of-Thucydides against the plaintiff. Ancient Athenian historian and general Thucydides states:

    *"'Right', as the world goes, is only in question between equals in power, while **the strong do what they can and the weak suffer what they must."***

Such statement by then Athenian general Thucydides is better-explained by internationally-renowned economist and professor Yanis Varoufakis:

    *"And even the original expression comes from Thucydides in the History of the Peloponnesian War, when he recounts as an Athenian—remember, Thucydides is an Athenian historian and soldier and general who is recounting the story of when Athens sent a fleet with troops, the marines, the Athenian marines, to the island of Melos to crash the local society, the local city-state. Why? Because Melos refused to take sides in the cold war, or actually the hot war at the time, between Athens and Sparta. And Athens had its own NATO in the archipelago of the Aegean and it was very worried that if the Melians were allowed to be independent, then the rest might get ideas that they want to exit NATO, the NATO of the time, so they sent the troops to crush them. And there is this interesting meeting when the Athenian generals meet the Melian representatives, delegates to announce to them, but you know, your life is over, surrender quietly and we will sell you as slaves. If you resist, we are going to crush you. And the Melians gave them a Kantian argument that you should never treat human beings as a means to an end, you should treat them as an ends in themselves. Not exactly but more or less this ... it was more or less that kind of Kantian argument. You should treat those in a position of weakness in the same way you would want to be treated in a position of weakness, because one day you will be in a position of weakness, as of course the Athenians of course did become ... Shortly afterwards when they lost the war to Sparta, and the Athenian general responded, no, you've got it just wrong: **The strong do what they can, and the weak suffer what they must.** But Thucydides is telling us this story in order to allow us to criticize it."*

Then Athenian general Thucydides is essentially informing the Melians that the Melians are not entitled to justice, because the Melians are a losing party in such war, and as such a losing party, the Melians are not *"equals in power"* with the Athenians, and furthermore, due to such inequality in power, **"the strong do what they can and the weak suffer what they must"**. The plaintiff asserts that this Maxim-of-Thucydides very-thoroughly explains all of the defendants' abusive, oppressive and predatory conduct towards the plaintiff – over a decade of the defendants' racial-oppression and pattern-of-racketeering-activity against the plaintiff.

Ⓑ  Secondly, although the plaintiff was *"powerless"* to the defendants' decade of abusive, oppressive and predatory actions against the plaintiff, the plaintiff also asserts that the defendants operated under a second, more modern, principle or adage:

    *"The best defense is a good offense."*

Such adage is generally made regarding a conflict between *"equals in power"* – while due to the plaintiff's *"powerlessness"*

against the defendants, the plaintiff was never an *"equal in power"* with any of the defendants. However, the general idea behind such adage is that: Premptive attacks, *"proactivity (a strong offensive action) instead of a passive attitude will preoccupy the opposition and ultimately hinder its ability to mount an opposing counterattack, leading to a strategic advantage."* So, instead of following such adage that applies to *"equals in power"*, since the defendants always regarded the plaintiff as *"powerless"* against them, the plaintiff asserts that the defendants resorted to sheer, brute-force against the plaintiff – aggregately and repeatedly flooding (or inundating) the plaintiff with a virtually endless stream of hate-crimes/civil-rights-violations/racketeering-acts/abuses that they aggregately committed against the plaintiff over the course of over a decade, so that the plaintiff would have little-to-no chance at any legal recourse – due to the sheer and overwhelming volume of the defendants' decade of hate-crimes/civil-rights-violations/racketeering-acts/abuses aggregately committed against the plaintiff.

(Δ)   Since the plaintiff's private-housing, [788KLLTX78641], did *"receive federal financial assistance"*, each-and-every-count of crimes-of-violence that was aggregately committed by the defendants against the plaintiff in relation to the plaintiff's private-housing – and in particular, on account of the plaintiff's enjoyment of the rights, privileges and benefits of such private-housing – is asserted to be a separate-and-distinct-count of the defendants' crime of *"Interference-with-Federally-Protected-Activities"* ([18-USC-PI-C13-§245]) against the plaintiff.

# §XXXV

# COMPLAINT SIGNIFICANTLY INCOMPLETE AND TO BE AMENDED BY PLAINTIFF ; MAXIMUM TIME FOR SERVICE SOUGHT

## ¶771

Unlike most civil-rights lawsuits that typically document only one, two or less than a handful of incident(s), this lawsuit attempts to substantially document over a decade of hate-crimes/civil-rights-violations/racketeering-acts/abuses (abbreviated as *"racial-oppression and pattern-of-racketeering-activity"*) that the plaintiff has suffered from the defendants, specifically, over a decade of the defendants':

Ⓐ [FHA]/[TFHA] housing-discrimination violations; AND

Ⓑ [RIaCOA] pattern-of-racketeering-activity violations ; AND

Ⓒ [KKKA]:§1983 deprivation-of-rights violations ; AND Ⓓ [KKKA]:§1985 conspiracy-to-interfere-with-civil-rights violations ; AND

Ⓔ [CRAo1866]:§1982 property-rights-of-citizens violations ; AND

Ⓕ [CRAo1866]:§1981 equal-rights-under-the-law violations ; AND

Ⓖ [CRAo1964]:§2000d discrimination-under-federally-assisted-programs violations -

- all against the plaintiff.

## ¶772

Unlike most civil-rights lawsuits that typically document only one, two or less than a handful of individuals that committed those violation(s), this lawsuit attempts to substantially document over a decade of numerous White-American private citizens - [JSP&KAP],[RSR] - conspiring with one-another while attempting to summon the collective power of the overwhelmingly-large White-American racial-majority of *"their"* municipal-corporation local-government, *"their"* residential-subdivision, and *"their"* [HOA] to all predatorily participate in the violation of the plaintiff's rights, due to the plaintiff's minority-of-one racial-profile.

## ¶773

So, despite the fact that the plaintiff has expended an excruciating amount of time and effort along with substantial amount(s) of money in compiling, drafting and filing this complaint, this complaint is still very incomplete as the plaintiff still has not yet completely-specified all of the incidents of hate-crimes/civil-rights-violations/racketeering-acts/abuses - especially due to the overwhelming volume of such incidents that the plaintiff has suffered from the primary-defendants over the course of more than a decade. The harassment/stalking/intimidation/interference/disorderly-conduct/criminal-mischief incidents, in particular, are only briefly-summarized and/or alluded-to in the current version of this complaint especially since defendants [JSP],[RSR], in particular, have committed harassment/stalking/intimidation/interference/disorderly-conduct/criminal-mischief against the plaintiff during different incidents, so numerous (and even countless), so as to make it very-difficult, time-consuming, onerous and overwhelming for the plaintiff to fully-detail each-and-every single, such harassment/stalking/intimidation/interference/disorderly-conduct/criminal-mischief incident. As the plaintiff has already stated above, the defendants deliberately engaged in such malicious strategy/tactic of *"flooding"* against the plaintiff - inundating the plaintiff with this long-term pattern of racial-oppression and racketeering-activity (during the course of over a decade) against the plaintiff in-order-to make it very-difficult, time-consuming, onerous, and overwhelming for the plaintiff to be able to meaningfully file these claims against the defendants, especially within the relatively short amount of time provided for by all of the relevant statute-of-limitations.

## ¶774

As this Court is fully aware, most [RIaCOA] prosecutions and, at least some [FHA]/[TFHA] prosecutions, take an enormous amount of time to research, investigate, compile and draft - due to the usually large volume of evidence spanning the usually lengthy period of time during which the pattern of racketeering-activity and discrimination (respectively) take place. The private-citizen petitioners of these particular types of lawsuits have to play the same role of a full-time prosecutorial team composed of numerous highly-experienced prosecutors, except for the fact that only the latter has the virtually-unlimited, taxpayer-funded resources - including the vast investigative resources along with the substantial search/seizure powers - of the government. Thus, not only is the plaintiff's lawsuit not an exception in this sense, but also, the plaintiff has been forced to single-handedly play the role of an entire prosecutorial team (along with their investigative team(s)) - without any outside help, without any outside funding, without any search/seizure power, without any other governmental powers - in researching, investigating, compiling and drafting this necessarily-lengthy lawsuit documenting over a decade of the defendants' racial-oppression and pattern-of-racketeering-activity against the plaintiff. This lawsuit is truly the result of more than 2 years of the plaintiff's research and substantial (but yet, seriously incomplete) investigation into the defendants' decade of racial-oppression and pattern-of-racketeering-activity against the plaintiff. The plaintiff has necessarily needed to spend an extraordinary amount of time and effort in compiling all of the evidence - figuring-out and putting-

together an enormous amount of puzzle-pieces in a massive jigsaw puzzle - into drafting this initial version of this complaint.

## ¶775

Due to the sheer, overwhelming-volume of evidence that the plaintiff has gathered against the defendants, the plaintiff has also not had sufficient time to review at least some of such overwhelming volume of evidence - including but not limited to, all of the plaintiff's relevant security-camera-recordings, and all of the plaintiff's relevant body-worn-camera-recordings, all of the emails and social-media-postings - in-order-to fully document, in this initial version of this complaint, every single incident of hate-crimes/civil-rights-violations/racketeering-acts/abuses that the defendants aggregately perpetrated against the plaintiff as part of their decade-long obstructive-and-retaliatory, blackmailing-and-defrauding racketeering-enterprise against the plaintiff. In particular, the plaintiff has yet to fully-review and document many ancillary pieces of evidence necessary to more-thoroughly (or more-completely) prove the plaintiff's racial-discrimination and pattern-of-racketeering-activity claims against the defendants. The plaintiff has also not yet reviewed most of the even-larger volume of the plaintiff's additional security-camera-recordings and/or body-worn-camera-recordings to determine the number of additional incidents of currently-undetected hate-crimes/civil-rights-violations/racketeering-acts/abuses that the plaintiff has suffered from the defendants. Of secondary importance, while the plaintiff has an enormous volume of evidence of the racially-discriminatory enforcement of the property-maintenance-laws (including the racially-discriminatory enforcement of restrictive-covenants) within the neighborhood, such racially-discriminatory enforcement is only minimally documented and/or alluded-to in this initial version of this complaint - as the plaintiff has only, thus far, focused the overwhelming volume of the text of this initial version of this complaint on the defendants' long-term pattern of racial-oppression and racketeering-activity against the plaintiff. For all of these additional reasons, the plaintiff will more-likely-than-not, and at a minimum, need to append-to and/or amend the:

Ⓐ *"SEQUENCE OF RELEVANT INCIDENTS"* section with more-detailed incidents and information; AND

Ⓑ *"PRAYER FOR RELIEF"* and/or the *"REQUESTED RELIEF"* sections with more-detailed and/or additional relief requested

- in amended version(s) of this complaint.

## ¶776

The plaintiff asserts that this lawsuit is not limited to the subclaims/requested-relief stated in this particular version of the complaint. The plaintiff asserts that additional subclaims/requested-relief may need to be filed and/or existing subclaims/requested-relief may need to be amended, especially based upon Discovery/Depositions (and/or other investigations) executed as part of this lawsuit. The plaintiff asserts that although the plaintiff has additional potential subclaims against one-or-more of the defendants, those additional potential subclaims cannot be properly asserted until such time that the plaintiff has more evidence (resulting from Discovery/Depositions/investigations) to fully-prove such additional subclaims.

## ¶777

After the initial filing of this complaint, the plaintiff seeks to ensure from this Court that the plaintiff is granted the full-maximum of 90 days to serve all of the defendants with this complaint. The purpose of this time is to ensure not only that the plaintiff can use this needed time to amend this complaint as necessary, but also so that the plaintiff can extract and make-available all of the evidence required to prove the plaintiff's multiple claims, again, with the facts/circumstances surrounding this lawsuit being much-more-complex (arguably, even

extraordinarily-complex) and much-larger-in-scale (by the sheer volume of evidence) compared to most other civil-rights-violation(s) lawsuits and/or [RIaCOA] lawsuits.

## ¶778

The plaintiff humbly and respectfully seeks forgiveness from this Court for any spelling-errors, typographical errors, grammatical errors, or any other errors of the English language that are present in this particular version of the complaint, as the plaintiff has made the best attempt to fix any-and-all of such errors and to the best of the plaintiff's abilities - especially, given the substantial length of this lawsuit.

---

# §XXXVI

# PRAYER FOR RELIEF

## ¶779

WHEREFORE, the plaintiff requests that this Court enter an ORDER that:

## ¶780

Declares that Defendants' cumulative-and-aggregate actions, conducts, behaviors, policies and practices against the plaintiff from the years of {2009} through {2023} egregiously violated the [FHA], the [TFHA], the [KKKA]:§1983, the [KKKA]:§1985, the [RIaCOA], the [CRAo1866]:§1982, the [CRAo1866]:§1981, and the [CRAo1964]:§2000d against the plaintiff, as substantially detailed in this complaint.

## ¶781

Declares that the majority of peoples-of-color (including the overwhelming-majority of indigenous-peoples) around the world do not live (lifestyles) according to White-American standards, and do not maintain their land according to White-American standards, and as a result of such difference in racial/cultural/religious/ethnic/national standards, person(s) of the White/Caucasian/American color/race/nationality cannot reasonably impose and/or coerce their ethnocentric/culturally-insensitive way-of-life/lifestyle and/or private-property-maintenance standards onto any such person(s)-of-color that innocently fail to conform to such White-American standards, as such unjust imposition and/or coercion is a direct violation of such person(s)-of-color's first-amendment-rights, fourteenth-amendment-rights and fair-housing-rights.

## ¶782

Declares that any person(s)-of-color's innocent failure and/or *"inability"* to maintain such person(s)-of-color's private-property according to White-American standards is never a crime, especially if such private-property-maintenance practice(s) of such person(s)-of-color is genuinely,

knowingly and deliberately asserted by such person(s)-of-color as part of one-or-more Constitutionally-or-Statutorily-protected religious/cultural

practice(s) and/or lifestyle(s) and/or other first-amendment-right and/or fair-housing-right of such person(s)-of-color.

## ¶783

Declares that, if it can be proven by *"clear and convincing"* evidence that people-of-color within any particular neighborhood located within

the United States are not imposing their ethnocentric standards of lifestyle and/or private-property-maintenance onto any White-Americans,

then no White-American person(s) within such neighborhood can reasonably impose and/or coerce their White-American standards of lifestyle

and/or private-property-maintenance onto any such person(s)-of-color, as such unjust imposition and/or coercion is a direct violation of such

person(s)-of-color's fair-housing-rights and fourteenth-amendment-rights guaranteeing *"equal protection of the laws"*.

## ¶784

Declares that any municipal-corporation's *"cherry-picking"* of which restrictive-covenants/laws to enforce in any manner that such *"cherry-picking"* favors White resident(s)/property-owner(s) and/or disfavors any person-of-color resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶785

Declares that any municipal-corporation's *"cherry-picking"* of which restrictive-covenants/laws to enforce in any manner that such *"cherry-picking"* favors non-immigrant resident(s)/property-owner(s) and/or disfavors any immigrant resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶786

Declares that any municipal-corporation's *"cherry-picking"* of which restrictive-covenants/laws to enforce in any manner that such *"cherry-picking"* favors non-disabled/non-handicapped resident(s)/property-owner(s) and/or disfavors any disabled/handicapped resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶787

Declares that any municipal-corporation's *"cherry-picking"* of which restrictive-covenants/laws to enforce in any manner that such *"cherry-picking"* favors heterosexual resident(s)/property-owner(s) and/or disfavors any (*"actual or perceived"*) [LGBTQIA+] resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶788

Declares that any municipal-corporation's selective interpretation and/or enforcement of restrictive-covenants/laws in any manner that such selective interpretation/enforcement favors White resident(s)/property-owner(s) and/or disfavors any person-of-color resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶789

Declares that any municipal-corporation's selective interpretation and/or enforcement of restrictive-covenants/laws in any manner that such selective interpretation/enforcement favors non-immigrant resident(s)/property-owner(s) and/or disfavors any immigrant resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶790

Declares that any municipal-corporation's selective interpretation and/or enforcement of restrictive-covenants/laws in any manner that such selective interpretation/enforcement favors non-disabled/non-handicapped resident(s)/property-owner(s) and/or disfavors any disabled/handicapped resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶791

Declares that any municipal-corporation's selective interpretation and/or enforcement of restrictive-covenants/laws in any manner that such selective interpretation/enforcement favors heterosexual resident(s)/property-owner(s) and/or disfavors any *("actual or perceived")* [LGBTQIA+] resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶792

Declares that any municipal-corporation's adverse action taken against any person-of-color resident(s)/property-owner(s) that is based even partly upon the racial animus/prejudice/bias of any White resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶793

Declares that any municipal-corporation's adverse action taken against any immigrant resident(s)/property-owner(s) that is based even partly upon the anti-immigrant animus/prejudice/bias of any non-immigrant resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶794

Declares that any municipal-corporation's adverse action taken against any disabled/handicapped resident(s)/property-owner(s) that is based even partly upon the ableist animus/prejudice/bias of any non-disabled/non-handicapped resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶795

Declares that any municipal-corporation's adverse action taken against any (*"actual or perceived"*) [LGBTQIA+] resident(s)/property-owner(s) that is based even partly upon the anti-[LGBTQIA+] animus/prejudice/bias of any heterosexual resident(s)/property-owner(s) is an egregiously discriminatory housing practice, in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment.

## ¶796

Declares that Defendants [WCLE]'s deliberate failure, with respect to the plaintiff, to enforce the Hate-Crime laws, the Abuse-of-Office laws, the Bribery-and-Corrupt-Influence laws, the Perjury-and-Other-Falsification laws, the Fraud laws, the Government-Discrimination laws, and the Racial-Profiling laws of the State of Texas not only repeatedly and egregiously violated the plaintiff's rights, but that such deliberate lack of enforcement, at least, with respect to the plaintiff, is an egregiously discriminatory housing practice, thus in clear violation of the [FHA], the [TFHA], and the fourteenth-amendment - which directly resulted in the plaintiff suffering numerous dozen counts of additional retaliatory crimes above-and-beyond what the plaintiff would have suffered had those initial crimes been prosecuted to the fullest extent of the law - for example, in the initial years of {2011}/{2012}.

## ¶797

Declares that no law-enforcement agency of defendant [WC] has the authority/power to deny and/or ignore and/or circumvent the full-investigation and full-enforcement of the hate-crimes laws, the civil-rights laws, the abuse-of-office laws, the bribery-and-corrupt-influence laws, the perjury-and-other-falsification laws, the fraud laws, the government-discrimination laws, and the racial-profiling laws of the State of Texas.

## ¶798

Declares that the use of the word *"weeds"* as it is used within [THaSC-T5-SA-C343] does not apply to any *"vegetable growth or matter"* that is intentionally-grown (thus, *"cultivated"*) by resident(s) exclusively within the confines of such resident(s)' private-property (*"premises"*) as part of any harmless:

Ⓐ *"drought-resistant landscaping"* ; AND/OR

Ⓑ constitutionally-or-statutorily-protected religious/cultural practice(s) ; AND/OR

Ⓒ other first-amendment-right ; AND/OR

Ⓓ other statutory-right.

## ¶799

Declares that the harm caused by the widespread use of landscaping chemicals within (human-inhabited) private-properties in any residential-subdivision, including, but not limited to, pesticides and synthetic/chemical fertilizers - to human health, to wildlife and to environmental health (including air, water and land pollution) - is exponentially-more than any alleged or actual harm caused by the relatively small number of *"mosquitoes, rodents, vermin, or other disease-carrying pests"* originating from within such (human-inhabited) private-properties.

# ¶800

Declares that the potential-for-harm - and in some cases, the actual harm - caused by the rampant-and-illegal lighting of fireworks, the rampant-and-illegal speeding vehicles, and the illegally-unleashed large-dogs and large-cats (roaming freely onto public-property and/or others' private-property) in any residential-subdivision is exponentially-more than the potential-for-harm of any alleged or actual public-nuisance violation that is entirely within the confines of a single (human-inhabited) private-property.

# ¶801

Enjoins Defendants, their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with Defendants - by way of any direct or indirect action, conduct, behavior, policy or practice - either individually or in a conspiracy - and in any manner, shape or form - from:

01. Harassing any person because of race and/or color and/or religion and/or disability and/or national origin; AND

02. Denying housing, or otherwise making housing unavailable to any person because of race and/or color and/or religion and/or disability and/or national origin; AND

03. Evicting any person or any person's guest because of race and/or color and/or religion and/or disability and/or national origin; AND

04. Providing any person different housing services or facilities because of race and/or color and/or religion and/or disability and/or national origin; AND

05. Failing or delaying any service(s) to any person because of race and/or color and/or religion and/or disability and/or national origin; AND

06. Discouraging or deterring any person from the purchase or rental of housing because of race and/or color and/or religion and/or disability and/or national origin; AND

07. Discouraging, deterring any person from (or punishing any person for) continued residence at housing because of race and/or color and/or religion and/or disability and/or national origin; AND

08. Assigning any person to a particular building or neighborhood or section of a building or neighborhood, because of race and/or color and/or religion and/or disability and/or national origin; AND

09. Retaliating against any person who has filed any type of fair-housing-complaint (including, but not limited to, hate-crime-report) or assisted in any type of fair-housing-investigation (including, but not limited to, hate-crime-investigation); AND

10. Denying, depriving or otherwise limiting any person of minority race and/or religion and/or national origin from such person's protected racial, religious and/or national practice(s) and/or lifestyle(s) and/or clothing and/or grooming ; AND

11. Vandalizing and/or attempting to vandalize and/or participating in any conspiracy to vandalize any part of a person's private-property because of race and/or color and/or religion and/or disability and/or national origin.

12. Engaging in any crime against any person and/or person's private-property because of race and/or color and/or religion and/or disability and/or national origin.

13. Denying, depriving or otherwise limiting reasonable accommodations and/or reasonable modifications that may be necessary to allow any person with disabilities to enjoy their housing; AND

14. Making, printing or publishing any notice, statement or advertisement with respect to housing that indicates any preference, limitation or

discrimination because of race and/or color and/or religion and/or disability and/or national origin; AND

15. Imposing different costs, benefits or burdens with respect to housing because of race and/or color and/or religion and/or disability and/or national origin; AND

16. Using different qualification criteria with respect to housing services because of race and/or color and/or religion and/or disability and/or national origin; AND

17. Limiting terms, conditions, privileges and/or services with respect to housing because of race and/or color and/or religion and/or disability and/or national origin; AND

18. Discriminating in the terms, conditions, or privileges of housing and/or housing-services and/or housing-facilities in connection therewith, because of race and/or color and/or religion and/or disability and/or national origin; AND

19. For profit, persuading, or trying to persuade, homeowners to sell their homes by suggesting that people of a particular protected characteristic are about to move into the neighborhood (*"blockbusting"*); AND

20. Coercing, intimidating, threatening, or interfering with any person in the exercise or enjoyment of, or on account of her having exercised or enjoyed, or on account of her having aided or encouraged any other person in the exercise or enjoyment of, any fair housing right granted or protected by [42-USC-C45-SI-§3603],[42-USC-C45-SI-§3604],[42-USC-C45-SI-§3605],[42-USC-C45-SI-§3606]; AND

21. Violating any aspect(s) of the aforestated Court-ordered declaratory-relief; AND

22. Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory or otherwise unlawful conduct in the future and to eliminate, to the extent practicable, the effects of Defendants' discriminatory or otherwise unlawful conduct.

# ¶802

Enjoins Defendants [WCCO], [WCSO], and [WCCHD] - and their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with Defendants [WCCO], [WCSO], and [WCCHD] - by way of all direct and indirect actions, conducts, behaviors, policies and practices - and in all manners, shapes and forms - to:

01. Make any-and-all necessary modifications to such Defendants' policies, practices, and procedures to comply with any-and-all aspects of the [FHA],[TFHA], other related anti-discrimination/anti-racial-profiling laws of the State of Texas, all of the civil-rights-laws of the United States and/or the State of Texas, along with any-and-all of the aforestated Court-ordered declaratory-relief; AND

02. Fully-Train any-aud-all of such Defendants' current and/or future employees and/or agents with responsibilities related to the design, implementation, and operation of such Defendants' housing-related services on the [FHA],[TFHA], along with any-and-all of the Court-ordered declaratory-relief; AND

03. Fully-Train any-and-all of such Defendants' current and/or future employees and/or agents to fully-understand and to fully-respect the civil-rights-laws of the United States and the State of Texas - to the maximum extent that such laws fully-protect and equally-protect the civil-rights of **all** private-citizens of the United States and the State of Texas : AND

04. Fully-Allow federal-law-enforcement's monitoring (see below) of such Defendants' policies, practices and procedures for a period of at least 10 years to ensure future compliance with the [FHA],[TFHA], other related anti-discrimination/anti-racial-profiling laws of the State-of-Texas, all civil-rights-laws of the United States and the State of Texas, along with any-and-all of the aforestated Court-ordered

declaratory-relief ; AND

05.   Meticulously document, maintain, retain and preserve, in pristine and original condition, any-and-all fully-detailed records that fully
allows for the aforestated compliance-monitoring (see below) by federal-law-enforcement.


# ¶803

Orders Federal-Law-Enforcement to monitor (as alluded-to above), for a period of at least 10 years, Defendants [WCCO], [WCSO], and
[WCCHD] - including their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with
Defendants [WCCO], [WCSO], and [WCCHD] - in-order-to ensure that such parties are fully complying with all of the terms-and-conditions
of the [FHA],[TFHA], other related anti-discrimination/anti-racial-profiling laws of the State of Texas, all of the civil-rights-laws of the United-
States and the State of Texas, along with all the aforestated Court-ordered declaratory-relief.


# ¶804

Orders Federal-Law-Enforcement to fully-investigate Defendants [WCCO], [WCSO], and [WCCHD] - and their agents, employees, assigns,
successors, and all other persons and entities in active concert or participation with Defendants [WCCO], [WCSO], and [WCCHD] - with the
same type of thorough-federal-investigation done for the {Louisville Metro Police Department} and the {Minneapolis Police
Department}.


# ¶805

Requires such action by Defendants as may be necessary to restore the plaintiff - harmed by the Defendants' egregiously-violative, cumulative-
and-aggregate actions, conducts, behaviors, polices and practices - to the position the plaintiff would have occupied but for the Defendants'
egregiously-violative, cumulative-and-aggregate actions, conducts, behaviors, polices and practices against the plaintiff, including but not limited
to:

01.   Requiring Defendants to issue a public letter-of-apology to plaintiff, in which the defendants fully and publicly:

Ⓐ admit to all of the plaintiff's allegations, claims and subclaims against the defendants, as substantially presented in this complaint ;
AND

Ⓑ accept the truthfulness, legitimacy and necessity of all of the aforestated Court-ordered declaratory-relief as sought by the plaintiff.

02.   Requiring Defendants to, after privately (and securely) submitting any-and-all of such information to the plaintiff during the processes of
Discovery/Depositions of this case, permanently expunge any-and-all records-of and/or information-of and/or related-to, any aspect of
the Defendants' fraudulent and purely-retaliatory enforcement actions taken against the plaintiff - including, but not limited to, the
fraudulent Class-C-Misdemeanor-Public-Nuisance charge and purely-retaliatory prosecution against the plaintiff - from the years of
{2009} through {2022}.

03.   Requiring Defendants to restore all of the plaintiff's multiple businesses to original and/or undamaged condition prior to the plaintiff being
injured in such businesses by the defendants' egregiously-violative, cumulative-and-aggregate actions, conducts, behaviors, polices and
practices.

04.   Requiring Defendants to restore all of the plaintiff's private-property to original and/or undamaged condition prior to the plaintiff being

injured in such private-property by the defendants' egregiously-violative, cumulative-and-aggregate actions, conducts, behaviors, polices and practices.

05. ____

# ¶806

Enjoins Defendants, their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with Defendants - by way of any direct or indirect action, conduct, behavior, policy or practice - either individually or in a couspiracy - and in any manner, shape or form - from participating (or conspiring-to-participate or attempting-to-participate) in any racketeering-enterprise ([18-USC-PI-C96-§1961],[18-USC-PI-C96-§1962]) and/or committing (or conspiring-to-commit or attempting-to-commit) any racketeering-act(s) (as specified in [18-USC-PI-C96-§1961]) against any person, including, but not limited to:

01. Obstruction-of-Justice, and particularly, the Omnibus-Clause, [18-USC-PI-C73-§1503] ; AND

02. Retaliating-against-Witness, [18-USC-PI-C73-§1513],[TPeC-T8-C36-§36.06] ; AND

03. Wire-Fraud, [18-USC-PI-C63-§1343] ; AND

04. Mail-Fraud, [18-USC-PI-C63-§1341] ; AND

05. Witness-Tampering, [18-USC-PI-C73-§1512],[TPeC-T8-C36-§36.05] ; AND

06. Witness-Intimidation, [18-USC-PI-C73-§1512],[TPeC-T8-C36-§36.05] ; AND

07. Evidence-Tampering and/or Evidence-Destruction and/or Fabricated-Evidence, [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1512],[18-USC-PI-C73-§1519],[TPeC-T8-C37-§37.09],[TPeC-T7-C32-§32.47] ; AND

08. Blackmail/Extortion, [18-USC-PI-C41-§873] ; AND

09. Interfere-with-Commerce-by-Threats-or-Violence, [18-USC-PI-C95-§1951],[18-USC-PI-C96-§1959] ; AND

10. Threat(s)-Involving-Murder, [18-USC-PI-C96-§1961],[18-USC-PI-C96-§1959] ; AND

11. ____

12. ____

# ¶807

Enjoins Defendants, their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with Defendants - by way of any direct or indirect action, conduct, behavior, policy or practice - either individually or in a conspiracy - and in any manner, shape or form - from violating the following federal laws protecting the rights of any-and-all person(s) of the United States, including but not limited to, the plaintiff:

01. Deprivation of rights under color of law, [18-USC-PI-C13-§242] ; AND

02. Conspiracy against rights, [18-USC-PI-C13-§241]; AND

03. Interference, coercion, or intimidation, [42-USC-C45-SI-§3617],[42-USC-C45-SII-§3631],[TPrC-T15-C301-SI-§301.171],[18-USC-PI-C13-§245]

## ¶808

Enjoins Defendants [WCCO],[WCCHD],[WCSO],[WCCAO],[WCDAO] - and their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with Defendants - to:

01.  Fully enforce, without exception, and to the fullest extent of the law, all of the Hate-Crime laws of the State of Texas, including but not limited to: [TPrC-T15-C301-SI-§301.171],[TPeC-T3-C12-SD-§12.47],[TCoCP-T1-C42-A42.014] ; AND

02.  Fully enforce, without exception, and to the fullest extent of the law, all of the Harassment/Stalking/Disorderly-Conduct laws of the State of Texas, including but not limited to: [TPeC-T9-C42-§42.07],[TPeC-T9-C42-§42.072],[TPeC-T9-C42-§42.01] ; AND

03.  Fully enforce, without exception, and to the fullest extent of the law, all of the Abuse-of-Office laws of the State of Texas, codified in [TPeC-T8-C39], including but not limited to: [TPeC-T8-C39-§39.03],[TPeC-T8-C39-§39.02],[TPeC-T8-C39-§39.06] ; AND

04.  Fully enforce, without exception, and to the fullest extent of the law, all of the Bribery-and-Corrupt-Influence laws of the State of Texas, codified in [TPeC-T8-C36], including but not limited to: [TPeC-T8-C36-§36.05],[TPeC-T8-C36-§36.06] ; AND

05.  Fully enforce, without exception, and to the fullest extent of the law, all of the Perjury-and-Other-Falsification laws of the State of Texas, codified in [TPeC-T8-C37], including but not limited to: [TPeC-T8-C37-§37.09] ; AND

06.  Fully enforce, without exception, and to the fullest extent of the law, all of the Fraud laws of the State of Texas, codified in [TPeC-T7-C32], including but not limited to: [TPeC-T7-C32-§32.46], [TPeC-T7-C32-§32.47], [TPeC-T7-C32-§32.51] and [TPeC-T7-C32-§32.32] ; AND

07.  Fully enforce, without exception, and to the fullest extent of the law, the Government-Discrimination laws of the State of Texas, codified in [TCPaRC-T5-C106], including but not limited to: [TCPaRC-T5-C106-§106.001]; AND

08.  Fully enforce, without exception, and to the fullest extent of the law, the Racial-Profiling law of the State of Texas, codified in [TCoCP-T1-C2-A2.131]; AND

09.  Fully prioritize, to the highest level of priority, the investigation, charging and prosecution of: felony-crimes (including all retaliatory crimes), violent-crimes/assaultive-crimes, hate-crimes, burglary-crimes, bribery-and-corrupt-influence-crimes, perjury-and-other-falsification-crimes, racketeering-acts, robbery/theft-crimes, harassment/stalking/disorderly-conduct crimes, abuse-of-office-crimes, government-discrimination-crimes, civil-rights-violations, criminal-mischief-crimes, fraud-crimes; AND

10.  Fully deprioritize, to the lowest level of priority, the investigation, charging and prosecution of, alleged private-property-maintenance-violations (of any kind), while only focusing on such alleged private-property-maintenance-violations that actually cause harm **and** where the accused-person(s) have been known to act maliciously or recklessly.

11.  Fully and timely release (within a reasonable amount of time) to the local-news-media and/or local-civil-rights-organizations - Body-Worn-Camera-Recordings and/or Dash-Camera-Recordings and/or other documentary-evidence, documenting acts of [WC] police-misconduct and/or other [WC] law-enforcement-misconduct and/or other [WC] government-misconduct - as the interest-of-justice demands that the general-public - and, in particular, the county taxpayers - have the right to be fully-aware of such government-misconduct.

## ¶809

Enjoins Defendants [WCCO],[WCCHD],[WCSO],[WCCAO],[WCDAO] - and their agents, employees, assigns, successors, and all other

persons and entities in active concert or participation with Defendants - by way of any direct or indirect action, conduct, behavior, policy or practice - either individually or in a conspiracy - and in any manner, shape or form - from:

01. Misinterpreting and/or abusively enforcing any aspect of the private-property-maintenance-laws in any manner that discriminatorily and/or disproportionately targets any person(s)-of-color - especially, those person(s)-of-color residing within White neighborhoods.

02. Criminalizing any person(s)-of-color - especially, those person(s)-of-color residing within White neighborhoods - for such person(s)-of-color's innocent failure and/or *"inability"* to maintain such person(s)-of-color's private-property according to any White-American standard(s).

03. Acting upon anonymous complaint(s) alleging private-property-maintenance-violations.

04. Acting upon any private-property-maintenance-complaint(s) from any accuser-person - including, but not limited to a [HOA], a [HOA-BoD], a [HOA] property-management-company, a [HOA] property-management-company-employee - that has not directly witnessed such alleged private-property-maintenance-violation.

05. Upon investigating any alleged complaint of private-property-maintenance-violation, failing to immediately-disclose to such accused-person(s) accused of an alleged private-property-maintenance-violation, the full names and addresses of the accuser-person(s).

06. Hiring any prospective employee/official/officer (police-officer, health-district-sanitarian, prosecutor, etc.) with even one (or more), verified/authenticated/substantiated prior incidence of misconduct (of any type or form) - whether official misconduct, off-duty criminal-offense or lawsuit indicating misconduct (of any type or form).

07. Hiring any prospective employee/official/officer (police-officer, health-district-sanitarian, prosecutor, etc.) with any (current or former) ties to far-right-wing-extremist and/or White-Supremacist group(s)/movement(s) such as, but not limited to: the *"Proud Boys"*, the *"Boogaloo Movement"*, the *"Sovereign Citizen Movement"*, the *"QAnon Movement"*, the *"Oath Keepers Movement"*, the *"Ku Klux Klan"*, the Neo-Nazis, the Skinheads, any Militia-Movement(s), any Christian-Identity-Movement(s).

08. Hiring any prospective employee/official/officer (police-officer, health-district-sanitarian, prosecutor, etc.) that has made any favorable and/or sympathetic social-media-posting (or writings/messages of any kind) about any far-right-wing-extremist and/or White-Supremacist group(s)/movement(s), including, but not limited to: the *"Proud Boys"*, the *"Boogaloo Movement"*, the *"Sovereign Citizen Movement"*, the *"QAnon Movement"*, the *"Oath Keepers Movement"*, the *"Ku Klux Klan"*, the Neo-Nazis, the Skinheads, any Militia-Movement(s), any Christian-Identity-Movement(s).

# ¶810

Enjoins Defendants [WCCHD],[WCCO],[WCSO] - and their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with Defendants [WCCHD],[WCCO],[WCSO] - from:

01. Creating any public-health policy that violates any harmless Constitutional-or-Statutory right(s) (including religious practice(s)) of any person exercising and/or enjoying such right(s) exclusively within the confines of such person's private-property - especially, the exercise and/or enjoyment of such right(s) within the interior of such person's residential-building ("house").

02. Implementing and/or Enforcing any public-health policy (including any existing policy) that violates any harmless Constitutional-or-Statutory right(s) (including religious practice(s)) of any person exercising and/or enjoying such right(s) exclusively within the confines of such person's private-property - especially, the exercise and/or enjoyment of such right(s) within the interior of such person's house.

03. Creating any public-health policy that regulates, restricts or prohibits any harmless conditions (including purely-aesthetic or purely-cosmetic conditions) within a person's private-property.

04. Implementing and/or Enforcing any public-health policy (including any existing policy) that regulates, restricts or prohibits any harmless conditions (including purely-aesthetic or purely-cosmetic conditions) within a person's private-property.

05. Misinterpreting and/or Abusively-Enforcing any part or text of the [THaSC], including, but not limited to, the Texas-Public-Nuisance-Law.

06. Executing any search/seizure of any private-area(s) (including curtilage-area(s)) of a person's private-property - especially, any area(s) of a person's private-property that are not visible from the public street - without a valid search-warrant lawfully obtained with sufficient probable-cause for a crime *"already having been committed"*, unless there exists one-or-more of those *"exigent circumstances"* specifically-recognized by the Federal-Courts that allows law-enforcement to lawfully execute an exceptional search/seizure without such search-warrant.

07. Executing any search-warrant in any unlawful manner - that is, any manner that does not lawfully follow the legal procedure prescribed by both State-Law and Federal-Law.


# ¶811

Enjoins Defendants [WCCAO],[WCDAO] - and their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with Defendants [WCCAO],[WCDAO] - to:

01. Fully investigate any-and-all cases, without exception, of suspected [WC] police-misconduct, any other suspected [WC] law-enforcement-misconduct, or any other [WC] government-misconduct, whenever, wherever and as-soon-as such prosecutor's offices become-aware-of and/or suspect such misconduct, and furthermore, wherever the evidence resulting from such investigation warrants criminal prosecution, prosecute such [WC] police-officer(s) and/or such [WC] law-enforcement-employee(s) and/or such [WC] government-employee(s) for such substantiated misconduct - and to the fullest extent of the law.

02. ____


# ¶812

Enjoins Defendants [WCCAO],[WCDAO] - and their agents, employees, assigns, successors, and all other persons and entities in active concert or participation with Defendants [WCCAO],[WCDAO] - from:

01. Violating any aspect or text of: 【Texas Code of Criminal Procedure: Title 1. Code Of Criminal Procedure: Chapter 2. General Duties of Officers: Art. 2.01. Duties of District Attorneys】 ([TCoCP-T1-C2-A2.01]).

02. Violating any rule of the 【Texas Disciplinary Rules of Professional Conduct: III. Advocate.: Rule 3.09 Special Responsibilities of a Prosecutor】 , but specifically, rules: [TDRoPC-III-Rule-3.09], [TDRoPC-VIII-Rule-8.04], and [TDRoPC-VIII-Rule-8.03].

## ¶813

Enjoins Defendant [WC] and/or Defendant [WC]'s applicable department(s), bureau(s), board(s), commission(s), office(s), agency(s), council(s), and/or commissioners-court(s) to grant *"SPECIAL EXCEPTION OR VARIANCE TO PUBLIC NUISANCE CLASSIFICATION"* ([THaSC-T5-SA-C343-SB-§343.0111]) to any resident within the County of Williamson that legitimately, genuinely and harmlessly maintains his/her private-property in such manner that:

01 . is required by such resident's Constitutionally-or-Statutorily-protected religious/cultural view(s)/practice(s); OR

02 . is protected by such resident's Constitutionally-or-Statutorily-protected other first-amendment-rights (under the freedom-of-expression and/or political-speech and/or art); OR

03 . otherwise *"promotes justice"*.

## ¶814

Enjoins Defendant [WC] and/or Defendant [WC]'s applicable department(s), bureau(s), board(s), commission(s), office(s), agency(s), council(s), and/or commissioners-court(s) to require the execution of a affidavit (made *"under penalty of perjury"*) of any accuser-person(s) (including, but not limited to, any member of law-enforcement) seeking to file a complaint of (civil or criminal) private-property *("curable")* Public-Nuisance-violation (a private-property violation under Texas law [THaSC-T5-SA-C343] or [THaSC-T5-SA-C341]) and/or (civil) private-property *("curable")* restrictive-covenant-violation (a private-property violation under civil contract law) against any accused-person(s). Defendant [WC] shall prescribe a standardized form for such affidavit to be available for online download at Defendant [WC]'s website, and Defendant [WC] shall also provide physical copies of such standardized affidavit form to any-and-all accuser-person(s) seeking to file such complaint. The contents of such standardized affidavit form shall include all of the following, in which such accuser-person(s) - the affiant(s) - shall fully-affirm to all of the following:

01 . such accuser-person(s) have never committed nor conspired-to-commit any crime, civil-rights-violation or otherwise abusive-action against such accused-person(s) or the private-property(s) owned by such accused-person(s).

02 . such accuser-person(s) have never demonstrated - through actions, conducts, behaviors, policies or practices - any type of animus, hostility and/or abuse against such accused-person(s).

03 . such accuser-person(s) are not involved and have never been involved in any conspiracy-to-interfere-with-civil-rights (whether with or without law-enforcement, whether with or without [HOA]) of the accused-person(s).

04 . such accuser-person(s) have never provided any bit of false-information or misleading-information regarding such accused-person(s) or the private-property(s) owned by such accused-person(s) to any other person and/or organization (as a form of witness-tampering or as part of a conspiracy/collusion) or to any of Defendant [WC]'s department(s), bureau(s), board(s), commission(s), office(s), agency(s), council(s), and/or commissioners-court(s).

05 . such accuser-person(s) have never, *"under color of law"* or otherwise, conducted any unlawful and/or unconstitutional search and/or seizure of the accused-person(s) private-property, including but not limited to, the unauthorized/nonconsensual sharing/dissemination of photograph(s)/video(s) of private/curtilage areas of the accused-person(s) private-property to any other person(s) and/or organization(s).

06 . such accuser-person(s) have fully-read and fully-understand all of the text of the [FHA] (codified under [42-USC-C45]), all of the

text of the [TFHA] (codified under [TPrC-T15-C301]), all of the text of the Public-Nuisance-law (codified under [THaSC-T5-SA-C343],[THaSC-T5-SA-C341],[THaSC-T5-SB-C365]), all of the text of the Texas law governing restrictive-covenants (codified under [TPrC-T11]), and particularly, all of the text of the Texas law governing property-owners' rights (codified under [TPrC-T11-C202] and [TPrC-T11-C209]).

07. such accuser-person(s) are making a completely truthful, accurate and legitimate complaint about the alleged Public-Nuisance-violation and/or alleged restrictive-covenant-violation of accused-person(s), that is fully-compliant-with and also not in violation of any of the aforementioned laws/rights, and without acting in any discriminatory or fraudulent manner, whatsoever, towards the accused-person(s).

08. such accuser-person(s) are making a completely truthful, accurate and legitimate complaint about the alleged Public-Nuisance-violation and/or alleged restrictive-covenant-violation of accused-person(s) within the appropriate statute-of-limitations - as any object(s) and/or condition(s) on the accused-person(s)' private-property that has existed for a period of two-or-more years in the case of alleged Public-Nuisance-violation or for a period of three-or-more years in the case of restrictive-covenant-violation is beyond the statute-of-limitations, and thus, unactionable, due to the expiration of such statute-of-limitations. Furthermore, it is incumbent upon the accuser-person(s) to prove by *"clear and convincing"* evidence that the accuser-person(s) is timely raising such legitimate complaint within the appropriate statute-of-limitations.

09. such accused-person(s), of such alleged Public-Nuisance-violation and/or alleged restrictive-covenant-violation, in committing such alleged violation, have acted either with deliberate malice **or** with deliberate recklessness **or** or in a brazenly negligent manner against the accuser-person(s).

10. such accused-person(s) have caused demonstrable harm(*) (by *"clear and convincing"* evidence) or are highly-likely to cause harm(*) (by *"clear and convincing"* evidence), onto such accuser-person(s) by such alleged Public-Nuisance-violation and/or alleged restrictive-covenant-violation.

(*) Any baseless or unsubstantiated allegation by the accuser-person(s) of *"reduction of property value(s)"* allegedly caused by the accused-person(s) and/or the accused-person(s)' private-property is never to be considered *"harm"*.

(*) Any baseless or unsubstantiated allegation by the accuser-person(s) that the accuser-person(s) is not able to sell or lease his/her private-property because of the accused-person(s) and/or the accused-person(s)' private-property is never to be considered *"harm"*.

(*) Any allegation by the accuser-person(s) regarding purely aesthetic/cosmetic (thus harmless) violation(s), such as alleged *"unsightly condition(s)"*, especially within private areas of private-property (such as the concealed backyard or the concealed front-porch), is never to be considered *"harm"*.

(*) If there exists an opaque-privacy-fence (of 6-feet-tall or taller) separating any private-or-confined-area of the private-properties of the accused-person(s) and the accuser-person(s), and the alleged Public-Nuisance-violation and/or alleged restrictive-covenant-violation occurs within such private-or-confined-area confined by such opaque-privacy-fence, then the accuser-person(s) still has indisputable proof of such demonstrable harm or the high-likelihood of such harm spreading and/or spilling under, over or through

such opaque-privacy-fence from the accused-person(s) private-property and onto the accuser-person(s) private-property.

11. This affidavit only applies to alleged, *"curable"* violations, as defined by [TPrC-T11-C209], such as:

Ⓐ any parking violation

Ⓑ any maintenance violation

Ⓒ any failure to construct improvements or modifications in accordance with approved plans and specifications

Ⓓ any ongoing noise violation such as a barking dog

12. Thus, this affidavit does not apply to alleged *"uncurable"* and/or one-time and/or sporadic and/or randomly-occurring violation(s), as defined by [TPrC-T11-C209], such as, but not limited to:

Ⓐ shooting fireworks

Ⓑ any act constituting a (immediate) threat to health or safety

Ⓒ any noise violation that is not ongoing

Ⓓ property damage, including the removal or alteration of landscape

Ⓔ holding a garage sale or other event prohibited by a dedicatory instrument

13. A verbatim copy of this affidavit by the accuser-person(s) shall be delivered both by certified-mail-return-receipt-requested **and** by regular-mail to the accused-person(s), at least 30 days prior to the accuser-person(s) proceeding in filing such official complaint of Public-Nuisance-violation and/or restrictive-covenant-violation, with the accuser-person(s) providing the accused-person(s) with such 30-day-time-period for such accused-person(s) to either cure/abate the alleged violation and/or for such accused-person(s) to provide other written-response directly-addressing and/or denying such alleged violation by both certified-mail-return-receipt-requested **and** by regular-mail both to the accuser-person(s).

14. If, after having *"clear and convincing"* evidence that the accused-person(s) has not provided any such adequate written-response directly-addressing such alleged violation (in such affidavit) **and** that the accused-person(s) maliciously, recklessly or negligently failed to cure/abate the alleged harmful violation at the end of the 30-day-period, the accuser-person(s) fails to file a complaint against the accused-person(s), in the case of an alleged Public-Nuisance-violation, within 2 years after the termination of the aforementioned 30-day-period or, in the case of an alleged restrictive-covenant-violation, within 3 years after the termination of the aforementioned 30-day-period, the accused-person(s) permanently waives his/her right to file such complaint, at the very least, on that originally-raised allegation, as a result of the expiration of the statute-of-limitations.

# ¶815

Awards appropriate fees, costs and monetary damages - as specified in the following section(s) - to the plaintiff that was harmed by the Defendants' egregiously-violative, cumulative and aggregate actions, conducts, behaviors, policies and practices against the plaintiff from the years of {2009} through {2023} (detailed in this complaint), as authorized by [42-USC-C45-SI-§3613] and [TPrC-T15-C301-SH-§301.153] and [18-USC-PI-C96-§1964] and [42-USC-C21-SI-§1983] and [42-USC-C21-SI-§1985] and [42-USC-C21-SI-§1988].

# ¶816

Granting the preliminary ex-parte gag order, and the preliminary ex-parte protective orders sought by the plaintiff - as fully detailed in a

following section (see section below).

## ¶817

Granting plaintiff such additional and further relief as the interest-of-justice may require.

---

# §XXXVII

# REQUESTED RELIEF: DAMAGES, FEES AND COSTS

## ¶818

The plaintiff seeks any-and-all reasonable attorneys' fees, any-and-all expert-witness fees, and any-and-all costs associated with all aspects of the filing and litigation of this lawsuit from all of the defendants, as per:

01. [42-USC-C45-SI-§3613(c)(2)],[TPrC-T15-C301-§301.153(2,3)] concerning defendants' numerous [FHA],[TFHA] violations against plaintiff ; AND

02. [42-USC-C21-SI-§1988(b)] concerning defendants' numerous deprivation-of-rights-under-color-of-law violations against plaintiff under the [KKKA]:§1983 ; AND

03. [42-USC-C21-SI-§1988(b)] concerning defendants' numerous conspiracy-to-interfere-with-civil-rights violations against plaintiff under the [KKKA]:§1985 ; AND

04. [18-USC-PI-C96-§1964(c)] concerning defendants' numerous [RIaCOA] violations against plaintiff ; AND

05. [42-USC-C21-SI-§1988(b)] concerning defendants' numerous violations of plaintiff's property-rights-of-citizens under the [CRAo1866]:§1982 ; AND

06. [42-USC-C21-SI-§1988(b,c)] concerning defendants' numerous violations of plaintiff's equal-rights-under-the-law under the [CRAo1866]:§1981 ; AND

07. [42-USC-C21-SV-§2000d–7] concerning defendants' numerous discrimination-under-federally-assisted-programs violations against plaintiff's under [42-USC-C21-SV-§2000d].

## ¶819

The plaintiff asserts that the primary-defendants - [WC], [JSP&KAP], [RSR], [WCCO], [WCSO], and [WCCHD] - are jointly and severally liable to the plaintiff for the primary-defendants' violations of federal laws, state laws and the common-law against the plaintiff because these defendants acted *"in concert with"* each other in-order-to:

Ⓐ violate the plaintiff's rights ; AND

Ⓑ deprive the plaintiff of the plaintiff's rights ; AND

Ⓒ conspire to interfere with the plaintiff's rights ; AND

Ⓓ directly injure the plaintiff ; AND

Ⓔ conspire to injure the plaintiff ; AND

Ⓕ injure the plaintiff in the plaintiff's businesses ; AND

Ⓖ conspire to injure the plaintiff in the plaintiff's businesses ; AND

Ⓗ injure the plaintiff in the plaintiff's properties ; AND

Ⓘ conspire to injure the plaintiff in the plaintiff's properties -


- under those laws.


# ¶820

From defendant [WC], the plaintiff seeks:


Ⓐ    punitive damages for defendant [WC]'s numerous violations of the [FHA] and [TFHA] against the plaintiff as authorized by [42-USC-C45-SI-§3613(e)(1)] and [TPrC-T15-C301-§301.153(1)] (respectively) - with the specific amount(s) awarded in punitive damages to be determined by the Jury in this case.


Ⓑ    compensatory damages of $2,097,152 for defendant [WC]'s:

01.   numerous violations of the [FHA],[TFHA] against the plaintiff as per [42-USC-C45-SI-§3613(c)(1)],[TPrC-T15-C301-§301.153(1)].

02.   numerous violations of the [KKKA]:§1983 (Deprivation-Of-Rights-Under-Color-of-Law) against the plaintiff as per [42-USC-C21-SI-§1983],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§242].

03.   numerous violations of the [KKKA]:§1985 (Conspiracy-To-Interfere-With-Civil-Rights) against the plaintiff as per [42-USC-C21-SI-§1985],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§241].

04.   numerous violations of the [RIaCOA] against the plaintiff as per [18-USC-PI-C96-§1964].

05.   numerous violations of the [CRAo1866]:§1982 (Property-Rights-Of-Citizens) against the plaintiff as per [42-USC-C21-SI-§1982],[42-USC-C21-SI-§1988].

06.   numerous violations of the [CRAo1866]:§1981 (Equal-Rights-Under-The-Law) against the plaintiff as per [42-USC-C21-SI-§1981],[42-USC-C21-SI-§1988].

07.   numerous violations of the [CRAo1964]:§2000d (Discrimination-under-Federally-Assisted-Programs) against the plaintiff as per [42-USC-C21-SV-§2000d],[42-USC-C21-SV-§2000d-7].

08.   numerous violations against the plaintiff of the Intimidation/Interference law specified in [42-USC-C45-SI-§3617],[42-USC-C45-SII-§3631],[TPrC-T15-C301-SI-§301.171].

09.   numerous violations against the plaintiff of the Discrimination law specified in [TCPaRC-T5-C106].

10.   numerous violations against the plaintiff of the Racial-Profiling law specified in [TCoCP-T1-C2-A2.131].

11.  numerous violations against the plaintiff of the Disorderly-Conduct/Harassment/Stalking law specified in [TPeC-T9-C42-§42.01], [TPeC-T9-C42-§42.07],[TPeC-T9-C42-§42.072].

12.  numerous violations against the plaintiff of the Obstruction/Retaliation law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1513],[TPeC-T8-C36-§36.06].

13.  numerous violations against the plaintiff of the Witness-Intimidation/Witness-Tampering law specified in [18-USC-PI-C73-§1512], [TPeC-T8-C36-§36.05].

14.  one-or-more violations against the plaintiff of the Fabricated-Evidence law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1519],[TPeC-T8-C37-§37.09].

15.  numerous violations against the plaintiff of the Fraud law specified in [18-USC-PI-C63-§1341],[18-USC-PI-C63-§1343],[TPeC-T7-C32].

16.  numerous violations against the plaintiff of the Blackmail/Extortion law specified in [18-USC-PI-C41-§873],[TPeC-T7-C31].

17.  numerous violations against the plaintiff of the Interference-with-Commerce-by-Threats-or-Violence law specified in [18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959].

18.  numerous violations against the plaintiff of the Interference-with-Federally-Protected-Activities law specified in [18-USC-PI-C13-§245] (Δ).

19.  numerous violations against the plaintiff of the Abuse-of-Office law specified in [TPeC-T8-C39-§39.03],[TPeC-T8-C39-§39.02], [TPeC-T8-C39-§39.06].

20.  numerous violations against the plaintiff of the Criminal-Conspiracy law specified in [TPeC-T4-C15-§15.02].

21.  numerous violations against the plaintiff of the Obstruction-of-Justice law specified in [18-USC-PI-C73-§1503].

22.  infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 12 years), negligent-infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 12 years), loss-of-enjoyment-of-life, fraud, false-imprisonment/detention, breach-of-duty, malfeasance, malpractice, defamation, trespassing, invasion-of-privacy, intrusion-upon-physical-solitude, public-disclosure-of-private-facts, breach-of-confidence, abuse-of-process, abuse-of-position-of-trust, selective-enforcement, tortious-interference, restraints-on-trade, conspiracy/collusion - all, against the plaintiff.

## ¶821

From defendants [JSP&KAP], the plaintiff seeks:

Ⓐ  punitive damages for defendants [JSP&KAP]'s numerous violations of the [FHA] and [TFHA] against the plaintiff as authorized by [42-USC-C45-SI-§3613(c)(1)] and [TPrC-T15-C301-§301.153(1)] (respectively) - with the specific amount(s) awarded in punitive damages to be determined by the Jury in this case.

Ⓑ  compensatory damages of $4,194,304 for defendants [JSP&KAP]'s:

01.  numerous violations of the [FHA],[TFHA] against the plaintiff as per [42-USC-C45-SI-§3613(c)(1)],[TPrC-T15-C301-§301.153(1)].

02. numerous violations of the [KKKA]:§1983 (Deprivation-Of-Rights-Under-Color-of-Law) against the plaintiff as per [42-USC-C21-SI-§1983],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§242].

03. numerous violations of the [KKKA]:§1985 (Conspiracy-To-Interfere-With-Civil-Rights) against the plaintiff as per [42-USC-C21-SI-§1985],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§241].

04. numerous violations of the [RIaCOA] against the plaintiff as per [18-USC-PI-C96-§1964].

05. numerous violations of the [CRAo1866]:§1982 (Property-Rights-Of-Citizens) against the plaintiff as per [42-USC-C21-SI-§1982],[42-USC-C21-SI-§1988].

06. numerous violations of the [CRAo1866]:§1981 (Equal-Rights-Under-The-Law) against the plaintiff as per [42-USC-C21-SI-§1981],[42-USC-C21-SI-§1988].

07. numerous violations of the [CRAo1964]:§2000d (Discrimination-under-Federally-Assisted-Programs) against the plaintiff as per [42-USC-C21-SV-§2000d],[42-USC-C21-SV-§2000d-7].

08. multiple violations of the [HCPA] against the plaintiff as per [18-USC-PI-C13-§249].

09. numerous violations of the [CHCA] against the plaintiff as per [135-USSaL-265].

10. numerous violations against the plaintiff of the Intimidation/Interference law specified in [42-USC-C45-SI-§3617],[42-USC-C45-SII-§3631],[TPrC-T15-C301-SI-§301.171].

11. numerous violations against the plaintiff of the Disorderly-Conduct/Harassment/Stalking law specified in [TPeC-T9-C42-§42.01],[TPeC-T9-C42-§42.07],[TPeC-T9-C42-§42.072].

12. numerous violations against the plaintiff of the Assault/Terroristic-Threats law specified in [TPeC-T5-C22-§22.01],[TPeC-T5-C22-§22.07].

13. numerous violations against the plaintiff of the Criminal-Mischief law specified in [TPeC-T7-C28-§28.03].

14. numerous violations against the plaintiff of the Obstruction/Retaliation law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1513],[TPeC-T8-C36-§36.06].

15. numerous violations against the plaintiff of the Witness-Intimidation/Witness-Tampering law specified in [18-USC-PI-C73-§1512],[TPeC-T8-C36-§36.05].

16. numerous violations against the plaintiff of the Evidence-Tampering/Fabricated-Evidence law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1519],[TPeC-T8-C37-§37.09].

17. multiple violations against the plaintiff of the Fraud law specified in [18-USC-PI-C63-§1341],[18-USC-PI-C63-§1343],[TPeC-T7-C32].

18. numerous violations against the plaintiff of the Blackmail/Extortion law specified in [18-USC-PI-C41-§873],[TPeC-T7-C31].

19. numerous violations against the plaintiff of the Interference-with-Commerce-by-Threats-or-Violence law specified in [18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959].

20. numerous violations against the plaintiff of the Interference-with-Federally-Protected-Activities law specified in [18-USC-PI-C13-§245] (△).

21. numerous violations against the plaintiff of the Impersonator-Making-Arrest-or-Search and/or Impersonating-Public-Servant law specified in [18-USC-PI-C43-§913],[TPeC-T8-C37-§37.11].

22. numerous violations against the plaintiff of the Criminal-Conspiracy law specified in [TPeC-T4-C15-§15.02].

23. numerous violations against the plaintiff of the Obstruction-of-Justice law specified in [18-USC-PI-C73-§1503].

24. infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 13 years), negligent-infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 13 years), loss-of-enjoyment-of-life, fraud, false-imprisonment/detention, defamation, trespassing, invasion-of-privacy, intrusion-upon-physical-solitude, public-disclosure-of-private-facts, breach-of-confidence, abuse-of-process, tortious-interference, restraints-on-trade, conspiracy/collusion - all, against the plaintiff.

# ¶822

From defendant [RSR], the plaintiff seeks:

Ⓐ   punitive damages for defendant [RSR]'s numerous violations of the [FHA] and [TFHA] against the plaintiff as authorized by [42-USC-C45-SI-§3613(c)(1)] and [TPrC-T15-C301-§301.153(1)] (respectively) - with the specific amount(s) awarded in punitive damages to be determined by the Jury in this case.

Ⓑ   compensatory damages of $3,145,728 for defendant [RSR]'s:

01. numerous violations of the [FHA],[TFHA] against the plaintiff as per [42-USC-C45-SI-§3613(c)(1)],[TPrC-T15-C301-§301.153(1)].

02. numerous violations of the [KKKA]:§1983 (Deprivation-Of-Rights-Under-Color-of-Law) against the plaintiff as per [42-USC-C21-SI-§1983],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§242].

03. numerous violations of the [KKKA]:§1985 (Conspiracy-To-Interfere-With-Civil-Rights) against the plaintiff as per [42-USC-C21-SI-§1985],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§241].

04. numerous violations of the [RIaCOA] against the plaintiff as per [18-USC-PI-C96-§1964].

05. numerous violations of the [CRAo1866]:§1982 (Property-Rights-Of-Citizens) against the plaintiff as per [42-USC-C21-SI-§1982],[42-USC-C21-SI-§1988].

06. numerous violations of the [CRAo1866]:§1981 (Equal-Rights-Under-The-Law) against the plaintiff as per [42-USC-C21-SI-§1981],[42-USC-C21-SI-§1988].

07. numerous violations of the [CRAo1964]:§2000d (Discrimination-under-Federally-Assisted-Programs) against the plaintiff as per [42-USC-C21-SV-§2000d],[42-USC-C21-SV-§2000d-7].

08. numerous violations against the plaintiff of the Intimidation/Interference law specified in [42-USC-C45-SI-§3617],[42-USC-C45-SII-§3631],[TPrC-T15-C301-SI-§301.171].

09. numerous violations against the plaintiff of the Disorderly-Conduct/Harassment/Stalking law specified in [TPeC-T9-C42-§42.01],[TPeC-T9-C42-§42.07],[TPeC-T9-C42-§42.072].

10. one-or-more violations against the plaintiff of the Assault/Terroristic-Threats law specified in [TPeC-T5-C22-§22.01],[TPeC-T5-C22-§22.07].

11. one-or-more violations against the plaintiff of the Criminal-Mischief law specified in [TPeC-T7-C28-§28.03].

12. numerous violations against the plaintiff of the Obstruction/Retaliation law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1513],[TPeC-T8-C36-§36.06].

13. numerous violations against the plaintiff of the Witness-Intimidation/Witness-Tampering law specified in [18-USC-PI-C73-§1512], [TPeC-T8-C36-§36.05].

14. numerous violations against the plaintiff of the Evidence-Tampering law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1519], [TPeC-T8-C37-§37.09].

15. numerous violations against the plaintiff of the Fraud law specified in [18-USC-PI-C63-§1341],[18-USC-PI-C63-§1343],[TPeC-T7-C32].

16. numerous violations against the plaintiff of the Blackmail/Extortion law specified in [18-USC-PI-C41-§873],[TPeC-T7-C31].

17. numerous violations against the plaintiff of the Interference-with-Commerce-by-Threats-or-Violence law specified in [18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959].

18. numerous violations against the plaintiff of the Interference-with-Federally-Protected-Activities law specified in [18-USC-PI-C13-§245] (Δ).

19. multiple violations against the plaintiff of the Impersonator-Making-Arrest-or-Search and/or Impersonating-Public-Servant law specified in [18-USC-PI-C43-§913],[TPeC-T8-C37-§37.11].

20. numerous violations against the plaintiff of the Criminal-Conspiracy law specified in [TPeC-T4-C15-§15.02].

21. numerous violations against the plaintiff of the Obstruction-of-Justice law specified in [18-USC-PI-C73-§1503].

22. infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 14 years), negligent-infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 14 years), loss-of-enjoyment-of-life, fraud, false-imprisonment/detention, defamation, trespassing, invasion-of-privacy, intrusion-upon-physical-solitude, public-disclosure-of-private-facts, breach-of-confidence, abuse-of-process, tortious-interference, restraints-on-trade, conspiracy/collusion - all, against the plaintiff.


# ¶823

From defendant [WCCO], the plaintiff seeks:

Ⓐ punitive damages for defendant [WCCO]'s numerous violations of the [FHA] and [TFHA] against the plaintiff as authorized by [42-USC-C45-SI-§3613(c)(1)] and [TPrC-T15-C301-§301.153(1)] (respectively) - with the specific amount(s) awarded in punitive damages to be determined by the Jury in this case.


Ⓑ compensatory damages of $1,048,576 for defendant [WCCO]'s:

01. numerous violations of the [FHA],[TFHA] against the plaintiff as per [42-USC-C45-SI-§3613(c)(1)],[TPrC-T15-C301-§301.153(1)].

02. numerous violations of the [KKKA]:§1983 (Deprivation-Of-Rights-Under-Color-of-Law) against the plaintiff as per [42-USC-C21-SI-§1983],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§242].

03. numerous violations of the [KKKA]:§1985 (Conspiracy-To-Interfere-With-Civil-Rights) against the plaintiff as per [42-USC-C21-SI-§1985],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§241].

04. numerous violations of the [RIaCOA] against the plaintiff as per [18-USC-PI-C96-§1964].

05. numerous violations of the [CRAo1866]:§1982 (Property-Rights-Of-Citizens) against the plaintiff as per [42-USC-C21-SI-§1982],[42-USC-C21-SI-§1988].

06. numerous violations of the [CRAo1866]:§1981 (Equal-Rights-Under-The-Law) against the plaintiff as per [42-USC-C21-SI-§1981],[42-USC-C21-SI-§1988].

07. numerous violations of the [CRAo1964]:§2000d (Discrimination-under-Federally-Assisted-Programs) against the plaintiff as per [42-USC-C21-SV-§2000d],[42-USC-C21-SV-§2000d–7].

08. numerous violations against the plaintiff of the Intimidation/Interference law specified in [42-USC-C45-SI-§3617],[42-USC-C45-SII-§3631],[TPrC-T15-C301-SI-§301.171].

09. numerous violations against the plaintiff of the Discrimination law specified in [TCPaRC-T5-C106].

10. numerous violations against the plaintiff of the Racial-Profiling law specified in [TCoCP-T1-C2-A2.131].

11. numerous violations against the plaintiff of the Disorderly-Conduct/Harassment/Stalking law specified in [TPeC-T9-C42-§42.01], [TPeC-T9-C42-§42.07],[TPeC-T9-C42-§42.072].

12. numerous violations against the plaintiff of the Obstruction/Retaliation law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1513],[TPeC-T8-C36-§36.06].

13. numerous violations against the plaintiff of the Witness-Intimidation/Witness-Tampering law specified in [18-USC-PI-C73-§1512], [TPeC-T8-C36-§36.05].

14. one-or-more violations against the plaintiff of the Fabricated-Evidence law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1519],[TPeC-T8-C37-§37.09].

15. numerous violations against the plaintiff of the Fraud law specified in [18-USC-PI-C63-§1341],[18-USC-PI-C63-§1343],[TPeC-T7-C32].

16. numerous violations against the plaintiff of the Blackmail/Extortion law specified in [18-USC-PI-C41-§873],[TPeC-T7-C31].

17. numerous violations against the plaintiff of the Interference-with-Commerce-by-Threats-or-Violence law specified in [18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959].

18. numerous violations against the plaintiff of the Interference-with-Federally-Protected-Activities law specified in [18-USC-PI-C13-§245] (Δ).

19. numerous violations against the plaintiff of the Abuse-of-Office law specified in [TPeC-T8-C39-§39.03],[TPeC-T8-C39-§39.02],[TPeC-T8-C39-§39.06].

20. numerous violations against the plaintiff of the Criminal-Conspiracy law specified in [TPeC-T4-C15-§15.02].

21. numerous violations against the plaintiff of the Obstruction-of-Justice law specified in [18-USC-PI-C73-§1503].

22. infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 8 years), negligent-infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 12 years), loss-of-enjoyment-of-life, fraud, false-imprisonment/detention, breach-of-duty, malfeasance, malpractice, defamation, trespassing, invasion-of-privacy, intrusion-upon-physical-solitude, public-disclosure-of-private-facts, breach-of-confidence, abuse-of-process, abuse-of-position-of-trust, selective-enforcement, tortious-interference, restraints-on-trade, conspiracy/collusion - all, against the plaintiff.

# ¶824

From defendant [WCCHD], the plaintiff seeks:

Ⓐ   punitive damages for defendant [WCCHD]'s numerous violations of the [FHA] and [TFHA] against the plaintiff as authorized by [42-USC-C45-SI-§3613(c)(1)] and [TPrC-T15-C301-§301.153(1)] (respectively) - with the specific amount(s) awarded in punitive damages to be determined by the Jury in this case.

Ⓑ   compensatory damages of $1,048,576 for defendant [WCCHD]'s:

01.   numerous violations of the [FHA],[TFHA] against the plaintiff as per [42-USC-C45-SI-§3613(c)(1)],[TPrC-T15-C301-§301.153(1)].

02.   numerous violations of the [KKKA]:§1983 (Deprivation-Of-Rights-Under-Color-of-Law) against the plaintiff as per [42-USC-C21-SI-§1983],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§242].

03.   numerous violations of the [KKKA]:§1985 (Conspiracy-To-Interfere-With-Civil-Rights) against the plaintiff as per [42-USC-C21-SI-§1985],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§241].

04.   numerous violations of the [RIaCOA] against the plaintiff as per [18-USC-PI-C96-§1964].

05.   numerous violations of the [CRAo1866]:§1982 (Property-Rights-Of-Citizens) against the plaintiff as per [42-USC-C21-SI-§1982],[42-USC-C21-SI-§1988].

06.   numerous violations of the [CRAo1866]:§1981 (Equal-Rights-Under-The-Law) against the plaintiff as per [42-USC-C21-SI-§1981],[42-USC-C21-SI-§1988].

07.   numerous violations of the [CRAo1964]:§2000d (Discrimination-under-Federally-Assisted-Programs) against the plaintiff as per [42-USC-C21-SV-§2000d],[42-USC-C21-SV-§2000d-7].

08.   numerous violations against the plaintiff of the Intimidation/Interference law specified in [42-USC-C45-SI-§3617],[42-USC-C45-SII-§3631],[TPrC-T15-C301-SI-§301.171].

09.   numerous violations against the plaintiff of the Discrimination law specified in [TCPaRC-T5-C106].

10.   numerous violations against the plaintiff of the Racial-Profiling law specified in [TCoCP-T1-C2-A2.131].

11.   numerous violations against the plaintiff of the Disorderly-Conduct/Harassment/Stalking law specified in [TPeC-T9-C42-§42.01],[TPeC-T9-C42-§42.07],[TPeC-T9-C42-§42.072].

12.   numerous violations against the plaintiff of the Obstruction/Retaliation law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1513],[TPeC-T8-C36-§36.06].

13.   numerous violations against the plaintiff of the Witness-Intimidation/Witness-Tampering law specified in [18-USC-PI-C73-§1512],[TPeC-T8-C36-§36.05].

14.   numerous violations against the plaintiff of the Fraud law specified in [18-USC-PI-C63-§1341],[18-USC-PI-C63-§1343],[TPeC-T7-C32].

15.   numerous violations against the plaintiff of the Blackmail/Extortion law specified in [18-USC-PI-C41-§873],[TPeC-T7-C31].

16.   multiple violations against the plaintiff of the Interference-with-Commerce-by-Threats-or-Violence law specified in [18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959].

17.   multiple violations against the plaintiff of the Interference-with-Federally-Protected-Activities law specified in [18-USC-PI-C13-

§245](△).

18. numerous violations against the plaintiff of the Abuse-of-Office law specified in [TPeC-T8-C39-§39.03],[TPeC-T8-C39-§39.02], [TPeC-T8-C39-§39.06].

19. multiple violations against the plaintiff of the Criminal-Conspiracy law specified in [TPeC-T4-C15-§15.02].

20. numerous violations against the plaintiff of the Obstruction-of-Justice law specified in [18-USC-PI-C73-§1503].

21. infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 10 years), negligent-infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 10 years), loss-of-enjoyment-of-life, fraud, false-imprisonment/detention, breach-of-duty, malfeasance, malpractice, defamation, trespassing, invasion-of-privacy, intrusion-upon-physical-solitude, public-disclosure-of-private-facts, breach-of-confidence, abuse-of-process, abuse-of-position-of-trust, selective-enforcement, tortious-interference, restraints-on-trade, conspiracy/collusion - all, against the plaintiff.

# ¶825

From defendant [WCSO], the plaintiff seeks:

Ⓐ  punitive damages for defendant [WCSO]'s numerous violations of the [FHA] and [TFHA] against the plaintiff as authorized by [42-USC-C45-SI-§3613(c)(1)] and [TPrC-T15-C301-§301.153(1)] (respectively) - with the specific amount(s) awarded in punitive damages to be determined by the Jury in this case.

Ⓑ  compensatory damages of $1,048,576 for defendant [WCSO]'s:

01. numerous violations of the [FHA],[TFHA] against the plaintiff as per [42-USC-C45-SI-§3613(c)(1)],[TPrC-T15-C301-§301.153(1)].

02. numerous violations of the [KKKA]:§1983 (Deprivation-Of-Rights-Under-Color-of-Law) against the plaintiff as per [42-USC-C21-SI-§1983],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§242].

03. numerous violations of the [KKKA]:§1985 (Conspiracy-To-Interfere-With-Civil-Rights) against the plaintiff as per [42-USC-C21-SI-§1985],[42-USC-C21-SI-§1988] and [18-USC-PI-C13-§241].

04. numerous violations of the [RIaCOA] against the plaintiff as per [18-USC-PI-C96-§1964].

05. numerous violations of the [CRAo1866]:§1982 (Property-Rights-Of-Citizens) against the plaintiff as per [42-USC-C21-SI-§1982],[42-USC-C21-SI-§1988].

06. numerous violations of the [CRAo1866]:§1981 (Equal-Rights-Under-The-Law) against the plaintiff as per [42-USC-C21-SI-§1981],[42-USC-C21-SI-§1988].

07. numerous violations of the [CRAo1964]:§2000d (Discrimination-under-Federally-Assisted-Programs) against the plaintiff as per [42-USC-C21-SV-§2000d],[42-USC-C21-SV-§2000d–7].

08. numerous violations against the plaintiff of the Intimidation/Interference law specified in [42-USC-C45-SI-§3617],[42-USC-C45-SII-§3631],[TPrC-T15-C301-SI-§301.171].

09. numerous violations against the plaintiff of the Discrimination law specified in [TCPaRC-T5-C106].

10. numerous violations against the plaintiff of the Racial-Profiling law specified in [TCoCP-T1-C2-A2.131].

11. numerous violations against the plaintiff of the Disorderly-Conduct/Harassment/Stalking law specified in [TPeC-T9-C42-§42.01], [TPeC-T9-C42-§42.07],[TPeC-T9-C42-§42.072].

12. numerous violations against the plaintiff of the Obstruction/Retaliation law specified in [18-USC-PI-C73-§1503],[18-USC-PI-C73-§1513],[TPeC-T8-C36-§36.06].

13. numerous violations against the plaintiff of the Witness-Intimidation/Witness-Tampering law specified in [18-USC-PI-C73-§1512], [TPeC-T8-C36-§36.05].

14. numerous violations against the plaintiff of the Fraud law specified in [18-USC-PI-C63-§1341],[18-USC-PI-C63-§1343],[TPeC-T7-C32].

15. numerous violations against the plaintiff of the Blackmail/Extortion law specified in [18-USC-PI-C41-§873],[TPeC-T7-C31].

16. numerous violations against the plaintiff of the Interference-with-Commerce-by-Threats-or-Violence law specified in [18-USC-PI-C95-§1951],[18-USC-PI-C95-§1959].

17. numerous violations against the plaintiff of the Interference-with-Federally-Protected-Activities law specified in [18-USC-PI-C13-§245] (Δ).

18. numerous violations against the plaintiff of the Abuse-of-Office law specified in [TPeC-T8-C39-§39.03],[TPeC-T8-C39-§39.02], [TPeC-T8-C39-§39.06].

19. numerous violations against the plaintiff of the Criminal-Conspiracy law specified in [TPeC-T4-C15-§15.02].

20. numerous violations against the plaintiff of the Obstruction-of-Justice law specified in [18-USC-PI-C73-§1503].

21. infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 12 years), negligent-infliction-of-severe-emotional-distress/psychological-trauma/mental-anguish (extreme pain-and-suffering spanning over 12 years), loss-of-enjoyment-of-life, fraud, false-imprisonment/detention, breach-of-duty, malfeasance, malpractice, defamation, trespassing, invasion-of-privacy, intrusion-upon-physical-solitude, public-disclosure-of-private-facts, breach-of-confidence, abuse-of-process, abuse-of-position-of-trust, selective-enforcement, tortious-interference, restraints-on-trade, conspiracy/collusion - all, against the plaintiff.

# §XXXVIII

# REQUESTED RELIEF: PRELIMINARY EX-PARTE GAG ORDER AND PRELIMINARY EX-PARTE PROTECTIVE ORDERS

¶826

Pursuant to [42-USC-C45-SI-§3613(c)], *"Relief which may be granted"*, which states in part: *"if the court finds that a discriminatory housing practice has occurred or is about to occur, the court ... may grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate)"*, the plaintiff seeks the following preliminary ex-parte protective orders from this Court:

# ¶827

Due to the corrupt, malicious, predatory, conspiratorial, discriminatory and retaliatory acts that the plaintiff alleges the defendants to have engaged in against the plaintiff, and pursuant to **[Federal Rules of Evidence:  Rule 615. Excluding Witnesses]** , informally known as the *"Rule of Sequestration"*, the plaintiff seeks a preliminary ex-parte gag order from this court, effective at the earliest possible date, prohibiting any party - plaintiff or defendants - from all of the following acts:

Ⓐ making any extrajudicial statement about any aspect of this case ; AND

Ⓑ communicating-with - outside of the legally-permissible, supervised processes of discovery/depositions/subpoenas/courtroom-testimony and other legal-proceedings for this case - any non-party witnesses in this case in-order-to discuss any aspect of this case.

The primary purpose of this ex-parte gag order is to ensure that all parties - plaintiff and defendants - are prohibited from conspiring-to or acting-to strategize and/or coordinating-their-course-of-action with any witness(s) or potential witness(s) in-order-to affect the outcome of this case. Another purpose of this ex-parte gag order is to prohibit any party - plaintiff or defendants - from tampering with the jury pool, for example, by making extrajudicial statement(s) about any aspect of this case. At a minimum, the plaintiff, the defendants and any non-party witnesses that testify and/or produce records/information in this case should be able to swear under oath (*"under penalty of perjury"*) during discovery/depositions/motions/trial/etc that they did not violate this gag order. The list of potential non-party witnesses includes, but is not limited to, all of the named witnesses listed in this complaint (even if identified only by their initials, in-order-to to protect their privacy), all of the parties listed in the *"IMPLICATED NON-PARTIES"* section (see above), all of the unidentified witnesses beginning with acronym *"[U*, as indiciated in the section(s) above, and all of the following:

01. Any current or former board member of the [SPOA].

02. Any current or former [SPOA] property-management-company employee from any current or former [SPOA] property-management-company (including, but not limited to: [RealManage], [SAM]).

03. Any current or former attorney, paralegal or other employee from the law-firm(s) representing the [SPOA].

04. Any current or former resident of [521LSLTX78641].

05. Any current or former resident of [525LSLTX78641].

06. Any current or former resident of [529LSLTX78641].

07. Any current or former resident of [773KLLTX78641].

08. Any current or former resident of [777KLLTX78641].

09. Any current or former resident of [776KLLTX78641].

10. Any current or former resident of [780KLLTX78641].

11. Any current or former resident of [781KLLTX78641].

12. Any current or former resident of [785KLLTX78641].

13. Any current or former owner of [789KLLTX78641] that owned this property since the month of {2021-04}.

14. Any current or former resident of [789KLLTX78641] that resided at this location since the month of {2021-04}.

15. Any current or former owner of [784KLLTX78641] that owned this property since the month of {2021-08}.

16. Any current or former resident of [784KLLTX78641] that resided at this location since the month of {2022-08}.

17. Any current or former resident of [792KLLTX78641].

18. Any current or former resident of [793KLLTX78641].

19. Any current or former resident of [797KLLTX78641].

20. Any current or former resident of [796KLLTX78641].

21. Any current or former resident of [800KLLTX78641].

22. Any current or former resident of the 〖Summerlyn〗 subdivision that is named or revealed in any aspect or execution of this lawsuit.

23. Any current or former resident of the 〖Summerlyn〗 subdivision that any of the defendants have spoken-to/written-to about the plaintiff/plaintiff's-properties - including, but not limited to, in: [SPOA] meetings, social-media, blog-postings, phone-calls, emails, and in-person conversations.

24. Any current or former resident of the 〖Summerlyn〗 subdivision that has commented/thanked/liked on any social-media/blog posting documented in this lawsuit.

25. Any moderator or administrator of the 〖Summerlyn〗 subdivision's current or former social-media/blog platforms including (but not limited to): nextdoor.com ("[Summerlyn Leander Nextdoor-Group]") (CURRENT), facebook.com ("[summerlynleander Faeebook-Group]") (CURRENT), yahoo.com ("[SummerlynTx Yahoo-Group]") (FORMER), jabbster.com ("[Summerlyn Jabbster-Group]") (FORMER), eneighbors.com ("[Summerlyn eNeighbors-Neighborhood]") (FORMER).

26. Any current or former employee/official of the [TCEQ].

27. Any current or former employee/official of the [CoGUS] - the water-utility-service provider of the 〖Summerlyn〗 subdivision.

28. Any family member of the plaintiff.

29. Any former attorney of the plaintiff, including but not limited to: [ATTORNEY-PS], [ATTORNEY-DK], [ATTORNEY-TK]

30. Any current or former attorney of the plaintiff's family members including but not limited to: [ATTORNEY-PS], [ATTORNEY-DK], [ATTORNEY-WD].

31. Any delivery-person delivering mail(s), package(s), or other object(s) to [788KLLTX78641] from the period of the years {2009} through {PRESENT-DAY}.

32. Any contractor or workman summoned-by or hired-by the plaintiff from the period of the years {2009} through {PRESENT-DAY}.

33. Any contractor or workman summoned-by or hired-by [JSP&KAP] to appear at-or-directly-around property [784KLLTX78641] from the period of the years {2009} through {2022}.

34. Any contractor or workman summoned-by or hired-by [RSR] to appear at-or-directly-around property [789KLLTX78641] from the period of the years {2009} through {2021}.

35. Any former employee/official/officer of defendant [WC] that, in any manner, interacted-with or dealt-with the plaintiff and/or any casework involving the plaintiff/plaintiff's-properties (unless such former employee/official/officer named as a defendant).

36. Any individuals former employee/official/officer of defendant [WC] that, in any manner, interacted-with or dealt-with the plaintiff and/or

any casework involving the plaintiff/plaintiff's-properties (unless such former employee/official/officer named as a defendant).

## ¶828

Since both of the plaintiff's former-neighbor defendants [RSR] and [JSP] have, in the past -

Ⓐ threatened acts of violence (including terroristic-threats and/or threats-of-murder) against the plaintiff and/or the plaintiff's family-members ; AND/OR

Ⓑ repeatedly trespassed onto the plaintiff's property ; AND/OR

Ⓒ destroyed and/or attempted-to-destroy and/or threatened-to-destroy substantial and/or expensive parts of the plaintiff's property

- the plaintiff also seeks a permanent ex-parte protective order from this court, effective at the earliest possible date, against these 2 individual defendants - prohibiting these 2 individual defendants from:

Ⓐ confronting/approaching-within-ten-feet-of the plaintiff or any other member of the plaintiff's extended-family anywhere, anytime ; AND

Ⓑ entering into any of the plaintiff's properties or any property owned by any of the plaintiff's extended-family-members.

## ¶829

Since defendant [JSP] (and [NP]) have damaged/destroyed approximately $1,700 worth of the plaintiff's security-cameras/recording-equipment (and caused an additional approximately $500 worth of damages to the [HOUSE]-fascia/soffit/rafter/gutter-structure and/or [HOUSE]-roof-area upon which most of such security-cameras are mounted), but more importantly, did so for the express purpose of destroying evidence and destroying the recording capabilities of such security-cameras/recording-equipment, so that they and their co-conspirators could continue to commit hate-crimes/civil-rights-violations/racketeering-acts/abuses against the plaintiff without such criminal actions being recorded, and since defendants [JSP&KAP],[RSR] and many employees/officials of defendant [WCLE] have made inappropriate/suspicious questions/comments/complaints about the plaintiff's security-cameras, the plaintiff seeks a permanent ex-parte protective order from this court, effective at the earliest possible date, preventing any of the defendants from, in any way, obstructing and/or tampering with any of aspects of the plaintiff's cameras/recording-equipment - body-worn-cameras, hand-held-cameras, and security-camera-system(s) - including the security-cameras, the recording system(s), the cabling, and/or the electric-service and/or batteries needed to power such electrical system(s).

## ¶830

Since the plaintiff has suffered numerous egregious, abusive/oppressive/coercive/violative/intrusive/invasive/humiliative acts (including hate-crimes/civil-rights-violations/racketeering-acts/abuses) of obstruction-of-justice, obstruction/retaliation, harassment/stalking, disorderly-conduct, intimidation/interference, blackmail/extortion/threats, official-oppression, abuse-of-official-capacity, misuse-of-official-information, humiliation, invasion-of-privacy, discrimination, abuse-of-office, fraud from several members of [WCLE], the plaintiff also seeks a permanent ex-parte protective order from this court, effective at the earliest possible date, prohibiting any unauthorized or nonconsensual entry onto any of the plaintiff's properties by any member(s) of [WCLE], at any point in time.

## ¶831

Since the plaintiff has suffered numerous egregious, abusive/oppressive/coercive/violative/intrusive/invasive/humiliative acts (including hate-crimes/civil-rights-violations/racketeering-acts/abuses) of obstruction-of-justice, obstruction/retaliation, harassment/stalking, disorderly-conduct, intimidation/interference, blackmail/extortion/threats, official-oppression, abuse-of-official-capacity, misuse-of-official-information, humiliation, invasion-of-privacy, discrimination, abuse-of-office, fraud from several members of [WCLE], the plaintiff also seeks a permanent ex-parte protective order, effective at the earliest possible date, prohibiting any member of [WCLE] from engaging in any such act against the plaintiff - at any place or at any point in time.

## ¶832

The plaintiff also seeks an ex-parte protective order from this court, effective at the earliest possible date, prohibiting any concealment, tampering, deletion and/or destruction of any evidence of hate-crimes/civil-rights-violations/racketeering-acts/abuses as documented in this lawsuit. In particular, the plaintiff seeks to ensure that any-and-all of the following evidence, from the years {2009} through {2023}, regarding any aspect of this particular case, the plaintiff and/or plaintiff's properties either created/recorded by defendants [WC],[WCLE] or received/gathered by defendants [WC],[WCLE] to be preserved originally (untampered, unremoved, unedited, unredacted) and in its entirety, to be submitted to the plaintiff and/or one-or-more of the other defendants during Discovery, including, but not limited to:

01.  body-worn-camera footage (including transcripts)
02.  dash-camera footage (including transcripts)
03.  recorded-phone-calls (including transcripts)
04.  voice-mail (including transcripts)
05.  virtual/online teleconferencing meetings/hearings (including transcripts)
06.  in-person meetings/hearings (including transcripts)
07.  interviews (including transcripts)
08.  verbal statements (including transcripts)
09.  in-person and virtual/online conversations (including transcripts)
10.  written statements (including sworn-statements or affidavits)
11.  emails
12.  SMS/text messages
13.  social-media/internet/blog postings/private-messages
14.  electronic/online-form submissions
15.  online-chat-messages/instant-messages
16.  electronic communications/media
17.  printed/hardcopy materials

## ¶833

The plaintiff also seeks an ex-parte protective order from this court, effective at the earliest possible date, ensuring that any and all of the following evidence relevant to this case from non-party [SPOA] - including, but not limited to, their current and former board members, current and former management companies (formerly [RealManage], currently [SAM]) - to be preserved originally (untampered, unremoved, unedited, unredacted) and in its entirety, and to be subpoenaed either by the plaintiff and/or any of the defendants during Discovery, including but not limited to:

01. any documents/recordings related to [HOA] meetings (including, but not limited to: town-hall-meetings, board-meetings, annual meetings, executive sessions/meetings)

02. recorded-phone-calls (including transcripts)

03. voice-mail (including transcripts)

04. virtual/online teleconferencing meetings/hearings (including transcripts)

05. in-person meetings/hearings (including transcripts)

06. interviews (including transcripts)

07. verbal statements (including transcripts)

08. in-person and virtual/online conversations (including transcripts)

09. written statements (including sworn-statements or affidavits)

10. emails

11. SMS/text messages

12. social-media/internet/blog postings/private-messages

13. electronic/online-form submissions

14. online-chat-messages/instant-messages

15. electronic communications/media

16. printed/hardcopy materials

## ¶834

The plaintiff also seeks an ex-parte protective order from this court, effective at the earliest possible date, ensuring that any and all evidence relevant to this case from non-party social-media-platforms (all of which are involved in interstate or foreign commerce) - nextdoor.com, facebook.com, yahoo.com, jabbster.com, eneighbors.com - or any non-party moderator/administrator of any of the 【Summerlyn】 subdivision's (current or previous) social-media-platforms - including, but not limited to, [Summerlyn Leander Nextdoor-Group], [summerlynleander Facebook-Group], [SummerlynTx Yahoo-Group], [Summerlyn Jabbster-Group], [Summerlyn eNeighbors-Neighborhood] - to be preserved originally and pristinely (untampered, unremoved, unedited, unredacted) and in its entirety, and to be subpoenaed by the plaintiff and/or any of the defendants during Discovery.

## ¶835

The plaintiff seeks an ex-parte protective order from this court, effective at the earliest possible date, permanently-barring from public-

disclosure - or to any another person except privately to the plaintiff and only during the legally-permissible private processes of Discovery of this case - any and all illegally-seized evidence (including interrogations/statements/testimony/documents/images/videos/etc.) concerning the plaintiff and/or the plaintiff's property(s) - in other words, any evidence seized from unconstitutional-and-unlawful detention(s)/inspection(s)/search(es)/interrogation(s) conducting within or directly-around the plaintiff's property(s) at any point in time. The plaintiff seeks to ensure that if any party seeks to present such information, that such information be presented under seal, thus, not available to the public.

## ¶836

The plaintiff seeks an ex-parte protective order from this court, effective at the earliest possible date, permanently-preventing the defendants and any witnesses from revealing in any public document (including unsealed motions/pleadings/etc.) or in any public Court proceeding or in any publicly-released Depositions or in any public media or any other public setting, any private details (including any-and-all details from any-and-all illegally-seized evidence) about the plaintiff's private-life and/or plaintiff's private-property(s) - including, but not limited to, any aspects of the plaintiff's [HOUSE] and any aspects of the private/curtilage areas of private-property [788KLLTX78641], which have the same fourth-amendment protections as the interior-of-the-[HOUSE].

## ¶837

The plaintiff seeks to present evidence that defendant [WC] - in particular, defendant [WC]'s law-enforcement agencies, [WCLE] - is either a very-retaliatory organization (in general) - or, at the very least, an organization that is very-retaliatory towards one-or-more persons that it perceives to be *"powerless"* such as the plaintiff - that will not hesitate to further-retaliate against the plaintiff as a result of the plaintiff's filing of this lawsuit against [WC] and [WCLE] (🔒) . The plaintiff seeks to present evidence that defendants [JSP&KAP],[RSR] are extremely retaliatory private citizens that will not, even in the least bit, hesitate to further-retaliate against the plaintiff (and/or the plaintiff's family members) as a result of the plaintiff's filing of this lawsuit against [JSP&KAP],[RSR]. The plaintiff additionally asserts that, in this initial version of this complaint, the plaintiff has not stated all of the plaintiff's subclaims of defendants' acts of retaliation against the plaintiff, as the plaintiff can only properly assert one-or-more of those additional subclaims after conducting Discovery/Depositions on all of the relevant parties. Therefore, the plaintiff seeks any other ex-parte protective order(s) from this Court that this Court deems approximate to protect the plaintiff (and/or the plaintiff's family members) from any current, pending and future acts of retaliation from the defendants.

# §XXXIX

# DEMAND FOR JURY TRIAL

## ¶838

All conditions precedent to the plaintiff's filing of this complaint have been performed or have occurred.

## ¶839

The plaintiff hereby demands a trial by fair-and-impartial jury of the plaintiff's peers of all issues so triable pursuant to **[Federal Rules of Civil Procedure:   Rule 38. Right to a Jury Trial; Demand]** , ("[FRoCP-R38]").

RESPECTFULLY SUBMITTED,

BY PLAINTIFF.

DATE OF SIGNING                          :     2023 - 10 - 09

SIGNATURE OF PLAINTIFF          :     *Siddharth Kode*

PRINTED NAME OF PLAINTIFF     :     Siddharth Kode

ADDRESS OF PLAINTIFF             :     788 Kingfisher Lane, Leander, TX 78641

E-MAIL ADDRESS OF PLAINTIFF  :     Siddharth.Choudhary.Kode@alumni.cs.utexas.edu

TELEPHONE NUMBER OF PLAINTIFF :   (512) 869 9204

# §XL

# CERTIFICATION AND CLOSING

## ¶840

Under 〖Federal Rules of Civil Procedure:  Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions〗 , by signing below, plaintiff certifies to the best of plaintiff's knowledge, information, and belief that this complaint:

01.  is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; AND

02.  is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; AND

03.  the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; AND

04.  the complaint otherwise complies with the requirements of 〖Federal Rules of Civil Procedure:  Rule 11. Signing Pleadings, Motions, and Other Papers; Representations to the Court; Sanctions〗 .

## ¶841

**For Parties Without an Attorney:**

Plaintiff agrees to provide the Clerk's Office with any changes to plaintiff's address where case–related papers may be served. Plaintiff understands that plaintiff's failure to keep a current address on file with the Clerk's Office may result in the dismissal of plaintiff's case.

| | | |
|---|---|---|
| DATE OF SIGNING | : | 2023 - 10 - 09 |
| SIGNATURE OF PLAINTIFF | : | *Siddharth Kode* |
| PRINTED NAME OF PLAINTIFF | : | Siddharth Kode |
| ADDRESS OF PLAINTIFF | : | 788 Kingfisher Lane, Leander, TX 78641 |
| E-MAIL ADDRESS OF PLAINTIFF | : | Siddharth.Choudhary.Kode@alumni.cs.utexas.edu |
| TELEPHONE NUMBER OF PLAINTIFF | : | (512) 869 9204 |